BONNIE E. ESKENAZI (SBN 119401)
BEskenazi@ggfirm.com
ELISABETH A. MORIARTY (SBN 156569)
EMoriarty@ggfirm.com
RICARDO P. CESTERO (SBN 203230)
RCestero@ggfirm.com
GREENBERG GLUSKER FIELDS CLAMAN &
MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590
Telephone: 310.553.3610
Fax: 310.553.0687

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FOURTH AGE LIMITED, a United Kingdom corporation; PRISCILLA MARY ANNE REUEL TOLKIEN, as TRUSTEE OF THE TOLKIEN TRUST, a United Kingdom Charitable Trust; THE J.R.R. TOLKIEN ESTATE LIMITED, a United Kingdom corporation; HARPERCOLLINS PUBLISHERS, LTD., a United Kingdom corporation; UNWIN HYMAN LTD., a United Kingdom corporation; and GEORGE ALLEN & UNWIN (PUBLISHERS) LTD., a United Kingdom corporation, | Case No. CV 12-09912 ABC (SHx) |
| | Hon. Audrey B. Collins |
| | **COUNTERCLAIM DEFENDANTS' NOTICE OF MOTION AND SPECIAL MOTION TO STRIKE THE WARNER PARTIES' FIRST AMENDED COUNTERCLAIM PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE SECTION 425.16** |
| Plaintiffs, | |
| v. | |
| WARNER BROS. DIGITAL DISTRIBUTION, INC., a division of WARNER BROS. HOME ENTERTAINMENT, INC., a Delaware corporation; WARNER BROS. ENTERTAINMENT, INC., a Delaware corporation, as successor-in-interest to New Line Cinema Corp.; WARNER BROS. CONSUMER PRODUCTS, INC., a Delaware corporation; WARNER BROS. INTERACTIVE ENTERTAINMENT, INC., a division of WARNER BROS. HOME ENTERTAINMENT, INC.; NEW LINE PRODUCTIONS, INC., a California corporation; THE SAUL ZAENTZ COMPANY d/b/a Middle-earth Enterprises, a Delaware corporation; and DOES 1-10, inclusive, | **[Declarations of Ricardo P. Cestero and Steven A. Maier in support thereof and Motions to Dismiss filed concurrently herewith]** |
| | Date: May 13, 2013 Time: 10:00 a.m. Courtroom: 680 |
| Defendants. | |

GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

AND RELATED COUNTERCLAIMS.

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on May 13, 2013 at 10:00 a.m. in Courtroom 680 of the above-entitled Court located at The Roybal Federal Building, 225 East Temple St., Los Angeles, CA 90012, Plaintiffs and Counterclaim Defendants Fourth Age Limited, Priscilla Mary Anne Reuel Tolkien, as Trustee of the Tolkien Trust, The J.R.R. Tolkien Estate Ltd., Harper Collins Publishers, Ltd., Unwin Hyman Ltd. and George Allen & Unwin (Publishers), Ltd. (collectively, the "Tolkien/HC Parties") will bring on for hearing their Special Motion to Strike the First Counterclaim in the First Amended Counterclaims of Defendants and Counterclaim Plaintiffs Warner Bros. Home Entertainment, Inc., Warner Bros. Entertainment, Inc., Warner Bros. Consumer Products, Inc. and New Line Productions, Inc. (collectively, the "Warner Parties") pursuant to California Code of Civil Procedure Section 425.16. The Tolkien/HC Parties' motion is based on the fact that the Warner Parties' First Counterclaim arises out of protected First Amendment activities, namely the Tolkien/HC Parties' assertion of legal claims in good faith anticipation of litigation and the subsequent filing of this lawsuit, and that the Warner Parties' First Counterclaim is barred by California's litigation privilege.

This motion is made following a telephone conference of counsel pursuant to Local Rule 7-3, which took place on March 14, 2013, to discuss the merits of the motion.

///

///

///

///

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1

SPECIAL MOTION TO STRIKE WB COUNTERCLAIM

1       The Tolkien/HC Parties' motion is based on this notice, the attached

2   Memorandum of Points and Authorities, the Declarations of Ricardo P. Cestero and

3   Steven A. Maier filed concurrently herewith, the other pleadings and files in this

4   matter and such other and further evidence and argument as may be submitted at or

5   before the hearing on this matter.

6

7   DATED:  March 28, 2013          GREENBERG GLUSKER FIELDS

8                                      CLAMAN & MACHTINGER LLP

9

10                               By:  /s/ Bonnie E. Eskenazi

                                   BONNIE E. ESKENAZI (SBN 119401)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP**
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION .................................................................................. 1

II. FACTUAL SUMMARY ......................................................................... 3

    A.   The Literary Works ................................................................... 4

    B.   The Relevant Underlying Agreements ..................................... 4

    C.   *The Lord of the Rings* Films and the Prior Dispute ............... 6

    D.   The Hobbit Binding Term Sheet and the 2010 Regrant Agreement .................................................................................. 8

    E.   The Tolkien/HC Parties Assert Their Rights .......................... 10

    F.   The Warner Parties' Counterclaims ......................................... 11

III. ARGUMENT ....................................................................................... 13

    A.   Legal Standards ....................................................................... 13

    B.   The Warner Parties' First Amended Counterclaim for Breach of Contract Arises From Protected Speech ................. 14

    C.   The Warner Parties Cannot Demonstrate a Probability of Prevailing on their Counterclaim ........................................... 21

        1.   The Warner Parties' First Amended Breach of Contract Counterclaim is Legally Deficient ............................ 21

        2.   The Warner Parties' Breach of Contract Counterclaim is Barred by the Litigation Privilege ........................... 23

IV. CONCLUSION .................................................................................... 25

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*Andrews v. Metro North Committees Railroad Co.*,
882 F.2d 705 (2d Cir. 1989) ................................................................ 16

*Batzel v. Smith*,
333 F.3d 1018 (9th Cir. 2003) ............................................................ 13

*Microsoft Corp. v. BEC Computer Co., Inc.*,
818 F.Supp. 1313 (C.D. Cal. 1992) .................................................... 23

*U.S. v. McKeon*,
738 F.2d 26 (2d Cir. 1984) ................................................................. 15

*Unicom Systems, Inc. v. Electronic Data Systems, Corp.*,
2005 U.S. Dist. LEXIS 45707 (C.D. Cal. 2005) ................................ 15

*United States ex rel. Newsham v. Lockheed Missile & Space Co., Inc.*,
190 F.3d 963 (9th Cir. 1999) .............................................................. 13

**STATE CASES**

*Abraham v. Lancaster Community Hosp.*,
217 Cal.App.3d 796 (1990) ................................................................. 23

*Atkinson v. District Bond Co.*,
5 Cal.App.2d 738 (1935) ..................................................................... 22

*Braun v. Chronicle Publishing Co.*,
52 Cal.App.4th 1036, 61 Cal.Rptr.2d 58 (Cal. Ct. App. 1997) .......... 14

*Briggs v. Eden Council for Hope & Opportunity*,
19 Cal.4th 1106, 81 Cal.Rptr.2d 471 (Cal. 1999) ......................... 2, 3, 17

*British Films Do Brasil, Ltda v. London Film Productions, Inc.*,
166 N.Y.S.2d 703 (N.Y. Sup. Ct. 1957) ............................................ 22

*Digerati Holdings, LLC v. Young Money Entertainment, LLC*,
194 Cal.App.4th 873 (Cal. Ct. App. 2011) ................... 17, 19, 20, 21, 23, 24

*Dove Audio, Inc. v. Rosenfeld Meyer & Sussman*,
47 Cal.App.4th 777, 54 Cal.Rptr.2d 830 (Cal. Ct. App. 1996) ...... 17, 23

*Equilon Enterprises v. Consumer Cause, Inc.*,
29 Cal.4th 53, 124 Cal.Rptr.2d 507 (Cal. 2002) ......................... 14, 21

*Feldman v. 1100 Park Lane Associates*,
160 Cal.App.4th 1467, 74 Cal.Rptr.3d 1 (Cal. Ct. App. 2008) ...... 16, 17

*Gittlitz v. Lewis*,
212 N.Y.S.2d 219 (N.Y. Sup. Ct. 1961) ............................................ 22

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

<div align="center">

**TABLE OF AUTHORITIES**
**(continued)**

</div>

**Page**

*Hagberg v. California Federal Bank*,
    32 Cal.4th 350, 7 Cal.Rptr.3d 803 (Cal. 2004) ................................... 23

*Hall v. Time Warner, Inc.*,
    153 Cal.App.4th 1337, 63 Cal.Rptr.3d 798 (Cal. Ct. App. 2007) ..................... 20

*Hendy v. Losse*,
    54 Cal.3d 723 (Cal. 1991) ................................................ 15

*HMS Capital, Inc. v. Lawyers Title Co.*,
    118 Cal.App.4th 204, 12 Cal.Rptr.3d 786 (Cal. Ct. App. 2004) ....................... 14

*Mundy v. Lenc*,
    203 Cal.App.4th 1401, 138 Cal.Rptr.3d 464 (Cal. Ct. App. 2012) ............... 3, 16

*Salma v. Capon*,
    161 Cal.App.4th 1275, 74 Cal.Rptr.3d 873 (Cal. Ct. App. 2008) ................ 14, 17

*Slaney v. Ranger Insurance Co.*,
    115 Cal.App.4th 306, 8 Cal.Rptr. 915 (Cal. Ct. App. 2004) ............................ 14

*Taus v. Loftus*,
    40 Cal.4th 683, 54 Cal.Rptr.3d 775 (Cal. 2007) ................................. 21

*Taylor v. Johnston*,
    15 Cal.3d 130 (Cal. 1975) ................................................. 22

*Varian Med. Systems, Inc. v. Delfino*,
    35 Cal.4th 180, 25 Cal.Rptr.3d 298 (Cal. 2005) ................................ 13

*Wentland v. Wass*,
    126 Cal.App.4th 1484, 25 Cal.Rptr.3d 109 (Cal. Ct. App. 2005) ..................... 23

*Wilcox v. Superior Court*
    27 Cal.App.4th 809, 33 Cal.Rptr.2d 446 (Cal. Ct. App. 1994) ....................... 2, 3

*Wilson v. Parker, Covert & Chidester*,
    28 Cal.4th 811, 123 Cal.Rptr.2d 19 (Cal. 2002) ................................. 21

*Zamos v. Stroud*,
    32 Cal.4th 958, 12 Cal.Rptr.3d 54 (Cal. 2004) ................................ 14

**STATE STATUTES**

Cal. Civ. Code §47(b) ............................................................ 3, 23

Cal. Civ. Proc. Code § 425.16 ..................................................... 3, 13

Cal. Civ. Proc. Code §425.16(a) ..................................................... 13

Cal. Civ. Proc. Code §425.16 (e) ................................................ 15, 14

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

SPECIAL MOTION TO STRIKE WB
COUNTERCLAIM

# TABLE OF AUTHORITIES
## (continued)

Page

Cal. Civ. Proc. Code §425.16(e)(1) ...................................................................16, 20

Cal. Civ. Proc. Code § 425.16(e)(2) ................................................................19, 20

**RULES**

F.R.C.P. 12(b)(6) ................................................................................................. 12

**OTHER AUTHORITIES**

Black's Law Dictionary (Pocket Edition, West 1996) ............................................ 16

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

<div style="text-align: center"><b><u>MEMORANDUM OF POINTS AND AUTHORITIES</u></b></div>

## I.   <u>INTRODUCTION</u>

On November 19, 2012, Plaintiffs Fourth Age Limited, Priscilla Mary Anne Reuel Tolkien, as Trustee of the Tolkien Trust, The J.R.R. Tolkien Estate Ltd., Harper Collins Publishers, Ltd., Unwin Hyman Ltd. and George Allen & Unwin (Publishers), Ltd. (collectively, the "Tolkien/HC Parties") sued defendants Warner Bros. Home Entertainment, Inc., Warner Bros. Entertainment, Inc., Warner Bros. Consumer Products, Inc. and New Line Productions, Inc. (collectively, the Warner Parties") and the Saul Zaentz Company ("Zaentz") for copyright infringement, declaratory relief and breach of contract.  The Tolkien/HC Parties contend that the Warner Parties and Zaentz have exceeded the proper scope of merchandising rights in and to Professor J.R.R. Tolkien's seminal literary works *The Hobbit* and the three volumes comprising the work entitled *The Lord of the Rings* (collectively, the "Tolkien Works") granted to their predecessors in interest.  Specifically, the Complaint alleges that the Warner Parties and Zaentz improperly developed, licensed and/or sold gambling games and video games delivered otherwise than by way of physical media such as DVD or cartridge, including (but not limited to) games delivered by way of electronic download, mobile telephone networks or social media websites ("Intangible Video Games") featuring characters and story elements from the Tolkien Works.

The main dispute giving rise to this lawsuit began in September 2010 when the Tolkien/HC Parties learned for the first time that the Warner Parties had purported to license third parties the right to make online slot machines and other gambling games based on the Tolkien Works.  The Tolkien/HC Parties immediately objected to that activity because it was outside the scope of the license granted, and therefore was a right reserved to the Tolkien/HC Parties.  The Warner Parties refused to cease and desist their unauthorized conduct, claiming not only the right

<div style="text-align: center; writing-mode: vertical-rl"><b>GREENBERG GLUSKER FIELDS CLAMAN<br>& MACHTINGER LLP</b><br>1900 Avenue of the Stars, 21st Floor<br>Los Angeles, California 90067-4590</div>

<div style="text-align: center">1</div>

<div style="text-align: right">SPECIAL MOTION TO STRIKE WB<br>COUNTERCLAIM</div>

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

to license gambling activities based on the Tolkien Works, but also the right to license Intangible Video Games.  Prior to filing this lawsuit, the Tolkien/HC Parties engaged in extensive settlement discussions with the Warner Parties and Zaentz, including attending two day-long mediation sessions in two different U.S. cities.[1]  Ultimately, however, the parties could not reach a compromise and the Tolkien/HC Parties had no choice but to file this suit.

The Warner Parties and Zaentz did not simply answer the Complaint and defend against the Tolkien/HC Parties' claims on the merits.  Instead, in a tactical maneuver designed to intimidate the Tolkien/HC Parties and increase the costs of this litigation, the Warner Parties and Zaentz have filed counterclaims in which they purport to sue the Tolkien/HC Parties simply for having sued them.  Of course, filing a lawsuit is fully protected by the First Amendment, and the Tolkien/HC Parties have every right to enforce their rights under the parties' agreements and to assert their claims against Zaentz and the Warner Parties for breach of contract, copyright infringement and declaratory relief.  Indeed, their doing so is <u>absolutely privileged</u> as a matter of law.  Yet, the Warner Parties and Zaentz nevertheless seek to punish the Tolkien/HC Parties for daring to assert their rights in this protected manner.

Fortunately, this type of chilling behavior is not tolerated under the law.  The Warner Parties' first counterclaim for breach of contract is a classic example of a SLAPP suit.[2]  SLAPP suits are meritless claims brought simply to chill the valid exercise of First Amendment rights.  *Wilcox v. Superior Court* 27 Cal.App.4th 809, 816, 33 Cal.Rptr.2d 446, 449 (Cal. Ct. App. 1994).  Defendants file SLAPP suits in order "to obtain an economic advantage over the defendant, not to vindicate a legally cognizable right of the plaintiff."  *Id.*  This is true even in the context of a

---

[1] The Tolkien/HC Parties are all located in the United Kingdom.
[2] The acronym "SLAPP" stands for "Strategic Lawsuit Against Public Participation."  *Briggs v. Eden Council for Hope & Opportunity*, 19 Cal.4th 1106, 1109 fn. 1, 81 Cal.Rptr.2d 471, 472 (Cal. 1999)

counterclaim because the defendant/counterclaimant's objective is to increase litigation costs hoping that the plaintiff/counterclaim defendant will abandon its case. *Id.* at 817.  California has enacted Code of Civil Procedure Section 425.16 in order to protect parties like the Tolkien/HC Parties from being subjected to baseless SLAPP suits like this one.

The Tolkien/HC Parties' filing of this lawsuit is fully protected by the anti-SLAPP statute.  *See Mundy v. Lenc*, 203 Cal.App.4th 1401, 1408, 138 Cal.Rptr.3d 464, 470 (Cal. Ct. App. 2012).  So are their prelitigation communications, such as demand letters and settlement negotiations, in which they asserted their rights in anticipation of contemplated litigation. *Briggs*, 19 Cal.4th at 1115.   Finally, the Tolkien/HC Parties' conduct in asserting their rights under the parties' agreements and filing this lawsuit is also absolutely privileged as a matter of law under California's statutory litigation privilege.  *See* Cal. Civ. Code §47(b).  For all these reasons, as well as those set forth in more detail below, the Warner Parties' first counterclaim should be stricken with prejudice, and the Tolkien/HC Parties are entitled to recover their attorneys' fees incurred in responding to this bad faith filing.

## II.   FACTUAL SUMMARY

Because the present dispute arose and evolved during the resolution of a separate, prior litigation between the parties, the relevant factual history is, unfortunately, long and detailed, and spans a course of years.  While extensive, this history shows unequivocally that the Warner Parties' first counterclaim is premised entirely on the Tolkien/HC Parties' assertion of their legal rights under the parties' agreements and in connection with litigation that was contemplated in good faith and under serious consideration (and ultimately filed), and involves conduct which is absolutely protected by California's litigation privilege.

GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

## A.    The Literary Works.

J.R.R. Tolkien (1892 – 1973) was a writer, poet, philologist and University professor at Oxford University.  He is the world-famous author and original copyright owner of the fantasy classics *The Hobbit: or There And Back Again* ("*The Hobbit*") and the three volume work known as *The Lord of the Rings*, which consists of "The Fellowship of the Ring," "The Two Towers" and "The Return of the King" (collectively, "*The Lord of the Rings*").  (The Warner Parties' Answer, ¶ 26).[3]

Professor Tolkien's literary works have been translated into numerous different languages and are widely considered to be among the most popular and influential works in 20th-century literature.  *The Lord of the Rings* has repeatedly been voted the "Book of the 20th Century" by various publications worldwide.  Since their first publication more than 50 years ago, *The Hobbit* and each volume of *The Lord of the Rings* have been among the best-selling fictional works of all time.

*The Lord of the Rings* and *The Hobbit* (collectively, the "Tolkien Works") are set in Professor Tolkien's fictional world of Middle-earth, inhabited by his own imaginary characters and populated by his own imaginary places, scenes, elements, situations and events.  The language and lore of Middle-earth, and the fantasy-realm Professor Tolkien created in these literary works, have delighted readers around the world and have permeated our popular culture.  The international following generated by Professor Tolkien's literary works have helped make *The Lord of the Rings* and *The Hobbit*, and the characters, places, scenes, elements, situations and events depicted therein distinctive and famous throughout the world.

## B.    The Relevant Underlying Agreements.

The Tolkien/HC Parties' predecessors-in-interest, George Allen & Unwin,

---

[3]  Where factual matters have been admitted by the Warner Parties, the Tolkien/HC Parties cite to those admissions in support of the factual statements supporting this motion.

**GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP**
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1   Ltd. ("GAU") and Sassoon Trustee and Executor Corporation, Ltd. ("Sassoon"),

2   and Zaentz's and the Warner Parties' predecessor-in-interest, United Artists

3   Corporation ("United Artists"), entered into a pair of contemporaneously written

4   contracts, dated as of July 8, 1969 regarding, *inter alia*, certain motion picture

5   rights in the Tolkien Works.  (Warner Parties' Answer, ¶ 32).  These two

6   agreements are collectively referred to by the parties as the "1969 Agreements" and

7   are attached as Exhibits A and B to the concurrently filed Declaration of Ricardo P.

8   Cestero ("Cestero Decl.").

9   Under the 1969 Agreements, United Artists obtained, *inter alia*, the limited

10  right to make and distribute films based on the Tolkien Works and agreed, among

11  other things, to pay GAU and Sassoon a defined percentage of "Gross Receipts"

12  from any films based upon the Tolkien Works.

13  The 1969 Agreements as originally executed did not grant any merchandising

14  rights in and to the Tolkien Works.  Rather, merchandising rights are covered by

15  Schedule D to the two 1969 Agreements, subsequently executed by the parties

16  (collectively referred to herein as "Schedule D").  Under Schedule D, United Artists

17  obtained certain limited merchandising rights in connection with the Tolkien

18  Works.  (Cestero Decl., Exhs. C, D).

19  The crux of the parties' agreement with respect to merchandising was that

20  United Artists obtained the limited right to use the characters, places, objects and

21  events referred to in the Tolkien Works, "<u>solely and only</u> upon and in connection

22  with the manufacture, sale and distribution of…any and all <u>articles of tangible</u>

23  <u>personal property</u>, other than novels, paperbacks and other printed published

24  matter..."  (Exs. C and D, ¶ 1.A) (emphasis added).  Moreover, the 1969

25  Agreements contain an express reservation of rights pursuant to which the

26  Tolkien/HC Parties' predecessors-in-interest specifically reserved "the right to

27  utilize and/or dispose of all rights and/or interests <u>not herein specifically granted</u>…"

28  (the "Reserved Rights").  (Exs. A and B, ¶ 8) (emphasis added).

Paragraph 15 of Schedule D additionally contains a "No Waiver" clause, which provides, *inter alia*, that "[n]one of the terms of this agreement can be waived or modified except by an express agreement in writing signed by both parties."  (Exs. C and D, ¶ 15).

Schedule D was amended on or about October 20, 1975 (the "1975 Amendment").  (Cestero Decl., Exh. E).  The 1975 Amendment further clarifies the scope of the limited merchandising rights granted under the 1969 Agreements and was intended to "provide general guidance in determining the rights in other such articles as to which questions may arise in the future."  In providing such guidance, the 1975 Amendment lays out several categories of consumer products as illustrative examples of the types of "articles of tangible personal property" the parties intended to be included in the limited 1969 merchandising rights grant, such as drawing books, posters, stationery items, figurines, calendars and similar items using primarily artwork from the films and not the printed word or any other artwork.

Thereafter, pursuant to a written agreement and assignment dated as of December 2, 1976 between United Artists and Zaentz, Zaentz acquired from United Artists, all of United Artists' right, title and interest in and to the Tolkien Works under and pursuant to the 1969 Agreements and Schedule D, as amended (the "Zaentz/UA Agreement").  (Cestero Decl., Exh. F).

On or about November 16, 1981, Schedule D was further amended to address certain accounting and other issues relating to merchandising (the "1981 Amendment").  (Cestero Decl., Exh. G).  Collectively, Schedule D to the 1969 Agreements, the 1975 Amendment and the 1981 Amendment shall be referred to herein as the "Merchandising License."

## C.   *The Lord of the Rings* **Films and the Prior Dispute.**

In the late 1990s, through a series of written agreements, the Warner Parties

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

SPECIAL MOTION TO STRIKE WB
COUNTERCLAIM

succeeded to many of the rights, interests and obligations of United Artists and Zaentz under the 1969 Agreements and the Merchandising License.  In 2001, 2002 and 2003, the Warner Parties released three motion pictures based on *The Lord of the Rings* (collectively, the "Films").  The three Films met with virtually unprecedented critical and financial success.  The Films were nominated for a total of 30 Academy Awards, winning in 17 categories, including Best Picture for the third film.

The Films generated a reported $6 billion in worldwide revenue for the Warner Parties.  The Tolkien/HC Parties are informed and believe that the Films have additionally earned Zaentz and the Warner Parties millions of dollars in legitimate and undisputed merchandising licensing revenue.

Notwithstanding the phenomenal commercial success of the films and the fact that the Tolkien/HC Parties were contractually entitled to 7.5% of adjusted gross revenues, the Warner Parties refused to pay the Tolkien/HC Parties a single penny for their profit participation.  In essence, the Warner Parties claimed that, although the Films had generated billions in worldwide revenue, there were no profits to be shared with the Tolkien/HC Parties.  Accordingly, in February, 2008, the Tolkien/HC Parties sued certain of the Warner Parties for, *inter alia*, breach of contract and an accounting (the "Accounting Lawsuit").  (Cestero Decl., ¶ 10).

In August 2009, the Tolkien/HC Parties and the Warner Parties agreed to settle the Accounting Lawsuit.  (Cestero Decl., ¶ 11).  The parties entered into a "Binding Term Sheet" memorializing the terms of that settlement.  (Cestero Decl., Exh. H).  Among other things, the Binding Term Sheet provided that the Tolkien/HC Parties would not pursue any statutory rights to terminate the Warner Parties' rights in the Tolkien Works pursuant to the United States Copyright Act and that the parties would negotiate a long form document to effectuate that agreement.  (Cestero Decl., Exh. H, ¶ 4.b.).  The parties further agreed that, once the Binding Term Sheet was fully ratified and approved, the parties would meet and

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

SPECIAL MOTION TO STRIKE WB
COUNTERCLAIM

confer to discuss a long form settlement agreement and an agreement to address the parties' accounting disputes on a going forward basis. (Cestero Decl., ¶ 12). The Binding Term Sheet was fully ratified and became binding in September 2009. (*Id.*)

Thereafter, the parties engaged in negotiations in an effort to find the best mechanism to effectuate the Tolkien/HC Parties' waiver of their copyright termination rights and to resolve the parties' disagreements over various accounting provisions. (Cestero Decl., ¶ 13). During the course of these negotiations, and pursuant to the provisions of the Binding Term Sheet, the parties requested the assistance of retired Judge Daniel Weinstein to reach agreement. (*Id.*) Ultimately, the parties agreed to conduct a mediation in August 2010 to try and finally resolve the open issues. (Cestero Decl., ¶ 14).

### D.   The Hobbit Binding Term Sheet and the 2010 Regrant Agreement

On or about August 26, 2010, the Tolkien/HC Parties and the Warner Parties reached agreement on the material terms of a further settlement agreement which addressed the outstanding issues regarding copyright termination and accounting for the Tolkien/HC Parties' participation in film profits. (Cestero Decl., ¶ 14). Among the terms agreed to was a payment from the Warner Parties to the Tolkien/HC Parties in exchange for the revocation and regrant of rights in order to resolve any potential defects in the Warner Parties' chain of title. (Exh. I). The parties then began negotiating a document entitled "Hobbit Binding Term Sheet" to effectuate the parties' agreement. (Cestero Decl., ¶ 15).

As of September 8, 2010, the parties were still negotiating the final terms of the Hobbit Binding Term Sheet and exchanging draft documents. (Cestero Decl., ¶ 16). On that day, the Tolkien/HC Parties learned of an online slot machine game from the "Roxy Palace Online Casino" which prominently featured characters, events, images and story elements from the first volume of Professor Tolkien's *The*

SPECIAL MOTION TO STRIKE WB COUNTERCLAIM

GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

*Lord of the Rings*.  (Declaration of Steven Maier filed concurrently herewith ("Maier Decl."), ¶ 2, Exh. Q).  The Tolkien/HC Parties immediately informed the Warner Parties that this online slot machine was not authorized by the Merchandising License and that the releases in the Hobbit Binding Term Sheet must now be modified to expressly preserve any claims the Tolkien/HC Parties might bring as a result of this unauthorized exploitation, as well as any other exploitations that were beyond the scope of the rights licensed.  (Cestero Decl., ¶ 16).  Accordingly, the parties agreed to modify the release in the Hobbit Binding Term Sheet between the Tolkien/HC Parties and the Warner Parties to exclude any claims by the Tolkien/HC Parties that the Warner Parties' "exploitation of the [Tolkien Works] has exceeded the scope of [the Warner Parties'] rights...."[4] (Cestero Decl., Exh. I, Exh. B thereto).  The Hobbit Binding Term Sheet was signed and signatures were exchanged by the parties on or about September 14, 2010.  (Cestero Decl., ¶ 17).

Following the execution of the Hobbit Binding Term Sheet, in fulfillment of the Tolkien/HC Parties' agreement to effectuate the waiver of copyright termination rights, the parties negotiated and ultimately executed another agreement whereby the Tolkien/HC Parties revoked the prior grants of rights contained in the 1969 Agreements and the Merchandising License and regranted the exact same rights as of September 1, 2010 (the "2010 Regrant Agreement").  (Cestero Decl., Exh. 18). The parties executed the 2010 Regrant Agreement on or about September 30, 2010. (Cestero Decl., ¶ 18).  Of particular relevance to this motion, the 2010 Regrant Agreement specifically provides that "nothing herein shall limit the Tolkien Parties' or HarperCollins' right to bring any claim and seek all available remedies based on the assertion that a Party engaged in activity not covered by the [rights granted]."

---

[4]  The release in the Hobbit Binding Term Sheet between the Tolkien/HC Parties and Zaentz included only claims related to accounting for merchandising revenue. Therefore, this release was never contemplated to affect claims regarding unauthorized exploitation.

1    (Cestero Decl., Exh. J, ¶ 9).

2

3         **E.      The Tolkien/HC Parties Assert Their Rights**

4         On September 20, 2010, (<u>before</u> the 2010 Regrant Agreement was signed),

5    the Tolkien/HC Parties sent a formal cease and desist letter to the Warner Parties

6    based on the unauthorized online gambling activities.  (Cestero Decl., ¶ 19, Exh.

7    K).  That letter expressly threatened that the Tolkien/HC Parties reserved the right

8    to bring "an action for injunctive relief, damages, exemplary damages and/or

9    attorneys fees…" based on the Warner Parties' conduct.  (*Id*.)  On October 4, 2010,

10   the Tolkien/HC Parties sent a similar letter to Zaentz.  (Cestero Decl., ¶ 20, Exh. L).

11        In their October 8, 2010 response, the Warner Parties argued that they were

12   entitled to exploit online gambling games, but indicated a willingness to try and

13   negotiate a resolution of the dispute.  (Cestero Decl., ¶ 21, Exh. M)   Unfortunately,

14   the Warner Parties' infringing activities proved to be worse than the Tolkien/HC

15   Parties had originally thought — the Tolkien/HC Parties learned that the Warner

16   Parties had licensed not only online slot machines, but also <u>physical</u> slot machines

17   based on the Tolkien Works located in casinos across the country.  Accordingly, on

18   October 12, 2010, the Tolkien/HC Parties again wrote to the Warner Parties

19   demanding that they cease and desist from this newly discovered, additional

20   unauthorized conduct; the Tolkien/HC Parties also responded to the Warner Parties'

21   contentions as to online gambling.  (Cestero Decl., ¶ 22, Exh. N).  Again, the

22   Tolkien/HC Parties threatened litigation.  (*Id*.)

23        On October 13, 2010, Zaentz responded to the Tolkien/HC Parties' cease and

24   desist letter.  Like the Warner Parties, Zaentz too claimed that it had the unlimited

25   right to license gambling activities based on the Tolkien Works.  (Cestero Decl., ¶

26   23, Exh. O).  Zaentz, however, claimed that it had *additional* categories of rights far

27   beyond what was originally granted in the 1969 Agreements, including not only

28   online gambling games, but also Intangible Video Games and broad merchandising

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

rights in things such as "hotels, restaurants, travel agencies, ringtones, online games and housing developments." (*Id.*)  The Tolkien/HC Parties responded to Zaentz's unfounded position on October 25, 2010, again making clear that if this matter could not be resolved amicably, "a lawsuit will be issued." (Cestero Decl., ¶ 24, Exh. P).

Thereafter, the parties engaged in extensive settlement discussions to try and resolve these disputes. (Cestero Decl., ¶ 25).  Counsel for all parties met in person on several occasions and conducted several conference calls. (*Id.*)  Ultimately, in June 2012, the parties conducted two day-long mediation sessions in two different cities, although the Warner Parties only attended one session. (Cestero Decl., ¶ 26).  The Tolkien/HC Parties flew client representatives in from England to attend these two mediation sessions. (*Id.*)  Ultimately, the parties' settlement discussions were unsuccessful. (Cestero Decl., ¶ 27).  Accordingly, the Tolkien/HC Parties were left with no choice but to file this lawsuit.

The Tolkien/HC Parties have never asserted the claims set forth in this lawsuit directly to any third parties. (Cestero Decl., ¶ 28).  The only place the Tolkien/HC Parties have ever asserted these claims is in the correspondence and communications leading up to the filing of this lawsuit and in this very lawsuit. (*Id.*)

### F.   The Warner Parties' Counterclaims

The Warner Parties responded to the Tolkien/HC Parties' lawsuit by filing two counterclaims of their own:  one for breach of contract and one for declaratory relief.  On February 21, 2013, the Tolkien/HC Parties informed the Warner Parties that they would attack the counterclaims by way of a Motion to Dismiss and an anti-SLAPP Motion. (Cestero Decl., ¶ 29).  In response, the Warner Parties filed their First Amended Counterclaims.  The First Amended Counterclaims continue to suffer from the same defects as the original counterclaims.  Accordingly, the

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

SPECIAL MOTION TO STRIKE WB
COUNTERCLAIM

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

Tolkien/HC Parties informed the Warner Parties that they still intended to attack the First Amended Counterclaims by way of motion.  This motion addresses only the first claim in the First Amended Counterclaim for breach of contract.[5]

The first counterclaim alleges no real breach by the Tolkien/HC Parties of any of the parties' agreement.  Instead, the Warner Parties have simply sued the Tolkien/HC Parties for asserting claims against them.  The Warner Parties' description of the "nature" of their counterclaim is telling.  They allege that they acquired certain rights in *The Lord of the Rings* and *The Hobbit*, and that they and Zaentz have exploited those rights "for years" with the Tolkien/HC Parties' knowledge and consent.  (First Amended Counterclaim ("FACC"), ¶ 3).  The Warner Parties further contend that the Tolkien/HC Parties "have made a complete about face and now assert that Warner does not have certain rights…."  (FACC, ¶ 4).  As a result, the Warner Parties contend that the Tolkien/HC Parties have "repudiated" the grant of rights contained in the 1969 Agreements.   (FACC, ¶ 5).

The Warner Parties further allege that in the 2010 Regrant Agreement, the Tolkien/HC Parties and others revoked the rights granted under copyright laws pursuant to the 1969 Agreements and re-granted all the rights that had been previously granted, on the same terms and conditions as existed previously. (FACC, ¶ 32).  Accordingly, the Warner Parties contend, the 2010 Regrant Agreement conveyed the rights to online video games and gambling games. (FACC, ¶ 40).  The Warner Parties further allege that they are an intended third-party beneficiary to the rights granted to Zaentz under the 2010 Regrant Agreement. (FACC, ¶ 42).  Finally, the Warner Parties allege that the Tolkien/HC Parties have "breached the 2010 Regrant Agreement by, among other things, repudiating their broad grant of rights under the 2010 Regrant Agreement…."  (FACC, ¶ 44).

Of course, the Warner Parties cannot hide from the allegations of their

---

[5] The second claim in the First Amended Counterclaim for declaratory relief is the subject of a concurrently-filed Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).

SPECIAL MOTION TO STRIKE WB
COUNTERCLAIM

1   original counterclaims.  When the Warner Parties originally pleaded this claim, they

2   alleged that the Tolkien/HC Parties had breached the contract by "challenging

3   Warner's exploitation of the broad rights granted…and denying that the 2010

4   Regrant Agreement conveyed the rights to exploit online video games and

5   gambling games."  (Original Counterclaim, ¶ 41).  The Warner Parties further

6   alleged that the Tolkien/HC Parties made these assertions in an attempt to "extract

7   additional huge sums of money for rights and/or take back rights that they had

8   already granted."  (Original Counterclaim, ¶ 35).

9

10  **III.   ARGUMENT**

11      **A.    Legal Standards**

12      California's anti-SLAPP statute (Cal. Code Civ. Pro. § 425.16) is designed to

13  put limitations on retaliatory lawsuits which seek to punish those who simply

14  exercise their fundamental rights.  *See Varian Med. Systems, Inc. v. Delfino,* 35

15  Cal.4th 180, 192-193, 25 Cal.Rptr.3d 298, 308 (Cal. 2005) ("Indeed, the point of

16  the anti-SLAPP statute is that you have a right not to be dragged through the courts

17  because you exercised your constitutional rights.") (internal quotes omitted).  The

18  anti-SLAPP statute creates a substantive immunity from suit, designed to protect

19  people who choose to exercise their First Amendment rights.  *Batzel v. Smith*, 333

20  F.3d 1018, 1025 (9th Cir. 2003).  For this reason, California's anti-SLAPP statute

21  applies in federal court proceedings to strike California state law claims.  *Id.*;

22  *United States ex rel. Newsham v. Lockheed Missile & Space Co., Inc.*, 190 F.3d

23  963, 973 (9th Cir. 1999).  Further, the anti-SLAPP statute is intended to be

24  interpreted broadly to further its purpose of protecting the fundamental right of free

25  speech and "to encourage continued participation in matters of public

26  significance…."  Cal. Civ. Proc. Code §425.16(a).

27      Evaluation of an anti-SLAPP motion requires a two-step process.  First, the

28  court must determine whether the defendant (here, counterclaim defendant) has

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

made a threshold showing that the challenged conduct arises from protected activity. *Equilon Enterprises v. Consumer Cause, Inc.,* 29 Cal.4th 53, 67, 124 Cal.Rptr.2d 507, 518 (Cal. 2002). To make this showing, the movant must demonstrate that the conduct giving rise to the challenged claim fits within one of the categories set forth in C.C.P. section 425.16(e). *Braun v. Chronicle Publishing Co.,* 52 Cal.App.4th 1036, 1043, 61 Cal.Rptr.2d 58, 61 (Cal. Ct. App. 1997). If the moving party satisfies the first step, the burden shifts to the plaintiff (here, the counterclaim plaintiff) to demonstrate a probability of prevailing on its claim. *Equilon Enterprise,* 29 Cal.4th at 67.

In order to satisfy its burden in the second step, the plaintiff must present admissible evidence that would support a judgment in plaintiff's favor. *Slaney v. Ranger Insurance Co.,* 115 Cal.App.4th 306, 318, 8 Cal.Rptr. 915, 924 (Cal. Ct. App. 2004). "The plaintiff cannot rely on the allegations of the complaint, but must produce evidence that would be admissible at trial." *HMS Capital, Inc. v. Lawyers Title Co.,* 118 Cal.App.4th 204, 212, 12 Cal.Rptr.3d 786, 791 (Cal. Ct. App. 2004). The court does not weigh the evidence, but simply determines whether evidence of a *prima facie* case has been presented that would permit the case to go forward. *Id.* Whether plaintiff has done so is a question of law. *Zamos v. Stroud,* 32 Cal.4th 958, 965, 12 Cal.Rptr.3d 54, 59 (Cal. 2004).

**B.      The Warner Parties' First Amended Counterclaim for Breach of Contract Arises From Protected Speech.**

Under the anti-SLAPP statute, a moving party has the burden to establish that the challenged cause of action "arises from" protected speech as defined in the statute. *Equilon,* 29 Cal.4th at 67. In making this showing, the defendant can rely on both the pleadings and evidence. *Salma v. Capon,* 161 Cal.App.4th 1275, 1286, 74 Cal.Rptr.3d 873, 882 (Cal. Ct. App. 2008). The statute specifically identifies four categories of protected speech, including: "(1) any written or oral statement or

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

writing made before a legislative, executive or judicial proceeding…, [and] (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive or judicial proceeding…."  Cal. Civ. Proc. Code §425.16 (e).  The Warner Parties' counterclaim falls within each of these categories.

The Warner Parties' breach of contract counterclaim arises solely and expressly from <u>the Tolkien/HC Parties' assertion of their legal rights</u>.  (*See* FACC, ¶¶ 4, 5, 35).  The Tolkien/HC Parties only asserted their rights regarding the Warner Parties' unauthorized merchandising activity in statements leading up to this lawsuit and then in this very lawsuit.  (Cestero Decl., ¶¶ 16-28).  These acts are unquestionably protected by the anti-SLAPP statute.

The Warner Parties' First Amended Counterclaims attempt to hide the true nature of their breach of contract claim by using the word "repudiation" throughout the First Amended Counterclaim, instead of the language included in the Original Counterclaim.  However, the Warner Parties cannot run away from their original allegations.  *See U.S. v. McKeon*, 738 F.2d 26, 31 (2d Cir. 1984) ("A party thus cannot advance one version of the facts in its pleadings, conclude that its interests would be better served by a different version, and amend its pleadings to incorporate that version, safe in the belief that the trier of fact will never learn of the change in stories"), *citing*, *Kunglig Jarnvagsstyrelsen v. Dexter & Carpenter, Inc.*, 32 F.2d 195, 198 (2d Cir. 1929).  *See also*, *Hendy v. Losse*, 54 Cal.3d 723, 742-43 (Cal. 1991) ("'Where a. . . complaint contains allegations destructive of a cause of action, the defect cannot be cured in subsequently filed pleadings by simply omitting such allegations without explanation.  In such a case, the original defect infects the subsequent pleading so as to render it vulnerable'" to a pleading motion) (internal citations omitted); *Unicom Systems, Inc. v. Electronic Data Systems, Corp.*, 2005 U.S. Dist. LEXIS 45707 at *31 (C.D. Cal. 2005) (admission in original complaint, though excluded in amended complaint, is "strong evidence of that"

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

SPECIAL MOTION TO STRIKE WB
COUNTERCLAIM

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1  admission).  The Warner Parties are bound by the allegations pleaded in their

2  original counterclaim.  *Andrews v. Metro North Committees Railroad Co.*, 882 F.2d

3  705, 707 (2d Cir. 1989) ("The amendment of a pleading does not make it any the

4  less an admission of the party").

5      No matter how hard the Warner Parties may try to avoid saying it, the alleged

6  "repudiation" by the Tolkien/HC Parties is the Tolkien/HC Parties' assertion of

7  their legal rights in pre-litigation communications and in this lawsuit.  Of course,

8  the term "repudiation" is a legal conclusion about "a contracting's party's words or

9  actions that indicate an intention not to perform the contract…."  Black's Law

10  Dictionary (Pocket Edition, West 1996).  The allegations in the Original

11  Counterclaims make abundantly clear that the Tolkien/HC Parties' words or actions

12  that constitute the alleged repudiation fall within the anti-SLAPP statute.

13  Specifically, the Warner Parties previously alleged that the Tolkien/HC Parties

14  breached the Merchandising License by "challenging" the Warner Parties'

15  exploitation of Intangible Video Games and by "denying" that the grant of rights

16  contained in either the 1969 Agreements or the 2010 Regrant Agreement included

17  gambling games and Intangible Video Games.  (Original Counterclaim, ¶ 43).

18      The filing of a lawsuit is, of course, an act in furtherance of the right of

19  petition and is squarely protected by the anti-SLAPP statute.  Cal. Civ. Proc. Code

20  §425.16(e)(1); *Mundy*, 203 Cal.App.4th at 1408-1409; *Feldman v. 1100 Park Lane*

21  *Associates*, 160 Cal.App.4th 1467, 1479, 74 Cal.Rptr.3d 1, 10-11 (Cal. Ct. App.

22  2008).  Accordingly, to the extent the Warner Parties have alleged that the

23  Tolkien/HC Parties "repudiated" the Merchandising License by asserting their

24  rights in this lawsuit, the first amended counterclaim falls squarely within the anti-

25  SLAPP statute.

26      Likely in an attempt to avoid the application of the statute, the Warner Parties

27  do not expressly allege that their claim is based on the Tolkien/HC Parties' filing of

28  this lawsuit.  However, the Court may consider evidence submitted by the

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

Tolkien/HC Parties in evaluating the basis for the Warner Parties' counterclaim. *Salma*, 161 Cal.App.4th at 1286.  That evidence shows that the Warner Parties have sued the Tolkien/HC Parties simply for suing them. (Cestero Decl. ¶¶ 16-28).[6]

Just as the filing of a lawsuit is protected by the anti-SLAPP statute, so are communications made in connection with anticipated litigation.  *Briggs,* 19 Cal.4th at 1115; *Feldman*, 160 Cal.App.4th at 1483, 1484; *Dove Audio, Inc. v. Rosenfeld Meyer & Sussman*, 47 Cal.App.4th 777, 784, 54 Cal.Rptr.2d 830 (Cal. Ct. App. 1996); *Digerati Holdings, LLC v. Young Money Entertainment, LLC*, 194 Cal.App.4th 873, 887-888 (Cal. Ct. App. 2011).  Demand letters, settlement discussions and the like are all protected by the anti-SLAPP statute.  *Digerati*, 194 Cal.App.4th at 888; *Feldman*, 160 Cal.App.4th at 1483-1484.

Here, the alleged breaches of contract all involve communications by the Tolkien/HC Parties made in anticipation of the instant lawsuit, namely: (i) the Tolkien/HC Parties' assertion of their rights in the Tolkien Works (FACC, ¶¶ 4, 35); (ii) their "challenging" the Warner Parties' exploitation of video games accessible only online or through download and gambling games (Original Counterclaim, ¶ 43); and (iii) their "denying" that the grant of rights contained in either the 1969 Agreements or the 2010 Regrant Agreement included gambling games and video games accessible only online or through download (Original Counterclaim, ¶ 43).

The Tolkien/HC Parties only raised these claims in connection with seeking to enforce their Reserved Rights under the Merchandising License and in anticipation of litigation to do just that.  (Cestero Decl., ¶¶ 16-28).  As discussed

---

[6] Nor can the Warner Parties avoid the application of the anti-SLAPP statute by combining allegations of protected conduct with allegations of unprotected conduct. *See e.g., Salma*, 161 Cal.App.4th at 1287-1288.  Accordingly, even if the Warner Parties could demonstrate that the Tolkien/HC Parties had also asserted their claims in a context other than the filing of this lawsuit and not protected by the anti-SLAPP statute (they cannot), the statute still applies and the Court must proceed to step two.  *Id.*

above, the Tolkien/HC Parties first raised the issue in September 2010 in connection with the negotiation of the Hobbit Binding Term Sheet and the 2010 Regrant Agreement and prior to the execution of those documents.  (Cestero Decl., ¶¶ 16-20).  Given these facts, the Tolkien parties are mystified by the assertion in the Warner Parties' Amended Counterclaims that the Tolkien/HC Parties had challenged their rights to online gambling and Intangible Video Games only <u>after</u> signature of the 2010 Regrant Agreement, as this is allegation is demonstrably false.  Indeed, the parties negotiated specific language to be included in the Hobbit Binding Term Sheet and the 2010 Regrant Agreement which expressly preserved the Tolkien/HC Parties' right to assert this current claim in the future.  (Cestero Decl., ¶ 17).[7]  Thereafter, the Tolkien/HC Parties sent cease and desist letters to both the Warner Parties and Zaentz describing the Warner Parties' and Zaentz's unauthorized activities, including gambling activities, and demanding that they immediately cease and desist from such infringing and unauthorized exploitation. That correspondence explicitly discussed the possibility of legal action.  (Cestero Decl., ¶¶ 19-20, Exhs. K and L).  The parties then exchanged further correspondence about this issue, all of which evidence underscores that the Tolkien/HC Parties intended to bring this lawsuit if the parties could not arrive at a mutually agreeable resolution (which they could not do).  (Cestero Decl., ¶¶ 21-24, Exhs. M-P).

While this correspondence was being exchanged, and continuing for months thereafter, the parties engaged in protracted settlement negotiations, both in person and telephonically, which included two day-long mediation sessions in two different cities with a private mediator.  (Cestero Decl., ¶ 25).  Finally, when all else had failed, the Tolkien/HC Parties filed this lawsuit.  (Cestero Decl., ¶ 27). The Tolkien/HC Parties have never asserted their claims regarding gambling or

---

[7]  Notably, the negotiations of the Regrant Agreement began as a required term of the settlement agreement entered into with respect to the Accounting Lawsuit. (Cestero Decl., ¶¶ 12-13).

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1   Intangible Video Games outside of the context of this lawsuit and the

2   correspondence and settlement discussions that preceded it.  (Cestero Decl., ¶ 28).

3   Unquestionably, all of the alleged conduct on which the first counterclaim is based

4   involves the Tolkien/HC Parties' assertion of their rights in anticipation of

5   litigation.

6        *Digerati,* 194 Cal.App.4th 873, is directly on point.  Like the present case,

7   *Digerati* involved a cross complaint for breach of the covenant of good faith and

8   fair dealing arising out of the assertion of claims for breach of contract.  *Id*. at 881.

9   The cross complainant, Digerati, was a film production company that had produced

10  a documentary about the rapper L'il Wayne.  The cross-defendants (Young Money

11  Entertainment, LLC and Dwayne Carter), claimed that Digerati breached the film

12  production agreement which gave L'il Wayne final say over the content of the film.

13  *Id*. at 877.  The cross-defendants had asserted these claims in demand letters both to

14  Digerati as well as to third parties, and had ultimately filed a lawsuit and sought a

15  preliminary injunction.  *Id*. at 881.  Digerati alleged that that the cross-defendants'

16  assertion of the claims for breach of the approval provisions in the production

17  agreement was in bad faith and therefore a breach of the covenant of good faith and

18  fair dealing.  *Id*.

19       The cross-defendants brought an anti-SLAPP motion, arguing that the

20  assertion of their claims for breach of contract fell within the anti-SLAPP statute

21  and were absolutely privileged as a matter of law.  *Id*. at 881-882.  The trial court

22  agreed and granted the motion.  *Id*. at 882.  The Court of Appeal affirmed, finding

23  that the conduct at issue was protected under Section 425.16(e)(2).  Specifically, the

24  Court of Appeal held:

25           "Young Money's and Carter's statements made through
             their attorney to Digerati protesting the exhibition of the
26           film and asserting a right of final approval, and their
             alleged statements made to distributors that the film was
27           not authorized and threatening them with litigation,
             concerned the subject of the dispute over the right of final
28           approval and that the statements were made in

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

SPECIAL MOTION TO STRIKE WB
COUNTERCLAIM

anticipation of a lawsuit by Young Money and Carter against Digerati and the distributors."

*Id.* at 887-888.  The Court of Appeal further held that the filing of the lawsuit and seeking of a preliminary injunction fell within Section 425.16(e)(1).  *Id.* Accordingly, the cross-complaint for breach of the implied covenant arising out of the assertion of legal rights in the film production agreement was subject to the anti-SLAPP statute.  *Id.*

Our case is even stronger than *Digerati*.  The Warner Parties have sued the Tolkien/HC Parties for seeking to enforce their Reserved Rights under the 1969 Agreements, the Merchandising License and the 2010 Regrant Agreement.  The Tolkien/HC Parties asserted their rights in demand letters, settlement discussions and ultimately in this lawsuit.  However, unlike the cross-defendants in *Digerati*, the Tolkien/HC Parties never asserted these claims to any third parties.  Surely, if the cross-claims in *Digerati* were subject to the anti-SLAPP statute, so too is the Warner Parties' counterclaim. [8]

Accordingly, the Tolkien/HC Parties have satisfied the first step of the anti-SLAPP analysis.

---

[8]  Even if the Tolkien/HC Parties' assertion of their legal rights in challenging the Warner Parties' unauthorized activities did not fall within subsections (e)(1) or (e)(2) as discussed above (it does), it clearly falls within subsection (e)(4), which protects speech-related conduct on an issue of public interest.  The Tolkien/HC Parties' assertion that the Warner Parties have exceeded the scope of their license is certainly speech-related conduct.  A statement is considered to be made in connection with an issue of public interest "if the statement or conduct concerns a topic of widespread public interest and contributes in some manner to a public discussion of the topic."  *Hall v. Time Warner, Inc.*, 153 Cal.App.4th 1337, 1347, 63 Cal.Rptr.3d 798, 805 (Cal. Ct. App. 2007).  The Tolkien/HC Parties' claims relate to the exploitation of rights in the world-renowned *Lord of the Rings* and *Hobbit* novels.  As evidenced by the phenomenal success of the *Lord of the Rings* and *Hobbit* films and the widespread popularity of Professor Tolkien's works, the exploitation of these works is an issue about which the public is keenly interested.

GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

SPECIAL MOTION TO STRIKE WB COUNTERCLAIM

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

**C.**     **The Warner Parties Cannot Demonstrate a Probability of Prevailing on their Counterclaim.**

In the second step of the anti-SLAPP analysis, the Warner Parties have the burden of proving a probability of success on the merits of their counterclaim. *Equilon,* 29 Cal.4th at 67.  To make this showing, the Warner Parties must "state and substantiate a legally sufficient claim."  *Taus v. Loftus*, 40 Cal.4th 683, 713-714, 54 Cal.Rptr.3d 775, 798-799 (Cal. 2007).  In other words, the Warner Parties must demonstrate that their counterclaim is both legally sufficient and supported by sufficient admissible evidence to establish a *prima facie* case for breach of contract. *Id*.  In making this determination, the Court considers the pleadings and the evidence submitted by both parties, but does not weigh the evidence and draws all reasonable inferences in favor of the Warner Parties.  *Id.* at 714.

However, if the Tolkien/HC Parties present evidence establishing a complete defense to the Warner Parties' claim, the motion must be granted.  *Digerati*, 194 Cal.App.4th at 884; *Wilson v. Parker, Covert & Chidester*, 28 Cal.4th 811, 821, 123 Cal.Rptr.2d 19, 26 (Cal. 2002).  Specifically, the Warner Parties cannot establish a probability of prevailing if their counterclaim is barred by the litigation privilege.  *Digerati, supra*, 194 Cal.App.4th at 888.  Here, the Warner Parties' counterclaim is both legally deficient and barred by California's litigation privilege.

**1.**     **The Warner Parties' First Amended Breach of Contract Counterclaim is Legally Deficient.**

As set forth in more detail the concurrently filed Motion to Dismiss, the Warner Parties have failed to adequately plead a claim for breach of contract.  The Warner Parties claim that the Tolkien/HC Parties have "repudiated" the grant of rights in the 1969 Agreement and the 2010 Regrant Agreement.  However, the facts alleged by the Warner Parties do not constitute a repudiation as a matter of law.

For a party to repudiate a contract, an "essential element [] is that the repudiation by the promisor occur before his performance is due under the

contract." *Taylor v. Johnston*, 15 Cal.3d 130, 137 (Cal. 1975).  Furthermore, the repudiation must be "an unqualified and positive refusal to perform and must go to *the whole of the contract*."  *Gittlitz v. Lewis*, 212 N.Y.S.2d 219, 220 (N.Y. Sup. Ct. 1961) (emphasis added).  *See also*, *Taylor, supra*, at 140 (to constitute an express repudiation "the refusal to perform must be of the whole contract") (internal quotations omitted); *Atkinson v. District Bond Co.*, 5 Cal.App.2d 738, 743 (1935) ("refusal to perform *must be of the whole contract* or of a covenant going to the whole consideration") (emphasis added); *British Films Do Brasil, Ltda v. London Film Productions, Inc.*, 166 N.Y.S.2d 703, 706 (N.Y. Sup. Ct. 1957) (repudiation "must be entire, absolute and unequivocal, covering the entire performance to which the contract binds the promisor").[9]

Yet, the Warner Parties' own allegations demonstrate that the Tolkien/HC Parties have long ago performed their obligations under the relevant agreements. Indeed, the Warner Parties allege that they have been exploiting the rights granted by the Tolkien/HC Parties for years.  (FACC, ¶¶ 3, 21, 28, 29, 35).  Moreover, it is undisputed that the Warner Parties have obtained and exploited the film rights granted under the 1969 Agreements and the 2010 Regrant Agreement.  (Warner Parties' Answer, ¶¶ 41-43).  Indeed, the essence of the claims asserted by the Tolkien/HC Parties demonstrates the exact opposition of a repudiation — the Tolkien/HC Parties are affirming the contract and seeking to enforce their Reserved Rights.  Accordingly, the Warner Parties have not alleged, and cannot allege, that the Tolkien/HC Parties "repudiated" the whole of the 1969 Agreement or the 2010 Regrant Agreement or that they "repudiated" anything before their performance occurred.  The Warner Parties' first amended counterclaim for breach of contract fails as pleaded.

---

[9] The 1969 Agreements are governed by New York substantive law.  The 2010 Regrant Agreement is governed by California substantive law.  The law of the forum, California, applies to procedural questions.

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

SPECIAL MOTION TO STRIKE WB
COUNTERCLAIM

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

**2.**   **The Warner Parties' Breach of Contract Counterclaim is Barred by the Litigation Privilege.**

California Civil Code Section 47(b) provides an absolute privilege for any communications made in, or in connection with, judicial proceedings. *Digerati*, 194 Cal.App.4th at 888; *Dove Audio*, 47 Cal.App.4th at 786. The privilege is an absolute bar to claims other than malicious prosecution. *Hagberg v. California Federal Bank*, 32 Cal.4th 350, 360, 7 Cal.Rptr.3d 803, 808 (Cal. 2004). The privilege applies regardless of the defendants' motives and even if the result seems inequitable. *See, Abraham v. Lancaster Community Hosp.*, 217 Cal.App.3d 796, 813 (1990); *Microsoft Corp. v. BEC Computer Co., Inc.*, 818 F.Supp. 1313, 1319 (C.D. Cal. 1992). The privilege applies both to filings in a lawsuit and to communications preliminary to a proposed judicial proceeding, such as a demand letter. *Dove Audio,* 47 Cal.App.4th at 781. Moreover, the litigation privilege is to be interpreted broadly in order to further "its principal purpose of affording litigants…the utmost freedom of access to the courts…." *Digerati*, 194 Cal.App.4th  at 888. As a result, courts have applied the litigation privilege to breach of contract cases when its application furthers the purposes behind the privilege. *Wentland v. Wass*, 126 Cal.App.4th 1484, 1492, 25 Cal.Rptr.3d 109, 115 (Cal. Ct. App. 2005).

As discussed above, the Warner Parties' first amended counterclaim for breach of contract arises out of the Tolkien/HC Parties' prelitigation demand letters and settlement communications as well as the filing of this lawsuit. This conduct is manifestly protected by the litigation privilege — the Tolkien/HC Parties' assertion of their claims and attempts to enforce their Reserved Rights were in anticipation of filing this lawsuit and in this very lawsuit. This is precisely the type of conduct that the litigation privilege was designed to protect.

*Digerati* is again on point. In *Digerati*, after the Court of Appeal determined that the cross-complaint was subject to the anti-SLAPP statute, the Court of Appeal

1   held that the litigation privilege barred the claim.  Specifically, the Court of Appeal

2   held:

3          "[A]s a matter of law, the alleged prelitigation statements
           on which the count for breach of the implied covenant is
4          based related to litigation that was contemplated in good
           faith and under serious consideration….We therefore
5          conclude that these statements made prior to, or in the
           course of litigation were protected by the litigation
6          privilege.  Digerati therefore cannot establish a
           probability of prevailing…."
7

8   *Id.* at 889.[10]

9          Again, our case is on all fours.  The Tolkien/HC Parties' lawyers sent

10  demand letters to the Warner Parties (and Zaentz) objecting to the Warner Parties'

11  licensing and exploitation of gambling games featuring the Tolkien Works.

12  (Cestero Decl., ¶¶ 19-20).  The Tolkien/HC Parties' lawyers also asserted that any

13  form of Intangible Video Game was not an "article of tangible personal property"

14  and therefore not permitted to be exploited under the Merchandising License, but

15  rather, was a Reserved Right for the Tolkien/HC Parties.  (*Id.*)  The Tolkien/HC

16  Parties' lawyers then engaged in extensive discussions with counsel for the Warner

17  Parties attempting to resolve the dispute.  Clearly, all of the Tolkien/HC Parties'

18  statements objecting to, challenging, or denying the Warner Parties' right to use the

19  Tolkien Works in gambling games and Intangible Video Games were in

20  anticipation of filing this lawsuit.  Just as the statements made in anticipation of

21  Young Money and Carter's lawsuit against Digerati were privileged, so too are the

22  Tolkien/HC Parties' statements in this case.

23         The Warner Parties cannot establish that the Tolkien/HC Parties asserted

24  their rights in any manner that is not absolutely protected by the litigation privilege.

25  (Cestero Decl., ¶ 28).  Accordingly, the Warner Parties' counterclaim for breach of

26  contract is barred by the litigation privilege as a matter of law and the Tolkien/HC

27  ───────────────
    [10]  Importantly, "'[g]ood faith in this context refers to a good faith intention to file a
28  lawsuit rather than a good faith belief in the truth of the communication." *Id.* at
    887.

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

SPECIAL MOTION TO STRIKE WB
COUNTERCLAIM

Parties anti-SLAPP Motion should be granted in its entirety without leave to amend.

**IV.    <u>CONCLUSION</u>**

For all the foregoing reasons, The Tolkien/HC Parties respectfully request that the Court grant their anti-SLAPP Motion in its entirety and strike the Warner Parties' first amended counterclaim for breach of contract without leave to amend.

DATED:  March 28, 2013            GREENBERG GLUSKER FIELDS
                                  CLAMAN & MACHTINGER LLP


                                  By:  /s/ Bonnie E. Eskenazi
                                       BONNIE E. ESKENAZI (SBN 119401)

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590