# EXHIBIT A

3/3/69
HS:sk:X
5: 4:69

THIS AGREEMENT made and entered into as of the 8.th day of July , 1969 by and between:

GEORGE ALLEN & UNWIN, LTD., Ruskin House, 40 Museum Street, London, W.C.1, England (hereinafter referred to as "the Seller") and

UNITED ARTISTS CORPORATION of 729 Seventh Avenue, New York, New York 10036 (hereinafter referred to as "the Purchaser")

JOHN RONALD REUEL TOLKIEN (hereinafter referred to as "the Author") is the sole author of the original works entitled "THE LORD OF THE RINGS", consisting of three separate works entitled: "THE FELLOWSHIP OF THE RING", "THE TWO TOWERS" and "THE RETURN OF THE KING" (hereinafter referred to collectively as "THE TRILOGY") and "THE HOBBIT: OR THERE AND BACK AGAIN" (hereinafter referred to as "THE HOBBIT"). THE TWO TOWERS and THE HOBBIT are hereinafter referred to as "the Work".

Except as hereinafter set forth with respect to THE HOBBIT, the Seller has sole and unencumbered ownership of all the motion picture and other rights in the Work hereinafter referred to.

By separate contemporaneous agreement with SASSOON TRUSTEE AND EXECUTOR CORPORATION, LTD., the Purchaser is acquiring certain motion picture and other rights in THE FELLOWSHIP OF THE RING and THE RETURN OF THE KING, as more particularly set forth therein.

The Seller has the sole and unencumbered ownership of the right to reproduce THE TRILOGY and THE HOBBIT in material legible form throughout the world, subject to certain prior grants, as hereinafter recited.

The Purchaser, relying on the warranties and representations herein made by the Seller, desires to acquire the sole

and exclusive motion picture, and certain other rights in and
to the Work from the Seller, so that together with the contemp-
oraneous acquisition of the other two works in THE TRILOGY,
Purchaser will have the sole and exclusive motion picture and
certain other rights in and to THE TRILOGY and THE HOBBIT.

Accordingly, the parties agree as follows:-

1. The Seller hereby represents and warrants that:-

a)  All the Work is wholly original with the
Author, no incident therein contained and no part thereof was
taken from or based upon any other literary or dramatic or
musical material or any motion picture and the full use of the
Work as herein granted will not violate, conflict with, or in-
fringe upon any rights whatsoever(including, without limitation,
any copyright, common-law or statutory, and any right against
libel, slander, invasion of privacy or similar right) of any
person, firm or corporation;

b) The Seller is the sole owner of all rights
hereinafter granted to the Purchaser, and that there is not now
valid or outstanding any right, title or interest in or to or in
connection with the Work adverse to or inconsistent with the rights
hereinafter granted to the Purchaser, or by which any of said
rights or the enjoyment thereof by the Purchaser might be invalidated,
impeded or impaired except as set forth in Schedule A attached
hereto and made a part hereof.

c)  To the best of Sellers' knowledge, no
claim has been made that the Work infringes the copyright or
violates any right of first publication or any other rights in any
other work and/or of any person, firm or corporation whatsoever;

-2-

d)  Valid copyright in the Work exists in the United States and in all countries which have subscribed to the Berne Convention.

e)  "THE LORD OF THE RINGS" was published in the United States by Ballantine Books and was duly registered for copyright by the Author in the United States of America, on October 25, 1965, under Entry No. A 804788.

THE HOBBIT was registered for ad interim copyright in the United States of America by the Author on November 5, 1937 No. Ad. Int. 23245, and an American edition was registered by the Author on March 7, 1938 No. A 115280.  A revised edition of THE HOBBIT was registered for copyright in the United States of America by the Author on February 28, 1966, No. A 877837.

f)  The titles of the two works constituting the Work, may, to the best of Seller's knowledge, be used legally by Purchaser in the exercise of the rights granted hereunder;

g)  There are no claims or litigations concerning or purporting to affect adversely the Seller's rights or title in or to the Work as herein represented or conveyed;

h)  No motion picture or television program (live, filmed or taped) has ever been made based upon any part of the Work, and no right, license or privilege so to do has heretofore been granted, except that a film strip was produced pursuant to the agreement referred to in Paragraph 9.A. hereof.

2.  The Owner hereby grants and sells to the Purchaser for the entire world all of the motion picture rights in and to the Work, for the period of copyright and all extensions and renewals of copyright; provided, however, that to the extent that the Seller has any of the rights granted hereunder which may

-3-

or will continue after the period of copyright, and extensions and renewals of copyright, by operation of law or otherwise, Seller hereby grants and sells such rights to Purchaser forever. The term "motion picture rights" as used herein means the following:

    a)  The sole and exclusive right to make one or more sound, silent, talking and/or musical motion picture photoplays based upon the Work or any part thereof of any type now or hereafter known, including but not limited to animated cartoon versions.

    b)  The sole and exclusive right in connection with the making, exhibition and exploitation of said motion picture photoplays to translate into all languages, to freely adapt, change, transpose, revise, rearrange, add to and subtract from the Work or any part thereof and the title, theme plot, sequences, incidents and characterizations thereof, to make interpolations in and substitutions for any part of parts thereof, to make sequels to and new versions or adaptations of the Work or any part thereof, to use any part or parts of the Work or of the theme thereof or any incidents, characters, character names, scenes, sequences or characterizations therein contained in conjunction with any other work or works, and to separately or cumulatively do any or all of the foregoing, to such extent as the Purchaser, in its sole discretion may deem expedient in the exercise of any of the rights, licenses or privileges herein conveyed and to interpolate in said motion picture photoplays music compositions, gags, lyrics and music of all kinds, to set to music any verse, lyric, prose or part or parts of the Work and any characters thereof, and to

-4-

use, print, reprint, publish, copy or vend such song, and the music and/or lyrics (on film, magnetic tape, wire, record or other reproducing device, whether similar or dissimilar to the foregoing, and whether now or hereafter known), and to perform for profit (or non-profit), arrange, adapt, and exploit same throughout the world and to secure copyright therein throughout the world in Purchaser's name or otherwise, and to use, super-impose and/or photograph lines, excerpts from or translation of such Work for the title, subtitles, text and dialogue of said motion picture photoplays (the foregoing shall not prevent Seller from exercising the rights granted in this subparagraph (b) in connection with the rights reserved by Seller).

c)   The right to advertise and exploit THE TRILOGY and THE HOBBIT and the title or titles thereof in connection with said motion picture photoplays in any manner and through any mediums that the Purchaser may desire and solely for the purpose thereof, to publish or cause to be published in all languages and in such form as the Purchaser may deem advisable, including publication in newspapers, fan magazines and trade periodicals, synopses, summaries, resume and stories of THE TRILOGY and THE HOBBIT and of said motion picture photo-plays not exceeding, however, 7,500 words in length, (which 7,500 word publication may not be serialized), to use excerpts from and resumes and summaries of THE TRILOGY and THE HOBBIT in heralds, programs, posters, lobby displays, press books,

-5-

newspapers, magazines and other periodicals, commercial and
other tie-ups, and all other mediums of advertising and
publicity whatsoever, and to copyright the same in the name
of the Purchaser or its nominees; provided, however, that no
exercise by Purchaser of its right under this subparagraph (c)
shall result in causing THE TRILOGY and THE HOBBIT or any part
thereof to fall into public domain.  It is specifically under-
stood and agreed between the parties that no part of the consi-
deration to be paid under this Agreement is referable to the
"material legible form" rights herein granted.  Purchaser agrees
that Author's name shall not be used in such manner as to
indicate that Author wrote any such synopses, summaries,
resumes, or stories.  Author may be appropriately indicated,
however, to be the author of THE TRILOGY and THE HOBBIT.

   d)  The right for advertising, publicity and
exploitation purposes only to broadcast by radio, wire or any
other means or method, or license or authorize others to so
broadcase, one or more radio adaptations, versions or sketches
of the Work (whether or not incorporated in said motion picture
photoplays) from disc or other sound records, sound tracks,
electrical transcriptions, re-recordings, or with living persons
or otherwise provided, however, that no broadcast shall exceed
fifteen (15) minutes nor shall any such broadcast be in serial
form; Author's name shall not be used in such manner as to
indicate Author wrote any such adaptations, versions or sketches,
but Author may be appropriately indicated to be the author of the
Work.

e)   The exclusive, unlimited and unrestricted rights to produce, issue, reproduce, remake, reissue, distribute, exhibit, transmit, project, perform, sell, lease, rent, license for exhibition, exploit, dispose of and generally deal in and with in any other manner or by any method whatsoever, whether now known or hereafter devised, said motion picture photoplays (including foreign versions) and trailers in connection therewith, including negative and positive prints thereof, of any size, color or type, and/or in substance of any kind (including film, tape or otherwise), and to secure copyright and copyright registration of said motion picture photoplays in all countries of the world in the Purchaser's name or otherwise; provided, however, that no exercise by Purchaser of its rights under this subparagraph (e) shall result in causing the Work or any part thereof to fall into public domain.

f)   The sole and exclusive right to make, copy, vend, license and otherwise use in any manner that the Purchaser may desire, disc or other sound records, sound on film, and any and all other mechanical, electrical and any other contrivances or devices of any nature whatsoever, for the recordation and re-recordation of the sound, talking, musical and any and all other audible portions of said motion picture photoplays, and for the reproduction, transmission, projection and/or performance of any or all such sounds separately (including the right to make, sell, use or otherwise exploit commercial

-7-

phonograph records) or as part of or incidental to or in synchronization with the exhibition or performance thereof, whether such contrivances or devices are now known or are hereafter known, invented or devised;

g)  The sole and exclusive right to televise by means of film and/or by any other means or method other than direct from living actors, said motion picture photoplays or any part thereof.  Purchaser may so televise said motion picture photoplays serially or otherwise but shall not have the right to produce and exploit a television series except as such right shall be acquired by Purchaser pursuant to the provisions of Article 10.  In addition to the television rights granted to the Purchaser pursuant hereto Purchaser shall have the right throughout the world to televise with living persons (live, filmed or taped) or otherwise excerpts from and condensations of the Work and said motion picture photoplays based thereon but only for advertising and exploitation purposes provided, however, that such telecasts shall not exceed ten (10) minutes in length.

h)  The exclusive right (insofar as the Seller can give the same) to use the title or titles by which the Work and THE TRILOGY and THE HOBBIT are now known or may hereafter be known, or any components of any such title or titles as the title of said motion picture photoplays and in connection with the advertising and exploitation thereof, whether said motion picture photoplays are based wholly or partially upon the Work; and to use such title or titles or any components of the same

-8-

and further provided that Seller reserves the right to make commercial tie-ups in connection with the exploitation, advertising and publicity of the rights reserved by Seller hereunder. Nothing herein contained nor elsewhere contained in this Agreement shall prevent Purchaser from making commercial tie-ups without using Author's name.

The Seller further grants and sells to the Purchaser during the term of Purchaser's rights hereunder and for the entire world the sole and exclusive legitimate stage rights, including but not limited to the right to produce and present dramatic, musical and/or dramatico-musical plays and to adapt the Work for the exercise of such legitimate stage rights.

3. Except as otherwise specifically set forth herein, the Seller agrees that it will not hereafter publish or authorize the publication of THE TRILOGY or THE HOBBIT, or any part of either thereof, in any form in the United States of America unless the same shall be duly copyrighted in the United States of America.

4. Seller agrees that during the period in which the hereinafter referred to renewals or extensions may be applied for, the Seller will, prior to the expiration of any copyright or copyrights in the Work, or any part of either thereof (as the same may be extended), renew or extend, or procure the renewal or extension of, any such copyright or copyrights, and will convey grant and assign to the Purchaser the rights herein conveyed, granted and assigned for such renewal or extended term.  If Seller

-10-

in connection with musical compositions and songs used in such
motion picture photoplays and in connection with the publication,
recordation, performance and any other use whatsoever thereof.
The right to so use the title of TRILOGY and THE HOBBIT, and each
part of each thereof, is granted exclusively only for and in
connection with said motion picture photoplays and/or musical
compositions used in or in connection with said motion picture
photoplays.  Anything in this Agreement to the contrary notwith-
standing, "THE HOBBIT" may not be used as the title of any motion
picture to be produced pursuant to the provisions of this Agreement,
unless the Purchaser shall have complied with the provisions of
Paragraph 9. C. hereof;

      i)  The exclusive right to secure copyright
registration (or equivalent protection in countries where no
copyright law exists) of said motion picture photoplays and any
sound records, sound tracks, or recordings in connection therewith,
in all countries of the world under any now existing or hereafter
created laws, regulations or rules, in the name of the Purchaser
or any other person, firm or corporation;

      j)  The right to use and exploit and to license
others to use and exploit all commercial tie-ups of any sort or
nature arising out of or connected with said motion picture
photoplays and/or the title or titles thereof and/or the characters
thereof and/or their names and their characteristics provided,
however, that Purchaser shall have no right to use Author's name
in such commercial tie-ups nor shall any indication be made in
such commercial tie-ups that Author endorses any commercial product

-9-

fails to secure the renewal or extension of any such copyright or copyrights, or to convey, grant and assign the same as herein provided within 180 days prior to the last date on which it may do so, then the Seller hereby irrevocably appoints the Purchaser and its successors and assigns as the attorney-in-fact of the Seller to execute, deliver and record, on behalf of the Seller and in the name of the Seller, any and all documents necessary or proper to secure the renewal or extension of any such copyright or copyrights and all rights therein and thereto for the term of such renewal or extension, and to execute, deliver and record on behalf of the Seller and in the name of the Seller, any and all assignments and other documents necessary or proper to convey, grant, and assign to the Purchaser, its successors and assigns, the rights hereby conveyed, granted and assigned, for the term of such renewal or extension.  The Seller agrees that in the event that the present Copyright Law of the United States of America, or of any other country where the Work or either part thereof, is or may hereafter be protected by copyright, shall be amended or changed, or a new Copyright Law enacted, so that the term of copyright is enlarged, the Purchaser and its successors and assigns shall forthwith automatically become entitled to all the rights hereby conveyed, granted and assigned to the Purchaser for such extended or enlarged term.  Simultaneously herewith the Seller has caused to be

-11-

delivered to the Purchaser an agreement by Author's heirs agreeing to the provisions of this paragraph and conveying, granting and assigning to the Purchaser the copyright or copyrights of the Work during the renewal or extension periods of such copyrights to the extent that such persons have or may have any rights therein; agreeing to renew or extend or procure the renewal or extension in such copyright or copyrights to the extent that they may have the right so to do; and upon their failure so to do, appointing the Purchaser as their attorney-in-fact for such purpose.

     5.  The Seller agrees to execute and deliver to the Purchaser and to provide the Purchaser with any and all further documents necessary or proper to evidence or secure to the Purchaser the rights herein conveyed, granted and assigned, and to perfect the record thereof. Without limiting the generality of the foregoing, Seller agrees to execute and deliver a short-form assignment of all of the rights, licenses, privileges and property herein granted to Purchaser, duly executed and acknowledged by the Seller, provided that said short form assignment contains a provision to the effect that all of the terms, covenants, provisions and conditions of this agreement are incorporated therein by reference. In case of the failure or refusal of the Seller to execute and deliver any such instrument or document, and in particular the

short form assignment, the Seller hereby nominates, constitutes and appoints each and severally the Purchaser, its successors and assigns, and/or its then officers, as its true and lawful attorney-in-fact, irrevocably, in the name of the Seller, or otherwise, to execute and deliver all such documents and assignments.

6. A.  At the request of the Purchaser, the Seller will join in any action brought by the Purchaser against any person, firm or corporation infringing upon any rights of the Purchaser under this Agreement, and (whether or not the Seller is requested to and/or joins in any such action) to cooperate with the Purchaser in any such action; provided, however, that subject to the provisions hereinafter in this Paragraph 6 set forth, the Purchaser indemnifies and saves and holds the Seller harmless of and from any counsel fees or legal or other expenses, or costs of any such action, unless the infringements are a result of any authorized or permissible act or conduct by such third party resulting from an omission or act of commission by the Seller constituting a breach of any warranty, representation or covenant on the part of the Seller contained in this Agreement.

B.  The Seller further agrees to indemnify and save harmless the Purchaser, its successors and assigns, and its and their licensees, against any and all claims, demands,

-13-

suits, losses, costs, expenses (including reasonable counsel
fees), damages or recoveries (including any amounts paid in
settlement, but only if the Seller consents thereto in writing)
incurred by the Purchaser or its successors and assigns, or its
licensees, by reason of any breach of any warranty, undertaking,
representation, agreement or certification made or entered into
herein or hereunder by the Seller and/or by Sassoon Trustee And
Executor Corporation, Ltd., pursuant to the separate and
contemporaneous agreement between the said Sassoon Trustee And
Executor Corporation, Ltd. and the Purchaser, with respect to
"THE FELLOWSHIP OF THE RING" and "THE RETURN OF THE KING";
provided, however, that the Seller shall have no liability
under this Paragraph 6. B unless the Seller shall (i) have
consented to any settlement in writing; or (ii) there shall have
been a final determination by a court of competent jurisdiction
in favor of any such claimant or plaintiff.  It is agreed,
however, that Seller's maximum liability hereunder shall be in
an amount equal to all sums paid by Purchaser, its successors or
assigns, pursuant to this agreement and pursuant to the contem-
poraneous agreement for the acquisition of motion picture and
other rights to the other works of THE TRILOGY (except that this
limitation of liability shall not apply if such liability is
predicated on any claim of plagiarism).  Seller shall be

-14-

entitled to a credit hereunder to the extent of any payments
made to Purchaser, its successors or assigns, in discharge
of the liability thereunder by the grantor of similar motion
picture and other rights in the other works of THE TRILOGY.

7.  The Purchaser agrees to give Author a
possessive credit on the main title of any motion picture
that may be produced by it and adapted from the Work sub-
stantially incorporating the plot, theme, characterizations,
motif and treatment thereof, above the title of the motion
picture.  If the title of any motion picture shall be different
from the title of the work upon which it is based, then the
title of the work shall be referred to.  Purchaser shall,
in good faith, endeavor to grant to Author such credit of
the same prominence as the credits granted the director
and/or screenplay writer(s) in any paid advertising of
said motion picture photoplays in which credit is given
to the director and/or screenplay writer(s), provided,
however, that Purchaser reserves the right to grant a
director more prominent credits if required by the
terms of the contract with any such director.  The foregoing
obligation with respect to such paid advertising shall not

- 14 A -

apply to group, list or so-called "teaser" advertising, publicity
or exploitation; or special advertising, publicity or exploitation;
or special advertising, publicity or exploitation relating to
any member or members of the cast, the author, director, pro-
ducer or other personnel concerned in its production or similar
matters; or any exploitation, publication or fictionalization
of the story, screenplay or other literary or musical material
upon which the motion picture is based; or to by-products of
any kind (including but not limited to sheet music and phono-
graph records); or to "trailer" or other advertising on the
screen or radio or television; or to institutional or other
advertising or publicity not relating to the motion picture; or
to advertising eight column inches in size or less; or to adver-
tising of such nature that the consent to the use of Author's
name in connection therewith has not been granted hereunder;
provided, that if in any such excluded advertisements, regard-
less of the size, (except for so-called teasers or advertisements
with respect to which the Author has not granted consent to use
his name, or advertisements which have no application to Author
such as, but not limited to advertisements in connection with
personal appearance, Academy Award nominees and the like), the
name of the director and/or screenplay writer(s) is used, then
the name of the Author shall appear in such advertisement.
Nothing contained herein with respect to size of type shall apply
to advertising or publicity material in narrative form.  No
casual or inadvertent failure of the Purchaser to comply with

-15-

the provisions hereof and no failure of persons other than the
Purchaser to comply with their contracts with the Purchaser
shall constitute a breach of this agreement by the Purchaser.
The rights and remedies of the Seller and Author, in the event
of a breach of this section by the Purchaser shall be limited
to the Seller's rights, if any, to recover damages in an action
at law, and in no event shall Seller or Author be entitled by
reason of any breach to terminate this agreement or to enjoin
or restrain the distribution or exhibition of the motion picture.
Anything in the previous sentence to the contrary notwithstand-
ing, the Seller and Author may restrain the use and distribution
of any advertising matter not printed at the time of the Seller's
or Author's application for injunction or any advertisement then
not placed with advertising media.

8.   (a)   The Seller hereby reserves the right to
utilize and/or dispose of all rights and/or interests not here-
in specifically granted, including but not limited to, publi-
cation rights in THE TRILOGY and in THE HOBBIT (subject to the
limited publication rights granted to Purchaser pursuant to
Paragraph 2 hereof), radio rights in THE TWO TOWERS and in THE
HOBBIT (subject to the limited radio rights granted to Purchaser
pursuant to Paragraph 2 hereof) and all live television rights
in THE TWO TOWERS and THE HOBBIT (subject to the limited tele-
vision rights granted to Purchaser pursuant to Paragraph 2 here-
of and to the option granted to Purchaser pursuant to the pro-
visions of subparagraph (c) hereof) in and to and in connection
with the Work.

i) "Live television rights" as herein used shall be deemed to include the right to televise direct from living actors only, an adaptation of THE HOBBIT or THE TRILOGY as a single, complete program ( as distinguished from episodes in a television series, as that term is hereafter defined); as well as a re-telecast of a live telecast by kinescope, tape, wire or other mechanical or electronic device or method now or hereafter known, provided that such reproduction shall be telecast only during the sixty-day period following the live telecast, shall be telecast only once and only in television markets in which original live telecast did not occur and further provided that all such reproductions shall be destroyed or erased no later than two business days after said 60-day period, except for two library and audition copies which may not otherwise be used.

ii)   Live television rights shall not include the right to transmit or telecast the Work or THE TRILOGY or any adaptation or part thereof for exhibition or reproduction at any theatre, auditorium or other place of public assembly away from where the program is projected or performed by television or otherwise; and does not include the right to exhibit or reproduce the Work or any adaptation thereof or to transmit the same to or in connection with "subscription", "toll", or "pay" television, or by what other name the method or system may be described under which a consideration is paid or given for the right to view the program, whether at home or elsewhere.

b)  Anything herein to the contrary notwith-

-17-

standing, and subject to the provisions of Paragraph (c) hereof, Seller agrees not to exercise or authorize others (except the Purchaser, as provided in Paragraph 2 hereof) to exercise the reserved radio and live television rights until seven (7) years after the first general release date in the United States of America, of the first motion picture photoplay to be hereafter made based on the Work or THE TRILOGY pursuant hereto or to the contemporaneous agreement referred to herein, or upon the expiration of Purchaser's rights without having commenced principal photography of a feature length motion picture based upon the Work, whichever of said two periods of time shall first expire.

Anything in this Paragraph 8 to the contrary notwithstanding, Seller shall have the exclusive right, in the United Kingdom, and each party shall have the non-exclusive right elsewhere in the world, without restriction, to license readings of the actual text of the Work (not dramatized) on sound radio.

(c)  At any time after the expiration of the periods set forth in subparagraph (b) hereof, that the Seller desires to sell, license or otherwise dispose of the reserved radio and live television rights, Seller shall give Purchaser at least 20 days prior written notice of the terms and con-

-18-

HS:k:X
5:27:69

ditions of any proposed sale, license or other dis-
position.  Seller shall, at the expiration of such
20-day period, have the right to sell, license or
otherwise dispose of such rights to any person, firm
or corporation upon the terms and conditions set
forth in such notice, unless Purchaser shall have,
within such 20-day period, accepted the offer as
made by the Seller.  The notice of acceptance by the
Purchaser shall constitute the offer as the binding
contract between the parties.

-18 a-

If Seller shall not have sold, licensed or otherwise disposed of the rights upon the terms and conditions of the offer aforesaid within one year from the giving of notice to the Purchaser, then the procedure hereinabove outlined shall again be and become effective and Seller shall not sell, license or otherwise dispose of such rights unless Seller shall thereafter make the offer as above set forth.

         d)  Nothing in this paragraph 8 is intended to limit, restrict or diminish Purchaser's television rights as set forth in paragraph 2 hereof.

         9.  A.  Seller and Author heretofore by agreement dated April 2, 1962, as amended by agreement bearing the same date, with William L. Snyder, doing business as Rembrandt Films, (which agreement as so amended is hereinafter referred to as the "Snyder Agreement") sold and granted certain motion picture rights in THE HOBBIT, and certain other rights. The Snyder Agreement has, by mesne assignments, been assigned to the Purchaser.  All warranties and representations in this agreement by Seller are subject to the provisions of the Snyder Agreement, and Purchaser specifically accepts this agreement subject to the provisions of the Snyder Agreement.  Nothing in the Snyder Agreement, however, shall be construed or is intended to prohibit or restrict the Purchaser in the full exercise of all rights granted to Purchaser under this agreement.  Seller acknowledges that there are no defaults under or breaches of the Snyder Agreement by Snyder or his assigns.

-19-

B.   Anything in this agreement to the contrary notwithstanding, the rights herein granted in THE HOBBIT may not be used in a motion picture to be produced based on THE TRILOGY except in an expository fashion of no more than one reel or apporximately twenty (20) minutes in the aggregate.

C.   Should Purchaser elect to produce a separate feature length motion picture based on THE HOBBIT, it shall give the Seller notice of such intention, and shall make the payments to Seller as are set forth on Schedule B attached hereto and made a part hereof.

10.   The Seller hereby grants to the Purchaser the option to acquire television series rights in and to the Work.   Such option may be exercised by the Purchaser at any time within five (5) years after the first general release of the last motion picture photoplay based upon the Work or THE TRILOGY.   A picture shall be deemed to be the "last motion picture photoplay based upon the Work or THE TRILOGY" if principal photography has not commenced on a subsequent motion picture photoplay within three years from the first general release of the previous motion picture photoplay based upon the Work or THE TRILOGY.   "Television series rights" shall be deemed to mean the sole and exclusive right to use a character or characters, characterizations, names of characters, settings, locations, themes, or other material suggested by or derived from the Work and the titles thereof in different stories, in separate episodes and/or in serial type television programs.

-20-

Should the Purchaser exercise such option as aforesaid, then the Purchaser shall pay to the Seller the sum of $3,250.00 against the following sums:

Two hundred fifty Dollars ($250.00) for each one-half hour episode; and

Three hundred thirty three and 33/100 Dollars ($333.33) for each one (1) hour episode; and

Five hundred Dollars ($500.00) for each episode one and one-half (1-1/2) hours or longer.

The said sum of $3,250.00 shall apply against the first payment due under the per episode payments. From and after the time when additional sums are payable, such sums shall be paid at or before the commencement of principal photogrpahy of each episode.

In addition to the foregoing sums, the Seller shall be entitled to receive, and the Purchaser shall pay 25% of the original payment for each of the first four (4) re-runs of each such television episode, the fourth of such re-run payments to constitute full and final payment for all subsequent re-run rights without limitation.

Nothing in this Paragraph 10 contained shall constitute a requirement on the part of the Purchaser to produce or distribute any television series or episodes, whether or not the option shall have been exercised.

11. Seller makes the same warranties and representations and grants the same rights with respect to the television series as Seller makes with respect to the motion picture rights, as in this agreement set forth, and agrees to execute

-21-

and deliver to Purchaser such other and further instruments as
may reasonably be required to effectuate the purposes of
Paragraph 10.

12. In reliance on the warranties and repre-
sentations herein contained, and in consideration for all
rights herein granted and agreed to be granted, and for all
undertakings herein made on the part of the Seller, the Purchaser
agrees to pay to the Seller the total of the following sums:

(a) The sum of Eighty Three Thousand Three
Hundred Thirty Three and 33/100 Dollars
($83,333.33) as follows:

(i) Thirty Three Thousand Three Hundred
Thirty Three and 33/100 ($33,333.33)
on signing of this agreement;

(ii) Twelve Thousand Five Hundred Dollars
($12,500.00) one (1) year from the
date hereof; and

(iii) a like amount in each of the next
succeeding three (3) years.

(b) With respect to each feature length motion
picture photoplay based on the Work or THE TRILOGY, a sum equal
to two and one-half (2-1/2%) percent of the Gross Receipts of
said photoplay (hereinafter called "Seller's Gross Receipts
Participation") after the artificial payment level is reached.
SCHEDULE C attached hereto and made a part hereof sets forth the
definition of Gross Receipts of the photoplay and the artificial
payment level and the time and method of payment of Seller's
Gross Receipts Participation.

(c) A percentage of the author's royalty with
respect to each legitimate stage presentation, such percentage
to be negotiated by the parties in good faith, but not less than

-22-

HS:sk:X
5:27:69

thirteen and one-third percent (13-1/3%) of the total author's
royalty payable on a dramatic production, and not less than
one-third of one percent (1/3 of 1%) of the Gross Receipts of
a musical and/or dramatico-musical production, subject, how-
ever, to the provisions of sub-paragraph c) of SCHEDULE B
hereof.  Should the parties be unable to agree on the author's
royalty under this sub-paragraph, the dispute between them
shall be submitted for arbitration to and in accordance with
the then applicable rules and regulations of the American
Arbitration Association in the City of New York.

> (d)  One-ninth (1/9) of the gross income
from merchandising of products based on the Work or THE TRILOGY.
At Purchaser's request, Seller will execute and deliver an
agreement substantially in the form attached hereto and made
a part hereof as SCHEDULE D with Purchaser's designee.

> 13.  The rights granted in this agreement to
the Purchaser with respect to the Work and THE TRILOGY, in-
clude the right to make an unlimited number of "remakes"
and "sequels" of said motion picture photoplay, as said
terms are commonly understood in the motion picture industry.
Nothing contained in this agreement shall be construed to
require the Purchaser to make any remakes or sequels or
any photoplay or photoplays whatsoever.  Irespective of
whether or not the Purchaser shall make any remakes or
sequels hereunder, it is expressly understood and agreed
that the television series rights granted in this agreement
to the Purchaser shall belong exclusively, uncondi-

-23-

HS:sk:X
5:27:69

tionally and forever to the Purchaser, subject to the provi-
sions of Paragraph 10 hereof.  Anything herein to the contrary
notwithstanding, however, and subject to the provisions of sub-
paragraph d) of SCHEDULE B, in the event that Purchaser shall
cause a sequel or remake of the picture to be produced, it
shall, at or prior to the commencement of principal photogra-
phy of each such sequel or remake, pay to the Seller the sum
of Twenty Thousand Eight Hundred Thirty-Three and 33/100
($20,833.33) Dollars and, in addition, seller shall be entitled
to the other payments provided for in paragraph 12 (b), (c)
and (d) hereof.

    14.  The Seller reserves the right to authorize
and license others to write and publish sequels (as that term
is hereinafter defined) subject to the terms and conditions
contained in this Paragraph 14.  The term "sequel" shall be
construed to mean a play, novel, short story, novella, or
other literary work, written or published subsequent to the
date of this agreement, containing any character or characters
who have been portrayed in the Work, and in which sequel they
are portrayed or participate in similar or different incidents,
situations, settings and events to or from those in the Work.
Seller agrees that it will not sell, license or otherwise
dispose of any of the right to such sequel as have been
granted to the Purchaser hereunder with respect to the Work,
unless Seller shall have given to the Purchaser the option,
on forty-five (45) days prior written notice, to acquire

-24-

such rights upon the terms and conditions (which shall
be set forth at length in such notice) of any bona fide
offer received by the Seller for such rights.   Should
the Purchaser fail or neglect to exercise such option
within such forty-five (45) day period, then the Seller
may sell, license or otherwise dispose of such rights to
any other party within eighteen (18) months from the giv-
ing of notice to the Purchaser as aforesaid, upon the terms
and conditions of such bona fide offer.

In the event that Seller does not consummate
the sale, license or other disposition of such rights within
such eighteen (18) months period, then Seller shall not there-
after sell, license or otherwise dispose of such rights
without giving the Purchaser a new forty-five (45) day
option upon such notice and upon the same terms and condi-
tions as set forth in this Paragraph 14.

Should Purchaser not acquire such rights to such
sequel, then Seller covenants and agrees that any agreement
with any third party purchaser of such rights shall prohibit
the exercise of any of such rights (including without limita-
tion the release of any feature length motion picture, the pro-
duction of any play, or the exercise of any radio or television
rights) for a period of no less than eighteen (18) months fol-

25

lowing the first general release of the first feature length
motion picture based on the Work, in each territory of the world
or the expiration of Purchaser's rights hereunder, whichever
shall first occur; and in no event shall the Seller make any
grant of any television rights whatsoever (live television
or television series or otherwise) in said sequel except the
right to televise the feature length motion picture photoplay
based upon such sequel and except the right to advertise such
motion picture by live, motion picture and other forms  of
television, limited to the extent of Purchaser's limitation
as contained in Paragraph 2 hereof.

Should Seller authorize or license any other person
to write or publish sequels as in this Paragraph 14 provided,
then as a condition of such authorization or license, the Seller
shall require an agreement in writing by the grantee or licensee
to be bound by all of the terms, covenants and provisions of
this Paragraph 14 with the same force and effect as if such
grantee or licensee were the Seller named herein, such agreement
specifically to recite that it is intended, among other things,
for the benefit of the Purchaser and may be enforced by the
Purchaser, and the Seller as a condition for the exercise of
its rights hereunder agrees that forthwith after the execution
of such grant or license, Seller will deliver to the Purchaser
an executed counterpart of such agreement by such grantee or
licensee.

15.  In the event that Purchaser shall have exercised

26

its television series rights, then anything hereinabove to the contrary notwithstanding, the Seller shall not exercise or suffer or permit any other person, firm or corporation to exercise its reserved live television and/or radio rights at any time prior to three (3) years from the final network telecast of the last television episode of any series produced hereunder, or the restrictive periods set forth in Paragraphs 8. b) and c), which-ever shall be latest.  Anthing herein to the contrary notwith-standing, the Seller shall have the exclusive right in the United Kingdom, and each party shall have the non-exclusive right elsewhere in the world, without restriction, to house readings of the actual text of the Work (not dramatized) on sound radio.

16.  The Seller hereby grants the Purchaser the right to use the name and likeness of the Author for the purpose of advertising, exploiting and publicizing the rights herein granted, provided, however, that Purchaser shall not cause or authorize any endorsement of any commercial product or service to be attributed to Author without Author's prior written consent.

17.  Anything in Paragraph 23 to the contrary not-withstanding, if principal photography of a feature length motion picture based on THE TRILOGY is not commenced within fifteen (15) years, then all rights herein granted shall automatically revert to the Seller, without further act or notice to the Purchaser, provided, however, that Purchaser shall have the right to extend

-27-

such 15-year period for an additional five (5) years upon payment
to Purchaser of an additional sum of Sixteen Thousand Six Hundred
Sixty-Six and 67/100 Dollars ($16,666.67) on or before the
expiration of such 15-year period.

In the event that the Work shall have reverted
to the Seller as hereinabove provided, then Seller agrees that it
will not sell, license or otherwise dispose of any of the rights
to the Work and/or THE TRILOGY herein granted, unless Seller
shall have given to the Purchaser the option on thirty (30) days
prior written notice to re-acquire such rights upon the terms
and conditions (which shall be set forth at length in such notice)
of any bona fide offer received by the Seller for such rights.
Should the Purchaser fail or neglect to exercise such option
within such 30-day period, then the Seller may sell, license or
otherwise dispose of such rights to any other party within one
(1) year from the giving of notice to the Purchaser as aforesaid,
upon the terms and conditions of such bona fide offer.

In the event that Seller does not consummate
the sale, license or other disposition of such right within such
one-year period, then Seller shall not thereafter sell, license
or otherwise dispose of such rights without giving the Purchaser
a new thirty (30) days option upon such notice and upon the same
terms and conditions as set forth in this Paragraph 17.

18.   Any notices, statements and other documents
or writings required or desired to be given hereunder shall be

-28-

in writing and shall be addressed to the Purchaser at:

> United Artists Corporation
> 729 Seventh Avenue
> New York, New York 10036

with a copy to:

> Katzka Berne Productions, Inc.
> c/o Herbert Schrank, Esq.
> 122 East 42nd Street
> New York, New York 10017

and to Seller at:

> George Allen & Unwin Ltd.
> Ruskin House
> 40 Museum Street
> London W.C.1, England

with copies to:

> Saul S. Meyers, Esq.
> 30 Broad Street
> New York, New York 10004

and

> H. N. Swanson, Inc. Agency
> 8523 Sunset Boulevard
> Los Angeles, California 90069

or to such other address or addresses as the Seller or Purchaser
may hereafter designate in writing, and shall be sufficiently
given by telegraphing or by mailing the same in a postpaid
wrapper addressed to the other party as aforesaid, and the date
of such delivery, telegraphing or mailing shall be the date of
the giving of such notice.

19.  All payments due to Seller shall be made
payable to George Allen & Unwin, Ltd., or as otherwise directed

-29-

HS:sk:X
5:27:69

by Seller, by written notice sent as herein set forth, and
actually received by Purchaser.  Purchaser shall not be re-
quired to make payments to more than three (3) designees.

20.  Nothing herein or elsewhere contained shall
obligate the Purchaser to produce at any time any motion pic-
ture based upon the Work, and the Seller shall have no cause
of action or claim against the Purchaser for damages based
upon a claim that the Purchaser did not at any time produce
any such motion picture.

21.  Purchaser may freely sell, assign or transfer
any and all of its right hereunder and may license the use
thereof or dispose of or deal in or with this agreement and
of the rights of Purchaser therein, provided that any vendee,
transferee or assignee shall assume all of Purchaser's obliga-
tions hereunder, and a copy of the assignment and assumption
are thereafter delivered to the Seller.  Purchaser shall not
be relieved of its obligations hereunder unless such sale,
transfer or assignment be to Metro-Goldwyn-Mayer, Inc.,
Columbia Pictures Corp., 20th Century-Fox Film Corp., Para-
mount Pictures Corp., Universal Pictures or National General
Corp., or any other motion picture distributor who at the time
of such assignment is generally considered in the industry as
a major distributor at least equal to the specific motion pic-
ture distributors herein referred to.

-30-

HS:sk:X
5:27:69

    22.  This agreement shall be binding upon and inure to the benefit of the parties and their heirs, executors, administrators, legal representatives, distributees, next-of-kin, successors and permitted assigns.

    23.  The rights herein granted to the Purchaser shall vest in Purchaser absolutely and shall not, except as otherwise provided in Paragraph 17 hereof, revert to the Seller, or be subject to termination or revocation notwithstanding the breach of any provisions hereof other than the breach of the provisions of Paragraph (a) of Paragraph 12 hereof, and other than the breach of any other requirement for the payment of any sums of money provided that there shall have been a final determination of such breach by a court of competent jurisdiction.

    24.  This agreement contains the complete understanding of the parties with respect to the within subject matter, supersedes any and all other agreements pertaining thereto whether written or oral, and may not be altered, modified, amended or terminated, except by an instrument in writing signed by the Seller and the Purchaser. Wherever the masculine gender is used, it shall be deemed to refer to the feminine or neuter as well, as the sense of this agreement requires, and wherever the singular is

-31-

HS:sk:X
5:27:69

used, it shall be deemed to refer to the plural as well,
as the sense of this agreement requires.

     25.  This agreement has been made in, and shall
be governed by and construed in accordance with the laws
of the State of New York.

     IN WITNESS WHEREOF, the parties hereto have caused
this agreement to be duly executed as of the day and year
first above written.

                         UNITED ARTISTS CORPORATION

                         By:

The Common Seal of GEORGE ALLEN & UNWIN, LTD. was
hereunto affixed in the presence of

                         By:

                                DIRECTOR

                                SECRETARY.

-32-

:27:69

<u>SCHEDULE A</u>

AGREEMENTS AFFECTING THE WORKS ENTERED
INTO BETWEEN GEORGE ALLEN & UNWIN, LTD.
AND INDICATED PERSONS

## With Respect to "THE LORD OF THE RINGS"

Agreement dated November 26, 1952, with J. R.R. Tolkien.

Agreement dated January 16, 1956 with Uitgeverij Het Spectrum N.V.

Agreement dated March 7, 1967 with Case Editrice Astrolabio-
Ubaldini Editore.

Agreement dated October 14, 1966 with Ernst Klett Verlag.

Agreement dated September 16, 1954 with The Houghton Mifflin
Company.

Agreement dated October 31, 1966 with Almqvist & Wiksell/
Gebers Forlag.

Agreement dated September 28, 1960 with Compania Genera
Fabril Editora.

Agreement dated May 17, 1967 with Hyoron Sha Limited.

Agreement dated February 27, 1967 with Donald Swann.

Agreement dated May 10, 1967 with Caedmon Records.

Agreement dated November 7, 1966 with Gyldendalske Boghandel-
Nordisk Forlag A/S.

## With Respect to "THE TWO TOWERS"

Agreement dated January 16, 1961 with Zpodzielnia Wydawnicza
Czytelnik.

Agreement dated January 21, 1960 with Almqvist & Wiksell/
Gabers Forlag Aktiebolag.

:27:69

SCHEDULE A  (Cont.)

With Respect to "THE HOBBIT"

   Agreement dated December 2, 1936 with J. R.R. Tolkien.

   Agreement dated May 21, 1937 with The Houghton Mifflin Company.

   Agreement dated March 3, 1961 with Penguin Books Limited.

   Agreement dated August 24, 1965 with Longmans Green and
   Company Limited.

   Agreement dated November 20, 1967 with The Dramatic Publish-
   ing Company.

   Agreement dated January 31, 1968 with Gyldendal.

   Agreement dated January 5, 1959 with Uitgeverij Het Spectrum N.V.

   Agreement dated October 4, 1967 with Editions Stock.

   Agreement dated March 12, 1959 with M. Newman Publishing Co., Ltd.

   Agreement dated July 5, 1956 with Messrs. Paulus Verlag.

   Agreement dated September 3, 1965 with Iwanami Shoten.

   Agreement dated December 18, 1958 with Panstwowe Wydawnictwo
   Iskry.

   Agreement dated June 22, 1961 with Americo Fraga Lamares & C.A.

   Agreement dated January 10, 1961 with Compania General Fabril
   Editora.

   Agreement dated February 11, 1960 with AB Raben & Sjogren/
   Bokforlag.

   Agreement dated January 3, 1947 with Kooperative Forbundet.

   Agreement dated April 2, 1962 between George Allen & Unwin, Ltd.
   and John Ronald Reuel Tolkien and William L. Snyder doing
   business as Rembrandt Films.

HS:sk:X
5:27:69

## SCHEDULE B

PAYMENTS WITH RESPECT TO "THE HOBBIT"
AS SET FORTH IN PARAGRAPH 9 C.

a)  The sum of One Hundred Twenty Five Thousand
($125,000.00) Dollars to be paid within ten (10) days
after the commencement of principal photography of a
separate feature length motion picture based on "THE HOBBIT".

b)  A sum equal to Seven and one-half per cent
(7-1/2%) of the Gross Receipts of the said feature length
motion picture (hereinafter called "Seller's Gross Receipts
Participation") after the artificial payment level is reached.

The definition of "Gross Receipts" and the
artificial payment level and the time and method of payment
of Seller's Gross Receipts Partizipation shall be as defined
in SCHEDULE C.

c)  A percentage of the Author's royalty with
respect to each legitimate stage presentation, such percentage
to be negotiated by the parties in good faith, but not less than
forty percent (40%) of the total Author's royalty payable on a
dramatic production, and not less than one per cent (1%) of the
Gross Receipts of a musical and/or dramatico-musical production.
Should the parties be unable to agree on the Author's royalty
under this sub-paragraph, the dispute between them shall be
submitted for arbitration to and in accordance with the then
applicable rules and regulations of the American Arbitration
Association in the City of New York.

SCHEDULE B (Cont.)

d)  In the event that Purchaser shall cause a
sequel or remake of a separate feature length motion picture
based on "THE HOBBIT", should such separate feature length
motion picture have been produced pursuant to the provisions
of sub-Paragraph 9 C, Purchaser shall at or prior to the
commencement of principal photography of each such sequel
or remake, pay to the Seller the sum of Sixty Two Thousand
Five Hundred Dollars ($62,500.00) and, in addition, Seller
shall be entitled to the other payments provided for in this
agreement (other than the payment provided for in sub-Para-
graph a) of this SCHEDULE B.)

e)  Purchaser shall give Seller and Sassoon Trustee
and Executor Corporation Ltd. noticeof whether Purchaser
deems payment with respect to any legitimate stage presentation
or sequel or remake to be appropriately payable under Paragraph
12 C and Paragraph 13, or under sub-Paragraphs c) and d) of
this SCHEDULE B.  Unless within thirty (30) days after such
notice, either of such parties shall notify Purchaser that
it disputes Purchaser's determination, Purchaser shall make pay-
ments as Purchaser has indicated.  Should such notice of dispute
be given to Purchaser, Purchaser shall make no payment until, and
then and in accordance with, joint notification of Seller and
Sassoon Trustee and Executor Corporation Ltd., or service
upon Purchaser of a certified or exemplified copy of a final
judgment, order or decree of a court of competent jurisdiction
in a suit, action or proceeding in which Seller and Sassoon
Trustee and Executor Corporation Ltd. were parties.

SCHEDULE C

For purposes of this Agreement, the term "artificial payment level" shall mean the level at which the Gross Receipts of the photoplay (as that term is hereinafter defined) equal 2.6 times the final cost of production of the photoplay (except that if the photoplay shall have been produced in black and white, and not in color, then 2.4 times the final cost of production of the photoplay), plus (i) all interest on pre-production, production and completion loans and advances in connection with the photoplay at the then prevailing rate generally charged by banks and/or comparable lending institutions on loans caused to be made by the distributor of the photoplay in the country in which such loans are made and (ii) all worldwide advertising costs for the photoplay in excess of fifteen (15%) per cent of the approved final cash production budget of the photoplay (iii) all sums payable to W. L. Snyder for his rights in and to the motion picture produced by him entitled "THE HOBBIT", (iv) all gross receipts payments payable to third parties prior to reaching the artificial payment level except those gross receipts payments which are in lieu of cash compensation, as more fully described in paragraph 3 of this Schedule C.

Because of continually changing factors, such as additional worldwide advertising costs, it is specifically understood and agreed that the artificial payment level should be recomputed at the end of each accounting period in order to determine if and to the extent that Seller's Gross Receipts Participation may be payable in such accounting period. Notwithstanding that the artificial payment level may be recomputed from time to time, as herein pro-

vided, any moneys theretofore paid to Seller based on the prior computation of artificial payment level may be retained by Seller as a non-returnable advance.

For purposes of determining the artificial payment level in any accounting period and the amount of Seller's Gross Receipts Participation, if any, payable in any accounting period, the term "Gross Receipts of the photoplay" shall be defined as follows:

1.  The term "total gross receipts" as used herein shall be deemed to mean all moneys derived by the distributor of the photoplay (hereinafter called the "Distributor") and its subsidiaries from the lease, license, rental, dealing in and distribution of the photoplay in all gauges and in all versions, including moneys received from reissues of the photoplay (but excluding any moneys derived from the exploitation of merchandising rights and the sale, licensing or other exploitation of souvenir programs or souvenir books and phonograph records or tapes) and by reason of the infringement or interference by third persons of or with the photoplay, or any part thereof; and all moneys received by Distributor from the sale, licensing or other distribution in the United States of trailers in connection with the photoplay.

Total gross receipts shall include the aggregate of the following, to wit:  The "domestic theatrical gross receipts", the "foreign theatrical gross receipts", and the "incidental gross receipts", as hereinafter defined.

(a)  The term "domestic theatrical gross receipts" shall mean all moneys (after deducting all costs and expenses incurred in the collection of same, including reasonable attorneys' fees), actually received as

-2-

film rental from the parties exhibiting the photo-
play in the United States of America in the theatric-
al field either paid directly to Distributor or to
a subsidiary of Distributor and after giving effect
to any adjustments with exhibitors for rebates,
credits, allowances or refunds.  There shall also
be included in the term "domestic theatrical gross
receipts" the net sums received or derived by Dis-
tributor from the trailer distribution in the United
States.  Receipts from rentals, leases or licenses
to United States Army, Navy, Air Force and other
military or Armed Service installations, the American
Red Cross, and American veterans' hospitals or facil-
ities for shut-ins wherever situated throughout the
world shall also be deemed a part of and included in
the domestic theatrical gross receipts, whether in
35 mm or in sub-standard gauges.

(b)  The term "foreign theatrical gross receipts"
shall mean the aggregate of (i) all monies (after
deducting all costs and expenses incurred in the
collection of same, including reasonable attorneys'
fees) actually received by Distributor as film rental
from the parties exhibiting the photoplay in the
theatrical and non-theatrical fields in any foreign
countries in the licensed territory where Distributor
or its subsidiaries distribute directly to exhibitors,
after giving effect to any adjustment with exhibitors

-3-

for rebates, credits, allowances or refunds; and
(ii) all monies (after deducting all costs and
expenses incurred in the collection of same, including reasonabl
attorneys' fees), actually received by Distributor's
subdistributors or licensees in any foreign countries
in the licensed territory where Distributor distributes
through subdistributors or licensees on a percentage
basis, after giving effect to any adjustment with
exhibitors for rebates, credits, allowances or re-
funds; and (iii) the net amounts received by Distributor
from the distribution of the photoplay in the theatrical
and non-theatrical fields in foreign territories where
Distributor licenses the distribution of the photoplay
upon a flat or outright basis after deducting all
costs and expenses incurred in the collection of same,
including reasonable attorneys' fees, provided, however,
that Distributor shall make no outright sales in the
United States, Canada and England; and (iv) with respect
to exhibitions on ships at sea, flying the flag of any
foreign country or at United States civilian overseas
bases, or construction camps in foreign territories,
the amounts received by Distributor from the shipping
companies, bookers, agencies or other parties through
whom Distributor services such ships and bases. Dis-
tributor shall exert its best efforts to cause all for-
eign theatrical gross receipts to be transmitted to

-4-

Distributor in the United States as quickly as possible.
Distributor shall not be required to remit to Seller
or for its account any portion of such foreign theatrical
gross receipts to which Seller or its assignees would
otherwise be entitled unless and until such portion of
such gross receipts have been transmitted to Distributor
in the United States in U. S. Dollars.  All trailer
rental received from the rental of trailers in foreign
territories shall be the sole property of Distributor
or its subsidiaries, affiliates, subdistributors or
licensees, and such parties shall not be required to
account to Seller therefor, nor shall Distributor
charge any expenses in connection with foreign trailers
to Seller or recoup the same from the receipts of the
photoplay.

(c)  The term "incidental gross receipts" shall mean
the aggregate of all moneys (after deducting all costs
and expenses in the collection of same,  including reasonable
attorneys' fees) actually received by Distributor in the
United States in U. S. Dollars from the licensing or
other disposition of any of the other rights in the
photoplay including but not limited to television
rights (but excluding any monies derived from the exploit-
ation of merchandising rights and the sale, licensing or
other exploitation of souvenir programs or souvenir books
and phonograph records or tapes).  There shall likewise
be included in said term all sums received by Purchaser
in the United States (after deducting all costs and

-5-

expenses in the collection of same, including reason-
able attorneys' fees) from any claims, suits or pro-
ceedings against third persons for infringements of
any rights owned or possessed by Distributor in the
photoplay including, but without limiting the generality
of the foregoing, copyright infringement actions, plag-
iarism actions, actions for the unauthorized use or
exhibition of the photoplay or any of the prints thereof.

(d)   Anything in subparagraphs (b) and (c) hereof to
the contrary notwithstanding, if by reason of a mora-
torium, embargo or banking or other restriction, Dis-
tributor finds it impracticable or impossible to have any
moneys derived from the photoplay in foreign countries
transmitted to New York City, New York, then, if Seller
shall so request in writing, within sixty (60) days
from the date that Seller is first notified in writing
by Distributor that the transmission of such moneys is
thus prevented, by embargo, moratorium, or banking or
other restriction, and is permitted by the laws of such
territory or country, Distributor shall deposit the share
of the Net Proceeds to which Seller would be entitled,
upon transmission to New York in Seller's name, in any
bank or other depository designated by Seller in such
territory or country.   Such deposit shall, for the pur-
pose hereof, be payment to Seller of the amount so deposited
(computed at the official rate of exchange) and neither

-6-

Distributor nor Producer shall have any further liability of any kind or nature in connection with the sums so deposited.

2.   "Gross Receipts of the photoplay" shall be the remainder after deducting from total gross receipts the following:

(a)   Trade Association Fees:  Any monies payable by Distributor to the M.P.A.A. or any successor to which Distributor may now or hereafter belong, or any trade associations in foreign countries to which Distributor may now or hereafter belong, on account of receipts or proceeds derived from the distribution of the photoplay.

(b)   Taxes: All sums required to be paid or payable by Distributor or any of its subsidiary, affiliated, allied, associate or related distributors as state, county, city or other taxes based upon the value of the photoplay, and all sums required to be paid or payable by Distributor or any of its subsidiary, affiliated, allied or associated or related distributors and Distributor's or their licensees, as imposts, taxes and like charges, however, denominated, imposted, assessed or levied by any government, or any duly constituted taxing authority, based upon or relating to the gross moneys derived on account of or from the distribution or exhibition of the photoplay in any country, subdivision thereof, or territory or upon the portion thereof payable to Distributor, whether such taxes are denominated as turnover taxes, sales taxes, gross business taxes or by any other denomination.  Nothing herein contained, however, shall be deemed to mean that Seller

-7-

shall be obligated to pay or participate in any net
income, franchise, excess profits, corporation or other
similar tax, if such tax is computed upon the actual net
profits realized by Distributor, its subsidiary, affil-
iated, allied, associated or related distributors or
Distributor's or their licensees, and may be charged
against them.

(c) Checking Expenses:  The cost of checking percent-
age engagements of the photoplay.  If checking is under-
taken to ascertain the accuracy of the box office reports
submitted generally by a theatre or theatres without
reference to particular pictures, then the cost of such
checking in any territory in any year shall be allocated
against the gross receipts of the photoplay in the ratio of
the photoplay's gross receipts during that year in that
territory to the gross receipts of all motion pictures
distributed by Distributor in that territory during that
year.  In no event shall checking expenses chargeable
hereunder exceed one (1%) per cent of gross receipts of
photoplay.

(d) Industry Assessments:  Industry assessments, in-
cluding industry campaigns endorsed and supported by
all or substantially all the major companies in the in-
dustry, copyright protection dues, assessments for awards,
settlements, contributions, judgments, legal fees and
other costs incurred in connection with anti-trust pro-
ceedings (including lawsuits and arbitrations) of any
kind to which Distributor is a party.  Any such pay-

-8-

ments shall be allocated against the gross receipts
of the photoplay in the ratio of the photoplay's gross
receipts during the year concerned in the territory
concerned to the gross receipts of all motion pictures
distributed by Distributor in that territory during
that year.

(e)   Television Payments to Unions and Guilds:   All sums
payable to the Screen Actors Guild, Screen Directors
Guild, Writers Guild of America, American Federation of
Musicians, International Alliance of Theatrical Stage
Employees and any other unions or guilds in the motion
picture industry, or the members thereof, on account of
or resulting from the exhibition of the photoplay on
television, whether such sums are computed upon the gross
receipts of the photoplay, or any percentage thereof, the
salaries and/or other compensation payable to the individual
members of such unions or guilds or on any other basis.

3.   For purposes of computing the artificial payment level,
the final cost of production of the photoplay shall include the follow-
ing costs:   the aggregate of all costs, charges and expenses paid or
incurred in connection with the preparation, production, completion
and delivery of the photoplay, calculated in accordance with custom-
ary motion picture accounting practices, and shall include, without
limiting the generality of the foregoing, all cash sums payable to
Seller hereunder, items of cost the payment of which may be fixed
or guaranteed but deferred in point of time of payment, deferred
costs (including salary and/or other compensation) of whatever

-9-

kind and however computed payable out of the receipts of the photoplay, charges for stage space and studio facilities, producer fees, legal fees, accounting charges, insurance premiums, and the cost of all materials, services, facilities, taxes (other than income, franchise and like taxes) and royalties attributable to the photoplay, and any payments to third parties of a percentage or percentages of the gross receipts of the photoplay prior to the reaching of the artificial payment level which are made in lieu of cash compensation and which do not exceed the then going rate of compensation of the party concerned (example: if an actor or other party receives ten (10%) per cent of the gross receipts from the first dollar thereof until he receives $400,000 or, if an actor or other party receives a cash advance plus ten (10%) per cent of the gross receipts which in the aggregate equal $400,000, these payments would be considered part of the final cost of production of the photoplay and, therefore, multiplied 2.6 times if Producer could reasonably establish that the amount so paid represented his then going rate of compensation; it being agreed that any excess gross payments up to and including the artificial payment level would be added to the artificial payment level formula singularly as provided in subsection (iv) of the first full paragraph of this Schedule C.)

Seller acknowledges and agrees that neither Purchaser nor Distributor makes any representation, warranty, guaranty or agreement as to the gross receipts to be derived from the photoplay or the distribution or exhibition thereof, nor do Purchaser

-10-

or Distributor guarantee the performance by an exhibitor of any contract for the exhibition of the photoplay.

4. With respect to domestic theatrical and incidental gross receipts, Distributor shall furnish to Seller during the first thirty-six (36) months from and after the first release of the photoplay, a settlement statement showing billings or collections, as the case may be, for each preceding four (4) or five (5) week period, (but at least three (3) such statements in each thirteen (13) week period). With respect to foreign theatrical and incidental gross receipts, during said first thirty-six (36) months, Distributor shall furnish Seller with quarterly settlement statements from and after the first release of the photoplay showing billings or collections for each preceding three (3) month period. After the first thirty-six (36) months all statements shall be furnished semi-annually relating to the preceding semi-annual period. Distributor shall not be required to furnish any settlement statements for any period in which there are no receipts or expenses; nor in the case of foreign receipts, shall Distributor be required to report where Distributor has not received any information with respect to the foreign receipts. The said statements may be on a billings or on a collection basis, and Distributor shall have the right to change the method from time to time, but each statement shall specify whether it is on a billings or on a collection basis. In the event that the said statements shall be made on a billings basis, Distributor shall have the right in subsequent statements to make adjustments for un-collected bills. Each such statement shall include a statement in

-11-

reasonable detail of the items of expense charged against or deducted from the gross receipts of the photoplay as provided in this agreement. Distributor shall accompany each such statement with a remittance to Seller, as herein provided, of such sums as may be due to Seller under the terms of this agreement as indicated by such statement. Any statement submitted to Seller by Distributor shall be deemed conclusively true and accurate if not disputed in writing within eighteen (18) months after such statement shall have been delivered to Seller.

SCHEDULE D

AGREEMENT made as of this        day of              19  ,

by and between:

GEORGE ALLEN & UNWIN, LTD., Ruskin House, 40 Museum

Street, London, W.C. 1, England, (hereinafter called "Licensor")

and

(hereinafter called "Licensee"):

W I T N E S S E T H  :

Licensor has certain rights to the valuable name,

character, symbol, design, likeness and visual representation

of all characters, places, objects and events referred to in

the literary work entitled "THE LORD OF THE RINGS", consisting

of three separate works entitled: "THE FELLOWSHIP OF THE RING",

"THE TWO TOWERS" and "THE RETURN OF THE RING", sometimes herein

referred to as THE TRILOGY (which name, character, symbol, de-

sign, likeness and visual representation and/or each of the

individual components thereof shall hereinafter be called the

"Name").  Licensor has the sole and unencumbered ownership of

the right to reproduce THE TRILOGY and the literary work en-

titled THE HOBBIT in material legible form throughout the world

subject to certain prior grants, and has sole and unencumbered

ownership of all   motion picture and other rights in THE TWO

TOWERS and THE HOBBIT, subject to certain prior grants.

Licensor as or may apply for Trademark registration(s) of the Name and/or components thereof (all of which are hereinafter called the "Subject Mark(s)").

Licensee desires to utilize the Name and the Subject Mark(s) upon and in connection with the manufacture, sale and distribution of the articles hereinafter described.

Accordingly, the parties agree as follows:

1.  GRANT OF LICENSE:

A.  Articles:  Upon the terms and conditions hereinafter set forth, Licensor hereby grants to Licensee and Licensee hereby accepts the sole and exclusive right, license and privilege of utilizing the Name and Subject Mark(s) solely and only upon and in connection with the manufacture, sale and distribution of the following articles: any and all articles of tangible personal property, other than novels, paperbacks and other printed published matter with respect to THE TRILOGY and THE HOBBIT.  It is intended to except from this license the publication rights heretofore granted to various parties, and there are, therefore, excepted from this license the rights granted pursuant to the agreements set forth in EXHIBIT 1 attached hereto and made a part hereof.

B.  Territory:  The license hereby granted extends throughout the world.

C.  Term:  The term of this license shall be effective as of the date hereof and shall continue in perpetuity.

2.  TERMS OF PAYMENT:

A.  Rate:  Licensee agrees to pay to Licensor as royalty a sum equal to eleven and one-ninth (11-1/9%) per cent of gross income of Licensee derived from the licensed articles covered

-2-

hereunder.

The term "Gross Income" shall mean

i)  In the instance where Licenseesublicenses the manufacture, sale, distribution and exploitation of the articles, the net payments received by Licensee from its sub-licensees, after and subject only to the deduction of taxes applicable to such income, and the deduction of such direct merchandising expense as trade marking costs and fees, commissions to exploitation agents, obligatory royalties to performers (e.g., which may be payable if an actor's name or likeness is used in connection with a merchandising arrangement) and other similar direct merchandising expenses, but in no event subject to any deduction for internal or  other general overhead expenses of Licensee; and

ii)  In the instance where License itself, or through affiliated, associated or subsidiary companies, manufactures, sells, distributes and exploits such articles, the term "gross income" shall mean gross amounts received by Licensee (or such affiliated, associated or subsidiary companies) from the sale by it of such articles less discounts and returns for uncollect-ible accounts, and less all direct and indirect costs of manu-facture and sale.

B.  Periodic Statements:  Within one hundred twenty (120) days after the initial shipment of the articles covered by this agreement, and quarterly thereafter, Licensee shall furnish to Licensor accurate statements certified to be accurate by Licensee,

-3-

showing in reasonable detail the computation of gross

income.  Such statements need not be furnished to Licensor

if any of the articles have not been sold during the pre-

ceding calendar quarter.

      C.  Royalty Payments:  Payment of royalties shall

accompany the statements furnished as required above.  The

receipt or acceptance by Licensor of any of the statements

furnished pursuant to this agreement or of any royalties

paid hereunder (or the cashing of any royalty checks paid

hereunder) shall not preclude Licensor from questioning the

correctness thereof at any time (within one (1) year of the

delivery thereof but not thereafter), and in the event that

any inconsistencies or mistakes are discovered in such state-

ments or payments, they shall immediately be rectified and

the appropriate payments made by Licensee.

3.  LICENSOR'S TITLE AND PROTECTION OF LICENSOR'S RIGHTS:

      A.  Licensee agrees that it will not during the

term of this agreement, or thereafter, attack the title or any

rights of Licensor in and to the Name or Subject Mark or attack

the valdity of this license.  Licensor hereby indemnifies

Licensee and undertakes to hold it harmless against any claims

or suits arising solely out of the use by Licensee of the Name or

-4-

Subject Mark as authorized in this agreement, provided, further, that Licensor shall have the option to undertake and control the defense or settlement of any suit so brought.

B.   Licensor agrees to assist Licensee to the extent necessary in the procurement of any protection, statutory or otherwise, or to protect any of the Licensee's rights to the Name or Subject Mark and Licensee, if it so desires may commence or prosecute any claims or suits in its own name or in the name of Licensor or join Licensor as a party thereto.   Licensor shall notify Licensee in writing of any infringements or imitations by others of the Name or Subject Mark on articles similar to those covered by this agreement which may come to the Licensor's attention.

4.   INDEMNIFICATION BY LICENSEE:

Licensee hereby indemnifies Licensor and undertakes to defend Licensee and/or Licensor against and hold Licensor harmless from any claims, suits, loss and damage (including reasonable attorneys' fees) arising out of any allegedly unauthorized use of

-5-

any patent, process, idea, method or device by Licensee in connec-
tion with the articles covered by this agreement or any other
alleged action by Licensee and also from any claims, suits, loss
and damage (including reasonable attorneys' fees) arising out of
alleged defects in the articles.

5. LABELING:

    A. Licensee agrees as an essential condition hereof
that it will cause to appear on or within each article sold by
it under this license and on or within all packaging, advertising,
promotional or display material bearing the Name or Subject Mark,
the notice: " © Copyright 19   (and/or Trademarks of) Licensee --
All Rights Reserved" and any other notice reasonably required by
Licensor and, where such article or advertising, promotional or
display material bears a trademark or service mark, appropriate
statutory notice of registration or application for registration
thereof.

    B. Licensee shall register the Name and Subject Mark
as a copyright, trademark and/or service mark in the appropriate
class in the name of Licensee.

6. PROMOTIONAL MATERIAL:

    A. In all cases where Licensee desires artwork involving
articles which are the subject of this License to be executed, the
cost of such artwork and the time for the production thereof shall
be borne by Licensee. All artwork and designs involving the Name,
or any reproduction thereof, shall be and remain the property of

-6-

Licensee and Licensee shall be entitled to use the same and to license the use of the same by others.

B.  Licensee shall have the right, but shall not be under any obligation, to use the Name and/or the name of Licensor so as to give the Name, Licensee, Licensor and/or programs connected with the Name full and favorable prominence and publicity.  Licensee shall not be under any obligation whatsoever to continue to exhibit theatrically, or broadcast any radio or television program or use the Name or any person, character, symbol, design or likeness or visual representation thereof in any radio or television program or theatrical exhibition.

7.  DISTRIBUTION:

A.  Licensee agrees that during the term of this license it will, consistent with sound business practices, diligently offer or cause to be offered for dale and distribution to meet orders for such articles covered by this agreement as it, in its sole discretion, elects to manufacture or cause to be manufactured.

B.  In the event that Licensee itself, or through affiliated, associated or subsidiary companies, manufactures, sells, distributes and exploits such articles, and any sale is made at a special price to any of Licensee's subsidiaries or to any other person, firm or corporation related in any manner to Licensee or its officers, directors or major stockholders, there shall be a royalty paid on such sale based upon the price generally charged the trade by Licensee.

8.  RECORDS:

Licensee agrees to keep accurate books of account and records covering all transactions relating to the license

-7-

hereby granted, and Licensor and its duly authorized representa-
tives shall have the right at reasonable times to an examination
of said books of account and records and of all other documents
and material in the possession or under the control of the Licensee
with respect to the subject matter and terms of this agreement,
and shall have free and full access thereto for said purposes
and for the purpose of making extracts therefrom--but not more
than once in any one year.  All books of account and records shall
be kept available for at least two (2) years after the furnishing
of the statement with respect thereto.

9.  LICENSOR'S REMEDIES:

Licensor's sole remedy for a breach or alleged breach
by Licensee of its obligations hereunder shall be an action at law
for damages.  Under no circumstances shall the rights and licenses
hereunder be subject to revocation, termination or reversion.

10.  NOTICES:

All notices and statements to be given, and all pay-
ments to be made hereunder, shall be given or made at the respect-
ive addresses of the parties as set forth above unless notification
of a change of address is given in writing and the date of mailing
shall be deemed the date the notice or statement is given.

11.  NO JOINT VENTURE:

Nothing herein contained shall be construed to place
the parties in the relationship of partners or joint venturers,
and Licensor shall have no power to obligate or bind Licensor in
any  manner whatsoever.

-8-

12.   ASSIGNMENT OR SUBLICENSE BY LICENSEE:

   This agreement and all rights and duties hereunder may freely, without restriction, be assigned, sublicensed or otherwise dealt in or with by Licensee or by operation of law.

13.   SUBJECT MARK:

   It is understood and agreed that wherever the word "Name" is used herein, there shall be considered added to the printed form and to all of the provisions hereof the words "Subject Mark," it being the intention of the parties to protect the Subject Mark as well as the Name in all instances in which the Subject Mark is protectable.  Nothing herein contained shall be deemed an express or implied warranty on the part of the Licensee that its application for registration of the Trademark(s), Copyight(s) and Service Mark(s) will be granted and no liability shall attach to Licensee for any failure to secure registration of such Trademark(s), Copyright(s) or Service Mark(s).

14.   EXCLUSIVITY:

   The exclusivity granted hereunder shall apply to all of the articles in the Trademark, Copyright or Service Mark categories or classifications in which the licensed article may fall.

15.   NO WAIVER, ETC.:

   None of the terms of this agreement can be waived or modified except by an express agreement in writing signed by both parties.  There are no representations, promises, warranties, covenants or undertakings other than those contained in this

-9-

agreement, which represents the entire understanding of the parties. This agreement shall be deemed made in and shall be enforced in accordance with the internal laws of the State of New York.

IN WITNESS WHEREOF, the parties hereto have caused this instrument to be duly executed as of the day and year first above written.

GEORGE ALLEN & UNWIN, LTD., Licensor

By_____

_____
Licensee

By_____

EXHIBIT I

AGREEMENTS AFFECTING THE WORKS ENTERED
INTO BETWEEN GEORGE ALLEN & UNWIN, LTD.
AND INDICATED PERSONS

With Respect to "THE LORD OF THE RINGS"

Agreement dated November 26, 1952, with J. R.R. Tolkien.

Agreement dated January 16, 1956 with Uitgeverij Het Spectrum N.V.

Agreement dated March 7, 1967 with Case Editrice Astrolabio-
Ubaldini Editore.

Agreement dated October 14, 1966 with Ernst Klett Verlag.

Agreement dated September 16, 1954 with The Houghton Mifflin
Company.

Agreement dated October 31, 1966 with Almqvist & Wiksell/
Gebers Forlag.

Agreement dated September 28, 1960 with Compania Genera
Fabril Editora.

Agreement dated May 17, 1967 with Hyoron Sha Limited.

Agreement dated February 27, 1967 with Donald Swann.

Agreement dated May 10, 1967 with Caedmon Records.

Agreement dated November 7, 1966 with Gyldendalske Boghandel-
Nordisk Forlag A/S.

With Respect to "THE TWO TOWERS"

Agreement dated January 16, 1961 with Zpodzielnia Wydawnicza
Czytelnik.

Agreement dated January 21, 1960 with Almqvist & Wiksell/
Gabers Forlag Aktiebolag.

EXHIBIT I (Cont.)


With Respect to "FELLOWSHIP OF THE RING"

> Agreement dated September 5, 1956 with Almqvist & Wiksell/
> Gebers Forlag Aktiebolag.

> Agreement dated August 11, 1954 with Houghton Mifflin Company.

> Agreement dated July 8, 1958 with Spodzielnia Wydawnicza
> Czytelnik

With Respect to "RETURN OF THE KING"

> Agreement dated January 21, 1960 with Almqvist & Wiksell/
> Gebers Forlag Aktiebolag.

> Agreement dated November 21, 1961 with Spodzielnia
> Wydawnicza Czytelnik.

27:69

## EXHIBIT I   (Cont.)

With Respect to "THE HOBBIT"

Agreement dated December 2, 1936 with J. R.R. Tolkien.

Agreement dated May 21, 1937 with The Houghton Mifflin Company.

Agreement dated March 3, 1961 with Penguin Books Limited.

Agreement dated August 24, 1965 with Longmans Green and Company Limited.

Agreement dated November 20, 1967 with The Dramatic Publishing Company.

Agreement dated January 31, 1968 with Gyldendal.

Agreement dated January 5, 1959 with Uitgeverij Het Spectrum N.V.

Agreement dated October 4, 1967 with Editions Stock.

Agreement dated March 12, 1959 with M. Newman Publishing Co., Ltd.

Agreement dated July 5, 1956 with Messrs. Paulus Verlag.

Agreement dated September 3, 1965 with Iwanami Shoten.

Agreement dated December 18, 1958 with Panstwowe Wydawnictwo Iskry.

Agreement dated June 22, 1961 with Americo Fraga Lamares & C.A.

Agreement dated January 10, 1961 with Compania General Fabril Editora.

Agreement dated February 11, 1960 with AB Raben & Sjogren/ Bokforlag.

Agreement dated January 3, 1947 with Kooperative Forbundet.

Agreement dated April 2, 1962 between George Allen & Unwin, Ltd. and John Ronald Reuel Tolkien and William L. Snyder doing business as Rembrandt Films.