# EXHIBIT F

VI 3

AGREEMENT AND ASSIGNMENT

THIS AGREEMENT made as of December 2, 1976, by and between UNITED ARTISTS CORPORATION, a Delaware corporation with its principal office located in the City of New York, State of New York (hereinafter referred to as "SELLER") and THE SAUL ZAENTZ PRODUCTION COMPANY, a Delaware corporation with its principal office located in the City of Berkeley, State of California (hereinafter referred to as "PURCHASER"):

R E C I T A L S:

A.  SELLER has heretofore entered into the agreements (or has succeeded to the rights of the purchasers thereunder) described in Exhibit "A" attached hereto and by this reference made a part hereof (collectively the "AGREEMENTS") with respect to the trilogy entitled "THE LORD OF THE RINGS" (consisting of the works entitled "THE FELLOWSHIP OF THE RING", "THE TWO TOWERS" and "THE RETURN OF THE KING") and "THE HOBBIT", all of said works having been written by J. R. R. TOLKIEN, and a short unreleased animated motion picture film entitled "THE HOBBIT", produced by REMBRANDT FILMS (the "REMBRANDT" FILM), all of which are collectively herein referred to as the "PROPERTY"; and

B.  SELLER desires to sell to PURCHASER and PURCHASER desires to purchase from SELLER, upon the terms and conditions and for the considerations hereinbelow set forth, all of SELLER'S right, title and interest in and to the PROPERTY and under and pursuant to the AGREEMENTS; and

NGR :d--7/16/79- 1                -1-

C.  PURCHASER desires to produce and deliver to SELLER for distribution and SELLER desires to distribute one or more feature motion pictures to be based in whole or in part on the PROPERTY.

NOW, THEREFORE, THE PARTIES AGREE:

1.  SELLER has delivered to PURCHASER and PURCHASER is in possession of and is familiar with true copies of each and all of the AGREEMENTS listed in Exhibit "A" annexed hereto (herein the "AGREEMENTS").

2.  SELLER hereby represents and warrants to PURCHASER:

    (a) As of the date of this agreement, SELLER's rights in and to the PROPERTY and under the AGREEMENTS are not subject to any claim, interest, mortgage, hypothecation or other adverse right held by any third party, save and except for rights reserved under the AGREEMENTS;

    (b) SELLER's rights acquired under and pursuant to the AGREEMENTS are in full force and effect, and there has been no rescission, revocation, reversion or other termination of any of the rights acquired by SELLER thereunder;

    (c) SELLER has not committed any breach or default of any of the obligations it assumed under and pursuant to the AGREEMENTS or any of them, and SELLER has (or its predecessors in interest have) made the following payments:

        (i) The sum of FIFTY THOUSAND DOLLARS ($50,000) pursuant to Paragraph 7(a)

NGR:d---7/16/79---1

-2-

of the agreement described as Number 4 in Exhibit "A";

(ii) The sum of EIGHTY THREE THOUSAND, THREE HUNDRED THIRTY THREE DOLLARS and 33/100 ($83,333.33) due pursuant to Paragraph 12(a) of the Agreement described as Number 6 in Exhibit "A";

(iii) The sum of EIGHTY EIGHT THOUSAND, THREE HUNDRED THIRTY THREE DOLLARS and 34/100 ($88,333.34) due pursuant to Paragraph 11AI of the Agreement described as Number 7 in Exhibit "A"; and

(iv) The sum of SEVENTY EIGHT THOUSAND, THREE HUNDRED THIRTY THREE DOLLARS and 33/100 ($78,333.33) due pursuant to Paragraph 11AII of the Agreement described as Number 7 in Exhibit "A".

(d) SELLER has done and suffered no action or event the result of which might be to impair the rights obtained by SELLER pursuant to the AGREEMENTS, and SELLER has taken all such actions as are or have been required to assure the perpetuation of the rights obtained by SELLER pursuant to the AGREEMENTS, such that the rights being conveyed and assigned herewith are being transferred in the same state and condition as received by SELLER.

(e) SELLER has heretofore entered into a Financing and Security Agreement and Distribution Agreement, both dated July 18, 1969, with KATZKA-BERNE PRODUCTIONS, INC. with respect to a proposed photoplay

NGR:d---7/18/79-1 -3-


to be entitled "LORD OF THE RINGS"; and SELLER sent KATZKA-BERNE PRODUCTIONS, INC. a Notice of Abandonment dated June 12, 1972, in accordance with the provisions of the Financing and Security Agreement; and KATZKA-BERNE PRODUCTIONS, INC. did not exercise its right to re-acquire SELLER'S rights in and to the PROPERTY.

(f)   SELLER has heretofore entered into a pre-production agreement with AERO PRODUCTIONS, A.G. with respect to a proposed photoplay to be entitled "LORD OF THE RINGS" and SELLER did not approve the production of said photoplay under said agreement.

(g)   To the best of SELLER'S knowledge, there are no adverse claims nor is there pending any litigation with respect to SELLER'S rights in and to the PROPERTY or under the AGREEMENTS.

(h)   SELLER has delivered or will deliver to PURCHASER complete copies of all of the AGREEMENTS as well as any other agreements it has in its possession with respect to the PROPERTY.

(i)   SELLER has taken all corporate action necessary for the transfer described herein.

SELLER shall indemnify and otherwise hold PURCHASER free and harmless from and against any and all claims, demands and expenses (including reasonable attorneys' fees) arising out of or resulting from any breach by SELLER of its

NGR:d--7/16/79-1                    -4-

aforesaid warranties and agreements.

3. In consideration of the sums herein agreed to be paid by PURCHASER to SELLER, SELLER hereby assigns, sells, transfers, conveys and sets over to PURCHASER, all of its right, title and interest in and to the PROPERTY and under the AGREEMENTS.

4. In consideration of the rights granted to PURCHASER by SELLER hereunder, PURCHASER shall pay to SELLER the following which shall be in addition to the execution by PURCHASER of that certain Distribution Agreement (denominated "LEASE AGREEMENT") described in Paragraph 6 below:

(a) A cash payment of TWO HUNDRED THOUSAND DOLLARS ($200,000), receipt of which is hereby acknowledged by SELLER;

(b) An additional cash payment of ONE HUNDRED NINETY THOUSAND DOLLARS ($190,000) on the date one (1) year from the date hereof or on the date of first release of the first motion picture based in whole or in part upon the PROPERTY in the United States, whichever is earlier. In this connection, the parties acknowledge that this formal agreement is being executed a substantial period of time after informal agreements between the parties have been reached and relied upon by the parties with respect to the subject matter hereof, and accordingly, SELLER acknowledges receipt of the payment called for by this sub-paragraph and waives any claim of

NGR:d--7/16/79-1                         -5-

default arising by reason of any delay in the payment provided for in this sub-paragraph or in the payment provided for in the sub-paragraph next preceding.

(c)   A first contingent deferment in an amount equal to SELLER's actual verified interest cost accrued on SELLER's total cash investment in the PROPERTY, not to exceed ONE HUNDRED SEVENTY FIVE THOUSAND DOLLARS ($175,000) (hereinafter referred to as "SELLER'S DEFERMENT"), which amount shall be payable after PURCHASER has recouped the cash production cost (except those items which need not be paid in cash as herein provided) of the first motion picture based in whole or in part on the PROPERTY (inclusive of a ten per cent (10%) overhead and a six per cent (6%) completion guarantee charge which may be made to the production cost of the picture by PURCHASER and which need not be paid in cash) plus interest thereon. If SELLER has not been paid the full amount of SELLER's deferment out of the receipts derived by the first picture based in whole or in part upon the PROPERTY, the balance of SELLER's deferment not theretofore paid to SELLER shall be payable in like manner as a first contingent deferment out of any and all other motion pictures based in whole or in part upon the PROPERTY thereafter produced.

5.   From and after the effective date hereof, PURCHASER agrees to assume the obligations to perform all of the terms, covenants and conditions of the AGREEMENTS, including, without limitation, the obligation to make any and all payments

NGR:d--- 7/17/79-1              -6-

set forth in the AGREEMENTS which thereafter become due. PURCHASER agrees to indemnify and hold SELLER free and harmless from and against any and all claims, demands and expenses (including reasonable attorneys' fees) arising out of its use of the rights herein transferred in and to the PROPERTY, save and except such as may be attributable to any breach or default by SELLER pursuant to its warranties hereinabove set forth, and save and except such as may arise out of SELLER's actions pursuant to the Distribution Agreement ("LEASE AGREEMENT") hereinbelow referred to as to which SELLER may not be indemnified under the terms of said Lease Agreement.

6. From and after the effective date hereof, PURCHASER shall be the sole and exclusive owner of the PROPERTY and of the first and of all subsequent motion pictures to be produced based upon the PROPERTY, and all contracts and rights with respect thereto and all physical material in connection therewith, subject to the terms of this agreement and that certain Distribution Agreement ("LEASE AGREEMENT") being entered into concurrently herewith between PURCHASER and SELLER providing for SELLER's acquisition of certain distribution rights in and to the first motion picture to be produced and based in whole or in part upon the AGREEMENTS and/or the PROPERTY. In accordance with the informal agreements upon which the parties have relied, PURCHASER shall grant similar distribution rights to SELLER upon the same terms and conditions as are set forth in said LEASE AGREEMENT in and to any and all further motion pictures based in whole or in part upon the AGREEMENTS and/or the PROPERTY.

7. Included among the rights herein granted to PURCHASER by SELLER are the following:

NGR:d--7/16/79-1         -7-

(a) The benefit and all rights of action under and pursuant to the representations and warranties received by SELLER from its assignors and/or licensors pursuant to the AGREEMENTS;

(b) All merchandising rights in and to the PROPERTY and to the names, titles, characters, themes, plots and incidents (hereinbelow "Tolkien fanciful creations") contained therein, including, but not limited to, all rights which SELLER acquired pursuant to the AGREEMENTS or which SELLER may have otherwise acquired to the protection of said merchandising rights under contract or pursuant to trademark, trade name, unfair competition or other law, statutory or otherwise. In consideration of the grant of said merchandising rights, PURCHASER shall pay to SELLER a sum equal to six and two-thirds per cent (6-2/3%) of PURCHASER's net income derived from the exercise of said merchandising rights as hereinbelow defined.

8. Notwithstanding anything to the contrary herein contained, PURCHASER shall be free to exploit and shall have no obligation to deliver to SELLER for distribution nor to pay SELLER any portion of PURCHASER's income derived from PURCHASER's production, distribution or other exercise of any of the following rights which are included among those herein transferred by SELLER to PURCHASER:

(a) Music (including publishing and phonograph recordings and tapes);

(b) Television series rights, subject to SELLER'S rights of first negotiation and first refusal as set forth in paragraph 10 of the LEASE AGREEMENT and provided ////////////////////////////

NGR:d--7/16/79-1

-8-

that PURCHASER shall not produce or authorize the production of any television series based upon the PROPERTY prior to three (3) years after the first theatrical release in the United States of America of the last feature film produced by PURCHASER based upon the PROPERTY, it being understood that a theatrical feature film shall be deemed to be the "last feature film" based upon the PROPERTY if a period of 3 years has elapsed from its delivery to SELLER under the applicable LEASE AGREEMENT without the commencement of principal photography upon a subsequent theatrical feature film. Notwithstanding the foregoing, if thereafter and notwithstanding the production of a television series based upon the PROPERTY a subsequent theatrical feature film is produced or authorized to be produced by PURCHASER, PURCHASER shall not be in default of this provision, but the provisions hereof with respect to SELLER's distribution rights in such subsequent theatrical feature film shall apply.

(c) Audio visual cassette rights for private home use, provided, however, that PURCHASER will not exercise or exploit said rights in any territory in which SELLER is acquiring distribution rights with respect to any picture based upon the PROPERTY in whole or in part until the expiration of three (3) years from the first theatrical release of such film within such territory.

9. For purposes of determination of the PURCHASER's net income from PURCHASER's exercise of the merchandising rights herein granted, to which SELLER's percentage

NGR:d--7/16/79-1             -9-

as provided in Paragraph 7(b) hereof shall apply, such income shall be defined as follows:

(a) In the instance where PURCHASER licenses the manufacturer, sale, distribution and exploitation of the articles, the term "PURCHASER'S NET INCOME" shall mean the net payments received by PURCHASER from its licensees after and subject to the deduction of taxes applicable to such income, and the deduction of such direct merchandising expenses, trademarking costs and fees, commissions to exploitation agents, obligatory royalties to performers (e.g., which may be payable if an actor's name or likeness is used in connection with a merchandising arrangement), obligatory royalties or participations pursuant to the AGREEMENTS, payments of the costs and expenses of resolving adverse claims, by litigation or otherwise, which might interfere with PURCHASER'S full exercise of its merchandising rights under this Agreement, whether by its own merchandising efforts or by licensing others to use Tolkien fanciful creations as trademarks or service marks (including, but not limited to, the payments of judgments, settlements, purchase prices, legal fees, expert witness fees, costs and disbursements incident to such litigation) and other similar direct merchandising expenses, but in no event subject to any deduction for internal or other general overhead expenses of PURCHASER; and

(b) In the instance where PURCHASER itself or through affiliated, associated or subsidiary companies, manufacturers, sells, distributes and exploits such articles, the term "PURCHASER'S NET INCOME" shall mean the gross amounts received by PURCHASER (or such affiliated, associated or subsidiary companies) from the sale by it of

-10-

NGR:d--7/16/79-1

such articles, less discounts and returns for uncollectable accounts, and less all direct and indirect costs of manufacture and sale, including, where applicable, costs of the kinds enumerated in subparagraph (a) of this Paragraph 9.

PURCHASER shall account to SELLER at the same times and in the same manner as is provided in Paragraphs 2(b) and 2(c) of Schedule D of the AGREEMENTS (part of the AGREEMENTS attached hereto as recited in Exhibit "A") between SELLER and SASSOON TRUSTEE AND EXECUTOR CORPORATION, LTD. and GEORGE ALLEN & UNWIN, LTD., respectively of July 8, 1969, whose performance PURCHASER is hereby assuming.

10. The parties acknowledge that pursuant to the AGREEMENTS, SELLER is permitted only to assign its distribution rights in the picture(s) to be produced based upon the PROPERTY in whole or in part to one of the other major distribution companies (which are identified in the AGREEMENTS) and this condition will survive any reversion or expiration of SELLER's distribution rights under the Distribution Agreement (LEASE AGREEMENT) executed contemporaneously herewith. As provided in Paragraph 5 hereof, PURCHASER hereby assumes the obligation to pay the original grantors of the rights in the literary property (the aforesaid SASSOON TRUSTEE AND EXECUTOR CORPORATION, LTD. and the aforesaid GEORGE ALLEN & UNWIN, LTD. - herein for convenience collectively referred to as the "TOLKIEN ESTATE"), the TOLKIEN ESTATE's gross percentage interest as set forth in the AGREEMENTS and has hereby agreed

NGR:d--7/17/79-1                -11-

to indemnify and hold SELLER harmless against any claim or claims which the TOLKIEN ESTATE may make against SELLER with respect to said payments. The within undertaking and indemnity shall apply not only with respect to income derived from the feature motion picture or pictures to be distributed by SELLER pursuant to the Distribution Agreement (LEASE AGREEMENT) or Agreements, but to all media and territories in which SELLER will not be directly involved in distribution (e.g., the territories of Sweden, Australia and New Zealand, and the media of audio-visual cassettes and merchandising) as well (as may be applicable) as to PURCHASER's reserved music rights and television series rights. PURCHASER agrees to undertake the burden of obtaining the TOLKIEN ESTATE's written consent to the novation and substitution of PURCHASER for SELLER in such connection, but in the event that PURCHASER is unsuccessful in obtaining such consent, nevertheless the within indemnity shall apply, said indemnity to extend to, and PURCHASER shall hold SELLER harmless from, any claim or claims, demands and expenses (including reasonable attorneys' fees) arising out of or with respect to the obligation to account to the TOLKIEN ESTATE for its interest in income derived from the exercise by PURCHASER of any and all rights acquired by PURCHASER under the within Agreement and Assignment.

11. The within Agreement shall inure to the benefit of and shall bind the parties hereto and their respective successors, representatives and assigns. As used in the within agreement, the number, gender, case and tense of a word shall be deemed to include all other numbers, genders,

NGR:d--7/17/79-1                -12-

cases and tenses as may be required by the context.

12. SELLER undertakes to execute and deliver to PURCHASER all such further instruments and documents, including, but not limited to, short form assignments for recording purposes, which PURCHASER may deem necessary or convenient to effectuate the intent and purposes hereof, and SELLER hereby appoints PURCHASER, with full power of appointment and designation, its attorney-in-fact, irrevocably and coupled with an interest, so to do in the event of any failure by SELLER to comply promptly with any request from PURCHASER in this respect.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first hereinabove set forth.

UNITED ARTISTS CORPORATION

BY: _____ (SELLER)

THE SAUL ZAENTZ PRODUCTION COMPANY

BY: _____ (PURCHASER)

NGR:d--7/17/79-1            -13-

1. Agreement dated April 2, 1962, between John Ronald Reuel Tolkien and George Allen and Unwin, Ltd., and William L. Snyder ("Snyder"), doing business as Rembrandt Films, as amended by two agreements dated April 2, 1962 and April 1, 1963 with respect to "THE HOBBIT".

2. Option Agreement dated March 6, 1968 between William L. Snyder, doing business as Rembrandt Films and Katzka-Berne Productions, Inc. with respect to "THE HOBBIT" and the Rembrandt Film.

3. Exercise of Option dated June 18, 1968 between William L. Snyder, doing business as Rembrandt Films and Katzka-Berne Productions, Inc. with respect to "THE HOBBIT" and the Rembrandt Film.

4. Acquisition Agreement from William L. Snyder, doing business as Rembrandt Films, and Katzka-Berne Productions, Inc. dated June 18, 1968 with respect to "THE HOBBIT" and the Rembrandt Film.

5. Assignment dated June 18, 1968 from Katzka-Berne to United Artists Corporation, with respect to agreements described in 1 through 4 above.

6. Agreement dated July 8, 1969 between George Allen and Unwin Ltd., United Artists Corporation and John Ronald Reuel Tolkien with respect to "The Two Towers" and "The Hobbit", as amended by two letters from United Artists Corporation to George Allen and Unwin Ltd., dated July 8, 1969.

7. Agreement dated July 8, 1969 between Sassoon Trustee and Executor Corporation, Ltd., United Artists Corporation and John Ronald Reuel Tolkien with respect to the "Fellowship of the Ring" and "The Return of the King", as amended by two letters from United Artists Corporation to Sassoon Trustee and Executor Corporation Ltd., dated July 8, 1969.

8. Agreement dated July 8, 1969 between John Ronald Reuel Tolkien and United Artists Corporation with respect to "LORD OF THE RINGS" and "THE HOBBIT".

EXHIBIT "A"

-1-

9. Agreement dated July 8, 1969 between Edith Mary Tolkien, John Francis Reuel Tolkien, Michael Hilary Reuel Tolkien, Priscilla Mary Ann Reuel Tolkien, Michael George David Reuel Tolkien, Joan Anne Reuel Tolkien and United Artists Corporation with respect to "LORD OF THE RINGS" and "THE HOBBIT".

10. Agreement dated July 8, 1969 between George Allen and Unwin Ltd. and United Artists Corporation with respect to certain merchandising rights in "The Two Towers" and "The Hobbit".

11. Agreement dated July 8, 1969 between Sassoon Trustee and Executor Corporation, Ltd. and United Artists Corporation with respect to certain merchandising rights in "The Fellowship of the Ring" and "The Return of the King".

12. Amendatory Agreement dated October 20, 1975 between George Allen and Unwin Ltd., C.A. Bank & Trust International Limited (formerly known as Sassoon Trustee and Executor Corporation, Ltd.) and United Artists Corporation with respect to merchandising rights in and to "LORD OF THE RINGS" and "THE HOBBIT".

EXHIBIT "A"

-2-