# EXHIBIT O



**HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN**

*A Professional Corporation*

Three Embarcadero Center
Seventh Floor
San Francisco, CA 94111-4024

Telephone 415.434.1600
Facsimile 415.677.6262
*www.howardrice.com*

Writer's Information:

   Thomas A. Magnani
   Direct: 415.677.6464
   tmagnani@howardrice.com

October 13, 2010

VIA ELECTRONIC MAIL

Bonnie E. Eskenazi
Greenberg Glusker Fields Claman & Machtinger LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, CA  90067

      Re:    *The Lord of the Rings* Slot Machine and Online Video Game Issues

Dear Bonnie:

      This letter responds to your letter to me of October 4, 2010 (attaching Ricardo Cestero's letter to Mark Helm of September 20, 2010), as well as your letter to Mark Helm of October 12, 2010.  Although the prior letters were focused on online slot machines and video games that utilize various logos, characters, and other visual elements from New Line's trilogy of *The Lord of the Rings* films, your latest letter also raises an issue with respect to casino slot machines that utilize similar elements.  This letter is intended to address both issues.

      Having considered the matter carefully, The Saul Zaentz Company ("Zaentz") does not agree with your interpretation of the various agreements between Zaentz and your clients (or any of their predecessors-in-interest) over the years, which you have generally referred to as the "1969 Agreements."  The July 8, 1969 Agreements do not, as you contend, *only* grant merchandising rights in articles of "tangible personal property."  So-called Schedules D to Contracts A and B contemplate use of the Name and Subject Mark(s) in connection with services.  For example, Sections 5.B. of Schedules D reference registration of the Name and Subject Mark(s) as "trademark[s], *and/or service mark[s]*..."  Moreover, Sections 14 of Schedules D state "The exclusivity granted hereunder shall apply to all of the articles in the Trademark, Copyright, or *Service Mark* categories or classifications in which the licensed article may fall."  In addition, Contracts A and B grant to Zaentz broad merchandising rights.  For example, Section 2(c) of Contract A grants the right to "exploit THE TRILOGY and THE HOBBIT and the title or titles thereof in connection with said motion picture photoplays *in any manner and mediums that the Purchaser may desire...*"  Similarly, Section 2(j) of Contract A grants "the right to use and exploit and to license others to use and exploit *all commercial tie-ups of any sort or nature* arising out of or connected with said motion picture photoplays and/or the title or titles thereof and/or the characters thereof and/or their names and their characteristics . . ."

Bonnie E. Eskenazi
October 13, 2010
Page 2

In light of the broad wording of the 1969 Agreements, it is not surprising that your clients and their predecessors have long-recognized that Zaentz's rights extend beyond mere articles of tangible personal property as you seem to have narrowly defined them. For example, Dick Williamson, acting in his capacity as General Executor of J.R.R. Tolkien's estate, signed a sworn statement on December 2, 1977 acknowledging Zaentz's "right to licence others to use the Tolkien characters for merchandise *or in association with services*" and confirming that J.R.R. Tolkien's children have consented to Zaentz's rights. Similarly, the July 31, 1978 agreement among Zaentz, your clients, and HarperCollins' predecessor also confirms Zaentz's rights to use the names of the Tolkien book titles, likenesses, places, events, and characters as "marks for merchandise or services" and clearly describes Zaentz's business as "merchandising by direct use and/or licensing the use by others of the names of Tolkien fanciful characters as trademarks or service marks."

Zaentz has reasonably relied on the above statements and agreements, as well as on countless other interactions with your clients, for more than 30 years. Over the decades, your clients have been well aware of Zaentz's efforts to exploit and police its rights relating to a wide variety of goods and services, including hotels, restaurants, travel agencies, ringtones, online games, and housing developments. At times, your clients have actively assisted Zaentz in these efforts and often have forwarded licensing requests or suspected infringements in these areas to Zaentz for handling. In light of all of the foregoing, Zaentz is surprised by, and rejects, your assertion that its rights are limited to articles of tangible personal property as you seem to have narrowly defined them.

Even assuming *arguendo* that Zaentz's rights were limited to use of the Tolkien-related marks on or in connection with articles of tangible personal property, all of the slot machines and online video games in question are clearly within the scope of Zaentz's rights. You do not attempt to define "tangible personal property" in your letter. It is generally accepted that tangible personal property encompasses all property other than real estate or property that lacks any physical existence, such as legal rights. For example, Black's Law Dictionary defines "tangible personal property" as "personal property that can be seen, weighed, measured, felt, or touched, or is in any other way perceptible to the senses." It defines "personal property" as "any movable or intangible thing that is subject to ownership and not classified as real property." It defines real property as "land and anything growing on, attached to, or erected on it, excluding anything that may be severed without injury to the land."

Casino slot machines are clearly tangible personal property in that they are capable of being perceived and are not classifiable as real property (i.e., they are equipment that can be removed from the premises). Indeed, slot machines are treated as personal property under myriad laws, including tax laws.

The same is true of online slot machine games and video games. Again, online games are capable of being perceived and are not classifiable as real property. While you admit that online games are personal, you state that they are "definitely not tangible," without explanation. It

appears as if you believe that "tangible" means "capable of being touched." As noted above, it does not have such a limited meaning, either under the law or even in common usage. For example, is tangible proof only that evidence which is capable of being touched?

Your clients have understood that Zaentz's rights extend to online activities for more than a decade. At least as early as 1998, Zaentz corresponded with Cathleen Blackburn about its licensing of computer game rights to Sierra On-Line, to which you refer in your letter of October 12. Cathleen was given a copy of the Sierra On-Line agreement, which clearly licensed online games operating on networked servers. No distribution of client software, in either physical or electronic form, was required (See, e.g., the definition of "OLMMP Product"). Indeed, distribution via downloads was specifically addressed (See, e.g., the definition of "Commercial Release," which expressly includes distribution via download). After reviewing that agreement, your clients made no objection to the online nature of the games. To the contrary, Cathleen quite appropriately acknowledged in a letter dated November 16, 1998 that the Sierra On-Line agreement dealt with "the rights granted under the 1969 merchandising agreements" as amended by the parties over the years. The Turbine game you refer to in your letter is, in fact, the culmination of the development efforts begun by Sierra On-Line under the 1998 agreement, and, as such, it has always been contemplated that the Turbine game would be made available via downloading or other online transmission, contrary to your suggestion.

Of course, in the many years since the Sierra On-Line agreement was entered into, Zaentz has communicated with your clients and their representatives, in writing, over the telephone, and in person, with respect to a variety of other online activities, including the prior Electronic Arts video games, mobile ringtones, and domain names. Your clients have never made any objection to the online nature of such activities as being beyond the scope of the rights granted to Zaentz. On the contrary, your clients have accepted millions of dollars in royalties from such activities over the years. To the extent there has been any discussion with your clients about the scope of Zaentz's rights with respect to video games (and there has not been any such discussion in quite some time), the discussion was about whether such games were primarily "text-based," and so fell within the reservation of rights your clients carved out in the 1969 Agreements, or were primarily "image-based," in which case the parties agreed that Zaentz was the appropriate party to license such games. That distinction is clearly not relevant here.

We note that you also object to the gambling aspect of the slot machine games in question. We do not understand the legal basis for your objection. In your letter of October 12, you refer to several provisions in a variety of agreements between Zaentz and other parties, including but not limited to New Line. It is true that Zaentz has been careful to preserve the value of its rights by imposing various quality standards on its licensees. However, those provisions in Zaentz's licenses with third parties do not confer on your clients any additional rights, nor do they subject Zaentz to any limitations not contained in Zaentz's agreements with your clients.

Moreover, we do not see how the slot machine games in question are inconsistent with those quality standards. Many families regard bingo, mahjong, bridge, and poker as entirely

Bonnie E. Eskenazi
October 13, 2010
Page 4

proper games for family play. Since their invention in the late 1800's, slot machines have been enjoyed by adults of all ages. The elements of many literary and film properties have been used in connection with slot machines for years, including such famous properties as *The Wizard of Oz*, *Star Wars*, and *Gone with the Wind*. In some ways, *The Lord of the Rings* is a more adult-oriented property than these others, given its pervasive violence, depictions of drinking and smoking, and dark themes. In fact, an act of gambling is central to the events depicted in *The Lord of the Rings* and *The Hobbit*. After finding the One Ring and getting lost in Gollum's caves, Bilbo Baggins won his freedom by playing a riddle-game with Gollum. The stakes were high: if Gollum won the riddle-game, Gollum would be entitled to eat Bilbo; if Bilbo won, Gollum would be required to show Bilbo the way out of his cave (fortunately for humanity, Bilbo won.). In *The Hobbit*, J.R.R. Tolkien describes the riddle-game as being "sacred and of immense antiquity." It is difficult to square this description with your own description of gambling as "sordid and disreputable."

For the reasons stated above, Zaentz believes that it has the right to license slot machine games and other online games, and that the games in question are not inconsistent with standards appropriate for *The Lord of the Rings*. Nevertheless, Zaentz has tremendous respect for your clients and values its relationship with them. To that end, Zaentz gladly would participate in discussions with your clients and New Line to discuss the future of New Line's gambling activities and to see if we can achieve an amicable resolution satisfactory to all concerned. From Mark Helm's letter of October 8, it seems New Line also would be happy to participate in such a meeting. My sense is that an in-person meeting involving the three parties would be best. Please let me know if you would like to arrange one. In the meantime, I am sure you can understand that Zaentz reserves all of its rights.

Very truly yours,

Thomas A. Magnani

TAM/tam

cc:   Ricardo Cestero, Esq.
      Albert M. Bendich, Esq.
      Paul Zaentz, Esq.
      Cathleen Blackburn, Esq.
      Steven Maier, Esq.
      Mark B. Helm, Esq.

1629486