1    ARNOLD & PORTER LLP
     MARTIN R. GLICK (No. 40187)
2    marty.glick@aporter.com
     JOHN C. ULIN (No. 165524)
3    john.ulin@aporter.com
     SEAN M. CALLAGY (No. 255230)
4    sean.callagy@aporter.com
     Three Embarcadero Center, 10th Floor
5    San Francisco, California 94111-4024
     Telephone:  415.471.3100
6    Facsimile:   415.471.3400

7    Attorneys for Defendant and Counterclaim Plaintiff
     THE SAUL ZAENTZ COMPANY d/b/a Middle-
8    earth Enterprises, a Delaware corporation

9             UNITED STATES DISTRICT COURT

10          CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| 11   FOURTH AGE LIMITED, a United Kingdom corporation; PRISCILLA MARY ANNE REUEL TOLKIEN, as TRUSTEE OF THE TOLKIEN TRUST, a United Kingdom Charitable Trust; THE J.R.R. TOLKIEN ESTATE LIMITED, a United Kingdom corporation; HARPERCOLLINS PUBLISHERS, LTD., a United Kingdom corporation; UNWIN HYMAN LTD., a United Kingdom corporation; and GEORGE ALLEN & UNWIN (PUBLISHERS) LTD., a United Kingdom corporation, | Case No. 12-cv-09912-ABC (SHx) **DECLARATION OF ALBERT BENDICH IN SUPPORT OF THE SAUL ZAENTZ COMPANY'S OPPOSITION TO COUNTERCLAIM DEFENDANTS' MOTION TO STRIKE** |

17                  Plaintiffs,

18        v.

19    WARNER BROS. DIGITAL DISTRIBUTION, INC., a division of WARNER BROS. HOME ENTERTAINMENT, INC., a Delaware corporation; WARNER BROS. ENTERTAINMENT, INC., a Delaware corporation, as successor-in-interest to New Line Cinema Corp.; WARNER BROS. CONSUMER PRODUCTS, INC., a Delaware corporation; WARNER BROS. INTERACTIVE ENTERTAINMENT, INC., a division of WARNER BROS. HOME ENTERTAINMENT, INC., a Delaware corporation; NEW LINE PRODUCTIONS, INC., a California corporation, THE SAUL ZAENTZ COMPANY d/b/a Middle-earth Enterprises, a Delaware corporation; and DOES 1-10, inclusive,

27                  Defendants.

28

## <u>DECLARATION OF ALBERT BENDICH</u>

I, Albert Bendich, declare as follows:

1.     I have been an officer and employee of The Saul Zaentz Company ("Zaentz") since its incorporation in 1976.  My responsibilities include overseeing legal affairs and negotiating contracts and agreements.  I am also an attorney licensed to practice law in the State of California, although my present bar status is inactive.  The facts set forth herein are of my own personal knowledge, and if sworn, I could and would testify competently thereto.

2.     Zaentz holds rights in certain works by J.R.R. Tolkien, including *The Hobbit*, and the three books comprising the *Lord of the Rings* trilogy (namely, *The Fellowship of the Ring*, *The Two Towers*, and *The Return of the King*).  I will refer to these four works collectively for purposes of this declaration as the "Tolkien Works."

3.     The rights presently held by Zaentz were first acquired by United Artists Corporation ("United Artists"), Zaentz's direct predecessor-in-interest, in 1969.  Zaentz acquired these rights from United Artists in 1976.  On July 8, 1969, United Artists executed two contracts by which it obtained film and stage rights, and related ancillary rights in the Tolkien Works from the predecessors-in-interest to the plaintiffs to this lawsuit (to whom I refer collectively as the "Estate/HC Parties").  On the same date, United Artists exercised its two contractual options to obtain additional merchandising rights in the Tolkien Works independent of film rights.

4.     As noted, two of the four agreements executed in 1969 grant Zaentz film and stage rights to the Tolkien Works, as well as broad rights to advertise and exploit such productions.  The signatories colloquially referred to these two agreements as "Contract A" and "Contract B," and that convention has been maintained to the present date.  Contracts A and B confer identical rights, except that each covers two of the four books comprising the Tolkien Works.  Attached hereto as Exhibits 1 and 2 are true and correct copies of Contracts A and B, respectively.

5.     I will draw attention to some of the particular provisions of Contracts A

and B that relate to this lawsuit.  Section 2 of the Contracts gives Zaentz "motion picture rights" in the Tolkien Works, the scope of which is set forth in each Contract's succeeding paragraphs.  For example, Section 2(c) grants Zaentz the right "to advertise and exploit" the Tolkien Works, in connection with films based on them, "in any manner and through any mediums that [Zaentz] may desire," including (but not limited to) "commercial and other tie-ups."

6.      In addition, Section 2(e) of Contracts A and B grants Zaentz "exclusive, unlimited and unrestricted rights to produce, issue, reproduce, make, reissue, distribute, exhibit, transmit, project, perform, sell, lease, rent, license for exhibition, exploit, dispose of, and generally deal in and with [its films] in any other manner or by any method whatsoever, whether now known or hereafter devised . . . ."

7.      Moreover, Section 2(j) of Contracts A and B grants Zaentz the "right to use and exploit and to license others to use and exploit all commercial tie-ups of any sort or nature arising out of or connected with" the films or the titles, characters, or names associated with the films.

8.      The preceding paragraphs give Zaentz the right to engage in the very disputed activity and trademark registration conduct at issue in this lawsuit.  In fact, as I describe in greater detail herein, Zaentz has relied on this understanding and exploited these rights for decades without objection from the Tolkien/HC Parties— and with the Tolkien/HC Parties' knowledge and encouragement.

9.      In addition to the film-related rights Zaentz has under Contracts A and B, Zaentz has *additional and independent* rights to conduct trademark and merchandising activities that need not have any tie to film or stage works relating to the Tolkien Works.  Zaentz has these rights by virtue of two agreements that were executed at the option of United Artists contemporaneously with Contracts A and B, as stated in Section 12(d) of Contract A and Section 11(B)(III) of Contract B.  As with Contracts A and B, each agreement covers two of the four books comprising the Tolkien Works.  By convention, the parties to the agreements and their successors-in-

interest (including Zaentz) have referred to each of these agreements as "Schedule D." Attached hereto as Exhibits 3 and 4 are true and correct copies of Schedule D to Contract A and Schedule D to Contract B, respectively.

10.    Section 1(a) of Schedule D grants Zaentz the "sole and exclusive right, license and privilege of utilizing the Name and Subject Mark(s) solely on only upon and in connection with the manufacture, sale and distribution of the following articles: any and all articles of tangible personal property, other than novels, paperbacks and other printed published matter with respect to [the Tolkien Works]." Section 1(a) clarifies that "[i]t is intended to except from this license the publication rights heretofore granted to various parties," as set forth in an accompanying Exhibit to Schedule D.

11.    At various times since their execution in 1969, Contracts A and B and their respective Schedules D have been amended and clarified by the parties to those agreements. For example, in an amendment dated October 20, 1975 (the "1975 Agreement"), the parties clarified certain rights conferred under Schedules D. The parties clarified in paragraph 2 that rights in books related to the Tolkien Works and "using the printed word primarily" along with drawings and illustrations by J.R.R. Tolkien were reserved to the grantors, while rights in "books and other writings using primarily the art work from the film or films and using the printed word only incidentally" were granted to Zaentz's predecessor-in-interest. The parties clarified other matters in the 1975 Agreement, including that the rights of Zaentz's predecessor-in-interest with respect to sound recordings would be limited to those contained in Contracts A and B and not Schedules D, preserving for the grantors the rights in non-dramatized readings of the Tolkien Works. Attached hereto as Exhibit 5 is a true and correct copy of the 1975 Agreement. For the Court's convenience, I will refer collectively to Contracts A and B, Schedules D thereto, and any amendments to these contracts, as the 1969 Agreements.

12.    Since obtaining the film and merchandising rights in the Tolkien Works

under the 1969 Agreements, Zaentz has vigorously exploited its rights worldwide, defended these rights against the actions of infringers, and also licensed to other parties certain of these rights.

13.     Among its many trademark registrations, Zaentz has obtained trademark registrations in certain areas I understand the Tolkien/HC Parties now contend are beyond the rights granted under the 1969 Agreements.  This includes trademarks derived from the Tolkien Works used for slot machines, video games, and various services.  For example, Zaentz or its predecessor-in-interest registered in Japan for use with slot machines the marks LORD OF THE RINGS in 1982 and HOBBIT in 1984.  Zaentz registered HOBBIT in the United Kingdom in 1997 for use with "entertainment services" and "on-line computer game services."  In 2001, Zaentz registered THE FELLOWSHIP OF THE RING in the European Union for "Downloadable online interactive computer game programs having single and multi-player capabilities."  Zaentz followed suit in the United States in 2002, registering THE LORD OF THE RINGS for "Entertainment services, namely, providing news and information in the field of entertainment relating to motion picture films, computer games, and video games via global and local area networks."  These are merely illustrative examples of thousands of registrations Zaentz has undertaken over the course of four decades in areas including gambling, video games of all kinds, and services.

14.     Over the past twenty years, Zaentz has on numerous occasions apprised the Tolkien/HC Parties of its activities exploiting the Tolkien Works.  For example, in a letter dated May 16, 1996, Zaentz wrote to the Tolkien/HC Parties to remind them of Zaentz's exclusive right to computer and online games in which graphics (as opposed to text) are the dominant element.  HarperCollins responded on July 18, 1996 that it was "prepared to concede . . . that the right to license computer games belongs to Zaentz."  HarperCollins made no distinction as to games delivered to consumers via a disk and those delivered electronically.  The representatives of the

Tolkien Estate (which I will refer to hereinafter as the "Estate") lodged no objection whatsoever.  True and correct copies of Zaentz's letter and HarperCollins' reply are attached hereto as Exhibits 6 and 7, respectively.

15.    In the late 1990's, Zaentz engaged in negotiations with Sierra On-line concerning a license to create online and other interactive video games based on the Tolkien Works.  Zaentz expressly informed the Estate by facsimile letter dated March 5, 1998, a true and correct copy of which is attached hereto as Exhibit 8, of its intent to license "computer and on-line games."  Zaentz later sent a copy of the executed license to the Estate, Section 1(*l*) of which indicated that a "Commercial Release" of the video games included "making available for sale, use or download."  Section 1(f) of the same license defined "Licensed Platforms" to include "any on-line network" (including the Internet), and Section §1(j) defined "OLMMP Product" to include "an on-line massively-multiplayer persistent 'universe' that operates on one or more network servers, but that may also include client software distributed to end-users." A true and correct copy of this license agreement is attached hereto as Exhibit 9.  In correspondence with Zaentz dated November 16, 1998, Estate representative Cathleen Blackburn confirmed that the rights granted in the Sierra On-line license agreement fell under the rights granted in the 1969 Agreements.  A true and correct copy of Ms. Blackburn's letter to Zaentz is attached hereto as Exhibit 10.  Moreover, Ms. Blackburn noted in a facsimile letter to me dated August 4, 2000 that she had informed a representative of Sierra On-line that, in the Estate's view, the license between Zaentz and Sierra On-line "was validly granted."  A true and correct copy of Ms. Blackburn's letter is attached hereto as Exhibit 11.

16.    In addition to the foregoing correspondence, it has come to Zaentz's attention that the Tolkien/HC Parties have advised potential third-party licensees that videogame rights are held by Zaentz.  In 2000, Zaentz received notice that a videogame company, 3DO, had contacted the Estate's representative seeking permission to create an interactive, on-line "persistent world" based on the Tolkien

Works.   The Estate referred this request to Zaentz, without cautioning 3DO (or Zaentz) that the Estate viewed certain modes of transmitting videogames to consumers (*i.e.*, without a physical storage device of some kind) to be within the rights reserved by the Tolkien/HC Parties under the 1969 Agreements.   A true and correct copy of the correspondence from the Estate concerning this licensing enquiry is attached hereto as Exhibit 12.

17.   On May 2, 2007, Ms. Blackburn informed a company seeking to offer services under the name "Hobbit Hole Guesthouse and Charters" that rights to use the HOBBIT mark in connection with a hotel and tour operation "were disposed of by the late Professor Tolkien prior to his death in connection with the sale of film rights in 'The Hobbit' and 'The Lord of the Rights.'   Those rights are now owned by [Zaentz] . . . ."   A true and correct copy of Ms. Blackburn's letter is attached hereto as Exhibit 13.

18.   Aside from these communications regarding trademark registration, merchandising and licensing activities, at many times over the course of the last several decades, the Tolkien/HC Parties have approached Zaentz and asked Zaentz to undertake enforcement efforts to protect trademarks relating to the Tolkien Works. This includes in areas that I understand the Estate to now be challenging as beyond the scope of the rights held by Zaentz under the 1969 Agreements, namely services. Of particular note, on July 23, 1993, the Estate's representative, Paul Sleven, wrote to me to describe the actions of an individual in the New York area providing entertainment services under the name GANDALF THE WIZARD CLOWN.   A true and correct copy of that letter is attached hereto as Exhibit 14.   Mr. Sleven stated: "These issues are in your domain."   Upon the Estate's request, Zaentz commenced litigation to cause this individual to cease using an infringing mark for his services.

19.   More recently, in the late 2000's, Zaentz pursued a costly multi-year litigation against a company based in Minnesota offering travel services under the name HOBBIT TRAVEL.   Zaentz did so with the support of the Tolkien/HC Parties.

1  Zaentz kept the Tolkien/HC Parties informed of its enforcement actions in that
2  litigation, during which time the Tolkien/HC Parties did not suggest that Zaentz was
3  enforcing rights that it did not own.

4      20.    By various agreements, Zaentz has licensed certain of its rights in the
5  Tolkien Works acquired under the 1969 Agreements to Warner Bros. Entertainment
6  Inc., its affiliated entities, and its predecessors-in-interest, including New Line
7  Cinema.  For ease of reference, I refer to these entities collectively as "Warner Bros."
8  Pursuant to these rights, Warner Bros. has released to date three critically-acclaimed
9  films based on the *Lord of the Rings* trilogy, another blockbuster film based on *The*
10 *Hobbit*, and has announced plans to release two additional films based on *The Hobbit*.
11 Of relevance to this dispute, Zaentz has licensed to Warner Bros. the rights to use the
12 trademarks associated with the Tolkien Works on various types of merchandise,
13 including slot machines, online games of chance, and video games.  As royalties for
14 licensing activities have been provided to Zaentz, Zaentz in turn has provided
15 royalties related to these categories of merchandising and licensing to the Tolkien/HC
16 Parties.  More recently, Warner Bros. has been directly remitting royalties to the
17 Tolkien/HC Parties for merchandise it licenses, including video games.

18     21.    I was very surprised when I learned that the Tolkien/HC Parties,
19 notwithstanding the explicit language of the 1969 Agreements and our long course of
20 conduct, repudiated Zaentz's rights under those contracts with respect to certain video
21 game rights, physical items such as slot machines, and Zaentz's right to register
22 trademarks in various categories, including for services.  I am informed and believe
23 that, as direct result of that repudiation, Warner has been harmed in its efforts to
24 exploit the rights licensed to them by Zaentz, and any such harm has and will
25 continue to diminish the royalties Zaentz earns under those contracts.

26 //
27 //
28 //

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

I declare under penalty of perjury of the laws of the state of California and the United States, I state that the foregoing is true and correct.  Executed on this 15ᵗʰ day of April, 2013, in *Berkeley, California*.

_____
ALBERT M. BENDICH