1   DANIEL M. PETROCELLI (S.B. #97802)
    dpetrocelli@omm.com
2   VICTOR JIH (S.B. #186515)
    vjih@omm.com
3   MOLLY M. LENS (S.B. #283867)
    mlens@omm.com
4   O'MELVENY & MYERS LLP
    1999 Avenue of the Stars, 7th Floor
5   Los Angeles, California  90067-6035
    Telephone:   (310) 553-6700
6   Facsimile:   (310) 246-6779

7   Attorneys for the Warner Parties

8              **UNITED STATES DISTRICT COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10  FOURTH AGE LTD., *et al*,                     Case No. 12-9912-ABC (SHx)

11              Plaintiffs,                       **DISCOVERY MATTER**

12        v.                                      **[REDACTED] DECLARATION
                                                  OF MOLLY M. LENS IN**
13  WARNER BROS. DIGITAL                          **SUPPORT OF WARNER'S
    DISTRIBUTION, *et al*,                        MOTION TO COMPEL**
14                                                **DOCUMENTS AND PRIVILEGE
                Defendants.                       LOG**
15
                                                  **(UNREDACTED VERSION
16                                                FILED UNDER SEAL
                                                  PURSUANT TO JUNE 4, 2013**
17                                                **PROTECTIVE ORDER)**

18
                                                  **Judge**: Hon. Audrey B. Collins
19                                                **Magistrate**: Hon. Stephen J. Hillman

20  WARNER BROS. DIGITAL
    DISTRIBUTION INC., *et al*,                   **Hearing Date**:   February 24, 2014
21                                                **Hearing Time**:   2:00 p.m.
                Counterclaim
22              Plaintiffs,                       **Discovery Cut-Off**:  Apr. 15, 2014

23        v.

24  FOURTH AGE LTD., *et al*,

25              Counterclaim
                Defendants.
26

27

28

1    I, Molly M. Lens, the undersigned, hereby declare:

2    1.    I am a member in good standing of the State Bar of California, an

3    attorney in the law firm of O'Melveny & Myers LLP, and counsel for defendants

4    and counterclaim plaintiffs Warner Bros. Home Entertainment Inc., Warner Bros.

5    Entertainment Inc., Warner Bros. Consumer Products Inc., and New Line

6    Productions, Inc. (collectively, "Warner").  I submit this declaration in support of

7    Warner's Motion to Compel Documents and Privilege Log (the "Motion").  I have

8    personal knowledge of the facts set forth herein and, if called to testify, could and

9    would testify competently thereto.

10    2.    On January 7, 2014, I sent a letter pursuant to Local Rule 37-1 to

11    Rachel Valadez, counsel for plaintiffs and counterclaim defendants Fourth Age

12    Limited, Priscilla Mary Anne Reuel Tolkien, as Trustee of the Tolkien Trust, The

13    J.R.R. Tolkien Estate Ltd., Harper Collins Publishers, Ltd., Unwin Hyman Ltd. and

14    George Allen & Unwin (Publishers), Ltd. (collectively, the "Tolkien/HC Parties"),

15    in which Warner outlined several discovery disputes, including the issues raised in

16    Warner's Motion.  Attached as **Exhibit 1** is a true and correct copy of my January

17    7, 2014 letter.

18    3.    Pursuant to Local Rule 37-1, the Tolkien/HC Parties had ten days from

19    the receipt of Warner's letter to meet and confer regarding the issues raised in my

20    January 7, 2014 letter.  That ten-day period ended on January 17, 2014.

21    4.    As of January 16, 2014, Warner had still not received a response to my

22    January 7 letter.  As a result, I sent an email to Ms. Valadez reminding her of the

23    statutory ten-day meet-and-confer window.  Because the parties were scheduled to

24    attend a deposition on January 17 in San Francisco, Warner proposed that the

25    parties schedule a meet-and-confer conference for January 21, 2014—fourteen days

26    after I sent Warner's initial letter.  Attached as **Exhibit 2** is a true and correct copy

27

28

LENS DECLARATION IN SUPPORT OF
WARNER'S MOTION TO COMPEL
CASE N0. 12-9912-ABC (SHX)

of my email correspondence with Rachel Valadez, which includes my January 16, 2014 email.

5.      On January 16, 2014, I received an email from Ms. Valadez in which she indicated that the Tolkien/HC Parties were "still working to gather all the information necessary to be able to respond substantively."  Ms. Valadez informed me that the Tolkien/HC Parties were unable to meet and confer on January 21, but asked whether Warner would agree to meet and confer on January 23 or 24.   A true and correct copy of Ms. Valadez's January 16 email is included in Exhibit 2.

6.      On January 21, 2014, I emailed Ms. Valadez to inform her that Warner was willing to meet and confer on January 23—sixteen days after Warner first sent its meet-and-confer correspondence.  A true and correct copy of my January 21 email is included in Exhibit 2.

7.      On January 22, 2014, Ms. Valadez informed me via email that the Tolkien/HC Parties were no longer available to meet on January 23, and asked that Warner instead propose times for a meet-and-confer conference on January 30 or 31—twenty-three or twenty-four days after Warner served the Tolkien/HC Parties with its initial meet-and-confer letter.  A true and correct copy of Ms. Valadez's January 22 email is included in Exhibit 2.

8.      On January 23, 2014, I informed Ms. Valadez via email that in light of the Tolkien/HC Parties' failure to "confer in a timely fashion as required by L.R. 37-1," Warner intended to seek relief from the Court.  A true and correct copy of my January 23 email is included in Exhibit 2.

9.      Although Warner intended to serve the Tolkien/HC Parties with a joint stipulation, as specified under Local Rule 37-1, the Tolkien/HC Parties' repeated refusal to meet and confer in a timely fashion gave Warner no option but to file its Motion.

LENS DECLARATION IN SUPPORT OF
WARNER'S MOTION TO COMPEL
CASE N0. 12-9912-ABC (SHX)

10.     To date, Warner has received no further response to my January 7 email, including any response to Warner's questions about the Tolkien/HC Parties' issuance of any evidence preservation notices.

11.     Since Warner sent its initial meet-and-confer letter on January 7, the Tolkien/HC Parties have taken the depositions of four defense witnesses: one on January 15, 2014, one on January 17, 2014, one on January 22, 2014, and another on January 24, 2014.

12.     Some of the issues in Warner's Motion have been the subject of discussions between the parties for months.  For example, on July 1, 2013, during a meet-and-confer conference between the parties, I first asked counsel for the Tolkien/HC Parties about their collection and production of ESI from Cathleen Blackburn and Steven Maier from the time of their employment at Manches, LLP. I asked specifically whether Ms. Blackburn and Mr. Maier transferred any of their electronic data from Manches to Maier Blackburn, LLP, Ms. Blackburn's and Mr. Maier's current law firm, when they departed Manches in 2011.  Ricardo Cestero, counsel for the Tolkien/HC Parties, responded that Ms. Blackburn and Mr. Maier did not transfer any of their ESI from Manches to Maier Blackburn.

13.     Attached hereto as **Exhibit 3** is a true and correct copy of a letter sent by Rachel Valadez to John Ulin, counsel for defendant and counterclaim plaintiff The Saul Zaentz Company ("Zaentz"), on September 9, 2013.

14.     Attached hereto as **Exhibit 4** is a true and correct copy of excerpts from the deposition of Steven Maier, which was taken in the above-captioned action on December 13, 2013.

15.     Attached hereto as **Exhibit 5** is a true and correct copy of excerpts from the deposition of Cathleen Blackburn, which was taken in the above-captioned action on December 10, 2013.

LENS DECLARATION IN SUPPORT OF
WARNER'S MOTION TO COMPEL
CASE N0. 12-9912-ABC (SHX)

16.     Attached hereto as **Exhibit 6** is a true and correct copy of the document marked as Exhibit 1 at the deposition of Cathleen Blackburn.

17.     Attached hereto as **Exhibit 7** is a true and correct copy of a letter sent by Rachel Valadez to John Ulin and myself on July 9, 2013. In Section II D of her letter, Ms. Valadez responds to my June 22, 2013 email, a true and correct copy of which is attached hereto as **Exhibit 8**, in which Warner and Zaentz proposed that the parties exchange certain metadata fields, including custodian metadata, with their document productions. In Ms. Valadez's July 9 letter, she notes the Tolkien/HC Parties' agreement to exchange most of the metadata fields included in my June 22 email, including custodian metadata.

18.     Attached hereto as **Exhibit 9** is a true and correct copy of the Tolkien/HC Parties' Initial Disclosures, which were filed on March 28, 2013.

19.     Attached hereto as **Exhibit 10** is a true and correct copy of a letter sent by Rachel Valadez to John Ulin and myself on October 11, 2013.

20.     Attached hereto as **Exhibit 11** is a true and correct copy of the Tolkien Parties' response to Warner's Interrogatory No. 5.

LENS DECLARATION IN SUPPORT OF
WARNER'S MOTION TO COMPEL
CASE N0. 12-9912-ABC (SHX)

21.     Attached hereto as **Exhibit 12** is a true and correct copy of an Opinion and Order by Hon. Shira S. Scheindlin which states that custodial information, meaning "the name of the custodian or source system from which the item was collected," is a metadata field that should be included with every production of ESI. *Nat'l Day Laborer Org. Network v. U.S. Immigration & Customs Enforcement Agency*, 2011 WL 381625, at *21 (S.D.N.Y. Feb. 7, 2011) (withdrawn on other grounds), http://ellblog.com/wp-content/uploads/2011/06/National-Day-Laborer-Org-Net-v.-US-ICEA-opinion.pdf.

I declare under penalty of perjury that the foregoing is true and correct. Executed on January 27, 2014, at New York, New York.

_____
Molly M. Lens

LENS DECLARATION IN SUPPORT OF
WARNER'S MOTION TO COMPEL
CASE N0. 12-9912-ABC (SHX)

# EXHIBIT 1

# O'MELVENY & MYERS LLP

BEIJING

BRUSSELS

HONG KONG

JAKARTA†

LONDON

LOS ANGELES

NEWPORT BEACH

NEW YORK

**1999 Avenue of the Stars**
**Los Angeles, California  90067-6035**

TELEPHONE  (310) 553-6700
FACSIMILE  (310) 246-6779
www.omm.com

SAN FRANCISCO

SEOUL

SHANGHAI

SILICON VALLEY

SINGAPORE

TOKYO

WASHINGTON, D.C.

January 7, 2014

WRITER'S DIRECT DIAL
(310) 246-8593

Rachel Valadez
Greenberg Glusker Fields Claman & Machtinger LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, CA 90067

WRITER'S E-MAIL ADDRESS
mlens@omm.com

Re:   _**Fourth Age Ltd. v. Warner Bros. Digital Distribution**_

Dear Rachel:

As you know, Warner has been asking for clarification on the scope of the Tolkien/HC Parties' collection efforts for the better part of a year.  Cathleen Blackburn's and Steven Maier's deposition testimony, coupled with your recent correspondence, confirm the Tolkien/HC Parties' complete failure to meet their discovery obligations.  Accordingly, pursuant to Local Rule 37-1, please let us know when you are available to meet and confer on the issues below.

A.   Ms. Blackburn's and Mr. Maier's Files

As an initial matter, the Tolkien Parties must immediately collect and produce Cathleen Blackburn's and Steven Maier's electronic files both from Manches LLP and Maier Blackburn LLP.  Your assertion that "Manches is a third-party" and that your clients therefore have no obligation to produce Manches' files is, quite frankly, preposterous.  As Manches' files are your own clients' files, they are unquestionably within the Tolkien Parties' possession, custody, or control.  Moreover, the Tolkien Parties' attempt to rely on a purported "print to file" policy does not excuse their obligations under the Federal Rules of Civil Procedure to produce electronically stored information ("ESI").  Mr. Maier's testimony, and the Tolkien Parties' incomplete document production, underscore the inadequacy of this approach.  _See, e.g._, Maier Rough Tr. 92:12-14 (stating that he could not be certain that the policy was always followed); 94:20-21 (admitting that he could not guarantee that he had printed all emails for the file).  Please confirm your agreement to collect and produce Ms. Blackburn's and Mr. Maier's ESI.

Further, your evasive and changing representations with respect to Ms. Blackburn's and Mr. Maier's ESI is deeply troubling.  During the preliminary meet and confer on July 1, Ricardo told us that Ms. Blackburn and Mr. Maier did not transfer any of their ESI from Manches to Maier Blackburn LLP.  During his deposition, however, Mr. Maier revealed that electronic information relating to "active matters," including matters for The Tolkien Estate, was

† In association with Tumbuan & Partners

**EXHIBIT 1**
**6**

O'MELVENY & MYERS LLP

January 7, 2014 - Page 2

transferred to Maier Blackburn when he and Ms. Blackburn departed Manches.  *See* Maier Rough Tr. 183:14-186:24.  Was Mr. Cestero or Mr. Maier correct?  And, if the latter, what was the scope of the information transferred to Maier Blackburn?  You will note that the transfer of data from Manches to Maier Blackburn is included among the topics in the supplemental notice of Rule 30(b)(6) topics to Fourth Age Ltd., which is being served today.

During the July 1 meet and confer, Ricardo also informed us that he believed that Ms. Blackburn and/or Mr. Maier had made an inquiry to Manches about their files and were informed that their data from their tenure with Manches no longer existed.  Despite Warner's and Zaentz's repeated follow-up efforts, you consistently dodged—for many months—our inquiries or provided placeholder responses.  *See, e.g.,* Sept. 9 letter to J. Ulin (stating that you were "in the process of inquiring as to the status of Steven Maier's and Cathleen Blackburn's Manches-related electronic files").  Today, over five months after we requested confirmation that you would be producing this information, you apparently have made no progress, other than to suggest that your clients failed to preserve this information.  *See* Dec. 4, 2013 letter from R. Valadez (stating that you have been "corresponding with Manches in an effort to obtain any relevant electronic files which remain in their possession").  Accordingly, we must disagree with your statement that you "have been more than willing to share information with [us] as [you] receive it."  *Id*.  Given our inability to obtain this information from you, we have again included this topics in the supplemental Rule 30(b)(6) notice.

Finally, Ms. Blackburn's deposition revealed that the collection of Ms. Blackburn's and Mr. Maier's hard copy files was similarly inadequate.  As Ms. Blackburn testified, she simply provided a preexisting index of hard copy files and, on that basis, responsiveness determinations were made by your firm.  *See* Blackburn Rough Tr. 221:5-14.  Mr. Maier further testified that no Greenberg lawyer has even set foot in Maier Blackburn's offices.  *See* Maier Rough Tr. 197:3-198:25.  How were responsiveness determinations made?  To get to the bottom of this, the scope of the Tolkien parties' collection efforts are included in the supplemental Rule 30(b)(6) notice.

B. Document Preservation Notices

Mr. Maier's testimony raised grave concerns about whether documents have been adequately preserved.  *See* Maier Rough Tr. 190:22-191:3 (testifying that he did not know whether Manches' electronic files had been preserved); Tr. 182:15-22 (testifying that he "did nothing personally" to have Manches files obtained); Tr. 195:1-196:5 (testifying that he did not know if anyone had done anything to prevent relevant ESI from being deleted at Manches).  Please immediately confirm, with respect to both the Tolkien and HC parties, which entity or individuals have been issued document preservation notices and the date(s) of any such notice(s).  We are additionally requesting Rule 30(b)(6) deposition testimony on whether any information relevant to this dispute, which was available on September 7, 2010, was not preserved and, if so, which such information.

**EXHIBIT 1**

7

O'MELVENY & MYERS LLP
January 7, 2014 - Page 3

    C.  <u>Ms. Blackburn's and Mr. Maier's Depositions</u>

        As we informed you when we requested (and noticed) their depositions, Warner anticipated needing more than seven hours with Ms. Blackburn and Mr. Maier.  In response to our request, you suggested that "the parties simply reserve their rights to seek additional deposition time for any witness once the initial seven hour period has been exhausted, at which point the parties can properly meet and confer on the matter."  *See* Oct. 16 email from R. Cestero.  Warner hereby confirms that it requires additional time with both Ms. Blackburn and Mr. Maier.  For example, as discussed in this letter, critical files for these individuals remain outstanding.  Further, seven hours was insufficient for Warner (and Zaentz) to depose Ms. Blackburn and Ms. Maier on the pertinent documents produced to date.  Please confirm that you will make them both available for a second day.

    D.  <u>Custodian Metadata</u>

        Back on July 9, you agreed to produce "custodian" metadata for email, electronic files, and hard copy files.  You now claim that this agreement does not require you to provide "custodian" information and that "custodian" means "company," which is, of course, a separate and distinct metadata field that you also agreed to produce.  Your position is untenable.  Even without your agreement, custodial information is a requisite part of a production of ESI.  *See, e.g.*, *Nat'l Day Laborer Org. Network v. United States Immigration and Customs Enforcement Agency*, 2011 WL 381625 at *21 (S.D.N.Y. Feb. 7, 2011) (withdrawn on other grounds) (stating that custodial information, meaning "the name of the custodian or source system from which the item was collected," is a metadata field that should be included with every production of ESI).  Your refusal to provide this information is a transparent attempt to obscure which custodian had which documents and/or otherwise mask the incompleteness of your production.  Please immediately provide an overlay for all files produced to date with complete custodial information and confirm that you will include such information for your future productions.

    E.  <u>HarperCollins</u>

        Your disclosures to date about HarperCollins' ESI and your collection thereof have been dilatory, inconsistent, and opaque.  From what we can piece together, in contrast to your earlier position, you are no longer claiming that any potentially relevant (and non-duplicative) ESI became inaccessible or unavailable since September 2010.  Based on your disclosures, we further believe that you have agreed to collect—and produce—David Brawn's, Simon Dowson-Collins', Jane Johnson's, and Chris Smith's hard copy, email, and other electronic files (such as loose Word, PDF, and Excel files) as well as hard copy and electronic documents from central sources.  For the former employees, including Mary Butler, Adrian Laing, and any other individual for whom you contend may have had responsive data but for which their electronic documents are only available on an inaccessible source, please tell us when each individual left HarperCollins' (or one of its affiliates') employ.  Finally, for these former employees, what happened to their hard copy files when they left HarperCollins' employ?

**EXHIBIT 1**
**8**

O'Melveny & Myers llp

January 7, 2014 - Page 4

    F.  Assertions of Privilege

        During Ms. Blackburn's and Mr. Maeir's depositions, we were, to put it mildly, astonished at the claims of privilege.  Specifically, it appears that, despite her dual role as both an attorney and business manager, you have seemingly withheld all of Ms. Blackburn's communications with her clients as privileged.  Similarly, even though Mr. Maier functions as a director of The Tolkien Estate Ltd., so as to maintain a blanket claim of privilege over all his communications, Mr. Maier claims that he has never uttered a single word in that capacity.  *See* Maier Rough Tr. 172:13-15.  Further, we learned for the first time during Ms. Blackburn's deposition that you are claiming some sort of common interest privilege between the Tolkien Estate and HarperCollins.  We additionally learned—this time during Mr. Maier's deposition— that you are purporting to withhold documents between the Tolkien Estate and SZC on matters relevant to the current litigation, claiming that the communications remain protected even though your clients have sued SZC.

        Needless to say, we disagree with the validity of all of the above positions.  As an initial step, please immediately confirm whether we have misunderstood your position on any of the above assertions of privilege.  Additionally, please specify, with respect to the two claims of common interest, the time period(s) allegedly covered by the common interest, the subject matter(s) of the withheld documents, and the individuals included on such communications.

        In light of these untenable claims of privilege, Warner hereby insists that the Tolkien/HC Parties provide a privilege log for any documents withheld under an assertion of privilege.

    G.  Engagement Letter

        In contrast to your prior representation that no engagement letters existed prior to 2012, Mr. Maier testified that "he was sure Manches would have had an engagement letter."  *See* Maier Rough Tr. 175:3-4.  We further object to your assertion that every single sentence of Ms. Blackburn's 2012 engagement letter with the Tolkien Parties is privileged.

    H.  Simon Dowson-Collins

        In light of Ms. Blackburn's and Mr. Maier's testimony that they generally communicate with Simon Dowson-Collins at HarperCollins about Tolkien matters, Warner requests that you make him available in Los Angeles for a deposition.  Please promptly provide dates when Mr. Dowson-Collins is available.

        Mr. Maier also identified Karly Last as an attorney at HarperCollins with whom he dealt on Tolkien matters.  *See* Maier Rough Tr. 277:12-13.  Please confirm whether you have collected Ms. Last's files and, if not, why not.

EXHIBIT 1
9

O'MELVENY & MYERS LLP

January 7, 2014 - Page 5

I.  <u>Tolkien Heirs</u>

During the July 1 meet and confer, we asked that you to confirm that your discovery responses included information from the directors of the Tolkien entities, and you assured us that they did.  Cathleen Blackburn, however, testified that both Michael Tolkien and Steven Maier are directors of The Tolkien Estate Ltd. but neither of them appear on your list of custodians.  Please confirm your willingness to include both Mr. Tolkien and Mr. Maier as custodians.

J.  <u>Jeremy Nussbaum's Files</u>

Your December 4 letter states that "it is [y]our understanding that [Jeremy Nussbaum's] files were collected by the Tolkien/HC Parties' prior counsel (and/or their predecessors) in connection with the audit that prompted the prior lawsuit."  What is the basis for this assertion?  What was the scope of that collection?  Have you taken any steps to preserve or collect Mr. Nussbaum's files after the audit that proceeded the prior lawsuit in 2008?  Finally, please confirm when Mr. Nussbaum passed away.

Sincerely,

Molly M. Lens
of O'MELVENY & MYERS LLP

cc:   John UIin

**EXHIBIT 1**
**10**

# EXHIBIT 2

**From:** Lens, Molly
**Sent:** Thursday, January 23, 2014 7:09 PM
**To:** 'Valadez, Rachel'
**Cc:** Eskenazi, Bonnie; Cestero, Ricardo; Moriarty, Elisabeth; Marty.Glick@aporter.com; Ulin, John C. (John.Ulin@APORTER.COM); Callagy, Sean M. (Sean.Callagy@aporter.com); Hallman, Robert D. (Robert.Hallman@aporter.com); Petrocelli, Daniel; Jih, Victor; Primack, Nikolas A.; Haye, Julia
**Subject:** RE: Fourth Age Ltd.

Rachel –

You have failed to confer in a timely fashion as required by L.R. 37-1. You cannot unilaterally delay our right to proceed, and we intend to seek relief from the Court. We should nonetheless meet and confer on Thursday afternoon, given the number of outstanding items that we are still waiting for you to address. We propose 3:00 pm.

Thanks,

Molly

_____

**Molly M. Lens**
**O'Melveny & Myers LLP**
1999 Avenue of the Stars
Los Angeles, CA 90067
Phone: (310) 246-8593
Fax: (310) 246-6779
mlens@omm.com

*This message and any attached documents contain information from the law firm of O'Melveny & Myers LLP that may be confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.*

**From:** Valadez, Rachel [mailto:rvaladez@greenbergglusker.com]
**Sent:** Wednesday, January 22, 2014 2:47 PM
**To:** Lens, Molly
**Cc:** Eskenazi, Bonnie; Cestero, Ricardo; Moriarty, Elisabeth; Marty.Glick@aporter.com; Ulin, John C. (John.Ulin@APORTER.COM); Callagy, Sean M. (Sean.Callagy@aporter.com); Hallman, Robert D. (Robert.Hallman@aporter.com); Petrocelli, Daniel; Jih, Victor; Primack, Nikolas A.; Haye, Julia
**Subject:** RE: Fourth Age Ltd.

Molly,

Due to unexpected developments in connection with the depositions and related travel this week and next, we will be unable to substantively confer regarding the issues in your January 7th letter addressing various document production matters until after David Imhoff's deposition has concluded next week. Please propose a time that works on your end for either Thursday the 30th or Friday the 31st and we will do our best to make ourselves available.

We anticipate being able to respond to the majority of the other outstanding meet and confer issues you have raised by the end of this week.

Best,

1
**EXHIBIT 2**
**11**

Rachel

---

**From:** Lens, Molly [mailto:mlens@omm.com]
**Sent:** Tuesday, January 21, 2014 9:20 AM
**To:** Valadez, Rachel
**Cc:** Eskenazi, Bonnie; Cestero, Ricardo; Moriarty, Elisabeth; Marty.Glick@aporter.com; Ulin, John C.
(John.Ulin@APORTER.COM); Callagy, Sean M. (Sean.Callagy@aporter.com); Hallman, Robert D.
(Robert.Hallman@aporter.com); Petrocelli, Daniel; Jih, Victor; Primack, Nikolas A.
**Subject:** RE: Fourth Age Ltd.

Rachel –

Since the vast majority of the issues in our January 7 letter date back months, we trust that your need for more than the
statutorily provided ten-day period signifies that your clients finally understand the importance of the issues raised
therein.  Accordingly, we are willing to meet and confer on Thursday, January 23 at 11:00 am.  Please confirm whether
you intend to provide a written response to our January 7 Rule 37-1 letter before then.

Further, we have not heard from Greenberg in response to our three letters of January 3, our other letter of January 7,
or our email of January 13.  We ask for a response on these issues as soon as possible and, in any event, no later than
the close of the week.

Thanks,

Molly

_____

**Molly M. Lens**
**O'Melveny & Myers LLP**
1999 Avenue of the Stars
Los Angeles, CA 90067
Phone: (310) 246-8593
Fax: (310) 246-6779
mlens@omm.com

*This message and any attached documents contain information from the law firm of O'Melveny & Myers LLP that may be
confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute, or use this
information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then
delete this message.*

---

**From:** Valadez, Rachel [mailto:rvaladez@greenbergglusker.com]
**Sent:** Thursday, January 16, 2014 4:57 PM
**To:** Lens, Molly
**Cc:** Eskenazi, Bonnie; Cestero, Ricardo; Moriarty, Elisabeth; Marty.Glick@aporter.com; Ulin, John C.
(John.Ulin@APORTER.COM); Callagy, Sean M. (Sean.Callagy@aporter.com); Hallman, Robert D.
(Robert.Hallman@aporter.com); Petrocelli, Daniel; Jih, Victor; Primack, Nikolas A.
**Subject:** RE: Fourth Age Ltd.

Molly,

Given the breadth of the issues raised in your letter, and the fact that certain of the issues are being raised for the first
time, we are still working to gather all the information necessary to be able to respond substantively.  I apologize for the
delay, but given all that is currently happening in the case, we need a few additional days to prepare our
response.  Although the 21st will not work for us, we are available to have a conference sometime later that
week.  Please let us know a time on Thursday or Friday that might work for Warner.

Best,
Rachel

**Rachel Valadez** | **Attorney at Law** | Biography
D: 310.785.6862 | F: 310.201.2331 | RValadez@greenbergglusker.com

**Greenberg Glusker Fields Claman & Machtinger LLP**
1900 Avenue of the Stars, 21st Floor, Los Angeles, CA 90067
O: 310.553.3610 | GreenbergGlusker.com

**IRS Circular 230 Disclosure:**
To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax related penalties under the Internal Revenue Code, or (ii) promoting, marketing or recommending to another party any tax-related matters addressed herein.

This message is intended solely for the use of the addressee(s) and is intended to be privileged and confidential within the attorney client privilege. If you have received this message in error, please immediately notify the sender at Greenberg Glusker and delete all copies of this email message along with all attachments. Thank you.

**From:** Lens, Molly [mailto:mlens@omm.com]
**Sent:** Thursday, January 16, 2014 4:04 PM
**To:** Valadez, Rachel
**Cc:** Eskenazi, Bonnie; Cestero, Ricardo; Moriarty, Elisabeth; Marty.Glick@aporter.com; Ulin, John C. (John.Ulin@APORTER.COM); Callagy, Sean M. (Sean.Callagy@aporter.com); Hallman, Robert D. (Robert.Hallman@aporter.com); Petrocelli, Daniel; Jih, Victor; Primack, Nikolas A.
**Subject:** RE: Fourth Age Ltd.

Rachel:

We have not received a response to our January 7 letter (reattached here).  As you should know, the last day for plaintiffs to meet and confer with us is tomorrow.  Given your lack of response, and the deposition tomorrow, we are reaching out in a final attempt to schedule the parties' L.R. 37-1 conference on Tuesday, January 21.  Otherwise, Warner intends to move forward with its portion of a joint stipulation.

Thanks,

Molly

_____
**Molly M. Lens**
**O'Melveny & Myers LLP**
1999 Avenue of the Stars
Los Angeles, CA 90067
Phone: (310) 246-8593
Fax: (310) 246-6779
mlens@omm.com

*This message and any attached documents contain information from the law firm of O'Melveny & Myers LLP that may be confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.*

**From:** Lens, Molly
**Sent:** Tuesday, January 07, 2014 1:02 PM
**To:** Valadez, Rachel (rvaladez@greenbergglusker.com)
**Cc:** Eskenazi, Bonnie (beskenazi@greenbergglusker.com); rcestero@greenbergglusker.com; Moriarty, Elisabeth (emoriarty@greenbergglusker.com); Marty.Glick@aporter.com; Ulin, John C. (John.Ulin@APORTER.COM); Callagy, Sean M. (Sean.Callagy@aporter.com); Hallman, Robert D. (Robert.Hallman@aporter.com); Petrocelli, Daniel; Jih, Victor; Primack, Nikolas A.
**Subject:** Fourth Age Ltd.

Please see the attached.

_____

**Molly M. Lens**
**O'Melveny & Myers LLP**
1999 Avenue of the Stars
Los Angeles, CA 90067
Phone: (310) 246-8593
Fax: (310) 246-6779
mlens@omm.com

*This message and any attached documents contain information from the law firm of O'Melveny & Myers LLP that may be confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.*

# EXHIBIT 3

**Rachel Valadez**
D: 310.785.6862
F: 310.201.2331
RValadez@GreenbergGlusker.com
File Number: 84971-00003



GREENBERG GLUSKER
The Counsel You Keep™

September 9, 2013

**Via E-Mail and U.S. Mail**

John C. Ulin, Esq.
ARNOLD & PORTER, LLP
777 S. Figueroa Street
Los Angeles, CA 90017-5844

Re:  *Fourth Age Limited, et al. v. Warner Bros. Digital Distribution, Inc., et al.*
(Case No. CV 12-09912 ABC (SHx))

Dear John:

I write in response to your letter of August 16, 2013.

As a preliminary matter, we disagree with your characterization of the Tolkien/HC Parties' document production efforts to date. The Tolkien/HC Parties have been diligently reviewing and producing documents in compliance with the parties' meet and confer discussions since early May 2013. Although we anticipated making a substantial additional production Friday afternoon, Thursday evening our production database became corrupted and we will have to redo much of our work. In any event, we intend to make an additional production as soon as the database has been repaired and will continue to produce documents on a good faith, rolling basis.

Your purported "concern" regarding the Tolkien/HC Parties' collection efforts is similarly disingenuous. During the parties' in-person meet and confer session on June 27, 2013 we repeatedly informed you that the vast majority of the Tolkien/HC Parties' production would consist of hard copy files. As to the Tolkien Parties, their practice has always been to print and file all email correspondence. We have reviewed all relevant Tolkien Party files and are producing responsive documents therefrom, including email. We will also be producing responsive, non-privileged electronic emails from several Greenberg Glusker attorneys and we are in the process of inquiring as to the status of Steven Maier's and Cathleen Blackburn's Manches-related electronic files. As to the HC Parties, electronic email files are only maintained for eight (8) weeks before being purged and placed onto back-up tapes that are not reasonably accessible. As such, any accessible electronic email files were generated post-filing of this action and consist solely of privileged communications. It is unclear what you mean by "archive format," but, as I am sure you are aware, it is not the Tolkien/HC Parties' obligation to produce electronic files identified as not reasonably accessible. *F.R.C.P. Rule 26(b)(2)(B).* The cost and burden of restoring the HC Parties' back-up tapes is simply too great considering most, if not all, relevant, responsive electronic documents are being produced from the Tolkien/HC Parties' hard copy files.

**Greenberg Glusker Fields Claman & Machtinger LLP**
1900 Avenue of the Stars, 21st Floor, Los Angeles, California, 90067
T: 310.553.3610  |  F: 310.553.0687
84971-00003/1972548.1

**EXHIBIT 3**
**15**

**GreenbergGlusker.com**

ARNOLD & PORTER, LLP
September 9, 2013
Page 2

As to your remaining questions with regard to the HC Parties' files, as we have
repeatedly explained, these files are not maintained by custodian, but are instead filed centrally
by topic. We can confirm that we have pulled and are reviewing and producing all of the HC
Parties' accessible, responsive, non-privileged files. As to the HC Parties' documents produced
to date, we have included an HC metadata designation in connection with all documents
produced from the HC Parties.

## I.   Zaentz Responses

A.   RFP Nos. 1, 3, 6-7, 9-10 & 60

As to Categories 2 and 4[1], please confirm your agreement to produce documents that
*refer to, reflect, describe or evidence*[2] the relevant substantive categories.

B.   RFP Nos. 2, 4-5, 8 & 38-45

It appears we are in agreement as to these requests.

C.   RFP Nos. 11-13 & 61-63

As to Category 1 – Limited Development Documents – it appears we have reached an
impasse. Your refusal to produce these admittedly relevant documents based on your burden
objection and insistence that the final versions of the games should be sufficient, rings hollow for
several reasons. First, even if the final versions of the games were the best way to determine the
source of ultimate content (they are not), you have consistently refused to produce the final
versions of these games. Second, we have repeatedly explained that the final art and
correspondence/memos related to visual creative content are absolutely necessary to analyze the
source of ultimate content included in a given game, as well as Zaentz's and its licensees' related
decision making processes. For example, the fact that a certain mountainscape was included in a
game may be observed by playing the final version, but whether it was sourced from one of the
films or the books, and whether Zaentz or its licensees intentionally included (or excluded) a film
or book-sourced image, could not be discerned from the game itself. We are absolutely entitled
to all Limited Development Documents to be able to fully analyze such issues. Moreover,
discussion between Zaentz and the game developers regarding the "look and feel" of a game is
likely to shed light on whether particular images were based on the films or the books.

---

[1] As with my letter of August 7, 2013, for efficiency, this letter summarizes the discovery requests and responses,
and the parties' proposals in prior meet and confer correspondence. Please refer to the actual requests, responses,
and proposals in my prior letters to determine the full scope of the requests at issue and the current state of the
parties' meet and confer discussions.
[2] Pursuant to my 8/7 letter, we have proposed this "*refer to, reflect, describe or evidence*" language in connection
with several requests. As you have not raised any concerns in connection with this language, we will interpret the
requested confirmation to apply to all requests referencing this language unless you indicate otherwise.

**EXHIBIT 3**

**16**

**GreenbergGlusker.com**

ARNOLD & PORTER, LLP
September 9, 2013
Page 3

Third, any alleged burden in gathering these documents is outweighed by their admitted
relevance to the affirmative defense <u>you</u> have raised concerning the contractual source of
Zaentz's merchandising rights. Any burden associated with these documents exists only because
of the position you have taken with respect to the rights granted by paragraph 2 of the 1969
Agreements. As we have repeatedly explained, should you abandon that argument, we will
withdraw our requests for these documents. Absent that, we will move for a full production and
are confident the Magistrate will agree.

As to Category 4 – Limited Revenue Documents – you have misstated the scope of what
remains at issue. Pursuant to our prior meet and confer discussions, the remaining disputes
between the parties concern royalty statements and accompanying correspondence Zaentz
received from its licensees, including Warner,[3] and documents sufficient to show when any
relevant Disputed Exploitation began and when the Tolkien/HC Parties began receiving
merchandising revenue in connection therewith. As to statements and correspondence Zaentz
received from its licensees, your letter wholly fails to address this category. We assume your
omission means you are refusing to produce despite the reasons proffered in my 8/7 letter. As
such, we will seek the assistance of the Magistrate. Regarding documents sufficient to show
when exploitations began and when/whether the Tolkien/HC Parties began receiving related
revenue, we do not understand your position. We are not seeking "many thousands of pages of
back-up from licensees" over a "15 year" period as you claim. Instead, as we've explained on
multiple occasions, we are only seeking documents "sufficient to show" this information, which
you concede is "relevant," and which you have represented you believe can be obtained from the
documents you have already agreed to produce. If that is true, we do not understand your
reluctance to commit to this production. You do not dispute that we are entitled to these
documents. If you are unwilling to commit to their production, we will ask the Magistrate to
intervene.

    C1.    <u>RFP Nos. 15 and 65</u>

Your letter fails to address your position as to Category 1. Please either confirm your
agreement or provide an explanation for your position.

    D.    <u>RFP Nos. 13, 20, 21, 32-34, 42-43, 48, 53, 63, 74 -75, 77, & 79; Interrogatory</u>
<u>Nos. 5-6, 9 & 12-14; and RFA No. 3 – Intangible Games</u>

It appears we are in agreement.

    E.    <u>RFP Nos. 14, 22, 59, 64 & 66 (and 23, 35-37, 44-45, 49 & 78) – Disputed Marks</u>

Subject to further discussions as to Class 16, it seems the only remaining issues here
mirror the above concerns expressed in connection with Category 4 (Limited Revenue

---

[3] References to Warner include its affiliates, subsidiaries and internal divisions.

**EXHIBIT 3**
**17**

GreenbergGlusker.com

ARNOLD & PORTER, LLP
September 9, 2013
Page 4


Documents).  As explained above, we are prepared to move as to the disputed Limited Revenue Documents.

F.   RFP Nos. 17, 19, 21, 23 & 25

We do not understand your position as to these requests.  In my 7/9 letter, we proposed a production in 4 specific categories.  In your 7/19 responsive letter, you agreed to produce documents in Categories 2 and 3[4], raised issues with Category 1 (communications between Warner, Zaentz, the Tolkien/HC Parties and internal analyses), and reiterated your issues with Category 4 (Limited Revenue Documents).  As to Category 1, we believed the only remaining dispute concerned your exclusion of non-rights related communications as between Zaentz and Warner, and internal analyses responsive to these requests.  As to Category 4, the Limited Revenue Document discussion throughout our meet and confer correspondence applied.  In your most recent letter of 8/16, you state only that you are willing to produce documents "as to the negotiation and modification (or termination) of the license, and to adopt the framework here that [we] proposed for analogous requests for documents "relating to the interpretation" of agreements.

We find your departure from the established positions the parties' have taken during the past months of meet and confer discussions extremely frustrating.  Please refer to the summary of our discussions in my 7/9 and 8/7 letters and state your current position in light of the entirety of our past discussions.  We intend to seek the Magistrate's assistance absent your willingness to produce the documents we have repeatedly requested.

G.   RFP Nos. 26, 29, 32 & 35

We believe we are in agreement provided the parties' understanding applies to Request No. 32 as well.  Please confirm.

H.   RFP Nos. 27-28, 30-31, 36-37, 46-47, 49, 55 & 74

We intend to seek the production of all responsive Limited Revenue Documents in connection with each of these requests.  As to your inquiry regarding RFP Nos. 55 and 74, in response to the proposals in your 6/10 letter, the Tolkien/HC Parties proposed the Limited Revenue Documents limitation discussed at the parties' in-person meet and confer meetings and in my 7/9 letter.  Since that time, we have consistently requested that Zaentz produce all responsive Limited Revenue Documents in connection with these requests.  We continue to do so.

---

[4] As to Category 3, you incorporated your discussion from section I.E of your 7/19 letter, where you greed to provide responsive documents.

**EXHIBIT 3**
**18**

**GreenbergGlusker.com**

ARNOLD & PORTER, LLP
September 9, 2013
Page 5

I.   RFP Nos. 51-52

The Tolkien/HC Parties' position as to the Limited Development Documents continues to apply to these requests.  We are prepared to move.

J.   RFP No. 58

It appears we are in agreement, however, as requested in my 8/7 letter, for the sake of clarity, please confirm you will produce documents in compliance with the language in my 7/9 letter.

K.   RFP Nos. 67 & 68

It appears we are in agreement.

L.   RFP No. 70

It appears we are in agreement.

M.   RFP No. 71

Your letter wholly misconstrues the proposal in my 8/7 letter.  First, you completely ignore the statement that "we are seeking the Limited Development Documents described in my 7/9 letter, as limited by the 'visual creative content' proposal discussed above in item I.C."  Second, at no point did we state that the Tolkien/HC Parties would limit the documents sought here to those that "'refer, relate to, or reflect'" the negotiation and modification of the amendment at issue."  Once again, we find your mischaracterization of the parties' discussions frustrating and unhelpful.  We are prepared to move on the request based on the limitations stated in my 8/7 letter.

N.   RFP Nos. 72 & 73

As with RFP No. 71, your letter entirely misrepresents the proposal in my 8/7 letter.  We intend to seek the Magistrate's assistance here as well.

O.   RFP No. 80

We do not agree to your proposal.  For the reasons set forth in all prior meet and confer correspondence to date, we will ask the Magistrate to compel a full production.

P.   Interrogatory Nos. 7-8 & 10-11 (and 9 & 12)

You have agreed to produce documents sufficient to answer Interrogatory Nos. 7-8 & 10-11.  Please confirm this applies to Interrogatory Nos. 9 & 12 as well.

**EXHIBIT 3**
**19**

**GreenbergGlusker.com**

ARNOLD & PORTER, LLP
September 9, 2013
Page 6

      This letter constitutes the Tolkien/HC Parties' final meet and confer attempt with respect
to the foregoing requests. Absent your concession on the issues addressed above by the end of
this week, we intend to provide you with the Tolkien/HC Parties' portion of a joint stipulation in
support of a motion to compel in connection with the above requests.

II.      **<u>Tolkien/HC Parties' Responses</u>**

      A.      <u>Interrogatory No. 1</u>

      As you are aware, responding to this interrogatory has required the Tolkien/HC Parties to
review and analyze thousands of trademark and service mark registration and application
summaries that were previously uniquely in Zaentz's possession. We are in the process of
completing this analysis and anticipate supplementing this response by the end of September.

      B.      <u>Interrogatory No. 2</u>

      As Zaentz has yet to complete its document production, we cannot agree to supplement
this response by a date certain. However, as we have repeatedly stated, upon completion of this
portion of your document production, we intend to supplement this response.

      C.      <u>Interrogatory No. 4</u>

      It appears we are in agreement.

      D.      <u>RFP No. 1</u>

      Having considered the discussion in your 8/16 letter, subsequent to confirming with our
client, we would be inclined to produce documents responsive to this request, exclusive of
documents related to (1) copyrights in the Tolkien Works at issue; (2) the Tolkien name; (3) the
appendices to the Tolkien Works; (4) songs; (5) maps; (6) sound recordings; (7) poems; and (8)
illustrations, except that we will also produce registrations and applications in connection with
the Disputed Marks even if they would otherwise fall under one of these exclusions. Please let
me know if this would be acceptable.

      E.      <u>RFP Nos. 2-3</u>

      Subsequent to receiving final confirmation from our clients, we are willing to adopt the
SZC Modified (Disputed) Exploitation Categories, exclusive of e-books, in response to these
requests. We will confirm shortly.

**EXHIBIT 3**
**20**

**GreenbergGlusker.com**

ARNOLD & PORTER, LLP
September 9, 2013
Page 7

   F.  RFP Nos. 4-5, 8-10, 17-18

  As to RFP Nos. 4-5, 9-10, and 18, we can agree to produce responsive documents that
discuss the SZC Modified (Disputed) Exploitation Categories, minus e-books. As to Nos. 8 &
17, we appreciate your willingness to exclude third party complaints. However, we still do not
understand the relevance of the Tolkien/HC Parties' complaints regarding Zaentz's indisputably
legitimate licensing activity. The concerns expressed in my 8/7 letter regarding third party
complaints as to legitimate exploitations such as board games and/or the films apply equally to
the Tolkien/HC Parties. For example, how would a HarperCollins employee's comment made to
a third party regarding his or her disapproval of the casting of Elijah Wood in *The Lord of the
Rings* films possibly be relevant to the claims and defenses in this case? To address the points in
your letter, such a comment would in no way bear on the parties' relationship over the years, the
nature and extent of Plaintiffs' monitoring and enforcement activities, nor the grounds on which
Plaintiffs have deemed any prior Zaentz activity to be improper or unauthorized in any way
relevant to this case. Moreover, even if such documents were minimally relevant (they are not),
the burden associated with attempting to search for and collect such random, isolated comments
would far outweigh any purported utility they may have. We have already agreed to produce
such complaints made in connection with the Disputed Exploitations. We believe that is
sufficient.

   G.  RFP Nos. 15-16

  Subsequent to receiving final confirmation from our clients, we confirm we are willing to
produce documents in response to these requests as limited by the SZC Modified (Disputed)
Exploitation Categories, exclusive of e-books, to the extent we have them in our possession,
custody, or control. We will confirm shortly.

   H.  RFP No. 19

  It appears we are in agreement.

   I.  RFP No. 21

  After conferring with our clients, we can represent that there is no repository of
agreements that would allow us to search for and collect documents responsive to this request in
any sort of reasonable manner. A production of agreements responsive to this request would
thus require Plaintiffs to literally search through every file potentially containing an agreement,
regardless of when that agreement was executed or its subject matter, and then manually read
through the text of each agreement to determine whether it contained the phrase "articles of
tangible personal property." As to the HC Parties, such a search would require the review of
millions of pages of agreements that have no relationship whatsoever to the Tolkien Works,
Zaentz, or Warner, let alone the claims and defenses at issue in this case. Such a review would
require hundreds of additional hours and potentially hundreds of thousands of dollars in

**EXHIBIT 3**
**21**

**GreenbergGlusker.com**

ARNOLD & PORTER, LLP
September 9, 2013
Page 8


additional attorneys' fees.  The burden in responding to this "needle-in-a-haystack" request is patent, and we are confident the Magistrate will agree.  We must stand on our objections.

Best,

Rachel Valadez

RV

cc:      Sean M. Callagy
         Martin R. Glick
         Robert D. Hallman
         Victor Jih
         Molly Lens
         Daniel Petrocelli

GreenbergGlusker.com

# EXHIBIT 4

## FILED UNDER SEAL PURSUANT TO JUNE 4, 2013 PROTECTIVE ORDER

EXHIBIT 4
23 - 79

# EXHIBIT 5

## FILED UNDER SEAL PURSUANT TO JUNE 4, 2013 PROTECTIVE ORDER

EXHIBIT 5
80 - 98

# EXHIBIT 6

## CATHLEEN BLACKBURN

| | |
|---|---|
| **Date of Birth:** | August 25, 1960 |
| **School:** | St Joseph's R C Comprehensive School, Hebburn on Tyne |
| **University:** | University of Oxford<br>Lady Margaret Hall |
| | BA (Hons) Modern Languages (French and German) 1982,<br>MA 1989 |

### Professional

| | |
|---|---|
| **1984-1989** | **Linklaters** – commercial litigation |
| | Admitted as a Solicitor 1986 |
| **1989-1997** | **Morrell Peel & Gamlen** – non-contentious IP and<br>commercial law |
| | Partner 1991 |
| **1997-2011** | **Manches LLP** – partner, head of non-contentious media<br>and entertainment department |
| | Member of the firm's Executive Board from 2000 to 2006 |
| **2012 -** | **Maier Blackburn –** founding partner, non-contentious<br>media and entertainment |
| **Experience:** | Extensive experience of copyright and trade mark law,<br>especially as affecting publishing and related creative<br>industries; also specialising in advice to the cultural and<br>heritage sectors |
| | Noted for quality of work, calibre of clients and highly<br>commercial, confidence-inspiring approach; Legal 500<br>'Leading Individual' in the South East region and<br>recommended for copyright and publishing work |
| | Member of the Copyright Committee of the Association of<br>Learned Professional and Society Publishers; member of the<br>Museums Copyright Group |



**EXHIBIT 6**

**99**

## **Recent Work Examples**

- Advising the J R R Tolkien Estate on the licensing of its titles for e-book publication in various territories, including the US

- Advising a family entertainment company on its plans to acquire the properties and brands of a number of estates of classic children's writers with a view to wider exploitation of their assets

- Advising a US publisher on recurrent trade mark issues arising from use/depiction of famous brands in book titles and on book covers

- Advising a US comic book publisher on chain of title and rights issues on its acquisition of a famous 1960s comic book character from a UK author

- Advising a US entertainment company on its rights in the future output of the author and illustrator of a series of popular children's works acquired from a predecessor in title

- Advising a US publisher on the special status accorded to J M Barrie's "Peter Pan" under UK copyright law and its impact on the scope for creating derivative works

- Advising an educational publisher on a royalty dispute involving complex statutory termination issues under US copyright law

- Advising a European learned society on the termination of its contract with its existing publisher and the appointment of a successor

- Advising various clients on the impact of the copyright extension/revival in the EU and 1911 Copyright Act limitations on the power to assign the post-death copyright term

- Advising a US publisher on the UK/EU protection for US works out of copyright in their home territory arising from the US adherence to the Universal Copyright Convention and under wartime treaties and simultaneous publication rules

- Advising a publisher of clinical reviews on the copyright implications of gathering data from on-line resources and research findings

- Advising a UK literary estate on the implications of the Supreme Court challenge (*Golan v Holder*) to the US copyright restoration of foreign works implemented pursuant to the Uruguay round of GATT in the mid-1990s

- Advising an educational charity on issues relating to the sale of cultural property and the law relating to conditional benefactions

**EXHIBIT 6**
**100**

Additionally, managing the business of a well-known literary estate across its worldwide operations, involving:

- Advising on contracts and licences for the exploitation of various copyright rights

- Managing and licensing an extensive worldwide trade mark portfolio

- Advising on posthumous publication/access to unpublished archive materials

- Dealing with complex permissions issues

- Managing relations with publishers, film companies and would-be licensees of rights

- Dealing with tax, financial and structural issues and matters relating to trust and charitable status

- Referring and managing the work of various professional advisers, including overseas counsel, trade mark attorneys and others

EXHIBIT 6
101

# EXHIBIT 7



**Rachel Valadez**
D: 310.785.6862
F: 310.201.2331
RValadez@GreenbergGlusker.com
File Number: 84971-00003

July 9, 2013

**Via E-Mail and U.S. Mail**

John C. Ulin, Esq.
ARNOLD & PORTER, LLP
777 S. Figueroa Street
Los Angeles, CA 90017-5844

Molly Lens, Esq.
O'MELVENY & MEYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067

> Re: *Fourth Age Limited, et al. v. Warner Bros. Digital Distribution, Inc., et al.*
> (Case No. CV 12-09912 ABC (SHx))

Dear Counsel:

I write to summarize and continue the parties' discussion from our June 27, 2013 meeting concerning Warner's and Zaentz's responses to Fourth Age Ltd.'s First Sets of Requests for Production of Documents, Requests for Admissions, and Interrogatories.

## I.   Specific Requests to Zaentz and Warner

### A.   RFP Nos. 1, 3, 6-7, 9-10 & 60 to Zaentz and Nos. 1-10 & 60 to Warner

These requests seek documents relating to the negotiation, interpretation, or modification of the Merchandising License (defined as Schedules D to the 1969 Agreements and the 1975 and 1981 Amendments thereto), as well as communications and internal documents related to the same. Both Zaentz and Warner expressed concerns about the overbreadth of these requests due to the potential expansiveness of the terms "interpretation" and "relating." In particular, you were concerned these terms would encompass some irrelevant correspondence with third parties relating to the implementation of various sublicenses. During our discussion, the parties generally agreed on a framework whereby Zaentz and Warner would produce documents in four categories included within these requests. We propose that Zaentz and Warner produce the following documents in response to these requests:

> 1.   Documents relating to the negotiation and modification of the Merchandising License, and documents that discuss or reflect the interpretation of the Merchandising License;

**Greenberg Glusker Fields Claman & Machtinger LLP**
1900 Avenue of the Stars, 21st Floor, Los Angeles, California, 90067
T: 310.553.3610  |  F: 310.553.0687
84971-00003/1952015.1

**EXHIBIT 7**
**102**

**GreenbergGlusker.com**

ARNOLD & PORTER, LLP
O'MELVENY & MEYERS LLP
July 9, 2013
Page 2



2.      Documents relating to the scope of rights granted under the Merchandising
        License;

3.      Documents relating to Online/Downloadable/Intangible Games, Online Slots,
        Casino Slot Machines, the Disputed Marks (redefined below in section I.E), and
        Video Games (the "Disputed Exploitations"), exclusive of development
        documents (which are addressed below) and documents reflecting the non-rights
        related administration of any relevant licenses; and

4.      Documents relating to the source of any merchandising rights as between the
        1969 Agreements and the Merchandising License.

Please let us know if this is acceptable.

B.      <u>RFP Nos. 2, 4-5 & 8 (and 38-41 & 44-45) to Zaentz</u>

        RFP Nos. 2, 4-5 & 8 also seek Merchandising License-related documents, but as between
Warner and/or United Artists, and other parties. Here, Zaentz was initially unwilling to produce
documents it believed the Tolkien/HC Parties would receive from Warner. We explained the
relevance of Zaentz's receipt and possession of these documents given its estoppel/waiver
affirmative defenses and counterclaims, and the fact that we may not get a full production from
Warner given the length of time concerned and the nature of the review process. Zaentz said it
would consider its position and get back to us. The Warner duplication issue also applies to RFP
Nos. 38-41 & 44-45.

C.      <u>RFP Nos. 11-12, 15, 61-62 & 65 to Zaentz and 11-13, 15, 61-63 & 65 to Warner</u>

        These requests seek communications and internal documents relating to the disputed
exploitations of Online Slots, Casino Slot Machines, and Video Games as to Zaentz and Warner,
as well as Intangible Games as to Warner. As to Online Slots and Casino Slot Machines (RFP
Nos. 11-12 and 61-62) we explained that at a minimum, we will need documents relating to
creative development, rights and revenues, and the licenses themselves.

        Although Zaentz and Warner expressed overbreadth and burden concerns regarding the
development and revenue documents, you agreed to consider our proposal. Warner stated that it
believed revenue documents pre-9/1/2010 were irrelevant because of the release in the Hobbit
Binding Term Sheet. We explained that regardless of the release, historical revenue documents
were relevant to predict the future value of these rights – a component of the Tolkien/HC Parties'
damages in this case. Warner asked us to provide authority for the proposition that the future
value of rights may be recoverable on a copyright infringement claim. As requested, § 504 of
the Copyright Act and the following cases amply support that proposition: 15 U.S.C. § 504
("…an infringer of copyright is liable for *either the copyright owner's actual damages <u>and</u> any
additional profits of the infringer…<u>or</u>* statutory damages, as provided by subsection (c)")

**Greenberg Glusker Fields Claman & Machtinger LLP**
1900 Avenue of the Stars, 21st Floor, Los Angeles, California, 90067
T: 310.553.3610   |   F: 310.553.0687
84971-00003/1952015.1

**EXHIBIT 7**
**103**

**GreenbergGlusker.com**

ARNOLD & PORTER, LLP
O'MELVENY & MEYERS LLP
July 9, 2013
Page 3

(emphasis added); *Oracle America, Inc. v. Google, Inc.*, 847 F.Supp.2d 1178, 1182-1184 (N.D. Cal. 2012) (hypothetical lost license fee and future value of property are properly recoverable in copyright infringement action, in addition to disgorgement of profits); *Polar Bear Productions, Inc. v. Timex Corporation*, 384 F.3d 700, 707-708 (9th Cir. 2004) (copyright owner is entitled to recover the actual damages suffered by him or her attributable to the infringement, including the value of the copyrighted work to the infringer, and any profits of the infringer that are attributable to the infringement).

Given the foregoing, as to Online Slots, Casino Slot Machines (RFP Nos. 11-12 and 61-62), and Intangible Games (RFP Nos. 13 & 63 to Warner) we propose Warner and Zaentz produce documents in the following categories of documents:

1. "Limited Development Documents," meaning: (a) the final art for any relevant Disputed Exploitation; (b) all final versions of any relevant Disputed Exploitation; and (c) all correspondence and memos relating to the creative content of any relevant Disputed Exploitation (the "Limited Development Documents" limitation would be without prejudice to our ability to seek additional development related documents at a later date);

2. Relating to rights in and to these items, including the scope of any party's rights in and to these items;

3. Licenses for these items; and

4. "Limited Revenue Documents," meaning: (a) all royalty statements produced to any party, including, without limitation, Zaentz, Warner (including any Warner affiliates, subsidiaries, or internal divisions), the Tolkien/HC Parties, and any sublicensee or participant, as well as any correspondence accompanying any such statement; (b) drafts of all royalty statements as between Zaentz, Warner (including any Warner affiliates, subsidiaries, or internal divisions), and the Tolkien/HC Parties; (c) documents sufficient to determine the distribution of revenues as between and among the Tolkien/HC Parties, Zaentz, Warner (including any Warner affiliates, subsidiaries, or internal divisions), and any sublicensee; (d) documents sufficient to show when any relevant Disputed Exploitation began and when the Tolkien/HC Parties began receiving merchandising revenues in connection therewith; and (e) projections or estimates of revenue to be generated from any Disputed Exploitation (the "Limited Revenue Documents" limitation includes documents pre-9/1/2010 and is without prejudice to our ability to seek additional revenue related documents at a later date).

Due to the long historical exploitation of Video Games (RFP Nos. 15 and 65) and the increased burden and overbreadth concerns Zaentz and Warner expressed at the meeting, the

ARNOLD & PORTER, LLP
O'MELVENY & MEYERS LLP
July 9, 2013
Page 4

Tolkien/HC Parties would be willing to accept the following categories of documents in connection with these Video Game-related requests:

1.    Relating to rights in and to these items, including the scope of any party's rights in and to these items;

2.    Licenses; and

3.    Limited Revenue Documents.

D.    RFP Nos. 13, 20, 21, 32-34, 42-43, 48, 53, 63, 74 -75, 77, & 79; Interrogatory Nos. 5-6, 9 & 12-14; and RFA No. 3 to Zaentz – Intangible Games

Zaentz refuses to respond to nearly all of these requests on the ground that it believes the defined term "Intangible Games" is argumentative. Zaentz claims it is concerned a jury would view a response to these requests as an admission as to the appropriateness of the defined term. That, however, is not a proper basis for refusing to respond to what Zaentz has conceded are clear, and easily understood requests directed to one of the core areas of dispute in this case. There is simply no legitimate basis for Zaentz's refusal to answer.

If Zaentz is uncomfortable with the label the Tolkien/HC Parties have used to describe the concept of "non-gambling video games delivered otherwise than by way of physical media such as disc or cartridge, featuring characters, events, images and/or story elements from the Tolkien Works," then the proper course of action is for Zaentz to object to these requests on whatever grounds it feels are appropriate, and then qualify its responses in light of its objections (as Warner has done). Zaentz's suggestion that the Tolkien/HC Parties redraft and repropound these requests is indefensible under the Federal Rules. We are confident the Magistrate would agree.

Nevertheless, in a final attempt to avoid motion practice on this issue, we propose Zaentz begin its responses to these requests by acknowledging the following: *"Zaentz and the Tolkien/HC Parties acknowledge that Zaentz has objected to the term 'Intangible Games.' For purposes of this request/interrogatory, Zaentz and the Tolkien/HC Parties have stipulated that this request/interrogatory is limited to documents and/or information related to 'non-gambling video games delivered otherwise than by way of physical media such as disc or cartridge, featuring characters, events, images and/or story elements from the Tolkien Works.' Based on that understanding and agreement, Zaentz agrees to provide the following documents/information…"*

We believe this proposal more than addresses Zaentz's concerns and is a fair compromise considering the parties' positions. Please let us know if you agree.

GreenbergGlusker.com

**EXHIBIT 7**
**105**

ARNOLD & PORTER, LLP
O'MELVENY & MEYERS LLP
July 9, 2013
Page 5

     E.    RFP Nos. 14, 22, 59, 64 & 66 (and 23, 35-37, 44-45, 49 & 78) to Zaentz and Warner – Disputed Marks

     As to all requests referring to the "Disputed Marks" (several of which are addressed further below), the Tolkien/HC Parties proposed that Zaentz and Warner produce documents in the following substantive categories: *hotels, restaurants, travel agencies, ringtones, video games (all types, including intangible/downloadable/online only. etc.), online slots, housing developments, casino gambling, all services, including, without limitation, theme parks, and Limited Class 16 (see below).* This proposal would be without prejudice to the Tolkien/HC Parties' right to seek additional categories at a later date.

     Regarding RFP Nos. 14, 22, 59, 64 & 66, we propose the following limitations, all or some of which may be relevant to the requests at issue[1]:

     1.    The trademark and service mark applications and registrations for all Tolkien Work-related marks, or a summary chart containing the registration/application numbers, the date applied for, uses applied for, class, jurisdiction, and mark;

     2.    Documents relating to rights in and to the relevant Disputed Mark, including the scope of any party's rights in and to these items;

     3.    Licenses; and

     4.    Limited Revenue Documents.

     Please let us know if this is acceptable.

     As to Class 16, the parties agreed to further meet and confer on this issue. However, we are still in the process of conferring with our clients. We hope to have a proposal to you shortly.

     F.    RFP Nos. 17, 19, 23 & 25 to Zaentz and 17, 19, 21, 23 & 25 to Warner

     These requests seek documents related to the negotiation, interpretation or modification of license agreements concerning the Disputed Exploitations. We discussed a framework similar to those addressed above. We propose the following limitations:

     1.    As to communications between and among Zaentz, Warner (including any Warner affiliates, subsidiaries, or internal divisions), and the Tolkien/HC Parties,

---

[1] For example, RFP No. 59 seeks all trademark and service mark applications made in connection with the Disputed Marks. We would only expect the applications themselves to be responsive to this request, but we group this request here for ease of reference. This limitation would also be implicated by our recent Requests for Production regarding all Tolkien Work-related trademark and service mark registrations and applications.

**GreenbergGlusker.com**

ARNOLD & PORTER, LLP
O'MELVENY & MEYERS LLP
July 9, 2013
Page 6

as well as any internal analyses relevant to the requests – all responsive
documents;

2.      As to communications with third parties – documents relating to rights in and to
the relevant Disputed Exploitation, including the scope of any party's rights in
and to those items;

3.      Licenses; and

4.      Limited Revenue Documents.

Also, please confirm that you interpret these requests to include any licenses between and
among Zaentz, Warner, and Warner affiliates, subsidiaries, or internal divisions.

G.      RFP Nos. 26, 29 & 35 to Zaentz and 26, 29, 32, 35, 38, 40, 42 & 44 to Warner

These requests seek documents related to offers or potential offers from potential
licensees in connection with the Disputed Exploitations. Zaentz had proposed producing
communications between Zaentz and any licensee or potential licensee, and Zaentz and the
Tolkien/HC Parties that reflect or concern the solicitation or receipt of the relevant offers.
Although Zaentz and Warner wanted to further consider their position as to these requests, we
must insist on communications between and among Zaentz and Warner, as well as internal
analyses. We therefore propose the following limitations:

1.      As to communications between and among Zaentz, Warner (including any
Warner affiliates, subsidiaries, or internal divisions), and the Tolkien/HC Parties,
as well as any internal analyses relevant to the requests – all responsive
documents; and

2.      As to communications with third parties – documents relating to rights in and to
the relevant Disputed Exploitation, including the scope of any party's rights in
and to those items.

H.      RFP Nos. 27-28, 30-31, 36-37, 46-47, 49, 55 & 74 to Zaentz and 27-28, 30-31, 33-
34, 36-37, 39, 41, 43, 45-49 & 74 to Warner

These requests seek documents related to revenue projections, revenue received, and
merchandising royalty accounting statements related to the Disputed Exploitations. We propose
to limit these requests to responsive Limited Revenue Documents (described above it section
I.C.4).

**GreenbergGlusker.com**

ARNOLD & PORTER, LLP
O'MELVENY & MEYERS LLP
July 9, 2013
Page 7

I.  RFP Nos. 51-52 to Zaentz and 51-53 to Warner

These requests seek documents related to the development of Online Slots, Casino Slot Machines (and Intangible Games as to Warner). We propose to limit these requests to the Limited Development Documents (described above it section I.C.1).

J.  RFP No. 58 to Zaentz

This request seeks documents relating to the negotiation, interpretation, or modification of the phrase "articles of tangible personal property." Zaentz expressed concern that the term "relate" causes the request to be overbroad, and proposed a limitation to documents that discuss or reflect this phrase. As a compromise, we propose Zaentz produce: *Documents relating to the scope of the phrase "articles of tangible personal property," or that discuss or reflect the negotiation, interpretation, or modification of the phrase.* We hope this addresses your concerns.

K.  RFP Nos. 67 & 68 to Zaentz and Warner

These requests seek documents reflecting objections and communications relating to objections by LOTR/Hobbit Film participants regarding the use of their images or likenesses in connection with Online Slots or Casino Slot Machines. At the meeting, we clarified that the Tolkien/HC Parties are only interested in objections related to the fact that gambling is different than other more traditional merchandising, a participant's being associated with gambling, or that gambling related rights were not granted pursuant to the participants' agreements with Warner/New Line. Warner and Zaentz are considering this and will get back to us.

L.  RFP Nos. 69 to Warner & 70 to Zaentz and Warner

These requests seek documents relating to the negotiation, interpretation, or modification of any Tolkien Work-related merchandising agreements between and among Zaentz, Warner (including any Warner affiliates, subsidiaries, or internal divisions), and New Line, and the agreements themselves. We propose the limitations outlined above in section I.A, with the understanding that any relevant agreements will also be produced. Please let us know if this is acceptable.

M.  RFP No. 71 to Zaentz

This request seeks documents relating to the alleged 1998 Amendment to the 1969 Agreement. At the meeting, Zaentz expressed overbreadth concerns and suggested limiting the request to documents that reflect or relate to the Amendment's execution or modification, and documents that refer to or discuss its impact. We are unable to agree to that limitation and must insist on a full production in response to the request as written. As you are aware, the existence of the alleged 1998 Amendment is disputed by the Tolkien/HC Parties. We contend it was

**EXHIBIT 7**
**108**

**GreenbergGlusker.com**

ARNOLD & PORTER, LLP
O'MELVENY & MEYERS LLP
July 9, 2013
Page 8

invented by Warner and Zaentz to relieve them of their obligations under the Merchandising
License. To the extent Zaentz is concerned the term "relate" causes this request to include
documents related to the exploitation of the rights allegedly granted pursuant to the
Amendment's terms – namely, Intangible/Online/Downloadable Game rights – the Tolkien/HC
Parties are absolutely entitled to every document relating to such exploitation. Indeed, one
would think Zaentz would be eager to produce these documents to support both the existence of,
and the parties' operation under, the alleged Amendment. We believe the Magistrate would
agree.

     N.    RFP Nos. 72 & 73 to Zaentz and Warner

These requests seek documents, to the extent not produced in response to other requests,
relating to the negotiation, interpretation, or modification of a handful of licenses that one or
more of the parties contend relate to online game content. Upon further consideration, we must
insist on a full production of documents in response to these requests. This limited handful of
agreements governs several of the key games in dispute in this case. Both the meaning of their
terms and the actions and exploitations taken thereunder are central to all parties' claims and
defenses. For example, if Zaentz and Sierra had a discussion about the state of video game
technology at the time the agreement was executed, and whether online-only products were
contemplated by Sierra at that time, the Tolkien/HC Parties are absolutely entitled to those
documents. We will insist on all responsive documents.

     O.    RFP No. 76 to Warner

This request seeks Ben Zinkin's files from 1997 to 2001 relating to Video Games and
Intangible Games. You have asked us to accept that in response to this request, Warner will
search, collect, and produce documents from Mr. Zinkin's files as it would in connection with
the other substantive requests. Upon a written representation to that effect, we will agree to your
proposal.

     P.    RFP Nos. 77 & 78 to Zaentz and Warner

These requests ask for documents related to any future plans to exploit Online Slots,
Casino Slot Machines, Intangible Games (No. 77), or the Disputed Marks (No. 78). Zaentz said
it is willing to produce documents sufficient to show its relevant future plans and documents
reflecting the extent of its reliance (or lack thereof) on its having these rights, as well as
documents supporting or contradicting its damages based on the termination of relevant licenses
or delay in relevant exploitations. We confirm this limitation is acceptable. We would also ask
Warner to produce the same limited production based on the authority provided above in section
I.C.

**GreenbergGlusker.com**

**EXHIBIT 7**
**109**

ARNOLD & PORTER, LLP
O'MELVENY & MEYERS LLP
July 9, 2013
Page 9

    Q.    <u>RFP No. 80 to Zaentz</u>

        This request seeks documents related to Ben Zinkin's March 15, 2000 proposed
agreement with the Tolkien/HC Parties regarding interactive gaming rights. Zaentz proposes to
produce documents showing its awareness of or reaction to the proposed agreement. This is
insufficient. This request seeks documents related to a single agreement at the very core of the
Intangible/Online/Downloadable Games dispute. Moreover, as the agreement was never
executed, any overbreadth concerns regarding documents related to the exploitation of rights
arising from the agreement are without merit. Furthermore, in light of the representations in
your June 10th letter questioning whether any responsive documents exist in your possession, any
burden concerns similarly fall flat. We must insist on all responsive documents.

    R.    <u>Interrogatory Nos. 7-8 & 10-11 to Zaentz</u>

        These interrogatories ask Zaentz to identify all revenues Zaentz and the Tolkien/HC
Parties received in connection with Online Slots and Casino Slot Machines. The Tolkien/HC
Parties would accept responsive Limited Revenue Documents (described above it section I.C.4).
Please confirm whether this is acceptable.

    S.    <u>Interrogatory Nos. 7-9 to Warner</u>

        These interrogatories ask Warner to identify all revenues it received in connection with
Online Slots, Casino Slot Machines, and Intangible Games. In light of the authority provided
above in section I.C., please confirm Warner's willingness to produce responsive Limited
Revenue Documents (described above it section I.C.4). Please also confirm whether Intangible
Game revenue can be disaggregated from non-Intangible Video Game revenue.

    T.    <u>Interrogatory Nos. 1-6 & 10-12 to Warner</u>

        These interrogatories seek information regarding various licenses as to the Disputed
Exploitations, as well as revenues received by the Tolkien/HC Parties in connection therewith.
Please confirm whether you will provide bates ranges in connection with your F.R.C.P. Rule
33(d) representation in response to these interrogatories.

    U.    <u>Interrogatory Nos. 13-14 to Warner</u>

        These interrogatories seek information regarding the release date of the first Intangible
Game, and the name of each Intangible Game, licensed by Zaentz or Warner. At the meeting,
Warner explained that it is still investigating the answer to these interrogatories but is unable to
state whether Warner is currently in possession of this information or when it might be able to
provide  substantive responses – even if just to state that Warner does not presently know the
answers. As we explained at the meeting, this is unacceptable. The Tolkien/HC Parties are
entitled to a substantive response one way or the other. If you do not provide substantive

**GreenbergGlusker.com**

**EXHIBIT 7**
**110**

ARNOLD & PORTER, LLP
O'MELVENY & MEYERS LLP
July 9, 2013
Page 10

responses either providing the requested information or the current state of Warner's knowledge by July 15, 2013, we will be forced to raise this issue with the Magistrate.

## II.   Global Issues

The following global issues were discussed at the June 27th meeting, as well as at the parties' subsequent meeting on July 1, 2013.

### A.   Production Schedule

As of now, the parties have agreed to produce documents on a rolling, good faith basis.

### B.   Privilege Logs

We propose the following language regarding a mutual agreement to forgo privilege logs in this case for the time being: *"The parties agree to mutually forgo attorney-client/work product privilege logs at this stage of the case, without prejudice to their rights or ability to seek the preparation and production of a such a privilege log regarding all or any portion of another party's production at some later date. For the avoidance of doubt, this agreement does not create a presumption one way or the other regarding the appropriateness of a such a privilege log or any redactions made by any party, or the applicability of the attorney-client or work product privilege regarding any withheld document or redaction. The parties further agree to mutually exchange a list of persons they contend trigger the attorney-client and/or work product privilege."* Please let us know if this is acceptable.

### C.   Custodians and Search Terms

Warner and Zaentz have asked for a general description of the topography of our document search. Specifically, you have requested: 1) a list of custodians to the extent we are using them; 2) a general description of the files we have reviewed; 3) a description of the time frame we are reviewing; and 4) a description of our email collection policy, including confirmation regarding duplicative electronic files, the status of Manches' files, the status of the relevant Tolkien heirs' electronic files, and a description of HC's email policy. We are considering your request and will get back to you. Of course, as previously discussed, any agreement to exchange such information must be mutual.

### D.   Metadata

In response to Molly's June 24, 2013 email regarding Warner's and Zaentz's suggested global metadata proposal, I can confirm we will be providing all requested data regarding hard copy documents.

GreenbergGlusker.com

**EXHIBIT 7**
**111**

ARNOLD & PORTER, LLP
O'MELVENY & MEYERS LLP
July 9, 2013
Page 11


  With regard to emails and other forms of electronic files, please explain what you mean by "Body" and "Record Type" information.  We are unable to agree to your proposal regarding "Company," "Confidential Designation," "Doc Type," and "File Path" information.  We do, however, request that the parties agree to mutually exchange dat files and Ipro upload files with children identified.  Furthermore, our qualified acceptance to your email/electronic proposal must be without prejudice to our rights to alter our approach in the event we collect additional electronic documents from new sources that may or may not be able to provide the requested information.  Finally, we understand you will be providing additional terms regarding your global metadata proposal.  We too may have additional terms once we have a chance to review yours.


  We look forward to your responses regarding the above items and to your summaries from our July 1st meeting regarding the Tolkien/HC Parties' responses.  Of course, as we repeatedly stated during our meetings, we expect any proposals with regard to Warner's and Zaentz's responses to be met with similar, reciprocal proposals as to the Tolkien/HC Parties' responses.  As such, the foregoing is conditioned upon receiving your proposals with regard to the Tolkien/HC Parties' responses.

Best

Rachel Valadez


RV/RV

**GreenbergGlusker.com**

**EXHIBIT 7**
**112**

# EXHIBIT 8

**From:** Lens, Molly
**Sent:** Saturday, June 22, 2013 2:32 PM
**To:** Valadez, Rachel
**Cc:** Eskenazi, Bonnie; Moriarty, Elisabeth; John.Ulin@APORTER.COM; Marty.Glick@aporter.com; Sean.Callagy@aporter.com; Petrocelli, Daniel; Jih, Victor; Primack, Nikolas A.; Cestero, Ricardo
**Subject:** Fourth Age v. Warner Bros.

Rachel -

To enable the parties to have a productive conversation during Thursday's meet and confer, below please find Warner's and Zaentz's proposal for the exchange of metadata, which would govern all the parties' productions.  You will note that the fields differ depending on the type of document.

Thanks,

Molly

**Emails:**
Beg Bates
End Bates
BegAttach
EndAttach
AttCount
Custodian
From
To
CC
BCC
SentDate
SentTime
Subject
Folder
FilePath
FileName
FileExt
FileSize
PgCount
Doc Type
Record Type
Volume
Body
Confidential Designation
Redaction

**Other Electronic Files:**
BegBates
EndBates
BegAttach

EndAttach
Custodian
LastModDate;
LastModTime;
FilePath
FileName
FileExt
FileSize
PgCount
DocType
Author
Company
DateCreated
TimeCreated
Volume
Body
Confidential Designation
Redaction

**<u>Hard Copy Documents:</u>**
BegBates
EndBates
BegAttach
EndAttach
Custodian
PgCount
OCR
Confidential Designation
Redaction

_____

**Molly M. Lens**
**O'Melveny & Myers LLP**
1999 Avenue of the Stars
Los Angeles, CA 90067
Phone: (310) 246-8593
Fax: (310) 246-6779
mlens@omm.com

_This message and any attached documents contain information from the law firm of O'Melveny & Myers LLP that may be confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message._

# EXHIBIT 9

1   BONNIE E. ESKENAZI (SBN 119401)
    BEskenazi@ggfirm.com
2   ELISABETH A. MORIARTY (SBN 156569)
    EMoriarty@ggfirm.com
3   RICARDO P. CESTERO (SBN 203230)
    RCestero@ggfirm.com
4   GREENBERG GLUSKER FIELDS CLAMAN &
    MACHTINGER LLP
5   1900 Avenue of the Stars, 21st Floor
    Los Angeles, California  90067-4590
6   Telephone:  310.553.3610
    Fax:  310.553.0687
7
    Attorneys for Plaintiffs and Counterclaim Defendants
8

9              UNITED STATES DISTRICT COURT

10            CENTRAL DISTRICT OF CALIFORNIA

11

12  FOURTH AGE LIMITED, a United          Case No.  CV 12-09912 ABC (SHx)
    Kingdom corporation; PRISCILLA MARY
13  ANNE REUEL TOLKIEN, as TRUSTEE        Assigned To: Hon. Audrey B.
    OF THE TOLKIEN TRUST, a United        Collins
14  Kingdom Charitable Trust; THE J.R.R.
    TOLKIEN ESTATE LIMITED, a United
15  Kingdom corporation; HARPERCOLLINS
    PUBLISHERS, LTD., a United Kingdom    **PLAINTIFFS AND**
16  corporation; UNWIN HYMAN LTD., a      **COUNTERCLAIM**
    United Kingdom corporation; and       **DEFENDANTS' INITIAL**
17  GEORGE ALLEN & UNWIN                  **DISCLOSURES PURSUANT TO**
    (PUBLISHERS) LTD., a United Kingdom   **F.R.C.P. 26(a)(1)(A)**
18  corporation,

19                 Plaintiffs,

20  v.                                    Trial Date:  None Set
                                          Action Filed:  November 19, 2012
21  WARNER BROS. DIGITAL
    DISTRIBUTION, INC., a division of
22  WARNER BROS. HOME
    ENTERTAINMENT, INC., a Delaware
23  corporation; WARNER BROS.
    ENTERTAINMENT, INC., a Delaware
24  corporation, as successor-in-interest to New
    Line Cinema Corp.; WARNER BROS.
25  CONSUMER PRODUCTS, INC., a
    Delaware corporation; WARNER BROS.
26  INTERACTIVE ENTERTAINMENT,
    INC., a division of WARNER BROS.
27  HOME ENTERTAINMENT, INC.; NEW
    LINE PRODUCTIONS, INC., a California
28  corporation; THE SAUL ZAENTZ

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

84971-00003/1912448.4

1  COMPANY d/b/a Middle-earth
   Enterprises, a Delaware corporation; and
2  DOES 1-10, inclusive,

3                  Defendants.

4

   AND RELATED COUNTERCLAIMS.
5

6

7          Plaintiffs and Counterclaim Defendants Fourth Age Limited, Priscilla Mary

8  Anne Reuel Tolkien, as Trustee of the Tolkien Trust, The J.R.R. Tolkien Estate

9  Ltd., Harper Collins Publishers, Ltd., Unwin Hyman Ltd., and George Allen &

10 Unwin (Publishers), Ltd. (collectively, the "Tolkien/HC Parties") submit the

11 following initial disclosures pursuant to Rule 26(a) of the Federal Rules of Civil

12 Procedure.

13         The Tolkien/HC Parties make these initial disclosures based on information

14 presently known and without prejudice to or waiver of their right to supplement

15 these disclosures or to present additional or different information or evidence at

16 trial as permitted under the Federal Rules of Civil Procedure and the Local Rules of

17 this Court.  These disclosures shall not be deemed as an admission as to any fact in

18 dispute or as a waiver of any rights or claims the Tolkien/HC Parties have asserted

19 or may assert in this action.

20         By making these disclosures, the Tolkien/HC Parties do not represent that

21 they are identifying every document, tangible thing or witness possibly relevant to

22 this action.  The Tolkien/HC Parties' initial disclosures represent a good faith effort

23 at an early stage of this litigation to identify information they reasonably believe

24 may be relevant to their claims and defenses in this case.

25         The Tolkien/HC Parties reserve the right to object to the production and/or

26 admission of any testimony, witness, document or tangible thing identified in these

27 initial disclosures.

28

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1

PLAINTIFFS AND COUNTERCLAIM
DEFENDANTS' INITIAL DISCLOSURES

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

## Definitions

As used herein, the following terms shall have the following meanings:

A.  "Zaentz" means defendant and counterclaimant The Saul Zaentz Company d/b/a Middle-earth Enterprises.

B.  "Warner" means defendants and counterclaimants Warner Bros. Home Entertainment, Inc., Warner Bros. Entertainment, Inc., Warner Bros. Consumer Products, Inc., Warner Bros. Digital Distribution, New Line Productions, Inc., and their predecessor in interest, New Line Cinema Corp.

C.  The "Tolkien Parties" means plaintiffs and counterclaim defendants Fourth Age Limited, Priscilla Mary Anne Reuel Tolkien, as Trustee of the Tolkien Trust, and The J.R.R. Tolkien Estate Ltd.

D.  The "H/C Parties" means plaintiffs and counterclaim defendants Harper Collins Publishers, Ltd., Unwin Hyman Ltd., and George Allen & Unwin (Publishers), Ltd.

E.  "United Artists" means the entity United Artists Corporation.

F.  The "Complaint" means the Complaint filed by The Tolkien/HC Parties in the above-entitled action.

G.  The "1969 GAU Agreement" means the contract entered into between George Allen & Unwin, Ltd. and Warner's predecessor in interest, United Artists, on July 8, 1969.

H.  The "1969 Sassoon Agreement" means the contract entered into between the Sassoon Trustee and Executor Corp., Ltd. and Warner's predecessor in interest, United Artists, on July, 8, 1969.

I.  The "1969 Agreements" means the 1969 GAU Agreement and the 1969 Sassoon Agreement.

J.  The "Merchandising License" means Schedule D to the 1969 GAU Agreement, Schedule D to the 1969 Sassoon Agreement, and the 1975 and

2

PLAINTIFFS AND COUNTERCLAIM DEFENDANTS' INITIAL DISCLOSURES

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1    1981 Amendments to those Schedules, as defined in paragraph 40 of the

2    Complaint.

3    K.    The "Tolkien Works" means the three volume literary work by the author

4    J.R.R. Tolkien, consisting of "The Lord of the Rings: The Fellowship of the

5    Ring," "The Lord of the Rings: The Two Towers," and "The Lord of the

6    Rings: The Return of the King," as well as J.R.R. Tolkien's literary work,

7    "The Hobbit."

8    L.    "Video Games" means interactive, computer, and other electronic and/or

9    digital games featuring characters, events, images and/or story elements from

10   the Tolkien Works.

11   M.    "Intangible Video Games" Video Games based on the Tolkien Works that

12   are delivered otherwise than by way of physical media such as DVD or

13   cartridge, including (but not limited to) games delivered by way of electronic

14   download, mobile telephone networks or social media websites.

15   N.    "Online Slots" means any online gambling slot machine game featuring

16   characters, events, images and/or story elements from the Tolkien Works,

17   including, but not limited to, the "Online Slots" as defined in paragraph 45 of

18   the Complaint.

19   O.    "Casino Slot Machines" means any gambling casino slot machine featuring

20   characters, events, images and/or story elements from the Tolkien Works,

21   including, but not limited to, the "Casino Slot Machine" as defined in

22   paragraph 48 of the Complaint.

23   P.    The "Disputed Marks" means the trademarks and/or service marks being

24   exploited by Zaentz and/or Warner based on, or related to, the characters,

25   events, images and/or story elements from the Tolkien Works, which the

26   Tolkien/HC Parties allege are beyond the scope of the Merchandising

27   License, as alleged in paragraphs 81-84 of the Complaint.  The Disputed

28   Marks include, but are not limited to, trademarks and/or service marks

3

PLAINTIFFS AND COUNTERCLAIM
DEFENDANTS' INITIAL DISCLOSURES

1       registered in connection with hotels, restaurants, travel agencies, ringtones,

2       housing developments, Online Slots, Casino Slot Machines, Intangible

3       Games, and in International Class 16.

4   Q.     The "2010 Regrant Agreement" means the agreement dated as of September

5       1, 2010 between the Tolkien/HC Parties and several other Tolkien-related

6       entities and heirs, as well as Zaentz and certain of the Warner-related parties,

7       relating to the Tolkien Works.

8   R.     The "Hobbit Term Sheet" means the Hobbit Binding Term Sheet dated as of

9       September 7, 2010 entered into by several of the Tolkien/HC Parties and

10      related persons and entities, and several Warner and Zaentz related entities.

11   S.     The "Binding Term Sheet" means the Binding Term Sheet dated as of

12      August 21, 2009 entered into by several of the Tolkien/HC Parties and

13      related persons and entities, and several Warner related entities.

14

15   **1.**     <u>**Witness Disclosures**</u>

16      The Tolkien/HC Parties currently believe that the following witnesses,

17   excluding expert witnesses, are likely to have discoverable information that the

18   Tolkien/HC Parties may use to support their claims and defenses, unless solely for

19   impeachment. The Tolkien/HC Parties reserve the right to supplement these

20   disclosures as discovery continues and as the case develops, or as otherwise

21   reasonably necessary and appropriate:

22      a.     Cathleen Blackburn. Ms. Blackburn is an attorney at Maier

23   Blackburn, counsel for the Tolkien Parties. Ms. Blackburn can be contacted c/o the

24   Tolkien/HC Parties' counsel of record. Subjects of information include, without

25   limitation: (i) the 1969 Agreements; (ii) the Merchandising License; (iii) Video

26   Games; (iv) Intangible Video Games; (v) Online Slots; (vi) Casino Slot Machines;

27   (vii) the Disputed Marks; (viii) communications between and among the

28   Tolkien/HC Parties, Zaentz, Warner, and third parties as they relate to Video

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

4

PLAINTIFFS AND COUNTERCLAIM
DEFENDANTS' INITIAL DISCLOSURES

1   Games, Intangible Video Games, Online Slots, Casino Slot Machines, and the

2   Disputed Marks; (viii) the goodwill the Tolkien/HC Parties have cultivated

3   surrounding the Tolkien Works and related intellectual property; (ix) the 2010

4   Regrant Agreement, The Binding Term Sheet, and the Hobbit Term Sheet; and (x)

5   the settlement discussions between the Tolkien/HC Parties, Zaentz, and Warner that

6   preceded the filing of the above-entitled action.

7        b.    Dick Williamson. Mr. Williamson was an attorney for the Tolkien

8   Parties at various times throughout the parties' history. Mr. Williamson can be

9   contacted c/o the Tolkien/HC Parties' counsel of record. Subjects of information

10  include, without limitation: (i) 1969 Agreements; (ii) the Merchandising License;

11  (iii) Video Games; (iv) Intangible Video Games; (v) Online Slots; (vi) Casino Slot

12  Machines; (vii) the Disputed Marks; (viii) communications between and among the

13  Tolkien/HC Parties, Zaentz, and third parties as they relate to Video Games,

14  Intangible Video Games, Online Slots, Casino Slot Machines, and the Disputed

15  Marks.

16       c.    Priscilla Mary Anne Reuel Tolkien. Ms. Tolkien is a trustee of the

17  Tolkien Trust and plaintiff in this action. Ms. Tolkien can be contacted c/o the

18  Tolkien/HC Parties' counsel of record. Subjects of information include, without

19  limitation: the goodwill the Tolkien/HC Parties have cultivated surrounding the

20  Tolkien Works and related intellectual property.

21       d.    David Brawn. Mr. Brawn is an employee of plaintiff and counterclaim

22  defendant HarperCollins Publishers, Ltd. Mr. Brawn can be contacted c/o the

23  Tolkien/HC Parties' counsel of record. Subjects of information include, without

24  limitation: (i) the 1969 Agreements; (ii) the Merchandising License; (iii) Video

25  Games; (iv) Intangible Video Games; (v) Online Slots; (vi) Casino Slot Machines;

26  (vii) the Disputed Marks; and (viii) communications between and among the

27  Tolkien/HC Parties, Zaentz, Warner, and third parties as they relate to Video

28  Games, Intangible Video Games, Online Slots, Casino Slot Machines, and the

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

5

PLAINTIFFS AND COUNTERCLAIM
DEFENDANTS' INITIAL DISCLOSURES

EXHIBIT 9
120

84971-00003/1912448.4

1    Disputed Marks.

2         e.    Mary Butler.  Ms. Butler was an employee of plaintiff and

3    counterclaim defendant Unwin Hyman Ltd.  Subjects of information include,

4    without limitation: (i) the 1969 Agreements; (ii) the Merchandising License; (iii)

5    Video Games; (iv) Intangible Video Games; (v) Online Slots; (vi) Casino Slot

6    Machines; (vii) the Disputed Marks; and (viii) communications between and among

7    the Tolkien/HC Parties, Zaentz, Warner, and third parties as they relate to Video

8    Games, Intangible Video Games, Online Slots, Casino Slot Machines, and the

9    Disputed Marks.

10        f.    Adrian Laing.  Mr. Laing was an employee and in-house counsel at

11   plaintiff and counterclaim defendant HarperCollins Publishers, Ltd.  Subjects of

12   information include, without limitation: (i) the Merchandising License; (ii) Video

13   Games; (iii) Intangible Video Games; (iv) Online Slots; (v) Casino Slot Machines;

14   (vi) the Disputed Marks; and (vii) communications between and among the

15   Tolkien/HC Parties, Zaentz, Warner, and third parties as they relate to Video

16   Games, Intangible Video Games, Online Slots, Casino Slot Machines, and the

17   Disputed Marks.

18        g.    Bonnie E. Eskenazi.  Ms. Eskenazi is an attorney at Greenberg Glusker

19   Fields Claman & Machtinger LLP, counsel of record for the Tolkien/HC Parties.

20   Subjects of information include, without limitation: (i) the 2010 Regrant

21   Agreement, The Binding Term Sheet, and the Hobbit Term Sheet; and (ii) the

22   settlement discussions between the Tolkien/HC Parties, Zaentz, and Warner that

23   preceded the filing of the above-entitled action.

24        h.    Ricardo P. Cestero.  Mr. Cestero is an attorney at Greenberg Glusker

25   Fields Claman & Machtinger LLP, counsel of record for the Tolkien/HC Parties.

26   Subjects of information include, without limitation: (i) the 2010 Regrant

27   Agreement, The Binding Term Sheet, and the Hobbit Term Sheet; and (ii) the

28   settlement discussions between the Tolkien/HC Parties, Zaentz, and Warner that

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

6

PLAINTIFFS AND COUNTERCLAIM
DEFENDANTS' INITIAL DISCLOSURES

**EXHIBIT 9**
**121**

84971-00003/1912448.4

1   preceded the filing of the above-entitled action.

2        i.    Alan Benjamin.  Mr. Benjamin was a business affairs executive at

3   United Artists.  Mr. Benjamin can be contacted c/o the Tolkien/HC Parties' counsel

4   of record.   Subjects of information include, without limitation: (i) 1969 Agreement;

5   and (ii) Merchandising License.

6        j.    Albert M. Bendich. Mr. Bendich can be contacted at 2600 Tenth St.,

7   Berkeley, California, 94710.  Mr. Bendich was, and on information and belief, still

8   is, a vice-president and general counsel for Zaentz.   Subjects of information

9   include, without limitation: (i) the Merchandising License; (ii) Video Games; (iii)

10   Intangible Video Games; (iv) Online Slots; (v) Casino Slot Machines; (vi) the

11   Disputed Marks; (vii) the goodwill the Tolkien/HC Parties have cultivated

12   surrounding the Tolkien Works and related intellectual property;  and (viii)

13   communications between and among the Tolkien/HC Parties, Zaentz, Warner, and

14   third parties as they relate to Video Games, Intangible Video Games, Online Slots,

15   Casino Slot Machines, and the Disputed Marks.

16        k.    Thomas A. Magnani.  Mr. Magnani was an attorney at Howard, Rice,

17   Nemerovski, Canady, Falk & Rabkin, counsel for Zaentz at various times

18   throughout the parties' history.  On information and belief, Mr. Magnani is

19   currently a partner at Arnold & Porter LLP, counsel of record for Zaentz.  Subjects

20   of information include, without limitation: (i) the Merchandising License; (ii)

21   Video Games; (iii) Intangible Video Games; (iv) Online Slots; (v) Casino Slot

22   Machines; (vi) the Disputed Marks; (vii) communications between and among the

23   Tolkien/HC Parties, Zaentz, Warner, and third parties as they relate to Video

24   Games, Intangible Video Games, Online Slots, Casino Slot Machines, and the

25   Disputed Marks; (viii) the 2010 Regrant Agreement, The Binding Term Sheet, and

26   the Hobbit Term Sheet; and (ix) the settlement discussions between the

27   Tolkien/HC Parties, Zaentz, and Warner that preceded the filing of the above-

28   entitled action.

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

7

PLAINTIFFS AND COUNTERCLAIM
DEFENDANTS' INITIAL DISCLOSURES

**EXHIBIT 9**

**122**

84971-00003/1912448.4

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1         l.      David Imhoff. Mr. Imhoff was an executive at New Line Cinema

2 Corp. Subjects of information include, without limitation: (i) the Merchandising

3 License; (ii) Video Games; (iii) Intangible Video Games; (iv) Online Slots; (v)

4 Casino Slot Machines; (vi) the Disputed Marks; and (vii) communications between

5 and among the Tolkien/HC Parties, Zaentz, Warner, and third parties as it relates to

6 Video Games, Intangible Video Games, Online Slots and Casino Slot Machines.

7         m.     Benjamin Zinkin. Mr. Zinkin was an executive at, and at times general

8 counsel of, New Line Cinema Corp. Subjects of information include, without

9 limitation: (i) the Merchandising License; (ii) Video Games; (iii) Intangible Video

10 Games; (iv) Online Slots; (v) Casino Slot Machines; (vi) the Disputed Marks; and

11 (vii) communications between and among the Tolkien/HC Parties, Zaentz, Warner,

12 and third parties as they relate to Video Games, Intangible Video Games, Online

13 Slots, Casino Slot Machines, and the Disputed Marks.

14         n.     Jeremy Williams. Mr. Williams is an attorney at Warner. Subjects of

15 information include, without limitation: (i) the Merchandising License; (ii) Video

16 Games; (iii) Intangible Video Games; (iv) Online Slots; (v) Casino Slot Machines;

17 (vi) the Disputed Marks; (vii) communications between and among the Tolkien/HC

18 Parties, Zaentz, Warner, and third parties as they relate to Video Games, Intangible

19 Video Games, Online Slots, Casino Slot Machines, and the Disputed Marks; (viii)

20 the 2010 Regrant Agreement, The Binding Term Sheet, and the Hobbit Term Sheet;

21 and (ix) the settlement discussions between the Tolkien/HC Parties, Zaentz, and

22 Warner that preceded the filing of the above-entitled action.

23         o.     Mark B. Helm. Mr. Helm is an attorney at Munger, Tolles & Olson

24 LLP, counsel for Warner at various times throughout the parties' history. Subjects

25 of information include, without limitation: (i) the 2010 Regrant Agreement, The

26 Binding Term Sheet, and the Hobbit Term Sheet; and (ii) the settlement discussions

27 between the Tolkien/HC Parties, Zaentz, and Warner that preceded the filing of the

28 above-entitled action.

PLAINTIFFS AND COUNTERCLAIM
DEFENDANTS' INITIAL DISCLOSURES

84971-00003/1912448.4

**EXHIBIT 9**

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1    p.    Eric P. Tuttle.  Mr. Tuttle is an attorney at Munger, Tolles & Olson

2    LLP, counsel for Warner at various times throughout the parties' history.  Subjects

3    of information include, without limitation: (i) the 2010 Regrant Agreement, The

4    Binding Term Sheet, and the Hobbit Term Sheet; and (ii) the settlement discussions

5    between the Tolkien/HC Parties, Zaentz, and Warner that preceded the filing of the

6    above-entitled action.

7    q.    Unknown employees and representatives at Warner, including, without

8    limitation, persons with knowledge of Warner's licensing activity related to the

9    Tolkien Works and persons with knowledge of the development of the Online

10    Slots, Casino Slot Machines and Intangible Video Games, including what elements

11    of the Tolkien Works were incorporated therein.  The Tolkien/HC Parties reserve

12    the right to depose and/or call as a witness a Warner representative designated

13    pursuant to F.R.C.P. 30(b)(6).

14    r.    Unknown employees and representatives at Zaentz, including, without

15    limitation, persons with knowledge of Zaentz's licensing and trademark activity

16    related to the Tolkien Works and persons with knowledge of the development of the

17    Online Slots, Casino Slot Machines and Intangible Video Games, including what

18    elements of the Tolkien Works were incorporated therein.  The Tolkien/HC Parties

19    reserve the right to depose and/or call as a witness a Zaentz representative

20    designated pursuant to F.R.C.P. 30(b)(6).

21    s.    Unknown witnesses at Sierra Online who were involved with the

22    negotiation of the 1998 license related to the Tolkien Works.

23    t.    The Tolkien/HC Parties also incorporate by reference the list of

24    individuals identified by Zaentz and the Warner Parties in their Initial Disclosures

25    and reserve the right to call any such witnesses.

26

27    **2.    Document Disclosure**

28    The Tolkien/HC Parties are presently aware of the following documents,

PLAINTIFFS AND COUNTERCLAIM
DEFENDANTS' INITIAL DISCLOSURES

84971-00003/1912448.4

**EXHIBIT 9**

**124**

1    electronically stored information, and tangible things in their possession, custody or

2    control that they may use to support their claims and defenses, unless solely for

3    impeachment.  The listing of a category of documents is not a representation that

4    the Tolkien/HC Parties have necessarily obtained such documents or that any such

5    category is necessarily discoverable or relevant.  The Tolkien/HC Parties reserve

6    the right to supplement these disclosures as discovery continues and as the case

7    develops, or as otherwise reasonably necessary and appropriate, and to object to the

8    discovery of any of the following categories of documents or any specific document

9    falling into such category on any grounds permitted by the applicable rules and the

10    law.

11        a.    The 1969 Agreements and documents and communications relating

12    thereto.

13        b.    Schedules D to the 1969 Agreements and documents and

14    communications relating thereto.

15        c.    The 1975 Amendment to Schedules D to the 1969 Agreements, and

16    documents and communications relating thereto.

17        d.    The 1981 Amendment to Schedules D to the 1969 Agreements, and

18    documents and communications relating thereto.

19        e.    The WMS Gaming License, the Microgaming License, and any other

20    licenses purporting to grant rights relating to Intangible Video Games, Casino Slot

21    Machines, Online Slots and/or the Disputed Marks, and documents and

22    communications relating thereto.

23        f.    The August 7, 1998 agreement between New Line Cinema and Zaentz,

24    the May 9, 2000 agreement between New Line Cinema and Zaentz, and the

25    interactive game license dated May 27, 2009 between Zaentz and Warner Bros.

26    Games, Inc., and documents and communications relating thereto.

27        g.    The Tolkien Works.

28        h.    The films produced by Warner that are based on the Tolkien Works.

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California  90067-4590

10

PLAINTIFFS AND COUNTERCLAIM
DEFENDANTS' INITIAL DISCLOSURES

1    i.    The Video Games, Intangible Video Games, Online Games and Casino

2  Gambling Games.

3    j.    The 2010 Regrant Agreement, the Binding Term Sheet, and the Hobbit

4  Term Sheet, and documents and communications relating thereto.

5    k.    The December 2, 1976 agreement between United Artists and Zaentz,

6  and documents and communications relating thereto.

7    l.    The draft agreement dated March 15, 2000 proposed by Ben Zinkin to

8  the Tolkien/HC Parties and rejected by the Tolkien/HC Parties, and documents and

9  communications relating thereto.

10    m.    Trade and service mark applications and registrations relating to the

11  Disputed Marks.

12    n.    Documents and communications relating to the Merchandising

13  License, Online Slots, Casino Slot Machines, Intangible Video Games, and the

14  Disputed Marks.

15    o.    Documents and communications relating to the value of Tolkien

16  Work-related Intangible Video Games and/or new media rights on the open market.

17    p.    Documents reflecting the history of interactive, computer, and other

18  electronic and/or digital games incorporating the Tolkien Works, including, without

19  limitation, the Electronic Arts, Sierra Online, and Turbine licenses, and

20  communications amongst the parties and with third parties relating thereto.

21    q.    Documents evidencing royalties or other amounts received by Zaentz

22  in connection with merchandising rights.

23    r.    Documents evidencing royalties or other amounts received by Warner

24  in connection with merchandising rights.

25    s.    Documents evidencing revenues earned and/or projected to be earned

26  in connection with gambling games based on, incorporating, or related to Video

27  Games, Intangible Video Games, Online Slots and Casino Slot Machines.

28    t.    Documents evidencing the division and computation of royalties as

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

11

PLAINTIFFS AND COUNTERCLAIM
DEFENDANTS' INITIAL DISCLOSURES

84971-00003/1912448.4

EXHIBIT 9
126

1   between Warner, Zaentz and the Tolkien/HC Parties in connection with Video

2   Games, Intangible Video Games, Online Slots and Casino Slot Machines.

3       u.    Documents establishing the goodwill the Tolkien/HC Parties have

4   cultivated surrounding the Tolkien Works and related intellectual property.

5       v.    Documents evidencing negative reactions to gambling-related games

6   featuring the Tolkien Works, including the Online Slots and the Casino Slot

7   Machines.

8       w.    All communications between and among Zaentz, Warner, and the

9   Tolkien/HC Parties relating to Online Slots, Casino Slot Machines, Video Games,

10  Intangible Video Games, the Disputed Marks, the Tolkien/HC Parties' claims and

11  defenses in the above-entitled action, Zaentz's and Warner's claims and defenses in

12  the above-entitled action, and any objections by the Tolkien/HC Parties relating to

13  any of the above.

14

15  **3.**    **Computation of Damages**

16      The Tolkien/HC Parties' damages in this case will either be the subject of

17  expert testimony, or such information is uniquely in the possession of Zaentz and/or

18  Warner.  However, as to Intangible Video Games, the Tolkien/HC Parties are

19  informed and believe that, conservatively, and assuming worldwide licensing across

20  all categories of exploitation (e.g. mobile, social, MMOs, casual) and some

21  geographic, territory specific licenses (e.g. China and Japan) across platforms, the

22  total of typical minimum guarantees for such licenses would be in the range of

23  approximately $80 million to $130 million for a five year license for fantasy-genre

24  properties as beloved and historically successful as the Tolkien Works.  Damages

25  resulting from Zaentz' and Warner's licensing and exploitation of the Disputed

26  Marks, Online Slots, and Casino Slot Machines are currently unknown, but are

27  believed to be multiple millions of dollars.  Additionally, the Tolkien/HC Parties

28  have incurred, and continue to incur, substantial attorneys' fees in pursuing this

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

12

PLAINTIFFS AND COUNTERCLAIM
DEFENDANTS' INITIAL DISCLOSURES

**EXHIBIT 9**

**127**

1    action.

2         The Tolkien/HC Parties reserve the right to supplement these disclosures as

3    discovery continues and as the case develops, or as otherwise reasonably necessary

4    and appropriate.

5

6    **4.    <u>Insurance</u>**

7         The Tolkien/HC Parties are not currently aware of any applicable insurance

8    policies.

9

10

11   DATED:  March 28, 2013              GREENBERG GLUSKER FIELDS
                                         CLAMAN & MACHTINGER LLP
12

13                                  By: _Bonnie Eskenazi_

14                                       BONNIE E. ESKENAZI (SBN 119401)
                                         Attorneys for PLAINTIFFS AND
15                                       COUNTERCLAIM DEFENDANTS

16

17

18

19

20

21

22

23

24

25

26

27

28

*GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP*
*1900 Avenue of the Stars, 21st Floor*
*Los Angeles, California 90067-4590*

13

PLAINTIFFS AND COUNTERCLAIM
DEFENDANTS' INITIAL DISCLOSURES

**EXHIBIT 9**
**128**

**PROOF OF SERVICE BY MAIL**

I am a citizen of the United States and employed in Los Angeles County, California.  I am over the age of eighteen years and not a party to the within-entitled action.  My business address is 1900 Avenue of the Stars, 21st Floor, Los Angeles, California  90067.  I am readily familiar with this firm's practice for collection and processing of correspondence for mailing with the United States Postal Service.  On March 28, 2013, I placed with this firm at the above address for deposit with the United States Postal Service a true and correct copy of the within document(s):

> PLAINTIFFS AND COUNTERCLAIM DEFENDANTS'
> INITIAL DISCLOSURES PURSUANT TO F.R.C.P.
> 26(a)(1)(A)

in a sealed envelope, postage fully paid, addressed as follows:

SEE ATTACHED SERVICE LIST

Following ordinary business practices, the envelope was sealed and placed for collection and mailing on this date, and would, in the ordinary course of business, be deposited with the United States Postal Service on this date.

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on March 28, 2013, at Los Angeles, California.

Robert Massing

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California  90067-4590

84971-00003/1884083.1

PROOF OF SERVICE

EXHIBIT 9
129

1

SERVICE LIST

2

3
Arnold & Porter LLP
4
Martin R. Glick
5
John C. Ulin
6
Sarah J. Givan
Sean M. Callagy
7
Three Embarcadero Center, 7th Floor
San Francisco, California 94111-4024

Attorneys for Defendant
THE SAUL ZAENTZ
COMPANY d/b/a
Middleearth Enterprises, a
Delaware corporation

8
O'Melveny & Meyers LLP
9
Daniel M. Petrocelli
10
Victor Jih
11
Molly Lens
12
1999 Avenue of the Stars
7th Floor
Los Angeles CA 90067

Attorneys for Defendants
WARNER BROS.
DIGITAL
DISTRIBUTION, INC.;
WARNER BROS.
ENTERTAINMENT, INC.;
WARNER BROS.
CONSUMER PRODUCTS,
INC.; WARNER BROS.
INTERACTIVE
ENTERTAINMENT, INC.;
NEW LINE
PRODUCTIONS, INC.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

84971-00003/1884083.1

2

PROOF OF SERVICE

**EXHIBIT 9**

**130**

# EXHIBIT 10

**Rachel Valadez**
D: 310.785.6862
F: 310.201.2331
RValadez@GreenbergGlusker.com
File Number: 84971-00003



October 11, 2013

**Via E-Mail and U.S. Mail**

John C. Ulin, Esq.
ARNOLD & PORTER, LLP
777 S. Figueroa Street
Los Angeles, CA 90017-5844

Molly Lens, Esq.
O'MELVENY & MEYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067

Re:   *Fourth Age Limited, et al. v. Warner Bros. Digital Distribution, Inc., et al.*
(Case No. CV 12-09912 ABC (SHx))

Dear Counsel:

I write in response to Molly Lens' letter of October 4, 2013 and John Ulin's letter of October 9, 2013. As an initial matter, I must reiterate our long-held position that any exchange of document information must be entirely mutual. Therefore, we must insist that Zaentz and Warner provide reciprocal information concerning their collection and review policies as soon as possible.

1.    Individual Custodians[1]

As we explained at the in-person meet and confer meeting on July 2, 2013, many of the responsive documents Zaentz and Warner have requested are not maintained by individual custodians. Rather, for both the Tolkien Parties and the HC Parties, Tolkien-related documents are stored in central files. However, in order to ensure we've fully complied with our discovery obligations, we have endeavored to collect some additional files from individual custodians in cases where we had reason to believe all relevant files may not have been maintained centrally. Specifically, in addition to entity custodian central files, we have collected, or are in the process of collecting, files from the following individuals: Christopher Tolkien, Priscilla Tolkien, Ballie Tolkien, Simon Tolkien, David Brawn, Simon Dowson-Collins, Jane Johnson, Chris Smith, Bonnie Eskenazi, Elisabeth Moriarty, Ricardo Cestero, Candace Carlo, Aaron Moss and myself. As data collection is ongoing, this list may be supplemented as the case goes forward. Please identify the custodians from whom you have collected, or will be collecting, any and all responsive documents.

---

[1] Headings correspond to those in Ms. Lens' October 4th letter.

**Greenberg Glusker Fields Claman & Machtinger LLP**
1900 Avenue of the Stars, 21st Floor, Los Angeles, California, 90067
T: 310.553.3610   |   F: 310.553.0687
84971-00003/1985580.1

GreenbergGlusker.com

**EXHIBIT 10**
131

ARNOLD & PORTER, LLP
O'MELVENY & MEYERS LLP
October 11, 2013
Page 2


2.      Search Terms

We are not currently using search terms to collect responsive documents.  Please provide
us with a list of any search terms Zaentz and Warner have used to collect responsive information.

3.      Custodian Metadata

We wholly disagree with your characterization of the parties' obligations and discussions
as to this item.  First, under the Federal Rules, there is no obligation to provide individual
custodian and/or file label metadata information in connection with each and every document
produced in discovery.  Indeed, such an undertaking would be incredibly burdensome and in
many cases, would require the disclosure of information protected by the attorney work product
privilege.

Second, your account of the parties' prior discussions is inaccurate.  For one thing, the
parties never engaged in a meet and confer discussion on August 25, 2013.  August 25th was a
Sunday and none of the Tolkien/HC Parties' counsel was at our offices to participate in such a
discussion.  Furthermore, I was certainly never part of a discussion with any of Defendants'
counsel during which Defendants' counsel objected to the manner in which the Tolkien/HC
Parties were populating the custodian metadata field in their production.  Sean Callagy's August
8, 2013 email to Ricardo Cestero simply noted that the custodian field on documents produced
up to that point was populated with the term "Tolkien," and questioned whether any
HarperCollins documents had been produced.  At no time did he, nor anyone else at either of
your offices, express the opinion that the Tolkien/HarperCollins designations were inappropriate,
let alone "meaningless."  Finally, our use of the Tolkien/HarperCollins designations is entirely
consistent with the parties' metadata agreement.  In response to Ms. Lens' June 24, 2013
metadata request, the Tolkien/HC Parties simply agreed to populate the "Custodian" metadata
field.  The Tolkien/HC Parties have complied with that agreement by identifying from which
party each document was collected.  Nothing more is required.

4.      HarperCollins Electronic Documents[2]

*1.      Please describe HarperCollins' electronic document retention policy and, to the
extent that it differs for emails, shared drives, and files saved locally or to personal files, please
explain those differences.  If the document retention policy exists in written form, in full or in
part, please provide that to us.*

The current policy (which was put in place two years ago), is to backup applications,
email, shared data and personal shares to tape each month and keep those tapes for seven years.
For the time period preceding this, there are un-catalogued tapes which date back to 1996 for
HarperCollins' Glasgow office and back to 2002 for the Hammersmith office.  The tapes are not

---

[2] For ease of reference we have copied Ms. Lens' questions from her August 20, 2013 email to Mr. Cestero.

**EXHIBIT 10**
**132**
GreenbergGlusker.com

ARNOLD & PORTER, LLP
O'MELVENY & MEYERS LLP
October 11, 2013
Page 3

accessible to HarperCollins and would require a data restore specialist company to be instructed. The chances of a successful restore on the tapes is unknown and the cost would be high.

> 2.      *Please confirm (1) that your statement that the only source for electronic email predating 2012 is back-up tapes does not apply other ESI, such as loose electronic files saved to, for example, desktops, shared folders, personal folders, or local drives; and (2) that you are collecting such loose electronic files for this litigation.  Please also confirm whether you are collecting electronic email postdating January 2012.*

The backup tapes include email and shared files from servers.  Any potentially responsive ESI stored on individual desktops has been, or is being, collected, including ESI postdating January 2012.

> 3.      *How long is email maintained on active servers for individual's inbox, sent box, and deleted box?  How long are emails maintained on active servers for emails saved to folders or psts?  If an individual wants to maintain access to an email following the time that an email would normally be available only on a back-up tape, how does one do that?  Are emails available in a form of archive (as opposed to the back-up tapes)?*

Although the policy is to save all email to the main servers, email stored on individual desktops is not automatically purged, so will remain unless deleted.  Users have a 1 GB mailbox which when full, they manage by deleting email or storing in an archive PST file.  Individuals can have PST files which are stored in the monthly backed up user drive.

> 4.      *How is ESI stored on back-up tapes?  For example, are snapshots taken of an individual's email on regular intervals and if so, what are those intervals?  Are the back-up tapes ever overwritten?  If so, for what period(s) of time is ESI that was stored on back-up tapes no longer available?  Have any back-up tapes for the HarperCollins' custodians relevant to this litigation been restored in prior litigations?  Please also explain for us the process of restoring the back-up tapes, including how many tapes would have to be restored for each custodian, the time it takes to restore the tapes, and how much it costs to restore each tape.*

Under the policy implemented two years ago, daily backups are stored on disk for eight weeks, monthly backups are taken at a point in time every month.  The tapes are stored for seven years.  These backups are not known to have been restored before.  However, we understand the restore process is as follows: (a) system is Commvault, HC browses the mailbox or file share and selects the time period; (b) Commvault then prompts for an index tape and HC requests the tape number from the opposite site and it is inserted; (c) Commvault then requests the restore tape(s) and again this is requested to be inserted by the Glasgow office; (d) Commvault then restores and; (e) time per restore is half a day if stored onsite, to 24-48 hours if stored offsite (i.e. a single mailbox for a single month), but this can be longer if issues arise such as tape library locks or Commvault software issues.  We are still investigating costs.

**EXHIBIT 10**
                                             **133**

GreenbergGlusker.com

ARNOLD & PORTER, LLP
O'MELVENY & MEYERS LLP
October 11, 2013
Page 4

     *5.*     *Have you performed any sampling to date of contents of any of the back-up tapes at issue?*

     No.

     *6.*     *What were Mr. Brawn, Mr. Daley, Ms. Butler, and Mr. Laing's practices when it comes to email correspondence? Did they store hard copies or electronic copies of received and sent mail outside of their email inboxes? And if so, to what extent are such copies presently available?*

     David Brawn: Most Tolkien emails saved in an Outlook sub-folder. Immaterial day-to-day emails deleted (although Litigation Hold is in place). His practice is not to print or keep hardcopies. His emails have been, or are being, collected.

     David Daley, Mary Butler and Adrian Laing: None stored electronically within the current back-up solution. These individuals have left the company, but to the best of our knowledge some hardcopy emails were kept. Responsive documents have been collected.

     Please provide reciprocal information for all questions applicable to Zaentz and Warner and their custodians.

     5.     <u>Electronic Information</u>

     Given the detailed explanations above, we do not understand your question. Please elaborate.

     6.     <u>Manches Files</u>

     We have written to Manches and requested that they provide us with the status of any Cathleen Blackburn and Steven Maier Tolkien-related files in their possession. To date, we have had no response.

     7.     <u>Privilege Log Stipulation</u>

     We were unable to locate any privilege log stipulations contained in any emails from Mr. Cestero sent on July 9, 2013, or otherwise. Are you referring to the stipulation in my letter of the same date? Please confirm to which stipulation you are referring. In addition, please identify the other privileges to which you would have the stipulation apply so that we may properly consider your request.

**GreenbergGlusker.com**

**EXHIBIT 10**
**134**

ARNOLD & PORTER, LLP
O'MELVENY & MEYERS LLP
October 11, 2013
Page 5


8.    F.R. Williamson

It is our current intention not to present Mr. Williamson's testimony in this matter. However, at this time, we cannot represent that we will not do so at a later date. We must reserve all rights with respect to Mr. Williamson's testimony.

Best,

Rachel Valadez

RV/RV

GreenbergGlusker.com

84971-00003/1985580.1

**EXHIBIT 10**
**135**

# EXHIBIT 11

1  BONNIE E. ESKENAZI (SBN 119401)
   BEskenazi@GreenbergGlusker.com
2  ELISABETH A. MORIARTY (SBN 156569)
   EMoriarty@GreenbergGlusker.com
3  RICARDO P. CESTERO (SBN 203230)
   RCestero@GreenbergGlusker.com
4  RACHEL VALADEZ (SBN 252415)
   RValadez@GreenbergGlusker.com
5  GREENBERG GLUSKER FIELDS CLAMAN &
   MACHTINGER LLP
6  1900 Avenue of the Stars, 21st Floor
   Los Angeles, California 90067-4590
7  Telephone: 310.553.3610
   Fax: 310.553.0687
8
   Attorneys for Plaintiffs and Counterclaim Defendants
9

10              UNITED STATES DISTRICT COURT

11              CENTRAL DISTRICT OF CALIFORNIA

12

13  FOURTH AGE LIMITED, a United Kingdom        Case No. CV 12-09912
    corporation; PRISCILLA MARY ANNE REUEL      ABC (SHx)
14  TOLKIEN, as TRUSTEE OF THE TOLKIEN
    TRUST, a United Kingdom Charitable Trust; THE   **THE TOLKIEN**
15  J.R.R. TOLKIEN ESTATE LIMITED, a United      **PARTIES'**
    Kingdom corporation; HARPERCOLLINS           **RESPONSES TO**
16  PUBLISHERS, LTD., a United Kingdom corporation;  **WARNER'S FIRST**
    UNWIN HYMAN LTD., a United Kingdom            **SET OF**
17  corporation; and GEORGE ALLEN & UNWIN        **INTERROGATORIES**
    (PUBLISHERS) LTD., a United Kingdom
18  corporation,

19                   Plaintiffs,

20  v.

21  WARNER BROS. DIGITAL DISTRIBUTION, INC.,
    a division of WARNER BROS. HOME
22  ENTERTAINMENT, INC., a Delaware corporation;
    WARNER BROS. ENTERTAINMENT, INC., a
23  Delaware corporation, as successor-in-interest to New
    Line Cinema Corp.; WARNER BROS. CONSUMER
24  PRODUCTS, INC., a Delaware corporation;
    WARNER BROS. INTERACTIVE
25  ENTERTAINMENT, INC., a division of WARNER
    BROS. HOME ENTERTAINMENT, INC.; NEW
26  LINE PRODUCTIONS, INC., a California
    corporation; THE SAUL ZAENTZ COMPANY d/b/a
27  Middle-earth Enterprises, a Delaware corporation; and
    DOES 1-10, inclusive,
28

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

84971-00003/1914318.3

TOLKIEN PARTIES' RESPONSES TO
WARNER'S FIRST SET OF
INTERROGATORIES

**EXHIBIT 11**
**136**

| | Defendants. |
|---|---|
| | AND RELATED CROSS-ACTIONS. |

PROPOUNDING PARTY:        THE WARNER PARTIES

RESPONDING PARTY:         THE TOLKIEN PARTIES

SET NO.:                  ONE

Plaintiffs and Counterclaim Defendants Fourth Age Ltd., Priscilla Mary
Anne Reuel Tolkien, as Trustee of the Tolkien Trust, and The J.R.R. Tolkien Estate
Ltd. (the "Tolkien Parties") hereby respond to the First Set of Interrogatories
propounded by Defendants and Counterclaimants Warner Bros. Entertainment, Inc.,
Warner Bros. Home Entertainment, Inc., Warner Bros. Consumer Products, Inc.,
Warner Bros. Digital Distribution, and New Line Productions, Inc. ("Warner" or
the "Warner Parties"), as follows:

## PRELIMINARY STATEMENT

1.      Each of the responses to the individual interrogatories herein
incorporates and is subject to this preliminary statement and the general and
specific objections set forth below.  The preliminary statement and objections form
a part of the response to each interrogatory and are set forth in this manner to avoid
repetition.  While the preliminary statement and objections may be referred to
specifically in response to an individual interrogatory, the failure to do so is not and
should not be construed as a waiver thereof.

2.      The Tolkien Parties have not completed their investigation of the facts
relating to this case.  In particular, the Tolkien Parties have not yet had the
opportunity to depose or interview all persons who may have knowledge of relevant

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

84971-00003/1914318.3                    1                    TOLKIEN PARTIES' RESPONSES TO
                                                              WARNER'S FIRST SET OF
                                                              INTERROGATORIES

**EXHIBIT 11**
**137**

facts, or to discover or otherwise obtain and review all documents which may have some bearing on this case.  The responses herein are thus based on and therefore limited by, the documents and information discovered to date.  The responses set forth herein are at all times subject to such additional or different information that discovery or further investigation or evaluation may disclose.

3.      The Tolkien Parties anticipate that further discovery, research and analysis will supply additional facts and additional meaning to the known facts.  Without in any way obligating themselves to do so, the Tolkien Parties reserve the right to modify or supplement their responses and to produce, introduce or rely upon subsequently acquired or discovered information or documents at trial or in any pretrial proceedings held herein as additional facts are ascertained, as documents are obtained, as additional contentions are formulated, and as additional discovery, analysis, or research may reveal.  The Tolkien Parties' responses are not in any way to be deemed an admission or representation that there are no further facts, documents, or witnesses with knowledge or information relevant to the subject matter of these interrogatories.

4.      The Tolkien Parties' responses are made solely for the purposes of this action.  Except for express admissions set forth herein, no incidental or implied admissions are intended by these responses.  The Tolkien Parties do not concede the relevance, materiality, propriety, or admissibility of any interrogatory or the subject matter to which it relates.  These responses are made by the Tolkien Parties subject to, and without in any way waiving or intending to waive:

a.      Any objections as to competency, materiality, privilege, relevancy, propriety, confidentiality/trade secrecy, admissibility and/or any other objections on grounds which would require exclusion of any information contained herein;

b.      The right to object to other discovery proceedings involving or relating to the same subject matter as the interrogatories; or

c.      The right at any time to revise, correct, add to, or clarify any of the

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

TOLKIEN PARTIES' RESPONSES TO
WARNER'S FIRST SET OF
INTERROGATORIES

1    responses set forth herein.  Furthermore, these responses are given subject to

2    correction of any omissions or errors.

3        5.    The Tolkien Parties will make reasonable efforts to respond to every

4    interrogatory, to the extent it has not been objected to, as the Tolkien Parties

5    understand and interpret the interrogatory, provided that the interrogatory is not so

6    vague and ambiguous that a response is impossible.  If Warner subsequently asserts

7    an interpretation of the interrogatory that differs from that of the Tolkien Parties,

8    they reserve the right to supplement their objections and response as necessary.

9

10                        **GENERAL OBJECTIONS**

11       1.    The Tolkien Parties object to these interrogatories, and to each of the

12   individual interrogatories, on the grounds that they are overbroad and not

13   reasonably calculated to lead to the discovery of admissible evidence in the use of

14   the terms "REFER," "RELATE," "IDENTIFY," and "DESCRIBE."

15       2.    The Tolkien Parties further object to these interrogatories, and to each

16   of the individual interrogatories, on the grounds that they are unduly burdensome,

17   oppressive, harassing, and compound by their use of the term "IDENTIFY."

18       3.    The Tolkien Parties further object to these interrogatories, and to each

19   of the individual interrogatories, to the extent they seek information protected from

20   disclosure by the attorney-client privilege, the work product doctrine, or any other

21   applicable claim of privilege ("privileged information").  The Tolkien Parties do

22   not intend to disclose any privileged information in response to these

23   interrogatories, and any undertaking by the Tolkien Parties to respond to these

24   interrogatories should be understood to exclude privileged information.  Any

25   disclosure of privileged information is inadvertent and shall not be deemed to

26   constitute a waiver of any privilege or protection.

27       4.    The Tolkien Parties object to the interrogatories in their entirety to the

28   extent they attempt or purport to impose obligations on the Tolkien Parties beyond

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1    those set forth in the Federal Rules of Civil Procedure and Central District Local

2    Rules.  In the following responses, all definitions and other instructions shall be

3    treated as having no force or effect to the extent that they exceed those duties.

4         5.     The Tolkien Parties object to each interrogatory to the extent it calls

5    for proprietary or confidential information of the Tolkien Parties; HarperCollins

6    Publishers, Ltd., Unwin Hyman Ltd. and George Allen & Unwin (Publishers) Ltd.

7    (collectively, the "HC Parties"); and/or third parties, and/or information protected

8    by the right of privacy.

9         6.     The Tolkien Parties object to the interrogatories to the extent they seek

10   information that is equally available to Warner and/or within the possession,

11   custody, or control of Warner.

12        7.     The Tolkien Parties object to each interrogatory to the extent it

13   attempts or purports to impose an obligation to investigate or discover information

14   from third parties not under their control and/or persons who are equally accessible

15   to Warner.

16        8.     The Tolkien Parties' responses are made subject to all general and

17   specific objections and they specifically reserve the right to reassert those

18   objections by motion or at any time at trial.

19

20                   **RESPONSES TO INTERROGATORIES**

21

22   **INTERROGATORY NO. 1:**

23        IDENTIFY all PERSONS who are (and were) involved in monitoring,

24   tracking, or observing on YOUR behalf the worldwide exploitation of the

25   TOLKIEN WORKS.

26   **RESPONSE TO INTERROGATORY NO. 1:**

27        The Tolkien Parties incorporate by reference the Preliminary Statement and

28   General Objections set forth above.  The Tolkien Parties further object to this

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

TOLKIEN PARTIES' RESPONSES TO
WARNER'S FIRST SET OF
INTERROGATORIES

**EXHIBIT 11**
**140**

1    interrogatory on the grounds that it is overly broad, seeks information which is

2    irrelevant, and is not reasonably calculated to lead to the discovery of admissible

3    evidence.  The Tolkien Parties further object to this interrogatory on the grounds

4    that it is vague and ambiguous as to what is meant by "involved in monitoring,

5    tracking or observing" the "worldwide exploitation of the TOLKIEN WORKS."

6    Subject to and without waiving the foregoing general and specific objections, the

7    Tolkien Parties respond as follows:  Cathleen Blackburn, Steven Maier, David

8    Brawn, and Adrian Laing.  Numerous employees and representatives of the HC

9    Parties and other third party licensees of the Tolkien Parties (including The Saul

10   Zaentz Company) also likely observed and monitored the worldwide exploitation of

11   the Tolkien Works in connection with performing their duties as legitimate

12   licensees of the Tolkien Works.  Discovery is continuing and the Tolkien Parties

13   specifically reserve the right to supplement their response to this interrogatory.

14   **INTERROGATORY NO. 2:**

15       STATE the date YOU first knew of WARNER's or ZAENTZ's exploitation

16   of any GAMBLING featuring or using characters, events, images, or story elements

17   from the TOLKIEN WORKS, the LOTR FILMS, or the HOBBIT FILMS.

18   **RESPONSE TO INTERROGATORY NO. 2:**

19       The Tolkien Parties incorporate by reference the Preliminary Statement and

20   General Objections set forth above.  The Tolkien Parties further object to this

21   interrogatory on the grounds that it is compound.  The Tolkien Parties further object

22   to this interrogatory on the grounds that it is vague, ambiguous, and unintelligible.

23   Subject to and without waiving the foregoing general and specific objections, the

24   Tolkien Parties respond as follows:  The Tolkien Parties first became aware of an

25   online slot game featuring the Tolkien Works on or about September 7, 2010.  The

26   Tolkien Parties were not aware that Zaentz or Warner were involved with the

27   exploitation of the online slot game until Warner's counsel indicated the same on or

28   about September 8, 2010.  The Tolkien Parties first became aware of a casino slot

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

84971-00003/1914318.3                    5                    TOLKIEN PARTIES' RESPONSES TO
WARNER'S FIRST SET OF
INTERROGATORIES

**EXHIBIT 11**
141

1    machine featuring the Tolkien Works on or about October 11, 2010.

2    **INTERROGATORY NO. 3:**

3        STATE the date YOU first knew of WARNER's or ZAENTZ's exploitation

4    of any ONLINE GAMBLING featuring or using characters, events, images, or

5    story elements from the TOLKIEN WORKS, the LOTR FILMS, or the HOBBIT

6    FILMS.

7    **RESPONSE TO INTERROGATORY NO. 3:**

8        The Tolkien Parties incorporate by reference the Preliminary Statement and

9    General Objections set forth above.  The Tolkien Parties further object to this

10   interrogatory on the grounds that it is compound.  The Tolkien Parties further object

11   to this interrogatory on the grounds that it is vague, ambiguous, and unintelligible.

12   Subject to and without waiving the foregoing general and specific objections, the

13   Tolkien Parties respond as follows:  The Tolkien Parties first became aware of an

14   online slot game featuring the Tolkien Works on or about September 7, 2010.  The

15   Tolkien Parties were not aware that Zaentz or Warner were involved with the

16   exploitation of the online slot game until Warner's counsel indicated the same on or

17   about September 8, 2010.

18   **INTERROGATORY NO. 4:**

19       STATE the date YOU first knew of WARNER's or ZAENTZ's exploitation

20   of any ONLINE GAMES featuring or using characters, events, images, or story

21   elements from the TOLKIEN WORKS, the LOTR FILMS, or the HOBBIT FILMS.

22   **RESPONSE TO INTERROGATORY NO. 4:**

23       The Tolkien Parties incorporate by reference the Preliminary Statement and

24   General Objections set forth above.  The Tolkien Parties further object to this

25   interrogatory on the grounds that it is compound.  The Tolkien Parties further object

26   to this interrogatory on the grounds that it is vague, ambiguous, and unintelligible.

27   Subject to and without waiving the foregoing general and specific objections, the

28   Tolkien Parties respond as follows:  The Tolkien Parties first became aware of an

GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

84971-00003/1914318.3                     6                    TOLKIEN PARTIES' RESPONSES TO
                                                               WARNER'S FIRST SET OF
                                                               INTERROGATORIES

**EXHIBIT 11**
**142**

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1   online slot game featuring the Tolkien Works on or about September 7, 2010.  The

2   Tolkien Parties were not aware that Zaentz or Warner were involved with the

3   exploitation of the online slot game until Warner's counsel indicated the same on or

4   about September 8, 2010.  After receiving Tom Magnani's letter of  October 13,

5   2010, the Tolkien Parties learned for the first time that Warner and Zaentz

6   contended that they had the right to exploit not only online gambling games, but

7   also more broadly video games based on the Tolkien Works that are delivered

8   otherwise than by way of physical media such as disc or cartridge, including

9   (without limitation) games delivered by way of electronic download (the

10  "Intangible Video Games").  Even then, to the best of their knowledge and belief

11  the Tolkien Parties were unaware of any actual exploitation by Zaentz or Warner of

12  Intangible Video Games other than the online slot game discovered on or about

13  September 7, 2010.  The Tolkien Parties subsequently became aware of such actual

14  exploitation during the investigation surrounding this dispute.  To the extent the

15  Tolkien Parties were aware of any video games based on *The Lord of the* Rings

16  and/or *The Hobbit* that featured a component playable online, including, without

17  limitation, *The Lord of the Rings Online*, the Tolkien Parties understood and

18  believed such video games required the purchase of physical media such as a disc

19  or cartridge in order to be played.

20  **INTERROGATORY NO. 5:**

21      IDENTIFY all license agreements that REFER or RELATE to GAMBLING,

22  ONLINE GAMBLING, ONLINE GAMES, or VIDEO GAMES featuring or using

23  characters, events, images, or story elements from the TOLKIEN WORKS, the

24  LOTR FILMS, and/or the HOBBIT FILMS that were received or reviewed by

25  YOU, and the date that YOU received each agreement.

26  **RESPONSE TO INTERROGATORY NO. 5:**

27      The Tolkien Parties incorporate by reference the Preliminary Statement and

28  General Objections set forth above.  The Tolkien Parties further object to this

84971-00003/1914318.3                    7

TOLKIEN PARTIES' RESPONSES TO
WARNER'S FIRST SET OF
INTERROGATORIES

**EXHIBIT 11**
**143**

1   the Tolkien Parties respond as follows:  The Tolkien Parties objected to the online

2   slot machine game on or about September 8, 2010.  This objection is reflected in

3   email correspondence between counsel for the Tolkien/HC Parties and counsel for

4   Warner.  The Tolkien Parties further respond that this interrogatory calls for a

5   compilation or summary of documents, and the burden of deriving the answer to

6   this interrogatory is substantially the same for the propounding party as the Tolkien

7   Parties.  As such, the Tolkien Parties respond, pursuant to Federal Rule of Civil

8   Procedure 33(d), that this information is contained in the documents which the

9   Tolkien Parties will produce in response to the Requests for Production of

10  Documents propounded by Warner.

13  DATED:  May 3, 2013                    GREENBERG GLUSKER FIELDS
                                           CLAMAN & MACHTINGER LLP

15                                         By: _Bonnie Cokesan_____
16                                            BONNIE E. ESKENAZI (SBN 119401)

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

84971-00003/1914318.3                      9                    TOLKIEN PARTIES' RESPONSES TO
                                                               WARNER'S FIRST SET OF
                                                               INTERROGATORIES

EXHIBIT 11
144

1

## PROOF OF SERVICE BY MAIL

2  I am a citizen of the United States and employed in Los Angeles County,

3  California.  I am over the age of eighteen years and not a party to the within-entitled

4  action.  My business address is 1900 Avenue of the Stars, 21st Floor, Los Angeles,

5  California  90067.  I am readily familiar with this firm's practice for collection and

6  processing of correspondence for mailing with the United States Postal Service.  On

7  May 3, 2013, I placed with this firm at the above address for deposit with the

8  United States Postal Service a true and correct copy of the within document(s):

9
   THE TOLKIEN PARTIES' RESPONSES TO
   WARNER'S FIRST SET OF INTERROGATORIES
10

11  in a sealed envelope, postage fully paid, addressed as follows:

12  SEE ATTACHED SERVICE LIST

13  Following ordinary business practices, the envelope was sealed and placed

14  for collection and mailing on this date, and would, in the ordinary course of

15  business, be deposited with the United States Postal Service on this date.

16  I declare that I am employed in the office of a member of the bar of this court

17  at whose direction the service was made.

18  Executed on May 3, 2013, at Los Angeles, California.

19

20  _____

21  Robert Massing

22

23

24

25

26

27

28

GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

84971-00003/1884083.1                                    PROOF OF SERVICE

**EXHIBIT 11**
145

1                         SERVICE LIST

2

3     Arnold & Porter LLP              Attorneys for Defendant

    Martin R. Glick                 THE SAUL ZAENTZ

4     John C. Ulin                    COMPANY d/b/a

    Sarah J. Givan                 Middleearth Enterprises, a

5     Sean M. Callagy              Delaware corporation

    Three Embarcadero Center, 7th Floor

6     San Francisco, California 94111-4024

7

8     O'Melveny & Meyers LLP      Attorneys for Defendants

    Daniel M. Petrocelli         WARNER BROS.

9     Victor Jih                     DIGITAL

    Molly Lens                    DISTRIBUTION, INC.;

10     1999 Avenue of the Stars       WARNER BROS.

    7th Floor                     ENTERTAINMENT, INC.;

11     Los Angeles CA 90067         WARNER BROS.

                                   CONSUMER PRODUCTS,

12                                INC.; WARNER BROS.

13                                INTERACTIVE

14                                ENTERTAINMENT, INC.;

                               NEW LINE

15                                PRODUCTIONS, INC.

16

17

18

19

20

21

22

23

24

25

26

27

28

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

# EXHIBIT 12

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

NATIONAL DAY LABORER
ORGANIZING NETWORK, *et al.*,

         **Plaintiffs,**

   - against -

UNITED STATES IMMIGRATION AND
CUSTOMS ENFORCEMENT AGENCY, *et
al.*,

         **Defendants.**
-------------------------------------------------------X

**OPINION AND ORDER**

**10 Civ. 3488 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

# I.  INTRODUCTION

      Plaintiffs brought this action for the purpose of obtaining records,

pursuant to the Freedom of Information Act ("FOIA"), from four government

agencies (collectively, "Defendants").  Specifically, the requests pertain to Secure

Communities, a collaborative program established by the United States

Immigration and Customs Enforcement Agency ("ICE") and the Department of

Justice ("DOJ") that enlists states and localities in the enforcement of federal

immigration law.[1]  A dispute has now arisen regarding the format in which the

---

    [1]    Secure Communities now operates in thirty-eight states, and is
expected to operate nationwide by 2013.  The Secure Communities program must
be activated at the state level through a signed agreement with ICE known as the
Secure Communities Memorandum of Agreement ("MOA").  It is unclear whether
participation in Secure Communities is mandatory for localities once their state has

EXHIBIT 12
147

Downloaded from LessonsLearnedBlog.com

Defendants have produced records to Plaintiffs, and will be required to produce records to Plaintiffs in the future. Those records consist of electronic text records, e-mails, spreadsheets, and paper records. To set the stage, I note that generally speaking records can be produced in hard copy, static images (with or without load files) and native file format (with or without load files).

## II. BACKGROUND

In February 2010, Plaintiffs submitted identical twenty-one page FOIA requests to each of the four defendant agencies.[2] Defendants claim that these requests would require production of millions of pages of responsive documents. Because the Plaintiffs received no substantive response to their requests, on April 27, 2010, they brought this suit to compel production of responsive records. After negotiating with the Government, Plaintiffs agreed to create a five-page Rapid Production List ("RPL") identifying specific records that would be sought and hopefully produced on an expedited basis. The Government believes that even responses to the RPL will involve thousands of pages of records.

---

signed an MOA. A question exists as to whether local jurisdictions can "opt-out" of the program and prevent ICE from using their police records to identify persons subject to deportation. The primary purpose of Plaintiffs' FOIA request is to answer this question.

[2] In addition to ICE, the agencies include the Department of Homeland Security, the Federal Bureau of Investigation, and the Office of Legal Counsel.

-2-

EXHIBIT 12
148

After further negotiations, the parties reached an agreement on July 7, 2010, regarding production responsive to the RPL. In substance, the Defendants agreed to produce "the bulk of responsive, non-exempt materials by Friday, July 30."[3] The agreement also provided that if the Defendants identified responsive, non-exempt materials that could not be produced by that date, they would provide Plaintiffs with a description of such materials by July 26, and would propose an alternative date for their production. Defendants failed to produce any records by the agreed-upon July 30 date, but nearly two thousand pages of records were produced on August 3, August 13, September 8, and October 22, 2010.[4] These productions did not satisfy the July 7 agreement.

On October 22, 2010, Plaintiffs moved for a preliminary injunction to compel production for five categories of the RPL documents that had not been produced. Specifically, Plaintiffs asked the Court to order (1) that Opt-Out records – defined in the RPL as "National policy memoranda, legal memoranda or communications relating to the ability of states or localities to opt-out or limit their participation in [the program]" – be produced within five days; (2) that Defendants

---

[3]     7/9/10 Letter from Assistant United States Attorney ("AUSA") Christopher Connolly to Bridget Kessler, Plaintiffs' Counsel.

[4]     Three of these productions were from ICE. The August 13 production was from the FBI.

-3-

EXHIBIT 12
149

provide a *Vaughn* index within ten days;[5] and (3) that an expedited briefing schedule be set for contested exemptions. The motion was resolved at a conference held on December 9, 2010, with an order requiring Defendants to provide the Opt-Out Records by January 17, 2011.[6]

On December 22, 2010, Plaintiffs sent the Government a Proposed Protocol Governing the Production of Records ("Proposed Protocol"). This proposal, annexed hereto as Exhibit A, sets forth a requested format for the production of electronic records and a separate requested format for the production of paper records. As Plaintiffs note, the Proposed Protocol is based, in part, on the format demands routinely made by two government entities – the Securities and Exchange Commission and the Department of Justice Criminal Division.

In advance of a court conference scheduled for January 12, 2011, Defendants produced five PDF files totaling less than three thousand pages. Upon receipt of these files, Plaintiffs again sought assistance from the Court, asserting

---

[5] The term "*Vaughn* index" arises from *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), which held that a government agency must describe how it searched for records, as well as its rationale for any claimed FOIA exemptions, in order to satisfy its statutory obligations under FOIA.

[6] *See* December 17, 2010 Order [docket # 25].

-4-

EXHIBIT 12
150

that the form in which these records were produced was unusable.[7]   Plaintiffs

made three specific complaints: (1) the data was produced in an unsearchable PDF

format; (2) electronic records were stripped of all metadata; and (3) paper and

electronic records were indiscriminately merged together in one PDF file.

Plaintiffs asked the Court to "so order" the Proposed Protocol.[8]  In response, the

Government submitted a letter defending its form of production.[9]  An oral

argument on this issue was held on January 12, 2011.[10]

Before turning to a discussion of the issues raised by this dispute, it is

important to describe what the parties did and did not do in an effort to negotiate

an agreed upon form of production.  As far as I can tell from the record submitted

by the parties, the equivalent of a Rule 26(f) conference, at which the parties are

required to discuss form of production, was not held and no agreement regarding

form of production was ever reached.  Nor was a dispute regarding form of

production brought to the Court for resolution.  The Proposed Protocol was first

---

[7]       *See* 1/6/11 Letter from Norman Cerullo, Plaintiffs' Counsel, to the Court.

[8]       *See* Proposed Protocol, Exhibit C to 1/6/11 Letter.

[9]       *See* 1/11/11 Letter from AUSAs Joseph N. Cordaro and Christopher Connolly, Defendants' Counsel, to the Court.

[10]       *See* 1/12/11 Transcript of Proceedings ("Tr.").

EXHIBIT 12
151

provided to Defendants on December 22, 2010, and also was the first time

Plaintiffs made a written demand for load files and metadata fields.[11]  Prior to

December 22, the only written specification of form of production was a July 23 e-

mail from Bridget Kessler, Plaintiffs' counsel, to AUSA Connolly, Defendants'

counsel.  Given its importance and brevity, I quote the full text of this e-mail:

> We would appreciate if you could let us know as soon as
> possible how ICE plans to produce the Rapid Production
> List to plaintiffs.  To facilitate review of the documents
> between several offices, please (1) produce the responsive
> records on a CD and, if possible, as an attachment to an
> email; (2) save each document on the CD as a separate file;
> (3) provide excel documents in excel file format and not as
> PDF screen shots; and (4) produce all documents with
> consecutively numbered bate [sic] stamps. . . . Thank you
> for your help and if you have any questions or concerns,
> please feel free to call me.

It is undisputed that Defendants' counsel did not respond to the e-mail by raising any

questions or concerns.  Defendants do not deny that the records that have been

produced, including but not limited to spreadsheets, are in an unsearchable PDF

format with no metadata.

## III.  APPLICABLE LAW

### A.     FOIA and the Federal Rules of Civil Procedure

---

[11]     The parties dispute whether this was the first written demand for production in single page format with respect to text documents and native format production with respect to spreadsheets.

Downloaded from eLesserPriceBlog.com

EXHIBIT 12
152

FOIA provides that "[i]n making any record available to a person under this paragraph, an agency shall provide the record in any form or format requested by the person if the record is readily reproducible by the agency in that form or format."[12] While Congress has recognized the need for "Government agencies [to] use new technology to enhance public access to agency records and information," there is surprisingly little case law defining this standard.[13] The leading case, *Sample v. Bureau of Prisons*, provides the following guidance:

> Under any reading of the statute, however, "readily reproducible" simply refers to an agency's technical capability to create the records in a particular format. No case construing the language focuses on the characteristics of the requester. *See, e.g., TPS, Inc. v. U.S. Dep't of Defense,* 330 F.3d 1191, 1195 (9th Cir. 2003) (interpreting "readily reproducible" as referring to technical capability); *see also, e.g., Carlson v. U.S. Postal Serv.*, 2005 WL 756573, at *7 (N.D. Cal. 2005) (holding that "readily reproducible" in a requested format means "readily accessible" by the agency in that format); *Landmark Legal Found. v. EPA*, 272 F. Supp. 2d 59, 63 (D.D.C. 2003) (construing "readily reproducible" as the ability to duplicate).[14]

---

[12] 5 U.S.C. § 552(a)(3)(B) (effective Oct. 1, 1997).

[13] Electronic Freedom of Information Act Amendments of 1996, Pub. L. No. 104-231, § 2(a)(6), 110 Stat. 3050 (1996).

[14] 466 F.3d 1086 (D.C. Cir. 2006) (holding that Bureau of Prisons had the obligation to produce records electronically when requested to do so). *Accord TPS*, 330 F.3d at 1195 ("[A] FOIA request *must be processed in a requested format* if 'the capability exists to respond to the request' [in that format]." (citing

-7-

**EXHIBIT 12**
**153**

Rule 34 of the Federal Rules of Civil Procedure also addresses the form of production of records, albeit in the context of discovery. The Rule is divided into a series of steps that are intended to facilitate production in a useful format. *First*, the requesting party may specify the form of production of electronically stored information ("ESI").[15] *Second*, the responding party may object to the specified form; if it does so, it must state the form that it intends to use.[16] If the requesting party disagrees with the counter-proposal, the parties must attempt to resolve the disagreement. If they cannot, the requesting party may make a motion to compel production in the requested form. *Third*, if the requesting party has not specified a form of production, the responding party must state the form that it intends to use.[17] The responding party may select the form in which the material "is ordinarily maintained," or in a "reasonably usable form."[18] The Advisory Committee Note to Rule 34 states that the responding party's "option to

─────────────────

32 C.F.R. § 286.4(g)(2) (emphasis added)).

[15]     *See* Fed. R. Civ. P. 34(b)(1)(C).

[16]     *See* Fed. R. Civ. P. 34(b)(2)(D).

[17]     *See id.*

[18]     Fed. R. Civ. P. 34(b)(2)(E)(ii). *See also* The Sedona Principles: Best Practices Recommendations and Principles for Addressing Electronic Document Production (2d ed. 2007) ("Sedona Principles 2d"), Principle 12 ("[P]roduction should be made in the form or forms in which the information is ordinarily maintained or in a reasonably usable form . . . .").

-8-

**EXHIBIT 12**
**154**

produce [ESI] in a reasonably usable form does not mean that [it] is free to convert [ESI] from the form in which it is ordinarily maintained to a different form that makes it more difficult or burdensome for the requesting party to use the information efficiently."[19]  Finally, the Advisory Committee Note also states that if the ESI is kept in an electronically-searchable form, it "should not be produced in a form that removes or significantly degrades this feature."[20]

    **B.**     **Case Law**

         **1.**     **Metadata and Load Files**

In *Aguilar v. Immigration and Customs Enforcement Division of the United States Department of Homeland Security,* Magistrate Judge Frank Maas, of this District, provided a guidebook that explained the various types of metadata and the relationship between a record and its metadata.[21]  In that opinion, Judge Maas noted that in the second edition of the Sedona Principles, the Conference abandoned an earlier presumption against the production of metadata in recognition of "'the need to produce reasonably accessible metadata that will enable the receiving party to have the same ability to access, search, and display

---

[19]     Fed. R. Civ. P. 34(b), 2006 Advisory Committee Note.

[20]     *Id.*

[21]     255 F.R.D. 350 (S.D.N.Y. 2008).

-9-

**EXHIBIT 12**
**155**

Downloaded from eLessonsLearnedBlog.com

the information as the producing party . . . .'"[22]  By now, it is well accepted, if not

indisputable, that metadata is generally considered to be an integral part of an

electronic record.[23]

      The *Aguilar* decision also explained the term load file, quoting from

The Sedona Conference Glossary.  The 2010 version of the Glossary now defines

the term as follows:

> A file that relates to a set of scanned images of
> electronically processed files, and indicates where
> individual pages or files belong together as documents, to
> include attachments, and where each document begins and
> ends.  A load file may also contain data relevant to the
> individual documents, such as selected metadata, coded
> data, and extracted texts.  Load files should be obtained and
> provided in prearranged or standardized formats to ensure
> transfer of accurate and usable images and data.[24]

---

[22]    *Id.* at 356 (quoting Sedona Principles 2d Principle 12).

[23]    *See, e.g.*, *Williams v. Sprint/United Mgmt. Co.*, 230 F.R.D. 640, 652 (D. Kan. 2005) (holding that "metadata is an inherent part of an electronic document, and its removal ordinarily requires an affirmative act by the producing party that alters the electronic document").  *See generally* W. Lawrence Wescott, *The Increasing Importance of Metadata in Electronic Discovery*, 14 Rich J.L. & Tech. 10 (2008).

[24]    The Sedona Conference® Glossary: E-Discovery & Digital Information Management (3d ed. Sept. 2010), at 31.  *See also* Sedona Principles 2d Principle 12, cmt 12(b) ("In an effort to replicate the usefulness of native files while retaining the advantage of static productions, image format productions are typically accompanied by 'load files,' which are ancillary files that may contain textual content and relevant system metadata.").

-10-

EXHIBIT 12
156

Once again, it is by now well accepted that when a collection of static images are produced, load files must also be produced in order to make the production searchable and therefore reasonably usable.[25]

### 2.     FOIA and Metadata

No federal court has yet recognized that metadata is part of a public record as defined in FOIA.  However, this precise issue has been addressed by several state courts, which have uniformly held, in the context of state freedom of information laws, that metadata is indeed a part of public records and must be disclosed pursuant to a request for public records.[26]  In his January 6, 2011 letter,

---

[25]     The question arises as to the expense of creating load files.  While I cannot predict the exact cost of creating such files in every case, the fact is that a significant collection of static TIFF images is not reasonably usable without load files.  A party can generally avoid the expense of creating load files by producing the records in native format.  However, some metadata is *not* embedded in the native file and so will not necessarily travel with the native file.  For this metadata, load files might still be necessary even with a native production.  These files include: Identifier, File Name, Custodian, Source Device, Source Path, Production Path, Modified Date, Modified Time, and Time Offset Value (allowing documents and messages to be properly sorted temporally).  All of these terms are defined *infra* Part IV.B at 20-22.

[26]     *See Irwin v. Onondaga Cnty. Res. Recovery Agency,*, 895 N.Y.S.2d 262, 319 (4th Dep't 2010) (finding that petitioner's request for "all computer records that are associated with published [photographs]" included a demand for the metadata associated with those images, and that the metadata should have been disclosed pursuant to New York's Freedom of Information Law); *O'Neill v. City of Shoreline*, 240 P.3d 1149, 1152 (Wash. 2010) (holding, in a manner of first impression, that metadata associated with an e-mail sent to a public official constituted a public record subject to disclosure under Washington's Public

-11-

EXHIBIT 12
157

Plaintiffs' counsel does cite one FOIA case recognizing that production in a medium which detrimentally affects the access to the information sought is inappropriate because it could improperly "reduce the quantum of information made available."[27]

## IV. DISCUSSION

### A. August - October 2010 and January 2011 Productions

The Government defends the format of the productions to date based on its claim that Plaintiffs failed to make a timely request for metadata. Placing heavy reliance on *Aguilar*, Defendants quote the following language: "[I]f a party wants metadata, it should 'Ask for it. Up front. Otherwise, if [the party] asks[s] too late or ha[s] already received the document in another form, [it] may be out of

---

Records Act); *Lake v. City of Phoenix*, 218 P.3d 1004, 1007-08 (Ariz. 2009) ("[T]he metadata in an electronic document is part of the underlying document; it does not stand on its own. When a public officer uses a computer to make a public record, the metadata forms part of the document as much as the words on the page.").

[27] 1/6/11 Letter (quoting *Dismukes v. Department of Interior*, 603 F. Supp. 760, 762 (D.D.C. 1984) (holding that production of microfiche instead of computer tape could violate FOIA if production of microfiche "affects [the] access to the information [sought]")). *Accord Armstrong v. Executive Office of the President*, 1 F.3d 1274, 1280 (D.C. Cir. 1993) (providing paper print-outs of electronic documents violated the Federal Records Act because "essential transmittal information relevant to a fuller understanding of the context and import of the electronic communication will simply vanish").

-12-

EXHIBIT 12
158

luck.'"[28]  Given Plaintiffs' July 23 e-mail and Defendants' tardy productions, I

cannot accept this lame excuse for failing to produce the records in a *usable*

*format*.

> *First*, the language of Plaintiffs' July 23 e-mail, while less than crystal

clear, was sufficient to put Defendants on notice of certain requests regarding form

of production.  Defendants were asked to "(2) save each document on the CD as a

separate file; (3) provide excel documents in excel file format and not as PDF

screen shots; and (4) produce all documents with consecutively numbered bate

[sic] stamps."  These requests explicitly placed Defendants on notice that

spreadsheets were sought in native format — not as a PDF screen shot — and that

each text record should be produced as a separate file (*i.e.*, in single file format). In

addition, the request for consecutively numbered Bates stamping also put

Defendants on notice of the need for single file format.  *Second*, and of equal if not

greater importance, Plaintiffs asked the Government to "let us know as soon as

possible how ICE plans to produce the Rapid Production List."   Had the

Government done as it was asked, any ambiguity as to the nature of the requested

format would have been resolved.  Finally, Plaintiffs wrote "if you have any

questions or concerns, please feel free to call me."  This invitation was ignored.

---

[28]     1/11/11 Letter (quoting *Aguilar*, 255 F.R.D. at 357 (quoting Levitt &
Farrell, *Taming the Metadata Beast*, N.Y.L.J. May 16, 2008, at 4)).

**EXHIBIT 12**
**159**

Defendants violated the explicit requests of the July 23 e-mail by producing all of the records in non-searchable PDF format, merging all records without indicating any separate files, merging paper with electronic records, and failing to produce e-mails with attachments.  They also violated the Federal Rules of Civil Procedure (the "Rules") by failing to produce the records in a reasonably usable form, and by producing the records in a form that makes it difficult or burdensome for the requesting party to use the information efficiently.

The Government argues that metadata is substantive information that must be explicitly requested and then reviewed by an agency for possible exemptions.[29]  Because there is no controlling FOIA precedent recognizing that metadata is an integral part of the electronic record that must be produced when an electronic record is requested, the Government asserts that it complied with its FOIA obligations, even if it did not comply with the Rules.[30]  To that end, the Government argues that if the requirements of FOIA and the requirements of the

---

[29]    *See* Tr. at 9, 11.

[30]    *See id*. at 13, 23-24**.**  Specifically, the Government argues that FOIA places the burden on the requesting party to ask for metadata, rather than on the producing party to object to requests regarding the form of production.  Moreover, the Government argues that its compliance with its FOIA obligations must be assessed by the adequacy of its *search* for responsive documents, rather than on the quantity and quality of its production.  *See id*. at 26.

-14-

EXHIBIT 12
160

Rules conflict, FOIA must trump the Rules.[31]

However, there is no need to decide this question because FOIA does not conflict with the Rules. FOIA is silent with respect to form of production, requiring only that the record be provided in "any form or format requested by the person if the record is readily reproducible by the agency in that form or format." There is no doubt in my mind that this language refers only to technical ability or, at most, reasonable accessibility. Defendants do not argue that they are *unable* to produce the records in the requested form — namely native format for spreadsheets and single file format for text records — but that reviewing all of the metadata would greatly increase the burden of search and production. To that extent, they have unwittingly argued that a request to produce *all* metadata would push the request into the second tier of Rule 26(b)(2)(B) because such records are not reasonably accessible based on undue burden and cost.[32]

Nonetheless, the Government argues that FOIA is not synonymous with discovery in a civil litigation. It is a statute requiring the production of records to the public, upon request, subject to certain exemptions. While

---

[31]     *See id.* at 24**.**

[32]     In short, Defendants do not argue that Plaintiffs are not entitled to the metadata or that it is privileged. Rather, they stress that the review and production of that data will increase the time and expense of responding to the FOIA request. *See* Tr. at 11, 14-15.

EXHIBIT 12
161

rhetorically nuanced, this argument is unavailing. Regardless of whether FOIA requests are subject to the same rules governing discovery requests, Rule 34 surely should inform highly experienced litigators as to what is expected of them when making a document production in the twenty-first century.[33] As noted earlier, Defendants' productions to date have failed to comply with Rule 34 *or* with FOIA.

       The next issue to address is the appropriate remedy. Because no metadata was specifically requested in Plaintiffs' July 23 e-mail, and because this is an issue of first impression, I will not require Defendants to re-produce all of the records with metadata. Moreover, while native format is often the best form of production, it is easy to see why it is not feasible where a significant amount of information must be redacted.[34] Therefore, Defendants are ordered to re-produce

---

[33]     It is well-established that FOIA was not intended to supplant or supplement the discovery rules; as far as I can tell, however, courts have not addressed the reverse question of whether the discovery rules govern FOIA productions. Nonetheless, because the fundamental goal underlying both the statutory provisions and the Federal Rules is the same — *i.e.*, to facilitate the exchange of information in an expeditious and just manner — common sense dictates that parties incorporate the spirit, if not the letter, of the discovery rules in the course of FOIA litigation. Thus, attorneys should meet and confer throughout the process, and make every effort to agree as to the form in which responsive documents will ultimately be produced. In this context I note that Rule 26(f) specifically requires the parties to discuss "any issues about disclosure or discovery of electronically stored information, including the form or forms in which it should be produced."

[34]     In this case, for example, if the Government does not convert appropriately-redacted documents into static image format, there is concern that

EXHIBIT 12
162

all text records in static image single file format together with their attachments. However, they must re-produce all spreadsheets in native format as requested by Plaintiffs' July 23 e-mail.[35]  All records must be Bates stamped, which should also assist in the production of single file format.[36]

That said, I now hold, consistent with the state court decisions cited

---

Plaintiffs could use the metadata embedded in natively-produced documents to circumvent certain FOIA exemptions.  There is also concern that, even with a static image production – accompanied by load files containing metadata – the information redacted pursuant to FOIA exemption (b)(6) could be "reverse engineered."  Tr. at 11-12 (". . . if the [government] took exemption (b)(6) for privacy purposes[,] [t]he question would be if we then produced the system metadata, would that be a way for the requester to get around the exemption by finding the information that we redacted in the first place based on personal information.").  *See* 5 U.S.C. § 552(b)(6) (exempting "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy" from FOIA productions).  Faced with such a risk, both static images *and* the metadata would have to be redacted.

[35]    *See* Tr. at 20 (ordering re-production "the way it was requested").  However, if the Government can demonstrate why native production of spreadsheets would inevitably reveal exempt information, it may produce them in TIFF format, but must include load files.

[36]    Generally, when a court orders a "do-over" it gives serious consideration to cost shifting or cost sharing.  *See generally Covad Comm'cs Co. v. Revonet, Inc.*, 254 F.R.D. 147 (D.D.C. 2008) (requiring parties to share costs of re-producing previously produced hard copies in electronic format as both parties were at fault).  However, in this case, I conclude that Defendants failed to comply with Plaintiffs' request in the July 23 e-mail and the explicit invitation to confer with Plaintiffs regarding any questions or concerns.  Moreover, Defendants produced records in a format that was not reasonably usable.  As a result, I decline to require Plaintiffs to bear any of the costs of a re-production.

-17-

EXHIBIT 12
163

earlier, that certain metadata is an integral or intrinsic part of an electronic record.[37]

As a result, such metadata is "readily reproducible" in the FOIA context.  The

only remaining issue is which of the many types of metadata are an intrinsic part of

an electronic record.  Unfortunately, there is no ready answer to this question.  The

answer depends, in part, on the type of electronic record at issue (*i.e.*, text record,

e-mail, or spreadsheet) and on how the agency maintains its records.  Some

agencies may maintain only a printed or imaged document as the final or official

version of a record.  Others retain all records in native format, which preserves

much of the metadata.  Electronic records may have migrated from one system to

another, maintaining some metadata but not all.  The best way I can answer the

question is that metadata *maintained* by the agency *as a part of an electronic

record* is *presumptively* producible under FOIA, unless the agency demonstrates

that such metadata is not "readily reproducible."

### B.    Future Productions

The Government argues that the Proposed Protocol should not be

required for the January 17 production of the Opt-out Records because it was

received *after* the Government had completed the great bulk of its search.[38]  While

---

[37]      *See supra* note 26.

[38]      *See* Tr. at 30-31.

EXHIBIT 12
164

it surely had not reviewed all of the documents as of December 22, there is no
reason to question the Government's claim that it began to search in earnest on
December 10, following a court conference on December 9 which set a production
deadline of January 17, and that it had completed the bulk of its collection efforts
by December 22.[39]  The Government notes that the form of production issue was
not raised at the December 9 conference or at any time prior to December 22.
Given this time line, the January 17 production shall be made (or re-made if
already completed) in the same format that I have now required for the earlier
productions.

      I turn now to all future productions.  Here, Plaintiffs ask that the bulk
of the ESI be produced in TIFF image format but with corresponding load files,
Bates stamping, and the preservation of "parent-child" relationships (*i.e.* the
association between an attachment and its parent record).  Plaintiffs also request
twenty-four specific fields of metadata, which presumably will be the content of
the load files.  Finally, Plaintiffs request that spreadsheets be produced in both
native format and TIFF format.  Hard copy records are requested in single page
TIFF image format with corresponding load files to provide ease of review.

      The Government has not made a counterproposal in response to

---

[39]    *See id.* at 27-28.

Downloaded from eLessonsLearnedBlog.com

**EXHIBIT 12**
**165**

Plaintiffs' Proposed Protocol. Nonetheless, the Court will not impose any greater burden on the Defendants than is absolutely necessary to conduct an efficient review. After reviewing the Proposed Protocol as well as various sources discussing essential metadata fields,[40] I conclude that all future productions by Defendants must include load files that contain the following fields, which apply to *all forms of ESI*.[41]

1.  **Identifier**: A unique production identifier ("UPI") of the item.[42]

2.  **File Name**: The original name of the item or file when collected from the source custodian or system.

---

[40]    The Federal Judicial Center recently sponsored an E-Discovery Seminar for Federal Judges. At the session on Form of Production, held on September 28, 2010, the presenters suggested the fourteen fields of metadata were likely to be necessary in any production of ESI produced in a digital format. These fields, however, relate primarily to e-mail. *See* Form of Production PowerPoint slides prepared by Magistrate Judges James C. Francis and Frank Maas and attorney Maura Grossman (recommending the following fields: Bates_Begin; Bates_End; Attach_Begin; Attach_End; Sent_Date; Sent_Time; To; From; CC; BCC; Subject/Title; Text; Custodian; and Native_File). *Cf.* Craig Ball, *Beyond Data about Data: The Litigator's Guide to Metadata* (2005-2011), available at http://www.craigball.com/metadataguide2011.pdf, at 11 (setting forth six fundamental metadata fields).

[41]    While not necessary to the holding in this case, I believe that these are the minimum fields of metadata that should accompany *any* production of a significant collection of ESI. Requests for additional fields should be considered by courts on a case-by-case basis.

[42]    For native files, this might be a Bates number system either on the entire file or on each page within the file as feasible.

EXHIBIT 12
166

3. **Custodian**: The name of the custodian or source system from which the item was collected.

4. **Source Device**: The device from which the item was collected.

5. **Source Path**: The file path *from* the location from which the item was collected.

6. **Production Path**: The file path *to* the item produced from the production media.

7. **Modified Date**: The last modified date of the item when collected from the source custodian or system.

8. **Modified Time**: The last modified time of the item when collected from the source custodian or system.

9. **Time Offset Value**: The universal time[43] offset of the item's modified date and time based on the source system's time zone and daylight savings time settings.

The following additional fields shall accompany production of all e-mail messages:

1. **To**: Addressee(s) of the message.

2. **From**: The e-mail address of the person sending the message.

---

[43] *I.e.*, Coordinated Universal Time ("UTC") or Greenwich Mean Time ("GMT").

-21-

EXHIBIT 12
167

3.     **CC**: Person(s) copied on the message.

4.     **BCC**: Person(s) blind copied on the message.

5.     **Date Sent**: Date the message was sent.

6.     **Time Sent**: Time the message was sent.

7.     **Subject**: Subject line of the message.

8.     **Date Received**: Date the message was received.

9.     **Time Received**: Time the message was received.

10.    **Attachments**: The Bates number ranges of e-mail attachments.  The parties may alternatively choose to use: Bates_Begin, Bates_End, Attach_Begin and Attach_End.

The following additional fields shall accompany images of paper records:

1.     **Bates_Begin**: The beginning Bates number or UPI for the first page of the document.

2.     **Bates_End**: The ending Bates number or UPI for the last page of the document.

3.     **Attach_Begin**: The Bates number or UPI of the first page of the first attachment to the parent document; and

4.     **Attach_End**: The Bates number or UPI of the last page of the last

**EXHIBIT 12**
**168**

attachment to the parent document.

In addition, Defendants must produce spreadsheets in native format, with accompanying load files if the required metadata is not preserved in the native file. However, unless Plaintiffs can demonstrate why it is also necessary to produce the spreadsheets in TIFF format, Defendants need not make such a production. Conversely, the Government may produce the spreadsheets in TIFF format with load files containing the applicable metadata fields, if it can demonstrate why native production of spreadsheets would inevitably reveal exempt information.

Although Plaintiffs requested certain additional fields – namely Parent Folder; File Size; File Extension; Record Type; Master_Date; and Author – I conclude that these fields need not be produced in this case. Except as noted in this Opinion, all of the other format requirements in the Proposed Protocol with respect to both ESI and hard copy are hereby ordered.[44]

_____

[44] To be clear, my Order requiring the use of this Proposed Protocol for future productions – as amended by the specific metadata fields I have required and by the options I have offered the parties regarding the form of production for spreadsheets – is limited to this case. I am certainly not suggesting that the Proposed Protocol should be used as a standard production protocol in all cases. The production of individual static images on a small scale, where no automated review platform is likely to be used, may be perfectly reasonable depending on the scope and nature of the litigation. While Rule 34 requires that records be produced in a reasonably usable format — which at a minimum requires searchability — any further production specifications are subject to negotiation by the parties on a case

-23-

EXHIBIT 12
169

One final note. Whether or not metadata has been specifically requested — which it should be — production of a collection of static images without any means of permitting the use of electronic search tools is an inappropriate downgrading of the ESI. That is why the Government's previous production — namely, static images stripped of all metadata and lumped together without any indication of where a record begins and ends — was not an acceptable form of production. The Government would not tolerate such a production when it is a receiving party, and it should not be permitted to make such a production when it is a producing party. Thus, it is no longer acceptable for any party, including the Government, to produce a significant collection of static images of ESI without accompanying load files.[45]

---

by case basis. If no agreement is reached, the court must determine the appropriate form of production, taking into account the principles of proportionality and considering both the needs of the requesting party and the burden imposed on the producing party.

[45] *See SEC v. Collins & Aikman Corp.,* 256 F.R.D. 403, 413 (S.D.N.Y. 2009) (holding that government agencies "must abide by the Federal Rules of Civil Procedure," and are subject as are all parties to the requirements of Rule 34). A party often has the option to produce ESI in native format, which will reduce costs. But if a party chooses to produce a significant collection of TIFF images, it must assume that the receiving party will review those images on some sort of review platform — such as a Concordance database — which requires load files in order to be reasonably useable.

-24-

EXHIBIT 12
170

## V.    CONCLUSION

Once again, this Court is required to rule on an e-discovery issue that could have been avoided had the parties had the good sense to "meet and confer," "cooperate" and generally make every effort to "communicate" as to the form in which ESI would be produced.  The quoted words are found in opinion after opinion and yet lawyers fail to take the necessary steps to fulfill their obligations to each other and to the court.  While certainly not rising to the level of a breach of an ethical obligation, such conduct certainly shows that all lawyers — even highly respected private lawyers, Government lawyers, and professors of law — need to make greater efforts to comply with the expectations that courts now demand of counsel with respect to expensive and time-consuming document production. Lawyers are all too ready to point the finger at the courts and the Rules for increasing the expense of litigation, but that expense could be greatly diminished if lawyers met their own obligations to ensure that document production is handled as expeditiously and inexpensively as possible.  This can only be achieved through cooperation and communication.

-25-

EXHIBIT 12
171

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:    New York, New York
           February 7, 2011

Downloaded from eLessonsLearnedBlog.com

-26-

EXHIBIT 12
172

## - Appearances -

**For Plaintiffs:**

Bridget Kessler, Esq.
Immigration Justice Clinic
Benjamin N. Cardozo School of Law
55 Fifth Ave., Rm 1154
New York, New York 10003
(212) 790-0213

Norman Cerullo, Esq.
Anthony J. Diana, Esq.
Mayer Brown LLP
1675 Broadway
New York, New York 10019
(212) 506-2500

Sunita Patel, Esq.
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6439

**For Defendants:**

Joseph N. Cordaro
Christopher Connolly
Assistant U. S. Attorneys
86 Chambers Street, 3rd Floor
New York, NY 10004
(212) 637-2745/2761

Downloaded from eLessonsLearnedBlog.com

-27-

EXHIBIT 12
173

# EXHIBIT A

Downloaded from eLessonsLearnedBlog.com

EXHIBIT 12
174

## PROTOCOL GOVERNING THE PRODUCTION OF RECORDS

### I.  Production Formats of Electronic Records

Defendants agree that all responsive electronically stored information ("ESI") shall be produced in the following formats:

A.  **TIFFs.** All images shall be delivered as single page Group IV TIFF image files. Image file names should not contain spaces.

B.  **Unique IDs.** Each image should have a unique file name and should be named with the Bates number assigned to it.

C.  **Text Files.** Extracted full text in the format of multipage .txt files shall be provided. The total number of text files delivered should match the total number of TIFF files delivered. Each text file should match the respective TIFF filename. Text from redacted pages will be produced in OCR format rather than extracted text.

D.  **Parent-Child Relationships.** Parent-child relationships (the association between an attachment and its parent record) should be preserved.

E.  **Database Load Files/Cross-Reference Files.** Records should be provided in a format compatible with Concordance 8x and Opticon 3x in the following format:

Example Concordance Delimited File

þBegDocþ_þEndDoc þ_ þBegAttach þ_ þ EndAttach þ_ þ DocPages þ_ þ RecordType þ_ þ MasterDate þ_ þ SentOn_Date þ_ þ SentOne_Time þ_ þ Recvd_Time þ

þ ABC001 þ_ þ ABC002 þ_ þ ABC001 þ_ þ ABC005 þ_ þ 2 þ_ þ Email þ_ þ þ_ þ 01/01/2008 þ_ þ 13 05 GMT þ_ þ 13:08 GMT þ

þ ABC003 þ_ þ ABC005 þ_ þ ABC001 þ_ þ ABC005 þ_ þ 3 þ_ þ Attachment þ_ þ þ _ þ þ_ þ þ_ þ

Example Opticon Delimited File

There should be one row in each load file per TIFF image. Files that are the first page of a record should contain a "Y" in the file where appropriate.

*Format:* ProductionNumber,VolumeLabel,ImagePath,DocBreak, FolderBreak,BoxBreak,PageCount

*Example:* Record MS000001 – MS000003 and MS000004 – MS000005 on DVD volume MS001 would be:

**EXHIBIT 12**
**175**

```
MS000001,MS001,D:\IMAGES\001\MS000001.TIF,Y,,,3
MS000002,MS001,D:\IMAGES\001\MS000002.TIF,,,,
MS000003,MS001,D:\IMAGES\001\MS000003.TIF,,,,
MS000004,MS001,D:\IMAGES\001\MS000004.TIF,Y,,,2
MS000005,MS001,D:\IMAGES\001\MS000005.TIF,,,,
```

F. **Metadata.** For records that were originally created using common, off-the-shelf software (*e.g.*, Microsoft Word, Microsoft PowerPoint, Adobe PDF), Defendants will provide all metadata fields set forth in the below metadata fields. Defendants must produce all files attached to each email they produce, but only if such files are actually attached to that email in the ordinary course of business. To the extent a Defendant produces email attachments that were originally created using common, off-the-shelf software, a Defendant will produce the metadata for those attached electronic records in accordance with this section.

Metadata Fields

- Custodian
- Beginning Bates Number
- Ending Bates Number
- Beginning Attachment Number
- Ending Attachment Number
- Record Type
- Master_Date
- SentOn_Date and Time
- Received_Date and Time
- Create_Date and Time
- Last_Modified Date and Time
- Parent Folder
- Author
- To
- From
- CC
- BCC
- Subject/Title
- OriginalSource
- Native Path
- File Extension
- File Name
- File Size
- Full Text

G. **Spreadsheets.** For spreadsheets that were originally created using common, off-the-shelf software (*e.g.*, Microsoft Excel), Defendants will produce the spreadsheets in native format and, in addition, in TIFF format.

2

EXHIBIT 12
176

Downloaded from eLessonsLearnedBlog.com

## II. Production Format of Hard Copy Records

Defendants agree that all responsive hard copy records shall be produced in the following formats:

A. **TIFFs.** All images shall be delivered as single page Group IV TIFF image files. Image file names should not contain spaces.

B. **Unique IDs.** Each image should have a unique file name and should be named with the Bates number assigned to it.

C. **OCR.** High-quality multipage OCR text should be provided. Each text file should match the respective TIFF filename.

D. **Database Load File/Cross-Reference Files.** Records should be provided in a format compatible with Concordance 8x and Opticon 3x in the formats identified in Section I.E above.

E. **Unitizing of Records.** In scanning hard copy records, distinct records should not be merged into a single record, and single records should not be split into multiple records (*i.e.*, hard copy records should be logically unitized).

F. **Parent-Child Relationships.** Parent-child relationships (the association between an attachment and its parent record) should be preserved.

G. **Objective Coding Fields.** The following objective coding fields should be provided:

- Beginning Bates Number
- Ending Bates Number
- Beginning Attachment Number
- Ending Attachment Number
- Source/Custodian

H. **Objective Coding Format.** The objective coding fields should be provided in the following format:

- Fields should be Pipe (|) delimited.
- String values within the file should be enclosed with Carats (^).
- Multiple entries in a field should have a semi-colon (;) delimiter.
- The first line should contain metadata headers and below the first line there should be exactly only one line for each record.
- Each field row must contain the same amount of fields as the header row.

3

DownloadedFromOneLessLawsuitandBlog.com

**EXHIBIT 12**
**177**