1   DANIEL M. PETROCELLI (S.B. #97802)
    dpetrocelli@omm.com
2   VICTOR JIH (S.B. #186515)
    vjih@omm.com
3   MOLLY M. LENS (S.B. #283867)
    mlens@omm.com
4   O'MELVENY & MYERS LLP
    1999 Avenue of the Stars, 7th Floor
5   Los Angeles, California  90067-6035
    Telephone:   (310) 553-6700
6   Facsimile:   (310) 246-6779

7   Attorneys for the Warner Parties

8                  **UNITED STATES DISTRICT COURT**

9                  **CENTRAL DISTRICT OF CALIFORNIA**

10  FOURTH AGE LTD., *et al*,                    Case No. 12-9912-ABC (SHx)

11              Plaintiffs,                      **DISCOVERY MATTER**

12       v.                                      **DECLARATION OF MOLLY M.
                                                 LENS IN SUPPORT OF JOINT
13  WARNER BROS. DIGITAL                         STIPULATION REGARDING
    DISTRIBUTION, *et al*,                       WARNER'S MOTION TO
14                                               COMPEL ADDITIONAL
                Defendants.                      DEPOSITIONS
15

16                                               **Judge**: Hon. Audrey B. Collins
                                                 **Magistrate**: Hon. Stephen J. Hillman
17  ─────────────────────────────
    WARNER BROS. DIGITAL
18  DISTRIBUTION INC., *et al*,                  **Hearing Date**:   March 17, 2014
                                                 **Hearing Time**:   2:00 p.m.
19              Counterclaim
                Plaintiffs,                      **Discovery Cut-Off**:  Apr. 15, 2014
20
21       v.

22  FOURTH AGE LTD., *et al*,

23              Counterclaim
                Defendants.
24

25

26

27

28
                                                 LENS DECLARATION IN SUPPORT OF
                                                 JOINT STIPULATION
                                                 CASE N0. 12-9912-ABC (SHX)

I, Molly M. Lens, the undersigned, hereby declare:

1.    I am a member in good standing of the State Bar of California, an attorney in the law firm of O'Melveny & Myers LLP, and counsel for defendants and counterclaim plaintiffs Warner Bros. Home Entertainment Inc., Warner Bros. Entertainment Inc., Warner Bros. Consumer Products Inc., and New Line Productions, Inc. (collectively, "Warner"). I submit this declaration in support of Joint Stipulation Regarding Warner's Motion to Compel Additional Depositions (the "Motion"). I have personal knowledge of the facts set forth herein and, if called to testify, could and would testify competently thereto.

2.    Early in the discovery process, defendants and counterclaim plaintiffs informed counsel for plaintiffs and counterclaim defendants Fourth Age Limited, Priscilla Mary Anne Reuel Tolkien, as Trustee of The Tolkien Trust, The J.R.R. Tolkien Estate Ltd., HarperCollins Publishers, Ltd., Unwin Hyman Ltd. and George Allen & Unwin (Publishers), Ltd. (collectively, the "Tolkien/HC Parties") that in light of Ms. Blackburn's and Mr. Maier's extensive involvement and knowledge, defendants and counterclaim plaintiffs anticipated needing more time with these witnesses.

3.    The Tolkien/HC Parties suggested that the depositions be scheduled for one day each and that the parties meet and confer in good faith regarding any requests for additional time by defendants upon the completion of Ms. Blackburn's and Mr. Maier's depositions. Attached as **Exhibit 1** is a true and correct copy of Ricardo Cestero's October 16, 2013 email.

4.    On January 7, 2014, following the completion of Ms. Blackburn's and Mr. Maier's depositions, I sent a letter pursuant to Local Rule 37-1 to Rachel Valadez, counsel for the Tolkien/HC Parties, in which I reiterated Warner's request for additional deposition time with both Ms. Blackburn and Mr. Maier. The letter

1  also included Warner's request for the deposition of Simon Dowson-Collins.

2  Attached as **Exhibit 2** is a true and correct copy of my January 7, 2014 letter.

3       5.     On January 30, 2014, I received a letter from Julia Haye, counsel for

4  the Tolkien/HC Parties, in which she indicated that the Tolkien/HC Parties would

5  not make Mr. Maier available for additional questioning and that they would make

6  Ms. Blackburn available for an additional one-half day, but only on the condition

7  that Warner (a) not seek additional time with Mr. Maier; (b) not seek additional

8  time with Ms. Blackburn beyond the one-half day; and (3) that the deposition take

9  place at least two and a half weeks before the 30(b)(6) deposition for the Tolkien

10  Estate.  The letter also indicated that the Tolkien/HC parties would not consent to

11  an eleventh fact deposition.  Attached as **Exhibit 3** is a true and correct copy of Ms.

12  Haye's January 30, 2014 letter.

13       6.     That same day, counsel for Warner and counsel for the Tolkien/HC

14  Parties discussed, among other things, Warner's request for additional deposition

15  time with both Ms. Blackburn and Mr. Maier and Warner's request for additional

16  fact depositions (beyond the default limit under Federal Rule of Civil Procedure

17  30).  The Parties were not able to reach an agreement on these issues.

18       7.     On January 31, 2014, my colleague, Victor Jih, sent an email to the

19  Tolkien/HC Parties confirming that the parties were at an impasse on these issues.

20  Attached as **Exhibit 4** is a true and correct copy of Mr. Jih's January 31, 2014

21  email.

22       8.     Attached hereto as **Exhibit 5** is a true and correct copy of excerpts

23  from the deposition of Cathleen Blackburn, which was taken in the above-captioned

24  action on December 10, 2013.

25       9.     Attached hereto as **Exhibit 6** is a true and correct copy of excerpts

26  from the deposition of Steven Maier, which was taken in the above-captioned

27  action on December 13, 2013.

28

LENS DECLARATION IN SUPPORT OF
JOINT STIPULATION
CASE N0. 12-9912-ABC (SHX)

10.     Attached hereto as **Exhibit 7** is a true and correct copy of the Tolkien/HC Parties' Initial Disclosures, which were served on March 28, 2013.

11.     Attached hereto as **Exhibit 8** is a true and correct copy of a letter sent by Rachel Valadez to John Ulin, counsel for defendant and counterclaim plaintiff Zaentz, on September 9, 2013.

12.     Attached hereto as **Exhibit 9** is a true and correct copy of a letter sent by Rachel Valadez to John Ulin and myself on October 11, 2013

13.     Attached hereto as **Exhibit 10** is a true and correct copy of the April 8, 2013 Scheduling Conference Order in the above-captioned action.

14.     Attached hereto as **Exhibit 11** is a true and correct copy of the August 28, 2013 Order on Stipulation to: (1) Vacate the Scheduling Order and Stay Trial Pending Appeal; and (2) Allow Discovery to Proceed Pending Appeal.

15.     On February 11, 2014, my colleague, Nikolas Primack, ran a search for "Blackburn" across the Tolkien/HC Parties' production.  The search returned nearly 2,000 documents.

16.     On February 11, 2014, my colleague, Nikolas Primack, ran a search for "Maier" across the Tolkien/HC Parties' production.  The search returned 749 documents.

I declare under penalty of perjury that the foregoing is true and correct. Executed on February 11, 2014, at Los Angeles, California.

Molly M. Lens

LENS DECLARATION IN SUPPORT OF
JOINT STIPULATION
CASE N0. 12-9912-ABC (SHX)

# EXHIBIT 1

**From:** Cestero, Ricardo [mailto:rcestero@greenbergglusker.com]
**Sent:** Wednesday, October 16, 2013 7:12 PM
**To:** Callagy, Sean M.; Lens, Molly
**Cc:** Eskenazi, Bonnie; Moriarty, Elisabeth; Valadez, Rachel; Ulin, John C.; Hallman, Robert D.; Petrocelli, Daniel; Jih, Victor; Primack, Nikolas A.; Glick, Martin R.
**Subject:** RE: Fourth Age Ltd.

Counsel:

We are agreeable to having the deposition of Cathleen Blackburn on December 10, 2013 and the deposition of Steven Maier on December 13, 2013, consistent with the notices that Zaentz has served.  To be clear, we do not agree that Ms. Blackburn can be deposed for two days and will object to Warner's notice on that basis.  As I discussed with Marty, although we believe that all parties should be able to complete the depositions with in the allotted seven hours, I suggest that the parties simply reserve their rights to seek additional deposition time for any witness once the initial seven hour period has been exhausted, at which point the parties can properly meet and confer on the matter.

As for the schedule of the remaining depositions, there are some conflicts with some of the dates you have proposed.  Here is where we are with all of the other witnesses:

1. We cannot do January 10, 2014 for Laurie Battle.  We would like to take Laurie Battle on January 15, 2014.
2. We intend to take Laurie battle before Fredrica Drotos and cannot do January 13, 2014, so January 14, 2014 will not work for Ms. Drotos.  We would propose January 17, 2014 for Ms. Drotos, assuming Ms. Battle can go on January 15.
3. January 15, 2014 in Los Angeles is fine for Ben Zinkin, even if Laurie Battle is scheduled for the same day in San Francisco.
4. January 23, 2014 is fine for Tom Magnani.
5. We will not be able to do the London depositions during the weeks of January 27 or February 3 because Mary Butler will be out of the country.  We are working with her and Priscilla Tolkien to determine other dates.
6. David Brawn is generally available in January and February, so I suggest you propose dates on which you would like his deposition.
7. We are still waiting for Warner to provide dates for David Imhoff.
8. You have asked for dates for Benjamin Bernstein.  I'm not sure to whom you are referring.  If you're seeking dates for Alan Benjamin, I will get dates for him shortly.  If you are asking for dates for Bill Bernstein, we do not intend to make him available for deposition because of the significant health issues which we have previously discussed.

Please let me know if you'd like to discuss any of these dates.

Regards,
Ricardo

---

**From:** Callagy, Sean M. [mailto:Sean.Callagy@aporter.com]
**Sent:** Monday, October 14, 2013 3:21 PM
**To:** 'Lens, Molly'; Cestero, Ricardo
**Cc:** Eskenazi, Bonnie; Moriarty, Elisabeth; Valadez, Rachel; Ulin, John C.; Hallman, Robert D.; Petrocelli, Daniel; Jih, Victor; Primack, Nikolas A.; Glick, Martin R.
**Subject:** RE: Fourth Age Ltd.

Counsel:

Attached are courtesy copies of SZC's amended deposition notices of Steven Maier and Cathleen Blackburn which were served by US Mail today.

Sean

---

**From:** Callagy, Sean M.
**Sent:** Friday, October 11, 2013 4:06 PM
**To:** 'Lens, Molly'; Cestero, Ricardo
**Cc:** Eskenazi, Bonnie; Moriarty, Elisabeth; Valadez, Rachel; Ulin, John C.; Hallman, Robert D.; Petrocelli, Daniel; Jih, Victor; Primack, Nikolas A.; Glick, Martin R.
**Subject:** RE: Fourth Age Ltd.

Ricardo,

As John suggested last week, much about your proposal of October 3 re depositions is agreeable to SZC.  We appreciate your willingness to work with us to schedule the London depositions for a single trip.  We are available on the dates you proposed for the depositions of Mr. Maier and Ms. Blackburn and will re-notice those individuals' depositions, albeit on the dates noticed by Warner (i.e. Ms. Blackburn on Dec. 10 and Mr. Maier on Dec. 13) as you have not indicated that these dates will not work for you.

We still do not agree that you can condition your witnesses' appearance for deposition on a unilaterally-imposed requirement that certain document production milestones be met.  Nevertheless, we anticipate and, on that basis, are willing to commit that SZC will complete its production in response to the outstanding, non-disputed document requests (aside from the possibility of minor clean-up issues) prior to November 4.  If we understand your position, this, together with our agreement to re-notice Mr. Maier's and Ms. Blackburn's depositions, will eliminate the basis of your first motion.  (The issues addressed in  the draft stipulation sent by Rachel yesterday will be separately addressed.)

As for SZC witnesses, we can offer Laurie Battle on January 10, 2014, Frederica Drotos on January 14, 2014, and Tom Magnani on January 23, 2014.  We are still looking into the availability of Al Bendich.  Per your conversation with Marty on Wednesday, SZC will make Mr. Bendich available for 7 hours of deposition time spread evenly across two consecutive days.

Regards,
Sean

---

**From:** Lens, Molly [mailto:mlens@omm.com]
**Sent:** Monday, October 07, 2013 4:54 PM
**To:** Cestero, Ricardo
**Cc:** Eskenazi, Bonnie; Moriarty, Elisabeth; Valadez, Rachel; Ulin, John C.; Hallman, Robert D.; Callagy, Sean M.; Petrocelli, Daniel; Jih, Victor; Primack, Nikolas A.
**Subject:** RE: Fourth Age Ltd.

Ricardo –

We would like to keep Cathleen Blackburn's deposition before Steven Maier's.  That being said, we are generally agreeable with the dates that you have proposed for Ms. Blackburn and Mr. Maier and are, accordingly, serving amended notices for these two depositions this evening.  Ms. Blackburn is being noticed for December 10 and 11 and Steven Maier is being noticed for December 13.  Given these amended deposition notices, we understand that you have withdrawn your portion of the previously-served joint stipulation.

We recognize that there are ongoing discussions between you and Zaentz regarding the length of Ms. Blackburn's and Mr. Bendich's depositions.  We did not think it made sense, however, to delay scheduling Ms. Blackburn's deposition

2
**EXHIBIT 1**
5

while those conversations continue.   Please be advised that Warner reserves its rights with respect to the length of time for Ms. Blackburn's deposition (as to both her individual deposition as well any deposition in a 30(b)(6) capacity).

We confirm that we anticipate being substantially complete with our document production by November 4, 2013.  As you know, it is Warner's position that depositions should move forward in the event that any party's document productions are not substantially complete by that date.  That being said, we understand that all the parties have reserved their rights with respect to that issue.

Finally, we are working on dates for David Imhoff and Ben Zinkin and expect to be in a position to provide dates later this week.  Please provide a suggested week for the London witnesses, as well as dates for David Brawn and Benjamin Bernstein.


Thanks,


Molly

_____

**Molly M. Lens**
**O'Melveny & Myers LLP**
1999 Avenue of the Stars
Los Angeles, CA 90067
Phone: (310) 246-8593
Fax: (310) 246-6779
mlens@omm.com

*This message and any attached documents contain information from the law firm of O'Melveny & Myers LLP that may be confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.*

**From:** Cestero, Ricardo [mailto:rcestero@greenbergglusker.com]
**Sent:** Thursday, October 03, 2013 6:50 PM
**To:** Lens, Molly
**Cc:** Eskenazi, Bonnie; Moriarty, Elisabeth; Valadez, Rachel; Ulin, John C. (John.Ulin@APORTER.COM); Hallman, Robert D. (Robert.Hallman@aporter.com); Callagy, Sean M. (Sean.Callagy@aporter.com); Petrocelli, Daniel; Jih, Victor; Primack, Nikolas A.
**Subject:** RE: Fourth Age Ltd.


Molly-

Let me address Priscilla Tolkien's deposition first.  While I disagree with your description of our position, based on the withdrawal of Warner's and Zaentz's deposition notices, we can confirm that we will not be proceeding with Ms. Tolkien's deposition on October 9, 2013.  We will work with you to try and coordinate her deposition with Ms. Butler's and possibly Mr. Laing's.

As to the depositions of Mr. Maier and Ms. Blackburn, your position appears to be that you will not withdraw your October deposition notices unless two conditions are met: (1) we agree that you can take their depositions before any Warner (or Zaentz) witnesses are deposed; and (2) the depositions happen by no later than the middle of December.  Despite the fact that you are not entitled to any form of deposition priority under the Federal Rules, we are nevertheless prepared, in the spirit of compromise, to agree to allow Mr. Maier and Ms. Blackburn to be deposed before any other witnesses.  As for completing the depositions in December, due to the holidays and tight schedules of the parties, there is only a limited window in which to do so.  We are available to have Mr. Maier's deposition on December 10, 2013 with Ms. Blackburn's deposition to follow on December 12 and 13, 2013.  Of course, the offer to make Ms. Blackburn available for two days is based on the prior agreement that, in exchange, the Tolkien/HC Parties would be

permitted to have two days to depose Al Bendich. If these dates do not work for you, Mr. Maier and Ms. Blackburn will not be available until the middle of the week of January 13, 2014.

We continue to insist that document production be completed in sufficient time to allow us to review the documents produced prior to the depositions. In that regard, our agreement to make Mr. Maier and Ms. Blackburn available for deposition on the dates proposed is expressly conditioned upon all parties substantially completing the outstanding document productions by November 4, 2013. In light of recent correspondence, it does not appear this will be a problem. However, we will need commitments from both Warner and Zaentz that they will be able to comply with that deadline. To be clear, the November 4, 2013 deadline would not include production of the documents in the categories remaining in dispute or general "clean-up" productions that might be necessary.

Please also note that, while we are prepared to compromise regarding the timing of Mr. Maier's and Ms. Blackburn's deposition, we do not intend to allow you to take all of the Tolkien/HC Parties' witnesses before we get to depose any of Warner's or Zaentz's witnesses. We remain fully prepared to discuss a reasonable schedule that begins with Mr. Maier and Ms. Blackburn and then takes the remaining depositions in an orderly and even-handed manner.

As to our motion for protective order, we are confident it is entirely proper and well founded. As we discussed on the phone last week, we cannot, and will not, withdraw our motion unless and until you and Zaentz withdraw all outstanding deposition notices. If Warner and Zaentz are in agreement on the proposed compromise outlined above regarding Mr. Maier's and Ms. Blackburn's depositions, we will withdraw our motion once Warner and Zaentz withdraw the outstanding deposition notices. However, we will reserve all of our rights on this issue and will only withdraw the current Joint Stipulation without prejudice to our right to bring that motion at a later date, if necessary.

I will provide you with dates for Mr. Brawn, Ms. Tolkien, Ms. Butler and Mr. Benjamin shortly. Please provide me dates for Messrs. Zinkin and Imhoff. I will also need dates from Zaentz for Mr. Bendich, Ms. Battle, Ms. Drotos and Mr. Magnani.


Regards,
Ricardo



**Ricardo P. Cestero** | **Attorney at Law** | Biography
D: 310.785.6809 | F: 310.201.2309 | RCestero@greenbergglusker.com

**Greenberg Glusker Fields Claman & Machtinger LLP**
1900 Avenue of the Stars, 21st Floor, Los Angeles, CA 90067
O: 310.553.3610 | GreenbergGlusker.com

**IRS Circular 230 Disclosure:**
To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax related penalties under the Internal Revenue Code, or (ii) promoting, marketing or recommending to another party any tax-related matters addressed herein.


This message is intended solely for the use of the addressee(s) and is intended to be privileged and confidential within the attorney client privilege. If you have received this message in error, please immediately notify the sender at Greenberg Glusker and delete all copies of this email message along with all attachments. Thank you.

**From:** Lens, Molly [mailto:mlens@omm.com]
**Sent:** Tuesday, October 01, 2013 1:22 PM
**To:** Cestero, Ricardo

Cc: Eskenazi, Bonnie; Moriarty, Elisabeth; Valadez, Rachel; Ulin, John C. (John.Ulin@APORTER.COM); Hallman, Robert D. (Robert.Hallman@aporter.com); Callagy, Sean M. (Sean.Callagy@aporter.com); Petrocelli, Daniel; Jih, Victor; Primack, Nikolas A.

Subject: Fourth Age Ltd.

Ricardo –

Pursuant to our conversation last week and the parties' ongoing meet-and-confer efforts, in an effort to avoid motion practice, Warner confirms its willingness to withdraw its pending deposition notices and replace them with amended notices for dates in the first half of December.  Please note that Warner's willingness to do so is expressly contingent on its ability to depose Cathleen Blackburn and Steven Maier by the middle of December and before any Warner witnesses are deposed.

As discussed last week, Warner disagrees that Ms. Tolkien's deposition should move forward on October 9, 2013 and, accordingly, based in part on your recent disclosures that Ms. Butler will appear for a deposition in London and that you do not represent Mr. Laing, Warner hereby withdraws the deposition notice for October 9.  Warner continues to believe that the London depositions should be consolidated as a matter of efficiency.  Furthermore, we object to your mandate, on one hand, that depositions cannot proceed without the completion of document discovery with your insistence, on the other hand, that Ms. Tolkien's deposition should move forward months before any other witnesses are "allowed" to be deposed.  In light of your confirmation that you have yet to make travel arrangements, we understand that any inconvenience on your end is minimal and far outweighed by the inefficiencies of repeat trips to London.

Warner will serve amended deposition notices for the depositions of Ms. Blackburn, Ms. Tolkien, Mr. Maier, and Mr. Brawn (as well as notices for Ms. Butler and Mr. Benjamin) after we have agreement on specific dates, assuming those dates are reasonably forthcoming.  (We assume that you prefer this to service of amended notices now but please let us know if we are mistaken and you insist on formal amended notices now).

For the avoidance of doubt, Warner continues to disagree that you are entitled unilaterally to delay the commencement of depositions based on your unfounded position that all the parties' document productions must be completed first and has agreed to the above to avoid burdening the Court with your application for a protective order.  However, in the (albeit seemingly unlikely) event that any party's document production remains substantially incomplete at the end of November, it is Warner's position that depositions must nonetheless proceed at that time.

In light of the above, please confirm that you are formally withdrawing your portion of the prematurely served (and procedurally flawed) joint stipulation and provide dates for Ms. Blackburn and Mr. Maier in early December as well as dates for Ms. Tolkien, Mr. Brawn, Mr. Benjamin, and Ms. Butler.  We are in the process of identifying dates for Mr. Imhoff's and Mr. Zinkin's depositions consistent with the schedule discussed above.

Thanks,

Molly

_____
**Molly M. Lens**
**O'Melveny & Myers LLP**
1999 Avenue of the Stars
Los Angeles, CA 90067
Phone: (310) 246-8593
Fax: (310) 246-6779
mlens@omm.com

*This message and any attached documents contain information from the law firm of O'Melveny & Myers LLP that may be confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.*

**EXHIBIT 1**

U.S. Treasury Circular 230 Notice

Any U.S. federal tax advice included in this communication (including any attachments) was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding U.S. federal tax-related penalties or (ii) promoting, marketing or recommending to another party any tax-related matter addressed herein.

This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any dissemination, distribution, or copying of this communication is strictly proh bited. Anyone who receives this message in error should notify the sender immediately by telephone or by return e-mail and delete it from his or her computer.

----------------------------------------------------------------
For more information about Arnold & Porter LLP, click here:
http://www.arnoldporter.com

6

**EXHIBIT 1**
**9**

# EXHIBIT 2

# O'MELVENY & MYERS LLP

BEIJING
BRUSSELS
HONG KONG
JAKARTA†
LONDON
LOS ANGELES
NEWPORT BEACH
NEW YORK

1999 Avenue of the Stars
Los Angeles, California  90067-6035

TELEPHONE  (310) 553-6700
FACSIMILE  (310) 246-6779
www.omm.com

SAN FRANCISCO
SEOUL
SHANGHAI
SILICON VALLEY
SINGAPORE
TOKYO
WASHINGTON, D.C.

January 7, 2014

WRITER'S DIRECT DIAL
(310) 246-8593

WRITER'S E-MAIL ADDRESS
mlens@omm.com

Rachel Valadez
Greenberg Glusker Fields Claman & Machtinger LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, CA 90067

Re:   *Fourth Age Ltd. v. Warner Bros. Digital Distribution*

Dear Rachel:

As you know, Warner has been asking for clarification on the scope of the Tolkien/HC Parties' collection efforts for the better part of a year.  Cathleen Blackburn's and Steven Maier's deposition testimony, coupled with your recent correspondence, confirm the Tolkien/HC Parties' complete failure to meet their discovery obligations.  Accordingly, pursuant to Local Rule 37-1, please let us know when you are available to meet and confer on the issues below.

A.   Ms. Blackburn's and Mr. Maier's Files

As an initial matter, the Tolkien Parties must immediately collect and produce Cathleen Blackburn's and Steven Maier's electronic files both from Manches LLP and Maier Blackburn LLP.  Your assertion that "Manches is a third-party" and that your clients therefore have no obligation to produce Manches' files is, quite frankly, preposterous.  As Manches' files are your own clients' files, they are unquestionably within the Tolkien Parties' possession, custody, or control.  Moreover, the Tolkien Parties' attempt to rely on a purported "print to file" policy does not excuse their obligations under the Federal Rules of Civil Procedure to produce electronically stored information ("ESI").  Mr. Maier's testimony, and the Tolkien Parties' incomplete document production, underscore the inadequacy of this approach.  *See, e.g.*, Maier Rough Tr. 92:12-14 (stating that he could not be certain that the policy was always followed); 94:20-21 (admitting that he could not guarantee that he had printed all emails for the file).  Please confirm your agreement to collect and produce Ms. Blackburn's and Mr. Maier's ESI.

Further, your evasive and changing representations with respect to Ms. Blackburn's and Mr. Maier's ESI is deeply troubling.  During the preliminary meet and confer on July 1, Ricardo told us that Ms. Blackburn and Mr. Maier did not transfer any of their ESI from Manches to Maier Blackburn LLP.  During his deposition, however, Mr. Maier revealed that electronic information relating to "active matters," including matters for The Tolkien Estate, was

† In association with Tumbuan & Partners

**EXHIBIT 2**
**10**

O'MELVENY & MYERS LLP

January 7, 2014 - Page 2

transferred to Maier Blackburn when he and Ms. Blackburn departed Manches. *See* Maier Rough Tr. 183:14-186:24. Was Mr. Cestero or Mr. Maier correct? And, if the latter, what was the scope of the information transferred to Maier Blackburn? You will note that the transfer of data from Manches to Maier Blackburn is included among the topics in the supplemental notice of Rule 30(b)(6) topics to Fourth Age Ltd., which is being served today.

During the July 1 meet and confer, Ricardo also informed us that he believed that Ms. Blackburn and/or Mr. Maier had made an inquiry to Manches about their files and were informed that their data from their tenure with Manches no longer existed. Despite Warner's and Zaentz's repeated follow-up efforts, you consistently dodged—for many months—our inquiries or provided placeholder responses. *See, e.g.,* Sept. 9 letter to J. Ulin (stating that you were "in the process of inquiring as to the status of Steven Maier's and Cathleen Blackburn's Manches-related electronic files"). Today, over five months after we requested confirmation that you would be producing this information, you apparently have made no progress, other than to suggest that your clients failed to preserve this information. *See* Dec. 4, 2013 letter from R. Valadez (stating that you have been "corresponding with Manches in an effort to obtain any relevant electronic files which remain in their possession"). Accordingly, we must disagree with your statement that you "have been more than willing to share information with [us] as [you] receive it." *Id.* Given our inability to obtain this information from you, we have again included this topics in the supplemental Rule 30(b)(6) notice.

Finally, Ms. Blackburn's deposition revealed that the collection of Ms. Blackburn's and Mr. Maier's hard copy files was similarly inadequate. As Ms. Blackburn testified, she simply provided a preexisting index of hard copy files and, on that basis, responsiveness determinations were made by your firm. *See* Blackburn Rough Tr. 221:5-14. Mr. Maier further testified that no Greenberg lawyer has even set foot in Maier Blackburn's offices. *See* Maier Rough Tr. 197:3-198:25. How were responsiveness determinations made? To get to the bottom of this, the scope of the Tolkien parties' collection efforts are included in the supplemental Rule 30(b)(6) notice.

B. Document Preservation Notices

Mr. Maier's testimony raised grave concerns about whether documents have been adequately preserved. *See* Maier Rough Tr. 190:22-191:3 (testifying that he did not know whether Manches' electronic files had been preserved); Tr. 182:15-22 (testifying that he "did nothing personally" to have Manches files obtained); Tr. 195:1-196:5 (testifying that he did not know if anyone had done anything to prevent relevant ESI from being deleted at Manches). Please immediately confirm, with respect to both the Tolkien and HC parties, which entity or individuals have been issued document preservation notices and the date(s) of any such notice(s). We are additionally requesting Rule 30(b)(6) deposition testimony on whether any information relevant to this dispute, which was available on September 7, 2010, was not preserved and, if so, which such information.

**EXHIBIT 2**
**11**

O'MELVENY & MYERS LLP

January 7, 2014 - Page 3

C.  Ms. Blackburn's and Mr. Maier's Depositions

As we informed you when we requested (and noticed) their depositions, Warner anticipated needing more than seven hours with Ms. Blackburn and Mr. Maier.  In response to our request, you suggested that "the parties simply reserve their rights to seek additional deposition time for any witness once the initial seven hour period has been exhausted, at which point the parties can properly meet and confer on the matter."  *See* Oct. 16 email from R. Cestero.  Warner hereby confirms that it requires additional time with both Ms. Blackburn and Mr. Maier.  For example, as discussed in this letter, critical files for these individuals remain outstanding.  Further, seven hours was insufficient for Warner (and Zaentz) to depose Ms. Blackburn and Ms. Maier on the pertinent documents produced to date.  Please confirm that you will make them both available for a second day.

D.  Custodian Metadata

Back on July 9, you agreed to produce "custodian" metadata for email, electronic files, and hard copy files.  You now claim that this agreement does not require you to provide "custodian" information and that "custodian" means "company," which is, of course, a separate and distinct metadata field that you also agreed to produce.  Your position is untenable.  Even without your agreement, custodial information is a requisite part of a production of ESI.  *See, e.g.*, *Nat'l Day Laborer Org. Network v. United States Immigration and Customs Enforcement Agency*, 2011 WL 381625 at *21 (S.D.N.Y. Feb. 7, 2011) (withdrawn on other grounds) (stating that custodial information, meaning "the name of the custodian or source system from which the item was collected," is a metadata field that should be included with every production of ESI).  Your refusal to provide this information is a transparent attempt to obscure which custodian had which documents and/or otherwise mask the incompleteness of your production.  Please immediately provide an overlay for all files produced to date with complete custodial information and confirm that you will include such information for your future productions.

E.  HarperCollins

Your disclosures to date about HarperCollins' ESI and your collection thereof have been dilatory, inconsistent, and opaque.  From what we can piece together, in contrast to your earlier position, you are no longer claiming that any potentially relevant (and non-duplicative) ESI became inaccessible or unavailable since September 2010.  Based on your disclosures, we further believe that you have agreed to collect—and produce—David Brawn's, Simon Dowson-Collins', Jane Johnson's, and Chris Smith's hard copy, email, and other electronic files (such as loose Word, PDF, and Excel files) as well as hard copy and electronic documents from central sources.  For the former employees, including Mary Butler, Adrian Laing, and any other individual for whom you contend may have had responsive data but for which their electronic documents are only available on an inaccessible source, please tell us when each individual left HarperCollins' (or one of its affiliates') employ.  Finally, for these former employees, what happened to their hard copy files when they left HarperCollins' employ?

**EXHIBIT 2**
**12**

O'MELVENY & MYERS LLP

January 7, 2014 - Page 4

F.   <u>Assertions of Privilege</u>

During Ms. Blackburn's and Mr. Maeir's depositions, we were, to put it mildly, astonished at the claims of privilege.  Specifically, it appears that, despite her dual role as both an attorney and business manager, you have seemingly withheld all of Ms. Blackburn's communications with her clients as privileged.  Similarly, even though Mr. Maier functions as a director of The Tolkien Estate Ltd., so as to maintain a blanket claim of privilege over all his communications, Mr. Maier claims that he has never uttered a single word in that capacity.  *See* Maier Rough Tr. 172:13-15.  Further, we learned for the first time during Ms. Blackburn's deposition that you are claiming some sort of common interest privilege between the Tolkien Estate and HarperCollins.  We additionally learned—this time during Mr. Maier's deposition—that you are purporting to withhold documents between the Tolkien Estate and SZC on matters relevant to the current litigation, claiming that the communications remain protected even though your clients have sued SZC.

Needless to say, we disagree with the validity of all of the above positions.  As an initial step, please immediately confirm whether we have misunderstood your position on any of the above assertions of privilege.  Additionally, please specify, with respect to the two claims of common interest, the time period(s) allegedly covered by the common interest, the subject matter(s) of the withheld documents, and the individuals included on such communications.

In light of these untenable claims of privilege, Warner hereby insists that the Tolkien/HC Parties provide a privilege log for any documents withheld under an assertion of privilege.

G.   <u>Engagement Letter</u>

In contrast to your prior representation that no engagement letters existed prior to 2012, Mr. Maier testified that "he was sure Manches would have had an engagement letter."  *See* Maier Rough Tr. 175:3-4.  We further object to your assertion that every single sentence of Ms. Blackburn's 2012 engagement letter with the Tolkien Parties is privileged.

H.   <u>Simon Dowson-Collins</u>

In light of Ms. Blackburn's and Mr. Maier's testimony that they generally communicate with Simon Dowson-Collins at HarperCollins about Tolkien matters, Warner requests that you make him available in Los Angeles for a deposition.  Please promptly provide dates when Mr. Dowson-Collins is available.

Mr. Maier also identified Karly Last as an attorney at HarperCollins with whom he dealt on Tolkien matters.  *See* Maier Rough Tr. 277:12-13.  Please confirm whether you have collected Ms. Last's files and, if not, why not.

EXHIBIT 2
13

O'MELVENY & MYERS LLP

January 7, 2014 - Page 5

 

I.   <u>Tolkien Heirs</u>

During the July 1 meet and confer, we asked that you to confirm that your discovery responses included information from the directors of the Tolkien entities, and you assured us that they did.  Cathleen Blackburn, however, testified that both Michael Tolkien and Steven Maier are directors of The Tolkien Estate Ltd. but neither of them appear on your list of custodians.  Please confirm your willingness to include both Mr. Tolkien and Mr. Maier as custodians.

J.   <u>Jeremy Nussbaum's Files</u>

Your December 4 letter states that "it is [y]our understanding that [Jeremy Nussbaum's] files were collected by the Tolkien/HC Parties' prior counsel (and/or their predecessors) in connection with the audit that prompted the prior lawsuit."  What is the basis for this assertion?  What was the scope of that collection?  Have you taken any steps to preserve or collect Mr. Nussbaum's files after the audit that proceeded the prior lawsuit in 2008?  Finally, please confirm when Mr. Nussbaum passed away.

Sincerely,

Molly M. Lens
of O'MELVENY & MYERS LLP

cc:   John UIin

**EXHIBIT 2**
**14**

# EXHIBIT 3

**Julia R. Haye**
D:  310.201.7432
F:  310.201.2370
JHaye@GreenbergGlusker.com
File Number: 84971-00003



January 30, 2014

**Via E-Mail and U.S. Mail**

Molly M. Lens
O'Melveny & Myers LLP
1999 Avenue of the Stars
Los Angeles, CA 90067

John C. Ulin
Arnold & Porter LLP
7th Floor
Three Embarcadero Center
San Francisco CA 94111-4024

      Re:     *Fourth Age Limited, et al. v. Warner Bros. Digital Distribution, Inc., et al.* (Case
No. CV 12-09912 ABC (SHx))

Dear Molly and John:

In anticipation of this afternoon's meet and confer conference, I write to address the
issues raised in Molly's January 7, 2014 letter to Rachel Valadez regarding various discovery
issues and Warner's improperly filed Motion to Compel Documents and Privilege Log (the
"Motion").

We believe this resolves all of the issues raised in the Motion, rendering the Motion
moot.  This is precisely the reason that Warner should have waited to file its Motion after today's
meet and confer was concluded (a delay of only two days).  That is, indeed, the purpose of the
meet and confer requirement and joint stipulation process —to resolve as many issues as possible
before burdening the Court, and to only seek the Court's intervention when the parties have
reached an impasse.

In any event, we believe all of the issues raised in the Motion have been addressed and
resolved below.  The Motion should be withdrawn.

We also address other issues you have raised, below.

A.     <u>Ms. Blackburn and Mr. Maier's Files; Prior Law Firm Files</u>

Your letter misconstrues the Tolkien Parties' efforts to collect, review and produce Ms.
Blackburn's and Mr. Maier's hard copy and electronic files.  Contrary to your accusations, the

**Greenberg Glusker Fields Claman & Machtinger LLP**
1900 Avenue of the Stars, 21st Floor, Los Angeles, California 90067
T:  310.553.3610  |  F:  310.553.0687
   84971-00003/2116607.3

**GreenbergGlusker.com**

**EXHIBIT 3**
**15**

Molly M. Lens
John C. Ulin
January 30, 2014
Page 2

Tolkien Parties are not avoiding their obligations to collect and produce documents for Ms. Blackburn or Mr. Maier.

First, the Tolkien Parties have no objection to producing Ms. Blackburn's and Mr. Maier's electronic files from MaierBlackburn LLP, and we are already in the process of collecting, reviewing and producing these files. As previously explained during earlier meet and confer discussions, it was our understanding that under the "print to file" policy utilized at MaierBlackburn, all relevant documents had been printed and filed in hard copy format. The hard copy documents were then collected and reviewed, and non-privileged, responsive documents were produced. Although we believe that the MaierBlackburn electronic files will be entirely duplicative of the hard copy documents previously produced, to assuage your concerns, and in an abundance of caution, we elected to collect, review and produce electronic files for Ms. Blackburn and Ms. Maier from MaierBlackburn. This is in process currently.

Second, the Tolkien Parties have made diligent efforts to collect Ms. Blackburn's and Mr. Maier's electronic files from Manches. As Mr. Maier previously explained, available electronic information relating to "active matters," including matters relating to the Tolkien Estate, was transferred from Manches to MaierBlackburn when Ms. Blackburn and Mr. Maier left Manches. To the extent responsive Manches electronic files were transferred to MaierBlackburn (and we believe they were), those files will be included in our collection and review of Ms. Blackburn's and Mr. Maier's MaierBlackburn electronic files.

As for any electronic files remaining at Manches, the Tolkien Parties have made diligent efforts to collect such electronic files as well. Beginning in September, we contacted Manches to ascertain the accessibility of Tolkien electronic files and to arrange for their collection. Over the past four months, we have exchanged numerous communications with Manches regarding the accessibility of Tolkien electronic files. However, it is our understanding that Manches has been in administration (the equivalent, we understand, of an insolvency proceeding) and, consequently, Manches has been preoccupied with its own difficulties. For these reasons, representatives of Manches have been extremely slow to respond despite our repeated follow-up communications. It is our further understanding that Manches is now coming out of that proceeding and has been acquired by or merged with another firm. After our repeated attempts to obtain information regarding Tolkien electronic files, on December 30, 2013, we were informed for the first time that the Tolkien electronic files are stored, and are only available, on backup tapes. Given the cost, expense and difficultly that will be incurred in any attempt to restore numerous backup tapes, particularly given that they are likely duplicative of the tens of thousands of pages of hard copy documents previously produced from the Manches files, Manches electronic files (to the extent responsive and not transferred) are not reasonably accessible. Accordingly, our position is that the Tolkien Parties do not have an obligation to incur the cost and expense of retrieving this inaccessible data. However, we look forward to discussing this further with you this afternoon. We also note that Manches (now Penningtons

**EXHIBIT 3**
**16**

GreenbergGlusker

Molly M. Lens
John C. Ulin
January 30, 2014
Page 3

Manches, we believe), of course, is a third party, and Warner has the option to subpoena documents directly from them.

Warner also raises a concern regarding electronic files for Dick Williamson. We have confirmed that there are no email files for Mr. Williamson. Morrell Peel & Gamlen ("MPG") did not have an email system, and the attorneys did not begin using email until MPG merged with Manches in 1997. This coincides with Mr. Williamson's retirement.

Fourth, Warner questions our collection of Greenberg Glusker electronic files. With respect to Greenberg Glusker electronic files, we have collected and produced non-privileged, responsive documents for the following custodians you list: Bonnie Eskenazi, Elisabeth Moriarty, Aaron Moss, Ricardo Cestero, Candace Carlo, and Rachel Valadez.

Given Warner's and Zaentz's insistence that plaintiffs collect documents from Manches, we fully expect that Warner and Zaentz have also collected hard copy and electronic files from all prior firms who possess relevant information including: Munger Tolles & Olson LLP; Howard Rice; Kegan, Kegan & Berkman (Kegan & Kegan Ltd.); Arent Fox LLP; and Slaff, Mosk & Rudman; Burnstein & Walker; and Bendich & Burnstein, among others. Please confirm that you have done so.

Finally, your characterization of our collection of Mr. Maier's and Mr. Blackburn's hard copy files is entirely inaccurate. We did not simply select files to review from an index (not that this would be inappropriate). Rather, Ms. Blackburn and Mr. Maier sent all Tolkien film, merchandising and trademark related files to Greenberg Glusker for review. (These documents also included hard copy files from Manches, custody of which was transferred to MaierBlackburn). We reviewed these voluminous documents, and produced responsive, non-privileged documents. In addition, Mr. Maier and Ms. Blackburn sent us an index of all Manches/MaierBlackburn Tolkien files. Greenberg Glusker chose any and all additional files we believed could be even remotely relevant to the matters at issue in this case, to cross-check against the files provided. Those additional files were also provided to Greenberg Glusker for review and production. Your argument that our collection was somehow insufficient simply because no Greenberg Glusker attorney traveled to London to examine files onsite, or at the storage facility, is unfounded. Nor does the case law you provided support such a position. We are confident that our collection of hard copy files is complete.

B.     Document Preservation Notices

Once again, Warner's professed "grave concerns" regarding whether documents have been adequately preserved are unfounded. A document preservation notice was issued to the Tolkien Parties by Greenberg Glusker in connection with the profit participation action on February 21, 2008; given the manner in which the current dispute arose, this notice continued through to the present litigation. Additionally, in an abundance of caution, the Tolkien Parties

**EXHIBIT 3**
**17**

GreenbergGlusker

Molly M. Lens
John C. Ulin
January 30, 2014
Page 4

were issued a second document preservation notice in this action on January 11, 2012; the HC
Parties were issued a document preservation notice on January 14, 2012.

Given that you have insisted that the Tolkien/HC parties provide information regarding
the document preservation notices issued to the Tolkien/HC parties, we request that all
defendants similarly confirm which entity or individuals have been issued document preservation
notices and the date(s) of any such notice(s).

C.   Mr. Maier's and Mr. Blackburn's Depositions

Warner's request for a second day of deposition for both Mr. Maier and Ms. Blackburn is
wholly unwarranted.  Warner wasted significant time at both Mr. Maier's and Ms. Blackburn's
depositions, covering the same ground Mr. Ulin had already investigated in the first half of the
deposition, addressing irrelevancies and wasting time on argumentative questions and colloquy.
Particularly given Mr. Maier's minimal level of involvement with respect to the issues in dispute,
we will not make Mr. Maier available for an additional day of deposition.

With respect to Ms. Blackburn, provided that the parties are able to reach agreement that
designation of counsel in response to a 30(b)(6) deposition notice will not be deemed a waiver of
the attorney-client privilege or attorney work product doctrine, defendants will likely have an
opportunity to further depose Ms. Blackburn for an additional day.  Accordingly, and solely as a
matter of compromise, we would be willing to provide Ms. Blackburn for an additional ½ day of
deposition as a percipient witness, provided that defendants agree: (1) not to seek additional time
for the deposition of Mr. Maier; (2) not to seek additional time for Ms. Blackburn beyond the
additional ½ day; and (3) the additional percipient witness deposition take place at least two
weeks prior to the 30(b)(6) deposition.  Assuming this is acceptable, we propose scheduling Ms.
Blackburn's additional ½ day of percipient deposition testimony while all of the parties are in
England.  Ms. Blackburn is available for further deposition on Sunday, February 23, 2014.
Please let us know if you are agreeable to the date and location of the continued deposition and
the conditions set forth above.

D.   Custodian Metadata

We are perplexed by Warner's inflammatory description of the "custodian" information
provided by plaintiffs as "a transparent attempt to obscure which custodian had which documents
and/or otherwise mask the incompleteness of your production."  As you are undoubtedly aware,
plaintiffs have provided custodian information in a similar manner to Zaentz.  Indeed, the vast
majority of Zaentz electronic files have either no custodian information whatsoever or list "SZC"
as the custodian.  Given that plaintiffs have interpreted the parties' agreement to provide
"custodian" information in the exact manner as Warner's co-defendant, clearly such a position is
reasonable and was understood to be sufficient.  Notwithstanding that plaintiffs believe the
custodian information provided is sufficient, if all parties agree to provide "custodian"

**EXHIBIT 3**
**18**

GreenbergGlusker.com

Molly M. Lens
John C. Ulin
January 30, 2014
Page 5

information which identifies the names of the individual custodians of the electronic files,
plaintiffs will do the same.

With respect to hard copy files, we are confused by the request in Warner's Motion for
hard copy "metadata." As we understand the term, there is no metadata associated with hard
copy documents. And, Warner did not provide custodian data for many hard copy documents;
Zaentz, for its part, listed the custodian of all hard copy documents as "SZC," consistent with
what plaintiffs have done. Please explain precisely what you are proposing with respect to hard
copy documents so that we can further discuss a proposal which will be applicable to all parties.

E.     HarperCollins Documents

We disagree with your characterization of our collection efforts and our meet and confer
discussions with respect to HarperCollins. We have collected, reviewed and/or produced all
responsive HarperCollins documents that plaintiffs agreed to produce in response to Warner's
and Zaentz's requests. Regarding HarperCollins' hard copy documents, as we have repeatedly
explained, HarperCollins does not maintain these documents by custodian; they are instead
stored in central files. This applies to both former and current employees. All relevant files have
been collected, reviewed and/or produced in accordance with our meet and confer
agreements. As to David Brawn, Simon Dowson-Collins, Jane Johnson and Chris Smith, we
have collected their accessible, relevant ESI and our review and production of these documents
is nearly complete. The ESI of former employees Mary Butler (left in 1995), Adrian Laing (left
2001), Adrian Bourne (left 2002), David Daley (left 2009), David Marshall (left 2003), Peter
Winslow (left 1994) and David Young (left 2003) is stored on inaccessible, unindexed back-up
tapes. We do not understand your reference to loose Word, PDF, and Excel files. Please clarify.
However, if you are referring to network shared files, we did collect such accessible, relevant
documents, and produced responsive, non-privileged documents.

As to your January 3rd letter regarding the search terms we have employed in connection
with HarperCollins ESI, our use of search terms has been broader than as indicated in your
letter. Although we initially tested a broad set of terms narrowed by a secondary set of more
specific terms, we were concerned that the results might be too narrow. Thus, we ultimately
conducted the search using a broad, core set of key terms – FOTR, Fellowship of the Ring,
Hobbit, LOTR, Lord of the Rings, ROTK, Return of the King, TTT, The Two Towers and
Tolkien (with expanders) – and then put eyes on every page in conducting our review.
Accordingly, the search we conducted is actually broader than the additional search terms you
propose.

The additional terms you have requested us to use (excluding the term "Microsoft") pull
in approximately 1% of all the ESI collected. We are willing to apply those terms to the
collected data and review any additional documents that have not previously been reviewed,
provided that Warner confirms that it has also applied its list of new search terms against its ESI

**EXHIBIT 3**
**19**

GreenbergGlusker

Molly M. Lens
John C. Ulin
January 30, 2014
Page 6

and will similarly agree to review and produce any additional documents.  However, the term
"Microsoft" hits on virtually every single document, as it appears to be pulling documents
associated with underlying Microsoft software, and so we cannot agree to use that term in our
searches.

     F.    <u>Assertion of Privilege/Privilege Log</u>

Once again, we disagree with your contention that communications between Ms.
Blackburn and/or Mr. Maier and their clients were made in a non-legal capacity.  Likewise, we
disagree with your contention that plaintiffs have improperly withheld communications between
Tolkien/HC based on a common interest privilege, or communications between the Tolkien
Estate and Zaentz based on a common interest and/or joint client privilege.  We have already
provided authority supporting our assertion of the common interest and joint client privilege.  If
you believe you have any authority to support your position, please provide it to us immediately.

Moreover, we have as many, if not more, questions regarding the privilege assertions
made by defendants.  For example, Warner has made numerous unfounded privilege assertions,
including with respect to Ben Zinkin and David Imhoff communications.  Similarly, during the
deposition of Laurie Battle, Zaentz asserted for the very first time that all communications
between Ms. Battle and/or any employee of Zaentz and Al Bendich are purportedly privileged
based on the new founded assertion that Al Bendich was acting as general counsel.  Zaentz
clawed back numerous documents at the deposition based on this new privilege assertion — we
believe inappropriately.  This will be the subject of a further meet and confer shortly.  In
addition, Warner and Zaentz appear to have improperly redacted numerous relevant documents,
including documents exchanged among them long before this dispute arose.

While we believe that preparing a privilege log will be incredibly burdensome and time-
consuming (a position with which all parties agreed at the early meeting), we are prepared to do
so, as long as the agreement to provide privilege logs is reciprocal and all defendants agree to do
the same.

     G.    <u>Engagement Letter</u>

We believe that you have misunderstood Mr. Maier's deposition testimony.  We have
again confirmed that there are no engagement letters prior to 2012.  Mr. Maier was not the
partner responsible for the Tolkien Estate and may have been making an assumption based on
what became an established practice.  Indeed, it is clear from the continuation of his deposition
testimony that he was simply discussing general Manches policies:

Q.    You're sure? Are you speculating now or are you sure?
A.    It was Manches' practice to have an engagement letter.

GreenbergGlusker.com

Molly M. Lens
John C. Ulin
January 30, 2014
Page 7

> Q.    That doesn't respond to my question, okay?  Do you know for a fact whether there was an engagement letter?
>
> A.    No.

Tr. 199:1-8.

Regarding Mr. Blackburn's 2012 engagement letter, we stand by our position that the letter is privileged and wholly irrelevant to this dispute, and will not agree to produce it.

H.    <u>Simon Dowson-Collins Depositions and Karly Last Files</u>

Defendants have already requested/noticed ten depositions.  Plaintiffs will not consent to an eleventh deposition.  Accordingly, we will not make Mr. Dowson-Collins available for deposition.

Regarding Ms. Last's files, it is our understanding that Ms. Last only began working on Tolkien matters in connection with this litigation, and that she has had no involvement in the underlying issues in dispute.  Additionally, she is an attorney, and so the majority, if not all, of her communications will be privileged.  For these reasons, we have not collected Ms. Last's files, nor do we believe it is necessary to do so.  Nonetheless, we are confirming that Ms. Last has no files related to the underlying issues in dispute.

I.    <u>Documents for Tolkien Heirs</u>

Your assumption that Michael Tolkien and Steven Maier were not included on our list of custodians is incorrect.  As explained above, Mr. Maier's hard copy and electronic files have been, and are being collected.  Regarding the Tolkien Heirs, to avoid any confusion, below is a summary of the status of our collection and production of hard copy and electronic files for each of the Tolkien heirs:

1.    <u>Christopher Tolkien and Baillie Tolkien</u>:  We have collected, reviewed and produced non-privileged, responsive hard copy and electronic files for Christopher Tolkien and Baillie Tolkien.

2.    <u>Priscilla Tolkien</u>: We have collected, reviewed and produced non-privileged, responsive hard copy documents for Priscilla Tolkien.  Ms. Tolkien does not use, and has not used, email or a computer.

3.    <u>Michael Tolkien</u>:  We have collected, reviewed and produced some of the hard copy documents for Michael Tolkien.  We are in the process of collecting and reviewing additional hard copy documents and electronic documents.

**EXHIBIT 3**
**21**

GreenbergGlusker

Molly M. Lens
John C. Ulin
January 30, 2014
Page 8

       4.    <u>Simon Tolkien</u>:  We have collected, reviewed and produced some of the hard copy documents for Simon Tolkien.  We are in the process of collecting and reviewing additional hard copy documents and electronic documents.

       J.    <u>Jeremy Nussbaum Files</u>

       As previously explained, Mr. Nussbaum's files were collected by the Tolkien/HC Parties' prior counsel in connection with the prior litigation.  We obtained those files from prior counsel and are in the process of reviewing and producing non-privileged, responsive documents.  While we have no personal knowledge of when Mr. Nussbaum passed away, based on online research, it is our understanding that Mr. Nussbaum passed away on June 12, 2012.  We are unclear as to what additional information you are seeking with respect to Mr. Nussbaum's files, or why any further information is relevant.  Please provide a further explanation.

       In sum, the Tolkien/HC Parties are diligently working to complete their document collection and production.  It is obvious from Warner's recent document productions on the eve of critical depositions that it too is continuing to gather and produce additional documents and has not completed its production.

       Rather than waste time and resources posturing and filing premature (and now moot) motions, we urge Warner and Zaentz to focus their attentions on completing discovery and moving the case towards trial.  That is the approach we intend to take.

       In any event, please confirm that Warner will withdraw its Motion.  We look forward to speaking to you this afternoon.

            Sincerely,

            Julia R. Haye

JRH/rm

cc:    Sean M. Callagy
       Martin R. Glick
       Robert D. Hallman
       Victor Jih
       Daniel Petrocelli
       Nikolas A. Primack

**EXHIBIT 3**
**22**

GreenbergGlusker

# EXHIBIT 4

**From:** Jih, Victor
**Sent:** Friday, January 31, 2014 2:31 PM
**To:** jhaye@greenbergglusker.com
**Cc:** beskenazi@greenbergglusker.com; Cestero, Ricardo (rcestero@greenbergglusker.com); Moriarty, Elisabeth; Valadez, Rachel; Glick, Martin R. (Marty.Glick@aporter.com); Ulin, John C. (John.Ulin@APORTER.COM); Callagy, Sean M.; Hallman, Robert D. (Robert.Hallman@aporter.com); Petrocelli, Daniel; Lens, Molly
**Subject:** Tolkien Litigation

Julia-

We would be willing to file a stipulation on Monday withdrawing our motion if you are willing to stipulate to the following:

(1)     by February 28, 2013, produce all responsive non-privileged electronic and hard copy documents (excluding the allegedly "inaccessible" electronic documents from Manches and Harper Collins), with accompanying custodian information, from: (1) Cathleen Blackburn, Steven Maier, Christopher Tolkien, Priscilla Tolkien, Baillie Tolkien, Simon Tolkien, Michael Tolkien, David Brawn, Simon Dowson-Collins, Jane Johnson, Chris Smith, Bonnie Eskenazi, Elisabeth Moriarty, Ricardo Cestero, Candace Carlo, Aaron Moss, Rachel Valadez, Jeremy Nussbaum, Richard Williamson, Mary Butler, and Adrian Laing; (2) any central repositories of documents; and (3) any additional individuals the Tolkien/HC Parties have determined may possess responsive information.

(2)     by February 28, 2013, produce information sufficient to indicate whether, when, and to whom document preservation notices were issued, as well as any copies of such preservation notices;

(3)     by February 28, 2013, produce custodian information for all documents previously produced by the Tolkien/HC Parties in this action;

(4)     by February 28, 2013, produce a privilege log for all documents withheld prior to October 12, 2010, sufficient to assess the claim of privilege, including (1) whether communications involving Ms. Blackburn or Mr. Maier were made in a legal (as opposed to a business) advisory capacity; and (2) whether the timing and subject matter of any communications between the Tolkien/HC Parties and Zaentz, or between the Tolkien Parties and the HarperCollins Parties, actually justify the assertion of a common interest privilege.

If that's agreeable, we will withdraw the current motion and refile a new motion addressing the "inaccessible" Manches/Harper Collins documents as well as the remaining issues from our discussions yesterday (including the deposition issues that are at an impasse).  Let us know and we'll send you a draft stipulation.

We'll also have to reschedule the depositions in the interim until after we get documents on February 28.  To that end, please provide us dates for David Brawn, Priscilla Tolkien, and Mary

Butler. We need your agreement that we will schedule these promptly so they occur before any new depositions.

We will, of course, continue to provide custodian information with our productions and are in the process of preparing our privilege log.

Victor Jih
**Reply information:**
Telephone: (310) 246-6708
Facsimile: (310) 246-6779

* * * *

IMPORTANT NOTE: This message and any attached documents contain information from the law firm of O'Melveny & Myers LLP that may be privileged and/or confidential. If you are not the intended recipient, you may not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message. Thank you for your assistance.

# EXHIBIT 5

## PAGES 33-34 FILED UNDER SEAL PURSUANT TO JUNE 4, 2013 PROTECTIVE ORDER

```
 1              UNITED STATES DISTRICT COURT

 2            CENTRAL DISTRICT OF CALIFORNIA

 3

 4   FOURTH AGE LTD., et al.,      )

 5             Plaintiffs,         ) Case No. 12-9912-ABC (SHx)

 6        vs.                      )

 7   WARNER BROS. DIGITAL          )            CERTIFIED
     DISTRIBUTION, et al.,         )            TRANSCRIPT

 8             Defendants.         )
     _____)

 9   WARNER BROS. DIGITAL          )
     DISTRUBUTION INC., et al.,    )

10             Counterclaim        )
               Plaintiffs,         )

11        vs.                      )

12   FOURTH AGE LTD., et al.,      )

13             Counterclaim        )

14             Defendants.         )
     _____)

15

16      VIDEOTAPED DEPOSITION OF CATHLEEN BLACKBURN

17             Los Angeles, California

18           Tuesday, December 10, 2013

19

20

21

     Reported by:  SHANDA GABRIEL, CSR No. 10094

22   Job No. 1779924

23   PAGES 1-376

24   CONFIDENTIAL PAGES BOUND UNDER SEPARATE COVER:

25   36-39; 194-201; 218-220; 234-235; 356-359
```

Page 1

```
 1        A.  For two years.  1982 to 1984.        09:15:12

 2        Q.  Then is it correct that your first job as a   09:15:22

 3   lawyer was at Linklaters?                     09:15:27

 4        A.  Yes, I started as a trainee at Linklaters.   09:15:28

 5        Q.  Okay.  And at Linklaters you were in   09:15:32

 6   commercial litigation; is that correct?       09:15:35

 7        A.  Well, when I was training I was in a number   09:15:37

 8   of different departments, and when I qualified, I   09:15:39

 9   went into the commercial litigation department.   09:15:41

10        Q.  And did your work there involve copyright   09:15:43

11   or trademark litigation matters?              09:15:45

12        A.  Not until the later stages.  It was mainly   09:15:46

13   capital markets work that we -- we did there.   09:15:51

14        Q.  Did you work on any matters relating to the   09:15:54

15   Tolkien Estate or the works of J.R.R. Tolkien while   09:16:01

16   you were at Linklaters?                       09:16:05

17        A.  No.                                  09:16:07

18        Q.  In 1989 it appears you moved to Morrell   09:16:07

19   Peel & Gamlen; is that correct?               09:16:12

20        A.  That's correct.                      09:16:12

21        Q.  Okay.  And why did you decide to join   09:16:13

22   Morrell Peel?                                 09:16:15

23        A.  I didn't really enjoy working in a great   09:16:16

24   big city of London firm.  And I found my work was   09:16:20

25   becoming quite lim- -- limited, a limited range of   09:16:24
```

Page 22

```
 1    cases and not much client contact.                    09:16:29
 2        Q.  And at Morrell Peel is it correct that        09:16:32
 3    you -- let me start that question again.              09:16:36
 4            Is it correct that it was at Morrell Peel      09:16:37
 5    that you began working on Tolkien Estate matters?     09:16:39
 6        A.  That's correct.                               09:16:42
 7        Q.  Okay.  When did you first begin working on    09:16:43
 8    Tolkien Estate matters?                               09:16:46
 9        A.  I think in 1990.                              09:16:47
10        Q.  And what was the earliest Tolkien Estate      09:16:48
11    matter that you began working on?                     09:16:55
12        A.  I can't be precise about this, but in 1990    09:16:57
13    I worked on -- well, I dealt with aspects of the      09:17:05
14    fact that our then publishers, the Tolkien Estate's   09:17:11
15    then publishers were acquired by HarperCollins.       09:17:15
16        Q.  And at that time were you supporting the      09:17:19
17    work of Richard Williamson?                           09:17:33
18        A.  Dick Williamson.                              09:17:35
19        Q.  Fair enough.                                  09:17:37
20        A.  I assisted him, yes.                          09:17:37
21        Q.  And is it correct that he was the partner     09:17:41
22    in charge of Tolkien Estate matters at Morrell Peel?  09:17:42
23        A.  That's correct.                               09:17:47
24        Q.  Were there other lawyers who worked with      09:17:47
25    you supporting Mr. Williamson?                         09:17:49
```

Page 23

| | | |
|---|---|---|
| 1 | MS. ESKENAZI:  Objection.  Vague and | 09:17:53 |
| 2 | ambiguous. | 09:17:53 |
| 3 | THE WITNESS:  Not really as I -- as I think | 09:18:03 |
| 4 | about it today. | 09:18:10 |
| 5 | BY MR. ULIN: | 09:18:10 |
| 6 | Q.  And was that -- now just focusing entirely | 09:18:11 |
| 7 | on the period of time when you worked with | 09:18:14 |
| 8 | Mr. Williamson at Morrell Peel between 1990 and | 09:18:17 |
| 9 | 1997 -- | 09:18:20 |
| 10 | A.  Yes. | 09:18:22 |
| 11 | Q.  -- were you and he the only two lawyers who | 09:18:22 |
| 12 | worked on Tolkien Estate matters at Morrell Peel | 09:18:25 |
| 13 | during that period? | 09:18:28 |
| 14 | A.  I think it would depend on the work, but | 09:18:29 |
| 15 | occasionally other people might -- might assist, but | 09:18:31 |
| 16 | I can't rec- -- I can't recollect any names. | 09:18:34 |
| 17 | Q.  At some point during your tenure at Morrell | 09:18:36 |
| 18 | Peel you became the partner with principal | 09:18:46 |
| 19 | responsibility -- | 09:18:48 |
| 20 | A.  I did. | 09:18:48 |
| 21 | Q.  -- for Tolkien Estate matters? | 09:18:49 |
| 22 | A.  Yes, I did. | 09:18:50 |
| 23 | Q.  Okay.  And when was that? | 09:18:51 |
| 24 | A.  1992. | 09:18:52 |
| 25 | Q.  And that was upon the retirement of Dick | 09:18:54 |

Page 24

```
 1    Williamson?                                      09:18:56

 2         A.   Mr. Williamson retired as a partner in   09:18:56

 3    1992, but remained as a consultant to the firm.   09:19:00

 4         Q.   How long did he remain as a consultant --  09:19:07

 5         A.   Until 1997.                              09:19:09

 6         Q.   -- to the firm?                          09:19:10

 7              MS. ESKENAZI:  I just want to remind the   09:19:10

 8    witness to wait until Mr. Ulin has finished his   09:19:12

 9    questions before you start answering because there's  09:19:15

10    a little bit of overlap.                           09:19:17

11              MR. ULIN:  Thank you.                     09:19:19

12              THE WITNESS:  Sorry.                      09:19:20

13    BY MR. ULIN:                                        09:19:20

14         Q.   And during the period between '92 and '97  09:19:26

15    when Mr. Williamson stayed on as a consultant, did   09:19:33

16    he continue to work on Tolkien Estate matters?     09:19:37

17         A.   Yes, he did.                              09:19:39

18         Q.   And continued to work with you on those?  09:19:40

19         A.   Yes.                                      09:19:41

20         Q.   Okay.  In 1997, you left Morrell Peel for  09:19:48

21    Manches?                                            09:19:48

22         A.   Well --                                   09:19:48

23         Q.   Please.                                   09:19:57

24         A.   Is that the end of the question?         09:19:57

25         Q.   It can be.                               09:19:58
```

Page 25

| | | |
|---|---|---|
| 1 | "reviews"? | 09:28:36 |
| 2 | BY MR. ULIN: | 09:28:36 |
| 3 | Q. The question I'm asking goes to whether | 09:28:39 |
| 4 | someone reviews reports of the registered marks for | 09:28:42 |
| 5 | purposes of knowing what marks have been registered | 09:28:44 |
| 6 | by the Saul Zaentz Company? | 09:28:46 |
| 7 | MS. ESKENAZI: Same objection. | 09:28:49 |
| 8 | THE WITNESS: We don't review reports of | 09:28:51 |
| 9 | such matters. | 09:28:54 |
| 10 | BY MR. ULIN: | 09:28:54 |
| 11 | Q. Okay. Are you familiar with what marks are | 09:28:56 |
| 12 | registered by the Saul Zaentz Company? | 09:29:02 |
| 13 | A. Not in specific terms. | 09:29:04 |
| 14 | Q. And is there someone from the Estate who is | 09:29:23 |
| 15 | responsible for reviewing what uses the Saul Zaentz | 09:29:25 |
| 16 | Company has licensed of Tolkien-related trademarks? | 09:29:31 |
| 17 | MS. ESKENAZI: Objection. Vague and | 09:29:34 |
| 18 | ambiguous. | 09:29:39 |
| 19 | THE WITNESS: Nobody at the Tolkien Estate | 09:29:39 |
| 20 | has detailed knowledge of how and what the Saul | 09:29:41 |
| 21 | Zaentz Company licenses in terms of Tolkien | 09:29:46 |
| 22 | trademarks, Tolkien-related trademarks. | 09:29:49 |
| 23 | BY MR. ULIN: | 09:29:49 |
| 24 | Q. And just to clarify, when you say "nobody | 09:29:51 |
| 25 | at the Tolkien Estate," you include outside counsel? | 09:29:53 |

Page 33

| | | |
|---|---|---|
| 1 | MS. ESKENAZI:  Objection.  Vague and | 09:29:56 |
| 2 | ambiguous. | 09:30:02 |
| 3 | THE WITNESS:  If you're asking whether I'm | 09:30:02 |
| 4 | encompassing my own activity or lack of it, | 09:30:03 |
| 5 | that's -- it -- it covers that, too. | 09:30:06 |
| 6 | BY MR. ULIN: | 09:30:06 |
| 7 | Q.  Fair enough. | 09:30:08 |
| 8 | Do you have any formal position within the | 09:30:08 |
| 9 | Tolkien Estate? | 09:30:12 |
| 10 | A.  Yes, I do.  The Tolkien Estate essentially | 09:30:13 |
| 11 | now consists of two elements.  There's a private | 09:30:19 |
| 12 | limited company and there's another that's called | 09:30:24 |
| 13 | the Tolkien Estate Limited. | 09:30:27 |
| 14 | Q.  And what is the other element? | 09:30:32 |
| 15 | A.  Just to explain to you, the Tolkien Estate | 09:30:34 |
| 16 | Limited is the same as Fourth Age Limited.  It | 09:30:40 |
| 17 | simply changed its name. | 09:30:42 |
| 18 | Q.  And when did that occur? | 09:30:48 |
| 19 | A.  Oh, gosh.  I believe that was at the | 09:30:48 |
| 20 | beginning of this year. | 09:30:55 |
| 21 | Q.  And what is the other element of the | 09:30:59 |
| 22 | Tolkien Estate? | 09:31:04 |
| 23 | A.  The other element is a charitable company | 09:31:04 |
| 24 | called the Tolkien Trust. | 09:31:07 |
| 25 | Q.  Okay.  And I believe your answer was a | 09:31:13 |

Page 34

EXHIBIT 5
31

```
 1    preface to telling us what your formal role within      09:31:14

 2    the Estate is.                                           09:31:17

 3        A.  I am -- I am company secretary of each of       09:31:18

 4    those companies.                                         09:31:20

 5        Q.  And for how long have you served as company     09:31:24

 6    secretary of the Tolkien Estate Limited and Tolkien      09:31:35

 7    Trust?                                                   09:31:39

 8        A.  Since inception in each of those cases.          09:31:39

 9              (Pages 36 through 39 are

10              marked confidential and are bound

11              under separate cover.  The

12              noncofidential portion of this

13              transcript continues on page 40.)

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 35

# PAGE FILED UNDER SEAL PURSUANT TO JUNE 4, 2013 PROTECTIVE ORDER

EXHIBIT 5

33

# PAGE FILED UNDER SEAL PURSUANT TO JUNE 4, 2013 PROTECTIVE ORDER

EXHIBIT 5
34

```
 1        Q.  Is HarperCollins your client?            09:32:48

 2        A.  No.                                      09:32:50

 3        Q.  Have they ever been your client?         09:32:51

 4        A.  No.                                      09:32:53

 5            MR. ULIN:  I'm going to mark Exhibit 2.   09:33:08

 6                (The document referred to was         09:33:10

 7            marked for identification as              09:33:10

 8            Exhibit 2 and attached to this            09:33:10

 9            deposition.)                              09:33:22

10            THE WITNESS:  Can I put this aside?       09:33:25

11   BY MR. ULIN:                                       09:33:25

12        Q.  Yes, you may put the CV aside.  Sorry.    09:33:27

13   Good question.                                     09:33:29

14            MS. ESKENAZI:  Are -- are -- but -- but   09:33:31

15   you're not giving the witness the actual exhibits? 09:33:31

16            MR. ULIN:  I haven't.  I've left them with 09:33:33

17   the reporter.                                      09:33:36

18            MS. ESKENAZI:  Okay.  I only say that     09:33:36

19   because it may become confusing later if you go back 09:33:38

20   to exhibits that have not been numbered.  I just   09:33:40

21   noticed that the witness is not numbering these.   09:33:44

22            MR. ULIN:  That's a -- that's a fair point 09:33:46

23   so why don't we -- yeah, let's -- let's change     09:33:47

24   course and give the witness the marked exhibits.   09:33:49

25   That's a good point.                               09:33:51
```

Page 40

```
1    Blackburn.                                      15:31:30

2         Q.  And which people were involved in the    15:31:31

3    giving or receiving of -- of the privileged       15:31:35

4    information?                                       15:31:37

5           MS. ESKENAZI:  You can identify the         15:31:39

6    clients.                                           15:31:41

7           THE WITNESS:  The -- the clients are the    15:31:42

8    two clients I've mentioned to you.                 15:31:43

9    BY MR. PETROCELLI:                                 15:31:43

10        Q.  Which people in the law firm who are the  15:31:46

11   attorneys in the attorney part of the             15:31:49

12   attorney-client privilege were involved in this?  15:31:51

13        A.  The partners in the firm, myself and Steven 15:31:55

14   Maier.                                             15:31:57

15        Q.  Are you the only partners in the firm, the 15:31:57

16   two of you?                                        15:32:01

17        A.  Yes, we are.                              15:32:01

18        Q.  Okay.  And who were the clients involved in 15:32:02

19   the communication that's the subject of that      15:32:04

20   instruction?                                       15:32:07

21        A.  The Tolkien Estate Limited and the Tolkien 15:32:07

22   Trust.                                             15:32:11

23        Q.  Okay.  And what people on behalf of those 15:32:12

24   entities were involved in that communication?     15:32:15

25        A.  In the case of the Tolkien Estate Limited, 15:32:19
```

Page 204

```
 1    the directors, and in the case of the Tolkien Trust,    15:32:22

 2    the directors/trustees.                                 15:32:26

 3           THE REPORTER:  "The directors," what?  I'm        15:32:26

 4    sorry.                                                  15:32:26

 5           THE WITNESS:  "Stroke," trustees.                 15:32:26

 6           THE REPORTER:  Thank you.                         15:32:26

 7           THE WITNESS:  "Slash."                            15:32:34

 8    BY MR. PETROCELLI:                                       15:32:35

 9        Q.  So the directors in the case of the Tolkien     15:32:35

10    Estate Limited, you identified as Christopher,           15:32:39

11    Baillie, Michael, Priscilla, Simon and Steven Maier?     15:32:42

12        A.  Correct.                                         15:32:49

13        Q.  Okay.  And Priscilla, Christopher, Baillie,      15:32:51

14    Michael for the trust?                                   15:32:53

15        A.  Correct.                                         15:32:55

16        Q.  Okay.  Now, are there any documents, such        15:32:56

17    as minutes or memos, that reflect the decision to        15:33:03

18    authorize the filing of this lawsuit?                    15:33:11

19           MS. ESKENAZI:  Objection.  Attorney-client        15:33:15

20    privilege.                                               15:33:16

21           You can answer that question "yes" or "no"        15:33:18

22    to the extent that I have a stipulation that it will     15:33:22

23    not waive the -- her answer to the question will not     15:33:26

24    waive the attorney-client privilege.                     15:33:28

25           MR. PETROCELLI:  You don't need one, but          15:33:30
```

                                                        Page 205

```
 1    I'll give it to you.                          15:33:32

 2          THE WITNESS:  Could you repeat the      15:33:36

 3    question, please?                             15:33:37

 4    MR. PETROCELLI:                               15:33:37

 5       Q.  Yeah.  Are there any documents such as 15:33:41

 6    minutes or memos that reflect the decision to 15:33:42

 7    authorize filing of this lawsuit?             15:33:45

 8       A.  There will be documents.               15:33:47

 9       Q.  Where are those documents?             15:33:49

10       A.  They will be in the files of Maier     15:33:51

11    Blackburn, LLP.                               15:33:55

12       Q.  Okay.  Are there minutes of -- of meetings 15:33:59

13    that are kept by the directors of the two entities? 15:34:03

14       A.  Yes, there are minute books.           15:34:08

15       Q.  Okay.  Your firm maintains those minute 15:34:09

16    books?                                        15:34:12

17       A.  Yes.                                    15:34:12

18       Q.  Okay.  Are there minutes related to the 15:34:17

19    decision or authorization to file this lawsuit? 15:34:20

20       A.  No, there aren't.                       15:34:22

21       Q.  Okay.  Are there other documents, such as 15:34:24

22    memos?                                         15:34:25

23          MS. ESKENAZI:  Again, to the extent that we 15:34:28

24    have the same --                              15:34:30

25          MR. PETROCELLI:  You do.                 15:34:31
```

Page 206

```
 1    STATE OF CALIFORNIA        )
                                 )  ss.
 2    COUNTY OF LOS ANGELES      )

 3

 4           I, Shanda Gabriel, Certified Shorthand

 5    Reporter, Certificate No. 10094, for the State of

 6    California, hereby certify:

 7           I am the deposition officer that

 8    stenographically recorded the testimony in the

 9    foregoing deposition;

10           Prior to being examined the witness was by

11    me first duly sworn;

12           The foregoing transcript is a true record

13    of the testimony given.

14           Before completion of the deposition,

15    review of the transcript [X] was [] was not

16    requested.  If requested, any changes made by the

17    deponent (and provided to the reporter) during the

18    period allowed are appended hereto.

19

20    Dated 1/10/14

21

22

                    Shanda Gabriel
23                  CSR 10094

24

25
```

Veritext National Deposition & Litigation Services
866 299-5127

**EXHIBIT 5**
**39**

# EXHIBIT 6

```
 1              UNITED STATES DISTRICT COURT

 2             CENTRAL DISTRICT OF CALIFORNIA

 3

 4   FOURTH AGE LTD., et al.,      )        CERTIFIED

 5              Plaintiffs,        )        TRANSCRIPT

                vs.                ) No. 12-9912-ABC

 6   WARNER BROS. DIGITAL          )        (SHx)

 7   DISTRIBUTION, et al.,         )

 8              Defendants.        )

     _____)

 9   WARNER BROS. DIGITAL          )

10   DISTRUBUTION INC., et al.,    )

11              Counterclaim       )

12              Plaintiffs,        )

                vs.                )

13   FOURTH AGE LTD., et al.,      )

14              Counterclaim       )

15              Defendants.        )

     _____)

16

17    VIDEOTAPED DEPOSITION OF STEVEN ANDREW MAIER

18            Los Angeles, California

19           Friday, December 13, 2013

20

21   Reported by: SHANDA GABRIEL, CSR No. 10094

     JOB No. 1779931

22

23   PAGES 1-393

24   CONFIDENTIAL PAGES BOUND UNDER SEPARATE COVER:

25   25-29; 78-91; 164-174; 204-206; 292-293; 299-306
```

Page 1

```
 1    your recollection?                                09:18:04

 2         A.  I wouldn't say they refreshed my         09:18:06

 3    recollection.  I could see what the documents said. 09:18:09

 4         Q.  Fair enough.  Have you brought any       09:18:12

 5    documents with you today to the deposition?       09:18:14

 6         A.  No.                                      09:18:16

 7         Q.  I'm going to ask a few questions about your 09:18:28

 8    background and we're going to mark Exhibit Number 09:18:30

 9    23.  The reason we don't start at number 1 is we had 09:18:33

10    22 exhibits at Ms. Blackburn's deposition and we're 09:18:37

11    going to use a continuous sequence.               09:18:39

12         A.  Okay.                                    09:18:41

13                  (The document referred to was       09:18:53

14              marked for identification as            09:18:53

15              Exhibit 23 and attached to this         09:18:53

16              deposition.)                            09:18:54

17    BY MR. ULIN:                                      09:18:54

18         Q.  Mr. Maier, do you recognize Exhibit 23?  09:19:05

19         A.  Yeah, it appears to be a copy of my CV.  09:19:07

20         Q.  And this is the CV that's posted on the  09:19:18

21    Maier Blackburn Web site; is that correct?        09:19:22

22         A.  I believe so.                            09:19:26

23         Q.  Does your CV accurately set forth your   09:19:27

24    educational background?                           09:19:31

25         A.  As far as I can see, yes, it does.       09:19:33
```

Page 22

| | | |
|---|---|---|
| 1 | Q.   Okay.   And you studied law at Oxford; is | 09:19:40 |
| 2 | that correct? | 09:19:40 |
| 3 | A.   Yes, I did. | 09:19:44 |
| 4 | Q.   Does your CV accurately set forth your | 09:19:48 |
| 5 | professional history? | 09:19:50 |
| 6 | A.   It does.   The only thing that isn't | 09:19:52 |
| 7 | included is one year of what we call Law Society | 09:19:59 |
| 8 | finals that was in between university and starting | 09:20:03 |
| 9 | my professional career at Simmons & Simmons. | 09:20:06 |
| 10 | Q.   Fair enough.   Did any of your work, prior | 09:20:08 |
| 11 | to joining the Manches law firm, relate to the | 09:20:15 |
| 12 | Tolkien Estate or the works of J.R.R. Tolkien? | 09:20:22 |
| 13 | A.   No, it did not. | 09:20:24 |
| 14 | Q.   Okay.   And you joined the Manches firm in | 09:20:32 |
| 15 | 1992; is that correct? | 09:20:34 |
| 16 | A.   That's correct. | 09:20:36 |
| 17 | Q.   At what point in your career at Manches did | 09:20:36 |
| 18 | you begin working on Tolkien Estate matters? | 09:20:40 |
| 19 | A.   To the best of my recollection, sometime | 09:20:45 |
| 20 | around 2002, roughly. | 09:20:49 |
| 21 | Q.   And how did that come about? | 09:20:56 |
| 22 | A.   Manches merged with a firm called Morrell | 09:21:00 |
| 23 | Peel & Gamlen.   That firm was already working for | 09:21:09 |
| 24 | the Tolkien Estate.   So that work came to the | 09:21:10 |
| 25 | combined firm.   And at some point I was asked to get | 09:21:13 |

Page 23

```
 1    involved in certain litigation matters.              09:21:19

 2        Q.  Okay.  Had you done any work for the         09:21:22

 3    Tolkien Estate or in connection with the works of    09:21:23

 4    J.R.R. Tolkien -- pardon my pronunciation -- prior   09:21:25

 5    to the merger of Morrell Peel into Manches?          09:21:32

 6        A.  No.                                          09:21:35

 7        Q.  Okay.  What was the first Tolkien Estate     09:21:39

 8    matter that you worked on?                           09:21:41

 9        A.  I don't recall.                              09:21:42

10        Q.  On how many matters have you worked for the  09:21:45

11    Tolkien Estate over the years, if you can estimate?  09:21:58

12        A.  I -- I can't say.                            09:22:02

13            (Pages 25 through 29 are

14            marked confidential and are bound

15            under separate cover.  The

16            nonconfidential portion of this

17            transcript continues on page 30.)

18

19

20

21

22

23

24

25
```

Veritext National Deposition & Litigation Services
866 299-5127

**EXHIBIT 6**
**43**

```
 1    Blackburn, yes.                                    09:33:09

 2        Q.  Fair enough.  Do you still have all of your  09:33:10

 3    files on Tolkien Estate-related work from the period  09:33:14

 4    at which you -- in which you worked at Manches?    09:33:19

 5            MS. ESKENAZI:  Objection.  Vague and       09:33:22

 6    ambiguous.                                         09:33:26

 7            THE WITNESS:  That's quite a complex       09:33:26

 8    question in view of archiving of files, current   09:33:28

 9    files, closed files.  I think you would have to be  09:33:32

10    more specific.                                     09:33:35

11    BY MR. ULIN:                                       09:33:35

12        Q.  Do you have access to all of the files for  09:33:35

13    your Tolkien Estate matters, regardless of whether  09:33:39

14    they were at Manches or since you've opened your new  09:33:43

15    firm?                                              09:33:46

16            MS. ESKENAZI:  Objection.  Vague and       09:33:47

17    ambiguous.                                         09:33:49

18            THE WITNESS:  Yes, I believe that I do.    09:33:49

19    BY MR. ULIN:                                       09:33:58

20        Q.  And were those files made available to your  09:33:58

21    counsel in this case in connection with the       09:34:00

22    discovery that's been served?                      09:34:03

23        A.  Yes, they were.                            09:34:05

24        Q.  What entities do you understand to comprise  09:34:11

25    the Tolkien Estate?                                09:34:14
```

Page 36

| | | |
|---|---|---|
| 1 | MS. ESKENAZI:  Objection.  Vague and | 09:34:16 |
| 2 | ambiguous. | 09:34:16 |
| 3 | THE WITNESS:  Two entities, the Tolkien | 09:34:16 |
| 4 | Estate Limited, which is a U.K. limited company, and | 09:34:22 |
| 5 | the Tolkien Trust, which is a charity. | 09:34:26 |
| 6 | BY MR. ULIN: | 09:34:26 |
| 7 | Q.  And those are both your clients; is that | 09:34:32 |
| 8 | correct? | 09:34:32 |
| 9 | A.  They're both clients of the firm for whom I | 09:34:34 |
| 10 | do work. | 09:34:36 |
| 11 | Q.  Okay.  And are they your clients in this -- | 09:34:42 |
| 12 | in connection with this case? | 09:34:44 |
| 13 | A.  Yes, they are. | 09:34:45 |
| 14 | Q.  Do you have any formal position, either in | 09:34:46 |
| 15 | the Tolkien Estate Limited or the Tolkien Trust? | 09:34:58 |
| 16 | A.  Yes. | 09:35:02 |
| 17 | Q.  Can you explain? | 09:35:03 |
| 18 | A.  I'm appointed as a director of the Tolkien | 09:35:04 |
| 19 | Estate Limited. | 09:35:08 |
| 20 | Q.  Do you also have a formal position in the | 09:35:14 |
| 21 | Tolkien Trust? | 09:35:21 |
| 22 | A.  No, I have no position in the Tolkien | 09:35:21 |
| 23 | Trust. | 09:35:24 |
| 24 | Q.  When were you appointed as a director of | 09:35:24 |
| 25 | the Tolkien Estate Limited? | 09:35:27 |

Page 37

| | | |
|---|---|---|
| 1 | A.  I believe it was 2011. | 09:35:29 |
| 2 | Q.  And you've served continuously since that | 09:35:33 |
| 3 | time; is that correct? | 09:35:38 |
| 4 | A.  Yes, I have. | 09:35:39 |
| 5 | Q.  Is there a term for your appointment? | 09:35:40 |
| 6 | A.  I don't believe so. | 09:35:43 |
| 7 | Q.  So you're appointed to the directorship | 09:35:48 |
| 8 | indefinitely; is that correct? | 09:35:51 |
| 9 | A.  To the best of my understanding. | 09:35:53 |
| 10 | Q.  Do you receive compensation for your | 09:35:54 |
| 11 | services as director of the Tolkien Estate Limited? | 09:35:57 |
| 12 | A.  No. | 09:36:00 |
| 13 | Q.  Have you ever? | 09:36:04 |
| 14 | A.  No. | 09:36:04 |
| 15 | Q.  What are your responsibilities as a | 09:36:08 |
| 16 | director of the Tolkien Estate Limited? | 09:36:10 |
| 17 | MS. ESKENAZI:  Objection.  Vague and | 09:36:12 |
| 18 | ambiguous. | 09:36:13 |
| 19 | THE WITNESS:  It's very much a nominal | 09:36:16 |
| 20 | appointment as what we refer to as the non-family | 09:36:18 |
| 21 | director.  And I don't have any executive | 09:36:20 |
| 22 | responsibility at all. | 09:36:25 |
| 23 | BY MR. ULIN: | 09:36:30 |
| 24 | Q.  How much of your time do you commit to | 09:36:30 |
| 25 | that -- to your role as a non-family director of the | 09:36:31 |

Page 38

```
 1        Q.  Dowson-Collins was, right?              17:06:12

 2        A.  Yes.                                     17:06:13

 3        Q.  Okay.  And you receive e-mails from him or  17:06:14

 4   her from time to time?                            17:06:16

 5        A.  Yes.                                     17:06:17

 6        Q.  At Manches, as well as your current firm,  17:06:18

 7   right?                                            17:06:23

 8        A.  Yes.                                     17:06:23

 9        Q.  And you -- you don't have any kind of    17:06:30

10   writing at all with HarperCollins that indicates  17:06:32

11   that you have a joint representation relationship  17:06:35

12   with them; is that right?                         17:06:40

13        MS. ESKENAZI:  Objection.  Misstates the     17:06:42

14   evidence.                                         17:06:43

15        THE WITNESS:  I would not be aware of that.  17:06:45

16   BY MR. PETROCELLI:                                17:06:45

17        Q.  You are not aware of that, right?        17:06:48

18        A.  What I meant to say was that if there is  17:06:51

19   one, Cathleen Blackburn would have that information,  17:06:53

20   not me.                                           17:06:55

21        Q.  But you don't know of any, correct?      17:06:56

22        A.  I don't know of any written agreement.   17:07:00

23        Q.  Okay.  Have you ever in the course of your  17:07:10

24   work done any checking on computer games, video   17:07:12

25   games, Internet-related games, that were out in the  17:07:23
```

Page 309

| | | |
|---|---|---|
| 1 | marketplace, so to speak, with respect to the | 17:07:33 |
| 2 | Tolkiens? | 17:07:36 |
| 3 | MS. ESKENAZI:  Objection.  Vague and | 17:07:38 |
| 4 | ambiguous.  Compound. | 17:07:40 |
| 5 | THE WITNESS:  I don't recall ever having | 17:07:42 |
| 6 | dealt with a matter concerning games until | 17:07:44 |
| 7 | September, October 2010. | 17:07:47 |
| 8 | BY MR. PETROCELLI: | 17:07:47 |
| 9 | Q.  My question is broader.  I meant at any | 17:07:49 |
| 10 | point in time did you ever check or ask somebody | 17:07:51 |
| 11 | else to check what kind of uses with respect to | 17:07:55 |
| 12 | games are being made, whether they're online games, | 17:07:58 |
| 13 | video games, Internet games, anything like that that | 17:08:04 |
| 14 | you've done over the years prior to this dispute | 17:08:08 |
| 15 | in -- prior to September 2010? | 17:08:11 |
| 16 | A.  No. | 17:08:13 |
| 17 | Q.  Do you gamble, by the way? | 17:08:13 |
| 18 | A.  In a limited way. | 17:08:18 |
| 19 | Q.  What does that mean? | 17:08:19 |
| 20 | A.  I occasionally play online poker.  I | 17:08:21 |
| 21 | occasionally put a bet on a horse. | 17:08:25 |
| 22 | Q.  How long have you been betting? | 17:08:27 |
| 23 | A.  I don't recall. | 17:08:29 |
| 24 | Q.  Well, you -- you were gambling before | 17:08:34 |
| 25 | September 2010, right? | 17:08:37 |

Page 310

```
 1        A.  Yes.                              17:08:37

 2             MS. ESKENAZI:  Object- --        17:08:37

 3    BY MR. PETROCELLI:                        17:08:37

 4        Q.  Okay.                             17:08:41

 5             MS. ESKENAZI:  Objection to this line of   17:08:41

 6    questioning as -- as irrelevant.          17:08:42

 7    BY MR. PETROCELLI:                        17:08:42

 8        Q.  When did you first begin gambling?   17:08:46

 9             MS. ESKENAZI:  Objection.  Relevance.   17:08:50

10             THE WITNESS:  I don't recall.    17:08:53

11    BY MR. PETROCELLI:                        17:08:53

12        Q.  Have you been gambling since 2000 -- the   17:08:56

13    year 2000?                                17:09:01

14             MS. ESKENAZI:  Objection.  Relevance.   17:09:02

15             THE WITNESS:  Well, I'm not sure that "been   17:09:04

16    gambling" is a fair characterization.  I    17:09:06

17    occasionally have a bet, and more recently I've   17:09:08

18    occasionally played online poker.  I don't want to   17:09:11

19    sound as though I'm a regular gambler.    17:09:14

20    BY MR. PETROCELLI:                        17:09:14

21        Q.  I wasn't trying to characterize it.   17:09:19

22        A.  Thank you.                        17:09:20

23        Q.  I'm just trying to date it.      17:09:21

24        A.  Okay.                             17:09:23

25        Q.  So how far can we go back with -- with   17:09:27
```

Page 311

| | | |
|---|---|---|
| 1 | this? | 17:09:29 |
| 2 | A.  I can't recall when I first placed a bet on | 17:09:30 |
| 3 | a horse. | 17:09:35 |
| 4 | Q.  When did you first -- | 17:09:37 |
| 5 | A.  If that's the question. | 17:09:39 |
| 6 | Q.  -- play online gambling? | 17:09:40 |
| 7 | A.  You mean online poker? | 17:09:42 |
| 8 | Q.  Well, isn't that gambling? | 17:09:45 |
| 9 | A.  Yeah. | 17:09:47 |
| 10 | Q.  Okay.  Yeah.  Online poker, then. | 17:09:48 |
| 11 | MS. ESKENAZI:  Objection.  Relevance. | 17:09:50 |
| 12 | THE WITNESS:  Perhaps two, three years ago. | 17:09:59 |
| 13 | BY MR. PETROCELLI: | 17:09:59 |
| 14 | Q.  Have you ever been in a casino? | 17:10:01 |
| 15 | A.  Yes. | 17:10:03 |
| 16 | MS. ESKENAZI:  Objection.  Relevance. | 17:10:04 |
| 17 | BY MR. PETROCELLI: | 17:10:04 |
| 18 | Q.  When is the first time you've been into -- | 17:10:05 |
| 19 | in a casino? | 17:10:07 |
| 20 | MS. ESKENAZI:  Objection.  Relevance. | 17:10:08 |
| 21 | THE WITNESS:  I've been in a casino once | 17:10:09 |
| 22 | about 20 years ago. | 17:10:13 |
| 23 | BY MR. PETROCELLI: | 17:10:13 |
| 24 | Q.  Only time? | 17:10:16 |
| 25 | MS. ESKENAZI:  Objection.  Relevance. | 17:10:18 |

Page 312

```
 1    STATE OF CALIFORNIA     )

                              )  ss.

 2    COUNTY OF LOS ANGELES   )

 3

 4          I, Shanda Gabriel, Certified Shorthand

 5    Reporter, Certificate No. 10094, for the State of

 6    California, hereby certify:

 7          I am the deposition officer that

 8    stenographically recorded the testimony in the

 9    foregoing deposition;

10          Prior to being examined the witness was by

11    me first duly sworn;

12          The foregoing transcript is a true record

13    of the testimony given.

14          Before completion of the deposition,

15    review of the transcript [X] was [] was not

16    requested.  If requested, any changes made by the

17    deponent (and provided to the reporter) during the

18    period allowed are appended hereto.

19

20    Dated: 1/13/2014.

21

22

23

24          Shanda Gabriel

25          CSR No. 10094

                                        Page 393
```

# EXHIBIT 7

1  BONNIE E. ESKENAZI (SBN 119401)
   BEskenazi@ggfirm.com
2  ELISABETH A. MORIARTY (SBN 156569)
   EMoriarty@ggfirm.com
3  RICARDO P. CESTERO (SBN 203230)
   RCestero@ggfirm.com
4  GREENBERG GLUSKER FIELDS CLAMAN &
   MACHTINGER LLP
5  1900 Avenue of the Stars, 21st Floor
   Los Angeles, California  90067-4590
6  Telephone:  310.553.3610
   Fax:  310.553.0687
7
   Attorneys for Plaintiffs and Counterclaim Defendants
8

9              UNITED STATES DISTRICT COURT

10            CENTRAL DISTRICT OF CALIFORNIA

11

12  FOURTH AGE LIMITED, a United            Case No.  CV 12-09912 ABC (SHx)
    Kingdom corporation; PRISCILLA MARY
13  ANNE REUEL TOLKIEN, as TRUSTEE          Assigned To: Hon. Audrey B.
    OF THE TOLKIEN TRUST, a United          Collins
14  Kingdom Charitable Trust; THE J.R.R.
    TOLKIEN ESTATE LIMITED, a United
15  Kingdom corporation; HARPERCOLLINS
    PUBLISHERS, LTD., a United Kingdom
16  corporation; UNWIN HYMAN LTD., a        **PLAINTIFFS AND**
    United Kingdom corporation; and         **COUNTERCLAIM**
17  GEORGE ALLEN & UNWIN                    **DEFENDANTS' INITIAL**
    (PUBLISHERS) LTD., a United Kingdom      **DISCLOSURES PURSUANT TO**
18  corporation,                            **F.R.C.P. 26(a)(1)(A)**

19            Plaintiffs,

20  v.                                      Trial Date:  None Set
                                            Action Filed:  November 19, 2012
21  WARNER BROS. DIGITAL
    DISTRIBUTION, INC., a division of
22  WARNER BROS. HOME
    ENTERTAINMENT, INC., a Delaware
23  corporation; WARNER BROS.
    ENTERTAINMENT, INC., a Delaware
24  corporation, as successor-in-interest to New
    Line Cinema Corp.; WARNER BROS.
25  CONSUMER PRODUCTS, INC., a
    Delaware corporation; WARNER BROS.
26  INTERACTIVE ENTERTAINMENT,
    INC., a division of WARNER BROS.
27  HOME ENTERTAINMENT, INC.; NEW
    LINE PRODUCTIONS, INC., a California
28  corporation; THE SAUL ZAENTZ

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

84971-00003/1912448.4

PLAINTIFFS AND COUNTERCLAIM
DEFENDANTS' INITIAL DISCLOSURES

**EXHIBIT 7**

1 COMPANY d/b/a Middle-earth
2 Enterprises, a Delaware corporation; and
DOES 1-10, inclusive,

3         Defendants.

4

5 AND RELATED COUNTERCLAIMS.

6

7         Plaintiffs and Counterclaim Defendants Fourth Age Limited, Priscilla Mary
8 Anne Reuel Tolkien, as Trustee of the Tolkien Trust, The J.R.R. Tolkien Estate
9 Ltd., Harper Collins Publishers, Ltd., Unwin Hyman Ltd., and George Allen &
10 Unwin (Publishers), Ltd. (collectively, the "Tolkien/HC Parties") submit the
11 following initial disclosures pursuant to Rule 26(a) of the Federal Rules of Civil
12 Procedure.

13         The Tolkien/HC Parties make these initial disclosures based on information
14 presently known and without prejudice to or waiver of their right to supplement
15 these disclosures or to present additional or different information or evidence at
16 trial as permitted under the Federal Rules of Civil Procedure and the Local Rules of
17 this Court. These disclosures shall not be deemed as an admission as to any fact in
18 dispute or as a waiver of any rights or claims the Tolkien/HC Parties have asserted
19 or may assert in this action.

20         By making these disclosures, the Tolkien/HC Parties do not represent that
21 they are identifying every document, tangible thing or witness possibly relevant to
22 this action. The Tolkien/HC Parties' initial disclosures represent a good faith effort
23 at an early stage of this litigation to identify information they reasonably believe
24 may be relevant to their claims and defenses in this case.

25         The Tolkien/HC Parties reserve the right to object to the production and/or
26 admission of any testimony, witness, document or tangible thing identified in these
27 initial disclosures.

28

GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1
PLAINTIFFS AND COUNTERCLAIM
DEFENDANTS' INITIAL DISCLOSURES

**EXHIBIT 7**
**53**

84971-00003/1912448.4

## Definitions

As used herein, the following terms shall have the following meanings:

A. "Zaentz" means defendant and counterclaimant The Saul Zaentz Company d/b/a Middle-earth Enterprises.

B. "Warner" means defendants and counterclaimants Warner Bros. Home Entertainment, Inc., Warner Bros. Entertainment, Inc., Warner Bros. Consumer Products, Inc., Warner Bros. Digital Distribution, New Line Productions, Inc., and their predecessor in interest, New Line Cinema Corp.

C. The "Tolkien Parties" means plaintiffs and counterclaim defendants Fourth Age Limited, Priscilla Mary Anne Reuel Tolkien, as Trustee of the Tolkien Trust, and The J.R.R. Tolkien Estate Ltd.

D. The "H/C Parties" means plaintiffs and counterclaim defendants Harper Collins Publishers, Ltd., Unwin Hyman Ltd., and George Allen & Unwin (Publishers), Ltd.

E. "United Artists" means the entity United Artists Corporation.

F. The "Complaint" means the Complaint filed by The Tolkien/HC Parties in the above-entitled action.

G. The "1969 GAU Agreement" means the contract entered into between George Allen & Unwin, Ltd. and Warner's predecessor in interest, United Artists, on July 8, 1969.

H. The "1969 Sassoon Agreement" means the contract entered into between the Sassoon Trustee and Executor Corp., Ltd. and Warner's predecessor in interest, United Artists, on July, 8, 1969.

I. The "1969 Agreements" means the 1969 GAU Agreement and the 1969 Sassoon Agreement.

J. The "Merchandising License" means Schedule D to the 1969 GAU Agreement, Schedule D to the 1969 Sassoon Agreement, and the 1975 and

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

2

PLAINTIFFS AND COUNTERCLAIM
DEFENDANTS' INITIAL DISCLOSURES

**EXHIBIT 7**
**54**

1    1981 Amendments to those Schedules, as defined in paragraph 40 of the

2    Complaint.

3  K.    The "Tolkien Works" means the three volume literary work by the author

4    J.R.R. Tolkien, consisting of "The Lord of the Rings: The Fellowship of the

5    Ring," "The Lord of the Rings: The Two Towers," and "The Lord of the

6    Rings: The Return of the King," as well as J.R.R. Tolkien's literary work,

7    "The Hobbit."

8  L.    "Video Games" means interactive, computer, and other electronic and/or

9    digital games featuring characters, events, images and/or story elements from

10    the Tolkien Works.

11  M.    "Intangible Video Games" Video Games based on the Tolkien Works that

12    are delivered otherwise than by way of physical media such as DVD or

13    cartridge, including (but not limited to) games delivered by way of electronic

14    download, mobile telephone networks or social media websites.

15  N.    "Online Slots" means any online gambling slot machine game featuring

16    characters, events, images and/or story elements from the Tolkien Works,

17    including, but not limited to, the "Online Slots" as defined in paragraph 45 of

18    the Complaint.

19  O.    "Casino Slot Machines" means any gambling casino slot machine featuring

20    characters, events, images and/or story elements from the Tolkien Works,

21    including, but not limited to, the "Casino Slot Machine" as defined in

22    paragraph 48 of the Complaint.

23  P.    The "Disputed Marks" means the trademarks and/or service marks being

24    exploited by Zaentz and/or Warner based on, or related to, the characters,

25    events, images and/or story elements from the Tolkien Works, which the

26    Tolkien/HC Parties allege are beyond the scope of the Merchandising

27    License, as alleged in paragraphs 81-84 of the Complaint. The Disputed

28    Marks include, but are not limited to, trademarks and/or service marks

GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

3

PLAINTIFFS AND COUNTERCLAIM
DEFENDANTS' INITIAL DISCLOSURES

**EXHIBIT 7**

55

1    registered in connection with hotels, restaurants, travel agencies, ringtones,

2    housing developments, Online Slots, Casino Slot Machines, Intangible

3    Games, and in International Class 16.

4  Q.  The "2010 Regrant Agreement" means the agreement dated as of September

5      1, 2010 between the Tolkien/HC Parties and several other Tolkien-related

6      entities and heirs, as well as Zaentz and certain of the Warner-related parties,

7      relating to the Tolkien Works.

8  R.  The "Hobbit Term Sheet" means the Hobbit Binding Term Sheet dated as of

9      September 7, 2010 entered into by several of the Tolkien/HC Parties and

10     related persons and entities, and several Warner and Zaentz related entities.

11 S.  The "Binding Term Sheet" means the Binding Term Sheet dated as of

12     August 21, 2009 entered into by several of the Tolkien/HC Parties and

13     related persons and entities, and several Warner related entities.

14

15 **1.  Witness Disclosures**

16     The Tolkien/HC Parties currently believe that the following witnesses,

17 excluding expert witnesses, are likely to have discoverable information that the

18 Tolkien/HC Parties may use to support their claims and defenses, unless solely for

19 impeachment. The Tolkien/HC Parties reserve the right to supplement these

20 disclosures as discovery continues and as the case develops, or as otherwise

21 reasonably necessary and appropriate:

22     a.  Cathleen Blackburn. Ms. Blackburn is an attorney at Maier

23 Blackburn, counsel for the Tolkien Parties. Ms. Blackburn can be contacted c/o the

24 Tolkien/HC Parties' counsel of record. Subjects of information include, without

25 limitation: (i) the 1969 Agreements; (ii) the Merchandising License; (iii) Video

26 Games; (iv) Intangible Video Games; (v) Online Slots; (vi) Casino Slot Machines;

27 (vii) the Disputed Marks; (viii) communications between and among the

28 Tolkien/HC Parties, Zaentz, Warner, and third parties as they relate to Video

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

4

PLAINTIFFS AND COUNTERCLAIM
DEFENDANTS' INITIAL DISCLOSURES

**EXHIBIT 7**

**56**

Games, Intangible Video Games, Online Slots, Casino Slot Machines, and the Disputed Marks; (viii) the goodwill the Tolkien/HC Parties have cultivated surrounding the Tolkien Works and related intellectual property; (ix) the 2010 Regrant Agreement, The Binding Term Sheet, and the Hobbit Term Sheet; and (x) the settlement discussions between the Tolkien/HC Parties, Zaentz, and Warner that preceded the filing of the above-entitled action.

b.     Dick Williamson. Mr. Williamson was an attorney for the Tolkien Parties at various times throughout the parties' history. Mr. Williamson can be contacted c/o the Tolkien/HC Parties' counsel of record. Subjects of information include, without limitation: (i) 1969 Agreements; (ii) the Merchandising License; (iii) Video Games; (iv) Intangible Video Games; (v) Online Slots; (vi) Casino Slot Machines; (vii) the Disputed Marks; (viii) communications between and among the Tolkien/HC Parties, Zaentz, and third parties as they relate to Video Games, Intangible Video Games, Online Slots, Casino Slot Machines, and the Disputed Marks.

c.     Priscilla Mary Anne Reuel Tolkien. Ms. Tolkien is a trustee of the Tolkien Trust and plaintiff in this action. Ms. Tolkien can be contacted c/o the Tolkien/HC Parties' counsel of record. Subjects of information include, without limitation: the goodwill the Tolkien/HC Parties have cultivated surrounding the Tolkien Works and related intellectual property.

d.     David Brawn. Mr. Brawn is an employee of plaintiff and counterclaim defendant HarperCollins Publishers, Ltd. Mr. Brawn can be contacted c/o the Tolkien/HC Parties' counsel of record. Subjects of information include, without limitation: (i) the 1969 Agreements; (ii) the Merchandising License; (iii) Video Games; (iv) Intangible Video Games; (v) Online Slots; (vi) Casino Slot Machines; (vii) the Disputed Marks; and (viii) communications between and among the Tolkien/HC Parties, Zaentz, Warner, and third parties as they relate to Video Games, Intangible Video Games, Online Slots, Casino Slot Machines, and the

5

PLAINTIFFS AND COUNTERCLAIM DEFENDANTS' INITIAL DISCLOSURES

**EXHIBIT 7**
**57**

84971-00003/1912448.4

GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1  Disputed Marks.

2       e.      Mary Butler. Ms. Butler was an employee of plaintiff and
3  counterclaim defendant Unwin Hyman Ltd. Subjects of information include,
4  without limitation: (i) the 1969 Agreements; (ii) the Merchandising License; (iii)
5  Video Games; (iv) Intangible Video Games; (v) Online Slots; (vi) Casino Slot
6  Machines; (vii) the Disputed Marks; and (viii) communications between and among
7  the Tolkien/HC Parties, Zaentz, Warner, and third parties as they relate to Video
8  Games, Intangible Video Games, Online Slots, Casino Slot Machines, and the
9  Disputed Marks.

10      f.      Adrian Laing. Mr. Laing was an employee and in-house counsel at
11  plaintiff and counterclaim defendant HarperCollins Publishers, Ltd. Subjects of
12  information include, without limitation: (i) the Merchandising License; (ii) Video
13  Games; (iii) Intangible Video Games; (iv) Online Slots; (v) Casino Slot Machines;
14  (vi) the Disputed Marks; and (vii) communications between and among the
15  Tolkien/HC Parties, Zaentz, Warner, and third parties as they relate to Video
16  Games, Intangible Video Games, Online Slots, Casino Slot Machines, and the
17  Disputed Marks.

18      g.      Bonnie E. Eskenazi. Ms. Eskenazi is an attorney at Greenberg Glusker
19  Fields Claman & Machtinger LLP, counsel of record for the Tolkien/HC Parties.
20  Subjects of information include, without limitation: (i) the 2010 Regrant
21  Agreement, The Binding Term Sheet, and the Hobbit Term Sheet; and (ii) the
22  settlement discussions between the Tolkien/HC Parties, Zaentz, and Warner that
23  preceded the filing of the above-entitled action.

24      h.      Ricardo P. Cestero. Mr. Cestero is an attorney at Greenberg Glusker
25  Fields Claman & Machtinger LLP, counsel of record for the Tolkien/HC Parties.
26  Subjects of information include, without limitation: (i) the 2010 Regrant
27  Agreement, The Binding Term Sheet, and the Hobbit Term Sheet; and (ii) the
28  settlement discussions between the Tolkien/HC Parties, Zaentz, and Warner that

PLAINTIFFS AND COUNTERCLAIM
DEFENDANTS' INITIAL DISCLOSURES

84971-00003/1912448.4
**EXHIBIT 7**
**58**

1    preceded the filing of the above-entitled action.

2         i.    Alan Benjamin. Mr. Benjamin was a business affairs executive at

3    United Artists. Mr. Benjamin can be contacted c/o the Tolkien/HC Parties' counsel

4    of record.   Subjects of information include, without limitation: (i) 1969 Agreement;

5    and (ii) Merchandising License.

6         j.    Albert M. Bendich. Mr. Bendich can be contacted at 2600 Tenth St.,

7    Berkeley, California, 94710. Mr. Bendich was, and on information and belief, still

8    is, a vice-president and general counsel for Zaentz.  Subjects of information

9    include, without limitation: (i) the Merchandising License; (ii) Video Games; (iii)

10   Intangible Video Games; (iv) Online Slots; (v) Casino Slot Machines; (vi) the

11   Disputed Marks; (vii) the goodwill the Tolkien/HC Parties have cultivated

12   surrounding the Tolkien Works and related intellectual property;  and (viii)

13   communications between and among the Tolkien/HC Parties, Zaentz, Warner, and

14   third parties as they relate to Video Games, Intangible Video Games, Online Slots,

15   Casino Slot Machines, and the Disputed Marks.

16        k.    Thomas A. Magnani. Mr. Magnani was an attorney at Howard, Rice,

17   Nemerovski, Canady, Falk & Rabkin, counsel for Zaentz at various times

18   throughout the parties' history. On information and belief, Mr. Magnani is

19   currently a partner at Arnold & Porter LLP, counsel of record for Zaentz. Subjects

20   of information include, without limitation: (i) the Merchandising License; (ii)

21   Video Games; (iii) Intangible Video Games; (iv) Online Slots; (v) Casino Slot

22   Machines; (vi) the Disputed Marks; (vii) communications between and among the

23   Tolkien/HC Parties, Zaentz, Warner, and third parties as they relate to Video

24   Games, Intangible Video Games, Online Slots, Casino Slot Machines, and the

25   Disputed Marks; (viii) the 2010 Regrant Agreement, The Binding Term Sheet, and

26   the Hobbit Term Sheet; and (ix) the settlement discussions between the

27   Tolkien/HC Parties, Zaentz, and Warner that preceded the filing of the above-

28   entitled action.

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

7

PLAINTIFFS AND COUNTERCLAIM
DEFENDANTS' INITIAL DISCLOSURES

**EXHIBIT 7**
**59**

1         l.     David Imhoff.  Mr. Imhoff was an executive at New Line Cinema

2  Corp.  Subjects of information include, without limitation: (i) the Merchandising

3  License; (ii) Video Games; (iii) Intangible Video Games; (iv) Online Slots; (v)

4  Casino Slot Machines; (vi) the Disputed Marks; and (vii) communications between

5  and among the Tolkien/HC Parties, Zaentz, Warner, and third parties as it relates to

6  Video Games, Intangible Video Games, Online Slots and Casino Slot Machines.

7        m.    Benjamin Zinkin.  Mr. Zinkin was an executive at, and at times general

8  counsel of, New Line Cinema Corp.  Subjects of information include, without

9  limitation: (i) the Merchandising License; (ii) Video Games; (iii) Intangible Video

10  Games; (iv) Online Slots; (v) Casino Slot Machines; (vi) the Disputed Marks; and

11  (vii) communications between and among the Tolkien/HC Parties, Zaentz, Warner,

12  and third parties as they relate to Video Games, Intangible Video Games, Online

13  Slots, Casino Slot Machines, and the Disputed Marks.

14        n.     Jeremy Williams.  Mr. Williams is an attorney at Warner.  Subjects of

15  information include, without limitation: (i) the Merchandising License; (ii) Video

16  Games; (iii) Intangible Video Games; (iv) Online Slots; (v) Casino Slot Machines;

17  (vi) the Disputed Marks; (vii) communications between and among the Tolkien/HC

18  Parties, Zaentz, Warner, and third parties as they relate to Video Games, Intangible

19  Video Games, Online Slots, Casino Slot Machines, and the Disputed Marks; (viii)

20  the 2010 Regrant Agreement, The Binding Term Sheet, and the Hobbit Term Sheet;

21  and (ix) the settlement discussions between the Tolkien/HC Parties, Zaentz, and

22  Warner that preceded the filing of the above-entitled action.

23        o.     Mark B. Helm.  Mr. Helm is an attorney at Munger, Tolles & Olson

24  LLP, counsel for Warner at various times throughout the parties' history.  Subjects

25  of information include, without limitation: (i) the 2010 Regrant Agreement, The

26  Binding Term Sheet, and the Hobbit Term Sheet; and (ii) the settlement discussions

27  between the Tolkien/HC Parties, Zaentz, and Warner that preceded the filing of the

28  above-entitled action.

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

8

PLAINTIFFS AND COUNTERCLAIM
DEFENDANTS' INITIAL DISCLOSURES

1         p.     Eric P. Tuttle. Mr. Tuttle is an attorney at Munger, Tolles & Olson

2    LLP, counsel for Warner at various times throughout the parties' history. Subjects

3    of information include, without limitation: (i) the 2010 Regrant Agreement, The

4    Binding Term Sheet, and the Hobbit Term Sheet; and (ii) the settlement discussions

5    between the Tolkien/HC Parties, Zaentz, and Warner that preceded the filing of the

6    above-entitled action.

7         q.     Unknown employees and representatives at Warner, including, without

8    limitation, persons with knowledge of Warner's licensing activity related to the

9    Tolkien Works and persons with knowledge of the development of the Online

10   Slots, Casino Slot Machines and Intangible Video Games, including what elements

11   of the Tolkien Works were incorporated therein. The Tolkien/HC Parties reserve

12   the right to depose and/or call as a witness a Warner representative designated

13   pursuant to F.R.C.P. 30(b)(6).

14        r.     Unknown employees and representatives at Zaentz, including, without

15   limitation, persons with knowledge of Zaentz's licensing and trademark activity

16   related to the Tolkien Works and persons with knowledge of the development of the

17   Online Slots, Casino Slot Machines and Intangible Video Games, including what

18   elements of the Tolkien Works were incorporated therein. The Tolkien/HC Parties

19   reserve the right to depose and/or call as a witness a Zaentz representative

20   designated pursuant to F.R.C.P. 30(b)(6).

21        s.     Unknown witnesses at Sierra Online who were involved with the

22   negotiation of the 1998 license related to the Tolkien Works.

23        t.     The Tolkien/HC Parties also incorporate by reference the list of

24   individuals identified by Zaentz and the Warner Parties in their Initial Disclosures

25   and reserve the right to call any such witnesses.

26

27   **2.**    **Document Disclosure**

28        The Tolkien/HC Parties are presently aware of the following documents,

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

9

PLAINTIFFS AND COUNTERCLAIM
DEFENDANTS' INITIAL DISCLOSURES

**EXHIBIT 7**

**61**

84971-00003/1912448.4

1  electronically stored information, and tangible things in their possession, custody or
2  control that they may use to support their claims and defenses, unless solely for
3  impeachment.  The listing of a category of documents is not a representation that
4  the Tolkien/HC Parties have necessarily obtained such documents or that any such
5  category is necessarily discoverable or relevant.  The Tolkien/HC Parties reserve
6  the right to supplement these disclosures as discovery continues and as the case
7  develops, or as otherwise reasonably necessary and appropriate, and to object to the
8  discovery of any of the following categories of documents or any specific document
9  falling into such category on any grounds permitted by the applicable rules and the
10  law.

11      a.    The 1969 Agreements and documents and communications relating
12  thereto.

13      b.    Schedules D to the 1969 Agreements and documents and
14  communications relating thereto.

15      c.    The 1975 Amendment to Schedules D to the 1969 Agreements, and
16  documents and communications relating thereto.

17      d.    The 1981 Amendment to Schedules D to the 1969 Agreements, and
18  documents and communications relating thereto.

19      e.    The WMS Gaming License, the Microgaming License, and any other
20  licenses purporting to grant rights relating to Intangible Video Games, Casino Slot
21  Machines, Online Slots and/or the Disputed Marks, and documents and
22  communications relating thereto.

23      f.    The August 7, 1998 agreement between New Line Cinema and Zaentz,
24  the May 9, 2000 agreement between New Line Cinema and Zaentz, and the
25  interactive game license dated May 27, 2009 between Zaentz and Warner Bros.
26  Games, Inc., and documents and communications relating thereto.

27      g.    The Tolkien Works.

28      h.    The films produced by Warner that are based on the Tolkien Works.

GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

10

PLAINTIFFS AND COUNTERCLAIM DEFENDANTS' INITIAL DISCLOSURES

1        i.      The Video Games, Intangible Video Games, Online Games and Casino
2   Gambling Games.

3        j.      The 2010 Regrant Agreement, the Binding Term Sheet, and the Hobbit
4   Term Sheet, and documents and communications relating thereto.

5        k.     The December 2, 1976 agreement between United Artists and Zaentz,
6   and documents and communications relating thereto.

7        l.      The draft agreement dated March 15, 2000 proposed by Ben Zinkin to
8   the Tolkien/HC Parties and rejected by the Tolkien/HC Parties, and documents and
9   communications relating thereto.

10        m.    Trade and service mark applications and registrations relating to the
11   Disputed Marks.

12        n.     Documents and communications relating to the Merchandising
13   License, Online Slots, Casino Slot Machines, Intangible Video Games, and the
14   Disputed Marks.

15        o.     Documents and communications relating to the value of Tolkien
16   Work-related Intangible Video Games and/or new media rights on the open market.

17        p.     Documents reflecting the history of interactive, computer, and other
18   electronic and/or digital games incorporating the Tolkien Works, including, without
19   limitation, the Electronic Arts, Sierra Online, and Turbine licenses, and
20   communications amongst the parties and with third parties relating thereto.

21        q.     Documents evidencing royalties or other amounts received by Zaentz
22   in connection with merchandising rights.

23        r.      Documents evidencing royalties or other amounts received by Warner
24   in connection with merchandising rights.

25        s.     Documents evidencing revenues earned and/or projected to be earned
26   in connection with gambling games based on, incorporating, or related to Video
27   Games, Intangible Video Games, Online Slots and Casino Slot Machines.

28        t.      Documents evidencing the division and computation of royalties as

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

11

PLAINTIFFS AND COUNTERCLAIM
DEFENDANTS' INITIAL DISCLOSURES

**EXHIBIT 7**

**63**

84971-00003/1912448.4

1  between Warner, Zaentz and the Tolkien/HC Parties in connection with Video
2  Games, Intangible Video Games, Online Slots and Casino Slot Machines.

3      u.    Documents establishing the goodwill the Tolkien/HC Parties have
4  cultivated surrounding the Tolkien Works and related intellectual property.

5      v.    Documents evidencing negative reactions to gambling-related games
6  featuring the Tolkien Works, including the Online Slots and the Casino Slot
7  Machines.

8      w.    All communications between and among Zaentz, Warner, and the
9  Tolkien/HC Parties relating to Online Slots, Casino Slot Machines, Video Games,
10 Intangible Video Games, the Disputed Marks, the Tolkien/HC Parties' claims and
11 defenses in the above-entitled action, Zaentz's and Warner's claims and defenses in
12 the above-entitled action, and any objections by the Tolkien/HC Parties relating to
13 any of the above.

15 **3.   Computation of Damages**

16 The Tolkien/HC Parties' damages in this case will either be the subject of
17 expert testimony, or such information is uniquely in the possession of Zaentz and/or
18 Warner. However, as to Intangible Video Games, the Tolkien/HC Parties are
19 informed and believe that, conservatively, and assuming worldwide licensing across
20 all categories of exploitation (e.g. mobile, social, MMOs, casual) and some
21 geographic, territory specific licenses (e.g. China and Japan) across platforms, the
22 total of typical minimum guarantees for such licenses would be in the range of
23 approximately $80 million to $130 million for a five year license for fantasy-genre
24 properties as beloved and historically successful as the Tolkien Works. Damages
25 resulting from Zaentz' and Warner's licensing and exploitation of the Disputed
26 Marks, Online Slots, and Casino Slot Machines are currently unknown, but are
27 believed to be multiple millions of dollars. Additionally, the Tolkien/HC Parties
28 have incurred, and continue to incur, substantial attorneys' fees in pursuing this

GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP 1900 Avenue of the Stars, 21st Floor Los Angeles, California 90067-4590

12
PLAINTIFFS AND COUNTERCLAIM DEFENDANTS' INITIAL DISCLOSURES

**EXHIBIT 7**
**64**

84971-00003/1912448.4

1 | action.

2 |     The Tolkien/HC Parties reserve the right to supplement these disclosures as

3 | discovery continues and as the case develops, or as otherwise reasonably necessary

4 | and appropriate.

5 |

6 | **4.**    **Insurance**

7 |     The Tolkien/HC Parties are not currently aware of any applicable insurance

8 | policies.

9 |

10 |

11 | DATED: March 28, 2013            GREENBERG GLUSKER FIELDS
CLAMAN & MACHTINGER LLP

12 |

13 |                 By: _Bonnie Cokenan_

14 |                     BONNIE E. ESKENAZI (SBN 119401)
Attorneys for PLAINTIFFS AND
COUNTERCLAIM DEFENDANTS

Sidebar (vertical text, left margin):
GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

13

PLAINTIFFS AND COUNTERCLAIM
DEFENDANTS' INITIAL DISCLOSURES

**EXHIBIT 7**

**65**

1    **PROOF OF SERVICE BY MAIL**

2    I am a citizen of the United States and employed in Los Angeles County,

3    California. I am over the age of eighteen years and not a party to the within-entitled

4    action. My business address is 1900 Avenue of the Stars, 21st Floor, Los Angeles,

5    California 90067. I am readily familiar with this firm's practice for collection and

6    processing of correspondence for mailing with the United States Postal Service. On

7    March 28, 2013, I placed with this firm at the above address for deposit with the

8    United States Postal Service a true and correct copy of the within document(s):

9    PLAINTIFFS AND COUNTERCLAIM DEFENDANTS'
     INITIAL DISCLOSURES PURSUANT TO F.R.C.P.
10    26(a)(1)(A)

11    in a sealed envelope, postage fully paid, addressed as follows:

12    SEE ATTACHED SERVICE LIST

13    Following ordinary business practices, the envelope was sealed and placed

14    for collection and mailing on this date, and would, in the ordinary course of

15    business, be deposited with the United States Postal Service on this date.

16    I declare that I am employed in the office of a member of the bar of this court

17    at whose direction the service was made.

18    Executed on March 28, 2013, at Los Angeles, California.

19

20

21    Robert Massing

22

23

24

25

26

27

28

84971-00003/1884083.1                                             PROOF OF SERVICE

**EXHIBIT 7**
**66**

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1

SERVICE LIST

2

3   Arnold & Porter LLP                    Attorneys for Defendant
    Martin R. Glick                        THE SAUL ZAENTZ
4   John C. Ulin                           COMPANY d/b/a
    Sarah J. Givan                         Middleearth Enterprises, a
5   Sean M. Callagy                        Delaware corporation
6   Three Embarcadero Center, 7th Floor
    San Francisco, California 94111-4024
7

8   O'Melveny & Meyers LLP                 Attorneys for Defendants
    Daniel M. Petrocelli                   WARNER BROS.
9   Victor Jih                             DIGITAL
10  Molly Lens                             DISTRIBUTION, INC.;
    1999 Avenue of the Stars               WARNER BROS.
11  7th Floor                              ENTERTAINMENT, INC.;
    Los Angeles CA 90067                   WARNER BROS.
12                                         CONSUMER PRODUCTS,
13                                         INC.; WARNER BROS.
                                           INTERACTIVE
14                                         ENTERTAINMENT, INC.;
15                                         NEW LINE
16                                         PRODUCTIONS, INC.

17

18

19

20

21

22

23

24

25

26

27

28

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

84971-00003/1884083.1                    2                      PROOF OF SERVICE

EXHIBIT 7
67

# EXHIBIT 8

**Rachel Valadez**
D: 310.785.6862
F: 310.201.2331
RValadez@GreenbergGlusker.com
File Number: 84971-00003



September 9, 2013

**Via E-Mail and U.S. Mail**

John C. Ulin, Esq.
ARNOLD & PORTER, LLP
777 S. Figueroa Street
Los Angeles, CA  90017-5844

Re:   *Fourth Age Limited, et al. v. Warner Bros. Digital Distribution, Inc., et al.*
      (Case No. CV 12-09912 ABC (SHx))

Dear John:

I write in response to your letter of August 16, 2013.

As a preliminary matter, we disagree with your characterization of the Tolkien/HC
Parties' document production efforts to date.  The Tolkien/HC Parties have been diligently
reviewing and producing documents in compliance with the parties' meet and confer discussions
since early May 2013.  Although we anticipated making a substantial additional production
Friday afternoon, Thursday evening our production database became corrupted and we will have
to redo much of our work.  In any event, we intend to make an additional production as soon as
the database has been repaired and will continue to produce documents on a good faith, rolling
basis.

Your purported "concern" regarding the Tolkien/HC Parties' collection efforts is
similarly disingenuous.  During the parties' in-person meet and confer session on June 27, 2013
we repeatedly informed you that the vast majority of the Tolkien/HC Parties' production would
consist of hard copy files.  As to the Tolkien Parties, their practice has always been to print and
file all email correspondence.  We have reviewed all relevant Tolkien Party files and are
producing responsive documents therefrom, including email.  We will also be producing
responsive, non-privileged electronic emails from several Greenberg Glusker attorneys and we
are in the process of inquiring as to the status of Steven Maier's and Cathleen Blackburn's
Manches-related electronic files.  As to the HC Parties, electronic email files are only maintained
for eight (8) weeks before being purged and placed onto back-up tapes that are not reasonably
accessible.  As such, any accessible electronic email files were generated post-filing of this
action and consist solely of privileged communications.  It is unclear what you mean by "archive
format," but, as I am sure you are aware, it is not the Tolkien/HC Parties' obligation to produce
electronic files identified as not reasonably accessible.  *F.R.C.P. Rule 26(b)(2)(B).*  The cost and
burden of restoring the HC Parties' back-up tapes is simply too great considering most, if not all,
relevant, responsive electronic documents are being produced from the Tolkien/HC Parties' hard
copy files.

**Greenberg Glusker Fields Claman & Machtinger LLP**
1900 Avenue of the Stars, 21st Floor, Los Angeles, California, 90067
T: 310.553.3610   |   F: 310.553.0687
84971-00003/1972548.1

**EXHIBIT 8**
**68**

**GreenbergGlusker.com**

ARNOLD & PORTER, LLP
September 9, 2013
Page 2

As to your remaining questions with regard to the HC Parties' files, as we have repeatedly explained, these files are not maintained by custodian, but are instead filed centrally by topic. We can confirm that we have pulled and are reviewing and producing all of the HC Parties' accessible, responsive, non-privileged files. As to the HC Parties' documents produced to date, we have included an HC metadata designation in connection with all documents produced from the HC Parties.

**I.    Zaentz Responses**

A.    RFP Nos. 1, 3, 6-7, 9-10 & 60

As to Categories 2 and 4[1], please confirm your agreement to produce documents that *refer to, reflect, describe or evidence*[2] the relevant substantive categories.

B.    RFP Nos. 2, 4-5, 8 & 38-45

It appears we are in agreement as to these requests.

C.    RFP Nos. 11-13 & 61-63

As to Category 1 – Limited Development Documents – it appears we have reached an impasse. Your refusal to produce these admittedly relevant documents based on your burden objection and insistence that the final versions of the games should be sufficient, rings hollow for several reasons. First, even if the final versions of the games were the best way to determine the source of ultimate content (they are not), you have consistently refused to produce the final versions of these games. Second, we have repeatedly explained that the final art and correspondence/memos related to visual creative content are absolutely necessary to analyze the source of ultimate content included in a given game, as well as Zaentz's and its licensees' related decision making processes. For example, the fact that a certain mountainscape was included in a game may be observed by playing the final version, but whether it was sourced from one of the films or the books, and whether Zaentz or its licensees intentionally included (or excluded) a film or book-sourced image, could not be discerned from the game itself. We are absolutely entitled to all Limited Development Documents to be able to fully analyze such issues. Moreover, discussion between Zaentz and the game developers regarding the "look and feel" of a game is likely to shed light on whether particular images were based on the films or the books.

---

[1] As with my letter of August 7, 2013, for efficiency, this letter summarizes the discovery requests and responses, and the parties' proposals in prior meet and confer correspondence. Please refer to the actual requests, responses, and proposals in my prior letters to determine the full scope of the requests at issue and the current state of the parties' meet and confer discussions.

[2] Pursuant to my 8/7 letter, we have proposed this "*refer to, reflect, describe or evidence*" language in connection with several requests. As you have not raised any concerns in connection with this language, we will interpret the requested confirmation to apply to all requests referencing this language unless you indicate otherwise.

**EXHIBIT 8**
**69**

GreenbergGlusker.com

ARNOLD & PORTER, LLP
September 9, 2013
Page 3

Third, any alleged burden in gathering these documents is outweighed by their admitted relevance to the affirmative defense you have raised concerning the contractual source of Zaentz's merchandising rights. Any burden associated with these documents exists only because of the position you have taken with respect to the rights granted by paragraph 2 of the 1969 Agreements. As we have repeatedly explained, should you abandon that argument, we will withdraw our requests for these documents. Absent that, we will move for a full production and are confident the Magistrate will agree.

As to Category 4 – Limited Revenue Documents – you have misstated the scope of what remains at issue. Pursuant to our prior meet and confer discussions, the remaining disputes between the parties concern royalty statements and accompanying correspondence Zaentz received from its licensees, including Warner,[3] and documents sufficient to show when any relevant Disputed Exploitation began and when the Tolkien/HC Parties began receiving merchandising revenue in connection therewith. As to statements and correspondence Zaentz received from its licensees, your letter wholly fails to address this category. We assume your omission means you are refusing to produce despite the reasons proffered in my 8/7 letter. As such, we will seek the assistance of the Magistrate. Regarding documents sufficient to show when exploitations began and when/whether the Tolkien/HC Parties began receiving related revenue, we do not understand your position. We are not seeking "many thousands of pages of back-up from licensees" over a "15 year" period as you claim. Instead, as we've explained on multiple occasions, we are only seeking documents "sufficient to show" this information, which you concede is "relevant," and which you have represented you believe can be obtained from the documents you have already agreed to produce. If that is true, we do not understand your reluctance to commit to this production. You do not dispute that we are entitled to these documents. If you are unwilling to commit to their production, we will ask the Magistrate to intervene.

C1.     RFP Nos. 15 and 65

Your letter fails to address your position as to Category 1. Please either confirm your agreement or provide an explanation for your position.

D.     RFP Nos. 13, 20, 21, 32-34, 42-43, 48, 53, 63, 74 -75, 77, & 79; Interrogatory Nos. 5-6, 9 & 12-14; and RFA No. 3 – Intangible Games

It appears we are in agreement.

E.     RFP Nos. 14, 22, 59, 64 & 66 (and 23, 35-37, 44-45, 49 & 78) – Disputed Marks

Subject to further discussions as to Class 16, it seems the only remaining issues here mirror the above concerns expressed in connection with Category 4 (Limited Revenue

---

[3] References to Warner include its affiliates, subsidiaries and internal divisions.

**EXHIBIT 8**
**70**

GreenbergGlusker.com

ARNOLD & PORTER, LLP
September 9, 2013
Page 4


Documents).  As explained above, we are prepared to move as to the disputed Limited Revenue
Documents.

     F.    RFP Nos. 17, 19, 21, 23 & 25

     We do not understand your position as to these requests.  In my 7/9 letter, we proposed a
production in 4 specific categories.  In your 7/19 responsive letter, you agreed to produce
documents in Categories 2 and 3[4], raised issues with Category 1 (communications between
Warner, Zaentz, the Tolkien/HC Parties and internal analyses), and reiterated your issues with
Category 4 (Limited Revenue Documents).  As to Category 1, we believed the only remaining
dispute concerned your exclusion of non-rights related communications as between Zaentz and
Warner, and internal analyses responsive to these requests.  As to Category 4, the Limited
Revenue Document discussion throughout our meet and confer correspondence applied.  In your
most recent letter of 8/16, you state only that you are willing to produce documents "as to the
negotiation and modification (or termination) of the license, and to adopt the framework here
that [we] proposed for analogous requests for documents "relating to the interpretation" of
agreements.

     We find your departure from the established positions the parties' have taken during the
past months of meet and confer discussions extremely frustrating.  Please refer to the summary
of our discussions in my 7/9 and 8/7 letters and state your current position in light of the entirety
of our past discussions.  We intend to seek the Magistrate's assistance absent your willingness to
produce the documents we have repeatedly requested.

     G.    RFP Nos. 26, 29, 32 & 35

     We believe we are in agreement provided the parties' understanding applies to Request
No. 32 as well.  Please confirm.

     H.    RFP Nos. 27-28, 30-31, 36-37, 46-47, 49, 55 & 74

     We intend to seek the production of all responsive Limited Revenue Documents in
connection with each of these requests.  As to your inquiry regarding RFP Nos. 55 and 74, in
response to the proposals in your 6/10 letter, the Tolkien/HC Parties proposed the Limited
Revenue Documents limitation discussed at the parties' in-person meet and confer meetings and
in my 7/9 letter.  Since that time, we have consistently requested that Zaentz produce all
responsive Limited Revenue Documents in connection with these requests.  We continue to do
so.

---

[4] As to Category 3, you incorporated your discussion from section I.E of your 7/19 letter, where you greed to provide
responsive documents.

**EXHIBIT 8**
**71**
**GreenbergGlusker.com**

ARNOLD & PORTER, LLP
September 9, 2013
Page 5

I.    RFP Nos. 51-52

The Tolkien/HC Parties' position as to the Limited Development Documents continues to apply to these requests.  We are prepared to move.

J.    RFP No. 58

It appears we are in agreement, however, as requested in my 8/7 letter, for the sake of clarity, please confirm you will produce documents in compliance with the language in my 7/9 letter.

K.    RFP Nos. 67 & 68

It appears we are in agreement.

L.    RFP No. 70

It appears we are in agreement.

M.    RFP No. 71

Your letter wholly misconstrues the proposal in my 8/7 letter.  First, you completely ignore the statement that "we are seeking the Limited Development Documents described in my 7/9 letter, as limited by the 'visual creative content' proposal discussed above in item I.C."  Second, at no point did we state that the Tolkien/HC Parties would limit the documents sought here to those that "'refer, relate to, or reflect'" the negotiation and modification of the amendment at issue."  Once again, we find your mischaracterization of the parties' discussions frustrating and unhelpful.  We are prepared to move on the request based on the limitations stated in my 8/7 letter.

N.    RFP Nos. 72 & 73

As with RFP No. 71, your letter entirely misrepresents the proposal in my 8/7 letter.  We intend to seek the Magistrate's assistance here as well.

O.    RFP No. 80

We do not agree to your proposal.  For the reasons set forth in all prior meet and confer correspondence to date, we will ask the Magistrate to compel a full production.

P.    Interrogatory Nos. 7-8 & 10-11 (and 9 & 12)

You have agreed to produce documents sufficient to answer Interrogatory Nos. 7-8 & 10-11.  Please confirm this applies to Interrogatory Nos. 9 & 12 as well.

**EXHIBIT 8**

**72**

**GreenbergGlusker.com**

ARNOLD & PORTER, LLP
September 9, 2013
Page 6

This letter constitutes the Tolkien/HC Parties' final meet and confer attempt with respect to the foregoing requests. Absent your concession on the issues addressed above by the end of this week, we intend to provide you with the Tolkien/HC Parties' portion of a joint stipulation in support of a motion to compel in connection with the above requests.

## II.    Tolkien/HC Parties' Responses

### A.    Interrogatory No. 1

As you are aware, responding to this interrogatory has required the Tolkien/HC Parties to review and analyze thousands of trademark and service mark registration and application summaries that were previously uniquely in Zaentz's possession. We are in the process of completing this analysis and anticipate supplementing this response by the end of September.

### B.    Interrogatory No. 2

As Zaentz has yet to complete its document production, we cannot agree to supplement this response by a date certain. However, as we have repeatedly stated, upon completion of this portion of your document production, we intend to supplement this response.

### C.    Interrogatory No. 4

It appears we are in agreement.

### D.    RFP No. 1

Having considered the discussion in your 8/16 letter, subsequent to confirming with our client, we would be inclined to produce documents responsive to this request, exclusive of documents related to (1) copyrights in the Tolkien Works at issue; (2) the Tolkien name; (3) the appendices to the Tolkien Works; (4) songs; (5) maps; (6) sound recordings; (7) poems; and (8) illustrations, except that we will also produce registrations and applications in connection with the Disputed Marks even if they would otherwise fall under one of these exclusions. Please let me know if this would be acceptable.

### E.    RFP Nos. 2-3

Subsequent to receiving final confirmation from our clients, we are willing to adopt the SZC Modified (Disputed) Exploitation Categories, exclusive of e-books, in response to these requests. We will confirm shortly.

**EXHIBIT 8**
**73**

**GreenbergGlusker.com**

ARNOLD & PORTER, LLP
September 9, 2013
Page 7


    F.    <u>RFP Nos. 4-5, 8-10, 17-18</u>

As to RFP Nos. 4-5, 9-10, and 18, we can agree to produce responsive documents that
discuss the SZC Modified (Disputed) Exploitation Categories, minus e-books. As to Nos. 8 &
17, we appreciate your willingness to exclude third party complaints. However, we still do not
understand the relevance of the Tolkien/HC Parties' complaints regarding Zaentz's indisputably
legitimate licensing activity. The concerns expressed in my 8/7 letter regarding third party
complaints as to legitimate exploitations such as board games and/or the films apply equally to
the Tolkien/HC Parties. For example, how would a HarperCollins employee's comment made to
a third party regarding his or her disapproval of the casting of Elijah Wood in *The Lord of the
Rings* films possibly be relevant to the claims and defenses in this case? To address the points in
your letter, such a comment would in no way bear on the parties' relationship over the years, the
nature and extent of Plaintiffs' monitoring and enforcement activities, nor the grounds on which
Plaintiffs have deemed any prior Zaentz activity to be improper or unauthorized in any way
relevant to this case. Moreover, even if such documents were minimally relevant (they are not),
the burden associated with attempting to search for and collect such random, isolated comments
would far outweigh any purported utility they may have. We have already agreed to produce
such complaints made in connection with the Disputed Exploitations. We believe that is
sufficient.

    G.    <u>RFP Nos. 15-16</u>

Subsequent to receiving final confirmation from our clients, we confirm we are willing to
produce documents in response to these requests as limited by the SZC Modified (Disputed)
Exploitation Categories, exclusive of e-books, to the extent we have them in our possession,
custody, or control. We will confirm shortly.

    H.    <u>RFP No. 19</u>

It appears we are in agreement.

    I.    <u>RFP No. 21</u>

After conferring with our clients, we can represent that there is no repository of
agreements that would allow us to search for and collect documents responsive to this request in
any sort of reasonable manner. A production of agreements responsive to this request would
thus require Plaintiffs to literally search through every file potentially containing an agreement,
regardless of when that agreement was executed or its subject matter, and then manually read
through the text of each agreement to determine whether it contained the phrase "articles of
tangible personal property." As to the HC Parties, such a search would require the review of
millions of pages of agreements that have no relationship whatsoever to the Tolkien Works,
Zaentz, or Warner, let alone the claims and defenses at issue in this case. Such a review would
require hundreds of additional hours and potentially hundreds of thousands of dollars in

**EXHIBIT 8**
**74**

**GreenbergGlusker.com**

ARNOLD & PORTER, LLP
September 9, 2013
Page 8


additional attorneys' fees.  The burden in responding to this "needle-in-a-haystack" request is patent, and we are confident the Magistrate will agree.  We must stand on our objections.

Best,

Rachel Valadez

RV

cc:      Sean M. Callagy
         Martin R. Glick
         Robert D. Hallman
         Victor Jih
         Molly Lens
         Daniel Petrocelli

# EXHIBIT 9

**Rachel Valadez**
D: 310.785.6862
F: 310.201.2331
RValadez@GreenbergGlusker.com
File Number: 84971-00003


GREENBERG GLUSKER
The Counsel You Keep℠

October 11, 2013

**Via E-Mail and U.S. Mail**

John C. Ulin, Esq.
ARNOLD & PORTER, LLP
777 S. Figueroa Street
Los Angeles, CA  90017-5844

Molly Lens, Esq.
O'MELVENY & MEYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067

Re:   *Fourth Age Limited, et al. v. Warner Bros. Digital Distribution, Inc., et al.*
      (Case No. CV 12-09912 ABC (SHx))

Dear Counsel:

I write in response to Molly Lens' letter of October 4, 2013 and John Ulin's letter of
October 9, 2013.  As an initial matter, I must reiterate our long-held position that any exchange
of document information must be entirely mutual.  Therefore, we must insist that Zaentz and
Warner provide reciprocal information concerning their collection and review policies as soon as
possible.

1.    Individual Custodians[1]

As we explained at the in-person meet and confer meeting on July 2, 2013, many of the
responsive documents Zaentz and Warner have requested are not maintained by individual
custodians.  Rather, for both the Tolkien Parties and the HC Parties, Tolkien-related documents
are stored in central files.  However, in order to ensure we've fully complied with our discovery
obligations, we have endeavored to collect some additional files from individual custodians in
cases where we had reason to believe all relevant files may not have been maintained centrally.
Specifically, in addition to entity custodian central files, we have collected, or are in the process
of collecting, files from the following individuals:  Christopher Tolkien, Priscilla Tolkien, Ballie
Tolkien, Simon Tolkien, David Brawn, Simon Dowson-Collins, Jane Johnson, Chris Smith,
Bonnie Eskenazi, Elisabeth Moriarty, Ricardo Cestero, Candace Carlo, Aaron Moss and myself.
As data collection is ongoing, this list may be supplemented as the case goes forward.  Please
identify the custodians from whom you have collected, or will be collecting, any and all
responsive documents.

---

[1] Headings correspond to those in Ms. Lens' October 4th letter.

**GreenbergGlusker.com**

**EXHIBIT 9**
**76**

ARNOLD & PORTER, LLP
O'MELVENY & MEYERS LLP
October 11, 2013
Page 2


2.    Search Terms

    We are not currently using search terms to collect responsive documents.  Please provide
us with a list of any search terms Zaentz and Warner have used to collect responsive information.

3.    Custodian Metadata

    We wholly disagree with your characterization of the parties' obligations and discussions
as to this item.  First, under the Federal Rules, there is no obligation to provide individual
custodian and/or file label metadata information in connection with each and every document
produced in discovery.  Indeed, such an undertaking would be incredibly burdensome and in
many cases, would require the disclosure of information protected by the attorney work product
privilege.

    Second, your account of the parties' prior discussions is inaccurate.  For one thing, the
parties never engaged in a meet and confer discussion on August 25, 2013.  August 25th was a
Sunday and none of the Tolkien/HC Parties' counsel was at our offices to participate in such a
discussion.  Furthermore, I was certainly never part of a discussion with any of Defendants'
counsel during which Defendants' counsel objected to the manner in which the Tolkien/HC
Parties were populating the custodian metadata field in their production.  Sean Callagy's August
8, 2013 email to Ricardo Cestero simply noted that the custodian field on documents produced
up to that point was populated with the term "Tolkien," and questioned whether any
HarperCollins documents had been produced.  At no time did he, nor anyone else at either of
your offices, express the opinion that the Tolkien/HarperCollins designations were inappropriate,
let alone "meaningless."  Finally, our use of the Tolkien/HarperCollins designations is entirely
consistent with the parties' metadata agreement.  In response to Ms. Lens' June 24, 2013
metadata request, the Tolkien/HC Parties simply agreed to populate the "Custodian" metadata
field.  The Tolkien/HC Parties have complied with that agreement by identifying from which
party each document was collected.  Nothing more is required.

4.    HarperCollins Electronic Documents[2]

    *1.    Please describe HarperCollins' electronic document retention policy and, to the
extent that it differs for emails, shared drives, and files saved locally or to personal files, please
explain those differences.  If the document retention policy exists in written form, in full or in
part, please provide that to us.*

    The current policy (which was put in place two years ago), is to backup applications,
email, shared data and personal shares to tape each month and keep those tapes for seven years.
For the time period preceding this, there are un-catalogued tapes which date back to 1996 for
HarperCollins' Glasgow office and back to 2002 for the Hammersmith office.  The tapes are not

---

[2] For ease of reference we have copied Ms. Lens' questions from her August 20, 2013 email to Mr. Cestero.

**EXHIBIT 9**    GreenbergGlusker.com

ARNOLD & PORTER, LLP
O'MELVENY & MEYERS LLP
October 11, 2013
Page 3

accessible to HarperCollins and would require a data restore specialist company to be instructed.
The chances of a successful restore on the tapes is unknown and the cost would be high.

     *2.     Please confirm (1) that your statement that the only source for electronic email
predating 2012 is back-up tapes does not apply other ESI, such as loose electronic files saved to,
for example, desktops, shared folders, personal folders, or local drives; and (2) that you are
collecting such loose electronic files for this litigation. Please also confirm whether you are
collecting electronic email postdating January 2012.*

     The backup tapes include email and shared files from servers. Any potentially responsive
ESI stored on individual desktops has been, or is being, collected, including ESI postdating
January 2012.

     *3.     How long is email maintained on active servers for individual's inbox, sent box,
and deleted box? How long are emails maintained on active servers for emails saved to folders
or psts? If an individual wants to maintain access to an email following the time that an email
would normally be available only on a back-up tape, how does one do that? Are emails
available in a form of archive (as opposed to the back-up tapes)?*

     Although the policy is to save all email to the main servers, email stored on individual
desktops is not automatically purged, so will remain unless deleted. Users have a 1 GB mailbox
which when full, they manage by deleting email or storing in an archive PST file. Individuals
can have PST files which are stored in the monthly backed up user drive.

     *4.     How is ESI stored on back-up tapes? For example, are snapshots taken of an
individual's email on regular intervals and if so, what are those intervals? Are the back-up
tapes ever overwritten? If so, for what period(s) of time is ESI that was stored on back-up tapes
no longer available? Have any back-up tapes for the HarperCollins' custodians relevant to this
litigation been restored in prior litigations? Please also explain for us the process of restoring
the back-up tapes, including how many tapes would have to be restored for each custodian, the
time it takes to restore the tapes, and how much it costs to restore each tape.*

     Under the policy implemented two years ago, daily backups are stored on disk for eight
weeks, monthly backups are taken at a point in time every month. The tapes are stored for seven
years. These backups are not known to have been restored before. However, we understand the
restore process is as follows: (a) system is Commvault, HC browses the mailbox or file share and
selects the time period; (b) Commvault then prompts for an index tape and HC requests the tape
number from the opposite site and it is inserted; (c) Commvault then requests the restore tape(s)
and again this is requested to be inserted by the Glasgow office; (d) Commvault then restores
and; (e) time per restore is half a day if stored onsite, to 24-48 hours if stored offsite (i.e. a single
mailbox for a single month), but this can be longer if issues arise such as tape library locks or
Commvault software issues. We are still investigating costs.

**GreenbergGlusker.com**

**EXHIBIT 9**

**78**

ARNOLD & PORTER, LLP
O'MELVENY & MEYERS LLP
October 11, 2013
Page 4


    *5.      Have you performed any sampling to date of contents of any of the back-up tapes
at issue?*

    No.

    *6.      What were Mr. Brawn, Mr. Daley, Ms. Butler, and Mr. Laing's practices when it
comes to email correspondence?  Did they store hard copies or electronic copies of received and
sent mail outside of their email inboxes?  And if so, to what extent are such copies presently
available?*

    David Brawn:  Most Tolkien emails saved in an Outlook sub-folder.  Immaterial day-to-
day emails deleted (although Litigation Hold is in place).  His practice is not to print or keep
hardcopies.  His emails have been, or are being, collected.

    David Daley, Mary Butler and Adrian Laing:  None stored electronically within the
current back-up solution.  These individuals have left the company, but to the best of our
knowledge some hardcopy emails were kept.  Responsive documents have been collected.

    Please provide reciprocal information for all questions applicable to Zaentz and Warner
and their custodians.

    5.    Electronic Information

    Given the detailed explanations above, we do not understand your question.  Please
elaborate.

    6.    Manches Files

    We have written to Manches and requested that they provide us with the status of any
Cathleen Blackburn and Steven Maier Tolkien-related files in their possession.  To date, we have
had no response.

    7.    Privilege Log Stipulation

    We were unable to locate any privilege log stipulations contained in any emails from Mr.
Cestero sent on July 9, 2013, or otherwise.  Are you referring to the stipulation in my letter of the
same date?  Please confirm to which stipulation you are referring.  In addition, please identify the
other privileges to which you would have the stipulation apply so that we may properly consider
your request.

GreenbergGlusker.com

ARNOLD & PORTER, LLP
O'MELVENY & MEYERS LLP
October 11, 2013
Page 5

    8.    F.R. Williamson

It is our current intention not to present Mr. Williamson's testimony in this matter. However, at this time, we cannot represent that we will not do so at a later date. We must reserve all rights with respect to Mr. Williamson's testimony.

Best,

Rachel Valadez

RV/RV

GreenbergGlusker.com

84971-00003/1985580.1

**EXHIBIT 9**
**80**

# EXHIBIT 10

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 12-9912 ABC (SHx) | Date | April 8, 2013 |
|---|---|---|---|
| Title | Fourth Age Limited -vs- Warner Bros Digital Distribution Inc. | | |

Present: The Honorable    **AUDREY B. COLLINS, UNITED STATES DISTRICT JUDGE**

| Angela Bridges | Katherine Stride | N/A |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Bonnie Eskenazi | Martin Glick |
| Elisabeth Moriaty | John Ulin |
| | Victor Jih |

**Proceedings:**         SCHEDULING CONFERENCE

Case called.  Counsel makes appearances.  Scheduling Conference held.  The Court sets the following dates:

Add Claims/Parties Cut-Off: July 8, 2013

Discovery Cut-Off: November 15, 2013 non-expert, December 20, 2013 expert designation and reports , January 31, 2014 rebuttal

Law & Motion Cut-Off: March 14, 2014, opposition March 28, 2014, reply April 4, 2014

Motion Hearing Date: April 21, 2014 at 10:00 a.m.

Final Pre Trial Conference: June 16, 2014 at 10:00 a.m.

Jury Trial: July 1, 2014 at 8:30 a.m.

Counsel are reminded of the requirements of Local Rule 16-15. Court acknowledges parties have agreed upon ADR procedure no. 3, private mediation. Court signs Order/Referral to ADR Pilot Program in open Court.  The ADR proceedings to be completed by no later than March 7, 2014.

### IT IS SO ORDERED.

|  | : | 15 |
|---|---|---|
| Initials of Preparer | AB | |

**EXHIBIT 10**
**81**

# EXHIBIT 11

1  BONNIE E. ESKENAZI (SBN 119401)
   BEskenazi@ggfirm.com
2  ELISABETH A. MORIARTY (SBN 156569)
   EMoriarty@ggfirm.com
3  RICARDO P. CESTERO (SBN 203230)
   RCestero@ggfirm.com
4  GREENBERG GLUSKER FIELDS CLAMAN &
   MACHTINGER LLP
5  1900 Avenue of the Stars, 21st Floor
   Los Angeles, California 90067-4590
6  Telephone: 310.553.3610
   Fax: 310.553.0687
7                          NOTE: CHANGES MADE BY THE COURT

   Attorneys for Plaintiffs
8
                    UNITED STATES DISTRICT COURT
9
                  CENTRAL DISTRICT OF CALIFORNIA
10

| | |
|---|---|
| 11  FOURTH AGE LIMITED, a United Kingdom corporation; PRISCILLA MARY ANNE REUEL TOLKIEN, as TRUSTEE OF THE TOLKIEN TRUST, a United Kingdom Charitable Trust; THE J.R.R. TOLKIEN ESTATE LIMITED, a United Kingdom corporation; HARPERCOLLINS PUBLISHERS, LTD., a United Kingdom corporation; UNWIN HYMAN LTD., a United Kingdom corporation; and GEORGE ALLEN & UNWIN (PUBLISHERS) LTD., a United Kingdom corporation, | Case No. CV 12-09912 ABC (SHx)  *Hon. Audrey B. Collins*  **[PROPOSED] ORDER ON STIPULATION TO: (1) VACATE SCHEDULING ORDER AND STAY TRIAL PENDING APPEAL; AND (2) ALLOW DISCOVERY TO PROCEED PENDING APPEAL** |
| Plaintiffs, | |
| v. | |
| WARNER BROS. DIGITAL DISTRIBUTION INC., a division of WARNER BROS. HOME ENTERTAINMENT INC., a Delaware corporation; WARNER BROS. ENTERTAINMENT INC., a Delaware corporation, as successor-in-interest to New Line Cinema Corp.; WARNER BROS. CONSUMER PRODUCTS INC., a Delaware corporation; WARNER BROS. INTERACTIVE ENTERTAINMENT INC., a division of WARNER BROS. HOME ENTERTAINMENT INC.; NEW LINE PRODUCTIONS, INC., a California corporation; THE SAUL ZAENTZ COMPANY d/b/a Middle-earth Enterprises, a Delaware corporation; and DOES 1-10, inclusive, | [Stipulation To: (1) Vacate Scheduling Order and Stay Trial Pending Appeal; and (2) Allow Discovery to Proceed Pending Appeal filed concurrently herewith] |
| Defendants. | |
| AND RELATED COUNTERCLAIMS. | |

NOTE: CHANGES MADE BY THE COURT

84971-00003/1969859.2                    [PROPOSED] ORDER RE STIPULATION

**EXHIBIT 11**

**82**

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1    The Court, having considered the Stipulation to (1) Vacate Scheduling Order

2    and Stay Trial Pending Appeal; and (2) Allow Discovery to Proceed Pending

3    Appeal entered into by and between Plaintiffs and Counterclaim Defendants Fourth

4    Age Limited, Priscilla Mary Anne Reuel Tolkien, as Trustee of the Tolkien Trust,

5    The J.R.R. Tolkien Estate Ltd., Harper Collins Publishers, Ltd., Unwin Hyman Ltd.

6    and George Allen & Unwin (Publishers), Ltd. (collectively, the "Tolkien/HC

7    Parties") and Defendants and Counterclaim Plaintiffs Warner Bros. Home

8    Entertainment Inc., Warner Bros. Entertainment Inc., Warner Bros. Consumer

9    Products Inc. and New Line Productions, Inc. (collectively, the "Warner Parties")

10   and The Saul Zaentz Company ("Zaentz"), and good cause appearing therefore,

11   hereby ORDERS as follows:

12       1.    The Scheduling Order issued on April 8, 2013, including all discovery

13   and motion cutoff dates, the Final Pretrial Conference Date and the Trial Date, is

14   hereby VACATED;

15       2.    Trial and all litigation on the merits of the parties' claims (including

16   Motions for Summary Judgment, Motions in Limine, Motions for Preliminary

17   Injunctions, and the like) are hereby stayed until August 26, 2014 (the "Stay

18   Period");

19       3.    The parties reserve all rights with respect to whether any or all of the

20   claims in the case should remain stayed after the Stay Period expires and shall meet

21   and confer in good faith to determine whether an extension of the Stay Period is

22   appropriate.  For clarity, this Order shall create no presumptions one way or the

23   other regarding whether any matters shall be stayed following the expiration of the

24   Stay Period;

25       **4.**    The Court sets a status conference for **Monday, September 8, 2014 at**

26   **10:00 a.m.** to consider the status of the appeal; **Joint status report to be filed by**

27   **Tuesday, September 2, 2014.**

28       5.    The parties are permitted to proceed with percipient discovery,

1  whether by deposition, written discovery or otherwise, on all claims and causes of

2  action, and all such percipient discovery must be completed no later than April 15,

3  2014;

4          6.      The Court retains jurisdiction to adjudicate any discovery disputes that

5  arise during the Stay Period, including ruling on Motions to Compel and/or

6  Motions for Protective Orders as necessary; and

7          7.      Following the conclusion of percipient discovery, the parties shall

8  meet and confer in good faith regarding proceeding with expert discovery at that

9  time.

10         IT IS SO ORDERED.

11

12

13  Dated: August 28, 2013
                                        Honorable Audrey B. Collins
14                                      United States District Court Judge

15                                      Respectfully submitted,

16  DATED: August 27, 2013             GREENBERG GLUSKER FIELDS
                                        CLAMAN & MACHTINGER LLP
17

18                                      By: /s/ Bonnie E. Eskenazi
                                            BONNIE E. ESKENAZI (SBN 119401)
19                                          Attorneys for Plaintiffs

20

21  DATED: August 27, 2013             O'MELVENY & MYERS LLP

22

23                                      By: /s/ Victor Jih
                                            VICTOR JIH (SBN 186515)
24  DATED: August 27, 2013             ARNOLD & PORTER LLP

25

26                                      By: /s/ John C. Ulin
                                            JOHN C. ULIN (SBN 165524)
27

28

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

84971-00003/1969859.2                    2              [PROPOSED] ORDER RE STIPULATION

**EXHIBIT 11**

**84**