1  BONNIE E. ESKENAZI (SBN 119401)
   BEskenazi@ggfirm.com
2  ELISABETH A. MORIARTY (SBN 156569)
   EMoriarty@ggfirm.com
3  RICARDO P. CESTERO (SBN 203230)
   RCestero@ggfirm.com
4  GREENBERG GLUSKER FIELDS CLAMAN &
   MACHTINGER LLP
5  1900 Avenue of the Stars, 21st Floor
   Los Angeles, California 90067-4590
6  Telephone: 310.553.3610
   Fax: 310.553.0687
7
   Attorneys for Plaintiffs
8

9              **UNITED STATES DISTRICT COURT**

10             **CENTRAL DISTRICT OF CALIFORNIA**

11

| | |
|---|---|
| FOURTH AGE LTD., *et al*, | Case No. 12-9912-ABC (SHx) |
| Plaintiffs, | **DISCOVERY MATTER** |
| v. | **DECLARATION OF JULIA R. HAYE IN SUPPORT OF JOINT STIPULATION REGARDING WARNER'S MOTION TO COMPEL ADDITIONAL DEPOSITIONS** |
| WARNER BROS. DIGITAL DISTRIBUTION, *et al*, | |
| Defendants. | JOINT STIPULATION FILED CONCURRENTLY HEREWITH |
| | **Judge**: Hon. Audrey B. Collins |
| | **Magistrate**: Hon. Stephen J. Hillman |
| WARNER BROS. DIGITAL DISTRIBUTION INC., *et al*, | |
| Counterclaim Plaintiffs, | **Hearing Date**: March 17, 2014 |
| | **Hearing Time**: 2:00 p.m. |
| v. | **Discovery Cut-Off**: April 15, 2014 |
| FOURTH AGE LTD., *et al*, | **PUBLIC VERSION - REDACTED** |
| Counterclaim Defendants. | **[CONFIDENTIAL VERSION FILED PROVISIONALLY UNDER SEAL]** |

(sidebar, left margin, rotated:)
GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

HAYE DECL. ISO JOINT SIPUTATION RE
WARNER'S MOTION TO COMPEL
DEPOSITIONS

## DECLARATION OF JULIA R. HAYE

I, Julia R. Haye, declare:

1.      I am an attorney duly licensed to practice in all of the courts of the State of California and I am a Partner of Greenberg Glusker Fields Claman & Machtinger LLP, attorneys of record for Fourth Age Limited, Priscilla Mary Anne Reuel Tolkien, as Trustee of the Tolkien Trust, the J.R.R. Tolkien Estate Limited, Harper Collins Publishers, Ltd., Unwin Hyman, Ltd. and George Allen & Unwin (Publishers), Ltd. (the "Tolkien/HC Parties") herein.  The facts set forth herein are of my own personal knowledge and if sworn I could and would testify competently thereto under oath.

2.      Attached hereto as Exhibit "A" is a true and correct copy of those portions of the transcript of Cathleen Blackburn's deposition taken in this action on December 10, 2013 (the "Blackburn Deposition"), which were not designated confidential.

3.      Attached hereto as Exhibit "B" is a true and correct copy of those portions of the transcript of the Blackburn Deposition which were designated confidential.

4.      Attached hereto as Exhibit "C" is a true and correct copy of those portions of the transcript of Steven Maier's deposition taken in this action on December 13, 2013 (the "Maier Deposition"), which were not designated confidential.

5.      Attached hereto as Exhibit "D" is a true and correct copy of those portions of the transcript of the Maier Deposition which were designated confidential.

6.      Throughout the course of this action, Warner and Zaentz have asserted a joint defense/common interest privilege with respect to their communications concerning this action, and have redacted communications between them regarding

GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1   this lawsuit.  In addition, Warner and Zaentz have taken joint positions with respect

2   to discovery issues in this action.

3        7.        On the morning of January 30, 2014, I sent John C. Ulin and Molly M.

4   Lens, Zaentz's and Warner's counsel respectively, a meet and confer letter

5   addressing, among other things, Warner's request for additional time to depose Mr.

6   Maier and Ms. Blackburn.  In my January 30th letter, solely as a matter of

7   compromise, plaintiffs offered to produce Ms. Blackburn for an additional half day

8   of deposition, provided that defendants forego any further time with Mr. Maier.  A

9   true and correct copy of my January 30th letter is attached hereto as Exhibit "E."

10        8.        Thereafter, on the afternoon of January 30th, I participated in a

11   telephonic meet and confer conference with counsel for Zaentz, Warner and several

12   other Greenberg Glusker lawyers to discuss the issues outlined in my January 30th

13   letter, including, without limitation, Warner's request for additional time to depose

14   Mr. Maier and Ms. Blackburn.  During that call, Warner and Zaentz refused to

15   accept plaintiffs' compromise offer of an additional half day of deposition with Ms.

16   Blackburn, provided that defendants forego any further time with Mr. Maier, and

17   instead insisted on an additional full day with each.

18        9.        Attached hereto as Exhibit "F" is a true and correct copy of an email,

19   dated October 1, 2013, from Ms. Lens, counsel for Warner, to my colleague,

20   Ricardo P. Cestero.

21        10.       Attached hereto as Exhibit "G" is a true and correct copy of an email,

22   dated July 29, 2013, from Ms. Lens to Mr. Cestero.

23        11.       On February 18, 2014, my colleague, JoAnna Blythe, ran a search for

24   the following names across Warner's and Zaentz's document productions: "Battle,"

25   "Bendich," "Magnani," and "Zinkin."  The search returned 4,636 documents for

26   "Battle"; 2,300 documents for "Bendich"; 1,846 documents for "Magnani"; and

27   582 documents for "Zinkin."

28

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

HAYE DECL. ISO JOINT SIPUTATION RE
WARNER'S MOTION TO COMPEL
DEPOSITIONS

1    12.    Attached hereto as Exhibit "H" is a true and correct copy of the

2    Tolkien/HC Parties' Initial Disclosures, dated March 28, 2013.

3    13.    Attached hereto as Exhibit "I" is a true and correct copy of Warner's

4    Initial Disclosures, dated March 28, 2013.

5    14.    Attached hereto as Exhibit "J" is a true and correct copy of Zaentz's

6    Initial Disclosures, dated March 28, 2013.

7

8

9    I declare under penalty of perjury under the laws of the United States of

10   America that the foregoing is true and correct.

11

12   Executed this 18th day of February, 2014 at Los Angeles, California.

13

14                          /s/ Julia R. Haye
                                                                        
15                                Julia R. Haye

16

17

18

19

20

21

22

23

24

25

26

27

28

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

HAYE DECL. ISO JOINT SIPUTATION RE
WARNER'S MOTION TO COMPEL
DEPOSITIONS

EXHIBIT A

```
 1              UNITED STATES DISTRICT COURT
 2              CENTRAL DISTRICT OF CALIFORNIA
 3
 4   FOURTH AGE LTD., et al.,      )
 5              Plaintiffs,        ) Case No. 12-9912-ABC (SHx)
 6         vs.                     )
 7   WARNER BROS. DIGITAL          )
     DISTRIBUTION, et al.,         )
 8              Defendants.        )
     _____)
 9   WARNER BROS. DIGITAL          )
     DISTRUBUTION INC., et al.,    )
10              Counterclaim       )
                Plaintiffs,        )
11         vs.                     )
12   FOURTH AGE LTD., et al.,      )
13              Counterclaim       )
14              Defendants.        )
     _____)
15
16      VIDEOTAPED DEPOSITION OF CATHLEEN BLACKBURN
17              Los Angeles, California
18            Tuesday, December 10, 2013
19
20
21
     Reported by:  SHANDA GABRIEL, CSR No. 10094
22   Job No. 1779924
23   PAGES 1-376
24   CONFIDENTIAL PAGES BOUND UNDER SEPARATE COVER:
25   36-39; 194-201; 218-220; 234-235; 356-359
```

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2             CENTRAL DISTRICT OF CALIFORNIA
 3
 4   FOURTH AGE LTD., et al.,      )
 5              Plaintiffs,        ) Case No. 12-9912-ABC (SHx)
 6         vs.                     )
 7   WARNER BROS. DIGITAL          )
     DISTRIBUTION, et al.,         )
 8              Defendants.        )
     _____  )
 9   WARNER BROS. DIGITAL          )
     DISTRUBUTION INC., et al.,    )
10              Counterclaim       )
                Plaintiffs,        )
11         vs.                     )
12   FOURTH AGE LTD., et al.,      )
13              Counterclaim       )
14              Defendants.        )
     _____  )
15
16
17
18
19         Videotaped deposition of CATHLEEN
20   BLACKBURN, taken on behalf of the Defendants and
21   Counterclaim Plaintiffs at 1999 Avenue of the Stars,
22   Los Angeles, California, commencing at 9:04 a.m.,
23   Tuesday, December 10, 2013, before SHANDA GABRIEL,
24   CSR No. 10094.
25
```

Page 2

```
 1   APPEARANCES:

 2

 3   FOR THE PLAINTIFFS AND COUNTERCLAIM DEFENDANTS:

 4        GREENBERG GLUSKER

 5        BY:  BONNIE E. ESKENAZI, ESQ.

 6             ELISABETH A. MORIARTY, ESQ.

 7        1900 Avenue of the Stars, 21st Floor

 8        Los Angeles, California  90067

 9        (310) 553-3610

10        beskenazi@greenbergglusker.com

11        emoriarty@greenbergglusker.com

12

13   FOR THE DEFENDANTS AND COUNTERCLAIM PLAINTIFFS

14   WARNER BROS. HOME ENTERTAINMENT, INC., WARNER BROS.

15   ENTERTAINMENT, INC., WARNER BROS. CONSUMER PRODUCTS,

16   INC., and NEW LINE PRODUCTIONS, INC.:

17        O'MELVENY & MYERS

18        BY:  DANIEL PETROCELLI, ESQ.

19             MOLLY LENS, ESQ.

20        1999 Avenue of the Stars, 7th Floor

21        Los Angeles, California  90067

22        (310) 553-6700

23        dpetrocelli@omm.com

24        mlens@omm.com

25
```

Page  3

```
 1    APPEARANCES (CONTINUED):

 2

 3    FOR THE DEFENDANT AND COUNTERCLAIM PLAINTIFF

 4    THE SAUL ZAENTZ COMPANY:

 5         ARNOLD & PORTER LLP

 6         BY:  JOHN C. ULIN, ESQ.

 7              LAUREN S. MIYAMOTO, ESQ.

 8         777 South Figueroa Street, 44th Floor

 9         Los Angeles, California  90017-5844

10         (213) 243-4000

11         John.Ulin@aporter.com

12         Lauren.Miyamoto@aporter.com

13                   - and -

14         ARNOLD & PORTER LLP

15         BY:  MARTIN R. GLICK, ESQ.

16         Three Embarcadero Center, 7th Floor

17         San Francisco, California  94111-4024

18         (415) 471-3153

19         marty.glick@aporter.com

20

21

22    ALSO PRESENT:

23         ROBYN MARTIN

24         JILL WARREN, VIDEOGRAPHER

25
```

                                        Page  4

```
 1                          I N D E X

 2

 3    WITNESS                 EXAMINATION              PAGE

 4    CATHLEEN BLACKBURN      BY MR. ULIN                13

 5                            BY MR. PETROCELLI        193

 6

 7                     E X H I B I T S

 8    NO.                  DESCRIPTION                 PAGE

 9    Exhibit 1    Cathleen Blackburn's Curriculum      20

10                 Vitae

11    Exhibit 2    Letter dated 13 July 1992 to         40

12                 Laurie Battle from Cathleen

13                 Blackburn; 19 June 1992 letter

14                 to Mary from Cathleen Blackburn,

15                 Bates stamped SZC0049931 through

16                 33

17    Exhibit 3    Letter dated 23 July 1993 to         45

18                 Laurie Battle from Cathleen

19                 Blackburn Bates stamped

20                 PLAINTIFFS015595 through 96

21    Exhibit 4    Table Bates stamped SZC0048135       47

22                 through 38

23

24

25

                                           Page  5
```

```
1              I N D E X (CONTINUED)

2

3                  E X H I B I T S

4    NO.              DESCRIPTION              PAGE

5    Exhibit 5    Letter dated 2 November 1993 to    51

6                 Albert M. Bendich from Cathleen

7                 Blackburn Bates stamped

8                 PLAINTIFFS029253 through 56

9    Exhibit 6    Letter dated May 16, 1996 to       66

10                Adrian C. Laing from Malcolm

11                Burnstein Bates stamped

12                PLAINTIFFS007448 through 49

13   Exhibit 7    Letter dated 18 July 1996 to       75

14                Malcolm Burnstein from Adrian

15                Laing Bates stamped

16                PLAINTIFFS014248 through 51

17   Exhibit 8    Letter dated October 2, 1997 to    82

18                Cathleen Blackburn from Al

19                Bendich Bates stamped

20                PLAINTIFFS009344

21   Exhibit 9    Letter dated November 12, 1998     86

22                to Cathleen Blackburn from

23                Laurie Battle, with enclosure,

24                Bates stamped SZC0033357 through

25                73
```

Page 6

```
 1                 I N D E X (CONTINUED)

 2

 3                     E X H I B I T S

 4   NO.               DESCRIPTION              PAGE

 5   Exhibit 10    Fax dated 16 November, 1998 to      93

 6                 Laurie Battle from Cathleen

 7                 Blackburn Bates stamped

 8                 PLAINTIFFS007822 through 23

 9   Exhibit 11    Fax dated 4 August, 2000 to Al      100

10                 Bendich from Cathleen Blackburn

11                 Bates stamped PLAINTIFFS029279

12                 through 80

13   Exhibit 12    Document entitled "Tolkien          107

14                 Enterprises Active Merchandise

15                 Licensees List as of 4/26/01"

16                 Bates stamped PLAINTIFFS009396

17                 through 97

18   Exhibit 13    E-mail string Bates stamped         120

19                 PLAINTIFFS011156 through 59

20   Exhibit 14    Fax dated 23 March, 1999 to A.M.    134

21                 Bendich from Cathleen Blackburn

22                 with enclosures Bates stamped

23                 SZC0037735 through 40

24

25

                                            Page  7
```

```
 1                I N D E X  (CONTINUED)

 2

 3                    E X H I B I T S

 4    NO.                DESCRIPTION                 PAGE

 5    Exhibit 15    Fax dated 3 August, 2000 to Al     142

 6                  Bendich from Cathleen Blackburn,

 7                  with enclosures, Bates stamped

 8                  SZC0001926 through 28

 9    Exhibit 16    E-mail string Bates stamped        146

10                  PLAINTIFFS011044 through 48

11    Exhibit 17    Affidavit by Frank Richard         155

12                  Williamson Bates stamped

13                  PLAINTIFFS007324 through 25

14    Exhibit 17-A  Affidavit by Frank Richard         157

15                  Williamson Bates stamped

16                  SZC0001804

17    Exhibit 18    Document dated July 31, 1978       162

18                  signed by Rayner S. Unwin, F.R.

19                  Williamson and Christopher Reuel

20                  Tolkien, Bates stamped

21                  PLAINTIFFS001410 through 17

22    Exhibit 19    E-mail string Bates stamped        169

23                  SZC0049234 through 35

24

25

                                                Page  8
```

```
1                  I N D E X (CONTINUED)

2

3                      E X H I B I T S

4    NO.                 DESCRIPTION                PAGE

5    Exhibit 20   Letter dated 3 May, 2002 to A.M.   179

6                 Bendich from Cathleen Blackburn,

7                 with enclosures, Bates stamped

8                 SZC0033255 through 70

9    Exhibit 21   Article dated 11/16/2003           334

10                entitled "Lord of the Gold Ring"

11   Exhibit 22   Le Monde article entitled "My      346

12                Father's Eviscerated Work: Son

13                of Hobbit Scribe J.R.R. Tolkien

14                Finally Speaks Out"

15

16

17

18

19

20

21

22

23

24

25

                                          Page  9
```

Veritext National Deposition & Litigation Services
866 299-5127

```
1              I N D E X (CONTINUED)
2
3            UNANSWERED QUESTIONS
4              PAGE             LINE
5                72               17
                 80                5
6               159               19
                163               21
7               177               15
                189               15
8               202                1
                250                5
9               250               11
                252                5
10              252               16
                253               12
11              280                7
                282               23
12              325               22
                342                2
13              343               14
                344               24
14              352               10
                353               10
15              362                3
                362               13
16              362               23
17
18
19
20
21
22
23
24
25

                               Page 10
```

```
 1                    Los Angeles, California

 2                 Tuesday, December 10, 2013

 3                    9:04 a.m.                          08:21:48

 4                                                       09:04:29

 5          THE VIDEOGRAPHER:  Good morning.  We are on  09:04:29

 6     the record at 9:05 a.m. on December 10, 2013.  This  09:04:31

 7     is the video recorded deposition of Cathleen       09:04:35

 8     Blackburn.                                          09:04:39

 9          My name is Jill Warren, here with our court   09:04:40

10     reporter, Shanda Gabriel.  We are here from Veritext  09:04:43

11     Legal Solutions.  This deposition is being held at  09:04:48

12     1999 Avenue of the Stars in Los Angeles, California.  09:04:50

13          The caption of this case is Fourth Age        09:04:55

14     Limited, et al., versus Warner Bros. Digital, et    09:05:00

15     al., and related counterclaim.  Case number        09:05:02

16     12-9912-ABC (SHx), pending in the United States     09:05:11

17     District Court, Central District of California.     09:05:13

18          Please note that audio and video recording    09:05:16

19     will take place unless all parties agree to go off  09:05:18

20     the record.  Microphones are sensitive and may pick  09:05:21

21     up whispers, private conversations and cellular     09:05:24

22     interference.                                        09:05:27

23          I am not related to any party in this         09:05:27

24     action, nor am I financially interested in the     09:05:30

25     outcome in any way.                                 09:05:32

                                              Page 11
```

```
 1              At this time, will counsel and all present    09:05:34

 2    please identify themselves for the record.             09:05:38

 3              MR. ULIN:  My name is John Ulin from Arnold   09:05:41

 4    & Porter for the Saul Zaentz Company.                  09:05:44

 5              MR. GLICK:  Marty Glick from Arnold &         09:05:46

 6    Porter for the Saul Zaentz Company.                    09:05:48

 7              MS. MIYAMOTO:  Lauren -- Lauren Miyamoto      09:05:51

 8    with Arnold & Porter for the Saul Zaentz Company.      09:05:51

 9              MR. PETROCELLI:  Daniel Petrocelli for the    09:05:55

10    Warner parties.                                        09:05:55

11              MS. LENS:  Molly Lens for the Warner          09:05:57

12    parties.                                               09:05:58

13              MS. MARTIN:  Robyn Martin from New Line       09:05:59

14    Cinema.                                                09:06:01

15              MS. MORIARTY:  Elisabeth Moriarty,            09:06:01

16    Greenberg Glusker on behalf of plaintiffs and the      09:06:02

17    witness.                                               09:06:03

18              MS. ESKENAZI:  Bonnie Eskenazi from           09:06:04

19    Greenberg Glusker on behalf of plaintiffs and the      09:06:06

20    witness.                                               09:06:07

21              THE WITNESS:  Cathleen Blackburn.             09:06:09

22              THE VIDEOGRAPHER:  Thank you.                 09:06:11

23              The witness will be sworn in and counsel      09:06:13

24    may begin the examination.                             09:06:15

25    ///
```

Page 12

```
 1                    CATHLEEN BLACKBURN,

 2            having been first duly sworn, was

 3            examined and testified as follows:

 4

 5                    EXAMINATION

 6    BY MR. ULIN:

 7        Q.  Good morning, Ms. Blackburn.              09:06:25

 8        A.  Good morning.                             09:06:27

 9        Q.  My name is John Ulin.  We met earlier.  I'm  09:06:27

10    counsel for Saul Zaentz Company.                 09:06:32

11            Do you understand that?                  09:06:34

12        A.  I do.                                     09:06:34

13        Q.  And Mr. Marty Glick is with me representing  09:06:35

14    Saul Zaentz this morning.                        09:06:39

15        A.  Thank you.                                09:06:40

16        Q.  We will examine you for several hours today  09:06:40

17    and you will also be examined by Mr. Petrocelli from  09:06:42

18    O'Melveny & Myers for the Warner Bros. parties.  09:06:45

19            Do you understand that?                  09:06:49

20        A.  I do.                                     09:06:49

21        Q.  You understand that you're under oath today  09:06:50

22    to tell the truth as you would be if you were    09:06:51

23    testifying in a court of law?                    09:06:53

24        A.  Yes, I do.                                09:06:54

25        Q.  And you've done a pretty good job with it  09:06:55
```

Page 13

| | | |
|---|---|---|
| 1 | so far.  When I ask you questions, you're going to | 09:07:00 |
| 2 | need to answer my questions verbally, as opposed to | 09:07:02 |
| 3 | with a nod or an answer like "uh-huh," and that's | 09:07:05 |
| 4 | for the sake of the reporter who needs to transcribe | 09:07:07 |
| 5 | everything we say today. | 09:07:09 |
| 6 | Do you understand that? | 09:07:10 |
| 7 | A.  I do. | 09:07:11 |
| 8 | Q.  We also need to -- and we've done a good | 09:07:11 |
| 9 | job with this so far -- avoid talking over one | 09:07:14 |
| 10 | another, again, so that the reporter can take down | 09:07:16 |
| 11 | everything that's said. | 09:07:19 |
| 12 | Do you understand that? | 09:07:20 |
| 13 | A.  Yes, I do. | 09:07:20 |
| 14 | Q.  You're represented by counsel this morning? | 09:07:21 |
| 15 | A.  Yes, I am. | 09:07:23 |
| 16 | Q.  And that's Ms. Eskenazi? | 09:07:24 |
| 17 | A.  That's correct. | 09:07:25 |
| 18 | Q.  And Ms. Moriarty? | 09:07:26 |
| 19 | A.  Yes. | 09:07:27 |
| 20 | Q.  I want to go over briefly some ground rules | 09:07:31 |
| 21 | so that we under- -- both understand how the | 09:07:35 |
| 22 | procedure will go on today. | 09:07:36 |
| 23 | A.  Thank you. | 09:07:37 |
| 24 | Q.  It's a question-and-answer period. | 09:07:38 |
| 25 | Generally speaking, I ask questions and you answer. | 09:07:40 |

Page 14

```
 1              Do you understand that?                    09:07:42

 2       A.  Yes.                                          09:07:43

 3       Q.  Okay.  From time to time your counsel may     09:07:44

 4   object to the form of a question that I ask.  Unless  09:07:47

 5   your counsel instructs you not to answer the          09:07:51

 6   question, even if she objects, typically you should   09:07:53

 7   still answer the question.                            09:07:56

 8              Do you understand that?                    09:07:57

 9       A.  Yes, I do.                                    09:07:58

10       Q.  If you don't understand one of my             09:07:58

11   questions, or you don't hear what I've said           09:08:03

12   completely, you can ask for the que- -- for me to     09:08:07

13   repeat the question or for the question to be read    09:08:09

14   back from the reporter so that you understand what's  09:08:10

15   being asked.                                          09:08:14

16              Do you understand that?                    09:08:14

17       A.  Yes.                                          09:08:14

18       Q.  And if you don't ask for clarification or     09:08:17

19   for the question to be read back, I'm going to        09:08:20

20   understand that you understood the question and are   09:08:22

21   answering the question I asked.                       09:08:24

22              Do you understand?                         09:08:25

23       A.  Yes, I do.                                    09:08:25

24       Q.  We can take a break at any time you like.     09:08:26

25   You just need to let us know.                         09:08:28
```

                                                          Page 15

```
 1              Do you understand that?                09:08:30

 2        A.   Yes, I do.                              09:08:31

 3        Q.   Okay.  And some period of time, typically  09:08:33

 4   in the range of ten days to two weeks or so after    09:08:35

 5   this deposition is concluded, you will receive a     09:08:40

 6   booklet that contains the transcription of           09:08:43

 7   everything that's been said today.  And you will     09:08:45

 8   have an opportunity to review the testimony and make  09:08:47

 9   any corrections that you think are necessary.        09:08:50

10              Do you understand that?                09:08:52

11        A.   I do.                                    09:08:52

12        Q.   Okay.  If you correct the transcript, I and  09:08:54

13   any other counsel will have the opportunity to       09:08:57

14   comment on how those corrections may bear on your    09:09:00

15   credibility, whether your testimony should be        09:09:04

16   believed.                                           09:09:06

17              Do you understand that?                09:09:06

18        A.   I do.                                    09:09:06

19        Q.   So it behooves you to give your best and  09:09:07

20   most complete testimony here today.                  09:09:09

21              Do you understand that?                09:09:11

22        A.   I do.                                    09:09:11

23        Q.   Have you ever given testimony in court    09:09:11

24   before?                                             09:09:16

25        A.   No, I haven't.                           09:09:16
```

                                              Page 16

| | | |
|---|---|---|
| 1 | Q.  Have you ever given testimony at a | 09:09:18 |
| 2 | deposition before? | 09:09:19 |
| 3 | A.  No. | 09:09:20 |
| 4 | Q.  Is there any reason why you cannot give | 09:09:24 |
| 5 | your best and most complete testimony here today? | 09:09:27 |
| 6 | A.  No. | 09:09:29 |
| 7 | Q.  Are you suffering any illness? | 09:09:32 |
| 8 | A.  No. | 09:09:33 |
| 9 | Q.  Have you drunk any alcohol within the last | 09:09:34 |
| 10 | 24 hours? | 09:09:36 |
| 11 | A.  Yes. | 09:09:36 |
| 12 | Q.  Is that affecting your ability to testify | 09:09:37 |
| 13 | or to remember this morning? | 09:09:39 |
| 14 | A.  No. | 09:09:40 |
| 15 | Q.  Okay.  Are you taking any drugs or | 09:09:42 |
| 16 | prescription medications that would impair your | 09:09:44 |
| 17 | memory or your ability to testify? | 09:09:46 |
| 18 | A.  No. | 09:09:47 |
| 19 | Q.  What have you done to prepare for this | 09:09:51 |
| 20 | deposition? | 09:09:52 |
| 21 | A.  I met with counsel, Ms. Eskenazi and | 09:09:53 |
| 22 | Ms. Moriarty of Greenberg Glusker to understand the | 09:09:56 |
| 23 | deposition procedure and the sorts of questions | 09:10:00 |
| 24 | which might arise. | 09:10:04 |
| 25 | Q.  And on how many occasions did you meet with | 09:10:05 |

Page 17

```
 1    Ms. Moriarty and Ms. Eskenazi?                    09:10:07

 2        A.  Four occasions.                           09:10:10

 3        Q.  And when were those?                      09:10:13

 4        A.  I met with them for -- on Thursday, Friday,  09:10:15

 5    Saturday, and yesterday.                          09:10:21

 6        Q.  And how long was the Thursday session?    09:10:32

 7        A.  Three or four hours.                      09:10:33

 8        Q.  And how long was the Friday session?      09:10:36

 9        A.  About the same.                           09:10:40

10        Q.  How about Saturday?                       09:10:41

11        A.  Two or three hours.                       09:10:42

12        Q.  And what about the session yesterday?     09:10:44

13        A.  Four to five hours.                       09:10:46

14        Q.  Did you review documents with your counsel  09:10:48

15    in the course of your meetings to prepare for the   09:10:57

16    deposition today?                                09:10:59

17        A.  Yes.                                      09:10:59

18        Q.  And did those documents refresh your      09:11:12

19    recollection on the subjects that counsel         09:11:14

20    anticipated being asked about?                    09:11:18

21        MS. ESKENAZI:  Objection.  Vague and          09:11:22

22    ambiguous.                                        09:11:23

23        You can answer.                               09:11:24

24        THE WITNESS:  Some of the documents I         09:11:25

25    reviewed refreshed my general rec- -- recollection  09:11:30
```

Page 18

| | | |
|---|---|---|
| 1 | of certain aspects of the history of the Tolkien | 09:11:34 |
| 2 | Estate's relationships with the Saul Zaentz Company | 09:11:38 |
| 3 | and also New Line Cinema/Warner Bros. | 09:11:40 |
| 4 | BY MR. ULIN: | 09:11:40 |
| 5 | Q.  Do you know whether the documents that you | 09:11:51 |
| 6 | reviewed with counsel have been produced in | 09:11:52 |
| 7 | discovery in this case? | 09:11:54 |
| 8 | A.  Some of they -- they often had numbers in | 09:11:55 |
| 9 | the bottom right-hand corner.  I think that | 09:12:00 |
| 10 | signifies production. | 09:12:02 |
| 11 | Q.  Are you aware of any documents that you | 09:12:04 |
| 12 | reviewed with counsel that have not been produced in | 09:12:05 |
| 13 | discovery in this case? | 09:12:08 |
| 14 | MS. ESKENAZI:  Objection.  Attorney-client | 09:12:10 |
| 15 | privilege. | 09:12:11 |
| 16 | If you can answer that question without | 09:12:15 |
| 17 | revealing any privilege. | 09:12:17 |
| 18 | THE WITNESS:  Could you repeat that | 09:12:20 |
| 19 | question, please? | 09:12:21 |
| 20 | BY MR. ULIN: | 09:12:21 |
| 21 | Q.  Yes. | 09:12:23 |
| 22 | Are you aware of any documents that you | 09:12:24 |
| 23 | reviewed with counsel that have not been produced in | 09:12:25 |
| 24 | discovery in this case? | 09:12:27 |
| 25 | A.  I think I can answer it this way:  I | 09:12:27 |

Page 19

| 1 | think -- I think I did also review privileged | 09:12:33 |
| 2 | documents. | 09:12:35 |
| 3 | Q.  Okay.  And did any of those privileged | 09:12:40 |
| 4 | documents refresh your recollection? | 09:12:51 |
| 5 | A.  In a general sense. | 09:12:53 |
| 6 | Q.  I want to ask a few questions about your | 09:12:57 |
| 7 | background. | 09:13:13 |
| 8 | Let's mark Exhibit 1 to the deposition. | 09:13:17 |
| 9 | (The document referred to was | 09:13:34 |
| 10 | marked for identification as | 09:13:34 |
| 11 | Exhibit 1 and attached to this | 09:13:34 |
| 12 | deposition.) | 09:13:35 |
| 13 | THE REPORTER:  Do you want the witness to | 09:13:35 |
| 14 | have the marked copy? | 09:13:35 |
| 15 | MR. ULIN:  It doesn't matter. | 09:13:35 |
| 16 | Q.  Ms. Blackburn, have you seen Exhibit 1 | 09:13:36 |
| 17 | before? | 09:13:38 |
| 18 | A.  Yes, I have. | 09:13:38 |
| 19 | Q.  And is this a copy of your curriculum vitae | 09:13:39 |
| 20 | from the Blackburn Maier Web site? | 09:13:41 |
| 21 | A.  Yes.  I've been given two copies, actually. | 09:13:44 |
| 22 | Q.  Thank you. | 09:13:44 |
| 23 | A.  Yes, it is. | 09:13:52 |
| 24 | Q.  And -- | 09:13:52 |
| 25 | A.  Well, it looks like it is. | 09:13:53 |

Page 20

```
 1        Q.  Very good.                              09:13:55

 2            Does this CV accurately reflect your    09:13:55

 3    educational background?                         09:14:00

 4        A.  It's -- there are elements that are not on   09:14:01

 5    there relating to my educational background, for     09:14:08

 6    example, where I went to school before I was at      09:14:11

 7    secondary school and it -- it doesn't actually refer 09:14:13

 8    to my legal training.                           09:14:17

 9        Q.  Okay.  And I'll come back to that.      09:14:21

10            Does this CV accurately refle- -- reflect    09:14:23

11    your professional history?                      09:14:27

12        A.  In -- in broad outline in terms of the  09:14:29

13    firms at which I worked.                        09:14:34

14        Q.  Do you have academic training in law?   09:14:38

15        A.  Yes, I do.                              09:14:42

16        Q.  And where did you study law?            09:14:43

17        A.  I studied at the College of Law in      09:14:45

18    Lancaster Gate in London.                       09:14:47

19        Q.  And do you have a degree from that school?  09:14:49

20        A.  I have -- trying to remember the name of 09:14:51

21    it.  I think it's called a Certificate of       09:14:55

22    Professional Education.  And then I have a --    09:14:59

23    something called the Law Society final examination.  09:15:04

24        Q.  And when did you study at the College of 09:15:08

25    Law in Lancaster Gate?                          09:15:10
```

Page 21

```
 1         A.  For two years.  1982 to 1984.          09:15:12

 2         Q.  Then is it correct that your first job as a  09:15:22

 3  lawyer was at Linklaters?                         09:15:27

 4         A.  Yes, I started as a trainee at Linklaters.  09:15:28

 5         Q.  Okay.  And at Linklaters you were in    09:15:32

 6  commercial litigation; is that correct?          09:15:35

 7         A.  Well, when I was training I was in a number  09:15:37

 8  of different departments, and when I qualified, I  09:15:39

 9  went into the commercial litigation department.  09:15:41

10         Q.  And did your work there involve copyright  09:15:43

11  or trademark litigation matters?                 09:15:45

12         A.  Not until the later stages.  It was mainly  09:15:46

13  capital markets work that we -- we did there.    09:15:51

14         Q.  Did you work on any matters relating to the  09:15:54

15  Tolkien Estate or the works of J.R.R. Tolkien while  09:16:01

16  you were at Linklaters?                          09:16:05

17         A.  No.                                    09:16:07

18         Q.  In 1989 it appears you moved to Morrell  09:16:07

19  Peel & Gamlen; is that correct?                  09:16:12

20         A.  That's correct.                        09:16:12

21         Q.  Okay.  And why did you decide to join   09:16:13

22  Morrell Peel?                                    09:16:15

23         A.  I didn't really enjoy working in a great  09:16:16

24  big city of London firm.  And I found my work was  09:16:20

25  becoming quite lim- -- limited, a limited range of  09:16:24
```

                                                    Page 22

| | | |
|---|---|---|
| 1 | cases and not much client contact. | 09:16:29 |
| 2 | Q.  And at Morrell Peel is it correct that | 09:16:32 |
| 3 | you -- let me start that question again. | 09:16:36 |
| 4 | Is it correct that it was at Morrell Peel | 09:16:37 |
| 5 | that you began working on Tolkien Estate matters? | 09:16:39 |
| 6 | A.  That's correct. | 09:16:42 |
| 7 | Q.  Okay.  When did you first begin working on | 09:16:43 |
| 8 | Tolkien Estate matters? | 09:16:46 |
| 9 | A.  I think in 1990. | 09:16:47 |
| 10 | Q.  And what was the earliest Tolkien Estate | 09:16:48 |
| 11 | matter that you began working on? | 09:16:55 |
| 12 | A.  I can't be precise about this, but in 1990 | 09:16:57 |
| 13 | I worked on -- well, I dealt with aspects of the | 09:17:05 |
| 14 | fact that our then publishers, the Tolkien Estate's | 09:17:11 |
| 15 | then publishers were acquired by HarperCollins. | 09:17:15 |
| 16 | Q.  And at that time were you supporting the | 09:17:19 |
| 17 | work of Richard Williamson? | 09:17:33 |
| 18 | A.  Dick Williamson. | 09:17:35 |
| 19 | Q.  Fair enough. | 09:17:37 |
| 20 | A.  I assisted him, yes. | 09:17:37 |
| 21 | Q.  And is it correct that he was the partner | 09:17:41 |
| 22 | in charge of Tolkien Estate matters at Morrell Peel? | 09:17:42 |
| 23 | A.  That's correct. | 09:17:47 |
| 24 | Q.  Were there other lawyers who worked with | 09:17:47 |
| 25 | you supporting Mr. Williamson? | 09:17:49 |

Page 23

```
 1           MS. ESKENAZI:  Objection.  Vague and        09:17:53

 2    ambiguous.                                          09:17:53

 3           THE WITNESS:  Not really as I -- as I think  09:18:03

 4    about it today.                                     09:18:10

 5    BY MR. ULIN:                                        09:18:10

 6        Q.  And was that -- now just focusing entirely  09:18:11

 7    on the period of time when you worked with          09:18:14

 8    Mr. Williamson at Morrell Peel between 1990 and     09:18:17

 9    1997 --                                             09:18:20

10        A.  Yes.                                        09:18:22

11        Q.  -- were you and he the only two lawyers who 09:18:22

12    worked on Tolkien Estate matters at Morrell Peel    09:18:25

13    during that period?                                 09:18:28

14        A.  I think it would depend on the work, but    09:18:29

15    occasionally other people might -- might assist, but 09:18:31

16    I can't rec- -- I can't recollect any names.        09:18:34

17        Q.  At some point during your tenure at Morrell 09:18:36

18    Peel you became the partner with principal          09:18:46

19    responsibility --                                   09:18:48

20        A.  I did.                                      09:18:48

21        Q.  -- for Tolkien Estate matters?             09:18:49

22        A.  Yes, I did.                                 09:18:50

23        Q.  Okay.  And when was that?                   09:18:51

24        A.  1992.                                       09:18:52

25        Q.  And that was upon the retirement of Dick    09:18:54
```

Page 24

| | | |
|---|---|---|
| 1 | Williamson? | 09:18:56 |
| 2 | A.  Mr. Williamson retired as a partner in | 09:18:56 |
| 3 | 1992, but remained as a consultant to the firm. | 09:19:00 |
| 4 | Q.  How long did he remain as a consultant -- | 09:19:07 |
| 5 | A.  Until 1997. | 09:19:09 |
| 6 | Q.  -- to the firm? | 09:19:10 |
| 7 | MS. ESKENAZI:  I just want to remind the | 09:19:10 |
| 8 | witness to wait until Mr. Ulin has finished his | 09:19:12 |
| 9 | questions before you start answering because there's | 09:19:15 |
| 10 | a little bit of overlap. | 09:19:17 |
| 11 | MR. ULIN:  Thank you. | 09:19:19 |
| 12 | THE WITNESS:  Sorry. | 09:19:20 |
| 13 | BY MR. ULIN: | 09:19:20 |
| 14 | Q.  And during the period between '92 and '97 | 09:19:26 |
| 15 | when Mr. Williamson stayed on as a consultant, did | 09:19:33 |
| 16 | he continue to work on Tolkien Estate matters? | 09:19:37 |
| 17 | A.  Yes, he did. | 09:19:39 |
| 18 | Q.  And continued to work with you on those? | 09:19:40 |
| 19 | A.  Yes. | 09:19:41 |
| 20 | Q.  Okay.  In 1997, you left Morrell Peel for | 09:19:48 |
| 21 | Manches? | 09:19:48 |
| 22 | A.  Well -- | 09:19:48 |
| 23 | Q.  Please. | 09:19:57 |
| 24 | A.  Is that the end of the question? | 09:19:57 |
| 25 | Q.  It can be. | 09:19:58 |

Page 25

```
 1        A.  The firm of Morrell Peel & Gamlen merged    09:20:01

 2   with Manches in 1997.  It was -- it wasn't just me    09:20:03

 3   who left and started at a new place.                  09:20:10

 4        Q.  And did Mr. Williamson continue at Manches   09:20:12

 5   after the merger?                                     09:20:15

 6        A.  No, he didn't.                               09:20:18

 7        Q.  Did he continue to be involved in your work  09:20:18

 8   on Tolkien Estate matters after the Manches merger?   09:20:24

 9        A.  No, he didn't.                               09:20:28

10        Q.  Did you continue to consult with             09:20:29

11   Mr. Williamson on Tolkien Estate matters after the    09:20:31

12   Manches merger?                                       09:20:34

13        A.  No.  Not really.                             09:20:35

14        Q.  So is it fair to say from your testimony     09:20:37

15   that after the -- after 1997 Mr. Williamson was no    09:20:42

16   longer involved in Tolkien Estate matters?            09:20:46

17        A.  That's correct.                              09:20:48

18        Q.  During the period when you were at Manches   09:20:49

19   from 1997 to 2011, were you the partner in charge of  09:21:00

20   Tolkien Estate matters for that entire time?          09:21:04

21        A.  Yes, I was.                                  09:21:06

22        Q.  And who were the lawyers that worked with    09:21:06

23   you on Tolkien Estate matters?                        09:21:08

24        A.  There were -- at intervals I involved two    09:21:16

25   or three assistants.  I remember Edward Humphreys     09:21:26
```

Page 26

```
 1    helped me at one time.  A lawyer called Catherine    09:21:36

 2    Rohll.                                               09:21:45

 3        Q.   Can you spell that?                          09:21:45

 4        A.   Yes, R-o-h-l-l, helped me.                   09:21:45

 5             Was the question directed at the entire     09:21:50

 6    period?                                              09:21:56

 7        Q.   Yes.                                         09:21:57

 8        A.   Right.  And at some point Steven Maier      09:21:57

 9    began to help me with Tolkien matters.               09:22:03

10        Q.   Other than Mr. Humphreys, Ms. Rohll and     09:22:07

11    Mr. Maier, were there other attorneys at Manches who 09:22:10

12    assisted you on Tolkien Estate matters?              09:22:13

13        A.   There may have been an assistant or two who 09:22:16

14    would do the pieces of research for me.  But I don't 09:22:18

15    think they had any client relationship as such.      09:22:23

16    I -- I'm just saying that because I think that may   09:22:27

17    have happened, but I can't remember any specific     09:22:29

18    names.                                               09:22:32

19        Q.   During what time period did Mr. Humphreys   09:22:38

20    help you with Tolkien Estate matters?                09:22:40

21        A.   I don't specifically recall.                09:22:51

22        Q.   What matters did he assist you with?        09:22:52

23        A.   I don't specifically recall.                09:22:56

24        Q.   What about Ms. Rohll?  What matters did she 09:23:05

25    assist you with?                                     09:23:07
```

Page 27

```
1        A.  Again, I couldn't be specific.          09:23:08

2        Q.  Okay.  And I will come back to Mr. Maier.  09:23:10

3            Actually, let me just take that for a    09:23:18

4   moment.                                           09:23:20

5            So when did -- when did Mr. Maier first  09:23:20

6   begin working on Tolkien Estate matters?          09:23:22

7        A.  I'm not sure.  Some- -- sometime --      09:23:24

8   sometime around about The Lord of the Rings films 09:23:32

9   being out there, released.                        09:23:36

10       Q.  Early 2000s?                              09:23:38

11       A.  Probably.                                 09:23:40

12       Q.  And what has -- what matters has Mr. Maier  09:23:47

13  worked on related to the Tolkien Estate?          09:23:49

14       A.  He would mainly look after lit- --       09:23:50

15  disputes, litigation enforcement.  He's -- he's a  09:23:55

16  contentious lawyer.                               09:24:03

17       Q.  Like so many in this room.               09:24:04

18           I realize that takes on a different meaning  09:24:05

19  in the English system.                            09:24:08

20       A.  It is different.  Somebody once said to me  09:24:09

21  all lawyers are contentious.                      09:24:16

22       Q.  It's probably true.                      09:24:17

23           And then at the beginning of 2012, you and  09:24:18

24  Mr. Maier left Manches to form your own firm; is  09:24:24

25  that correct?                                     09:24:24
```

Page 28

```
 1        A.  We did.                              09:24:29

 2        Q.  And you took the Tolkien Estate work with  09:24:30

 3   you, correct?                                  09:24:32

 4        A.  They followed us.                     09:24:33

 5        Q.  And is it correct that you remain the  09:24:33

 6   partner in charge of Tolkien Estate matters today?  09:24:35

 7        A.  Yes, it is.                           09:24:38

 8        Q.  Okay.  Are there attorneys at Maier   09:24:42

 9   Blackburn who assist you with Tolkien Estate   09:24:44

10   matters?                                       09:24:46

11        A.  Just Steven Maier.                    09:24:46

12        Q.  Are there attorneys at Maier -- I'm sorry,  09:24:47

13   Maier Blackburn other than yourself and Mr. Maier?  09:24:52

14        A.  No.                                   09:24:55

15        Q.  Does Manches still do any work for the  09:24:58

16   Tolkien Estate?                                09:25:02

17        A.  Yes.                                   09:25:05

18        Q.  And what does Manches do for the Tolkien  09:25:05

19   Estate currently?                              09:25:07

20        A.  They assist with trademark registrations.  09:25:08

21   They also do corporate work, when there's a need for  09:25:11

22   corporate work.                                09:25:18

23        Q.  At the final page, page 3 of your     09:25:24

24   curriculum vitae, you describe managing the business  09:25:29

25   of a well-known literary estate across its worldwide  09:25:33
```

                                                    Page 29

```
 1   operations.                                    09:25:36

 2          Do you see that?                        09:25:36

 3      A.  Yes, I do.                              09:25:36

 4      Q.  Does that refer to your work for the    09:25:37

 5   Tolkien Estate?                                09:25:39

 6      A.  Yes, it does.                           09:25:40

 7      Q.  And does the bullet point summary on page 3  09:25:40

 8   of your CV fairly describe the types of work you do  09:25:46

 9   for the Estate?                                09:25:49

10          MS. ESKENAZI:  Objection.  Vague and    09:25:52

11   ambiguous.                                     09:25:54

12          You can answer.                         09:25:54

13          THE WITNESS:  This is a general summary.  I  09:26:04

14   wouldn't say it was comprehensive, but it's    09:26:08

15   representative of the work that I do.          09:26:11

16   BY MR. ULIN:                                   09:26:11

17      Q.  The second bullet describes managing and  09:26:13

18   licensing an extensive worldwide trademark     09:26:15

19   portfolio.                                     09:26:20

20          Do you see that?                        09:26:21

21      A.  Yes, I do.                              09:26:21

22      Q.  What do you do to manage the Estate's   09:26:22

23   worldwide trademark portfolio?                 09:26:24

24      A.  I consider what marks to register, where  09:26:25

25   and in what classes.  Those sorts of issues.  And  09:26:32
```

Page 30

```
 1    downstream of that, licensing people to use them or      09:26:38

 2    preventing people from using them where the Tolkien     09:26:45

 3    Estate wishes that they shouldn't be used.              09:26:49

 4         Q.   And is it important for you in that context   09:26:51

 5    to know what Tolkien-related trademarks are             09:26:58

 6    registered worldwide?                                   09:27:02

 7              MS. ESKENAZI:  Objection.  Vague and          09:27:03

 8    ambiguous.                                              09:27:06

 9              THE WITNESS:  Could you ask the question      09:27:06

10    again?                                                  09:27:06

11    BY MR. ULIN:                                            09:27:06

12         Q.   Sure.  Is it important for you in that        09:27:07

13    context to know what Tolkien-related trademarks are     09:27:08

14    registered worldwide?                                   09:27:13

15         A.   I think --                                    09:27:14

16              MS. ESKENAZI:  Same objections.               09:27:15

17              THE WITNESS:  I think the term                09:27:15

18    "Tolkien-related trademarks" is very vague.             09:27:17

19    BY MR. ULIN:                                            09:27:17

20         Q.   Okay.  Are you conversant with the            09:27:20

21    trademarks that are registered by the Tolkien           09:27:24

22    Estate?                                                 09:27:27

23              MS. ESKENAZI:  Objection.  Vague and          09:27:27

24    ambiguous.                                              09:27:32

25              THE WITNESS:  Well, I look after the          09:27:32

                                                     Page 31
```

```
 1    portfolio.  I couldn't today give you a list of what    09:27:34

 2    marks the Tolkien Estate has registered and where.      09:27:41

 3    But I have an understanding of what that activity       09:27:45

 4    covers.                                                 09:27:48

 5    BY MR. ULIN:                                            09:27:48

 6        Q.  Do you review regular reports of the marks      09:27:49

 7    that are registered by the Tolkien Estate?              09:27:51

 8            MS. ESKENAZI:  Objection.  Vague and            09:27:54

 9    ambiguous.                                              09:27:56

10            THE WITNESS:  I'm aware of what is              09:27:56

11    registered and what the state of any applications       09:28:00

12    for registration are.                                   09:28:04

13    BY MR. ULIN:                                            09:28:04

14        Q.  Do you also review reports of the marks         09:28:06

15    registered by the Saul Zaentz Company?                  09:28:10

16        A.  No.                                             09:28:12

17            MS. ESKENAZI:  Objection.  Vague and            09:28:13

18    ambiguous.                                              09:28:14

19    BY MR. ULIN:                                            09:28:14

20        Q.  Okay.  Is there someone who reviews the         09:28:14

21    marks registered by the Saul Zaentz Company on          09:28:27

22    behalf of the Estate?                                   09:28:29

23            MS. ESKENAZI:  Objection.  Vague and            09:28:33

24    ambiguous.                                              09:28:35

25            THE WITNESS:  What do you mean by               09:28:35
```

Page 32

```
 1    "reviews"?                                          09:28:36

 2    BY MR. ULIN:                                        09:28:36

 3        Q.  The question I'm asking goes to whether     09:28:39

 4    someone reviews reports of the registered marks for 09:28:42

 5    purposes of knowing what marks have been registered 09:28:44

 6    by the Saul Zaentz Company?                         09:28:46

 7            MS. ESKENAZI:  Same objection.              09:28:49

 8            THE WITNESS:  We don't review reports of    09:28:51

 9    such matters.                                       09:28:54

10    BY MR. ULIN:                                        09:28:54

11        Q.  Okay.  Are you familiar with what marks are 09:28:56

12    registered by the Saul Zaentz Company?              09:29:02

13        A.  Not in specific terms.                      09:29:04

14        Q.  And is there someone from the Estate who is 09:29:23

15    responsible for reviewing what uses the Saul Zaentz 09:29:25

16    Company has licensed of Tolkien-related trademarks? 09:29:31

17            MS. ESKENAZI:  Objection.  Vague and        09:29:34

18    ambiguous.                                          09:29:39

19            THE WITNESS:  Nobody at the Tolkien Estate  09:29:39

20    has detailed knowledge of how and what the Saul     09:29:41

21    Zaentz Company licenses in terms of Tolkien         09:29:46

22    trademarks, Tolkien-related trademarks.             09:29:49

23    BY MR. ULIN:                                        09:29:49

24        Q.  And just to clarify, when you say "nobody   09:29:51

25    at the Tolkien Estate," you include outside counsel? 09:29:53
```

Page 33

| | | |
|---|---|---|
| 1 | MS. ESKENAZI:  Objection.  Vague and | 09:29:56 |
| 2 | ambiguous. | 09:30:02 |
| 3 | THE WITNESS:  If you're asking whether I'm | 09:30:02 |
| 4 | encompassing my own activity or lack of it, | 09:30:03 |
| 5 | that's -- it -- it covers that, too. | 09:30:06 |
| 6 | BY MR. ULIN: | 09:30:06 |
| 7 | Q.  Fair enough. | 09:30:08 |
| 8 | Do you have any formal position within the | 09:30:08 |
| 9 | Tolkien Estate? | 09:30:12 |
| 10 | A.  Yes, I do.  The Tolkien Estate essentially | 09:30:13 |
| 11 | now consists of two elements.  There's a private | 09:30:19 |
| 12 | limited company and there's another that's called | 09:30:24 |
| 13 | the Tolkien Estate Limited. | 09:30:27 |
| 14 | Q.  And what is the other element? | 09:30:32 |
| 15 | A.  Just to explain to you, the Tolkien Estate | 09:30:34 |
| 16 | Limited is the same as Fourth Age Limited.  It | 09:30:40 |
| 17 | simply changed its name. | 09:30:42 |
| 18 | Q.  And when did that occur? | 09:30:48 |
| 19 | A.  Oh, gosh.  I believe that was at the | 09:30:48 |
| 20 | beginning of this year. | 09:30:55 |
| 21 | Q.  And what is the other element of the | 09:30:59 |
| 22 | Tolkien Estate? | 09:31:04 |
| 23 | A.  The other element is a charitable company | 09:31:04 |
| 24 | called the Tolkien Trust. | 09:31:07 |
| 25 | Q.  Okay.  And I believe your answer was a | 09:31:13 |

Page 34

```
 1    preface to telling us what your formal role within    09:31:14

 2    the Estate is.                                         09:31:17

 3         A.  I am -- I am company secretary of each of     09:31:18

 4    those companies.                                       09:31:20

 5         Q.  And for how long have you served as company   09:31:24

 6    secretary of the Tolkien Estate Limited and Tolkien    09:31:35

 7    Trust?                                                 09:31:39

 8         A.  Since inception in each of those cases.       09:31:39

 9              (Pages 36 through 39 are

10              marked confidential and are bound

11              under separate cover.  The

12              nonceonfidential portion of this

13              transcript continues on page 40.)

14

15

16

17

18

19

20

21

22

23

24

25

                                                   Page  35
```

| | | |
|---|---|---|
| 1 | Q.  Is HarperCollins your client? | 09:32:48 |
| 2 | A.  No. | 09:32:50 |
| 3 | Q.  Have they ever been your client? | 09:32:51 |
| 4 | A.  No. | 09:32:53 |
| 5 | MR. ULIN:  I'm going to mark Exhibit 2. | 09:33:08 |
| 6 | (The document referred to was | 09:33:10 |
| 7 | marked for identification as | 09:33:10 |
| 8 | Exhibit 2 and attached to this | 09:33:10 |
| 9 | deposition.) | 09:33:22 |
| 10 | THE WITNESS:  Can I put this aside? | 09:33:25 |
| 11 | BY MR. ULIN: | 09:33:25 |
| 12 | Q.  Yes, you may put the CV aside.  Sorry. | 09:33:27 |
| 13 | Good question. | 09:33:29 |
| 14 | MS. ESKENAZI:  Are -- are -- but -- but | 09:33:31 |
| 15 | you're not giving the witness the actual exhibits? | 09:33:31 |
| 16 | MR. ULIN:  I haven't.  I've left them with | 09:33:33 |
| 17 | the reporter. | 09:33:36 |
| 18 | MS. ESKENAZI:  Okay.  I only say that | 09:33:36 |
| 19 | because it may become confusing later if you go back | 09:33:38 |
| 20 | to exhibits that have not been numbered.  I just | 09:33:40 |
| 21 | noticed that the witness is not numbering these. | 09:33:44 |
| 22 | MR. ULIN:  That's a -- that's a fair point | 09:33:46 |
| 23 | so why don't we -- yeah, let's -- let's change | 09:33:47 |
| 24 | course and give the witness the marked exhibits. | 09:33:49 |
| 25 | That's a good point. | 09:33:51 |

Page 40

```
 1              MS. ESKENAZI:  So do you want to take --      09:33:57

 2     take the marked exhibits.                             09:33:57

 3              MR. ULIN:  I had the helpful notion that it  09:33:58

 4     would keep the marked exhibits in the hands of the    09:34:00

 5     reporter, which is always a good thing.               09:34:03

 6         Q.  Ms. Blackburn, have you seen Exhibit 2        09:34:14

 7     before?                                               09:34:16

 8         A.  Almost certainly.                             09:34:16

 9         Q.  Okay.  And do you recognize this as a         09:34:24

10     letter that you sent to Laurie Battle?                09:34:25

11         A.  The first page is a letter sent to Laurie     09:34:29

12     Battle.                                               09:34:35

13         Q.  With -- with an attachment?                   09:34:36

14         A.  I just need to read it to see if anything     09:34:37

15     is attached.                                          09:34:40

16         Q.  And I'm only going to be focusing on the      09:34:47

17     first page.                                           09:34:49

18         A.  Do you want me to read this in detail?        09:35:11

19         Q.  No, we won't -- we won't be focusing -- no,   09:35:13

20     we won't be focusing on the attachments, so it's not  09:35:15

21     necessary.                                            09:35:18

22              In -- Ms. Battle was a contact of yours at   09:35:18

23     Saul Zaentz; is that correct?                         09:35:23

24         A.  Well, at that point, I don't know -- this     09:35:26

25     might have been the first occasion I had any          09:35:29
```

Page 41

| | | |
|---|---|---|
| 1 | dealings with Laurie.  It might well be because it | 09:35:31 |
| 2 | was often my practice to write, "if I may," if I | 09:35:37 |
| 3 | didn't know somebody, if I say, "Dear Laurie, if I | 09:35:40 |
| 4 | may." | 09:35:43 |
| 5 | Q.  Fair enough.  So the purpose of this letter | 09:35:45 |
| 6 | is to introduce yourself as the -- the partner | 09:35:47 |
| 7 | taking over responsibility for Tolkien Estate work; | 09:35:53 |
| 8 | is that correct? | 09:35:53 |
| 9 | A.  Yes.  Well, the bulk of our work for the | 09:35:59 |
| 10 | Tolkien Estate.  This is talking about the future. | 09:36:01 |
| 11 | Q.  Uh-huh. | 09:36:05 |
| 12 | A.  And it may be.  I'm anticipating in the | 09:36:09 |
| 13 | first paragraph that Dick Williamson may already | 09:36:11 |
| 14 | have introduced me. | 09:36:13 |
| 15 | Q.  When you took over the bulk of the Tolkien | 09:36:15 |
| 16 | Estate work on Mr. Williamson's retirement, did you | 09:36:23 |
| 17 | review his files in preparation for making that | 09:36:26 |
| 18 | transition? | 09:36:29 |
| 19 | A.  Not in preparation.  I -- when -- when | 09:36:29 |
| 20 | he -- when he retired in 1992, I started the task of | 09:36:36 |
| 21 | reviewing files at that stage. | 09:36:41 |
| 22 | Q.  And do you still have Mr. Williamson's | 09:36:43 |
| 23 | files? | 09:36:51 |
| 24 | A.  Yes. | 09:36:51 |
| 25 | Q.  Are they at Maier -- Maier Blackburn with | 09:36:54 |

Page 42

```
 1    you?                                          09:36:58

 2         A.  Yes, they -- well, they're in storage.   09:36:58

 3    There wouldn't be enough room for all of them at   09:37:03

 4    Maier Blackburn.                                09:37:06

 5         Q.  I note in this letter that you write:   09:37:13

 6              "One of the jobs which has           09:37:15

 7          already fallen to me to deal with       09:37:16

 8          is that of computer games."             09:37:18

 9          Do you see that?                         09:37:21

10         A.  Yes.                                  09:37:21

11         Q.  And is it correct that review of computer   09:37:23

12    game licensing was one of the first tasks you took   09:37:25

13    on when you became the relationship partner on   09:37:28

14    Tolkien Estate matters?                        09:37:31

15              MS. ESKENAZI:  Objection.  Vague and   09:37:34

16    ambiguous.                                     09:37:35

17              THE WITNESS:  No, because this is in 1992.   09:37:36

18    I think this is -- this is an aspect of work   09:37:39

19    involving the Saul Zaentz Company, but I had done   09:37:43

20    other work related -- for the Tolkien Estate before   09:37:46

21    that.                                          09:37:50

22    BY MR. ULIN:                                    09:37:50

23         Q.  Okay.  Related to computer games?     09:37:51

24         A.  I doubt it.  No, I wouldn't have thought   09:37:53

25    so.                                            09:37:58
```

                                                    Page 43

```
 1        Q.  All right.  Okay.  You began a dialogue        09:37:59

 2   shortly afterward with the Saul Zaentz Company          09:38:27

 3   related to a company called Beam, also known as         09:38:31

 4   Melbourne House.                                        09:38:37

 5        Do you recall that?                                09:38:39

 6        MS. ESKENAZI:  Objection.  Vague and               09:38:39

 7   ambiguous.                                              09:38:40

 8        THE WITNESS:  I recall the name of that            09:38:40

 9   company.                                                09:38:42

10   BY MR. ULIN:                                            09:38:42

11        Q.  Okay.  And do you recall a dialogue with       09:38:44

12   the Saul Zaentz Company about licensing of compu        09:38:52

13   novels?                                                 09:38:56

14        A.  In a historical sense, because that had        09:38:57

15   already happened.  Compu novels had -- were -- were     09:39:02

16   a thing of the 1980s, I believe.                        09:39:05

17        Q.  And how did compu novels operate, to your      09:39:10

18   understanding?                                          09:39:16

19        MS. ESKENAZI:  Objection.  Vague and               09:39:16

20   ambiguous.                                              09:39:17

21        THE WITNESS:  I -- I -- I can't answer             09:39:17

22   that.  I -- I never saw one of the products.            09:39:19

23        MR. ULIN:  Okay.  Let's -- sorry.  Move to         09:39:29

24   the next document.  Let's mark Exhibit 3.               09:39:30

25        MS. ESKENAZI:  May I have a copy?                  09:40:14
```

Page 44

```
 1              MR. ULIN:  Yes, you certainly may.        09:40:15

 2              MS. ESKENAZI:  Thank you.                 09:40:16

 3                   (The document referred to was        09:40:29

 4              marked for identification as             09:40:29

 5              Exhibit 3 and attached to this           09:40:29

 6              deposition.)                             09:40:30

 7   BY MR. ULIN:                                         09:40:30

 8       Q.  Ms. Blackburn, have you seen Exhibit 3      09:40:30

 9   before?                                             09:40:32

10       A.  This looks like a letter I wrote to Laurie  09:40:37

11   Battle which I signed, so, yes.                     09:40:41

12       Q.  And is it correct that you're responding to 09:40:51

13   an inquiry from Ms. Battle about new games from Beam 09:40:56

14   or Melbourne House?                                 09:41:00

15              MS. ESKENAZI:  If you're going to ask the 09:41:03

16   witness to answer substantive questions about the   09:41:05

17   document, I would ask that she actually read it.     09:41:07

18              THE WITNESS:  Would you like me to read it? 09:41:11

19   BY MR. ULIN:                                         09:41:11

20       Q.  Yes, although I am concerned about how much  09:41:18

21   time is necessary.  But you may take time to --      09:41:20

22       A.  I think I would have to read this.  This is  09:41:23

23   a document from 20 years ago.                        09:41:25

24       Q.  Okay.                                        09:41:25

25       A.  I've read it.                                09:42:24
```

Page 45

| | | |
|---|---|---|
| 1 | Q.   Okay.   Is -- is the attachment with this -- | 09:42:24 |
| 2 | the letter? | 09:42:35 |
| 3 | THE WITNESS:  I haven't got the attachment. | 09:42:35 |
| 4 | MR. ULIN:  Do we have the letter with the | 09:42:35 |
| 5 | attachment? | 09:42:35 |
| 6 | Q.   Okay.   All right.   At the first paragraph | 09:43:16 |
| 7 | of the letter, you indicate that you've enclosed a | 09:43:17 |
| 8 | table setting out the history of the licensing of | 09:43:21 |
| 9 | computer games based on the Tolkien works. | 09:43:25 |
| 10 | Do you see that? | 09:43:27 |
| 11 | A.   I do. | 09:43:27 |
| 12 | Q.   Is it your recollection that you sent | 09:43:27 |
| 13 | Ms. Battle a table of the history of the Tolkien | 09:43:29 |
| 14 | works-related computer game licensing in the summer | 09:43:34 |
| 15 | of 1993? | 09:43:37 |
| 16 | A.   My recollection is that I sent her a table | 09:43:43 |
| 17 | setting out the history of the licensing of computer | 09:43:45 |
| 18 | games based on Tolkien works. | 09:43:48 |
| 19 | MR. ULIN:  I only have one copy of this. | 09:43:50 |
| 20 | I'm going to mark it and then I'll allow you to | 09:43:52 |
| 21 | share it with the witness.  I apologize for that.  I | 09:43:55 |
| 22 | thought I had copies of the attachment, but I don't. | 09:43:55 |
| 23 | Can we mark this as Exhibit 4, please. | 09:43:57 |
| 24 | (The document referred to was | 09:43:59 |
| 25 | marked for identification as | 09:43:59 |

Page 46

| | | |
|---|---|---|
| 1 | Exhibit 4 and attached to this | 09:43:59 |
| 2 | deposition.) | 09:44:34 |
| 3 | BY MR. ULIN: | 09:44:34 |
| 4 | Q.  And Ms. Blackburn, does this appear to be | 09:44:35 |
| 5 | the table that you sent to Ms. Battle in the summer | 09:44:36 |
| 6 | of 1993? | 09:44:38 |
| 7 | A.  I think it is, yes. | 09:44:39 |
| 8 | Q.  That was attached to the letter which is | 09:44:49 |
| 9 | marked Exhibit -- as Exhibit 3? | 09:44:51 |
| 10 | A.  It was an enclosure to the letter. | 09:44:54 |
| 11 | Q.  Why did you provide a table of the history | 09:45:00 |
| 12 | of computer game licensing to Ms. Battle at that | 09:45:02 |
| 13 | time? | 09:45:08 |
| 14 | A.  From memory, in early 1993 as part of the | 09:45:08 |
| 15 | process of my taking over from Dick Williamson, we | 09:45:16 |
| 16 | met with representatives of the Saul Zaentz Company | 09:45:21 |
| 17 | in Berkeley.  Did I say the date?  In early -- | 09:45:26 |
| 18 | Q.  Early 1993. | 09:45:30 |
| 19 | A.  -- early 1993. | 09:45:32 |
| 20 | And one of the points which arose at that | 09:45:35 |
| 21 | meeting was the licensing of computer games. | 09:45:38 |
| 22 | Specifically, the question that had arisen was | 09:45:42 |
| 23 | whether the nature of computer games was different | 09:45:46 |
| 24 | then to what it had been when it was agreed that | 09:45:51 |
| 25 | George Allen and Unwin would license them. | 09:45:54 |

Page 47

| | | |
|---|---|---|
| 1 | THE REPORTER:  "George Allen and"? | 09:45:54 |
| 2 | THE WITNESS:  Unwin, U-n-w-i-n. | 09:45:57 |
| 3 | BY MR. ULIN: | 09:46:10 |
| 4 | Q.  Okay.  And who was present at the meeting | 09:46:10 |
| 5 | in Berkeley with Saul Zaentz representatives in | 09:46:13 |
| 6 | early 1993 that you just referred to? | 09:46:17 |
| 7 | A.  I think it was me, Dick Williamson, and Al | 09:46:19 |
| 8 | Bendich. | 09:46:28 |
| 9 | Q.  Just the three of you? | 09:46:28 |
| 10 | A.  Yes.  But while I was there, I was | 09:46:29 |
| 11 | introduced to Laurie Battle. | 09:46:33 |
| 12 | Q.  Okay.  And you referred to a discussion | 09:46:52 |
| 13 | about whether the nature of computer games was | 09:46:54 |
| 14 | different at that time from what it had been when it | 09:46:56 |
| 15 | was agreed that the publishing company of the | 09:46:59 |
| 16 | Tolkien works would handle them. | 09:47:07 |
| 17 | Can you elaborate on that discussion? | 09:47:09 |
| 18 | MS. ESKENAZI:  Objection.  Vague and | 09:47:12 |
| 19 | ambiguous. | 09:47:13 |
| 20 | THE WITNESS:  In the 1980s, when the first | 09:47:14 |
| 21 | things that people called computer games came about, | 09:47:21 |
| 22 | the parties considered what their status was in | 09:47:26 |
| 23 | relation to the merchandising agreement which had | 09:47:30 |
| 24 | been put in place in 1969. | 09:47:35 |
| 25 | In that agreement, the predecessor in | 09:47:40 |

Page 48

```
 1    interest of the Saul Zaentz Company had the right to      09:47:46

 2    license articles of tangible personal property.  But     09:47:50

 3    there was an exception in effect, a reservation of        09:47:55

 4    rights for articles of tangible personal property,       09:47:59

 5    which -- which consisted of books or printed             09:48:05

 6    published materials, so effectively text.  And the       09:48:08

 7    analysis of the 1980s was that games at that time        09:48:13

 8    were essentially text-based.                             09:48:19

 9    BY MR. ULIN:                                             09:48:22

10        Q.  And when you say "games," you mean computer      09:48:22

11    games?                                                   09:48:24

12        A.  Yes, I do.  Well, this was the phrase used       09:48:24

13    at the time, "compu novel."                              09:48:28

14        Q.  Okay.  And your discussion with Mr. Bendich      09:48:39

15    surrounded whether the nature of computer games had      09:48:43

16    changed by the early 1990s; is that correct?             09:48:46

17        A.  One of the points Mr. Bendich made was that      09:48:48

18    the text-based nature of computer games was no           09:48:51

19    longer applicable.  He argued that they were             09:48:55

20    becoming more graphics-based.                            09:48:59

21        Q.  And that as a result they should be -- the       09:49:06

22    graphics-based computer games should be licensed by      09:49:08

23    Saul Zaentz as opposed to by the Tolkien works           09:49:11

24    publisher?                                               09:49:16

25        A.  Correct.                                         09:49:16

                                                  Page 49
```

```
 1        Q.  And what was the response from you or      09:49:16

 2   Mr. Williamson?                                     09:49:24

 3        A.  At the meeting, we listened to what        09:49:25

 4   Mr. Bendich said and agreed to go back and          09:49:28

 5   investigate, really, his -- his contention.  We     09:49:35

 6   had -- we had to consult with HarperCollins -- yes, 09:49:41

 7   it was HarperCollins at that time.  We had to       09:49:44

 8   consult with HarperCollins over the question because 09:49:46

 9   they were doing the licensing.                      09:49:51

10        Q.  And did you consult with HarperCollins?    09:50:13

11        A.  Almost certainly.  Though I don't have any 09:50:14

12   specific recollection.                              09:50:17

13        Q.  Don't recall who you would have -- who you 09:50:18

14   consulted with at HarperCollins on the subject --   09:50:26

15        A.  The person -- the person involved there was 09:50:28

16   a lady called Mary Butler.                          09:50:30

17        Q.  And then subsequently you had further      09:50:34

18   conversations and correspondence with Saul Zaentz on 09:50:46

19   the subject of the changing nature of video games?  09:50:49

20        A.  I don't know what -- what the nature of    09:50:53

21   that correspondence was.  Clearly we have an example 09:50:57

22   of an item of correspondence.  I don't recall what  09:51:01

23   form that interaction took, how many letters at this 09:51:05

24   distance in time.                                   09:51:11

25        Q.  Okay.  At the end of Exhibit 3, the letter 09:51:24
```

Page 50

```
 1    to which you attached the chart of previous video    09:51:27

 2    game or computer game licenses --                     09:51:31

 3        A.   Uh-huh.                                       09:51:33

 4        Q.   -- you indicate that you will be in contact  09:51:34

 5    with Ms. Battle on the subject of rights in two       09:51:39

 6    games that you were reviewing.                        09:51:43

 7             Do you see that?                              09:51:46

 8        A.   I see I'm trying to get hold of some games   09:51:46

 9    to see what they are like.  And after that I          09:51:57

10    anticipate being in contact with her.                 09:52:01

11             MR. ULIN:  Okay.  Let's mark Exhibit 5.      09:52:04

12                  (The document referred to was           09:52:05

13             marked for identification as                 09:52:05

14             Exhibit 5 and attached to this               09:52:05

15             deposition.)                                 09:52:30

16             MR. PETROCELLI:  Bonnie, can I have that     09:52:30

17    chart so I can get copies made for everybody.         09:52:32

18             THE WITNESS:  Sorry, you want this back?     09:52:34

19             MR. ULIN:  Yes.                              09:52:34

20             MR. PETROCELLI:  Yes.                        09:53:12

21             THE WITNESS:  Do you want me to read this    09:53:12

22    letter?                                               09:53:13

23    BY MR. ULIN:                                          09:53:13

24        Q.   Is this -- well, let me ask you one          09:53:14

25    question:  Is this letter one of the documents that  09:53:16
```

Page 51

| | | |
|---|---|---|
| 1 | you reviewed with counsel in preparing for this | 09:53:18 |
| 2 | deposition? | 09:53:21 |
| 3 | A.  I don't recollect doing so. | 09:53:21 |
| 4 | Q.  Okay.  I can direct you to portions of the | 09:53:29 |
| 5 | letter that I want to focus on. | 09:53:32 |
| 6 | First of all, this appears to be a letter | 09:53:34 |
| 7 | that you sent to Al Bendich on or about November the | 09:53:38 |
| 8 | 2nd, 1993. | 09:53:43 |
| 9 | A.  Yes. | 09:53:44 |
| 10 | Q.  And -- | 09:53:45 |
| 11 | A.  Can -- can I -- I have -- I have seen this | 09:53:50 |
| 12 | document recently. | 09:53:53 |
| 13 | Q.  Okay.  And is it correct that this letter | 09:53:59 |
| 14 | discusses the rights in licensing of two games | 09:54:02 |
| 15 | issued around that time by Melbourne House, which | 09:54:10 |
| 16 | then called itself Beam, entitled "The Lord of the | 09:54:13 |
| 17 | Rings, Volume 1" and "The Two Towers"? | 09:54:17 |
| 18 | MS. ESKENAZI:  If -- again, if you're going | 09:54:19 |
| 19 | to ask the witness to answer substantive questions | 09:54:21 |
| 20 | about this document, can you give her a chance to | 09:54:24 |
| 21 | read it? | 09:54:26 |
| 22 | MR. ULIN:  I can, but again, just in the | 09:54:27 |
| 23 | interest of time I'm hopeful that I can direct her | 09:54:29 |
| 24 | to relevant portions of the document. | 09:54:31 |
| 25 | MS. ESKENAZI:  I totally understand.  It's | 09:54:32 |

Page 52

| | | |
|---|---|---|
| 1 | just that if you want -- if you're asking for her | 09:54:34 |
| 2 | most accurate recollection, she should read it. | 09:54:37 |
| 3 | MR. ULIN:  Yes, is the answer to that. | 09:54:42 |
| 4 | Ms. Blackburn, you can just let me know | 09:55:21 |
| 5 | when you're ready. | 09:55:23 |
| 6 | THE WITNESS:  Okay. | 09:55:25 |
| 7 | MR. PETROCELLI:  Is this Exhibit 5? | 09:55:36 |
| 8 | MR. ULIN:  Yes. | 09:55:37 |
| 9 | THE WITNESS:  It is. | 09:55:37 |
| 10 | MR. PETROCELLI:  With or without | 09:55:47 |
| 11 | attachments?  I'm sorry.  Did it include or not | 09:55:48 |
| 12 | include the attachments? | 09:55:55 |
| 13 | MS. ESKENAZI:  We don't have an | 09:55:56 |
| 14 | attachment -- | 09:55:57 |
| 15 | MR. ULIN:  No, we do not. | 09:55:57 |
| 16 | MS. ESKENAZI:  -- on what's been handed to | 09:55:59 |
| 17 | us. | 09:56:00 |
| 18 | MR. PETROCELLI:  Okay.  For the record, I | 09:56:01 |
| 19 | was referring to the March 15, 1984 agreement and | 09:56:11 |
| 20 | the February 9, 1984 letter.  In the third paragraph | 09:56:13 |
| 21 | it says they are attached. | 09:56:16 |
| 22 | MR. ULIN:  And I'm not sure I have a copy | 09:56:21 |
| 23 | of this letter with those documents attached to it. | 09:56:23 |
| 24 | I have those documents, but I'm not sure I have them | 09:56:25 |
| 25 | as attachments to this letter. | 09:56:26 |

Page 53

| | | |
|---|---|---|
| 1 | THE WITNESS:  I've -- I've reviewed the | 09:56:32 |
| 2 | document briefly. | 09:56:33 |
| 3 | BY MR. ULIN: | 09:56:33 |
| 4 | Q.  Okay.  And this is a letter you sent to | 09:56:37 |
| 5 | Mr. Bendich about the Estate's position concerning | 09:56:42 |
| 6 | rights in two new games by Beam; is that correct? | 09:56:45 |
| 7 | A.  Well, I'm -- it's broader than that. | 09:56:52 |
| 8 | I'm -- I'm surveying not just the specific instance | 09:56:54 |
| 9 | of what to do with Melbourne House/Beam, but the | 09:56:59 |
| 10 | generality of the licensing of computer games. | 09:57:03 |
| 11 | Q.  Okay.  You indicate at the third paragraph | 09:57:08 |
| 12 | of this letter that the starting point in this area | 09:57:11 |
| 13 | is the 15 March 1984 agreement between the Estate | 09:57:15 |
| 14 | and the Saul Zaentz Company and the correspondence | 09:57:21 |
| 15 | between Mr. Bendich and Dick Williamson which | 09:57:24 |
| 16 | preceded it, notably including a letter of the 9th | 09:57:28 |
| 17 | of February, 1984. | 09:57:33 |
| 18 | Do you see that? | 09:57:34 |
| 19 | A.  I see that. | 09:57:35 |
| 20 | Q.  Okay.  Can you explain what you mean by | 09:57:38 |
| 21 | that? | 09:57:40 |
| 22 | MS. ESKENAZI:  Objection.  Vague and | 09:57:42 |
| 23 | ambiguous.  Also, objection, relevance. | 09:57:45 |
| 24 | THE WITNESS:  I'm referring to | 09:57:52 |
| 25 | correspondence at which the question of computer | 09:57:53 |

Page 54

```
 1    games was debated and some agreement reached back in    09:57:57

 2    1984.                                                   09:58:04

 3    BY MR. ULIN:                                            09:58:04

 4        Q.  And you refer at the second page of the         09:58:18

 5    letter in the second full paragraph, the one that      09:58:23

 6    begins, "Following our approach," that the question    09:58:32

 7    to be addressed in determining who should properly     09:58:36

 8    be licensing video games is, "whether new games are    09:58:40

 9    still other writings using the printed word            09:58:46

10    primarily, or whether, as suggested by the 1975        09:58:50

11    agreement and referred to in Dick's February 1984     09:58:53

12    letter, they used the printed word only incidentally   09:58:56

13    and fall on your side of the line."                    09:58:59

14        Do you see that?                                    09:59:01

15        A.  I see this paragraph.                           09:59:02

16        Q.  Okay.  Can you explain that distinction and     09:59:03

17    how it affected the position you were taking with      09:59:06

18    respect to computer game rights?                       09:59:10

19        MS. ESKENAZI:  Objection.  Vague and                09:59:11

20    ambiguous.  Objection.  Relevance.                     09:59:19

21        THE WITNESS:  What I'm alluding to here is          09:59:20

22    the analysis of who should license computer games by   09:59:22

23    reference to the 1969 merchandising agreement.         09:59:29

24    BY MR. ULIN:                                            09:59:29

25        Q.  Okay.  And what is the -- you draw a            09:59:36
```

Page 55

| | | |
|---|---|---|
| 1 | distinction in this paragraph between who should | 09:59:38 |
| 2 | license computer games. | 09:59:42 |
| 3 | Can you explain that distinction? | 09:59:43 |
| 4 | A.   Yes.   There are -- in the analysis of this | 09:59:45 |
| 5 | question, there were two elements, and still are two | 09:59:49 |
| 6 | elements. | 09:59:52 |
| 7 | The first requirement of the merchandising | 09:59:53 |
| 8 | agreement for the rights of the Saul Zaentz Company | 09:59:56 |
| 9 | to be engaged at all is that there be the | 10:00:01 |
| 10 | manufacture of an article of tangible personal | 10:00:04 |
| 11 | property.   If there isn't an article of tangible | 10:00:07 |
| 12 | personal property, the merchandising agreement is | 10:00:12 |
| 13 | not engaged. | 10:00:14 |
| 14 | But if there is such an article of tangible | 10:00:17 |
| 15 | personal property, the next question is to analyze | 10:00:21 |
| 16 | whether, notwithstanding its nature, it falls within | 10:00:25 |
| 17 | the reservation of rights in that agreement to the | 10:00:30 |
| 18 | Tolkien Estate. | 10:00:36 |
| 19 | And from memory, the reservation is | 10:00:39 |
| 20 | expressed as articles of tangible -- excluding | 10:00:44 |
| 21 | books, but including paperbacks and other printed | 10:00:54 |
| 22 | published material.   There's an exception which we | 10:00:59 |
| 23 | have always in shorthand referred to as the -- an | 10:01:03 |
| 24 | exception for text-based articles. | 10:01:09 |
| 25 | Q.   So if I understand you correctly, if | 10:01:18 |

Page 56

| | | |
|---|---|---|
| 1 | computer games were principally text-based, then | 10:01:21 |
| 2 | your position is that they should be licensed by | 10:01:24 |
| 3 | HarperCollins or the publisher; is that correct? | 10:01:27 |
| 4 | MS. ESKENAZI:  Objection.  Misstates the | 10:01:29 |
| 5 | testimony.  Vague and ambiguous. | 10:01:34 |
| 6 | THE WITNESS:  The analysis at the time was | 10:01:34 |
| 7 | that if there was a computer game which constituted | 10:01:36 |
| 8 | an article of tangible personal property and its | 10:01:41 |
| 9 | nature was text-based, I'm -- I'm paraphrasing, then | 10:01:44 |
| 10 | it -- it did not fall to the Saul Zaentz Company to | 10:01:50 |
| 11 | license that.  The rights that they had under the | 10:01:53 |
| 12 | merchandising agreement simply weren't engaged. | 10:01:56 |
| 13 | BY MR. ULIN: | 10:02:00 |
| 14 | Q.  And if there was a computer game that was | 10:02:00 |
| 15 | principally graphics-based as to which text was | 10:02:02 |
| 16 | incidental, then the licensing of that game did fall | 10:02:06 |
| 17 | to the Saul Zaentz Company; is that correct? | 10:02:08 |
| 18 | MS. ESKENAZI:  Objection.  Misstates the | 10:02:10 |
| 19 | testimony. | 10:02:11 |
| 20 | THE WITNESS:  Well, first of all, your | 10:02:12 |
| 21 | computer game has to be an article of tangible | 10:02:13 |
| 22 | personal property. | 10:02:16 |
| 23 | BY MR. ULIN: | 10:02:16 |
| 24 | Q.  Okay. | 10:02:20 |
| 25 | A.  Then if it -- if it didn't fall within the | 10:02:20 |

Page 57

| | | |
|---|---|---|
| 1 | text-based exception very clearly, one would have to | 10:02:25 |
| 2 | further analyze the situation and look at the | 10:02:31 |
| 3 | amendment to the merchandising agreement which was | 10:02:35 |
| 4 | entered into in 1975.  It was a complex analysis. | 10:02:38 |
| 5 | Q.  Your conclusion with respect to the games | 10:02:57 |
| 6 | that you are writing about in this letter at the | 10:02:59 |
| 7 | fourth full paragraph is -- | 10:03:07 |
| 8 | A.  Page -- page 2? | 10:03:10 |
| 9 | Q.  Yes, I'm sorry, of page 2, is that the new | 10:03:11 |
| 10 | games continue to rely very heavily on words and, | 10:03:13 |
| 11 | therefore, are principally text-based; is that | 10:03:18 |
| 12 | correct? | 10:03:18 |
| 13 | A.  Well, I indicate that the question isn't -- | 10:03:30 |
| 14 | isn't susceptible to a straightforward answer.  That | 10:03:32 |
| 15 | they still -- they always had a graphic element, but | 10:03:37 |
| 16 | the nature of the graphic element now is it's -- | 10:03:41 |
| 17 | it's -- it's moving.  But I argue that that's a | 10:03:43 |
| 18 | change of form rather than substance. | 10:03:50 |
| 19 | Q.  Okay.  But you acknowledge at the bottom of | 10:03:57 |
| 20 | page 2 that the new games are not word-based to the | 10:03:59 |
| 21 | same extent as prior games, compu novels issued by | 10:04:06 |
| 22 | Beam, correct? | 10:04:11 |
| 23 | A.  Well, I just refer to the new games and the | 10:04:15 |
| 24 | old games. | 10:04:20 |
| 25 | Q.  Okay. | 10:04:22 |

Page 58

```
 1        A.  So I'm not specific.                    10:04:22

 2        Q.  But leaving aside whether this -- whether 10:04:25

 3   you're specific as to what the old games were, you 10:04:26

 4   acknowledge that the new games are not word-based to 10:04:29

 5   the same extent as -- as you described them, old    10:04:33

 6   computer games?                                     10:04:38

 7        A.  Well, what I say is that it's arguable that 10:04:39

 8   the new games are not produced to the same formula   10:04:43

 9   and so fall into a contractual vacuum.               10:04:47

10        Q.  And do I understand it correctly that your 10:04:53

11   suggestion is that as games become more             10:04:55

12   graphics-based, they are more likely to be ones that 10:04:57

13   should be licensed by the Saul Zaentz Company?      10:04:59

14        MS. ESKENAZI:  Objection.  Vague and           10:05:01

15   ambiguous.  Misstates the testimony.               10:05:02

16        THE WITNESS:  I don't think --                 10:05:03

17        MS. ESKENAZI:  Misstates the document.         10:05:04

18        THE WITNESS:  Sorry.                           10:05:05

19        MS. ESKENAZI:  You can answer.                 10:05:06

20        THE WITNESS:  I don't think I'm suggesting     10:05:07

21   that.                                               10:05:08

22        Excuse me.  Is it possible for somebody        10:05:16

23   just to get me a bit -- a glass of water?  I don't  10:05:17

24   wish to take a break especially.                    10:05:21

25        MR. ULIN:  That's all right.  We're            10:05:22
```

Page 59

| | | |
|---|---|---|
| 1 | probably going to take a break in about five | 10:05:24 |
| 2 | minutes, but you can get water right now if you | 10:05:26 |
| 3 | want.  That's fine. | 10:05:27 |
| 4 | THE WITNESS:  Oh, no, no, no.  I'll wait. | 10:05:27 |
| 5 | That's fine. | 10:05:31 |
| 6 | MS. MORIARTY:  I can get you water. | 10:05:31 |
| 7 | BY MR. ULIN: | 10:05:31 |
| 8 | Q.  Do you recall the -- the Beam games, The | 10:05:32 |
| 9 | Lord of the Rings, Volume 1, and The Hobbit? | 10:05:36 |
| 10 | A.  I don't. | 10:05:37 |
| 11 | Q.  Do you recall whether they were based on | 10:05:38 |
| 12 | any movie? | 10:05:40 |
| 13 | A.  I'm pretty sure they weren't based on any | 10:05:46 |
| 14 | movie. | 10:05:50 |
| 15 | Q.  They were not? | 10:05:50 |
| 16 | A.  But -- but I -- I noticed in that letter, | 10:05:51 |
| 17 | that correspondence with Laurie Battle, that there | 10:05:56 |
| 18 | was something about a film, they wanted to use a | 10:06:00 |
| 19 | film clip. | 10:06:03 |
| 20 | Thank you very much. | 10:06:04 |
| 21 | Q.  But to your -- | 10:06:04 |
| 22 | A.  But the games -- the games existed.  This | 10:06:07 |
| 23 | was -- I think they wanted to add a piece of film to | 10:06:10 |
| 24 | that -- that -- the new game or something. | 10:06:14 |
| 25 | Q.  But to your knowledge, the games you were | 10:06:16 |

Page 60

| | | |
|---|---|---|
| 1 | looking at in connection with the letter that's | 10:06:17 |
| 2 | marked as Exhibit 5 were not based on any movie, | 10:06:20 |
| 3 | correct? | 10:06:20 |
| 4 | MS. ESKENAZI:  Objection.  Calls for | 10:06:25 |
| 5 | speculation.  Lacks foundation. | 10:06:26 |
| 6 | THE WITNESS:  I act- -- I act- -- sorry, | 10:06:26 |
| 7 | Bonnie. | 10:06:28 |
| 8 | I actually don't know. | 10:06:29 |
| 9 | BY MR. ULIN: | 10:06:29 |
| 10 | Q.  Okay.  Do you know if they used footage or | 10:06:31 |
| 11 | images or artwork from any movie? | 10:06:32 |
| 12 | MS. ESKENAZI:  Objection.  Asked and | 10:06:35 |
| 13 | answered.  Calls for speculation.  Lacks foundation. | 10:06:36 |
| 14 | THE WITNESS:  I don't know. | 10:06:41 |
| 15 | BY MR. ULIN: | 10:06:41 |
| 16 | Q.  Okay. | 10:06:41 |
| 17 | A.  It's perhaps more accurate to say I don't | 10:06:46 |
| 18 | recollect, because I have no recollection of that | 10:06:49 |
| 19 | analysis. | 10:06:52 |
| 20 | Q.  Okay.  Did Zae- -- did you have any | 10:06:53 |
| 21 | discussions with Mr. Bendich or anyone else at | 10:06:57 |
| 22 | Zaentz about -- apart from this letter -- about | 10:07:02 |
| 23 | whether the new Beam games should be licensed by the | 10:07:09 |
| 24 | Saul Zaentz Company? | 10:07:14 |
| 25 | A.  I don't recall what surrounded this letter, | 10:07:14 |

Page 61

| | | |
|---|---|---|
| 1 | what interaction surrounded this letter. | 10:07:18 |
| 2 | Q.  Okay.  Did the Zaentz company agree with | 10:07:22 |
| 3 | your position that the new Beam games, Lord of the | 10:07:24 |
| 4 | Rings and The Two -- and the -- sorry.  Let me start | 10:07:27 |
| 5 | that question again. | 10:07:31 |
| 6 | Did the Zaentz company agree with the | 10:07:32 |
| 7 | position taken in your letter that's marked as | 10:07:35 |
| 8 | Exhibit 5 that the new Beam game should be licensed | 10:07:37 |
| 9 | by HarperCollins? | 10:07:39 |
| 10 | MS. ESKENAZI:  Objection.  Vague and | 10:07:42 |
| 11 | ambiguous.  Calls for speculation.  Lacks | 10:07:43 |
| 12 | foundation. | 10:07:43 |
| 13 | THE WITNESS:  I don't know whether they | 10:07:43 |
| 14 | actually responded to my proposals here.  I think it | 10:07:47 |
| 15 | was a situation in which over a period of time there | 10:07:55 |
| 16 | was no response, and one assumed from that that they | 10:08:03 |
| 17 | weren't interested in the proposals. | 10:08:08 |
| 18 | MR. ULIN:  At this point, we've been going | 10:08:12 |
| 19 | for an hour.  I'd like to take a break for about | 10:08:14 |
| 20 | five minutes to revise some notes.  Why don't we do | 10:08:17 |
| 21 | that. | 10:08:19 |
| 22 | THE VIDEOGRAPHER:  This is the end of media | 10:08:19 |
| 23 | number 1.  Off the record at 10:09 a.m. | 10:08:21 |
| 24 | (Brief recess.) | 10:24:55 |
| 25 | THE VIDEOGRAPHER:  We are back on the | 10:26:43 |

Page 62

| | | |
|---|---|---|
| 1 | record at 10:29 a.m.  This is the beginning of media | 10:27:59 |
| 2 | number 2.  Counsel may proceed. | 10:28:04 |
| 3 | BY MR. ULIN: | 10:28:04 |
| 4 | Q.  Ms. Blackburn, before we broke we were | 10:28:09 |
| 5 | talking about your letter to Mr. Bendich of | 10:28:11 |
| 6 | November the 2nd, 1993 which is -- Mr. Bendich of | 10:28:15 |
| 7 | November the 2nd, 1993, which is marked as | 10:28:21 |
| 8 | Exhibit 5. | 10:28:24 |
| 9 | And you indicated when we discussed how to | 10:28:27 |
| 10 | determine whether the Saul Zaentz Company would have | 10:28:36 |
| 11 | rights to license computer games that there was a | 10:28:40 |
| 12 | two-step analysis. | 10:28:42 |
| 13 | Do you recall that? | 10:28:43 |
| 14 | A.  Yes. | 10:28:43 |
| 15 | Q.  Okay.  And as you said, one -- the first | 10:28:45 |
| 16 | step of the -- of the analysis dealt with whether | 10:28:50 |
| 17 | the computer game constituted an article of tangible | 10:28:54 |
| 18 | personal property; is that correct? | 10:28:57 |
| 19 | A.  Correct. | 10:28:58 |
| 20 | Q.  And the second step of the analysis dealt | 10:28:59 |
| 21 | with a distinction between games that are mostly | 10:29:01 |
| 22 | text-based and games that are mostly graphics-based? | 10:29:04 |
| 23 | A.  No, that's not strictly correct. | 10:29:06 |
| 24 | Q.  Okay. | 10:29:06 |
| 25 | A.  As I said -- as I believe I said, the first | 10:29:13 |

Page 63

| | | |
|---|---|---|
| 1 | element was to establish whether one was dealing | 10:29:15 |
| 2 | with an article of tangible personal property. | 10:29:17 |
| 3 | Q.  May I pause you there? | 10:29:19 |
| 4 | A.  Uh-huh. | 10:29:21 |
| 5 | Q.  Is that in your letter? | 10:29:21 |
| 6 | A.  Is it in this letter? | 10:29:22 |
| 7 | Q.  Right. | 10:29:23 |
| 8 | A.  I don't think it is, actually.  It's -- but | 10:29:31 |
| 9 | it's -- that -- that would be the purpose of | 10:29:34 |
| 10 | referencing the earlier documents in my -- to my | 10:29:35 |
| 11 | recollection.  In other words, that first element of | 10:29:39 |
| 12 | the test was implicit by the stage of writing this | 10:29:43 |
| 13 | letter. | 10:29:46 |
| 14 | Q.  Implicit in the sense that you -- | 10:29:47 |
| 15 | A.  Both parties would understand that that was | 10:29:50 |
| 16 | the starting point.  We wouldn't be having the | 10:29:52 |
| 17 | discussion if that weren't already understood. | 10:29:55 |
| 18 | Q.  Your understanding -- just to make sure | 10:29:59 |
| 19 | I -- I get your testimony, your understanding, as | 10:30:02 |
| 20 | you're drafting this letter in November of 1993, is | 10:30:07 |
| 21 | that the video games in question are articles of | 10:30:09 |
| 22 | tangible personal property; is that correct? | 10:30:11 |
| 23 | A.  When I was writing this letter, the | 10:30:23 |
| 24 | starting point was that the computer games of the | 10:30:25 |
| 25 | time constituted articles of tangible personal | 10:30:28 |

Page 64

```
 1    property.                                        10:30:32

 2        Q.  Okay.  But you don't articulate that in the  10:30:33

 3    letter, right?                                   10:30:34

 4        A.  No.                                      10:30:35

 5        Q.  Or articulate that that is an element of  10:30:36

 6    the analysis, right?                             10:30:41

 7        A.  I don't seem to -- I --                  10:30:41

 8        MS. ESKENAZI:  Objection.  Vague and         10:30:42

 9    ambiguous.  And asked and answered.              10:30:43

10        THE WITNESS:  I think it's implicit.         10:30:45

11    BY MR. ULIN:                                     10:30:45

12        Q.  Okay.  But if it's implicit, it's not    10:30:51

13    articulated in this letter; is that correct?     10:30:53

14        A.  Well, I haven't got these -- the agreement  10:30:55

15    in the letter.  If to the extent I'm incorporating  10:31:01

16    those in this letter, I may in fact be expressing  10:31:06

17    the principal, if it wasn't expressed in those   10:31:09

18    letters.                                         10:31:14

19        In this letter itself I don't, I think,      10:31:14

20    refer to that first element of the test.         10:31:16

21        Q.  Okay.                                    10:31:16

22        And I want to go to one before it also.  I   10:31:40

23    want to take both of them.  These two.           10:31:43

24        So let's mark Exhibit 6 to the deposition.   10:31:54

25    I'm sorry.
```

Page 65

```
 1                (The document referred to was

 2           marked for identification as

 3           Exhibit 6 and attached to this

 4           deposition.)

 5           THE WITNESS:  Thank you.

 6           MR. ULIN:  Yeah, that's going to be 7.

 7           MS. ESKENAZI:  Oh, is there a 7?          10:32:49

 8           MR. ULIN:  Not yet.                       10:32:50

 9           MS. ESKENAZI:  Oh.  It's like who's on    10:32:51

10    first.                                           10:32:52

11    BY MR. ULIN:                                     10:32:52

12        Q.  Ms. Blackburn, have you seen the letter  10:33:02

13    that has been marked as Exhibit 6 before?        10:33:04

14        A.  Yes, I have.                             10:33:09

15        Q.  And you recognize this as a letter from  10:33:11

16    Malcolm Burnstein to Adrian Laing at HarperCollins?  10:33:16

17        A.  Yes.                                     10:33:23

18        Q.  And this letter is dated on May the 16th, 10:33:23

19    1996; is that correct?                           10:33:26

20        A.  Correct.                                 10:33:27

21        Q.  And you were copied on this letter,      10:33:28

22    correct?                                         10:33:28

23        A.  Yes.                                     10:33:28

24        Q.  Did you receive this letter in or around 10:33:32

25    1996?                                            10:33:34
```

Page 66

| | | |
|---|---|---|
| 1 | A.  I don't know when I received it, but I did | 10:33:36 |
| 2 | receive it. | 10:33:38 |
| 3 | Q.  Okay.  You recall receiving this letter? | 10:33:39 |
| 4 | A.  Yes. | 10:33:40 |
| 5 | Q.  And you read it when you received it? | 10:33:42 |
| 6 | A.  Yes. | 10:33:42 |
| 7 | Q.  And Mr. Burnstein was counsel for the Saul | 10:33:44 |
| 8 | Zaentz Company; is that correct? | 10:33:52 |
| 9 | A.  I don't know. | 10:33:53 |
| 10 | Q.  Do you know who Mr. Burnstein is? | 10:33:53 |
| 11 | A.  I've heard his name before. | 10:33:56 |
| 12 | Q.  Okay.  And the first line of the letter | 10:34:00 |
| 13 | indicates from Mr. Burnstein: | 10:34:03 |
| 14 | "I have been retained by the Saul | 10:34:05 |
| 15 | Zaentz Company (doing business as | 10:34:10 |
| 16 | Tolkien Enterprises) in connection | 10:34:11 |
| 17 | with the licensing of merchandising | 10:34:13 |
| 18 | rights to the Tolkien properties." | 10:34:14 |
| 19 | Do you see that? | 10:34:17 |
| 20 | A.  I see the first sentence of the letter. | 10:34:17 |
| 21 | Q.  Does that refresh your recollection that | 10:34:20 |
| 22 | Mr. Burnstein was counsel for the Saul Zaentz | 10:34:22 |
| 23 | Company? | 10:34:25 |
| 24 | MS. ESKENAZI:  Objection.  Calls for | 10:34:25 |
| 25 | speculation.  Lacks foundation. | 10:34:27 |

Page 67

```
 1    BY MR. ULIN:                                    10:34:27

 2        Q.  You may answer.                         10:34:28

 3        A.  My knowledge of Mr. Burnstein is that he   10:34:29

 4    occasionally became involved in questions that    10:34:32

 5    related to the Saul Zaentz Company and the Tolkien   10:34:36

 6    Estate.  That's how I know his name.  I don't     10:34:39

 7    know -- I don't know anything about his specific   10:34:42

 8    relationship.                                    10:34:45

 9        Q.  And when you say "he became involved," did   10:34:46

10    he -- did he become involved on the Saul Zaentz    10:34:49

11    side?                                            10:34:51

12        A.  Yes.                                     10:34:51

13        Q.  Okay.  And -- sorry.  Is it your         10:34:58

14    understanding that this letter refers to         10:35:59

15    HarperCollins' rights to continue licensing the   10:36:04

16    games that were the subject of your letter to    10:36:07

17    Mr. Bendich in 1993?                             10:36:10

18            MS. ESKENAZI:  Objection.  Document speaks   10:36:12

19    for itself.  Calls for speculation.  Lacks       10:36:14

20    foundation.                                      10:36:17

21            THE WITNESS:  I haven't -- I haven't read   10:36:17

22    the letter.  Do you want me to read it?          10:36:19

23    BY MR. ULIN:                                     10:36:19

24        Q.  Yes.                                     10:36:19

25        A.  I've read the letter.                    10:37:37

                                              Page 68
```

```
 1        Q.   Okay.  And is it your understanding that      10:37:40

 2   this letter relates to the question of who has the      10:37:41

 3   rights to license the games you were writing with       10:37:44

 4   Mr. Bendich about in 1993?                              10:37:48

 5        MS. ESKENAZI:  Objection.  Vague and               10:37:50

 6   ambiguous.  Calls for speculation.  Lacks               10:37:51

 7   foundation.                                             10:37:56

 8        THE WITNESS:  I think Mr. Burnstein writes         10:37:56

 9   very broadly here about -- he talks about games,        10:37:58

10   including computer games.  So it's -- it's -- as I      10:38:01

11   read this letter, it's -- it's very broaden.  It        10:38:05

12   goes -- it goes wider than what we were talking         10:38:10

13   about with Al Bendich.                                  10:38:14

14   BY MR. ULIN:                                            10:38:14

15        Q.   Okay.  But it would incorporate those games   10:38:17

16   within the scope of what it's addressing?               10:38:18

17        MS. ESKENAZI:  Same objections.  Calls for         10:38:20

18   speculation.  Lacks foundation.                         10:38:22

19        THE WITNESS:  What I would say about this          10:38:24

20   letter is it -- it -- it doesn't really encompass       10:38:25

21   our discussions with the Saul Zaentz Company on         10:38:31

22   computer games at this point.  It seems to take a --    10:38:35

23   a different approach.                                   10:38:40

24   BY MR. ULIN:                                            10:38:40

25        Q.   Okay.  Mr. Burnstein writes at the bottom     10:38:45
```

Page 69

```
1    of the first page carrying over onto the top of the    10:38:49

2    second page that he wants to make clear on behalf of    10:38:55

3    the Saul Zaentz Company "in the strongest possible      10:38:58

4    terms, that HarperCollins has no right to any           10:39:01

5    computer games as defined below."                       10:39:05

6          Do you see that?                                  10:39:07

7     A.  Sorry, where did you direct me?                    10:39:07

8     Q.  Bottom of page 1 to the top of page 2.             10:39:11

9     A.  "We want to make it clear" -- sorry.  Could        10:39:17

10   you repeat your question?                               10:39:20

11    Q.  The question is only that Mr. Burnstein            10:39:23

12   writes that Saul Zaentz wants to make clear that        10:39:25

13   HarperCollins has no right to any computer games as     10:39:27

14   defined below.                                          10:39:31

15         Do you see that?                                  10:39:32

16    A.  Yes.                                               10:39:32

17         MS. ESKENAZI:  Objection.  Document speaks        10:39:33

18   for itself.                                             10:39:34

19   BY MR. ULIN:                                            10:39:34

20    Q.  And in the next paragraph, he draws the            10:39:36

21   distinction between two types of computer games.        10:39:40

22         Do you see that?                                  10:39:45

23    A.  I see what he says in the first full               10:39:45

24   paragraph on page 2.                                    10:39:59

25    Q.  Okay.  And he indicates there that any             10:40:01
```

Page 70

| | | |
|---|---|---|
| 1 | computer or online game that uses graphics rather | 10:40:03 |
| 2 | than words as its primary tool is ipso facto the | 10:40:07 |
| 3 | property of Tolkien Enterprises. | 10:40:11 |
| 4 | Do you see that? | 10:40:15 |
| 5 | A.  I see that he says that. | 10:40:15 |
| 6 | Q.  Okay.  Did you respond to Mr. Burnstein's | 10:40:16 |
| 7 | letter? | 10:40:22 |
| 8 | A.  I don't believe I responded personally.  I | 10:40:25 |
| 9 | would have discussed this letter with Adrian Laing. | 10:40:28 |
| 10 | HarperCollins and the Tolkien Estate are joint | 10:40:35 |
| 11 | owners of the residual rights.  That's to say they | 10:40:37 |
| 12 | are the licensors of the Saul Zaentz Company. | 10:40:44 |
| 13 | So in any discussions such as this, I | 10:40:46 |
| 14 | would -- we would have to coordinate our response | 10:40:52 |
| 15 | and, specifically, our legal analysis. | 10:40:57 |
| 16 | Q.  Do you recall a conversation with Mr. Laing | 10:40:59 |
| 17 | or anybody at HarperCollins around this time in | 10:41:01 |
| 18 | response to Mr. Burnstein's letter? | 10:41:04 |
| 19 | A.  I don't -- | 10:41:05 |
| 20 | MS. ESKENAZI:  I'm going to advise the -- | 10:41:06 |
| 21 | I'm going to let the witness answer this one | 10:41:09 |
| 22 | question, but to the extent that it starts getting | 10:41:11 |
| 23 | into attorney-client privileged information I'm | 10:41:18 |
| 24 | going to instruct her not to answer.  But she can | 10:41:20 |
| 25 | answer that one question. | 10:41:23 |

Page 71

| | | |
|---|---|---|
| 1 | MR. ULIN:  Let's address that when -- | 10:41:25 |
| 2 | MS. ESKENAZI:  Fair enough. | 10:41:25 |
| 3 | MR. ULIN:  -- the time comes. | 10:41:26 |
| 4 | THE WITNESS:  I've forgotten what the | 10:41:27 |
| 5 | question is. | 10:41:29 |
| 6 | BY MR. ULIN: | 10:41:29 |
| 7 | Q.  Do you recall any conversations with | 10:41:30 |
| 8 | Mr. Laing or anybody at HarperCollins about | 10:41:30 |
| 9 | Mr. Burnstein's letter at or around this time, May | 10:41:32 |
| 10 | of 1996? | 10:41:34 |
| 11 | MS. ESKENAZI:  That is a "yes" or "no" | 10:41:36 |
| 12 | question. | 10:41:37 |
| 13 | THE WITNESS:  I don't recall the specifics | 10:41:41 |
| 14 | of the conversation.  But I believe I would have had | 10:41:50 |
| 15 | conversations or correspondence. | 10:41:54 |
| 16 | BY MR. ULIN: | 10:41:54 |
| 17 | Q.  Did you discuss with Mr. Laing or anybody | 10:41:56 |
| 18 | at HarperCollins the assertion by Zaentz that any | 10:42:00 |
| 19 | online game that uses graphics was the property of | 10:42:05 |
| 20 | the Saul Zaentz Company or Tolkien Enterprises? | 10:42:14 |
| 21 | MS. ESKENAZI:  Objection.  Attorney-client | 10:42:18 |
| 22 | privilege.  Instruct the witness not to answer. | 10:42:19 |
| 23 | BY MR. ULIN: | 10:42:19 |
| 24 | Q.  Are you accepting your counsel's | 10:42:23 |
| 25 | instruction? | 10:42:24 |

Page 72

```
 1        A.  I am.                                    10:42:24

 2            MR. ULIN:  She -- she has testified that  10:42:26

 3    she does not represent the -- HarperCollins or the 10:42:31

 4    HarperCollins parties.  What's the basis for the   10:42:37

 5    assertion that it's attorney-client privilege?     10:42:39

 6            MS. ESKENAZI:  She's also testified as     10:42:41

 7    joint owners, they came to legal conclusions       10:42:43

 8    together, so she just explained that to you.  And on 10:42:45

 9    that basis, we're -- there's a joint attorney-client 10:42:49

10    privilege assertion.                               10:42:54

11    BY MR. ULIN:                                       10:42:54

12        Q.  Did HarperCollins and the Estate have a    10:43:24

13    written common interest agreement in 1996?         10:43:27

14            MS. ESKENAZI:  Objection.  Vague and       10:43:31

15    ambiguous.                                         10:43:33

16            THE WITNESS:  What is a written -- what is 10:43:33

17    a common interest agreement?                       10:43:36

18    BY MR. ULIN:                                       10:43:37

19        Q.  Was there an agreement between             10:43:37

20    HarperCollins and the Estate that communications   10:43:38

21    between them relating to the licensing of -- excuse 10:43:42

22    me -- Tolkien works or trademarks would be         10:43:48

23    privileged?                                        10:43:51

24            MS. ESKENAZI:  Objection.  It's vague and  10:43:53

25    ambiguous.                                         10:43:53
```

Page 73

```
 1    BY MR. ULIN:                                    10:43:53

 2        Q.  You may answer.                         10:44:04

 3            MS. ESKENAZI:  If you understand the    10:44:06

 4    question, you may answer.                       10:44:06

 5            THE WITNESS:  I -- I don't understand the  10:44:07

 6    question.  Not -- that's not a -- that's not the  10:44:08

 7    sort of document I've come across before.       10:44:12

 8    BY MR. ULIN:                                    10:44:12

 9        Q.  Okay.  So as you sit here today, you can't  10:44:15

10    recall a written agreement with HarperCollins in  10:44:16

11    around 1996 that communications between you and   10:44:19

12    representatives of HarperCollins would remain     10:44:21

13    privileged; is that correct?                     10:44:23

14            MS. ESKENAZI:  Objection.  Vague and     10:44:25

15    ambiguous.                                        10:44:25

16            You can answer if you understand the     10:44:31

17    question.                                         10:44:32

18            THE WITNESS:  I don't think there was a   10:44:37

19    written agreement to that effect, but the parties  10:44:38

20    acted together in legal matters to deal with these  10:44:43

21    jointly-held rights.                              10:44:47

22            When you asked me earlier if -- if       10:44:51

23    HarperCollins was my client, I understood you to  10:44:55

24    mean had -- had -- had they hired my firm.  The   10:44:58

25    answer is they hadn't hired my firm, hence my     10:45:04
```

                                                  Page 74

```
 1    answer.  But we worked absolutely together over any      10:45:07

 2    legal issues to do with the 1969 agreements and we       10:45:14

 3    still do.                                                10:45:17

 4             MR. PETROCELLI:  Move to strike everything      10:45:20

 5    after the words "agreement to that effect" as            10:45:22

 6    nonresponsive to the question.                           10:45:23

 7             MS. ESKENAZI:  Well --                          10:45:29

 8    BY MR. ULIN:                                             10:45:29

 9        Q.  Did -- did you respond to Mr. Burnstein's        10:45:29

10    assertion that online games that use graphics rather     10:45:36

11    than words as their primary tool are the property of     10:45:45

12    Tolkien Enterprises?                                     10:45:49

13             MS. ESKENAZI:  Objection.  It's vague and       10:45:49

14    ambiguous.                                               10:45:52

15             THE WITNESS:  I don't believe I responded       10:45:52

16    to Mr. Burnstein.                                        10:45:54

17             MR. ULIN:  Put Exhibit 7 before the             10:46:08

18    witness.                                                 10:46:10

19                 (The document referred to was               10:46:10

20                 marked for identification as                10:46:10

21                 Exhibit 7 and attached to this              10:46:10

22                 deposition.)                                10:46:28

23             MS. ESKENAZI:  May I have a copy of             10:46:28

24    Exhibit 7?                                               10:46:29

25             MR. ULIN:  Yes, you certainly may.  We find     10:46:29
```

                                                        Page 75

| | | |
|---|---|---|
| 1 | it more amusing to keep you in the dark, actually. | 10:46:31 |
| 2 | THE WITNESS:  Do you want me to read this | 10:47:16 |
| 3 | letter? | 10:47:17 |
| 4 | BY MR. ULIN: | 10:47:17 |
| 5 | Q.  Sure, yes.  I can tell you that my | 10:47:18 |
| 6 | questions are going to be directed to the first | 10:47:20 |
| 7 | paragraph.  I think that's it. | 10:47:24 |
| 8 | A.  Okay. | 10:47:24 |
| 9 | Q.  Ms. Blackburn, have you seen Exhibit 7? | 10:48:35 |
| 10 | MS. ESKENAZI:  I'm sorry, have you read the | 10:48:37 |
| 11 | entire document? | 10:48:38 |
| 12 | THE WITNESS:  I've looked at the -- I've | 10:48:38 |
| 13 | looked at what I think I need to look at. | 10:48:44 |
| 14 | MS. ESKENAZI:  Okay. | 10:48:46 |
| 15 | BY MR. ULIN: | 10:48:46 |
| 16 | Q.  Ms. Blackburn, have you seen Exhibit -- | 10:48:47 |
| 17 | Exhibit 7 before? | 10:48:48 |
| 18 | A.  Yes. | 10:48:49 |
| 19 | Q.  Do you recognize this as a letter from | 10:48:51 |
| 20 | Mr. Laing to Mr. Burnstein dated July 18, 1996? | 10:48:54 |
| 21 | A.  18 July 1996, yes. | 10:49:02 |
| 22 | Q.  And you were copied on this letter, | 10:49:06 |
| 23 | correct? | 10:49:06 |
| 24 | A.  Correct. | 10:49:11 |
| 25 | Q.  Do you recall receiving this letter around | 10:49:12 |

Page 76

```
 1    the 18th of July 1996?                         10:49:14

 2        A.  Yes.                                    10:49:16

 3        Q.  And this letter refers in paragraph 1 in   10:49:21

 4    the first full sentence to games produced in the   10:49:27

 5    United States by Interplay Productions under license   10:49:35

 6    from Beam International of Australia.            10:49:38

 7            Do you see that?                        10:49:43

 8        A.  It says there, "games produced by the U.S.   10:49:43

 9    company."  It doesn't deal with the geographical   10:49:45

10    ambit.                                          10:49:49

11        Q.  Fair enough.                            10:49:50

12        A.  But -- but I've read the sentence.      10:49:51

13        Q.  And those are the same games that you and   10:49:53

14    Mr. Bendich corresponded about in 1993; isn't that   10:50:04

15    correct?                                        10:50:08

16            MS. ESKENAZI:  Objection.  Vague and    10:50:08

17    ambiguous.                                      10:50:16

18            THE WITNESS:  I believe that the current   10:50:16

19    computer games to which Adrian Laing is referring   10:50:18

20    are essentially the same ones as we had been     10:50:21

21    discussing in this period.                      10:50:24

22    BY MR. ULIN:                                    10:50:24

23        Q.  And those are -- and does that also refresh   10:50:26

24    your recollection that those are the same games that   10:50:28

25    were being referred to by Mr. Burnstein in the   10:50:29
```

Page 77

```
 1    letter which we marked as Exhibit 6?              10:50:32

 2          MS. ESKENAZI:  Objection.  Calls for        10:50:34

 3    speculation.  Lacks foundation.                   10:50:35

 4    BY MR. ULIN:                                      10:50:35

 5          Q.  You may answer.                          10:50:38

 6          A.  I -- I don't know what Mr. Burnstein was 10:50:38

 7    referring to.  He -- he's very, very broad in     10:50:40

 8    that -- in that letter as to what he's referring to. 10:50:44

 9          Q.  In -- sorry, turning to Exhibit 6 for a  10:50:54

10    moment, the letter from Mr. Burnstein, the second -- 10:51:24

11    on the second page, the final full paragraph, in the 10:51:28

12    center of the paragraph Mr. Burnstein writes:      10:51:33

13              "We know that Interplay                  10:51:36

14          Productions continues to sell three          10:51:38

15          games under your license."                  10:51:40

16          And then it goes on to talk about royalties  10:51:41

17    for those games.                                   10:51:43

18          Does that refresh your recollection that     10:51:44

19    Mr. Burnstein is talking about these same Beam games 10:51:47

20    that are being referred to in the response from    10:51:50

21    Mr. Laing?                                         10:51:56

22          MS. ESKENAZI:  Objection.  Calls for         10:51:56

23    speculation.  Lacks foundation.                    10:51:58

24          THE WITNESS:  I don't know precisely what    10:52:00

25    Mr. Burnstein was referring to and the relationship 10:52:03
```

Page 78

| | | |
|---|---|---|
| 1 | between that and what Mr. Laing was referring to. | 10:52:08 |
| 2 | BY MR. ULIN: | 10:52:08 |
| 3 | Q.  Fair enough.  Returning to Exhibit 7, and | 10:52:12 |
| 4 | the first full paragraph in Exhibit 7, Mr. -- | 10:52:15 |
| 5 | Mr. Laing writes that he is -- at the bot- -- in the | 10:52:25 |
| 6 | last sentence of paragraph 1 -- "prepared to concede | 10:52:30 |
| 7 | that the right to license computer games in the form | 10:52:34 |
| 8 | licensed under the 1990 and '91 agreements belongs | 10:52:39 |
| 9 | to your client," meaning the Saul Zaentz Company. | 10:52:42 |
| 10 | Do you see that? | 10:52:46 |
| 11 | A.  I can see the sentence. | 10:52:46 |
| 12 | Q.  Okay.  And Mr. Laing is, therefore, | 10:52:48 |
| 13 | conceding for HarperCollins that Saul Zaentz had the | 10:52:55 |
| 14 | right to license the Beam games about which you and | 10:52:58 |
| 15 | Mr. Bendich corresponded in 1993, correct? | 10:53:01 |
| 16 | A.  I think you're making too many links there. | 10:53:04 |
| 17 | I don't know what the 1990 and 1991 agreements were. | 10:53:09 |
| 18 | At least I don't recall.  I don't recall with whom | 10:53:16 |
| 19 | those agreements were formed and what the subject | 10:53:19 |
| 20 | matter was. | 10:53:21 |
| 21 | And so to answer your question, I would -- | 10:53:22 |
| 22 | I could only answer your question in the affirmative | 10:53:25 |
| 23 | or in the negative, if I reviewed those agreements. | 10:53:27 |
| 24 | Q.  Okay.  But it does -- the concession of | 10:53:32 |
| 25 | rights is in the context of the Beam games in this | 10:53:33 |

Page 79

```
 1   paragraph?                                         10:53:37

 2       A.  I don't know.  I mean, it doesn't say in    10:53:37

 3   this letter that the 1990 and the 1991 agreements  10:53:39

 4   were with Beam.                                     10:53:43

 5       Q.  Did Mr. Laing share this -- this letter to 10:53:47

 6   Mr. Burnstein with you in draft form before it was 10:54:03

 7   sent?                                               10:54:06

 8          MS. ESKENAZI:  Objection.  Attorney-client  10:54:06

 9   privilege.  Work product.  Instruct not to answer. 10:54:09

10   BY MR. ULIN:                                        10:54:09

11       Q.  Did you respond in any way to              10:54:23

12   Mr. Burnstein's letter -- sorry, to Mr. Laing's    10:54:26

13   letter to Mr. Burnstein conceding rights in computer 10:54:29

14   games licensed in 1990 and '91?                    10:54:32

15          MS. ESKENAZI:  Objection to the extent it   10:54:37

16   calls for attorney-client privileged information.  10:54:40

17          So to the extent that you can answer that   10:54:43

18   question without revealing attorney-client         10:54:46

19   privileges, you're -- the -- Mr. Ulin is entitled to 10:54:49

20   an answer.                                          10:54:56

21          THE WITNESS:  I don't recall.               10:54:56

22   BY MR. ULIN:                                        10:54:56

23       Q.  Okay.  Did you communicate with the Saul   10:55:03

24   Zaentz Company or any of its representatives about 10:55:07

25   Mr. Laing's letter and the concession of rights in 10:55:10
```

Page 80

| | | |
|---|---|---|
| 1 | computer games licensed in 1990 and '91? | 10:55:16 |
| 2 | MS. ESKENAZI:  Objection.  Misstates the | 10:55:18 |
| 3 | document.  Misstates the evidence. | 10:55:19 |
| 4 | THE WITNESS:  I don't recall. | 10:55:23 |
| 5 | BY MR. ULIN: | 10:55:23 |
| 6 | Q.  Did you indicate to the Saul Zaentz Company | 10:55:28 |
| 7 | any disagreement with any of the conclusions made by | 10:55:30 |
| 8 | Mr. Laing in his letter of July 18, 1996? | 10:55:35 |
| 9 | A.  I don't recall. | 10:55:40 |
| 10 | Q.  Mr. -- Mr. Laing, it appears, does not | 10:55:41 |
| 11 | respond specifically to Mr. Burnstein's suggestion | 10:56:14 |
| 12 | that Zaentz holds rights to license online games | 10:56:17 |
| 13 | based on The Lord of the Rings and The Hobbit. | 10:56:24 |
| 14 | Is that your understanding also? | 10:56:25 |
| 15 | MS. ESKENAZI:  Objection.  Misstates the | 10:56:27 |
| 16 | document. | 10:56:30 |
| 17 | THE WITNESS:  Could -- could I ask you to | 10:56:35 |
| 18 | repeat the question? | 10:56:37 |
| 19 | BY MR. ULIN: | 10:56:37 |
| 20 | Q.  Yeah, let me rephrase the question. | 10:56:39 |
| 21 | It appears that Mr. Laing does not respond | 10:56:40 |
| 22 | specifically to Mr. Burnstein's suggestion that | 10:56:45 |
| 23 | Zaentz holds rights to license online games versus | 10:56:50 |
| 24 | The Lords of the Rings and The Hobbit; is that | 10:56:52 |
| 25 | correct? | 10:56:52 |

Page 81

Veritext National Deposition & Litigation Services
866 299-5127

| | | |
|---|---|---|
| 1 | MS. ESKENAZI:  Objection.  Misstates the | 10:56:54 |
| 2 | document.  Also relevance. | 10:56:55 |
| 3 | THE WITNESS:  I don't think he refers to | 10:57:02 |
| 4 | the word "online" in this letter. | 10:57:03 |
| 5 | BY MR. ULIN: | 10:57:03 |
| 6 | Q.  Do you recall anyone responding to | 10:57:05 |
| 7 | Mr. Burnstein about his assertion relat- -- | 10:57:06 |
| 8 | regarding the right to license online games based on | 10:57:08 |
| 9 | The Lord of the Rings and The Hobbit? | 10:57:13 |
| 10 | A.  I don't recall.  I think you asked me if I | 10:57:15 |
| 11 | recalled, so the answer is no. | 10:57:18 |
| 12 | MR. ULIN:  Exhibit 8. | 10:57:49 |
| 13 | (The document referred to was | 10:58:10 |
| 14 | marked for identification as | 10:58:10 |
| 15 | Exhibit 8 and attached to this | 10:58:10 |
| 16 | deposition.) | 10:58:11 |
| 17 | MS. ESKENAZI:  May I have a copy of it? | 10:58:11 |
| 18 | MR. ULIN:  Yes. | 10:58:12 |
| 19 | MS. ESKENAZI:  Thank you. | 10:58:13 |
| 20 | THE WITNESS:  I've read the document. | 10:58:45 |
| 21 | BY MR. ULIN: | 10:58:45 |
| 22 | Q.  Okay.  Ms. Blackburn, have you seen Exhibit | 10:58:49 |
| 23 | 8 before? | 10:58:49 |
| 24 | A.  Yes. | 10:58:52 |
| 25 | Q.  And you recognize this as a letter from Al | 10:58:52 |

Page 82

| | | |
|---|---|---|
| 1 | Bendich to you of October the 2nd, 1997? | 10:58:56 |
| 2 | A.  Yes, I do. | 10:58:59 |
| 3 | Q.  And do you recall receiving this letter | 10:58:59 |
| 4 | around that time? | 10:59:01 |
| 5 | A.  I don't have any specific recollection, but | 10:59:06 |
| 6 | it's clear that I did. | 10:59:08 |
| 7 | Q.  And in the fourth full paragraph of the | 10:59:09 |
| 8 | letter, Mr. Bendich reports to you that the Zaentz | 10:59:15 |
| 9 | company has been negotiating with several competing | 10:59:19 |
| 10 | companies for rights to graphics-based video, | 10:59:23 |
| 11 | CD-ROM, online and other interactive computer games. | 10:59:27 |
| 12 | Do you see that? | 10:59:30 |
| 13 | A.  I do. | 10:59:30 |
| 14 | Q.  Okay.  Did you have any conversations with | 10:59:34 |
| 15 | Mr. Bendich in response to his -- let me start that | 10:59:39 |
| 16 | question again. | 10:59:46 |
| 17 | Did you have any conversations with | 10:59:46 |
| 18 | Mr. Bendich about whether Zaentz had the right to | 10:59:48 |
| 19 | license online and interactive computer games? | 10:59:52 |
| 20 | A.  I don't recall. | 10:59:56 |
| 21 | Q.  At this -- I'm sorry, in response to this | 10:59:57 |
| 22 | letter in 1997? | 11:00:00 |
| 23 | A.  I don't recall. | 11:00:00 |
| 24 | Q.  As you sit here today, you don't recall | 11:00:02 |
| 25 | having conversations with him in 1997 about whether | 11:00:03 |

Page 83

| | | |
|---|---|---|
| 1 | Zaentz had the right to license online or | 11:00:06 |
| 2 | interactive computer games; is that correct? | 11:00:09 |
| 3 | MS. ESKENAZI:  Objection.  Vague and | 11:00:12 |
| 4 | ambiguous. | 11:00:16 |
| 5 | THE WITNESS:  Sitting here today, I don't | 11:00:16 |
| 6 | recall having discussed the subject matter of that | 11:00:17 |
| 7 | paragraph with Mr. Bendich at that time. | 11:00:22 |
| 8 | BY MR. ULIN: | 11:00:22 |
| 9 | Q.  Did you -- well, let me ask this:  What was | 11:00:43 |
| 10 | your response to the information that Zaentz was | 11:00:49 |
| 11 | negotiating with several companies concerning the | 11:00:54 |
| 12 | rights to develop online or interactive computer | 11:00:57 |
| 13 | games concerning The Lord of the Rings? | 11:01:02 |
| 14 | A.  Sorry, could you -- | 11:01:05 |
| 15 | MS. ESKENAZI:  Objection. | 11:01:06 |
| 16 | THE WITNESS:  Sorry. | 11:01:07 |
| 17 | MS. ESKENAZI:  Objection.  Vague and | 11:01:08 |
| 18 | ambiguous. | 11:01:09 |
| 19 | MR. ULIN:  Sure. | 11:01:09 |
| 20 | Q.  What was your response to Mr. Bendich's | 11:01:09 |
| 21 | letter informing you that Zaentz was negotiating | 11:01:14 |
| 22 | with several companies concerning the right to | 11:01:20 |
| 23 | develop online and interactive computer games | 11:01:22 |
| 24 | concerning The Lord of the Rings? | 11:01:24 |
| 25 | MS. ESKENAZI:  Same objection.  Vague and | 11:01:26 |

Page 84

```
 1    ambiguous.                                    11:01:27

 2          THE WITNESS:  I don't recall.           11:01:27

 3    BY MR. ULIN:                                   11:01:27

 4       Q.  You understood at that -- sorry, let me ask  11:01:37

 5    the question again.                            11:01:41

 6          By 1997, online and interactive games were  11:01:41

 7    already available over the Internet.  Is that your  11:01:48

 8    understanding?                                 11:01:51

 9          MS. ESKENAZI:  Objection.  It's vague and  11:01:51

10    ambiguous.                                    11:01:52

11          THE WITNESS:  I don't know.             11:01:52

12    BY MR. ULIN:                                   11:01:52

13       Q.  Okay.  Did you take the position in    11:01:55

14    response to this letter that Zaentz could not  11:02:10

15    license online computer games unless they had some  11:02:17

16    physical component?                            11:02:20

17       A.  No, I didn't.  And the reason I wouldn't  11:02:23

18    have done that is that they knew that.         11:02:26

19          MR. PETROCELLI:  Move to strike as      11:02:29

20    nonresponsive after the words, "No, I didn't."  11:02:30

21          MS. ESKENAZI:  Just to be clear,        11:02:34

22    Mr. Petrocelli's motion to strike has no effect  11:02:35

23    in -- in this deposition, so you can answer whatever  11:02:38

24    you need to answer to be accurate.             11:02:41

25          THE WITNESS:  Thank you.                11:02:43
```

Page 85

```
 1    BY MR. ULIN:                                    11:02:43

 2        Q.  Do you recall subsequently being informed   11:03:19

 3    about Zaentz's negotiating a video game license with  11:03:22

 4    a company called Sierra On-Line?                 11:03:27

 5        A.  Yes.                                     11:03:29

 6        Q.  And who at Zaentz did you discuss this    11:03:31

 7    Sierra On-Line license with?                     11:03:34

 8        A.  I don't know that I did discuss the       11:03:39

 9    Sierra -- you asked me about being informed.     11:03:42

10        Q.  Okay.  And when you say -- so let's probe  11:03:48

11    that.                                            11:03:51

12            How were you informed of Zaentz's        11:03:51

13    negotiations with Sierra On-Line?                11:03:55

14        A.  I don't -- I don't recall.               11:03:56

15            MR. ULIN:  Let's mark Exhibit 9.         11:04:27

16                (The document referred to was        11:04:28

17            marked for identification as             11:04:28

18            Exhibit 9 and attached to this           11:04:28

19            deposition.)                             11:04:28

20            MR. ULIN:  Oh, I see.  Okay.  These ones  11:05:15

21    are double-sided.  It's half as thick, so it gave me  11:05:15

22    some pause.                                      11:05:15

23            MS. ESKENAZI:  This is number 9?         11:05:25

24            MR. ULIN:  Yes.                          11:05:25

25        Q.  Ms. Blackburn, have you seen Exhibit 9    11:06:37

                                                 Page 86
```

| | | |
|---|---|---|
| 1 | before? | 11:06:40 |
| 2 |     A.  I've seen the letter from Laurie Battle | 11:06:40 |
| 3 | before. | 11:06:46 |
| 4 |     Q.  Okay.  And have you seen the attached | 11:06:46 |
| 5 | license agreement? | 11:06:48 |
| 6 |     A.  If that's the attachment to her letter, | 11:06:49 |
| 7 | then yes, I've seen that. | 11:06:53 |
| 8 |     Q.  Okay.  And this letter from Laurie Battle, | 11:06:58 |
| 9 | is this one of the means by which you were informed | 11:07:01 |
| 10 | of Zaentz's negotiations with Sierra On-Line? | 11:07:05 |
| 11 |     A.  Yes. | 11:07:08 |
| 12 |     Sorry, can I ask a question?  Did you say | 11:07:15 |
| 13 | informed about the negotiations? | 11:07:18 |
| 14 |     Q.  I did.  And I -- go ahead. | 11:07:22 |
| 15 |     A.  Because by the time of this letter, it | 11:07:25 |
| 16 | seems that it's happened. | 11:07:29 |
| 17 |     Q.  Fair enough. | 11:07:31 |
| 18 |     A.  Except that the license agreement -- she | 11:07:32 |
| 19 | says, "a copy of the signed license agreement" but | 11:07:36 |
| 20 | this isn't signed and it doesn't seem to have an end | 11:07:39 |
| 21 | page.  So I simply make that observation. | 11:07:43 |
| 22 |     Q.  Fair enough.  Do you recall seeing this | 11:07:47 |
| 23 | letter or -- on or around November the 12th, 1998? | 11:08:00 |
| 24 |     A.  I recall seeing it sometime after it was | 11:08:04 |
| 25 | sent and I have no reason to think it wasn't | 11:08:10 |

Page 87

| | | |
|---|---|---|
| 1 | reasonably contemporaneously. | 11:08:12 |
| 2 | Q.  Fair enough.  Turning to the attached | 11:08:16 |
| 3 | license agreement. | 11:08:21 |
| 4 | A.  Yeah. | 11:08:22 |
| 5 | Q.  At the second page of the agreement, the | 11:08:28 |
| 6 | document provides in its definition section at | 11:08:43 |
| 7 | paragraph (e), the definition of an interactive | 11:08:48 |
| 8 | software product. | 11:08:51 |
| 9 | Do you see that? | 11:08:52 |
| 10 | A.  Yes, I see that. | 11:08:52 |
| 11 | Q.  Okay.  And among those definitions includes | 11:08:56 |
| 12 | software product that is "embodied in software or | 11:09:00 |
| 13 | other digital electronic form and capable of use or | 11:09:05 |
| 14 | operation on one or more of the licensed platforms." | 11:09:10 |
| 15 | Do you see that? | 11:09:12 |
| 16 | A.  I'm not sure whether you read it -- read it | 11:09:16 |
| 17 | out.  I can see the definition paragraph. | 11:09:17 |
| 18 | Q.  Did you read these definitions at the time | 11:09:20 |
| 19 | you received this document? | 11:09:22 |
| 20 | A.  I don't recall. | 11:09:24 |
| 21 | Q.  Okay.  In paragraph (f) of the definition | 11:09:32 |
| 22 | of licensed platforms, it -- Roman numeral (iii) -- | 11:09:35 |
| 23 | A.  Yes. | 11:09:42 |
| 24 | Q.  -- includes "any online network, including | 11:09:43 |
| 25 | without limitation, the global computer network | 11:09:47 |

Page 88

| | | |
|---|---|---|
| 1 | commonly known as the Internet." | 11:09:52 |
| 2 | Do you see that? | 11:09:53 |
| 3 | A.  Yes. | 11:09:54 |
| 4 | Q.  Did you read that definition at the time | 11:09:54 |
| 5 | you received this license? | 11:09:56 |
| 6 | MS. ESKENAZI:  Objection.  Asked and | 11:09:57 |
| 7 | answered. | 11:09:58 |
| 8 | You can answer again. | 11:09:59 |
| 9 | THE WITNESS:  I don't recall. | 11:09:59 |
| 10 | BY MR. ULIN: | 11:09:59 |
| 11 | Q.  And sorry, in the -- in paragraph (g) of | 11:10:12 |
| 12 | the -- of the license, an entertainment product is | 11:10:17 |
| 13 | defined as "any interactive software product." | 11:10:19 |
| 14 | Do you see that? | 11:10:23 |
| 15 | A.  Yes. | 11:10:23 |
| 16 | Q.  And that term was defined above in | 11:10:23 |
| 17 | paragraph (e), right? | 11:10:25 |
| 18 | MS. ESKENAZI:  Objection.  Calls for a | 11:10:26 |
| 19 | legal conclusion. | 11:10:28 |
| 20 | MR. ULIN:  She's a lawyer. | 11:10:28 |
| 21 | THE WITNESS:  I can see that at paragraph | 11:10:31 |
| 22 | (e) there's a definition of interactive software | 11:10:33 |
| 23 | product. | 11:10:35 |
| 24 | BY MR. ULIN: | 11:10:35 |
| 25 | Q.  And then finally turning to the -- to the | 11:10:36 |

Page 89

| | | |
|---|---|---|
| 1 | following page, paragraph (1), the definition of | 11:10:38 |
| 2 | commercial release -- | 11:10:45 |
| 3 | A.  Yes. | 11:10:47 |
| 4 | Q.  -- includes making available for download | 11:10:50 |
| 5 | of a licensed product. | 11:10:53 |
| 6 | Do you see that? | 11:10:55 |
| 7 | A.  Well, the definition of commercial release | 11:10:55 |
| 8 | is stated to mean "the shipment, license, sale or | 11:11:01 |
| 9 | making available for sale, use or download of a" -- | 11:11:05 |
| 10 | "a licensed product."  I don't think that was what | 11:11:09 |
| 11 | you said. | 11:11:12 |
| 12 | Q.  No, what I said is that it includes making | 11:11:12 |
| 13 | a -- making a licensed product available for | 11:11:15 |
| 14 | download. | 11:11:20 |
| 15 | Would you agree with that? | 11:11:23 |
| 16 | A.  It includes -- | 11:11:23 |
| 17 | MS. ESKENAZI:  Objection.  Misstates the | 11:11:25 |
| 18 | document. | 11:11:26 |
| 19 | THE WITNESS:  Could you repeat, please? | 11:11:28 |
| 20 | BY MR. ULIN: | 11:11:29 |
| 21 | Q.  Yes.  The definition of "commercial | 11:11:29 |
| 22 | release" includes making a licensed product | 11:11:31 |
| 23 | available for download. | 11:11:35 |
| 24 | A.  I don't think that is what it says. | 11:11:42 |
| 25 | Q.  Because it includes more -- other means of | 11:11:45 |

Page 90

```
 1    commercial release?                             11:11:56

 2        A.   Yes.                                   11:11:57

 3        Q.   Okay.  But one of the means of commercial  11:12:01

 4    release that's included on that list is making the  11:12:03

 5    licensed product available for download, correct?  11:12:05

 6            MS. ESKENAZI:  Same objection.  Misstates  11:12:08

 7    the document.  Calls for a legal conclusion.    11:12:11

 8            THE WITNESS:  Sorry.                     11:12:34

 9    BY MR. ULIN:                                    11:12:34

10        Q.   So the question was, one of the means of  11:12:36

11    commercial release included is making the licensed  11:12:38

12    product available for download, correct?        11:12:42

13            MS. ESKENAZI:  Same objections.          11:12:48

14            You can answer if you understand.         11:12:48

15            THE WITNESS:  I think -- I think that's   11:13:00

16    what it was saying is, as a summary of -- in stating  11:13:01

17    an element of what that definition -- definition  11:13:04

18    encompasses, I can accept.                       11:13:07

19    BY MR. ULIN:                                    11:13:07

20        Q.   So the license includes making interactive  11:13:11

21    games available for download over the Internet.  Let  11:13:26

22    me -- let me start -- let me rephrase that.      11:13:31

23            So the license authorizes Sierra On-Line to  11:13:34

24    make interactive games available for download over  11:13:40

25    the Internet; is that correct?                   11:13:44

                                              Page 91
```

| | | |
|---|---|---|
| 1 | MS. ESKENAZI:  Objection.  Misstates the | 11:13:46 |
| 2 | document. | 11:13:47 |
| 3 | THE WITNESS:  What we're looking at here | 11:13:49 |
| 4 | is -- is a -- a defined term which includes the word | 11:13:52 |
| 5 | "download."  I don't think -- I don't know whether | 11:13:55 |
| 6 | that references what Sierra On-Line is being | 11:13:58 |
| 7 | authorized to do or not. | 11:14:02 |
| 8 | BY MR. ULIN: | 11:14:02 |
| 9 | Q.  Did you ask anyone to review this license | 11:14:27 |
| 10 | at the time you received it? | 11:14:36 |
| 11 | MS. ESKENAZI:  Objection.  Vague and | 11:14:38 |
| 12 | ambiguous.  And to the extent it calls for | 11:14:40 |
| 13 | attorney-client information, it's privileged. | 11:14:45 |
| 14 | THE WITNESS:  I don't -- I don't understand | 11:14:49 |
| 15 | the question. | 11:14:51 |
| 16 | BY MR. ULIN: | 11:14:51 |
| 17 | Q.  Okay.  Did you make an effort to determine | 11:14:51 |
| 18 | whether this license was within Zaentz's rights to | 11:14:54 |
| 19 | grant a license for video game development at the | 11:14:58 |
| 20 | time you received it? | 11:15:02 |
| 21 | MS. ESKENAZI:  Objection.  Vague and | 11:15:05 |
| 22 | ambiguous. | 11:15:06 |
| 23 | THE WITNESS:  I would have reviewed this | 11:15:07 |
| 24 | document with that consideration in mind. | 11:15:11 |
| 25 | BY MR. ULIN: | 11:15:11 |

Page 92

| | | |
|---|---|---|
| 1 | Q.  Okay.  Let's turn to Exhibit Number 10. | 11:15:22 |
| 2 | I'll give you that in just a moment. | 11:15:27 |
| 3 | (The document referred to was | 11:15:47 |
| 4 | marked for identification as | 11:15:47 |
| 5 | Exhibit 10 and attached to this | 11:15:47 |
| 6 | deposition.) | 11:15:51 |
| 7 | MS. ESKENAZI:  Can I get a copy? | 11:15:51 |
| 8 | MR. ULIN:  Yes, you certainly may.  I keep | 11:15:52 |
| 9 | doing that. | 11:15:54 |
| 10 | Q.  Ms. Blackburn, have you seen Exhibit 10 | 11:16:48 |
| 11 | before? | 11:16:51 |
| 12 | A.  Yes. | 11:16:51 |
| 13 | Q.  Do you recognize this as a fax letter that | 11:16:52 |
| 14 | you sent to Laurie Battle at the Saul Zaentz Company | 11:16:53 |
| 15 | on or about the 16th of November 1998? | 11:16:57 |
| 16 | A.  Yes, I do. | 11:16:59 |
| 17 | Q.  And this fax responds to the letter that | 11:17:02 |
| 18 | was marked as Exhibit 9, correct? | 11:17:05 |
| 19 | A.  Yeah.  Yes. | 11:17:09 |
| 20 | Q.  Okay.  And you indicate your view in the | 11:17:19 |
| 21 | second full paragraph, that the rights that the Saul | 11:17:22 |
| 22 | Zaentz Company granted to Sierra fall within the | 11:17:27 |
| 23 | 1969 merchandising agreements as opposed to rights | 11:17:32 |
| 24 | granted under contracts A and B, correct? | 11:17:38 |
| 25 | A.  Correct. | 11:17:40 |

Page 93

```
 1        Q.  Okay.  And you do not suggest in this      11:17:46

 2   letter that any portion of the Sierra license       11:17:47

 3   exceeds the rights that Zaentz was granted in the   11:17:50

 4   1969 merchandising agreements, do you?              11:17:55

 5        MS. ESKENAZI:  Objection.  Misstates the       11:17:57

 6   document.                                           11:17:58

 7        THE WITNESS:  Could you repeat the             11:18:00

 8   question, please?                                   11:18:00

 9   BY MR. ULIN:                                        11:18:01

10        Q.  Sure.  You do not suggest in this letter   11:18:02

11   that any portion of the Sierra license exceeds the  11:18:08

12   rights that Zaentz was granted in the 1969          11:18:10

13   merchandising agreements, do you?                   11:18:13

14        MS. ESKENAZI:  Same objection.  And            11:18:15

15   document speaks for itself.                         11:18:21

16        THE WITNESS:  Well, I -- I do pick up a        11:18:23

17   point on that agreement on page 2 of my fax.        11:18:25

18   BY MR. ULIN:                                        11:18:25

19        Q.  What are you referring to?                 11:18:30

20        A.  I looked -- I was drawing Laurie Battle's  11:18:31

21   attention to the definition of "licensed content." 11:18:35

22        Q.  Okay.  And actually I was going to ask you 11:18:41

23   about that.  So that does suggest that you did read 11:18:43

24   the definitions in --                              11:18:45

25        A.  It does.  It does.                        11:18:46
```

Page 94

```
 1        Q.  We just need to avoid talking over one      11:18:48

 2    another.                                            11:18:51

 3        A.  Sorry.  Apologies.                          11:18:51

 4        Q.  I'm going to ask the question again just to 11:18:52

 5    make the record clear.                              11:18:54

 6        A.  Okay.                                       11:18:55

 7        Q.  That does suggest that you did read the     11:18:55

 8    definitions in the license agreement in 1998 when  11:18:58

 9    Ms. Battle sent them to you, correct?              11:19:00

10        A.  Well, I think it suggests I read that one.  11:19:02

11        Q.  At the very least you read the definition   11:19:04

12    of "licensed content" --                           11:19:10

13        A.  I did.                                      11:19:11

14        Q.  -- correct?                                 11:19:11

15            And as you sit here today, you can't recall 11:19:12

16    whether you read the other definitions that are in 11:19:13

17    the agreement; is that right?                      11:19:15

18            MS. ESKENAZI:  Asked and answered.          11:19:17

19            THE WITNESS:  I notice that I write to       11:19:20

20    Laurie very soon after her letter to me of November 11:19:22

21    11.  Whether I had reviewed the whole thing in     11:19:27

22    detail at that point must therefore be questionable. 11:19:31

23    But I don't recall.                                11:19:40

24    BY MR. ULIN:                                       11:19:40

25        Q.  And so, I'm sorry, you were -- you had     11:19:44
```

Page 95

| | | |
|---|---|---|
| 1 | pointed out the licensed content comment as an | 11:19:47 |
| 2 | example of where you questioned whether the license | 11:19:51 |
| 3 | granted by Zaentz to Sierra was within the rights | 11:19:55 |
| 4 | that Zaentz was granted under the 1969 merchandising | 11:19:58 |
| 5 | agreements; is that correct? | 11:20:03 |
| 6 | MS. ESKENAZI:  Objection.  Misstates the | 11:20:07 |
| 7 | document.  Document speaks for itself. | 11:20:08 |
| 8 | THE WITNESS:  What I'm pointing out here is | 11:20:11 |
| 9 | if Sierra wants to use printed words from the works, | 11:20:13 |
| 10 | they'll have to have a license from the Tolkien | 11:20:24 |
| 11 | Estate. | 11:20:27 |
| 12 | BY MR. ULIN: | 11:20:27 |
| 13 | Q.  Okay.  Other than that indication of when | 11:20:29 |
| 14 | you thought Sierra would need a license from the | 11:20:32 |
| 15 | Tolkien Estate, did you make any other suggestions | 11:20:35 |
| 16 | about when Sierra would need a license from the | 11:20:39 |
| 17 | Tolkien Estate in connection with its games? | 11:20:45 |
| 18 | A.  I don't believe I did. | 11:20:49 |
| 19 | Q.  Did you make any other reference to rights | 11:20:50 |
| 20 | granted under the Sierra license that might be | 11:20:54 |
| 21 | outside the scope of the rights that Zaentz was | 11:20:56 |
| 22 | granted in the 1969 merchandising agreements? | 11:20:59 |
| 23 | MS. ESKENAZI:  Objection.  Vague and | 11:21:01 |
| 24 | ambiguous.  Document speaks for itself.  Misstates | 11:21:04 |
| 25 | the document. | 11:21:07 |

Page 96

```
 1    BY MR. ULIN:                                   11:21:07

 2        Q.  You may answer.                        11:21:08

 3        A.  I don't recall.                        11:21:09

 4        Q.  As you sit here today looking at this  11:21:16

 5    letter, can you identify any other place where you  11:21:17

 6    indicated to Zaentz that some portion of the rights  11:21:20

 7    granted to Sierra was beyond what they were entitled  11:21:24

 8    to grant under the merchandising agreements?    11:21:31

 9        MS. ESKENAZI:  Objection.  Document speaks  11:21:33

10    for itself.                                     11:21:34

11        THE WITNESS:  Could you repeat that --     11:21:35

12    BY MR. ULIN:                                    11:21:35

13        Q.  Sure.                                   11:21:35

14        A.  -- sentence, that question, please.    11:21:38

15        Q.  As you sit here today looking at this  11:21:41

16    letter, can you identify any other place where you  11:21:42

17    indicated that any of the rights that Zaentz granted  11:21:45

18    to Sierra On-Line were beyond what they were     11:21:47

19    entitled to license under the 1969 merchandising  11:21:51

20    agreements?                                     11:21:55

21        A.  No.                                     11:21:55

22        Q.  And separate and apart from this letter, at  11:22:11

23    any time prior to 2010 can you recall telling    11:22:17

24    anybody at Zaentz that rights granted under the  11:22:24

25    Sierra On-Line license went beyond the rights that  11:22:27
```

Page 97

| | | |
|---|---|---|
| 1 | Zaentz could grant pursuant to the 1969 | 11:22:31 |
| 2 | merchandising agreements? | 11:22:35 |
| 3 | A. The beginning of that? | 11:22:37 |
| 4 | MS. ESKENAZI: Objection. Vague and | 11:22:40 |
| 5 | ambiguous. | 11:22:41 |
| 6 | MR. ULIN: Sure. | 11:22:41 |
| 7 | Q. Separate and apart from this letter, at any | 11:22:41 |
| 8 | time prior to 2010, can you recall telling anybody | 11:22:45 |
| 9 | at Zaentz that rights they granted under the Sierra | 11:22:47 |
| 10 | On-Line license were outside the scope of the rights | 11:22:51 |
| 11 | that Zaentz was granted under the 1969 merchandising | 11:22:54 |
| 12 | agreements? | 11:22:56 |
| 13 | MS. ESKENAZI: Objection. Vague and | 11:22:58 |
| 14 | ambiguous. | 11:22:58 |
| 15 | THE WITNESS: No. I cannot recall. | 11:22:59 |
| 16 | BY MR. ULIN: | 11:22:59 |
| 17 | Q. So as you sit here today, you can recall | 11:23:03 |
| 18 | no -- no instance, correct? | 11:23:05 |
| 19 | MS. ESKENAZI: Same objection. | 11:23:08 |
| 20 | THE WITNESS: I think I've answered the | 11:23:09 |
| 21 | question. | 11:23:11 |
| 22 | BY MR. ULIN: | 11:23:11 |
| 23 | Q. Fair enough. And your letter to Ms. Battle | 11:23:11 |
| 24 | in November of 1998 makes no reference to the | 11:23:28 |
| 25 | possibility that Sierra's games -- let me start that | 11:23:34 |

Page 98

```
 1    question again.                               11:23:40

 2          Your -- your letter to Ms. Battle makes no   11:23:40

 3    reference to the possibility that games under the  11:23:43

 4    Sierra license could be commercially released by   11:23:46

 5    making them available for download over the        11:23:49

 6    Internet, right?                                   11:23:53

 7          MS. ESKENAZI:  Objection.  Vague and         11:23:54

 8    ambiguous.  Document speaks for itself.            11:23:55

 9          THE WITNESS:  Could you -- I'm sorry.        11:23:59

10    Could you repeat that?                             11:24:01

11    BY MR. ULIN:                                       11:24:01

12       Q.  Sure.  You make no reference in this        11:24:02

13    November 1998 letter to the possibility that games 11:24:04

14    that are released pursuant to the Sierra license   11:24:06

15    could be released by making them available for     11:24:08

16    download over the Internet, right?                 11:24:11

17          MS. ESKENAZI:  Objection.  Vague and         11:24:13

18    ambiguous.  Also the document speaks for itself.   11:24:15

19          THE WITNESS:  I think the document does      11:24:17

20    speak for itself.  There's no -- there's no        11:24:18

21    reference in it to those things.                   11:24:20

22    BY MR. ULIN:                                       11:24:20

23       Q.  Okay.  Let's go to this one.               11:24:37

24          I direct your attention to a communication   11:24:38

25    from you to Al Bendich at Zaentz from the 4th of   11:24:41
```

                                                 Page 99

| | | |
|---|---|---|
| 1 | August 2000.  We'll mark this as Exhibit 11. | 11:24:48 |
| 2 | (The document referred to was | 11:24:48 |
| 3 | marked for identification as | 11:24:48 |
| 4 | Exhibit 11 and attached to this | 11:24:48 |
| 5 | deposition.) | 11:25:08 |
| 6 | THE WITNESS:  Yeah, thank you. | 11:26:08 |
| 7 | BY MR. ULIN: | 11:26:08 |
| 8 | Q.  And Ms. Blackburn, have you seen Exhibit 11 | 11:26:10 |
| 9 | before? | 11:26:14 |
| 10 | A.  Yes. | 11:26:14 |
| 11 | Q.  Okay.  You recognize this as a fax letter | 11:26:15 |
| 12 | that you sent to Mr. Bendich on or about the 4th of | 11:26:18 |
| 13 | August 2000? | 11:26:20 |
| 14 | A.  Yes, I do. | 11:26:21 |
| 15 | Q.  And you are writing about a call you | 11:26:22 |
| 16 | received from someone named David Williamson at | 11:26:28 |
| 17 | Sierra, correct? | 11:26:30 |
| 18 | A.  It just says he's been in contact. | 11:26:31 |
| 19 | Q.  Okay.  And do you recall being contacted by | 11:26:35 |
| 20 | David Williamson of Sierra around that time? | 11:26:38 |
| 21 | A.  No. | 11:26:40 |
| 22 | Q.  Okay.  You say he asked you about | 11:26:41 |
| 23 | interactive rights in various Tolkien works. | 11:26:43 |
| 24 | Do you see that? | 11:26:46 |
| 25 | A.  I say he was trying to establish just who | 11:26:47 |

Page 100

| | | |
|---|---|---|
| 1 | owns what interactive rights. | 11:26:53 |
| 2 | Q.  Okay.  What did you understand the term | 11:26:55 |
| 3 | "interactive rights" to mean? | 11:26:56 |
| 4 | A.  I don't suppose I knew. | 11:26:58 |
| 5 | Q.  Did you understand them to mean rights in | 11:27:03 |
| 6 | online gaming? | 11:27:17 |
| 7 | A.  I don't know what I understood them to | 11:27:18 |
| 8 | mean. | 11:27:23 |
| 9 | Q.  Okay.  Sitting here today, what do you | 11:27:29 |
| 10 | understand the term "interactive rights" to mean? | 11:27:31 |
| 11 | MS. ESKENAZI:  Objection.  Relevance. | 11:27:33 |
| 12 | Assumes facts not in evidence. | 11:27:36 |
| 13 | THE WITNESS:  I don't think it's possible | 11:27:42 |
| 14 | to -- to -- to state what that means. | 11:27:43 |
| 15 | BY MR. ULIN: | 11:27:43 |
| 16 | Q.  You indicate in the next sentence that you | 11:27:47 |
| 17 | told Mr. Williamson that all you could usefully say | 11:27:52 |
| 18 | to him was that the license which SZC granted to | 11:27:56 |
| 19 | Sierra was validly granted. | 11:28:01 |
| 20 | Do you see that? | 11:28:03 |
| 21 | A.  Yeah. | 11:28:03 |
| 22 | Q.  And that's the license that we were just | 11:28:04 |
| 23 | discussing a few minutes ago, correct? | 11:28:05 |
| 24 | A.  I imagine it is. | 11:28:07 |
| 25 | Q.  Okay.  And what did you mean by saying that | 11:28:13 |

Page 101

```
1    it was validly granted?                         11:28:14

2         A.  Mr. Williamson's company was in litigation  11:28:21

3    with the Saul Zaentz Company.  I think he was trying  11:28:23

4    to drive a wedge between the Saul Zaentz Company and  11:28:29

5    the Tolkien Estate.  I didn't want that to happen.   11:28:35

6    Being a business partner with the Saul Zaentz       11:28:42

7    Company when they're in litigation with somebody, I  11:28:45

8    didn't want to be in any way unhelpful to them.  And  11:28:47

9    that's why I said what I did.                   11:28:52

10        Q.  Okay.  And it was your understanding that,  11:28:58

11   in fact, that license was validly granted, correct?  11:29:01

12        MS. ESKENAZI:  Objection.  Assumes facts      11:29:04

13   not in evidence.                                11:29:06

14        THE WITNESS:  Could you possibly repeat the  11:29:09

15   beginning of that sentence?                     11:29:13

16   BY MR. ULIN:                                    11:29:13

17        Q.  It was your understanding that, in fact,  11:29:14

18   the Saul Zaentz license to Sierra On-Line was   11:29:15

19   validly granted, correct?                       11:29:20

20        MS. ESKENAZI:  Same objection.  And vague    11:29:23

21   and ambiguous.                                  11:29:23

22   BY MR. ULIN:                                    11:29:23

23        Q.  That's what you told Mr. Williamson,     11:29:32

24   correct?                                        11:29:32

25        A.  That's right, yes.                      11:29:34
```

Page 102

```
 1        Q.  And it's previously what you told          11:29:35

 2   Ms. Battle in the last letter that we looked at,    11:29:37

 3   correct?                                            11:29:37

 4            MS. ESKENAZI:  Objection.  Misstates the   11:29:39

 5   document.                                           11:29:40

 6            THE WITNESS:  I didn't -- I didn't say that 11:29:46

 7   in this letter to Laurie Battle.                    11:29:48

 8   BY MR. ULIN:                                        11:29:48

 9        Q.  You indicate that the rights granted to    11:30:00

10   Sierra fall within the 1969 merchandising           11:30:02

11   agreements, correct?                                11:30:05

12        A.  Sorry, are we back on Exhibit 10 now?      11:30:07

13        Q.  Back on your letter to Ms. Battle and      11:30:09

14   that's my last question on that document.           11:30:12

15            MS. ESKENAZI:  Objection.  Document speaks 11:30:13

16   for itself.                                         11:30:16

17            THE WITNESS:  Could I -- I'm sorry.  Could 11:30:19

18   I have the question again?                          11:30:20

19   BY MR. ULIN:                                        11:30:21

20        Q.  Sure.  You indicate in your November 16,   11:30:23

21   1998 letter to Ms. Battle that the rights granted by 11:30:26

22   Zaentz to Sierra fall within the 1969 merchandising 11:30:32

23   agreements, correct?                                11:30:36

24            MS. ESKENAZI:  Objection.  Misstates the   11:30:37

25   document.                                           11:30:38
```

Page 103

```
 1              THE WITNESS:  What I say in my second        11:30:45

 2    paragraph is that the relevant agreement for the       11:30:53

 3    Sierra rights is the 1969 agreement.  They have to     11:30:56

 4    be viewed against that contractual framework, not      11:31:00

 5    the contractual framework which applies to films.      11:31:03

 6    BY MR. ULIN:                                           11:31:03

 7        Q.  Fair enough.  Turning back to Exhibit 11,      11:31:15

 8    the second page, you refer Sierra back to Zaentz on    11:31:45

 9    the question of combining their interactive rights     11:31:51

10    with any -- which New Line may have.                   11:31:53

11              Do you see that?                             11:31:56

12              MS. ESKENAZI:  Objection.  Vague and         11:31:57

13    ambiguous.                                             11:31:57

14    BY MR. ULIN:                                           11:31:57

15        Q.  First paragraph on page 2.                     11:32:12

16              MS. ESKENAZI:  That misstates the document.  11:32:13

17              THE WITNESS:  I've read that paragraph.      11:32:21

18    Now, would you please repeat the question?            11:32:23

19    BY MR. ULIN:                                           11:32:24

20        Q.  Sure.  There's a -- you were referring         11:32:25

21    Mr. Williamson back to Saul Zaentz in response to      11:32:28

22    his expression of interest in combining Sierra's       11:32:33

23    interactive rights and any which New Line Cinema        11:32:36

24    might have, correct?                                   11:32:39

25        A.  No, I don't think that -- I don't think        11:32:41
```

                                            Page 104

| | | |
|---|---|---|
| 1 | that was what was -- what I'm referring to. | 11:32:42 |
| 2 | Q.  What are you referring to? | 11:32:46 |
| 3 | A.  Mr. Williamson also said that his company | 11:32:47 |
| 4 | was interested in the combination of their | 11:32:54 |
| 5 | interactive rights -- rights and any which New Line | 11:32:57 |
| 6 | Cinema might have. | 11:33:00 |
| 7 | I think what he was trying to establish | 11:33:01 |
| 8 | with me was the -- essentially was what -- what | 11:33:03 |
| 9 | rights in computer games the Saul Zaentz Company had | 11:33:09 |
| 10 | and what rights in computer games New Line Cinema | 11:33:13 |
| 11 | had. | 11:33:17 |
| 12 | Q.  Okay.  And why -- and -- and why did you | 11:33:19 |
| 13 | refer him to the Saul Zaentz Company on that | 11:33:23 |
| 14 | subject? | 11:33:25 |
| 15 | A.  Because I -- I didn't know what the | 11:33:25 |
| 16 | relationship was between those two companies and how | 11:33:27 |
| 17 | they had subdivided the computer games category of | 11:33:32 |
| 18 | merchandise. | 11:33:37 |
| 19 | Q.  Fair enough. | 11:33:38 |
| 20 | I think at this point this is a good time | 11:33:40 |
| 21 | for us to break.  Let's see if I can -- | 11:33:42 |
| 22 | THE VIDEOGRAPHER:  This is the end of media | 11:33:45 |
| 23 | number 2.  Off the record at 11:34 a.m. | 11:33:47 |
| 24 | (Brief recess.) | 11:34:29 |
| 25 | THE VIDEOGRAPHER:  We are back on the | 11:42:53 |

Page 105

| | | |
|---|---|---|
| 1 | record at 11:44 a.m.  This is the beginning of media | 11:43:03 |
| 2 | number 3.  Counsel may proceed. | 11:43:07 |
| 3 | BY MR. ULIN: | 11:43:07 |
| 4 | Q.  Ms. Blackburn, when we spoke earlier about | 11:43:12 |
| 5 | Laurie Battle's letter to you, which is Exhibit 9, | 11:43:16 |
| 6 | from November the 12th, 1998, you indicated that you | 11:43:19 |
| 7 | don't recall specifically reviewing paragraph by | 11:43:23 |
| 8 | paragraph the license agreement that's attached to | 11:43:28 |
| 9 | that letter; is that correct? | 11:43:32 |
| 10 | A.  I don't recall doing it, but I believe I | 11:43:34 |
| 11 | did. | 11:43:36 |
| 12 | Q.  You believe you did. | 11:43:37 |
| 13 | And that would have been part of your | 11:43:37 |
| 14 | responsibility of managing trademarks and licensing | 11:43:40 |
| 15 | for the Estate, correct? | 11:43:43 |
| 16 | A.  Yes. | 11:43:43 |
| 17 | Q.  And managing the relationship with -- with | 11:43:47 |
| 18 | Saul Zaentz, correct? | 11:43:49 |
| 19 | A.  Yes. | 11:43:49 |
| 20 | Q.  And assuring yourself that whatever Saul | 11:43:51 |
| 21 | Zaentz was licensing was appropriately within the | 11:43:53 |
| 22 | scope of -- of what they were entitled to license, | 11:43:55 |
| 23 | correct? | 11:43:55 |
| 24 | A.  Yes. | 11:43:55 |
| 25 | Q.  Okay.  So while you don't specifically | 11:44:05 |

Page 106

```
 1    recall, as you sit here today, reviewing the        11:44:07

 2    paragraphs of the definition section of that        11:44:11

 3    agreement that I called out, it's very likely, in   11:44:14

 4    fact almost certain, that you did actually review   11:44:16

 5    those paragraphs, correct?                          11:44:18

 6              MS. ESKENAZI:  Objection.  Misstates the  11:44:20

 7    testimony.                                          11:44:21

 8              MR. ULIN:  I'm not asking about her prior 11:44:24

 9    testimony.                                          11:44:25

10              THE WITNESS:  I -- I believe I would have 11:44:27

11    reviewed that document.                             11:44:28

12    BY MR. ULIN:                                        11:44:30

13         Q.  And all of the paragraphs in the document, 11:44:30

14    correct?                                            11:44:30

15         A.  The whole thing.                           11:44:33

16         Q.  And you would have reviewed them carefully 11:44:33

17    to assure yourself that the doc- -- that the license 11:44:38

18    agreement was a proper exercise of Zaentz's rights, 11:44:39

19    correct?                                            11:44:39

20         A.  Yes.                                       11:44:39

21              MR. ULIN:  Let's mark Exhibit 12 and put it 11:44:44

22    before the witness.                                 11:44:47

23              (The document referred to was             11:44:48

24              marked for identification as              11:44:48

25              Exhibit 12 and attached to this           11:44:48
```

Veritext National Deposition & Litigation Services
866 299-5127

```
 1              deposition.)                        11:45:34

 2              MR. ULIN:  Sorry.  Just a question for you:

 3      Is it -- is it preferable for you to get a

 4      double-sided or single-sided document?

 5              THE REPORTER:  Doesn't matter.

 6              MR. ULIN:  Doesn't matter?  Okay.  I'll

 7      give you the double- -- the single-sided document.

 8      It's the same document, it's just this is a

 9      double-sided version.

10         Q.  Ms. Blackburn, have you seen Exhibit 12    11:45:34

11      before?                                          11:45:36

12         A.  I don't recollect this document.          11:45:37

13         Q.  I'll represent to you and you can see from 11:45:42

14      the Bates number at the bottom right-hand corner of 11:45:45

15      the document that this is a document produced by the 11:45:48

16      plaintiffs in this case.                         11:45:53

17              Do -- do you have any understanding of   11:45:56

18      whether this document comes from the Estate's files? 11:45:58

19              MS. ESKENAZI:  Objection.  Asked and     11:46:02

20      answered.                                        11:46:03

21              THE WITNESS:  I don't -- I couldn't answer 11:46:05

22      that question.  I don't know.                    11:46:06

23      BY MR. ULIN:                                     11:46:06

24         Q.  Does it come from your files?             11:46:08

25              MS. ESKENAZI:  Same objection.           11:46:10
```

                                        Page 108

| | | |
|---|---|---|
| 1 | THE WITNESS:  There's nothing on this | 11:46:12 |
| 2 | document that enables me to identify it as coming | 11:46:13 |
| 3 | from -- when you say my files, do you mean the files | 11:46:16 |
| 4 | of Maier Blackburn or the law firm in question? | 11:46:20 |
| 5 | BY MR. ULIN: | 11:46:20 |
| 6 | Q.  Well, let's start with your personal files. | 11:46:24 |
| 7 | A.  Well, I don't have personal files.  I have | 11:46:26 |
| 8 | files that I maintain as a lawyer for the Tolkien | 11:46:28 |
| 9 | Estate. | 11:46:32 |
| 10 | Q.  Okay.  Does it come from the files that you | 11:46:33 |
| 11 | maintain as a lawyer for the Tolkien Estate? | 11:46:35 |
| 12 | A.  I don't know. | 11:46:37 |
| 13 | Q.  Do you recall receiving -- let me -- | 11:46:37 |
| 14 | actually, let me ask a different question first. | 11:46:45 |
| 15 | The document is titled "Tolkien Enterprises | 11:46:47 |
| 16 | Active Merchandise Licensees List as of April 26, | 11:46:51 |
| 17 | 2001." | 11:46:55 |
| 18 | Do you see that? | 11:46:56 |
| 19 | A.  Yes. | 11:46:56 |
| 20 | Q.  And is it your understanding that Tolkien | 11:46:56 |
| 21 | Enterprises was a dba for the Saul Zaentz Company? | 11:46:59 |
| 22 | A.  What's a dba? | 11:47:05 |
| 23 | Q.  Doing business as.  Another business name. | 11:47:07 |
| 24 | MS. ESKENAZI:  Objection.  Calls for | 11:47:09 |
| 25 | speculation.  Lacks foundation. | 11:47:12 |

Page 109

```
 1              THE WITNESS:  You asked me is Tolkien        11:47:13

 2   Enterprises the business name of the Saul Zaentz        11:47:22

 3   Company?                                                11:47:24

 4   BY MR. ULIN:                                            11:47:24

 5        Q.  Or was it at this time in 2001?               11:47:25

 6        A.  I don't know.  There were various             11:47:28

 7   restructurings.                                         11:47:29

 8        Q.  You understand Tolkien Enterprises to be a    11:47:30

 9   Zaentz entity, though, correct?                         11:47:34

10        A.  For present purposes, yes.                    11:47:35

11        Q.  Okay.  Do you recall receiving a list of      11:47:41

12   active licensees from Zaentz in 2001?                   11:47:45

13        A.  No.                                            11:47:49

14        Q.  Do you regularly receive lists of active      11:47:50

15   licensees from Zaentz?                                  11:47:53

16        A.  No.                                            11:47:54

17        Q.  Okay.  Do you regularly review Zaentz's       11:47:59

18   licenses and licensing activity?                        11:48:01

19           MS. ESKENAZI:  Objection.  Vague and           11:48:05

20   ambiguous.                                              11:48:06

21           THE WITNESS:  I don't regularly review          11:48:09

22   their licenses.                                         11:48:19

23   BY MR. ULIN:                                            11:48:19

24        Q.  Okay.  This document, Exhibit 12, refers to   11:48:21

25   a license to Decipher, Inc. for collectable card       11:48:29
```

Page 110

| | | |
|---|---|---|
| 1 | games and collectable card games in digital | 11:48:35 |
| 2 | electronic form. | 11:48:37 |
| 3 | Do you see that? | 11:48:38 |
| 4 | A. Yes. | 11:48:38 |
| 5 | Q. Are you aware of a license that Zaentz | 11:48:39 |
| 6 | granted to Decipher, Inc.? | 11:48:44 |
| 7 | MS. ESKENAZI: Objection. Vague and | 11:48:49 |
| 8 | ambiguous. | 11:48:54 |
| 9 | THE WITNESS: I recall the name Decipher, | 11:48:54 |
| 10 | Inc. and I can recall having issues with what | 11:48:56 |
| 11 | Decipher was licensed to do, but I can't recall the | 11:48:59 |
| 12 | detail. | 11:49:02 |
| 13 | BY MR. ULIN: | 11:49:02 |
| 14 | Q. Okay. Are you -- well, you say you had | 11:49:07 |
| 15 | issues with what Decipher was licensed to do. | 11:49:11 |
| 16 | What do you understand Decipher was | 11:49:13 |
| 17 | licensed to do? | 11:49:16 |
| 18 | A. I don't know, but some information I had as | 11:49:18 |
| 19 | to what they were doing, I -- I had issues with. | 11:49:20 |
| 20 | Q. Okay. Are you aware of how Decipher's | 11:49:26 |
| 21 | digital card game operate -- operated? | 11:49:31 |
| 22 | A. No. | 11:49:35 |
| 23 | Q. Do you know one way or another whether that | 11:49:36 |
| 24 | game was played entirely online? | 11:49:37 |
| 25 | A. I have no knowledge of that game -- | 11:49:42 |

Page 111

```
 1        Q.  Okay.                                   11:49:44

 2        A.  -- and how it was played.               11:49:45

 3        Q.  Would -- in the course of your managing the  11:49:57

 4   licensing activity of Saul Zaentz would you have  11:50:00

 5   reviewed the Decipher license?                    11:50:04

 6           MS. ESKENAZI:  Objection.  Calls for      11:50:08

 7   speculation.  Lacks --                            11:50:08

 8           THE WITNESS:  I don't --                  11:50:08

 9           MS. ESKENAZI:  -- foundation.             11:50:10

10           THE WITNESS:  Sorry.                      11:50:10

11           I don't manage the licensing activity of  11:50:12

12   the Saul Zaentz Company.                          11:50:15

13   BY MR. ULIN:                                      11:50:15

14        Q.  You're right, so let me reframe the      11:50:18

15   question.                                         11:50:20

16           In the course of your reviewing the       11:50:20

17   licensing of the Saul Zaentz Company to determine 11:50:23

18   whether it is appropriate under the Estate's      11:50:25

19   agreements with Saul Zaentz, would you have reviewed  11:50:28

20   the license that Zaentz granted to Decipher?      11:50:31

21        A.  I don't believe they sent it to me.      11:50:36

22        Q.  And would you have requested -- would you 11:50:37

23   have demanded to see copies of all licenses by    11:50:47

24   Zaentz of Lord of the Rings and Hobbit merchandise? 11:50:52

25           MS. ESKENAZI:  Objection.  It's vague and 11:50:59
```

                                              Page 112

```
 1    ambiguous.  Calls for speculation.              11:51:03

 2           THE WITNESS:  From time to time I would   11:51:04

 3    request details of their agreements with licensees.  11:51:06

 4    BY MR. ULIN:                                    11:51:06

 5       Q.  Okay.  Correspondence between the Estate  11:51:30

 6    and the Saul Zaentz Company about video game rights  11:51:33

 7    seems to stop around 2000 or 2001, in that general  11:51:41

 8    time period.                                    11:51:47

 9           Is that consistent with your recollection?  11:51:49

10           MS. ESKENAZI:  Objection.  Vague and      11:51:50

11    ambiguous.  Assumes facts not in evidence.       11:51:52

12           THE WITNESS:  I think there was a point   11:51:54

13    when the live issues between us became different to  11:52:08

14    computer games, if that answers your question.   11:52:12

15    BY MR. ULIN:                                    11:52:12

16       Q.  Not quite.  I guess my question is -- and  11:52:16

17    I'm making this representation based on the       11:52:21

18    documents that have been produced in this case --  11:52:23

19       A.  Uh-huh.                                  11:52:26

20       Q.  -- by the Estate and also by HarperCollins.  11:52:27

21           Having reviewed those documents,          11:52:29

22    correspondence between the -- the Estate and -- and  11:52:34

23    Zaentz about computer games seems to stop around  11:52:38

24    2000, 2001.  There is nothing further.           11:52:41

25           Is that consistent with your understanding  11:52:45
```

Page 113

```
1     of the correspondence between the parties?          11:52:47

2          MS. ESKENAZI:  Objection.  Assumes facts       11:52:48

3     not in evidence.                                     11:52:50

4          THE WITNESS:  My recollection of the            11:52:51

5     discussion of the question of computer games -- can  11:52:54

6     I ask you to read back something I've said now?      11:53:01

7     Could you possibly read back what I've just said so  11:53:04

8     I get the sentence correct?                          11:53:06

9     BY MR. ULIN:                                          11:53:06

10         Q.  Sure.  You said that the live issues        11:53:07

11    between Zaentz and the Estate became different from  11:53:09

12    computer games.                                      11:53:12

13         A.  No, the -- the sentence I didn't complete.  11:53:12

14         Q.  You said -- I understand.                   11:53:18

15         A.  I'm trying to complete the sentence but     11:53:19

16    I've forgotten the first part.                       11:53:21

17         Q.  It might be better if you just start again. 11:53:23

18    I'm sorry.                                           11:53:25

19         A.  Okay.  Well --                              11:53:25

20         Q.  I don't want to overcomplicate matters.     11:53:26

21         A.  No, but what -- but that will mean that     11:53:28

22    I've got to ask you to repeat your question.         11:53:29

23         Q.  Sure.  I -- my -- my question is, is it     11:53:32

24    consistent with your recollection that the           11:53:34

25    correspondence between the Estate and Saul Zaentz    11:53:35
```

Page 114

| | | |
|---|---|---|
| 1 | concerning computer games stopped around 2000 or | 11:53:38 |
| 2 | 2001? | 11:53:41 |
| 3 | A.  I'm not -- I'm not sure of the date.  My | 11:53:42 |
| 4 | recollection is that the last substantive | 11:53:45 |
| 5 | discussions about computer games arose when there | 11:53:49 |
| 6 | was a debate between New Line Cinema and the Saul | 11:53:54 |
| 7 | Zaentz Company about what they, between them, were | 11:53:59 |
| 8 | doing with computer games. | 11:54:02 |
| 9 | Q.  Okay. | 11:54:02 |
| 10 | A.  I don't -- so I don't know when that was | 11:54:04 |
| 11 | but that was the -- the point at which I recall the | 11:54:06 |
| 12 | conclusion. | 11:54:16 |
| 13 | Q.  Okay.  And do you recall correspondence or | 11:54:18 |
| 14 | discussions between the Estate and Saul Zaentz | 11:54:22 |
| 15 | concerning Zaentz's rights to license computer games | 11:54:31 |
| 16 | after about 2001 and prior to 2010? | 11:54:37 |
| 17 | A.  In that -- in that period, without being | 11:54:44 |
| 18 | specific as to precise dates, I don't think we were | 11:54:47 |
| 19 | in discussion with -- about computer games. | 11:54:50 |
| 20 | Q.  And that's because the issues you were | 11:54:52 |
| 21 | discussing with Zaentz in that period, roughly | 11:54:54 |
| 22 | the -- the -- most of the decade of the 2000s did | 11:54:58 |
| 23 | not surround computer games, correct? | 11:55:01 |
| 24 | A.  Well, my understanding was that the | 11:55:02 |
| 25 | computer games -- the matter of computer games had | 11:55:04 |

Page 115

| | | |
|---|---|---|
| 1 | been -- was exactly where it stood in -- in -- at | 11:55:10 |
| 2 | the time of Sierra. | 11:55:12 |
| 3 | Q.  Is it your understanding that The Lord of | 11:55:14 |
| 4 | the Rings Online computer game eventually became | 11:55:25 |
| 5 | available online for download only? | 11:55:28 |
| 6 | A.  What is The Lord of the Rings Online -- | 11:55:33 |
| 7 | say -- the game that you mentioned, could you repeat | 11:55:40 |
| 8 | the -- | 11:55:43 |
| 9 | Q.  Sure.  Was it your understanding that The | 11:55:43 |
| 10 | Lord of the Rings Online computer game eventually | 11:55:45 |
| 11 | became available for -- for down line -- excuse me, | 11:55:49 |
| 12 | for download-only online? | 11:55:53 |
| 13 | A.  I don't know which game you're referring | 11:55:55 |
| 14 | to, but I'm not aware of any computer games until | 11:55:57 |
| 15 | relatively recently that have been available for | 11:56:00 |
| 16 | purchase by download only. | 11:56:02 |
| 17 | Q.  Did you follow the development of | 11:56:05 |
| 18 | downloadable Lord of the Rings games between 2000 | 11:56:09 |
| 19 | and 2010? | 11:56:14 |
| 20 | MS. ESKENAZI:  Objection.  Vague and | 11:56:15 |
| 21 | ambiguous. | 11:56:17 |
| 22 | THE WITNESS:  Did you say | 11:56:17 |
| 23 | "downloadable-only"? | 11:56:18 |
| 24 | BY MR. ULIN: | 11:56:19 |
| 25 | Q.  Yes. | 11:56:19 |

Page 116

```
 1        A.  What do you mean by that?                11:56:20

 2        Q.  Well, actually, what I said was          11:56:21

 3    "downloadable."                                  11:56:22

 4        A.  What do you mean by that?                11:56:24

 5        Q.  Available for download on the Internet.  11:56:33

 6        A.  To be purchased --                       11:56:35

 7        Q.  Yes.                                      11:56:36

 8        A.  -- by download?  I was not aware that you 11:56:36

 9    could purchase computer games, any of these computer 11:56:38

10    games for download over the Internet.  I understood  11:56:40

11    computer games, going back to my point about         11:56:46

12    articles of tangible personal property, that         11:56:48

13    computer games were on physical media, that you had  11:56:51

14    to purchase a physical item, an article of tangible  11:56:58

15    personal property.                                    11:57:02

16        Q.  And did you follow the development or     11:57:04

17    release of Lord of the Rings computer games of any  11:57:08

18    kind between 2001 or 2010?                           11:57:12

19            MS. ESKENAZI:  Objection.  Vague and       11:57:16

20    ambiguous.                                           11:57:17

21            THE WITNESS:  I don't understand what you  11:57:17

22    mean by --                                           11:57:18

23            MS. ESKENAZI:  Assumes facts not in        11:57:18

24    evidence.                                            11:57:19

25    BY MR. ULIN:                                        11:57:19
```

Page 117

| | | |
|---|---|---|
| 1 | Q.  Did you ask your firm's library, for | 11:57:20 |
| 2 | example, to track press releases or articles about | 11:57:23 |
| 3 | Lord of the Rings or Hobbit-related computer games? | 11:57:30 |
| 4 | MS. ESKENAZI:  Objection.  Assumes facts | 11:57:37 |
| 5 | not in evidence. | 11:57:38 |
| 6 | THE WITNESS:  I did not ask my library to | 11:57:38 |
| 7 | do that. | 11:57:40 |
| 8 | BY MR. ULIN: | 11:57:40 |
| 9 | Q.  Did you read trade press or public -- | 11:57:40 |
| 10 | published articles about Lord of the Rings or Hobbit | 11:57:42 |
| 11 | computer games during -- during the period from 2001 | 11:57:44 |
| 12 | to 2010? | 11:57:47 |
| 13 | MS. ESKENAZI:  Objection.  Vague and | 11:57:47 |
| 14 | ambiguous. | 11:57:47 |
| 15 | THE WITNESS:  I don't recall. | 11:57:47 |
| 16 | MS. ESKENAZI:  Assumes facts not in | 11:57:48 |
| 17 | evidence. | 11:57:49 |
| 18 | THE WITNESS:  I don't recall. | 11:57:49 |
| 19 | BY MR. ULIN: | 11:57:49 |
| 20 | Q.  As you sit here today, you can't recall -- | 11:57:57 |
| 21 | THE REPORTER:  "I don't recall" -- I didn't |  |
| 22 | hear you.  "I don't recall" -- |  |
| 23 | THE WITNESS:  I just said, "I don't |  |
| 24 | recall." |  |
| 25 | BY MR. ULIN: |  |

Page 118

| | | |
|---|---|---|
| 1 | Q.  As you sit here today, you can't recall | 11:57:59 |
| 2 | having read articles about Lord of the Rings or | 11:57:59 |
| 3 | Hobbit-related computer games during the period from | 11:58:03 |
| 4 | 2001 to 2010? | 11:58:07 |
| 5 | A.  I think I -- | 11:58:08 |
| 6 | MS. ESKENAZI:  Objection.  Vague and | 11:58:09 |
| 7 | ambiguous. | 11:58:10 |
| 8 | THE WITNESS:  I think I may have read an | 11:58:10 |
| 9 | article or two, but I can't be more specific than | 11:58:11 |
| 10 | that. | 11:58:14 |
| 11 | BY MR. ULIN: | 11:58:14 |
| 12 | Q.  Did you do anything else to track published | 11:58:19 |
| 13 | articles about Lord of the Rings or Hobbit-related | 11:58:21 |
| 14 | computer games during the period 2001 to 2010? | 11:58:25 |
| 15 | MS. ESKENAZI:  Objection.  Vague and | 11:58:28 |
| 16 | ambiguous. | 11:58:29 |
| 17 | THE WITNESS:  You said did I do anything | 11:58:29 |
| 18 | else? | 11:58:30 |
| 19 | BY MR. ULIN: | 11:58:30 |
| 20 | Q.  Yes. | 11:58:31 |
| 21 | A.  I'm -- else in addition to what? | 11:58:31 |
| 22 | Q.  In addition to reading one or two articles, | 11:58:35 |
| 23 | which is I believe what you said you could recall. | 11:58:38 |
| 24 | A.  I was -- I was reading those articles, such | 11:58:41 |
| 25 | articles as I read for information.  I wasn't | 11:58:43 |

Page 119

| | | |
|---|---|---|
| 1 | necessarily reading them to track anything. | 11:58:47 |
| 2 | Q.  Okay.  Did you do anything like set a | 11:58:52 |
| 3 | Google alert that would inform you of developments | 11:58:54 |
| 4 | concerning Lord of the Rings or Hobbit-related | 11:58:58 |
| 5 | computer games? | 11:59:01 |
| 6 | MS. ESKENAZI:  Objection.  Vague and | 11:59:02 |
| 7 | ambiguous. | 11:59:02 |
| 8 | MR. ULIN:  Not really. | 11:59:07 |
| 9 | THE WITNESS:  I had no reason to -- to feel | 11:59:08 |
| 10 | that I had to police what Zaentz was doing with | 11:59:09 |
| 11 | computer games or indeed Warner Bros. | 11:59:11 |
| 12 | MR. PETROCELLI:  Move to strike as | 11:59:16 |
| 13 | nonresponsive. | 11:59:18 |
| 14 | MR. ULIN:  I'm going to mark Exhibit 13 and | 11:59:56 |
| 15 | put it before the witness. | 11:59:58 |
| 16 | (The document referred to was | 12:00:22 |
| 17 | marked for identification as | 12:00:22 |
| 18 | Exhibit 13 and attached to this | 12:00:22 |
| 19 | deposition.) | 12:00:52 |
| 20 | BY MR. ULIN: | 12:00:52 |
| 21 | Q.  Ms. Blackburn, have you seen Exhibit 13 | 12:00:52 |
| 22 | before? | 12:00:54 |
| 23 | A.  Well, this looks like an e-mail exchange | 12:00:54 |
| 24 | with Fredrica Drotos which -- with me so I -- so I | 12:01:01 |
| 25 | assume I have. | 12:01:06 |

Page 120

```
 1        Q.   Okay.  And do you recall the e-mail      12:01:06

 2   exchange with Ms. Drotos that's in Exhibit 13?     12:01:08

 3        A.   No.                                       12:01:12

 4        Q.   Do you recall the Saul Zaentz Company     12:01:12

 5   sending you the New York Times review of The Lord of 12:01:13

 6   the Rings Online game on or about May the 4th, 2007? 12:01:16

 7        A.   I don't recall that.  But it's evident here 12:01:20

 8   that they did.                                      12:01:24

 9        Q.   Is this one of the articles that you read 12:01:25

10   about Lord of the Rings-related computer games      12:01:27

11   during the period between 2001 and 2010?           12:01:29

12        A.   It may --                                 12:01:32

13        MS. ESKENAZI:  Objection.  Vague and           12:01:33

14   ambiguous.                                          12:01:34

15        THE WITNESS:  It may have been.  I can't be    12:01:34

16   specific.                                           12:01:35

17        Do you want me to read it?                     12:01:41

18   BY MR. ULIN:                                        12:01:41

19        Q.   Yes.                                       12:01:41

20        A.   I'm trying to read it as quickly as I can. 12:03:44

21        Q.   Fair enough.                              12:03:46

22        A.   I've read the document.                   12:04:29

23        Q.   Having reviewed Exhibit 13, does this     12:04:32

24   refresh your recollection that it was one of the one 12:04:34

25   or two articles that you referred to concerning Lord 12:04:36
```

Page 121

| | | |
|---|---|---|
| 1 | of the Rings computer games that you read in the | 12:04:41 |
| 2 | 2001 to 2010 time period? | 12:04:42 |
| 3 | A.  What I recollect in -- amongst other things | 12:04:44 |
| 4 | is the reference in this article to W.H. Auden.  So | 12:04:47 |
| 5 | I do recall that this was one of the articles. | 12:04:51 |
| 6 | Q.  Okay.  And were you aware that The Lord of | 12:04:59 |
| 7 | the Rings Online game was released by Turbine around | 12:05:03 |
| 8 | 2007? | 12:05:08 |
| 9 | A.  Was I aware? | 12:05:09 |
| 10 | Q.  Yes. | 12:05:09 |
| 11 | A.  Did you say July? | 12:05:17 |
| 12 | Q.  No, I said around -- around 2007. | 12:05:18 |
| 13 | A.  All right.  Was I aware then?  Well, on | 12:05:21 |
| 14 | reading this article, I would have been aware that | 12:05:23 |
| 15 | this game was available because the New York Times | 12:05:30 |
| 16 | was doing a review of it.  So I think the answer to | 12:05:33 |
| 17 | your question is yes. | 12:05:38 |
| 18 | Q.  Okay.  Did you express any concern to the | 12:05:43 |
| 19 | Saul Zaentz Company about the licensing of | 12:05:45 |
| 20 | downloadable Lord of the Rings games? | 12:05:48 |
| 21 | MS. ESKENAZI:  Objection.  Assumes facts | 12:05:50 |
| 22 | not in evidence. | 12:05:53 |
| 23 | THE WITNESS:  This says nothing about | 12:05:53 |
| 24 | down- -- downloadable. | 12:05:55 |
| 25 | BY MR. ULIN: | 12:05:55 |

Page 122

| | | |
|---|---|---|
| 1 | Q.  Did you express any concern to the Saul | 12:05:57 |
| 2 | Zaentz Company about Lord of the Rings computer | 12:05:59 |
| 3 | games played online? | 12:06:00 |
| 4 | MS. ESKENAZI:  Objection.  Vague and | 12:06:05 |
| 5 | ambiguous. | 12:06:06 |
| 6 | THE WITNESS:  I wouldn't have objected to | 12:06:09 |
| 7 | the word "online" in itself because of my | 12:06:12 |
| 8 | understanding of that term. | 12:06:13 |
| 9 | BY MR. ULIN: | 12:06:13 |
| 10 | Q.  Did you express any concern that the game | 12:06:22 |
| 11 | might be available online without a physical | 12:06:23 |
| 12 | component? | 12:06:25 |
| 13 | A.  No, because I had no reason to assume that | 12:06:26 |
| 14 | it was available. | 12:06:31 |
| 15 | Q.  Are you aware of any -- | 12:06:33 |
| 16 | MR. PETROCELLI:  Move to strike as | 12:06:34 |
| 17 | nonresponsive everything after the word "no." | 12:06:35 |
| 18 | MS. ESKENAZI:  Can we let the witness | 12:06:37 |
| 19 | finish her answer before everybody jumps on her. | 12:06:38 |
| 20 | Then you can jump. | 12:06:41 |
| 21 | MR. ULIN:  I'll join in -- in | 12:06:44 |
| 22 | Mr. Petrocelli's objection or motion as it were. | 12:06:45 |
| 23 | THE WITNESS:  Right.  So are we concl- -- | 12:06:52 |
| 24 | are we finishing with -- because I don't think I had | 12:06:53 |
| 25 | finished what I had said. | 12:06:57 |

Page 123

```
 1    BY MR. ULIN:                                        12:06:57

 2        Q.  Then --                                     12:06:59

 3            MS. ESKENAZI:  You may complete your         12:07:02

 4    answer.                                             12:07:03

 5    BY MR. ULIN:                                        12:07:03

 6        Q.  You may -- you may complete your answer.    12:07:04

 7        A.  Now I can't remember.                       12:07:06

 8        Q.  All right.  Let's move on.  Let's move on.  12:07:07

 9    I think I have one more question.                   12:07:08

10            Are you aware of anyone at the Estate,       12:07:10

11    other than yourself or at HarperCollins, who        12:07:11

12    expressed any concern to the Saul Zaentz Company    12:07:16

13    about the possibility that The Lord of the Rings    12:07:19

14    Online game would become available for download only 12:07:23

15    around 2007?                                        12:07:27

16        A.  I don't believe any of the people you have  12:07:29

17    mentioned would have had any reason to think that   12:07:32

18    there was a problem with a game described as online. 12:07:36

19        Q.  So your answer is no?                       12:07:40

20            MR. PETROCELLI:  Move to strike as           12:07:42

21    nonresponsive.                                      12:07:44

22    BY MR. ULIN:                                        12:07:44

23        Q.  So your answer is no?                       12:07:45

24        A.  What I -- what I will do, if you're not     12:07:46

25    happy with my answer, is I'd ask you to ask the     12:07:48
```

Page 124

```
 1    question again and I'll try and answer it in a        12:07:50

 2    different way.                                         12:07:53

 3          MS. ESKENAZI:  Well, just to be clear, you      12:07:56

 4    can answer the question any way you want that you     12:07:57

 5    believe is true and accurate.  And -- and counsel     12:08:00

 6    has the right to object or whatever they want.  But   12:08:05

 7    you're being asked the questions and you get to       12:08:08

 8    answer them any way you think is true and accurate.   12:08:10

 9          MR. GLICK:  Typically, though, if you're        12:08:15

10    asked, "Did you," it's a "yes" or a "no."  What --    12:08:16

11    then if you're asked, "Why did you" or "did you       12:08:19

12    not," well, of course, that would encompass the       12:08:21

13    answer that you're giving.                            12:08:23

14          MS. ESKENAZI:  That's -- that's not             12:08:25

15    necessarily true.  But --                             12:08:27

16          MR. GLICK:  It is, actually.                    12:08:29

17          MS. ESKENAZI:  -- you can answer.               12:08:29

18          MR. GLICK:  But that's okay.                    12:08:30

19          MR. ULIN:  Actually, there is no question       12:08:32

20    pending and I don't want to ask another one.  We can  12:08:33

21    break.                                                12:08:35

22          MS. ESKENAZI:  Okay.                            12:08:36

23          THE VIDEOGRAPHER:  Off the record at 12:09      12:08:36

24    p.m.                                                  12:10:34

25               (At 12:09 p.m., the
```

Page 125

```
 1              deposition of CATHLEEN BLACKBURN

 2              was adjourned for noon recess.)

 3  ///

 4  ///

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 126

```
 1                    (At 1:20 p.m., the deposition
 2            of CATHLEEN BLACKBURN was
 3            reconvened.)                              13:19:47
 4            THE VIDEOGRAPHER:  We are back on the     13:19:47
 5    record at 1:20 p.m.  Counsel may proceed.         13:19:57
 6    BY MR. ULIN:                                      13:19:57
 7        Q.  Ms. Blackburn, before the break when we   13:20:03
 8    talked about The Lord of the Rings Online game, you 13:20:05
 9    indicated that your learning about the release of 13:20:09
10    that game didn't give you any concern that Zaentz 13:20:13
11    had licensed games beyond the scope of its rights. 13:20:17
12            Do you recall that?                       13:20:19
13            MS. ESKENAZI:  Objection.  Misstates the  13:20:21
14    testimony.                                        13:20:22
15            THE WITNESS:  I can't recall precisely what 13:20:23
16    we discussed at that point.  If you want to read me 13:20:25
17    something.                                        13:20:29
18    BY MR. ULIN:                                      13:20:29
19        Q.  Well, did it give you any concern that    13:20:30
20    Zaentz had exceeded the scope of its rights when The 13:20:32
21    Lord of the Rings Online game came out in 2007?   13:20:36
22        A.  Did what give me?                         13:20:39
23        Q.  The release of the game.                  13:20:40
24            MS. ESKENAZI:  Objection.  Vague and      13:20:41
25    ambiguous.                                        13:20:43
```

Page 127

| | | |
|---|---|---|
| 1 | THE WITNESS:  The release of the game or | 13:20:43 |
| 2 | the game itself?  I -- | 13:20:48 |
| 3 | BY MR. ULIN: | 13:20:48 |
| 4 | Q.  Let's -- let me phrase -- I like the way | 13:20:53 |
| 5 | you suggested it. | 13:20:57 |
| 6 | Did -- did the -- did The Lord of the Rings | 13:20:58 |
| 7 | Online game, when you learned about it in 2007, give | 13:21:03 |
| 8 | you any concern that Zaentz had exceeded the scope | 13:21:07 |
| 9 | of its licensing rights? | 13:21:09 |
| 10 | A.  From what I reviewed in that article, I | 13:21:10 |
| 11 | didn't see anything that indicated that to me. | 13:21:13 |
| 12 | Q.  Okay.  And that -- is that because it was | 13:21:15 |
| 13 | your understanding that the game was sold with some | 13:21:17 |
| 14 | physical component? | 13:21:21 |
| 15 | A.  Correct.  Well, no, that the game was a | 13:21:22 |
| 16 | physical object. | 13:21:26 |
| 17 | Q.  Okay. | 13:21:26 |
| 18 | A.  Not that it was sold with a physical | 13:21:28 |
| 19 | component, though that might have been the case. | 13:21:30 |
| 20 | Q.  Is it your position that Zaentz is within | 13:21:32 |
| 21 | its rights to license a computer game if users have | 13:21:37 |
| 22 | to buy a disc before they can play it? | 13:21:41 |
| 23 | MS. ESKENAZI:  Objection.  Calls for legal | 13:21:46 |
| 24 | conclusion. | 13:21:48 |
| 25 | THE WITNESS:  My understanding is that | 13:21:50 |

Page 128

| | | |
|---|---|---|
| 1 | computer games on physical media discs, cartridges, | 13:21:53 |
| 2 | are within the Zaentz right to grant -- | 13:21:57 |
| 3 | BY MR. ULIN: | 13:22:00 |
| 4 | Q.  Okay. | 13:22:01 |
| 5 | A.  -- to license. | 13:22:01 |
| 6 | Q.  Is that true, in your view, even if users | 13:22:02 |
| 7 | play the game online? | 13:22:05 |
| 8 | A.  Well, here we need to be clear what we | 13:22:06 |
| 9 | understand by "online."  You may have a different | 13:22:11 |
| 10 | understanding to me.  So is it appropriate for me to | 13:22:14 |
| 11 | explain my understanding? | 13:22:17 |
| 12 | Q.  Sure.  Why don't you explain your | 13:22:19 |
| 13 | understanding. | 13:22:21 |
| 14 | A.  My understanding of playing a game online | 13:22:21 |
| 15 | is that you acquire the game, and that with | 13:22:24 |
| 16 | technology as it stands today, it is possible to | 13:22:27 |
| 17 | hook up with other players over a computer network. | 13:22:30 |
| 18 | Q.  Okay.  So if a player obtains a game by | 13:22:35 |
| 19 | buying a disc, it is -- that's within Zaentz's | 13:22:42 |
| 20 | rights to license, even if the game is played | 13:22:46 |
| 21 | online, correct? | 13:22:50 |
| 22 | A.  Correct. | 13:22:51 |
| 23 | Q.  Okay.  And is it your view that it's also | 13:22:53 |
| 24 | within Zaentz's licensing rights, even if the user | 13:22:55 |
| 25 | can download additional content that's available | 13:22:58 |

Page 129

```
 1    online?                                          13:23:01

 2         A.  I don't think that it is any part of    13:23:01

 3    Zaentz's right to sell any element of computer games  13:23:06

 4    by means of download.  If there is -- if those extra  13:23:10

 5    items are not acquired on disc or on physical media,  13:23:13

 6    then they stand outside the ground.              13:23:18

 7         Q.  Okay.  And did you raise that -- no, I  13:23:22

 8    don't need to ask that question.                 13:23:25

 9         By that same token, your view is that       13:23:26

10    Zaentz cannot license a game if it's only available  13:23:45

11    online, correct, only available for download online?  13:23:47

12         A.  It's not a question of being available for  13:23:50

13    download.  It's a question of how the game is    13:23:52

14    purchased.                                       13:23:55

15         Q.  So to your understanding, if the game is  13:23:57

16    purchased as a disc, then it falls within the scope  13:23:59

17    of Zaentz's licensing rights?                    13:24:05

18         A.  If the computer game takes the form of  13:24:07

19    physical media, so a disc or a cartridge, and it's  13:24:11

20    acquired in that way, it is available to Zaentz to  13:24:15

21    license.                                         13:24:19

22         Q.  And if the same exact game with the same  13:24:20

23    software, characters are -- that's played the same  13:24:27

24    way, is available only online or is purchased only  13:24:31

25    online, then your position is it's not within   13:24:37
```

Page 130

```
 1    Zaentz's licensing rights; is that correct?        13:24:42

 2           MS. ESKENAZI:  Objection.  Incomplete       13:24:45

 3    hypothetical.                                        13:24:47

 4           THE WITNESS:  I think the phrase you're      13:24:47

 5    using there, purchasing online, is ambiguous.       13:24:48

 6    Because I can purchase a game in a box from Amazon.  13:24:54

 7    I've purchased it online.  It's delivered to my     13:24:57

 8    door.                                                13:25:01

 9    BY MR. ULIN:                                         13:25:02

10       Q.   Okay.  If the same exact -- so just start   13:25:02

11    again.                                               13:25:05

12           If the same exact game that a user can       13:25:05

13    purchase on a disc can also be acquired by --        13:25:12

14    purchased by downloading it without acquiring a     13:25:17

15    disc, your position is that the purchase by download 13:25:21

16    is outside of Zaentz's -- the scope of Zaentz's     13:25:26

17    right to license; is that correct?                  13:25:29

18       A.   If the game is acquired by download without 13:25:31

19    there being a purchase of a physical item, my       13:25:34

20    position is that that stands outside the grounds    13:25:37

21    because then you don't have an article of tangible  13:25:40

22    personal property.  And if you don't have an article 13:25:43

23    of tangible personal property, Zaentz has no rights. 13:25:45

24       Q.   Where a game is available for purchase as a 13:28:35

25    physical item, is it your position that Zaentz      13:28:38
```

Page 131

| | | |
|---|---|---|
| 1 | has -- has the right to license that game even if | 13:28:48 |
| 2 | elements of the game can later be acquired by | 13:28:50 |
| 3 | download only? | 13:28:52 |
| 4 | MS. ESKENAZI:  Objection.  Incomplete | 13:28:53 |
| 5 | hypothetical.  Calls for a legal conclusion. | 13:28:56 |
| 6 | THE WITNESS:  I think, in fact, you've | 13:28:58 |
| 7 | asked that question already. | 13:28:59 |
| 8 | BY MR. ULIN: | 13:28:59 |
| 9 | Q.  And what is your position? | 13:29:01 |
| 10 | A.  What I said it was before. | 13:29:02 |
| 11 | Q.  And what -- | 13:29:05 |
| 12 | A.  Each -- each element of a computer game, in | 13:29:07 |
| 13 | order to fall within the -- the power of Zaentz to | 13:29:11 |
| 14 | license, must be purchased in the form of physical | 13:29:14 |
| 15 | media, whether it is the first part of the game or | 13:29:18 |
| 16 | an additional element to it to be acquired later on. | 13:29:24 |
| 17 | Q.  From time to time you have received | 13:29:29 |
| 18 | inquiries from third parties about obtaining | 13:29:47 |
| 19 | licenses in video games and interactive rights, | 13:29:50 |
| 20 | correct? | 13:29:50 |
| 21 | A.  That's correct. | 13:29:55 |
| 22 | Q.  And is it fair to say that you've generally | 13:29:55 |
| 23 | referred those inquiries to Zaentz? | 13:29:58 |
| 24 | A.  I've probably -- | 13:30:00 |
| 25 | MS. ESKENAZI:  Objection.  Vague and | 13:30:03 |

Page 132

| | | |
|---|---|---|
| 1 | ambiguous. | 13:30:04 |
| 2 | BY MR. ULIN: | 13:30:04 |
| 3 | Q.  You may answer. | 13:30:05 |
| 4 | A.  I have probably involved Zaentz in those -- | 13:30:06 |
| 5 | in those issues. | 13:30:09 |
| 6 | Q.  Can you think of any examples in which a | 13:30:10 |
| 7 | third party acquired -- inquired about licensing | 13:30:12 |
| 8 | Lord of the Rings or Hobbit video game rights and | 13:30:15 |
| 9 | you have not referred them to Zaentz? | 13:30:18 |
| 10 | MS. ESKENAZI:  Objection.  Vague and | 13:30:21 |
| 11 | ambiguous. | 13:30:22 |
| 12 | THE WITNESS:  I don't know if there are any | 13:30:26 |
| 13 | such instances. | 13:30:27 |
| 14 | BY MR. ULIN: | 13:30:28 |
| 15 | Q.  As you sit here today, you can't think of | 13:30:28 |
| 16 | any? | 13:30:29 |
| 17 | A.  I can't think of anything specific.  I'm | 13:30:29 |
| 18 | not saying I never -- I'm not saying that every | 13:30:32 |
| 19 | inquiry I sent to Zaentz. | 13:30:35 |
| 20 | Q.  But you can't recall any that you did not? | 13:30:37 |
| 21 | A.  Can I recall any that I did not?  I can't | 13:30:39 |
| 22 | recall any specifically. | 13:30:45 |
| 23 | MR. ULIN:  Okay.  Let's mark Exhibit 14. | 13:31:04 |
| 24 | (The document referred to was | 13:31:05 |
| 25 | marked for identification as | 13:31:05 |

Page 133

| | | |
|---|---|---|
| 1 | Exhibit 14 and attached to this | 13:31:05 |
| 2 | deposition.) | 13:31:17 |
| 3 | BY MR. ULIN: | 13:31:17 |
| 4 | Q.  We'll give you the one from the reporter. | 13:31:18 |
| 5 | A.  Thank you. | 13:31:19 |
| 6 | Q.  Ms. Blackburn, have you seen Exhibit 14 | 13:31:57 |
| 7 | before? | 13:31:58 |
| 8 | A.  Sorry.  I have read an element of it. | 13:31:59 |
| 9 | Q.  Do you need more time? | 13:32:02 |
| 10 | A.  Please. | 13:32:03 |
| 11 | I'm just trying to work out how these | 13:32:47 |
| 12 | elements interrelate because there's -- it's not | 13:32:49 |
| 13 | immediately apparent. | 13:32:53 |
| 14 | Q.  It's my understanding based on your -- | 13:33:06 |
| 15 | well, let me start differently. | 13:33:10 |
| 16 | Do you recognize Exhibit 14 as a fax that | 13:33:11 |
| 17 | you sent to Al Bendich on or about March 23rd, 1999? | 13:33:13 |
| 18 | A.  Sorry, I'm -- I'll need you to ask that | 13:33:19 |
| 19 | question again but I'm -- there's something missing | 13:33:24 |
| 20 | from this sequence of correspondence which is -- | 13:33:26 |
| 21 | hold on a minute. | 13:33:37 |
| 22 | Mr. Bray -- | 13:33:50 |
| 23 | MS. ESKENAZI:  I'm sorry, is there a | 13:33:52 |
| 24 | question? | 13:33:53 |
| 25 | MR. ULIN:  There wasn't.  I was going to | 13:33:54 |

Page 134

```
 1    let Ms. Blackburn --                        13:33:56

 2          THE WITNESS:  Sorry.  Okay.           13:33:56

 3    BY MR. ULIN:                                13:33:56

 4        Q.  So, I'm sorry, Ms. Blackburn, do you   13:33:58

 5    recognize this collection of documents in Exhibit 14   13:33:59

 6    as a set of documents that you faxed to Al Bendich   13:34:00

 7    on or about March 23rd, 1999?               13:34:07

 8        A.  I -- I -- I can understand now that   13:34:09

 9    these -- I couldn't understand the sequence.  Yes,   13:34:15

10    these are -- this is a fax I sent to Al Bendich on   13:34:17

11    that date.                                  13:34:21

12        Q.  Okay.  And it contains a cover sheet and   13:34:21

13    five pages of correspondence between you and   13:34:26

14    Mr. Anthony Bray of Sun Corporation, correct?   13:34:28

15        A.  Yes.                               13:34:28

16        Q.  Do you recall sending this to Mr. Bendich?   13:34:31

17        A.  No.                                13:34:33

18        Q.  Do you recall your correspondence with   13:34:34

19    Mr. Bray?                                   13:34:35

20        A.  No.                                13:34:35

21        Q.  Mr. Bray indicates that -- well, you --   13:34:39

22    indicates and you indicate to Mr. Bendich that   13:34:43

23    Mr. Bray is interested in developing video games on   13:34:46

24    new platforms.                             13:34:49

25          Do you see that?                     13:34:50
```

Page 135

```
 1        A.  Yes.                                    13:34:54

 2        Q.  What did you understand "new platforms" to  13:34:56

 3   mean?                                             13:34:59

 4        A.  Well, the first question is what did I   13:34:59

 5   understand "platforms" to mean.  I understood     13:35:03

 6   "platforms" to mean the physical system into which a  13:35:06

 7   game would be put.  So things like a personal     13:35:11

 8   computer or a dedicated game play- -- computer game  13:35:17

 9   playing system like Nintendo or Sega or PlayStation,  13:35:22

10   so the physical equipment, if you like, on which the  13:35:32

11   games would be -- into which the games would be    13:35:34

12   inserted in order to play them.                   13:35:36

13        Q.  Do you understand platforms to include the  13:35:38

14   Internet?                                         13:35:40

15        A.  I don't think the Internet is a platform.  13:35:43

16        Q.  But it was referred to as a platform, for  13:35:45

17   example, on the Sierra On-Line license that you    13:35:47

18   reviewed earlier than this, right?               13:35:49

19        MS. ESKENAZI:  Objection.  Misstates the     13:35:51

20   documents.                                        13:35:52

21        MR. ULIN:  No, it doesn't.                   13:35:52

22        MS. ESKENAZI:  Misstates the evidence.       13:35:53

23        THE WITNESS:  I don't recollect what that    13:35:58

24   document says.                                    13:36:00

25   BY MR. ULIN:                                      13:36:00
```

Page 136

| | | |
|---|---|---|
| 1 | Q.  Have you reviewed licenses where the | 13:36:06 |
| 2 | Internet is referred to as a platform? | 13:36:08 |
| 3 | A.  I don't know. | 13:36:10 |
| 4 | Q.  In any event, you refer Mr. Bray to the | 13:36:22 |
| 5 | Saul Zaentz Company for -- to resolve his inquiry, | 13:36:37 |
| 6 | correct? | 13:36:37 |
| 7 | A.  Yes.  I am -- well, I have two exchanges | 13:36:45 |
| 8 | with him and then I refer him to Al Bendich. | 13:36:50 |
| 9 | Q.  And did you ask Mr. Bray what platforms he | 13:36:56 |
| 10 | was talking about when he was talking about | 13:37:03 |
| 11 | developing games for new platforms? | 13:37:04 |
| 12 | A.  I don't recall that I did.  But, as I say, | 13:37:11 |
| 13 | there's a missing element in this, which is | 13:37:19 |
| 14 | Mr. Bray's fax of 19 March.  I don't know what that | 13:37:23 |
| 15 | said.  Because what we have here is his -- on, hang | 13:37:26 |
| 16 | on.  Sorry.  Here's his fax of 19 -- well, there you | 13:37:36 |
| 17 | are.  Sorry.  Could you repeat the question for me, | 13:37:58 |
| 18 | please? | 13:37:58 |
| 19 | Q.  Did you ask Mr. Bray what platforms he was | 13:38:06 |
| 20 | talking about developing when he -- let me start | 13:38:08 |
| 21 | that again. | 13:38:12 |
| 22 | Did you ask Mr. Bray what platforms he was | 13:38:12 |
| 23 | talking about when he asked about developing games | 13:38:15 |
| 24 | for new platforms? | 13:38:16 |
| 25 | A.  No.  It doesn't appear that I did. | 13:38:18 |

Page 137

```
 1        Q.   Okay.  And turning to Exhibit 9, which was      13:38:21

 2   the letter from Ms. Battle attaching the Sierra           13:38:29

 3   On-Line license, at page 2 of the license, the            13:38:35

 4   definition at paragraph (f) of licensed platforms         13:38:49

 5   which we looked at earlier.                               13:38:52

 6        A.   Licensed platforms.                             13:38:54

 7        Q.   And the (f) subparagraph (iii) includes --      13:38:56

 8   includes among licensed platforms, "any online            13:39:03

 9   network, including without limitation, the global         13:39:05

10   computer network commonly known as the Internet."         13:39:08

11        Do you see that?                                     13:39:11

12        A.   Yes.                                            13:39:11

13        Q.   Does that refresh -- refresh your               13:39:12

14   recollection that video game developers include the       13:39:13

15   Internet among platforms when they use that term?         13:39:17

16        MS. ESKENAZI:  Objection.  Calls for                 13:39:20

17   speculation.  Lacks foundation.                           13:39:21

18   BY MR. ULIN:                                              13:39:21

19        Q.   You may answer.                                 13:39:24

20        MS. ESKENAZI:  Assumes facts not in                  13:39:25

21   evidence.                                                 13:39:26

22        THE WITNESS:  I don't know what a -- a               13:39:26

23   computer games developer would understand by that         13:39:31

24   term.  I only know what I understand by it.               13:39:35

25   BY MR. ULIN:                                              13:39:35
```

Page 138

| | | |
|---|---|---|
| 1 | Q.  And you -- you testified earlier you likely | 13:39:38 |
| 2 | would have read the Sierra On-Line license when it | 13:39:40 |
| 3 | was sent to you, correct? | 13:39:43 |
| 4 | A.  Yeah. | 13:39:43 |
| 5 | Q.  Including the definition of licensed | 13:39:44 |
| 6 | platforms, correct? | 13:39:47 |
| 7 | A.  Yes. | 13:39:47 |
| 8 | Q.  Including the definition of licensed | 13:39:48 |
| 9 | platforms that encompass the Internet and online | 13:39:50 |
| 10 | networks, correct? | 13:39:53 |
| 11 | MS. ESKENAZI:  Objection.  Misstates the | 13:39:54 |
| 12 | document. | 13:39:55 |
| 13 | MR. ULIN:  No, it doesn't. | 13:39:56 |
| 14 | THE WITNESS:  Could you repeat the | 13:40:01 |
| 15 | question? | 13:40:02 |
| 16 | BY MR. ULIN: | 13:40:02 |
| 17 | Q.  Sure.  You would -- you would -- among the | 13:40:02 |
| 18 | things you would have read would be -- | 13:40:03 |
| 19 | A.  Yes, I would have read that clause. | 13:40:04 |
| 20 | Q.  Right.  The clause (iii) in paragraph (f) | 13:40:06 |
| 21 | that includes any online network -- | 13:40:07 |
| 22 | A.  Yeah. | 13:40:09 |
| 23 | Q.  -- including the Internet -- | 13:40:10 |
| 24 | A.  Yes. | 13:40:12 |
| 25 | Q.  -- among the platforms? | 13:40:13 |

Page 139

| | | |
|---|---|---|
| 1 | A.  Yes. | 13:40:14 |
| 2 | Q.  And you would have read that in -- around | 13:40:15 |
| 3 | November 1998, correct? | 13:40:17 |
| 4 | A.  Correct. | 13:40:17 |
| 5 | Q.  And that was a few months prior to, about | 13:40:20 |
| 6 | four months prior to receiving the correspondence | 13:40:26 |
| 7 | from Mr. Bray, correct? | 13:40:28 |
| 8 | A.  Yes. | 13:40:28 |
| 9 | Q.  So at that time you had read at least one | 13:40:30 |
| 10 | license which informed you that "new platforms" is a | 13:40:32 |
| 11 | term that might encompass the Internet, correct? | 13:40:35 |
| 12 | MS. ESKENAZI:  Objection.  Vague and | 13:40:37 |
| 13 | ambiguous.  Calls for speculation.  Lacks | 13:40:40 |
| 14 | foundation.  Misstates the document. | 13:40:42 |
| 15 | THE WITNESS:  When we talked earlier about | 13:40:45 |
| 16 | platforms and computers and we talked about the | 13:40:46 |
| 17 | ability to play a game online, clearly playing the | 13:40:49 |
| 18 | game online over the Internet is an element of how | 13:40:55 |
| 19 | that game is played.  But you need -- you need a | 13:40:58 |
| 20 | starting point for that.  You need to have your | 13:41:01 |
| 21 | equipment. | 13:41:05 |
| 22 | So, for example, in one Windows -- you know | 13:41:06 |
| 23 | that's a -- that's a PC.  You need to have that to | 13:41:11 |
| 24 | get to the online network, assuming that's the sort | 13:41:14 |
| 25 | of game it is that you're playing on your computer. | 13:41:19 |

Page 140

```
 1    On your computer.                                13:41:25

 2    BY MR. ULIN:                                     13:41:26

 3        Q.   Useful, but not an answer to my question.   13:41:26

 4        A.   Sorry.                                   13:41:28

 5        Q.   All I'm asking is whether when you received   13:41:29

 6    the inquiry from Mr. Bray about developing games on   13:41:31

 7    new platforms, you had read at least one license    13:41:34

 8    four months earlier that referred to platforms as   13:41:38

 9    including online networks in the Internet.       13:41:42

10    That's -- that's right, isn't it?                13:41:45

11            MS. ESKENAZI:  Objection.  Calls for     13:41:46

12    speculation.                                     13:41:47

13            THE WITNESS:  I had -- I had read this    13:41:47

14    document and this paragraph.                     13:41:49

15    BY MR. ULIN:                                     13:41:56

16        Q.   Okay.  And that did not lead you to believe   13:41:56

17    that Mr. Bray might be talking about developing   13:42:05

18    games for an Internet platform?                  13:42:09

19            MS. ESKENAZI:  Objection.  Asked and      13:42:14

20    answered.                                        13:42:17

21            You can answer again.                    13:42:17

22            THE WITNESS:  Well, we're differing, aren't   13:42:18

23    we, on -- on an Internet platform.  I'm telling you   13:42:20

24    what I understand to be a platform and the        13:42:24

25    relationship of the Internet to that platform.   13:42:26
```

Page 141

```
 1    BY MR. ULIN:                                      13:42:26

 2         Q.  Did you advise Mr. Bray or anyone at Sun  13:42:30

 3    that you believed it would be necessary for Sun to 13:42:33

 4    obtain a license from the Estate if it intended to 13:42:36

 5    develop games that were delivered only online?      13:42:39

 6         A.  Well, it isn't clear what Mr. Bray wants,  13:42:43

 7    so I had no reason to tell him such a thing.  At    13:42:46

 8    that point, I didn't know enough about what he      13:42:52

 9    wanted to do in order to make a comment of that     13:42:54

10    sort.                                               13:42:58

11         Q.  Okay.  And you don't recall inquiring?     13:42:58

12         A.  I don't recall inquiring.  I sent him to Al 13:43:00

13    Bendich so that Al Bendich could do the inquiring.  13:43:07

14              MR. ULIN:  Let's mark Exhibit 15.          13:43:52

15                   (The document referred to was         13:43:54

16              marked for identification as               13:43:54

17              Exhibit 15 and attached to this            13:43:54

18              deposition.)                               13:45:30

19    BY MR. ULIN:                                        13:45:30

20         Q.  Ms. Blackburn, have you seen the documents 13:45:32

21    that comprise Exhibit 15 before?                    13:45:33

22         A.  Yes.                                        13:45:36

23         Q.  And you recognize this as a fax that you    13:45:37

24    sent to Al Bendich on or about the 3rd of August,    13:45:39

25    2000?                                               13:45:44
```

Page 142

| | | |
|---|---|---|
| 1 | A.   Yes. | 13:45:44 |
| 2 | Q.   And this document refers to an inquiry from | 13:45:47 |
| 3 | a Mr. Cook, James Cook, of 3DO Company; is that | 13:45:50 |
| 4 | correct? | 13:45:58 |
| 5 | A.   I think I would have read it "3DO" but -- | 13:45:58 |
| 6 | Q.   "3DO" Company? | 13:46:02 |
| 7 | A.   I see it.  I agree. | 13:46:02 |
| 8 | Q.   First of all, do you recall sending this | 13:46:04 |
| 9 | fax to Mr. Bendich? | 13:46:08 |
| 10 | A.   No, I don't. | 13:46:11 |
| 11 | Q.   Do you recall receiving an inquiry from 3DO | 13:46:11 |
| 12 | Company in the summer of 2000? | 13:46:15 |
| 13 | A.   I don't. | 13:46:16 |
| 14 | Q.   Looking at the second page of the fax which | 13:46:17 |
| 15 | incorporates Mr. Cook's letter to you of August the | 13:46:25 |
| 16 | 2nd, 2000, I'm looking at the third paragraph of | 13:46:31 |
| 17 | that letter, do you -- are you with me? | 13:46:35 |
| 18 | A.   Yes. | 13:46:37 |
| 19 | Q.   Mr. Cook asks whether the online rights to | 13:46:38 |
| 20 | Tolkien's trilogy and The Hobbit were, in fact, | 13:46:41 |
| 21 | granted to the Saul Zaentz Company or Zaentz's | 13:46:46 |
| 22 | Tolkien Enterprises or whether the opportunity still | 13:46:49 |
| 23 | exists to license the online rights to such literary | 13:46:51 |
| 24 | works from the Estate of J.R.R. Tolkien. | 13:46:54 |
| 25 | Do you see that? | 13:46:57 |

Page 143

```
 1        A.   Yes.                                    13:46:57

 2        Q.   And you referred that inquiry to Zaentz for 13:47:06

 3   response, correct?                                13:47:11

 4        A.   That's right.                           13:47:13

 5        Q.   Did you ask Mr. Cook whether he         13:47:17

 6   contemplated developing online games that were   13:47:19

 7   downloadable-only?                                13:47:21

 8        A.   I didn't make any -- on -- on the basis of 13:47:22

 9   what I have here, I didn't make any inquiry of him 13:47:25

10   as to what he was doing.                          13:47:28

11        Q.   Did you inform Mr. Cook that the Estate 13:47:29

12   retained rights to computer games that were      13:47:34

13   downloadable-only?                                13:47:39

14        A.   No, it would not have been my practice to 13:47:40

15   do that.                                          13:47:42

16        Q.   Did you raise that concern with -- with 13:47:42

17   Zaentz?                                           13:47:45

18        A.   No, I would have had no reason to do so at 13:47:46

19   that time.  Computer games were computer games on 13:47:49

20   physical media only.  It didn't occur to me to    13:47:52

21   speculate on a realm of rights for which there was 13:47:55

22   no technological advance to support.              13:47:59

23        Q.   But you don't --                        13:48:03

24            MR. PETROCELLI:  Move to strike as       13:48:03

25   nonresponsive after the word "no."               13:48:04
```

Page 144

```
 1    BY MR. ULIN:                                    13:48:04

 2        Q.  You had read the Sierra On-Line license,   13:48:07

 3    correct?                                         13:48:07

 4        A.  Correct.                                 13:48:07

 5        Q.  And that was a license that contemplated  13:48:12

 6    the release of video games by making them available  13:48:13

 7    for download online, correct?                   13:48:16

 8        MS. ESKENAZI:  Objection.  Misstates the     13:48:19

 9    document.  Assumes facts not in evidence.  Calls for  13:48:20

10    a legal conclusion.  Calls for speculation.  Lacks  13:48:26

11    foundation.                                      13:48:29

12        THE WITNESS:  There's no definition in that  13:48:29

13    document of what the word "download" means.  I'm not  13:48:30

14    sure it had any specific meaning to a person like me  13:48:36

15    in 1998 or 1999.  Because we all understand today  13:48:40

16    what "download" means because the technology exists  13:48:46

17    to enable us to acquire something over the Internet  13:48:51

18    without a physical purchase.  But it didn't exist  13:48:54

19    then.  And, therefore, you know, I don't have   13:48:58

20    perfect foresight.                               13:49:00

21        It may be that computer developers had a     13:49:02

22    better understanding of that word.  But the tech- --  13:49:04

23    the technology didn't exist, as I understand it, to  13:49:07

24    download computer games over the Internet without  13:49:11

25    the purchase of a physical object.              13:49:14
```

Page 145

```
 1    BY MR. ULIN:                                        13:49:17

 2        Q.  You're aware that the commercial Internet   13:49:17

 3    had been available for at least five years by that  13:49:19

 4    time?                                               13:49:22

 5        A.  I don't know what I'm aware of in relation  13:49:22

 6    to the nature of the Internet and what was available 13:49:24

 7    and what wasn't.  All I know is that since the time 13:49:27

 8    that we last talked about computer games with the   13:49:30

 9    Saul Zaentz Company, there had been no discussion of 13:49:33

10    any tech- -- technological advance.                 13:49:36

11            MR. ULIN:  I'm going to mark Exhibit 16.     13:49:58

12                (The document referred to was            13:50:06

13            marked for identification as                 13:50:06

14            Exhibit 16 and attached to this              13:50:06

15            deposition.)                                 13:52:03

16            THE WITNESS:  I've read the document.        13:52:03

17    BY MR. ULIN:                                         13:52:03

18        Q.  Okay.  Ms. Blackburn, do you recognize      13:52:06

19    Exhibit 16 as e-mail correspondence between you and 13:52:09

20    Laurie Battle at Saul Zaentz in or around June of   13:52:16

21    2006?                                                13:52:18

22        A.  Yes, I do.                                   13:52:19

23        Q.  Do you recall this e-mail exchange?         13:52:20

24        A.  No, I don't.                                 13:52:23

25        Q.  The e-mail exchange reflects correspondence 13:52:23
```

Page 146

| | | |
|---|---|---|
| 1 | about an inquiry you received from an Ian Pare, | 13:52:30 |
| 2 | P-a-r-e, of Silicon Magic about a license to develop | 13:52:36 |
| 3 | Hobbit-based games for mobile devices; is that | 13:52:38 |
| 4 | correct? | 13:52:42 |
| 5 | A.  The correspondence refers to his inquiry. | 13:52:42 |
| 6 | Q.  Okay.  And turning to the third-to-last | 13:52:46 |
| 7 | page of the document, at the bottom of that page is | 13:52:57 |
| 8 | what appears to be Mr. Pare's original inquiry to | 13:53:06 |
| 9 | you; is that correct? | 13:53:11 |
| 10 | MS. ESKENAZI:  Sorry, where are you | 13:53:12 |
| 11 | looking?  Can you give us a Bates number? | 13:53:14 |
| 12 | MR. GLICK:  11047. | 13:53:29 |
| 13 | MR. ULIN:  I'm sorry, it's my fault.  It's | 13:53:29 |
| 14 | 11047.  I'm looking at our produced version and the | 13:53:31 |
| 15 | one I gave you is your -- is the version you | 13:53:34 |
| 16 | produced back to us. | 13:53:36 |
| 17 | MS. ESKENAZI:  I was just confused. | 13:53:37 |
| 18 | MR. ULIN:  It's 11047. | 13:53:38 |
| 19 | MS. ESKENAZI:  Got it.  Now, I just wanted | 13:53:40 |
| 20 | a number. | 13:53:42 |
| 21 | THE WITNESS:  I'm sorry, I've forgotten the | 13:53:46 |
| 22 | question. | 13:53:48 |
| 23 | BY MR. ULIN: | 13:53:48 |
| 24 | Q.  Sure.  The e-mail on page 11047 appears to | 13:53:49 |
| 25 | be Mr. Pare's original inquiry to you; is that | 13:53:55 |

Page 147

| | | |
|---|---|---|
| 1 | correct? | 13:53:55 |
| 2 | A.  That seems right. | 13:53:58 |
| 3 | Q.  Okay.  And Mr. Pare refers to his company | 13:53:59 |
| 4 | as, "a small development company, writing games | 13:54:06 |
| 5 | predominantly for mobile devices, such as cell | 13:54:08 |
| 6 | phones and PDAs," correct? | 13:54:11 |
| 7 | A.  Yeah. | 13:54:11 |
| 8 | Q.  And asks about an opportunity to develop an | 13:54:13 |
| 9 | adventure game based on The Hobbit, correct? | 13:54:17 |
| 10 | A.  Correct. | 13:54:17 |
| 11 | Q.  And in the e-mail on the preceding page you | 13:54:21 |
| 12 | refer Mr. Pare to Tolkien Enterprises, Saul Zaentz | 13:54:25 |
| 13 | for resolution of his inquiry, correct? | 13:54:30 |
| 14 | A.  I suggest that he contacts them. | 13:54:36 |
| 15 | Q.  Okay.  And you indicate in your first | 13:54:37 |
| 16 | e-mail to Ms. Battle, which is two e-mails above | 13:54:49 |
| 17 | that one on the same -- | 13:54:49 |
| 18 | A.  "Hi Laurie, long time no speak"? | 13:54:53 |
| 19 | Q.  Exactly. | 13:54:55 |
| 20 | A.  Yeah. | 13:54:55 |
| 21 | Q.  That it seems to you that the rights in | 13:54:56 |
| 22 | which Silicon Magic is interested, "would certainly | 13:54:57 |
| 23 | fall on your side of the line," meaning the Zaentz | 13:55:00 |
| 24 | side of the line, correct? | 13:55:03 |
| 25 | A.  Yeah. | 13:55:03 |

Page 148

```
 1        Q.  Okay.  So the position you're taking here    13:55:04

 2   is, if I understand it correctly, that Hobbit cell     13:55:08

 3   phone games are one in which Zaentz owns the rights,   13:55:11

 4   correct?                                                13:55:11

 5        A.  Incorrect.                                     13:55:15

 6        Q.  Okay.  What -- what is the position you're     13:55:16

 7   taking?                                                 13:55:18

 8        A.  I'm not taking a position.  I'm trying to      13:55:21

 9   answer questions.  Is there a question?                 13:55:24

10        Q.  Yes.  I was asking you what position you       13:55:30

11   were taking with respect to the rights to              13:55:31

12   Hobbit-related cell phone games.                       13:55:34

13        A.  Oh, I understand.  They -- they are not --     13:55:36

14   they're not theirs, they're not for Zaentz to          13:55:39

15   license if the nature of the technology means that     13:55:43

16   they do not get on to a mobile phone by means of a     13:55:45

17   purchase of a physical object.                         13:55:51

18        Q.  Okay.  And is it your understanding that      13:55:54

19   cell phones don't accommodate discs and physical       13:56:02

20   objects?                                                13:56:06

21        MS. ESKENAZI:  Objection.  Vague and               13:56:08

22   ambiguous.                                              13:56:12

23        THE WITNESS:  Did you say "accommodated"?          13:56:12

24   BY MR. ULIN:                                            13:56:14

25        Q.  Let me ask the question differently.          13:56:15
```

                                                    Page 149

| | | |
|---|---|---|
| 1 | A cell phone game would necessarily be one | 13:56:17 |
| 2 | that's digitally distributed, correct? | 13:56:19 |
| 3 | MS. ESKENAZI:  Objection.  Vague and | 13:56:22 |
| 4 | ambiguous. | 13:56:23 |
| 5 | THE WITNESS:  I don't -- I don't know that | 13:56:23 |
| 6 | that is necessarily the case.  But I think today | 13:56:24 |
| 7 | that is commonly the situation, that you acquire the | 13:56:27 |
| 8 | game to your mobile phone -- | 13:56:32 |
| 9 | BY MR. ULIN: | 13:56:33 |
| 10 | Q.  And -- | 13:56:34 |
| 11 | A.  -- out of the ether. | 13:56:34 |
| 12 | Q.  And is it your -- was it your understanding | 13:56:35 |
| 13 | in 2006 that the situation was different? | 13:56:38 |
| 14 | A.  Well, I don't know whether the technology | 13:56:42 |
| 15 | was -- was well-known at that point.  I don't recall | 13:56:44 |
| 16 | when it became possible to play games on a mobile | 13:56:48 |
| 17 | phone. | 13:56:51 |
| 18 | Q.  Were you aware in 2006 of any games for | 13:56:51 |
| 19 | mobile phones that were sold in -- on -- were sold | 13:56:58 |
| 20 | on discs or some other physical storage medium? | 13:57:05 |
| 21 | A.  I didn't -- | 13:57:09 |
| 22 | MS. ESKENAZI:  Objection.  Vague and | 13:57:09 |
| 23 | ambiguous. | 13:57:10 |
| 24 | THE WITNESS:  I -- I don't know what | 13:57:10 |
| 25 | knowledge I had at that time about games on mobile | 13:57:13 |

Page 150

```
 1    phones.                                          13:57:15

 2    BY MR. ULIN:                                     13:57:15

 3        Q.  Did you indicate to Mr. Pare that the    13:57:16

 4    rights about which he was inquiring might belong to  13:57:23

 5    the Estate?                                      13:57:28

 6            MS. ESKENAZI:  Objection.  Vague and     13:57:32

 7    ambiguous.                                       13:57:32

 8            THE WITNESS:  I don't -- I don't respond to  13:57:32

 9    him on that point at all.                        13:57:33

10    BY MR. ULIN:                                     13:57:33

11        Q.  Did you indicate to Mr. Pare that if he was  13:57:35

12    developing cell phone games for which there was no   13:57:43

13    physical medium, that he -- his inquiry should be   13:57:45

14    directed to you or to the Estate?                13:57:49

15        A.  Well, his -- his -- his inquiry is -- is   13:57:51

16    very vague.  So I had no reason to treat it as   13:57:55

17    specific and highlight that issue and tell him that  13:57:59

18    those -- that -- that that matter would be for the   13:58:02

19    Estate.                                          13:58:05

20            I simply referred him to Zaentz because, as  13:58:05

21    I say in the e-mail I sent to him, games -- rights   13:58:08

22    in this area at that time were administered by   13:58:13

23    Tolkien Enterprises.  They would do the          13:58:17

24    investigation.  They would analyze what the      13:58:18

25    applicant wanted specifically so they could see   13:58:22
```

Page 151

```
 1    whether that cut across their legitimate rights.      13:58:24

 2        Q.  But you did not raise with Mr. Pare your       13:58:29

 3    view that a digitally-delivered cell phone game        13:58:35

 4    would be within the Estate's rights?                   13:58:39

 5        A.  I wouldn't share with an applicant of this     13:58:41

 6    sort the -- the precise division of rights between     13:58:44

 7    the Saul Zaentz Company and -- and the Tolkien         13:58:49

 8    Estate --                                              13:58:53

 9        Q.  Did you raise that issue -- I'm sorry, go      13:58:53

10    ahead.                                                 13:58:58

11        A.  -- against a very vague background.            13:58:58

12        Q.  Did you raise that issue with Ms. Battle?      13:59:01

13        A.  What issue?                                    13:59:03

14        Q.  Your view that digitally-delivered cell        13:59:05

15    phone games were only for the Estate to license?       13:59:09

16            MS. ESKENAZI:  Do -- objection.  Do you         13:59:14

17    mean in connection with this document?                 13:59:14

18            MR. ULIN:  Yes, at this -- at this time in      13:59:16

19    2006 in connection with the inquiry from Silicon       13:59:17

20    Magic.                                                 13:59:22

21            THE WITNESS:  It doesn't appear from the        13:59:22

22    correspondence that I had with Laurie that I had any   13:59:23

23    detailed discussion of what Mr. Pare was wanting.      13:59:26

24    BY MR. ULIN:                                           13:59:28

25        Q.  Do you recall any communication with anyone    13:59:28
```

Page 152

| | | |
|---|---|---|
| 1 | at Zaentz about the Silicon Magic request outside | 13:59:29 |
| 2 | the scope of this e-mail -- | 13:59:32 |
| 3 | A.  No. | 13:59:35 |
| 4 | Q.  -- traffic? | 13:59:35 |
| 5 | A.  No. | 13:59:35 |
| 6 | Q.  With respect to the three inquiries that we | 14:00:29 |
| 7 | just reviewed, let's talk about Mr. Bray and Sun | 14:00:37 |
| 8 | first. | 14:00:40 |
| 9 | Did you have any communications with | 14:00:40 |
| 10 | Mr. Bray outside of what's reflected in the | 14:00:42 |
| 11 | correspondence in your -- in your fax to Al Bendich | 14:00:45 |
| 12 | that's in Exhibit 14? | 14:00:50 |
| 13 | A.  I don't recall. | 14:00:51 |
| 14 | Q.  As you're sitting here today, you don't | 14:00:51 |
| 15 | recall any communication with him -- | 14:00:54 |
| 16 | A.  No, I don't. | 14:00:55 |
| 17 | Q.  -- other than what's in that fax? | 14:00:55 |
| 18 | A.  No, I don't. | 14:00:57 |
| 19 | Q.  Okay.  And with respect to the | 14:00:58 |
| 20 | communication you had with 3DO Company, did you have | 14:01:06 |
| 21 | any -- any conversations or other communication with | 14:01:10 |
| 22 | 3DO outside of the correspondence that's reflected | 14:01:14 |
| 23 | in Exhibit 15? | 14:01:18 |
| 24 | A.  I don't recall. | 14:01:19 |
| 25 | Q.  As you sit here today, you don't -- you do | 14:01:20 |

Page 153

```
 1    not recall any other communications with 3DO except    14:01:21

 2    what's in 3- -- Exhibit 15, correct?                    14:01:24

 3         A.  No, I don't.                                   14:01:26

 4         Q.  And then, finally, with respect to your        14:01:28

 5    communications with Mr. Pare of Silicon Magic, do       14:01:34

 6    you recall any communications or -- or conversations    14:01:39

 7    with Mr. Pare outside of the correspondence that's      14:01:43

 8    reflected in Exhibit 16?                                14:01:47

 9         A.  I think you asked me that question and I        14:01:49

10    answered it before you went back to those two.  But,    14:01:51

11    no.                                                     14:01:51

12         Q.  Okay.  So as you sit here today, you don't     14:01:55

13    recall any --                                           14:01:57

14         A.  I don't recall.                                14:01:58

15         Q.  -- other communications?                       14:01:58

16         A.  I don't.                                       14:01:59

17         Q.  The Estate has taken the position in this      14:02:00

18    lawsuit that Zaentz is not entitled to license Lord     14:02:17

19    of the Rings or Hobbit-related trademarks in            14:02:23

20    connection with services.                               14:02:24

21              Are you aware of that?                        14:02:25

22         A.  I am aware of that.                            14:02:25

23         Q.  Okay.

24              MR. ULIN:  Mark Exhibit 17.

25              (The document referred to was
```

Page 154

```
 1              marked for identification as

 2              Exhibit 17 and attached to this

 3              deposition.)                        14:03:34

 4         THE WITNESS:  Can I just make the point  14:03:34

 5    that paragraph 6 seems to have been chopped off.  14:03:35

 6         MR. ULIN:  Not on the copy that I'm looking  14:03:43

 7    at.                                           14:03:45

 8         MS. ESKENAZI:  Oh, yeah.                 14:03:53

 9         MR. ULIN:  Okay.  I can tell you that I'm  14:04:02

10    not asking about paragraph 6.  I'm happy to   14:04:03

11    substitute it.                                14:04:05

12         MS. ESKENAZI:  That's good because we don't  14:04:06

13    have a paragraph 6.  We just see a 6 or part of a 6.  14:04:08

14         MR. ULIN:  Okay.  6 carries over --      14:04:17

15         MR. GLICK:  It's fine on the next --     14:04:17

16         MR. ULIN:  Okay.  Yeah.  I mean, it doesn't  14:04:20

17    matter.  I'm happy to --                      14:04:20

18         MR. GLICK:  (Inaudible).                 14:04:20

19         MR. ULIN:  Yes, I know that.  That's     14:04:28

20    exactly what I'm going to ask about.  But that's the  14:04:28

21    reason I don't want to give it to her.        14:04:28

22         MR. GLICK:  Maybe we can just -- on a break  14:04:28

23    just --                                       14:04:28

24         MR. ULIN:  That's fine.                  14:05:22

25         Q.  Ms. Blackburn, have you seen Exhibit 18  14:05:22
```

                                                 Page 155

```
 1    before -- I'm sorry.  I don't want to misspeak on      14:05:25

 2    the document.                                          14:05:25

 3              MS.  ESKENAZI:  17.                           14:05:25

 4              MR. ULIN:  17.                                14:05:25

 5         Q.  Exhibit 17 before?                            14:05:26

 6         A.  I don't recall this document.                 14:05:27

 7         Q.  This document purports to be an affidavit     14:05:31

 8    by Frank Richard Williamson.                           14:05:40

 9              Do you see that?                              14:05:43

10         A.  Yes.                                           14:05:43

11         Q.  And that's Dick Williamson; is that           14:05:44

12    correct?                                               14:05:44

13         A.  That's Dick Williamson, yes.                  14:05:47

14         Q.  The same --                                   14:05:48

15         A.  Yes.                                           14:05:49

16         Q.  -- attorney who handled the Tolkien Estate    14:05:49

17    matters before you did?                                14:05:51

18         A.  That's correct.                               14:05:52

19         Q.  And with whom you worked at Manches in        14:05:52

20    connection with Tolkien Estate matters?                14:05:56

21         A.  At Morrell Peel & Gamlen.                     14:05:57

22         Q.  I'm sorry, at Morrell Peel.                   14:05:59

23              Let's -- if we may, let's substitute this    14:06:00

24    document for Exhibit 17 at the appropriate time.  It   14:06:05

25    has a complete paragraph 6.                            14:06:10
```

Page 156

```
 1              MR. GLICK:  Well, let's do it now.        14:06:13

 2              MR. ULIN:  We can do that, sure.          14:06:14

 3              THE WITNESS:  So I give back this 17?     14:06:16

 4              MR. ULIN:  Yes, why don't we do that.     14:06:19

 5              MR. GLICK:  You want to mark it 17-A and  14:06:19

 6      then the record will be good.                     14:06:20

 7              MS. ESKENAZI:  Yes, that's a good idea.

 8              MR. ULIN:  That's a good idea.

 9              MS. ESKENAZI:  17-A.

10              MR. ULIN:  It's all good.  That makes

11      sense.

12                   (The document referred to was

13                   marked for identification as

14                   Exhibit 17-A and attached to this

15                   deposition.)

16      BY MR. ULIN:

17         Q.  So 17-A is a complete version of the       14:06:32

18      Williamson affidavit, which is Exhibit 17.        14:06:36

19         A.  I've read it.  Well -- sorry.  You were    14:06:44

20      writing.  I've read it.                           14:06:51

21         Q.  Fair enough.  And your testimony is you    14:06:53

22      have not seen this before?                        14:06:55

23         A.  I don't recall seeing this before.         14:06:55

24         Q.  You don't recall reviewing it at the time  14:06:57

25      you took over the Tolkien work at Morrell Peel?   14:06:58
```

Page 157

```
 1        A.  I don't recall reviewing it.              14:07:04

 2        Q.  Okay.  At -- at the second page of        14:07:09

 3   Exhibit 17-A -- first of all, at the bottom        14:07:12

 4   right-hand corner there is a signature.            14:07:15

 5            Is that Mr. Williamson's signature?       14:07:18

 6            MS. ESKENAZI:  Objection.  Lacks          14:07:20

 7   foundation.                                        14:07:24

 8            THE WITNESS:  It appears to be            14:07:24

 9   Mr. Williamson's signature.  It resembles his      14:07:25

10   signature.                                         14:07:28

11   BY MR. ULIN:                                       14:07:28

12        Q.  You recognize that from having worked for 14:07:30

13   Mr. Williamson --                                  14:07:32

14        A.  Yes.                                       14:07:32

15        Q.  -- for so many years?                     14:07:33

16        A.  Yes.                                       14:07:33

17        Q.  At paragraph 7 of this document,          14:07:34

18   Mr. William- --                                    14:07:36

19        A.  Yes.                                       14:07:37

20        Q.  -- Mr. Williamson refers -- I just caution 14:07:38

21   you, we need to avoid talking over one another.    14:07:40

22        A.  So sorry.                                 14:07:42

23        Q.  Mr. Williamson refers to an agreement     14:07:43

24   between United Artists Corporation and the Saul    14:07:46

25   Zaentz production company.                         14:07:47
```

Veritext National Deposition & Litigation Services
866 299-5127

```
 1              Do you see that?                     14:07:49

 2      A.   Yes.                                     14:07:49

 3      Q.   And he refers to that agreement being one   14:07:51

 4  where Zaentz agreed for a substantial sum to acquire   14:07:53

 5  all of the rights of United Artists, correct?     14:07:59

 6      A.   Yes.                                     14:07:59

 7      Q.   Which include the production of motion   14:08:03

 8  picture, theatrical, stage and music entertainment,   14:08:07

 9  incorporating characters, places and events created   14:08:10

10  by Professor Tolkien in The Hobbit and The Lord of   14:08:12

11  the Rings.                                         14:08:15

12              Do you see that?                     14:08:15

13      A.   Yes.                                     14:08:16

14      Q.   And then also the right to license others   14:08:16

15  to use the Tolkien characters for merchandise or in   14:08:18

16  association with services.                         14:08:21

17              Do you see that?                     14:08:22

18      A.   I do see that.                          14:08:23

19      Q.   Okay.  Did you have occasion to discuss   14:08:26

20  with Mr. Williamson the Saul Zaentz Company's right   14:08:28

21  to license others to use the Tolkien characters for   14:08:35

22  merchandise or in association with services?       14:08:40

23          MS. ESKENAZI:  Objection.  Calls for     14:08:42

24  attorney-client privileged information.  I'll      14:08:44

25  instruct.                                          14:08:46
```

Page 159

| | | |
|---|---|---|
| 1 | MR. GLICK:  You're instructing her not to | 14:08:50 |
| 2 | answer that? | 14:08:51 |
| 3 | MS. ESKENAZI:  Instructing her not to | 14:08:52 |
| 4 | answer. | 14:08:53 |
| 5 | MR. GLICK:  And therefore you will not put | 14:08:53 |
| 6 | such evidence in at trial, having refused -- | 14:08:55 |
| 7 | MS. ESKENAZI:  I'm instructing her not to | 14:08:56 |
| 8 | answer this question about which invades the | 14:08:58 |
| 9 | attorney-client privilege. | 14:09:00 |
| 10 | MR. GLICK:  And I'm going to state again | 14:09:01 |
| 11 | for the record that we will certainly take the | 14:09:03 |
| 12 | position that that seals that forever, because we're | 14:09:06 |
| 13 | here on her deposition today. | 14:09:08 |
| 14 | BY MR. ULIN: | 14:09:08 |
| 15 | Q.  And you're accepting your attorney's | 14:09:13 |
| 16 | instruction not to answer? | 14:09:14 |
| 17 | A.  I am. | 14:09:15 |
| 18 | Q.  The declaration -- sorry, the affidavit | 14:09:21 |
| 19 | further indicates that the aforesaid children have | 14:09:24 |
| 20 | consented to the assignment of rights, including the | 14:09:28 |
| 21 | right to license the Tolkien characters in | 14:09:32 |
| 22 | association with services to the Saul Zaentz | 14:09:34 |
| 23 | Company. | 14:09:37 |
| 24 | Do you see that? | 14:09:37 |
| 25 | A.  The sentence says that the four Tolkien | 14:09:37 |

Page 160

| | | |
|---|---|---|
| 1 | children -- well, it doesn't say the four Tol- -- | 14:09:40 |
| 2 | the four children -- the four said children have | 14:09:44 |
| 3 | consented to the assignment of rights between United | 14:09:46 |
| 4 | Artists and the Saul Zaentz production company. | 14:09:51 |
| 5 | Q.  And Mr. Williamson swore this document to a | 14:09:53 |
| 6 | notary public on or about the 2nd of | 14:09:57 |
| 7 | December 1977 -- | 14:10:00 |
| 8 | MS. ESKENAZI:  Objection.  Calls for | 14:10:01 |
| 9 | speculation. | 14:10:01 |
| 10 | BY MR. ULIN: | 14:10:01 |
| 11 | Q.  -- correct? | 14:10:02 |
| 12 | MS. ESKENAZI:  Lacks foundation. | 14:10:03 |
| 13 | THE WITNESS:  I don't -- I don't know.  I | 14:10:06 |
| 14 | can only -- I can only draw conclusions from the | 14:10:08 |
| 15 | fact that that is said on the document.  But I don't | 14:10:13 |
| 16 | know.  I wasn't there in 1977. | 14:10:16 |
| 17 | BY MR. ULIN: | 14:10:17 |
| 18 | Q.  You don't -- you don't have any reason to | 14:10:17 |
| 19 | doubt that Mr. Williamson swore this to a notary in | 14:10:19 |
| 20 | 1977 as the seal indicates on this document, do you? | 14:10:22 |
| 21 | MS. ESKENAZI:  Objection.  Calls for | 14:10:24 |
| 22 | speculation.  Lacks foundation. | 14:10:25 |
| 23 | BY MR. ULIN: | 14:10:25 |
| 24 | Q.  You may answer. | 14:10:27 |
| 25 | A.  I don't know the circumstances.  I don't | 14:10:28 |

Page 161

| | | |
|---|---|---|
| 1 | know.  All I can -- all I can do, as you do, is read | 14:10:31 |
| 2 | this document. | 14:10:33 |
| 3 | Q.  Fair enough.  And -- and you did not | 14:10:34 |
| 4 | consider this document in connection with the | 14:10:38 |
| 5 | Estate's position that Saul Zaentz Company lacks the | 14:10:41 |
| 6 | right to license services? | 14:10:46 |
| 7 | MS. ESKENAZI:  Objection.  Misstates the | 14:10:47 |
| 8 | evidence. | 14:10:49 |
| 9 | BY MR. ULIN: | 14:10:49 |
| 10 | Q.  Is that correct? | 14:10:49 |
| 11 | A.  I don't recall this document.  I have | 14:10:50 |
| 12 | always drawn my understanding of what rights the | 14:10:51 |
| 13 | Saul Zaentz Company has in relation to these | 14:10:57 |
| 14 | trademarks from -- from the 1969 merchandising | 14:10:59 |
| 15 | agreement. | 14:11:03 |
| 16 | MR. ULIN:  Let's mark Exhibit 18. | 14:11:05 |
| 17 | (The document referred to was | 14:11:06 |
| 18 | marked for identification as | 14:11:06 |
| 19 | Exhibit 18 and attached to this | 14:11:06 |
| 20 | deposition.) | 14:11:45 |
| 21 | BY MR. ULIN: | 14:11:45 |
| 22 | Q.  You're certainly free to look at the entire | 14:11:46 |
| 23 | document, Ms. Blackburn.  I am only going to be | 14:11:47 |
| 24 | asking you questions about the paragraph on the | 14:11:51 |
| 25 | third page of this document, Plaintiffs' 1412.  It | 14:11:55 |

Page 162

| | | |
|---|---|---|
| 1 | begins underneath the Roman numeral III. | 14:12:02 |
| 2 | A.  I've looked at the document. | 14:15:42 |
| 3 | Q.  Okay.  Ms. Blackburn, have you seen Exhibit | 14:15:44 |
| 4 | 18 before? | 14:15:46 |
| 5 | A.  Yes, I have. | 14:15:46 |
| 6 | Q.  Okay.  And is this one of the documents | 14:15:48 |
| 7 | that you received from Mr. Williamson when you took | 14:15:52 |
| 8 | over the work for the Estate at Morrell Peel? | 14:15:56 |
| 9 | MS. ESKENAZI:  Objection.  Vague and | 14:16:00 |
| 10 | ambiguous. | 14:16:02 |
| 11 | THE WITNESS:  I didn't receive documents | 14:16:02 |
| 12 | from Mr. Williamson.  The Tolkien Estate files were | 14:16:03 |
| 13 | in the custody of the firm. | 14:16:07 |
| 14 | BY MR. ULIN: | 14:16:07 |
| 15 | Q.  Okay.  Is this a document that you reviewed | 14:16:10 |
| 16 | at or around the time you took over the Tolkien | 14:16:11 |
| 17 | Estate work for Mr. Williamson? | 14:16:13 |
| 18 | A.  I can't be precise as to when I reviewed | 14:16:15 |
| 19 | it, but I will have reviewed this document as part | 14:16:18 |
| 20 | of my becoming familiar with the background. | 14:16:20 |
| 21 | Q.  Okay.  And is this also a document that you | 14:16:23 |
| 22 | reviewed with counsel in preparation for this | 14:16:26 |
| 23 | deposition? | 14:16:28 |
| 24 | MS. ESKENAZI:  Objection.  Calls for | 14:16:28 |
| 25 | attorney-client privileged information. | 14:16:32 |

Page 163

```
 1              MR. ULIN:  Are you instructing your witness   14:16:35

 2   not to answer?                                           14:16:37

 3              MS. ESKENAZI:  Yes.                            14:16:38

 4   BY MR. ULIN:                                             14:16:38

 5       Q.  And are you accepting your counsel's             14:16:39

 6   instruction?                                             14:16:40

 7       A.  I am.                                            14:16:40

 8       Q.  Fair enough.  This document reflects an          14:16:41

 9   agreement among Saul Zaentz Company, the Estate of       14:16:48

10   J.R.R. Tolkien and the George Allen & Unwin              14:16:56

11   publishing company, correct?                             14:17:02

12              MS. ESKENAZI:  Objection.  Document speaks     14:17:02

13   for itself.                                              14:17:04

14   BY MR. ULIN:                                             14:17:04

15       Q.  You may answer.                                 14:17:04

16       A.  This document reflects -- is intended to         14:17:06

17   reflect the understanding between those parties, the     14:17:15

18   Saul Zaentz Company and their -- and Elan                14:17:18

19   Merchandising, Inc.                                      14:17:20

20       Q.  Okay.  And at the final page of the              14:17:22

21   document, it's signed by representatives of all          14:17:25

22   three of those parties, correct?                         14:17:28

23       A.  I recognize the signatures for Allen &           14:17:32

24   Unwin and the Estate of J.R.R. Tolkien and the           14:17:36

25   signature for -- for the Saul Zaentz Company is Saul     14:17:40
```

Page 164

| | | |
|---|---|---|
| 1 | Zaentz.  Never seen that signature before. | 14:17:46 |
| 2 | Q.  At -- | 14:17:48 |
| 3 | A.  Sorry, I should say I don't think I have | 14:17:51 |
| 4 | ever seen that signature before. | 14:17:53 |
| 5 | Q.  At the third -- fair enough. | 14:17:54 |
| 6 | At the third page of the document just | 14:17:58 |
| 7 | below the Roman numeral III -- | 14:18:00 |
| 8 | A.  Yeah. | 14:18:02 |
| 9 | Q.  -- the document indicates: | 14:18:02 |
| 10 | "We hereby grant to you the | 14:18:04 |
| 11 | exclusive right to use the name | 14:18:05 |
| 12 | Tolkien Enterprises as the tradename | 14:18:07 |
| 13 | to be used by your affiliate Elan," | 14:18:10 |
| 14 | E-l-a-n, "Merchandising, Inc. in | 14:18:14 |
| 15 | connection with its efforts to pursue | 14:18:15 |
| 16 | the rights owned by you under | 14:18:16 |
| 17 | contracts C and D to use and/or | 14:18:19 |
| 18 | license others to use as marks for | 14:18:23 |
| 19 | merchandise or services, the names" -- | 14:18:26 |
| 20 | et cetera -- "made famous by J.R.R. | 14:18:30 |
| 21 | Tolkien in The Hobbit and The Lord of | 14:18:33 |
| 22 | the Rings trilogy." | 14:18:35 |
| 23 | Do you see that? | 14:18:37 |
| 24 | A.  I can see the first -- I can read that | 14:18:37 |
| 25 | paragraph. | 14:18:39 |

Page 165

```
 1        Q.   Okay.  Did you consider this document in     14:18:39

 2   connection with the Estate's position that Zaentz is   14:18:46

 3   not entitled to license the trademarks in The Lord     14:18:55

 4   of the Rings or The Hobbit for services?               14:19:00

 5        A.   I'm sorry, can you give me the beginning of  14:19:04

 6   your question again?                                   14:19:06

 7        Q.   Sure.  Did you consider this document in     14:19:07

 8   connection with forming the Estate's position that     14:19:08

 9   Zaentz is not entitled to license trademarks in The    14:19:11

10   Lord of the Rings or The Hobbit for services or        14:19:16

11   service marks for them?                                14:19:18

12        A.   I would have considered this document as     14:19:19

13   part of the contractual framework governing            14:19:22

14   merchandising and use of the Estate's trademarks.      14:19:25

15        Q.   And reached the conclusion that Zaentz is    14:19:32

16   not authorized to license service marks or             14:19:34

17   trademarks for services notwithstanding the language   14:19:37

18   of this agreement; is that correct?                    14:19:40

19        A.   Well, what -- what I think is important      14:19:42

20   about this agreement is -- is -- is its subject        14:19:43

21   matter.  The -- the purpose of this -- the main        14:19:47

22   purpose of this agreement was to grant the right to    14:19:50

23   the Saul Zaentz Company and its affiliate the right    14:19:55

24   to call itself or call themselves Tolkien              14:19:58

25   Enterprises --                                         14:20:02
```

Page 166

| | | |
|---|---|---|
| 1 | Q.  Okay.  But do you recog- -- | 14:20:02 |
| 2 | A.  -- in connection with that activity. | 14:20:06 |
| 3 | Q.  You recognize that according to the | 14:20:07 |
| 4 | language on paragraph 3, that right is granted in | 14:20:10 |
| 5 | connection with the Saul Zaentz Company's right to | 14:20:13 |
| 6 | use the Tolkien marks for merchandise or services, | 14:20:16 |
| 7 | correct? | 14:20:16 |
| 8 | MS. ESKENAZI:  Objection.  Misstates the | 14:20:22 |
| 9 | document. | 14:20:22 |
| 10 | BY MR. ULIN: | 14:20:22 |
| 11 | Q.  You may answer. | 14:20:23 |
| 12 | MS. ESKENAZI:  Misstates the document. | 14:20:24 |
| 13 | THE WITNESS:  I can see that in line 6 of | 14:20:25 |
| 14 | this paragraph, there's a reference to using marks | 14:20:30 |
| 15 | for merchandise or services.  However, I also note | 14:20:36 |
| 16 | in paragraph Roman III that what is in article III | 14:20:41 |
| 17 | does not -- is not to expand -- add to or expand the | 14:20:48 |
| 18 | rights granted under contract C and D.  And | 14:20:53 |
| 19 | contract -- trying to work out which one -- which | 14:21:03 |
| 20 | one is D.  A, B -- yeah, contract D is the | 14:21:06 |
| 21 | merchandising agreement. | 14:21:17 |
| 22 | So whatever -- in construing this document, | 14:21:19 |
| 23 | whatever -- irrespective of the reference to | 14:21:23 |
| 24 | merchandise or services, what -- it's clear from | 14:21:27 |
| 25 | this section of the agreement that the parties are | 14:21:31 |

Page 167

| | | |
|---|---|---|
| 1 | not changing in any way what the merchandising | 14:21:36 |
| 2 | agreements themselves say. | 14:21:39 |
| 3 | BY MR. ULIN: | 14:21:40 |
| 4 | Q.  And irrespective of that language, you | 14:21:40 |
| 5 | would acknowledge that this document constitutes the | 14:21:44 |
| 6 | parties to contract C and D describing the rights | 14:21:48 |
| 7 | granted under those contracts as including Zaentz's | 14:21:53 |
| 8 | right to use the Tolkien marks for services, | 14:21:56 |
| 9 | correct? | 14:21:56 |
| 10 | MS. ESKENAZI:  Objection.  Vague and | 14:22:00 |
| 11 | ambiguous. | 14:22:00 |
| 12 | THE WITNESS:  No, I don't -- | 14:22:00 |
| 13 | MS. ESKENAZI:  Misstates the document. | 14:22:01 |
| 14 | THE WITNESS:  It doesn't say that.  It's an | 14:22:02 |
| 15 | incorrect paraphrase of what the merchandising | 14:22:08 |
| 16 | agreements say. | 14:22:11 |
| 17 | MR. ULIN:  Let's go off the record. | 14:22:12 |
| 18 | THE VIDEOGRAPHER:  This is the end of media | 14:22:15 |
| 19 | number 3.  Off the record at 2:23 p.m. | 14:22:17 |
| 20 | (Brief recess.) | 14:22:23 |
| 21 | THE VIDEOGRAPHER:  We're back on the record | 14:43:55 |
| 22 | at 2:45 p.m.  This is the beginning of media number | 14:44:08 |
| 23 | 4.  Counsel may proceed. | 14:44:12 |
| 24 | MR. ULIN:  I'd like to mark Exhibit 19. | 14:44:15 |
| 25 | (The document referred to was | 14:44:35 |

Page 168

| | | |
|---|---|---|
| 1 | marked for identification as | 14:44:35 |
| 2 | Exhibit 19 and attached to this | 14:44:35 |
| 3 | deposition.) | 14:45:04 |
| 4 | BY MR. ULIN: | 14:45:04 |
| 5 | Q.  Ms. Blackburn, have you seen Exhibit 19 | 14:45:05 |
| 6 | before? | 14:45:07 |
| 7 | A.  I don't recall this document. | 14:45:07 |
| 8 | Q.  It purports to be an e-mail from Ms. Battle | 14:45:14 |
| 9 | to David Brawn at HarperCollins dated on November | 14:45:18 |
| 10 | the 9th, 2001. | 14:45:22 |
| 11 | Do you see that? | 14:45:22 |
| 12 | A.  I've got an e-mail from Laurie Battle to | 14:45:23 |
| 13 | David Brawn on 8 November and David Brawn's -- | 14:45:29 |
| 14 | Q.  I'm sorry, I got it backwards. | 14:45:34 |
| 15 | A.  -- reply. | 14:45:34 |
| 16 | Q.  It's from David Brawn to Laurie Battle. | 14:45:35 |
| 17 | A.  Yeah, well, there's one each. | 14:45:38 |
| 18 | Q.  Right.  And you are copied on Mr. Brawn's | 14:45:40 |
| 19 | e-mail to Ms. Battle.  In fact, you're copied on | 14:45:43 |
| 20 | both e-mails, correct? | 14:45:46 |
| 21 | A.  Yes, I am. | 14:45:52 |
| 22 | Q.  Do you recall receiving these e-mails on or | 14:45:52 |
| 23 | about November the 9th, 2001? | 14:45:54 |
| 24 | A.  I don't -- I don't actually recall them. | 14:45:55 |
| 25 | Q.  But you don't have any reason to doubt that | 14:45:59 |

Page 169

| | | |
|---|---|---|
| 1 | you received them, do you? | 14:46:00 |
| 2 | A.  No. | 14:46:00 |
| 3 | Q.  In the first paragraph of Mr. Brawn's | 14:46:01 |
| 4 | e-mail -- | 14:46:03 |
| 5 | A.  Shall I read this? | 14:46:04 |
| 6 | Q.  Oh, I'm sorry, I thought you had already. | 14:46:05 |
| 7 | A.  No.  No. | 14:46:07 |
| 8 | Q.  Okay.  And I'm only going to be asking you | 14:46:08 |
| 9 | about the first paragraph.  In fact, only about | 14:46:22 |
| 10 | the -- well, actually, only about the first | 14:46:27 |
| 11 | paragraph of this first e-mail.  Anything more, | 14:46:29 |
| 12 | you're welcome to read.  I can save you the trouble. | 14:47:22 |
| 13 | A.  It's just, this relates to matters which | 14:47:25 |
| 14 | live in a remote part of my memory. | 14:47:29 |
| 15 | Q.  I would say more or less anything that | 14:47:38 |
| 16 | happened in 2001 lives in a remote part of my | 14:47:40 |
| 17 | memory, if at all. | 14:47:43 |
| 18 | A.  I've looked at it now. | 14:47:58 |
| 19 | Q.  Very good.  In the first paragraph of | 14:48:00 |
| 20 | Mr. Brawn's e-mail from November the 9th, he | 14:48:03 |
| 21 | indicates that: | 14:48:07 |
| 22 | "We" -- apparently meaning | 14:48:07 |
| 23 | HarperCollins -- "operate under a | 14:48:13 |
| 24 | series of permissions guidelines drawn | 14:48:15 |
| 25 | up by the Tolkien Estate in the | 14:48:17 |

Page 170

```
1         mid-1990s specifically for              14:48:19

2         HarperCollins' use which seek to         14:48:20

3         clarify for practical purposes what      14:48:21

4         can and cannot be granted and where      14:48:23

5         consultation is required with the        14:48:26

6         Estate."                                 14:48:27

7             Do you see that?                     14:48:27

8     A.   "Where consultation is required with the  14:48:28

9   Estate and/or with Tolkien Enterprises."        14:48:30

10    Q.   Fair -- fair enough.  Do you see that?   14:48:32

11    A.   I do see that.                           14:48:34

12    Q.   Are you familiar with the permissions   14:48:35

13  guidelines that Mr. Brawn is referring to?      14:48:38

14        MS. ESKENAZI:  I'm going to let the witness  14:48:41

15  answer that question, but I just want to forewarn  14:48:42

16  counsel that he may be getting into an area of    14:48:48

17  attorney-client communication, work product      14:48:51

18  privilege.                                       14:48:53

19        But you can answer that one question.  It's  14:48:54

20  a "yes" or "no" question.                        14:48:58

21        THE WITNESS:  And I'm sorry, I'm going to   14:48:59

22  have to ask you -- ask you to ask it again.      14:49:00

23  BY MR. ULIN:                                     14:49:00

24    Q.   Sure.  Are you familiar with the         14:49:02

25  permissions guidelines that Mr. Brawn is referring  14:49:03
```

                                        Page 171

```
 1    to?                                          14:49:05

 2        A.  Yes, I am.                           14:49:05

 3        Q.  Is that a written document?          14:49:06

 4            MS. ESKENAZI:  You can answer that question  14:49:09

 5    as well.                                     14:49:09

 6            THE WITNESS:  Yes, it is.            14:49:10

 7    BY MR. ULIN:                                 14:49:10

 8        Q.  Is that a document you prepared?     14:49:11

 9            MS. ESKENAZI:  You can answer that as well.  14:49:12

10            THE WITNESS:  Yes, it is.            14:49:14

11    BY MR. ULIN:                                 14:49:14

12        Q.  Do you still have a copy?            14:49:22

13            MS. ESKENAZI:  You may answer that question  14:49:24

14    as well.  It's a "yes" or "no" question.     14:49:25

15            THE WITNESS:  Yes, I do.             14:49:27

16    BY MR. ULIN:                                 14:49:27

17        Q.  And is it still to this day used by the  14:49:29

18    Estate and HarperCollins?                    14:49:33

19            MS. ESKENAZI:  Objection.  Well, objection.  14:49:33

20    Calls for -- it could call for attorney-client  14:49:37

21    privileged information.                      14:49:40

22            And if there's a question in your mind we  14:49:43

23    should -- you're not to answer anything that would  14:49:45

24    reveal attorney-client communications.       14:49:49

25            THE WITNESS:  Right.                 14:49:52
```

Page 172

```
 1              So your question again was?              14:49:53

 2    BY MR. ULIN:                                       14:49:53

 3         Q.  Is -- are the permissions -- is the       14:49:56

 4    permissions guidelines document that you drafted   14:49:58

 5    still used by the Estate and HarperCollins?        14:50:02

 6         A.  I believe it is.  It is wildly out of date. 14:50:05

 7         Q.  Okay.  When did you draft it?             14:50:09

 8         A.  I think I drafted it in -- I can't be     14:50:11

 9    precise when I drafted it.  But it would have been 14:50:18

10    after I became -- after Mr. Williamson retired and I 14:50:27

11    was the responsible partner for the Tolkien Estate, 14:50:33

12    and so I think early '90s.                         14:50:36

13         Q.  Okay.  And have you revised it?           14:50:40

14         A.  As I say, no.  I haven't -- I haven't      14:50:42

15    revised --                                         14:50:46

16              MS. ESKENAZI:  That's the -- you've       14:50:47

17    answered the question.                             14:50:49

18              THE WITNESS:  Okay.                       14:50:49

19    BY MR. ULIN:                                       14:50:49

20         Q.  Was the -- were the permissions guidelines 14:50:51

21    collected by your counsel in connection with       14:50:54

22    discovery in this case?                            14:50:56

23              MS. ESKENAZI:  Objection.  That question  14:50:56

24    calls for potentially a attorney-client            14:51:03

25    communication.                                     14:51:06
```

Page 173

| | | |
|---|---|---|
| 1 | If you can answer that question without | 14:51:08 |
| 2 | divulging attorney-client communication, please do. | 14:51:11 |
| 3 | THE WITNESS:  In connection with the | 14:51:14 |
| 4 | Estate's discovery obligations in this litigation, I | 14:51:17 |
| 5 | provided Ms. Eskenazi and her firm with details of | 14:51:20 |
| 6 | all of our files and they directed me to what | 14:51:24 |
| 7 | they -- what I had to have scanned and sent to them. | 14:51:28 |
| 8 | BY MR. ULIN: | 14:51:32 |
| 9 | Q.  Fair enough.  So you provided them with | 14:51:32 |
| 10 | access to files -- | 14:51:33 |
| 11 | A.  Everything. | 14:51:34 |
| 12 | Q.  -- in which the permissions guidelines were | 14:51:35 |
| 13 | included; is that correct? | 14:51:37 |
| 14 | A.  Yes. | 14:51:37 |
| 15 | MR. ULIN:  Okay.  We can fight this out off | 14:51:38 |
| 16 | line but we -- | 14:51:46 |
| 17 | MR. GLICK:  Need more foundation.  More | 14:51:48 |
| 18 | foundation. | 14:51:50 |
| 19 | MS. ESKENAZI:  Are we done with this | 14:51:57 |
| 20 | document? | 14:51:59 |
| 21 | BY MR. ULIN: | 14:51:59 |
| 22 | Q.  Do the permission guidelines address the | 14:52:09 |
| 23 | use of Tolkien trademarks in connection with the | 14:52:16 |
| 24 | licensing of services? | 14:52:23 |
| 25 | A.  I don't recall. | 14:52:25 |

Page 174

```
 1        Q.  Do they address the use of Tolkien        14:52:26

 2   trademarks in connection with the licensing of     14:52:30

 3   merchandise?                                        14:52:33

 4        MS. ESKENAZI:  Well, objection.  I            14:52:34

 5   interposed an objection late and I apologize for    14:52:36

 6   that, but again, to the extent that -- that -- I'm  14:52:39

 7   going to let this witness talk about basic areas of 14:52:41

 8   subject matter, to the extent you'll agree that that 14:52:44

 9   itself won't waive the privilege.  I don't think it 14:52:49

10   does.  But to the extent that you're going to probe 14:52:52

11   into exactly what the document says and -- and then 14:52:55

12   I think that it would.                              14:52:59

13        MR. ULIN:  Okay.  And I -- I'm going to        14:53:01

14   tell you at least our preliminary position is the   14:53:02

15   privilege has already been waived, including by the 14:53:05

16   fact that they're referenced in e-mail traffic that 14:53:07

17   went to Zaentz and to Zaentz's outside counsel,     14:53:09

18   Howard Rice, 12 years ago.  But again, we can fight 14:53:13

19   that out off line.                                  14:53:16

20        MR. GLICK:  Let's be clear.  The fact that     14:53:17

21   you allow him -- allow her to answer the subject    14:53:19

22   matter questions, we will not contend that that is a 14:53:23

23   waiver.                                             14:53:27

24        MS. ESKENAZI:  That is fair enough, Marty.     14:53:28

25        MR. ULIN:  Okay.                               14:53:28
```

Page 175

```
 1              MS. ESKENAZI:  And it's a "yes" or "no"      14:53:33

 2    question.                                             14:53:34

 3              MR. ULIN:  Just was looking to see what the

 4    last question was.

 5              THE REPORTER:  I have it.  Do you want me

 6    to read it?

 7              MR. ULIN:  Sure.

 8                  (The reporter read the record

 9              as follows:

10                  "QUESTION:  Do they address            14:52:26

11              the use of Tolkien trademarks in           14:52:29

12              connection with the licensing of           14:52:31

13              merchandise?")                             14:52:33

14              MS. ESKENAZI:  You may answer that one     14:53:50

15    question "yes" or "no" with that stipulation that     14:53:52

16    it's not a waiver.                                    14:53:54

17              THE WITNESS:  I don't recall.              14:53:55

18    BY MR. ULIN:                                          14:53:55

19         Q.  Do they address the use of Tolkien          14:53:57

20    trademarks in connection with the licensing of       14:53:59

21    computer games?                                       14:54:02

22              MS. ESKENAZI:  Same agreement?             14:54:03

23              MR. ULIN:  Yes, we can keep that as a      14:54:05

24    continuing agreement, that --                        14:54:07

25              MS. ESKENAZI:  Thank you.                  14:54:07
```

                                                     Page 176

| | | |
|---|---|---|
| 1 | MR. ULIN:  -- we won't argue that the | 14:54:07 |
| 2 | responses to these questions in this deposition | 14:54:08 |
| 3 | constitute a waiver of privilege. | 14:54:11 |
| 4 | MS. ESKENAZI:  Thank you. | 14:54:12 |
| 5 | You may answer "yes" or "no." | 14:54:13 |
| 6 | THE WITNESS:  I don't recall.  It's a long | 14:54:17 |
| 7 | time since I've looked at the document. | 14:54:19 |
| 8 | BY MR. ULIN: | 14:54:19 |
| 9 | Q.  Do the permission guidelines address the | 14:54:22 |
| 10 | licensing of gambling games or games of chance? | 14:54:27 |
| 11 | MS. ESKENAZI:  It's a "yes" or "no" | 14:54:36 |
| 12 | question. | 14:54:37 |
| 13 | THE WITNESS:  I don't believe they do. | 14:54:43 |
| 14 | BY MR. ULIN: | 14:54:43 |
| 15 | Q.  Ms. Blackburn, as best you can recall, can | 14:55:04 |
| 16 | you outline for me what the permission guidelines | 14:55:08 |
| 17 | instruct HarperCollins with respect to the use of | 14:55:13 |
| 18 | Tolkien-related marks? | 14:55:15 |
| 19 | MS. ESKENAZI:  Well, again, I think that | 14:55:19 |
| 20 | that's -- that encompasses more than just -- just | 14:55:19 |
| 21 | subject matter. | 14:55:24 |
| 22 | MR. GLICK:  We're making a record.  You'll | 14:55:26 |
| 23 | instruct when you do. | 14:55:28 |
| 24 | MS. ESKENAZI:  Okay.  Well, I just wanted | 14:55:29 |
| 25 | to make sure -- | 14:55:29 |

Page 177

| 1 | MR. ULIN:  Yes. | 14:55:30 |
| 2 | MS. ESKENAZI:  -- that we're now moving on | 14:55:31 |
| 3 | to the -- essentially the next topic. | 14:55:32 |
| 4 | MR. ULIN:  We are. | 14:55:34 |
| 5 | MS. ESKENAZI:  Okay.  In which case I am | 14:55:35 |
| 6 | going to instruct not to answer because I think that | 14:55:37 |
| 7 | crosses the line. | 14:55:40 |
| 8 | MR. ULIN:  And Bonnie, just to be clear, | 14:55:41 |
| 9 | you would instruct not to answer any question I ask | 14:55:43 |
| 10 | that goes to the substance of what the permission | 14:55:45 |
| 11 | guidelines instruct with respect to the use of the | 14:55:49 |
| 12 | Tolkien trademarks; is that correct? | 14:55:51 |
| 13 | MS. ESKENAZI:  What the permission | 14:55:53 |
| 14 | guidelines communicates as between the Estate and | 14:55:55 |
| 15 | HarperCollins, yes, that's correct. | 14:55:59 |
| 16 | MR. ULIN:  Okay. | 14:56:02 |
| 17 | Q.  And Ms. Blackburn, you would accept your | 14:56:03 |
| 18 | counsel's instruction not to respond about the | 14:56:05 |
| 19 | substance of what the permission guidelines | 14:56:07 |
| 20 | communicate between the Estate and HarperCollins | 14:56:10 |
| 21 | with respect to the use of Tolkien-related | 14:56:12 |
| 22 | trademarks? | 14:56:15 |
| 23 | A.  I will accept my counsel's advice on that | 14:56:17 |
| 24 | question. | 14:56:18 |
| 25 | MR. ULIN:  Okay.  All right.  For the | 14:56:33 |

Page 178

Veritext National Deposition & Litigation Services
866 299-5127

EXHIBIT A                                                     PAGE 177

```
 1    record, we will request and again, deal with this    14:56:34

 2    off -- outside of this context, that you produce the  14:56:36

 3    permission guidelines in response to our discovery,   14:56:39

 4    which we think they're called for and we'll argue     14:56:41

 5    that they're not privileged and should have been      14:56:43

 6    produced.                                             14:56:45

 7         MS. ESKENAZI:  I understand your position.       14:56:45

 8    We disagree.                                          14:56:46

 9         MR. ULIN:  Fair enough.                          14:56:47

10         We'll mark Exhibit 20 and place it before        14:56:52

11    the witness.  These documents are stapled separately  14:56:59

12    but they constitute one exhibit.                      14:57:02

13              (The document referred to was               14:57:02

14              marked for identification as                14:57:02

15              Exhibit 20 and attached to this             14:57:02

16              deposition.)                                14:57:02

17         MR. ULIN:  Bonnie, this is yours.                14:57:22

18         MS. ESKENAZI:  Thank you.  Is this two           14:57:22

19    documents?                                            14:57:23

20         MR. ULIN:  It is one document that was           14:57:24

21    stapled separately.  It's a document and its          14:57:25

22    enclosure, and they were stapled separately.  You'll  14:57:29

23    note from the Bates numbers that they're              14:57:33

24    consecutive.                                          14:57:35

25         THE WITNESS:  This letter establishes that       14:57:47
```

Page 179

| | | |
|---|---|---|
| 1 | it's Humphreys with an "E." | 14:57:49 |
| 2 | MR. ULIN:  I knew I had read that name. | 14:57:55 |
| 3 | Thank you. | 14:57:57 |
| 4 | THE WITNESS:  You were right. | 14:57:57 |
| 5 | BY MR. ULIN: | 14:57:57 |
| 6 | Q.  Again, Ms. Blackburn, while you're free to | 14:58:04 |
| 7 | read the document, I will only be asking you | 14:58:06 |
| 8 | questions about the first paragraph on the final | 14:58:07 |
| 9 | page of the letter and also about certain entries in | 14:58:10 |
| 10 | the enclosed chart. | 14:58:14 |
| 11 | A.  Okay. | 14:58:16 |
| 12 | MS. ESKENAZI:  In which case you should | 14:58:19 |
| 13 | probably read it. | 14:58:20 |
| 14 | THE WITNESS:  I've read these documents. | 15:01:11 |
| 15 | BY MR. ULIN: | 15:01:12 |
| 16 | Q.  Okay.  And Ms. Blackburn, do you recognize | 15:01:12 |
| 17 | Exhibit 20 as a letter you sent to Al Bendich on or | 15:01:15 |
| 18 | about May the 3rd, 2002? | 15:01:18 |
| 19 | A.  Yes, I do. | 15:01:20 |
| 20 | Q.  And do you remember sending this letter to | 15:01:21 |
| 21 | Mr. Bendich? | 15:01:22 |
| 22 | A.  I suppose the answer to that is I remember | 15:01:24 |
| 23 | now. | 15:01:38 |
| 24 | Q.  And seeing the letter refreshes your | 15:01:40 |
| 25 | recollection -- | 15:01:41 |

Page 180

```
 1        A.  Yes.                                      15:01:41

 2        Q.  -- that you --                            15:01:42

 3        A.  Yes, that's what I mean.                  15:01:43

 4        Q.  Okay.  In -- on the second page -- I'm    15:01:45

 5   sorry, it's the third page of the letter, in the  15:01:46

 6   first full paragraph on that page you indicate that 15:01:50

 7   you're enclosing a couple of schedules dealing with 15:01:53

 8   the status of the Estate's various applications for 15:01:55

 9   registration of the Tolkien name and monogram as   15:01:58

10   trademarks.                                        15:02:06

11        Do you see that?                              15:02:07

12        A.  I do.                                     15:02:07

13        Q.  And is the chart that is attached to      15:02:07

14   Exhibit 20 the schedules that you were referring to 15:02:09

15   in the letter?                                     15:02:14

16        A.  Yes, I believe it is.                     15:02:15

17        Q.  And to be clear, this chart reflects the  15:02:22

18   Tolkien Estate's own registration of its trademarks 15:02:25

19   in the Tolkien name and the J.R.R.T. monogram; is  15:02:30

20   that correct?                                      15:02:30

21        A.  That's right.  There's -- there's two     15:02:34

22   elements to it.  The first bit is the Tolkien word 15:02:35

23   mark and the second, the graphic device, J.R.R.    15:02:40

24   Tolkien's own signature or monogram.  Not -- sorry, 15:02:42

25   not signature, his monogram, his initials.         15:02:46
```

Page 181

| | | |
|---|---|---|
| 1 | Q.   And these are registrations that would have | 15:02:49 |
| 2 | been accomplished by the Estate through the Manches | 15:02:51 |
| 3 | law firm, correct? | 15:02:54 |
| 4 | A.   In 2002?  Yes. | 15:02:55 |
| 5 | Q.   Okay.  And you were the attorney at Manches | 15:02:57 |
| 6 | who would have been responsible to oversee these | 15:03:01 |
| 7 | registrations; is that correct? | 15:03:05 |
| 8 | A.   Yes. | 15:03:06 |
| 9 | Q.   Looking at the first page of the -- the | 15:03:07 |
| 10 | chart on the Tolkien mark -- | 15:03:14 |
| 11 | A.   Yes. | 15:03:15 |
| 12 | Q.   -- you indicate that it was registered in | 15:03:16 |
| 13 | Class 9? | 15:03:19 |
| 14 | A.   Yes. | 15:03:20 |
| 15 | Q.   And then you list the various -- the | 15:03:22 |
| 16 | specifications for which it was registered -- | 15:03:24 |
| 17 | A.   Yes. | 15:03:26 |
| 18 | Q.   -- which include computer software. | 15:03:27 |
| 19 | Do you see that at the second line -- | 15:03:28 |
| 20 | A.   Yes. | 15:03:32 |
| 21 | Q.   -- of that entry? | 15:03:32 |
| 22 | A.   Yes. | 15:03:32 |
| 23 | Q.   Which also includes computer software, | 15:03:33 |
| 24 | looking further down the entry, provided by | 15:03:35 |
| 25 | telecommunications networks, by online delivery and | 15:03:38 |

Page 182

| | | |
|---|---|---|
| 1 | from the Internet. | 15:03:41 |
| 2 | Do you see that? | 15:03:42 |
| 3 | A.   Yes. | 15:03:42 |
| 4 | Q.   And you registered the Tolkien mark for | 15:03:43 |
| 5 | computer software that was available by online | 15:03:46 |
| 6 | delivery and from the Internet in April of 2000; is | 15:03:48 |
| 7 | that correct? | 15:03:48 |
| 8 | A.   This document is May 2002.  I don't know | 15:03:58 |
| 9 | when -- oh, sorry, I see what you mean.  You're | 15:04:03 |
| 10 | referring to the -- that would be the -- the date | 15:04:07 |
| 11 | of -- of the application. | 15:04:10 |
| 12 | Q.   Okay.  So you filed the application for | 15:04:12 |
| 13 | registration in that class for computer software | 15:04:13 |
| 14 | provided -- including software provided by online | 15:04:20 |
| 15 | delivery in April of 2000, correct? | 15:04:23 |
| 16 | A.   Yes. | 15:04:23 |
| 17 | Q.   Okay.  And then looking at your -- turning | 15:04:25 |
| 18 | to -- excuse me -- page 3 of the -- actually, let | 15:04:31 |
| 19 | me -- sorry. | 15:04:36 |
| 20 | Turning to page 2 of the chart, you | 15:04:38 |
| 21 | register the Tolkien name in the European Union | 15:04:44 |
| 22 | under Class 41. | 15:04:49 |
| 23 | Do you see that? | 15:04:51 |
| 24 | A.   Uh-huh. | 15:04:51 |
| 25 | Q.   And then you provide specifications for the | 15:04:52 |

Page 183

| | | |
|---|---|---|
| 1 | purposes for which that mark is registered under | 15:04:57 |
| 2 | Class 41 which include, looking three lines up from | 15:04:59 |
| 3 | the bottom of the page, electronic games including | 15:05:02 |
| 4 | interactive games provided online or from the | 15:05:04 |
| 5 | Internet, including Web sites. | 15:05:07 |
| 6 | Do you see that? | 15:05:09 |
| 7 | A.   Yes. | 15:05:09 |
| 8 | Q.   All right.  And then on page 3, looking at | 15:05:12 |
| 9 | your Class 9 registration for New Zealand, the | 15:05:16 |
| 10 | second -- the first full entry on page 3 of the | 15:05:20 |
| 11 | chart, virtually the same language contained, you | 15:05:22 |
| 12 | registered in Class 9 for New Zealand, computer | 15:05:26 |
| 13 | games and electronic games, including interactive | 15:05:30 |
| 14 | games provided online or from the Internet, | 15:05:33 |
| 15 | including Web sites. | 15:05:35 |
| 16 | Do you see that? | 15:05:36 |
| 17 | A.   Yes. | 15:05:37 |
| 18 | Q.   Okay.  And those -- that EU registration | 15:05:38 |
| 19 | was in April of 2000 as well or the application for | 15:05:41 |
| 20 | registration, rather, was filed in April of 2000 as | 15:05:43 |
| 21 | well, correct?  I'm looking at the EU registration | 15:05:45 |
| 22 | for Class 9 on page 2 of the document. | 15:05:51 |
| 23 | A.   Can I just -- can I just clarify the | 15:05:54 |
| 24 | U.K. -- that would be a U.K. date so that would be 4 | 15:05:57 |
| 25 | February. | 15:06:00 |

Page 184

| | | |
|---|---|---|
| 1 | Q.  I'm sorry.  Okay. | 15:06:00 |
| 2 | A.  Okay.  So the question? | 15:06:01 |
| 3 | Q.  Sure.  Let's ask the question again. | 15:06:04 |
| 4 | Looking at page 2, the EU application for | 15:06:08 |
| 5 | the Tolkien mark in Class 41 would have been made as | 15:06:10 |
| 6 | of February 2000, correct? | 15:06:19 |
| 7 | A.  Yes.  It looks like that was the case. | 15:06:22 |
| 8 | Q.  The same is true of the New Zealand | 15:06:24 |
| 9 | application for the Tolkien mark in Class 9, | 15:06:29 |
| 10 | correct? | 15:06:29 |
| 11 | A.  That appears to be the case. | 15:06:31 |
| 12 | Q.  Okay.  Does -- do these registrations | 15:06:35 |
| 13 | refresh -- refresh your recollection that you were, | 15:06:38 |
| 14 | in fact, aware as of February of 2000 that computer | 15:06:40 |
| 15 | software and electronic games, including interactive | 15:06:45 |
| 16 | games, were available for distribution online, | 15:06:50 |
| 17 | including over the Internet? | 15:06:56 |
| 18 | A.  No. | 15:06:57 |
| 19 | Q.  No?  Why not? | 15:06:58 |
| 20 | A.  Well, I didn't devise these specifications | 15:07:00 |
| 21 | of goods. | 15:07:03 |
| 22 | Q.  But you did review them, didn't you? | 15:07:04 |
| 23 | A.  I may have.  But my concern was simply to | 15:07:07 |
| 24 | register as widely as possible.  And the trademark | 15:07:10 |
| 25 | attorneys, for example, in New Zealand would | 15:07:13 |

Page 185

| | | |
|---|---|---|
| 1 | probably have provided specimen wording for the | 15:07:16 |
| 2 | goods specifications. | 15:07:20 |
| 3 | Q.  So you were at least aware, based on your | 15:07:21 |
| 4 | review of your trademark applications, that the | 15:07:23 |
| 5 | Estate itself had registered for marks relating to | 15:07:27 |
| 6 | computer and electronic games provided online in | 15:07:31 |
| 7 | 2000, correct? | 15:07:34 |
| 8 | A.  I don't think that's a correct summary of | 15:07:37 |
| 9 | the position, but I'd need to hear your statement | 15:07:39 |
| 10 | again. | 15:07:42 |
| 11 | Q.  All I'm asking is whether you were aware | 15:07:43 |
| 12 | that the Estate had registered for -- sorry, had | 15:07:46 |
| 13 | applied for trademark registrations relating to | 15:07:51 |
| 14 | computer and electronic games provided online as | 15:07:53 |
| 15 | early as February 2000? | 15:07:56 |
| 16 | A.  Well, I was -- | 15:08:00 |
| 17 | MS. ESKENAZI:  Objection.  Vague and | 15:08:00 |
| 18 | ambiguous. | 15:08:01 |
| 19 | THE WITNESS:  I was aware in February -- | 15:08:01 |
| 20 | in -- in February of 2000 that we had made | 15:08:06 |
| 21 | applications to register goods in these classes.  I | 15:08:10 |
| 22 | don't -- I don't know that I would have applied my | 15:08:16 |
| 23 | mind to the absolute detail of all of the components | 15:08:18 |
| 24 | of the goods specification. | 15:08:22 |
| 25 | BY MR. ULIN: | 15:08:22 |

Page 186

```
 1        Q.  And it was your understanding at that time    15:08:25

 2   that it was lawful and possible to register           15:08:28

 3   trademarks that the Estate owned for electronic        15:08:34

 4   games and computer software provided online,           15:08:39

 5   correct?                                               15:08:39

 6        MS. ESKENAZI:  Objection.  Vague and              15:08:42

 7   ambiguous.                                             15:08:43

 8        THE WITNESS:  What I knew at the time was         15:08:43

 9   that music could be downloaded from the Internet.  I   15:08:46

10   don't know what -- I don't -- I didn't have any        15:08:51

11   specific knowledge of other technologies, but it is    15:08:52

12   common practice when devising these goods              15:08:56

13   specifications to anticipate technological             15:08:59

14   developments.  So my assessment of these marks is      15:09:03

15   that the trademark attorneys we were using who --      15:09:05

16   who assisted with the specification of goods would     15:09:09

17   have wanted to anticipate those technological          15:09:12

18   developments.                                          15:09:16

19   BY MR. ULIN:                                           15:09:16

20        Q.  Okay.  And you understand -- and you          15:09:16

21   understood you had the right to register for marks     15:09:17

22   in those -- sorry.  Let me start the question again.   15:09:20

23        You understood you had the right to apply         15:09:23

24   for registrations in those classes for the marks       15:09:25

25   that the Estate owned, correct?                        15:09:27
```

Veritext National Deposition & Litigation Services
866 299-5127

| | | |
|---|---|---|
| 1 | MS. ESKENAZI:  Objection.  Calls for a | 15:09:30 |
| 2 | legal conclusion.  Calls for speculation. | 15:09:31 |
| 3 | Potentially invades the attorney-client privilege. | 15:09:33 |
| 4 | To the extent that you may have learned | 15:09:36 |
| 5 | information from counsel, local counsel, as you | 15:09:39 |
| 6 | refer to maybe New Zealand counsel or whatever, that | 15:09:43 |
| 7 | invades attorney-client privilege and I would | 15:09:48 |
| 8 | instruct you not to answer. | 15:09:50 |
| 9 | To the extent you can answer that question | 15:09:51 |
| 10 | without divulging attorney-client privileged | 15:09:53 |
| 11 | information, you can answer. | 15:09:55 |
| 12 | THE WITNESS:  I'm sorry, I need the | 15:09:57 |
| 13 | question again. | 15:09:57 |
| 14 | MR. ULIN:  Would you read it back, please. | 15:10:08 |
| 15 | (The reporter read the record | 15:10:08 |
| 16 | as follows: | 15:10:08 |
| 17 | "QUESTION:  And you | 15:09:17 |
| 18 | understood you had the right to | 15:09:17 |
| 19 | register for marks in those -- | 15:09:18 |
| 20 | sorry. | 15:09:21 |
| 21 | "You understood you had the | 15:09:23 |
| 22 | right to apply for registrations | 15:09:25 |
| 23 | in those classes for the marks | 15:09:26 |
| 24 | that the Estate owned, correct?") | 15:09:27 |
| 25 | THE WITNESS:  I understood that the Tolkien | 15:10:09 |

Page 188

| | | |
|---|---|---|
| 1 | Estate could register the Tolkien marks as it -- as | 15:10:13 |
| 2 | it chose according to any local advice received. | 15:10:18 |
| 3 | BY MR. ULIN: | 15:10:18 |
| 4 | Q.  Okay.  Including for computer software and | 15:10:23 |
| 5 | electronic or interactive games provided online or | 15:10:26 |
| 6 | over the Internet, correct? | 15:10:30 |
| 7 | A.  The Tolkien Estate could register the mark | 15:10:32 |
| 8 | Tolkien for any specifications of goods it saw fit. | 15:10:34 |
| 9 | Q.  Okay.  Did you ever apply to register The | 15:10:46 |
| 10 | Lord of the Rings or The Hobbit titles or characters | 15:10:53 |
| 11 | from those works for electronic games or computer | 15:10:55 |
| 12 | software provided online or over the Internet? | 15:10:59 |
| 13 | A.  I've made no applications to register The | 15:11:04 |
| 14 | Lord of the Rings or The Hobbit as -- as trademarks. | 15:11:07 |
| 15 | Q.  Why not? | 15:11:08 |
| 16 | MS. ESKENAZI:  Well, objection.  Again, to | 15:11:10 |
| 17 | the extent that that calls for a legal conclusion or | 15:11:12 |
| 18 | calls for any attorney-client privileged | 15:11:15 |
| 19 | information, I'm going to instruct not to answer. | 15:11:17 |
| 20 | To the extent you can answer that question | 15:11:20 |
| 21 | without divulging attorney-client privileged | 15:11:22 |
| 22 | information. | 15:11:24 |
| 23 | THE WITNESS:  I can't -- I can't answer | 15:11:24 |
| 24 | that question without divulging attorney -- without | 15:11:25 |
| 25 | divulging privileged information. | 15:11:29 |

Page 189

| | | |
|---|---|---|
| 1 | BY MR. ULIN: | 15:11:31 |
| 2 | Q.  Let me ask two more questions, then I'm | 15:11:31 |
| 3 | going to stop. | 15:11:33 |
| 4 | It's your position that the Estate retains | 15:11:34 |
| 5 | the rights to use The Lord of the Rings and Hobbit | 15:11:37 |
| 6 | trademarks in video games that are available by | 15:11:41 |
| 7 | download only, correct? | 15:11:45 |
| 8 | A.  Correct. | 15:11:47 |
| 9 | Q.  Why have you not attempted to register | 15:11:47 |
| 10 | those trademarks for those uses? | 15:11:53 |
| 11 | A.  Because the -- | 15:11:56 |
| 12 | MS. ESKENAZI:  Same objection. | 15:11:57 |
| 13 | If you can answer that without -- | 15:11:58 |
| 14 | THE WITNESS:  The Tolkien Estate has not -- | 15:12:00 |
| 15 | the Tolkien Estate has not -- trying to get the | 15:12:06 |
| 16 | phrasing of this right. | 15:12:12 |
| 17 | The Tolkien Estate does not seek to use | 15:12:13 |
| 18 | those names on downloadable-only.  It has not | 15:12:16 |
| 19 | licensed those rights to -- to -- to use the marks | 15:12:20 |
| 20 | for downloadable-only games.  One would only | 15:12:25 |
| 21 | register a trademark if one were minded to use it or | 15:12:27 |
| 22 | it might be foreseen that one might use it in that | 15:12:31 |
| 23 | way. | 15:12:34 |
| 24 | BY MR. ULIN: | 15:12:34 |
| 25 | Q.  Has the Tolkien Estate used the name | 15:12:34 |

Page 190

```
 1    Tolkien or the J.R.R.T. monogram in connection with      15:12:37

 2    downloadable-only video games or computer software       15:12:39

 3    at any time since 2000?                                  15:12:45

 4         A.  Could you repeat?                               15:12:47

 5              MR. ULIN:  Could you read the question         15:12:47

 6    back, please.                                            15:12:47

 7                  (The reporter read the record              15:12:47

 8              as follows:                                    15:12:47

 9                  "QUESTION:  Has the Tolkien                15:12:34

10              Estate used the name Tolkien or                15:12:36

11              the J.R.R.T. monogram in                       15:12:37

12              connection with downloadable-only              15:12:39

13              video games or computer software               15:12:41

14              at any time since 2000?")                      15:12:45

15              THE WITNESS:  To the extent that electronic    15:13:01

16    books constitute computer software, it has licensed      15:13:02

17    those marks.                                             15:13:05

18    BY MR. ULIN:                                             15:13:05

19         Q.  And what about in -- in electronic games?       15:13:05

20              MS. ESKENAZI:  Well, objection.  Asked and     15:13:12

21    answered.                                                15:13:14

22              THE WITNESS:  I don't -- I don't believe it    15:13:14

23    has.                                                     15:13:18

24              MR. ULIN:  At this point I'm going to          15:13:20

25    suspend my questioning pursuant to an arrangement        15:13:21
```

Veritext National Deposition & Litigation Services
866 299-5127

```
 1    with counsel for Warner Bros. and allow          15:13:23

 2    Mr. Petrocelli to take the remainder of the three  15:13:27

 3    hours today.                                       15:13:29

 4         I do have further questions for the witness  15:13:29

 5    and we reserve our right to pursue more time with  15:13:31

 6    this witness.  Among other topics, for example, I  15:13:34

 7    have not been able, given the time constraints, to  15:13:37

 8    address the disputes regarding registrations in    15:13:40

 9    Class 16, registration for a number of disputed    15:13:43

10    areas of goods and services.  This was a matter of  15:13:47

11    discussion between our firms over whether this      15:13:52

12    deposition should continue for two days or more.  We  15:13:54

13    certainly feel given the centrality of this witness  15:13:57

14    to the matters at issue in this case, this          15:14:00

15    deposition should have been set for more than one   15:14:02

16    day.  And we'll take that position with the Court,  15:14:04

17    assuming that we can't work it out with counsel for  15:14:06

18    the Estate.                                         15:14:09

19         MS. ESKENAZI:  We understand.  Just           15:14:09

20    understand that we disagree.                        15:14:11

21         MR. ULIN:  Understood.                         15:14:12

22         MR. GLICK:  Go off the record.                 15:14:15

23         THE VIDEOGRAPHER:  Off the record at 3:15      15:14:15

24    p.m.                                                15:14:18

25         (Brief recess.)                                15:14:54
```

Page 192

```
 1              THE VIDEOGRAPHER:  We're back on the record  15:16:43

 2    at 3:17 p.m.  Counsel may proceed.                     15:16:53

 3                                                           15:16:53

 4                     EXAMINATION                           15:16:53

 5    BY MR. PETROCELLI:                                     15:16:53

 6         Q.  Good afternoon, Ms. Blackburn.  I'm Dan       15:16:57

 7    Petrocelli and counsel for Warner Bros.                15:17:00

 8         A.  Good afternoon.                               15:17:02

 9              (Pages 194 through 201 are

10              marked confidential and are bound

11              under separate cover.  The

12              nonconfidential portion of this

13              transcript continues on page 202.)

14

15

16

17

18

19

20

21

22

23

24

25
```

Veritext National Deposition & Litigation Services
866 299-5127

| | | |
|---|---|---|
| 1 | Q.  Who authorized the filing of the lawsuit on | 15:26:57 |
| 2 | behalf of Fourth Age Limited? | 15:27:00 |
| 3 | MS. ESKENAZI:  Objection to the extent it | 15:27:02 |
| 4 | calls for divulging attorney-client privileged | 15:27:04 |
| 5 | information. | 15:27:08 |
| 6 | You can answer if you can disclose that | 15:27:09 |
| 7 | without divulging attorney-client privileged | 15:27:12 |
| 8 | information. | 15:27:14 |
| 9 | THE WITNESS:  I don't -- I don't know | 15:27:17 |
| 10 | whether it does or -- I don't know -- I don't really | 15:27:18 |
| 11 | understand what would and would not amount to | 15:27:22 |
| 12 | disclosure of privileged information. | 15:27:25 |
| 13 | MS. ESKENAZI:  Okay.  Well, then, why don't | 15:27:27 |
| 14 | we take a break and we can discuss what does divulge | 15:27:29 |
| 15 | and what doesn't divulge attorney-client privileged | 15:27:35 |
| 16 | information. | 15:27:37 |
| 17 | MR. PETROCELLI:  Well, I can't stop you | 15:27:38 |
| 18 | from taking a break.  The question does not | 15:27:40 |
| 19 | conceivably violate the privilege, but go ahead and | 15:27:42 |
| 20 | take your break. | 15:27:44 |
| 21 | MS. ESKENAZI:  Of course, it does. | 15:27:46 |
| 22 | THE VIDEOGRAPHER:  Off the record at 3:28 | 15:27:48 |
| 23 | p.m. | 15:27:50 |
| 24 | (Brief recess.) | 15:28:45 |
| 25 | THE VIDEOGRAPHER:  We are back on the | 15:30:25 |

Page 202

| | | |
|---|---|---|
| 1 | record at 3:31 p.m. | 15:30:36 |
| 2 | MS. ESKENAZI:  I'm going to instruct the | 15:30:41 |
| 3 | witness not to answer that question.  After | 15:30:42 |
| 4 | consultation, it appears as though any information | 15:30:45 |
| 5 | she would have would be through | 15:30:48 |
| 6 | attorney-client comm- -- attorney-client privileged | 15:30:51 |
| 7 | communications. | 15:30:52 |
| 8 | BY MR. PETROCELLI: | 15:30:52 |
| 9 | Q.  With respect to that instruction, | 15:30:55 |
| 10 | Ms. Blackburn, who -- who was the lawyer involved in | 15:30:56 |
| 11 | the communication? | 15:31:00 |
| 12 | A.  What communication? | 15:31:00 |
| 13 | Q.  The communication that's the subject of the | 15:31:02 |
| 14 | instruction not to answer my question. | 15:31:05 |
| 15 | A.  Are you asking me who advised me?  I don't | 15:31:10 |
| 16 | understand your question. | 15:31:14 |
| 17 | MS. ESKENAZI:  Yeah, it's vague and | 15:31:17 |
| 18 | ambiguous. | 15:31:17 |
| 19 | BY MR. PETROCELLI: | 15:31:17 |
| 20 | Q.  The -- the -- the attorney-client | 15:31:18 |
| 21 | instruction, you were instructed not to answer on | 15:31:20 |
| 22 | the ground of the attorney-client privilege. | 15:31:22 |
| 23 | A.  Right. | 15:31:25 |
| 24 | Q.  Who is the attorney and who is the client? | 15:31:26 |
| 25 | A.  The attorney is the firm of Maier | 15:31:28 |

Page 203

```
 1    Blackburn.                                         15:31:30

 2         Q.  And which people were involved in the     15:31:31

 3    giving or receiving of -- of the privileged        15:31:35

 4    information?                                        15:31:37

 5            MS. ESKENAZI:  You can identify the         15:31:39

 6    clients.                                            15:31:41

 7            THE WITNESS:  The -- the clients are the    15:31:42

 8    two clients I've mentioned to you.                  15:31:43

 9    BY MR. PETROCELLI:                                  15:31:43

10         Q.  Which people in the law firm who are the   15:31:46

11    attorneys in the attorney part of the              15:31:49

12    attorney-client privilege were involved in this?   15:31:51

13         A.  The partners in the firm, myself and Steven 15:31:55

14    Maier.                                              15:31:57

15         Q.  Are you the only partners in the firm, the 15:31:57

16    two of you?                                         15:32:01

17         A.  Yes, we are.                               15:32:01

18         Q.  Okay.  And who were the clients involved in 15:32:02

19    the communication that's the subject of that       15:32:04

20    instruction?                                        15:32:07

21         A.  The Tolkien Estate Limited and the Tolkien 15:32:07

22    Trust.                                              15:32:11

23         Q.  Okay.  And what people on behalf of those  15:32:12

24    entities were involved in that communication?      15:32:15

25         A.  In the case of the Tolkien Estate Limited, 15:32:19
```

                                              Page  204

```
 1    the directors, and in the case of the Tolkien Trust,    15:32:22

 2    the directors/trustees.                                 15:32:26

 3            THE REPORTER:  "The directors," what?  I'm       15:32:26

 4    sorry.                                                  15:32:26

 5            THE WITNESS:  "Stroke," trustees.               15:32:26

 6            THE REPORTER:  Thank you.                       15:32:26

 7            THE WITNESS:  "Slash."                          15:32:34

 8    BY MR. PETROCELLI:                                      15:32:35

 9        Q.  So the directors in the case of the Tolkien     15:32:35

10    Estate Limited, you identified as Christopher,          15:32:39

11    Baillie, Michael, Priscilla, Simon and Steven Maier?    15:32:42

12        A.  Correct.                                        15:32:49

13        Q.  Okay.  And Priscilla, Christopher, Baillie,     15:32:51

14    Michael for the trust?                                  15:32:53

15        A.  Correct.                                        15:32:55

16        Q.  Okay.  Now, are there any documents, such       15:32:56

17    as minutes or memos, that reflect the decision to       15:33:03

18    authorize the filing of this lawsuit?                   15:33:11

19            MS. ESKENAZI:  Objection.  Attorney-client      15:33:15

20    privilege.                                              15:33:16

21            You can answer that question "yes" or "no"      15:33:18

22    to the extent that I have a stipulation that it will    15:33:22

23    not waive the -- her answer to the question will not    15:33:26

24    waive the attorney-client privilege.                    15:33:28

25            MR. PETROCELLI:  You don't need one, but        15:33:30
```

                                                    Page 205

```
 1    I'll give it to you.                          15:33:32

 2           THE WITNESS:  Could you repeat the     15:33:36

 3    question, please?                             15:33:37

 4    MR. PETROCELLI:                               15:33:37

 5       Q.  Yeah.  Are there any documents such as 15:33:41

 6    minutes or memos that reflect the decision to 15:33:42

 7    authorize filing of this lawsuit?             15:33:45

 8       A.  There will be documents.               15:33:47

 9       Q.  Where are those documents?             15:33:49

10       A.  They will be in the files of Maier     15:33:51

11    Blackburn, LLP.                               15:33:55

12       Q.  Okay.  Are there minutes of -- of meetings 15:33:59

13    that are kept by the directors of the two entities? 15:34:03

14       A.  Yes, there are minute books.           15:34:08

15       Q.  Okay.  Your firm maintains those minute 15:34:09

16    books?                                        15:34:12

17       A.  Yes.                                    15:34:12

18       Q.  Okay.  Are there minutes related to the 15:34:17

19    decision or authorization to file this lawsuit? 15:34:20

20       A.  No, there aren't.                      15:34:22

21       Q.  Okay.  Are there other documents, such as 15:34:24

22    memos?                                        15:34:25

23           MS. ESKENAZI:  Again, to the extent that we 15:34:28

24    have the same --                              15:34:30

25           MR. PETROCELLI:  You do.               15:34:31
```

Page 206

| | | |
|---|---|---|
| 1 | MS. ESKENAZI:  -- agreement. | 15:34:32 |
| 2 | You may answer that "yes" or "no." | 15:34:33 |
| 3 | THE WITNESS:  There are documents.  Sorry, | 15:34:35 |
| 4 | I can't remember the question. | 15:34:40 |
| 5 | BY MR. PETROCELLI: | 15:34:40 |
| 6 | Q.  Documents that reflect the decision or | 15:34:42 |
| 7 | authorization to file the lawsuit? | 15:34:44 |
| 8 | A.  Yes, there are. | 15:34:45 |
| 9 | Q.  And those documents are privileged? | 15:34:46 |
| 10 | MS. ESKENAZI:  We are asserting the | 15:34:50 |
| 11 | privilege. | 15:34:52 |
| 12 | MR. PETROCELLI:  I'm asking -- | 15:34:53 |
| 13 | THE WITNESS:  I am assert- -- yes. | 15:34:54 |
| 14 | MR. PETROCELLI:  I didn't ask you if you're | 15:34:55 |
| 15 | asserting it.  I'm asking, are they privileged? | 15:34:56 |
| 16 | THE WITNESS:  Well -- | 15:34:59 |
| 17 | MS. ESKENAZI:  Under advice of U.S. counsel | 15:34:59 |
| 18 | in this lawsuit, we believe they are privileged. | 15:35:00 |
| 19 | They are privileged. | 15:35:05 |
| 20 | THE WITNESS:  Privilege in this -- in this | 15:35:08 |
| 21 | instance is, as I understand, a U.S. law concept. | 15:35:09 |
| 22 | So I have to -- I have to understand that principle | 15:35:13 |
| 23 | from my counsel. | 15:35:16 |
| 24 | BY MR. PETROCELLI: | 15:35:16 |
| 25 | Q.  Have you turned those documents over to the | 15:35:18 |

Page 207

```
 1    Greenberg firm?                                    15:35:21

 2         A.  I've turned over everything to the       15:35:21

 3    Greenberg firm.                                    15:35:24

 4         Q.  Does everything include those documents?  15:35:25

 5         A.  Yes, I think it would.                    15:35:27

 6         Q.  Okay.  When did you turn everything over to  15:35:29

 7    the Greenberg firm?                                15:35:31

 8         A.  Well, in stages.                          15:35:32

 9         Q.  Beginning when and ending when?           15:35:36

10         A.  I don't recall the exact dates.           15:35:45

11         Q.  General time frames will do.              15:35:48

12         A.  Well, I'm not -- I'm not sure, but        15:35:51

13    certainly we started to turn over documents once the  15:36:07

14    lawsuit was filed.  We might have done it before --  15:36:11

15    I -- I really don't recall.                        15:36:14

16         Q.  How did you provide Greenberg with the    15:36:16

17    documents?  Did you mail them?  Did you hand-deliver  15:36:20

18    them?  Did you e-mail them?                         15:36:24

19              THE WITNESS:  Can I answer this question?  15:36:26

20              MS. ESKENAZI:  You may answer this        15:36:27

21    question.                                          15:36:29

22              THE WITNESS:  I provided the list of files  15:36:32

23    to Greenberg Glusker.                               15:36:35

24              MS. ESKENAZI:  That's not the question.   15:36:39

25              THE WITNESS:  Sorry.                      15:36:40
```

Page 208

```
 1              MS. ESKENAZI:  That's why I allowed you to     15:36:41

 2     answer the question.  Not what you communicated to     15:36:43

 3     us.  How did you provide the files.                    15:36:46

 4              THE WITNESS:  Oh, I'm so sorry.  Well, they    15:36:48

 5     were scanned in a -- in a -- through a provider in     15:36:51

 6     London and transmitted directly from the provider to  15:36:55

 7     Greenberg Glusker.                                     15:37:01

 8     BY MR. PETROCELLI:                                     15:37:01

 9         Q.  And when did that happen?  Around the time     15:37:06

10     the case was filed?                                    15:37:08

11         A.  It -- it has happened in stages because        15:37:09

12     there is a lot of documentation.                       15:37:14

13         Q.  When is the last time it happened?             15:37:16

14         A.  Some months ago.  I can't be specific.  But    15:37:17

15     the process hasn't involved me.                        15:37:26

16         Q.  Excuse me?                                     15:37:29

17         A.  The process has involved the provider and      15:37:29

18     Greenberg Glusker.                                     15:37:32

19         Q.  But the provider is an outside service         15:37:33

20     in --                                                  15:37:36

21         A.  That's right, but they've collected the        15:37:36

22     files, scanned them and sent them to Greenberg         15:37:38

23     Glusker.                                               15:37:42

24         Q.  Which city does your firm work out of or is    15:37:42

25     headquartered in?                                      15:37:45
```

                                            Page 209

| | | |
|---|---|---|
| 1 | A.   Maier Blackburn operates in Oxford. | 15:37:46 |
| 2 | Q.   Oxford? | 15:37:48 |
| 3 | A.   Yes. | 15:37:50 |
| 4 | Q.   Okay.  What was the name of the service you | 15:37:50 |
| 5 | used? | 15:37:52 |
| 6 | A.   The company processing the documents is | 15:37:54 |
| 7 | a -- a company called Millnet. | 15:37:57 |
| 8 | Q.   In Oxford? | 15:38:01 |
| 9 | A.   No, in London. | 15:38:02 |
| 10 | Q.   In London?  Where did you get the documents | 15:38:03 |
| 11 | that you gave to the service to provide to | 15:38:06 |
| 12 | Greenberg? | 15:38:08 |
| 13 | A.   I didn't give the documents to the service. | 15:38:09 |
| 14 | They collected them from a storage facility, save in | 15:38:11 |
| 15 | relation to current files in the office. | 15:38:17 |
| 16 | Q.   So the two locations were your firm's | 15:38:19 |
| 17 | offices and the storage facility? | 15:38:22 |
| 18 | A.   Correct. | 15:38:23 |
| 19 | Q.   Okay.  And you have an inventory or list of | 15:38:24 |
| 20 | all these files? | 15:38:27 |
| 21 | A.   I have a list of files in storage. | 15:38:28 |
| 22 | Q.   And do you have a list of current files? | 15:38:33 |
| 23 | A.   Not really a list. | 15:38:34 |
| 24 | Q.   You have something like a list? | 15:38:38 |
| 25 | A.   No, because the -- the current files are | 15:38:42 |

Page 210

Veritext National Deposition & Litigation Services
866 299-5127

| | | |
|---|---|---|
| 1 | just the ones in the drawer.  They go onto a list | 15:38:44 |
| 2 | when they're put away. | 15:38:47 |
| 3 | Q.  You mean in storage? | 15:38:49 |
| 4 | A.  Yes. | 15:38:50 |
| 5 | Q.  Is it your firm's storage facility? | 15:38:51 |
| 6 | A.  No. | 15:38:53 |
| 7 | Q.  It's a general storage facility and you | 15:38:55 |
| 8 | have space there? | 15:38:57 |
| 9 | A.  It's a third-party provider of storage | 15:38:57 |
| 10 | space. | 15:39:00 |
| 11 | Q.  For physical documents? | 15:39:00 |
| 12 | A.  In our case for physical documents. | 15:39:02 |
| 13 | Q.  Okay.  And the documents that are in | 15:39:06 |
| 14 | storage, what's -- what's the name of the storage | 15:39:09 |
| 15 | facility? | 15:39:12 |
| 16 | A.  It's called Restore. | 15:39:12 |
| 17 | Q.  And where is it located? | 15:39:15 |
| 18 | A.  It's located in an air- -- a former | 15:39:17 |
| 19 | aircraft hanger in -- somewhere in Oxfordshire. | 15:39:20 |
| 20 | Q.  Okay.  Did you bring with you all of the | 15:39:27 |
| 21 | Tolkien-related files and documents from your prior | 15:39:31 |
| 22 | law firm when you started your current firm? | 15:39:34 |
| 23 | A.  Yes, I did. | 15:39:36 |
| 24 | Q.  Did you leave anything behind? | 15:39:37 |
| 25 | A.  No. | 15:39:39 |

Page 211

```
 1          Q.   Did you take files out of their storage?      15:39:40

 2          A.   They used the same storage facility, so it    15:39:42

 3     wasn't necessary to move them.                          15:39:47

 4          Q.   So the files literally did not have to         15:39:48

 5     move?                                                   15:39:50

 6          A.   Correct.                                      15:39:50

 7          Q.   They're still there from before?               15:39:50

 8          A.   Correct.                                      15:39:52

 9          Q.   The name of your prior firm was Manches; is   15:39:55

10     that right?                                             15:39:55

11          A.   That's correct.                               15:40:01

12          Q.   And when Morrell Peel & Gamlen merged into    15:40:02

13     Manches, did all of the Tolkien files at Morrell go     15:40:10

14     to Manches or stay with Manches?                        15:40:13

15          A.   Yes, they did.                                15:40:18

16          Q.   Are you aware of documents related to -- to   15:40:23

17     this case, to the issues in this case that have been    15:40:25

18     tossed out or discarded over the years?                 15:40:29

19          A.   No.  I was always careful to make sure that   15:40:32

20     the Tolkien files were kept intact.                     15:40:41

21          Q.   From when?  From the time that you got        15:40:44

22     actively involved?                                      15:40:46

23          A.   From all -- all the time that I have been     15:40:47

24     involved.                                               15:40:49

25          Q.   And I understand that that's from around      15:40:49
```

Page 212

```
 1    1992?                                           15:40:52

 2        A.  Yeah.  Yes.                             15:40:52

 3        Q.  What about electronic files?  Does your --  15:40:57

 4    does the Man- -- did the Manches firm have e-mail?  15:41:01

 5        A.  Yes.                                    15:41:04

 6        Q.  Okay.  Did Morrell Peel & Gamlen have   15:41:06

 7    e-mail?                                          15:41:09

 8        A.  No.                                     15:41:09

 9        Q.  When did that merge occur, in '97?      15:41:11

10        A.  1997.                                   15:41:13

11        Q.  Okay.  And so there was no e-mail used at  15:41:14

12    all by the firm in '97, right?                  15:41:17

13        A.  I don't believe so.                     15:41:19

14        Q.  Okay.  And when did Manches begin using  15:41:19

15    e-mail?                                          15:41:22

16        A.  Late '90s.                              15:41:23

17        Q.  And your current firm Maier Blackburn    15:41:29

18    probably -- is it "Maier" or "Maier"?           15:41:33

19        A.  Maier.  Maier.                          15:41:36

20        Q.  Maier Blackburn, does it have e-mail?    15:41:37

21        A.  Yes, it does.                           15:41:39

22        Q.  Okay.  Have you -- have you gone back to  15:41:43

23    the Manches firm or have you asked someone on your  15:41:49

24    behalf to obtain their electronic data related to  15:41:52

25    the Tolkien Estate?                             15:41:59
```

Page 213

| | | |
|---|---|---|
| 1 | A.   I believe Greenberg Glusker have been in | 15:42:00 |
| 2 | contact with the firm about that. | 15:42:03 |
| 3 | MS. ESKENAZI:   Again, to the extent that | 15:42:04 |
| 4 | you learned that information through attorney-client | 15:42:06 |
| 5 | privileged information, that is not the subject of | 15:42:09 |
| 6 | what you should be disclosing to Mr. Petrocelli in | 15:42:10 |
| 7 | this deposition. | 15:42:14 |
| 8 | BY MR. PETROCELLI: | 15:42:14 |
| 9 | Q.   When -- have you personally done anything | 15:42:15 |
| 10 | to acquire electronic data, such as e-mails or files | 15:42:18 |
| 11 | stored electronically at the Manches firm? | 15:42:24 |
| 12 | MS. ESKENAZI:   You can answer that question | 15:42:28 |
| 13 | if you've personally done anything. | 15:42:29 |
| 14 | THE WITNESS:   I have not done anything. | 15:42:31 |
| 15 | BY MR. PETROCELLI: | 15:42:31 |
| 16 | Q.   Okay.   Do you know if your partner Steven | 15:42:33 |
| 17 | has? | 15:42:35 |
| 18 | A.   I think that question should be directed at | 15:42:35 |
| 19 | him. | 15:42:38 |
| 20 | Q.   I'm asking you, though. | 15:42:39 |
| 21 | A.   I'm not aware that he has had any contact | 15:42:41 |
| 22 | with them. | 15:42:43 |
| 23 | Q.   Do you have any other employees besides -- | 15:42:45 |
| 24 | A.   No. | 15:42:47 |
| 25 | Q.   Just the two of you, right? | 15:42:47 |

Page 214

| | | |
|---|---|---|
| 1 | A.  Yes. | 15:42:47 |
| 2 | Q.  Okay.  Is the -- | 15:42:48 |
| 3 | A.  Sorry, no.  Sorry.  Employees, we do have | 15:42:50 |
| 4 | two other employees. | 15:42:54 |
| 5 | Q.  Do you know whether any of they have had | 15:42:55 |
| 6 | anything to do with gathering documents from the | 15:42:58 |
| 7 | Manches firm? | 15:43:01 |
| 8 | A.  No, they haven't. | 15:43:01 |
| 9 | Q.  Have they had any role in collecting | 15:43:03 |
| 10 | documents to provide to Greenberg in this | 15:43:05 |
| 11 | litigation? | 15:43:08 |
| 12 | A.  When files currently in the office have | 15:43:08 |
| 13 | been sent for scanning, they have. | 15:43:11 |
| 14 | Q.  What are their names? | 15:43:13 |
| 15 | A.  They are Nic- -- Nicola Peedell and Julie | 15:43:14 |
| 16 | Knight. | 15:43:20 |
| 17 | Q.  Okay. | 15:43:20 |
| 18 | A.  We have -- | 15:43:20 |
| 19 | Q.  When you -- I'm sorry. | 15:43:26 |
| 20 | A.  There might also be another employee, | 15:43:26 |
| 21 | Leslie Dancy. | 15:43:29 |
| 22 | Q.  And when you left the Manches firm, did you | 15:43:31 |
| 23 | take with you any electronic files? | 15:43:34 |
| 24 | A.  No. | 15:43:36 |
| 25 | Q.  Did you do anything to cause Tolkien | 15:43:37 |

Page  215

EXHIBIT A

| | | |
|---|---|---|
| 1 | material that resided on electronic files to be | 15:43:43 |
| 2 | converted to paper copies? | 15:43:46 |
| 3 | A.  The practice at -- at Manches was to print | 15:43:49 |
| 4 | out every electronic document and put the paper copy | 15:43:53 |
| 5 | on the file.  We didn't file -- we -- the system of | 15:43:57 |
| 6 | filing was paper-based. | 15:44:01 |
| 7 | Q.  What month did you form Maier Blackburn? | 15:44:03 |
| 8 | A.  January 2012. | 15:44:08 |
| 9 | Q.  Do you still follow that same practice at | 15:44:19 |
| 10 | Maier Blackburn that you had at Manches with respect | 15:44:21 |
| 11 | to documents that exist electronically? | 15:44:24 |
| 12 | A.  We now have a hybrid system.  We print some | 15:44:27 |
| 13 | things out and we have the power to file | 15:44:30 |
| 14 | electronically, too. | 15:44:32 |
| 15 | Q.  Have you -- has the firm saved all of its | 15:44:34 |
| 16 | electronic data related to the Tolkien matter or the | 15:44:39 |
| 17 | Tolkien Estate since the time you formed the firm? | 15:44:42 |
| 18 | A.  Yes, it has. | 15:44:45 |
| 19 | Q.  Has -- to your knowledge, has any data been | 15:44:46 |
| 20 | lost or discarded or deleted? | 15:44:49 |
| 21 | A.  I don't -- I don't believe that has | 15:44:52 |
| 22 | happened. | 15:44:54 |
| 23 | Q.  So you have backup tapes or servers with | 15:44:55 |
| 24 | data that go back to January 2012? | 15:44:59 |
| 25 | A.  I'm not precisely certain of the medium on | 15:45:01 |

Page 216

| | | |
|---|---|---|
| 1 | which this is all done and how this is all done, but | 15:45:05 |
| 2 | I believe we have everything. | 15:45:08 |
| 3 | Q.  And how is it that you know that everything | 15:45:09 |
| 4 | has been preserved and nothing has been deleted? | 15:45:12 |
| 5 | A.  Well, I haven't deleted anything. | 15:45:16 |
| 6 | Q.  What -- what about your partner? | 15:45:20 |
| 7 | A.  I don't believe he has deleted anything, | 15:45:21 |
| 8 | either. | 15:45:23 |
| 9 | Q.  So if we looked at your e-mail we would | 15:45:23 |
| 10 | find folders and files going back to January -- | 15:45:26 |
| 11 | A.  Yes, you would. | 15:45:28 |
| 12 | Q.  -- 2012? | 15:45:29 |
| 13 | A.  Yes, you would. | 15:45:29 |
| 14 | Q.  Do you e-mail with your clients, any of the | 15:45:30 |
| 15 | Tolkiens? | 15:45:35 |
| 16 | A.  I e-mail with some of the Tol- -- the | 15:45:36 |
| 17 | directors and trustees. | 15:45:38 |
| 18 | (Pages 218 through 220 are | |
| 19 | marked confidential and are bound | |
| 20 | under separate cover.  The | |
| 21 | nonconfidential portion of this | |
| 22 | transcript continues on page 221.) | |
| 23 | | |
| 24 | | |
| 25 | | |

Page 217

```
 1          Q.   Okay.  Did you provide all your e-mail      15:48:21

 2     files, your electronic files from your current firm   15:48:24

 3     which you said have all been preserved to Greenberg   15:48:28

 4     Glusker?                                              15:48:32

 5          A.   I don't recall.                             15:48:32

 6          Q.   Have you made any copies of the tapes, the  15:48:46

 7     computer tapes --                                     15:48:48

 8          A.   No.                                          15:48:49

 9          Q.   -- to provide to the firm?                  15:48:49

10          A.   No.                                          15:48:50

11          Q.   Do you e-mail to members of the Tolkien     15:48:59

12     family?                                               15:49:02

13               MS. ESKENAZI:  Objection.  Asked and        15:49:03

14     answered.                                             15:49:04

15     BY MR. PETROCELLI:                                    15:49:04

16          Q.   I'm told you said yes.                      15:49:07

17          A.   I e-mail --                                 15:49:09

18          Q.   Which members do you --                     15:49:10

19          A.   -- some of them.                            15:49:11

20          Q.   -- do you e-mail with?                      15:49:12

21          A.   I e-mail Baillie Tolkien, Michael Tolkien,  15:49:13

22     and Simon Tolkien.                                    15:49:22

23          Q.   The -- what kind of -- what is the current  15:49:23

24     health and condition of Christopher Tolkien?          15:49:48

25               MS. ESKENAZI:  Objection.  Relevance.       15:49:53
```

Page 221

| | | |
|---|---|---|
| 1 | THE WITNESS:  I'm not a -- I'm not a doctor | 15:49:55 |
| 2 | and I don't know about his medical -- | 15:50:00 |
| 3 | BY MR. PETROCELLI: | 15:50:01 |
| 4 | Q.  I thought you were a doctor.  I was jealous | 15:50:02 |
| 5 | that you got to introduce yourself as a doctor. | 15:50:03 |
| 6 | A.  No, so sorry. | 15:50:05 |
| 7 | Q.  Is he in good health? | 15:50:07 |
| 8 | MS. ESKENAZI:  Objection. | 15:50:10 |
| 9 | BY MR. PETROCELLI: | 15:50:10 |
| 10 | Q.  To your knowledge? | 15:50:11 |
| 11 | A.  As far as I know, he is a well man. | 15:50:12 |
| 12 | Q.  Okay.  When is the last time you've had a | 15:50:13 |
| 13 | communication with him about this case? | 15:50:18 |
| 14 | A.  Just before I left to come to the | 15:50:20 |
| 15 | deposition. | 15:50:30 |
| 16 | Q.  The -- is it accurate that the -- the | 15:50:30 |
| 17 | Tolkien Estate owns all the copyrights in The Lord | 15:50:37 |
| 18 | of the Rings outside of the U.S.? | 15:50:47 |
| 19 | A.  Is it the case that the Tolkien Estate | 15:50:50 |
| 20 | Limited owns -- no, that's not correct. | 15:50:57 |
| 21 | Q.  The Tolkien Estate Limited owns all of the | 15:51:03 |
| 22 | copyrights in The Lord of the Rings outside of the | 15:51:08 |
| 23 | U.S., except for the HarperCollins interest? | 15:51:10 |
| 24 | A.  Correct. | 15:51:13 |
| 25 | Q.  Okay.  And the Tolkien Estate Limited owns | 15:51:13 |

Page 222

```
 1    all of the copyrights in The Hobbit worldwide?        15:51:17

 2         A.  That's correct, except that under the        15:51:21

 3    contract with -- for the publication of The Hobbit    15:51:29

 4    with the predecessor in interest of HarperCollins,    15:51:32

 5    the publisher has an interest in that copyright.      15:51:37

 6         Q.  Okay.  And the -- the Tolkien Trust owns      15:51:41

 7    the copyrights in The Lord of the Rings in the U.S.,  15:51:47

 8    is that correct, except for the HarperCollins         15:51:50

 9    interest?                                             15:51:52

10         A.  Correct.                                     15:51:53

11         Q.  Okay.  Since the time that you've been        15:51:58

12    working on Tolkien matters going back to 1992 --       15:52:00

13    well, let me -- let me withdraw that.                  15:52:08

14         You -- before showing up for this                 15:52:10

15    deposition today, have you spoken to any person        15:52:21

16    other than a lawyer from Greenberg regarding the       15:52:27

17    deposition?                                            15:52:32

18         MS. ESKENAZI:  Objection.  Vague and              15:52:36

19    ambiguous.                                             15:52:38

20         THE WITNESS:  My clients know I'm here on         15:52:39

21    deposition.                                            15:52:41

22    BY MR. PETROCELLI:                                    15:52:41

23         Q.  By the "clients," you're referring to the    15:52:42

24    directors of the two entities?                        15:52:44

25         A.  Yes.                                          15:52:46
```

Page 223

```
 1        Q.  Have you spoken to anybody who's neither a      15:52:48

 2   client nor a lawyer at the Greenberg firm about          15:52:51

 3   the -- about your deposition and about your              15:52:57

 4   anticipated testimony?                                   15:52:58

 5        A.  No.                                             15:52:59

 6        Q.  Okay.                                           15:53:02

 7        A.  Well, no.                                       15:53:02

 8        Q.  You hesitated?                                  15:53:03

 9        A.  Yes, because I'm -- I'm trying to make the      15:53:06

10   distinction between telling somebody I'm going to do     15:53:07

11   a deposition --                                          15:53:10

12        Q.  Right.                                          15:53:11

13        A.  -- and the subject matter of the testimony.     15:53:12

14        Q.  Right.  Have you -- since the time this         15:53:13

15   lawsuit was filed, and even in the events before the     15:53:14

16   filing of the lawsuit, have you spoken to anybody        15:53:18

17   who might be considered a witness to these               15:53:24

18   proceedings?                                             15:53:26

19        MS. ESKENAZI:  Objection.  Vague and                15:53:26

20   ambiguous.                                               15:53:34

21        THE WITNESS:  Well, I think the directors           15:53:34

22   and trustees are potential witnesses, aren't they?       15:53:36

23   BY MR. PETROCELLI:                                       15:53:40

24        Q.  You mean your clients that we've talked         15:53:40

25   about?                                                   15:53:42
```

                                                        Page  224

```
 1        A.  Yes.                                    15:53:42

 2        Q.  Okay.  Besides --                        15:53:42

 3        A.  Sorry.                                    15:53:42

 4        Q.  Besides the members of the Tolkien family 15:53:43

 5   whom you've identified, have you spoken to anybody  15:53:44

 6   else about the issues in this case, going back to   15:53:47

 7   the -- the time period even before it was filed all 15:53:52

 8   the way to the present?  So that would include      15:53:54

 9   people involved in the making of the contracts,     15:53:57

10   lawyers who represented the various interests over  15:54:00

11   the years, anybody?                                 15:54:04

12        MS. ESKENAZI:  Objection.  Vague and          15:54:06

13   ambiguous.  Compound.                               15:54:07

14        THE WITNESS:  That's too vague a question     15:54:09

15   to answer.  If you can limit it in time, perhaps.   15:54:10

16   BY MR. PETROCELLI:                                  15:54:10

17        Q.  Well, how about since 2010 to the present? 15:54:16

18        A.  So in addition to discussing the case with 15:54:20

19   Greenberg Glusker, and my clients, I've discussed it 15:54:23

20   with HarperCollins.                                 15:54:28

21        Q.  And who at HarperCollins?                 15:54:30

22        MS. ESKENAZI:  Again, to -- I'm going to      15:54:33

23   let the witness answer the question to the extent   15:54:35

24   that it doesn't -- that there's an agreement that it 15:54:37

25   won't waive attorney-client privilege.             15:54:40
```

Page 225

```
 1            MR. PETROCELLI:  You understand we don't      15:54:43

 2    agree with the privilege, but we'll agree that        15:54:44

 3    answering the question doesn't waive it.              15:54:46

 4            THE WITNESS:  Yeah, communications with       15:54:48

 5    HarperCollins are with their head of legal and        15:54:52

 6    business affairs.                                     15:54:56

 7    BY MR. PETROCELLI:                                    15:54:56

 8       Q.  Who --                                         15:54:58

 9       A.  His name is Simon Dowson-Collin- --            15:54:59

10    Collins.                                              15:55:02

11       Q.  Do you want to spell that for the reporter?    15:55:02

12       A.  D-o-w-s-o-n, C-o double l i-n-s.               15:55:04

13       Q.  How long have you been in contact with         15:55:16

14    Mr. -- is it Dowson-Collins?                          15:55:19

15       A.  Yes.                                           15:55:21

16       Q.  Is that one name?                              15:55:21

17       A.  I've never been sure whether it's two names    15:55:24

18    or one.                                               15:55:27

19       Q.  How long have you been in touch with           15:55:28

20    Mr. Dowson-Collins about the issues in this case?     15:55:31

21       A.  Since the issues in this case arose.           15:55:36

22       Q.  When -- when did your contact with him         15:55:39

23    begin?                                                15:55:41

24       A.  When he joined HarperCollins.                  15:55:41

25       Q.  When was that?                                 15:55:42
```

                                                   Page 226

```
1       A.  I don't recall.                        15:55:43

2       Q.  Was it before 2010?                    15:55:44

3       A.  Yes.                                    15:55:46

4       Q.  Long before then?                       15:55:48

5           MS. ESKENAZI:  Objection.  Calls for    15:55:53

6   speculation.  Lacks foundation.                 15:55:55

7           THE WITNESS:  I'm not -- I'm not certain 15:55:55

8   when he joined the firm.                         15:55:56

9   BY MR. PETROCELLI:                               15:55:56

10      Q.  And where is he officed?                 15:55:58

11      A.  His office is in the HarperCollins building 15:55:59

12  in London.                                       15:56:03

13      Q.  Okay.  And is there anybody else there   15:56:05

14  that -- with whom you've been in contact since the 15:56:07

15  time that he has been there regarding the matters 15:56:09

16  involved in this case?                           15:56:12

17      A.  I'm in contact with David Brawn there, who 15:56:13

18  deals with Tolkien publishing.  But I haven't     15:56:18

19  discussed with him the issues in this case.       15:56:21

20      Q.  And prior to Mr. Dowson-Collins, who are -- 15:56:24

21  were you in touch with anybody else there regarding 15:56:32

22  legal issues related to this case?                15:56:37

23      A.  Before --                                15:56:40

24          MS. ESKENAZI:  Objection.  Vague and     15:56:40

25  ambiguous.                                        15:56:42
```

Page 227

```
 1              THE WITNESS:  Before Mr. Dowson-Collins    15:56:42
 2    assumed the position of head of legal and business   15:56:46
 3    affairs, the incumbent was an Adrian -- a person     15:56:48
 4    called Adrian Laing, so I used to communicate with   15:56:54
 5    him.                                                 15:56:58
 6    BY MR. PETROCELLI:                                   15:56:58
 7         Q.  We've seen his name in the correspondence.  15:56:58
 8         A.  Yes.                                        15:57:00
 9         Q.  And you've indicated your firm doesn't      15:57:02
10    represent HarperCollins, correct?                    15:57:05
11         A.  It -- it's not retained as lawyers by       15:57:07
12    HarperCollins.  But as -- as we've discussed, when   15:57:11
13    you were referring to that ownership of rights, we   15:57:14
14    have joint interests in The Hobbit and The Lord of   15:57:18
15    the Rings copyrights and the contracts downstream of 15:57:23
16    those copyrights.                                    15:57:26
17         Q.  Do you have any document or agreement       15:57:27
18    between the -- between HarperCollins and your        15:57:29
19    clients regarding retaining joint counsel or being   15:57:32
20    joint clients in a legal matter or anything of that  15:57:41
21    nature?                                              15:57:42
22         A.  There's nothing in writing.  We -- we've    15:57:43
23    had a relationship with HarperCollins now for some   15:57:44
24    20 years and we -- our agreement in these matters    15:57:47
25    is -- is -- is part of the course of dealings.       15:57:52
```

Page 228

| | | |
|---|---|---|
| 1 | There's nothing in writing. | 15:57:54 |
| 2 | Q.   Okay.   Do you e-mail Mr. Dowson-Collins? | 15:58:01 |
| 3 | A.   Yes. | 15:58:04 |
| 4 | Q.   And your e-mails with HarperCollins, | 15:58:05 |
| 5 | including Mr. Dowson-Collins, are still in your | 15:58:09 |
| 6 | e-mail -- | 15:58:12 |
| 7 | A.   Yes. | 15:58:12 |
| 8 | Q.   -- files? | 15:58:13 |
| 9 | And you were e-mailing him when you were at | 15:58:13 |
| 10 | Manches? | 15:58:18 |
| 11 | A.   Yes, he was at HarperCollins at that time. | 15:58:18 |
| 12 | Q.   Okay.   And as you sit here now, you don't | 15:58:20 |
| 13 | know whether all of Manches' electronic data and | 15:58:25 |
| 14 | e-mails have been preserved; is that right? | 15:58:28 |
| 15 | MS. ESKENAZI:   Well, to the extent that you | 15:58:33 |
| 16 | know that without having to divulge any | 15:58:35 |
| 17 | attorney-client privileged information, you can | 15:58:39 |
| 18 | answer. | 15:58:40 |
| 19 | THE WITNESS:   I only have an understanding | 15:58:41 |
| 20 | of the answer to your question from information | 15:58:46 |
| 21 | communicated to me by Ms. Eskenazi. | 15:58:49 |
| 22 | BY MR. PETROCELLI: | 15:58:49 |
| 23 | Q.   Are you a witness in this case? | 15:58:56 |
| 24 | MS. ESKENAZI:   Objection.   Vague and | 15:58:57 |
| 25 | ambiguous. | 15:58:59 |

Page 229

| | | |
|---|---|---|
| 1 | THE WITNESS:  I assumed from the fact that | 15:59:01 |
| 2 | I was being deposed that I was a witness.  But I | 15:59:03 |
| 3 | don't really understand your question. | 15:59:06 |
| 4 | BY MR. PETROCELLI: | 15:59:06 |
| 5 | Q.  Well, when do you anticipate testifying in | 15:59:08 |
| 6 | this -- in this case on behalf of your clients? | 15:59:11 |
| 7 | MS. ESKENAZI:  Objection.  Vague and | 15:59:15 |
| 8 | ambiguous.  Also calls for speculation.  Lacks | 15:59:17 |
| 9 | foundation.  Calls for attorney-client privileged | 15:59:21 |
| 10 | information. | 15:59:23 |
| 11 | So to the extent that your information | 15:59:24 |
| 12 | comes from counsel, you need to carve that | 15:59:27 |
| 13 | information out.  If you can answer the question | 15:59:30 |
| 14 | without reference to divulging information you might | 15:59:32 |
| 15 | have received from counsel, you're welcome to | 15:59:36 |
| 16 | answer. | 15:59:39 |
| 17 | THE WITNESS:  I don't understand the | 15:59:41 |
| 18 | question. | 15:59:41 |
| 19 | BY MR. PETROCELLI: | 15:59:41 |
| 20 | Q.  Do you anticipate providing testimony in | 15:59:43 |
| 21 | support of the plaintiff's position in this case? | 15:59:47 |
| 22 | MS. ESKENAZI:  Same objections.  Plus vague | 15:59:52 |
| 23 | and ambiguous. | 15:59:57 |
| 24 | THE WITNESS:  Perhaps I can answer it this | 15:59:57 |
| 25 | way:  If I'm called upon to give testimony on behalf | 15:59:58 |

Page 230

| | | |
|---|---|---|
| 1 | of those clients, then I will do so. | 16:00:01 |
| 2 | BY MR. PETROCELLI: | 16:00:01 |
| 3 | Q.  Okay.  Do you have a financial interest in | 16:00:04 |
| 4 | this case? | 16:00:08 |
| 5 | A.  I don't. | 16:00:08 |
| 6 | Q.  Do you have any agreements with your | 16:00:09 |
| 7 | clients or does your firm have any agreements with | 16:00:14 |
| 8 | your clients, the Tolkiens, in any way related to | 16:00:17 |
| 9 | this lawsuit? | 16:00:23 |
| 10 | A.  No. | 16:00:23 |
| 11 | Q.  Do -- | 16:00:26 |
| 12 | A.  The only -- | 16:00:26 |
| 13 | MS. ESKENAZI:  Objection.  Calls for | 16:00:27 |
| 14 | attorney-client privileged information. | 16:00:30 |
| 15 | BY MR. PETROCELLI: | 16:00:30 |
| 16 | Q.  You can answer. | 16:00:32 |
| 17 | MS. ESKENAZI:  You can only answer to the | 16:00:34 |
| 18 | extent you're not divulging information that is | 16:00:36 |
| 19 | between you and your clients. | 16:00:40 |
| 20 | MR. PETROCELLI:  She is required to fully | 16:00:41 |
| 21 | divulge all financial entanglements that she has | 16:00:45 |
| 22 | with these clients.  If you want to -- if she's | 16:00:48 |
| 23 | planning to testify. | 16:00:51 |
| 24 | THE WITNESS:  Can I answer the question in | 16:00:53 |
| 25 | this way? | 16:00:55 |

Page 231

```
 1   BY MR. PETROCELLI:                                16:00:55

 2       Q.  You can answer the question in the way I  16:00:56

 3   asked it, please.  Not your way.  You want me to  16:00:57

 4   repeat the question?                              16:01:01

 5       A.  Yes, please.                              16:01:02

 6       Q.  Okay.  We'll start all over again.        16:01:03

 7           Do you have any agreements or arrangements, 16:01:04

 8   whether they're written, oral or based on conduct, 16:01:10

 9   by which you or your firm may financially benefit  16:01:14

10   from this lawsuit?                                16:01:21

11       A.  No.                                       16:01:22

12       Q.  Okay.  Do you -- do you charge your -- the 16:01:25

13   Tolkiens, your clients, for the time you spent    16:01:28

14   dealing with this case?                           16:01:33

15       A.  Yes, I do.                                16:01:34

16       Q.  How do you charge them?                   16:01:35

17       A.  In the same way as I charge any other     16:01:37

18   client for the work I do for that client, pursuant 16:01:39

19   to the time recorded.                             16:01:43

20       Q.  It's an hourly fee?                       16:01:46

21       A.  It's an -- there is an hourly rate.       16:01:49

22       Q.  And there's something over and above the  16:01:51

23   hourly rate?                                      16:01:54

24       A.  No.                                       16:01:55

25       Q.  Well, is there any other method of        16:01:57
```

                                                Page 232

```
 1    compensation that you receive, other than your        16:01:59

 2    recording your hours, times the hourly rate?          16:02:01

 3         A.   No.                                         16:02:04

 4         Q.   All right.  Is your firm on any kind of     16:02:06

 5    retainer?                                             16:02:08

 6         A.   No.                                         16:02:09

 7              (Pages 234 through 235 are

 8         marked confidential and are bound

 9         under separate cover.  The

10         nonconfidential portion of this

11         transcript continues on page 236.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 233

```
 1        Q.  Are you charging for the time that you have    16:03:22

 2   spent preparing for this deposition?  You said         16:03:29

 3   you've been here since last week, you've had            16:03:32

 4   numerous meetings, you're here all day today.           16:03:34

 5        A.  We haven't -- we haven't made a charge for    16:03:37

 6   that time yet.                                           16:03:40

 7        Q.  Do you intend to?                               16:03:41

 8        A.  Yes.                                            16:03:42

 9        Q.  Okay.  What is your hourly rate?               16:03:43

10        A.  It's 325 pounds per hour.                       16:03:44

11        Q.  Okay.  And it's been the same since 2012?      16:03:49

12        A.  Yes.                                            16:03:52

13        Q.  And what is Mr. Maier's rate?                   16:03:54

14        A.  The same.                                       16:03:55

15        Q.  When did you first retain the Greenberg        16:03:56

16   firm?                                                   16:04:10

17        MS. ESKENAZI:  Objection.  Vague and               16:04:12

18   ambiguous.                                              16:04:12

19   BY MR. PETROCELLI:                                      16:04:12

20        Q.  I meant in connection with this matter.        16:04:16

21        MS. ESKENAZI:  It's still vague and                16:04:22

22   ambiguous.                                              16:04:28

23        THE WITNESS:  Our relationship with the            16:04:28

24   Greenberg Glusker firm goes back to The Lord of the    16:04:29

25   Rings film participation litigation and we have        16:04:35
```

Page 236

| | | |
|---|---|---|
| 1 | continued to have that relationship. | 16:04:40 |
| 2 | BY MR. PETROCELLI: | 16:04:40 |
| 3 | Q.  Have you -- do you know what year that was, | 16:04:43 |
| 4 | approximately? | 16:04:46 |
| 5 | A.  The year of the litigation or the year of | 16:04:47 |
| 6 | Greenberg becoming involved? | 16:04:50 |
| 7 | Q.  Greenberg. | 16:04:53 |
| 8 | A.  It would have been shortly before the -- | 16:04:53 |
| 9 | the commencement of The Lord of the Rings film | 16:04:57 |
| 10 | partic- -- participation. | 16:05:00 |
| 11 | Q.  What year was that? | 16:05:01 |
| 12 | A.  I think that was -- that litigation was | 16:05:03 |
| 13 | commenced at the beginning of 2008 so, to the best | 16:05:04 |
| 14 | of my recollection, 2007.  But I can't be sure. | 16:05:10 |
| 15 | Q.  Have you -- since the time that you -- you | 16:05:15 |
| 16 | didn't retain the Greenberg firm, your clients have | 16:05:24 |
| 17 | retained the Greenberg firm, correct? | 16:05:27 |
| 18 | A.  Correct. | 16:05:29 |
| 19 | Q.  Okay.  Since the time your clients have | 16:05:31 |
| 20 | retained the Greenberg firm in approximately 2007, | 16:05:32 |
| 21 | have you or they been in contact with any other | 16:05:38 |
| 22 | United States law firms or lawyers regarding this | 16:05:42 |
| 23 | matter or the events involved in this matter? | 16:05:47 |
| 24 | A.  Since retaining -- sorry.  If you wouldn't | 16:05:49 |
| 25 | mind just asking that question again so I have it | 16:05:57 |

Page 237

```
 1   clear.                                            16:05:59

 2       Q.   Sure.   Since the Greenberg firm was     16:06:00

 3   retained by your clients, have you or your clients 16:06:02

 4   been in contact with any other American law firms  16:06:04

 5   regarding this matter or the events at issue in this 16:06:07

 6   matter?                                            16:06:09

 7       A.   No.                                       16:06:10

 8       Q.   Okay.                                     16:06:10

 9       A.   Not as far as I'm aware.                  16:06:14

10       Q.   That's as far as you know, right?         16:06:15

11       A.   Yes.                                      16:06:17

12       Q.   So I've seen, in reviewing the documents, 16:06:19

13   that there were other American law firms involved  16:06:21

14   from time to time, including Jeremy Nussbaum at Kay 16:06:25

15   Collyer & Boose, is it?                            16:06:28

16       A.   Yes.                                      16:06:30

17       Q.   In New York?                              16:06:30

18       A.   Yes.                                      16:06:31

19       Q.   Right.   And then there's Paul Slevin, at -- 16:06:32

20   I can't even pronounce it.   Szold --              16:06:37

21       A.   Szold & Brandwen.                         16:06:38

22       Q.   Szold & Brandwen, right?                  16:06:40

23            And Molly will give you those spellings.  16:06:42

24            Have you been in touch with anybody at -- 16:06:46

25   at those law firms regarding this case in -- since 16:06:48
```

Page 238

| | | |
|---|---|---|
| 1 | the time it was filed? | 16:06:52 |
| 2 | A.   No. | 16:06:53 |
| 3 | Q.   What about before it was filed? | 16:06:54 |
| 4 | A.   No. | 16:06:55 |
| 5 | Q.   Do you know whether -- | 16:06:57 |
| 6 | MS. ESKENAZI:  Well, I'm going to object as | 16:06:58 |
| 7 | vague and ambiguous. | 16:07:00 |
| 8 | BY MR. PETROCELLI: | 16:07:00 |
| 9 | Q.   Is Mr. Nussbaum deceased? | 16:07:02 |
| 10 | A.   He is. | 16:07:03 |
| 11 | Q.   Okay.  Do you know when the -- the | 16:07:04 |
| 12 | Tolkiens -- if I say "Tolkiens," I'm referring to | 16:07:08 |
| 13 | either the Estate or the -- the two entities that | 16:07:10 |
| 14 | you described, okay? | 16:07:13 |
| 15 | A.   Right. | 16:07:13 |
| 16 | Q.   Do you know when the Tolkiens stopped using | 16:07:14 |
| 17 | Mr. Nussbaum's firm? | 16:07:19 |
| 18 | MS. ESKENAZI:  Objection.  Assumes facts | 16:07:22 |
| 19 | not in evidence. | 16:07:28 |
| 20 | THE WITNESS:  In effect, they haven't. | 16:07:28 |
| 21 | BY MR. PETROCELLI: | 16:07:28 |
| 22 | Q.   They still work for the Tolkiens? | 16:07:30 |
| 23 | A.   Well, it isn't -- it isn't that firm. | 16:07:33 |
| 24 | Q.   It merged into another firm? | 16:07:35 |
| 25 | A.   The firm when Mr. Nussbaum was there was | 16:07:38 |

Page 239

```
 1    called Kay & Boose and --                      16:07:41

 2        Q.  Kay what?                               16:07:44

 3        A.  Kay, K-a-y, & Boose, B-o-o-s-e.  And that  16:07:45

 4    firm merged with a firm called Davis Wright     16:07:55

 5    Tremaine.                                        16:07:59

 6        Q.  In -- and do you deal with folks at Davis  16:07:59

 7    Wright & Tremaine?                               16:08:04

 8        A.  Yes, I do.                               16:08:04

 9        Q.  Regarding the Tolkiens?                  16:08:05

10        A.  Yes.                                     16:08:06

11        Q.  Is that the New York office?            16:08:09

12        A.  Yes, it is.                              16:08:10

13        Q.  And who's your principal contact there?  16:08:10

14        A.  I have two principal contacts there.    16:08:13

15        Q.  And who are they?                        16:08:16

16        A.  They're And- -- Andrew Boose and Marsha  16:08:17

17    Paul.                                            16:08:21

18        Q.  Marsha who?                              16:08:24

19        A.  Marsha Paul.                             16:08:25

20        Q.  "Paul"?  What kind of matters do they    16:08:26

21    handle?                                          16:08:30

22        A.  Any U.S. -- I think -- well, no, that's  16:08:31

23    not, correct.                                    16:08:36

24            They deal with different U.S. legal issues  16:08:37

25    apart from those engaged in this case.           16:08:46
```

Page 240

| | | |
|---|---|---|
| 1 | MS. ESKENAZI:  Well, again, to the extent | 16:08:50 |
| 2 | that Mr. Petrocelli may be inquiring as to what -- | 16:08:51 |
| 3 | specifically what was discussed between you and the | 16:08:57 |
| 4 | Kay Boose or the Davis Wright Tremaine firm, he's | 16:09:03 |
| 5 | not entitled to that information and I would | 16:09:07 |
| 6 | instruct you not to answer.  So you need to carve | 16:09:08 |
| 7 | out that information from your answer. | 16:09:10 |
| 8 | THE WITNESS:  Davis Wright -- Davis Wright | 16:09:17 |
| 9 | Tremaine do certain types of work for the Tolkien | 16:09:19 |
| 10 | Estate and the Tolkien Trust, other forms of legal | 16:09:24 |
| 11 | work. | 16:09:26 |
| 12 | BY MR. PETROCELLI: | 16:09:26 |
| 13 | Q.  What type of work? | 16:09:28 |
| 14 | MS. ESKENAZI:  You can talk about subject | 16:09:31 |
| 15 | matter -- | 16:09:32 |
| 16 | THE WITNESS:  Right. | 16:09:32 |
| 17 | MS. ESKENAZI:  -- but you cannot discuss | 16:09:32 |
| 18 | any specific issues that were discussed with them. | 16:09:38 |
| 19 | THE WITNESS:  Copyright registrations, | 16:09:41 |
| 20 | copyright documentation, generally.  I was trying to | 16:09:44 |
| 21 | think about a phrase.  Rights issues.  Scope for | 16:09:54 |
| 22 | taking action in certain circumstances.  Mainly | 16:10:08 |
| 23 | where rights such as copyright and ancillary rights | 16:10:14 |
| 24 | are involved. | 16:10:18 |
| 25 | BY MR. PETROCELLI: | 16:10:18 |

Page 241

| | | |
|---|---|---|
| 1 | Q.  Do they do any trademark work? | 16:10:22 |
| 2 | A.  Yes, they do. | 16:10:24 |
| 3 | Q.  How -- when did the relationship with -- | 16:10:27 |
| 4 | was Mr. Nussbaum the principal lawyer that the | 16:10:40 |
| 5 | Tolkiens or you dealt with at that firm prior to his | 16:10:45 |
| 6 | death? | 16:10:47 |
| 7 | MS. ESKENAZI:  Objection.  Vague and | 16:10:52 |
| 8 | ambiguous. | 16:10:52 |
| 9 | BY MR. PETROCELLI: | 16:10:52 |
| 10 | Q.  Or was it Mr. Boose as well? | 16:10:54 |
| 11 | A.  He was, I think, involved and also Marsha | 16:10:55 |
| 12 | Paul. | 16:10:58 |
| 13 | Q.  Marsha Paul? | 16:10:58 |
| 14 | A.  Yep. | 16:10:59 |
| 15 | Q.  And Marsha is still there now? | 16:11:00 |
| 16 | A.  Yes. | 16:11:02 |
| 17 | Q.  And what is Mr. Boose's first name? | 16:11:02 |
| 18 | A.  Andrew. | 16:11:04 |
| 19 | Q.  Andrew.  And he's also been involved in | 16:11:05 |
| 20 | Tolkien work? | 16:11:07 |
| 21 | A.  Yes. | 16:11:08 |
| 22 | Q.  Okay.  And do you know when the | 16:11:09 |
| 23 | relationship with that firm began? | 16:11:11 |
| 24 | MS. ESKENAZI:  Objection.  Vague and | 16:11:17 |
| 25 | ambiguous. | 16:11:17 |

Page 242

```
 1              THE WITNESS:  I don't recall because to me    16:11:17
 2    it seemed seamless.  It was -- it was Kay & Boose       16:11:18
 3    and then it was something else.  I don't know what      16:11:23
 4    day that was.                                           16:11:24
 5    BY MR. PETROCELLI:                                      16:11:29
 6        Q.  Well, when it was Kay & Boose, do you know      16:11:29
 7    when that relationship started?  That was the first     16:11:32
 8    iteration of the firm, right?                           16:11:33
 9        A.  Yes.                                            16:11:33
10        Q.  And when -- when did the Tolkiens retain        16:11:36
11    that firm for the first time?                           16:11:38
12        A.  In the '90s, the second half of the '90s.       16:11:45
13        Q.  And before retaining the Kay Boose firm,        16:11:47
14    were there any other U.S. law firms with whom the       16:11:51
15    Tolkiens had a relationship?                            16:11:57
16        A.  Yes.                                            16:11:57
17        Q.  And who were they?                              16:11:58
18        A.  Szold & Brandwen.                               16:11:59
19        Q.  And who are your -- and you communicated        16:12:01
20    with them from time to time on behalf of the            16:12:04
21    Tolkiens?                                               16:12:06
22        A.  Yes.                                            16:12:07
23        Q.  And same -- same was true with the              16:12:07
24    subsequent firm, with Kay Boose?                        16:12:10
25        A.  Yes.                                            16:12:12
```

Page 243

```
 1        Q.  You were -- would it fair -- be fair to say   16:12:13

 2   you were the principal point of contact for the        16:12:14

 3   Tolkiens?                                               16:12:16

 4        A.  Yes, that would be reasonable.                 16:12:16

 5        Q.  Both for Kay Boose as well as Szold            16:12:24

 6   Brandwen?                                               16:12:27

 7        A.  Well, the relationship with Szold &            16:12:27

 8   Brandwen went back before my time.                      16:12:31

 9        Q.  To Mr. Williamson?                             16:12:32

10        A.  Yes.                                           16:12:33

11        Q.  Was he the main point of contact before you   16:12:34

12   with that firm?                                         16:12:36

13        A.  Yes.                                           16:12:37

14        Q.  Okay.  And do you know how long that firm      16:12:38

15   went -- went back in terms of its relationship with     16:12:40

16   the Tolkiens?                                           16:12:43

17        A.  I believe it went back to the 1960s.           16:12:44

18        Q.  And was that firm involved in the -- in the    16:12:47

19   work related to the 1969 agreements?                    16:12:52

20           MS. ESKENAZI:  Objection.  Calls for            16:12:56

21   speculation.  Lacks foundation.                         16:13:00

22           THE WITNESS:  I think they had a role to        16:13:00

23   play.                                                   16:13:02

24   BY MR. PETROCELLI:                                      16:13:02

25        Q.  Have you spoken to anybody who was actually    16:13:03
```

Page 244

| | | |
|---|---|---|
| 1 | involved in the negotiation and drafting of the 1969 | 16:13:05 |
| 2 | agreements that are at issue in this case? | 16:13:09 |
| 3 | MS. ESKENAZI:  Well, to the extent that | 16:13:13 |
| 4 | that requires divulging attorney-client privileged | 16:13:16 |
| 5 | information, you need to carve that out. | 16:13:18 |
| 6 | BY MR. PETROCELLI: | 16:13:18 |
| 7 | Q.  I'm asking for -- I don't understand how | 16:13:23 |
| 8 | that could possibly call for privileged information, | 16:13:25 |
| 9 | so I don't want you to carve anything out.  I'm just | 16:13:27 |
| 10 | asking whether you had a conversation with anybody | 16:13:31 |
| 11 | who was directly involved in the 1969 contract, | 16:13:34 |
| 12 | either its negotiation or its drafting? | 16:13:38 |
| 13 | A.  Perhaps I can answer the question this way: | 16:13:41 |
| 14 | Mr. Williamson was involved at that time and I have | 16:13:47 |
| 15 | had conversations with him. | 16:13:50 |
| 16 | Q.  Is that the only person, to your knowledge? | 16:13:52 |
| 17 | A.  I can't be certain about this, but | 16:14:01 |
| 18 | Mr. Rayner Unwin was around at that time and I | 16:14:04 |
| 19 | have -- until he died, I had conversations with him, | 16:14:08 |
| 20 | without being specific as to what those | 16:14:11 |
| 21 | conversations were. | 16:14:14 |
| 22 | Q.  He's deceased now? | 16:14:16 |
| 23 | A.  He's deceased. | 16:14:18 |
| 24 | Q.  When did he die? | 16:14:19 |
| 25 | A.  In the 2000s some time. | 16:14:20 |

Page 245

| 1 | Q.   And Mr. Williamson? | 16:14:25 |
| 2 | A.   Mr. Williamson is still alive. | 16:14:27 |
| 3 | Q.   And to your knowledge, is he in good | 16:14:29 |
| 4 | health? | 16:14:31 |
| 5 | A.   I don't think he is really in good health. | 16:14:32 |
| 6 | Q.   In what way? | 16:14:34 |
| 7 | MS. ESKENAZI:   Well, objection. | 16:14:36 |
| 8 | THE WITNESS:   I don't have details of his | 16:14:38 |
| 9 | medical condition.   But he was not -- he -- he had | 16:14:39 |
| 10 | memory issues at the time of the film participation | 16:14:47 |
| 11 | litigation and he's very physically handicapped. | 16:14:52 |
| 12 | BY MR. PETROCELLI: | 16:14:52 |
| 13 | Q.   Where does he reside? | 16:14:57 |
| 14 | A.   He lives in Oxfordshire. | 16:14:58 |
| 15 | Q.   Besides Mr. Williamson -- and what's his | 16:15:02 |
| 16 | first name? | 16:15:12 |
| 17 | MS. LENS:   Rayner. | 16:15:12 |
| 18 | BY MR. PETROCELLI: | 16:15:12 |
| 19 | Q.   Rayner Unwin?   Rayner Unwin, have you | 16:15:13 |
| 20 | spoken to anybody else who was involved in those | 16:15:16 |
| 21 | negotiations? | 16:15:20 |
| 22 | A.   No, not to my knowledge. | 16:15:20 |
| 23 | Q.   Have you ever prepared any documents, | 16:15:29 |
| 24 | memos, notes from talking to these folks about | 16:15:33 |
| 25 | the -- the negotiation of the '69 agreements? | 16:15:38 |

Page 246

| | | |
|---|---|---|
| 1 | MS. ESKENAZI:  Objection.  Assumes facts | 16:15:41 |
| 2 | not in evidence. | 16:15:43 |
| 3 | THE WITNESS:  Have I created memos? | 16:15:50 |
| 4 | BY MR. PETROCELLI: | 16:15:50 |
| 5 | Q.  Let me -- | 16:15:52 |
| 6 | A.  Sorry, just to understand. | 16:15:53 |
| 7 | Q.  Let me back up. | 16:15:54 |
| 8 | Have you had conversations with either | 16:15:56 |
| 9 | Mr. Unwin or Mr. Richardson -- Mr. Williamson, | 16:15:57 |
| 10 | excuse me, regarding the '69 agreement, their | 16:16:01 |
| 11 | participation in it, their knowledge about the | 16:16:06 |
| 12 | agreement and so forth? | 16:16:08 |
| 13 | A.  I don't recall having detailed discussions | 16:16:10 |
| 14 | on that subject with Mr. Unwin.  But I had | 16:16:14 |
| 15 | conversations on that subject with Mr. Williamson. | 16:16:17 |
| 16 | Q.  Did you memorialize those conversations | 16:16:20 |
| 17 | in -- in any way? | 16:16:22 |
| 18 | A.  I didn't take verbatim notes of what | 16:16:23 |
| 19 | Mr. Williamson told me, but from time to time I made | 16:16:35 |
| 20 | my own notes relating to all that I learned about | 16:16:37 |
| 21 | the history of the Tolkien affairs. | 16:16:41 |
| 22 | Q.  And where are those notes? | 16:16:45 |
| 23 | A.  In the files. | 16:16:46 |
| 24 | Q.  Where are the files? | 16:16:47 |
| 25 | A.  They're in the storage facility. | 16:16:50 |

Page 247

| 1 | Q.   Where -- where you've -- you've made | 16:16:51 |
| 2 | running notes over the years since the first time | 16:16:55 |
| 3 | you got involved? | 16:16:58 |
| 4 | A.   From time to time, I would make notes for | 16:16:59 |
| 5 | myself. | 16:17:01 |
| 6 | Q.   Handwritten notes? | 16:17:01 |
| 7 | A.   Sometimes typed. | 16:17:02 |
| 8 | Q.   Typed.  And were -- were all of your notes | 16:17:06 |
| 9 | related to the issues in this case turned over to | 16:17:09 |
| 10 | counsel? | 16:17:14 |
| 11 | A.   Well, all of the notes I would make would | 16:17:14 |
| 12 | go onto the file, so to the extent that the files | 16:17:16 |
| 13 | were turned over to Greenberg Glusker, they would | 16:17:20 |
| 14 | have picked up. | 16:17:23 |
| 15 | Q.   But you don't know whether all those files, | 16:17:24 |
| 16 | in fact, were turned over; is that right? | 16:17:26 |
| 17 | A.   I understand that all of the files | 16:17:28 |
| 18 | containing anything discoverable in this litigation | 16:17:30 |
| 19 | have been scanned and sent to Greenberg Glusker. | 16:17:34 |
| 20 | Q.   How -- who -- who went through the files to | 16:17:38 |
| 21 | make the decision whether the contents of the files | 16:17:39 |
| 22 | were relevant and discoverable? | 16:17:43 |
| 23 | A.   Greenberg Glusker. | 16:17:45 |
| 24 | Q.   How did Greenberg get the full contents of | 16:17:47 |
| 25 | the files? | 16:17:49 |

Page 248

```
 1        A.  Because we had the full contents of the      16:17:50

 2   files scanned.                                        16:17:52

 3        Q.  Was -- was every single file in storage      16:17:53

 4   scanned and sent to Greenberg?                        16:17:56

 5        A.  No, because some of those files had no       16:17:58

 6   relevance at all to anything to do with the Saul      16:18:01

 7   Zaentz Corporation, Warner Bros. or these rights.     16:18:05

 8        Q.  Was Greenberg Glusker sent a list or an      16:18:07

 9   inventory of files and asked to select the ones they  16:18:09

10   thought were relevant?                                16:18:12

11        A.  Yes.                                         16:18:13

12        Q.  And who prepared the inventory or list of    16:18:15

13   files?                                                16:18:19

14        A.  The list of files already existed because    16:18:19

15   it consisted of those in storage.                     16:18:22

16        Q.  Does it go back to Manches?                  16:18:24

17        A.  It goes back to Morrell Peel & Gamlen.       16:18:27

18        Q.  The firms -- the law firms maintained those  16:18:31

19   files -- maintained those lists?  Those are actual    16:18:34

20   lists prepared by the firms that you got copies of?   16:18:36

21        A.  Well, I think in -- during my tenure, I      16:18:38

22   made up those lists.  From lists that Mr. Williamson  16:18:46

23   had, I would add to them.                             16:18:48

24        Q.  I think you said at the outset of the        16:18:50

25   examination that in preparation for this deposition   16:19:04
```

Page 249

```
 1    you reviewed documents that you believe may be      16:19:05

 2    privileged.                                          16:19:08

 3          Do you recall that?                            16:19:09

 4       A.  Yes, I think I was mistaken.                  16:19:11

 5       Q.  How did you learn that you were mistaken?     16:19:14

 6    You spoke to counsel about that?                     16:19:16

 7          MS. ESKENAZI:  Objection.  Calls for           16:19:17

 8    attorney-client privileged information.  Instruct    16:19:19

 9    not to answer.                                       16:19:21

10    BY MR. PETROCELLI:                                   16:19:21

11       Q.  How did you learn you were mistaken?          16:19:22

12          MS. ESKENAZI:  Instruct not to answer.         16:19:23

13    Attorney-client privilege.                           16:19:25

14    BY MR. PETROCELLI:                                   16:19:25

15       Q.  When did you learn you were mistaken?         16:19:27

16       A.  I'm instructed not to answer and I'm          16:19:29

17    following that advice.                               16:19:31

18       Q.  Well, you weren't instructed on the last      16:19:36

19    question.                                            16:19:38

20       A.  Would you like to ask the question again.     16:19:38

21       Q.  Yeah.  When did you learn that you were       16:19:40

22    mistaken?                                            16:19:41

23          MS. ESKENAZI:  You can answer when.            16:19:42

24          THE WITNESS:  I understood that -- I           16:19:43

25    learned that at lunchtime today.                     16:19:45
```

Page 250

```
1    BY MR. PETROCELLI:                                16:19:45

2        Q.  Okay.  Who did you have lunch with?       16:19:48

3        A.  Ms. Eskenazi and Ms. Moriarty.            16:19:50

4        Q.  Anybody else present?                     16:19:55

5        A.  Mr. Cestero was present.                  16:19:56

6        Q.  In the course of your meetings regarding  16:19:58

7    the deposition going back to last Thursday, who was  16:20:02

8    present at all those meetings?                    16:20:05

9        MS. ESKENAZI:  Objection.  Asked and          16:20:07

10   answered.                                         16:20:08

11       You can answer yet again.                     16:20:09

12       THE WITNESS:  Ms. Eskenazi, Ms. Moriarty,     16:20:10

13   Mr. -- Mr. Cestero and from time to time, Steven  16:20:16

14   Maier.                                            16:20:21

15   BY MR. PETROCELLI:                                16:20:25

16       Q.  And he's here in town now?                16:20:25

17       A.  He was this morning.                      16:20:27

18       MS. ESKENAZI:  Objection.                     16:20:28

19   BY MR. PETROCELLI:                                16:20:28

20       Q.  How were you mistaken about the privileged  16:20:30

21   documents?                                        16:20:33

22       A.  Because I wasn't -- I wasn't aware that all  16:20:33

23   of the documents that I had been shown were       16:20:36

24   documents disclosed in the case.                  16:20:39

25       Q.  So your testimony now is that all the     16:20:42
```

                                                Page 251

```
 1    documents you reviewed were documents disclosed in      16:20:45

 2    the case?                                               16:20:49

 3         A.   That's right, because that's what I've been   16:20:49

 4    told.                                                   16:20:52

 5         Q.   And who told you that?                        16:20:52

 6         A.   Well, what I have been told is that all       16:20:54

 7    of --                                                   16:20:57

 8              MS. ESKENAZI:   Well -- well, to the extent   16:20:57

 9    that you were provided information from counsel it's    16:20:59

10    attorney-client privileged information and              16:21:04

11    Mr. Petrocelli is not entitled to that information      16:21:06

12    so I'm going to instruct not to answer.                 16:21:08

13              THE WITNESS:   I'm following that             16:21:11

14    instruction.                                            16:21:12

15    BY MR. PETROCELLI:                                      16:21:12

16         Q.   Who told you that you were mistaken and who   16:21:14

17    told you that the documents that you reviewed were      16:21:16

18    all disclosed in the lawsuit?                           16:21:20

19              MS. ESKENAZI:   Instruct not to answer.       16:21:21

20    Attorney-client privileged information.                 16:21:24

21    BY MR. PETROCELLI:                                      16:21:24

22         Q.   What were the documents that you reviewed?    16:21:26

23         A.   I reviewed a quantity of documents.           16:21:28

24         Q.   Can you identify them?                        16:21:31

25         A.   No.                                           16:21:33
```

Page 252

| | | |
|---|---|---|
| 1 | Q.  Can you identify any of them? | 16:21:34 |
| 2 | A.  I can't make a list of the documents I | 16:21:35 |
| 3 | reviewed. | 16:21:43 |
| 4 | Q.  Did you not understand my question? | 16:21:43 |
| 5 | MS. ESKENAZI:  And she answered your | 16:21:47 |
| 6 | question.  If you'd like to pose another question | 16:21:48 |
| 7 | you may, Mr. Petrocelli. | 16:21:51 |
| 8 | BY MR. PETROCELLI: | 16:21:51 |
| 9 | Q.  I didn't ask you for a list.  I asked you | 16:21:53 |
| 10 | if you could identify any of them. | 16:21:54 |
| 11 | A.  What do you mean by "identify"? | 16:21:56 |
| 12 | Q.  Describe them.  Tell us what they are. | 16:21:58 |
| 13 | A.  I reviewed such -- such a quantity. | 16:22:04 |
| 14 | MS. ESKENAZI:  Well, I'm going to object | 16:22:06 |
| 15 | that to the extent you're asking for what counsel | 16:22:08 |
| 16 | showed this witness, without attaching that to | 16:22:11 |
| 17 | anything that refreshed her recollection, that's | 16:22:15 |
| 18 | privileged information and you're not entitled to | 16:22:18 |
| 19 | it.  So I'm going to instruct the witness not to | 16:22:20 |
| 20 | answer. | 16:22:22 |
| 21 | BY MR. PETROCELLI: | 16:22:22 |
| 22 | Q.  Well, the documents that you said you | 16:22:23 |
| 23 | reviewed that were privileged, you said refreshed | 16:22:26 |
| 24 | your recollection generally. | 16:22:28 |
| 25 | Do you recall giving that testimony? | 16:22:30 |

Page 253

```
 1        A.   Yes.                                      16:22:31

 2        Q.   So what were those documents that you now  16:22:31

 3   say are not privileged after having lunch with your 16:22:34

 4   lawyers?                                            16:22:36

 5        A.   I don't -- I don't recollect specific     16:22:37

 6   documents that refreshed my recollection as to the  16:22:44

 7   general sweep of the computer --                    16:22:47

 8        Q.   Well, what documents did you have in mind  16:22:51

 9   when you gave that testimony this morning?          16:22:52

10        A.   I didn't have any specific documents in   16:22:54

11   mind.                                               16:22:57

12        Q.   And why did -- why did you say they were  16:22:57

13   privileged then?                                    16:22:58

14             MS. ESKENAZI:  Objection.  Vague and      16:22:59

15   ambiguous.                                          16:23:03

16             THE WITNESS:  I didn't know the -- the    16:23:03

17   status of those documents that I reviewed.          16:23:07

18   BY MR. PETROCELLI:                                  16:23:07

19        Q.   So not knowing the status of them, you just 16:23:11

20   decided to say they were privileged, is that what   16:23:14

21   you're saying?                                      16:23:16

22             MS. ESKENAZI:  Argumentative.  It's       16:23:17

23   argumentative.  Asked and answered.                 16:23:18

24             You can answer again.                     16:23:20

25             THE WITNESS:  I did not know of the       16:23:21
```

Page 254

| | | |
|---|---|---|
| 1 | documents I reviewed that some were -- that -- | 16:23:26 |
| 2 | whether any were privileged or not when I was | 16:23:29 |
| 3 | reviewing them, but I thought there might have been | 16:23:34 |
| 4 | privileged documents. | 16:23:36 |
| 5 | BY MR. PETROCELLI: | 16:23:36 |
| 6 | Q.  What made you think that? | 16:23:37 |
| 7 | A.  I -- I -- I had no reason for it.  I | 16:23:38 |
| 8 | just -- I didn't apply my mind to the question. | 16:23:41 |
| 9 | Q.  Have you looked at the documents again over | 16:23:44 |
| 10 | lunch? | 16:23:50 |
| 11 | A.  I haven't looked at any documents over | 16:23:51 |
| 12 | lunch. | 16:23:53 |
| 13 | Q.  So to be clear, despite ten minutes of | 16:23:53 |
| 14 | questions, you can't tell me a single piece of paper | 16:23:58 |
| 15 | or document that you reviewed over three or four | 16:24:01 |
| 16 | days of time preparing for the deposition; is that | 16:24:04 |
| 17 | correct? | 16:24:04 |
| 18 | MS. ESKENAZI:  Objection.  It's been asked | 16:24:10 |
| 19 | and answered repeatedly. | 16:24:11 |
| 20 | You can answer again. | 16:24:11 |
| 21 | THE WITNESS:  I don't have anything to add | 16:24:12 |
| 22 | to what I've said before. | 16:24:14 |
| 23 | BY MR. PETROCELLI: | 16:24:14 |
| 24 | Q.  Well, unfortunately, you have to answer my | 16:24:15 |
| 25 | question.  I didn't ask you if you had anything to | 16:24:17 |

Page 255

```
 1    add.                                           16:24:20

 2           Can you please repeat the question?     16:24:20

 3               (The reporter read the record       16:24:20

 4           as follows:                             16:24:20

 5               "QUESTION:  So to be clear,          16:23:55

 6           despite ten minutes of questions        16:23:56

 7           you can't tell me a single piece        16:23:58

 8           of paper or document that you           16:24:00

 9           reviewed over three or four days        16:24:02

10           of time preparing for the               16:24:04

11           deposition; is that correct?")          16:24:05

12           THE WITNESS:  I don't --                16:24:34

13           MS. ESKENAZI:  Objection.  It's been asked  16:24:36

14    and answered.                                  16:24:36

15           You can answer again.                   16:24:37

16           THE WITNESS:  I don't have any specific  16:24:38

17    recollection of the documents I reviewed.      16:24:39

18    BY MR. PETROCELLI:                              16:24:39

19       Q.  You've identified now the two law firms  16:24:48

20    that we've talked about, the Kay Boose which is now  16:24:51

21    Davis --                                        16:24:56

22       A.  Wright Tremaine.                         16:24:57

23       Q.  -- Wright & Tremaine and we talked about  16:24:58

24    Szold Brandwen.                                 16:25:02

25           Are there any other American law firms with  16:25:03
```

Page 256

```
 1    whom you have been in contact over the years        16:25:07

 2    regarding the Tolkiens, on behalf of the Tolkiens?   16:25:10

 3            MS. ESKENAZI:  Objection.  It's vague and   16:25:17

 4    ambiguous.                                           16:25:20

 5            THE WITNESS:  We -- the Tolkien Estate has   16:25:20

 6    taken advice from other U.S. attorneys at times.     16:25:28

 7    BY MR. PETROCELLI:                                   16:25:28

 8        Q.  Can you identify those attorneys or the      16:25:32

 9    firms?                                               16:25:35

10        A.  I couldn't -- I couldn't give a              16:25:35

11    comprehensive list.  I could -- I could give an      16:25:37

12    example.                                             16:25:41

13        Q.  Well, give me every one you can remember.    16:25:42

14        A.  The one that I remember, sitting here        16:25:45

15    today, is Loeb & Loeb.                               16:25:47

16        Q.  And who at Loeb & Loeb?                       16:25:49

17        A.  I can't remember his name.  It's not coming  16:26:07

18    to me.                                               16:26:10

19        Q.  Do you know the -- the office of Loeb &      16:26:11

20    Loeb?                                                16:26:14

21        A.  It was the New York office.                  16:26:14

22        Q.  Do you know --                               16:26:17

23        A.  Yes.  It was the New York office.            16:26:20

24        Q.  Do you remember the name now?                16:26:21

25        A.  I can remember that they, in assisting the   16:26:22
```

                                           Page 257

| | | |
|---|---|---|
| 1 | Tolkien Estate, dealt with their -- | 16:26:36 |
| 2 | MS. ESKENAZI:  But the question was, can | 16:26:39 |
| 3 | you remember his name. | 16:26:41 |
| 4 | THE WITNESS:  I can't.  It may come to me. | 16:26:41 |
| 5 | BY MR. PETROCELLI: | 16:26:41 |
| 6 | Q.  Do you -- do you remember the time frame | 16:26:44 |
| 7 | during which the firm was involved in the Tolkiens' | 16:26:46 |
| 8 | affairs? | 16:26:50 |
| 9 | A.  For a few years in the middle of the | 16:26:51 |
| 10 | thousands.  Sorry. | 16:26:55 |
| 11 | Q.  The thousands? | 16:26:57 |
| 12 | A.  You know, 2000 to 2010.  So some -- some | 16:26:58 |
| 13 | point in the middle of that decade. | 16:27:03 |
| 14 | Q.  Does the firm still do work for the | 16:27:05 |
| 15 | Tolkiens? | 16:27:09 |
| 16 | A.  No. | 16:27:10 |
| 17 | Q.  Do you know when it stopped? | 16:27:12 |
| 18 | MS. ESKENAZI:  Objection.  Assumes facts | 16:27:15 |
| 19 | not in evidence. | 16:27:15 |
| 20 | THE WITNESS:  It ceased to do work for the | 16:27:18 |
| 21 | Tolkien Estate when representation -- they were | 16:27:25 |
| 22 | instructed in relation to certain matters and when | 16:27:30 |
| 23 | the representation in relation to those matters | 16:27:33 |
| 24 | passed to Greenberg Glusker they dropped out of the | 16:27:35 |
| 25 | picture. | 16:27:38 |

Page 258

```
 1    BY MR. PETROCELLI:                              16:27:39

 2        Q.   What were the matters they were handling?  16:27:39

 3        A.   Matters relating to the film participation  16:27:41

 4    question.                                       16:27:45

 5        Q.   Anything else?                          16:27:45

 6        A.   Not so far as I recollect.             16:27:52

 7        Q.   Any other lawyers or law firms?        16:27:57

 8        A.   Not so far as I can recollect.         16:28:00

 9        Q.   Going back to the beginning of your time  16:28:04

10    with -- with Tolkiens?                          16:28:06

11        A.   I don't recall any others.             16:28:08

12        Q.   Going beyond lawyers now, were there any  16:28:12

13    other professionals that -- with -- with whom you've  16:28:17

14    been in contact in connection with the          16:28:21

15    representation of the Tolkiens?                  16:28:23

16        A.   Lots of professionals.                 16:28:25

17        Q.   What kind of professionals?            16:28:27

18        A.   Accountants --                         16:28:29

19        Q.   U.S. based.                            16:28:31

20        A.   Oh.                                    16:28:32

21        Q.   Yeah.                                  16:28:32

22        A.   In relation to the film participation  16:28:37

23    litigation, the Tolkien Estate engaged auditors.  16:28:40

24        Q.   You -- do you know the name of the firm?  16:28:46

25             MS. ESKENAZI:   Objection.   Vague.   It's  16:28:53
```

Page 259

```
 1    irrelevant.                                          16:28:54

 2          THE WITNESS:  I'm trying hard.  I'm just       16:28:56

 3    not getting the name.                                16:29:03

 4    BY MR. PETROCELLI:                                   16:29:03

 5       Q.   Okay.  Do any professionals, U.S.-based      16:29:05

 6    professionals come to mind with whom you've dealt on 16:29:10

 7    behalf of the Tolkiens over the years?               16:29:13

 8       A.   Nothing is coming to mind.                   16:29:15

 9       Q.   Okay.  Besides your law firm --              16:29:20

10       A.   Yes.                                         16:29:25

11       Q.   -- and the Manches firm, have there been     16:29:25

12    any other law firms that have represented the -- the 16:29:31

13    Tolkiens in connection with matters involved in this 16:29:37

14    case?                                                16:29:39

15          MS. ESKENAZI:  Objection.  Relevance.          16:29:41

16          THE WITNESS:  I can remember one instance      16:29:43

17    where there was a conflict, a potential for conflict 16:29:49

18    of interest between the Tolkien Estate Limited and   16:29:54

19    the Tolkien Trust.  Well, correction.  The ent- --   16:29:57

20    predecessor entity of the Tolkien Estate Limited and 16:30:02

21    one or other of those clients sought independent     16:30:07

22    legal advice.                                        16:30:11

23    BY MR. PETROCELLI:                                   16:30:11

24       Q.   From what firm?                              16:30:12

25       A.   I think the firm's name was Farrers.         16:30:13
```

Page 260

```
 1          Q.  How do you spell that?                 16:30:16

 2          A.  F-a double r e-r-s.                     16:30:17

 3          Q.  And where is it based?                 16:30:19

 4          A.  In London.                             16:30:21

 5          Q.  Do you know the name of the attorney there?  16:30:21

 6          A.  No, I can't remember.                  16:30:23

 7          Q.  Did you -- did you deal with that attorney  16:30:23

 8     at all?                                         16:30:25

 9          A.  Only to the extent of facilitating the  16:30:25

10     transfer.                                       16:30:34

11          Q.  Is that --                             16:30:35

12          A.  The -- the referral of the client.     16:30:36

13          Q.  Is that attorney still involved or that  16:30:39

14     firm?                                           16:30:41

15          A.  Involved in?                           16:30:41

16          Q.  In representing the Tolkiens?          16:30:43

17          A.  No.                                    16:30:45

18          Q.  Okay.  You gave -- you were questioned this  16:30:49

19     morning and shown a number of documents about the  16:30:53

20     various uses made by Zaentz and others related to  16:30:57

21     the merchandising rights.  And in particular, you  16:31:04

22     were shown a number of documents concerning computer  16:31:09

23     games and platforms and online rights and so forth.  16:31:13

24          Have you ever retained a consultant or     16:31:22

25     anybody over the years to give you any advice    16:31:27
```

Page 261

| | | |
|---|---|---|
| 1 | regarding video games, computer games, computer | 16:31:32 |
| 2 | technology, online technology, Internet technology, | 16:31:37 |
| 3 | any of those topics? | 16:31:41 |
| 4 | A.  Not -- not so far as I recall. | 16:31:43 |
| 5 | Q.  What -- what have you done to educate | 16:31:46 |
| 6 | yourself regarding these matters? | 16:31:49 |
| 7 | MS. ESKENAZI:  Objection.  Vague and | 16:31:52 |
| 8 | ambiguous. | 16:31:53 |
| 9 | THE WITNESS:  Which matters? | 16:31:54 |
| 10 | BY MR. PETROCELLI: | 16:31:54 |
| 11 | Q.  Well, you indicated that you understood | 16:31:56 |
| 12 | that online video games that were downloaded on the | 16:32:01 |
| 13 | Internet involved, to some degree, some physical | 16:32:09 |
| 14 | object that you buy in the store. | 16:32:13 |
| 15 | Do you recall that testimony? | 16:32:17 |
| 16 | MS. ESKENAZI:  Objection.  Misstates the | 16:32:18 |
| 17 | testimony. | 16:32:19 |
| 18 | THE WITNESS:  That does misstate my | 16:32:19 |
| 19 | testimony. | 16:32:21 |
| 20 | BY MR. PETROCELLI: | 16:32:21 |
| 21 | Q.  How does it misstate your testimony? | 16:32:21 |
| 22 | A.  Because I was referring to the specifics of | 16:32:23 |
| 23 | the agreement with the Saul Zaentz Company when | 16:32:24 |
| 24 | referring to purchase of computer games on physical | 16:32:27 |
| 25 | media. | 16:32:31 |

Page 262

| | | |
|---|---|---|
| 1 | Q.  So you have been aware since inception that | 16:32:31 |
| 2 | video games or -- let's take video games -- can be | 16:32:38 |
| 3 | downloaded onto a computer or a mobile device | 16:32:45 |
| 4 | without reference to any physical hardware or | 16:32:51 |
| 5 | physical equipment that you would buy in the store, | 16:32:55 |
| 6 | correct? | 16:32:55 |
| 7 | MS. ESKENAZI:  Objection.  It's vague and | 16:32:58 |
| 8 | ambiguous. | 16:33:01 |
| 9 | THE WITNESS:  It's very vague and I don't | 16:33:01 |
| 10 | know what you mean by "from inception." | 16:33:02 |
| 11 | BY MR. PETROCELLI: | 16:33:02 |
| 12 | Q.  Well, from the first time you started | 16:33:05 |
| 13 | working on these matters going back to 1992. | 16:33:08 |
| 14 | A.  Right.  The question is still vague. | 16:33:11 |
| 15 | Q.  Well, you can answer it. | 16:33:14 |
| 16 | A.  Would you like to put it to me again? | 16:33:15 |
| 17 | Q.  Yeah.  What -- when did you first learn | 16:33:17 |
| 18 | that certain types of technology, like video games, | 16:33:21 |
| 19 | for example, can be played by downloading them | 16:33:31 |
| 20 | without -- downloading them and playing them on the | 16:33:39 |
| 21 | Internet? | 16:33:42 |
| 22 | MS. ESKENAZI:  Objection.  It's vague and | 16:33:43 |
| 23 | ambiguous.  It -- it also assumes facts not in | 16:33:46 |
| 24 | evidence. | 16:33:48 |
| 25 | THE WITNESS:  You're conflating two | 16:33:48 |

Page 263

| | | |
|---|---|---|
| 1 | concepts there.  One -- | 16:33:51 |
| 2 | BY MR. PETROCELLI: | 16:33:51 |
| 3 | Q.  Yeah, I'm sure I am. | 16:33:54 |
| 4 | A.  One is how a game is played and the other | 16:33:55 |
| 5 | is how a game is purchased. | 16:33:58 |
| 6 | Q.  Okay.  And you said I'm conflating them. | 16:34:03 |
| 7 | So you're clear in your mind there's a difference, | 16:34:05 |
| 8 | correct? | 16:34:05 |
| 9 | A.  I'm clear in my mind that there is a | 16:34:11 |
| 10 | difference between the manner -- I'm clear in my | 16:34:13 |
| 11 | mind that there's a difference between the -- the | 16:34:17 |
| 12 | manner of -- the question of purchasing and the | 16:34:19 |
| 13 | question of playing. | 16:34:23 |
| 14 | Q.  And what is the difference? | 16:34:23 |
| 15 | A.  One has to precede the other. | 16:34:26 |
| 16 | Q.  What has to precede? | 16:34:28 |
| 17 | A.  The purchase has to precede the playing. | 16:34:29 |
| 18 | Q.  And what does the purchase -- what has to | 16:34:31 |
| 19 | be purchased to precede the playing? | 16:34:35 |
| 20 | MS. ESKENAZI:  Objection.  It's vague and | 16:34:38 |
| 21 | ambiguous. | 16:34:45 |
| 22 | THE WITNESS:  In the context of the Saul | 16:34:45 |
| 23 | Zaentz rights, what has to be purchased is a game on | 16:34:47 |
| 24 | physical media, discs or cartridges, some storage | 16:34:51 |
| 25 | medium of that sort. | 16:34:55 |

Page 264

| | | |
|---|---|---|
| 1 | BY MR. PETROCELLI: | 16:34:55 |
| 2 | Q.  And you say it has to be purchased for -- | 16:34:57 |
| 3 | why does it have to be purchased? | 16:35:00 |
| 4 | A.  Because that is the nature of -- of the | 16:35:02 |
| 5 | merchandising agreement. | 16:35:04 |
| 6 | Q.  Okay. | 16:35:04 |
| 7 | A.  That's what it requires. | 16:35:06 |
| 8 | Q.  But you are aware that one does not have to | 16:35:07 |
| 9 | purchase an object licensed by Saul Zaentz in order | 16:35:11 |
| 10 | to play a down- -- a video game that's downloaded | 16:35:21 |
| 11 | from the Internet, right? | 16:35:24 |
| 12 | MS. ESKENAZI:  Objection.  It's vague and | 16:35:26 |
| 13 | ambiguous. | 16:35:26 |
| 14 | BY MR. PETROCELLI: | 16:35:26 |
| 15 | Q.  You could play it on a computer purchased | 16:35:27 |
| 16 | at Radio Shack, correct? | 16:35:29 |
| 17 | MS. ESKENAZI:  Objection.  It's vague and | 16:35:32 |
| 18 | ambiguous. | 16:35:35 |
| 19 | THE WITNESS:  Could I possibly have the | 16:35:35 |
| 20 | question again, please? | 16:35:40 |
| 21 | BY MR. PETROCELLI: | 16:35:41 |
| 22 | Q.  Yes.  You -- you -- your focus on the item | 16:35:42 |
| 23 | of equipment that's purchased on which -- which is | 16:35:46 |
| 24 | the first step in playing the game.  You said it | 16:35:53 |
| 25 | precedes the playing of the game.  You have to have | 16:35:57 |

Page 265

```
 1    an item that's purchased in a store, correct?        16:35:59

 2        A.  Can we stop there?  You're referring to      16:36:02

 3    equipment.  I think there are two elements.  There's 16:36:05

 4    the equipment and the game --                        16:36:07

 5        Q.  Okay.                                         16:36:11

 6        A.  -- on physical media.                         16:36:10

 7        Q.  So you're talking about going into a store    16:36:13

 8    and buying a disc or some physical medium on which    16:36:17

 9    the game -- the contents of the game appear,          16:36:20

10    correct?                                              16:36:20

11        A.  Correct.                                      16:36:24

12        Q.  Okay.  And then that is taken to your home    16:36:26

13    and put into some device that enables you to play     16:36:31

14    the game, correct?                                    16:36:35

15        A.  That's correct.                               16:36:38

16        Q.  Okay.  Now, you -- you also are aware that    16:36:41

17    you can access such a game without walking into a     16:36:44

18    store by downloading it from the Internet, correct?   16:36:46

19        A.  I became aware of that fact in the course     16:36:49

20    of the discussions leading up to this dispute.        16:36:53

21        Q.  Now, what fact did you become aware of in     16:36:58

22    the discussions leading up to this suit?              16:37:01

23        A.  I became aware of the assertion by the Saul   16:37:05

24    Zaentz Company that these -- this form of delivery    16:37:09

25    of a computer game existed and that they claimed the  16:37:13
```

Page 266

```
 1    right to the rights in question.              16:37:17

 2        Q.   What form of delivery?               16:37:20

 3        A.   Downloadable-only games.             16:37:22

 4        Q.   Why did you add the word "only"?     16:37:26

 5             MS. ESKENAZI:  Objection.  It's vague and   16:37:34

 6    ambiguous.                                    16:37:35

 7             THE WITNESS:  Because -- to make a    16:37:36

 8    distinction between the two kinds of games.  The   16:37:38

 9    kinds of game that came on physical media and this   16:37:43

10    new technology which obviated the need for physical   16:37:47

11    media.                                        16:37:52

12    BY MR. PETROCELLI:                            16:37:52

13        Q.   When did you have these discussions when   16:37:56

14    you first learned of the assertion by the Zaentz   16:37:58

15    Company that games that were downloadable-only were   16:38:04

16    covered by the license agreement?            16:38:12

17             MS. ESKENAZI:  Objection.  Vague and   16:38:15

18    ambiguous.  Misstates the testimony.  Assumes facts   16:38:16

19    not in evidence.                             16:38:18

20             THE WITNESS:  This issue arose out of the   16:38:20

21    discussion about online gaming.              16:38:25

22    BY MR. PETROCELLI:                            16:38:25

23        Q.   When -- when did you first learn of that   16:38:29

24    assertion?  That's my question.              16:38:33

25        A.   I can't be specific as to when.  But it was   16:38:36
```

Page 267

```
 1    at the time that we discovered that Warner Bros. and    16:38:39

 2    the Saul Zaentz Company were -- had licensed online     16:38:43

 3    gambling.                                               16:38:47

 4         Q.  Okay.  So the lawsuit says that that           16:38:48

 5    occurred in -- the complaint says that occurred in      16:38:52

 6    September of 2010, in paragraph 45.                     16:38:58

 7              So does that refresh your recollection that   16:39:03

 8    that would be the time frame?                           16:39:04

 9         A.  That was -- that was the time frame when we    16:39:06

10    became aware of online gambling.                        16:39:08

11         Q.  Okay.  Now, before September 2010 --           16:39:10

12              MS. ESKENAZI:  Well, objection.               16:39:15

13              MR. PETROCELLI:  I didn't finish my           16:39:18

14    question.                                               16:39:20

15              MS. ESKENAZI:  I -- I'm interposing an        16:39:20

16    objection to the prior question that it's vague and     16:39:22

17    ambiguous.                                              16:39:25

18              MR. PETROCELLI:  Okay.                        16:39:25

19         Q.  Before September 2010, had you ever heard      16:39:26

20    of the idea, of the notion, that a game could be        16:39:32

21    downloadable-only?                                      16:39:37

22         A.  I had not heard that assertion from the        16:39:40

23    Saul Zaentz Company.                                    16:39:43

24         Q.  I didn't ask you if you heard an assertion     16:39:43

25    from the Saul Zaentz Company.  I -- were you aware      16:39:45
```

Page 268

```
 1    that people could play games by downloading them       16:39:50

 2    onto their computer and not -- not go in and           16:39:57

 3    purchase a physical medium?                            16:40:02

 4            MS. ESKENAZI:  Objection.  It's vague and      16:40:04

 5    ambiguous.                                             16:40:06

 6            THE WITNESS:  I was not aware at that time      16:40:06

 7    that it -- it was generally possible simply to         16:40:09

 8    download a game without buying the physical disc.      16:40:13

 9    BY MR. PETROCELLI:                                     16:40:13

10        Q.  Okay.  So, up until September 2010, based      16:40:17

11    on all the work that you did and all the experience    16:40:22

12    that you had and all the people with whom you          16:40:25

13    consulted, it's your testimony that you had no idea    16:40:28

14    that it was possible to access a game by downloading   16:40:33

15    it?                                                    16:40:38

16            MS. ESKENAZI:  Objection.  It's been asked     16:40:40

17    and answered.                                          16:40:41

18            THE WITNESS:  I didn't have any need to        16:40:42

19    direct my --                                           16:40:44

20    BY MR. PETROCELLI:                                     16:40:44

21        Q.  I didn't ask you if you had a need.           16:40:45

22            Can you please repeat my question?            16:40:47

23            MS. ESKENAZI:  And you've interrupted the      16:40:48

24    witness' answer.                                       16:40:49

25            MR. PETROCELLI:  She's not answering my        16:40:50
```

Page 269

```
 1   question, so there's no point in having her        16:40:51

 2   continue.                                           16:40:53

 3          THE WITNESS:  I didn't finish the answer to  16:40:53

 4   my question, so --                                  16:40:54

 5          MR. PETROCELLI:  Well, I apologize for       16:40:55

 6   interrupting you, then.  It didn't sound like you   16:40:56

 7   were going to answer it.  Why don't we start all    16:40:59

 8   over again.                                         16:41:01

 9          Please repeat the question and then you can  16:41:02

10   answer.  Then we'll take a break because they're    16:41:04

11   telling me we're running out of tape.               16:41:06

12              (The reporter read the record            16:41:06

13          as follows:                                  16:41:06

14              "QUESTION:  So, up until                 16:40:17

15          September 2010, based on all the             16:40:18

16          work that you did and all the                16:40:22

17          experience that you had and all              16:40:24

18          the people with whom you                     16:40:26

19          consulted, it's your testimony               16:40:29

20          that you had" -- "it's your                  16:40:31

21          testimony that you no idea that it           16:40:31

22          was possible to access a game by             16:40:34

23          downloading it?")                            16:40:38

24          MS. ESKENAZI:  Objection.  Vague and         16:41:26

25   ambiguous.                                          16:41:32
```

                                                       Page 270

```
 1              THE WITNESS:  Mr. Petrocelli, your question  16:41:32

 2    assumes that I consulted with an awful lot of people  16:41:34

 3    on these matters and failed to understand what they  16:41:37

 4    were telling me.  But that wasn't my testimony.       16:41:41

 5    BY MR. PETROCELLI:                                    16:41:41

 6         Q.  Can you answer my question now that you've   16:41:44

 7    made your objection?                                  16:41:45

 8         A.  Can I have the question again, please.       16:41:47

 9         Q.  Yeah.                                        16:42:07

10              (The reporter read the record              16:42:07

11          as follows:                                    16:42:07

12              "QUESTION:  So, up until                    16:40:17

13          September 2010, based on all the                16:40:18

14          work that you did and all the                   16:40:22

15          experience that you had and all                 16:40:24

16          the people with whom you                        16:40:26

17          consulted, it's your testimony                  16:40:29

18          that you had no idea that it was                 16:40:31

19          possible to access a game by                    16:40:34

20          downloading it?")                               16:40:38

21         MS. ESKENAZI:  Same objections.  It's vague      16:42:08

22    and ambiguous.                                        16:42:10

23              THE WITNESS:  The premise of the -- of the  16:42:10

24    question leads to a -- will lead to a misleading       16:42:14

25    answer, because you're assuming that I had all kinds   16:42:19
```

Page 271

| | | |
|---|---|---|
| 1 | of contact with people and that what -- what my | 16:42:21 |
| 2 | knowledge, my state of knowledge about which you | 16:42:24 |
| 3 | asked me is based on that.  But the basis is wrong. | 16:42:26 |
| 4 | BY MR. PETROCELLI: | 16:42:26 |
| 5 | Q.  That's very good.  You're not even a | 16:42:31 |
| 6 | contentious lawyer.  You're a transactions lawyer, | 16:42:34 |
| 7 | aren't you? | 16:42:37 |
| 8 | A.  I'm trying to give a correct answer to | 16:42:38 |
| 9 | the -- to the point. | 16:42:41 |
| 10 | Q.  So, let's take out the business -- we're | 16:42:41 |
| 11 | going to come back to the consulting piece again. | 16:42:45 |
| 12 | But prior to September 2010, it's your | 16:42:47 |
| 13 | testimony that you had no idea whatsoever that it | 16:42:50 |
| 14 | was possible to access a game solely by downloading | 16:42:53 |
| 15 | it? | 16:42:57 |
| 16 | A.  I was not aware of that. | 16:42:58 |
| 17 | Q.  Did you ever make any inquiries of anybody, | 16:43:00 |
| 18 | prior to September 2010, whether that was possible? | 16:43:03 |
| 19 | A.  No, because I had no reason to do so. | 16:43:07 |
| 20 | MR. PETROCELLI:  Move to strike everything | 16:43:10 |
| 21 | after the word "no."  We'll talk about your reason | 16:43:11 |
| 22 | to do so after they change the tape. | 16:43:14 |
| 23 | THE VIDEOGRAPHER:  This is the end of media | 16:43:16 |
| 24 | number 4.  Off the record at 4:44 p.m. | 16:43:18 |
| 25 | (Brief recess.) | 16:43:24 |

Page 272

```
 1              THE VIDEOGRAPHER:  We are back on the        16:52:24
 2   record at 5:06 p.m. This is the beginning of media      17:05:50
 3   number 5.  Counsel may proceed.                         17:05:53
 4   BY MR. PETROCELLI:                                      17:05:53
 5       Q.  Your resume, Exhibit 1, states that you're      17:05:56
 6   managing the business of a well-known literary          17:06:03
 7   estate across its worldwide operations.                 17:06:06
 8           That refers to the Tolkien Estate?              17:06:07
 9       A.  I think Mr. Ulin asked that question and I      17:06:10
10   confirmed that it does.                                 17:06:13
11       Q.  It does.  Okay.                                 17:06:14
12           And are you the person on behalf of the         17:06:15
13   Tolkien Estate responsible for monitoring uses under    17:06:19
14   the '69 agreements and whether, in particular,          17:06:27
15   Zaentz's uses are permitted or not permitted?           17:06:29
16           MS. ESKENAZI:  Objection.  Vague and            17:06:35
17   ambiguous.                                              17:06:40
18           THE WITNESS:  I'm responsible for the           17:06:40
19   second -- in relation to the second limb of what you    17:06:41
20   mentioned, which -- which I'm going to have to ask      17:06:45
21   you to say it again.                                    17:06:49
22   BY MR. PETROCELLI:                                      17:06:49
23       Q.  The uses by Zaentz?                             17:06:50
24       A.  There was a bit of your question which says     17:06:51
25   "you're the person doing monitoring and you're the      17:06:54
```

Page 273

```
 1    person doing"?                                      17:06:57

 2        Q.  Are you the person most responsible for    17:06:57

 3    monitoring the merchandising uses by Zaentz?        17:07:01

 4           MS. ESKENAZI:  Objection.  Vague and         17:07:10

 5    ambiguous.                                          17:07:11

 6           THE WITNESS:  It's my job to deal with the   17:07:11

 7    lic- -- to oversee the licensing that is undertaken 17:07:18

 8    by Zaentz.                                          17:07:23

 9    BY MR. PETROCELLI:                                  17:07:23

10        Q.  Okay.  Is there anybody more involved and   17:07:24

11    who has been more involved in that endeavor over the 17:07:28

12    years than yourself?                                17:07:31

13        A.  No.                                         17:07:32

14        Q.  Okay.                                       17:07:32

15        A.  Not as far as I'm aware.                    17:07:34

16        Q.  Have you felt that you have been fully      17:07:35

17    capable of performing that task on behalf of your   17:07:38

18    clients?                                            17:07:42

19           MS. ESKENAZI:  Objection.  Vague and         17:07:43

20    ambiguous.                                          17:07:45

21           THE WITNESS:  I don't really understand the  17:07:51

22    question.                                           17:08:01

23    BY MR. PETROCELLI:                                  17:08:01

24        Q.  Well, at any point in time did you feel     17:08:01

25    that you were not competent to perform this task for 17:08:03
```

Page 274

```
 1    this -- for -- for your client?                    17:08:06

 2         A.  No.                                        17:08:08

 3         Q.  Okay.  You -- you've identified yourself   17:08:10

 4    and the -- in your resume, Exhibit 1, as having     17:08:13

 5    extensive experience in copyright and trademark law. 17:08:16

 6    And that's correct, is it not?                      17:08:19

 7         A.  Do you mind if I look for my resume because 17:08:21

 8    you're asking me questions about it?                17:08:23

 9         Q.  You may.  First exhibit.  There you go.    17:08:25

10    Right there.                                        17:08:33

11         It's true that you have and had had over       17:08:35

12    the years extensive experience in copyright and     17:08:37

13    trademark law, correct?                             17:08:40

14         A.  Yes.                                        17:08:42

15         Q.  You're a member of the Copyright Committee; 17:08:47

16    is that right?                                      17:08:52

17         MS. ESKENAZI:  Objection.  Vague and           17:08:52

18    ambiguous.                                          17:08:52

19    BY MR. PETROCELLI:                                  17:08:52

20         Q.  Copyright Committee of the Association of  17:08:55

21    Learned Professional and Society Publishers; is that 17:08:56

22    right?                                              17:08:56

23         A.  I -- I was a member of the Copyright       17:09:01

24    Committee of the Association of Learned Professional 17:09:03

25    Society Publishers, which we abbreviate to ALSP.    17:09:06
```

Page 275

```
 1        Q.  Are you still?                          17:09:10

 2        A.  No, I -- I ceased to be at the -- at -- at   17:09:10

 3   some point this year.                             17:09:13

 4        Q.  This year?                               17:09:17

 5        A.  Yes.                                      17:09:17

 6        Q.  How long were you a member?              17:09:18

 7        A.  Quite a number of years.                 17:09:20

 8        Q.  And you're also a member of the Museums   17:09:22

 9   Copyright Group; is that right?                   17:09:22

10        A.  Yes.                                      17:09:22

11        Q.  Okay.  And when you were receiving        17:09:29

12   documents of the sort that we saw today, documents   17:09:35

13   from Zaentz, for example, and documents from others,   17:09:40

14   did you feel competent to read and understand the   17:09:42

15   documents that were sent to you in the course of   17:09:47

16   your work?                                        17:09:49

17        MS. ESKENAZI:  Objection.  Vague and          17:09:52

18   ambiguous.                                        17:09:53

19        THE WITNESS:  Yes, I did.                     17:09:59

20   BY MR. PETROCELLI:                                17:09:59

21        Q.  Have you -- did you ever feel the need at   17:10:00

22   any point in time to reach out and seek special   17:10:02

23   training or education, for example, on computer   17:10:04

24   technology or Internet technology or the types of   17:10:07

25   uses that were -- were being made now with new   17:10:11
```

Page 276

```
 1    technologies?                                    17:10:17

 2        A.  No.                                       17:10:17

 3        Q.  Okay.  Did you ever consult with anybody to  17:10:19

 4    give you special advice on those matters?         17:10:22

 5            MS. ESKENAZI:  Objection.  Asked and       17:10:25

 6    answered.                                          17:10:26

 7            You can answer again.                       17:10:27

 8            THE WITNESS:  No.                            17:10:27

 9    BY MR. PETROCELLI:                                  17:10:27

10        Q.  Did you ever reach out to anybody to ask   17:10:33

11    for help or assistance in understanding any of those  17:10:35

12    matters?                                            17:10:37

13        A.  I may have --                               17:10:37

14            MS. ESKENAZI:  Objection.  Vague and        17:10:40

15    ambiguous.                                          17:10:41

16            THE WITNESS:  I may have discussed          17:10:41

17    developments in technology with other people.      17:10:44

18    BY MR. PETROCELLI:                                  17:10:44

19        Q.  Okay.  Anybody come to mind that was of    17:10:47

20    particular -- of particular assistance to you in   17:10:51

21    that regard in the matters of technology?          17:10:54

22        A.  I don't recall.                            17:10:55

23        Q.  Okay.  Is there any member of the Tolkien  17:11:08

24    family with whom you regularly consulted on whether  17:11:09

25    new technological uses were covered by the Zaentz   17:11:13
```

Page 277

```
 1    agreement?                                      17:11:17

 2           MS. ESKENAZI:  Objection to the extent that  17:11:19

 3    calls for attorney-client privileged information.   17:11:20

 4           THE WITNESS:  I can't answer that question    17:11:30

 5    without giving privileged information.          17:11:31

 6    BY MR. PETROCELLI:                              17:11:31

 7        Q.  Why can't you?  I'm just asking you     17:11:34

 8    whether -- what was my question?  I think I asked   17:11:37

 9    for -- yeah, is there any of your client group, is  17:11:39

10    there any one of them with whom you regularly      17:11:43

11    consulted on that subject?                      17:11:46

12           And I'll stipulate that answering doesn't    17:11:50

13    waive the privilege.                            17:11:52

14           MS. ESKENAZI:  Okay.                      17:11:53

15           THE WITNESS:  No.                         17:11:54

16    BY MR. PETROCELLI:                              17:11:54

17        Q.  Of the -- of the -- of all the members of   17:11:55

18    the Tolkien family client group, is there any one of 17:11:58

19    them in particular you regard as computer savvy?   17:12:01

20           MS. ESKENAZI:  Objection.  Assumes facts     17:12:10

21    not in evidence.  Vague and ambiguous.          17:12:10

22           THE WITNESS:  I don't know what you mean     17:12:11

23    by "computer savvy."                            17:12:13

24    BY MR. PETROCELLI:                              17:12:13

25        Q.  Very, very conversant with computers and    17:12:14
```

Page 278

```
 1    computer technology.                          17:12:21

 2          MS. ESKENAZI:  Same objections.         17:12:22

 3          THE WITNESS:  Could I have the beginning of  17:12:22

 4    the question again, please?                   17:12:24

 5    BY MR. PETROCELLI:                            17:12:24

 6       Q.  Yeah.  Of the -- are you aware whether any  17:12:25

 7    members of the Tolkien family who were part of your  17:12:28

 8    client group are especially conversant with  17:12:30

 9    computers or computer technology?             17:12:32

10          MS. ESKENAZI:  Same objections.         17:12:33

11          THE WITNESS:  I'm not aware that any is.  17:12:34

12    BY MR. PETROCELLI:                            17:12:34

13       Q.  Okay.  Do you know whether any of them have  17:12:39

14    ever played any -- any computer games licensed by  17:12:40

15    Zaentz?                                       17:12:45

16       A.  I -- I don't know.                     17:12:45

17       Q.  Have you?                              17:12:49

18       A.  No.  Well, I don't believe I have, no.  17:12:52

19       Q.  You don't -- you're not sure?          17:12:55

20       A.  Well, I conducted that review of games in  17:12:59

21    the '90s.  I probably looked at them then.    17:13:03

22       Q.  At computer games?                     17:13:07

23       A.  At the ones that were available then for  17:13:07

24    the purposes of that review.                  17:13:11

25       Q.  Prior to the break, you testified that it  17:13:12
```

Page 279

| | | |
|---|---|---|
| 1 | wasn't until September 2010 -- that prior to | 17:13:19 |
| 2 | September 2010 you had no idea that the games could | 17:13:22 |
| 3 | be accessed by downloading them onto the computer? | 17:13:27 |
| 4 | A.  By downloading them only without -- without | 17:13:29 |
| 5 | buying a computer -- a -- a computer game on disc or | 17:13:34 |
| 6 | other physical media. | 17:13:37 |
| 7 | Q.  Well, did you discuss your testimony with | 17:13:39 |
| 8 | your lawyer over the break? | 17:13:41 |
| 9 | MS. ESKENAZI:  Object.  Attorney-client | 17:13:43 |
| 10 | privilege.  Instruct not to answer. | 17:13:46 |
| 11 | BY MR. PETROCELLI: | 17:13:47 |
| 12 | Q.  Do you now want -- do you now want to | 17:13:48 |
| 13 | change your prior answer? | 17:13:49 |
| 14 | MS. ESKENAZI:  Misstates the testimony. | 17:13:50 |
| 15 | MR. PETROCELLI:  Could you go back and show | 17:13:53 |
| 16 | me the answer right before the break? | 17:13:54 |
| 17 | Q.  I'm going to -- I'm going to confront you | 17:13:55 |
| 18 | with it again and then you can tell me whether | 17:13:57 |
| 19 | you're going to change your answer or not.  Okay? | 17:13:59 |
| 20 | MS. ESKENAZI:  You can spend your time | 17:14:02 |
| 21 | however you'd like, Mr. Petrocelli, but when you ask | 17:14:04 |
| 22 | for more time from the judge, we're going to point | 17:14:06 |
| 23 | out that you're just going over irrelevant | 17:14:08 |
| 24 | information. | 17:14:11 |
| 25 | MR. PETROCELLI:  I'm -- I'm sure you will. | 17:14:11 |

Page 280

```
1            THE REPORTER:  The answer right before the   17:14:11
2      break, you said?                                    17:14:11
3            MR. PETROCELLI:  Yes.                          17:14:51
4            Can we go back to the transcript.  Molly,
5      you want to find it for me?
6            THE REPORTER:  I got it.
7                (The reporter read the record
8            as follows:
9                "QUESTION:  Did you ever make              16:43:01
10           any inquiries of anybody prior to             16:43:01
11           September 2010 whether that was               16:43:04
12           possible?                                     16:43:07
13               "ANSWER:  No, because I had               16:43:08
14           no reason to do so.")                         16:43:08
15           MR. PETROCELLI:  Prior question.              16:43:08
16               (The reporter read the record            16:43:08
17           as follows:                                  16:43:08
18               "QUESTION:  We're going to come          16:42:44
19           back to the consulting piece again.          16:42:46
20           But prior to September 2010, it's your       16:42:47
21           testimony that you had no idea               16:42:50
22           whatsoever that it was possible to           16:42:53
23           access a game solely by downloading it?      16:42:54
24               "ANSWER:  I was not aware of that.")      16:42:58
25      BY MR. PETROCELLI:                                 17:14:51
```

Page 281

```
 1        Q.  You stick by that answer?              17:14:51

 2        A.  You said solely by downloading it, which   17:14:52

 3   I -- which I understood to mean downloadable-only,   17:14:56

 4   i.e., a game without the purchase of a physical   17:14:58

 5   object.                                       17:15:01

 6        Q.  Are you changing your answer or are you   17:15:02

 7   standing --                                   17:15:05

 8        A.  I don't --                           17:15:05

 9        Q.  -- by your answer?                    17:15:05

10        A.  I -- I --                            17:15:06

11        MS. ESKENAZI:  Objection.  It's           17:15:06

12   argumentative.                                17:15:07

13   BY MR. PETROCELLI:                            17:15:07

14        Q.  You heard the -- you heard the question and 17:15:08

15   you heard your answer.  Do you want -- are you   17:15:09

16   telling me your answer is not accurate?        17:15:12

17        MS. ESKENAZI:  Counsel, move on.          17:15:15

18   BY MR. PETROCELLI:                            17:15:15

19        Q.  Please answer my question.            17:15:18

20        A.  I've clarif- -- I've clarified my answer.  17:15:18

21        Q.  Did you feel your answer was incorrect?   17:15:20

22        A.  No, but I think you misunderstood it.  17:15:22

23        Q.  Okay.  So you have nothing to -- do you   17:15:24

24   feel when you gave your answer that it was truthful   17:15:26

25   and you still feel right now that it was truthful or   17:15:28
```

Page 282

```
 1   do you feel you made a mistake and you want to        17:15:31

 2   correct it?                                            17:15:33

 3           MS. ESKENAZI:  Objection.  Asked and          17:15:33

 4   answered.  And you're battering the witness.  You're   17:15:35

 5   arguing with the witness.  I'm not going to allow      17:15:38

 6   you to do that.  She's given her answer.  Move on,     17:15:41

 7   Mr. Petrocelli.                                        17:15:43

 8   BY MR. PETROCELLI:                                     17:15:43

 9       Q.  Can you please answer my question now?         17:15:44

10           MS. ESKENAZI:  She's instructed not to         17:15:45

11   answer.  Move on.                                      17:15:47

12   BY MR. PETROCELLI:                                     17:15:47

13       Q.  Prior to 2010, did you have any clue           17:15:49

14   whatsoever -- prior to September 2010, did you have    17:15:52

15   any clue whatsoever that it was possible to download   17:15:57

16   a game from the Internet onto the computer and         17:16:03

17   access it that way?  Yes or no?                        17:16:09

18           MS. ESKENAZI:  Objection.  It's been asked     17:16:11

19   and answered.  It's vague and ambiguous.  It's         17:16:14

20   compound.                                              17:16:17

21           And you don't need to answer "yes" or "no."    17:16:18

22   You just need to answer truthfully.                    17:16:20

23           THE WITNESS:  I'm restating my testimony.      17:16:22

24   I said solely by means of download.  And by that       17:16:25

25   phrase, I meant the same as downloadable-only.         17:16:29
```

Page 283

```
 1   BY MR. PETROCELLI:                                17:16:29

 2       Q.  So you were not aware, then, prior to 2010   17:16:33

 3   that a person could obtain access to a game solely   17:16:36

 4   by downloading it onto a computer, correct?        17:16:41

 5       A.  Correct.  That there had to be -- there had  17:16:44

 6   to be a pur- -- a purchase of a physical object.   17:16:47

 7           MR. PETROCELLI:  I move to strike          17:16:53

 8   everything after the word "yes."                   17:16:54

 9           THE WITNESS:  Well, I've added that simply  17:16:58

10   to clarify my answer and make it accurate.         17:16:59

11   BY MR. PETROCELLI:                                 17:17:01

12       Q.  Now, did you understand prior to September  17:17:01

13   2010, did you have any knowledge or understanding   17:17:07

14   that it was technologically possible to download a  17:17:09

15   game from some site on the Internet onto a computer?  17:17:15

16       A.  I didn't apply my mind to what the         17:17:20

17   possibilities of technology were.                  17:17:23

18       Q.  That was not my question.                  17:17:24

19           Did you know prior to September 2010 that  17:17:25

20   it was possible to download a game from a Web site  17:17:30

21   on the Internet onto a computer?                   17:17:33

22           MS. ESKENAZI:  Objection.  It's been asked  17:17:35

23   and answered.                                      17:17:37

24           You can answer yet again.                  17:17:38

25           I'm also going to say it's vague and       17:17:39
```

Page 284

```
 1    ambiguous.                                    17:17:39

 2          You can answer again.                   17:17:46

 3          THE WITNESS:  Would you like to ask the 17:17:47

 4    question again, please?                       17:17:48

 5          MR. PETROCELLI:  Please repeat it.      17:17:59

 6              (The reporter read the record       17:17:59

 7          as follows:                             17:17:59

 8              "QUESTION:  Did you know            17:17:25

 9          prior to September 2010 that it         17:17:26

10          was possible to download a game         17:17:30

11          from a Web site on the Internet         17:17:33

12          onto a computer?")                      17:17:34

13          MS. ESKENAZI:  Same objections.         17:18:00

14          THE WITNESS:  I don't believe I knew it was 17:18:10

15    possible to do that.                          17:18:13

16    BY MR. PETROCELLI:                            17:18:13

17       Q.  Okay.  So prior to September 2010, you had 17:18:14

18    never heard of downloading, that phrase or that 17:18:16

19    word?                                         17:18:22

20          MS. ESKENAZI:  Objection.  Argumentative 17:18:23

21    and asked and answered.  Vague and ambiguous. 17:18:26

22          THE WITNESS:  It's already part of the  17:18:27

23    testimony in this case that I've seen the word 17:18:29

24    "download."                                   17:18:31

25    BY MR. PETROCELLI:                            17:18:31
```

                                            Page 285

```
 1        Q.   Okay.  So when you saw the word              17:18:33

 2   "download" -- so I take it your answer is, you were    17:18:36

 3   familiar with the word "download" prior to September   17:18:37

 4   2010; is that right?                                   17:18:41

 5        A.   I have seen the word "download."             17:18:41

 6        Q.   And had you ever heard or seen anything      17:18:43

 7   about downloading a game prior to September 2010,      17:18:46

 8   some kind of computer game or video game?              17:18:52

 9        A.   I -- I don't -- that's such a broad          17:18:54

10   question.  How can I possibly answer it?               17:18:56

11        Q.   Truthfully.                                  17:18:59

12        A.   I don't -- I don't -- I don't know.          17:18:59

13        Q.   As you sit here right now, you don't know    17:19:01

14   whether prior to 2010 you'd ever heard of the idea     17:19:05

15   of downloading a computer game or a video game.        17:19:07

16           Is that your testimony?                        17:19:11

17           MS. ESKENAZI:  Objection.  It's vague --       17:19:11

18           THE WITNESS:  Without.                         17:19:11

19           MS. ESKENAZI:  -- and ambiguous.               17:19:12

20           THE WITNESS:  Which I want to clarify, I       17:19:12

21   wasn't aware that it was possible to do that without   17:19:16

22   first buying a game on physical media.                 17:19:18

23   BY MR. PETROCELLI:                                     17:19:18

24        Q.   I'm trying to separate these two things.     17:19:23

25        A.   I understand that.                           17:19:25
```

Page 286

```
 1        Q.  Were you --                          17:19:25

 2        A.  But I'm trying to explain my knowledge.   17:19:26

 3        Q.  Well, we'll -- we'll -- let me -- let me   17:19:28

 4   examine you on that.                            17:19:32

 5            You keep saying you had to buy something in   17:19:33

 6   the store because you think the license agreement   17:19:39

 7   supports that view, correct?                    17:19:43

 8        A.  That's correct.                        17:19:45

 9        Q.  Okay.                                  17:19:45

10            MS. ESKENAZI:  Objection.              17:19:47

11   BY MR. PETROCELLI:                              17:19:47

12        Q.  I'm not interested right now in finding out   17:19:47

13   what your legal arguments are about the license   17:19:50

14   agreement.  I'm trying to find out factually what   17:19:54

15   you did and what you knew.  Okay?               17:19:57

16            So with that in mind, did you know, putting   17:20:00

17   aside the license agreement for a moment, the   17:20:06

18   merchandising agreement with -- with Zaentz, putting   17:20:08

19   that aside, did you know prior to 2010 that people   17:20:11

20   could go on to a computer, get on to the Internet,   17:20:15

21   find some game, download it, and then play it   17:20:20

22   without going into a store to buy anything, the game   17:20:25

23   on a physical media?  Did -- were you aware that   17:20:28

24   that was possible?                              17:20:31

25            MS. ESKENAZI:  Objection.  It's vague and   17:20:32
```

Page 287

```
 1    ambiguous.  It's been asked and answered.  And it's    17:20:35

 2    argumentative.                                          17:20:37

 3            You can answer yet again for the 15th time      17:20:39

 4    today.                                                  17:20:42

 5            THE WITNESS:  May I have the question           17:20:48

 6    again, please?                                          17:20:49

 7                (The reporter read the record               17:20:49

 8            as follows:                                     17:20:49

 9                "QUESTION:  I'm not                          17:19:47

10            interested right now in finding                 17:19:48

11            out what your legal arguments are               17:19:50

12            about the license agreement.  I'm               17:19:53

13            trying to find out factually what               17:19:55

14            you did and what you knew.  Okay?               17:19:57

15            So with that in mind, did you                   17:20:00

16            know, putting aside the license                 17:20:05

17            agreement for a moment, the                     17:20:06

18            merchandising agreement with                    17:20:08

19            Zaentz, putting that aside, did                 17:20:10

20            you know prior to 2010 that people              17:20:12

21            could go on to a computer, get on               17:20:15

22            to the Internet, find some game,                17:20:19

23            download it, and then play it                   17:20:22

24            without going into a store to buy               17:20:25

25            anything, the game on a physical                17:20:27
```

Page 288

```
 1            media?  Were you aware that that            17:20:29

 2            was possible?")                             17:20:31

 3            MS. ESKENAZI:  I'm going to add another     17:21:16

 4     objection which is compound.                       17:21:18

 5            THE WITNESS:  I'm not sure what the state    17:21:20

 6     of my knowledge was at that point.                 17:21:21

 7     BY MR. PETROCELLI:                                 17:21:21

 8        Q.  At what point?                              17:21:23

 9        A.  The point you referred to in your question. 17:21:25

10        Q.  When did you -- do you know -- do you know  17:21:26

11     now, as of today sitting here testifying, that it's 17:21:32

12     possible for people to go and download games onto a 17:21:37

13     computer and play them without walking into a store 17:21:40

14     to buy something?                                  17:21:42

15        A.  I believe it is now becoming possible.      17:21:44

16        Q.  It's possible?  Is that what you just said? 17:21:45

17        A.  It is becoming possible.                    17:21:48

18        Q.  Okay.  When is the first time you heard     17:21:49

19     that that was possible?                            17:21:50

20            MS. ESKENAZI:  Objection.  It's been asked  17:21:53

21     and answered.                                      17:21:54

22            You can answer it again.                    17:21:55

23            THE WITNESS:  It came to my attention in    17:21:56

24     the discussions which preceded this dispute.       17:21:57

25     BY MR. PETROCELLI:                                 17:21:57
```

Page 289

```
 1        Q.  You're talking about the -- the -- in or       17:22:01

 2   about September 2010, plaintiffs for the first time     17:22:06

 3   learned of an online slot game known as Lord of the     17:22:09

 4   Rings, which prominently features and uses              17:22:13

 5   characters, et cetera, et cetera, as alleged in the     17:22:16

 6   lawsuit?  Is that the event you're talking about?       17:22:18

 7        MS. ESKENAZI:  Objection.  It's vague and          17:22:20

 8   ambiguous.                                              17:22:21

 9        THE WITNESS:  That's an element of the --          17:22:21

10   BY MR. PETROCELLI:                                      17:22:21

11        Q.  Can you give me a date when you first          17:22:26

12   learned that somebody, anybody, could go and play       17:22:28

13   games on the computer by downloading them without       17:22:31

14   going into a store to buy some -- some physical         17:22:34

15   product?                                                17:22:38

16        MS. ESKENAZI:  Objection.  It's been asked         17:22:38

17   and answered.                                           17:22:39

18        You can answer yet again.                          17:22:40

19        THE WITNESS:  That specific knowledge came         17:22:41

20   to me in the -- in the discussions leading up to        17:22:43

21   this lawsuit.                                           17:22:49

22   BY MR. PETROCELLI:                                      17:22:49

23        Q.  So in or about September 2010?                 17:22:51

24        A.  Well, there were a number of assertions        17:22:55

25   made following on from that.  That -- in               17:22:57
```

Page 290

| | | |
|---|---|---|
| 1 | September 2010, we became aware of gambling online. | 17:23:00 |
| 2 | When we asked what was going on, and how that came | 17:23:07 |
| 3 | to be happening, having first established that it | 17:23:11 |
| 4 | wasn't actually an infringement, but it was -- this | 17:23:15 |
| 5 | was being done under the aegis of the Saul Zaentz | 17:23:18 |
| 6 | Company, we -- we had further communications with | 17:23:21 |
| 7 | the Saul Zaentz Company and they -- it was in the | 17:23:25 |
| 8 | course of that that they asserted rights to | 17:23:27 |
| 9 | downloadable-only games. | 17:23:32 |
| 10 | Q.  So prior to 2010, you had no idea, putting | 17:23:34 |
| 11 | aside the Saul Zaentz Company and putting aside what | 17:23:38 |
| 12 | the contract means, you had no idea that anybody | 17:23:41 |
| 13 | could go onto a computer and download a game without | 17:23:44 |
| 14 | buying it in the store? | 17:23:47 |
| 15 | MS. ESKENAZI:  Objection.  It's been asked | 17:23:48 |
| 16 | and answered.  This is the last time I'm going to | 17:23:50 |
| 17 | allow you to ask that question.  I'm going to | 17:23:51 |
| 18 | instruct not to answer the next time. | 17:23:54 |
| 19 | You can ans- -- answer yet again. | 17:23:56 |
| 20 | MR. PETROCELLI:  I can only ask the | 17:23:57 |
| 21 | questions, Bonnie. | 17:23:58 |
| 22 | MS. ESKENAZI:  Over and over again. | 17:23:59 |
| 23 | THE WITNESS:  Mr. Petrocelli, you're asking | 17:24:01 |
| 24 | the same question again and again. | 17:24:02 |
| 25 | MR. GLICK:  Respectfully, he's not. | 17:24:04 |

Page 291

```
 1          MS. ESKENAZI:  He is.                      17:24:05

 2          MR. PETROCELLI:  Look, I --               17:24:05

 3          MR. GLICK:  And if you instruct, we're    17:24:06

 4  going to all be back here from England.           17:24:08

 5          MS. ESKENAZI:  I'm sure.                   17:24:10

 6          MR. PETROCELLI:  We're going to be back -- 17:24:10

 7          MR. GLICK:  You'd like to really --       17:24:10

 8          MR. PETROCELLI:  -- here anyway.          17:24:11

 9      Q.  But can -- can you please try to answer -- 17:24:12

10  I'm trying to get -- I'm trying to establish a    17:24:12

11  timing.  I just want a time frame when you -- when 17:24:14

12  you first learned that -- you said in connection  17:24:18

13  with the events that lead to this lawsuit, and I'm 17:24:21

14  trying to get a year.  Can you give me a year?    17:24:24

15      A.  It was sometime after 2010.               17:24:27

16      Q.  Okay.                                      17:24:28

17      A.  Or in 2010 or sometime after that.        17:24:31

18      Q.  Close enough.  Okay.                       17:24:32

19          And how did you learn that, by the way, in 17:24:40

20  2010?  Who -- who told you for the first time that 17:24:41

21  somebody could actually go on a computer and play a 17:24:46

22  game by downloading it without running off to buy  17:24:49

23  something in the store first?                     17:24:52

24      A.  My knowledge didn't come about in the way  17:24:53

25  you describe.  My knowledge came about from        17:24:56
```

Page 292

| | | |
|---|---|---|
| 1 | communications from the Saul Zaentz Company and | 17:25:00 |
| 2 | their lawyers indicating that they claimed this | 17:25:03 |
| 3 | sort of right, they claimed the right to be able to | 17:25:07 |
| 4 | license games. | 17:25:09 |
| 5 | Q.  Well, I'm not talking about the rights now. | 17:25:10 |
| 6 | I'm simply talking about the fact that this could be | 17:25:12 |
| 7 | done, that people could play -- | 17:25:15 |
| 8 | A.  Yes, I und- -- | 17:25:15 |
| 9 | Q.  -- games in this manner, okay? | 17:25:16 |
| 10 | A.  I understand the question, Mr. Petrocelli, | 17:25:20 |
| 11 | but I'm telling you the context -- | 17:25:22 |
| 12 | Q.  Okay. | 17:25:22 |
| 13 | A.  -- in which I learned it. | 17:25:23 |
| 14 | Q.  Let me -- let me follow up, then.  When you | 17:25:24 |
| 15 | learned -- | 17:25:26 |
| 16 | MS. ESKENAZI:  Mr. Petrocelli, can you | 17:25:26 |
| 17 | allow the witness to finish her answer. | 17:25:27 |
| 18 | BY MR. PETROCELLI: | 17:25:27 |
| 19 | Q.  Well, I'm not -- I'm not asking about the | 17:25:29 |
| 20 | context.  I asked who told you. | 17:25:30 |
| 21 | Can you identify the person who first | 17:25:32 |
| 22 | informed you? | 17:25:34 |
| 23 | MS. ESKENAZI:  Objection.  Assumes facts | 17:25:35 |
| 24 | not in evidence. | 17:25:37 |
| 25 | THE WITNESS:  The information -- | 17:25:38 |

Page 293

```
 1    BY MR. PETROCELLI:                              17:25:40

 2        Q.  Person.  Name.                          17:25:41

 3            MS. ESKENAZI:  Objection.  Assumes facts 17:25:44

 4    not in evidence.                                17:25:45

 5            THE WITNESS:  You know, I didn't get -- I 17:25:45

 6    didn't get more than -- more than two words of my 17:25:46

 7    answer --                                       17:25:48

 8    BY MR. PETROCELLI:                              17:25:48

 9        Q.  I know because you --                   17:25:48

10        A.  -- there before you -- but you didn't know 17:25:48

11    what I was going to say.                        17:25:50

12        Q.  Well, I've been doing this long enough to 17:25:52

13    have a good guess.                              17:25:53

14        A.  That's not -- that's not fair,          17:25:54

15    Mr. Petrocelli.                                 17:25:55

16        Q.  Let me -- let me --                     17:25:55

17        A.  You haven't been doing it that long with 17:25:56

18    me.                                             17:26:00

19        Q.  So let me -- let me just learn from you. 17:26:00

20    Can you tell me who -- who first told you?      17:26:02

21        A.  I could have if you'd let me answer your 17:26:03

22    question.                                       17:26:05

23        Q.  Don't give me --                        17:26:06

24        A.  But now --                              17:26:06

25        Q.  -- about the information you learned -- 17:26:06
```

Page 294

```
 1        A.   But now --                        17:26:08

 2        Q.   -- and the context --             17:26:08

 3        A.   Now --                            17:26:08

 4        Q.   Just give me the name.            17:26:09

 5        A.   Now we are going to have to have the   17:26:10

 6   question again, wasting more time.          17:26:13

 7        Q.   Who first told you that it was possible for   17:26:15

 8   people in today's day and age to go onto a computer   17:26:17

 9   and download a game and play it without first   17:26:22

10   buying it --                                17:26:24

11        A.   That information --               17:26:24

12        Q.   -- in the store?                  17:26:25

13        A.   -- emerged from communications made with me   17:26:26

14   by the Saul Zaentz Company and their lawyers.   17:26:31

15        Q.   Who at Saul Zaentz?               17:26:33

16        A.   My specific recollection is that it was Tom   17:26:34

17   Magnani of Arnold & Porter as lawyers for the Saul   17:26:40

18   Zaentz Company by means of his assertion that --   17:26:46

19   that -- Zaent- -- Zaentz owned all of these rights,   17:26:49

20   that I became aware that he was -- that this form of   17:26:51

21   technology was -- was either -- either existed or   17:26:55

22   was about to exist.                         17:27:00

23        Q.   Were you shocked when you learned that?   17:27:00

24   And again, not about -- not about the rights he was   17:27:04

25   claiming, but about the technological fact that this   17:27:07
```

Page 295

```
 1    could be done?                                    17:27:11

 2         A.   Well, the two things are different.     17:27:12

 3         Q.   Well, I'm asking what was your reaction to  17:27:14

 4    learning that folks could download games at home  17:27:16

 5    without going off to buy it in the store first?   17:27:21

 6              MS. ESKENAZI:  Objection.  Vague and    17:27:24

 7    ambiguous.                                         17:27:24

 8    BY MR. PETROCELLI:                                 17:27:24

 9         Q.   What was your reaction when you learned  17:27:26

10    that from -- from Tom?                             17:27:28

11         A.   My reaction was not to the --            17:27:28

12         Q.   So you had no reaction to that?          17:27:32

13              MS. ESKENAZI:  Objection.  Assumes facts.  17:27:34

14              THE WITNESS:  I didn't get to finish my  17:27:36

15    answer.  Please.                                   17:27:37

16    BY MR. PETROCELLI:                                 17:27:38

17         Q.   I don't want to hear the reaction about the  17:27:38

18    rights issue.  I want to hear -- I want to hear the  17:27:40

19    reaction about the computer use.                   17:27:41

20              MS. ESKENAZI:  Okay.  Mr. Petrocelli, you  17:27:44

21    get to ask the questions, and the witness gets to  17:27:45

22    answer the questions.  I would appreciate it if you  17:27:47

23    would --                                           17:27:49

24              MR. PETROCELLI:  But she's not answering my  17:27:49

25    question.                                          17:27:51
```

Page 296

```
 1              MS. ESKENAZI:  She is answering the        17:27:51

 2    questions but she's not answering the way you want,  17:27:52

 3    which is why you keep -- which is why you keep --     17:27:55

 4              MR. PETROCELLI:  Come on now, you know that 17:27:56

 5    in court she would not be permitted to answer the     17:27:57

 6    questions in this way and there would be a judge who  17:27:59

 7    would be sustaining all my motions to strike.  But    17:28:03

 8    let's go forward.                                     17:28:08

 9              MS. ESKENAZI:  And you know very well that  17:28:08

10    a judge would not allow you to keep trying to get --  17:28:10

11    ask the same questions over and over and over again.  17:28:12

12    Let the witness finish her answer.                    17:28:14

13    BY MR. PETROCELLI:                                    17:28:14

14         Q.  Please try to be responsive.                 17:28:17

15              MS. ESKENAZI:  She is being responsive.     17:28:18

16    You just don't like what she's saying and so you're   17:28:19

17    trying to -- trying to browbeat this witness into     17:28:22

18    not giving you her full, complete, honest testimony.  17:28:25

19    So let her finish her answer.                         17:28:27

20              THE WITNESS:  Mr. Petrocelli, at the        17:28:30

21    beginning of today I undertook to give accurate       17:28:32

22    testimony.  I have to do that by making               17:28:36

23    clarifications and if I can't answer your question    17:28:39

24    because it wouldn't be accurate to answer in your     17:28:43

25    way, I feel I have to give context.                   17:28:48
```

Page 297

```
 1    BY MR. PETROCELLI:                                    17:28:48

 2         Q.   I'll ask you another question, okay?        17:28:51

 3         A.   Are we going back to the other one or?      17:28:52

 4         Q.   No, I'll ask you a different one.           17:28:53

 5              Have you -- you -- you -- you've given this  17:28:55

 6    testimony that -- with respect to computer games,     17:29:13

 7    including online games, that for Zaentz to have the   17:29:19

 8    rights, the person first has to go into the store     17:29:24

 9    and buy the device on which the contents of the game  17:29:28

10    appear, correct?                                      17:29:32

11         A.   My analysis of --                           17:29:34

12              MS. ESKENAZI:  Objection.                   17:29:35

13    BY MR. PETROCELLI:                                    17:29:35

14         Q.   Is that correct?                            17:29:36

15              MS. ESKENAZI:  Objection.  Misstates the    17:29:36

16    testimony.                                            17:29:37

17              THE WITNESS:  What I have said is that       17:29:40

18    there has to be an article of tangible personal       17:29:41

19    property.                                             17:29:44

20    BY MR. PETROCELLI:                                    17:29:44

21         Q.   That wasn't my question to you.  Okay?      17:29:46

22    You're just repeating the words that are in the       17:29:48

23    contract.  Okay?                                      17:29:51

24         A.   They're very important words.               17:29:51

25         Q.   Well, we're going to talk about that but I  17:29:53
```

Page 298

```
 1    want to get there first and I get to do it my way.    17:29:56

 2    Okay?                                                 17:29:59

 3            So my question is, when your -- you've --     17:29:59

 4    you've testified that you understood that for Zaentz  17:30:07

 5    to have rights for computer games or online games,    17:30:12

 6    games delivered by various computer platforms,        17:30:17

 7    including via the Internet, that there had to -- a    17:30:22

 8    person had to be able to walk into a store or -- or   17:30:26

 9    even go on Amazon or something, but buy a physical    17:30:32

10    object that has the contents of the game on it,       17:30:37

11    correct?                                              17:30:37

12        A.  I have testified that computer games had to   17:30:41

13    be on physical media, purchased on physical media in  17:30:44

14    order to fall within the ground.                      17:30:50

15        Q.  So the game itself had to be on a -- on a     17:30:51

16    device independent of the computer on which you play  17:30:55

17    the device, correct?                                  17:30:58

18        A.  The game had to be on a medium, a physical    17:31:00

19    medium.                                               17:31:04

20        Q.  Okay.  Do you mean a medium that you buy in   17:31:04

21    a store or you order online and have delivered to     17:31:07

22    your house?                                           17:31:10

23            MS. ESKENAZI:  Objection.  Vague and          17:31:12

24    ambiguous.                                            17:31:15

25            THE WITNESS:  I mean a physical item that     17:31:15
```

Page 299

| | | |
|---|---|---|
| 1 | you had to purchase, the mode of purchasing a | 17:31:18 |
| 2 | physical item.  It could take place in a number of | 17:31:21 |
| 3 | forms. | 17:31:26 |
| 4 | BY MR. PETROCELLI: | 17:31:26 |
| 5 | Q.  What are the types of physical media that | 17:31:27 |
| 6 | you understood contained contents of games?  Discs? | 17:31:29 |
| 7 | A.  Discs. | 17:31:34 |
| 8 | Q.  What else? | 17:31:34 |
| 9 | A.  Cartridges. | 17:31:35 |
| 10 | Q.  Cartridges.  Anything else? | 17:31:36 |
| 11 | A.  I'm not aware of any other specifics. | 17:31:40 |
| 12 | Q.  Now, was there -- so if a -- so your | 17:31:41 |
| 13 | testimony has been that Zaentz did not have the | 17:31:49 |
| 14 | right to merchandise a game that could only be | 17:31:52 |
| 15 | purchased by getting onto the computer and | 17:31:56 |
| 16 | downloading it onto -- onto the hard drive of the | 17:31:58 |
| 17 | computer? | 17:32:01 |
| 18 | MS. ESKENAZI:  Objection.  Asked and | 17:32:02 |
| 19 | answered.  Vague and ambiguous. | 17:32:03 |
| 20 | BY MR. PETROCELLI: | 17:32:03 |
| 21 | Q.  Correct? | 17:32:05 |
| 22 | A.  If there wasn't an article of tangible | 17:32:06 |
| 23 | personal property, a physical medium being | 17:32:08 |
| 24 | purchased, that's correct. | 17:32:10 |
| 25 | Q.  In my example, is there -- is there a | 17:32:11 |

Page 300

| | | |
|---|---|---|
| 1 | tangible -- article of tangible property in my | 17:32:15 |
| 2 | example of just downloading a game onto your hard | 17:32:20 |
| 3 | drive? | 17:32:22 |
| 4 | MS. ESKENAZI:  Objection.  Vague and | 17:32:28 |
| 5 | ambiguous. | 17:32:28 |
| 6 | THE WITNESS:  I don't really understand the | 17:32:29 |
| 7 | question. | 17:32:30 |
| 8 | BY MR. PETROCELLI: | 17:32:30 |
| 9 | Q.  You said there had to be an article of | 17:32:31 |
| 10 | tangible personal property? | 17:32:33 |
| 11 | A.  Uh-huh. | 17:32:34 |
| 12 | Q.  And -- and you're saying that an article of | 17:32:35 |
| 13 | tangible personal property only exists when the game | 17:32:37 |
| 14 | is on a disc or a cartridge and it doesn't exist if | 17:32:40 |
| 15 | you merely access the game by downloading it from | 17:32:44 |
| 16 | the Internet, correct? | 17:32:47 |
| 17 | A.  It depends.  I mean, that's a hypothetical | 17:32:50 |
| 18 | question.  I don't know what kind of game you're | 17:32:52 |
| 19 | talking about. | 17:32:54 |
| 20 | Q.  Well, give me an exam- -- | 17:32:56 |
| 21 | A.  I don't know how it -- | 17:32:58 |
| 22 | Q.  Give me an example of a game that would | 17:32:58 |
| 23 | constitute an article of tangible personal property | 17:33:01 |
| 24 | that you could -- a consumer could obtain by | 17:33:04 |
| 25 | downloading it from the computer -- | 17:33:10 |

Page 301

```
 1            MS. ESKENAZI:  Objection.              17:33:10

 2   BY MR. PETROCELLI:                              17:33:10

 3       Q.  -- onto a computer?                     17:33:11

 4            MS. ESKENAZI:  Objection.  Vague and   17:33:13

 5   ambiguous.                                      17:33:14

 6            THE WITNESS:  I can -- I can only apply the  17:33:14

 7   principles in that agreement.  So if somebody from  17:33:15

 8   the Internet, from the ether, acquired a computer  17:33:20

 9   game without that computer game taking the form of  17:33:23

10   an article of tangible personal property, then it --  17:33:28

11   it falls outside the Zaentz grant.             17:33:32

12   BY MR. PETROCELLI:                              17:33:32

13       Q.  So -- so you don't rule out, then, if some  17:33:36

14   computer forensic expert came up to you and said,  17:33:39

15   "By the way, when folks download computers onto  17:33:42

16   their hard drive, the -- we do have articles of  17:33:45

17   tangible personal property that now exist in the  17:33:49

18   hard drive," you wouldn't dispute that, would you?  17:33:52

19            MS. ESKENAZI:  Objection.  It's vague and  17:33:56

20   ambiguous.  Calls for expert testimony.        17:33:57

21            THE WITNESS:  I think it -- I think it --  17:34:07

22   it assumes its own conclusion, your question.  17:34:09

23   BY MR. PETROCELLI:                              17:34:09

24       Q.  So would you or would you not dispute that?  17:34:12

25            MS. ESKENAZI:  Same objections.        17:34:15
```

                                            Page 302

| | | |
|---|---|---|
| 1 | THE WITNESS:  I would need to understand | 17:34:15 |
| 2 | the nature of the technology to which you're | 17:34:17 |
| 3 | hypothetically referring.  And then I would need to | 17:34:19 |
| 4 | apply that definition. | 17:34:22 |
| 5 | BY MR. PETROCELLI: | 17:34:22 |
| 6 | Q.  So, during all this time, from the | 17:34:24 |
| 7 | beginning of computer games to the time you filed | 17:34:27 |
| 8 | this lawsuit, what have you done precisely to | 17:34:30 |
| 9 | determine whether different types of video games | 17:34:35 |
| 10 | downloadable from the Internet constitute articles | 17:34:40 |
| 11 | of tangible personal property? | 17:34:44 |
| 12 | MS. ESKENAZI:  Objection.  Calls for | 17:34:47 |
| 13 | attorney-client privileged information.  Also vague | 17:34:49 |
| 14 | and ambiguous. | 17:34:49 |
| 15 | BY MR. PETROCELLI: | 17:34:49 |
| 16 | Q.  You may answer. | 17:34:54 |
| 17 | MS. ESKENAZI:  And -- | 17:34:55 |
| 18 | THE WITNESS:  I have only considered this | 17:34:57 |
| 19 | question in the context of the Saul Zaentz Company's | 17:34:59 |
| 20 | rights. | 17:35:03 |
| 21 | BY MR. PETROCELLI: | 17:35:03 |
| 22 | Q.  Well, in connection with the Saul Zaentz | 17:35:04 |
| 23 | agreement, what exactly have you done in order to | 17:35:06 |
| 24 | make judgments about whether particular games are or | 17:35:09 |
| 25 | are not embraced by the agreement as items of | 17:35:14 |

Page 303

```
 1    tangible personal property?                    17:35:18

 2        A.  If I've received information --        17:35:20

 3             MS. ESKENAZI:  One second.            17:35:21

 4             THE WITNESS:  Sorry.  Sorry.          17:35:22

 5             MS. ESKENAZI:  Objection.  Attorney-client  17:35:23

 6    privilege.                                     17:35:24

 7             To the extent you can answer that question  17:35:25

 8    without breaching the privilege, be my guest.  17:35:28

 9             THE WITNESS:  Could I have the question  17:35:31

10    again, please?                                 17:35:48

11                  (The reporter read the record    17:35:48

12             as follows:                           17:35:48

13                  "QUESTION:  Well, in             17:35:04

14             connection with the Saul Zaentz       17:35:05

15             agreement, what exactly have you      17:35:06

16             done in order to make judgments       17:35:07

17             about whether particular games are    17:35:11

18             or are not embraced by the            17:35:14

19             agreement as items of tangible        17:35:16

20             personal property?")                  17:35:19

21             THE WITNESS:  I have considered the   17:35:49

22    information about the Saul Zaentz games that I --  17:35:49

23    that I have received.                          17:35:53

24    BY MR. PETROCELLI:                             17:35:53

25        Q.  Well, how did you consider it?         17:35:55
```

                                                Page 304

```
 1        A.  That would --                            17:35:55

 2            MS. ESKENAZI:  Objection.  Objection.    17:35:58

 3   Attorney-client privilege.                        17:36:00

 4            To the extent you can answer that question 17:36:01

 5   without breaching the privilege, you can answer.  17:36:03

 6            THE WITNESS:  That would depend on the form 17:36:05

 7   the information took.  If it was in writing, I would 17:36:07

 8   read it.  If it was communicated orally, I would   17:36:11

 9   listen to it.                                      17:36:15

10   BY MR. PETROCELLI:                                 17:36:15

11       Q.  So let's -- let's -- let's go through that, 17:36:17

12   then.                                              17:36:18

13            If you -- if you learned about a game or a 17:36:18

14   license like the Sierra license, for example, you  17:36:23

15   would read the document that you're being shown,   17:36:26

16   that mentioned the game, and you would think about 17:36:30

17   it for a few minutes.                              17:36:35

18            Would you do anything else then to make a  17:36:36

19   determination of whether or not it was covered or  17:36:39

20   not covered?                                       17:36:42

21            MS. ESKENAZI:  Objection.  It's an        17:36:43

22   incomplete hypothetical.  It's compound.  And it's 17:36:44

23   vague and ambiguous.                               17:36:46

24            THE WITNESS:  I thought you were asking me 17:36:48

25   about assessing the games and the information --   17:36:49
```

                                                    Page 305

```
 1    BY MR. PETROCELLI:                                17:36:49

 2        Q.  I am.                                     17:36:53

 3        A.  -- I had about games.                     17:36:53

 4        Q.  Yeah.                                      17:36:54

 5        A.  Well, the docu- -- the agreement, for     17:36:54

 6    example, the one you cite with Sierra, isn't a    17:36:56

 7    description of games which were actually produced. 17:36:59

 8        Q.  Well --                                   17:37:01

 9        A.  It's a framework.                         17:37:02

10        Q.  So, at any point in time when you saw a   17:37:03

11    game mentioned in any of the Zaentz documents,    17:37:05

12    whether it be a accounting statement or some other 17:37:08

13    statement, at any point in time did you stop and say 17:37:11

14    to yourself, "Okay, this is a computer game.  I now 17:37:13

15    have to think about whether it's an item of tangible 17:37:17

16    personal property and I have to go through this   17:37:20

17    analysis"?  Is that something that you did from time 17:37:23

18    to time?                                          17:37:27

19            MS. ESKENAZI:  Objection.  It's vague and 17:37:28

20    ambiguous.  Compound.  Incomplete hypothetical.   17:37:29

21            THE WITNESS:  I did not consider that I had 17:37:33

22    to police the activity of the Saul Zaentz Company. 17:37:36

23    BY MR. PETROCELLI:                                17:37:36

24        Q.  So did you not understand my question?  I 17:37:39

25    wasn't asking you about policing it.  I was asking 17:37:41
```

Page 306

| | | |
|---|---|---|
| 1 | you whether in your role on behalf of the Estate, | 17:37:44 |
| 2 | when you learned about the existence in whatever | 17:37:48 |
| 3 | form you learned of a video game or a computer game | 17:37:51 |
| 4 | or an online game, whether you went through an | 17:37:54 |
| 5 | exercise whereby you thought about the game, looked | 17:37:57 |
| 6 | at the contract and made a judgment whether or not | 17:38:02 |
| 7 | it was permitted? | 17:38:05 |
| 8 |     A.   Are you asking me about the Saul Zaentz | 17:38:06 |
| 9 | games? | 17:38:08 |
| 10 |     Q.   Correct. | 17:38:09 |
| 11 |         MS. ESKENAZI:   Objection.  It's vague and | 17:38:10 |
| 12 | ambiguous.  It's compound.  And it's an incomplete | 17:38:11 |
| 13 | hypothetical. | 17:38:16 |
| 14 |         THE WITNESS:   If I had information about | 17:38:16 |
| 15 | the games, I would consider it in the light of the | 17:38:18 |
| 16 | rights that the Saul Zaentz Company had. | 17:38:21 |
| 17 | BY MR. PETROCELLI: | 17:38:21 |
| 18 |     Q.   I didn't ask you if.  I asked you, did you? | 17:38:24 |
| 19 |     A.   I don't recall the details. | 17:38:26 |
| 20 |     Q.   Did you ever -- at any point in time, can | 17:38:27 |
| 21 | you ever remember going through this exercise, prior | 17:38:31 |
| 22 | to the events of September 2010, in which you made a | 17:38:34 |
| 23 | deliberate, conscious effort to consider whether a | 17:38:40 |
| 24 | particular game or usage made by Zaentz of a | 17:38:43 |
| 25 | computer game was covered or not covered by the | 17:38:49 |

Page 307

| | | |
|---|---|---|
| 1 | agreement? | 17:38:54 |
| 2 | And I'm not talking about the text base | 17:38:54 |
| 3 | versus graphics, I'm talking about the issue of | 17:38:56 |
| 4 | whether or not there was a physical component to it? | 17:38:59 |
| 5 | MS. ESKENAZI:  Objection.  Calls for | 17:39:03 |
| 6 | attorney-client privileged information. | 17:39:04 |
| 7 | If you can answer that question without | 17:39:06 |
| 8 | divulging attorney-client privileged information, | 17:39:07 |
| 9 | you're permitted to answer.  But you should carve | 17:39:11 |
| 10 | out any attorney-client privileged information from | 17:39:13 |
| 11 | your answer. | 17:39:16 |
| 12 | THE WITNESS:  I'm going to answer your | 17:39:18 |
| 13 | question with an example referring back to documents | 17:39:19 |
| 14 | shown to me already today. | 17:39:22 |
| 15 | Mr. Ulin showed me some correspondence, | 17:39:24 |
| 16 | part of which was a review of one of the -- the Saul | 17:39:31 |
| 17 | Zaentz games or the Saul Zaentz licensed games. | 17:39:35 |
| 18 | When I looked at that, I observed what was said | 17:39:40 |
| 19 | about the game and insofar as it told me about how | 17:39:42 |
| 20 | it was purchased or what its -- what its form was, I | 17:39:45 |
| 21 | took that into account. | 17:39:51 |
| 22 | BY MR. PETROCELLI: | 17:39:52 |
| 23 | Q.  And -- and what did you decide? | 17:39:52 |
| 24 | A.  In relation to that particular -- | 17:39:55 |
| 25 | Q.  To whether there was a physical component | 17:39:57 |

Page 308

```
 1    or not to the game and, therefore, whether it was      17:39:59

 2    authorized?                                            17:40:02

 3        A.  In relation to that particular article, it    17:40:04

 4    referred to personal computers.  It had -- it had     17:40:07

 5    information in it which indicated a purchase of a      17:40:13

 6    physical object.                                       17:40:15

 7        Q.  So did you ever feel -- felt like you -- so   17:40:16

 8    from the -- the very first time you had been working  17:40:21

 9    with respect to computer games, especially games      17:40:23

10    that are -- have -- can be delivered online or         17:40:27

11    played online, you've always been conscious of the    17:40:31

12    requirement that there be some physical component to  17:40:38

13    it; is that correct?                                   17:40:41

14        A.  I didn't agree with the first part of         17:40:44

15    your -- your question in --                            17:40:47

16        Q.  From -- from the inception of your work       17:40:50

17    on -- on the Zaentz agreements for the Tolkiens,      17:40:52

18    you've always been conscious of the requirement, at   17:40:57

19    least under your view of the -- of the merchandise    17:41:03

20    agreement, that there be a physical component         17:41:04

21    purchased for there to be a rights under the          17:41:07

22    agreement, correct?                                    17:41:15

23            MS. ESKENAZI:  Objection.  Vague and          17:41:16

24    ambiguous.                                             17:41:17

25            THE WITNESS:  My --                            17:41:18
```

Page 309

```
 1   BY MR. PETROCELLI:                              17:41:18

 2       Q.  For Zaentz to have rights for that item?  17:41:19

 3       A.  My understanding has always been that there  17:41:21

 4   had to be the purchase of a game on physical    17:41:23

 5   media --                                        17:41:25

 6       Q.  Okay.                                   17:41:26

 7       A.  -- in order for it to fall within the   17:41:27

 8   rights --                                       17:41:28

 9       Q.  And -- and every single time --         17:41:28

10       A.  Could I just finish the sentence?       17:41:30

11       Q.  Okay.  Please finish your answer.       17:41:32

12       A.  In order for it to be encompassed by the  17:41:34

13   rights of the Saul Zaentz Company.              17:41:36

14       Q.  And every single time that you came across  17:41:37

15   a video game or a computer game, you were aware of  17:41:41

16   that requirement, correct?                      17:41:45

17       A.  Every time I came across a Saul Zaentz  17:41:48

18   game?                                           17:41:50

19       Q.  Yes.  Any time you saw a reference to a  17:41:51

20   license agreement, to a -- to a -- to a computer  17:41:52

21   game in an accounting statement or to a schedule,  17:41:56

22   you were always aware that every single such    17:41:59

23   computer game had to have a physical component  17:42:01

24   that's purchased in -- in a store, correct?     17:42:04

25       A.  Not a physical component.  It had to take  17:42:09
```

Page 310

```
 1    the form -- it had to be a physical object.        17:42:11

 2         Q.  Meaning a disc or a cartridge?             17:42:15

 3         A.  Or some other physical --                  17:42:17

 4         Q.  Well, are you aware of any other           17:42:19

 5    physical --                                         17:42:20

 6         A.  No, but then to the extent that there might 17:42:20

 7    have been some, that was relevant to know.          17:42:23

 8         Q.  Like what?                                 17:42:24

 9         A.  I can't give an example.                   17:42:25

10         Q.  Okay.  Well, at -- at -- do you ever       17:42:26

11    remember writing back to Zaentz, at any point in    17:42:30

12    time, at any time in the 20 years or so you've been 17:42:34

13    dealing with this, asking "Is there a physical      17:42:38

14    component that's purchased with respect to this     17:42:41

15    computer game?  I need to know that in order to tell 17:42:45

16    you whether or not this is authorized."             17:42:48

17              MS. ESKENAZI:  Objection.                 17:42:50

18    BY MR. PETROCELLI:                                  17:42:50

19         Q.  Do you -- do you ever recall asking that   17:42:52

20    question in writing?                                17:42:54

21              MS. ESKENAZI:  Objection.                 17:42:56

22              THE WITNESS:  No, because I had no need to 17:42:56

23    do so.                                              17:42:57

24              MS. ESKENAZI:  Objection.                 17:42:58

25    BY MR. PETROCELLI:                                  17:42:58
```

Page 311

| | | |
|---|---|---|
| 1 | Q.  I didn't ask you if you had no need to do | 17:42:59 |
| 2 | that, but now that you volunteered the self-serving | 17:43:01 |
| 3 | response, I'll follow up on it, okay? | 17:43:04 |
| 4 | MS. ESKENAZI:  I'm going to interpose a | 17:43:06 |
| 5 | late objection.  When I was -- | 17:43:08 |
| 6 | BY MR. PETROCELLI: | 17:43:08 |
| 7 | Q.  You had no -- | 17:43:08 |
| 8 | MS. ESKENAZI:  Can we do this one at a | 17:43:09 |
| 9 | time, please?  One at a time.  You get to ask the | 17:43:10 |
| 10 | question -- | 17:43:13 |
| 11 | MR. PETROCELLI:  Go for it. | 17:43:13 |
| 12 | MS. ESKENAZI:  -- I get to pose the | 17:43:14 |
| 13 | objections and you get to answer the questions. | 17:43:15 |
| 14 | MR. PETROCELLI:  And she gets to object, | 17:43:17 |
| 15 | too, apparently. | 17:43:18 |
| 16 | MS. ESKENAZI:  Yeah, well, apparently -- | 17:43:18 |
| 17 | MR. PETROCELLI:  She's good at it, too. | 17:43:19 |
| 18 | But go for it.  Go ahead. | 17:43:21 |
| 19 | MS. ESKENAZI:  Let me interpose an | 17:43:23 |
| 20 | objection which is vague and ambiguous.  It's been | 17:43:25 |
| 21 | asked and answered. | 17:43:26 |
| 22 | BY MR. PETROCELLI: | 17:43:26 |
| 23 | Q.  What about with respect to games made by | 17:43:35 |
| 24 | or -- or licensed by Warner Bros. games or any of | 17:43:38 |
| 25 | the Warner Bros. entities, including New Line, did | 17:43:42 |

Page 312

| | | |
|---|---|---|
| 1 | you ever -- did you ever communicate to Warner | 17:43:46 |
| 2 | Bros. or New Line that any computer games needed to | 17:43:50 |
| 3 | in- -- include a physical component on which the | 17:44:00 |
| 4 | contents of the game actually appeared, like a disc | 17:44:04 |
| 5 | or a cartridge?  Did you ever communicate that to | 17:44:07 |
| 6 | them in writing? | 17:44:09 |
| 7 | A.  I don't believe so. | 17:44:11 |
| 8 | Q.  Okay.  Did you ever have a -- a direct | 17:44:12 |
| 9 | conversation with anybody, either at Zae- -- Zaentz, | 17:44:18 |
| 10 | New Line or Warner Bros., prior to September 2010, | 17:44:22 |
| 11 | that any and all computer games needed to have a | 17:44:27 |
| 12 | disc or a cartridge or some other physical | 17:44:33 |
| 13 | component? | 17:44:35 |
| 14 | A.  I -- | 17:44:40 |
| 15 | MS. ESKENAZI:  Objection. | 17:44:42 |
| 16 | THE WITNESS:  Sorry. | 17:44:42 |
| 17 | MS. ESKENAZI:  It's vague and ambiguous. | 17:44:42 |
| 18 | MR. PETROCELLI:  That's all? | 17:44:44 |
| 19 | MS. ESKENAZI:  Yes. | 17:44:45 |
| 20 | MR. PETROCELLI:  Okay. | 17:44:45 |
| 21 | THE WITNESS:  I do recall a conversation | 17:44:48 |
| 22 | with a person at Warner Bros. which touched on this | 17:44:50 |
| 23 | area.  It -- it didn't consist of what you're | 17:44:56 |
| 24 | inviting me to state. | 17:45:01 |
| 25 | BY MR. PETROCELLI: | 17:45:01 |

Page 313

```
 1        Q.  Who was the person?                    17:45:04

 2        A.  I believe it was a telephone call with 17:45:06

 3   Kevin.                                          17:45:09

 4        Q.  Tsujihara?                             17:45:12

 5        A.  Yes.                                   17:45:13

 6        Q.  Okay.  And when did that occur?        17:45:14

 7        A.  I think it was earlier in 2010.        17:45:16

 8        Q.  Okay.  And the -- did you make a note of 17:45:20

 9   the call?  Do you have a memo about it?         17:45:23

10        A.  I don't recall.                        17:45:26

11        Q.  Okay.  Have you ever seen any document  17:45:29

12   referring to that call or mentioning that call? 17:45:30

13        A.  I don't recall.                        17:45:32

14        Q.  Did you review any documents like that in 17:45:37

15   preparation for your deposition, a document that 17:45:39

16   memorialized the call or referred to the call with 17:45:42

17   Kevin?                                          17:45:44

18        A.  No.                                    17:45:44

19        Q.  Okay.  And what did you say on -- on the 17:45:46

20   subject and what did he say?                    17:45:49

21        MS. ESKENAZI:  Objection.  Vague and       17:45:54

22   ambiguous.                                      17:45:55

23        THE WITNESS:  I have to explain why that   17:45:55

24   call took place in order to answer your question. 17:46:00

25   BY MR. PETROCELLI:                              17:46:00
```

Page 314

```
 1        Q.  How long will it take?  Do it quickly,        17:46:04
 2    please.                                               17:46:04
 3        A.  At the beginning of 2010, I can't be          17:46:11
 4    precise as to the date, I met with John Rogovin,      17:46:14
 5    general counsel of Warner Bros.  This was following   17:46:19
 6    the conclusion of the film participation litigation.  17:46:22
 7            Mr. Rogovin wanted to explore with me how     17:46:27
 8    we could get our relationship on a better footing,    17:46:32
 9    because obviously we had up until that point been     17:46:36
10    litigants.                                            17:46:39
11            I indicated to him that the framework of      17:46:40
12    agreements in this area, namely involving the Saul    17:46:44
13    Zaentz Company and downstream of the Saul Zaentz      17:46:52
14    Company, Warner Bros., was extremely complicated.     17:46:55
15    And it was agreed that he would set up calls with a   17:47:01
16    couple of colleagues who were more closely involved   17:47:03
17    with these matters so that I could explain that to    17:47:07
18    them.                                                 17:47:10
19        Q.  Okay.  Then what -- what did you and what     17:47:12
20    did Kevin say on the subject that I asked you about,  17:47:15
21    which was whether there had to be a physical          17:47:19
22    component to a video game in order for it to be       17:47:22
23    covered by the merchandising agreement?               17:47:25
24        A.  We did not deal with the specifics of the     17:47:26
25    subject.  Mr. Tsujihara --                            17:47:29
```

Page 315

```
 1        Q.  "Tsujihara."                               17:47:35

 2        A.  -- Tsujihara was involved at that time in   17:47:37

 3   the area of computer games, electronic products      17:47:39

 4   within Warner Bros., and I alerted him to the very    17:47:45

 5   complicated agreements that governed that area.       17:47:49

 6        Q.  So there was no direct conversation on this  17:47:52

 7   subject, is that what you're telling me?              17:47:55

 8           MS. ESKENAZI:  Objection.  Misstates the     17:47:58

 9   testimony.                                            17:47:59

10           THE WITNESS:  Well, we had a conversation.   17:47:59

11   BY MR. PETROCELLI:                                    17:47:59

12        Q.  Well, what -- can you just tell me what was  17:48:01

13   said by you and him on the subject of whether or not  17:48:05

14   a physical device was required, disc, a cartridge,    17:48:07

15   anything like that in order for Warner Bros. or New   17:48:11

16   Line or Zaentz to have rights?                        17:48:15

17        A.  I did not go into the detail.  I simply      17:48:18

18   alerted him to the fact that the agreements in this   17:48:22

19   area were very complicated, that they dated back to   17:48:26

20   1969, that they did not cover modern technologies     17:48:32

21   and that one had, therefore, to be aware of that      17:48:35

22   fact.                                                 17:48:39

23        Q.  Anything beyond that that you can recall?    17:48:39

24        A.  No.                                          17:48:41

25        Q.  And what did he say, if you can recall?      17:48:42
```

Page 316

| | | |
|---|---|---|
| 1 | A.  I think he was very gracious on the | 17:48:44 |
| 2 | telephone.  He listened to what I said. | 17:48:46 |
| 3 | Q.  Okay.  When is the very first time that you | 17:48:51 |
| 4 | can ever remember forming the -- the -- the view or | 17:48:53 |
| 5 | having the conclusion that with respect to any video | 17:48:58 |
| 6 | game or computer game, that there had to be -- you | 17:49:03 |
| 7 | had to actually have a disc or a cartridge or other | 17:49:08 |
| 8 | physical medium in order for Warner Bros. or Zaentz | 17:49:12 |
| 9 | to have rights under the agreements?  When is the | 17:49:20 |
| 10 | very first time you formed that view? | 17:49:24 |
| 11 | A.  When I became involved in the review of | 17:49:25 |
| 12 | computer games licensing in the '90s. | 17:49:27 |
| 13 | Q.  In the early '90s? | 17:49:29 |
| 14 | A.  Yeah. | 17:49:30 |
| 15 | Q.  Okay.  So from 1992 to 2010, that's almost | 17:49:31 |
| 16 | 20 years, you can't recall a single instance when | 17:49:36 |
| 17 | you either wrote or said to Warner Bros., New Line, | 17:49:41 |
| 18 | or Zaentz, that a physical disc or cartridge or | 17:49:47 |
| 19 | other physical device containing the contents of the | 17:49:54 |
| 20 | game must exist in order for there to be coverage | 17:49:57 |
| 21 | under the agreements, correct? | 17:50:02 |
| 22 | A.  I -- | 17:50:05 |
| 23 | MS. ESKENAZI:  Objection.  Vague and | 17:50:06 |
| 24 | ambiguous.  Compound. | 17:50:06 |
| 25 | THE WITNESS:  I had no reason to remind | 17:50:08 |

Page 317

```
 1    Mr. Bendich of the scope of the Saul Zaentz rights.      17:50:10

 2    BY MR. PETROCELLI:                                        17:50:10

 3         Q.  Well, you know -- you know that's not what       17:50:15

 4    I asked you, right?                                       17:50:16

 5         A.  That's my answer.                                17:50:17

 6         Q.  But you -- you don't have the right to           17:50:19

 7    answer the way you want.  You have to answer the          17:50:20

 8    question.                                                 17:50:22

 9         So please read the question back.  I move            17:50:23

10    to strike that answer as nonresponsive.                   17:50:25

11         MS. ESKENAZI:  She answered the question.            17:50:26

12    BY MR. PETROCELLI:                                        17:50:26

13         Q.  You are -- you are explaining -- you are         17:50:29

14    explaining why you said -- or are trying to explain       17:50:31

15    why you said or did nothing, and I'm eliciting that       17:50:36

16    you said or did nothing.                                  17:50:39

17         Do you understand the difference?                    17:50:40

18         MS. ESKENAZI:  Objection.  You're badgering          17:50:41

19    the witness.                                              17:50:44

20    BY MR. PETROCELLI:                                        17:50:44

21         Q.  Please answer my question.                       17:50:45

22         Read it back, please.                                17:50:46

23              (The reporter read the record                   17:51:07

24         as follows:                                          17:51:07

25              "QUESTION:  So from 1992 to                     17:49:31
```

                                                          Page 318

```
 1              2010, that's almost 20 years, you        17:49:33

 2              can't recall a single instance           17:49:38

 3              when you either wrote or said to         17:49:41

 4              Warner Bros., New Line, or Zaentz,       17:49:45

 5              that a physical disc or cartridge        17:49:49

 6              or other physical device                 17:49:54

 7              containing the contents of the           17:49:56

 8              game must exist in order for there       17:49:57

 9              to be coverage under the                 17:50:01

10              agreements, correct?")                   17:50:03

11         THE WITNESS:  I did not do so because there   17:51:07

12     was no need to do so.                             17:51:09

13     BY MR. PETROCELLI:                                17:51:09

14        Q.  Well, I move to strike the second part of  17:51:10

15     your answer starting with the word "because."     17:51:16

16              Did anybody assist you in forming the view 17:51:20

17     back in the early '90s when you created this      17:51:34

18     viewpoint that a physical disc or cartridge or other 17:51:38

19     similar device was required to contain the contents 17:51:44

20     of the game in order for it to be covered under the 17:51:48

21     agreements or did -- did you reach that on your own? 17:51:52

22              MS. ESKENAZI:  Objection.  Attorney-client 17:51:56

23     privilege.                                        17:51:59

24              To the extent that you consulted with    17:51:59

25     others in the formation of your opinion, and that 17:52:04
```

                                                    Page 319

| | | |
|---|---|---|
| 1 | was with your clients or other attorneys, that needs | 17:52:07 |
| 2 | to be excluded from your answer. | 17:52:12 |
| 3 | BY MR. PETROCELLI: | 17:52:12 |
| 4 | Q.  Well, it's -- does not need to be excluded | 17:52:16 |
| 5 | from your answer.  But we'll deal with that. | 17:52:19 |
| 6 | A.  Please, could I have the question again. | 17:52:22 |
| 7 | Q.  The question called for a "yes" or "no" | 17:52:25 |
| 8 | answer. | 17:52:28 |
| 9 | Can you please repeat it. | 17:52:28 |
| 10 | (The reporter read the record | 17:52:47 |
| 11 | as follows: | 17:52:47 |
| 12 | "QUESTION:  Did anybody | 17:51:27 |
| 13 | assist you in forming the view | 17:51:28 |
| 14 | back in the early '90s, when you | 17:51:34 |
| 15 | created this viewpoint that a | 17:51:37 |
| 16 | physical disc or cartridge or | 17:51:41 |
| 17 | other similar device was required | 17:51:44 |
| 18 | to contain the contents of the | 17:51:46 |
| 19 | game in order for it to be covered | 17:51:48 |
| 20 | under the agreements or did you | 17:51:52 |
| 21 | reach that on your own?") | 17:51:53 |
| 22 | MS. ESKENAZI:  Same objection. | 17:52:48 |
| 23 | THE WITNESS:  That calls for privileged | 17:52:49 |
| 24 | information. | 17:52:52 |
| 25 | BY MR. PETROCELLI: | 17:52:52 |

Page 320

```
 1        Q.  Did anybody assist you in forming the view      17:52:54

 2   that you have expressed, that a physical disc,           17:52:57

 3   cartridge or other similar device was necessary in       17:53:03

 4   order for the game to be covered under the               17:53:08

 5   agreement?                                               17:53:11

 6        MS. ESKENAZI:  Same -- same objection.              17:53:12

 7   BY MR. PETROCELLI:                                       17:53:12

 8        Q.  It does not call for privileged                 17:53:14

 9   information.  It calls for a fact.  And then I'm --       17:53:16

10   the next question is going to be, who assisted you,      17:53:17

11   and then we'll take it from there.  But this is the      17:53:20

12   foundational question.  So please answer it.             17:53:23

13        MS. ESKENAZI:  If -- if the question is did         17:53:27

14   anybody assist you and if there's a stipulation that     17:53:29

15   it will not waive any --                                 17:53:33

16        MR. PETROCELLI:  You have it.                       17:53:35

17        MS. ESKENAZI:  -- attorney-client                   17:53:37

18   privilege, I'll let her answer that one question.        17:53:38

19   It's a "yes" or "no" question.                           17:53:41

20        THE WITNESS:  Yes.                                  17:53:42

21   BY MR. PETROCELLI:                                       17:53:42

22        Q.  Who -- who assisted you?                        17:53:43

23        A.  Mr. Williamson.                                 17:53:44

24        Q.  Okay.  Was it in a one-on-one conversation?     17:53:46

25        A.  Most of my communications with                  17:53:52
```

                                        Page 321

| | | |
|---|---|---|
| 1 | Mr. Williamson would have been face-to-face | 17:54:00 |
| 2 | communications. | 17:54:03 |
| 3 |    Q.  Is this a conversation that you had with | 17:54:04 |
| 4 | Mr. Williamson specifically on this subject of | 17:54:07 |
| 5 | whether a physical cartridge or disc or other device | 17:54:12 |
| 6 | was required in order for Zaentz, Warner Bros. or | 17:54:18 |
| 7 | New Line to have rights? | 17:54:21 |
| 8 |     MS. ESKENAZI:  Well, again, I'm going to | 17:54:24 |
| 9 | let the witness answer "yes" or "no" to the extent I | 17:54:26 |
| 10 | have a stipulation that -- | 17:54:28 |
| 11 |     MR. PETROCELLI:  You do. | 17:54:29 |
| 12 |     MS. ESKENAZI:  -- it does not waive the | 17:54:30 |
| 13 | attorney-client privilege, but I think you're | 17:54:32 |
| 14 | skirting very close to attorney-client | 17:54:33 |
| 15 | communications. | 17:54:36 |
| 16 |     MR. PETROCELLI:  I'm nowhere near -- I'm | 17:54:36 |
| 17 | nowhere near invading the privilege. | 17:54:38 |
| 18 |     MS. ESKENAZI:  I think you know you are. | 17:54:39 |
| 19 |     MR. PETROCELLI:  I don't even think this | 17:54:41 |
| 20 | witness has a right to assert the privilege, but | 17:54:42 |
| 21 | that's another subject.  We'll -- we'll -- she can't | 17:54:44 |
| 22 | have it both ways.  She's going to be precluded from | 17:54:46 |
| 23 | testifying or she's going to have to testify fully. | 17:54:49 |
| 24 |     Let's answer this question. | 17:54:52 |
| 25 |     THE WITNESS:  Well, I'm really sorry but | 17:54:53 |

Page 322

| | | |
|---|---|---|
| 1 | the question was a long time ago.  I have to have it | 17:54:55 |
| 2 | again. | 17:54:56 |
| 3 | MR. PETROCELLI:  I don't blame you.  Yes. | 17:54:56 |
| 4 | Can you please repeat the question. | 17:54:56 |
| 5 | (The reporter read the record | 17:54:56 |
| 6 | as follows: | 17:54:56 |
| 7 | "QUESTION:  Is this a | 17:54:05 |
| 8 | conversation that you had with Mr. | 17:54:06 |
| 9 | Williamson specifically on this | 17:54:09 |
| 10 | subject of whether a physical | 17:54:12 |
| 11 | cartridge or disc or other device | 17:54:16 |
| 12 | was required in order for Zaentz, | 17:54:18 |
| 13 | Warner Bros. or New Line to have | 17:54:20 |
| 14 | rights?") | 17:54:22 |
| 15 | THE WITNESS:  Well, at the time of | 17:55:12 |
| 16 | conversing with Mr. Williamson, New Line wasn't on | 17:55:15 |
| 17 | the scene. | 17:55:15 |
| 18 | BY MR. PETROCELLI: | 17:55:21 |
| 19 | Q.  Fair enough. | 17:55:21 |
| 20 | A.  And the question -- this question would | 17:55:21 |
| 21 | have been an element of our discussion. | 17:55:23 |
| 22 | Q.  Okay.  Did you memorialize that discussion? | 17:55:25 |
| 23 | MS. ESKENAZI:  That's a "yes" or "no" | 17:55:31 |
| 24 | answer. | 17:55:32 |
| 25 | THE WITNESS:  You mean did I create a | 17:55:32 |

Page 323

```
 1    document, is that what you mean by "memorialize"?     17:55:34

 2    BY MR. PETROCELLI:                                    17:55:35

 3         Q.  Yes.                                         17:55:35

 4         A.  I don't -- I don't think so.                 17:55:36

 5         Q.  Have you ever seen any reference to that     17:55:39

 6    conversation in a document?                           17:55:40

 7              MS. ESKENAZI:  Objection.  Same objection.  17:55:42

 8              You can answer "yes" or "no."               17:55:47

 9              THE WITNESS:  No.                           17:55:47

10    BY MR. PETROCELLI:                                    17:55:47

11         Q.  What year did the conversation occur?        17:55:48

12         A.  Well, I mean, this discussion when I became  17:55:49

13    involved in the Tolkien work, I mean, it wasn't       17:55:54

14    just -- it was a lengthy period of time over which    17:55:59

15    this matter of who was going to be licensing          17:56:02

16    computer games was -- was live.                       17:56:05

17         Q.  What year is this, '92?                      17:56:11

18         A.  Well, I think the matter was broached by     17:56:14

19    Mr. Bendich at the meeting in --                      17:56:16

20         Q.  Berkeley?                                    17:56:19

21         A.  -- 1993.                                     17:56:19

22         Q.  The Berkeley meeting in 19- -- the one you   17:56:20

23    testified earlier?                                    17:56:23

24         A.  That's my recollection.                      17:56:24

25         Q.  Okay.  And so that's -- that's 20 years      17:56:25
```

Page 324

| | | |
|---|---|---|
| 1 | ago? | 17:56:30 |
| 2 | A.  Yes. | 17:56:32 |
| 3 | Q.  And you recall what Mr. Williamson told you | 17:56:34 |
| 4 | 20 years ago, even though you've never once | 17:56:37 |
| 5 | documented it? | 17:56:40 |
| 6 | MS. ESKENAZI:  Objection.  Vague and | 17:56:41 |
| 7 | ambiguous.  Argumentative. | 17:56:44 |
| 8 | BY MR. PETROCELLI: | 17:56:44 |
| 9 | Q.  And yet you can't recall a single document | 17:56:45 |
| 10 | that you reviewed over the weekend? | 17:56:48 |
| 11 | MS. ESKENAZI:  Objection.  Argumentative. | 17:56:52 |
| 12 | That's not really a question. | 17:56:53 |
| 13 | MR. PETROCELLI:  It's not. | 17:56:54 |
| 14 | MS. ESKENAZI:  Why don't you ask a | 17:56:55 |
| 15 | question. | 17:56:57 |
| 16 | THE WITNESS:  What I'm trying to -- | 17:56:57 |
| 17 | BY MR. PETROCELLI: | 17:56:59 |
| 18 | Q.  I'll -- I'll put a -- | 17:56:59 |
| 19 | MS. ESKENAZI:  There's no question pending. | 17:57:00 |
| 20 | BY MR. PETROCELLI: | 17:57:00 |
| 21 | Q.  I'll put a question to you. | 17:57:02 |
| 22 | Did Mr. Williamson tell you how he knew | 17:57:03 |
| 23 | that a physical disc or cartridge was required in | 17:57:12 |
| 24 | order for there to be rights? | 17:57:18 |
| 25 | MS. ESKENAZI:  Objection.  Attorney-client | 17:57:19 |

Page 325

```
 1    privileged.  Instructing the witness not to answer.   17:57:20

 2    BY MR. PETROCELLI:                                     17:57:20

 3         Q.  Other than your conversation with            17:57:24

 4    Mr. Williams, your -- your -- he was your law          17:57:24

 5    partner, right?  Were you -- were you a partner at     17:57:27

 6    the time or a --                                       17:57:32

 7         A.  I was a partner in 1993.                      17:57:33

 8         Q.  Okay.  So this is right around the time       17:57:36

 9    that you were making partner at your law firm?         17:57:38

10         A.  I was already a partner.                      17:57:39

11         Q.  Okay.  So other than the conversation with   17:57:41

12    your law partner in 1993, did anybody else assist      17:57:45

13    you in forming this view that you've held for 20       17:57:53

14    years, that a physical disc or cartridge was           17:57:57

15    required?                                              17:58:02

16         A.  I don't believe so.                           17:58:03

17         Q.  Okay.  Now, you -- you have said repeatedly  17:58:03

18    throughout the day, over all of my numerous motions    17:58:20

19    to strike, that there was no reason to tell Zaentz     17:58:23

20    or tell Warner Bros. or tell New Line or whoever       17:58:30

21    about this topic.                                      17:58:34

22         Do you recall saying that a number of            17:58:36

23    times?                                                 17:58:38

24         A.  Yes.                                          17:58:39

25         Q.  Okay.  How do you know there was no reason?  17:58:39
```

Page 326

| | | |
|---|---|---|
| 1 | A.  Because -- | 17:58:47 |
| 2 | MS. ESKENAZI:  Objection.  Vague and | 17:58:47 |
| 3 | ambiguous. | 17:58:47 |
| 4 | BY MR. PETROCELLI: | 17:58:47 |
| 5 | Q.  If you never discussed it with them, which | 17:58:49 |
| 6 | you testified you never did, you never discussed | 17:58:51 |
| 7 | this topic with Zaentz, you never discussed this | 17:58:53 |
| 8 | topic with New Line, you never discussed this topic | 17:58:55 |
| 9 | with Warner Bros., how did you know there was no | 17:58:57 |
| 10 | reason to discuss it with them? | 17:59:00 |
| 11 | MS. ESKENAZI:  Objection.  Misstates the | 17:59:02 |
| 12 | testimony. | 17:59:03 |
| 13 | THE WITNESS:  It's not correct that I | 17:59:05 |
| 14 | didn't cover this ground with Al Bendich of the Saul | 17:59:06 |
| 15 | Zaentz Company. | 17:59:10 |
| 16 | BY MR. PETROCELLI: | 17:59:10 |
| 17 | Q.  I previously asked you these questions and | 17:59:12 |
| 18 | the only person that you identified was Kevin | 17:59:17 |
| 19 | Tsujihara, and even then you indicated that the | 17:59:19 |
| 20 | conversation did not get into this level of detail. | 17:59:22 |
| 21 | Is it -- is it your testimony now that you | 17:59:25 |
| 22 | had a specific conversation with Mr. Bendich that a | 17:59:27 |
| 23 | physical disc or cartridge was required in order for | 17:59:32 |
| 24 | him to have rights, and that if it was only | 17:59:38 |
| 25 | downloadable, then he didn't have rights? | 17:59:42 |

Page 327

```
 1              MS. ESKENAZI:  Objection.  It's          17:59:47

 2      argumentative.  It's vague and ambiguous.        17:59:47

 3      BY MR. PETROCELLI:                               17:59:49

 4          Q.  Did you have that conversation with him, 17:59:49

 5      yes or no?                                       17:59:51

 6              MS. ESKENAZI:  And it mis- -- and it      17:59:51

 7      misstates the prior testimony.                   17:59:52

 8              THE WITNESS:  In and around 1993 and      17:59:54

 9      thereafter, we discussed the ambit of Zaentz's   17:59:58

10      rights.  We did not look forward to the position in 18:00:02

11      2013.  We dealt with -- we looked at the agreements 18:00:09

12      then, we analyzed them, and that -- and this -- this 18:00:14

13      is -- this is what we've been talking about in my 18:00:20

14      evidence this morning.                           18:00:23

15      BY MR. PETROCELLI:                               18:00:23

16          Q.  I have no idea what you just said, but let 18:00:25

17      me just follow up.                               18:00:28

18              I'm asking a very simple question.  Did you 18:00:28

19      specifically discuss with -- with anybody at Saul 18:00:34

20      Zaentz Company, anybody at Warner Bros., anybody at 18:00:40

21      New Line, that the computer games, the video games, 18:00:42

22      the online games, whatever, required a disc or   18:00:52

23      cartridge or some other device containing the    18:00:57

24      contents of the game in order for rights to be   18:01:00

25      encompassed within the agreements?  Yes or no?   18:01:04
```

                                              Page 328

```
 1          MS. ESKENAZI:  Objection.  It's compound.      18:01:08
 2   It's vague and ambiguous.                             18:01:09
 3          THE WITNESS:  I'm not -- I'm not -- that       18:01:12
 4   question is not susceptible of an accurate answer     18:01:14
 5   which is yes or no.  In order to answer the question  18:01:18
 6   accurately, I have to tell you about the nature of    18:01:21
 7   the communication with Saul Zaentz Company in 1993.   18:01:25
 8          We looked at the 1969 merchandising           18:01:29
 9   agreements.  When I dealt with the specific point     18:01:32
10   there as to what was the nature of the current        18:01:37
11   games, implicit in that was the prior discussion      18:01:40
12   where we talked -- where Mr. Williamson had talked    18:01:44
13   about and it had been agreed that a computer game     18:01:47
14   had to be an article of tangible personal property.   18:01:51
15   BY MR. PETROCELLI:                                    18:01:51
16      Q.  My question is very simple.  Did you in        18:01:57
17   your -- whatever the context is, whatever             18:02:00
18   circumstances there were, whatever the history was,   18:02:03
19   I'm only asking whether you had a specific            18:02:06
20   conversation with -- with Saul Zaentz or anybody      18:02:09
21   else, and I -- and I broadened it to include anybody  18:02:14
22   at Warner Bros. or at New Line or Miramax or anybody  18:02:16
23   else who was on the other side of these agreements,   18:02:19
24   that they only had rights to merchandise video games  18:02:22
25   or computer games if there was a physical disc, a     18:02:26
```

Page 329

| | | |
|---|---|---|
| 1 | physical cartridge or some other physical device | 18:02:30 |
| 2 | containing the game that could be purchased?  Did | 18:02:33 |
| 3 | you have that direct conversation with anybody? | 18:02:36 |
| 4 | MS. ESKENAZI:  Objection.  It's been asked | 18:02:38 |
| 5 | and answered. | 18:02:40 |
| 6 | You can answer again. | 18:02:40 |
| 7 | THE WITNESS:  I think I've dealt with your | 18:02:41 |
| 8 | question insofar as it relates to people at New Line | 18:02:45 |
| 9 | and people at Warner Bros. | 18:02:47 |
| 10 | BY MR. PETROCELLI: | 18:02:48 |
| 11 | Q.  You dealt with it by saying you had no such | 18:02:50 |
| 12 | discussion, correct? | 18:02:53 |
| 13 | MS. ESKENAZI:  Misstates the testimony. | 18:02:55 |
| 14 | BY MR. PETROCELLI: | 18:02:55 |
| 15 | Q.  Is that correct? | 18:02:55 |
| 16 | A.  Is what correct?  That it misstates the | 18:02:58 |
| 17 | testimony? | 18:02:59 |
| 18 | Q.  That you had no such discussions with | 18:03:00 |
| 19 | people at Warner Bros. and New Line on that subject, | 18:03:01 |
| 20 | correct? | 18:03:01 |
| 21 | A.  Well, I've referred to my conversation with | 18:03:05 |
| 22 | Mr. -- sorry. | 18:03:07 |
| 23 | Q.  Tsujihara? | 18:03:10 |
| 24 | A.  Tsujihara. | 18:03:11 |
| 25 | Q.  But you've indicated that it didn't get | 18:03:12 |

Page 330

| | | |
|---|---|---|
| 1 | into that level of detail. | 18:03:14 |
| 2 | A.  I'm just referring you to the -- the -- my | 18:03:15 |
| 3 | earlier testimony on this subject in relation to | 18:03:20 |
| 4 | Warner Bros. and New Line. | 18:03:24 |
| 5 | Q.  And so other than the Tsujihara | 18:03:25 |
| 6 | conversation, which the record speaks for itself, | 18:03:27 |
| 7 | you didn't discuss this subject with anybody at | 18:03:33 |
| 8 | either Warner Bros. or New Line, correct? | 18:03:36 |
| 9 | A.  I don't recall doing so. | 18:03:38 |
| 10 | Q.  Okay.  Now -- now -- now, let's go to | 18:03:40 |
| 11 | Zaentz. | 18:03:44 |
| 12 | You referenced a meeting with Mr. Zaentz in | 18:03:45 |
| 13 | Berkeley in -- is that Berkeley, California? | 18:03:49 |
| 14 | Berkeley, London?  What Berkeley are we talking | 18:03:51 |
| 15 | about? | 18:03:54 |
| 16 | A.  The Berkeley where the Saul Zaentz Company | 18:03:55 |
| 17 | is headquartered. | 18:03:58 |
| 18 | Q.  Okay.  And where is that located, what | 18:03:59 |
| 19 | state? | 18:04:01 |
| 20 | A.  It's in California. | 18:04:01 |
| 21 | Q.  Okay.  In 1993 -- | 18:04:01 |
| 22 | A.  Yes. | 18:04:04 |
| 23 | Q.  -- right? | 18:04:04 |
| 24 | And first of all, is that the only | 18:04:05 |
| 25 | discussion that comes to mind in response to my | 18:04:08 |

Page 331

| | | |
|---|---|---|
| 1 | question, is that 1993 meeting? | 18:04:12 |
| 2 | MS. ESKENAZI:  Objection.  It's vague and | 18:04:17 |
| 3 | ambiguous. | 18:04:20 |
| 4 | THE WITNESS:  I've already explained that | 18:04:20 |
| 5 | this matter of computer games was under discussion | 18:04:21 |
| 6 | for a period of time, orally and in correspondence. | 18:04:27 |
| 7 | BY MR. PETROCELLI: | 18:04:27 |
| 8 | Q.  Yeah, but you understand that I'm not | 18:04:29 |
| 9 | interested in discussions about computer games that | 18:04:31 |
| 10 | involve whether it's graphic or text or all the | 18:04:33 |
| 11 | other issues associated with computer games.  We're | 18:04:35 |
| 12 | talking about a very -- I'm talking about the last | 18:04:38 |
| 13 | couple of hours, a very separate and distinct issue, | 18:04:41 |
| 14 | which is the concept that you've been positing, that | 18:04:45 |
| 15 | a physical disc or cartridge is required and has to | 18:04:52 |
| 16 | be purchased in order for there to be rights under | 18:04:56 |
| 17 | the agreement. | 18:04:57 |
| 18 | And I'm only trying to find out from you | 18:04:58 |
| 19 | whether you discussed that specific topic in those | 18:05:01 |
| 20 | terms with someone at the Zaentz company, yes or no? | 18:05:04 |
| 21 | A.  That subject was part of the review that we | 18:05:11 |
| 22 | conducted during those years.  And the second | 18:05:17 |
| 23 | element you said, in those terms, possibly not in | 18:05:18 |
| 24 | those terms. | 18:05:22 |
| 25 | Q.  Possibly not in those terms? | 18:05:22 |

Page 332

```
 1        A.  Possibly not in those specific terms.        18:05:24

 2        Q.  Not in those specific terms.  Okay.          18:05:26

 3        A.  We referred to the matter of what was in     18:05:27

 4   the merchandising agreement and you said you're not   18:05:33

 5   interested in graphics or --                          18:05:34

 6        Q.  Text.                                         18:05:36

 7        A.  -- text-based.  But the point is, you         18:05:37

 8   didn't get into that discussion without there being   18:05:40

 9   an article of tangible personal property.  And so     18:05:43

10   far as computer games were concerned, that meant      18:05:46

11   that they had to take the form of a physical object.  18:05:48

12        Q.  Over the years, did you -- did you -- prior   18:05:51

13   to 2010, did you ever ask a lawyer to review the      18:06:03

14   contracts and -- and make a legal opinion on that     18:06:13

15   subject?                                              18:06:17

16        MS. ESKENAZI:  Objection.  Attorney-client       18:06:19

17   privilege.                                            18:06:20

18        MR. PETROCELLI:  It calls for a "yes" or         18:06:21

19   "no."                                                 18:06:26

20        THE WITNESS:  I don't recall doing so.           18:06:26

21   BY MR. PETROCELLI:                                    18:06:26

22        Q.  Do you know whether your clients did so?     18:06:29

23        A.  I don't believe they would have done that.   18:06:36

24        Q.  Okay.                                         18:06:36

25        MS. ESKENAZI:  We've been going for about        18:06:39
```

Page 333

```
 1    an hour.                                     18:06:41

 2            MR. PETROCELLI:  Take a short break.  18:06:42

 3            MS. ESKENAZI:  Want to take a short break  18:06:43

 4    before we --                                 18:06:44

 5            MR. PETROCELLI:  Before we conclude for the  18:06:44

 6    day.                                         18:06:46

 7            THE VIDEOGRAPHER:  Off the record at 6:07  18:06:50

 8    p.m.                                         18:06:52

 9            (Brief recess.)                      18:16:31

10            THE VIDEOGRAPHER:  We're back on the record  18:29:29

11    at 6:30 p.m.  Counsel may proceed.           18:29:46

12                 (The document referred to was

13            marked for identification as

14            Exhibit 21 and attached to this

15            deposition.)

16    BY MR. PETROCELLI:

17       Q.  Okay.  In front of you is Exhibit 21 which  18:29:54

18    is an article --                            18:29:56

19            MS. ESKENAZI:  May I have a copy?    18:29:57

20            MR. PETROCELLI:  You may.            18:29:58

21       Q.  -- dated November 16, 2003 called "Lord of  18:29:59

22    the Gold Ring."                             18:30:05

23            Have you ever seen this before?      18:30:06

24            MS. ESKENAZI:  I note that this does not  18:30:17

25    have a Bates number on it.                   18:30:18
```

Page 334

```
 1   BY MR. PETROCELLI:                              18:30:18

 2       Q.  Have you ever seen this before?        18:30:31

 3       A.  I think I have seen this article before.  18:30:32

 4       Q.  Do you generally, as part of your job  18:30:38

 5   responsibilities, keep track of media reports about  18:30:42

 6   the Tolkiens?                                   18:30:45

 7           MS. ESKENAZI:  Objection.  Vague and   18:30:49

 8   ambiguous.                                      18:30:49

 9           THE WITNESS:  The Tolkien clients?     18:30:52

10   BY MR. PETROCELLI:                              18:30:52

11       Q.  Yes.  You know, articles that come out in  18:30:55

12   the press about them?  Do you monitor that or stay  18:30:57

13   abreast of what's written?                      18:31:03

14           MS. ESKENAZI:  Objection.  Vague and   18:31:06

15   ambiguous.  Compound.                           18:31:07

16           THE WITNESS:  On behalf of the Tolkien  18:31:11

17   clients, we -- I'm just trying to -- I can't    18:31:17

18   remember what you -- how you phrased your question.  18:31:24

19   So sorry.                                       18:31:27

20   BY MR. PETROCELLI:                              18:31:27

21       Q.  It's a very general question.          18:31:28

22       A.  I know.  I'm just getting tired and I  18:31:29

23   wanted to be specific --                        18:31:33

24       Q.  I'll repeat it.                         18:31:34

25       A.  -- what I heard.  Pardon?               18:31:35
```

Page 335

```
 1        Q.  As part of your work for the Tolkiens, do      18:31:36
 2   you keep track of press reports, media reports about     18:31:38
 3   the family?                                              18:31:41
 4        A.  Yes, if -- if -- if I find them or somebody     18:31:43
 5   draws them to my attention, yes, I do.                   18:31:46
 6        Q.  Keep a file of them?                            18:31:47
 7        A.  Not necessarily a separate file.                18:31:50
 8        Q.  Was this document in your file?                 18:31:53
 9        A.  I don't know.                                   18:31:55
10        Q.  It's a very long article.  I'm going to ask     18:31:55
11   you just a couple of questions about it.                 18:32:02
12        A.  Before you ask those questions, may I read      18:32:04
13   it?                                                      18:32:06
14        Q.  It would take you 20 minutes to read it.        18:32:07
15        A.  How do you know?                                18:32:09
16        Q.  Because there's 20 minutes left.                18:32:11
17        A.  Oh.                                             18:32:12
18        Q.  And I have a feeling you probably would use     18:32:13
19   all the 20 minutes to read the article.                 18:32:15
20            MS. ESKENAZI:  That calls for speculation.      18:32:17
21            THE WITNESS:  I think you think I'm better      18:32:21
22   versed at this than I am.  You put an idea into my       18:32:22
23   head now, though.                                        18:32:26
24   BY MR. PETROCELLI:                                       18:32:26
25        Q.  Yeah, I'm going to ask you about the --         18:32:27
```

Page 336

| | | |
|---|---|---|
| 1 | about the -- well, let me ask you this before you | 18:32:29 |
| 2 | read it. | 18:32:31 |
| 3 |      Have you ever been interviewed by the press | 18:32:32 |
| 4 | about the Tolkiens? | 18:32:35 |
| 5 |   A.  I have on occasion, yes. | 18:32:37 |
| 6 |   Q.  Who interviewed you and when? | 18:32:45 |
| 7 |   A.  Well, the one instance I can recall is | 18:32:48 |
| 8 | recently I spoke to a journalist at Le Monde | 18:32:51 |
| 9 | newspaper, a French newspaper. | 18:32:55 |
| 10 |   Q.  About the Tolkiens? | 18:32:57 |
| 11 |   A.  It was about the -- the Tolk- -- the | 18:32:59 |
| 12 | Tolkien Estate's business activity. | 18:33:09 |
| 13 |   Q.  And did you speak on the record? | 18:33:10 |
| 14 |      MS. ESKENAZI:  Objection.  Vague and | 18:33:12 |
| 15 | ambiguous. | 18:33:12 |
| 16 | BY MR. PETROCELLI: | 18:33:12 |
| 17 |   Q.  Do you know what I mean by that?  Did | 18:33:13 |
| 18 | you -- | 18:33:15 |
| 19 |   A.  I -- I understand that to mean that she | 18:33:16 |
| 20 | could report -- it was a lady journalist -- that she | 18:33:18 |
| 21 | could report what I said. | 18:33:21 |
| 22 |   Q.  Yes. | 18:33:24 |
| 23 |   A.  Is that your understanding? | 18:33:24 |
| 24 |   Q.  That's what it means, yeah. | 18:33:25 |
| 25 |   A.  Yes, except in the case of that, I did -- | 18:33:27 |

Page 337

```
 1    the understanding was that I would see what she was      18:33:31

 2    going to publish before she published it.               18:33:33

 3         Q.  And did you?                                    18:33:37

 4         A.  No.                                             18:33:38

 5         Q.  And was it published?                           18:33:40

 6         A.  It was.                                          18:33:41

 7         Q.  Did she misquote you?                           18:33:42

 8         A.  Yes.                                             18:33:45

 9         Q.  What -- what did she say you said that you      18:33:49

10    didn't say?                                              18:33:51

11         A.  I can't -- I can't answer that question         18:33:51

12    without reference to the article.                        18:33:54

13         Q.  Did you ask for a retraction?                   18:33:57

14         A.  No.                                             18:33:58

15         Q.  Did you contact her to tell her you had         18:33:59

16    been misquoted?                                          18:34:02

17         A.  No.                                             18:34:02

18         Q.  Was it a serious misquote or just a --          18:34:06

19             MS. ESKENAZI:  Objection.                       18:34:11

20    BY MR. PETROCELLI:                                       18:34:11

21         Q.  -- inconsequential error?                       18:34:12

22             MS. ESKENAZI:  Objection.  Vague and            18:34:14

23    ambiguous.                                               18:34:16

24             THE WITNESS:  At the time, I didn't -- I        18:34:16

25    didn't think it was material.                            18:34:25
```

Page 338

```
 1    BY MR. PETROCELLI:                              18:34:25

 2        Q.  Okay.  Let's go back to Exhibit -- what did  18:34:29

 3    you say, 21?                                    18:34:33

 4            And I want to draw your attention to the  18:34:34

 5    paragraph at the end of the third page.         18:34:42

 6        A.  Okay.                                    18:34:48

 7        Q.  That says:                               18:34:50

 8              "But besieged by interview             18:34:51

 9            requests Christopher" --                 18:34:53

10        A.  Okay.                                    18:34:55

11        Q.  Do you see that paragraph?               18:34:55

12        A.  I see that paragraph.  I'll now review the  18:34:56

13    document to see --                              18:34:58

14        Q.  I don't want you to review the whole     18:35:00

15    document.  I only want you to review that paragraph.  18:35:02

16        A.  I know that but I won't understand the   18:35:04

17    context.                                        18:35:06

18        Q.  Well, I'm not going to sit here and wait  18:35:06

19    ten minutes for you to review the document.  I'm  18:35:09

20    just going to ask you questions within it and I'm  18:35:11

21    only going to ask you to review that one paragraph.  18:35:14

22        A.  You said it was going to take 20 minutes  18:35:16

23    before.                                         18:35:19

24        Q.  Yeah, I know.  Just review the one        18:35:19

25    paragraph and then let the record note that you've  18:35:20
```

Page 339

| | | |
|---|---|---|
| 1 | asked to review the whole document.  Okay? | 18:35:22 |
| 2 | THE WITNESS:  Can I ask counsel whether | 18:35:27 |
| 3 | that's appropriate? | 18:35:28 |
| 4 | BY MR. PETROCELLI: | 18:35:29 |
| 5 | Q.  It's my -- it's my examination and you | 18:35:29 |
| 6 | don't have the right to read a document from | 18:35:31 |
| 7 | beginning to end if I want to call your attention to | 18:35:33 |
| 8 | a specific paragraph. | 18:35:35 |
| 9 | MS. ESKENAZI:  That's -- that's actually | 18:35:37 |
| 10 | not true. | 18:35:37 |
| 11 | MR. PETROCELLI:  It's actually absolutely | 18:35:41 |
| 12 | true. | 18:35:43 |
| 13 | MS. ESKENAZI:  And -- | 18:35:43 |
| 14 | MR. PETROCELLI:  But -- | 18:35:43 |
| 15 | MS. ESKENAZI:  And it just means that his | 18:35:44 |
| 16 | question -- | 18:35:45 |
| 17 | MR. PETROCELLI:  Bonnie, go ahead, if you | 18:35:45 |
| 18 | want her to read the -- you want her to read the | 18:35:46 |
| 19 | whole document, knowing that it's going to take 15 | 18:35:47 |
| 20 | minutes, go right ahead.  I'm -- I'm not going to | 18:35:49 |
| 21 | allow it to happen. | 18:35:52 |
| 22 | MS. ESKENAZI:  It just -- it just means | 18:35:53 |
| 23 | that his questions and your answers may not be | 18:35:54 |
| 24 | accurate because it may be completely out of | 18:35:56 |
| 25 | context.  That's what it means. | 18:35:59 |

Page 340

| | | |
|---|---|---|
| 1 | THE WITNESS:  Let me review -- let me | 18:36:01 |
| 2 | review the article and I'll do so as quickly as I | 18:36:03 |
| 3 | can. | 18:36:07 |
| 4 | BY MR. PETROCELLI: | 18:36:07 |
| 5 |     Q.  No.  That's not acceptable. | 18:36:08 |
| 6 |     My question -- I'm directing your attention | 18:36:10 |
| 7 | to the third page, bottom of the paragraph.  I have | 18:36:12 |
| 8 | a very -- a couple of very specific questions. | 18:36:17 |
| 9 | Okay? | 18:36:19 |
| 10 |     A.  That paragraph begins with the word "But." | 18:36:19 |
| 11 |     Q.  Correct. | 18:36:21 |
| 12 |     A.  My analysis means that it's, therefore, | 18:36:23 |
| 13 | contrasting what's said there with something that's | 18:36:27 |
| 14 | gone before, and I think I do need the context. | 18:36:29 |
| 15 |     MS. ESKENAZI:  If -- if you can't answer | 18:36:33 |
| 16 | the question without reading the document, you'll | 18:36:34 |
| 17 | just tell Mr. Petrocelli you can't answer his | 18:36:36 |
| 18 | question.  He may -- he may have no questions other | 18:36:38 |
| 19 | than, "Do you -- do you read these words on the | 18:36:41 |
| 20 | page?"  So let him ask his question.  If you can't | 18:36:43 |
| 21 | answer it, you'll tell him. | 18:36:46 |
| 22 |     THE WITNESS:  At this point I'm going to | 18:36:48 |
| 23 | read that paragraph. | 18:36:49 |
| 24 | BY MR. PETROCELLI: | 18:36:49 |
| 25 |     Q.  Thank you.  Appreciate it. | 18:36:50 |

Page 341

```
 1         A.   I've read that paragraph.              18:37:21

 2         Q.   Okay.  As part of your work for the    18:37:22

 3    Tolkiens, has it been your experience that the   18:37:29

 4    family, and Christopher in particular, has been  18:37:32

 5    opposed to widespread exploitation of the rights? 18:37:35

 6         MS. ESKENAZI:  Objection.  Calls for        18:37:41

 7    attorney-client privileged information.          18:37:43

 8         If you can answer that question without     18:37:44

 9    reference to what -- to communications you've had 18:37:46

10    with Christopher, Mr. Petrocelli is entitled to an 18:37:48

11    answer.  But if you -- if the only way you would  18:37:52

12    know that answer is by communications with        18:37:54

13    Mr. Tolkien, I'm instructing you not to answer.   18:37:57

14         THE WITNESS:  The only way I would know the  18:38:01

15    answer to that question was through communications 18:38:03

16    with Mr. Tolkien.                                 18:38:08

17    BY MR. PETROCELLI:                                18:38:08

18         Q.   Well, this article says:                18:38:09

19              "Christopher is powerless against       18:38:12

20         the big screen adaptation and the            18:38:14

21         merchandising, so the Estate fights          18:38:17

22         back through access to the archives,         18:38:18

23         granting of reprint rights and court         18:38:21

24         battles over copyright infringement."        18:38:23

25         Were you -- did you ever contact this         18:38:25
```

Page 342

| | | |
|---|---|---|
| 1 | author to indicate that his statements about | 18:38:28 |
| 2 | Mr. Tolkien were false? | 18:38:30 |
| 3 | A.  I don't recall. | 18:38:35 |
| 4 | Q.  Have you ever contacted or written to a | 18:38:38 |
| 5 | newspaper reporter to correct statements made that | 18:38:43 |
| 6 | were attributed to or that were about Mr. Tolkien, | 18:38:46 |
| 7 | Christopher Tolkien, that is? | 18:38:49 |
| 8 | A.  I may have done, but I can't -- I can't | 18:38:52 |
| 9 | recall. | 18:38:53 |
| 10 | Q.  Do you have a recollection of doing so in | 18:38:54 |
| 11 | this situation? | 18:38:57 |
| 12 | A.  No, I don't have a recollection of doing | 18:38:57 |
| 13 | so. | 18:38:58 |
| 14 | Q.  Okay.  Let me ask you about the next | 18:39:07 |
| 15 | document, Exhibit 22. | 18:39:09 |
| 16 | Is it fair to say, before you look at | 18:39:28 |
| 17 | Exhibit 22, that as part of your work for the | 18:39:30 |
| 18 | Estate, that based on your knowledge of | 18:39:34 |
| 19 | Christopher's Tolkien's views, even those that he | 18:39:38 |
| 20 | publicly stated, that he was opposed to massive | 18:39:41 |
| 21 | widespread exploitation of the rights to his | 18:39:46 |
| 22 | father's books? | 18:39:49 |
| 23 | MS. ESKENAZI:  I'm going to instruct not to | 18:39:50 |
| 24 | answer to the extent that you gained that knowledge | 18:39:52 |
| 25 | through conversations with Christopher. | 18:39:55 |

Page 343

```
 1              THE WITNESS:  So please may I just have    18:39:58

 2   it --                                                 18:40:13

 3              MR. PETROCELLI:  Yeah, please just repeat  18:40:13

 4   the question again.                                   18:40:13

 5                  (The reporter read the record          18:40:13

 6              as follows:                                18:40:13

 7                  "QUESTION:  Is it fair to              18:39:28

 8              say, before you look at Exhibit            18:39:29

 9              22, that as part of your work for          18:39:30

10              the Estate, that based on your             18:39:34

11              knowledge of Christopher's                 18:39:37

12              Tolkien's views, even those that           18:39:39

13              he publicly stated, that he was            18:39:41

14              opposed to massive widespread              18:39:43

15              exploitation of the rights to his          18:39:47

16              father's books?")                          18:39:49

17              MS. ESKENAZI:  Again, I'm going to remind  18:40:14

18   you not to respond -- not to disclose                 18:40:16

19   attorney-client communications.                       18:40:19

20              THE WITNESS:  If I were to answer your     18:40:22

21   question, I would be disclosing attorney-client       18:40:24

22   communications.                                       18:40:27

23   BY MR. PETROCELLI:                                    18:40:27

24       Q.  Is it -- is it your testimony that -- well,   18:40:28

25   let me ask you, did the views of Christopher Tolkien  18:40:31
```

                                                    Page 344

```
 1    about -- the views that he had about protecting his    18:40:34

 2    father's works, including The Hobbit and Lord of the   18:40:39

 3    Rings, influence you in any way in how you did your    18:40:42

 4    job for the family?                                    18:40:47

 5            MS. ESKENAZI:  Objection.  Calls for           18:40:50

 6    attorney-client privileged information.  I'm going     18:40:51

 7    to instruct not to answer to the extent that the       18:40:56

 8    question calls for divulging attorney-client           18:41:00

 9    privileged communications.                             18:41:03

10            THE WITNESS:  Again, sorry.                     18:41:03

11               (The reporter read the record               18:41:03

12            as follows:                                    18:41:03

13               "QUESTION:  Is it your                      18:40:28

14            testimony that -- well, let me ask             18:40:28

15            you, did the views of Christopher              18:40:32

16            Tolkien about -- the views that he             18:40:33

17            had about protecting his father's              18:40:37

18            works, including The Hobbit and                18:40:40

19            Lord of the Rings, influence you               18:40:41

20            in any way in how you did your job             18:40:44

21            for the family?")                              18:40:47

22            THE WITNESS:  I can't answer that without      18:41:19

23    re- -- revealing communications with my client.       18:41:22

24    BY MR. PETROCELLI:                                     18:41:22

25        Q.  Well, we'll -- we disagree.  But there's no    18:41:25
```

Page 345

| | | |
|---|---|---|
| 1 | judge here. | 18:41:31 |
| 2 | Do you have Exhibit 22 in front of you? | 18:41:37 |
| 3 | (The document referred to was | 18:41:46 |
| 4 | marked for identification as | 18:41:46 |
| 5 | Exhibit 22 and attached to this | 18:41:46 |
| 6 | deposition.) | 18:41:47 |
| 7 | THE WITNESS:  Thank you. | 18:41:47 |
| 8 | BY MR. PETROCELLI: | 18:41:47 |
| 9 | Q.  I've placed in front of you an article in | 18:41:50 |
| 10 | Le Monde dated on or about December 5, 2012 | 18:41:52 |
| 11 | saying -- entitled, "My Father's Eviscerated Work: | 18:41:56 |
| 12 | Son of Hobbit Scribe J.R.R. Tolkien Finally Speaks | 18:41:59 |
| 13 | Out." | 18:42:03 |
| 14 | A.  That's this document? | 18:42:05 |
| 15 | Q.  That's this document.  You've seen this | 18:42:07 |
| 16 | document before?  This is an English translation of | 18:42:10 |
| 17 | a -- what might have been an article that appeared | 18:42:14 |
| 18 | initially in French.  You said it was a French | 18:42:18 |
| 19 | magazine, Le Monde? | 18:42:21 |
| 20 | A.  The French -- Le Monde is a French | 18:42:22 |
| 21 | newspaper. | 18:42:25 |
| 22 | Q.  Newspaper.  Excuse me. | 18:42:25 |
| 23 | Is this the article that you mentioned | 18:42:25 |
| 24 | previously in your testimony? | 18:42:26 |
| 25 | A.  You asked me whether this was a document I | 18:42:27 |

Page 346

```
 1    had seen before.  I don't think I've seen this      18:42:28

 2    article in this form.                               18:42:31

 3         Q.  Is this the article that you had in mind in 18:42:36

 4    your testimony?                                     18:42:39

 5         A.  Yes, it was.                               18:42:39

 6         Q.  Okay.                                      18:42:40

 7         A.  Yes, it is.                                18:42:40

 8         Q.  When you read it, did you read it in        18:42:41

 9    English?                                            18:42:42

10         A.  I read it in French.                       18:42:42

11         Q.  And you're fluent in French?               18:42:46

12         A.  No.                                        18:42:49

13         Q.  But you're able to read an article of this 18:42:50

14    type in French?                                     18:42:52

15         A.  Yes.                                       18:42:52

16         Q.  Okay.  And you don't consider that fluency? 18:42:53

17         A.  No.                                        18:42:56

18         Q.  Okay.  Anyway, you'll see in here, the     18:42:57

19    second-to-last page --                              18:43:02

20         MS. ESKENAZI:  Sorry, where are you?  It's     18:43:02

21    not Bates numbered.                                 18:43:11

22         THE WITNESS:  Are you in the article, these    18:43:12

23    are the comments --                                 18:43:14

24    BY MR. PETROCELLI:                                  18:43:14

25         Q.  I'm in the article.  I'm in the article and 18:43:15
```

Page 347

| | | |
|---|---|---|
| 1 | they're right above the heading "Action Movies." | 18:43:16 |
| 2 | A.  Okay. | 18:43:19 |
| 3 | Q.  It says, "'We are in the back seat,'" end | 18:43:20 |
| 4 | of quotes, "Cathleen Blackburn comments." | 18:43:22 |
| 5 | A.  Yes. | 18:43:24 |
| 6 | MS. ESKENAZI:  I just want to -- | 18:43:25 |
| 7 | BY MR. PETROCELLI: | 18:43:26 |
| 8 | Q.  Do you see that reference? | 18:43:27 |
| 9 | MS. ESKENAZI:  I just want to say for the | 18:43:27 |
| 10 | record that this is not Bates numbered also. | 18:43:28 |
| 11 | BY MR. PETROCELLI: | 18:43:28 |
| 12 | Q.  Do you see that reference? | 18:43:32 |
| 13 | A.  Yes, I see that. | 18:43:33 |
| 14 | Q.  And this is the reporter that you spoke to | 18:43:34 |
| 15 | that you said misquoted you, Raphaelle, | 18:43:37 |
| 16 | R-e-r-o-l-l-e? | 18:43:44 |
| 17 | A.  She's the reporter. | 18:43:45 |
| 18 | Q.  Yeah.  Is that the person that you spoke | 18:43:48 |
| 19 | to? | 18:43:49 |
| 20 | A.  Yes, it is. | 18:43:49 |
| 21 | Q.  Okay.  Was that a telephone interview? | 18:43:50 |
| 22 | A.  Yes, it was. | 18:43:52 |
| 23 | Q.  Okay.  Why did you agree to do it? | 18:43:54 |
| 24 | A.  I was asked by my clients to do it. | 18:43:55 |
| 25 | Q.  Who asked you? | 18:43:58 |

Page 348

Veritext National Deposition & Litigation Services
866 299-5127

| | | |
|---|---|---|
| 1 | A.   Mr. Tolkien. | 18:43:59 |
| 2 | Q.   Which one? | 18:44:02 |
| 3 | A.   Sorry.  Christopher Tolkien. | 18:44:02 |
| 4 | Q.   Okay.  And you were aware that he | 18:44:09 |
| 5 | participated in this interview as well? | 18:44:13 |
| 6 | MS. ESKENAZI:  Objection to the extent it | 18:44:17 |
| 7 | calls for an attorney-client privileged | 18:44:18 |
| 8 | communication. | 18:44:19 |
| 9 | BY MR. PETROCELLI: | 18:44:19 |
| 10 | Q.  I mean, you would know that from talking to | 18:44:19 |
| 11 | the reporter. | 18:44:22 |
| 12 | Come on, Bonnie.  It's silly, but that's | 18:44:22 |
| 13 | all right.  Go ahead.  Instruct her not to answer. | 18:44:25 |
| 14 | MS. ESKENAZI:  I'm not going to instruct | 18:44:26 |
| 15 | her not to answer.  I'm going to say to her, if you | 18:44:28 |
| 16 | would let me finish, Dan, that to the extent you got | 18:44:31 |
| 17 | that information only from your client, you're | 18:44:34 |
| 18 | instructed not to answer. | 18:44:36 |
| 19 | MR. PETROCELLI:  That's not privileged, | 18:44:37 |
| 20 | either, but -- even if she did. | 18:44:39 |
| 21 | THE WITNESS:  When I spoke to the | 18:44:40 |
| 22 | journalist, I knew that the journalist had already | 18:44:41 |
| 23 | spoken to Mr. Tolkien. | 18:44:45 |
| 24 | BY MR. PETROCELLI: | 18:44:45 |
| 25 | Q.   Okay.  So did -- you stated, "We're in the | 18:44:48 |

Page 349

| | | |
|---|---|---|
| 1 | back seat"? | 18:44:51 |
| 2 | A.  Well, this is an English translation of | 18:44:52 |
| 3 | what appeared in French.  The inter- -- interview | 18:44:55 |
| 4 | was conducted in French. | 18:44:59 |
| 5 | Q.  And so did you say, "We're in the back | 18:45:01 |
| 6 | seat" in French? | 18:45:03 |
| 7 | A.  No, I don't believe I did. | 18:45:04 |
| 8 | Q.  And you deny saying that? | 18:45:05 |
| 9 | MS. ESKENAZI:  Objection.  Asked and | 18:45:09 |
| 10 | answered. | 18:45:09 |
| 11 | Answer again. | 18:45:10 |
| 12 | BY MR. PETROCELLI: | 18:45:10 |
| 13 | Q.  Do you deny saying in French, "We're in the | 18:45:16 |
| 14 | back seat"? | 18:45:18 |
| 15 | A.  I don't know exactly what I said in French. | 18:45:18 |
| 16 | Q.  But whatever you said, you didn't say that. | 18:45:24 |
| 17 | Is that what -- is that your testimony? | 18:45:26 |
| 18 | MS. ESKENAZI:  It's been asked and | 18:45:27 |
| 19 | answered. | 18:45:28 |
| 20 | You can answer it yet again. | 18:45:28 |
| 21 | THE WITNESS:  I don't recall what I said in | 18:45:30 |
| 22 | French. | 18:45:32 |
| 23 | BY MR. PETROCELLI: | 18:45:32 |
| 24 | Q.  Okay.  Is that the statement that you | 18:45:33 |
| 25 | earlier said you thought you had been misquoted? | 18:45:35 |

Page 350

```
 1        A.  I felt that all the bit in this paragraph    18:45:37

 2   was -- was misquoting and misleading.  The -- the     18:45:41

 3   way in which these elements were put together were     18:45:48

 4   misleading.                                            18:45:50

 5        Q.  "We were able to prove that nothing in the   18:45:51

 6   original contract dealt with that sort of              18:45:52

 7   exploitation," referring to slot machines.            18:45:54

 8            Do you see that?                              18:45:57

 9        A.  Yes.                                          18:45:57

10        Q.  And did you make that statement to the       18:45:59

11   reporter in French?                                    18:46:02

12        A.  No.                                           18:46:03

13        Q.  You see -- and again, you didn't ask for a   18:46:07

14   retraction or a correction; is that right?            18:46:11

15        A.  No, I didn't.                                 18:46:12

16        Q.  Okay.  Now, did Mr. -- Christopher Tolkien   18:46:15

17   instruct you to ask for a correction or a retraction  18:46:22

18   of any of the statements attributed to him?           18:46:25

19            MS. ESKENAZI:  Objection.  Attorney-client   18:46:29

20   privilege.  Instruct not to answer.                   18:46:30

21            MR. PETROCELLI:  It's -- it's not            18:46:31

22   privileged.  It's an instruction that she should      18:46:32

23   tell a reporter something.                             18:46:34

24            MS. ESKENAZI:  To the extent that was        18:46:39

25   communicated and you communicated something to the    18:46:40
```

Page 351

```
 1   reporter, that is not privileged.                18:46:42

 2        THE WITNESS:  Perhaps I can answer the      18:46:46

 3   question by saying, I did not go back to the     18:46:47

 4   reporter in relation to this article.  Does that 18:46:50

 5   answer the question?                             18:46:55

 6   BY MR. PETROCELLI:                               18:46:55

 7        Q.  Either with respect to comments attributed 18:46:56

 8   to you or to Mr. Tolkien; is that correct?       18:46:58

 9        A.  I didn't go back to them at all.        18:46:59

10        Q.  Okay.  Were the comments attributed --  18:47:02

11   attributed to Mr. Tolkien consistent with your   18:47:03

12   knowledge and understanding with his views over the 18:47:08

13   years?                                           18:47:11

14        MS. ESKENAZI:  Objection.  Calls for -- to  18:47:12

15   the extent it calls for attorney-client privileged 18:47:15

16   information, you're instructed not to answer.  If 18:47:18

17   you can answer the question without divulging     18:47:21

18   attorney-client communications --                18:47:23

19        THE WITNESS:  I can't -- I can't answer     18:47:26

20   that question without divulging what my client has 18:47:27

21   said to me.                                       18:47:30

22   BY MR. PETROCELLI:                                18:47:30

23        Q.  Is every -- every single one of your    18:47:31

24   conversations with Mr. Tolkien you think is covered 18:47:33

25   by the attorney-client privilege?  How long have you 18:47:35
```

                                                        Page 352

```
 1   known him?                                        18:47:39

 2       A.  Which question would you like me to answer?  18:47:41

 3       Q.  The second one.                            18:47:43

 4       A.  Okay.  I've known Mr. Tolkien since I      18:47:44

 5   became involved in Tolkien work in the '90s.       18:47:46

 6       Q.  So -- well, you became involved in the work  18:47:48

 7   earlier than that, did you not?                    18:47:51

 8       A.  I joined the firm in 1989, and I began     18:47:53

 9   doing some work for the Tolkien Estate in 1990.    18:47:58

10       Q.  Do you have any -- any decision-making     18:48:01

11   power, without having to consult any of the family  18:48:08

12   members, to make decisions about these contracts?  18:48:12

13           MS. ESKENAZI:  Objection.  Attorney-client  18:48:18

14   privileged information.                            18:48:20

15           To the extent -- to the extent -- to the   18:48:21

16   extent you have an understanding of what your      18:48:27

17   decision-making power is, only through conversations  18:48:29

18   that you've had with your clients, that is         18:48:33

19   privileged information and you're not to divulge   18:48:36

20   what your clients told you about what you can and  18:48:40

21   cannot do.                                         18:48:42

22           THE WITNESS:  I therefore can't answer the  18:48:43

23   question because anything I do derives from the    18:48:44

24   instructions I've had from my clients.             18:48:47

25   BY MR. PETROCELLI:                                 18:48:47
```

Page 353

| | | |
|---|---|---|
| 1 | Q.  Are they in writing, your instructions? | 18:48:49 |
| 2 | A.  At some times. | 18:48:51 |
| 3 | Q.  Do you have a written retainer agreement? | 18:48:52 |
| 4 | A.  There's a client engagement letter. | 18:48:55 |
| 5 | Q.  It's in writing? | 18:48:57 |
| 6 | A.  Yes. | 18:48:58 |
| 7 | Q.  Does it cover all the work that you've done | 18:48:58 |
| 8 | for the Tolkiens since 1992? | 18:49:00 |
| 9 | MS. ESKENAZI:  Objection.  It's vague and | 18:49:03 |
| 10 | ambiguous. | 18:49:04 |
| 11 | THE WITNESS:  There's a client engagement | 18:49:04 |
| 12 | letter beginning -- from -- entered into in the | 18:49:08 |
| 13 | beginning of 2012. | 18:49:13 |
| 14 | BY MR. PETROCELLI: | 18:49:14 |
| 15 | Q.  And before then? | 18:49:14 |
| 16 | A.  I don't believe there was a written | 18:49:15 |
| 17 | engagement letter. | 18:49:16 |
| 18 | Q.  Have you ever received any -- any gifts | 18:49:17 |
| 19 | from any members of the Tolkien family? | 18:49:25 |
| 20 | A.  Yes, I have. | 18:49:30 |
| 21 | Q.  Any -- any substantial gifts? | 18:49:31 |
| 22 | A.  Substantial in value? | 18:49:35 |
| 23 | Q.  Yes. | 18:49:39 |
| 24 | A.  No. | 18:49:39 |
| 25 | Q.  Just small gifts of appreciation? | 18:49:39 |

Page 354

```
 1        A.  Flowers.                                    18:49:42

 2                 (Pages 356 through 359 are

 3            marked confidential and are bound

 4            under separate cover.  The

 5            nonconfidential portion of this

 6            transcript continues on page 360.)

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 355

```
 1        Q.   Is all of the financial benefit that you     18:52:47

 2   have gained over the years as a result of your         18:52:51

 3   relationship with the Tolkiens derived solely from     18:52:55

 4   the practice of law?                                   18:52:57

 5        A.   Yes.                                          18:52:58

 6        Q.   Okay.   Have you been engaged in any          18:53:00

 7   business ventures with them?                           18:53:02

 8        A.   No.                                           18:53:06

 9        Q.   With any members of the family?              18:53:06

10        A.   No.                                           18:53:08

11        Q.   Have you ever calculated how much money you  18:53:13

12   have derived over the years as a result of your        18:53:16

13   relationship with the Tolkiens?                        18:53:20

14        A.   Well, I've derived my drawings from my       18:53:22

15   firms, the firms for which I've worked.   Some of      18:53:26

16   that comes from work done for the Tolkien Estate.      18:53:28

17        Q.   Well, the Tolkiens have been your -- really  18:53:32

18   your only client over the years, right?                18:53:36

19        A.   That's not correct.                          18:53:38

20        Q.   Well, their biggest client, right?           18:53:40

21        A.   Probably my biggest client.                  18:53:42

22        Q.   Yeah.                                         18:53:43

23        A.   Since -- since I -- since I became involved  18:53:43

24   with their work in -- from 1992 onwards.   But that    18:53:47

25   work wasn't always on the same scale as at present.    18:53:52
```

Page 360

| | | |
|---|---|---|
| 1 | So I can't be specific as to whether they were | 18:53:56 |
| 2 | always our biggest client. | 18:54:00 |
| 3 | Q.  How often -- was there a meeting with the | 18:54:02 |
| 4 | Tolkiens about the decision to file this lawsuit? | 18:54:05 |
| 5 | A.  There wasn't a meeting with all of the | 18:54:10 |
| 6 | directors together and the trustees together. | 18:54:14 |
| 7 | Q.  There was not? | 18:54:16 |
| 8 | A.  No. | 18:54:16 |
| 9 | Q.  Well, then, did you call for a vote somehow | 18:54:17 |
| 10 | of the various trustees of the two entities that | 18:54:20 |
| 11 | sued? | 18:54:22 |
| 12 | THE WITNESS:  Am I able to -- | 18:54:25 |
| 13 | MS. ESKENAZI:  Well, again, to the extent | 18:54:27 |
| 14 | that Mr. Petrocelli will agree that this is not a | 18:54:30 |
| 15 | waiver of the attorney-client privilege, I will -- I | 18:54:35 |
| 16 | will allow you to answer that. | 18:54:38 |
| 17 | MR. PETROCELLI:  For you, I will agree. | 18:54:39 |
| 18 | MS. ESKENAZI:  Yes or no?  Did you call for | 18:54:41 |
| 19 | a vote?  It's a "yes" or "no" answer. | 18:54:44 |
| 20 | THE WITNESS:  Well, we consult- -- | 18:54:45 |
| 21 | consulted with these clients and they were ad item | 18:54:47 |
| 22 | so there was no need for a vote.  They all agreed. | 18:54:51 |
| 23 | The decision was unanimous. | 18:54:54 |
| 24 | BY MR. PETROCELLI: | 18:54:56 |
| 25 | Q.  You consulted on a -- on a one-by-one | 18:54:56 |

Page 361

```
 1   basis?                                          18:55:01

 2       A.  No, I wrote to them collectively.       18:55:01

 3       Q.  When is the first time that you conveyed to  18:55:03

 4   your clients that you thought that Warner Bros. or  18:55:07

 5   Zaentz was in breach of the agreement?          18:55:12

 6           MS. ESKENAZI:  Objection.  Calls for    18:55:16

 7   attorney-client privilege information.  Instruct not  18:55:18

 8   to answer.                                      18:55:20

 9           MR. PETROCELLI:  When?  When I asked.   18:55:21

10           MS. ESKENAZI:  When is the first time you  18:55:23

11   conveyed to your clients?                       18:55:25

12           MR. PETROCELLI:  Right.                 18:55:26

13       Q.  When is the first time you had a discussion  18:55:26

14   with your clients or any one of them about either  18:55:29

15   Zaentz or Warner Bros. being in breach of the   18:55:35

16   agreement?                                      18:55:37

17           MS. ESKENAZI:  Objection.  Attorney-client  18:55:41

18   privileged communication.                       18:55:43

19           THE WITNESS:  I'm really sorry.  I can't --  18:55:47

20           MS. ESKENAZI:  Instruct not to answer.  18:55:48

21           THE WITNESS:  Okay.                     18:55:50

22   BY MR. PETROCELLI:                              18:55:50

23       Q.  Okay.  When is the first -- have you ever  18:55:57

24   told your clients over the years of your view, your  18:55:59

25   personal view, about the meaning of the agreement --  18:56:04
```

Page 362

```
 1              MS. ESKENAZI:  Objection.              18:56:08

 2    BY MR. PETROCELLI:                               18:56:08

 3         Q.  -- that a physical product or physical disc  18:56:09

 4    or cartridge is required in order for Zaentz and   18:56:13

 5    Warners to have rights to do video games?  Have you  18:56:17

 6    ever shared that view with them?                 18:56:22

 7              MS. ESKENAZI:  Objection.  Attorney-client  18:56:23

 8    privileged information.  I think instruct not to  18:56:25

 9    answer.                                          18:56:28

10    BY MR. PETROCELLI:                               18:56:28

11         Q.  Have you ever put that personal viewpoint  18:56:28

12    of yours into a document?                        18:56:30

13              MS. ESKENAZI:  Object --               18:56:33

14    BY MR. PETROCELLI:                               18:56:33

15         Q.  Have you ever recorded in a document,   18:56:35

16    written in a document, your -- your view that the  18:56:36

17    merchandising agreement requires a disc or a     18:56:42

18    cartridge for a computer game or a video game?   18:56:45

19         A.  I put it in -- I put it in -- in documents  18:56:51

20    addressed to the Saul Zaentz Company.            18:56:56

21         Q.  What document did -- oh, this is after the  18:57:00

22    event in September 2010 --                       18:57:02

23         A.  No --                                   18:57:02

24         Q.  -- around that period of time?          18:57:03

25         A.  -- it's implicit in the discussions we were  18:57:04
```

Page 363

| | | |
|---|---|---|
| 1 | having in 1993 and thereafter. | 18:57:07 |
| 2 | Q.  Well, I'm not asking about implicit because | 18:57:09 |
| 3 | what you think is implicit doesn't matter.  I'm | 18:57:11 |
| 4 | asking what words are written on a piece of paper. | 18:57:14 |
| 5 | And I'm simply trying to find out, other than the | 18:57:16 |
| 6 | correspondence that exists in 2010 that led to | 18:57:19 |
| 7 | mediation and then to the filing of this lawsuit, | 18:57:23 |
| 8 | okay, I'm trying to find out that -- whether you | 18:57:25 |
| 9 | ever put in writing, prior to 2010, your view about | 18:57:29 |
| 10 | the meaning of the contract, that it required a | 18:57:36 |
| 11 | physical disc or cartridge? | 18:57:37 |
| 12 | A.  Yes, I did.  I may not have used those | 18:57:38 |
| 13 | precise words, but I have addressed that matter in | 18:57:40 |
| 14 | correspondence -- | 18:57:43 |
| 15 | Q.  Can you point -- | 18:57:43 |
| 16 | A.  -- before 2010. | 18:57:44 |
| 17 | Q.  Can you point to a document in which you | 18:57:46 |
| 18 | have done so? | 18:57:49 |
| 19 | A.  We looked at one this morning. | 18:57:49 |
| 20 | Q.  Which? | 18:57:50 |
| 21 | A.  Which was setting out my review of the | 18:57:51 |
| 22 | computer games licensing question in -- in this | 18:57:57 |
| 23 | early part of the 1990s. | 18:58:00 |
| 24 | Q.  In the text versus graphic context? | 18:58:01 |
| 25 | A.  Yes. | 18:58:03 |

Page 364

```
 1        Q.   Okay.  And is it your testimony that that      18:58:04

 2   document specifically discusses the issue that a          18:58:07

 3   game that is solely downloadable is not covered but       18:58:10

 4   that a game to be covered has to have the contents        18:58:14

 5   of the game on a disc or cartridge?                       18:58:18

 6        MS. ESKENAZI:  Objection.  Compound.                 18:58:21

 7   BY MR. PETROCELLI:                                        18:58:21

 8        Q.   Is that your testimony?                         18:58:25

 9        MS. ESKENAZI:  Objection.  Vague and                 18:58:25

10   ambiguous.  Compound.                                     18:58:26

11        THE WITNESS:  Can I have the question                18:58:42

12   again?                                                    18:58:43

13             (The reporter read the record                   18:58:43

14        as follows:                                          18:58:43

15             "QUESTION:  And is it your                       18:58:04

16        testimony that that document                         18:58:06

17        specifically discusses the issue                     18:58:07

18        that a game that is solely                            18:58:09

19        downloadable is not covered but                      18:58:12

20        that a game to be covered has to                     18:58:14

21        have the contents of the game on a                   18:58:17

22        disc or cartridge?")                                 18:58:19

23        THE WITNESS:  That document does refer to            18:58:43

24   that proposition.                                         18:58:49

25   BY MR. PETROCELLI:                                        18:58:49
```

Page 365

```
 1        Q.  Can you -- can you show me, please?  Do you   18:58:50

 2   have it in front of you?                               18:58:52

 3        A.  Do you have the number of the exhibit?        18:58:53

 4        Q.  You have it right -- you have the exhibits    18:58:55

 5   there.  You can just -- you only have a handful.        18:58:58

 6   You can just point to it and show me where those        18:58:59

 7   words are written.                                     18:59:02

 8           John, can you assist?                          18:59:06

 9           MR. ULIN:  I'm trying.                         18:59:06

10           MR. PETROCELLI:  She only has 14 or 15         18:59:11

11   documents to choose from.                              18:59:12

12           THE WITNESS:  I've got it anyway.  It's        18:59:13

13   Exhibit -- it's Exhibit 5.                             18:59:15

14   BY MR. PETROCELLI:                                     18:59:15

15        Q.  Okay.  Exhibit 5 is Plaintiffs' Bates         18:59:24

16   number SO29253, a letter dated November 2, 1993.       18:59:27

17   And show me where those words appear.                  18:59:33

18        A.  In the third paragraph of this letter,        18:59:36

19   first two sentences, I incorporate by reference the    18:59:43

20   discussion of this point that took place in 1994.      18:59:47

21        Q.  And that's your --                            18:59:51

22           MS. ESKENAZI:  You mean 1984?                  18:59:54

23           THE WITNESS:  1984.  So sorry.                 18:59:55

24   BY MR. PETROCELLI:                                     18:59:55

25        Q.  And is it your -- and so there's nothing in   18:59:57
```

Page 366

| | | |
|---|---|---|
| 1 | this letter, Exhibit 5, that actually discusses the | 19:00:00 |
| 2 | contents of the game having to be on a physical | 19:00:05 |
| 3 | storage device like a disc or a cartridge, correct? | 19:00:08 |
| 4 | MS. ESKENAZI:  Objection.  Misstates the | 19:00:12 |
| 5 | testimony.  Misstates the document. | 19:00:13 |
| 6 | THE WITNESS:  The -- the letter | 19:00:15 |
| 7 | incorporates by reference those other documents. | 19:00:17 |
| 8 | BY MR. PETROCELLI: | 19:00:17 |
| 9 | Q.  But those other documents don't contain any | 19:00:20 |
| 10 | specific reference to computer games having to have | 19:00:22 |
| 11 | the contents of the game on a -- on disc or | 19:00:27 |
| 12 | cartridge, correct? | 19:00:31 |
| 13 | A.  They may not use the words "disc" or | 19:00:31 |
| 14 | "cartridge."  But they require the game to be an | 19:00:33 |
| 15 | item of -- article of tangible personal property. | 19:00:36 |
| 16 | Q.  But -- but -- but beyond reciting the words | 19:00:39 |
| 17 | of the agreement, they don't go on -- the | 19:00:41 |
| 18 | February 1984 document doesn't go on to, for | 19:00:44 |
| 19 | example, say, a game that's only downloadable and | 19:00:47 |
| 20 | not available for purchase on a disc or a cartridge | 19:00:51 |
| 21 | would not qualify?  There's nothing in that letter | 19:00:53 |
| 22 | to that effect in 1984.  Would you agree with me? | 19:00:56 |
| 23 | A.  I haven't -- I haven't reviewed those -- | 19:01:00 |
| 24 | MS. ESKENAZI:  Hold on a second.  I'm going | 19:01:02 |
| 25 | to object.  It misstates the document.  Misstates | 19:01:04 |

Page 367

| | | |
|---|---|---|
| 1 | the testimony.  It is argumentative.  It is vague | 19:01:08 |
| 2 | and ambiguous.  It's compound. | 19:01:10 |
| 3 | BY MR. PETROCELLI: | 19:01:10 |
| 4 | Q.  Okay.  And would you agree with me that you | 19:01:14 |
| 5 | didn't have that specific discussion?  That specific | 19:01:15 |
| 6 | discussion doesn't appear in the '84 document? | 19:01:18 |
| 7 | A.  Do you want me to ask this question that | 19:01:22 |
| 8 | you're asking now or the previous one? | 19:01:26 |
| 9 | Q.  Why are you asking me? | 19:01:27 |
| 10 | A.  Because I'm not sure whether these two -- | 19:01:28 |
| 11 | I'm not quite sure which question it is I'm asked to | 19:01:31 |
| 12 | answer. | 19:01:34 |
| 13 | Q.  Okay. | 19:01:34 |
| 14 | A.  And it seemed to me that you put the | 19:01:34 |
| 15 | question -- the subject matter in two different | 19:01:36 |
| 16 | forms. | 19:01:40 |
| 17 | Q.  I don't need to ask you.  You've already | 19:01:40 |
| 18 | answered the question about the Exhibit 5, okay? | 19:01:42 |
| 19 | And then you are suggesting now that a more specific | 19:01:45 |
| 20 | discussion of this very issue appears in a letter | 19:01:49 |
| 21 | dated February 9, 1984, which is eight years before | 19:01:53 |
| 22 | your involvement. | 19:01:59 |
| 23 | Would you like to see that letter?  Would | 19:02:01 |
| 24 | you like to see the February 9, '84 letter? | 19:02:06 |
| 25 | A.  I don't -- I don't believe I need to. | 19:02:10 |

Page 368

| | | |
|---|---|---|
| 1 | Q.   Okay.   Why is that?   You don't need to | 19:02:13 |
| 2 | because you remember what it says? | 19:02:17 |
| 3 | A.   No, I was going to say, I don't | 19:02:18 |
| 4 | specifically recall what it says. | 19:02:20 |
| 5 | Q.   Okay.   When is the last time you saw the | 19:02:21 |
| 6 | February 9, 1984 letter? | 19:02:25 |
| 7 | A.   I don't recall. | 19:02:26 |
| 8 | Q.   Okay.   And would you agree with me that in | 19:02:27 |
| 9 | 1984, it's unlikely that there was any discussion | 19:02:28 |
| 10 | about downloadable computer programs? | 19:02:32 |
| 11 | A.   Yes, I would. | 19:02:34 |
| 12 | Q.   Okay.   And that -- and that -- you would | 19:02:35 |
| 13 | not have written anything in February 9, 1984, | 19:02:38 |
| 14 | either, correct? | 19:02:41 |
| 15 | A.   Written anything -- | 19:02:43 |
| 16 | MS. ESKENAZI:   Objection.   Vague and | 19:02:43 |
| 17 | ambiguous. | 19:02:43 |
| 18 | BY MR. PETROCELLI: | 19:02:43 |
| 19 | Q.   Regarding this matter? | 19:02:44 |
| 20 | A.   What matter? | 19:02:46 |
| 21 | Q.   This case.   The issues in this case. | 19:02:46 |
| 22 | A.   This case hadn't happened then.   I couldn't | 19:02:50 |
| 23 | have dealt with the issues in this case if the case | 19:02:53 |
| 24 | hadn't happened.   One could only deal with the | 19:02:55 |
| 25 | matters in front of one.   So I was dealing with | 19:03:00 |

Page 369

```
 1    the -- the matter of computer games as it presented    19:03:03

 2    itself to the parties in -- in -- in 1993.             19:03:06

 3        Q.  So -- so, we got on --                         19:03:12

 4            THE REPORTER:  "1993," did you say?            19:03:12

 5            THE WITNESS:  1993.                            19:03:12

 6    BY MR. PETROCELLI:                                     19:03:12

 7        Q.  So is it correct then that you never put       19:03:13

 8    into a document, ever, you, yourself, wrote into a     19:03:17

 9    letter or a memo this interpretation you have of the   19:03:23

10    merchandising agreement that online rights, video     19:03:28

11    rights, computer game rights, require a disc or a      19:03:31

12    cartridge or other similar device to store the         19:03:36

13    contents of the game that can be purchased?  You've    19:03:38

14    never actually written that down any place, correct?   19:03:41

15            MS. ESKENAZI:  Objection.  Vague and           19:03:43

16    ambiguous.  Compound.  It's been asked and answered.   19:03:45

17            You can answer again.                          19:03:48

18            THE WITNESS:  Can you just give me the         19:04:05

19    beginning of the --                                    19:04:06

20                (The reporter read the record              19:04:06

21            as follows:                                    19:04:06

22                "QUESTION:  So is it correct               19:03:13

23            then that you never put into a                 19:03:15

24            document, ever, you, yourself,                 19:03:17

25            wrote into a letter or a memo this             19:03:22
```

Page 370

| | | |
|---|---|---|
| 1 | interpretation you have of the | 19:03:27 |
| 2 | merchandising agreement that | 19:03:28 |
| 3 | online rights, video rights, | 19:03:30 |
| 4 | computer game rights, require a | 19:03:32 |
| 5 | disc or cartridge or") -- | 19:03:36 |
| 6 | THE REPORTER:  Do you want me to go on? | 19:03:36 |
| 7 | THE WITNESS:  No, it's -- it's fine. | 19:04:06 |
| 8 | It is -- you asked, "is it correct that." | 19:04:09 |
| 9 | It is not correct that to this extent that I don't | 19:04:18 |
| 10 | recall. | 19:04:18 |
| 11 | BY MR. PETROCELLI: | 19:04:20 |
| 12 | Q.  You can't identify any section? | 19:04:20 |
| 13 | A.  I can't -- I can't -- | 19:04:22 |
| 14 | MS. ESKENAZI:  It misstates the testimony | 19:04:23 |
| 15 | of the witness. | 19:04:24 |
| 16 | MR. PETROCELLI:  Excuse me, don't interrupt | 19:04:25 |
| 17 | your own witness. | 19:04:26 |
| 18 | MS. ESKENAZI:  Misstates -- objection. | 19:04:26 |
| 19 | Well -- | 19:04:28 |
| 20 | BY MR. PETROCELLI: | 19:04:28 |
| 21 | Q.  You -- you can't identify any such | 19:04:30 |
| 22 | document, correct? | 19:04:31 |
| 23 | MS. ESKENAZI:  Objection.  It misstates the | 19:04:33 |
| 24 | testimony. | 19:04:34 |
| 25 | THE WITNESS:  I can't recall such a | 19:04:35 |

Page 371

```
 1    document.                                          19:04:38

 2    BY MR. PETROCELLI:                                 19:04:38

 3        Q.  Okay.  Okay.  Before -- you recall that -- 19:04:39

 4            MS. ESKENAZI:  Oh, I'm sorry.  Go ahead.   19:04:46

 5    Ask your question.                                 19:04:48

 6            MR. PETROCELLI:  No, that's -- that's all  19:04:49

 7    right.  You're going to look at the time, right?   19:04:51

 8    How much time do we have?                          19:04:53

 9            THE VIDEOGRAPHER:  We've been on the record 19:04:55

10    seven hours, eight minutes.                        19:05:02

11            MR. PETROCELLI:  Okay.  Well, look, we'll  19:05:04

12    adjourn now.  I am not finished.  As you can see, I 19:05:06

13    have a whole stack of documents that I have to go   19:05:13

14    through with you.  If I can't work this out with    19:05:16

15    your very able counsel, then we will have to deal   19:05:18

16    with this in other ways.  But for now, we'll        19:05:22

17    adjourn.                                            19:05:27

18            THE WITNESS:  That sounds very threatening. 19:05:28

19            MR. PETROCELLI:  Oh --                      19:05:30

20            MS. ESKENAZI:  It was meant -- it was meant 19:05:30

21    to be threatening.                                  19:05:31

22            MR. PETROCELLI:  Legal ways.  Legal ways.   19:05:31

23            THE WITNESS:  Good.                         19:05:33

24            MR. PETROCELLI:  Legal ways.                19:05:34

25            THE WITNESS:  That's fine.  That's fine.    19:05:35
```

Page 372

| | | |
|---|---|---|
| 1 | MR. ULIN:  And as I stated this morning, | 19:05:40 |
| 2 | Mr. Petrocelli's position with respect to continuing | 19:05:41 |
| 3 | the deposition on further days is also my position | 19:05:44 |
| 4 | and the position of the Saul Zaentz Company. | 19:05:47 |
| 5 | THE VIDEOGRAPHER:  We are off the record at | 19:05:50 |
| 6 | 7:06 p.m. and this concludes today's testimony given | 19:05:52 |
| 7 | by Cathleen Blackburn.  The total number of media | 19:05:56 |
| 8 | used was five and will be retained by Veritext Legal | 19:06:00 |
| 9 | Solutions. | 19:06:03 |
| 10 | (Brief recess.) | 19:06:03 |
| 11 | MR. PETROCELLI:  The transcript will be -- | 19:06:22 |
| 12 | a copy of the transcript will be sent to -- to -- to | 19:06:24 |
| 13 | you, Bonnie. | 19:06:27 |
| 14 | MS. LENS:  You want them to have a copy or | 19:06:34 |
| 15 | the original? | 19:06:36 |
| 16 | MR. PETROCELLI:  Original.  We get the | 19:06:36 |
| 17 | original.  The copy will go to you. | 19:06:37 |
| 18 | MS. ESKENAZI:  Usually the original -- | 19:06:37 |
| 19 | MR. PETROCELLI:  No, the person taking the | 19:06:39 |
| 20 | deposition gets the original. | 19:06:40 |
| 21 | MS. ESKENAZI:  No, but that's okay.  I | 19:06:42 |
| 22 | don't care who gets the original in today's day. | 19:06:42 |
| 23 | MR. PETROCELLI:  It doesn't matter. | 19:06:45 |
| 24 | THE WITNESS:  Is the original going to be | 19:06:46 |
| 25 | different from the copy? | 19:06:47 |

Page 373

```
 1          MR. PETROCELLI:  It is not.  And they're      19:06:48

 2    both going to be -- they're both going to be in     19:06:49

 3    English, too.                                       19:06:50

 4          THE WITNESS:  That's a relief.                19:06:53

 5          MR. PETROCELLI:  Okay.  In any event, the     19:06:53

 6    witness can have, what, 30 days --                  19:06:56

 7          MS. ESKENAZI:  30 days.  Fine.                19:07:00

 8          MR. PETROCELLI:  -- to review it and let us   19:07:02

 9    know if there are any changes or corrections.       19:07:04

10    Admonishing you, of course, if you do make any      19:07:07

11    corrections to the transcript, that it can bear on  19:07:09

12    your credibility.                                   19:07:11

13          If we don't get word of any changes, the      19:07:12

14    transcript can be used in the form transcribed and  19:07:15

15    the court reporter is otherwise relieved of her     19:07:17

16    duties under the rules.  So stipulated?             19:07:20

17          MS. ESKENAZI:  So stipulated.                 19:07:24

18          MR. ULIN:  So stipulated.                     19:07:26

19          (Deposition concluded at 7:07 p.m.)

20                        -oOo-

21

22

23

24

25
```

Page  374

```
 1                        DECLARATION

 2

 3

 4

 5

 6           I hereby declare I am the deponent in the

 7      within matter; that I have read the foregoing

 8      deposition and know the contents thereof, and I

 9      declare that the same is true of my knowledge except

10      as to the matters which are therein stated upon my

11      information or belief, and as to those matters, I

12      believe it to be true.

13           I declare under the penalties of perjury of

14      the State of California that the foregoing is true

15      and correct.

16           Executed on the _____ day of

17      _____ 2014, at

18      _____,

19      California.

20

21

22

23

24           _____

25                      CATHLEEN BLACKBURN

                                            Page  375
```

```
1   STATE OF CALIFORNIA    )
                           )  ss.
2   COUNTY OF LOS ANGELES  )

3

4        I, Shanda Gabriel, Certified Shorthand

5   Reporter, Certificate No. 10094, for the State of

6   California, hereby certify:

7        I am the deposition officer that

8   stenographically recorded the testimony in the

9   foregoing deposition;

10       Prior to being examined the witness was by

11  me first duly sworn;

12       The foregoing transcript is a true record

13  of the testimony given.

14       Before completion of the deposition,

15  review of the transcript [X] was [] was not

16  requested.  If requested, any changes made by the

17  deponent (and provided to the reporter) during the

18  period allowed are appended hereto.

19

20  Dated 1/10/14

21

22

                  Shanda Gabriel

23                CSR 10094

24

25
```

Page 376

EXHIBIT B

THIS EXHIBIT HAS BEEN DESIGNATED <u>CONFIDENTIAL</u> AND IS FILED SEPARATELY UNDER SEAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT C

1

1           UNITED STATES DISTRICT COURT

2           CENTRAL DISTRICT OF CALIFORNIA

3

4    FOURTH AGE LTD., et al.,      )

5               Plaintiffs,        )
              vs.                  ) No. 12-9912-ABC
6    WARNER BROS. DIGITAL          )      (SHx)

7    DISTRIBUTION, et al.,         )

8               Defendants.        )
     _____    )
9    WARNER BROS. DIGITAL          )

10   DISTRUBUTION INC., et al.,    )

11              Counterclaim       )

12              Plaintiffs,        )
              vs.                  )
13   FOURTH AGE LTD., et al.,      )

14              Counterclaim       )

15              Defendants.        )
     _____    )
16

17    VIDEOTAPED DEPOSITION OF STEVEN ANDREW MAIER

18             Los Angeles, California

19             Friday, December 13, 2013

20

21   Reported by: SHANDA GABRIEL, CSR No. 10094
     JOB No. 1779931
22

23   PAGES 1-393

24   CONFIDENTIAL PAGES BOUND UNDER SEPARATE COVER:

25   25-29; 78-91; 164-174; 204-206; 292-293; 299-306

2

1                UNITED STATES DISTRICT COURT

2                CENTRAL DISTRICT OF CALIFORNIA

3

4    FOURTH AGE LTD., et al.,     )

5              Plaintiffs,        )
           vs.                    ) No. 12-9912-ABC
6    WARNER BROS. DIGITAL         )     (SHx)

7    DISTRIBUTION, et al.,        )

8              Defendants.        )
     ─────────────────────────────)
9    WARNER BROS. DIGITAL         )

10   DISTRUBUTION INC., et al.,   )

11             Counterclaim       )

12             Plaintiffs,        )
           vs.                    )
13   FOURTH AGE LTD., et al.,     )

14             Counterclaim       )

15             Defendants.        )
     ─────────────────────────────)
16

17

18

19        Videotaped Deposition of STEVEN ANDREW

20   MAIER, taken on behalf of the Defendants and

21   Counterclaim Plaintiffs at 1999 Avenue of the Stars,

22   Los Angeles, California, commencing at 9:07 a.m.,

23   Friday, December 13, 2013, before SHANDA GABRIEL,

24   CSR No. 10094.

25

                                                                3

1    APPEARANCES:

2

3    FOR THE PLAINTIFFS AND COUNTERCLAIM DEFENDANTS:

4         GREENBERG GLUSKER

5         BY:  BONNIE E. ESKENAZI, ESQ.

6              ELISABETH A. MORIARTY, ESQ.

7         1900 Avenue of the Stars, 21st Floor

8         Los Angeles, California  90067

9         (310) 553-3610

10        beskenazi@greenbergglusker.com

11        emoriarty@greenbergglusker.com

12

13   FOR THE DEFENDANTS AND COUNTERCLAIM PLAINTIFFS

14   WARNER BROS. HOME ENTERTAINMENT, INC., WARNER BROS.

15   ENTERTAINMENT, INC., WARNER BROS. CONSUMER PRODUCTS,

16   INC., and NEW LINE PRODUCTIONS, INC.:

17        O'MELVENY & MYERS

18        BY:  DANIEL PETROCELLI, ESQ.

19             NIKOLAS PRIMACK, ESQ.

20        1999 Avenue of the Stars, 7th Floor

21        Los Angeles, California  90067

22        (310) 553-6700

23        dpetrocelli@omm.com

24        nprimack@omm.com

25

                    Maier, Steven (Final)
EXHIBIT C                              PAGE 382

4

1    APPEARANCES (CONTINUED):

2

3    FOR THE DEFENDANT AND COUNTERCLAIM PLAINTIFF

4    THE SAUL ZAENTZ COMPANY:

5         ARNOLD & PORTER LLP

6         BY:   JOHN C. ULIN, ESQ.

7              LAUREN S. MIYAMOTO, ESQ.

8         777 South Figueroa Street, 44th Floor

9         Los Angeles, California  90017-5844

10        (213) 243-4000

11        John.Ulin@aporter.com

12        Lauren.Miyamoto@aporter.com

13                  - and -

14        ARNOLD & PORTER LLP

15        BY:   MARTIN R. GLICK, ESQ.

16        Three Embarcadero Center, 7th Floor

17        San Francisco, California  94111-4024

18        (415) 471-3153

19        marty.glick@aporter.com

20

21

22   ALSO PRESENT:

23        ROBYN MARTIN

24        JILL WARREN, VIDEOGRAPHER

25

5

1                         I N D E X

2

3     WITNESS                 EXAMINATION              PAGE

4     STEVEN ANDREW MAIER      BY MR. ULIN               12

5                             BY MR. PETROCELLI         183

6

7                         E X H I B I T S

8     NUMBER                  DESCRIPTION              PAGE

9

10    Exhibit 23    Steven Andrew Maier's Curriculum    22

11                  Vitae

12    Exhibit 24    E-mail Bates stamped                64

13                  CTRL00023304 through 06

14    Exhibit 25    E-mail Bates stamped SZC0001931     72

15                  through 32

16    Exhibit 26    Document entitled "Note of          78

17                  Consultation with Richard Arnold

18                  QC at 11 South Square, Gray's

19                  INN on Thursday, 4th July 2002

20                  at 4:30 p.m."  Bates stamped

21                  SZC0060907 through 15

22                  (BOUND WITH THE CONFIDENTIAL

23                  PORTION OF THIS TRANSCRIPT)

24

25

6

```
 1                    EXHIBITS (CONTINUED)

 2     NUMBER               DESCRIPTION              PAGE

 3

 4     Exhibit 27   Document headed "Instructions to    84

 5                  Leading Counsel to Advise in

 6                  Consultation" Bates stamped

 7                  SZC0060898 through 905

 8                  (BOUND WITH THE CONFIDENTIAL

 9                  PORTION OF THIS TRANSCRIPT)

10     Exhibit 28   E-mail string with attachment      92

11                  Bates stamped SZC0036996 through

12                  7001

13     Exhibit 29   E-mail string Bates stamped        99

14                  SZC0036992 through 995

15     Exhibit 30   E-mail string Bates stamped       102

16                  PLAINTIFFS008379 through 81

17     Exhibit 31   Letter dated April 30, 2004 to    118

18                  Cathleen Blackburn and Steven

19                  Maier from Carole F. Barrett,

20                  Bates stamped PLAINTIFFS017445

21                  through 50

22     Exhibit 32   Letter dated 24th June 2004 to    123

23                  Annette Hurst from Steven A.

24                  Maier Bates stamped SZC0036673

25
```

7

```
 1                    EXHIBITS (CONTINUED)

 2    NUMBER              DESCRIPTION              PAGE

 3

 4    Exhibit 33    E-mail with attachment Bates      125

 5                  stamped PLAINTIFFS010970 through

 6                  74

 7    Exhibit 34    Document dated August 31, 2005     158

 8                  entitled "The Lord of the Rings

 9                  Online: Shadows of Angmar

10                  Proposal for Use of Tolkien

11                  Quotes" Bates stamped

12                  PLAINTIFFS007431 through 38

13    Exhibit 35    Tolkien Enterprises document       160

14                  entitled "Overview of Prominent

15                  Licensees, June 2007" Bates

16                  stamped SZC0033579 through 609

17    Exhibit 36    Letter dated July 23, 2004 to      314

18                  the Director of Licensing from

19                  Kevin T. Paradine, with

20                  enclosures, Bates stamped

21                  SZC0053049 through 53

22    Exhibit 37    E-mail string Bates stamped        318

23                  SZC0053047 through 48

24

25
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 386

8

```
 1                    EXHIBITS (CONTINUED)

 2   NUMBER                DESCRIPTION              PAGE

 3

 4   Exhibit 38    E-mail Bates stamped SZC0055157   361

 5   Exhibit 39    E-mail with attachment Bates      374

 6                 stamped SZC0033457 through 60

 7   Exhibit 40    Document entitled "Overview of     384

 8                 Prominent Licensees June 2007"

 9                 Bates stamped PLAINTIFFS004582

10                 through 609

11

12

13

14               PREVIOUSLY MARKED EXHIBITS

15                 NUMBER           PAGE

16                 Exhibit 20         56

17

18

19

20

21

22

23

24

25
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 387

9

1                     I N D E X (CONTINUED)

2

3                  UNANSWERED QUESTIONS

4              PAGE          LINE

5              83            16

6              90            3

7              105           4

8              192           5

9              197           22

10             253           2

11             255           11

12             257           3

13             259           14

14             270           12

15             270           20

16             298           11

17             360           5

18             366           17

19

20

21

22

23

24

25

Maier, Steven (Final)

EXHIBIT C                          PAGE 388

10

1                     Los Angeles, California

2                  Friday, December 13, 2013

3                         9:07 a.m.                          08:21:48

4                                                            09:04:29

5            THE VIDEOGRAPHER:  Good morning.  We are on     09:07:16

6    the record at 9:07 a.m. on December 13, 2013.  This    09:07:31

7    is the video recorded deposition of Steven Maier.      09:07:37

8    My name is Jill Warren, here with our court             09:07:40

9    reporter, Shanda Gabriel.  We are here from Veritext    09:07:48

10   Legal Solutions at the request of counsel for          09:07:50

11   defendants and counterclaim plaintiffs.                09:07:52

12           This deposition is being held at 1999          09:07:53

13   Avenue of the Stars, in Los Angeles, California.       09:07:56

14           The caption of this case is Fourth Age         09:07:59

15   Limited, et al., versus Warner Bros. Digital, et       09:08:02

16   al., and related counterclaim.  Case number            09:08:06

17   12-9912-ABC (SHx) pending in the United States         09:08:14

18   District Court, Central District of California.        09:08:17

19           Please note that audio and video recording     09:08:19

20   will take place unless all parties agree to go off     09:08:23

21   the record.  The microphones are sensitive and may     09:08:26

22   pick up whispers, private conversations and cellular   09:08:29

23   interference.                                          09:08:31

24           I'm not related to any party in this           09:08:31

25   action, nor am I financially interested in the         09:08:34

```
 1    outcome in any way.                          09:08:36

 2          At this time, will counsel and all present  09:08:36

 3    please identify themselves for the record.   09:08:40

 4          MR. ULIN:  My name is John Ulin from    09:08:43

 5    Arnold & Porter for the Saul Zaentz Company. 09:08:45

 6          MR. GLICK:  Marty Glick, also from Arnold &  09:08:48

 7    Porter and also for the Saul Zaentz Company. 09:08:51

 8          MR. PETROCELLI:  Daniel Petrocelli for the  09:08:54

 9    Warner parties.                              09:08:56

10          MR. PRIMACK:  Nikolas Primack from      09:08:58

11    O'Melveny & Myers for the Warner parties.    09:08:58

12          MS. MARTIN:  Robyn Martin from New Line 09:09:02

13    Cinema.                                      09:09:04

14          MS. MORIARTY:  Elisabeth Moriarty,      09:09:04

15    Greenberg Glusker, on behalf of the plaintiffs and  09:09:06

16    the witness.                                 09:09:07

17          MS. ESKENAZI:  Bonnie Eskenazi from     09:09:08

18    Greenberg Glusker on behalf of plaintiffs and the  09:09:12

19    witness.                                     09:09:13

20          THE WITNESS:  Steven Maier.             09:09:14

21          MS. ESKENAZI:  We also missed somebody in  09:09:17

22    the back.                                    09:09:19

23          MR. ULIN:  Oh, I'm sorry.  That's a good  09:09:19

24    point.                                       09:09:19

25          MS. MIYAMOTO:  Lauren Miyamoto with Arnold  09:09:19
```

12

```
 1    & Porter from the Saul Zaentz Company.          09:09:21

 2           THE VIDEOGRAPHER:  Thank you.  The witness   09:09:22

 3    will be sworn in and counsel may begin the      09:09:24

 4    examination.                                     09:09:26

 5                                                     09:09:27

 6                STEVEN ANDREW MAIER,

 7            having been first duly sworn, was

 8            examined and testified as follows:

 9

10                     EXAMINATION

11    BY MR. ULIN:                                     09:09:34

12        Q.  Good morning, Mr. Maier.                 09:09:35

13        A.  Good morning.                            09:09:36

14        Q.  My name is John Ulin, we just met.  I am 09:09:37

15    counsel for the Saul Zaentz Company.             09:09:41

16           Do you understand that?                   09:09:42

17        A.  I do.                                    09:09:46

18        Q.  And we are defendants in a litigation    09:09:47

19    brought by the Tolkien Estate.                   09:09:49

20           Do you understand that?                   09:09:51

21        A.  Tolkien Estate and HarperCollins.        09:09:53

22        Q.  And HarperCollins, yes.                  09:09:55

23           MR. PETROCELLI:  Can the witness please   09:09:55

24    keep your voice up.  I can't hear you.           09:09:57

25           THE WITNESS:  Okay.                       09:09:59
```

```
 1    BY MR. ULIN:                                        09:09:59

 2         Q.  Thank you.                                 09:09:59

 3              I want to start with a couple of -- a few  09:10:00

 4    ground rules for the deposition today, just so we   09:10:02

 5    both understand the procedures and are on the same  09:10:05

 6    page.  Okay?                                         09:10:07

 7         A.  Okay.                                       09:10:07

 8         Q.  You understand that you're under oath to   09:10:12

 9    tell the truth here today as you would be if you    09:10:15

10    were testifying in a court of law, correct?         09:10:18

11         A.  Yes.                                        09:10:20

12         Q.  And you've done a good job so far, but     09:10:22

13    throughout the day when I ask questions you're going 09:10:25

14    to need to answer my questions verbally, that is    09:10:26

15    with words, instead of with a nod of the head or an 09:10:28

16    answer like "uh-huh," and that's because the        09:10:31

17    reporter needs to be able to take down everything we 09:10:32

18    say here today.                                      09:10:34

19              Do you understand that?                    09:10:35

20         A.  Yes, I do.                                  09:10:35

21         Q.  And again, we started out well.  We'll also 09:10:38

22    need to avoid talking over one another.  That's for 09:10:40

23    the same reason, the reporter can only take down one 09:10:44

24    person's words at a time.                            09:10:47

25              Do you understand that?                    09:10:49
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 392

14

```
 1        A.   Yeah.                                 09:10:49

 2        Q.   You're represented by counsel here this   09:10:50

 3   morning?                                        09:10:51

 4        A.   Yes.                                  09:10:51

 5        Q.   And that's Ms. Eskenazi and Ms. Moriarty?   09:10:51

 6        A.   That's correct.                       09:10:53

 7        Q.   Briefly with respect to procedure, it's a   09:10:58

 8   question-and-answer session.  By and large I ask   09:11:00

 9   questions and you answer.                       09:11:03

10        Do you understand that?                    09:11:04

11        A.   Yes, I do.                            09:11:04

12        Q.   From time to time your counsel may object   09:11:05

13   to the form of a question that I ask, but typically   09:11:08

14   unless she instructs you not to answer, even if your   09:11:13

15   counsel objects, you still need to answer my      09:11:16

16   question.                                       09:11:17

17        Do you understand that?                    09:11:17

18        A.   Okay, yes.                            09:11:18

19        Q.   If at any time you don't hear or understand   09:11:22

20   one of my questions, we can have it read back by the   09:11:24

21   reporter or I can rephrase the question.        09:11:27

22        Do you understand that?                    09:11:29

23        A.   Yeah.                                 09:11:29

24        Q.   And if you don't ask for a question to be   09:11:29

25   rephrased or repeated, I'm going to understand that   09:11:32
```

Maier, Steven (Final)

EXHIBIT C                                          PAGE 393

15

| | | |
|---|---|---|
| 1 | you understood the question I'm asking. | 09:11:35 |
| 2 | Do you understand that? | 09:11:36 |
| 3 | A.  Yes. | 09:11:36 |
| 4 | Q.  We can take a break at any time in the | 09:11:41 |
| 5 | proceedings.  Just let us know and we'll accommodate | 09:11:42 |
| 6 | that. | 09:11:47 |
| 7 | Do you understand? | 09:11:48 |
| 8 | A.  Yeah. | 09:11:48 |
| 9 | Q.  And then finally, at some point a few weeks | 09:11:49 |
| 10 | after the deposition is concluded, you're going to | 09:11:52 |
| 11 | receive a booklet that contains the reporter's | 09:11:54 |
| 12 | transcription of everything that was said here | 09:11:57 |
| 13 | today. | 09:11:58 |
| 14 | Do you understand that? | 09:11:58 |
| 15 | A.  Yes. | 09:11:58 |
| 16 | Q.  And you will have the opportunity when you | 09:11:59 |
| 17 | receive that transcription to correct any errors you | 09:12:01 |
| 18 | perceive in what was transcribed. | 09:12:05 |
| 19 | Do you understand that? | 09:12:06 |
| 20 | A.  Yes. | 09:12:06 |
| 21 | Q.  If you make corrections to the transcript, | 09:12:07 |
| 22 | I would and other counsel here would have the | 09:12:09 |
| 23 | opportunity to comment on how your corrections | 09:12:11 |
| 24 | affect the credibility of your testimony, whether it | 09:12:15 |
| 25 | should be believed. | 09:12:17 |

Maier, Steven (Final)

EXHIBIT C                                    PAGE 394

16

```
 1              Do you understand that?              09:12:18

 2       A.   Okay, I understand.                    09:12:19

 3       Q.   So it behooves you to give your best and   09:12:19

 4  most complete testimony here today.            09:12:22

 5              Do you understand?                   09:12:24

 6       A.   Yes.                                    09:12:26

 7       Q.   Have you ever given testimony in court   09:12:26

 8  before?                                          09:12:28

 9       A.   Yes, I have.                            09:12:29

10       Q.   On how many occasions?                  09:12:29

11       A.   On one occasion.                        09:12:31

12       Q.   And what was that?                      09:12:32

13       A.   That was a criminal trial in the United   09:12:33

14  Kingdom.                                         09:12:36

15       Q.   Did it relate in any way to the Tolkien   09:12:37

16  Estate?                                          09:12:41

17       A.   No.                                     09:12:41

18       Q.   And when was the -- when did you give   09:12:42

19  testimony in that criminal trial?               09:12:44

20       A.   To the best of my recollection, it was   09:12:45

21  around 1990.                                     09:12:48

22       Q.   And was your testimony given as a lay   09:12:51

23  witness?  I can ask the question differently.   09:12:59

24              Were you giving testimony as a lawyer or   09:13:04

25  were you giving testimony of your observations of   09:13:07
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 395

17

1    facts and events?                                    09:13:10

2         A.  I don't really recall.  I had been a        09:13:10

3    solicitor for a company that was in some way         09:13:13

4    involved in the criminal proceedings, but I don't    09:13:18

5    now recall the details sitting here today.           09:13:21

6         Q.  Fair enough.  Have you ever given testimony 09:13:23

7    at a deposition before?                              09:13:25

8         A.  No.                                         09:13:28

9         Q.  Is there any reason why you cannot give     09:13:30

10   your best and most complete testimony here this      09:13:32

11   morning?                                             09:13:34

12        A.  No.                                         09:13:34

13        Q.  Are you suffering any illness that affects  09:13:35

14   your ability to testify today?                       09:13:37

15        A.  No.                                         09:13:38

16        Q.  Have you drunk any alcohol within the last  09:13:42

17   24 hours?                                            09:13:44

18        A.  Yes.                                        09:13:44

19        Q.  Is that affecting at all your ability to    09:13:44

20   remember or to give complete testimony?              09:13:46

21        A.  No.                                         09:13:48

22        Q.  Are you taking any drugs or prescription    09:13:48

23   medications that would affect your memory or your    09:13:52

24   ability to give your best testimony?                 09:13:54

25        A.  No.                                         09:13:55

Maier, Steven (Final)

EXHIBIT C                                    PAGE 396

18

1    Q.  What have you done to prepare for today's   09:13:58

2  deposition?                                      09:13:59

3    A.  I've spent some time with Greenberg        09:14:00

4  Glusker.                                         09:14:04

5    Q.  And when you say you've spent some time    09:14:05

6  with Greenberg Glusker, was that in person or on the  09:14:08

7  telephone or some combination of the two?        09:14:12

8    A.  In person.                                 09:14:14

9    Q.  And how many meetings have you had with    09:14:15

10 Greenberg to prepare for this deposition?        09:14:17

11   A.  I've met with them on occasions over the   09:14:19

12 past two days.                                    09:14:22

13   Q.  And on how many occasions?                 09:14:26

14   A.  Well, it's difficult to say.  We were in   09:14:27

15 and out of meeting rooms and taking lunch so --  09:14:30

16   Q.  Fair enough.  How -- so let's -- today's   09:14:34

17 Friday.  Let's start with Wednesday.             09:14:36

18      Was Wednesday the first day that you met    09:14:37

19 with Greenberg to prepare for deposition?        09:14:39

20   A.  It was.                                    09:14:40

21   Q.  And how long did you meet with lawyers at  09:14:41

22 Greenberg to prepare for deposition on Wednesday?  09:14:44

23   A.  I would say four or five hours in total.   09:14:49

24   Q.  And was this at Greenberg Glusker's offices  09:14:55

25 here in Century City?                            09:14:57

Maier, Steven (Final)

EXHIBIT C                                    PAGE 397

19

```
 1        A.  Yes, it was.                             09:14:59

 2        Q.  And who were the attorneys who were present  09:14:59

 3   at your meetings on Wednesday?                    09:15:02

 4        A.  At various times, Bonnie Eskenazi, Liz   09:15:03

 5   Moriarty and Ricardo Cestero.                     09:15:09

 6        Q.  Was Cathleen Blackburn also present?     09:15:13

 7        A.  No, she wasn't.                           09:15:16

 8        Q.  Was anybody else present aside from those  09:15:17

 9   three attorneys and yourself?                     09:15:20

10        A.  Not that I recall.                        09:15:21

11        Q.  And Thursday, yesterday, you also met at  09:15:24

12   Greenberg to prepare for deposition; is that      09:15:26

13   correct?                                          09:15:26

14        A.  Yes, that is correct.                     09:15:29

15        Q.  And who was present in the meetings other  09:15:31

16   than yourself?                                    09:15:33

17        A.  The same individuals that I've identified.  09:15:33

18        Q.  And how long were your meetings yesterday  09:15:35

19   in preparation for deposition?                    09:15:37

20        A.  Similarly, four or five hours.            09:15:40

21        Q.  Did you review documents with the attorneys  09:15:42

22   from Greenberg Glusker in preparation for         09:15:50

23   deposition?                                        09:15:57

24        A.  Yes, I did.                               09:15:57

25        Q.  And if you can estimate, roughly how many  09:15:58
```

20

```
 1    documents did you review?                        09:16:00

 2        A.  I'm not sure I can estimate.  There were a  09:16:01

 3    pile of documents.                               09:16:03

 4        Q.  Do you know one way or another whether all  09:16:04

 5    of the documents that you reviewed with the      09:16:09

 6    Greenberg attorneys in preparation for today's   09:16:12

 7    deposition had been -- have been produced in     09:16:13

 8    discovery in this case?                          09:16:16

 9        A.  Yes, I believe they have.                09:16:16

10        Q.  Okay.  Aside from -- one further question  09:16:24

11    on the meetings Thursday.                        09:16:28

12            Was Ms. Blackburn present at your meetings  09:16:29

13    on Thursday?                                     09:16:31

14        A.  No, she wasn't.                          09:16:32

15        Q.  Okay.  Aside from -- aside from your     09:16:35

16    meetings with the Greenberg attorneys over the past  09:16:45

17    two days to prepare for deposition, have you spoken  09:16:50

18    with anyone else about the deposition today?     09:16:52

19        A.  Well, other than people like family being  09:16:54

20    aware I was giving a deposition, no.             09:16:58

21        Q.  Any conversations with Ms. Blackburn about  09:17:01

22    the deposition?                                  09:17:03

23            MS. ESKENAZI:  Well, objection to the    09:17:06

24    extent that that calls for work product privilege,  09:17:09

25    attorney-client privilege.                       09:17:12
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 399

21

```
 1              MR. ULIN:  At this point I'm just asking     09:17:14

 2   whether they had conversations.                         09:17:15

 3              MS. ESKENAZI:  I understand.                  09:17:16

 4              You can answer "yes" or "no."                 09:17:17

 5              THE WITNESS:  Yes.                            09:17:18

 6   BY MR. ULIN:                                             09:17:18

 7         Q.  On how many occasions?                         09:17:19

 8         A.  I can't recall.                                09:17:20

 9         Q.  Did you discuss the substance of the          09:17:21

10   testimony that either you or she would offer at         09:17:23

11   deposition?                                             09:17:25

12         A.  No.                                            09:17:25

13         Q.  Have you reviewed the rough transcript of     09:17:30

14   Ms. Blackburn's deposition in this case from            09:17:33

15   Tuesday?                                                09:17:34

16         A.  No.                                            09:17:34

17         Q.  Do you have a copy of it?                      09:17:36

18         A.  No.                                            09:17:37

19              MS. ESKENAZI:  Would you like to give him     09:17:39

20   one?                                                    09:17:40

21              MR. ULIN:  I didn't bring mine with me        09:17:41

22   today.  I don't know that the reporting service         09:17:43

23   would look favorably on that.                           09:17:49

24         Q.  Did the documents that you reviewed with      09:17:57

25   Greenberg during your preparation sessions refresh      09:17:59
```

Maier, Steven (Final)

EXHIBIT C                                              PAGE 400

22

| | | |
|---|---|---|
| 1 | your recollection? | 09:18:04 |
| 2 | A.  I wouldn't say they refreshed my | 09:18:06 |
| 3 | recollection.  I could see what the documents said. | 09:18:09 |
| 4 | Q.  Fair enough.  Have you brought any | 09:18:12 |
| 5 | documents with you today to the deposition? | 09:18:14 |
| 6 | A.  No. | 09:18:16 |
| 7 | Q.  I'm going to ask a few questions about your | 09:18:28 |
| 8 | background and we're going to mark Exhibit Number | 09:18:30 |
| 9 | 23.  The reason we don't start at number 1 is we had | 09:18:33 |
| 10 | 22 exhibits at Ms. Blackburn's deposition and we're | 09:18:37 |
| 11 | going to use a continuous sequence. | 09:18:39 |
| 12 | A.  Okay. | 09:18:41 |
| 13 | (The document referred to was | 09:18:53 |
| 14 | marked for identification as | 09:18:53 |
| 15 | Exhibit 23 and attached to this | 09:18:53 |
| 16 | deposition.) | 09:18:54 |
| 17 | BY MR. ULIN: | 09:18:54 |
| 18 | Q.  Mr. Maier, do you recognize Exhibit 23? | 09:19:05 |
| 19 | A.  Yeah, it appears to be a copy of my CV. | 09:19:07 |
| 20 | Q.  And this is the CV that's posted on the | 09:19:18 |
| 21 | Maier Blackburn Web site; is that correct? | 09:19:22 |
| 22 | A.  I believe so. | 09:19:26 |
| 23 | Q.  Does your CV accurately set forth your | 09:19:27 |
| 24 | educational background? | 09:19:31 |
| 25 | A.  As far as I can see, yes, it does. | 09:19:33 |

Maier, Steven (Final)

EXHIBIT C                                                PAGE 401

23

```
 1        Q.  Okay.  And you studied law at Oxford; is      09:19:40

 2    that correct?                                          09:19:40

 3        A.  Yes, I did.                                    09:19:44

 4        Q.  Does your CV accurately set forth your         09:19:48

 5    professional history?                                  09:19:50

 6        A.  It does.  The only thing that isn't            09:19:52

 7    included is one year of what we call Law Society       09:19:59

 8    finals that was in between university and starting     09:20:03

 9    my professional career at Simmons & Simmons.           09:20:06

10        Q.  Fair enough.  Did any of your work, prior      09:20:08

11    to joining the Manches law firm, relate to the         09:20:15

12    Tolkien Estate or the works of J.R.R. Tolkien?         09:20:22

13        A.  No, it did not.                                09:20:24

14        Q.  Okay.  And you joined the Manches firm in      09:20:32

15    1992; is that correct?                                 09:20:34

16        A.  That's correct.                                09:20:36

17        Q.  At what point in your career at Manches did    09:20:36

18    you begin working on Tolkien Estate matters?           09:20:40

19        A.  To the best of my recollection, sometime       09:20:45

20    around 2002, roughly.                                  09:20:49

21        Q.  And how did that come about?                   09:20:56

22        A.  Manches merged with a firm called Morrell      09:21:00

23    Peel & Gamlen.  That firm was already working for      09:21:09

24    the Tolkien Estate.  So that work came to the          09:21:10

25    combined firm.  And at some point I was asked to get   09:21:13
```

Maier, Steven (Final)

EXHIBIT C                                          PAGE 402

24

```
 1    involved in certain litigation matters.          09:21:19

 2         Q.  Okay.  Had you done any work for the     09:21:22

 3    Tolkien Estate or in connection with the works of 09:21:23

 4    J.R.R. Tolkien -- pardon my pronunciation -- prior 09:21:25

 5    to the merger of Morrell Peel into Manches?        09:21:32

 6         A.  No.                                       09:21:35

 7         Q.  Okay.  What was the first Tolkien Estate  09:21:39

 8    matter that you worked on?                         09:21:41

 9         A.  I don't recall.                           09:21:42

10         Q.  On how many matters have you worked for the 09:21:45

11    Tolkien Estate over the years, if you can estimate? 09:21:58

12         A.  I -- I can't say.                         09:22:02

13              (Pages 25 through 29 are

14              marked confidential and are bound

15              under separate cover.  The

16              nonconfidential portion of this

17              transcript continues on page 30.)

18

19

20

21

22

23

24

25
```

Maier, Steven (Final)

EXHIBIT C                          PAGE 403

25

CONFIDENTIAL

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Maier, Steven (Final)

EXHIBIT C                                    PAGE 404

26

CONFIDENTIAL

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

27

CONFIDENTIAL

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

28

CONFIDENTIAL

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Maier, Steven (Final)

EXHIBIT C                    PAGE 407

29

CONFIDENTIAL

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Maier, Steven (Final)

EXHIBIT C                                    PAGE 408

30

```
 1        Q.  Does your work for the Tolkien Estate tend    09:23:36

 2   to focus on particular legal issues?                   09:23:51

 3           MS. ESKENAZI:  Objection.  Vague and            09:23:54

 4   ambiguous.                                              09:23:56

 5   BY MR. ULIN:                                            09:23:56

 6        Q.  You may answer.                                09:23:57

 7        A.  I'm called in to deal with particular          09:23:58

 8   litigation matters.                                     09:24:01

 9        Q.  And is all of your work for the Tolkien        09:24:13

10   Estate litigation matters or, as you might call it,     09:24:16

11   contentious work?                                       09:24:19

12        A.  I imagine there are odd occasions where        09:24:20

13   there are overlap into transactional, but mostly        09:24:32

14   litigation.                                             09:24:35

15        Q.  During the time when you were at Manches,      09:24:36

16   were there other attorneys who worked with you on       09:24:56

17   Tolkien Estate matters?                                 09:24:58

18        A.  I'm not exactly sure by what you mean, with    09:24:59

19   me.                                                     09:25:09

20        Q.  I suppose what I mean is, when you were        09:25:18

21   working on Tolkien Estate matters, were -- were you     09:25:21

22   the only attorney working on the matters for which      09:25:22

23   you had responsibility or did you have a team?  And     09:25:25

24   the next question will be, if so, who are they?         09:25:29

25        A.  Right.  I generally did not have anyone        09:25:31
```

31

```
 1    working beneath me.  However, there would be another    09:25:34

 2    attorney aware of all matters in which I was acting.    09:25:39

 3        Q.  And is that Ms. Blackburn?                      09:25:42

 4        A.  Yes.                                            09:25:44

 5        Q.  And do you typically consult with               09:25:58

 6    Ms. Blackburn on the litigation matters that you        09:26:01

 7    handle for the Tolkien Estate?                          09:26:02

 8        A.  Yes.                                            09:26:04

 9        Q.  Other than Ms. Blackburn, were there any        09:26:15

10    other Manches attorneys with whom you worked on         09:26:17

11    Tolkien Estate matters?                                 09:26:20

12            MS. ESKENAZI:  Objection.  Asked and            09:26:22

13    answered.                                               09:26:24

14            THE WITNESS:  Not that I recall.                09:26:24

15    BY MR. ULIN:                                            09:26:24

16        Q.  Did you ever work with Dick Williamson?         09:26:29

17        A.  No.                                             09:26:31

18        Q.  Have you ever met him?                          09:26:31

19        A.  Yes, I have.                                    09:26:33

20        Q.  Have you ever discussed the substance of       09:26:44

21    any of your Tolkien Estate matters with                 09:26:45

22    Mr. Williamson?                                         09:26:48

23            MS. ESKENAZI:  Objection.  Attorney-client     09:26:49

24    privilege.                                              09:26:50

25            You can answer just "yes" or "no," assuming     09:26:54
```

32

```
 1    that we have a stipulation that it doesn't waive --   09:26:56

 2            MR. ULIN:  That's fine.  I don't think this   09:26:57

 3    waives the privilege in any way anyhow, but that's    09:26:59

 4    fine, I'm happy to stipulate.                         09:27:02

 5            THE WITNESS:  Yes.                             09:27:03

 6    BY MR. ULIN:                                          09:27:03

 7        Q.  And on how many occasions have you            09:27:04

 8    consulted with Mr. Williamson about Tolkien Estate    09:27:05

 9    matters?                                              09:27:09

10        A.  Once.                                         09:27:10

11        Q.  And what year was that?                       09:27:14

12        A.  I don't recall.                               09:27:16

13        Q.  Prior to 2010?                                09:27:19

14        A.  Yes.                                          09:27:23

15        Q.  Do you recall whether it was closer to 2002  09:27:27

16    or closer to 2010?                                    09:27:31

17        A.  Somewhere in the middle of those two dates.   09:27:32

18        Q.  Do you recall what matter it was in which     09:28:00

19    you consulted with Mr. Williamson?                    09:28:02

20            MS. ESKENAZI:  Again, this is -- this is      09:28:03

21    potentially invasive of the attorney-client          09:28:06

22    privilege.  If there's a stipulation that he can      09:28:08

23    answer just about the subject matter, without         09:28:10

24    waiving that privilege, I'll allow him to answer --   09:28:12

25            MR. ULIN:  That's fine.                       09:28:15
```

33

| | | |
|---|---|---|
| 1 | MS. ESKENAZI: -- in a general sense. | 09:28:15 |
| 2 | THE WITNESS: Yes, I do. | 09:28:17 |
| 3 | BY MR. ULIN: | 09:28:17 |
| 4 | Q. And what was the matter on which you | 09:28:27 |
| 5 | consulted with Mr. Williamson? | 09:28:29 |
| 6 | MS. ESKENAZI: Same stipulation? | 09:28:33 |
| 7 | MR. ULIN: Yes. | 09:28:33 |
| 8 | MS. ESKENAZI: Thank you. | 09:28:34 |
| 9 | THE WITNESS: It related to the film | 09:28:34 |
| 10 | participations claim against New Line Cinema. | 09:28:35 |
| 11 | BY MR. ULIN: | 09:28:35 |
| 12 | Q. And do I understand correctly that other | 09:28:52 |
| 13 | than consulting with Mr. Williamson at some point | 09:28:53 |
| 14 | during the last decade about the film participations | 09:28:57 |
| 15 | claim against New Line Cinema, you otherwise have | 09:29:01 |
| 16 | not spoken with him about Tolkien Estate matters at | 09:29:03 |
| 17 | all; is that correct? | 09:29:06 |
| 18 | A. That's correct. | 09:29:10 |
| 19 | Q. With respect to your consultation with | 09:29:10 |
| 20 | Mr. Williamson about the film participations claim | 09:29:19 |
| 21 | against New Line Cinema, was that one meeting or | 09:29:22 |
| 22 | more than one meeting? | 09:29:27 |
| 23 | A. To the best of my recollection, one | 09:29:28 |
| 24 | meeting. | 09:29:35 |
| 25 | Q. And were there telephone calls as well? | 09:29:35 |

Maier, Steven (Final)

EXHIBIT C                    PAGE 412

34

```
 1        A.  No.                                        09:29:35

 2        Q.  When was the first time you recall being   09:29:55

 3    called on to become involved with a Tolkien Estate 09:29:58

 4    matter that related to the Saul Zaentz Company?    09:30:01

 5           MS. ESKENAZI:  Objection.  Vague and        09:30:08

 6    ambiguous.                                         09:30:09

 7           THE WITNESS:  I don't recall.               09:30:09

 8    BY MR. ULIN:                                       09:30:09

 9        Q.  Do you recall what the first matter was    09:30:23

10    that you worked on that related to the Saul Zaentz 09:30:25

11    Company?                                           09:30:27

12        A.  I don't recall.                            09:30:27

13        Q.  Speaking generally over the years in the   09:30:30

14    period 2002 to the present, what matters do you    09:30:42

15    recall working on that related to the Saul Zaentz  09:30:48

16    Company?                                           09:30:49

17        A.  I have a difficulty with the formulation   09:30:49

18    "related to."  Because they may have had an interest 09:30:55

19    or they may not have been the subject matter of    09:31:03

20    the -- the matter.                                 09:31:08

21        Q.  Fair enough.  So I -- let me reframe the   09:31:08

22    question to ask you what matters you recall working 09:31:13

23    on in which you have interacted with the Saul Zaentz 09:31:18

24    Company?                                           09:31:22

25        A.  I'm sorry, you'll need to rephrase again.  09:31:22
```

Maier, Steven (Final)

EXHIBIT C                                        PAGE 413

35

```
 1     Are you asking me the number of matters or to        09:31:31

 2     identify them or --                                  09:31:33

 3         Q.  I'm asking you to identify them.  And you    09:31:34

 4     can do it in broad strokes at this point.            09:31:35

 5         A.  The interaction I recall related to the      09:31:37

 6     Class 16 trademarks issue.  I remember that early on 09:31:45

 7     I was involved in a -- an infringement case where it 09:31:50

 8     came to my attention that they had registered the    09:31:55

 9     trademark Lord of the Rings in Class 16.  This was   09:31:59

10     problematic.  And I had some interaction with them   09:32:04

11     or their external counsel in connection with that.   09:32:09

12         Q.  And is that the matter that relates to the   09:32:12

13     book entitled "Magical World of Lord of" -- "Worlds  09:32:15

14     of Lord of the Rings"?                               09:32:18

15         A.  That sounds familiar.                        09:32:21

16         Q.  And we'll come back to that.                 09:32:22

17             In 2012 you and Ms. Blackburn left the       09:32:24

18     Manches firm and formed your own firm in Oxford,     09:32:44

19     correct?                                             09:32:44

20         A.  Yeah, I suppose technically we left on 31st  09:32:49

21     December 2011 and started up on 1st January 2012.    09:32:52

22         Q.  Fair enough.  Were you able to bring all of  09:32:55

23     your work related to the Tolkien Estate from Manches 09:33:02

24     to Maier Blackburn?                                  09:33:04

25         A.  Those clients chose to follow us to Maier    09:33:05
```

36

```
 1    Blackburn, yes.                                      09:33:09

 2        Q.  Fair enough.  Do you still have all of your  09:33:10

 3    files on Tolkien Estate-related work from the period 09:33:14

 4    at which you -- in which you worked at Manches?      09:33:19

 5            MS. ESKENAZI:  Objection.  Vague and         09:33:22

 6    ambiguous.                                           09:33:26

 7            THE WITNESS:  That's quite a complex         09:33:26

 8    question in view of archiving of files, current      09:33:28

 9    files, closed files.  I think you would have to be   09:33:32

10    more specific.                                       09:33:35

11    BY MR. ULIN:                                         09:33:35

12        Q.  Do you have access to all of the files for  09:33:35

13    your Tolkien Estate matters, regardless of whether   09:33:39

14    they were at Manches or since you've opened your new 09:33:43

15    firm?                                                09:33:46

16            MS. ESKENAZI:  Objection.  Vague and         09:33:47

17    ambiguous.                                           09:33:49

18            THE WITNESS:  Yes, I believe that I do.      09:33:49

19    BY MR. ULIN:                                         09:33:58

20        Q.  And were those files made available to your 09:33:58

21    counsel in this case in connection with the         09:34:00

22    discovery that's been served?                        09:34:03

23        A.  Yes, they were.                              09:34:05

24        Q.  What entities do you understand to comprise 09:34:11

25    the Tolkien Estate?                                  09:34:14
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 415

37

| | | |
|---|---|---|
| 1 | MS. ESKENAZI:  Objection.  Vague and | 09:34:16 |
| 2 | ambiguous. | 09:34:16 |
| 3 | THE WITNESS:  Two entities, the Tolkien | 09:34:16 |
| 4 | Estate Limited, which is a U.K. limited company, and | 09:34:22 |
| 5 | the Tolkien Trust, which is a charity. | 09:34:26 |
| 6 | BY MR. ULIN: | 09:34:26 |
| 7 | Q.  And those are both your clients; is that | 09:34:32 |
| 8 | correct? | 09:34:32 |
| 9 | A.  They're both clients of the firm for whom I | 09:34:34 |
| 10 | do work. | 09:34:36 |
| 11 | Q.  Okay.  And are they your clients in this -- | 09:34:42 |
| 12 | in connection with this case? | 09:34:44 |
| 13 | A.  Yes, they are. | 09:34:45 |
| 14 | Q.  Do you have any formal position, either in | 09:34:46 |
| 15 | the Tolkien Estate Limited or the Tolkien Trust? | 09:34:58 |
| 16 | A.  Yes. | 09:35:02 |
| 17 | Q.  Can you explain? | 09:35:03 |
| 18 | A.  I'm appointed as a director of the Tolkien | 09:35:04 |
| 19 | Estate Limited. | 09:35:08 |
| 20 | Q.  Do you also have a formal position in the | 09:35:14 |
| 21 | Tolkien Trust? | 09:35:21 |
| 22 | A.  No, I have no position in the Tolkien | 09:35:21 |
| 23 | Trust. | 09:35:24 |
| 24 | Q.  When were you appointed as a director of | 09:35:24 |
| 25 | the Tolkien Estate Limited? | 09:35:27 |

Maier, Steven (Final)

EXHIBIT C                                    PAGE 416

38

```
 1        A.  I believe it was 2011.              09:35:29

 2        Q.  And you've served continuously since that  09:35:33

 3   time; is that correct?                       09:35:38

 4        A.  Yes, I have.                         09:35:39

 5        Q.  Is there a term for your appointment?  09:35:40

 6        A.  I don't believe so.                  09:35:43

 7        Q.  So you're appointed to the directorship  09:35:48

 8   indefinitely; is that correct?               09:35:51

 9        A.  To the best of my understanding.     09:35:53

10        Q.  Do you receive compensation for your  09:35:54

11   services as director of the Tolkien Estate Limited?  09:35:57

12        A.  No.                                  09:36:00

13        Q.  Have you ever?                       09:36:04

14        A.  No.                                  09:36:04

15        Q.  What are your responsibilities as a  09:36:08

16   director of the Tolkien Estate Limited?      09:36:10

17           MS. ESKENAZI:  Objection.  Vague and  09:36:12

18   ambiguous.                                   09:36:13

19           THE WITNESS:  It's very much a nominal  09:36:16

20   appointment as what we refer to as the non-family  09:36:18

21   director.  And I don't have any executive    09:36:20

22   responsibility at all.                       09:36:25

23   BY MR. ULIN:                                 09:36:30

24        Q.  How much of your time do you commit to  09:36:30

25   that -- to your role as a non-family director of the  09:36:31
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 417

39

```
1    Tolkien Estate Limited?                        09:36:33

2        A.  No substantial time.                   09:36:34

3        Q.  Who are your client contacts at the Tolkien  09:36:53

4    Estate Limited?                                09:36:58

5        MS. ESKENAZI:  Objection.  Vague and       09:36:59

6    ambiguous.  Assumes facts not in evidence.     09:37:01

7        THE WITNESS:  The way that the clients      09:37:03

8    operate is that Cathleen Blackburn is the client  09:37:07

9    contact partner.                               09:37:10

10   BY MR. ULIN:                                    09:37:10

11       Q.  Are you saying that with respect to    09:37:17

12   contacting the Tolkien Estate clients, Ms. Blackburn  09:37:19

13   makes those contacts and you do not?           09:37:22

14       A.  In general terms, that's correct.      09:37:27

15       Q.  Do you have -- do you personally have  09:37:28

16   contacts with the client in connection with this  09:37:57

17   case?                                          09:37:59

18       A.  I have spoken to them on occasions in  09:38:00

19   connection with this case.                     09:38:10

20       Q.  And who are the people at the Tolkien  09:38:11

21   Estate that you have spoken with about this case?  09:38:16

22       MS. ESKENAZI:  Again, if there's a         09:38:21

23   stipulation that this doesn't waive the        09:38:22

24   attorney-client privilege.                     09:38:25

25       MR. ULIN:  That's fine.  I'm not asking    09:38:25
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 418

40

```
 1    about substance at the moment.  I'm just asking who.   09:38:27

 2            MS. ESKENAZI:  I hear you but we're --       09:38:28

 3            MR. ULIN:  Okay.                              09:38:28

 4            MS. ESKENAZI:  -- starting to get there.      09:38:30

 5            THE WITNESS:  Priscilla Tolkien, Michael      09:38:32

 6    Tolkien, Simon Tolkien, Christopher Tolkien, Baillie  09:38:34

 7    Tolkien.                                              09:38:39

 8    BY MR. ULIN:                                          09:38:39

 9        Q.  Page 2 of your CV, which is Exhibit 23, the   09:39:01

10    first entry in your recent examples of IP and media   09:39:06

11    litigation matters, you describe as advising the      09:39:12

12    J.R.R. Tolkien Estate in $150 million claim against   09:39:16

13    New Line Cinemas -- Cinema/Warner Bros., et cetera,   09:39:21

14    right?                                                09:39:21

15        A.  I see that.                                   09:39:24

16        Q.  Is that the only entry on your CV that        09:39:25

17    relates to your work for the Tolkien Estate?          09:39:29

18        A.  Sorry, are you asking me is that the only     09:39:31

19    entry listed on this page?                            09:39:36

20        Q.  Yes.  Well --                                 09:39:39

21        A.  Oh, I see.  I understand --                   09:39:40

22        Q.  -- you do have a second page of --            09:39:40

23        A.  -- the question.                              09:39:41

24        Q.  -- examples, but --                           09:39:41

25        A.  I understand the question.                    09:39:44
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 419

41

| | | |
|---|---|---|
| 1 | Q. -- yes. | 09:39:44 |
| 2 | A. That's the only Tolkien Estate matter | 09:40:01 |
| 3 | that's listed there. | 09:40:02 |
| 4 | Q. Outside of Maier Blackburn and Manches, are | 09:40:14 |
| 5 | there other law firms with which you have worked on | 09:40:17 |
| 6 | Tolkien Estate matters over the years? | 09:40:23 |
| 7 | A. Yes. | 09:40:24 |
| 8 | Q. And which firms are those? | 09:40:27 |
| 9 | A. Davis Wright Tremaine would be one. | 09:40:28 |
| 10 | Q. Any others? | 09:40:37 |
| 11 | A. There have been a couple of others just on | 09:40:38 |
| 12 | miscellaneous matters. I can't necessarily remember | 09:40:42 |
| 13 | who they were now. | 09:40:45 |
| 14 | Sorry. Would you -- would you repeat the | 09:40:54 |
| 15 | question? I want to make sure I've given you an | 09:40:55 |
| 16 | accurate answer. | 09:40:58 |
| 17 | Q. Yes. I asked whether outside of Maier | 09:40:58 |
| 18 | Blackburn and Manches there are other law firms with | 09:41:00 |
| 19 | which you have worked over the years on Tolkien | 09:41:03 |
| 20 | Estate matters. And I'm focusing on other firms | 09:41:05 |
| 21 | that also represented the Estate. | 09:41:07 |
| 22 | A. Right. So we need to include Loeb & Loeb | 09:41:08 |
| 23 | and Greenberg Glusker. | 09:41:12 |
| 24 | Q. On how many occasions have you worked with | 09:41:25 |
| 25 | Davis Wright to represent the Estate? | 09:41:28 |

Maier, Steven (Final)

EXHIBIT C                                              PAGE 420

42

| | | |
|---|---|---|
| 1 | MS. ESKENAZI:  Objection.  Vague and | 09:41:30 |
| 2 | ambiguous. | 09:41:33 |
| 3 | THE WITNESS:  I can only think of one | 09:41:41 |
| 4 | occasion as I sit here today. | 09:41:43 |
| 5 | BY MR. ULIN: | 09:41:43 |
| 6 | Q.  What case was that or what matter was that? | 09:41:44 |
| 7 | A.  It related to a subpoena in the United | 09:41:47 |
| 8 | States to obtain details of an infringing party who | 09:41:50 |
| 9 | was domiciled in the United States. | 09:41:56 |
| 10 | Q.  And who was the infringing party? | 09:42:02 |
| 11 | A.  I don't recall. | 09:42:03 |
| 12 | Q.  A subpoena that the Estate was serving on | 09:42:06 |
| 13 | an infringing party; is that correct? | 09:42:11 |
| 14 | A.  To the best of my recollection, the case | 09:42:13 |
| 15 | involved a file sharing Web site and we wanted to | 09:42:17 |
| 16 | obtain details of the individuals who were posting | 09:42:22 |
| 17 | infringing copies of the Tolkien books on that Web | 09:42:28 |
| 18 | site. | 09:42:30 |
| 19 | Q.  The subpoena went to the Web site or a Web | 09:42:36 |
| 20 | intermediary? | 09:42:40 |
| 21 | A.  I don't recall the details.  It was some | 09:42:41 |
| 22 | years ago. | 09:42:43 |
| 23 | Q.  Fair enough.  On how many occasions have | 09:42:44 |
| 24 | you worked with Loeb & Loeb on Tolkien Estate | 09:42:50 |
| 25 | matters? | 09:42:51 |

Maier, Steven (Final)

EXHIBIT C                                    PAGE 421

43

```
1        A.   One.                                    09:42:51

2        Q.   And what was that?                      09:42:52

3        A.   That was the film participation litigation   09:42:55

4   against New Line.                                 09:42:58

5        Q.   And on how many occasions have you worked   09:42:59

6   with Greenberg Glusker in connection with the Estate   09:43:04

7   matters?                                          09:43:07

8             MS. ESKENAZI:  Objection.  Vague and    09:43:07

9   ambiguous.                                        09:43:11

10            THE WITNESS:  Well, that is a little vague   09:43:11

11  because Greenberg have represented the Estate for a   09:43:13

12  number of years now in connection with, initially,   09:43:17

13  New Line/Warner and now the current matter.       09:43:23

14  BY MR. ULIN:                                      09:43:23

15       Q.   With respect to Greenberg, have you worked   09:43:32

16  with them outside the context of either the film   09:43:33

17  participation dispute or this case?               09:43:36

18            MS. ESKENAZI:  Objection.  Vague and    09:43:39

19  ambiguous.                                        09:43:41

20            THE WITNESS:  Do you mean on Tolkien    09:43:41

21  matters or --                                     09:43:42

22  BY MR. ULIN:                                      09:43:43

23       Q.   Yes, on Tolkien matters.  I do mean that.   09:43:43

24            MS. ESKENAZI:  Same objection.          09:43:47

25            THE WITNESS:  Not that I recall.        09:43:49
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 422

44

| | | |
|---|---|---|
| 1 | BY MR. ULIN: | 09:43:49 |
| 2 | Q.  Have you also worked with Greenberg on | 09:43:50 |
| 3 | matters for clients other than the Tolkien Estate? | 09:43:52 |
| 4 | A.  Yes. | 09:43:54 |
| 5 | MS. ESKENAZI:  That's -- yeah, that's a | 09:43:55 |
| 6 | "yes" or "no" question. | 09:43:57 |
| 7 | BY MR. ULIN: | 09:43:57 |
| 8 | Q.  And which clients? | 09:44:01 |
| 9 | MS. ESKENAZI:  Well, I'm going to object on | 09:44:03 |
| 10 | relevance and privacy grounds. | 09:44:06 |
| 11 | THE WITNESS:  Classic Media. | 09:44:11 |
| 12 | BY MR. ULIN: | 09:44:11 |
| 13 | Q.  Anyone other than Classic Media? | 09:44:16 |
| 14 | A.  Not that I recall. | 09:44:17 |
| 15 | Q.  And when was the Classic Media matter on | 09:44:22 |
| 16 | which you worked with Greenberg? | 09:44:30 |
| 17 | A.  I don't recall. | 09:44:31 |
| 18 | Q.  Prior to 2010? | 09:44:34 |
| 19 | A.  Yes. | 09:44:37 |
| 20 | Q.  Overall, how would you describe your duties | 09:44:56 |
| 21 | and responsibilities with respect to the Estate? | 09:44:58 |
| 22 | MS. ESKENAZI:  Objection.  Vague and | 09:45:03 |
| 23 | ambiguous. | 09:45:05 |
| 24 | THE WITNESS:  I handle litigation matters | 09:45:05 |
| 25 | for them when called upon to do so. | 09:45:07 |

Maier, Steven (Final)

EXHIBIT C                                    PAGE 423

45

```
 1    BY MR. ULIN:                                    09:45:07

 2        Q.  Outside of your particular litigation   09:45:31

 3    matters, do you have regular responsibilities in --  09:45:33

 4    with respect to the Estate?                     09:45:38

 5        A.  No.                                      09:45:39

 6        Q.  How would you describe Ms. Blackburn's   09:45:48

 7    duties and responsibilities with respect to the  09:45:49

 8    Estate?                                          09:45:51

 9            MS. ESKENAZI:  Objection.  Calls for      09:45:52

10    speculation.  Lacks foundation.  Vague and      09:45:54

11    ambiguous.                                       09:45:54

12    BY MR. ULIN:                                     09:45:54

13        Q.  You may answer.                          09:45:56

14        A.  She's the principal contact for the Tolkien  09:45:58

15    Estate within our law firm and she looks after their  09:46:00

16    legal matters.                                   09:46:03

17        Q.  Have your responsibilities with respect to  09:46:05

18    the Estate changed over time?                    09:46:10

19        A.  No.                                      09:46:11

20        Q.  Do you have any duties with respect to The  09:46:33

21    Lord of the Rings or Hobbit films?              09:46:39

22            MS. ESKENAZI:  Objection.  Vague and      09:46:43

23    ambiguous.  Lacks foundation.                    09:46:45

24    BY MR. ULIN:                                     09:46:45

25        Q.  You may answer.                          09:46:48
```

46

```
 1        A.  Other than in connection with the        09:46:50
 2   litigation that I've described, no, if I've       09:46:51
 3   understood your question.                         09:46:54
 4        Q.  Okay.  Do you have any duties with respect 09:46:56
 5   to monitoring on a regular basis compliance,      09:46:57
 6   infringement, royalties with respect to the films? 09:47:01
 7           MS. ESKENAZI:  Vague and ambiguous.  Lacks 09:47:07
 8   foundation.                                        09:47:07
 9   BY MR. ULIN:                                       09:47:07
10        Q.  You may answer.                           09:47:09
11        A.  What were the three things you listed?  I'm 09:47:10
12   sorry.                                             09:47:10
13        Q.  I listed compliance, infringement,        09:47:12
14   royalties.                                         09:47:16
15        A.  I'm not entirely sure what you mean        09:47:21
16   "infringement" with regard to the films.           09:47:22
17           Do you mean infringement of -- of what?    09:47:24
18        Q.  Well, I'm asking -- I'm probing further in 09:47:29
19   my previous questions --                           09:47:32
20        A.  Right.                                     09:47:33
21        Q.  -- which goes to -- which goes to whether  09:47:33
22   you have any ongoing responsibilities to monitor   09:47:35
23   legal issues with respect to the films.  I called  09:47:37
24   out a few examples but more generally, that's what  09:47:39
25   I'm asking.                                         09:47:44
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 425

47

```
 1          MS. ESKENAZI:  Objection.  Vague and        09:47:45

 2   ambiguous.  Lacks foundation.  Compound.           09:47:45

 3          THE WITNESS:   Insofar as I understand your 09:47:46

 4   question, the answer is no, I don't have ongoing   09:47:48

 5   responsibilities of that kind.                     09:47:50

 6   BY MR. ULIN:                                        09:47:50

 7       Q.  Is there somebody at your firm who does    09:47:52

 8   have such responsibilities?                         09:47:54

 9          MS. ESKENAZI:  Objection.  Vague and        09:47:57

10   ambiguous.  Lacks foundation.  Compound.  Calls for 09:48:00

11   speculation.                                        09:48:04

12          THE WITNESS:  I don't know.                 09:48:04

13   BY MR. ULIN:                                        09:48:04

14       Q.  How many lawyers at the firm?             09:48:06

15       A.  Two.                                        09:48:08

16       Q.  Yourself and Ms. Blackburn?               09:48:09

17       A.  Correct.                                    09:48:10

18       Q.  Do you have a fairly good idea of what     09:48:11

19   Ms. Blackburn's practice is?                        09:48:13

20          MS. ESKENAZI:  Objection.  Vague and        09:48:17

21   ambiguous.  Lacks foundation.  Speculation.         09:48:19

22   BY MR. ULIN:                                        09:48:19

23       Q.  You may answer.                             09:48:22

24       A.  Well, insofar as I interact with           09:48:23

25   Ms. Blackburn, yes, but Ms. Blackburn does a great 09:48:25
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 426

48

```
1    deal of work of which I have no knowledge.        09:48:27
2        Q.  And you and she jointly work on Tolkien   09:48:29
3    Estate matters, right?                            09:48:32
4        A.  On some Tolkien Estate matters.           09:48:33
5        Q.  You have for 12 or 13 years, correct?  My 09:48:34
6    number might be off.  11 years?                   09:48:40
7        A.  Something like.                           09:48:42
8        Q.  And you don't know whether she monitors   09:48:43
9    legal issues with respect to The Lord of the Rings 09:48:56
10   and Hobbit films?                                 09:48:58
11       MS. ESKENAZI:  Objection.  Vague and          09:49:01
12   ambiguous.                                        09:49:04
13       THE WITNESS:  I don't really understand       09:49:04
14   what you mean by monitoring legal issues.         09:49:05
15   BY MR. ULIN:                                      09:49:05
16       Q.  Keeping herself abreast of the films and  09:49:10
17   issues that may affect the Estate that result from 09:49:13
18   them?                                             09:49:19
19       MS. ESKENAZI:  Same objection, plus calls     09:49:20
20   for speculation.  Lacks foundation.              09:49:22
21       THE WITNESS:  Again, I don't really           09:49:23
22   understand to what extent you're implying a       09:49:24
23   proactive element.  But in any event, I don't know 09:49:26
24   the answer to the question.                       09:49:29
25   BY MR. ULIN:                                      09:49:29
```

49

```
 1        Q.  Fair enough.  Do you have any duties or        09:49:31

 2   responsibilities that relate to monitoring print        09:49:41

 3   publications that relate to The Lord of the Rings or    09:49:45

 4   The Hobbit?                                             09:49:49

 5        MS. ESKENAZI:  Objection.  Vague and               09:49:50

 6   ambiguous.                                              09:49:55

 7        THE WITNESS:  I will take action in respect        09:49:55

 8   of infringing print publications of which I'm made      09:49:57

 9   aware in appropriate cases.                             09:50:01

10   BY MR. ULIN:                                            09:50:01

11        Q.  And are you -- do you have any                 09:50:05

12   responsibility for monitoring what infringements may    09:50:06

13   be in the marketplace in -- in the realm of print?      09:50:10

14        A.  I carry out a certain number of spot-checks    09:50:13

15   from time to time.                                      09:50:15

16        Q.  And how do you accomplish that?                09:50:16

17        A.  Mainly on the Internet.                        09:50:18

18        Q.  Excuse me.  Do you have a service that         09:50:21

19   undertakes those spot-checks for you?                   09:50:25

20        A.  No.                                            09:50:28

21        MS. ESKENAZI:  Objection.  Vague and               09:50:29

22   ambiguous.                                              09:50:30

23   BY MR. ULIN:                                            09:50:30

24        Q.  You do the spot-checks yourself?               09:50:30

25        A.  Yes.                                           09:50:32
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 428

50

1        Q.  And what -- what exactly do you do to check      09:50:33

2   for infringing print publications relating to The        09:50:35

3   Lord of the Rings and The Hobbit?                         09:50:40

4        A.  Well, an example would be that I would do a      09:50:41

5   search within Amazon on the titles of the books.          09:50:44

6        Q.  Do you do anything other than search Amazon      09:50:49

7   for the titles of the books?                              09:50:52

8        A.  I don't recall.                                  09:50:54

9        Q.  How often do you search Amazon for the           09:50:55

10  titles of the books?                                      09:50:57

11       A.  It varies.                                       09:50:59

12       Q.  On roughly how many occasions have you           09:51:04

13  searched Amazon for the titles of the books?              09:51:09

14          MS. ESKENAZI:  Objection.  Vague and              09:51:11

15  ambiguous.                                                09:51:12

16          THE WITNESS:  I don't recall.                     09:51:12

17  BY MR. ULIN:                                              09:51:14

18       Q.  How many spot-checks did you do during           09:51:14

19  2013?                                                     09:51:16

20       A.  Probably one.                                    09:51:16

21       Q.  How many did you do during 2012?                 09:51:23

22       A.  One or two.                                      09:51:26

23       Q.  Would you say those represent average years      09:51:31

24  with respect to how many spot-checks you do?              09:51:35

25       A.  I would say so.                                  09:51:36

Maier, Steven (Final)

EXHIBIT C                                        PAGE 429

51

```
 1          Q.  Do you do any spot-checks for Lord of the    09:51:44

 2     Rings or Hobbit-related infringements in categories   09:51:52

 3     other than books?                                      09:51:59

 4          MS. ESKENAZI:  Objection.  Vague and             09:52:00

 5     ambiguous.                                             09:52:03

 6          THE WITNESS:  Yes, I do.                          09:52:03

 7     BY MR. ULIN:                                           09:52:03

 8          Q.  And what cat- -- what categories of          09:52:05

 9     infringements do you do spot-checks for?               09:52:09

10          A.  I would principally be looking for           09:52:12

11     copyright infringement on merchandise like mugs,      09:52:16

12     aprons, which will reproduce text from the works.     09:52:25

13          Q.  And how do you spot-check for that?          09:52:30

14          A.  Again, by doing Internet searches.          09:52:34

15          Q.  Is that on Amazon or something else?        09:52:37

16          A.  Not necessarily.                             09:52:40

17          Q.  Okay.  So what -- if not Amazon, what --    09:52:42

18     how are you conducting those searches?                09:52:46

19          A.  I would use a search term like, "Lord of    09:52:47

20     the Rings merchandise," something like that.          09:52:53

21          Q.  And what search engine would you use?       09:52:59

22          A.  Google.                                       09:53:02

23          Q.  How often do you do spot-checks on Google   09:53:03

24     for infringing Lord of the Rings merchandise?         09:53:13

25          A.  Perhaps once or twice a year.                09:53:17
```

Maier, Steven (Final)

EXHIBIT C                                          PAGE 430

52

```
 1        Q.  Do you also do spot-checks with relation to     09:53:19

 2   infringements connected to video games?               09:53:34

 3        A.  No.                                           09:53:40

 4        Q.  Have you ever?                                09:53:43

 5        A.  Not that I recall.                            09:53:43

 6        Q.  Do you have any responsibility to keep up     09:53:49

 7   with new media and how they may affect Lord of the    09:53:55

 8   Rings and The Hobbit IP rights?                        09:54:00

 9        MS. ESKENAZI:  Objection.  Vague and              09:54:02

10   ambiguous.                                             09:54:06

11        THE WITNESS:  I have no responsibility to         09:54:06

12   that effect, no.                                       09:54:08

13   BY MR. ULIN:                                           09:54:08

14        Q.  Have you undertaken to do any spot-checks     09:54:10

15   of new media and whether that's been a vehicle for    09:54:15

16   infringement of Lord of the Rings or Hobbit IP        09:54:20

17   rights?                                                09:54:24

18        MS. ESKENAZI:  Objection.  Vague and              09:54:24

19   ambiguous.  Compound.                                  09:54:26

20        THE WITNESS:  I don't really understand the       09:54:27

21   term "new media."                                      09:54:29

22   BY MR. ULIN:                                           09:54:29

23        Q.  Do you do any spot-checks on Web sites like   09:55:12

24   Facebook or YouTube or on Twitter to determine        09:55:18

25   whether there are Lord of the Rings and Hobbit        09:55:27
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 431

53

```
 1    infringements on those sort of Web sites?        09:55:31

 2        A.  No.                                       09:55:34

 3        Q.  Any spot-checks on user-generated content 09:55:34

 4    sites?  Again, YouTube would be an example of such a 09:55:38

 5    site, but there are others.                       09:55:43

 6            MS. ESKENAZI:  Objection.  Vague and      09:55:44

 7    ambiguous.                                        09:55:44

 8            THE WITNESS:  I don't do any spot-checks of 09:55:44

 9    that kind.                                        09:55:46

10    BY MR. ULIN:                                      09:55:50

11        Q.  Is HarperCollins your client?            09:55:50

12            MS. ESKENAZI:  Objection.  Vague and      09:55:53

13    ambiguous.                                        09:55:54

14            THE WITNESS:  HarperCollins is the joint  09:55:54

15    owner of The Lord of the Rings and Hobbit and we  09:55:56

16    work very closely with HarperCollins' legal and   09:55:59

17    business people in developing legal theories and  09:56:02

18    going forward with the enforcement of rights.  But 09:56:06

19    they're not technically a client of Maier Blackburn. 09:56:09

20    BY MR. ULIN:                                      09:56:09

21        Q.  You don't have a retainer agreement with  09:56:15

22    HarperCollins?                                    09:56:17

23            MS. ESKENAZI:  Objection.  Vague and      09:56:19

24    ambiguous.                                        09:56:21

25            THE WITNESS:  The firm Maier Blackburn does 09:56:21
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 432

54

```
 1    not have a retainer agreement with HarperCollins.    09:56:25

 2    BY MR. ULIN:                                          09:56:31

 3        Q.  And did Manches have a retainer agreement     09:56:31

 4    with HarperCollins?                                   09:56:34

 5        A.  Not to my knowledge.                          09:56:35

 6        Q.  I want to turn to what you discussed as the   09:56:45

 7    issue over trademarks in International Class 16.      09:56:49

 8            Has that been the princ- -- has the Class     09:56:56

 9    16 issues been the principal focus of your work in    09:57:13

10    connection with the Estate's interaction with the     09:57:19

11    Saul Zaentz Company up until the filing of this       09:57:25

12    litigation?                                           09:57:27

13            MS. ESKENAZI:  Objection.  Vague and          09:57:27

14    ambiguous.                                            09:57:31

15            THE WITNESS:  I would think that's the        09:57:31

16    issue that's occupied most of my time in interacting  09:57:33

17    with the Saul Zaentz Company.                         09:57:36

18    BY MR. ULIN:                                          09:57:36

19        Q.  And you're aware that Class 16 generally      09:57:40

20    covers paper goods and printed matter, correct?       09:57:42

21        A.  I would need to review exactly what it        09:57:46

22    says, but as a general statement of principle, that   09:57:47

23    sounds right.                                         09:57:49

24        Q.  Okay.  And you know the Estate's position     09:57:57

25    in this case is that Zaentz is unlawfully registered  09:58:01
```

55

```
 1    as the owners of trademarks in International Class    09:58:04

 2    16 with the effect of excluding plaintiffs from       09:58:08

 3    registering their own legitimate trademarks in that   09:58:11

 4    class with respect to The Lord of the Rings and The   09:58:14

 5    Hobbit, correct?                                      09:58:16

 6         A.  I'd need to review the complaint but that    09:58:18

 7    sounds right.                                         09:58:23

 8         Q.  When do you first recall becoming involved   09:58:24

 9    with the Class 16 issues as between Zaentz and the    09:58:27

10    Estate?                                               09:58:33

11         A.  It was in connection with the infringement   09:58:34

12    matter that I described to you earlier.               09:58:36

13         Q.  I'll come back to that in a moment.          09:58:38

14             How many attempts would you estimate have    09:58:55

15    been made to reach an agreement with respect to       09:59:00

16    Class 16 rights as between Zaentz and the Estate?     09:59:05

17             MS. ESKENAZI:  Objection.  It's vague and    09:59:08

18    ambiguous.                                            09:59:10

19             THE WITNESS:  I wouldn't characterize it as  09:59:10

20    a number of attempts.  There's been an ongoing        09:59:11

21    dialogue for many years seeking to do that.           09:59:15

22    BY MR. ULIN:                                          09:59:15

23         Q.  And both sides have made a number of         09:59:17

24    proposals to resolve the issues concerning Class 16,  09:59:19

25    correct?                                              09:59:19
```

Maier, Steven (Final)

EXHIBIT C                                           PAGE 434

56

```
 1        A.  I don't recall the exact details but that    09:59:25

 2   sounds right.                                          09:59:27

 3        Q.  But despite the proposals that have been      09:59:28

 4   exchanged, those issues have not been resolved as of   09:59:31

 5   yet, correct?                                          09:59:34

 6        A.  Correct.                                      09:59:36

 7        Q.  And that's why they're a part of the          09:59:36

 8   current lawsuit, correct?                              09:59:39

 9        A.  Correct.                                      09:59:40

10        Q.  I might have asked you this earlier.  Do      09:59:41

11   you recall a book entitled "The Magical World of The   09:59:54

12   Lord of the Rings"?                                    09:59:58

13        A.  That title is somewhat familiar.              09:59:58

14        Q.  Is that the dispute that you identified       10:00:00

15   earlier which was your first involvement with Estate   10:00:04

16   matters and your first -- sorry, with Estate matters   10:00:08

17   that relate to the Saul Zaentz Company, and your       10:00:10

18   first -- also your first involvement with the Class    10:00:13

19   16 issue?                                              10:00:15

20        A.  I don't recall.                               10:00:16

21        MR. ULIN:  Let's mark Exhibit 24.                 10:00:18

22            (The document referred to was                 10:00:18

23            previously marked for                         10:00:18

24            identification as Exhibit 20 and              10:00:18

25            attached to this deposition.)                 10:00:18
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 435

57

```
 1              MR. ULIN:  This may be duplicative of an      10:00:39
 2   earlier exhibit but I'm not sure I have the running    10:00:41
 3   list of exhibits and I think I'd be inclined just to   10:00:42
 4   mark it again for the purpose of proceeding today.     10:00:46
 5              MS. ESKENAZI:  I think it is, actually.      10:00:53
 6              MR. ULIN:  I'm pretty sure it is but I       10:00:54
 7   don't think we have the stack, so I think the only     10:00:56
 8   way we're going to be able to proceed is to mark it    10:00:58
 9   again as 24.                                           10:01:01
10              THE REPORTER:  O'Melveny was e-mailed the
11   exhibits.
12              MR. ULIN:  Oh.  We may be able to do
13   something at a break.
14              MS. ESKENAZI:  Yeah, we might be able to.
15              MR. ULIN:  Maybe we can renum- -- something
16   like that.
17              MS. ESKENAZI:  Yeah.
18   BY MR. ULIN:
19       Q.  Mr. Maier, have you seen Exhibit 24 before?  10:01:55
20       A.  I don't recall.                              10:01:58
21       Q.  This appears to be a letter from            10:02:06
22   Ms. Blackburn to Al Bendich at the Saul Zaentz        10:02:12
23   Company dated May the 3rd, 2002.                      10:02:16
24          Do you see that?                              10:02:16
25       A.  That's what it appears to be, yeah.          10:02:20
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 436

58

```
 1        Q.  And the letter relates to enforcement       10:02:22

 2   against or concerning the book Magical World of Lord  10:02:24

 3   of the Rings, right?                                  10:02:29

 4        A.  Okay, it's quite a complex letter.  Would    10:02:30

 5   you like me to read it?                               10:02:32

 6        Q.  I can direct -- you may, obviously, but I    10:02:35

 7   can direct you to the portions of the letter that     10:02:37

 8   are going to be significant for our purposes.         10:02:39

 9        In the center of the second page of the          10:02:42

10   letter, Ms. Blackburn refers to a -- excuse me -- a   10:02:49

11   problem in the Estate taking action against or with   10:02:55

12   respect to that book based on the Tolkien titles      10:02:58

13   because the trademark registrations in Class 16 for   10:03:05

14   those titles are held in Zaentz's name.               10:03:08

15        A.  I see that paragraph.                        10:03:14

16        Q.  Do you see that?                             10:03:14

17        A.  Yeah, yeah.                                  10:03:15

18        Q.  Is that your -- with respect to the          10:03:16

19   Estate's interaction with Zaentz concerning this      10:03:24

20   book Magical Worlds of -- Worlds of Lord of the       10:03:26

21   Rings, is that the Class 16 issue on which you wound  10:03:28

22   up being focused?                                     10:03:33

23        MS. ESKENAZI:  Objection.  Vague and             10:03:33

24   ambiguous.  Document speaks for itself.  Lacks        10:03:36

25   foundation.  Calls for speculation.                   10:03:39
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 437

59

```
 1            THE WITNESS:  Well, as I sit here today,    10:03:41

 2    I'd have to consider this paragraph in detail if     10:03:43

 3    you're asking me if it's an accurate statement.  It  10:03:47

 4    certainly references that issue.                     10:03:49

 5    BY MR. ULIN:                                         10:03:49

 6        Q.  Okay.  Ms. Blackburn writes that the         10:03:54

 7    Estate's reliance on the titles as trademarks in the 10:04:01

 8    context of publishing rights wouldn't conflict with  10:04:03

 9    Zaentz's use of its rights because the -- the goods   10:04:07

10    that Zaentz produces in Class 16 don't overlap with  10:04:12

11    the Estate's publishing activity.                    10:04:16

12            Do you see that?                             10:04:18

13        A.  I see that sentence, yeah.                   10:04:18

14        Q.  You're aware that Zaentz licenses Class      10:04:21

15    16 -- goods in Class 16, right?                      10:04:26

16        A.  That use primarily film art, I believe      10:04:30

17    that's right.                                        10:04:32

18        Q.  Okay.  And -- and the Estate licenses --     10:04:33

19    also licenses goods in Class 16, correct?            10:04:38

20            MS. ESKENAZI:  Objection.  Vague and         10:04:45

21    ambiguous.                                           10:04:47

22            THE WITNESS:  The Estate's rights relate to  10:04:47

23    all publishing in Class 16, other than that limited  10:04:51

24    carve-out for Zaentz, yes.                           10:04:53

25    BY MR. ULIN:                                         10:04:53
```

Maier, Steven (Final)

EXHIBIT C                                        PAGE 438

60

| 1 | Q.  And broadly speaking, both the Estate and | 10:04:58 |
| 2 | Zaentz are permitted to license goods in Class 16 | 10:04:59 |
| 3 | within their respective scopes of rights, correct? | 10:05:06 |
| 4 | A.  Well, I'm -- | 10:05:10 |
| 5 | MS. ESKENAZI:  Objection.  Calls for a | 10:05:11 |
| 6 | legal conclusion.  Vague and ambiguous. | 10:05:13 |
| 7 | THE WITNESS:  I'm -- I'm not sure if | 10:05:15 |
| 8 | "broadly speaking" would be a correct | 10:05:17 |
| 9 | characterization, because the Estate has massive | 10:05:19 |
| 10 | publishing activity and has had for decades, as | 10:05:22 |
| 11 | opposed to the very small carve-out for books of | 10:05:26 |
| 12 | film art. | 10:05:29 |
| 13 | BY MR. ULIN: | 10:05:29 |
| 14 | Q.  Okay.  But leaving aside the phrase | 10:05:30 |
| 15 | "broadly speaking," both the Estate and Zaentz are | 10:05:32 |
| 16 | entitled to license goods within Class 16, correct? | 10:05:35 |
| 17 | A.  Zaentz -- | 10:05:43 |
| 18 | MS. ESKENAZI:  Objection.  Calls for a | 10:05:43 |
| 19 | legal conclusion. | 10:05:46 |
| 20 | BY MR. ULIN: | 10:05:46 |
| 21 | Q.  This is just -- this is just a "yes" or | 10:05:46 |
| 22 | "no" question. | 10:05:50 |
| 23 | A.  Zaentz is entitled to license books that | 10:05:50 |
| 24 | use film art, primarily. | 10:05:52 |
| 25 | Q.  And not just books, other goods within | 10:05:53 |

Maier, Steven (Final)

EXHIBIT C                                    PAGE 439

61

```
 1    Class 16 as well, correct?                    10:05:55

 2         A.  I'd need to review the contracts to express  10:05:59

 3    a view on that.                                10:06:02

 4         Q.  Okay.  We'll come back to it.         10:06:02

 5              In the second-to-the-last paragraph on  10:06:04

 6    page 2 of her letter, Ms. Blackburn proposes that  10:06:25

 7    the Estate take an assignment or an exclusive  10:06:32

 8    license in the rights to use titles -- the titles as  10:06:36

 9    trademarks so that it can pursue enforcement  10:06:38

10    concerning The Magical World of Lord of the Rings.  10:06:40

11              Do you see that?                     10:06:42

12         A.  I see that.                           10:06:43

13         Q.  Do you know if that happened at that time?  10:06:51

14         A.  I don't believe it did.              10:06:53

15         Q.  And this letter does not raise an objection  10:06:56

16    to Zaentz having registered trademarks in Class 16,  10:07:09

17    does it?                                       10:07:16

18              MS. ESKENAZI:  Objection.  The document  10:07:16

19    speaks for itself.  Legal -- calls for a legal  10:07:20

20    conclusion.                                    10:07:24

21              THE WITNESS:  Well, I think it does.  10:07:25

22    BY MR. ULIN:                                   10:07:25

23         Q.  Is Ms. Blackburn saying that -- anywhere in  10:07:30

24    this letter that it -- Zaentz did not properly  10:07:33

25    register its trademarks in Class 16?           10:07:39
```

Maier, Steven (Final)

EXHIBIT C                                          PAGE 440

62

| | | |
|---|---|---|
| 1 | MS. ESKENAZI:  Objection.  Asked and | 10:07:42 |
| 2 | answered. | 10:07:43 |
| 3 | THE WITNESS:  Well, she refers to the | 10:07:44 |
| 4 | problem of the Zaentz registrations. | 10:07:45 |
| 5 | BY MR. ULIN: | 10:07:45 |
| 6 | Q.  She refers to an issue of the effect of the | 10:07:53 |
| 7 | registrations on the Estate's ability to enforce | 10:07:55 |
| 8 | its -- its rights in the titles, correct? | 10:08:02 |
| 9 | MS. ESKENAZI:  Objection.  Vague and | 10:08:04 |
| 10 | ambiguous.  Document speaks for itself. | 10:08:05 |
| 11 | BY MR. ULIN: | 10:08:05 |
| 12 | Q.  You may answer. | 10:08:08 |
| 13 | MS. ESKENAZI:  Calls for a legal | 10:08:08 |
| 14 | conclusion. | 10:08:09 |
| 15 | THE WITNESS:  I think you're going to have | 10:08:09 |
| 16 | to let me read the whole letter if you want me to | 10:08:11 |
| 17 | comment any further on it.  But in any event, it's | 10:08:14 |
| 18 | Ms. Blackburn's letter. | 10:08:16 |
| 19 | BY MR. ULIN: | 10:08:16 |
| 20 | Q.  Okay.  Did you review this letter before it | 10:08:18 |
| 21 | was sent? | 10:08:20 |
| 22 | A.  No. | 10:08:20 |
| 23 | Q.  Did you discuss the letter -- this letter | 10:08:27 |
| 24 | with Ms. Blackburn? | 10:08:29 |
| 25 | MS. ESKENAZI:  Objection.  Attorney-client | 10:08:31 |

Maier, Steven (Final)

EXHIBIT C                                    PAGE 441

63

| | | |
|---|---|---|
| 1 | privilege.  Instruct not to answer. | 10:08:33 |
| 2 | MR. ULIN:  The fact of whether he discussed | 10:08:35 |
| 3 | it? | 10:08:36 |
| 4 | MS. ESKENAZI:  Of this letter?  Yes. | 10:08:36 |
| 5 | That's a communication between the lawyers about the | 10:08:40 |
| 6 | particular -- | 10:08:43 |
| 7 | MR. ULIN:  Right.  I'm just asking about | 10:08:44 |
| 8 | the fact of the communication.  I'm not asking what | 10:08:46 |
| 9 | was said, though. | 10:08:48 |
| 10 | MS. ESKENAZI:  To the extent that -- to the | 10:08:48 |
| 11 | extent that you'll agree that this is not a waiver | 10:08:53 |
| 12 | of the attorney-client privilege -- | 10:08:54 |
| 13 | MR. ULIN:  That's agreed. | 10:08:55 |
| 14 | MS. ESKENAZI:  -- I will allow him to | 10:08:56 |
| 15 | answer "yes" or "no." | 10:08:57 |
| 16 | THE WITNESS:  I have no recollection of | 10:09:01 |
| 17 | seeing or discussing this letter at any time. | 10:09:02 |
| 18 | BY MR. ULIN: | 10:09:02 |
| 19 | Q.  Fair enough.  Let's go off the record. | 10:09:05 |
| 20 | THE VIDEOGRAPHER:  This is the end of media | 10:09:10 |
| 21 | number 1.  Off the record at 10:09 a.m. | 10:09:12 |
| 22 | (Brief recess.) | 10:17:20 |
| 23 | THE VIDEOGRAPHER:  We are back on the | 10:24:10 |
| 24 | record at 10:24 a.m.  This is the beginning of media | 10:24:12 |
| 25 | number 2.  Counsel may proceed. | 10:24:14 |

Maier, Steven (Final)

EXHIBIT C                                    PAGE 442

64

```
 1            MR. ULIN:  I'm just going to note for the    10:24:15

 2    record that the document that we marked as Exhibit    10:24:17

 3    24 had previously been marked as Exhibit 20 in        10:24:19

 4    Ms. Blackburn's deposition, so we're going to use     10:24:23

 5    the Exhibit 20 as the document for the record in      10:24:25

 6    this deposition and we will -- we have unmarked       10:24:29

 7    number 24 and we'll use that number for the next      10:24:33

 8    exhibit, which I'll mark right now.                   10:24:37

 9            MS. ESKENAZI:  Okay.                          10:24:42

10               (The document referred to was             10:24:42

11            marked for identification as                 10:24:42

12            Exhibit 24 and attached to this              10:24:42

13            deposition.)                                 10:24:52

14            MR. ULIN:  This document I'll note for the   10:24:52

15    record was --                                        10:24:57

16            THE REPORTER:  Wait.  Wait.  Thank you.      10:24:57

17            MS. ESKENAZI:  Now you can speak.            10:24:57

18            MR. ULIN:  Sorry.  Good point.              10:24:57

19            This document I'll note for the record was   10:24:58

20    not produced, and that was inadvertent on our part.  10:25:01

21    You'll note that there's a redacted portion at the   10:25:04

22    top, which is an e-mail which lead our coders to     10:25:06

23    believe that this was privileged, which it's not,    10:25:09

24    and we will produce it.                              10:25:10

25            MS. ESKENAZI:  Well, I'm going to object to  10:25:11
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 443

65

```
 1    him answering substantive questions about a document   10:25:18

 2    that has not previously been produced.  I understand   10:25:20

 3    you're going to ask the questions anyway, but --       10:25:22

 4           MR. GLICK:  Do you want to take a minute        10:25:26

 5    and read it?                                           10:25:27

 6           MS. ESKENAZI:  Sure.                            10:25:28

 7           MR. PETROCELLI:  This is Exhibit 24?            10:25:51

 8           MR. ULIN:  Yes, this is now Exhibit 24.         10:25:51

 9      Q.  Mr. Maier, have you seen Exhibit 24 before?      10:26:53

10      A.  I have no recollection of this but I see         10:26:56

11    that it has my name on it.                             10:27:02

12      Q.  It appears to be an e-mail from you to           10:27:03

13    Annette Hurst of the Howard Rice firm from May         10:27:06

14    the 7th, 2002.                                         10:27:11

15           Do you see that?                                10:27:12

16      A.  Yeah.                                            10:27:22

17      Q.  And you know that Ms. Hurst was outside          10:27:23

18    counsel for the Saul Zaentz Company at that time?      10:27:25

19      A.  I believe that's right, yes.                     10:27:27

20      Q.  And you worked with -- you worked with           10:27:28

21    Ms. Hurst a number of times over the years, correct?   10:27:29

22      A.  No.                                              10:27:32

23      Q.  No?  Do you have -- you did have                 10:27:32

24    correspondence and interaction with her related to     10:27:34

25    Saul Zaentz matters?                                   10:27:37
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 444

66

| | | |
|---|---|---|
| 1 | MS. ESKENAZI:  Objection.  Vague and | 10:27:42 |
| 2 | ambiguous. | 10:27:43 |
| 3 | THE WITNESS:  I -- I don't recall to what | 10:27:43 |
| 4 | extent I spoke or e-mailed with her. | 10:27:44 |
| 5 | BY MR. ULIN: | 10:27:44 |
| 6 | Q.  Fair enough.  You note at the beginning of | 10:27:46 |
| 7 | your e-mail, which is at the bottom of the first | 10:27:56 |
| 8 | page of Exhibit 24, that Ms. Blackburn forwarded you | 10:27:58 |
| 9 | a note from Ms. Hurst because you are the person who | 10:28:03 |
| 10 | deals with litigious matters on behalf of the | 10:28:06 |
| 11 | Tolkien Estate. | 10:28:10 |
| 12 | Do you see that? | 10:28:11 |
| 13 | A.  It's what it says, yeah. | 10:28:11 |
| 14 | Q.  Is this your first involvement with -- a | 10:28:12 |
| 15 | number of things I want to ask about. | 10:28:19 |
| 16 | Is this your first involvement with Tolkien | 10:28:22 |
| 17 | Estate matters? | 10:28:24 |
| 18 | A.  I don't recall. | 10:28:24 |
| 19 | Q.  Is this your first interaction with the | 10:28:24 |
| 20 | Saul Zaentz Company? | 10:28:29 |
| 21 | A.  I don't recall. | 10:28:29 |
| 22 | Q.  As you sit here today, can you recall any | 10:28:34 |
| 23 | interactions with the Saul Zaentz Company that | 10:28:36 |
| 24 | predated the dispute over The Magical Worlds of Lord | 10:28:38 |
| 25 | of the Rings? | 10:28:43 |

Maier, Steven (Final)

EXHIBIT C                    PAGE 445

1        A.  As I sit here today, I can't recall.        10:28:43

2        Q.  Okay.  Is this your first involvement with   10:28:50

3   what you described as the Class 16 issues as between  10:28:54

4   the Estate and Zaentz?                                10:28:58

5          MS. ESKENAZI:  Objection.  Asked and           10:29:03

6   answered.                                             10:29:03

7          THE WITNESS:  Again, I can't recall.           10:29:03

8   BY MR. ULIN:                                          10:29:03

9        Q.  At the second page of your e-mail, in the    10:29:28

10  middle of the page you suggest that of immediate      10:29:32

11  concern is the present stage of the trademark         10:29:36

12  registration in Class 16, correct?                    10:29:40

13         MS. ESKENAZI:  Objection.  Document speaks      10:29:47

14  for itself.                                           10:29:49

15         THE WITNESS:  Yeah, I can't add to what it      10:29:49

16  says there.                                           10:29:50

17  BY MR. ULIN:                                          10:29:50

18       Q.  Okay.  But what it says there is that        10:29:52

19  you're focused on the status of the Class 16          10:29:55

20  trademark registrations by Zaentz, correct?          10:30:00

21       A.  It says:                                     10:30:02

22            "One" -- "One issue of                      10:30:03

23            immediate concern is the present            10:30:04

24            status of the trademark                     10:30:07

25            registration."                              10:30:08

Maier, Steven (Final)

EXHIBIT C                                          PAGE 446

68

1      Q.  Okay.  And you are -- so you are raising in     10:30:23

2   this note, if I understand it correctly, the scope    10:30:25

3   of Zaentz's Class 16 registrations; is that correct?  10:30:27

4          MS. ESKENAZI:  Objection.  Document speaks     10:30:32

5   for itself.                                           10:30:33

6          THE WITNESS:  I don't have a recollection      10:30:34

7   of this e-mail so I can't tell you what was in my     10:30:36

8   mind at that time.                                    10:30:40

9   BY MR. ULIN:                                          10:30:40

10     Q.  Do you have a recollection of interacting      10:30:40

11  with Zaentz about the scope of its Class 16           10:30:42

12  registrations in or around 2002?                      10:30:47

13     A.  In general terms, yes, but I can't be          10:30:49

14  precise as to the date.                               10:30:53

15     Q.  Okay.  And that was in connection with the     10:30:55

16  Estate's efforts to enforce concerning The Magical    10:30:56

17  Worlds of Lord of the Rings book, correct?            10:31:02

18     A.  Correct.                                       10:31:03

19     Q.  Okay.  You acknowledge in the next             10:31:10

20  paragraph of this e-mail that the Estate has, in      10:31:12

21  your words, acted passively in the past with regard   10:31:15

22  to trademark registrations.                           10:31:20

23         Do you see that?                               10:31:21

24     A.  I see that sentence.                           10:31:21

25     Q.  Okay.  What do you mean by that?               10:31:24

Maier, Steven (Final)

EXHIBIT C                                    PAGE 447

69

```
 1              MS. ESKENAZI:  Objection.  Relevance.     10:31:27

 2    Document speaks for itself.                          10:31:31

 3              THE WITNESS:  Well, what it appears to mean 10:31:41

 4    is that the state -- the Estate has not had to be     10:31:43

 5    involved with trademark issues, other than relate to  10:31:44

 6    books.                                                10:31:47

 7    BY MR. ULIN:                                          10:31:47

 8        Q.  Okay.  And can you explain further what you   10:31:50

 9    meant by that at that time?                           10:31:56

10        A.  I can't because --                            10:31:58

11              MS. ESKENAZI:  Same objections.            10:31:59

12              THE WITNESS:  -- I have no recollection of  10:32:00

13    the document.                                         10:32:01

14    BY MR. ULIN:                                          10:32:01

15        Q.  Fair enough.  You note that:                  10:32:02

16              "The CTM registration insofar             10:32:12

17              as it applies to books in Class 16         10:32:16

18              is one which would appear to               10:32:17

19              clearly relate to existing rights          10:32:19

20              reserved by the Estate."  Correct?         10:32:23

21        A.  That's what it says.                          10:32:25

22        Q.  What do you mean by "the CTM registration"?  10:32:25

23              MS. ESKENAZI:  Objection.  Relevance.     10:32:28

24    Vague and ambiguous.                                  10:32:30

25              THE WITNESS:  It's a community trademark, a 10:32:31
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 448

70

```
 1    European trademark.                            10:32:34

 2    BY MR. ULIN:                                    10:32:34

 3        Q.  So the registration in the European Union,   10:32:34

 4    correct?                                        10:32:34

 5        A.  Yeah.                                    10:32:39

 6        Q.  And if I understand your objection here, it   10:32:42

 7    is that a Class 16 registration by Zaentz has   10:32:46

 8    extended into rights reserved by the Estate in its   10:32:51

 9    contracts with Zaentz; is that correct?         10:32:54

10        A.  That's what the sentence appears to say,   10:32:57

11    yes.                                            10:32:57

12        Q.  And that's affecting the Estate's ability   10:33:02

13    to enforce its trademark rights with respect to the   10:33:04

14    author and publisher of the -- of the infringing   10:33:08

15    book, correct?                                  10:33:11

16        A.  No, with regard to the title of the     10:33:16

17    infringing book.                                10:33:19

18        Q.  With regard to the title of the infringing   10:33:20

19    book.  Okay.                                    10:33:23

20            And that is the same objection that the   10:33:23

21    Estate's raising in this case with respect to Class   10:33:27

22    16, correct?                                    10:33:30

23            MS. ESKENAZI:  Objection.  Calls for a   10:33:31

24    legal conclusion.                               10:33:33

25            THE WITNESS:  The objection that the Estate   10:33:33
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 449

71

| | | |
|---|---|---|
| 1 | is raising, one of the objections that the Estate is | 10:33:36 |
| 2 | raising in this lawsuit, is to Zaentz's | 10:33:39 |
| 3 | registrations for books in Class 16. | 10:33:42 |
| 4 | BY MR. ULIN: | 10:33:42 |
| 5 | Q.  And that's the same objection that | 10:33:46 |
| 6 | is articulated -- that you articulate in your e-mail | 10:33:51 |
| 7 | to Ms. Hurst of May 7, 2002, correct? | 10:33:53 |
| 8 | MS. ESKENAZI:  Objection.  Calls for a | 10:33:58 |
| 9 | legal conclusion. | 10:33:59 |
| 10 | THE WITNESS:  I'm not exactly sure what you | 10:33:59 |
| 11 | mean by "the same objection." | 10:34:02 |
| 12 | BY MR. ULIN: | 10:34:02 |
| 13 | Q.  Your -- | 10:34:03 |
| 14 | A.  It's -- it's a similar objection but on | 10:34:04 |
| 15 | different occasions.  I -- I think that -- | 10:34:06 |
| 16 | Q.  Okay.  But the -- the point that you're | 10:34:09 |
| 17 | making in the e-mail to Ms. Hurst relates to -- is | 10:34:10 |
| 18 | that -- is to -- is to the breadth of Zaentz's | 10:34:29 |
| 19 | registration for trademarks and books in Class 16, | 10:34:32 |
| 20 | correct? | 10:34:32 |
| 21 | A.  Well, I think the objection that's being | 10:34:39 |
| 22 | made here is to the fact of Zaentz's registrations | 10:34:40 |
| 23 | in Class 16. | 10:34:42 |
| 24 | Q.  Okay.  You also again -- not again.  You | 10:34:51 |
| 25 | also suggest, as Ms. Blackburn did, that Zaentz | 10:35:17 |

Maier, Steven (Final)

EXHIBIT C                                    PAGE 450

72

```
1    grant the Estate an assignment or exclusive license    10:35:21

2    limited to books in Class 16, right?                   10:35:25

3         MS. ESKENAZI:  Objection.  Vague and              10:35:27

4    ambiguous.                                             10:35:28

5         THE WITNESS:  Sorry.  Can you show me where       10:35:28

6    that is?                                               10:35:30

7    BY MR. ULIN:                                           10:35:30

8         Q.  Sure.                                         10:35:31

9         A.  I see it.  I see it.                          10:35:36

10        Q.  Thank you.  I was just about to point it to   10:35:38

11   you, but it's in that second-to-last substantive       10:35:40

12   paragraph on page 2.                                   10:35:42

13        A.  Yeah, it says, "we had contemplated an        10:35:47

14   assignment or exclusive license."                      10:35:49

15        Q.  Okay.  Was there an assignment or license     10:35:51

16   granted?                                               10:35:55

17        A.  I don't believe so.                           10:35:56

18        MR. ULIN:  Let's mark Exhibit 25.                 10:36:06

19            (The document referred to was                 10:36:07

20            marked for identification as                  10:36:07

21            Exhibit 25 and attached to this               10:36:07

22            deposition.)                                  10:37:04

23        THE WITNESS:  Okay.  I've read that.              10:37:04

24   BY MR. ULIN:                                           10:37:04

25        Q.  Okay.  And have you seen Exhibit 5            10:37:06
```

73

```
 1   before -- excuse me, Exhibit 25 before?          10:37:07

 2        A.  I have no recollection of this -- this   10:37:09

 3   e-mail.                                           10:37:13

 4        Q.  But you don't have any reason to believe 10:37:13

 5   that you did not actually receive this e-mail from 10:37:15

 6   Ms. Hurst on or about May 15, 2002?               10:37:18

 7        MS. ESKENAZI:  Objection.  Misstates the     10:37:24

 8   document.  And vague and ambiguous.               10:37:25

 9        THE WITNESS:  It's the other way around.     10:37:28

10   It appears to be from me to --                    10:37:29

11   BY MR. ULIN:                                       10:37:29

12        Q.  Correct.  I did misstate the document.   10:37:31

13        A.  But I have -- I have no reason to think  10:37:33

14   that I didn't send it.                            10:37:35

15        Q.  Okay.  You refer to a conversation that you 10:37:36

16   had with Ms. Hurst on the telephone the preceding 10:37:42

17   Friday.                                           10:37:48

18        Do you see that?                             10:37:49

19   A.  Yes.                                          10:37:49

20        Q.  Do you remember that telephone           10:37:50

21   conversation?                                     10:37:51

22   A.  No.                                           10:37:51

23        Q.  Do you recall what was discussed?        10:37:54

24   A.  No.                                           10:37:55

25        Q.  In your e-mail, you indicate that Ms. Hurst 10:38:04
```

74

| | | |
|---|---|---|
| 1 | explained the reason why certain goods, e.g., books | 10:38:07 |
| 2 | in Class 16 had been included in the current CTM | 10:38:13 |
| 3 | application. | 10:38:16 |
| 4 | Do you see that? | 10:38:17 |
| 5 | A.  Yeah. | 10:38:17 |
| 6 | Q.  Do you recall what she told you about that? | 10:38:19 |
| 7 | A.  No. | 10:38:21 |
| 8 | Q.  Leaving aside any specific conversation | 10:38:37 |
| 9 | that you may or may not recall, do you recall, | 10:38:39 |
| 10 | generally, conversations about Class 16 rights in | 10:38:44 |
| 11 | books surrounding the enforcement concerning The | 10:38:49 |
| 12 | Magical World of Lord of the Rings book? | 10:38:57 |
| 13 | MS. ESKENAZI:  Objection. | 10:38:57 |
| 14 | THE WITNESS:  I don't recall any of that, | 10:38:59 |
| 15 | no. | 10:38:59 |
| 16 | BY MR. ULIN: | 10:38:59 |
| 17 | Q.  You don't recall conversations generally | 10:39:00 |
| 18 | with Zaentz or Zaentz's lawyers, even if you can't | 10:39:01 |
| 19 | recall a specific conversation? | 10:39:03 |
| 20 | A.  About The Magical Worlds issue? | 10:39:05 |
| 21 | Q.  About the Class 16 issues in connection | 10:39:07 |
| 22 | with Magical World? | 10:39:09 |
| 23 | A.  No, I don't recall. | 10:39:09 |
| 24 | MS. ESKENAZI:  Objection.  It's vague and | 10:39:10 |
| 25 | ambiguous. | 10:39:10 |

Maier, Steven (Final)

EXHIBIT C                                    PAGE 453

75

```
 1    BY MR. ULIN:                                    10:39:30

 2         Q.  Is it correct that you sought advice from   10:39:30

 3    the Estate's barrister in connection with enforc- --  10:39:33

 4    potential enforcement proceedings in response to The  10:39:39

 5    Magical Worlds book?                             10:39:43

 6              MS. ESKENAZI:  Well, I'm going to object as  10:39:44

 7    to attorney-client privileged communications.  I    10:39:46

 8    will let -- if you'll stipulate that it's not a     10:39:53

 9    waiver, I will allow this witness to say "yes" or    10:39:55

10    "no" to the subject matter of the discussions.     10:40:00

11              MR. ULIN:  I will.  And I have a document  10:40:02

12    which I think will allow us to move past the      10:40:05

13    attorney-client objections but we'll get to that in  10:40:07

14    a moment.                                        10:40:09

15              THE WITNESS:  Well, you referred to the   10:40:09

16    Estate's barrister.  I'm not aware of anyone that   10:40:11

17    meets that description.                          10:40:15

18    BY MR. ULIN:                                    10:40:15

19         Q.  Do you know who Richard Arnold QC is?    10:40:18

20         A.  Yes, I do.                             10:40:21

21         Q.  Okay.  Who is he?                      10:40:22

22         A.  He used to be a barrister.  He's now a   10:40:22

23    judge.                                          10:40:30

24         Q.  And does the "QC" designation indicate that  10:40:30

25    he was acting as a barrister if those letters follow  10:40:35
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 454

```
 1    his name?                                            10:40:39

 2         A.  No.  A QC is a designation for a senior     10:40:39

 3    barrister, what's called leading counsel as opposed  10:40:42

 4    to junior counsel.  It's -- Queen's Counsel is what  10:40:45

 5    the letters stand for.                               10:40:48

 6         Q.  Do you recall consulting with Mr. Arnold    10:40:50

 7    concerning enforcement arising from The Magical      10:40:56

 8    Worlds book?                                         10:41:04

 9         MS. ESKENAZI:  Same objection.  Again, it's     10:41:04

10    an attorney-client privileged communication.  And to 10:41:08

11    the extent I have a stipulation that his answering   10:41:12

12    this one question will not waive that                10:41:14

13    attorney-client privilege, I'll allow him to answer  10:41:16

14    the question.                                        10:41:19

15         MR. ULIN:  That's fine.                         10:41:19

16         THE WITNESS:  I have a recollection of a        10:41:20

17    conference with a barrister at some time that may    10:41:26

18    have been Richard Arnold, but I don't really recall. 10:41:29

19    BY MR. ULIN:                                         10:41:29

20         Q.  Okay.  And you -- you wrote instructions to 10:41:32

21    the barrister for -- with relation to issues that    10:41:36

22    you wanted to discuss, correct?                      10:41:39

23         A.  I don't recall.                             10:41:41

24         MS. ESKENAZI:  Same stipulation?                10:41:41

25         MR. ULIN:  Yes, and I think I've got the        10:41:42
```

77

```
 1    answer, but yes.                                    10:41:44

 2         Q.  And you did, in fact, meet with the -- with  10:41:47

 3    the barrister in connection with The Magical Worlds   10:41:49

 4    enforcement, correct?                                 10:41:55

 5              MS. ESKENAZI:  Again, same stipulation.      10:41:56

 6              THE WITNESS:  I don't recall.               10:41:57

 7                   (Pages 78 through 91 are

 8                 marked confidential and are bound

 9                 under separate cover.  The

10                 nonconfidential portion of this

11                 transcript continues on page 92.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

78

CONFIDENTIAL

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

79

CONFIDENTIAL

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

80

CONFIDENTIAL

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Maier, Steven (Final)

EXHIBIT C                                    PAGE 459

81

CONFIDENTIAL

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Maier, Steven (Final)

EXHIBIT C                                          PAGE 460

82

CONFIDENTIAL

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

83

CONFIDENTIAL

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

84

CONFIDENTIAL

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

85

CONFIDENTIAL

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

86

CONFIDENTIAL

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

87

CONFIDENTIAL

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

88

CONFIDENTIAL

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

89

CONFIDENTIAL

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Maier, Steven (Final)

EXHIBIT C                    PAGE 468

90

CONFIDENTIAL

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

91

CONFIDENTIAL

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

92

1          MR. ULIN:  Obviously we disagree and we'll      11:01:27

2    contest this and we think it is -- not only are we     11:01:28

3    right, but it's going to be a basis for Mr. Maier      11:01:31

4    having to return to Los Angeles for further           11:01:33

5    deposition.                                            11:01:35

6          MS. ESKENAZI:  We disagree.                      11:01:35

7    BY MR. ULIN:                                           11:01:35

8      Q.  During -- let me start the question again.       11:02:10

9          Do you recall a dispute arising during 2003      11:02:15

10   concerning the German publisher Klett-Cotta's          11:02:18

11   registration of trademarks in The Lord of the Rings    11:02:21

12   title in Germany?                                      11:02:24

13     A.  No.                                              11:02:25

14         MR. ULIN:  Mark Exhibit 28 and put it            11:02:31

15   before the witness.                                    11:02:38

16              (The document referred to was               11:02:38

17         marked for identification as                     11:02:38

18         Exhibit 28 and attached to this                  11:02:38

19         deposition.)                                     11:03:32

20         MR. PETROCELLI:  Number 28?                      11:03:32

21         MR. ULIN:  Yes.                                  11:04:25

22     Q.  Mr. Maier, have you seen Exhibit 28 before?      11:04:25

23         MS. ESKENAZI:  Have you finished reading         11:04:27

24   it?                                                    11:04:29

25         THE WITNESS:  I haven't finished reading         11:04:29

Maier, Steven (Final)

EXHIBIT C                                    PAGE 471

93

| | | |
|---|---|---|
| 1 | it. | 11:04:31 |
| 2 | Would you like me to finish reading it? | 11:04:33 |
| 3 | BY MR. ULIN: | 11:04:34 |
| 4 | Q.  Yeah, I can tell you, I'm not going to be | 11:04:42 |
| 5 | examining you on the substance of the attached | 11:04:46 |
| 6 | letter. | 11:04:47 |
| 7 | A.  Well, I've read the -- the e-mail at the | 11:04:50 |
| 8 | beginning of the exhibit. | 11:04:54 |
| 9 | Q.  Fair enough.  Does Exhibit 28 refresh your | 11:04:55 |
| 10 | recollection with respect to a dispute concerning | 11:05:02 |
| 11 | Klett-Cotta? | 11:05:05 |
| 12 | A.  No, it does not. | 11:05:07 |
| 13 | Q.  In -- and there's -- I may have asked you | 11:05:08 |
| 14 | this.  This may be a form of a question I've asked | 11:05:16 |
| 15 | you, but I just want to clarify. | 11:05:19 |
| 16 | Do you have any recollection at all of a | 11:05:21 |
| 17 | dispute involving trademark rights and the German | 11:05:22 |
| 18 | firm Klett-Cotta? | 11:05:26 |
| 19 | A.  I don't recall. | 11:05:28 |
| 20 | MS. ESKENAZI:  Objection.  Asked and | 11:05:29 |
| 21 | answered. | 11:05:29 |
| 22 | BY MR. ULIN: | 11:05:37 |
| 23 | Q.  In your e-mail to Ms. Hurst on Friday, | 11:05:37 |
| 24 | October the 24th, 2003, you indicate to her in the | 11:05:41 |
| 25 | fourth paragraph that it is and remains the Estate's | 11:05:45 |

Maier, Steven (Final)

EXHIBIT C                                    PAGE 472

94

| | | |
|---|---|---|
| 1 | position that Zaentz should not have registered | 11:05:50 |
| 2 | trademarks for books in Class 16, and that all such | 11:05:53 |
| 3 | registrations should properly be held by the Estate; | 11:05:57 |
| 4 | is that correct? | 11:06:05 |
| 5 | MS. ESKENAZI:  Objection.  Vague and | 11:06:05 |
| 6 | ambiguous.  Document speaks for itself. | 11:06:07 |
| 7 | THE WITNESS:  Well, I agree that's what it | 11:06:09 |
| 8 | says. | 11:06:11 |
| 9 | BY MR. ULIN: | 11:06:11 |
| 10 | Q.  Okay.  And that is the same position that | 11:06:12 |
| 11 | the Estate is asserting in this case, correct? | 11:06:20 |
| 12 | MS. ESKENAZI:  Objection.  Calls for a | 11:06:23 |
| 13 | legal conclusion. | 11:06:25 |
| 14 | THE WITNESS:  It relates to the same issue. | 11:06:25 |
| 15 | BY MR. ULIN: | 11:06:25 |
| 16 | Q.  And the position that Zaentz should not | 11:06:28 |
| 17 | have registered trademarks for books in Class 16 is | 11:06:30 |
| 18 | the same position that's being taken in this | 11:06:34 |
| 19 | litigation, correct? | 11:06:36 |
| 20 | MS. ESKENAZI:  Same objection. | 11:06:37 |
| 21 | THE WITNESS:  It relates to the same issue | 11:06:38 |
| 22 | in this litigation. | 11:06:39 |
| 23 | BY MR. ULIN: | 11:06:39 |
| 24 | Q.  What do you mean by that when you say, "it | 11:06:41 |
| 25 | relates to the same issue"? | 11:06:42 |

Maier, Steven (Final)

EXHIBIT C                                    PAGE 473

95

1      A.  Well, I don't have the complaint in front      11:06:44

2   of me and I can't compare the language in this         11:06:46

3   paragraph with the language in the complaint.  But     11:06:48

4   there is an issue concerning Zaentz's registrations    11:06:50

5   of trademarks for books in Class 16, I agree.          11:06:53

6      Q.  And you are raising that issue here in your     11:06:56

7   e-mail to Ms. Hurst in October of 2003, correct?       11:06:58

8      A.  That appears to be what this document says,     11:07:05

9   yeah.                                                  11:07:05

10     Q.  And that -- that's -- that -- that same         11:07:07

11  issue is raised by the Estate in this litigation,      11:07:09

12  correct?                                               11:07:09

13     MS. ESKENAZI:  Asked and answered.  Same            11:07:13

14  objections.  Calls for a legal conclusion.            11:07:15

15     THE WITNESS:  Well, as I've just said to            11:07:17

16  you, it relates to the same issue.  I'm not sure       11:07:19

17  that the wording is identical to the complaint in      11:07:21

18  this litigation.                                       11:07:25

19  BY MR. ULIN:                                           11:07:25

20     Q.  Okay.  Would you agree, then, that your         11:07:46

21  e-mail to Ms. Hurst is one in which you state          11:07:48

22  objections relating to the same Class 16 issue at      11:07:54

23  issue in this case, only that you state it -- only     11:07:57

24  stating those objections ten years ago?               11:08:03

25     MS. ESKENAZI:  Objection.  Vague and                11:08:05

Maier, Steven (Final)

EXHIBIT C                                    PAGE 474

96

```
 1    ambiguous.  Calls for a legal conclusion.           11:08:07

 2            THE WITNESS:  I would agree that this         11:08:09

 3    e-mail appears to refer to an objection to Zaentz    11:08:11

 4    having registered books in Class 16.                 11:08:15

 5    BY MR. ULIN:                                         11:08:15

 6        Q.  Okay.  And one that you made -- one that     11:08:17

 7    you made on behalf of the Estate, correct?           11:08:19

 8            MS. ESKENAZI:  Same objections.              11:08:22

 9            THE WITNESS:  As I sit here I have no         11:08:22

10    recollection of this e-mail, but that's what appears 11:08:26

11    to be the case.                                      11:08:28

12    BY MR. ULIN:                                         11:08:29

13        Q.  Okay.  And the one that you made on behalf   11:08:29

14    of the Estate ten years ago, correct?                11:08:31

15            MS. ESKENAZI:  Same objections and asked     11:08:33

16    and answered.                                        11:08:34

17            THE WITNESS:  The e-mail dates from ten      11:08:35

18    years ago.                                           11:08:37

19    BY MR. ULIN:                                         11:08:37

20        Q.  Okay.  You indicate in the next paragraph    11:08:47

21    that:                                                11:08:48

22            "It's the Estate that takes                  11:08:48

23            legal action worldwide in respect           11:08:49

24            of counterfeit books."                       11:08:51

25            Do you see that?                             11:08:52
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 475

97

| | | |
|---|---|---|
| 1 | A.  I do see that. | 11:08:53 |
| 2 | Q.  Is that correct? | 11:08:53 |
| 3 | A.  I'm certainly aware of a number of cases | 11:08:54 |
| 4 | that the Estate has taken in various jurisdictions | 11:09:01 |
| 5 | in respect of counterfeit books. | 11:09:03 |
| 6 | Q.  On how many occasions has the Estate taken | 11:09:05 |
| 7 | action with respect to counterfeit books, to your | 11:09:15 |
| 8 | knowledge? | 11:09:19 |
| 9 | A.  I don't recall. | 11:09:19 |
| 10 | Q.  Can you estimate? | 11:09:19 |
| 11 | A.  Are you asking about matters in which I've | 11:09:20 |
| 12 | been personally involved? | 11:09:25 |
| 13 | Q.  I'm asking about matters of which you are | 11:09:27 |
| 14 | aware. | 11:09:29 |
| 15 | A.  I can't estimate. | 11:09:37 |
| 16 | Q.  More than five? | 11:09:37 |
| 17 | A.  I believe so. | 11:09:40 |
| 18 | Q.  More than ten? | 11:09:40 |
| 19 | A.  Possibly. | 11:09:41 |
| 20 | Q.  More than 20? | 11:09:44 |
| 21 | A.  I would doubt it's more than 20 but it may | 11:09:44 |
| 22 | be. | 11:09:50 |
| 23 | Q.  More than 30? | 11:09:51 |
| 24 | A.  I don't think so. | 11:09:54 |
| 25 | Q.  Somewhere in the vicinity of 20.  Is that | 11:09:57 |

98

```
 1    fair?                                                11:09:57

 2         A.  I can't be any more specific.               11:10:00

 3         Q.  Okay.  And the issues concerning Class 16   11:10:01

 4    have not prevented the Estate from taking those      11:10:08

 5    enforcement actions, correct?                        11:10:11

 6         A.  Well, in many --                            11:10:13

 7             MS. ESKENAZI:  Objection.  Vague and        11:10:14

 8    ambiguous.                                           11:10:16

 9             THE WITNESS:  In many cases, the principal  11:10:16

10    action is for infringement of copyright so the Class 11:10:19

11    16 issue isn't engaged.                              11:10:23

12    BY MR. ULIN:                                         11:10:23

13         Q.  But in other cases the infringement issue   11:10:38

14    relates to trademark, correct?                       11:10:41

15         A.  Well, we're speaking hypothetically here    11:10:47

16    because I'm not sure exactly which cases you're      11:10:48

17    talking about.                                       11:10:50

18         Q.  Well, we're speaking in generalities.  I    11:10:51

19    don't think we're speaking hypothetically.           11:10:53

20         A.  Okay.                                       11:10:55

21         Q.  Are you aware of cases in which the         11:10:55

22    Estate's counterfeit enforcement has been based on   11:10:56

23    its trademark rights --                              11:10:59

24             MS. ESKENAZI:  Objection.  Vague and        11:11:00

25    ambiguous.                                           11:11:02
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 477

99

```
 1   BY MR. ULIN:                                      11:11:02

 2        Q.  -- as relates to counterfeit books?     11:11:04

 3        A.  I can't recall any cases in which -- other  11:11:07

 4   than the one you've reminded me about, The Magical  11:11:15

 5   Worlds, where there was a trademark issue without a  11:11:19

 6   copyright issue.                                  11:11:23

 7             MR. ULIN:  Let's mark Exhibit 29.       11:11:30

 8                  (The document referred to was      11:11:31

 9                  marked for identification as       11:11:31

10                  Exhibit 29 and attached to this    11:11:31

11                  deposition.)                       11:12:32

12   BY MR. ULIN:                                      11:12:32

13        Q.  Mr. Blackburn -- "Mr. Blackburn."       11:13:02

14             Mr. Maier, do you recall the e-mail     11:13:04

15   exchange contained in Exhibit 29?                 11:13:06

16        A.  No.                                      11:13:09

17        Q.  The first e-mail -- well, actually, the  11:13:13

18   second e-mail reflected in Exhibit 29 appears to be  11:13:17

19   one from you to Annette Hurst dated on or about the  11:13:20

20   6th of November 2003.                             11:13:23

21             Do you see that?                        11:13:25

22        A.  I see that.                              11:13:25

23        Q.  And it relates to the resolution of the  11:13:26

24   matter concerning Klett-Cotta, correct?           11:13:29

25        A.  It starts off by reference to the        11:13:37
```

100

```
 1    resolution of that matter, yes.                    11:13:38

 2         Q.  Does this refresh -- refresh your          11:13:42

 3    recollection at all with respect to that dispute?   11:13:43

 4         A.  Not at all.                                11:13:44

 5         Q.  And you don't -- do you have any           11:13:46

 6    recollection one way or another whether the dispute 11:13:48

 7    was resolved by Klett-Cotta assigning a trademark   11:13:49

 8    registration in -- in The Lord of the Rings title to 11:13:55

 9    Zaentz?                                             11:13:59

10         A.  No recollection whatsoever.                11:13:59

11         Q.  You don't recall one way or the other how  11:14:02

12    the case was resolved, you don't recall the case at 11:14:04

13    all, correct?                                       11:14:07

14         A.  That's correct.                            11:14:07

15         Q.  At the second page of Exhibit 29, you write 11:14:09

16    to Ms. Hurst:                                       11:14:15

17              "As between the Estate and               11:14:16

18              SZC, however, I would reiterate          11:14:18

19              that the Estate maintains it is          11:14:20

20              entitled to ownership of all             11:14:21

21              relevant trademarks so far as            11:14:23

22              books in Class 16 are concerned."        11:14:24

23              Do you see that?                          11:14:28

24         A.  I see that.                                11:14:28

25         Q.  Is that an accurate reflection of the      11:14:29
```

```
 1    Estate's position with respect to Class 16 rights in   11:14:32

 2    books as of November of 2003?                          11:14:34

 3        A.  Well, it appears to reflect the Estate's       11:14:48

 4    view as of that date.                                  11:14:50

 5        Q.  And the -- as expressed by you to counsel      11:14:51

 6    for Zaentz, correct?                                   11:14:54

 7        A.  That would be correct, yes.                    11:14:59

 8        Q.  And you further indicate, then, that the       11:15:08

 9    Estate considers Zaentz to be holding all relevant     11:15:10

10    Class 16 registrations and books in trust for the      11:15:15

11    Estate, correct?                                       11:15:18

12        A.  That's what it says.                           11:15:22

13        Q.  Okay.  And that the same would apply to any    11:15:23

14    German mark or registration that Klett-Cotta assigns   11:15:27

15    to Zaentz, correct?                                    11:15:31

16        A.  If that's what the reference to the German     11:15:38

17    mark means, then, yeah.  That's what it appears to     11:15:39

18    be, yeah.                                              11:15:44

19        Q.  Okay.  And then you indicate that that         11:15:45

20    would be pending assignment.                           11:15:46

21            Was there an assignment of the Klett-Cotta     11:15:49

22    application by Zaentz to the Estate?                   11:15:53

23            MS. ESKENAZI:  Objection.  Misstates the       11:15:55

24    document.                                              11:15:57

25            THE WITNESS:  I don't know.                    11:15:59
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 480

102

```
 1    BY MR. ULIN:                                      11:15:59

 2        Q.  Do you know whether the Estate took any   11:16:06

 3    action to secure an assignment of the Klett-Cotta 11:16:08

 4    trademark application from Zaentz?                 11:16:12

 5        A.  I don't recall.                           11:16:14

 6        Q.  As you sit here today, you can't recall the 11:16:17

 7    Estate taking any action with respect to securing an 11:16:20

 8    assignment of that registration?                  11:16:23

 9            MS. ESKENAZI:  Objection.  Vague and      11:16:24

10    ambiguous.                                        11:16:24

11    BY MR. ULIN:                                      11:16:24

12        Q.  Is that correct?                          11:16:24

13        A.  That is correct.                          11:16:26

14            MR. ULIN:  Let's mark Exhibit 30.         11:16:43

15        Q.  Before I mark Exhibit 30, do you recall a 11:16:48

16    dispute concerning a product called The Hobbit    11:16:49

17    calendar?                                         11:16:51

18        A.  No.                                       11:16:52

19            MR. ULIN:  Let's mark Exhibit 30.         11:16:54

20                (The document referred to was         11:17:06

21            marked for identification as              11:17:06

22            Exhibit 30 and attached to this           11:17:06

23            deposition.)                              11:18:10

24    BY MR. ULIN:                                      11:18:10

25        Q.  Mr. Maier, have you seen the e-mail       11:18:10
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 481

```
 1    exchange in Exhibit 30 before?                    11:18:12

 2         A.  I haven't finished reading it but I have no  11:18:13

 3    recollection of seeing this e-mail exchange before.  11:18:17

 4         Q.  Ms. Blackburn notes in her e-mail to --    11:18:19

 5    well, let me ask a different question.             11:18:42

 6              The top e-mail is one from Ms. Blackburn to  11:18:43

 7    Laurie Battle.                                     11:18:50

 8              Do you know who Laurie Battle is?         11:18:51

 9              MS. ESKENAZI:  Objection.  Misstates the   11:18:55

10    document.                                          11:18:55

11              THE WITNESS:  I don't recall who Laurie    11:18:56

12    Battle is.                                         11:19:01

13    BY MR. ULIN:                                       11:19:01

14         Q.  Do you know one way or another whether     11:19:03

15    she's someone who worked at the Saul Zaentz Company?  11:19:04

16         A.  I know the name and I wouldn't dispute that  11:19:08

17    if you tell me that was the case.                  11:19:11

18         Q.  Have you ever met her?                     11:19:13

19         A.  I don't believe so.                        11:19:14

20         Q.  Okay.  Ms. Blackburn notes in her e-mail to  11:19:21

21    Ms. Battle on the first page of Exhibit 30 that most  11:19:23

22    of the goods in Class 16 fall within the rights     11:19:27

23    reserved by the Estate and the trademarks in Class   11:19:30

24    16, therefore, should have been registered in the   11:19:34

25    name of the Estate.                                11:19:37
```

Maier, Steven (Final)

EXHIBIT C                                      PAGE 482

104

| | | |
|---|---|---|
| 1 | Do you see that? | 11:19:38 |
| 2 | A.  Well, I can only agree with you that that's | 11:19:38 |
| 3 | what it says in this document, yes. | 11:19:42 |
| 4 | Q.  Okay.  Are you aware of the Estate having | 11:19:44 |
| 5 | taken the position that Zaentz should not register | 11:19:46 |
| 6 | trademarks in Class 16 at all for any goods? | 11:19:48 |
| 7 | MS. ESKENAZI:  Objection.  Vague and | 11:19:56 |
| 8 | ambiguous. | 11:19:57 |
| 9 | THE WITNESS:  Sorry.  Would you repeat the | 11:19:59 |
| 10 | question? | 11:20:00 |
| 11 | BY MR. ULIN: | 11:20:00 |
| 12 | Q.  Sure.  Are you aware of the Estate having | 11:20:01 |
| 13 | taken the position that Zaentz should not register | 11:20:03 |
| 14 | trademarks in Class 16 at all for any goods? | 11:20:09 |
| 15 | A.  I have no recollection of the assertion | 11:20:10 |
| 16 | that you've just formulated. | 11:20:12 |
| 17 | Q.  That is not the Estate's position, correct? | 11:20:12 |
| 18 | A.  I didn't say that.  I said I have no | 11:20:14 |
| 19 | recollection of the formulation that you just put | 11:20:15 |
| 20 | forward. | 11:20:18 |
| 21 | Q.  Okay.  Has the Estate, at any time, taken | 11:20:23 |
| 22 | the position that Zaentz should not register | 11:20:25 |
| 23 | trademarks in Class 16 at all for any goods? | 11:20:28 |
| 24 | MS. ESKENAZI:  Objection.  Vague and | 11:20:30 |
| 25 | ambiguous.  Asked and answered. | 11:20:32 |

Maier, Steven (Final)

EXHIBIT C                                    PAGE 483

105

| | | |
|---|---|---|
| 1 | You can answer again. | 11:20:33 |
| 2 | THE WITNESS:  I don't recall. | 11:20:34 |
| 3 | BY MR. ULIN: | 11:20:34 |
| 4 | Q.  Did Ms. Blackburn ever express to you her | 11:20:45 |
| 5 | opinion that Zaentz should not register trademarks | 11:20:50 |
| 6 | in Class 16 all -- at all for any goods? | 11:20:54 |
| 7 | MS. ESKENAZI:  Objection.  Privilege. | 11:20:56 |
| 8 | Attorney-client privilege.  Instruct not to answer. | 11:20:58 |
| 9 | BY MR. ULIN: | 11:20:58 |
| 10 | Q.  Are you accepting your counsel's | 11:21:02 |
| 11 | instruction not to answer my question? | 11:21:05 |
| 12 | A.  Yes, I am. | 11:21:06 |
| 13 | Q.  In her -- in the third paragraph, it's | 11:21:36 |
| 14 | actually the fourth paragraph on the first page of | 11:21:40 |
| 15 | Exhibit 30, Ms. Blackburn writes: | 11:21:42 |
| 16 | "You have a trademark which | 11:21:44 |
| 17 | you cannot properly enforce (and, | 11:21:45 |
| 18 | indeed, should not have registered | 11:21:46 |
| 19 | in the first place), while we have | 11:21:48 |
| 20 | difficulty taking action against | 11:21:52 |
| 21 | this deeply offensive item." | 11:21:54 |
| 22 | Do you see that? | 11:21:57 |
| 23 | A.  I see that. | 11:22:00 |
| 24 | Q.  Her position is essentially that Zaentz | 11:22:00 |
| 25 | should not have registered class marks -- trademarks | 11:22:09 |

106

| | | |
|---|---|---|
| 1 | in Class 16 and that those registrations are | 11:22:11 |
| 2 | interfering with the Estate's ability to enforce its | 11:22:14 |
| 3 | trademark rights. | 11:22:17 |
| 4 | Would you agree with that? | 11:22:18 |
| 5 | MS. ESKENAZI:  Objection.  Document speaks | 11:22:19 |
| 6 | for itself.  Lacks foundation. | 11:22:23 |
| 7 | BY MR. ULIN: | 11:22:23 |
| 8 | Q.  You may answer. | 11:22:24 |
| 9 | A.  I can't comment on Ms. Blackburn's position | 11:22:25 |
| 10 | other than as set out in her e-mail. | 11:22:29 |
| 11 | Q.  Okay.  And her position here that the Class | 11:22:30 |
| 12 | 16 trademarks should not have been registered as | 11:22:35 |
| 13 | they were and are interfering with the Estate's | 11:22:37 |
| 14 | ability to enforce their rights in The Lord of the | 11:22:41 |
| 15 | Rings and The Hobbit is essentially the same | 11:22:43 |
| 16 | position taken in this case by the Estate; is that | 11:22:47 |
| 17 | correct? | 11:22:47 |
| 18 | MS. ESKENAZI:  Objection.  Calls for a | 11:22:52 |
| 19 | legal conclusion.  Misstates the document. | 11:22:52 |
| 20 | THE WITNESS:  As a broad statement of | 11:22:54 |
| 21 | principle, it is the Estate's case that Zaentz's | 11:22:56 |
| 22 | registrations for books in Class 16 were | 11:23:01 |
| 23 | inappropriate. | 11:23:03 |
| 24 | BY MR. ULIN: | 11:23:03 |
| 25 | Q.  And that's essentially the same objection | 11:23:04 |

Maier, Steven (Final)

EXHIBIT C                                                    PAGE 485

| | | |
|---|---|---|
| 1 | being made by Ms. Blackburn in this e-mail to | 11:23:05 |
| 2 | Ms. Battle, correct? | 11:23:10 |
| 3 | MS. ESKENAZI:  Objection.  Document speaks | 11:23:11 |
| 4 | for itself.  Lacks foundation. | 11:23:12 |
| 5 | THE WITNESS:  I can't make any comments on | 11:23:16 |
| 6 | this document, other than to agree with you what it | 11:23:18 |
| 7 | says on the piece of paper. | 11:23:20 |
| 8 | BY MR. ULIN: | 11:23:20 |
| 9 | Q.  Right.  But I'm not asking you what it says | 11:23:23 |
| 10 | on the piece of paper.  I'm asking you whether | 11:23:25 |
| 11 | that's the same objection being raised by the Estate | 11:23:27 |
| 12 | in this case? | 11:23:30 |
| 13 | MS. ESKENAZI:  Same objection. | 11:23:30 |
| 14 | BY MR. ULIN: | 11:23:30 |
| 15 | Q.  You may answer. | 11:23:31 |
| 16 | MS. ESKENAZI:  Lacks foundation. | 11:23:32 |
| 17 | THE WITNESS:  I think I just did answer | 11:23:33 |
| 18 | that question. | 11:23:34 |
| 19 | MR. ULIN:  Can we go off the record for | 11:24:24 |
| 20 | about three minutes? | 11:24:26 |
| 21 | MS. ESKENAZI:  Sure. | 11:24:27 |
| 22 | THE VIDEOGRAPHER:  Off the record at 11:24 | 11:24:27 |
| 23 | a.m. | 11:24:29 |
| 24 | (Brief recess.) | 11:24:35 |
| 25 | THE VIDEOGRAPHER:  We are back on the | 11:39:15 |

108

| | | |
|---|---|---|
| 1 | record at 11:39 a.m. | 11:39:22 |
| 2 | BY MR. ULIN: | 11:39:32 |
| 3 | Q.  Mr. Maier, I want to turn your attention | 11:39:32 |
| 4 | back just to a few of the exhibits that we've looked | 11:39:34 |
| 5 | at already this morning, starting with Exhibit | 11:39:39 |
| 6 | Number 24. | 11:39:45 |
| 7 | And this is a document you may recall that | 11:39:54 |
| 8 | we had not produced earlier than today in this case | 11:39:55 |
| 9 | because we had thought it was privileged based on | 11:40:00 |
| 10 | the top e-mail in the chain, which has been | 11:40:04 |
| 11 | redacted. | 11:40:06 |
| 12 | The -- | 11:40:07 |
| 13 | MS. ESKENAZI:  So just for the record, I | 11:40:10 |
| 14 | just want to make sure that you understand that I'm | 11:40:12 |
| 15 | objecting to you asking questions about this as I | 11:40:17 |
| 16 | did before. | 11:40:18 |
| 17 | MR. ULIN:  I understand. | 11:40:18 |
| 18 | MS. ESKENAZI:  But I understand you're | 11:40:19 |
| 19 | going to go forward and do that anyway. | 11:40:20 |
| 20 | MR. ULIN:  I am.  It's true. | 11:40:22 |
| 21 | MS. ESKENAZI:  But I'm not waiving my | 11:40:23 |
| 22 | objection. | 11:40:24 |
| 23 | BY MR. ULIN: | 11:40:24 |
| 24 | Q.  The e-mail that I asked you about was one | 11:40:25 |
| 25 | from you to Annette Hurst at Howard Rice from May of | 11:40:29 |

109

| | | |
|---|---|---|
| 1 | 2002. | 11:40:33 |
| 2 | Do you see that? | 11:40:33 |
| 3 | A.  I see that. | 11:40:34 |
| 4 | Q.  Would that e-mail be in your files from | 11:40:34 |
| 5 | Manches? | 11:40:43 |
| 6 | MS. ESKENAZI:  Objection.  Calls for | 11:40:45 |
| 7 | speculation. | 11:40:57 |
| 8 | THE WITNESS:  I know of no reason why it | 11:40:57 |
| 9 | wouldn't be. | 11:41:00 |
| 10 | BY MR. ULIN: | 11:41:00 |
| 11 | Q.  Would it be the ordinary practice for your | 11:41:01 |
| 12 | e-mails, particularly on substantive matters, to be | 11:41:04 |
| 13 | in the files? | 11:41:06 |
| 14 | A.  Yes. | 11:41:06 |
| 15 | Q.  Do you know whether this e-mail was | 11:41:07 |
| 16 | produced by the Estate in this case? | 11:41:09 |
| 17 | MS. ESKENAZI:  Objection.  Lacks | 11:41:14 |
| 18 | foundation. | 11:41:15 |
| 19 | THE WITNESS:  I don't know.  I have no | 11:41:15 |
| 20 | recollection of this e-mail. | 11:41:17 |
| 21 | BY MR. ULIN: | 11:41:17 |
| 22 | Q.  Okay.  Do you know whether your e-mail | 11:41:20 |
| 23 | files from Manches were searched by the Estate in | 11:41:24 |
| 24 | connection with responding to discovery in this | 11:41:29 |
| 25 | case? | 11:41:31 |

Maier, Steven (Final)

EXHIBIT C                    PAGE 488

110

```
 1          MS. ESKENAZI:  Objection.  Lacks        11:41:31

 2    foundation.  Calls for speculation.           11:41:33

 3          To the extent that you may learn that   11:41:35

 4    information from your attorneys, it's          11:41:37

 5    attorney-client privileged and Mr. Ulin is not 11:41:40

 6    entitled to invade the privilege.             11:41:45

 7          THE WITNESS:  Would you read back or repeat 11:41:49

 8    the question, please?                         11:41:50

 9          MR. ULIN:  Would you read the question  11:41:51

10    back, please.                                 11:42:00

11              (The reporter read the record       11:42:00

12          as follows:                             11:42:00

13              "QUESTION:  Do you know             11:41:21

14          whether your e-mail files from          11:41:22

15          Manches were searched by the            11:41:25

16          Estate in connection with               11:41:26

17          responding to discovery in this         11:41:29

18          case?")                                 11:42:01

19          MS. ESKENAZI:  Same objections.         11:42:01

20          THE WITNESS:  As far as I'm aware, all  11:42:03

21    documentation was turned over to Greenberg Glusker. 11:42:07

22    BY MR. ULIN:                                  11:42:07

23      Q.  Okay.  And is it your understanding, then, 11:42:09

24    that if your e-mail files from Manches were searched 11:42:12

25    in connection with discovery in this case, whoever 11:42:16
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 489

111

| | | |
|---|---|---|
| 1 | was doing the searching would have found this | 11:42:21 |
| 2 | e-mail? | 11:42:23 |
| 3 | MS. ESKENAZI:  Objection.  Calls for | 11:42:24 |
| 4 | speculation.  Lacks foundation.  Asked and answered. | 11:42:27 |
| 5 | THE WITNESS:  I don't recall the e-mail | 11:42:29 |
| 6 | retention policy at Manches that would relate to an | 11:42:32 |
| 7 | e-mail of this kind. | 11:42:36 |
| 8 | BY MR. ULIN: | 11:42:36 |
| 9 | Q.  Right.  Although you said just a minute ago | 11:42:37 |
| 10 | that your expectation is that this would be in | 11:42:39 |
| 11 | the -- in the -- in your files, correct? | 11:42:41 |
| 12 | A.  I said I knew of no reason why not.  My | 11:42:43 |
| 13 | recollection of the practice then was that | 11:42:48 |
| 14 | substantive e-mails would be printed off and put on | 11:42:49 |
| 15 | the physical files. | 11:42:53 |
| 16 | Q.  Okay.  And so someone searching those files | 11:42:53 |
| 17 | should have found this e-mail, correct? | 11:42:57 |
| 18 | MS. ESKENAZI:  Objection.  Calls for | 11:43:00 |
| 19 | speculation.  Lacks foundation. | 11:43:04 |
| 20 | THE WITNESS:  I know of no reason why not. | 11:43:04 |
| 21 | BY MR. ULIN: | 11:43:04 |
| 22 | Q.  Okay.  And in any event, you don't know | 11:43:06 |
| 23 | whether the files were actually searched one way or | 11:43:08 |
| 24 | the other, correct? | 11:43:10 |
| 25 | MS. ESKENAZI:  Objection.  Calls for | 11:43:12 |

Maier, Steven (Final)

EXHIBIT C                                    PAGE 490

112

```
1    speculation.  Lacks foundation.  And to the extent    11:43:14

2    it calls for attorney-client privileged               11:43:16

3    communications, I instruct the witness not to         11:43:18

4    answer.  But if you can answer outside of any          11:43:20

5    attorney-client communications, be my guest.          11:43:23

6         THE WITNESS:  Well, I can only repeat that       11:43:25

7    everything has been made available to Greenberg        11:43:27

8    Glusker.                                               11:43:28

9    BY MR. ULIN:                                           11:43:28

10        Q.  Okay.  And you don't know whether the        11:43:29

11   Estate actually produced this e-mail chain reflected  11:43:31

12   in Exhibit 24, correct?                                11:43:34

13        A.  I don't know.                                 11:43:37

14        Q.  Looking at Exhibit 25.  Again, here's an     11:43:38

15   e-mail from you to Annette Hurst at Howard Rice,      11:43:51

16   correct?                                               11:43:54

17        A.  We agree that that's what it appeared to    11:44:01

18   be, yeah.                                              11:44:03

19        Q.  Do you know whether this document was        11:44:04

20   produced by the Estate in discovery in this case?     11:44:05

21        MS. ESKENAZI:  Same objections.  Lacks           11:44:09

22   foundation.  Calls for speculation.  To the           11:44:11

23   extent -- to the extent it calls for attorney-client  11:44:15

24   communications, instruct the witness not to answer.   11:44:18

25        But if you know outside of that.                 11:44:20
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 491

113

| | | |
|---|---|---|
| 1 | THE WITNESS:  I don't know. | 11:44:22 |
| 2 | BY MR. ULIN: | 11:44:22 |
| 3 | Q.  And again, you would expect, based on your | 11:44:25 |
| 4 | understanding of the filing -- filing procedures at | 11:44:26 |
| 5 | Manches, that this e-mail would have been printed | 11:44:32 |
| 6 | and retained in your files, correct? | 11:44:36 |
| 7 | A.  The policy was to print off e-mails and | 11:44:39 |
| 8 | place them on the files.  I can't be certain that | 11:44:42 |
| 9 | happened in 100 percent of cases. | 11:44:44 |
| 10 | Q.  Fair enough.  But your expectation is | 11:44:45 |
| 11 | that -- | 11:44:45 |
| 12 | A.  In general, yes. | 11:44:48 |
| 13 | Q.  -- a substantive e-mail like -- | 11:44:48 |
| 14 | A.  Excuse me. | 11:44:48 |
| 15 | Q.  Right.  That a substantive e-mail like this | 11:44:50 |
| 16 | would have been printed off and retained in your | 11:44:52 |
| 17 | files, correct? | 11:44:54 |
| 18 | A.  In general terms that would be correct. | 11:44:54 |
| 19 | Q.  Okay.  Turning to Exhibit 28.  Again, an | 11:45:00 |
| 20 | e-mail from you to Annette Hurst, this one dating | 11:45:11 |
| 21 | from around October of 2003.  Excuse me. | 11:45:13 |
| 22 | Do you know whether this document was | 11:45:20 |
| 23 | produced by the Estate? | 11:45:21 |
| 24 | MS. ESKENAZI:  Same objections.  Lacks | 11:45:22 |
| 25 | foundation.  Calls for speculation.  Attorney-client | 11:45:27 |

Maier, Steven (Final)

EXHIBIT C                                    PAGE 492

114

| | | |
|---|---|---|
| 1 | privileged communication. | 11:45:29 |
| 2 | THE WITNESS:  I don't know. | 11:45:31 |
| 3 | BY MR. ULIN: | 11:45:31 |
| 4 | Q.  I'll represent to you that where you see | 11:45:34 |
| 5 | the Bates numbers SZC, that reflects production from | 11:45:35 |
| 6 | the files of the Saul Zaentz Company. | 11:45:40 |
| 7 | And where -- wherever possible in -- in | 11:45:43 |
| 8 | preparing for this deposition, if we had documents | 11:45:51 |
| 9 | produced by the Estate, we used them and you would | 11:45:53 |
| 10 | see a designation "Plaintiffs" at the bottom | 11:45:57 |
| 11 | right-hand corner of that page. | 11:46:00 |
| 12 | It's your expectation, based on the | 11:46:02 |
| 13 | document filing procedures at Manches, that a | 11:46:07 |
| 14 | printed-out copy of this document should be in your | 11:46:12 |
| 15 | files from Manches, correct? | 11:46:14 |
| 16 | A.  That would be my expectation. | 11:46:18 |
| 17 | Q.  Looking at Exhibit Number 29, the second | 11:46:19 |
| 18 | e-mail in the chain in Exhibit 29 is another e-mail | 11:46:39 |
| 19 | from you to Ms. Hurst, this one from the 6th of | 11:46:41 |
| 20 | November in 2003. | 11:46:46 |
| 21 | Do you see that? | 11:46:48 |
| 22 | A.  Yes, I see that. | 11:46:48 |
| 23 | Q.  And again, your expectation based on | 11:46:52 |
| 24 | Manches' document filing and retention policies is | 11:46:57 |
| 25 | that this e-mail would have been printed and | 11:46:59 |

Maier, Steven (Final)

EXHIBIT C                                      PAGE 493

115

```
 1    maintained in your files from Manches, correct?      11:47:01

 2          MS. ESKENAZI:  Objection.  Calls for          11:47:06

 3    speculation.                                          11:47:07

 4    BY MR. ULIN:                                          11:47:07

 5          Q.  You may answer.                            11:47:08

 6          A.  That was the general practice at Manches,  11:47:08

 7    as I recall.                                          11:47:10

 8          Q.  And your expectation is the general        11:47:11

 9    practice was followed in the overwhelming majority   11:47:13

10    of instances, correct?                               11:47:16

11          A.  Well, it would require the individual to   11:47:19

12    print out the e-mail, or his secretary, and put it   11:47:23

13    on the file in each case.  So as long as that        11:47:25

14    happened, then, yes.                                 11:47:28

15          Q.  And was that your practice, to print out   11:47:29

16    e-mails or have your secretary do that so that they  11:47:31

17    could be placed in the files at Manches?             11:47:33

18          A.  That was my practice.  I can't guarantee it 11:47:35

19    was followed in 100 percent of cases.                11:47:37

20          Q.  Do you know whether Exhibit 29 was produced 11:47:39

21    by the Estate in discovery in this case?             11:47:46

22          MS. ESKENAZI:  Objection.  Calls for           11:47:49

23    speculation.  Lacks foundation.  Attorney-client     11:47:52

24    privileged communication.                            11:47:53

25          If you can answer without invading the         11:47:54
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 494

116

```
1    attorney-client privilege, you can be my guest to      11:47:55

2    answer.                                                 11:47:58

3            THE WITNESS:  No, I don't know.                 11:47:58

4    BY MR. ULIN:                                            11:47:58

5        Q.  Does the fact that four randomly -- well,       11:48:06

6    "random" is the wrong term, but four e-mails            11:48:13

7    selected over a two-year period of time that relate     11:48:15

8    to the issues in this case were not produced by the     11:48:18

9    Estate suggest to you that your files were not          11:48:22

10   searched by the Estate in connection with discovery     11:48:26

11   in this case?                                           11:48:27

12           MS. ESKENAZI:  Objection.  Assumes facts        11:48:28

13   not in evidence.  Calls for speculation.  Lacks         11:48:32

14   foundation.  Vague and ambiguous.                       11:48:34

15           THE WITNESS:  It does not suggest that to       11:48:35

16   me.                                                     11:48:37

17   BY MR. ULIN:                                            11:48:37

18       Q.  Even though it was your practice to print       11:48:38

19   out your e-mails and save them in the files, and        11:48:40

20   thus far every e-mail we've had from you was not        11:48:45

21   produced by the Estate, that doesn't suggest to you     11:48:47

22   that the files were not searched?                       11:48:50

23           MS. ESKENAZI:  Assumes facts not in --          11:48:52

24   assumes facts not in evidence.  Calls for               11:48:55

25   speculation.  Lacks foundation.  Vague and              11:48:56
```

117

```
1    ambiguous.                                        11:49:00

2            THE WITNESS:  I know that the files were  11:49:00

3    searched.                                         11:49:02

4    BY MR. ULIN:                                      11:49:02

5        Q.  How do you know that?                     11:49:04

6        A.  Because I'm aware that all of the Estate's 11:49:05

7    archive records, without exception, were turned over 11:49:12

8    to Greenberg Glusker.                             11:49:14

9        Q.  You know they were made available, but I  11:49:15

10   think what you said earlier was that you didn't know 11:49:17

11   one way or the other whether they were searched?  11:49:19

12       A.  I know that they were made available.     11:49:24

13       Q.  Turning to Exhibit 20.  Now, this is a    11:49:31

14   letter from Ms. Blackburn to Mr. Bendich that we  11:49:41

15   looked at earlier.                                11:49:44

16           You know what, scratch this.  I'm going to 11:49:52

17   move on from this question.  I don't want to ask  11:49:54

18   this one.  So we can -- you can put aside Exhibit  11:49:56

19   20.  Thank you.                                   11:49:59

20           Mark Exhibit 30 and put it before the     11:50:04

21   witness.                                          11:50:39

22           THE REPORTER:  31.                        11:50:39

23           MS. ESKENAZI:  31.                        11:50:39

24           MR. ULIN:  I'm sorry, thank you.  31.     11:50:39

25   Let's mark Exhibit 31 and put it before the witness. 11:50:41
```

118

| | | |
|---|---|---|
| 1 | (The document referred to was | 11:50:55 |
| 2 | marked for identification as | 11:50:55 |
| 3 | Exhibit 31 and attached to this | 11:50:55 |
| 4 | deposition.) | 11:50:56 |
| 5 | MR. ULIN:  Will you give that to your | 11:50:56 |
| 6 | counsel, please.  Thank you.  That's what I get for | 11:50:56 |
| 7 | going back to review exhibits that we already talked | 11:50:57 |
| 8 | about. | 11:50:59 |
| 9 | THE WITNESS:  Do you want me to read this | 11:51:36 |
| 10 | in detail? | 11:51:39 |
| 11 | BY MR. ULIN: | 11:51:39 |
| 12 | Q.  Well, let's see for a minute.  I don't | 11:51:40 |
| 13 | think you need to, but you can see in response to my | 11:51:41 |
| 14 | questions whether you feel the need to. | 11:51:43 |
| 15 | Have you seen Exhibit 31 before? | 11:51:44 |
| 16 | A.  I don't specifically recall this document. | 11:51:47 |
| 17 | Q.  So you don't -- you don't -- this letter | 11:51:55 |
| 18 | purports to be a letter -- this letter purports to | 11:51:57 |
| 19 | be from Carole Barrett of the Howard Rice firm and | 11:52:00 |
| 20 | it's addressed to you and Ms. Blackburn dated | 11:52:04 |
| 21 | April the 30th, 2004, correct? | 11:52:06 |
| 22 | A.  Yeah. | 11:52:06 |
| 23 | Q.  As you sit here today, you don't recall | 11:52:11 |
| 24 | receiving this letter; is that correct? | 11:52:13 |
| 25 | A.  Well, I recall that around that time there | 11:52:15 |

Maier, Steven (Final)

EXHIBIT C                                    PAGE 497

119

| 1 | was correspondence between my firm and Howard Rice | 11:52:22 |
| 2 | with regard to the Class 16 trademark issue.  And | 11:52:26 |
| 3 | this appears to be part of that correspondence.  But | 11:52:30 |
| 4 | I don't specifically recognize this letter. | 11:52:35 |
| 5 | Q.  You don't have any reason to doubt that you | 11:52:52 |
| 6 | received this letter, though, as you sit here today, | 11:52:54 |
| 7 | do you? | 11:52:55 |
| 8 | A.  I don't have any reason to doubt that I | 11:52:57 |
| 9 | received this letter. | 11:52:58 |
| 10 | Q.  And again, I think you said it's generally | 11:52:59 |
| 11 | consistent with your recollection that there was | 11:53:01 |
| 12 | correspondence between the two firms on the | 11:53:03 |
| 13 | subject -- | 11:53:04 |
| 14 | A.  Yes. | 11:53:04 |
| 15 | Q.  -- of Class 16 rights? | 11:53:05 |
| 16 | A.  Yes. | 11:53:06 |
| 17 | Q.  Do you know who Ms. Barrett is? | 11:53:11 |
| 18 | A.  Yes, she was an attorney at Howard Rice. | 11:53:14 |
| 19 | Q.  And have you met her? | 11:53:17 |
| 20 | A.  Yes. | 11:53:18 |
| 21 | Q.  And you're -- are you aware that her | 11:53:19 |
| 22 | responsibilities related to trademark registration | 11:53:28 |
| 23 | and prosecution? | 11:53:30 |
| 24 | MS. ESKENAZI:  Objection.  Calls for | 11:53:31 |
| 25 | speculation.  Lacks foundation. | 11:53:32 |

Maier, Steven (Final)

EXHIBIT C                              PAGE 498

120

| | | |
|---|---|---|
| 1 | THE WITNESS:  I don't recall. | 11:53:39 |
| 2 | BY MR. ULIN: | 11:53:39 |
| 3 | Q.  Okay.  So Zaentz in Ms. Barrett's letter | 11:53:51 |
| 4 | disagrees with the Estate's position with respect to | 11:53:58 |
| 5 | whether they can register class -- whether they can | 11:54:00 |
| 6 | register marks in Class 16, correct? | 11:54:06 |
| 7 | MS. ESKENAZI:  Well, would you like him to | 11:54:10 |
| 8 | read the letter? | 11:54:12 |
| 9 | MR. ULIN:  I'm letting Mr. Maier advise me | 11:54:12 |
| 10 | on that subject. | 11:54:17 |
| 11 | THE WITNESS:  Well, if you're going to ask | 11:54:17 |
| 12 | me questions about what the letter says and related | 11:54:19 |
| 13 | questions, then I will have to read it. | 11:54:22 |
| 14 | BY MR. ULIN: | 11:54:22 |
| 15 | Q.  Okay.  And really the only questions that I | 11:54:25 |
| 16 | want to ask you, which I'm happy to let you know | 11:54:26 |
| 17 | right now is, is it correct that Zaentz is taking | 11:54:28 |
| 18 | the position here that it disagrees with the | 11:54:34 |
| 19 | Estate's contentions about their Class 16 rights and | 11:54:36 |
| 20 | also making a proposal for resolving the Class 16 | 11:54:40 |
| 21 | issues? | 11:54:45 |
| 22 | A.  Well, they appear in the letter to be | 11:55:31 |
| 23 | defending their position. | 11:55:33 |
| 24 | Q.  And taking a position with respect to | 11:55:35 |
| 25 | Zaentz's Class 16 rights that is contrary to the | 11:55:37 |

Maier, Steven (Final)

EXHIBIT C                                    PAGE 499

121

```
1    position taken by the Estate, correct?              11:55:39

2         MS. ESKENAZI:  Objection.  Document speaks     11:55:42

3    for itself.                                         11:55:43

4         THE WITNESS:  Well, they say that they're      11:55:43

5    disputing what Cathleen Blackburn said in her letter 11:55:47

6    of February 11, 2004 or responding to that issue.   11:55:52

7    BY MR. ULIN:                                        11:55:52

8         Q.  And Ms. Barrett also makes a proposal for  11:55:58

9    resolving the Class 16 issues, correct?             11:56:00

10        A.  Well, reading this very quickly, certainly 11:56:14

11   numbers 2 and 3 seems to be proposing their change  11:56:17

12   in their present position, but I will need to read  11:56:20

13   this letter in full to -- to answer your question.  11:56:22

14        Q.  I'm not sure you do, but you may if you    11:56:26

15   wish.                                               11:56:29

16        All -- all I'm asking is whether she makes     11:56:29

17   a proposal for resolving the Class 16 issues?       11:56:31

18        MS. ESKENAZI:  I'm going to object as the      11:56:35

19   document speaks for itself.                         11:56:37

20        THE WITNESS:  It's framed in terms of a        11:56:45

21   proposal.  Whether it's proposing anything other   11:56:48

22   than the status quo, I'm not clear from my very     11:56:49

23   brief read.                                         11:56:52

24   BY MR. ULIN:                                        11:56:52

25        Q.  And with respect to the status quo, you    11:56:53
```

Maier, Steven (Final)

EXHIBIT C                                      PAGE 500

122

| | | |
|---|---|---|
| 1 | mean that Zaentz withhold the Class 16 | 11:56:55 |
| 2 | registrations? | 11:56:57 |
| 3 |     A.  For books, yes. | 11:56:58 |
| 4 |     Q.  And that Zaentz would license the Estate | 11:56:59 |
| 5 | for use of those registrations within its reserved | 11:57:06 |
| 6 | rights under the agreements between Zaentz and the | 11:57:09 |
| 7 | Estate? | 11:57:11 |
| 8 |     A.  Could you point me to that proposal in the | 11:57:13 |
| 9 | letter? | 11:57:16 |
| 10 |     Q.  At page 5 of the letter in the first full | 11:57:25 |
| 11 | paragraph, the second sentence. | 11:57:32 |
| 12 |     A.  I see that. | 11:57:37 |
| 13 |         MS. ESKENAZI:  Objection.  Document speaks | 11:57:38 |
| 14 | for itself. | 11:57:41 |
| 15 |         And without reading the entire document, I | 11:57:41 |
| 16 | would caution the witness that that sentence taken | 11:57:46 |
| 17 | out of context might or might not be relevant. | 11:57:49 |
| 18 |         MR. ULIN:  I can move on. | 11:58:12 |
| 19 |         MS. ESKENAZI:  Okay. | 11:58:13 |
| 20 |         THE WITNESS:  Okay.  I'm sorry.  I didn't | 11:58:15 |
| 21 | know there was a question pending. | 11:58:16 |
| 22 |         MR. ULIN:  That's all right. | 11:58:18 |
| 23 |         MS. ESKENAZI:  There isn't. | 11:58:18 |
| 24 | BY MR. ULIN: | 11:58:18 |
| 25 |     Q.  Do you recall an exchange later in 2004 | 11:58:20 |

Maier, Steven (Final)

EXHIBIT C                                    PAGE 501

123

```
 1    with represent- -- representatives of Zaentz about    11:58:23

 2    your concerns with the way that Zaentz's Class 16     11:58:26

 3    rights were described in a complaint against Kultur,  11:58:32

 4    K-u-l-t-u-r, International Films?                      11:58:38

 5         A.  The name rings a bell.  I don't have a       11:58:43

 6    specific recollection of that.                        11:58:45

 7         Q.  Okay.  You don't recall a -- an exchange     11:58:45

 8    with Zaentz about your concerns about the way rights  11:58:49

 9    were articulated in Zaentz's dispute with Kultur; is  11:58:57

10    that correct?                                         11:58:57

11              MS. ESKENAZI:  Object- --                   11:59:02

12              THE WITNESS:  I don't -- I don't recall     11:59:02

13    any.                                                  11:59:03

14              MR. ULIN:  Okay.  Let's mark Exhibit 32.    11:59:49

15                   (The document referred to was          11:59:50

16                   marked for identification as           11:59:50

17                   Exhibit 32 and attached to this        11:59:50

18                   deposition.)                           12:01:11

19              THE WITNESS:  I've read it quickly.         12:01:11

20    BY MR. ULIN:                                          12:01:12

21         Q.  Mr. Maier, have you seen Exhibit 32 before?  12:01:12

22         A.  I don't recall this specific letter.         12:01:14

23         Q.  You don't recall this letter that you        12:01:19

24    apparently sent to Annette Hurst on or about the      12:01:23

25    24th of June 2004?                                    12:01:25
```

Maier, Steven (Final)

EXHIBIT C                                          PAGE 502

124

```
 1        A.  Well, I have no reason to doubt that I did    12:01:26

 2   so, but I don't specifically recall the letter.       12:01:28

 3        Q.  Okay.  Does it refresh your recollection      12:01:31

 4   about the Kultur dispute?                              12:01:33

 5        A.  It doesn't refresh my recollection about      12:01:36

 6   the name Kultur, but it does refresh my recollection   12:01:39

 7   that there was one instance where we discovered that   12:01:42

 8   the Saul Zaentz Company had claimed ownership of the   12:01:45

 9   J.R.R. Tolkien and Tolkien trademarks which belonged   12:01:48

10   to the Estate.                                         12:01:52

11        Q.  You indicate at page 2 of this letter that   12:01:54

12   you became aware of the complaint in the Kultur case  12:01:56

13   owing to the due dil- -- owing to the diligence of    12:02:01

14   one of your associated U.S. firms.                     12:02:02

15        Do you see that?                                  12:02:05

16        A.  Yeah, I see that.                             12:02:05

17        Q.  Which firm, if you recall?                    12:02:08

18        A.  I don't recall.                               12:02:10

19        Q.  Okay.  Do you -- does this letter refresh    12:02:13

20   your recollection with respect to your concerns        12:02:16

21   about the manner which Zaentz articulated its Class    12:02:19

22   16 rights in the Kultur complaint?                     12:02:25

23        MS. ESKENAZI:  Objection.  Vague and             12:02:28

24   ambiguous.                                             12:02:32

25        THE WITNESS:  No.                                 12:02:32
```

125

| | | |
|---|---|---|
| 1 | MR. ULIN:  Mark Exhibit 33. | 12:02:48 |
| 2 | (The document referred to was | 12:02:48 |
| 3 | marked for identification as | 12:02:48 |
| 4 | Exhibit 33 and attached to this | 12:02:48 |
| 5 | deposition.) | 12:05:22 |
| 6 | BY MR. ULIN: | 12:05:23 |
| 7 | Q.  Mr. Maier, have you seen Exhibit 33 before? | 12:05:23 |
| 8 | A.  Well, as before, I don't specifically | 12:05:27 |
| 9 | remember it, but I have no doubt -- I have no reason | 12:05:29 |
| 10 | to doubt that this is a letter from me to Carole | 12:05:31 |
| 11 | Barrett. | 12:05:34 |
| 12 | Q.  Consistent with your recollection that | 12:05:35 |
| 13 | there was correspondence between you and counsel for | 12:05:37 |
| 14 | the Saul Zaentz Company concerning the Class 16 | 12:05:41 |
| 15 | issues around this time? | 12:05:43 |
| 16 | A.  Correct. | 12:05:44 |
| 17 | Q.  Okay.  At the first page of your letter, | 12:05:47 |
| 18 | which is attached to the e-mail beginning at Bates | 12:05:52 |
| 19 | 10972, you indicate that you're responding to | 12:05:56 |
| 20 | Ms. Barrett's letter of April the 30th, 2004, | 12:06:05 |
| 21 | correct? | 12:06:05 |
| 22 | A.  That's what it says, yeah. | 12:06:11 |
| 23 | Q.  Okay.  And that letter is the document we | 12:06:12 |
| 24 | marked as Exhibit 31 and discussed a few minutes | 12:06:23 |
| 25 | ago; is that correct? | 12:06:27 |

126

| 1  | A.  Yeah, it appears to be. | 12:06:29 |
| 2  | Q.  Okay.  Why did it take you 11 months to | 12:06:33 |
| 3  | respond to Ms. Barrett's letter? | 12:06:34 |
| 4  | A.  I don't recall. | 12:06:36 |
| 5  | Q.  You say your clients and -- below the | 12:06:38 |
| 6  | heading "Class 16 Trademarks," remain extremely | 12:06:54 |
| 7  | unhappy about the trademark position, correct? | 12:06:55 |
| 8  | A.  Yeah. | 12:06:59 |
| 9  | Q.  What do you mean by that? | 12:07:00 |
| 10 | A.  Well -- | 12:07:01 |
| 11 | MS. ESKENAZI:  Objection. | 12:07:06 |
| 12 | BY MR. ULIN: | 12:07:06 |
| 13 | Q.  You may answer. | 12:07:06 |
| 14 | MS. ESKENAZI:  Objection to the extent it | 12:07:11 |
| 15 | calls for specific attorney-client communications. | 12:07:12 |
| 16 | But you can answer in general. | 12:07:15 |
| 17 | THE WITNESS:  I can't give any answer | 12:07:18 |
| 18 | beyond what is set out in the following paragraphs | 12:07:20 |
| 19 | of the letter. | 12:07:23 |
| 20 | BY MR. ULIN: | 12:07:23 |
| 21 | Q.  Okay.  Meaning what? | 12:07:26 |
| 22 | A.  Meaning that the following paragraphs of | 12:07:31 |
| 23 | the letter set out why the clients are extremely | 12:07:32 |
| 24 | unhappy about the trademark position. | 12:07:35 |
| 25 | Q.  Okay.  But I'm not asking you what it says | 12:07:37 |

Maier, Steven (Final)

EXHIBIT C                                    PAGE 505

```
 1    in the letter.  I'm asking you independent of the    12:07:40

 2    letter what -- what you meant when you said the       12:07:41

 3    clients remain extremely unhappy about the trademark  12:07:44

 4    position?                                             12:07:47

 5        A.  I don't recall.                               12:07:47

 6        Q.  So your only recollection with respect to     12:07:48

 7    what you meant or -- your only ability to testify     12:07:53

 8    about what you meant when you said the clients are    12:07:56

 9    unhappy about the trademark position is what it says  12:07:57

10    in this letter; is that correct?                      12:07:59

11        A.  That's --                                     12:08:01

12            MS. ESKENAZI:  Objection.                     12:08:01

13            THE WITNESS:  -- correct.                      12:08:01

14            MS. ESKENAZI:  Objection.  Vague and          12:08:01

15    ambiguous.                                            12:08:04

16    BY MR. ULIN:                                          12:08:04

17        Q.  You acknowledge in this letter at the         12:08:17

18    bottom of page 1 and top of page 2 that Zaentz does   12:08:19

19    indeed have rights to license goods in Class 16,      12:08:23

20    correct?                                              12:08:23

21            MS. ESKENAZI:  Objection.  Letter speaks      12:08:30

22    for itself.                                           12:08:30

23            THE WITNESS:  Well, I can't add to what it    12:08:39

24    says in the letter, but I don't see a reference to    12:08:42

25    Class 16 in that paragraph.                           12:08:47
```

128

```
 1    BY MR. ULIN:                                      12:08:47

 2         Q.  But you do recognize in -- you acknowledge  12:08:51

 3    that Zaentz has rights to license books, calendars,  12:08:55

 4    greeting cards, postcards, notelets and other      12:09:01

 5    printed stationery, poster and prints, et cetera,  12:09:03

 6    correct?                                           12:09:03

 7              MS. ESKENAZI:  Objection.  Document speaks  12:09:08

 8    for itself.                                        12:09:09

 9              THE WITNESS:  The -- the document recites  12:09:09

10    what it says in certain clauses of the 1975        12:09:12

11    agreement.                                         12:09:14

12    BY MR. ULIN:                                       12:09:14

13         Q.  Okay.  And those are all goods that are   12:09:15

14    within International Class 16, right?              12:09:17

15              MS. ESKENAZI:  Objection.  Calls for a   12:09:20

16    legal conclusion.                                  12:09:22

17              THE WITNESS:  I don't know.             12:09:23

18    BY MR. ULIN:                                       12:09:23

19         Q.  Come on, Mr. Maier, you know this.  You're  12:09:24

20    a trademark lawyer.                                12:09:26

21         A.  I would need to look at Class 16 and see  12:09:28

22    what the categories of goods are in there.  I can't  12:09:30

23    sit here now and say, yes, I know those -- those are  12:09:34

24    all in Class 16.                                   12:09:36

25         Q.  You'd agree that books are in Class 16,  12:09:38
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 507

129

```
 1    right?                                          12:09:38

 2        A.  Yes.                                    12:09:38

 3        Q.  You'd agree that calendars are in Class 16,  12:09:41

 4    right?                                          12:09:43

 5        A.  I don't know.                           12:09:43

 6        Q.  You don't know.  You'd agree that postcards  12:09:43

 7    are in Class 16, right?                         12:09:46

 8        A.  I don't know.                           12:09:47

 9        MS. ESKENAZI:  Same objections.             12:09:47

10    BY MR. ULIN:                                    12:09:47

11        Q.  You'd agree that printed materials are in  12:09:49

12    Class 16, right?                                12:09:51

13        A.  I don't know.                           12:09:51

14        Q.  Even though you engaged in this lengthy  12:09:52

15    correspondence and discussion with Zaentz over Class  12:09:58

16    16 matters, your testimony is you don't know what's  12:09:59

17    in Class 16; is that right?                     12:10:03

18        MS. ESKENAZI:  Objection.  Misstates the    12:10:05

19    testimony.                                      12:10:06

20        THE WITNESS:  I don't have a specific        12:10:06

21    recollection of this letter.  And the focus of the  12:10:07

22    correspondence that we previously discussed was  12:10:11

23    about books in Class 16.                        12:10:12

24    BY MR. ULIN:                                    12:10:12

25        Q.  You recognize in this letter that the   12:10:24
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 508

130

```
 1    Estate and Zaentz each have rights to license goods,   12:10:26

 2    including books, calendars, greeting cards, et         12:10:32

 3    cetera, correct?                                       12:10:37

 4          MS. ESKENAZI:  Objection.  Document speaks        12:10:40

 5    for itself.                                            12:10:41

 6          THE WITNESS:  The clause that we've been          12:10:47

 7    discussing sets out the categories of goods that are   12:10:48

 8    specifically rever- -- reserved to the licensor to     12:10:51

 9    the exclusion of the licensee, so that's what's        12:10:54

10    reserved to the Estate.                                12:10:57

11    BY MR. ULIN:                                           12:10:57

12       Q.  Okay.  But those goods are not reserved to      12:11:02

13    the Estate to the extent that they rely primarily on   12:11:03

14    artwork from the films and use the printed word only   12:11:11

15    incidentally, correct?                                 12:11:14

16          MS. ESKENAZI:  Objection.  Misstates the         12:11:16

17    document.                                              12:11:17

18          THE WITNESS:  I'm sorry.  Where does it say       12:11:17

19    that?                                                  12:11:19

20    BY MR. ULIN:                                           12:11:19

21       Q.  Bottom of page 1 and top of page 2.             12:11:20

22          MS. ESKENAZI:  Objection.  Misstates the         12:11:25

23    document.                                              12:11:27

24          THE WITNESS:  I see the words, "excluding        12:11:39

25    those using artwork only from the films."              12:11:40
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 509

131

```
 1    BY MR. ULIN:                                    12:11:40

 2        Q.  You take the position in the first full  12:11:43

 3    paragraph on page 2 that Zaentz's Class 16       12:11:49

 4    registrations do not carve out the Estate's rights  12:11:53

 5    and therefore were prosecuted improperly and are  12:11:55

 6    liable to rev- -- revocation, correct?          12:11:58

 7            MS. ESKENAZI:  Document speaks for itself.  12:12:03

 8            THE WITNESS:  That's what it says in that  12:12:06

 9    paragraph.                                       12:12:07

10    BY MR. ULIN:                                     12:12:07

11        Q.  And that -- is that -- was that the      12:12:08

12    Estate's position as of the 23rd of March 2005?  12:12:09

13        A.  I can't add to what it says in that      12:12:13

14    paragraph.                                       12:12:17

15        Q.  Was that the position that you were      12:12:17

16    asserting on behalf of the Estate as of the 23rd of  12:12:18

17    March 2005?                                      12:12:22

18        A.  Yes, it was.                             12:12:22

19        Q.  Okay.  And that's essentially the same   12:12:23

20    position the Estate asserts in this lawsuit,     12:12:30

21    correct?                                         12:12:30

22            MS. ESKENAZI:  Objection.  Calls for a    12:12:36

23    legal conclusion.                                12:12:38

24            THE WITNESS:  I can't be exact that it's  12:12:38

25    formulated in this letter in the same way that it's  12:12:40
```

132

```
 1    formulated in the complaint.  But part of the      12:12:42

 2    complaint relates to Zaentz's registrations for    12:12:45

 3    books in Class 16.                                  12:12:48

 4    BY MR. ULIN:                                        12:12:48

 5        Q.  And makes the assertion that they are too   12:12:52

 6    broad because they don't carve out rights that were 12:12:54

 7    reserved to the Estate, correct?                    12:13:00

 8            MS. ESKENAZI:  Objection.  Vague and        12:13:02

 9    ambiguous.  Calls for a legal conclusion.           12:13:02

10            THE WITNESS:  I don't recall how the        12:13:04

11    dispute is precisely set out in the complaint.      12:13:07

12    BY MR. ULIN:                                        12:13:07

13        Q.  Okay.  You also propose in this letter a    12:13:11

14    resolution to the Class 16 issues, correct?         12:13:12

15        A.  I can see there's a reference to being      12:13:20

16    prepared to deal with the matter on a compromised   12:13:23

17    basis, yes.                                         12:13:26

18        Q.  Okay.  And your proposal is that Zaentz     12:13:27

19    would amend its registrations in certain            12:13:30

20    jurisdictions and grant the Estate exclusive        12:13:32

21    licenses elsewhere, correct?                        12:13:35

22            MS. ESKENAZI:  Objection.  Document speaks   12:13:37

23    for itself.                                         12:13:38

24            THE WITNESS:  Insofar as that's what that   12:13:39

25    document says, yes.                                 12:13:42
```

Maier, Steven (Final)

EXHIBIT C                                      PAGE 511

133

| | | |
|---|---|---|
| 1 | BY MR. ULIN: | 12:13:42 |
| 2 | Q. Was that the proposal that you made to | 12:13:43 |
| 3 | Zaentz in March of 2005? | 12:13:47 |
| 4 | MS. ESKENAZI: Objection. Document speaks | 12:13:50 |
| 5 | for itself. | 12:13:51 |
| 6 | THE WITNESS: Insofar as the letter states | 12:13:54 |
| 7 | that proposal, that appears to be the case, yes. | 12:13:55 |
| 8 | BY MR. ULIN: | 12:13:55 |
| 9 | Q. In other words, you don't recall as you sit | 12:13:58 |
| 10 | here today what proposal you made in March of 2005, | 12:13:59 |
| 11 | but you're able to indicate what the -- what a | 12:14:02 |
| 12 | letter you drafted eight years ago says, correct? | 12:14:06 |
| 13 | MS. ESKENAZI: Objection. Vague and | 12:14:11 |
| 14 | ambiguous. | 12:14:13 |
| 15 | BY MR. ULIN: | 12:14:14 |
| 16 | Q. Let me -- let me break that down because | 12:14:16 |
| 17 | it's two questions. | 12:14:17 |
| 18 | A. Okay. | 12:14:17 |
| 19 | Q. I think what you're saying is, as you sit | 12:14:18 |
| 20 | here today, you don't recall what the substance of a | 12:14:20 |
| 21 | proposal for res- -- for resolving the Class 16 | 12:14:24 |
| 22 | issues to Zaentz was in 2005; is that correct? | 12:14:26 |
| 23 | A. Let me give you a more general answer that | 12:14:30 |
| 24 | may help. | 12:14:32 |
| 25 | Q. Fair enough. | 12:14:33 |

Maier, Steven (Final)

EXHIBIT C                    PAGE 512

134

```
 1        A.  I recall a course of correspondence         12:14:33

 2   regarding this issue at around this time.  I cannot   12:14:37

 3   recall, without the prompting of documents, what      12:14:39

 4   proposals and counterproposals were made when and by  12:14:42

 5   whom.  When you show me these documents, then I see    12:14:45

 6   what those documents say.                              12:14:48

 7        Q.  But you don't actually recall what the       12:14:49

 8   proposal was of your own memory.  You simply see      12:14:51

 9   what it says in the document; is that correct?        12:14:54

10        A.  That's correct.                              12:15:09

11        Q.  Did there -- do you recall a meeting that    12:15:09

12   you attended with representatives from the Saul       12:15:13

13   Zaentz Company and their outside counsel in Oxford    12:15:17

14   in 2005, in September of 2005?                        12:15:20

15        A.  I recall a meeting with some of the Zaentz   12:15:23

16   people in Oxford.  I can't be precise about the       12:15:30

17   date.                                                  12:15:34

18        Q.  Okay.  Who do you -- who do you recall --    12:15:34

19   well, let me just ask this question:  How many        12:15:39

20   in-person meetings do you recall taking place in      12:15:51

21   England between -- which you attended with            12:15:57

22   representatives of the Saul Zaentz Company at which   12:16:02

23   you addressed trying to resolve the Class 16 issue?   12:16:04

24        A.  I recall one meeting in Oxford and one       12:16:09

25   meeting in London, so two.                            12:16:15
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 513

135

```
 1          Q.  Okay.  And which one came first in time?    12:16:18

 2          A.  I think it was the Oxford meeting.          12:16:19

 3          Q.  And I'll represent to you that based on the  12:16:25

 4     documents I've read, I think that's right.            12:16:27

 5          Do you recall how far apart in time those        12:16:29

 6     two meetings were?                                    12:16:35

 7          A.  I don't recall.                              12:16:36

 8          Q.  Okay.  With respect to the Oxford meeting,  12:16:41

 9     the first one, who attended that meeting?             12:16:45

10          A.  I would like to answer your question but I  12:16:49

11     could only tell you who I think would have been       12:17:01

12     there as opposed to recalling who was there.          12:17:03

13          Q.  As you sit here today, you can't --          12:17:06

14          A.  I don't recall exactly.                      12:17:07

15          Q.  -- recall who actually attended the Oxford  12:17:08

16     meeting?                                              12:17:11

17          Why don't you answer the question that you       12:17:11

18     can answer, which is, who you think would have been   12:17:13

19     there, and then we'll move on from there.             12:17:15

20          MS. ESKENAZI:  Okay.  Well, I'm just going       12:17:17

21     to object as calling for speculation.                 12:17:18

22          MR. ULIN:  Fair enough.                          12:17:20

23          MS. ESKENAZI:  But with that understood --       12:17:21

24          MR. ULIN:  It's -- it's a discovery              12:17:22

25     deposition.  Sometimes speculation is helpful.        12:17:24
```

Maier, Steven (Final)

EXHIBIT C                                              PAGE 514

136

```
 1        THE WITNESS:  I would imagine that Cathleen    12:17:31

 2   Blackburn had been there, Al Bendich.  No, I -- I     12:17:33

 3   honestly don't recall.                                12:17:52

 4   BY MR. ULIN:                                          12:17:52

 5        Q.  Okay.  Do you recall whether                 12:17:54

 6   representatives of HarperCollins attended the         12:17:55

 7   meeting in Oxford?                                    12:17:59

 8        A.  I don't recall.                              12:18:00

 9        Q.  Do you recall where the meeting in Oxford    12:18:01

10   took place?                                           12:18:07

11        A.  It was at Manches' then premises.            12:18:07

12        Q.  Do you recall how long the meeting was?      12:18:25

13        A.  No.                                          12:18:27

14        Q.  Do you recall whether it was all day or      12:18:27

15   some portion of a day?                                12:18:35

16        A.  I don't think it was all day, but I can't    12:18:36

17   remember exactly how long it was.                     12:18:43

18        Q.  Do you recall whether it was in the morning  12:18:44

19   or afternoon?                                         12:18:46

20        A.  No.                                          12:18:46

21        Q.  Do you recall what subjects were addressed   12:18:57

22   at the September 2005 meeting in Oxford?              12:19:00

23        A.  No, I'd be speculating.                      12:19:03

24        Q.  Do you recall whether the Class 16 issue     12:19:12

25   was discussed at the September 2005 meeting in        12:19:22
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 515

137

```
1    Oxford?                                        12:19:27

2       A.  I believe it would have been, but I don't  12:19:27

3    specifically recall that meeting or what was    12:19:33

4    discussed at the meeting.                       12:19:36

5       Q.  And that may answer my next question, which 12:19:37

6    is, what was said about the Class 16 issue at the 12:19:40

7    September 2005 meeting in Oxford?               12:19:43

8       A.  I don't recall.                          12:19:46

9       Q.  Can you tell me everything that you do   12:19:49

10   recall about the September 2005 meeting in Oxford? 12:19:52

11      A.  No.  Again, I recall some of the issues  12:19:54

12   that were around at that time.  But I'd be      12:20:21

13   speculating if I said those were the issues     12:20:25

14   discussed at the meeting.  So I don't want to be 12:20:27

15   unhelpful, but I can't remember exactly what we  12:20:31

16   talked about in that meeting.                   12:20:33

17      Q.  Okay.  What were the -- when you say you  12:20:36

18   recall some of the issues that were around at that 12:20:37

19   time, what issues are you referring to?         12:20:39

20      A.  I recall that there was an issue about   12:20:41

21   the -- the Estate suffering by the 40 percent and 12:20:47

22   the 22 percent deduction on merchandising royalties 12:20:50

23   and the fact that Zaentz had previously agreed to 12:20:54

24   combine those deductions, but that hadn't happened. 12:21:01

25          At some stage Zaentz raised the name of  12:21:07
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 516

138

```
 1    their operation, their trading name, which I think    12:21:16

 2    was Tolkien Enterprises, and they wanted to continue   12:21:23

 3    using that beyond the period to which they were        12:21:25

 4    entitled.  And the Class 16 issue.                     12:21:30

 5           But as I sit here now, I can't remember         12:21:35

 6    those items actually being discussed.  So, again,      12:21:37

 7    it's a "would have been."                              12:21:40

 8       Q.  Okay.  And I take it that also means you        12:21:50

 9    can't recall whether there were any resolutions that   12:21:51

10    came out of that September 2005 meeting?               12:21:54

11       A.  No, I don't recall.                             12:21:56

12           MR. ULIN:  Why don't we break for lunch.        12:22:21

13           MS. ESKENAZI:  Okay.                            12:22:25

14           THE VIDEOGRAPHER:  This is the end of media     12:22:25

15    number 2.  Off the record at 12:22 p.m.                12:22:27

16               (At 12:22 p.m., the

17           deposition of STEVEN ANDREW MAIER

18           was adjourned for noon recess.)

19    ///

20    ///

21

22

23

24

25
```

139

```
 1              (At 1:31 p.m., the deposition
 2         of STEVEN ANDREW MAIER was
 3         reconvened.)
 4                                              13:31:33
 5         THE VIDEOGRAPHER:  We're back on the record 13:31:33
 6    at 1:31 p.m.  This is the beginning of media number 13:31:49
 7    3.  Counsel may proceed.                   13:31:53
 8         MS. ESKENAZI:  You asked that over lunch I 13:31:56
 9    come back with a couple of case cites.  This is 13:31:58
10    preliminary, but I -- I did want to comply with your 13:32:01
11    request, which is, U.S. vs. Gonzalez, 669 F.3d 13:32:03
12    974 -- if you'd like we can e-mail them to you, 13:32:12
13    but -- Ninth Circuit 2012.                 13:32:16
14         And then there's In Re: Teleglobe    13:32:17
15    Communications Corporation, 493 F.3d 345, which is 13:32:21
16    Third Circuit case 2007.                   13:32:26
17         I also have a proposal for a compromise if 13:32:31
18    you'd like to explore that.                13:32:35
19         MR. ULIN:  Go ahead.                  13:32:37
20         MS. ESKENAZI:  Okay.  I do believe these 13:32:38
21    are privileged communications, especially in light 13:32:41
22    of the document that you produced, number 27, which 13:32:45
23    does indeed show that the parties were joint 13:32:50
24    claimants.                                 13:32:53
25         But nonetheless, I would be willing to 13:32:55
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 518

140

| | | |
|---|---|---|
| 1 | allow questioning in this deposition about these | 13:32:58 |
| 2 | documents so long as everybody agrees that that in | 13:33:02 |
| 3 | and of itself will not constitute a waiver and that | 13:33:06 |
| 4 | if we kind of -- we can seal this part of the | 13:33:11 |
| 5 | testimony off, and if you guys would like to go to a | 13:33:14 |
| 6 | magistrate and say, well, it is a waiver, just by | 13:33:19 |
| 7 | virtue of our having sued you or for whatever | 13:33:23 |
| 8 | grounds you want to claim there's some kind of a | 13:33:25 |
| 9 | waiver, other than the fact that I let you continue | 13:33:28 |
| 10 | with questioning here, then if you win, you know, | 13:33:29 |
| 11 | everybody gets to use whatever was said here and | 13:33:36 |
| 12 | turned over.  And if you don't, then it remains | 13:33:39 |
| 13 | sealed in a box.  That's what I would propose. | 13:33:42 |
| 14 | MR. ULIN:  Why don't we take a second just | 13:33:53 |
| 15 | to discuss it. | 13:33:55 |
| 16 | MS. ESKENAZI:  Sure.  Fair enough.  I | 13:33:56 |
| 17 | just -- I'm trying to -- | 13:33:58 |
| 18 | MR. ULIN:  Proposal -- proposal seems | 13:33:59 |
| 19 | reasonable and worth discussing, so let's take a | 13:34:00 |
| 20 | second and do that. | 13:34:03 |
| 21 | MS. ESKENAZI:  Sure. | 13:34:03 |
| 22 | THE VIDEOGRAPHER:  Off the record at 1:34 | 13:34:04 |
| 23 | p.m. | 13:34:09 |
| 24 | (Brief recess.) | 13:35:24 |
| 25 | THE VIDEOGRAPHER:  We are back on the | 13:35:25 |

Maier, Steven (Final)

EXHIBIT C                                          PAGE 519

141

| | | |
|---|---|---|
| 1 | record at 1:35 p.m. | 13:35:26 |
| 2 | MR. ULIN:  We've discussed off the record | 13:35:27 |
| 3 | and we find the proposal acceptable.  Just to be | 13:35:29 |
| 4 | clear, we are going to revisit exhibits numbers -- | 13:35:31 |
| 5 | MS. ESKENAZI:  27 and 28. | 13:35:42 |
| 6 | MR. ULIN:  27 and 29.  Thank you. | 13:35:42 |
| 7 | MS. ESKENAZI:  Oh, no, 26 and 27. | 13:35:46 |
| 8 | MR. ULIN:  26 and 27? | 13:35:48 |
| 9 | MS. ESKENAZI:  Yeah. | 13:35:48 |
| 10 | MR. ULIN:  Let's start that again. | 13:35:49 |
| 11 | We're going to go back and revisit Exhibits | 13:35:50 |
| 12 | 26 and 27.  We will ask our substantive questions | 13:35:53 |
| 13 | about those documents.  We are willing to stipulate | 13:35:55 |
| 14 | that by virtue of Mr. Maier answering those | 13:35:57 |
| 15 | questions, that would not constitute a waiver of | 13:36:00 |
| 16 | your assertions of privilege over the documents. | 13:36:04 |
| 17 | And again, with the understanding that we dispute | 13:36:08 |
| 18 | your assertions of privilege and our accepting the | 13:36:11 |
| 19 | stipulation in no way prejudices our arguments about | 13:36:14 |
| 20 | privilege or, you know, any position we might take | 13:36:17 |
| 21 | in later motion practice about whether they are, in | 13:36:20 |
| 22 | fact, privileged. | 13:36:24 |
| 23 | MS. ESKENAZI:  And I just want to be clear | 13:36:24 |
| 24 | that it also includes the documents themselves, the | 13:36:26 |
| 25 | fact that I'm allowing you to use the documents in | 13:36:28 |

Maier, Steven (Final)

EXHIBIT C                                    PAGE 520

142

```
 1    this deposition with Warner Bros. here will also be    13:36:31

 2    carved out.  We're not -- that in and of itself is    13:36:35

 3    not going to constitute a waiver.                      13:36:38

 4          MR. ULIN:  Fair enough.  And again, without    13:36:39

 5    prejudice to our arguments that the documents are      13:36:41

 6    not, in fact, privileged and there's nothing to        13:36:44

 7    waive.                                                 13:36:46

 8          MS. ESKENAZI:  Both parties -- all parties    13:36:46

 9    are reserving their rights to argue whether any        13:36:47

10    prior conduct constituted a waiver.                    13:36:50

11          MR. ULIN:  With that said, I think we can      13:36:54

12    agree and move forward.                                13:36:56

13          MS. ESKENAZI:  Okay.                            13:36:57

14          MR. ULIN:  Okay with you, Dan?                  13:37:01

15          MR. PETROCELLI:  Yes.                           13:37:03

16          MR. ULIN:  All right.                           13:37:04

17       Q.  Mr. Maier, before we broke for lunch, we       13:37:05

18    had been discussing a meeting that took place in       13:37:09

19    Oxford in 2005.                                        13:37:14

20          Do you recall that?                             13:37:16

21       A.  I recall that discussion, yeah.                13:37:17

22       Q.  And one of the topics that was on the          13:37:18

23    agenda at that meeting, you suggested, was the Class   13:37:21

24    16 issues, correct?                                    13:37:25

25       A.  I would think it must have been.               13:37:27
```

Maier, Steven (Final)

EXHIBIT C                                          PAGE 521

143

```
 1         Q.  Okay.  You don't remember specifically, but    13:37:29

 2    you would think -- it being one of the issues that       13:37:30

 3    was being discussed at the time by Zaentz and the        13:37:32

 4    Estate, it was likely to have been discussed at the      13:37:37

 5    2005 meeting in Oxford, correct?                          13:37:39

 6         A.  I wasn't sure about the date but, yes.          13:37:41

 7         Q.  Okay.  That was the first of two meetings       13:37:46

 8    between representatives of Zaentz and                     13:37:47

 9    representatives of the Estate on a variety of            13:37:52

10    issues, correct?                                          13:37:55

11         MS. ESKENAZI:  Objection.  Asked and                13:37:55

12    answered.                                                 13:37:57

13         THE WITNESS:  I believe that's right.               13:37:58

14    BY MR. ULIN:                                              13:37:58

15         Q.  Okay.  I want to step back from those           13:38:00

16    meetings and any particular context for the moment      13:38:03

17    and ask you, from that first meeting, which I'll         13:38:05

18    represent to you took place in 2005, until 2010,         13:38:10

19    what do you recall about your communications and        13:38:17

20    exchanges with Zaentz about the Class 16 issue?         13:38:23

21         MS. ESKENAZI:  Objection.  Vague and                13:38:27

22    ambiguous.                                                13:38:30

23         THE WITNESS:  I recall that there was a             13:38:30

24    series of -- of back and forth involving proposals,     13:38:33

25    counterproposals.  There was a telephone                 13:38:39
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 522

144

```
 1    conversation at one stage.  An ongoing dialogue.     13:38:41

 2    BY MR. ULIN:                                         13:38:56

 3        Q.  And with respect to the series of            13:38:56

 4    back-and-forth proposals, are there any particular   13:39:01

 5    proposals made either by the Estate or by Zaentz     13:39:03

 6    that you recall as you sit here today?               13:39:07

 7          MS. ESKENAZI:  Objection.  Vague and           13:39:12

 8    ambiguous.                                           13:39:12

 9          THE WITNESS:  One of the letters we looked     13:39:17

10    at earlier referred to a proposal whereby Zaentz     13:39:19

11    were going to assign certain trademarks to us, and I 13:39:24

12    think there was going to be a license for others.  I 13:39:27

13    need to look at it again to be precise.              13:39:30

14          I have a recollection that in one of the       13:39:35

15    meetings Zaentz appeared to be moving backwards from 13:39:37

16    something we thought had been agreed.  I think that  13:39:40

17    was the second meeting.  And I recall there was a    13:39:43

18    certain amount of disappointment in that meeting at  13:39:45

19    some of the positions Zaentz were taking.            13:39:51

20          There was then further correspondence aimed    13:39:53

21    at resolving these issues.  At one stage I believe   13:39:58

22    Zaentz proposed some kind of joint venture company   13:40:03

23    that would hold the relevant trademarks, and I think 13:40:07

24    we then went back to them with some questions or     13:40:15

25    suggestions about that.  And I think there was then  13:40:19
```

Maier, Steven (Final)

EXHIBIT C                                           PAGE 523

145

```
 1    a period where each side thought it was waiting to    13:40:22

 2    hear from the other.  But I don't specifically        13:40:26

 3    recall the dates of these various elements or what    13:40:28

 4    ultimately transpired.                                13:40:32

 5    BY MR. ULIN:                                          13:40:34

 6        Q.  Do you recall any particular proposals that   13:40:34

 7    the Estate made concerning -- again, following the    13:40:51

 8    2005 meeting, that the Estate made concerning         13:40:53

 9    resolving the Class 16 issues?                        13:40:56

10        A.  The es- -- no, not as I sit here today.       13:40:58

11        Q.  You referred to at one point -- let me just   13:41:13

12    back up a second.                                     13:41:30

13            You referred to a couple of proposals that    13:41:31

14    Zaentz had -- had made.  One of them related to the   13:41:36

15    possibility of assignments or licensing of certain    13:41:43

16    Class 16 rights, correct?                             13:41:47

17        A.  I don't believe that was Zaentz's proposal.   13:41:48

18    I think that was the Estate's proposal, but I think   13:41:50

19    it preceded -- I think it was a letter from 2004,     13:41:53

20    which is why I didn't mention it.                     13:41:56

21        Q.  Fair enough.  So in the post 2005 period,     13:41:58

22    is the Zaentz proposal that related to a joint        13:42:01

23    venture the only one that you can recall as you sit   13:42:04

24    here today?                                           13:42:06

25        A.  There may have been others.  That's the       13:42:06
```

Maier, Steven (Final)

EXHIBIT C                                           PAGE 524

146

```
 1    only one I can specifically recall.              13:42:13

 2         Q.  Okay.  You also referred, when I asked you  13:42:19

 3    what did you remember in the post 2005 time period  13:42:22

 4    about the Class 16 issues, to a telephone conference  13:42:25

 5    at one stage.                                    13:42:30

 6         What did you mean by that?                  13:42:32

 7         A.  My recollection is that the telephone call  13:42:34

 8    followed from the joint venture proposal and that we  13:42:39

 9    expressed some concerns and misgivings about that  13:42:44

10    proposal and had some questions about it.  That's  13:42:49

11    all I can remember about that call.              13:42:53

12         Q.  Following the 2005 meeting in Oxford, when  13:42:58

13    is the next time you recall communicating with    13:43:03

14    Zaentz about the Class 16 issues?                13:43:08

15         MS. ESKENAZI:  Objection.  Vague and         13:43:11

16    ambiguous.                                       13:43:12

17         THE WITNESS:  I don't recall the dates.      13:43:13

18    BY MR. ULIN:                                     13:43:13

19         Q.  Okay.  If I were to represent to you that  13:43:24

20    there were no substantive communications following  13:43:25

21    that 2005 meeting until mid-2007, at least according  13:43:28

22    to the documents that I've reviewed, is that       13:43:34

23    consistent with your recollection of the course of  13:43:36

24    discussions of Class 16 --                       13:43:39

25         MS. ESKENAZI:  Objection.                   13:43:40
```

147

```
 1    BY MR. ULIN:                                      13:43:40

 2        Q.  -- between the Estate and Zaentz?        13:43:41

 3            MS. ESKENAZI:  Objection.  Assumes facts 13:43:42

 4    not in evidence.                                  13:43:43

 5            THE WITNESS:  Well, as I've said, I don't 13:43:43

 6    recall the dates, but I do recall that on a couple 13:43:46

 7    of occasions both parties acknowledged that they had 13:43:49

 8    been busy with other things and there had been     13:43:52

 9    delays in reverting to one another.                13:43:54

10    BY MR. ULIN:                                       13:43:54

11        Q.  Okay.  As you sit here today, can you     13:43:57

12    recall any communications with Zaentz about Class 16 13:43:59

13    that occurred between the 2005 meeting in Oxford and 13:44:02

14    the meeting in 2007?                               13:44:06

15        A.  Well, as I've said, I can't remember the  13:44:10

16    dates when the various communications took place.  13:44:14

17        Q.  But as you sit here today, you can't recall 13:44:14

18    any communications that occurred between 2005 and   13:44:16

19    2007; is that correct?                             13:44:18

20            MS. ESKENAZI:  Objection.  Asked and      13:44:19

21    answered.                                          13:44:20

22            THE WITNESS:  As I sit here today, I can't 13:44:20

23    identify any particular communication that took    13:44:22

24    place in that period.                              13:44:25

25    BY MR. ULIN:                                       13:44:25
```

Maier, Steven (Final)

EXHIBIT C                          PAGE 526

148

1      Q.   Okay.  Let's talk about the meeting in        13:44:27

2   London in 2007, and I -- let me -- let me back up    13:44:30

3   and say let's talk about the meeting in 2007.        13:44:32

4         Where did that take place?                     13:44:35

5      A.   If it's the one I'm thinking of, it was in   13:44:37

6   Manches' London office.                              13:44:40

7      Q.   And how did that meeting come about?         13:44:42

8      A.   It's possible that the Zaentz people were    13:44:44

9   in town anyway for The Lord of the Rings musical     13:44:56

10  premier, but I may be mistaken about that.           13:45:01

11     Q.   Who requested the meeting, if you recall?    13:45:06

12     A.   I don't recall.                              13:45:07

13     Q.   Who attended the meeting?                    13:45:16

14     A.   I remember that Cathleen Blackburn was       13:45:18

15  there, Tom Magnani, Carole Barrett, and there must   13:45:23

16  have been representatives of Zaentz but I can't      13:45:30

17  remember exactly who they were.  Again, I'd be -- I  13:45:32

18  could tell you who I think they must have been but I 13:45:36

19  would be speculating.                                13:45:38

20     Q.   Were there representatives from              13:45:39

21  HarperCollins present?                               13:45:45

22     A.   I don't recall.                              13:45:46

23     Q.   Were -- was there anyone else who was not a  13:45:48

24  representative of the Estate, Zaentz or              13:45:52

25  HarperCollins present?                               13:45:54

Maier, Steven (Final)

EXHIBIT C                                    PAGE 527

149

| | | |
|---|---|---|
| 1 | A.  I don't believe so. | 13:45:55 |
| 2 | Q.  Do you recall whether Al Bendich was | 13:46:05 |
| 3 | present? | 13:46:07 |
| 4 | A.  I think he must have been. | 13:46:07 |
| 5 | Q.  You've met Mr. Bendich? | 13:46:14 |
| 6 | A.  I have. | 13:46:16 |
| 7 | Q.  And you say you think he must have been. | 13:46:17 |
| 8 | Do you recall that specifically or you're | 13:46:20 |
| 9 | just speculating based on -- well, just speculating | 13:46:22 |
| 10 | that he must have been present, without actually | 13:46:25 |
| 11 | remembering it? | 13:46:28 |
| 12 | A.  In the picture I have in my mind's eye of | 13:46:28 |
| 13 | that meeting, I can recall the people I mentioned | 13:46:31 |
| 14 | earlier.  But it would make no sense to me that Al | 13:46:33 |
| 15 | Bendich wasn't there, so I'm concluding that he must | 13:46:36 |
| 16 | have been. | 13:46:39 |
| 17 | Q.  Do you recall whether Fredrica Drotos was | 13:46:40 |
| 18 | present? | 13:46:46 |
| 19 | A.  I don't recall. | 13:46:46 |
| 20 | Q.  Okay.  You've met Ms. Drotos? | 13:46:48 |
| 21 | A.  I believe I have.  I can't remember when. | 13:46:52 |
| 22 | And I can't be certain. | 13:46:59 |
| 23 | Q.  And then I -- I may have addressed this | 13:47:00 |
| 24 | before, but was -- can you recall anyone else from | 13:47:03 |
| 25 | Zaentz being present at the meeting? | 13:47:04 |

Maier, Steven (Final)

EXHIBIT C                                    PAGE 528

150

```
 1        A.  Well, I know that Mr. Noonan, I think      13:47:06

 2   that's his name, often traveled with Al Bendich, so  13:47:15

 3   he may have been there.                              13:47:18

 4        Q.  But you don't recall that specifically?     13:47:19

 5        A.  I don't specifically recall.                13:47:20

 6        Q.  Okay.  What was discussed at the meeting at  13:47:21

 7   Manches in London in 2007?                           13:47:28

 8        A.  The two specific issues that I believe I    13:47:30

 9   recall are the Class 16 issue and the wish of the    13:47:43

10   Saul Zaentz Company to continue to use the name      13:47:51

11   Tolkien Enterprises after the contractual end period  13:47:56

12   for that.  I can't remember the details of that.     13:48:01

13        And the reason that those two points stick      13:48:04

14   in my mind is that it's my recollection that Tom     13:48:08

15   Magnani proposed in some way trading off those two   13:48:16

16   issues after we had understood that Zaentz had       13:48:19

17   already agreed to a proposal about Class 16, which I  13:48:27

18   remember we found disappointing.                     13:48:31

19        Q.  And do you recall what Mr. Magnani's        13:48:51

20   proposal was?                                        13:48:55

21        MS. ESKENAZI:  Objection.  Asked and            13:48:57

22   answered.                                            13:48:57

23        THE WITNESS:  His proposal was to link the      13:49:01

24   two issues.                                          13:49:03

25   BY MR. ULIN:                                         13:49:04
```

Maier, Steven (Final)

EXHIBIT C                              PAGE 529

151

```
 1        Q.  In what manner?                          13:49:04

 2        A.  I don't recall and I don't recall if he was  13:49:05

 3   more specific.                                     13:49:06

 4        Q.  And you indicated you at -- the Estate    13:49:09

 5   believed that Zaentz had agreed to a Class 16      13:49:13

 6   proposal.  Why did you believe that?              13:49:16

 7           MS. ESKENAZI:  Objection.  Vague and       13:49:17

 8   ambiguous.                                         13:49:21

 9           THE WITNESS:  It's my recollection that at  13:49:23

10   some point they had agreed in principal to the     13:49:25

11   proposal that they would assign the marks to us in  13:49:30

12   the most important jurisdictions, but I could be   13:49:33

13   mistaken.  That's my recollection.                13:49:37

14   BY MR. ULIN:                                       13:49:37

15        Q.  And as you sit here today, can you recall  13:49:42

16   what the basis was for your belief that Zaentz had  13:49:47

17   agreed in principle to the assignment?            13:49:51

18           MS. ESKENAZI:  Objection.  Asked and       13:49:54

19   answered.                                          13:49:55

20           THE WITNESS:  Well, it must have arisen out  13:49:56

21   of the course of communications that I described,   13:49:58

22   but I can't remember at exactly what point in that  13:50:00

23   dialogue.                                          13:50:02

24   BY MR. ULIN:                                       13:50:02

25        Q.  Is there anything else that you can recall  13:50:13
```

152

| | | |
|---|---|---|
| 1 | about the meeting at Manches in London in 2007? | 13:50:16 |
| 2 | A.  I recall that we went to lunch within the | 13:50:21 |
| 3 | office after it, so it must have been in the | 13:50:26 |
| 4 | morning. | 13:50:29 |
| 5 | Q.  Anything other than that? | 13:50:29 |
| 6 | A.  No.  Not as I sit here today. | 13:50:34 |
| 7 | Q.  Did Zaentz's joint venture proposal come to | 13:50:42 |
| 8 | you before or after that meeting? | 13:50:56 |
| 9 | A.  I believe it was later but I can't be | 13:51:01 |
| 10 | certain. | 13:51:07 |
| 11 | Q.  And am I correct in understanding that the | 13:51:08 |
| 12 | Estate did not accept the joint venture pro- - | 13:51:17 |
| 13 | proposal? | 13:51:20 |
| 14 | A.  Well, as I said to you earlier, what | 13:51:21 |
| 15 | happened was that we had a call with Zaentz's | 13:51:25 |
| 16 | representatives to say that there were aspects of it | 13:51:26 |
| 17 | that we found troubling.  That we had some questions | 13:51:29 |
| 18 | about it.  I bel- -- well, my recollection is that | 13:51:33 |
| 19 | they were going to go away and re-think some of | 13:51:37 |
| 20 | those issues.  But I believe at some stage they said | 13:51:39 |
| 21 | that they thought we had gone away to re-think some | 13:51:42 |
| 22 | issues. | 13:51:45 |
| 23 | Q.  Okay.  Who was on the call between you and | 13:52:04 |
| 24 | Zaentz? | 13:52:05 |
| 25 | A.  Well, I think it must have been Tom Magnani | 13:52:05 |

Maier, Steven (Final)

EXHIBIT C                                      PAGE 531

153

| | | |
|---|---|---|
| 1 | and Carole Barrett but I can't be certain. | 13:52:19 |
| 2 | Q. And who was on the call for the Estate? | 13:52:21 |
| 3 | A. Myself and Cathleen Blackburn. | 13:52:26 |
| 4 | Q. And did that call take place in 2007? | 13:52:35 |
| 5 | A. I don't recall when that call took place. | 13:52:38 |
| 6 | Q. Was it shortly after the meeting in -- in | 13:52:41 |
| 7 | London at Manches? | 13:52:44 |
| 8 | A. I don't recall. | 13:52:45 |
| 9 | Q. You indicated that at some stage the | 13:52:49 |
| 10 | parties realized that they each thought the other | 13:52:53 |
| 11 | had gone away to re-think some issues. | 13:52:56 |
| 12 | When did that communication occur? | 13:52:58 |
| 13 | A. I don't recall. | 13:53:01 |
| 14 | Q. After the telephone conversation between | 13:53:03 |
| 15 | yourself and Ms. Blackburn on one side and | 13:53:13 |
| 16 | Mr. Magnani and Ms. Barrett on the other side | 13:53:17 |
| 17 | concerning the joint venture proposal, what's the | 13:53:20 |
| 18 | next time you can recall communicating with Zaentz | 13:53:23 |
| 19 | about the Class 16 issues? | 13:53:27 |
| 20 | A. I don't recall when that was. | 13:53:34 |
| 21 | Q. I'm correct in understanding that the Class | 13:53:54 |
| 22 | 16 issues remain unresolved today, correct? | 13:53:56 |
| 23 | A. That's correct. | 13:53:59 |
| 24 | Q. And that's why they're the subject of | 13:53:59 |
| 25 | litigation? | 13:54:01 |

Maier, Steven (Final)

EXHIBIT C                                    PAGE 532

154

1        A.   Yes.                                          13:54:02

2        Q.   Okay.  Mr. Maier, you're aware that the       13:54:12

3    Estate has -- are you aware that the Estate has        13:54:25

4    taken the position in this case that Zaentz does not   13:54:27

5    have the right to license video games that do not      13:54:30

6    require the purchase of any physical item, but         13:54:32

7    instead can be purchased by download only or           13:54:36

8    accessed on- -- accessed online?                       13:54:39

9        A.   I'm aware of that, yes.                       13:54:40

10       Q.   Prior to 2010, did you ever communicate       13:54:44

11   that position to Zaentz?                               13:54:47

12       A.   I have no reason to communicate that          13:54:52

13   position to Zaentz.                                    13:54:54

14       Q.   So the answer is no?                          13:54:54

15       A.   So the answer is no.                          13:54:56

16       Q.   Okay.  Are you aware of anyone at the         13:54:57

17   Estate who communicated that position to Zaentz        13:55:00

18   prior to 2010?                                         13:55:02

19            MS. ESKENAZI:  Objection to the extent it     13:55:03

20   calls for attorney-client communication.               13:55:05

21            You can answer the question to the extent     13:55:09

22   that you know outside of any communications you may    13:55:10

23   have had with other attorneys or the clients.          13:55:13

24            THE WITNESS:  I'm not aware of any such       13:55:16

25   communication.                                         13:55:17

Maier, Steven (Final)

EXHIBIT C                                    PAGE 533

155

```
 1    BY MR. ULIN:                                  13:55:17

 2         Q.  Is it fair to say that video game licensing  13:55:20

 3    was not a significant focus of your work for the    13:55:24

 4    Estate prior to 2010?                         13:55:27

 5              MS. ESKENAZI:  Objection.  Vague and  13:55:29

 6    ambiguous.                                    13:55:32

 7              THE WITNESS:  That is fair to say.   13:55:32

 8    BY MR. ULIN:                                  13:55:32

 9         Q.  Prior to 2010, on how many occasions can  13:55:34

10    you recall doing work for the Estate on matters  13:55:40

11    related to the licensing of video games?      13:55:41

12         A.  I don't recall being instructed in any  13:55:44

13    matters that related to the licensing of video games  13:55:53

14    as I sit here today.                          13:55:55

15         Q.  Okay.  And aside -- leaving aside the  13:55:58

16    question of whether you were instructed in any  13:56:00

17    matters, can you recall working on any matters that  13:56:03

18    related to the licensing of video games prior to  13:56:05

19    2010?                                         13:56:10

20              MS. ESKENAZI:  Objection.  Asked and  13:56:10

21    answered.  Vague and ambiguous.               13:56:11

22    BY MR. ULIN:                                  13:56:11

23         Q.  You may answer.                      13:56:11

24         A.  Sorry.  Prior to what date?          13:56:12

25         Q.  2010.                                13:56:14
```

| 1 | A.  As I sit here today, I don't recall being | 13:56:20 |

1     A.  As I sit here today, I don't recall being      13:56:20

2     involved in any such matters.                        13:56:21

3         Q.  Okay.  Prior to 2010, did you have any      13:56:24

4     communications with Zaentz concerning video game    13:56:33

5     licensing?                                           13:56:38

6         A.  I don't recall.                             13:56:39

7         Q.  As you sit here today, you can't recall     13:56:47

8     having had any communications with Zaentz concerning 13:56:48

9     video game licensing prior to 2010; is that correct? 13:56:51

10        MS. ESKENAZI:  Objection.  Asked and            13:56:57

11    answered.                                            13:56:58

12        THE WITNESS:  That is correct.                  13:56:58

13        MR. ULIN:  I'm sorry, we're at 34, is that      13:57:07

14    correct?  Okay.  Let's mark Exhibit 34.             13:57:16

15        If you can hold it one second.  I want to       13:57:30

16    ask a couple of questions before we put the document 13:57:33

17    in front of the witness.                             13:57:35

18        Q.  Do you recall at the 2005 meeting in Oxford 13:57:36

19    any discussions of a proposal from a company called  13:57:41

20    Turbine for the use of quotes from the Tolkien books 13:57:45

21    in The Lord of the Rings Online video game?          13:57:51

22        A.  I do recall an issue over the use of        13:57:58

23    quotes.  I don't recall what the context was.        13:58:04

24        Q.  Okay.  What do you recall about that?       13:58:07

25        A.  I recall that Zaentz wanted to use,         13:58:13

1    effectively, text from the works in conjunction with    13:58:17

2    games.    13:58:21

3         Q.   Okay.  And do you recall seeing a proposal    13:58:24

4    concerning the use of quotes in games, in video    13:58:27

5    games?    13:58:30

6         A.   I don't recall that.    13:58:30

7         Q.   Do you recall that being discussed at the    13:58:33

8    2005 meeting in Oxford?    13:58:35

9         MS. ESKENAZI:  Objection.  Asked and    13:58:39

10    answered.    13:58:39

11    BY MR. ULIN:    13:58:39

12         Q.   You may answer.    13:58:40

13         A.   It's possible.    13:58:42

14         Q.   But you don't specifically recall it?    13:58:43

15         A.   I don't specifically recall that.    13:58:44

16         Q.   Do you specifically recall any    13:58:46

17    communications concerning Zaentz's desire to have    13:58:48

18    quotes from the -- from the books used in video    13:58:56

19    games?    13:58:59

20         A.   Well, you have reminded me that that was    13:58:59

21    one of the issues that was discussed in the period    13:59:03

22    that we've been reviewing.  But I can't remember now    13:59:05

23    on what occasions that was discussed or what was    13:59:10

24    said about it.    13:59:12

25         MR. ULIN:  Let's put Exhibit 34 before the    13:59:13

158

| 1  | witness.                                          | 13:59:15 |
| 2  |          (The document referred to was            | 13:57:18 |
| 3  |      marked for identification as                 | 13:57:18 |
| 4  |      Exhibit 34 and attached to this              | 13:57:18 |
| 5  |      deposition.)                                 | 13:57:18 |
| 6  | BY MR. ULIN:                                       | 13:59:20 |
| 7  |    Q.  Mr. Maier, have you seen Exhibit 34 before? | 14:00:43 |
| 8  |    A.  I don't recall seeing this.                | 14:00:45 |
| 9  |    Q.  Do you recall one way or another whether   | 14:00:47 |
| 10 | this proposal was presented to you at the 2005    | 14:00:49 |
| 11 | meeting in Oxford?                                 | 14:00:54 |
| 12 |    A.  I don't recall that.                        | 14:00:54 |
| 13 |    Q.  Are you familiar with a company known as   | 14:01:11 |
| 14 | Turbine?                                           | 14:01:12 |
| 15 |       MS. ESKENAZI:  Objection.  Vague and        | 14:01:14 |
| 16 | ambiguous.                                         | 14:01:16 |
| 17 |       THE WITNESS:  I've heard the name.  I can't | 14:01:16 |
| 18 | remember in what context.                          | 14:01:19 |
| 19 | BY MR. ULIN:                                       | 14:01:19 |
| 20 |    Q.  Okay.  Do you recall a discussion of online | 14:01:24 |
| 21 | games at the meeting in Oxford in 2005?            | 14:01:26 |
| 22 |    A.  No.                                          | 14:01:29 |
| 23 |    Q.  Do you recall anyone at the Estate raising  | 14:01:31 |
| 24 | questions with Zaentz about whether the online games | 14:01:37 |
| 25 | that were being discussed in -- in the 2005 meeting | 14:01:44 |

159

```
1     in Oxford were -- had any components that were        14:01:49

2     available only online?                                14:01:53

3            MS. ESKENAZI:  Objection.  Vague and            14:01:55

4     ambiguous.  Assumes facts not in evidence.            14:01:57

5            THE WITNESS:  Yeah, I didn't really            14:01:59

6     understand the question because I -- I don't recall   14:02:00

7     having said that I remembered online games being      14:02:03

8     discussed.                                             14:02:06

9     BY MR. ULIN:                                           14:02:06

10           Q.  You don't recall any discussion of online  14:02:06

11    games at all at the 2005 meeting in Oxford, correct?  14:02:08

12           A.  The only --                                 14:02:11

13           MS. ESKENAZI:  Objection.  Asked and           14:02:11

14    answered.                                              14:02:12

15           THE WITNESS:  The only discussion I            14:02:13

16    remember about games was that one of the Zaentz       14:02:16

17    people concisely presented -- it was kind of an       14:02:18

18    afterthought -- presented some reasons why they       14:02:22

19    would like the Estate to think about them allowing    14:02:24

20    to use quotes, allowing them to use quotes in         14:02:27

21    connection with games because it would make the       14:02:30

22    games more credible and more popular with fans or     14:02:32

23    something along those lines.  It was one of those     14:02:34

24    sort of, "Just take this away and think about it"     14:02:36

25    kind of things.                                        14:02:39
```

Maier, Steven (Final)

EXHIBIT C                                   PAGE 538

160

```
 1    BY MR. ULIN:                                    14:02:40

 2        Q.  Do you recall anyone from the Estate    14:02:40

 3    raising an issue about those games needing to have  14:02:42

 4    some physical component or -- in order to be    14:02:47

 5    properly licensed by Zaentz?                    14:02:49

 6        A.  No, I'm sure there was no issue about that  14:02:50

 7    at that stage.                                  14:02:53

 8            MR. ULIN:  Mark Exhibit 35.             14:03:01

 9            (The document referred to was           14:03:02

10        marked for identification as                14:03:02

11        Exhibit 35 and attached to this             14:03:02

12        deposition.)                                14:03:53

13    BY MR. ULIN:                                    14:03:54

14        Q.  Mr. Maier, have you seen Exhibit 35 before?  14:03:54

15    I'm sorry -- yeah, Exhibit 35.                  14:03:57

16        A.  I'm -- I may have seen this document or  14:04:06

17    something like it at some stage.  I can't be    14:04:08

18    certain.                                        14:04:11

19        Q.  Do you remember specifically when you   14:04:11

20    received this document?                         14:04:13

21        A.  I don't --                              14:04:13

22            MS. ESKENAZI:  Objection.  Assumes facts  14:04:15

23    not in evidence.                                14:04:17

24            THE WITNESS:  I don't remember whether or  14:04:17

25    when I received this document.  I said it looks  14:04:19
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 539

161

```
 1    vaguely familiar and that I may have seen a document    14:04:21

 2    that was this or like this.                             14:04:23

 3    BY MR. ULIN:                                            14:04:23

 4        Q.  Do you recall receiving this document at        14:04:26

 5    the 2007 meeting in London or in connection with        14:04:29

 6    that meeting?                                           14:04:33

 7        A.  I don't recall that.                            14:04:33

 8        Q.  Do you recall discussing Zaentz's major         14:04:35

 9    Lord of the Rings and Hobbit-related licenses at the    14:04:45

10    London meeting in 2007?                                 14:04:48

11        A.  I don't recall that.                            14:04:50

12        Q.  Do you recall discussing Zaentz's license       14:04:53

13    to Electronic Arts at the London 2007 meeting?          14:05:06

14        A.  No.                                             14:05:13

15        Q.  Do you recall discussing the license to         14:05:14

16    Turbine for The Lord of the Rings Online game at the    14:05:17

17    London 2007 meeting?                                    14:05:20

18        A.  Well, if the discussion about use of text       14:05:26

19    related to Turbine, as I think you suggested to me      14:05:30

20    earlier it did, then I think use of text was also       14:05:32

21    discussed at that meeting.                              14:05:36

22        Q.  And I just want to make it clear, when we       14:05:37

23    talked about use of text, we were talking about a       14:05:39

24    presentation that was made at the 2005 Oxford           14:05:41

25    meeting.  Now I'm talking about the London 2007         14:05:44
```

Maier, Steven (Final)

EXHIBIT C                                                PAGE 540

162

```
 1    meeting.                                        14:05:47

 2         A.  Right.  In that case I don't recall.   14:05:47

 3         Q.  Do you recall any discussion of video games  14:05:59

 4    at the London 2007 meeting?                     14:06:04

 5         A.  I don't recall that.                   14:06:05

 6         Q.  As you're sitting here today, you don't  14:06:06

 7    recall any --                                   14:06:09

 8         A.  As I sit here today, I don't recall --  14:06:10

 9         Q.  -- discussion -- let me finish the question  14:06:12

10    then you can answer.                            14:06:13

11         As you're sitting here today, you don't    14:06:13

12    recall any discussion of video games at the London  14:06:17

13    2007 meeting; is that correct?                  14:06:18

14         A.  I don't recall any such discussion.    14:06:23

15         Q.  Did you review any of the press coverage  14:06:29

16    concerning the release of The Lord of the Rings  14:06:31

17    Online game in 2007?                            14:06:32

18         A.  No.                                    14:06:34

19         Q.  Have you reviewed press coverage concerning  14:06:36

20    The Lord of the Rings Online game -- let me start  14:06:38

21    the question again.                             14:06:43

22         Did you review press coverage concerning   14:06:44

23    The Lord of the Rings Online game around the time of  14:06:46

24    its release, even if you can't remember when that  14:06:48

25    was?                                            14:06:50
```

Maier, Steven (Final)

EXHIBIT C                                      PAGE 541

163

1        A.   No.                                          14:06:50

2                 (Pages 164 through 174 are

3              marked confidential and are bound

4              under separate cover.   The

5              nonconfidential portion of this

6              transcript continues on page 175.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

164

CONFIDENTIAL

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Maier, Steven (Final)

EXHIBIT C                                              PAGE 543

165

CONFIDENTIAL

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Maier, Steven (Final)

EXHIBIT C                                    PAGE 544

166

CONFIDENTIAL

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Maier, Steven (Final)

EXHIBIT C                                    PAGE 545

167

CONFIDENTIAL

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Maier, Steven (Final)

EXHIBIT C                    PAGE 546

168

CONFIDENTIAL

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Maier, Steven (Final)

EXHIBIT C                                           PAGE 547

169

CONFIDENTIAL

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

170

CONFIDENTIAL

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Maier, Steven (Final)

EXHIBIT C                                                    PAGE 549

171

CONFIDENTIAL

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

172

CONFIDENTIAL

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Maier, Steven (Final)

EXHIBIT C                                          PAGE 551

173

CONFIDENTIAL

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Maier, Steven (Final)

EXHIBIT C                                                    PAGE 552

174

CONFIDENTIAL

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Maier, Steven (Final)

EXHIBIT C                                        PAGE 553

175

```
 1    BY MR. ULIN:                                      14:23:45

 2        Q.  Fair enough.  When is the first time that  14:23:48

 3    you learned about the licensing of Lord of the Rings  14:23:55

 4    gambling games?                                   14:23:58

 5        A.  September of 2010.                         14:23:59

 6        Q.  And how did you -- what happened in        14:24:04

 7    September 2010 that you just referred to?          14:24:11

 8        A.  My recollection is that I turned on my     14:24:12

 9    computer one morning and had received a spam e-mail  14:24:18

10    from a casino offering Lord of the Rings online    14:24:22

11    slot.                                              14:24:28

12        Q.  And what did you do when you received that  14:24:35

13    e-mail?                                            14:24:36

14        A.  I believe that the first thing I did was to  14:24:36

15    forward the e-mail to Fredrica Drotos at Zaentz    14:24:44

16    asking her whether or not this was authorized by   14:24:49

17    Zaentz.                                            14:24:54

18        Q.  And did you get a response from Ms. Drotos?  14:24:57

19        A.  My recollection is I did not get an        14:25:00

20    immediate response, but she replied some weeks     14:25:04

21    later.                                             14:25:07

22        Q.  And what did she tell you?                 14:25:12

23        A.  By that stage it had been established that  14:25:17

24    Zaentz and/or Warner were aware of and had approved  14:25:23

25    this licensing and, therefore, her e-mail didn't  14:25:26
```

Maier, Steven (Final)

EXHIBIT C                                            PAGE 554

176

```
 1    answer that question, but as I recall, referred to a    14:25:31

 2    telephone call that she was proposing to discuss the    14:25:39

 3    issue.                                                  14:25:41

 4         Q.  And in what manner did you come to learn       14:25:42

 5    that the online slots of which you became aware had     14:25:48

 6    been licensed by Zaentz and/or Warner?                  14:25:54

 7         A.  My recollection is that I conducted my own     14:25:57

 8    Internet search for this game, established that a       14:26:04

 9    number of different casinos were offering it, all of    14:26:08

10    which were stating or asserting trademarks and          14:26:12

11    copyrights on behalf of Zaentz and/or Warner, which     14:26:18

12    led me to believe that this was not -- the one I had    14:26:23

13    received was not an isolated case where someone had     14:26:26

14    perhaps forged that, and this was, therefore,           14:26:29

15    authorized by them.                                     14:26:32

16         Q.  Did you make inquiries into whether there      14:26:34

17    were other licenses by Zaentz and/or Warner for         14:26:38

18    gambling games, whether online or otherwise?            14:26:43

19         A.  My recollection is that the matter was         14:26:46

20    placed in the hands of the -- of the Estate's U.S.      14:26:48

21    attorneys at that point.                                14:26:52

22         Q.  And when you say "the Estate's U.S.            14:26:55

23    attorneys," you're referring to the Greenberg           14:26:56

24    Glusker firm?                                           14:26:58

25         A.  Yes.                                           14:26:59
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 555

177

| | | |
|---|---|---|
| 1 | Q.  Were you aware of any licensing by Zaentz | 14:27:15 |
| 2 | and/or Warner of gambling games prior to September | 14:27:20 |
| 3 | 2010? | 14:27:27 |
| 4 | A.  I don't believe so. | 14:27:27 |
| 5 | Q.  Have you seen trademark registrations by | 14:27:34 |
| 6 | Zaentz for Lord of the Rings and Hobbit-related slot | 14:27:39 |
| 7 | machines in Japan dating to 1980 or '82? | 14:27:44 |
| 8 | A.  I don't recall seeing that. | 14:27:47 |
| 9 | Q.  You don't recall -- you -- one way or | 14:27:48 |
| 10 | another having seen those? | 14:27:51 |
| 11 | A.  As I sit here today, I don't recall one way | 14:27:52 |
| 12 | or another having seen that. | 14:27:55 |
| 13 | Q.  Were you aware of licenses to three -- at | 14:27:56 |
| 14 | least three separate companies for their production | 14:28:04 |
| 15 | of Lord of the Rings-related slot machines or | 14:28:06 |
| 16 | Pachinko machines dating well before September of | 14:28:11 |
| 17 | 2010? | 14:28:15 |
| 18 | A.  I'm sorry, I don't know what Pachinko is. | 14:28:18 |
| 19 | Q.  A form of -- of betting game; not a slot | 14:28:20 |
| 20 | machine but another type of machine? | 14:28:24 |
| 21 | A.  I wasn't aware of any such licenses. | 14:28:27 |
| 22 | Q.  I -- I'm not sure I got the exact | 14:28:31 |
| 23 | description of Pachinko right. | 14:28:32 |
| 24 | MS. ESKENAZI:  I'm going to interpose an | 14:28:34 |
| 25 | objection -- a late objection as vague and | 14:28:36 |

Maier, Steven (Final)

EXHIBIT C                                    PAGE 556

178

```
 1   ambiguous.                                        14:28:38

 2          MR. ULIN:  Fair enough.  And I'm going to   14:28:38

 3   gladly say I would probably have a difficult time  14:28:46

 4   describing Pachinko.                               14:28:49

 5          MS. ESKENAZI:  Okay.                        14:28:49

 6          MR. ULIN:  I'm probably better off that     14:28:50

 7   way.                                               14:28:51

 8       Q.  Are you aware of the production of Lord of 14:28:54

 9   the Rings slot machines in Japan dating back well  14:29:02

10   before September of 2010?                          14:29:09

11       A.  No.                                        14:29:12

12       Q.  In the U.K.?                               14:29:14

13       A.  No.                                        14:29:15

14       Q.  In the United States?                      14:29:15

15       A.  No.                                        14:29:17

16       Q.  Is there someone at the Estate who would be 14:29:23

17   responsible for reviewing the trademark            14:29:28

18   registrations and licensing and informing themselves 14:29:32

19   of the existence of these marks and licenses for   14:29:36

20   gambling-related games dating back well before     14:29:38

21   September of 2010?                                 14:29:43

22          MS. ESKENAZI:  Objection.  Vague and        14:29:44

23   ambiguous.  Assumes facts not in evidence.         14:29:45

24          THE WITNESS:  When you say "the trademark   14:29:46

25   licensing," do you mean Zaentz's trademark         14:29:48
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 557

179

| | | |
|---|---|---|
| 1 | licensing? | 14:29:50 |
| 2 | BY MR. ULIN: | 14:29:50 |
| 3 | Q.  Yes. | 14:29:52 |
| 4 | MS. ESKENAZI:  Same objections.  Vague and | 14:29:52 |
| 5 | ambiguous.  Assumes facts not in evidence.  Calls | 14:29:54 |
| 6 | for speculation.  Lacks foundation. | 14:29:57 |
| 7 | BY MR. ULIN: | 14:29:57 |
| 8 | Q.  You may answer. | 14:29:59 |
| 9 | A.  I'm not aware of anyone who would have | 14:30:00 |
| 10 | proactive responsibility of that kind.  But it would | 14:30:02 |
| 11 | probably fall within the overview of Cathleen | 14:30:05 |
| 12 | Blackburn. | 14:30:08 |
| 13 | Q.  Do you know whether Ms. Blackburn was | 14:30:11 |
| 14 | aware, prior to September 2010, of any of the | 14:30:14 |
| 15 | trademarks or licenses in Lord of the Rings-related | 14:30:18 |
| 16 | gambling games that I referred to in the course of | 14:30:21 |
| 17 | this questioning? | 14:30:24 |
| 18 | MS. ESKENAZI:  Objection to the extent it | 14:30:25 |
| 19 | calls for attorney-client communications. | 14:30:26 |
| 20 | If you can answer the question without | 14:30:28 |
| 21 | referring to communications you had with | 14:30:30 |
| 22 | Ms. Blackburn or any other lawyers, you're welcome | 14:30:32 |
| 23 | to answer it. | 14:30:36 |
| 24 | BY MR. ULIN: | 14:30:36 |
| 25 | Q.  You may answer. | 14:30:37 |

Maier, Steven (Final)

EXHIBIT C                                                PAGE 558

180

```
 1        A.  I'm not aware.                      14:30:39

 2        Q.  Okay.  It's also the Estate's position that  14:30:45

 3   licensing slot machines or physical gambling games  14:30:47

 4   is beyond the rights that were granted to Zaentz  14:30:53

 5   under the relevant agreements, correct?       14:30:56

 6             MS. ESKENAZI:  Objection.  Compound.  Vague  14:30:59

 7   and ambiguous.                                 14:31:03

 8             THE WITNESS:  Well, it's the Estate's  14:31:03

 9   position that the physical casino slot machines are  14:31:05

10   also outside the grounds of rights.            14:31:10

11   BY MR. ULIN:                                   14:31:10

12        Q.  What's the basis for that position?  14:31:12

13             MS. ESKENAZI:  Objection.  Calls for a  14:31:17

14   legal conclusion.                              14:31:17

15   BY MR. ULIN:                                   14:31:17

16        Q.  You may answer.                       14:31:18

17        A.  They're not articles of tangible personal  14:31:21

18   property, that gambling is not a licensed activity,  14:31:24

19   and that the product being sold to the public is an  14:31:31

20   opportunity to gamble, not the machine.        14:31:37

21        Q.  Is it your understanding that slot machines  14:31:40

22   are not articles of personal -- tangible personal  14:31:45

23   property?                                      14:31:47

24             MS. ESKENAZI:  Objection.  Asked and  14:31:48

25   answered.                                      14:31:49
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 559

181

```
 1              THE WITNESS:  My view would be that the      14:31:50

 2   casino machines are commercial property.              14:31:54

 3   BY MR. ULIN:                                           14:31:54

 4        Q.  Because they're owned by the casino -- the    14:32:00

 5   casino and not by the consumer?                        14:32:02

 6        A.  Because they are designed for the             14:32:07

 7   commercial purpose of offering gambling services to    14:32:09

 8   the public.  They're not a consumer item.              14:32:12

 9        Q.  Would the same be true of a Lord of the       14:32:17

10   Rings pinball machine in a bar?                        14:32:19

11              MS. ESKENAZI:  Objection.  Calls for a      14:32:27

12   legal conclusion.  Incomplete hypothetical.            14:32:28

13   BY MR. ULIN:                                           14:32:28

14        Q.  You may answer.                               14:32:30

15        A.  It may be.                                    14:32:31

16        Q.  Are you aware of Lord of the Rings pinball    14:32:36

17   machines that had been licensed for manufacture?       14:32:38

18        A.  As I sit here today I'm not aware of those.   14:32:41

19        Q.  Do you know one way or another how long       14:32:47

20   Lord of the Rings pinball machines have been           14:32:49

21   licensed for manufacture?                              14:32:50

22        A.  I don't have that information.                14:32:51

23        Q.  Has the Estate of J.R.R. Tolkien ever         14:32:52

24   raised any objection to Lord of the Rings pinball      14:32:55

25   machines ever?                                         14:33:00
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 560

182

```
 1        A.  I don't know.                      14:33:00

 2        Q.  What about Lord of the Rings-related    14:33:05

 3   costumes that belong to a costume shop and are   14:33:06

 4   available for rent?  How would you characterize  14:33:09

 5   those?                                       14:33:12

 6            MS. ESKENAZI:  Objection.  Calls for a  14:33:12

 7   legal conclusion.  Incomplete hypothetical.      14:33:13

 8   BY MR. ULIN:                                 14:33:13

 9        Q.  You may answer, as a lawyer.        14:33:15

10        A.  I haven't considered that and would need to  14:33:17

11   consider that.                               14:33:19

12        Q.  Do you know how long Lord of the     14:33:22

13   Rings-related costumes have been licensed?      14:33:28

14        A.  I don't.                            14:33:29

15            MS. ESKENAZI:  Assumes facts not in   14:33:32

16   evidence.                                    14:33:32

17   BY MR. ULIN:                                 14:33:32

18        Q.  Do you know whether the Estate has ever  14:33:35

19   raised any objection to Lord of the Rings costumes  14:33:36

20   being licensed because sometimes they're owned by  14:33:38

21   costume shops and rented out?                  14:33:42

22        A.  I don't know.                       14:33:45

23            MR. ULIN:  Let's go off the record.   14:33:48

24            THE VIDEOGRAPHER:  This is the end of media  14:33:49

25   number 3.  Off the record at 2:33 p.m.         14:33:52
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 561

183

| | | |
|---|---|---|
| 1 | (Brief recess.) | 14:33:56 |
| 2 | THE VIDEOGRAPHER:  We're back on the record | 14:42:02 |
| 3 | at 2:42 p.m.  This is the beginning of media number | 14:42:11 |
| 4 | 4.  Counsel may proceed. | 14:42:14 |
| 5 | | 14:42:14 |
| 6 | EXAMINATION | 14:42:14 |
| 7 | BY MR. PETROCELLI: | 14:42:21 |
| 8 | Q.  Good afternoon, Mr. Maier.  I'm Dan | 14:42:21 |
| 9 | Petrocelli.  I represent the Warner parties. | 14:42:23 |
| 10 | A.  Good afternoon. | 14:42:26 |
| 11 | Q.  When did you arrive in Los Angeles for this | 14:42:26 |
| 12 | deposition? | 14:42:28 |
| 13 | A.  On Wednesday of last week. | 14:42:28 |
| 14 | MS. ESKENAZI:  Before we get going, did -- | 14:42:30 |
| 15 | did Mr. Zaentz's counsel want to make a -- a comment | 14:42:33 |
| 16 | about whether he's done or not? | 14:42:35 |
| 17 | MR. ULIN:  Sure.  I'm happy to complete the | 14:42:39 |
| 18 | record. | 14:42:40 |
| 19 | At this point, I and the Saul Zaentz | 14:42:41 |
| 20 | Company have no further questions for Mr. Maier. | 14:42:43 |
| 21 | BY MR. PETROCELLI: | 14:42:43 |
| 22 | Q.  How many different days did you spend some | 14:42:50 |
| 23 | time preparing? | 14:42:52 |
| 24 | MS. ESKENAZI:  Objection.  Asked and | 14:42:54 |
| 25 | answered. | 14:42:55 |

Maier, Steven (Final)

EXHIBIT C                                                    PAGE 562

184

| | | |
|---|---|---|
| 1 | THE WITNESS:  Two days. | 14:42:56 |
| 2 | BY MR. PETROCELLI: | 14:42:56 |
| 3 | Q.  Which days were they? | 14:42:57 |
| 4 | A.  Wednesday of this week and yesterday. | 14:43:01 |
| 5 | Q.  Any other days besides those two days? | 14:43:05 |
| 6 | A.  No. | 14:43:08 |
| 7 | Q.  What about before you came to L.A.? | 14:43:08 |
| 8 | A.  No. | 14:43:12 |
| 9 | Q.  How many hours did you spend? | 14:43:13 |
| 10 | MS. ESKENAZI:  Objection.  Asked and | 14:43:14 |
| 11 | answered. | 14:43:16 |
| 12 | BY MR. PETROCELLI: | 14:43:16 |
| 13 | Q.  Total? | 14:43:16 |
| 14 | A.  On the two days in question? | 14:43:16 |
| 15 | Q.  Yeah. | 14:43:19 |
| 16 | A.  I would say four or five hours on each of | 14:43:19 |
| 17 | the two days, so eight or nine in total. | 14:43:21 |
| 18 | Q.  Four to five on each of the days.  That | 14:43:27 |
| 19 | comes to eight to ten. | 14:43:29 |
| 20 | A.  Excuse me.  You're quite right. | 14:43:31 |
| 21 | Q.  About how many documents did you review? | 14:43:32 |
| 22 | MS. ESKENAZI:  Objection.  Asked and | 14:43:39 |
| 23 | answered. | 14:43:39 |
| 24 | BY MR. PETROCELLI: | 14:43:39 |
| 25 | Q.  In the eight and ten hours of time? | 14:43:40 |

Maier, Steven (Final)

EXHIBIT C                                    PAGE 563

185

```
 1        A.  I can't estimate the number.  It was a pile    14:43:43

 2   of documents.                                           14:43:48

 3        Q.  More than 100?                                 14:43:48

 4        A.  Possibly.                                       14:43:49

 5        Q.  I notice that you had very little              14:43:50

 6   recollection of anything in the course of Mr. Ulin's    14:43:56

 7   examination, and yet you spent eight to ten hours       14:43:59

 8   and reviewed over 100 documents.                        14:44:05

 9        Do you have a problem with your memory,            14:44:10

10   sir?                                                     14:44:10

11        MS. ESKENAZI:  Objection.  Move to strike          14:44:12

12   all the colloquy.                                        14:44:13

13        THE WITNESS:  I don't have a problem with          14:44:14

14   my memory.                                               14:44:15

15   BY MR. PETROCELLI:                                      14:44:16

16        Q.  Do you have a good memory?                     14:44:16

17        A.  I think I have an average --                   14:44:18

18        MS. ESKENAZI:  Objection.                          14:44:18

19        THE WITNESS:  -- memory.                           14:44:19

20   BY MR. PETROCELLI:                                      14:44:19

21        Q.  You're a lawyer, right?                        14:44:19

22        A.  I'm a lawyer.                                   14:44:22

23        Q.  Your whole career?                             14:44:23

24        A.  Yes.                                            14:44:25

25        Q.  Have you ever done anything else other than    14:44:26
```

Maier, Steven (Final)

EXHIBIT C                                                    PAGE 564

186

1    practice law?                                        14:44:27

2          MS. ESKENAZI:  Objection.  Vague and          14:44:30

3    ambiguous.                                           14:44:32

4          THE WITNESS:  Not since I qualified as a       14:44:32

5    lawyer.                                              14:44:34

6    BY MR. PETROCELLI:                                   14:44:34

7          Q.  What about before then?                    14:44:34

8          A.  Well, Saturday and vacation jobs.          14:44:35

9          Q.  Have you been attempting to minimize your  14:44:40

10   knowledge in order to avoid disclosing information   14:44:43

11   in this deposition, sir?                             14:44:46

12         MS. ESKENAZI:  Objection.  Argumentative.      14:44:48

13   Vague and ambiguous.                                 14:44:50

14         THE WITNESS:  No.                              14:44:52

15   BY MR. PETROCELLI:                                   14:44:52

16         Q.  How long have you known Cathleen Blackburn? 14:44:54

17         A.  Since 1997.                                14:44:57

18         Q.  Okay.  So that's 2007, 2000- -- so what's  14:45:02

19   that, 16, 17 years?                                  14:45:05

20         A.  Yes.                                       14:45:07

21         Q.  And you have been practicing -- you left -- 14:45:10

22   the two of you left your law firm together and       14:45:13

23   joined your own -- made up your own firm, right?     14:45:16

24         MS. ESKENAZI:  Objection.  Compound.  Vague    14:45:18

25   and ambiguous.                                       14:45:22

Maier, Steven (Final)

EXHIBIT C                                      PAGE 565

187

```
 1              THE WITNESS:  We did set up our own firm,      14:45:22

 2     yes.                                                    14:45:22

 3     BY MR. PETROCELLI:                                      14:45:22

 4         Q.  And it's just the two of you, right?            14:45:25

 5         A.  We're the only two partners.                    14:45:28

 6         Q.  So fair to say you have a pretty close          14:45:32

 7     working relationship with Ms. Blackburn, right?         14:45:34

 8              MS. ESKENAZI:  Objection.  It's vague and      14:45:37

 9     ambiguous.                                              14:45:38

10              THE WITNESS:  Well, I don't quite know what    14:45:38

11     that means.                                             14:45:40

12     BY MR. PETROCELLI:                                      14:45:40

13         Q.  Why don't you know what that means?             14:45:40

14         A.  Because --                                      14:45:42

15              MS. ESKENAZI:  Objection.  Vague and           14:45:42

16     ambiguous.                                              14:45:44

17     BY MR. PETROCELLI:                                      14:45:44

18         Q.  What do you think it means?                     14:45:44

19         A.  Well, it's -- it's a subjective question,       14:45:45

20     what "fairly close" means.                              14:45:48

21         Q.  Well, what do you think it means?               14:45:49

22              MS. ESKENAZI:  Objection.  Vague and           14:45:51

23     ambiguous.                                              14:45:54

24              THE WITNESS:  I don't know what I think it     14:45:54

25     means.                                                  14:45:55
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 566

188

```
 1    BY MR. PETROCELLI:                              14:45:55

 2        Q.  Do you have a close working relationship  14:45:56

 3    with her?                                       14:45:57

 4           MS. ESKENAZI:  Objective -- objection.   14:45:58

 5    Vague and ambiguous.                            14:46:00

 6           THE WITNESS:  We have the same working   14:46:01

 7    relationship that I imagine any two-partner practice  14:46:02

 8    would have.                                     14:46:06

 9    BY MR. PETROCELLI:                              14:46:06

10        Q.  Can you answer my question now, sir?    14:46:07

11        A.  I don't think I can.                    14:46:08

12        Q.  Why not?  You don't know what those words  14:46:09

13    mean?                                           14:46:11

14           MS. ESKENAZI:  Objection.  Vague and     14:46:12

15    ambiguous.  And asked and answered.             14:46:13

16           THE WITNESS:  I don't really --          14:46:17

17    BY MR. PETROCELLI:                              14:46:17

18        Q.  You understand that if we can't compel you,  14:46:18

19    we're going to play this deposition, this video  14:46:19

20    deposition to the jury in this case, and I just --  14:46:23

21    I'm going to give you one last chance to tell the  14:46:26

22    jury when they watch this video, do you have a close  14:46:29

23    working relationship with Ms. Blackburn?  Yes or no,  14:46:32

24    sir?                                            14:46:32

25           MS. ESKENAZI:  Move to strike all the    14:46:36
```

189

```
 1    colloquy and prep that counsel is making.  It's been    14:46:37

 2    asked and answered.  It's vague and ambiguous.  If      14:46:40

 3    you want to rephrase the question or explain it to       14:46:42

 4    the witness, what you mean --                            14:46:44

 5          MR. PETROCELLI:  No, because the witness          14:46:46

 6    knows exactly what it means.                             14:46:48

 7          MS. ESKENAZI:  No, actually, probably             14:46:49

 8    nobody in this room knows what you mean, Dan, but --     14:46:51

 9          MR. PETROCELLI:  That's laughable.                14:46:54

10          MS. ESKENAZI:  -- you can either explain it       14:46:54

11    or not.  It's your choice.                               14:46:57

12          MR. PETROCELLI:  Can't wait for the jury to       14:46:57

13    hear that, too.                                          14:46:59

14       Q.  You -- you're sitting here under oath            14:46:59

15    telling me, telling the jury and telling the federal    14:47:01

16    judge, who may have an opportunity to watch this,        14:47:04

17    that you don't know what it means when I ask you do      14:47:06

18    you have a close working relationship with your one      14:47:08

19    and only law partner that you see every single day      14:47:09

20    of the week?                                             14:47:12

21          MS. ESKENAZI:  Same objections and                14:47:16

22    compound.                                                14:47:19

23          THE WITNESS:  I have a working relationship       14:47:19

24    with Cathleen Blackburn.  The word "close" is           14:47:20

25    clearly subjective.                                      14:47:23
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 568

190

```
 1   BY MR. PETROCELLI:                              14:47:23

 2        Q.  How would you characterize it, sir?   14:47:25

 3        A.  We have the same working relationship that  14:47:26

 4   I imagine any other two partners in a firm would  14:47:28

 5   have.                                           14:47:30

 6        Q.  I'm -- I'm not asking you to imagine   14:47:31

 7   anything, and you have no idea what my working  14:47:32

 8   relationship is with any of my partners, do you?  14:47:35

 9        A.  But you just --                        14:47:37

10            MS. ESKENAZI:  Objection --            14:47:37

11            THE WITNESS:  -- asked me to characterize  14:47:38

12   it.                                             14:47:39

13            MS. ESKENAZI:  Objection.  Argumentative.  14:47:41

14   BY MR. PETROCELLI:                              14:47:42

15        Q.  But can -- char- -- characterize it based  14:47:42

16   on your own personal knowledge.                 14:47:43

17            How often do you see Ms. Blackburn during  14:47:44

18   the week?                                       14:47:47

19        A.  Most days.                             14:47:47

20        Q.  Okay.  Talk to her most days?          14:47:51

21        A.  Yes.                                   14:47:52

22        Q.  Okay.  Talk to her about matters related to  14:47:54

23   the Tolkien Estate?                             14:47:58

24        A.  Yes.                                   14:47:58

25        Q.  Okay.  Talk to her since you've been to  14:48:02
```

Maier, Steven (Final)

EXHIBIT C                                          PAGE 569

191

```
 1    Los Angeles?                                      14:48:05

 2        A.  Yes.                                      14:48:06

 3        Q.  Have you -- did you see her every day since  14:48:08

 4    you've been to Los Angeles?                       14:48:11

 5        A.  Yes.                                       14:48:12

 6        Q.  Are you both staying in the same hotel?   14:48:14

 7        A.  Yes.                                       14:48:16

 8        Q.  Okay.  Have you spoken to her since she   14:48:20

 9    gave her deposition on Tuesday?                   14:48:24

10        A.  Yes.                                       14:48:27

11        Q.  Did you have any conversation at all with  14:48:27

12    her about her deposition testimony?               14:48:29

13            MS. ESKENAZI:  Objection.  It's been asked  14:48:30

14    and answered.  Also attorney-client privileged    14:48:32

15    communication.                                    14:48:35

16            You can answer --                          14:48:36

17            THE WITNESS:  No.                           14:48:36

18            MS. ESKENAZI:  -- to the extent that it    14:48:36

19    doesn't invade the attorney-client privileged     14:48:39

20    communication.                                    14:48:41

21    BY MR. PETROCELLI:                                 14:48:41

22        Q.  Not one word, sir?                         14:48:42

23        A.  Not about her testimony.                   14:48:43

24        Q.  Not -- not one word about what she was    14:48:44

25    asked in her deposition?                           14:48:49
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 570

192

```
 1        A.  No.                                      14:48:51

 2            MS. ESKENAZI:  Objection.  Objection.  It's  14:48:51

 3   been asked and answered.                          14:48:53

 4   BY MR. PETROCELLI:                                14:48:53

 5        Q.  Have you spoken to the Greenberg Glusker  14:48:58

 6   lawyers about the questions that were put to       14:49:01

 7   Ms. Blackburn in the deposition?                  14:49:03

 8            MS. ESKENAZI:  Objection.  Attorney-client  14:49:05

 9   privilege.  Instruct not to answer.              14:49:06

10   BY MR. PETROCELLI:                                14:49:06

11        Q.  I think you said that in September 2010 you  14:49:12

12   first heard about this gambling issue?           14:49:20

13        A.  That's when I received the spam e-mail.  14:49:24

14        Q.  And soon thereafter, after communicating  14:49:27

15   with the folks at Zaentz, as you testified, you came  14:49:32

16   to understand the Zaentz position, that it disagreed  14:49:39

17   with your position, correct?                     14:49:42

18            MS. ESKENAZI:  Objection.  Vague and     14:49:45

19   ambiguous.  Assumes facts not in evidence.       14:49:45

20            THE WITNESS:  No, that wasn't Zaentz's   14:49:50

21   initial position.                                14:49:51

22   BY MR. PETROCELLI:                                14:49:51

23        Q.  Zaentz wrote you a letter ind- -- take --  14:49:52

24   taking positions that it believed it had rights to  14:49:55

25   do the gambling games, correct?                  14:49:58
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 571

193

```
 1              MS. ESKENAZI:  Objection.  Misstates the      14:50:00
 2    evidence.  Assumes facts not in evidence.            14:50:01
 3              THE WITNESS:  Are you referring to the      14:50:04
 4    correspondence between the U.S. attorneys?           14:50:05
 5    BY MR. PETROCELLI:                                   14:50:05
 6         Q.  I'm referring to correspondence on which    14:50:08
 7    you were copied, sir.                                14:50:10
 8         A.  I don't recall exactly who received which   14:50:12
 9    letters.                                             14:50:14
10         Q.  Well, I didn't ask you that question, did   14:50:14
11    I?  I asked you did you become aware that Zaentz     14:50:17
12    disagreed with the Estate's position that it did not 14:50:21
13    have rights to do the gambling machines?             14:50:25
14         A.  At some --                                  14:50:28
15              MS. ESKENAZI:  Object- --                  14:50:28
16              THE WITNESS:  -- point.                     14:50:29
17    BY MR. PETROCELLI:                                   14:50:29
18         Q.  Okay.                                       14:50:29
19              MS. ESKENAZI:  Objection.  Misstates the    14:50:30
20    testimony.                                           14:50:31
21    BY MR. PETROCELLI:                                   14:50:31
22         Q.  And at some point, certainly by the end of  14:50:32
23    2010, correct?                                       14:50:35
24         A.  I believe so.                               14:50:38
25         Q.  Okay.  And you also became aware of the     14:50:40
```

Maier, Steven (Final)

EXHIBIT C                                        PAGE 572

194

```
1    position of Zaentz, that it had the rights to        14:50:44

2    merchandise the online video and computer games,     14:50:49

3    correct?                                             14:50:49

4         MS. ESKENAZI:  Objection.  Vague and           14:50:57

5    ambiguous.                                           14:50:57

6         THE WITNESS:  Yes.                              14:50:57

7    BY MR. PETROCELLI:                                   14:50:57

8         Q.  And you were aware of the Zaentz position   14:50:58

9    in that regard also by the end of 2010, right?       14:51:01

10        MS. ESKENAZI:  Objection.  Vague and            14:51:07

11   ambiguous.                                           14:51:08

12        THE WITNESS:  Yes.                              14:51:08

13   BY MR. PETROCELLI:                                   14:51:08

14        Q.  And indeed those are the issues that have   14:51:11

15   now brought us into litigation, correct?             14:51:14

16        A.  Those are some of the issues.               14:51:19

17        Q.  Okay.  Now, you said you're a director of   14:51:20

18   the -- what is it, the Tolkien Estate Limited?       14:51:25

19        A.  Correct.                                    14:51:28

20        Q.  Okay.  Did you, as a director, meet with    14:51:31

21   the other directors and make a decision to file this 14:51:34

22   lawsuit?                                             14:51:37

23        MS. ESKENAZI:  Objection.  Assumes facts        14:51:38

24   not in evidence.  Vague and ambiguous.               14:51:40

25        THE WITNESS:  No.                               14:51:41
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 573

195

```
 1    BY MR. PETROCELLI:                              14:51:41

 2        Q.  Was there any meeting among the directors  14:51:43

 3    of the Tolkien Estate Limited or its predecessor    14:51:46

 4    name?  Was that Fourth Estate Limited or something  14:51:51

 5    like that?  I don't have the complaint in front of  14:51:55

 6    me.  What is it?                                14:51:57

 7            MR. PRIMACK:  Fourth Age.               14:51:58

 8            MR. PETROCELLI:  Fourth Age.  Excuse me.  14:51:59

 9            MS. ESKENAZI:  Objection.  Vague and --  14:52:01

10    BY MR. PETROCELLI:                              14:52:01

11        Q.  The predecessor name?                   14:52:01

12            MS. ESKENAZI:  Objection.  Vague and    14:52:03

13    ambiguous.                                      14:52:04

14            THE WITNESS:  I'm sorry, what's the     14:52:04

15    question?                                       14:52:04

16    BY MR. PETROCELLI:                              14:52:04

17        Q.  Is the predecessor name to Fourth -- to  14:52:05

18    Tolkien Estate Limited, Fourth Age Limited?     14:52:11

19        A.  Yes, that is correct.                   14:52:13

20        Q.  Were you a director of Fourth Age?      14:52:16

21        A.  Yes, I was.                             14:52:25

22        Q.  Okay.  So when Fourth Age filed this    14:52:25

23    lawsuit in, I guess, November 2012, were you a  14:52:27

24    director?                                       14:52:35

25        A.  I was.                                  14:52:35
```

Maier, Steven (Final)

EXHIBIT C                                              PAGE 574

196

| | | |
|---|---|---|
| 1 | Q.  Okay.  Did you communicate with your fellow | 14:52:39 |
| 2 | directors about the filing of the case? | 14:52:41 |
| 3 | A.  Not in my capacity as a director. | 14:52:46 |
| 4 | Q.  Why not? | 14:52:49 |
| 5 | A.  Because -- | 14:52:49 |
| 6 | MS. ESKENAZI:  Objection.  Assumes facts | 14:52:52 |
| 7 | not in evidence. | 14:52:52 |
| 8 | THE WITNESS:  Because I was communicating | 14:52:55 |
| 9 | with them in my capacity as a legal advisor. | 14:52:57 |
| 10 | BY MR. PETROCELLI: | 14:52:57 |
| 11 | Q.  How do you -- how can they tell which hat | 14:53:04 |
| 12 | you're wearing, if you're the director or the | 14:53:07 |
| 13 | lawyer? | 14:53:12 |
| 14 | MS. ESKENAZI:  Objection.  Calls for | 14:53:14 |
| 15 | speculation.  Lacks foundation. | 14:53:17 |
| 16 | THE WITNESS:  I can't speculate on that. | 14:53:17 |
| 17 | BY MR. PETROCELLI: | 14:53:17 |
| 18 | Q.  I didn't ask you to speculate.  Just | 14:53:19 |
| 19 | because she put the word "speculation" in her | 14:53:21 |
| 20 | objection doesn't mean I'm actually asking you to | 14:53:23 |
| 21 | speculate.  That's just the lawyer's objection.  You | 14:53:27 |
| 22 | understand that, right? | 14:53:29 |
| 23 | MS. ESKENAZI:  Objection.  Argumentative. | 14:53:32 |
| 24 | THE WITNESS:  They view me as their legal | 14:53:34 |
| 25 | advisor. | 14:53:37 |

Maier, Steven (Final)

EXHIBIT C                                        PAGE 575

```
 1    BY MR. PETROCELLI:                               14:53:37

 2       Q.  So how do they know when you're acting in  14:53:37

 3    your capacity as a director?                     14:53:40

 4          MS. ESKENAZI:  Objection.  Calls for       14:53:42

 5    speculation.  Lacks foundation.                  14:53:44

 6          THE WITNESS:  Because I've never undertaken 14:53:46

 7    any positive or executive action in the capacity as 14:53:48

 8    director.                                        14:53:51

 9    BY MR. PETROCELLI:                               14:53:51

10       Q.  So even though you're a director and have  14:53:52

11    been since some time, you've never once had a    14:53:56

12    conversation or a communication with your fellow 14:54:00

13    directors in your capacity as a director?        14:54:02

14       A.  That's correct.                           14:54:04

15       Q.  Every single time you've opened your mouth 14:54:05

16    and spoken to them, you've been doing so as a lawyer 14:54:09

17    giving legal advice?  Is that your testimony?    14:54:12

18          MS. ESKENAZI:  Objection.  Compound and    14:54:15

19    argumentative.                                   14:54:17

20          THE WITNESS:  Yes.                          14:54:22

21    BY MR. PETROCELLI:                               14:54:22

22       Q.  And you're taking that position so that you 14:54:24

23    don't have to talk about any of those conversations 14:54:26

24    because you're going to claim they're all        14:54:28

25    privileged, I take it.  Is that right?           14:54:31
```

198

```
 1              MS. ESKENAZI:  Objection.  Argumentative.   14:54:33

 2    Instruct not to answer.  Also calls for a legal      14:54:35

 3    conclusion.                                          14:54:38

 4    BY MR. PETROCELLI:                                   14:54:38

 5         Q.  Do you have a written retainer agreement    14:54:47

 6    with your clients?                                   14:54:48

 7         A.  I believe we do.                            14:54:49

 8         Q.  Okay.  Do you have any kind of -- effective 14:54:51

 9    only since you and Cathleen started the firm; is     14:54:57

10    that right?                                          14:54:57

11         A.  Maier Blackburn has what's called an        14:55:03

12    engagement letter with the clients.                  14:55:05

13         Q.  Yeah, and prior to that point you had no    14:55:06

14    letter, right?                                       14:55:08

15              MS. ESKENAZI:  Objection.  Calls for       14:55:09

16    speculation.  Lacks --                               14:55:10

17              THE WITNESS:  I'm sure Manches --          14:55:10

18              MS. ESKENAZI:  -- foundation.              14:55:10

19              THE WITNESS:  -- would have had a --       14:55:13

20              THE REPORTER:  "I'm sure" what?            14:55:13

21              THE WITNESS:  Manches --                   14:55:13

22              THE REPORTER:  Thank you.                  14:55:13

23              THE WITNESS:  -- would have had an         14:55:14

24    engagement letter.                                   14:55:14

25    BY MR. PETROCELLI:                                   14:55:14
```

Maier, Steven (Final)

EXHIBIT C                              PAGE 577

199

1       Q.  You're sure?  Are you speculating now or        14:55:15

2   are you sure?                                            14:55:19

3       A.  It was Manches' practice to have an              14:55:20

4   engagement letter.                                       14:55:22

5       Q.  That doesn't respond to my question, okay?      14:55:22

6           Do you know for a fact whether there was an      14:55:27

7   engagement letter?                                       14:55:29

8       A.  No.                                              14:55:30

9       Q.  Okay.  Is there any document appointing you      14:55:35

10  as a director?                                           14:55:38

11      A.  There must be.                                   14:55:41

12      Q.  All right.  How do you know?                      14:55:43

13      A.  Because a document would have to be filed        14:55:45

14  at Companies House in London to appoint a director.      14:55:47

15      Q.  Whose idea was it to make you a director?        14:55:50

16          MS. ESKENAZI:  Objection.  Assumes facts         14:55:57

17  not in evidence.  Calls for speculation.  Lacks          14:55:58

18  foundation.                                              14:56:02

19          THE WITNESS:  I'm not sure I can answer          14:56:02

20  that without revealing privileged information.           14:56:05

21  BY MR. PETROCELLI:                                       14:56:05

22      Q.  Why is that?                                     14:56:08

23          MS. ESKENAZI:  Well, to the extent it does       14:56:09

24  reveal privileged information, I'll instruct you not     14:56:11

25  to answer.  Not that question.  If there's a why and     14:56:13

200

```
 1    you know why that is.  In other words, if you      14:56:16
 2    received information from a lawyer, you can disclose 14:56:21
 3    just that without waiving the privilege.            14:56:23
 4         THE WITNESS:  Would you repeat the             14:56:29
 5    question?                                           14:56:30
 6    BY MR. PETROCELLI:                                  14:56:30
 7         Q.  I've forgotten the question.               14:56:32
 8         A.  So have I.                                 14:56:33
 9         Q.  Fortunately, we have a reporter.           14:56:35
10         THE WITNESS:  Please, would you read back      14:56:38
11    the question.                                       14:56:38
12              (The reporter read the record             14:56:38
13         as follows:                                    14:56:38
14              "QUESTION:  Whose idea was it             14:55:55
15         to make you a director?")                      14:55:56
16         THE WITNESS:  I don't recall.                  14:56:47
17    BY MR. PETROCELLI:                                  14:56:47
18         Q.  Was it yours?                              14:56:49
19         A.  No.                                        14:56:49
20         Q.  Have you done anything in your role as a   14:56:56
21    director?  We've already established you've not     14:56:59
22    spoken one -- a word.  Have you written a word?     14:57:01
23    Have you done anything in your role as a director?  14:57:04
24         A.  No.                                        14:57:08
25         Q.  Do you have any financial interest in this 14:57:08
```

201

```
 1    case?                                           14:57:23

 2         A.  The only financial interest I have in this  14:57:23

 3    case is our hourly billing to our client for    14:57:26

 4    conducting the case.                            14:57:28

 5         Q.  You're conducting the case?            14:57:30

 6         A.  I'm sorry, is there a question?        14:57:37

 7         Q.  You're -- yes.  You are conducting the 14:57:41

 8    case, question mark?                            14:57:43

 9         A.  Insofar as my firm is involved in this 14:57:45

10    case, we charge on an hourly rate.              14:57:48

11         Q.  Including for testifying today?        14:57:52

12         A.  Including for being here today, yes.   14:57:59

13         Q.  And your preparation time?             14:58:01

14         A.  I'm sure we're entitled to charge for that.  14:58:04

15         Q.  And your travel time here?             14:58:06

16         A.  Also.                                  14:58:07

17         Q.  How many hours have you billed to this 14:58:08

18    matter since it began?                          14:58:14

19         A.  I don't know.                          14:58:17

20         Q.  Go back to September 2010.  Since that 14:58:18

21    point in time, how many hours have you charged? 14:58:20

22         A.  I don't know.                          14:58:26

23         Q.  Do you have an estimate?               14:58:26

24         A.  No.                                    14:58:28

25         Q.  Do you know how many hours you generally  14:58:32
```

Maier, Steven (Final)

EXHIBIT C                                   PAGE 580

202

```
 1   charge per year, in total, to all your clients?      14:58:34

 2       A.  No, I don't have that information here now.  14:58:38

 3       Q.  Do you bill approximately 2,000 hours per    14:58:44

 4   year, as most lawyers typically do?                  14:58:46

 5           MS. ESKENAZI:  Well, objection.  Assumes      14:58:49

 6   facts not in evidence.                               14:58:51

 7           MR. PETROCELLI:  I said "most."              14:58:52

 8           MS. ESKENAZI:  It still assumes facts not     14:58:55

 9   in evidence.                                         14:58:55

10           THE WITNESS:  I think most lawyers in the     14:58:57

11   U.K. bill somewhat less than lawyers in the U.S.     14:58:58

12   BY MR. PETROCELLI:                                   14:58:58

13       Q.  What -- what would you say has been your      14:59:02

14   average yearly chargeable hours to all clients?      14:59:04

15           MS. ESKENAZI:  Objection.  Assumes facts      14:59:11

16   not in evidence.                                     14:59:14

17           THE WITNESS:  This is only our second year    14:59:14

18   as Maier Blackburn.                                  14:59:16

19   BY MR. PETROCELLI:                                   14:59:16

20       Q.  Well, I meant over the last five years, for  14:59:17

21   purposes of deriving the average.                    14:59:21

22           MS. ESKENAZI:  Objection.  Relevance.         14:59:25

23           THE WITNESS:  I honestly don't remember.      14:59:30

24   People don't really think about hours in that way in 14:59:32

25   the U.K.                                             14:59:34
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 581

203

| | | |
|---|---|---|
| 1 | BY MR. PETROCELLI: | 14:59:34 |
| 2 | Q.  You have no clue? | 14:59:38 |
| 3 | MS. ESKENAZI:  Better off for you than for | 14:59:38 |
| 4 | us. | 14:59:40 |
| 5 | BY MR. PETROCELLI: | 14:59:40 |
| 6 | Q.  You have no clue? | 14:59:41 |
| 7 | MS. ESKENAZI:  Well -- | 14:59:44 |
| 8 | THE WITNESS:  Not as I sit here now. | 14:59:44 |
| 9 | (Pages 204 through 206 are | |
| 10 | marked confidential and are bound | |
| 11 | under separate cover.  The | |
| 12 | nonconfidential portion of this | |
| 13 | transcript continues on page 207.) | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

Maier, Steven (Final)

EXHIBIT C                              PAGE 582

204

CONFIDENTIAL

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Maier, Steven (Final)

EXHIBIT C                                    PAGE 583

205

CONFIDENTIAL

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

206

CONFIDENTIAL

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

207

```
 1        Q.  I notice on your resume you have          15:02:47

 2   highlighted your intellectual property expertise   15:02:50

 3   followed by commercial matters.  You do both of them  15:02:55

 4   for this client?                                   15:02:59

 5        A.  Yes.                                      15:02:59

 6        Q.  Okay.  I want -- I want to go back to when  15:03:00

 7   you left Manches.                                  15:03:14

 8            MR. ULIN:  Dan, excuse me, I just want to  15:03:18

 9   make clear that we're no longer in the confidential  15:03:20

10   portion?                                           15:03:22

11            MR. PETROCELLI:  Yeah, we're --           15:03:22

12            MS. ESKENAZI:  Oh, yes.  That's fine, yes.  15:03:23

13   BY MR. PETROCELLI:                                 15:03:29

14        Q.  Did you do anything to have copies made of  15:03:29

15   Manches' -- Manches' electronic files?             15:03:34

16            MS. ESKENAZI:  Objection.  Vague and      15:03:41

17   ambiguous.                                         15:03:41

18            THE WITNESS:  Did I personally?           15:03:43

19   BY MR. PETROCELLI:                                 15:03:43

20        Q.  Yes.                                      15:03:45

21        A.  I did nothing personally to have that done.  15:03:45

22        Q.  Did you -- did you direct anybody to do   15:03:50

23   that?                                              15:03:52

24            MS. ESKENAZI:  Well, to the extent it     15:03:54

25   invades the attorney-client privilege, I'll object.  15:03:54
```

Maier, Steven (Final)

EXHIBIT C                          PAGE 586

208

```
 1          But I will let you answer "yes" or "no" to      15:03:59

 2   the extent we have a stipulation that it won't waive   15:04:01

 3   the privilege.                                         15:04:04

 4   BY MR. PETROCELLI:                                     15:04:04

 5       Q.  Okay, wait a second.  Who is the client in     15:04:06

 6   this privilege assertion that your lawyer just made?   15:04:13

 7          MS. ESKENAZI:  To the extent he was             15:04:22

 8   discussing that with counsel in --                     15:04:23

 9          MR. PETROCELLI:  I didn't --                    15:04:23

10          MS. ESKENAZI:  -- the context of this           15:04:24

11   litigation -- well, he didn't make the -- he didn't    15:04:24

12   assert the privilege.  I did.                          15:04:26

13          MR. PETROCELLI:  Okay.  But --                  15:04:27

14       Q.  So let me -- let me rewind here, okay?         15:04:29

15          I'm trying to understand what you and your      15:04:32

16   firm did, you and Cathleen, when you left Manches      15:04:36

17   and came over and started your new firm, what you     15:04:40

18   did, if anything, to bring over copies of e-mails     15:04:45

19   and other electronic files?                           15:04:47

20       A.  We brought over all electronic files          15:04:50

21   relating to live matters.                             15:04:54

22       Q.  How did you do that?                           15:04:55

23       A.  The IT department arranged for it to be       15:04:59

24   transferred from one practice management system to    15:05:02

25   the other.                                             15:05:04
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 587

209

```
 1        Q.  Okay.  And what do you mean by "live        15:05:05

 2   files"?                                              15:05:11

 3        A.  Matters on which work was ongoing at the    15:05:11

 4   time, as opposed to archived files.                  15:05:14

 5        Q.  Okay.  And what about archived files?  Were 15:05:16

 6   those copied and -- and brought over?                15:05:21

 7        A.  They weren't copied, they were handed over  15:05:23

 8   from one firm to the other and they never left their 15:05:26

 9   location.                                            15:05:29

10        Q.  Are you talking about computer tapes or are 15:05:29

11   you talking about boxes of documents?                15:05:34

12        A.  Boxes of physical files.                    15:05:37

13        Q.  Okay.  I understand all that because I      15:05:38

14   asked Ms. Blackburn all those questions already,     15:05:42

15   okay?  I'm talking about something different now.    15:05:44

16   I'm talking about electronic data.  Are you with me? 15:05:47

17        A.  I understand what you're saying, yeah.      15:05:52

18        Q.  Okay.  So you -- just to be clear now, you  15:05:53

19   said that when you left the old firm and started the 15:05:56

20   new firm in the end of 2012, just the end of last    15:05:59

21   year, begin- -- beginning of this year, you had them 15:06:04

22   transfer the active electronic files; is that        15:06:08

23   correct?                                             15:06:08

24        A.  Yes.                                        15:06:08

25        Q.  Okay.  And that included active electronic  15:06:13
```

210

| | | |
|---|---|---|
| 1 | files for the Estate, right, the Tolkien Estate? | 15:06:16 |
| 2 | A.  Yes. | 15:06:19 |
| 3 | Q.  And what did you do for archived files with | 15:06:23 |
| 4 | respect to the Tolkien Estate?  And by "archived," I | 15:06:30 |
| 5 | meant files, electronic files that were not active. | 15:06:33 |
| 6 | A.  I was not involved in that. | 15:06:37 |
| 7 | Q.  What did your firm do? | 15:06:40 |
| 8 | A.  I'm not aware of that. | 15:06:43 |
| 9 | Q.  Okay.  So right now you're not aware that | 15:06:45 |
| 10 | any of those non-active Tolkien files in electronic | 15:06:46 |
| 11 | form were transferred over to your offices, correct? | 15:06:53 |
| 12 | A.  My understanding is that everything that | 15:06:58 |
| 13 | had been in electronic form would have been printed | 15:07:00 |
| 14 | out and put on the physical files to which I | 15:07:02 |
| 15 | referred earlier. | 15:07:04 |
| 16 | Q.  Well, that's not my question, sir.  I'm not | 15:07:05 |
| 17 | asking about practices and what would have happened. | 15:07:07 |
| 18 | So can you go back and read my question? | 15:07:10 |
| 19 | You're a smart lawyer.  I think you | 15:07:15 |
| 20 | understand I didn't ask that question, and it would | 15:07:17 |
| 21 | really make this go more quickly if you stuck to my | 15:07:19 |
| 22 | questions. | 15:07:22 |
| 23 | MS. ESKENAZI:  Well, I would -- | 15:07:22 |
| 24 | BY MR. PETROCELLI: | 15:07:22 |
| 25 | Q.  Especially given that you're a lawyer and a | 15:07:24 |

Maier, Steven (Final)

EXHIBIT C                                              PAGE 589

211

```
 1    litigator and you know how to answer and ask        15:07:26

 2    questions.                                           15:07:28

 3            MS. ESKENAZI:  Objection.  Move to strike    15:07:29

 4    as argumentative.                                    15:07:30

 5            MR. PETROCELLI:  I don't want to go through  15:07:34

 6    another day of evasive, nonresponsive answers.       15:07:36

 7            Please -- please reask the question.         15:07:39

 8            MS. ESKENAZI:  Objection.  Move to strike    15:07:40

 9    as nonresponsive.  Move to strike as argumentative.  15:07:41

10    Excuse me.                                           15:07:47

11               (The reporter read the record             15:07:57

12            as follows:                                  15:07:57

13               "QUESTION:  So right now                  15:06:45

14            you're not aware that any of those           15:06:45

15            non-active Tolkien files in                  15:06:48

16            electronic form were transferred             15:06:53

17            over to your offices, correct?")             15:06:54

18            THE WITNESS:  I don't have any information   15:07:58

19    about that.                                          15:08:00

20    BY MR. PETROCELLI:                                   15:08:00

21       Q.  Are you aware that any of the non-active      15:08:05

22    electronic files related to Tolkien matters were     15:08:11

23    transferred?  Yes or no?                             15:08:15

24       A.  I don't know.                                 15:08:16

25       Q.  So you have no knowledge on that; is that     15:08:16
```

Maier, Steven (Final)

EXHIBIT C                              PAGE 590

212

| | | |
|---|---|---|
| 1 | correct? | 15:08:16 |
| 2 | MS. ESKENAZI:  Objection.  It's been asked | 15:08:19 |
| 3 | and answered now three times. | 15:08:20 |
| 4 | You may answer again. | 15:08:22 |
| 5 | THE WITNESS:  That's correct. | 15:08:23 |
| 6 | BY MR. PETROCELLI: | 15:08:23 |
| 7 | Q.  Okay.  So, for example, you were shown some | 15:08:29 |
| 8 | e-mails by Mr. Ulin.  Take a look at -- oh, this is | 15:08:33 |
| 9 | an example, pick one.  29.  Exhibit 29. | 15:08:42 |
| 10 | Bonnie, if you could put that in front of | 15:08:45 |
| 11 | him. | 15:08:47 |
| 12 | Oh, you have the original ones there, | 15:08:47 |
| 13 | Mr. Maier.  Do you have that, sir? | 15:08:50 |
| 14 | A.  I do. | 15:08:58 |
| 15 | Q.  You have in front of you now an e-mail | 15:08:58 |
| 16 | chain that's on the Manches -- that includes you and | 15:09:02 |
| 17 | others, like Ms. Blackburn, at your Manches e-mail | 15:09:07 |
| 18 | addresses. | 15:09:10 |
| 19 | Do you see that? | 15:09:11 |
| 20 | A.  Yeah. | 15:09:11 |
| 21 | Q.  And you see that the dates are in | 15:09:17 |
| 22 | November 2003? | 15:09:20 |
| 23 | A.  Yeah. | 15:09:21 |
| 24 | Q.  Okay.  Do you know whether this e-mail was | 15:09:24 |
| 25 | included in any electronic files, active electronic | 15:09:30 |

Maier, Steven (Final)

EXHIBIT C                                    PAGE 591

213

```
 1    files, related to the Tolkien matters that were      15:09:35

 2    transferred to your offices?                         15:09:41

 3          MS. ESKENAZI:  Objection.  Vague and           15:09:42

 4    ambiguous.                                           15:09:44

 5          THE WITNESS:  No, I do not know that.          15:09:44

 6    BY MR. PETROCELLI:                                   15:09:44

 7     Q.  Okay.  Do you know whether this e-mail,         15:09:48

 8    Exhibit 29, was in an active file for the Tolkiens   15:09:52

 9    when you left Manches and started your firm?         15:09:57

10     A.  No, I do not know that.                         15:10:00

11     Q.  Okay.  Do you know whether there was an         15:10:09

12    evidence preservation notice given to the Manches    15:10:13

13    firm to save all their electronic files and not      15:10:22

14    delete any data, any file, any e-mail, related to    15:10:26

15    the Tolkiens?                                        15:10:30

16          MS. ESKENAZI:  Well, again, to the extent      15:10:32

17    that that -- this could call for privileged          15:10:33

18    information, I'd like -- I'll let him answer the     15:10:35

19    question "yes" or "no," but I'd like a stipulation   15:10:39

20    that it's not going to waive the privilege.          15:10:41

21          MR. PETROCELLI:  Agreed.                       15:10:43

22          THE WITNESS:  I have a recollect- --           15:10:45

23          MR. PETROCELLI:  Without agreeing with your    15:10:46

24    premise.  I'm trying to get through this.            15:10:49

25          MS. ESKENAZI:  I understand.                   15:10:51
```

Maier, Steven (Final)

EXHIBIT C                    PAGE 592

214

```
 1              MR. PETROCELLI:  But you really like to buy    15:10:52

 2      those stipulations.  I assume you're going to          15:10:53

 3      reciprocate.                                           15:10:55

 4              MS. ESKENAZI:  I will.                          15:10:57

 5              THE WITNESS:  I have a recollection that        15:10:58

 6      something was done in that regard.  I can't be         15:10:58

 7      precise as to what.                                    15:11:02

 8      BY MR. PETROCELLI:                                     15:11:02

 9        Q.  Who did it?                                      15:11:03

10        A.  Cathleen Blackburn had responsibility for       15:11:04

11      that area.                                             15:11:07

12        Q.  What area?                                       15:11:08

13        A.  Ensuring that Tolkien materials were            15:11:11

14      transferred and preserved.                             15:11:15

15        Q.  You're the -- you're the contentious            15:11:18

16      lawyer.  Is that -- is that what it's called?         15:11:21

17        A.  I understand it has a different meaning         15:11:23

18      here.                                                  15:11:24

19        Q.  What does it mean?                              15:11:24

20        A.  It means I deal with disputes and dispute       15:11:26

21      resolution.                                            15:11:28

22        Q.  Okay.  Can you go to court?                     15:11:29

23        A.  I don't appear in court.                        15:11:30

24        Q.  Can you -- do you do what we're doing here,     15:11:33

25      do depositions?                                        15:11:37
```

215

```
 1        A.  We don't do depositions in England.        15:11:37

 2        Q.  Okay.  You are -- as a litigator, you're    15:11:43

 3   called a solicitor, right?                          15:11:45

 4        A.  I'm a solicitor, yes.                       15:11:47

 5        Q.  Okay.  Are there different levels of        15:11:49

 6   solicitors?                                          15:11:50

 7        A.  No.                                         15:11:51

 8        Q.  Okay.  You've been a solicitor your whole   15:11:51

 9   professional career as a lawyer?                     15:11:55

10        A.  Yes.                                         15:11:56

11        Q.  Have you ever heard of a -- an evidence     15:11:57

12   preservation notice in the course of your           15:11:59

13   experience?                                          15:12:03

14        A.  That term doesn't mean anything to me.      15:12:03

15        Q.  Are you aware of obligations of litigants   15:12:08

16   and their counsel to preserve evidence related to   15:12:11

17   lawsuits?                                            15:12:16

18        A.  Yes, I'm aware of that.                      15:12:16

19        Q.  Okay.  Have you ever seen an evidence       15:12:18

20   preservation memo or notice of any kind that was    15:12:24

21   issued in the Manches firm related to the Tolkiens? 15:12:28

22            MS. ESKENAZI:  Objection.  Vague and        15:12:32

23   ambiguous.                                           15:12:34

24            THE WITNESS:  I don't recall.               15:12:34

25            MS. ESKENAZI:  Also asked and answered.     15:12:35
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 594

216

| | | |
|---|---|---|
| 1 | BY MR. PETROCELLI: | 15:12:35 |
| 2 | Q. Did you -- did you write one? Did you | 15:12:38 |
| 3 | prepare one? | 15:12:41 |
| 4 | A. I don't recall doing so. | 15:12:41 |
| 5 | Q. Do you know for a fact whether all of | 15:12:43 |
| 6 | Manches' electronic documents and materials, such as | 15:12:51 |
| 7 | e-mails, related to this dispute going back as far | 15:12:55 |
| 8 | as possible have been preserved in electronic form? | 15:13:03 |
| 9 | MS. ESKENAZI: Objection. Vague and | 15:13:09 |
| 10 | ambiguous. | 15:13:11 |
| 11 | THE WITNESS: I don't know. | 15:13:11 |
| 12 | BY MR. PETROCELLI: | 15:13:11 |
| 13 | Q. You said that there was a practice at | 15:13:16 |
| 14 | Manches to print copies of documents and then put | 15:13:24 |
| 15 | the hard copies in files; is that right? | 15:13:33 |
| 16 | A. Yes. | 15:13:35 |
| 17 | Q. Did you personally print your e-mails and | 15:13:36 |
| 18 | put them in files or did someone do that for you? | 15:13:38 |
| 19 | MS. ESKENAZI: Objection. Compound. | 15:13:41 |
| 20 | THE WITNESS: I would mostly do that -- I | 15:13:44 |
| 21 | would mostly print them myself and then they'd be | 15:13:46 |
| 22 | filed by my assistant. | 15:13:49 |
| 23 | BY MR. PETROCELLI: | 15:13:50 |
| 24 | Q. Now, you don't literally print every single | 15:13:50 |
| 25 | e-mail, do you? | 15:13:53 |

Maier, Steven (Final)

EXHIBIT C                                      PAGE 595

217

```
1              MS. ESKENAZI:  Objection.  Vague and       15:13:55

2    ambiguous.                                           15:13:57

3              THE WITNESS:  If it was on a matter file as 15:13:57

4    opposed to just a personal communication with a      15:14:00

5    colleague, then I would do.                          15:14:01

6    BY MR. PETROCELLI:                                   15:14:01

7         Q.  Okay.  And, for example, Exhibit 29, this   15:14:04

8    2003 e-mail exchange, was that printed and put into  15:14:08

9    a file?                                              15:14:13

10        A.  I can't recall.                             15:14:14

11        Q.  If it were printed and put into a file, can 15:14:15

12   you tell us the name of the file?                    15:14:25

13             MS. ESKENAZI:  Objection.  Calls for       15:14:27

14   speculation.  Lacks foundation.  Assumes facts not   15:14:28

15   in evidence.                                         15:14:28

16             THE WITNESS:  No.                          15:14:30

17   BY MR. PETROCELLI:                                   15:14:30

18        Q.  How many files were there?  How many        15:14:33

19   separate file names were there for the Tolkien       15:14:36

20   matters when you left Manches and joined your own -- 15:14:38

21   or created your own firm?                            15:14:42

22        A.  I don't know.                               15:14:43

23        Q.  Can you estimate?                           15:14:45

24        A.  No.                                         15:14:45

25        Q.  Was it more than 20?                        15:14:47
```

218

| | | |
|---|---|---|
| 1 | A.  I imagine it must be. | 15:14:51 |
| 2 | Q.  More than -- more than a thousand? | 15:14:52 |
| 3 | A.  I doubt it. | 15:14:58 |
| 4 | Q.  When you say "file," for example, in | 15:15:00 |
| 5 | September 2010, let's say, when this issue of | 15:15:05 |
| 6 | gambling arose and then subsequent events evolved, | 15:15:10 |
| 7 | what was the file into which you put documents | 15:15:15 |
| 8 | related to this matter starting in September 2010? | 15:15:19 |
| 9 | MS. ESKENAZI:  Objection.  Vague and | 15:15:23 |
| 10 | ambiguous.  Compound. | 15:15:25 |
| 11 | THE WITNESS:  Well, that would be a file | 15:15:26 |
| 12 | with the -- a description of the matter on it. | 15:15:28 |
| 13 | BY MR. PETROCELLI: | 15:15:28 |
| 14 | Q.  What was the description of the matter? | 15:15:31 |
| 15 | A.  I think it was initially Zaentz-Warner | 15:15:41 |
| 16 | gambling issues, something like that. | 15:15:45 |
| 17 | Q.  Who creates the names of the files?  You | 15:15:47 |
| 18 | did? | 15:15:51 |
| 19 | A.  I don't recall who created that one. | 15:15:55 |
| 20 | Q.  How many different people at Manches worked | 15:15:56 |
| 21 | on Tolkien matters as of the time you left the firm? | 15:16:02 |
| 22 | MS. ESKENAZI:  Objection.  Vague and | 15:16:08 |
| 23 | ambiguous. | 15:16:08 |
| 24 | BY MR. PETROCELLI: | 15:16:08 |
| 25 | Q.  Actually, as of September 2010? | 15:16:09 |

Maier, Steven (Final)

EXHIBIT C                                    PAGE 597

219

```
 1              MS. ESKENAZI:  Same objection.  Vague and     15:16:16

 2    ambiguous.                                              15:16:19

 3              THE WITNESS:  There would be three I can      15:16:19

 4    immediately think of who would have had current work   15:16:23

 5    at that time.  There may be others who from time to    15:16:26

 6    time did Tolkien work.                                 15:16:30

 7    BY MR. PETROCELLI:                                     15:16:30

 8         Q.  Who is the third?                             15:16:32

 9         A.  Someone called Gavin Stenton.                 15:16:34

10         Q.  Is Gavin still there at Manches?              15:16:37

11         A.  I don't know.                                 15:16:42

12         Q.  Do you communicate with him from time to      15:16:42

13    time?                                                  15:16:46

14         A.  I don't communicate with him at all.          15:16:46

15         Q.  Do you know if he still does Tolkien work?    15:16:47

16         A.  I don't know.                                 15:16:50

17         Q.  Why did you leave your -- your old firm?      15:16:51

18              MS. ESKENAZI:  Objection.  Relevance.        15:16:53

19              THE WITNESS:  We wanted to set up our own    15:16:57

20    firm.                                                  15:16:59

21    BY MR. PETROCELLI:                                     15:16:59

22         Q.  Did the reason for your setting up your own   15:17:06

23    firm have anything to do with the Tolkien matters?     15:17:09

24         A.  No.                                           15:17:13

25         Q.  You -- but you expected when you set up       15:17:17
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 598

220

```
 1    your firm that the Tolkien clients would follow,      15:17:19

 2    right?                                                 15:17:19

 3              MS. ESKENAZI:  Objection --                  15:17:23

 4              THE WITNESS:  We hoped they would.           15:17:24

 5              MS. ESKENAZI:  -- relevance.                 15:17:25

 6    BY MR. PETROCELLI:                                     15:17:25

 7         Q.  Including the work on this case, right?       15:17:27

 8         A.  Yes.                                          15:17:27

 9         Q.  Have you -- since September 2010, have you,   15:17:43

10    personally, done anything to stop the Manches          15:17:47

11    computer systems from deleting or dropping any         15:17:55

12    electronic data related to the Tolkiens?               15:17:58

13              MS. ESKENAZI:  Objection.  Vague and         15:18:02

14    ambiguous.                                             15:18:04

15              THE WITNESS:  No.                            15:18:04

16    BY MR. PETROCELLI:                                     15:18:04

17         Q.  Okay.  Do you know if anybody has done so?    15:18:05

18              MS. ESKENAZI:  Objection.  Calls for         15:18:08

19    attorney-client privileged communications.            15:18:10

20              To the extent you can answer that question   15:18:11

21    without divulging privileged communications, please   15:18:13

22    go ahead and do that.                                 15:18:17

23              THE WITNESS:  I don't know.                  15:18:18

24    BY MR. PETROCELLI:                                     15:18:18

25         Q.  When you answered that -- my last question,   15:18:21
```

Maier, Steven (Final)

EXHIBIT C                                          PAGE 599

221

```
 1    were you excluding information based on            15:18:23

 2    Ms. Eskenazi's objection?                          15:18:31

 3         A.  I'm sorry, I don't understand.            15:18:33

 4         Q.  Yeah, I -- I need to know when you're     15:18:34

 5    answering my questions whether you're answering on 15:18:36

 6    the basis of everything that you know or whether   15:18:39

 7    you're just answering by excluding.                15:18:41

 8         A.  I understand.  I was not excluding.       15:18:45

 9         Q.  Okay.  And so the answer was you don't know 15:18:48

10    whether anybody has done anything to preserve any of 15:18:56

11    the electronic data at the Manches firm related to 15:18:59

12    this dispute, correct?                             15:19:03

13         A.  I personally do not have that knowledge.  15:19:04

14         Q.  Okay.  And even though you were           15:19:13

15    knowledgeable about the obligations of litigants   15:19:16

16    to -- and lawyers to preserve evidence, you did    15:19:19

17    nothing in that regard, correct?                   15:19:23

18         MS. ESKENAZI:  Objection.  Vague and          15:19:25

19    ambiguous.  Assumes facts not in evidence.         15:19:26

20         THE WITNESS:  I didn't assume a               15:19:30

21    responsibility to do that.                         15:19:34

22    BY MR. PETROCELLI:                                 15:19:34

23         Q.  Well, do you know -- and at the same time 15:19:36

24    that you perceived that it wasn't your             15:19:38

25    responsibility, you took no measures to ensure that 15:19:43
```

Maier, Steven (Final)

EXHIBIT C                                         PAGE 600

222

```
1    someone else undertook that responsibility, correct?   15:19:46

2         MS. ESKENAZI:  Objection.  Misstates the      15:19:50

3    testimony.                                          15:19:51

4         THE WITNESS:  I took no measures is            15:19:53

5    correct.                                            15:19:54

6    BY MR. PETROCELLI:                                  15:19:54

7         Q.  You took no measures, including measures to 15:19:56

8    ensure that other people would undertake that      15:19:59

9    responsibility to preserve the evidence, correct?  15:20:02

10        A.  That's correct.                            15:20:04

11        Q.  Okay.  Have you ever had a meeting with the 15:20:05

12   Greenberg lawyers at the Manches firm?             15:20:15

13        A.  Yes.                                        15:20:24

14        Q.  When was that?                             15:20:25

15        A.  Probably around 2007.                      15:20:25

16        Q.  Was that the last time?                    15:20:40

17        A.  As far as I can recall.                    15:20:44

18        Q.  After 2007 have you ever met with one or   15:20:50

19   more of the Greenberg lawyers in the U.K.?         15:20:57

20        A.  Yes.                                        15:21:01

21        Q.  When was that?                             15:21:03

22        MS. ESKENAZI:  Objection.  Vague and          15:21:03

23   ambiguous.  Are you referring to just a social    15:21:12

24   meeting or are you saying a business meeting?      15:21:16

25        MR. PETROCELLI:  Any meeting.  I don't        15:21:18
```

Maier, Steven (Final)

EXHIBIT C                                        PAGE 601

223

```
 1    think you're going to go there just for social        15:21:20

 2    reasons.                                              15:21:23

 3          MS. ESKENAZI:  Well, that's assuming facts      15:21:24

 4    not in evidence.                                      15:21:26

 5          MR. PETROCELLI:  Maybe you do.  Maybe on a      15:21:26

 6    vacation you stopped by and said hello.               15:21:27

 7          THE WITNESS:  There was a purely social         15:21:33

 8    meeting about two or three months ago.                15:21:35

 9    BY MR. PETROCELLI:                                    15:21:35

10          Q.  Okay.  So between 2007 and the purely       15:21:38

11    social meeting two months ago -- who was the purely   15:21:41

12    social meeting with?                                  15:21:44

13          A.  Ms. Eskenazi.                               15:21:45

14          Q.  Anybody else?                               15:21:46

15          A.  Ms. Moriarty was there.                     15:21:50

16          Q.  Anybody else?                               15:21:51

17          A.  Cathleen Blackburn.                         15:21:53

18          Q.  Okay.  Anybody else?                        15:21:57

19          A.  No.                                         15:21:57

20          Q.  Okay.  Now, you say "purely social meeting" 15:21:58

21    because there were -- there was no business meeting   15:22:01

22    at all during that trip?                              15:22:03

23          A.  It was a dinner in London and there was no  15:22:05

24    business meeting.                                     15:22:07

25          Q.  Okay.  Either -- at any point --            15:22:08
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 602

224

| | | |
|---|---|---|
| 1 | A.  Not that I recall. | 15:22:10 |
| 2 | Q.  -- during that trip? | 15:22:11 |
| 3 | A.  Not that I recall. | 15:22:12 |
| 4 | Q.  Okay.  So between 2007 and the purely | 15:22:13 |
| 5 | social meeting a couple of months ago, have you had | 15:22:16 |
| 6 | any other meetings with the Greenberg lawyers in the | 15:22:20 |
| 7 | U.K.? | 15:22:23 |
| 8 | A.  I don't recall. | 15:22:24 |
| 9 | Q.  And do you recall meetings of the Greenberg | 15:22:27 |
| 10 | lawyers there in the U.K. that you did not | 15:22:31 |
| 11 | participate in but knew were taking place? | 15:22:36 |
| 12 | MS. ESKENAZI:  Objection.  Vague and | 15:22:40 |
| 13 | ambiguous. | 15:22:41 |
| 14 | THE WITNESS:  I didn't understand.  I'm | 15:22:41 |
| 15 | sorry. | 15:22:42 |
| 16 | BY MR. PETROCELLI: | 15:22:42 |
| 17 | Q.  Yeah.  In other words, there may have -- | 15:22:43 |
| 18 | they might have been there meeting with | 15:22:43 |
| 19 | Ms. Blackburn but you were not present at the | 15:22:45 |
| 20 | meeting.  Are you aware of any such meetings? | 15:22:47 |
| 21 | A.  I'm not aware of any such meetings. | 15:22:49 |
| 22 | Q.  Okay.  Who's -- who's in charge of the IT | 15:22:50 |
| 23 | department at the Manches firm? | 15:23:02 |
| 24 | A.  I don't know. | 15:23:03 |
| 25 | Q.  Who was in charge when you left? | 15:23:04 |

Maier, Steven (Final)

EXHIBIT C                                    PAGE 603

225

```
 1          A.  The last person to be in charge was Derek      15:23:05

 2     Brookes, but he was in the process of leaving at        15:23:11

 3     around the same time we did.                            15:23:14

 4          Q.  Did he come with you?                          15:23:15

 5          A.  No.                                            15:23:16

 6          Q.  Okay.  And who was the managing partner of     15:23:20

 7     the firm when you left?                                 15:23:22

 8          A.  There were separate managing partners in       15:23:23

 9     Oxford and in London.                                   15:23:27

10          Q.  What office did you work?                      15:23:28

11          A.  Oxford.                                        15:23:30

12          Q.  Oxford?  How many lawyers were in the          15:23:30

13     Oxford office when you left?                            15:23:32

14              MS. ESKENAZI:  Objection.  Relevance.          15:23:35

15              THE WITNESS:  Approximately 50.                15:23:37

16     BY MR. PETROCELLI:                                      15:23:37

17          Q.  50?  Is there a central server for the         15:23:39

18     various offices?                                        15:23:44

19          A.  I'm sorry, I don't really understand --        15:23:45

20          Q.  Computer server.                               15:23:45

21          A.  -- what that means.                            15:23:46

22          Q.  In other words, were you all online with       15:23:47

23     the various offices?                                    15:23:50

24              MS. ESKENAZI:  Objection.  Assumes facts        15:23:51

25     not in evidence.  Lacks foundation.  Calls for          15:23:52
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 604

226

```
 1    speculation.                               15:23:55

 2          THE WITNESS:  There are two offices.   15:23:55

 3    BY MR. PETROCELLI:                           15:23:55

 4          Q.  London and Oxford?                 15:23:57

 5          A.  London and Oxford.  I don't understand the   15:23:59

 6    IT architecture.  I don't know.             15:24:01

 7          Q.  So Brookes, he was in the Oxford office?   15:24:02

 8          A.  No, London.                        15:24:05

 9          Q.  London?  And who was the top IT guy in   15:24:06

10    Oxford?                                      15:24:09

11          MS. ESKENAZI:  Objection.  Assumes facts   15:24:09

12    not in evidence.                             15:24:10

13          THE WITNESS:  My recollection is there was   15:24:12

14    no top IT guy.  There was a couple of junior guys   15:24:14

15    whose identities changed from time to time.   15:24:17

16    BY MR. PETROCELLI:                           15:24:17

17          Q.  Well, their identities don't change.   15:24:20

18          A.  The identity of the person in place changed   15:24:22

19    from time to time.                           15:24:26

20          Q.  Okay.  You don't know their names, do you?   15:24:29

21          A.  No.                                15:24:29

22          Q.  Do you know whether -- you mentioned Andy   15:24:33

23    Boose before; is that right?  Is that his name?   15:24:36

24          MS. ESKENAZI:  Objection.             15:24:39

25          THE WITNESS:  I don't believe I mentioned   15:24:40
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 605

227

| | | |
|---|---|---|
| 1 | Andy Boose. | 15:24:41 |
| 2 | BY MR. PETROCELLI: | 15:24:41 |
| 3 | Q.  Is there such a person? | 15:24:42 |
| 4 | A.  I know Andy Boose. | 15:24:44 |
| 5 | Q.  Okay.  He's at Davis Wright & Tremaine? | 15:24:45 |
| 6 | A.  That's correct. | 15:24:50 |
| 7 | Q.  And he -- you've communicated with him from | 15:24:51 |
| 8 | time to time on -- on matters related to -- to the | 15:24:55 |
| 9 | Tolkiens? | 15:24:58 |
| 10 | MS. ESKENAZI:  Objection.  Assumes facts | 15:24:59 |
| 11 | not in evidence. | 15:25:00 |
| 12 | THE WITNESS:  I've communicated with him on | 15:25:03 |
| 13 | matters unrelated to the Tolkiens.  I can't recall | 15:25:07 |
| 14 | if I've ever communicated with him on matters | 15:25:09 |
| 15 | related to the Tolkiens. | 15:25:12 |
| 16 | BY MR. PETROCELLI: | 15:25:12 |
| 17 | Q.  You do know that he has done work and -- | 15:25:13 |
| 18 | Davis Wright & Tremaine has done work on matters | 15:25:16 |
| 19 | related to the Tolkiens? | 15:25:19 |
| 20 | A.  I know that Davis Wright Tremaine has, and | 15:25:20 |
| 21 | I know that Andy deals with Cathleen Blackburn.  I | 15:25:24 |
| 22 | can't be precise as to what work he and Cathleen | 15:25:27 |
| 23 | have done together. | 15:25:32 |
| 24 | Q.  Do you -- did you take any measures to | 15:25:33 |
| 25 | issue an evidence preservation notice to Davis | 15:25:34 |

Maier, Steven (Final)

EXHIBIT C                                    PAGE 606

228

| | | |
|---|---|---|
| 1 | Wright & Tremaine? | 15:25:39 |
| 2 | A.  No. | 15:25:39 |
| 3 | Q.  Or to Mr. Boose? | 15:25:40 |
| 4 | A.  Excuse me? | 15:25:42 |
| 5 | Q.  Or to Mr. Boose? | 15:25:43 |
| 6 | A.  No. | 15:25:44 |
| 7 | Q.  Or to any other American law firms that | 15:25:45 |
| 8 | were representing the Tolkiens? | 15:25:47 |
| 9 | A.  No. | 15:25:48 |
| 10 | Q.  Do you know whether anybody has? | 15:25:49 |
| 11 | A.  I don't know. | 15:25:50 |
| 12 | Q.  Let's talk a little bit about your | 15:26:11 |
| 13 | background. | 15:26:13 |
| 14 | You were head of technology and media | 15:26:14 |
| 15 | litigation at Manches for 20 years? | 15:26:19 |
| 16 | A.  That sounds right. | 15:26:23 |
| 17 | Q.  How did you become specialized in the area | 15:26:27 |
| 18 | of technology and media litigation? | 15:26:31 |
| 19 | MS. ESKENAZI:  Objection.  Assumes facts | 15:26:36 |
| 20 | not in evidence.  Vague and ambiguous. | 15:26:36 |
| 21 | THE WITNESS:  I would characterize it as IP | 15:26:38 |
| 22 | and media litigation rather than technology and | 15:26:42 |
| 23 | media litigation. | 15:26:43 |
| 24 | BY MR. PETROCELLI: | 15:26:43 |
| 25 | Q.  Why does your -- your resume say technology | 15:26:46 |

229

```
 1    and media litigation?                            15:26:49

 2        A.  I don't have it in front of me.          15:26:51

 3        Q.  Well --                                  15:26:52

 4        A.  Perhaps I do.                            15:26:53

 5        Q.  Exhibit 23.                              15:26:57

 6        A.  Yes, I see.  Well, that was the name of the  15:27:12

 7    department at Manches.  But as you can see, I say    15:27:13

 8    specializing in both IP and commercial litigation.  15:27:16

 9        Q.  You were the head of that department,    15:27:18

10    right?                                           15:27:18

11        A.  Yes.                                     15:27:20

12        Q.  How long were you the head of that       15:27:23

13    department?                                      15:27:26

14        A.  I think I took that title in about 2004, 15:27:26

15    2005.                                            15:27:33

16        Q.  Under "Experience," you write:           15:27:34

17            "In-depth experience of                  15:27:38

18            copyright, trademark, libel and          15:27:41

19            Internet-related cases, in               15:27:45

20            addition to general commercial           15:27:47

21            litigation and dispute                   15:27:49

22            resolution."                             15:27:56

23            What type of Internet-related cases have 15:27:56

24    you had experience in?                           15:28:00

25        A.  I've dealt with infringements of copyright 15:28:03
```

230

```
 1    on the Internet, libel on the Internet, domain name      15:28:06

 2    cases.                                                    15:28:15

 3         Q.  Over what period of time?                        15:28:15

 4         A.  A number of years.  I can't be precise.          15:28:21

 5         Q.  And have you become conversant as a result       15:28:28

 6    of your in-depth experience in Internet-related           15:28:34

 7    cases with basic Internet platforms?                      15:28:39

 8              MS. ESKENAZI:  Objection.  Vague and            15:28:48

 9    ambiguous.                                                15:28:49

10              THE WITNESS:  I'd have to say not because I     15:28:49

11    don't understand what that expression means.              15:28:51

12    BY MR. PETROCELLI:                                        15:28:51

13         Q.  You've heard of downloading things onto a        15:28:54

14    computer, have you not?                                   15:28:57

15         A.  I've heard that expression, yes.                 15:28:58

16         Q.  You've downloaded things onto a computer,        15:29:03

17    haven't you?                                              15:29:06

18         A.  I expect so, yes.                                15:29:08

19         Q.  Do you work at a computer?                       15:29:11

20         A.  Yes.                                             15:29:13

21         Q.  What kind of computer?                           15:29:13

22         A.  A PC.                                            15:29:15

23         Q.  Do you have any other computer devices           15:29:18

24    besides a PC?  Do you have like an iPad or anything       15:29:21

25    like that?                                                15:29:25
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 609

231

```
 1        A.  I do.                                   15:29:26

 2        Q.  Okay.  Anything else?                   15:29:28

 3        A.  iPhone.                                 15:29:30

 4        Q.  iPhone?  Before iPad and iPhone, what did  15:29:32

 5    you have?                                       15:29:38

 6        A.  Regular mobile phone.                   15:29:38

 7        Q.  Have you -- so back to downloading again, I  15:29:41

 8    assume based on -- on your -- your vast experience,  15:29:53

 9    that you are aware that people can download games  15:30:00

10    from the Internet onto a computer and play them,  15:30:06

11    correct?                                        15:30:06

12        MS. ESKENAZI:  Objection.  Vague and        15:30:10

13    ambiguous.                                      15:30:11

14        THE WITNESS:  I haven't referred to any     15:30:12

15    vast experience.                                15:30:14

16    BY MR. PETROCELLI:                              15:30:14

17        Q.  Well, how about in-depth?               15:30:15

18        MS. ESKENAZI:  Objection.  Misstates the    15:30:19

19    tes- --                                         15:30:20

20    BY MR. PETROCELLI:                              15:30:20

21        Q.  First two words after the word "experience"  15:30:21

22    on Exhibit 23, your resume?                     15:30:22

23        A.  I don't think "in-depth" --             15:30:24

24        MS. ESKENAZI:  Objection.                   15:30:24

25        THE WITNESS:  -- means "vast."              15:30:26
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 610

232

```
 1          MS. ESKENAZI:  Objection.  Misstates the    15:30:26

 2     document.                                          15:30:29

 3     BY MR. PETROCELLI:                                 15:30:29

 4          Q.  Again, you know, if you want to draw a    15:30:30

 5     distinction between "in-depth" and "vast," fine,   15:30:32

 6     I'll take in-depth.  I actually like it better.    15:30:37

 7          So based on your in-depth experience, have    15:30:42

 8     you become generally aware that people can download 15:30:45

 9     games from some Internet site onto a computer device 15:30:50

10     and play them?                                     15:30:56

11          A.  I'm aware of that now.                    15:30:57

12          Q.  Okay.  You added the word "now," I noticed. 15:31:01

13     When is now?                                       15:31:05

14          A.  Now is today.                             15:31:08

15          Q.  Okay.  So you became aware of that today  15:31:10

16     for the first time?                                15:31:12

17          A.  No.                                       15:31:13

18          Q.  Okay.  So when did you become aware that  15:31:15

19     people can download games onto a computer device and 15:31:23

20     play them?  When did you learn that for the first  15:31:30

21     time?                                              15:31:32

22          MS. ESKENAZI:  Objection.  Compound.          15:31:32

23          THE WITNESS:  In around September,            15:31:34

24     October 2010.                                      15:31:36

25     BY MR. PETROCELLI:                                 15:31:36
```

Maier, Steven (Final)

EXHIBIT C                                          PAGE 611

233

```
 1        Q.  And how did you learn that in September      15:31:41

 2   2010?                                                 15:31:45

 3        A.  I learned that in connection with this       15:31:45

 4   dispute.                                              15:31:49

 5        Q.  What does that mean, "in connection with     15:31:49

 6   this dispute"?  Did somebody tell you?                15:31:53

 7           MS. ESKENAZI:  Objection.  Compound.          15:31:57

 8           THE WITNESS:  The defendants asserted         15:31:58

 9   rights to license downloadable games, which caused    15:32:01

10   me to research what that meant.                       15:32:06

11   BY MR. PETROCELLI:                                    15:32:12

12        Q.  What exactly caused you to research what     15:32:12

13   that meant?                                           15:32:15

14        A.  The reference to downloadable games.         15:32:15

15        Q.  So prior to September 2010, you were wholly  15:32:17

16   unfamiliar with the concept of downloading of games?  15:32:23

17        A.  Yes.                                         15:32:27

18        Q.  Okay.  You were aware of video games prior   15:32:31

19   to 2010, right?                                       15:32:33

20        A.  Yes.                                         15:32:33

21        Q.  And you were aware of computer games, games  15:32:36

22   that could be played on a computer, right?            15:32:38

23        A.  Yes.                                         15:32:41

24           MS. ESKENAZI:  Objection.  Vague and          15:32:41

25   ambiguous.                                            15:32:41
```

234

| | | |
|---|---|---|
| 1 | BY MR. PETROCELLI: | 15:32:41 |
| 2 | Q.  And you had an iPad, did you not? | 15:32:43 |
| 3 | A.  No. | 15:32:45 |
| 4 | Q.  When did you get an iPad? | 15:32:45 |
| 5 | A.  About three weeks ago. | 15:32:47 |
| 6 | Q.  You -- had you ever heard of apps? | 15:32:49 |
| 7 | A.  Yes. | 15:32:52 |
| 8 | Q.  Well, you had an iPhone, right?  Did you | 15:32:53 |
| 9 | get that three weeks ago, too? | 15:32:54 |
| 10 | A.  No, I got that in the spring of 2011. | 15:32:56 |
| 11 | Q.  Okay.  So your testimony, then, in this | 15:33:01 |
| 12 | case is that until September 2010, you had no idea | 15:33:04 |
| 13 | whatsoever that there was such a thing called | 15:33:08 |
| 14 | downloading of games? | 15:33:13 |
| 15 | A.  That's correct. | 15:33:16 |
| 16 | MS. ESKENAZI:  Objection.  Misstates the | 15:33:17 |
| 17 | testimony. | 15:33:18 |
| 18 | BY MR. PETROCELLI: | 15:33:18 |
| 19 | Q.  And so your whole -- despite your -- | 15:33:18 |
| 20 | despite being head of technology and media | 15:33:21 |
| 21 | litigation for 20 years, despite having in-depth | 15:33:23 |
| 22 | experience in Internet-related cases, and despite | 15:33:27 |
| 23 | having been appointed a domain name adjudicator by | 15:33:32 |
| 24 | both the World Intellectual Property Organization | 15:33:35 |
| 25 | and Nominet U.K., it never once came to your | 15:33:37 |

235

```
 1   attention that games could be downloaded and played   15:33:43

 2   on a device?                                          15:33:51

 3          MS. ESKENAZI:  Objection.  It's               15:33:53

 4   argumentative.  It's compound.                        15:33:55

 5          THE WITNESS:  That's correct.  I wasn't        15:33:56

 6   aware of that.                                         15:33:57

 7   BY MR. PETROCELLI:                                     15:33:57

 8      Q.  And did you ever research that?                15:33:58

 9      A.  Not until September, October of 2010.          15:34:05

10      Q.  Had you ever seen the word "download"          15:34:08

11   between 2000- -- before September 2010?               15:34:12

12      A.  Yes.                                            15:34:14

13      Q.  Okay.  So when you saw the word "download,"    15:34:15

14   did you know what it meant?                            15:34:18

15          MS. ESKENAZI:  Objection.  Vague and           15:34:21

16   ambiguous.                                             15:34:23

17          THE WITNESS:  I know -- I knew that it was     15:34:23

18   a word related to computers.  I think it's a word      15:34:27

19   that could have a number of interpretations.           15:34:30

20   BY MR. PETROCELLI:                                     15:34:30

21      Q.  Well, no.  I'm not asking you what you         15:34:33

22   think it can mean.                                     15:34:34

23          When you first heard it, did you ask           15:34:35

24   somebody, "Well, what does that word mean, I've        15:34:37

25   never heard it," or did you look it up in the          15:34:39
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 614

236

```
 1    dictionary?                                     15:34:41

 2           MS. ESKENAZI:  Objection.  Vague and      15:34:41

 3    ambiguous.  Compound.  Argumentative.            15:34:42

 4           THE WITNESS:  I didn't look the word up in 15:34:43

 5    a dictionary.                                    15:34:45

 6    BY MR. PETROCELLI:                               15:34:46

 7       Q.  Okay.  So when you heard it, what, did you 15:34:46

 8    read it in a document?                           15:34:48

 9       A.  I can't recall.                           15:34:49

10       Q.  What year did you first hear the word      15:34:50

11    "download"?                                      15:34:54

12       A.  I have no idea.                           15:34:55

13       Q.  Was it before September 2010?             15:34:55

14       A.  Yes.                                      15:34:57

15       Q.  Well, how far back can you take it?       15:34:59

16       A.  I don't know.                             15:35:03

17       Q.  Tell me the latest point in time when --  15:35:03

18    when you -- the earliest point in time when you  15:35:07

19    think you might have known of the word "download." 15:35:10

20           MS. ESKENAZI:  Objection.  Vague and      15:35:12

21    ambiguous.                                       15:35:14

22           THE WITNESS:  I'm unable to do that.       15:35:14

23    BY MR. PETROCELLI:                               15:35:14

24       Q.  Can you tell me if you knew the word       15:35:16

25    "download" in 2009?                              15:35:19
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 615

237

```
 1              MS. ESKENAZI:  Objection.  Asked and      15:35:21

 2   answered.  Ambiguous.                               15:35:22

 3              THE WITNESS:  I believe so.              15:35:24

 4   BY MR. PETROCELLI:                                  15:35:24

 5        Q.  How about 2008?                            15:35:26

 6              MS. ESKENAZI:  Objection.                15:35:29

 7              THE WITNESS:  I believe so.              15:35:30

 8   BY MR. PETROCELLI:                                  15:35:30

 9        Q.  Okay.  How about 2007?                     15:35:32

10        A.  I don't recall.                            15:35:33

11        Q.  So around '07, '08, you think you first    15:35:35

12   encountered the word "download"?                    15:35:39

13        A.  No, I didn't say that.                     15:35:41

14        Q.  Well, that's what I'm trying to find out.  15:35:42

15   I don't want to put words in your mouth.  I want to  15:35:44

16   get your best testimony.                            15:35:47

17        A.  As I said, I have no idea when I first     15:35:48

18   heard that word.                                    15:35:51

19        Q.  Well, you do have some idea.  We -- we've  15:35:54

20   established that you would have heard of it before  15:35:57

21   2008.  So --                                        15:36:00

22              MS. ESKENAZI:  Objection.  Misstates the  15:36:03

23   testimony.                                          15:36:04

24   BY MR. PETROCELLI:                                  15:36:04

25        Q.  How about 2007?                            15:36:06
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 616

238

```
 1        A.  I have no more idea than --            15:36:06

 2            MS. ESKENAZI:  Objection.  Asked and   15:36:09

 3   answered.                                       15:36:09

 4            THE WITNESS:  -- I've answered.         15:36:08

 5   BY MR. PETROCELLI:

 6        Q.  So to get to 2000- --

 7            THE REPORTER:  I'm sorry, I didn't hear.

 8   "I have no more than I've answered."

 9            THE WITNESS:  That's it.

10   BY MR. PETROCELLI:

11        Q.  So is that where you want to leave it, that  15:36:10

12   before 2008 you have no idea whether you had ever  15:36:20

13   heard or seen the word "download"?             15:36:25

14        A.  Yes.                                   15:36:27

15        Q.  Okay.  Now, what about the word "online"?  15:36:27

16   Do you have any idea what that means?           15:36:35

17            MS. ESKENAZI:  Objection.  Vague and   15:36:37

18   ambiguous.                                       15:36:38

19            THE WITNESS:  I believe it can mean a  15:36:38

20   number of things.                               15:36:40

21   BY MR. PETROCELLI:                               15:36:40

22        Q.  Well, in the world of computers, what do  15:36:41

23   you think it means?                             15:36:43

24            MS. ESKENAZI:  Same objection.         15:36:45

25   BY MR. PETROCELLI:                               15:36:46
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 617

239

1          Q.   How about this, computer games.  Did you          15:36:46

2     ever hear of online computer games?                         15:36:50

3          A.   Yes.                                               15:36:51

4          Q.   Okay.  Tell us what you think that means.          15:36:54

5          A.   I believe that means a game that can be            15:36:59

6     played by multiple participants on their own                15:37:02

7     computers.                                                   15:37:05

8          Q.   Okay.  And when do you think you first            15:37:09

9     heard of that?                                               15:37:14

10          A.   I don't know.                                     15:37:15

11          Q.   Before September 2010?                            15:37:17

12          A.   Yes.                                              15:37:22

13          Q.   Okay.  How far back can we go on that?            15:37:23

14          A.   I don't know.                                     15:37:25

15          Q.   How about 2009?                                   15:37:26

16          A.   I don't know.                                     15:37:30

17          Q.   You don't know whether you had ever heard         15:37:30

18     of an online game in -- as of 2009?                         15:37:34

19          MS. ESKENAZI:  Objection.  Asked and                   15:37:40

20     answered.                                                   15:37:40

21          THE WITNESS:  I think it's -- it's likely              15:37:42

22     that I did, but I can't remember when.                      15:37:45

23     BY MR. PETROCELLI:                                          15:37:45

24          Q.   Yeah.  Well, you know --                          15:37:45

25          A.   If I could remember, I --                         15:37:48

Maier, Steven (Final)

EXHIBIT C                                        PAGE 618

240

| | | |
|---|---|---|
| 1 | Q.  I'm not actually asking -- | 15:37:48 |
| 2 | A.  -- would tell you. | 15:37:49 |
| 3 | Q.  -- you, sir, and I think you understand to, | 15:37:49 |
| 4 | like, really remember the date and what you were | 15:37:52 |
| 5 | doing when you first saw the word.  I'm asking for | 15:37:54 |
| 6 | your best recollection -- | 15:37:59 |
| 7 | A.  Right.  But my best recollection -- | 15:37:59 |
| 8 | Q.  -- when it's most likely that you would | 15:38:02 |
| 9 | have had experience with -- with the word and would | 15:38:04 |
| 10 | have used the word or read it in a document and | 15:38:06 |
| 11 | had -- had an understanding of what it means. | 15:38:08 |
| 12 | A.  I honestly can't recall. | 15:38:11 |
| 13 | Q.  You understand as you're sitting here right | 15:38:14 |
| 14 | now giving -- giving this testimony that there's an | 15:38:22 |
| 15 | issue in this case about your knowledge and how far | 15:38:24 |
| 16 | it goes back regarding online computer games, | 15:38:25 |
| 17 | correct? | 15:38:25 |
| 18 | MS. ESKENAZI:  Objection.  Argumentative. | 15:38:30 |
| 19 | And assumes facts not in evidence. | 15:38:32 |
| 20 | THE WITNESS:  I understand there may be an | 15:38:36 |
| 21 | issue about the Tolkien Estate's knowledge. | 15:38:37 |
| 22 | BY MR. PETROCELLI: | 15:38:37 |
| 23 | Q.  And you unders- -- and Tolkien Estate's | 15:38:41 |
| 24 | knowledge, to be clear, of -- of online computer | 15:38:42 |
| 25 | games, downloading of computer games and how far | 15:38:49 |

Maier, Steven (Final)

EXHIBIT C                                    PAGE 619

241

```
1    back that knowledge goes, you understand that        15:38:52

2    there's -- that's an issue in this case, correct?    15:38:54

3         A.  In general terms of --                      15:38:56

4              MS. ESKENAZI:  Objection.  Argumentative.  15:38:57

5    Assumes facts not in --                               15:38:58

6    BY MR. PETROCELLI:                                    15:38:58

7         Q.  And you under- --                            15:38:58

8              MS. ESKENAZI:  -- evidence.  Compound.     15:38:58

9    BY MR. PETROCELLI:                                    15:38:58

10        Q.  And you understand that your knowledge in   15:39:01

11   that regard, or lack thereof, your knowledge in that 15:39:04

12   regard or lack thereof, is relevant, correct?        15:39:10

13             MS. ESKENAZI:  Objection.  Calls for a     15:39:18

14   legal conclusion.                                     15:39:19

15             THE WITNESS:  I'm not certain to what      15:39:19

16   extent that is relevant.                              15:39:21

17   BY MR. PETROCELLI:                                    15:39:21

18        Q.  Well, but you understand that from the      15:39:22

19   standpoint of the defendants, it's an issue in this  15:39:25

20   case how -- how much you know about downloading of   15:39:29

21   games, how much you know about online games, and     15:39:32

22   when you knew about those things.  You --            15:39:35

23             MS. ESKENAZI:  Objection.                  15:39:35

24   BY MR. PETROCELLI:                                    15:39:35

25        Q.  -- understand that those are issues in this 15:39:38
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 620

242

```
 1    case, correct?                                    15:39:40

 2           MS. ESKENAZI:  Objection.  Compound.  And   15:39:41

 3    argumentative.                                    15:39:42

 4           THE WITNESS:  If you're telling me from the 15:39:43

 5    perspective of the defendants that is an issue, then 15:39:45

 6    I accept what you say.                            15:39:47

 7    BY MR. PETROCELLI:                                15:39:47

 8        Q.  Okay.  And so you understand, as you're    15:39:49

 9    giving testimony here, you -- you believe it's    15:39:52

10    helpful to the Estate that you don't have knowledge 15:39:56

11    of online games and downloading of games until very 15:40:03

12    recently, correct?                               15:40:10

13        A.  That's completely --                      15:40:14

14           MS. ESKENAZI:  Argumentative.              15:40:14

15           THE WITNESS:  -- untrue.                   15:40:15

16           MS. ESKENAZI:  Argumentative and compound. 15:40:15

17    BY MR. PETROCELLI:                                15:40:15

18        Q.  I'm not asking -- I'm not, at least right  15:40:17

19    now my question is not whether, in fact, you had  15:40:20

20    such knowledge.  My -- my question to you is, you  15:40:22

21    are aware that it is helpful to the position of the 15:40:24

22    Estate to say that you had little or no knowledge  15:40:28

23    until recently, correct?                          15:40:33

24        A.  No.                                       15:40:34

25           MS. ESKENAZI:  Objection.                  15:40:34
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 621

243

| | | |
|---|---|---|
| 1 | THE WITNESS:  It's helpful to the position | 15:40:35 |
| 2 | of the Estate for me to give truthful testimony, | 15:40:36 |
| 3 | which is what I'm doing. | 15:40:39 |
| 4 | BY MR. PETROCELLI: | 15:40:39 |
| 5 | Q.  Well, that wasn't my question, sir. | 15:40:41 |
| 6 | A.  Well, that's my answer. | 15:40:43 |
| 7 | Q.  Okay, but you're not allowed to answer your | 15:40:43 |
| 8 | questions.  You have to answer my questions.  Now, | 15:40:45 |
| 9 | if you want to take my deposition, we can do that | 15:40:47 |
| 10 | maybe, okay?  But for now it's my turn. | 15:40:50 |
| 11 | MS. ESKENAZI:  Move to strike as | 15:40:53 |
| 12 | argumentative.  The witness is permitted to give | 15:40:54 |
| 13 | truthful answers to his questions -- to your | 15:40:58 |
| 14 | questions, which he did. | 15:41:00 |
| 15 | BY MR. PETROCELLI: | 15:41:00 |
| 16 | Q.  So I'll repeat my question again, okay? | 15:41:03 |
| 17 | You are aware that it is helpful to the | 15:41:07 |
| 18 | position of the plaintiffs in this case that you had | 15:41:08 |
| 19 | little or no knowledge of online games and | 15:41:16 |
| 20 | downloading of games until recently, correct? | 15:41:22 |
| 21 | MS. ESKENAZI:  Objection.  Argumentative. | 15:41:25 |
| 22 | Vague and ambiguous.  Calls for a legal | 15:41:28 |
| 23 | conclusion -- conclusion.  Compound. | 15:41:31 |
| 24 | THE WITNESS:  I don't have a view about | 15:41:32 |
| 25 | whether it's helpful or unhelpful. | 15:41:33 |

Maier, Steven (Final)

EXHIBIT C                                    PAGE 622

244

```
  1    BY MR. PETROCELLI:                               15:41:33

  2        Q.  I didn't ask you if you had a view, did I?  15:41:36

  3        A.  I think you did.                          15:41:39

  4        Q.  Okay.  I asked you if you were aware.     15:41:41

  5            MS. ESKENAZI:  Same objections.           15:41:45

  6    BY MR. PETROCELLI:                                15:41:45

  7        Q.  You're an experienced litigator for, what,  15:41:49

  8    30 years?  And it's your truthful testimony under  15:41:52

  9    oath that you have no idea whether it's helpful or  15:41:58

 10    hurtful to the plaintiff's position in the case   15:42:03

 11    whether you had knowledge of online games and     15:42:06

 12    downloading of games early versus late.           15:42:10

 13            Is that your testimony?                    15:42:14

 14            MS. ESKENAZI:  Objection.                  15:42:14

 15            THE WITNESS:  Let me put it this way.       15:42:15

 16            MS. ESKENAZI:  Objection.  Argumentative.   15:42:17

 17            THE WITNESS:  Let me put it this way.  In   15:42:18

 18    response to the defendants' position that you     15:42:21

 19    articulated a moment ago, it would follow that that  15:42:22

 20    evidence would be helpful or unhelpful.           15:42:24

 21    BY MR. PETROCELLI:                                15:42:24

 22        Q.  What would follow that that would be      15:42:28

 23    helpful or unhelpful?  That wasn't my question.   15:42:31

 24        A.  I can see that your point is relevant to  15:42:33

 25    the defendants' position that you articulated.    15:42:35
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 623

245

```
 1        Q.  Sir, I'm trying to elicit that as you are      15:42:40

 2   giving this testimony, you understand that it is        15:42:46

 3   helpful to the plaintiff's position in this case        15:42:49

 4   that you had little or no knowledge about the           15:42:52

 5   downloading of computer games and about online          15:42:55

 6   computer games until recently.  Now, is that true?      15:42:59

 7        A.  I --                                           15:42:59

 8            MS. ESKENAZI:  Objection.  Argumentative.      15:43:05

 9   Asked and answered.  Compound.                          15:43:06

10            THE WITNESS:  I understand the argument,       15:43:08

11   yes.                                                    15:43:08

12   BY MR. PETROCELLI:                                      15:43:08

13        Q.  Have you ever -- ever taken any computer       15:43:24

14   courses?                                                15:43:28

15        A.  No.                                            15:43:29

16        Q.  Have you ever taken any law courses, law       15:43:31

17   studies or seminars or anything that had to do with     15:43:35

18   the Internet?                                           15:43:41

19            MS. ESKENAZI:  Objection.  Vague and           15:43:42

20   ambiguous.  Compound.                                   15:43:43

21            THE WITNESS:  Not that I recall.               15:43:45

22   BY MR. PETROCELLI:                                      15:43:45

23        Q.  You've had cases involving the Internet,       15:43:46

24   right?                                                  15:43:46

25        A.  Yes.                                           15:43:49
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 624

246

| | | |
|---|---|---|
| 1 | Q.  In your cases, do you -- is it your -- has | 15:43:50 |
| 2 | it been your practice to prepare yourself and be | 15:43:54 |
| 3 | knowledgeable about the issues in the case? | 15:43:58 |
| 4 | A.  Yes. | 15:43:59 |
| 5 | Q.  Now, I -- I -- I think I heard you say that | 15:44:14 |
| 6 | you would spot-check from time to time with respect | 15:44:18 |
| 7 | to some of the merchandising uses by -- by Zaentz | 15:44:26 |
| 8 | and others under the -- under the agreements with | 15:44:30 |
| 9 | the Estate. | 15:44:33 |
| 10 | Do you recall that? | 15:44:34 |
| 11 | A.  I don't think I said I would spot-check | 15:44:34 |
| 12 | Zaentz's uses.  I said I would spot-check, | 15:44:37 |
| 13 | generally. | 15:44:40 |
| 14 | Q.  Okay.  And you said you would go on Google, | 15:44:40 |
| 15 | maybe? | 15:44:46 |
| 16 | A.  Yeah. | 15:44:46 |
| 17 | Q.  You even spot-check for mugs, as I recall, | 15:44:47 |
| 18 | right? | 15:44:47 |
| 19 | A.  Yeah. | 15:44:47 |
| 20 | Q.  How did you do that?  How did you | 15:44:53 |
| 21 | spot-check for mugs? | 15:44:56 |
| 22 | A.  You would, for example, do a search for | 15:44:56 |
| 23 | Tolkien-branded merchandise. | 15:45:00 |
| 24 | Q.  Yep.  And then what would come up? | 15:45:02 |
| 25 | MS. ESKENAZI:  Objection.  Calls for -- | 15:45:06 |

Maier, Steven (Final)

EXHIBIT C                                                    PAGE 625

247

```
 1    BY MR. PETROCELLI:                                  15:45:06

 2        Q.  Mugs?                                       15:45:06

 3            MS. ESKENAZI:  -- speculation.  Incomplete  15:45:07

 4    hypothetical.                                       15:45:09

 5    BY MR. PETROCELLI:                                  15:45:09

 6        Q.  What would you do after that?               15:45:09

 7        A.  After what?                                 15:45:11

 8        Q.  Well, you would type in, you said,          15:45:12

 9    Tolkien-branded merchandise --                      15:45:13

10        A.  Yeah.                                       15:45:16

11        Q.  -- into the Google search request and then  15:45:17

12    you'd get a list of entries?                        15:45:20

13        A.  The search results would generally be       15:45:21

14    people offering a variety of goods, including       15:45:25

15    possibly infringing items.                          15:45:29

16        Q.  Okay.  So when -- by the way, does Zaentz    15:45:31

17    have the right to do mugs?                          15:45:35

18            MS. ESKENAZI:  Objection.  Vague and        15:45:37

19    ambiguous.                                          15:45:38

20            THE WITNESS:  I'm referring to the          15:45:38

21    Tolkien's Estate's own trademarks.                  15:45:40

22    BY MR. PETROCELLI:                                  15:45:40

23        Q.  Yeah.  I'm saying but when you put          15:45:43

24    Tolkien-branded merchandise, would there -- would it  15:45:45

25    ever produce any results with respect to merchandise  15:45:47
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 626

248

```
 1    licensed by -- by Zaentz?                    15:45:50

 2        A.  Zaentz doesn't have the mark Tolkien.  15:45:52

 3        Q.  So you only would look for the mark    15:45:54

 4    Tolkien?                                       15:45:56

 5        A.  Yes.                                    15:45:56

 6        Q.  Nothing else?                           15:45:57

 7        A.  And for text from the textbooks.        15:45:58

 8        Q.  In those search results, though, because  15:46:02

 9    the computer doesn't know what's in your state of  15:46:05

10    mind --                                         15:46:05

11        A.  Right.                                   15:46:05

12        Q.  -- you might see other branded merchandise,  15:46:07

13    right?                                          15:46:09

14        A.  That's possible.                         15:46:09

15        Q.  Okay.  So, for example, you might see video  15:46:11

16    games or computer games might have been in the  15:46:12

17    search results, right?                          15:46:15

18            MS. ESKENAZI:  Objection --             15:46:16

19            THE WITNESS:  I don't recall ever       15:46:18

20    seeing --                                       15:46:18

21            MS. ESKENAZI:  -- calls for speculation.  15:46:18

22            THE WITNESS:  -- computer games or video  15:46:18

23    games.                                          15:46:20

24    BY MR. PETROCELLI:                              15:46:20

25        Q.  You can't -- you're not suggesting that  15:46:20
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 627

249

```
1    they never showed up, right?                    15:46:21

2          MS. ESKENAZI:  Objection.  Calls for       15:46:22

3    speculation.                                     15:46:24

4          THE WITNESS:  I am suggesting that to the   15:46:24

5    best of my recollection because --              15:46:25

6    BY MR. PETROCELLI:                               15:46:27

7          Q.  You actually remember?                 15:46:28

8          A.  If you would let me finish the answer, the  15:46:29

9    kind of Web sites that I was reviewing were selling  15:46:31

10   merchandise often created by individuals or small  15:46:34

11   businesses who would typically be the kind of    15:46:38

12   infringers and that we would be concerned with, and  15:46:41

13   they would not be producers of video games.      15:46:44

14         Q.  In the -- so you never once bothered to,  15:46:46

15   even out of curiosity, check out a video game that  15:46:51

16   Zaentz had licensed to others?                   15:46:59

17         A.  No.  Not until September, October 2010.  15:47:01

18         Q.  Even though you had -- you had heard of the  15:47:06

19   launch of such games?                            15:47:09

20         MS. ESKENAZI:  Objection.  Assumes facts    15:47:12

21   not in evidence.                                 15:47:13

22         THE WITNESS:  I don't believe I had.        15:47:13

23   BY MR. PETROCELLI:                               15:47:13

24         Q.  Never?                                  15:47:14

25         A.  I don't recall ever hearing of the launch  15:47:15
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 628

250

```
 1    of --                                            15:47:15

 2         Q.  They never --                           15:47:15

 3         A.  -- such games.                           15:47:17

 4         Q.  They never told you about the launch of  15:47:18

 5    a -- of an online game, for example?              15:47:20

 6         A.  I don't recall that.                     15:47:22

 7         Q.  But if they did, would you have known what  15:47:25

 8    they're talking about?                            15:47:28

 9         MS. ESKENAZI:  Objection.  Incomplete        15:47:29

10    hypothetical.                                     15:47:32

11         THE WITNESS:  As a rule they didn't deal     15:47:32

12    directly with me.                                 15:47:33

13    BY MR. PETROCELLI:                                15:47:34

14         Q.  Well, but if they -- if they had said to  15:47:34

15    you one day or wrote to you one day and say, "Hey,  15:47:36

16    you know, you know, Zaentz has made a deal with a   15:47:38

17    company and we're launching an online video game,"  15:47:41

18    and if this occurred prior to 2010, would you have  15:47:45

19    known -- would you have understood those words?    15:47:48

20         MS. ESKENAZI:  Objection.  Calls for         15:47:51

21    speculation.                                      15:47:51

22    BY MR. PETROCELLI:                                15:47:51

23         Q.  Let me start there.                      15:47:53

24         MS. ESKENAZI:  Objection.  Calls for         15:47:54

25    speculation.                                      15:47:54
```

Maier, Steven (Final)

EXHIBIT C                              PAGE 629

251

| | | |
|---|---|---|
| 1 | BY MR. PETROCELLI: | 15:47:54 |
| 2 | Q.  Would you have generally understood what -- | 15:47:56 |
| 3 | A.  I can tell you what -- | 15:47:56 |
| 4 | Q.  -- they were saying to you? | 15:47:58 |
| 5 | A.  -- I would have understood by those words. | 15:47:59 |
| 6 | Q.  Okay.  So what would you have understood? | 15:48:00 |
| 7 | A.  I would have understood an online game to | 15:48:05 |
| 8 | be one where a player buys a physical disc, puts it | 15:48:09 |
| 9 | into his computer and can then play with other | 15:48:16 |
| 10 | people who've made a similar physical purchase. | 15:48:18 |
| 11 | Q.  Are you aware, sir, that that happens to be | 15:48:21 |
| 12 | exactly and precisely the same thing that | 15:48:28 |
| 13 | Ms. Blackburn said at her deposition? | 15:48:30 |
| 14 | MS. ESKENAZI:  Objection.  Misstates the | 15:48:31 |
| 15 | testimony. | 15:48:33 |
| 16 | BY MR. PETROCELLI: | 15:48:33 |
| 17 | Q.  Are you -- | 15:48:34 |
| 18 | A.  No, I'm not aware of that. | 15:48:34 |
| 19 | Q.  What a coincidence.  You and she, who talk | 15:48:35 |
| 20 | to each other every day and work to -- work with | 15:48:41 |
| 21 | each other -- did you ever talk to her about this, | 15:48:44 |
| 22 | by the way?  Did you ever -- did you ever share this | 15:48:46 |
| 23 | same interpretation and definition -- | 15:48:48 |
| 24 | MS. ESKENAZI:  Objection. | 15:48:51 |
| 25 | BY MR. PETROCELLI: | 15:48:51 |

Maier, Steven (Final)

EXHIBIT C                                    PAGE 630

252

```
 1        Q.  -- of what those words mean?              15:48:52

 2            MS. ESKENAZI:  Objection.  Calls for       15:48:54

 3   attorney-client privileged communication.          15:48:55

 4            MR. PETROCELLI:  I don't think that's an   15:48:56

 5   attorney-client privileged conversation.           15:48:58

 6            THE WITNESS:  If you're --                 15:48:59

 7            MS. ESKENAZI:  It is.                       15:49:01

 8            THE WITNESS:  -- asking me whether we have 15:49:01

 9   agreed to say the same thing in deposition, that is 15:49:03

10   completely untrue.                                  15:49:05

11   BY MR. PETROCELLI:                                  15:49:05

12        Q.  You mean it's a complete coincidence that 15:49:07

13   you happen to be saying exactly the same thing?     15:49:09

14            MS. ESKENAZI:  Mr. Petrocelli, you're      15:49:13

15   misstating the witness' testimony.  And you're      15:49:13

16   argumentative.  So move on and ask a question.      15:49:18

17   BY MR. PETROCELLI:                                  15:49:18

18        Q.  That's my question.  Are you saying it's a 15:49:20

19   coincidence that you and she said exactly the same  15:49:24

20   thing in almost exactly the same words?             15:49:25

21            MS. ESKENAZI:  Misstates the testimony.    15:49:27

22            THE WITNESS:  I don't know what she said.  15:49:28

23   BY MR. PETROCELLI:                                  15:49:28

24        Q.  Okay.  If I told you that she did, would   15:49:29

25   you say that that's a pure coincidence?             15:49:31
```

Maier, Steven (Final)

EXHIBIT C                    PAGE 631

253

```
 1        A.  Yes.                                      15:49:33

 2        Q.  So when -- and when you were reviewing    15:49:40

 3   those hundred-plus documents over those eight to ten  15:49:45

 4   hours over the last couple of days, did you see any  15:49:48

 5   documents in which there was reference to an online  15:49:52

 6   computer game or an online video game?              15:49:59

 7           MS. ESKENAZI:  Objection.  Privilege.  You  15:50:01

 8   haven't laid the foundation.                        15:50:03

 9           MR. PETROCELLI:  I'm -- that's --           15:50:05

10           MS. ESKENAZI:  You're not entitled to       15:50:05

11   know --                                             15:50:07

12           MR. PETROCELLI:  That's the question I'm    15:50:07

13   asking.                                             15:50:09

14           MS. ESKENAZI:  Oh, okay.  I'm going to      15:50:09

15   instruct the witness not to answer.  Insufficient --  15:50:10

16   insufficient foundation.  You're not entitled to    15:50:13

17   that information.  You know better than that,       15:50:17

18   Mr. Petrocelli.                                     15:50:18

19   BY MR. PETROCELLI:                                  15:50:18

20        Q.  Given all -- all the -- given the extreme  15:50:19

21   lack of recollection that you have exhibited        15:50:22

22   throughout these -- this day's questioning, would it  15:50:28

23   be fair to say, and honest and truthful to say that  15:50:33

24   when you saw those hundred or so documents, that    15:50:38

25   they helped refresh your recollection?              15:50:42
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 632

254

| | | |
|---|---|---|
| 1 | MS. ESKENAZI:  Objection.  Argumentative. | 15:50:45 |
| 2 | Assumes facts not in evidence.  Misstates the -- | 15:50:47 |
| 3 | mischaracterizes the testimony, earlier testimony of | 15:50:50 |
| 4 | this witness. | 15:50:53 |
| 5 | Do you want to restate that? | 15:50:57 |
| 6 | MR. PETROCELLI:  You know, I will. | 15:50:58 |
| 7 | MS. ESKENAZI:  Without the colloquy? | 15:50:59 |
| 8 | MR. PETROCELLI:  I will. | 15:51:00 |
| 9 | MS. ESKENAZI:  Okay. | 15:51:01 |
| 10 | BY MR. PETROCELLI: | 15:51:01 |
| 11 | Q.  Would it be fair and truthful and honest to | 15:51:04 |
| 12 | say that when you saw those documents in preparing | 15:51:07 |
| 13 | for the deposition, that they did help you to | 15:51:11 |
| 14 | refresh your recollection, correct? | 15:51:15 |
| 15 | MS. ESKENAZI:  Asked and answered. | 15:51:17 |
| 16 | THE WITNESS:  No, I don't recall any | 15:51:18 |
| 17 | documents that helped me to refresh my recollection. | 15:51:19 |
| 18 | BY MR. PETROCELLI: | 15:51:19 |
| 19 | Q.  I had a feeling you'd say that. | 15:51:24 |
| 20 | So let me get this straight.  You hadn't | 15:51:28 |
| 21 | seen those documents in a long time, right? | 15:51:31 |
| 22 | MS. ESKENAZI:  Objection. | 15:51:36 |
| 23 | THE WITNESS:  I'm not sure which documents | 15:51:36 |
| 24 | you're referring to. | 15:51:38 |
| 25 | BY MR. PETROCELLI: | 15:51:38 |

Maier, Steven (Final)

EXHIBIT C                                        PAGE 633

255

```
 1          Q.  The documents -- do you even remember the      15:51:38

 2    documents that you saw?                                   15:51:39

 3          A.  I don't particularly remember them.            15:51:40

 4          Q.  Okay.  So right now, a couple of days           15:51:45

 5    later, you -- you don't even remember the documents       15:51:47

 6    you saw and it was only a couple of days ago; is          15:51:50

 7    that -- is that right?                                    15:51:50

 8          A.  I don't recall specific documents.  We --       15:51:55

 9          Q.  Well, you --                                    15:51:55

10          A.  -- looked at a lot of documents.                15:51:58

11          Q.  You don't recall any of them, do you?           15:51:59

12          MS. ESKENAZI:  Objection.  I'm going to             15:52:00

13    instruct the witness not to answer because you're         15:52:01

14    not entitled to that information.  You haven't laid       15:52:03

15    the foundation.  As a matter of fact, the foundation      15:52:05

16    has been that you're not entitled to the                  15:52:06

17    information.                                               15:52:08

18          MR. PETROCELLI:  I didn't ask -- I didn't           15:52:08

19    ask about the specific documents he saw in that           15:52:11

20    question, even though I don't agree with your --          15:52:14

21    your analysis of this issue.  But let me just plug        15:52:17

22    away here.                                                 15:52:20

23          Q.  How many documents can you remember that        15:52:21

24    you saw in the last couple of days since you were         15:52:23

25    preparing for the deposition?                             15:52:26
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 634

256

| | | |
|---|---|---|
| 1 | MS. ESKENAZI:  Asked and answered. | 15:52:30 |
| 2 | You can answer again. | 15:52:30 |
| 3 | THE WITNESS:  It was probably more than a | 15:52:31 |
| 4 | hundred pages. | 15:52:32 |
| 5 | BY MR. PETROCELLI: | 15:52:32 |
| 6 | Q.  How many can you actually remember?  If | 15:52:33 |
| 7 | your lawyer let you answer the question, how many | 15:52:35 |
| 8 | could you sit here and generally describe for us? | 15:52:38 |
| 9 | A.  I don't recall. | 15:52:41 |
| 10 | Q.  It's not a recollection question.  It's a | 15:52:42 |
| 11 | question that calls for, "I can -- I can -- I can | 15:52:45 |
| 12 | think of four that I can describe, I can think of | 15:52:48 |
| 13 | 20" or "I couldn't describe a single one." | 15:52:53 |
| 14 | MS. ESKENAZI:  Objection.  Vague and | 15:52:57 |
| 15 | ambiguous. | 15:52:57 |
| 16 | BY MR. PETROCELLI: | 15:52:57 |
| 17 | Q.  Can you answer that question?  How many can | 15:52:58 |
| 18 | you -- | 15:52:58 |
| 19 | A.  I can't recall -- | 15:53:01 |
| 20 | MS. ESKENAZI:  Compound. | 15:53:02 |
| 21 | THE WITNESS:  -- any specific documents. | 15:53:02 |
| 22 | BY MR. PETROCELLI: | 15:53:02 |
| 23 | Q.  Did you see any e-mails? | 15:53:05 |
| 24 | MS. ESKENAZI:  You can answer that "yes" | 15:53:08 |
| 25 | or "no." | 15:53:11 |

Maier, Steven (Final)

EXHIBIT C                                   PAGE 635

257

```
 1              THE WITNESS:  I believe so.           15:53:11

 2    BY MR. PETROCELLI:                              15:53:11

 3        Q.  Did you see any documents with the word  15:53:14

 4    "online" in them?                               15:53:16

 5              MS. ESKENAZI:  Objection.  Instruct not to  15:53:18

 6    answer.  Privileged.  You haven't laid the      15:53:20

 7    foundation.                                     15:53:27

 8    BY MR. PETROCELLI:                              15:53:27

 9        Q.  If you saw a document with the word     15:53:29

10    "online" in it, would you agree with me that it  15:53:31

11    would help refresh your recollection as to the date  15:53:33

12    when you first saw the word "online"?           15:53:35

13              MS. ESKENAZI:  Objection.  Calls --    15:53:38

14    BY MR. PETROCELLI:                              15:53:38

15        Q.  Given your testimony that you can't     15:53:40

16    remember, would you agree with that?           15:53:41

17              MS. ESKENAZI:  Calls for an incomplete  15:53:44

18    hypothetical.  Calls for speculation.           15:53:48

19              THE WITNESS:  I'm not sure I understand  15:53:48

20    that.                                           15:53:49

21              MS. ESKENAZI:  Lacks foundation.       15:53:50

22    BY MR. PETROCELLI:                              15:53:51

23        Q.  If you were shown a document, let's say, in  15:53:51

24    the year 2007, I'll just pick that year, and it had  15:53:53

25    the word "online" in it, and you just saw it in  15:53:57
```

258

```
 1    preparing for your deposition and it was one of the    15:53:59
 2    documents that your lawyer showed you, would you       15:54:00
 3    agree with me that, at the minimum, it would help      15:54:02
 4    you to remember that you saw the word "online" in      15:54:05
 5    2007?                                                  15:54:07
 6          MS. ESKENAZI:  Objection.  Vague and             15:54:09
 7    ambiguous.  Incomplete hypothetical.  Calls for        15:54:10
 8    speculation.  Lacks foundation.                        15:54:14
 9          THE WITNESS:  I don't agree with that.  It       15:54:15
10    would depend what the focus of the document was.       15:54:18
11    BY MR. PETROCELLI:                                     15:54:19
12       Q.  No, it doesn't depend at all on the focus       15:54:19
13    of the document.                                       15:54:22
14       A.  I don't agree with you.                         15:54:23
15       Q.  Why don't you agree with me?  If -- if -- I     15:54:24
16    asked you earlier today whether you could tell me if   15:54:25
17    you heard of the word or had seen the word in the      15:54:29
18    year 2007, the word "online," and you said you         15:54:31
19    couldn't remember.                                     15:54:34
20          If you were shown a document a couple of         15:54:36
21    days ago dated in 2007 that had the word "online" in   15:54:38
22    it, would that -- would it not help you remember       15:54:41
23    that you had seen the word "online" in the year        15:54:44
24    2007?                                                  15:54:47
25       A.  Not necessarily.  Because the fact that the     15:54:47
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 637

| | | |
|---|---|---|
| 1 | word is in the document may not have had anything to | 15:54:50 |
| 2 | do with the purpose of reading the document. | 15:54:53 |
| 3 | Q.  I didn't connect it up to any purpose.  I | 15:54:54 |
| 4 | simply asked you whether it would help you to | 15:54:57 |
| 5 | refresh your memory as to the date or timing or year | 15:55:00 |
| 6 | in which you had seen the word "online." | 15:55:04 |
| 7 | MS. ESKENAZI:  Objection. | 15:55:08 |
| 8 | BY MR. PETROCELLI: | 15:55:08 |
| 9 | Q.  Would you agree that it would refresh your | 15:55:08 |
| 10 | recollection at least to that extent? | 15:55:10 |
| 11 | A.  Not necessarily. | 15:55:12 |
| 12 | Q.  I didn't say necessarily. | 15:55:13 |
| 13 | A.  It could do. | 15:55:16 |
| 14 | Q.  Okay.  So what documents did you see -- | 15:55:17 |
| 15 | withdrawn. | 15:55:22 |
| 16 | Did you see any documents that had the word | 15:55:23 |
| 17 | "online" in preparing for your deposition? | 15:55:27 |
| 18 | MS. ESKENAZI:  Objection.  Calls for | 15:55:28 |
| 19 | privilege -- | 15:55:31 |
| 20 | THE WITNESS:  I don't recall -- | 15:55:31 |
| 21 | MS. ESKENAZI:  Calls for privileged | 15:55:32 |
| 22 | information.  Instruct the witness not to answer. | 15:55:33 |
| 23 | You have not laid an adequate foundation. | 15:55:39 |
| 24 | MR. PETROCELLI:  I don't -- I -- I'm not | 15:55:41 |
| 25 | going to argue with you. | 15:55:43 |

Maier, Steven (Final)

EXHIBIT C                                                      PAGE 638

260

```
 1            THE WITNESS:  Could we take a five-minute    15:55:44

 2   break at this point?                                  15:55:46

 3            MR. PETROCELLI:  You may.                     15:55:46

 4            THE WITNESS:  Thank you.                      15:55:47

 5            THE VIDEOGRAPHER:  This is the end of media   15:55:47

 6   number 4.  Off the record at 3:55 p.m.                15:55:49

 7            (Brief recess.)                               16:02:00

 8            THE VIDEOGRAPHER:  We are back on the         16:07:11

 9   record at 4:09 p.m.  This is the beginning of media    16:09:30

10   number 5.  Counsel may proceed.                        16:09:33

11   BY MR. PETROCELLI:                                      16:09:33

12       Q.  When did you prepare your resume, Exhibit      16:09:37

13   23?                                                     16:09:40

14       A.  At the time we set up the new law firm.        16:09:41

15       Q.  And just for the record, that is -- you        16:09:45

16   started January 2012, correct?                         16:09:53

17       A.  Yes, that's correct.                            16:09:56

18       Q.  Okay.  What is the Data Protection Act?        16:10:06

19       A.  The Data Protection Act is a U.K. act          16:10:11

20   arising out of a European provision which regards      16:10:16

21   the privacy of data held -- personal data held about  16:10:25

22   individuals in the U.K.                                 16:10:32

23       Q.  And you've done some work with respect to      16:10:33

24   the Data Protection Act?                                16:10:35

25       A.  A limited amount.                               16:10:36
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 639

261

```
 1          Q.  And you've -- according to Exhibit 23, you     16:10:38

 2   give advice to a medical portal Web site on libel        16:10:45

 3   and Data Protection Act claims arising out of online     16:10:50

 4   postings.                                                16:10:54

 5          Do you see that?                                  16:10:56

 6          A.  That's under "Recent Work Examples," yeah.    16:10:57

 7          Q.  And you said "recent."  How recent?           16:11:00

 8          A.  Well, obviously prior to 1st of January       16:11:11

 9   2012, but I can't remember exactly when.                 16:11:15

10          Q.  How long have you been advising that          16:11:17

11   client?                                                  16:11:22

12          A.  I don't recall.                               16:11:27

13          Q.  You don't recall -- it was certainly during   16:11:27

14   your Manches years, but you don't remember when you      16:11:34

15   began?                                                   16:11:36

16          A.  That's right.                                 16:11:36

17          Q.  Have you ever downloaded a computer game?     16:11:37

18          A.  Yes.                                          16:11:47

19          Q.  Only after this dispute arose?               16:11:52

20          A.  Yes.                                          16:11:53

21          Q.  Which games did you download?                16:11:55

22          A.  I can't remember the name of the game.  I     16:11:56

23   downloaded something on my computer at home from        16:12:12

24   something called Steam, which is a downloading          16:12:18

25   service.  I don't remember exactly which game it        16:12:21
```

Maier, Steven (Final)

EXHIBIT C                                          PAGE 640

262

```
 1    was.  A first-person shooter game of some kind.      16:12:22

 2         Q.  Anything to do with this matter?            16:12:24

 3         A.  No.                                         16:12:28

 4         Q.  Just for enjoyment?                         16:12:31

 5         A.  Yes.                                        16:12:37

 6         Q.  Okay.  Do -- have you ever -- is that the   16:12:39

 7    only time you've downloaded a game?                  16:12:40

 8         A.  I think so, yeah.                           16:12:41

 9         Q.  Have you ever downloaded a movie or TV      16:12:43

10    program?                                             16:12:49

11         A.  Well, we have Netflix but I think that's    16:12:49

12    streaming.  And whether that's different from        16:13:02

13    whatever "download" means, I'm not sure.             16:13:03

14         Q.  So other than Netflix, have you ever        16:13:05

15    downloaded a movie or television show or some        16:13:08

16    other --                                             16:13:11

17         A.  No.                                         16:13:11

18         Q.  -- content onto -- onto a device?           16:13:11

19            MS. ESKENAZI:  Objection --                  16:13:14

20            THE WITNESS:  No.                            16:13:14

21            MS. ESKENAZI:  -- assumes facts not in       16:13:15

22    evidence.                                            16:13:16

23    BY MR. PETROCELLI:                                   16:13:16

24         Q.  Have you ever downloaded a song, a tune?    16:13:16

25         A.  Yes.                                        16:13:19
```

263

| | | |
|---|---|---|
| 1 | Q.  When is the first time you did that? | 16:13:25 |
| 2 | A.  I can't remember. | 16:13:31 |
| 3 | Q.  It was certainly before September 2010, | 16:13:32 |
| 4 | right? | 16:13:32 |
| 5 | A.  Oh, yes. | 16:13:38 |
| 6 | Q.  And you -- you're familiar with downloading | 16:13:38 |
| 7 | of music.  It's been around for -- for years, right? | 16:13:41 |
| 8 | A.  Yeah. | 16:13:47 |
| 9 | MS. ESKENAZI:  Objection.  Vague and | 16:13:47 |
| 10 | ambiguous. | 16:13:47 |
| 11 | BY MR. PETROCELLI: | 16:13:47 |
| 12 | Q.  And as an IP lawyer, for example, you had | 16:13:48 |
| 13 | some familiarity with the Napster litigation and | 16:13:50 |
| 14 | cases like that where copyright claims were made | 16:13:54 |
| 15 | with respect to the downloading of music, right? | 16:13:57 |
| 16 | A.  I don't recall what those cases were about. | 16:14:00 |
| 17 | Q.  But you had some general familiarity that | 16:14:02 |
| 18 | that was an issue that was being litigated? | 16:14:04 |
| 19 | A.  No, I don't recall that. | 16:14:08 |
| 20 | Q.  Not a clue about that?  This is the first | 16:14:09 |
| 21 | time you're hearing it today? | 16:14:12 |
| 22 | A.  I have no recollection of knowing about | 16:14:13 |
| 23 | those cases. | 16:14:16 |
| 24 | Q.  When is the first time you downloaded a | 16:14:17 |
| 25 | song? | 16:14:19 |

Maier, Steven (Final)

EXHIBIT C                                    PAGE 642

264

```
 1           MS. ESKENAZI:  Objection.  Asked and      16:14:19

 2    answered.                                         16:14:20

 3           THE WITNESS:  I don't recall.              16:14:20

 4    BY MR. PETROCELLI:                                16:14:20

 5       Q.  Early 2000 time frame?                     16:14:24

 6       A.  I don't recall.                            16:14:26

 7           MS. ESKENAZI:  Objection.  Asked and       16:14:28

 8    answered.                                         16:14:28

 9    BY MR. PETROCELLI:                                16:14:28

10       Q.  Do you have children?                      16:14:29

11       A.  Yes.                                        16:14:29

12       Q.  How old are they?                          16:14:30

13       A.  17, 15 and 13.                              16:14:31

14       Q.  Have your -- do you know whether your      16:14:34

15    children have ever -- any of them have ever       16:14:38

16    downloaded a song?                                16:14:41

17           MS. ESKENAZI:  Objection.  Calls for       16:14:44

18    speculation.  Lacks foundation.                   16:14:45

19           THE WITNESS:  I don't think any of them has 16:14:46

20    their own account with anybody.  Therefore, they  16:14:51

21    would have had to do it through us.                16:14:54

22    BY MR. PETROCELLI:                                16:14:54

23       Q.  And have they ever done so?  Have they ever 16:14:57

24    downloaded music?                                 16:15:03

25           MS. ESKENAZI:  Objection.  Vague and       16:15:04
```

265

| | | |
|---|---|---|
| 1 | ambiguous. | 16:15:04 |
| 2 | BY MR. PETROCELLI: | 16:15:04 |
| 3 | Q.  Regardless of whose account it was? | 16:15:05 |
| 4 | A.  I recall one occasion on which one of my | 16:15:08 |
| 5 | kids asked me to get a song for him. | 16:15:12 |
| 6 | Q.  When was that? | 16:15:14 |
| 7 | A.  Three or four years ago. | 16:15:15 |
| 8 | Q.  What about downloading of -- of movies? | 16:15:20 |
| 9 | Any of your kids ever do that? | 16:15:25 |
| 10 | A.  I don't believe so. | 16:15:26 |
| 11 | Q.  What about downloading of computer games or | 16:15:27 |
| 12 | video games?  Any of your kids ever do that? | 16:15:31 |
| 13 | A.  They play video -- some of them play video | 16:15:35 |
| 14 | games but I don't know the mechanism.  They're up in | 16:15:37 |
| 15 | their rooms doing it. | 16:15:40 |
| 16 | Q.  Ever ask them? | 16:15:41 |
| 17 | A.  No. | 16:15:41 |
| 18 | Q.  One second. | 16:15:46 |
| 19 | Earlier you testified that whenever you | 16:16:05 |
| 20 | first heard of online, you believed it meant that | 16:16:13 |
| 21 | a -- whatever was downloaded online had to involve | 16:16:21 |
| 22 | a -- the purchase of a physical disc or cartridge. | 16:16:28 |
| 23 | Do you recall that? | 16:16:31 |
| 24 | MS. ESKENAZI:  Objection. | 16:16:31 |
| 25 | THE WITNESS:  That wasn't my testimony. | 16:16:32 |

Maier, Steven (Final)

EXHIBIT C                                    PAGE 644

266

| 1 | MS. ESKENAZI:  It misstates the testimony. | 16:16:33 |
| 2 | You need to wait until -- everybody needs | 16:16:34 |
| 3 | to pause.  You need to finish your question, you | 16:16:36 |
| 4 | need to let me get my objections in.  Because | 16:16:39 |
| 5 | otherwise the court reporter is going to shoot | 16:16:42 |
| 6 | daggers at us. | 16:16:44 |
| 7 | THE WITNESS:  She -- she did warn me.  I | 16:16:45 |
| 8 | understand. | 16:16:46 |
| 9 | BY MR. PETROCELLI: | 16:16:46 |
| 10 | Q.  Why don't you tell me what you did say. | 16:16:47 |
| 11 | A.  Sorry.  You need to repeat the question. | 16:16:53 |
| 12 | Tell me what you'd like. | 16:16:53 |
| 13 | Q.  Yeah.  Why don't you tell me what you did | 16:16:55 |
| 14 | say.  Do you remember what you -- | 16:16:56 |
| 15 | MS. ESKENAZI:  Objection. | 16:16:59 |
| 16 | THE WITNESS:  The question before that. | 16:17:00 |
| 17 | BY MR. PETROCELLI: | 16:17:00 |
| 18 | Q.  Well, I was asking you about your prior | 16:17:01 |
| 19 | testimony about either online or downloading -- | 16:17:03 |
| 20 | A.  Right. | 16:17:09 |
| 21 | Q.  -- involving a purchase. | 16:17:10 |
| 22 | Do you recall that? | 16:17:12 |
| 23 | A.  Right.  I do recall that. | 16:17:12 |
| 24 | Q.  And we got into the whole -- | 16:17:14 |
| 25 | A.  Yeah. | 16:17:17 |

Maier, Steven (Final)

EXHIBIT C                    PAGE 645

267

1        Q.   -- question and answer about it being the        16:17:18

2   same as Ms. Blackburn's.                                    16:17:19

3            Do you recall that?                                16:17:21

4        A.   Yeah.                                             16:17:21

5        Q.   Okay.  So I want to go back to that               16:17:22

6   subject.                                                    16:17:23

7        A.   Right.                                            16:17:23

8        Q.   Okay.  So why don't you tell me what it           16:17:25

9   is -- repeat for me what you understood playing a           16:17:30

10  game online meant.                                          16:17:35

11       A.   I understood that if you bought a game            16:17:38

12  which would come on a disc, which you would then            16:17:41

13  install on your computer, then you could play with          16:17:44

14  other people who had similarly bought a disc and            16:17:49

15  installed a game on their computer.                         16:17:52

16       Q.   Okay.  And that was something you                 16:17:54

17  understood in connection with the playing of games          16:17:56

18  online, which involved playing with other people,           16:17:59

19  correct?                                                    16:17:59

20       A.   Yes.                                              16:17:59

21       Q.   Okay.  Now, when did you first derive that        16:18:08

22  understanding that you just gave me?                        16:18:10

23            MS. ESKENAZI:  Objection.  Asked and              16:18:12

24  answered.                                                   16:18:13

25  BY MR. PETROCELLI:                                          16:18:13

Maier, Steven (Final)

EXHIBIT C                                          PAGE 646

268

```
 1        Q.  That playing online required purchase of a    16:18:13

 2   disc that you would then install?                      16:18:17

 3        A.  I don't recall.                               16:18:20

 4        Q.  Can you give me a general time frame?         16:18:21

 5        A.  No.                                           16:18:23

 6        Q.  Okay.  Is it -- then is it -- would it be     16:18:31

 7   your testimony that whenever you saw a reference to    16:18:35

 8   an online computer game, you always believed it        16:18:38

 9   meant what you just said?                              16:18:43

10        MS. ESKENAZI:  Objection.                         16:18:45

11   BY MR. PETROCELLI:                                     16:18:45

12        Q.  Involving a purchase of a disc --             16:18:46

13        MS. ESKENAZI:  Objection.  Misstates --           16:18:47

14   BY MR. PETROCELLI:                                     16:18:48

15        Q.  -- to be inserted in a device?                16:18:49

16        MS. ESKENAZI:  Objection.  Misstates the          16:18:51

17   testimony.  Vague and ambiguous.                       16:18:52

18        THE WITNESS:  Until September, October of         16:18:57

19   2010, that's what I understood by an online game.      16:19:03

20   BY MR. PETROCELLI:                                     16:19:06

21        Q.  My -- my questions are before September       16:19:06

22   2010.                                                  16:19:08

23        MS. ESKENAZI:  No, actually, your question        16:19:09

24   was always.  That's why I said --                      16:19:10

25        MR. PETROCELLI:  Fair enough.                     16:19:10
```

Maier, Steven (Final)

EXHIBIT C                                      PAGE 647

269

| 1 | MS. ESKENAZI:  -- vague and ambiguous. | 16:19:12 |
| 2 | MR. PETROCELLI:  Fair enough. | 16:19:12 |
| 3 | Q.  Before September 2010, I want to know | 16:19:13 |
| 4 | whether that was always your understanding of online | 16:19:19 |
| 5 | computer games. | 16:19:23 |
| 6 | A.  Yes. | 16:19:24 |
| 7 | Q.  Okay.  Now, how did you gain that | 16:19:27 |
| 8 | understanding? | 16:19:28 |
| 9 | A.  I don't know. | 16:19:29 |
| 10 | Q.  Who told it to you? | 16:19:30 |
| 11 | A.  I don't know. | 16:19:32 |
| 12 | Q.  Did you read about it? | 16:19:33 |
| 13 | A.  I don't know. | 16:19:34 |
| 14 | Q.  When you first -- well, you had to learn it | 16:19:35 |
| 15 | somehow, right?  You didn't come up with it on your | 16:19:40 |
| 16 | own, did you? | 16:19:42 |
| 17 | A.  I don't recall how I learned of it. | 16:19:43 |
| 18 | Q.  Okay.  It's a very specific interpretation | 16:19:47 |
| 19 | of the word "online computer game."  Can you -- did | 16:19:52 |
| 20 | you -- were you taught that by somebody like | 16:19:56 |
| 21 | Cathleen Blackburn, for example? | 16:19:58 |
| 22 | MS. ESKENAZI:  Objection. | 16:19:59 |
| 23 | BY MR. PETROCELLI: | 16:19:59 |
| 24 | Q.  Did she tell you that's what that word | 16:20:00 |
| 25 | meant? | 16:20:03 |

270

| | | |
|---|---|---|
| 1 | MS. ESKENAZI:  Objection.  Move to strike. | 16:20:03 |
| 2 | THE WITNESS:  No. | 16:20:04 |
| 3 | BY MR. PETROCELLI: | 16:20:04 |
| 4 | Q.  Do you know when she happened to | 16:20:09 |
| 5 | coincidentally come up with the same interpretation | 16:20:10 |
| 6 | of the same words? | 16:20:14 |
| 7 | MS. ESKENAZI:  Objection.  Misstates the | 16:20:14 |
| 8 | testimony.  Misleading. | 16:20:15 |
| 9 | THE WITNESS:  I'm not aware of any language | 16:20:20 |
| 10 | that she's used. | 16:20:22 |
| 11 | BY MR. PETROCELLI: | 16:20:22 |
| 12 | Q.  Have you and she to this day ever shared | 16:20:23 |
| 13 | with each other that you both happen to have the | 16:20:27 |
| 14 | exact same definition of "online computer games"? | 16:20:30 |
| 15 | MS. ESKENAZI:  Objection.  Misleading. | 16:20:33 |
| 16 | Misstates the testimony.  Instruct not to answer. | 16:20:34 |
| 17 | Attorney-client privileged communication.  Attorney | 16:20:38 |
| 18 | work product. | 16:20:42 |
| 19 | BY MR. PETROCELLI: | 16:20:42 |
| 20 | Q.  Have you had a conversation with | 16:20:43 |
| 21 | Ms. Blackburn about your mutual agreement on the | 16:20:44 |
| 22 | meaning of those words, "online computer games"? | 16:20:50 |
| 23 | MS. ESKENAZI:  Objection.  Misstates the | 16:20:52 |
| 24 | testimony.  Assumes facts not in evidence. | 16:20:54 |
| 25 | Attorney-client privileged communication.  Instruct | 16:20:59 |

Maier, Steven (Final)

EXHIBIT C                                    PAGE 649

271

```
 1    not to answer.  And argumentative.              16:21:01

 2    BY MR. PETROCELLI:                               16:21:01

 3        Q.  Well, who is the client?  You heard the  16:21:07

 4    instruction.  You're going listen to it?        16:21:09

 5        A.  I am.                                    16:21:11

 6        Q.  Who is the client?                       16:21:12

 7            MS. ESKENAZI:  It was my instruction.    16:21:13

 8            MR. PETROCELLI:  Yeah.                    16:21:14

 9        Q.  Who is the client?  She said that every  16:21:15

10    such conversation you've had, apparently every  16:21:18

11    conversation you've had on the subject of online 16:21:22

12    computer games is a privileged conversation, just 16:21:24

13    like every time you speak to the Tolkiens, it's  16:21:27

14    apparently privileged.                           16:21:30

15            Is that accurate?  Every time you've ever 16:21:32

16    had a conversation with anybody about online     16:21:35

17    computer games, it's privileged?                 16:21:37

18            MS. ESKENAZI:  Objection.  It misstates the 16:21:42

19    testimony.  Do you want to ask a question?       16:21:43

20            MR. PETROCELLI:  I just did.              16:21:44

21        Q.  Is that true?                            16:21:46

22        A.  I have no expertise in the U.S. laws of  16:21:46

23    privilege.                                       16:21:49

24        Q.  What does that have to do with my question? 16:21:50

25    Did I ask you that?                              16:21:52
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 650

272

```
 1              MS. ESKENAZI:  Yes.                    16:21:53

 2              THE WITNESS:  Yes.                      16:21:54

 3    BY MR. PETROCELLI:                               16:21:54

 4         Q.  No, I asked you do you -- okay, let me  16:21:54

 5    reframe it, then, if you -- if you interpreted that  16:21:57

 6    I was quizzing you on U.S. law of privilege.     16:21:59

 7              Do you know when you're having a privileged  16:22:04

 8    conversation or not in -- in -- when you're talking  16:22:06

 9    to a person?                                     16:22:09

10              MS. ESKENAZI:  Objection.  Vague and   16:22:10

11    ambiguous.                                       16:22:13

12              THE WITNESS:  I don't know under which 16:22:13

13    legal system you're referring.                   16:22:15

14    BY MR. PETROCELLI:                               16:22:15

15         Q.  What legal system are you familiar with?  16:22:17

16         A.  The English legal system.              16:22:20

17         Q.  Okay.  Well, let's stick with that one,  16:22:21

18    then.                                            16:22:21

19              You apparently understood that every time  16:22:24

20    you opened your mouth and spoke to the Tolkiens, as  16:22:25

21    a director, that you were actually acting as a   16:22:30

22    lawyer and that every one of those statements were  16:22:34

23    privileged.                                      16:22:36

24              Do you recall we went through that?    16:22:36

25              MS. ESKENAZI:  Objection.  Misstates the  16:22:38
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 651

273

```
 1    testimony.  It's misleading.  Move to strike as        16:22:39

 2    argumentative.                                          16:22:42

 3    BY MR. PETROCELLI:                                      16:22:42

 4         Q.  Do you recall that?                            16:22:47

 5         A.  What I said was that I only spoke to the       16:22:47

 6    Tolkiens in my capacity as a solicitor.  I didn't       16:22:51

 7    reference privilege.                                    16:22:54

 8         Q.  Well, when you speak in your capacity as       16:22:55

 9    a -- as a solicitor, do you understand those are        16:22:57

10    conversations that are held in confidence by the        16:23:01

11    lawyer-client privilege?                                16:23:05

12         A.  In the U.K., yes.  I can't speak to the        16:23:09

13    U.S. law.                                               16:23:11

14         Q.  Well, let's just stick with the U.K. law,      16:23:12

15    then, okay?                                             16:23:14

16         A.  Okay.                                          16:23:14

17         Q.  You have an attorney-client privilege in       16:23:15

18    the U.K., right?                                        16:23:17

19         A.  Right.                                         16:23:20

20         Q.  And when you have confidential                 16:23:21

21    communications with your client about the giving of     16:23:24

22    legal advice, those are considered privileged?          16:23:25

23         MS. ESKENAZI:  Objection.  Calls for a             16:23:28

24    legal conclusion.                                       16:23:31

25         THE WITNESS:  Yes.                                 16:23:31
```

Maier, Steven (Final)

EXHIBIT C                                                  PAGE 652

274

| | | |
|---|---|---|
| 1 | BY MR. PETROCELLI: | 16:23:31 |

1    BY MR. PETROCELLI:                              16:23:31

2       Q.  Okay.  Now, let's -- you can work with that  16:23:32

3    definition, then.  That's apparently your         16:23:36

4    understanding of what it means to be privileged in 16:23:38

5    the U.K.                                          16:23:40

6           I want to go back now to your conversations 16:23:40

7    with Cathleen Blackburn.                          16:23:42

8           You would agree with me that not every     16:23:44

9    single one of your conversations with Cathleen    16:23:48

10   Blackburn is a privileged conversation, correct?  16:23:51

11   Let's start there.                                16:23:53

12      A.  I'm relying on the advice of counsel as to 16:23:54

13   what is privileged for these purposes.            16:23:57

14      Q.  Can you answer my question?                16:23:59

15      A.  I can't, other than that.                  16:24:00

16      Q.  That doesn't call for a privileged --      16:24:02

17      A.  It calls for a definition of privilege.    16:24:06

18      Q.  No, no, it does not, sir.                  16:24:07

19         MS. ESKENAZI:  It does.                      16:24:11

20         MR. PETROCELLI:  No, it does not.           16:24:11

21         MS. ESKENAZI:  Okay.                         16:24:12

22   BY MR. PETROCELLI:                                16:24:12

23      Q.  I'm applying your understanding and your   16:24:13

24   state of mind when you are having conversations.  16:24:15

25   I'm not asking for Bonnie Eskenazi's or an American 16:24:18

275

```
1    judge's view of privilege.  I'm asking for you, when    16:24:22

2    you're having conversations with your law partner,      16:24:26

3    fair to say that you understand that not every one      16:24:30

4    of those conversations is in your capacity as a         16:24:33

5    solicitor that would be protected by the U.K. laws      16:24:36

6    of privilege --                                         16:24:38

7            MS. ESKENAZI:  Objection.                       16:24:39

8    BY MR. PETROCELLI:                                      16:24:39

9        Q.  -- correct?                                     16:24:39

10           MS. ESKENAZI:  Objection.  Vague and            16:24:40

11   ambiguous.  Calls for a legal conclusion.              16:24:42

12           THE WITNESS:  Anything of a personal nature    16:24:44

13   would not be privileged.                               16:24:46

14   BY MR. PETROCELLI:                                     16:24:46

15       Q.  Well, what about the two of you are sitting    16:24:47

16   around talking about how -- how -- how -- what the     16:24:48

17   financial prospects are of your law business?          16:24:52

18   That's not a privilege to a particular client          16:24:56

19   either, correct?                                       16:24:58

20       A.  That's probably right.                         16:25:01

21       Q.  Okay.  So have you ever had a conversation     16:25:01

22   with Cathleen Blackburn on the subject of online       16:25:08

23   computer games?  Yes or no?                            16:25:11

24           MS. ESKENAZI:  Objection.  Are you -- to       16:25:13

25   the extent that those conversations took place in      16:25:15
```

276

```
 1    the context of this case with respect to the Tolkien   16:25:18

 2    Estate, it is privileged and --                        16:25:21

 3            MR. PETROCELLI:  I don't --                     16:25:21

 4            MS. ESKENAZI:  -- I'm going to instruct not     16:25:23

 5    to answer.                                              16:25:24

 6            MR. PETROCELLI:  I don't think that's           16:25:25

 7    privileged, the fact -- he can answer "yes," "no,"      16:25:26

 8    as to whether he had that -- any -- any such            16:25:28

 9    conversation.  And we can get into -- deeper into       16:25:31

10    the topic.                                              16:25:35

11            THE WITNESS:  Only in the context of this       16:25:36

12    litigation.                                             16:25:37

13    BY MR. PETROCELLI:                                      16:25:37

14       Q.  That's what your lawyer just said.               16:25:38

15       A.  That's what I just said.                         16:25:40

16       Q.  So this litigation started in November 2011      16:25:41

17    or '12.  What is it?  '12.  2012.                       16:25:47

18            Prior to November 2012, did you ever have a     16:25:50

19    discussion with Cathleen Blackburn about what           16:25:54

20    "online computer games" means?                          16:25:58

21            MS. ESKENAZI:  To the extent that you've        16:26:01

22    had conversations with Ms. Blackburn in the context     16:26:03

23    of this dispute with Warner and Zaentz on behalf of     16:26:06

24    the Tolkiens, I'm going to instruct you not to          16:26:13

25    answer.  Those conversations are privileged.            16:26:15
```

Maier, Steven (Final)

EXHIBIT C                                                    PAGE 655

277

| | | |
|---|---|---|
| 1 | BY MR. PETROCELLI: | 16:26:15 |
| 2 | Q.  So you can answer that, then. | 16:26:18 |
| 3 | A.  I can't answer. | 16:26:19 |
| 4 | Q.  I asked -- I asked -- it's a "yes" or "no" | 16:26:22 |
| 5 | question.  Prior to November '12, yes or no? | 16:26:25 |
| 6 | A.  I'm accepting the advice of my counsel. | 16:26:32 |
| 7 | MR. PETROCELLI:  Are you instructing him | 16:26:34 |
| 8 | not to answer that question? | 16:26:34 |
| 9 | MS. ESKENAZI:  We're going to take a break. | 16:26:41 |
| 10 | We're going to talk about the privilege. | 16:26:43 |
| 11 | MR. PETROCELLI:  Okay. | 16:26:44 |
| 12 | THE VIDEOGRAPHER:  Off the record at 4:26 | 16:26:46 |
| 13 | p.m. | 16:26:47 |
| 14 | (Brief recess.) | 16:29:06 |
| 15 | THE VIDEOGRAPHER:  We are back on the | 16:29:06 |
| 16 | record at 4:29 p.m. | 16:29:18 |
| 17 | BY MR. PETROCELLI: | 16:29:18 |
| 18 | Q.  I think where we left off, just to rewind | 16:29:21 |
| 19 | this a bit, was your conversations with Cathleen | 16:29:23 |
| 20 | Blackburn on the subject of online computer games, | 16:29:28 |
| 21 | whether you've had any conversations with her on | 16:29:34 |
| 22 | that subject prior to this lawsuit in November 2012. | 16:29:36 |
| 23 | MS. ESKENAZI:  And I'm going to allow the | 16:29:42 |
| 24 | witness to answer that question "yes" or "no," but I | 16:29:44 |
| 25 | do believe we are skirting privilege, given his | 16:29:47 |

Maier, Steven (Final)

EXHIBIT C                                    PAGE 656

278

```
 1   prior testimony.                                 16:29:49

 2   BY MR. PETROCELLI:                               16:29:49

 3        Q.  Okay.                                   16:29:51

 4        A.  Yes.                                     16:29:51

 5        Q.  Okay.  And when is the first time you had  16:29:52

 6   such a conversation?                             16:29:54

 7            MS. ESKENAZI:  You can answer when.     16:29:57

 8            THE WITNESS:  At some time after        16:29:58

 9   September or October 2010.                       16:30:02

10   BY MR. PETROCELLI:                               16:30:02

11        Q.  Okay.  And how many times have you had a  16:30:05

12   conversation with her between September or       16:30:09

13   October 2010 and the filing of this lawsuit in   16:30:12

14   November 2012?                                   16:30:15

15        A.  I don't recall.                         16:30:16

16        Q.  Approximately?                          16:30:18

17        A.  I don't recall.                         16:30:20

18        Q.  More than ten?                          16:30:22

19        A.  I don't know.                           16:30:24

20        Q.  More than one?                          16:30:24

21        A.  Probably.                               16:30:25

22        Q.  More than five?                         16:30:27

23        A.  Probably.                               16:30:29

24        Q.  More than ten?                          16:30:29

25        A.  I don't know.                           16:30:31
```

Maier, Steven (Final)

EXHIBIT C                                          PAGE 657

279

| | | |
|---|---|---|
| 1 | Q.  Between five and ten? | 16:30:31 |
| 2 | A.  I don't know. | 16:30:33 |
| 3 | Q.  Have you ever made a memo or note of any of | 16:30:34 |
| 4 | those discussions or written an e-mail about it? | 16:30:39 |
| 5 | A.  I don't believe so. | 16:30:42 |
| 6 | Q.  Do you know if she has? | 16:30:47 |
| 7 | MS. ESKENAZI:  Objection.  Calls for | 16:30:49 |
| 8 | speculation.  Lacks foundation. | 16:30:50 |
| 9 | THE WITNESS:  I don't know. | 16:30:52 |
| 10 | BY MR. PETROCELLI: | 16:30:52 |
| 11 | Q.  Have you ever seen such a memo or document | 16:30:54 |
| 12 | or e-mail from her on that subject? | 16:30:57 |
| 13 | MS. ESKENAZI:  I'll allow you to answer | 16:30:59 |
| 14 | that "yes" or "no" but I do believe it's skirting | 16:31:02 |
| 15 | attorney-client privileged communications. | 16:31:04 |
| 16 | THE WITNESS:  No. | 16:31:06 |
| 17 | BY MR. PETROCELLI: | 16:31:06 |
| 18 | Q.  Every -- is every -- every time you've had | 16:31:13 |
| 19 | such a conversation with her was in connection with | 16:31:16 |
| 20 | the Tolkien matters? | 16:31:18 |
| 21 | MS. ESKENAZI:  You can answer that "yes" | 16:31:20 |
| 22 | or "no." | 16:31:22 |
| 23 | THE WITNESS:  Yes. | 16:31:22 |
| 24 | BY MR. PETROCELLI: | 16:31:22 |
| 25 | Q.  And every time you had such a conversation | 16:31:24 |

Maier, Steven (Final)

EXHIBIT C                    PAGE 658

280

```
 1    with -- with Ms. Blackburn on the subject of online    16:31:26

 2    video games, you and she both charged for your time,    16:31:30

 3    charged --                                              16:31:36

 4          MS. ESKENAZI:  Objection.                         16:31:36

 5    BY MR. PETROCELLI:                                      16:31:36

 6      Q.  -- the client?                                    16:31:37

 7          MS. ESKENAZI:  Objection.  Relevance.             16:31:37

 8    Vague and ambiguous.                                    16:31:39

 9          THE WITNESS:  Well, I can't be precise that       16:31:43

10    that conversation was recorded there and then, but      16:31:45

11    in principle, yes.                                      16:31:47

12    BY MR. PETROCELLI:                                      16:31:47

13      Q.  Prior to September 2010, did you ever have        16:31:50

14    a conversation with anybody on the subject of online    16:31:56

15    video games?                                            16:31:59

16          MS. ESKENAZI:  Objection.  Vague and              16:32:01

17    ambiguous.                                              16:32:01

18    BY MR. PETROCELLI:                                      16:32:01

19      Q.  Or online computer games?                         16:32:03

20      A.  Not that I recall.                                16:32:05

21      Q.  Okay.  So prior to September 2010, you            16:32:10

22    never spoke to Cathleen Blackburn about your view       16:32:14

23    that an online computer game involved the purchase      16:32:18

24    of a disc or cartridge or device that gets inserted     16:32:21

25    into the computer?                                      16:32:25
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 659

281

```
 1          A.  I don't believe so.                    16:32:26

 2          Q.  And you -- and prior to that time did you   16:32:27

 3     ever have a written communication?  Prior to     16:32:30

 4     September 2010 did you ever have a written       16:32:33

 5     communication with Ms. Blackburn on that subject?   16:32:36

 6          A.  I don't believe so.                    16:32:39

 7          Q.  And prior to September 2010, had you ever   16:32:41

 8     communicated orally or in writing with anybody on   16:32:45

 9     the subject of -- of online computer games involves   16:32:49

10     the purchase of some disc or cartridge or other   16:32:55

11     physical device?                                 16:32:59

12          MS. ESKENAZI:  Objection to the extent it   16:33:00

13     calls for attorney-client privileged communication.   16:33:01

14          But you can answer.                         16:33:04

15          THE WITNESS:  I don't believe so.          16:33:05

16     BY MR. PETROCELLI:                               16:33:05

17          Q.  But you do believe that you had that view   16:33:11

18     prior to September 2010, correct?                16:33:13

19          A.  Yes.                                    16:33:13

20          Q.  Okay.  And is it your testimony that prior   16:33:28

21     to September 2010 you had no knowledge whatsoever   16:33:31

22     that an online computer game could be obtained,   16:33:40

23     accessed and/or played without purchasing a disc or   16:33:47

24     cartridge or other similar device?               16:33:52

25          MS. ESKENAZI:  Objection.  Vague and        16:33:57
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 660

282

| | | |
|---|---|---|
| 1 | ambiguous.  Compound. | 16:33:59 |
| 2 | THE WITNESS:  I had no knowledge that such | 16:34:01 |
| 3 | a game could be purchased or delivered without | 16:34:03 |
| 4 | buying physical media. | 16:34:05 |
| 5 | BY MR. PETROCELLI: | 16:34:05 |
| 6 | Q.  And by "physical media," you mean a disc or | 16:34:07 |
| 7 | a cartridge on which the contents of the game | 16:34:10 |
| 8 | appear? | 16:34:13 |
| 9 | A.  Yes. | 16:34:14 |
| 10 | Q.  Okay.  And you never looked into that | 16:34:18 |
| 11 | question at all? | 16:34:22 |
| 12 | MS. ESKENAZI:  Objection.  Vague and | 16:34:24 |
| 13 | ambiguous.  Asked and answered. | 16:34:26 |
| 14 | THE WITNESS:  Not until September, | 16:34:27 |
| 15 | October 2010. | 16:34:29 |
| 16 | BY MR. PETROCELLI: | 16:34:29 |
| 17 | Q.  And I'm focused on prior to September -- | 16:34:30 |
| 18 | A.  Okay. | 16:34:30 |
| 19 | Q.  -- 2010, okay? | 16:34:33 |
| 20 | You never looked into that? | 16:34:34 |
| 21 | A.  No. | 16:34:35 |
| 22 | Q.  So at the time when you formed this view | 16:34:36 |
| 23 | that it required a purchase of a device on which the | 16:34:38 |
| 24 | contents of the game were -- were contained, did you | 16:34:43 |
| 25 | do any research at all on -- in coming to that view? | 16:34:49 |

Maier, Steven (Final)

EXHIBIT C                                    PAGE 661

283

| | | |
|---|---|---|
| 1 | MS. ESKENAZI:  Objection.  Vague and | 16:34:54 |
| 2 | ambiguous. | 16:34:56 |
| 3 | THE WITNESS:  Well, as I said before, I | 16:34:56 |
| 4 | can't remember how I came to that view. | 16:34:58 |
| 5 | BY MR. PETROCELLI: | 16:34:58 |
| 6 | Q.  And so far as your testimony is concerned, | 16:35:00 |
| 7 | then, prior to 2010, you had that view but never | 16:35:04 |
| 8 | shared it with anyone, correct? | 16:35:09 |
| 9 | MS. ESKENAZI:  Objection.  Vague and | 16:35:11 |
| 10 | ambiguous.  Asked and answered. | 16:35:13 |
| 11 | THE WITNESS:  I can't recall if I ever | 16:35:14 |
| 12 | shared that view with anyone. | 16:35:15 |
| 13 | BY MR. PETROCELLI: | 16:35:15 |
| 14 | Q.  You can't identify anybody you ever shared | 16:35:17 |
| 15 | it with, correct? | 16:35:18 |
| 16 | A.  That's correct. | 16:35:21 |
| 17 | Q.  Did you say the Davis Wright & Tremaine | 16:35:21 |
| 18 | firm was involved in a case or matters involving | 16:35:58 |
| 19 | infringing copies of Tolkien books on -- that | 16:36:15 |
| 20 | appeared on Web sites? | 16:36:17 |
| 21 | MS. ESKENAZI:  Objection.  Misstates the | 16:36:19 |
| 22 | testimony. | 16:36:20 |
| 23 | BY MR. PETROCELLI: | 16:36:20 |
| 24 | Q.  Did you say something to that effect? | 16:36:22 |
| 25 | A.  Something to that effect. | 16:36:24 |

Maier, Steven (Final)

EXHIBIT C                                    PAGE 662

284

```
 1        Q.  Okay.  What time period was that, do you      16:36:25

 2   know?                                                  16:36:27

 3        A.  I would guess around 2008, 2009.              16:36:27

 4        Q.  Did you also say that involved file           16:36:53

 5   sharing?                                               16:36:56

 6            MS. ESKENAZI:  Objection.  Misstates the      16:36:57

 7   testimony.                                             16:36:58

 8            THE WITNESS:  If that's the correct           16:37:00

 9   expression.                                            16:37:01

10   BY MR. PETROCELLI:                                     16:37:01

11        Q.  I wrote those words down.  Do you know what   16:37:02

12   "file sharing" means?                                  16:37:04

13        A.  Well, what the case involved was a Web site   16:37:05

14   where members of the public post items and then        16:37:10

15   other members of the public can retrieve them.         16:37:14

16        Q.  What do you mean by "retrieve them"?          16:37:17

17   Download them?                                         16:37:18

18            MS. ESKENAZI:  Objection.                     16:37:20

19            THE WITNESS:  Download them.                  16:37:20

20   BY MR. PETROCELLI:                                     16:37:20

21        Q.  Okay.  And were you aware, prior to 2010,     16:37:23

22   whether books could be downloaded from a Web -- Web    16:37:28

23   site without going in and having to buy some           16:37:34

24   physical device, like in the case of games?            16:37:36

25        A.  Well, I can't recall when authorized books   16:37:43
```

Maier, Steven (Final)

EXHIBIT C                                          PAGE 663

285

```
 1    became available online, but the kind of sites that    16:37:46

 2    I described, people would post a PDF file, so it's     16:37:49

 3    not really a book, it was an infringing copy of a      16:37:52

 4    book.                                                  16:37:55

 5         Q.  Well, putting aside infringing,               16:37:55

 6    non-infringing, when did you become generally aware    16:37:57

 7    that people could obtain or access books without       16:37:59

 8    going into a bookstore to buy the book but by going    16:38:03

 9    online and downloading it onto a computer?             16:38:06

10         MS. ESKENAZI:  Objection.  Misstates the          16:38:09

11    testimony.  Vague and ambiguous.                       16:38:10

12         THE WITNESS:  I don't recall when I became        16:38:12

13    aware of that.                                         16:38:14

14    BY MR. PETROCELLI:                                     16:38:14

15         Q.  Was it before September 2010?                 16:38:15

16         A.  Yes.                                          16:38:16

17         Q.  You would have known it as of the time of     16:38:20

18    this lawsuit handled by Davis Wright & Tremaine?       16:38:22

19         A.  Well, I wouldn't characterize what the        16:38:29

20    infringer was doing as books.  They were photocopies   16:38:31

21    in PDF form.                                           16:38:35

22         Q.  Fair enough.  But I was just trying to use    16:38:37

23    that as a point of reference --                        16:38:39

24         A.  Right.                                        16:38:40

25         Q.  -- to establish timing of your knowledge.     16:38:41
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 664

286

```
 1    So I'm trying to -- I'm trying to get your best      16:38:43

 2    testimony, when you would have known about that      16:38:45

 3    capability, downloading a book without having to go  16:38:49

 4    and buy the book?                                    16:38:52

 5           MS. ESKENAZI:  Objection.  It misstates the   16:38:53

 6    testimony.  Vague and ambiguous.  Compound.          16:38:55

 7           THE WITNESS:  I'd have been aware of things    16:38:57

 8    like Kindle for some time, but I can't remember from 16:38:59

 9    when.                                                16:39:03

10    BY MR. PETROCELLI:                                   16:39:03

11        Q.  Have you downloaded books, used Kindle or    16:39:04

12    one of the other services?                           16:39:06

13        A.  I have.                                      16:39:07

14        Q.  Which ones have you used?                    16:39:10

15        A.  Kindle, and I've downloaded a book to my     16:39:11

16    iPad, which seems to be Apple's own system.          16:39:22

17        Q.  Well, that's --                              16:39:22

18        A.  I'm not exactly sure.                        16:39:24

19        Q.  iPad is relatively new, right, so --         16:39:25

20        A.  Right.                                       16:39:28

21        Q.  You never used an iPad before the last       16:39:29

22    couple of months, as I understand; is that right?    16:39:31

23        A.  Correct.                                     16:39:33

24        Q.  Okay.  But going back to Kindle, how long    16:39:34

25    have you had the Kindle?                             16:39:36
```

287

```
 1        A.  We bought an office Kindle two or three    16:39:39

 2   years ago.                                          16:39:51

 3        Q.  Is that the first time you've ever         16:39:52

 4   downloaded a book is two or three years ago?        16:39:54

 5        A.  Yeah.                                       16:39:57

 6        Q.  Okay.  Were you aware of downloading of    16:39:58

 7   books before two or three years ago?                16:40:02

 8        A.  Yes.                                        16:40:04

 9        Q.  Do your children download books?           16:40:04

10        A.  No.                                         16:40:06

11        Q.  Have you been involved in the course of    16:40:16

12   your career in any infringement actions involving   16:40:22

13   any kind of computer-related products?              16:40:25

14        MS. ESKENAZI:  Objection.  Vague and           16:40:28

15   ambiguous.                                          16:40:30

16        THE WITNESS:  Well, insofar as the one we      16:40:30

17   were just talking about was computer-related, I     16:40:34

18   guess so.                                           16:40:37

19   BY MR. PETROCELLI:                                  16:40:37

20        Q.  Which one was that?                         16:40:38

21        A.  The infringer putting books on a Web site. 16:40:39

22        Q.  Any -- any -- any other than that one?     16:40:42

23   Your resume talks -- I said "infringement actions," 16:40:48

24   right?  So the Internet-related cases that are      16:40:51

25   identified in your first bullet of your resume under 16:40:55
```

Maier, Steven (Final)

EXHIBIT C                                      PAGE 666

288

| | | |
|---|---|---|
| 1 | "Experience," were those infringement actions? | 16:40:58 |
| 2 | A.  When you say "infringement actions," the | 16:41:04 |
| 3 | vast majority of the work that I do doesn't involve | 16:41:06 |
| 4 | proceedings actually being issued.  It's dispute | 16:41:10 |
| 5 | resolution. | 16:41:13 |
| 6 | Q.  Okay. | 16:41:13 |
| 7 | A.  So I'm just not sure how you're -- | 16:41:14 |
| 8 | Q.  Fair enough. | 16:41:14 |
| 9 | A.  -- using the terminology. | 16:41:16 |
| 10 | Q.  Any -- any dispute related to computer | 16:41:16 |
| 11 | matters, computer products, the Internet, computer | 16:41:21 |
| 12 | technology? | 16:41:25 |
| 13 | MS. ESKENAZI:  Objection.  Compound. | 16:41:26 |
| 14 | BY MR. PETROCELLI: | 16:41:26 |
| 15 | Q.  Online.  Download.  Those concepts, I'm | 16:41:30 |
| 16 | trying to understand what the depth of your | 16:41:33 |
| 17 | experience is -- | 16:41:35 |
| 18 | A.  Right, right. | 16:41:35 |
| 19 | Q.  -- as a lawyer. | 16:41:36 |
| 20 | MS. ESKENAZI:  Objection.  Vague and | 16:41:37 |
| 21 | ambiguous.  Compound. | 16:41:38 |
| 22 | BY MR. PETROCELLI: | 16:41:38 |
| 23 | Q.  Can you -- can you share that with us? | 16:41:41 |
| 24 | A.  I will try to. | 16:41:44 |
| 25 | A number of cases involving electronic | 16:41:47 |

Maier, Steven (Final)

EXHIBIT C                                    PAGE 667

289

```
 1    books being sold on CD ROM on sites like eBay, and a    16:41:52

 2    number of cases where people, either for commercial     16:42:00

 3    profit or political motives, make the works of          16:42:06

 4    Tolkien available free to download from Web sites.      16:42:10

 5         Q.   What kind of works?  Books, you mean?         16:42:17

 6         A.   Yeah, The Lord of the Rings and The Hobbit.   16:42:19

 7    And --                                                  16:42:19

 8         Q.   Did you ever --                               16:42:19

 9         A.   -- other works.                               16:42:23

10         Q.   Did you ever hear of people downloading       16:42:23

11    from the Web site any games for free, you know,         16:42:26

12    infringers, without authorization, creating Web         16:42:31

13    sites where people could download games?                16:42:34

14         A.   I've never --                                 16:42:39

15              MS. ESKENAZI:  Objection.                     16:42:41

16              THE WITNESS:  -- come across that.             16:42:40

17    BY MR. PETROCELLI:                                      16:42:40

18         Q.   On the books --                               16:42:40

19              MS. ESKENAZI:  You guys need to wait.  You     16:42:41

20    ask the question, I object, you answer.                 16:42:43

21              Objection.  Vague and ambiguous.  Compound.   16:42:45

22    BY MR. PETROCELLI:                                      16:42:45

23         Q.   On the books, how far back does that          16:42:47

24    knowledge go, the downloading of -- of Tolkien books    16:42:50

25    from the Web sites?                                     16:43:00
```

Maier, Steven (Final)

EXHIBIT C                                           PAGE 668

290

```
 1        A.  That was the case I described earlier.        16:43:01

 2    Most of the cases have been sales of CDs with the     16:43:06

 3    books on them.                                        16:43:09

 4        Q.  In the course of your work doing cases or     16:43:11

 5    disputes related to either the Internet or any        16:43:22

 6    computer-related matters, have you ever worked with   16:43:26

 7    any computer experts or consultants or Internet       16:43:29

 8    consultants or people who have expertise in those     16:43:35

 9    areas?                                                16:43:37

10        MS. ESKENAZI:  Objection.  Vague and              16:43:37

11    ambiguous.  Compound.                                 16:43:39

12        THE WITNESS:  No.                                 16:43:40

13    BY MR. PETROCELLI:                                    16:43:40

14        Q.  What about other lawyers, and Davis           16:43:43

15    Wright & Tremaine, would you work with an attorney    16:43:46

16    there?                                                16:43:47

17        A.  Yes.                                          16:43:48

18        Q.  Who was that?                                 16:43:49

19        A.  I believe it was Lance Koonce.                16:43:52

20        Q.  How do you spell his name?                    16:43:54

21        A.  K-o-o-n-c-e.                                  16:43:56

22        Q.  When is the first time that you worked with   16:44:01

23    Greenberg Glusker?                                    16:44:05

24        A.  I don't recall.  I would guess it was         16:44:09

25    around 2003, 2004.                                    16:44:18
```

Maier, Steven (Final)

EXHIBIT C                                          PAGE 669

291

```
 1          Q.  Since that point in time, you've had        16:44:20

 2     regular -- well, withdrawn.                           16:44:24

 3          When is the first time you worked with           16:44:26

 4     Greenberg Glusker in connection with any matters      16:44:31

 5     related to the Tolkien Estate or the Tolkiens?        16:44:33

 6          A.  It's when the Tolkien Estate changed its     16:44:35

 7     U.S. attorneys from Loeb & Loeb to Greenberg          16:44:37

 8     Glusker.  I can't remember the exact date.  Around    16:44:41

 9     2007.                                                 16:44:44

10          Q.  And is -- before that switch of counsel,     16:44:47

11     you had had a relationship with the Greenberg firm    16:44:54

12     from 2003 to 2007?                                    16:44:57

13          A.  No, we had worked on one case.               16:44:59

14              (Pages 292 through 293 are

15              marked confidential and are bound

16              under separate cover.  The

17              nonconfidential portion of this

18              transcript continues on page 294.)

19

20

21

22

23

24

25
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 670

292

CONFIDENTIAL

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

293

CONFIDENTIAL

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

294

```
 1        Q.  And what about anybody -- what about      16:47:08

 2   Mr. Boose?  How long had you worked with him?      16:47:10

 3         MS. ESKENAZI:  Objection.  Assumes facts      16:47:12

 4   not in evidence.  Misstates the testimony.         16:47:13

 5         THE WITNESS:  I've only recently dealt with   16:47:17

 6   Mr. Boose on a matter that is not Tolkien-related.  16:47:19

 7   BY MR. PETROCELLI:                                  16:47:19

 8        Q.  What about Loeb?  Who did you work with at 16:47:24

 9   Loeb?                                               16:47:27

10        A.  The principal lawyer was Barry Slotnick in 16:47:30

11   New York.                                           16:47:37

12        Q.  Okay.  The various lawyers that you've     16:47:37

13   identified, did you understand they were            16:47:41

14   knowledgeable in matters related to intellectual    16:47:42

15   property rights?                                    16:47:45

16         MS. ESKENAZI:  Objection.  Vague and          16:47:50

17   ambiguous.                                          16:47:51

18         THE WITNESS:  Not in all cases.               16:47:52

19   BY MR. PETROCELLI:                                  16:47:52

20        Q.  Which one?                                 16:47:56

21        A.  Mr. Koonce I understood to be knowledgeable 16:47:56

22   in matters relating to intellectual property rights. 16:47:59

23        Q.  Have you identified all the American       16:48:02

24   lawyers with whom you have dealt with on any matters 16:48:06

25   related to either intellectual property rights or   16:48:09
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 673

295

```
 1    any computer-related issues?                      16:48:12

 2         A.  I think there was one other case.        16:48:16

 3         Q.  What was that?                            16:48:18

 4         A.  There was an infringer in Missouri selling  16:48:19

 5    infringing CD ROMS with the Tolkien works uploaded   16:48:29

 6    on them on eBay.  He did not respond to            16:48:32

 7    cease-and-desist letters, and we instructed a local  16:48:38

 8    lawyer in Missouri to put pressure on him.         16:48:42

 9         Q.  And who was that attorney?               16:48:45

10         A.  I recall that the attorney's name was Rick  16:48:47

11    Schnake.  I don't recall the name of the firm.    16:48:51

12         Q.  What year was that?                       16:48:52

13         A.  Four or five years ago.                   16:48:56

14         Q.  You -- you testified that the Estate wished  16:48:58

15    to be associated with books; the Estate did not wish  16:49:04

16    to be associated with any other activities,       16:49:11

17    including merchandising and film activities.       16:49:13

18         Do you recall that testimony?                 16:49:15

19         A.  I do.                                      16:49:15

20         Q.  Okay.  And you said that that was a matter  16:49:18

21    of public knowledge or public record.             16:49:20

22         Do you recall that?                           16:49:22

23         A.  I did say that.                            16:49:22

24         Q.  Yeah.  First of all, how do you know it was  16:49:27

25    a matter of public knowledge or public record?    16:49:31
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 674

296

```
1        A.  That's been my understanding from the time    16:49:33

2    that I started to do Tolkien work.  I can't tell you   16:49:36

3    how I came by that knowledge.                           16:49:39

4        Q.  And what is it -- what do you mean when you    16:49:40

5    say that the Estate does not wish to be associated     16:49:49

6    with merchandising and film activities?  What do you   16:49:53

7    mean by that?                                           16:49:59

8            MS. ESKENAZI:  Objection.  Vague and           16:50:00

9    ambiguous.                                              16:50:02

10           THE WITNESS:  The Estate believes that the     16:50:02

11   works of J.R.R. Tolkien should be enjoyed as works     16:50:06

12   of literature and doesn't want to be involved with     16:50:08

13   any other forms of exploitation as its present         16:50:12

14   policy.                                                 16:50:15

15   BY MR. PETROCELLI:                                      16:50:15

16       Q.  Who is the Estate?  Who -- who are those       16:50:16

17   people?                                                 16:50:19

18           MS. ESKENAZI:  Objection.  Asked and           16:50:20

19   answered.  Vague and ambiguous.                         16:50:22

20   BY MR. PETROCELLI:                                      16:50:22

21       Q.  Just give me their names.                       16:50:24

22       A.  The Tolkien Estate Limited and the Tolkien     16:50:26

23   Trust.                                                  16:50:29

24       Q.  But who are the people who have that view?     16:50:29

25           MS. ESKENAZI:  Well, objection.                16:50:32
```

Maier, Steven (Final)

EXHIBIT C                                      PAGE 675

297

```
 1              To the extent that you learned that       16:50:34

 2    information in attorney-client communications --    16:50:36

 3              MR. PETROCELLI:  You said it's a matter -- 16:50:36

 4              MS. ESKENAZI:  -- you need to carve that   16:50:39

 5    out.  To the extent you learned the information just 16:50:40

 6    generally, you're -- Mr. Petrocelli's entitled to   16:50:44

 7    it.                                                  16:50:49

 8              THE WITNESS:  The question of which members 16:50:51

 9    of the Estate held that view I think is going into  16:50:52

10    areas of privilege.                                  16:50:55

11    BY MR. PETROCELLI:                                   16:50:55

12       Q.  How do you know anybody holds that view?      16:50:57

13       A.  Well, I don't think I can discuss that        16:50:59

14    without revealing privileged information.            16:51:02

15       Q.  You said it's a matter of public knowledge    16:51:04

16    or public record.                                    16:51:07

17       A.  I did.                                         16:51:08

18       Q.  Are you saying that in connection with        16:51:09

19    that, the public record has never identified a       16:51:13

20    single Tolkien person who has expressed that view or 16:51:15

21    to whom that view has been attributed?               16:51:18

22              MS. ESKENAZI:  Objection.  Vague and       16:51:20

23    ambiguous.  Compound.                                16:51:21

24              THE WITNESS:  I don't know.  My belief is  16:51:22

25    that they generally refer to the Tolkien Estate.     16:51:24
```

Maier, Steven (Final)

EXHIBIT C                                          PAGE 676

298

```
 1    BY MR. PETROCELLI:                              16:51:24

 2        Q.  You do know the answer to my question,   16:51:28

 3    though, you are just declining to tell me, right?  16:51:30

 4        A.  I don't understand.                       16:51:33

 5            MS. ESKENAZI:  Objection.  Vague and      16:51:34

 6    ambiguous.                                         16:51:34

 7    BY MR. PETROCELLI:                                 16:51:34

 8        Q.  You do know which members of the Tolkien  16:51:35

 9    companies and trusts have this view?               16:51:39

10        A.  I do know which members have that view.   16:51:46

11        Q.  Do you -- and do you know which -- whether 16:51:48

12    there are any members who don't share that view?  16:51:50

13            MS. ESKENAZI:  Objection.  It --          16:51:53

14    BY MR. PETROCELLI:                                 16:51:53

15        Q.  You can answer that "yes" or "no."        16:51:56

16            MS. ESKENAZI:  -- invades the -- invades  16:51:58

17    the attorney-client privilege.                     16:51:59

18            MR. PETROCELLI:  Are you instructing him on 16:51:59

19    that?                                              16:52:01

20            MS. ESKENAZI:  I am.                       16:52:01

21              (Pages 299 through 306 are

22              marked confidential and are bound

23              under separate cover.  The

24              nonconfidential portion of this

25              transcript continues on page 307.)
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 677

299

CONFIDENTIAL

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

300

CONFIDENTIAL

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Maier, Steven (Final)

EXHIBIT C                    PAGE 679

301

CONFIDENTIAL

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

302

CONFIDENTIAL

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

303

CONFIDENTIAL

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

304

CONFIDENTIAL

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Maier, Steven (Final)

EXHIBIT C                                           PAGE 683

305

CONFIDENTIAL

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Maier, Steven (Final)

EXHIBIT C                                    PAGE 684

306

CONFIDENTIAL

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

307

```
 1          Q.  Right.  And just to be clear, if --      17:03:48

 2   withdrawn.  I'll move on.                           17:03:59

 3          Do you e-mail any of the Tolkiens?           17:04:16

 4      A.  No.                                          17:04:18

 5      Q.  Ever?                                        17:04:19

 6      A.  I once e-mailed Baillie Tolkien, who asked   17:04:19

 7   me a question about cars.                           17:04:29

 8          MS. ESKENAZI:  To the extent --              17:04:33

 9          THE WITNESS:  Un- -- unrelated to client     17:04:33

10   work.                                               17:04:35

11   BY MR. PETROCELLI:                                  17:04:35

12      Q.  I'm not interested in that.  Only time       17:04:35

13   you've e-mailed was to Baillie on cars?             17:04:39

14      A.  Yes.                                         17:04:41

15      Q.  And no one else?                             17:04:42

16      A.  I don't believe so.                          17:04:43

17      Q.  Do you communicate with anybody at           17:04:44

18   HarperCollins regarding the Tolkien matters?        17:04:52

19      A.  Yes.                                         17:04:55

20      Q.  And who?  Who do you communicate with and    17:04:57

21   who have you over the years?                        17:05:00

22          MS. ESKENAZI:  Objection.  Vague and         17:05:02

23   ambiguous and compound.                             17:05:04

24          THE WITNESS:  Principally Simon              17:05:06

25   Dowson-Collins, who is the general counsel.         17:05:10
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 686

308

```
 1    BY MR. PETROCELLI:                              17:05:12

 2        Q.  And before him?                         17:05:12

 3        A.  I don't recall there being anyone there 17:05:18

 4    before him.                                     17:05:20

 5        Q.  Was there an Adrian Laing, was it?      17:05:21

 6    "Laing"?  That -- did you ever communicate with that 17:05:25

 7    person?                                         17:05:28

 8        A.  No, I don't know him.                   17:05:28

 9        Q.  Okay.  Anybody else besides             17:05:29

10    Mr. Dowson-Collins?                             17:05:33

11        A.  Yes.                                    17:05:33

12        Q.  Who?                                    17:05:34

13        A.  There's a junior lawyer who works with him 17:05:36

14    whose name is Karly Last, L-a-s-t.              17:05:38

15        Q.  First name?  Karly?                     17:05:41

16        A.  Karly.                                  17:05:43

17        Q.  A woman?                                17:05:44

18        A.  Yes.                                    17:05:45

19        Q.  And do you e-mail either Ms. Last or    17:05:46

20    Mr. Dowson-Collins?                             17:05:56

21        A.  Yes.                                    17:05:57

22        Q.  And you e-mailed them while you were at the 17:06:04

23    Manches firm as well?                           17:06:06

24        A.  I don't think Ms. Last was there at that 17:06:10

25    time.                                           17:06:12
```

Maier, Steven (Final)

EXHIBIT C                                PAGE 687

309

```
 1        Q.  Dowson-Collins was, right?              17:06:12

 2        A.  Yes.                                    17:06:13

 3        Q.  Okay.  And you receive e-mails from him or  17:06:14

 4   her from time to time?                           17:06:16

 5        A.  Yes.                                    17:06:17

 6        Q.  At Manches, as well as your current firm,  17:06:18

 7   right?                                           17:06:23

 8        A.  Yes.                                    17:06:23

 9        Q.  And you -- you don't have any kind of   17:06:30

10   writing at all with HarperCollins that indicates  17:06:32

11   that you have a joint representation relationship  17:06:35

12   with them; is that right?                        17:06:40

13        MS. ESKENAZI:  Objection.  Misstates the    17:06:42

14   evidence.                                        17:06:43

15        THE WITNESS:  I would not be aware of that.  17:06:45

16   BY MR. PETROCELLI:                               17:06:45

17        Q.  You are not aware of that, right?       17:06:48

18        A.  What I meant to say was that if there is  17:06:51

19   one, Cathleen Blackburn would have that information,  17:06:53

20   not me.                                          17:06:55

21        Q.  But you don't know of any, correct?     17:06:56

22        A.  I don't know of any written agreement.  17:07:00

23        Q.  Okay.  Have you ever in the course of your  17:07:10

24   work done any checking on computer games, video  17:07:12

25   games, Internet-related games, that were out in the  17:07:23
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 688

310

```
 1   marketplace, so to speak, with respect to the        17:07:33

 2   Tolkiens?                                             17:07:36

 3          MS. ESKENAZI:  Objection.  Vague and           17:07:38

 4   ambiguous.  Compound.                                 17:07:40

 5          THE WITNESS:  I don't recall ever having       17:07:42

 6   dealt with a matter concerning games until            17:07:44

 7   September, October 2010.                              17:07:47

 8   BY MR. PETROCELLI:                                    17:07:47

 9      Q.  My question is broader.  I meant at any        17:07:49

10   point in time did you ever check or ask somebody      17:07:51

11   else to check what kind of uses with respect to       17:07:55

12   games are being made, whether they're online games,   17:07:58

13   video games, Internet games, anything like that that  17:08:04

14   you've done over the years prior to this dispute      17:08:08

15   in -- prior to September 2010?                        17:08:11

16      A.  No.                                            17:08:13

17      Q.  Do you gamble, by the way?                     17:08:13

18      A.  In a limited way.                              17:08:18

19      Q.  What does that mean?                           17:08:19

20      A.  I occasionally play online poker.  I           17:08:21

21   occasionally put a bet on a horse.                    17:08:25

22      Q.  How long have you been betting?                17:08:27

23      A.  I don't recall.                                17:08:29

24      Q.  Well, you -- you were gambling before          17:08:34

25   September 2010, right?                                17:08:37
```

Maier, Steven (Final)

EXHIBIT C                                        PAGE 689

311

```
 1        A.  Yes.                                17:08:37

 2             MS. ESKENAZI:  Object- --          17:08:37

 3    BY MR. PETROCELLI:                          17:08:37

 4        Q.  Okay.                               17:08:41

 5             MS. ESKENAZI:  Objection to this line of   17:08:41

 6    questioning as -- as irrelevant.            17:08:42

 7    BY MR. PETROCELLI:                          17:08:42

 8        Q.  When did you first begin gambling?  17:08:46

 9             MS. ESKENAZI:  Objection.  Relevance.   17:08:50

10             THE WITNESS:  I don't recall.      17:08:53

11    BY MR. PETROCELLI:                          17:08:53

12        Q.  Have you been gambling since 2000 -- the   17:08:56

13    year 2000?                                  17:09:01

14             MS. ESKENAZI:  Objection.  Relevance.   17:09:02

15             THE WITNESS:  Well, I'm not sure that "been   17:09:04

16    gambling" is a fair characterization.  I    17:09:06

17    occasionally have a bet, and more recently I've   17:09:08

18    occasionally played online poker.  I don't want to   17:09:11

19    sound as though I'm a regular gambler.      17:09:14

20    BY MR. PETROCELLI:                          17:09:14

21        Q.  I wasn't trying to characterize it.   17:09:19

22        A.  Thank you.                          17:09:20

23        Q.  I'm just trying to date it.         17:09:21

24        A.  Okay.                               17:09:23

25        Q.  So how far can we go back with -- with   17:09:27
```

312

```
 1   this?                                          17:09:29

 2       A.  I can't recall when I first placed a bet on  17:09:30

 3   a horse.                                       17:09:35

 4       Q.  When did you first --                  17:09:37

 5       A.  If that's the question.                17:09:39

 6       Q.  -- play online gambling?               17:09:40

 7       A.  You mean online poker?                 17:09:42

 8       Q.  Well, isn't that gambling?             17:09:45

 9       A.  Yeah.                                  17:09:47

10       Q.  Okay.  Yeah.  Online poker, then.      17:09:48

11           MS. ESKENAZI:  Objection.  Relevance.  17:09:50

12           THE WITNESS:  Perhaps two, three years ago.  17:09:59

13   BY MR. PETROCELLI:                             17:09:59

14       Q.  Have you ever been in a casino?        17:10:01

15       A.  Yes.                                   17:10:03

16           MS. ESKENAZI:  Objection.  Relevance.  17:10:04

17   BY MR. PETROCELLI:                             17:10:04

18       Q.  When is the first time you've been into --  17:10:05

19   in a casino?                                   17:10:07

20           MS. ESKENAZI:  Objection.  Relevance.  17:10:08

21           THE WITNESS:  I've been in a casino once  17:10:09

22   about 20 years ago.                            17:10:13

23   BY MR. PETROCELLI:                             17:10:13

24       Q.  Only time?                             17:10:16

25           MS. ESKENAZI:  Objection.  Relevance.  17:10:18
```

Maier, Steven (Final)

EXHIBIT C                                          PAGE 691

313

| | | |
|---|---|---|
| 1 | THE WITNESS:  As far as I can recall. | 17:10:20 |
| 2 | BY MR. PETROCELLI: | 17:10:20 |
| 3 | Q.  Have you ever played a slot machine? | 17:10:26 |
| 4 | MS. ESKENAZI:  Objection.  Relevance. | 17:10:28 |
| 5 | THE WITNESS:  I've played slot machines in | 17:10:30 |
| 6 | penny arcades at the Seaside. | 17:10:33 |
| 7 | BY MR. PETROCELLI: | 17:10:33 |
| 8 | Q.  Are those -- where are those located, in | 17:10:37 |
| 9 | the U.K.? | 17:10:44 |
| 10 | A.  Yes. | 17:10:45 |
| 11 | MS. ESKENAZI:  Objection.  Relevance. | 17:10:45 |
| 12 | BY MR. PETROCELLI: | 17:10:45 |
| 13 | Q.  And can you wager on them? | 17:10:46 |
| 14 | MS. ESKENAZI:  Same objection. | 17:10:47 |
| 15 | THE WITNESS:  Well, this is when I was a | 17:10:48 |
| 16 | kid.  You would put a two shilling or 10p coin in it | 17:10:51 |
| 17 | and pull a handle. | 17:10:56 |
| 18 | BY MR. PETROCELLI: | 17:10:57 |
| 19 | Q.  Have you done that consistently over the | 17:10:57 |
| 20 | years? | 17:11:00 |
| 21 | A.  No. | 17:11:00 |
| 22 | Q.  Just as a child? | 17:11:01 |
| 23 | MS. ESKENAZI:  Objection.  Relevance. | 17:11:03 |
| 24 | THE WITNESS:  Yes. | 17:11:04 |
| 25 | BY MR. PETROCELLI: | 17:11:04 |

Maier, Steven (Final)

EXHIBIT C                                    PAGE 692

314

```
1          Q.  You've never played a slot machine as an    17:11:08

2    adult?                                                  17:11:10

3          MS. ESKENAZI:  Objection.  Relevance.            17:11:11

4          THE WITNESS:  I may have.                         17:11:13

5    BY MR. PETROCELLI:                                      17:11:13

6          Q.  Do you know if Ms. Blackburn gambles?        17:11:18

7          MS. ESKENAZI:  Objection.  Rel- --               17:11:18

8          MR. PETROCELLI:  Don't tell me that's            17:11:22

9    privileged.                                             17:11:23

10         MS. ESKENAZI:  Objection.  Relevance.  And       17:11:23

11   calls for speculation.  Lacks foundation.              17:11:26

12   BY MR. PETROCELLI:                                      17:11:26

13         Q.  You can answer.                               17:11:31

14         A.  I know that Ms. Blackburn placed a bet on    17:11:32

15   the Grand National horse race for herself and for      17:11:35

16   her mother last year.  Beyond that, I have no          17:11:38

17   knowledge of any gambling on the part of               17:11:41

18   Ms. Blackburn.                                          17:11:44

19         Q.  Okay.  Let's look at a couple of documents.  17:11:57

20   Take a look at Exhibit 36, please.  It's a document    17:12:03

21   dated July 23, 2004.                                    17:12:19

22              (The document referred to was               17:12:05

23          marked for identification as                    17:12:05

24          Exhibit 36 and attached to this                 17:12:05

25          deposition.)                                     17:12:18
```

Maier, Steven (Final)

EXHIBIT C                                        PAGE 693

315

```
 1    BY MR. PETROCELLI:                              17:12:18

 2        Q.  Have you ever seen this document before?   17:12:36

 3    It's a letter to the director of licensing at    17:12:41

 4    Tolkien Enterprises in Berkeley, California      17:12:47

 5    regarding a massive multiplayer online role-playing  17:12:51

 6    game called The Two Towers based on the works of   17:12:55

 7    J.R.R. Tolkien.                                   17:12:58

 8        A.  I have no recollection of ever having seen  17:14:01

 9    this document.                                    17:14:03

10        Q.  When you started playing online poker, was  17:14:05

11    that before or after you discovered the online    17:14:13

12    Tolkien gambling game?                            17:14:17

13            MS. ESKENAZI:  Objection.  Relevance.    17:14:19

14            THE WITNESS:  I don't recall.             17:14:23

15    BY MR. PETROCELLI:                               17:14:23

16        Q.  When you played online poker, you didn't go  17:14:26

17    into a store to purchase a disc or cartridge, right?  17:14:28

18            MS. ESKENAZI:  Objection.  Relevance.    17:14:33

19            THE WITNESS:  That's correct.             17:14:35

20    BY MR. PETROCELLI:                               17:14:35

21        Q.  What computer did you use to -- when you   17:14:37

22    were gambling online?                             17:14:39

23        A.  My home computer.                         17:14:41

24        Q.  And what did you do, you just typed in the   17:14:42

25    name of an online poker site?                     17:14:46
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 694

316

| | | |
|---|---|---|
| 1 | A.  You go to their Web site. | 17:14:48 |
| 2 | Q.  Whose Web site? | 17:14:51 |
| 3 | MS. ESKENAZI:  Objection.  Relevance. | 17:14:51 |
| 4 | THE WITNESS:  I think it's PokerStars.  I'm | 17:14:53 |
| 5 | not sure. | 17:15:02 |
| 6 | BY MR. PETROCELLI: | 17:15:02 |
| 7 | Q.  When -- you say you're the one that got | 17:15:07 |
| 8 | this e-mail spam that led to the discovery of this | 17:15:10 |
| 9 | online slot machine game? | 17:15:13 |
| 10 | A.  Yes. | 17:15:16 |
| 11 | Q.  Okay.  Now, you got that e-mail spam | 17:15:18 |
| 12 | because you had already been playing online poker, | 17:15:19 |
| 13 | right? | 17:15:19 |
| 14 | MS. ESKENAZI:  Objection.  Assumes facts | 17:15:22 |
| 15 | not in evidence. | 17:15:25 |
| 16 | THE WITNESS:  That would not be the case. | 17:15:26 |
| 17 | BY MR. PETROCELLI: | 17:15:26 |
| 18 | Q.  Okay.  But you had been playing online | 17:15:28 |
| 19 | poker as of the time that you encountered the online | 17:15:29 |
| 20 | slot machine game, right? | 17:15:35 |
| 21 | A.  The -- | 17:15:35 |
| 22 | MS. ESKENAZI:  Objection.  Misstates the | 17:15:37 |
| 23 | testimony.  Misleading.  Assumes facts not in | 17:15:38 |
| 24 | evidence. | 17:15:41 |
| 25 | THE WITNESS:  The spam e-mail was received | 17:15:42 |

Maier, Steven (Final)

EXHIBIT C                                    PAGE 695

317

| | | |
|---|---|---|
| 1 | at my Manches work e-mail address. | 17:15:44 |
| 2 | BY MR. PETROCELLI: | 17:15:44 |
| 3 | Q.  That doesn't answer my question. | 17:15:49 |
| 4 | A.  Which was not the one used for online | 17:15:50 |
| 5 | poker. | 17:15:54 |
| 6 | Q.  I understand that.  But my question was | 17:15:54 |
| 7 | which came first, basically? | 17:15:57 |
| 8 | MS. ESKENAZI:  Objection.  Asked and | 17:15:59 |
| 9 | answered. | 17:15:59 |
| 10 | THE WITNESS:  I don't recall. | 17:16:00 |
| 11 | BY MR. PETROCELLI: | 17:16:00 |
| 12 | Q.  Do you have an account with that poker | 17:16:02 |
| 13 | company? | 17:16:06 |
| 14 | MS. ESKENAZI:  Objection.  Relevance. | 17:16:06 |
| 15 | THE WITNESS:  I do. | 17:16:08 |
| 16 | BY MR. PETROCELLI: | 17:16:08 |
| 17 | Q.  So there would be documents that would | 17:16:10 |
| 18 | establish when you opened up the account, right? | 17:16:12 |
| 19 | MS. ESKENAZI:  Objection.  Relevance. | 17:16:16 |
| 20 | Assumes facts not in evidence. | 17:16:17 |
| 21 | THE WITNESS:  I don't know what documents | 17:16:19 |
| 22 | there would be. | 17:16:20 |
| 23 | BY MR. PETROCELLI: | 17:16:20 |
| 24 | Q.  Credit card entries, things like that?  You | 17:16:23 |
| 25 | have to use a credit card, right? | 17:16:25 |

Maier, Steven (Final)

EXHIBIT C                    PAGE 696

318

```
 1            MS. ESKENAZI:  Objection.  Relevance.      17:16:27

 2            THE WITNESS:  I think that's right.        17:16:29

 3    BY MR. PETROCELLI:                                 17:16:29

 4       Q.  Do -- did you ever try the -- the -- the   17:16:33

 5    Tolkien online slot machine game?                  17:16:38

 6       A.  No.                                          17:16:42

 7       Q.  Do you know if Ms. Blackburn did?           17:16:44

 8            MS. ESKENAZI:  Objection --                 17:16:47

 9            THE WITNESS:  I don't believe --           17:16:48

10            MS. ESKENAZI:  -- calls for speculation.    17:16:50

11    Lacks foundation.                                  17:16:50

12            THE WITNESS:  I don't believe she did.     17:16:52

13    BY MR. PETROCELLI:                                 17:16:52

14       Q.  Okay.  Take a look at the next exhibit,     17:16:55

15    which is what?                                      17:16:58

16            MS. ESKENAZI:  37.                          17:16:58

17            (The document referred to was              17:16:58

18            marked for identification as               17:16:58

19            Exhibit 37 and attached to this            17:16:58

20            deposition.)                                17:17:02

21            MR. PETROCELLI:  July 23, '04 is Exhibit   17:17:02

22    36, right?                                          17:17:05

23            MS. ESKENAZI:  Yep.                         17:17:05

24            Thank you.                                  17:17:05

25    BY MR. PETROCELLI:                                 17:17:05
```

319

```
 1        Q.  I've placed in front of you an e-mail from    17:17:14

 2   Tom Magnani to yourself at the Manches e-mail          17:17:18

 3   address, with a copy to Carole Barrett and Annette     17:17:24

 4   Hurst and Fredrica Drotos dated Wednesday, August 4,   17:17:28

 5   2004 regarding Two Towers online -- online game        17:17:38

 6   letter.                                                17:17:41

 7        You don't have any reason to believe you          17:17:47

 8   didn't get this e-mail, correct?                       17:17:49

 9        A.  I don't recognize it, but it has my name at   17:17:55

10   the top and my e-mail address, so that would be        17:17:57

11   right.                                                 17:18:00

12        Q.  And you -- did you copy this e-mail and put    17:18:02

13   it in a file?                                          17:18:07

14        A.  I have no recollection of this e-mail.         17:18:08

15        Q.  Do you have any reason to believe that if     17:18:11

16   you received this, you did not cop- -- you did not     17:18:14

17   copy it and put it in a file or print it and put it    17:18:16

18   in a file?                                             17:18:20

19        A.  I have no reason to think that.                17:18:21

20        Q.  What file would you have put it in?            17:18:22

21        MS. ESKENAZI:  Objection.  Calls for              17:18:32

22   speculation.  Lacks foundation.  Assumes facts not     17:18:34

23   in evidence.                                           17:18:35

24        THE WITNESS:  I can't recall exactly what         17:18:35

25   filing system we had in 2004.                          17:18:41
```

Maier, Steven (Final)

EXHIBIT C                    PAGE 698

320

| | | |
|---|---|---|
| 1 | BY MR. PETROCELLI: | 17:18:41 |
| 2 | Q.  Okay.  When -- when you received this | 17:18:43 |
| 3 | e-mail, Exhibit 37 -- let me just read the first | 17:18:47 |
| 4 | couple of sentences: | 17:18:52 |
| 5 | "Dear Steven" -- that's | 17:18:53 |
| 6 | you -- "I've attached to this | 17:18:55 |
| 7 | e-mail a copy of a letter that Al | 17:18:57 |
| 8 | Bendich at SZC received recently." | 17:18:58 |
| 9 | SZC is Zaentz, correct? | 17:19:04 |
| 10 | A.  I imagine that's what it's referring to, | 17:19:07 |
| 11 | yes. | 17:19:07 |
| 12 | Q.  Continuing: | 17:19:09 |
| 13 | "As you will see, the letter | 17:19:09 |
| 14 | concerns a largely text-based | 17:19:11 |
| 15 | massively multiplayer online | 17:19:13 |
| 16 | role-playing game titled 'The Two | 17:19:16 |
| 17 | Towers.'  The game, which we are | 17:19:19 |
| 18 | told has been around for ten | 17:19:21 |
| 19 | years, has not been licensed by | 17:19:22 |
| 20 | SZC, nor, we presume, by the | 17:19:25 |
| 21 | Tolkien Estate.  We have not yet | 17:19:27 |
| 22 | investigated this particular | 17:19:33 |
| 23 | matter.  However, we wanted to | 17:19:34 |
| 24 | bring it to your attention because | 17:19:36 |
| 25 | it represents an area, like music, | 17:19:37 |

Maier, Steven (Final)

EXHIBIT C                                        PAGE 699

321

```
 1              that could benefit from a more         17:19:39

 2              focused enforcement effort,            17:19:41

 3              particularly in light of our           17:19:43

 4              existing massively multiplayer         17:19:43

 5              online game license with Vivendi       17:19:46

 6              Universal Games."                      17:19:48

 7         Now, when you received this e-mail and read 17:19:50

 8    it, did you understand it?                       17:19:54

 9        A.  I have no recollection of --             17:19:57

10              MS. ESKENAZI:  Objection.              17:19:57

11              THE WITNESS:  -- receiving this e-mail. 17:19:58

12              MS. ESKENAZI:  Objection.  Vague --    17:19:59

13    BY MR. PETROCELLI:                               17:19:59

14        Q.  You don't deny receiving it, do you?     17:20:00

15              MS. ESKENAZI:  Objection.  Vague and   17:20:02

16    ambiguous.  Assumes facts not in evidence.       17:20:03

17    BY MR. PETROCELLI:                               17:20:03

18        Q.  You don't deny receiving it, do you?     17:20:28

19        A.  I have no recollection of it.            17:20:30

20        Q.  But you're not denying it, are you?      17:20:31

21              MS. ESKENAZI:  Objection.  Asked and   17:20:33

22    answered.                                        17:20:34

23              THE WITNESS:  I can only tell you I don't 17:20:35

24    recognize it and I have no recollection of it.   17:20:37

25    BY MR. PETROCELLI:                               17:20:37
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 700

322

1          Q.  In 2004, when you received an e-mail in the     17:20:39

2    course of your work for the Tolkiens that had          17:20:41

3    reference to an online game, including an online       17:20:44

4    game license with Vivendi Universal, is it fair to     17:20:50

5    say that you would have understood the words used in    17:20:55

6    this letter?                                            17:20:58

7          MS. ESKENAZI:  Objection.  Vague and             17:20:58

8    ambiguous.                                              17:21:02

9          THE WITNESS:  I don't know.                       17:21:02

10         MS. ESKENAZI:  Calls for speculation.            17:21:03

11   Lacks foundation.                                       17:21:04

12   BY MR. PETROCELLI:                                      17:21:04

13         Q.  Well, did you call back and -- or write      17:21:05

14   back and say, "I don't understand what online means.   17:21:06

15   I've never heard of such a word before" or "Can you    17:21:09

16   please explain what online means?  Does it involve a   17:21:12

17   physical product?  Does it -- do you have to go into   17:21:14

18   the store?  I want to make sure."                       17:21:17

19         Did you -- do you recall doing any of those      17:21:18

20   things or asking any of those questions?               17:21:20

21         MS. ESKENAZI:  Objection.  Compound.  Vague      17:21:22

22   and ambiguous.  Assumes facts not in evidence.         17:21:25

23         THE WITNESS:  I have no recollection of          17:21:26

24   this e-mail or anything surrounding this e-mail.       17:21:28

25   BY MR. PETROCELLI:                                      17:21:28

Maier, Steven (Final)

EXHIBIT C                                    PAGE 701

323

| | | |
|---|---|---|
| 1 | Q.  Assuming you received this e-mail, and | 17:21:33 |
| 2 | there's no reason to believe you didn't, as you | 17:21:35 |
| 3 | previously testified, looking at it now, do you | 17:21:37 |
| 4 | believe that you would have inquired, in carrying | 17:21:40 |
| 5 | out your duties, whether the on game -- online game | 17:21:44 |
| 6 | license with Vivendi and Zaentz was one that | 17:21:47 |
| 7 | involved the purchase of a disc or -- or a cartridge | 17:21:53 |
| 8 | to confirm your understanding of what "online" | 17:22:00 |
| 9 | means? | 17:22:04 |
| 10 | A.  I would not -- | 17:22:05 |
| 11 | MS. ESKENAZI:  Objection.  Vague and | 17:22:05 |
| 12 | ambiguous.  Assumes facts not in evidence. | 17:22:06 |
| 13 | Compound. | 17:22:08 |
| 14 | THE WITNESS:  I would not have been aware | 17:22:09 |
| 15 | of the possibility of a game that didn't involve a | 17:22:12 |
| 16 | disc or cartridge. | 17:22:14 |
| 17 | BY MR. PETROCELLI: | 17:22:14 |
| 18 | Q.  Why is that? | 17:22:16 |
| 19 | A.  Because I wasn't aware of that possibility | 17:22:16 |
| 20 | until September, October 2010. | 17:22:20 |
| 21 | Q.  But you were aware that music could be | 17:22:22 |
| 22 | downloaded without a disc or a cartridge. | 17:22:24 |
| 23 | MS. ESKENAZI:  Objection.  Argumentative. | 17:22:28 |
| 24 | BY MR. PETROCELLI: | 17:22:28 |
| 25 | Q.  Correct? | 17:22:30 |

Maier, Steven (Final)

EXHIBIT C                                                    PAGE 702

324

```
 1        A.  I'm talking about my knowledge of games.    17:22:31

 2        Q.  I know.  But is -- do you have any basis    17:22:32

 3   for why you would have had this -- this bizarre      17:22:35

 4   interpretation, that games had to require a -- a     17:22:39

 5   disc or cartridge, but you did not have it with      17:22:43

 6   respect to music?                                    17:22:47

 7        MS. ESKENAZI:  Objection.  Argumentative.       17:22:49

 8   Mischaracterizes the testimony.  Misleading.         17:22:50

 9        MR. PETROCELLI:  I'll take out the word          17:22:53

10   "bizarre."  I'll re- -- I'll reask it --             17:22:55

11        MS. ESKENAZI:  Thank you.                        17:22:55

12        MR. PETROCELLI:  -- okay?                         17:22:57

13        Q.  Is there any reason why, in 2004, you --    17:22:58

14   you would have held -- you would have understood     17:23:01

15   that music could be downloaded without going into a  17:23:03

16   store and buying the music on a disc or a cartridge, 17:23:05

17   but a game could not be?  Do you recall having such  17:23:10

18   a distinction in your mind between music and games?  17:23:14

19        A.  I don't recall having addressed my mind to  17:23:18

20   that issue.                                          17:23:20

21        Q.  Is it -- are you certain, though, that when 17:23:23

22   you received this letter that you would have         17:23:29

23   understood that all the references to online games   17:23:33

24   required a physical disc or cartridge?  Is that a    17:23:40

25   certainty in your mind?                              17:23:45
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 703

325

| | | |
|---|---|---|
| 1 | MS. ESKENAZI:  Objection.  Vague and | 17:23:46 |
| 2 | ambiguous.  And assumes facts not in evidence. | 17:23:49 |
| 3 | Misleading.  Misstates the testimony. | 17:23:51 |
| 4 | THE WITNESS:  I'm certain that I wasn't | 17:23:56 |
| 5 | aware at that time that a game could be purchased | 17:23:57 |
| 6 | otherwise than by way of physical media. | 17:24:00 |
| 7 | BY MR. PETROCELLI: | 17:24:00 |
| 8 | Q.  Were you even prompted to ask that | 17:24:02 |
| 9 | question? | 17:24:07 |
| 10 | MS. ESKENAZI:  Objection.  Vague and | 17:24:08 |
| 11 | ambiguous. | 17:24:08 |
| 12 | THE WITNESS:  As I've told you, I have no | 17:24:10 |
| 13 | recollection of receiving this e-mail or any other | 17:24:12 |
| 14 | events surrounding it. | 17:24:14 |
| 15 | BY MR. PETROCELLI: | 17:24:14 |
| 16 | Q.  Were you -- if you -- assuming you did | 17:24:15 |
| 17 | receive it -- and because you have not produced it, | 17:24:17 |
| 18 | we have been prejudiced because I don't have the | 17:24:23 |
| 19 | ability now to confront you with the copy that's in | 17:24:26 |
| 20 | your files because it may have been destroyed or | 17:24:29 |
| 21 | spoliated or may be still sitting in your files, an | 17:24:32 |
| 22 | issue we will take up with the Court. | 17:24:36 |
| 23 | All that aside, do you believe you would | 17:24:37 |
| 24 | have at least inquired, asked a simple question or | 17:24:42 |
| 25 | wrote and said, "I want to be sure this is an online | 17:24:47 |

Maier, Steven (Final)

EXHIBIT C                                      PAGE 704

326

```
 1    game that's involving a physical device or        17:24:51

 2    cartridge"?                                        17:24:54

 3            MS. ESKENAZI:  Objection.  Move to strike  17:24:57

 4    all the colloquy as argumentative.  And it assumes 17:25:00

 5    facts not in evidence.  It's compound.  And it's   17:25:07

 6    vague and ambiguous.                               17:25:09

 7    BY MR. PETROCELLI:                                 17:25:09

 8        Q.  Put aside the colloquy.  Just answer the   17:25:11

 9    question.                                          17:25:13

10        A.  No, I do not believe I would have done     17:25:14

11    that.                                              17:25:16

12        Q.  Why not?                                   17:25:16

13        A.  Because I had no knowledge that games were 17:25:19

14    available otherwise than by way of --              17:25:23

15        Q.  But how would you --                       17:25:26

16        A.  -- physical media.                         17:25:25

17        Q.  -- even know they were available in the way 17:25:27

18    that you thought they were available?              17:25:29

19        A.  I don't recall.                            17:25:31

20            MS. ESKENAZI:  Objection.  Vague and       17:25:31

21    ambiguous.                                         17:25:31

22    BY MR. PETROCELLI:                                 17:25:31

23        Q.  How would you have had such a clear certain 17:25:33

24    belief about something that you apparently did     17:25:35

25    nothing to investigate?                            17:25:38
```

Maier, Steven (Final)

EXHIBIT C                    PAGE 705

327

```
 1          MS. ESKENAZI:  Objection.  Vague and      17:25:42

 2   ambiguous.                                        17:25:42

 3          THE WITNESS:  I don't recall.              17:25:45

 4   BY MR. PETROCELLI:                                17:25:46

 5      Q.  How do you know that games could even be -- 17:25:46

 6   were even available on a disc or a cartridge?  How 17:25:48

 7   did you even know that?                           17:25:50

 8      A.  I don't recall.                            17:25:53

 9      Q.  Did you ever go into a game store and --   17:25:54

10   and check it out and see how games are purchased and 17:25:56

11   in what kind of form they come?  Did you do that?  17:25:59

12      A.  I have been in a game store; not for the   17:26:05

13   purpose of checking out the form of games.        17:26:07

14      Q.  But when you were in a game store, was it  17:26:09

15   before September of 2010?                         17:26:10

16      A.  Yes.                                        17:26:11

17      Q.  When is the first time you've been in a    17:26:12

18   store that sold computer games?                   17:26:14

19          MS. ESKENAZI:  Objection.  Vague and      17:26:19

20   ambiguous.                                        17:26:19

21   BY MR. PETROCELLI:                                17:26:19

22      Q.  When is the first time in your life you've 17:26:20

23   been in a store that sold computer games?         17:26:23

24      A.  I don't recall.                            17:26:25

25          MS. ESKENAZI:  Objection.  Vague and      17:26:26
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 706

328

```
 1    ambiguous.                                          17:26:26

 2    BY MR. PETROCELLI:                                  17:26:26

 3        Q.  When is the first time -- did you ever buy  17:26:27

 4    a computer game for your kids, for example, or      17:26:28

 5    yourself?                                           17:26:29

 6        A.  Yes.                                         17:26:30

 7        Q.  When is the first time you did that?         17:26:31

 8        A.  I don't recall.                              17:26:33

 9        Q.  Okay.  Do your kids play computer games      17:26:37

10    online, with other people online?                   17:26:39

11            MS. ESKENAZI:  Objection.  Relevance.       17:26:43

12            THE WITNESS:  I don't know what kind of      17:26:44

13    games my kids play.                                 17:26:45

14    BY MR. PETROCELLI:                                  17:26:45

15        Q.  Have you ever asked a salesperson whether,   17:26:48

16    you know, if you buy this game, can you play online  17:26:50

17    with other people and have you ever had             17:26:52

18    conversations with how computer games go with       17:26:54

19    computer games salespeople?                         17:26:56

20        A.  No.                                         17:26:58

21        Q.  Okay.  Is it possible, sir, that the reason  17:27:02

22    why you have this clear definite view that the      17:27:04

23    computer games online have to involve a physical    17:27:10

24    cartridge or disc is because you think that's       17:27:16

25    helpful to your client's interpretation of the      17:27:21
```

Maier, Steven (Final)

EXHIBIT C                                          PAGE 707

329

```
1    merchandising agreement?                          17:27:25

2           MS. ESKENAZI:  Objection.                  17:27:26

3    BY MR. PETROCELLI:                                17:27:26

4       Q.  Do you think that's a possibility?         17:27:28

5           MS. ESKENAZI:  Objection.  Argumentative.  17:27:29

6           THE WITNESS:  No.                           17:27:31

7    BY MR. PETROCELLI:                                17:27:31

8       Q.  Well, at the time that you formed this view 17:27:33

9    that computer games had to involve a physical,    17:27:37

10   tangible disc or cartridge, you were aware of the 17:27:42

11   provision in the 1969 merchandising agreement in  17:27:47

12   schedule D that contained the words "article of   17:27:52

13   tangible personal property," correct?             17:27:57

14          MS. ESKENAZI:  Objection.  Vague and        17:28:01

15   ambiguous.                                         17:28:02

16          THE WITNESS:  I don't believe that's        17:28:05

17   correct.                                           17:28:05

18   BY MR. PETROCELLI:                                17:28:05

19      Q.  When is the first time that you became      17:28:06

20   aware that there was a contract involving the      17:28:08

21   Zaentz -- involving the Tolkien Estate that had    17:28:13

22   those words in it, "article of tangible personal   17:28:19

23   property"?                                         17:28:22

24      A.  I don't recall.                            17:28:24

25      Q.  Did you know about that before September    17:28:24
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 708

330

```
 1    2010?                                              17:28:29

 2        A.  Yes.                                       17:28:29

 3        Q.  Okay.  Is it fair to say that you've known 17:28:34

 4    that that wording was in the operative agreement   17:28:36

 5    during the 2000 time frame?                        17:28:43

 6        A.  I believe that wording was in those        17:28:45

 7    agreements, yes.                                   17:28:48

 8        Q.  You had knowledge that the wording was in  17:28:49

 9    the agreement from about the time you started      17:28:51

10    working on Tolkien matters, correct?               17:28:54

11        A.  No, I don't recall when I was first aware  17:28:57

12    of that particular provision.                      17:28:59

13        Q.  Well, you were aware of it by year 2000,   17:29:00

14    correct?                                           17:29:00

15            MS. ESKENAZI:  Objection.  Misstates the   17:29:04

16    evidence.  Misleading.                             17:29:05

17            THE WITNESS:  No.                          17:29:06

18    BY MR. PETROCELLI:                                 17:29:06

19        Q.  When -- what year is your best estimate    17:29:09

20    when you first became aware that there was any     17:29:11

21    contractual language involving the Zaentzes that   17:29:15

22    contained that language?                           17:29:18

23            MS. ESKENAZI:  Objection.  Vague and       17:29:20

24    ambiguous.                                         17:29:22

25            THE WITNESS:  I don't recall when I first  17:29:22
```

Maier, Steven (Final)

EXHIBIT C                                          PAGE 709

331

| | | |
|---|---|---|
| 1 | became aware of that. | 17:29:24 |
| 2 | BY MR. PETROCELLI: | 17:29:24 |
| 3 | Q.  Was it before or after 2004? | 17:29:25 |
| 4 | A.  I don't recall. | 17:29:30 |
| 5 | Q.  So it's your testimony that -- by the way, | 17:29:30 |
| 6 | do you believe that, as you've been giving your | 17:29:34 |
| 7 | testimony today, that an online computer game that | 17:29:37 |
| 8 | has a physical component like a disc or storage -- a | 17:29:42 |
| 9 | disc or a cartridge on which the game contents are | 17:29:48 |
| 10 | stored, do you believe that's a -- an article of | 17:29:50 |
| 11 | tangible personal property? | 17:29:54 |
| 12 | A.  I'm sorry, please, would you repeat the | 17:29:58 |
| 13 | question. | 17:29:59 |
| 14 | Q.  Yes. | 17:30:00 |
| 15 | THE WITNESS:  Would you read it back. | 17:30:00 |
| 16 | (The reporter read the record | 17:30:00 |
| 17 | as follows: | 17:30:00 |
| 18 | "QUESTION:  So it's your | 17:29:31 |
| 19 | testimony that -- by the way, do | 17:29:31 |
| 20 | you believe that, as you've been | 17:29:34 |
| 21 | giving your testimony today, that | 17:29:36 |
| 22 | an online computer game that has a | 17:29:39 |
| 23 | physical component like a disc or | 17:29:43 |
| 24 | storage -- a disc or a cartridge | 17:29:46 |
| 25 | on which the game contents are | 17:29:49 |

Maier, Steven (Final)

EXHIBIT C                                          PAGE 710

332

| 1 | stored, do you believe that's an | 17:29:50 |
| 2 | article of tangible personal | 17:29:54 |
| 3 | property?") | 17:29:55 |
| 4 | MS. ESKENAZI:  Objection.  Vague and | 17:30:16 |
| 5 | ambiguous. | 17:30:18 |
| 6 | THE WITNESS:  I believe that the disc -- | 17:30:18 |
| 7 | MS. ESKENAZI:  And calls for a legal | 17:30:20 |
| 8 | conclusion. | 17:30:21 |
| 9 | THE WITNESS:  I believe that the disc or | 17:30:21 |
| 10 | cartridge is an article of tangible personal | 17:30:25 |
| 11 | property. | 17:30:27 |
| 12 | BY MR. PETROCELLI: | 17:30:27 |
| 13 | Q.  So you believe such a video game or | 17:30:28 |
| 14 | computer game would be authorized by the license, | 17:30:29 |
| 15 | right? | 17:30:29 |
| 16 | MS. ESKENAZI:  Objection.  Calls for a | 17:30:33 |
| 17 | legal conclusion. | 17:30:34 |
| 18 | THE WITNESS:  If it's purchased by way of | 17:30:35 |
| 19 | physical media. | 17:30:38 |
| 20 | BY MR. PETROCELLI: | 17:30:38 |
| 21 | Q.  So the answer to my question is yes, | 17:30:41 |
| 22 | correct?  It would be authorized by the license | 17:30:44 |
| 23 | agreement, right? | 17:30:46 |
| 24 | MS. ESKENAZI:  Same objection. | 17:30:47 |
| 25 | THE WITNESS:  If it's purchased by way of | 17:30:48 |

Maier, Steven (Final)

EXHIBIT C                                    PAGE 711

333

```
 1    physical media.                                      17:30:49

 2    BY MR. PETROCELLI:                                   17:30:49

 3        Q.  What if it's rented?                         17:30:51

 4            MS. ESKENAZI:  Objection.  Vague and         17:30:53

 5    ambiguous.                                           17:30:53

 6    BY MR. PETROCELLI:                                   17:30:53

 7        Q.  What if you went into the game store and    17:30:54

 8    rented it?  You're saying it wouldn't be covered by  17:30:56

 9    the license?                                         17:30:58

10        A.  I would need to review the license as to    17:30:59

11    rentals.                                             17:31:01

12        Q.  So the -- what -- what do you mean by        17:31:02

13    "physical media"?  Suppose it's just a box with a -- 17:31:11

14    with a code inside the box and you go into your      17:31:16

15    computer and type in the code and get the game that  17:31:19

16    way?  Is that covered?                               17:31:22

17        A.  I'm not --                                   17:31:23

18            MS. ESKENAZI:  Objection.  Vague and         17:31:23

19    ambiguous.  Calls for a legal conclusion.            17:31:24

20            THE WITNESS:  I'm not aware of games of      17:31:25

21    that nature.                                         17:31:28

22    BY MR. PETROCELLI:                                   17:31:28

23        Q.  So what did you mean?  You mean like a -- a  17:31:30

24    full -- where the disc or cartridge has the whole    17:31:32

25    software for the game on it?                         17:31:35
```

Maier, Steven (Final)

EXHIBIT C                                              PAGE 712

334

```
 1          MS. ESKENAZI:  Objection.  Vague and        17:31:38

 2   ambiguous.                                          17:31:39

 3          THE WITNESS:  That in order to install the   17:31:42

 4   game on your computer, you need to start with       17:31:46

 5   physical media such as a disc or cartridge.         17:31:50

 6   BY MR. PETROCELLI:                                  17:31:50

 7      Q.  Now, where did you get that notion from?     17:31:53

 8      A.  That's how I understood it worked.           17:31:55

 9      Q.  What worked?                                 17:31:57

10      A.  How you played a game on your computer.      17:32:00

11      Q.  And you understand that's the only way a     17:32:01

12   computer game could be played, correct?            17:32:04

13          MS. ESKENAZI:  Objection.  Relevance.        17:32:06

14   Misstates the evidence.  Misleading.                17:32:07

15   BY MR. PETROCELLI:                                  17:32:07

16      Q.  Until September --                           17:32:11

17          MS. ESKENAZI:  Vague and --                  17:32:11

18   BY MR. PETROCELLI:                                  17:32:11

19      Q.  -- 2010 --                                   17:32:12

20          MS. ESKENAZI:  Vague and ambiguous.          17:32:12

21   BY MR. PETROCELLI:                                  17:32:12

22      Q.  -- you understood that's the only way a      17:32:13

23   human being could play a computer game, is they had 17:32:14

24   to go into a store and they had to somehow obtain   17:32:18

25   some physical media, as you put it, like a disc or a 17:32:21
```

335

```
 1    cartridge, and then take it home and then put it      17:32:28

 2    into a computer, correct?                             17:32:30

 3         A.  Well, I didn't say they had to go into a     17:32:33

 4    store, but the rest of the question, yes, correct.    17:32:35

 5         Q.  Well, how else are they going to get it?     17:32:38

 6         A.  Well, they could buy it from Amazon, for     17:32:40

 7    example.                                              17:32:40

 8         Q.  Okay.  So they had -- someone had to bring   17:32:42

 9    it into their home, carry it in their home, mailman   17:32:43

10    or a friend or themselves, but it had to be          17:32:47

11    physically transported to their house or to their    17:32:49

12    place of use, correct?                               17:32:52

13         MS. ESKENAZI:  Objection.  It's vague and       17:32:57

14    ambiguous.  Compound.                                17:32:57

15    BY MR. PETROCELLI:                                   17:32:57

16         Q.  Right?                                       17:32:58

17         A.  That was my understanding.                   17:32:58

18         Q.  And yet you can't give us -- and you         17:32:59

19    haven't been able to tell us at all how you somehow  17:33:03

20    derived that understanding, correct?                 17:33:06

21         MS. ESKENAZI:  Well, vague and ambiguous.        17:33:08

22    Objection.                                           17:33:09

23         THE WITNESS:  I don't --                         17:33:09

24         MS. ESKENAZI:  Misstates the testimony.          17:33:12

25         THE WITNESS:  I don't know how or when I         17:33:14
```

Maier, Steven (Final)

EXHIBIT C                                          PAGE 714

336

```
 1    derived that understanding.                    17:33:17

 2    BY MR. PETROCELLI:                             17:33:17

 3        Q.  And you're unable to give us any details,  17:33:18

 4    any information, anything whatsoever about how you  17:33:20

 5    derived that, when you derived that and so forth,  17:33:23

 6    correct?                                       17:33:23

 7        MS. ESKENAZI:  Same objections.            17:33:27

 8    BY MR. PETROCELLI:                             17:33:27

 9        Q.  Correct?                               17:33:29

10        A.  Correct.                               17:33:29

11        Q.  Okay.  Now, that understanding that you  17:33:31

12    cannot explain how you derived, happens to be  17:33:34

13    exactly what you believe the merchandising agreement  17:33:39

14    calls for, correct?                            17:33:46

15        MS. ESKENAZI:  Objection.  Misstates the  17:33:48

16    testimony.  Vague and ambiguous.  Calls for a legal  17:33:50

17    conclusion.  Argumentative.                    17:33:52

18        THE WITNESS:  Well, no, I'm not linking the  17:33:55

19    two things in my mind.                         17:33:58

20    BY MR. PETROCELLI:                             17:33:59

21        Q.  It's a coincidence, though, that your view,  17:33:59

22    your -- this sort of immaculate interpretation that  17:34:02

23    you have of the -- of -- of a computer game happens  17:34:07

24    to fit the definition that you give to articles of  17:34:13

25    personal -- tangible personal property in the  17:34:19
```

Maier, Steven (Final)

EXHIBIT C                                   PAGE 715

337

| | | |
|---|---|---|
| 1 | merchandising agreement, correct? | 17:34:21 |
| 2 | MS. ESKENAZI:  Objection.  Argumentative. | 17:34:22 |
| 3 | Calls for a legal conclusion.  Vague and ambiguous. | 17:34:27 |
| 4 | Misstates the testimony. | 17:34:29 |
| 5 | THE WITNESS:  Until September, | 17:34:32 |
| 6 | October 2010, my understanding was that games came | 17:34:36 |
| 7 | on physical media. | 17:34:40 |
| 8 | BY MR. PETROCELLI: | 17:34:42 |
| 9 | Q.  Well, let's be clear about something. | 17:34:43 |
| 10 | Whenever this agreement was created back in 1969, | 17:34:45 |
| 11 | and it used the words "articles of personal"  -- | 17:34:49 |
| 12 | "tangible personal property," you would agree these | 17:34:53 |
| 13 | computer games that you've been describing, with | 17:34:57 |
| 14 | discs and cartridges containing the contents, they | 17:35:02 |
| 15 | didn't exist in 1969, to your knowledge, correct? | 17:35:05 |
| 16 | A.  I can't remember when the first consoles | 17:35:12 |
| 17 | appeared, but I think that's right, they wouldn't | 17:35:14 |
| 18 | have existed -- | 17:35:16 |
| 19 | Q.  Right. | 17:35:16 |
| 20 | A.  -- in 1969. | 17:35:16 |
| 21 | Q.  Right.  And you have no evidence that when | 17:35:17 |
| 22 | the folks signed that agreement in 1969, that they | 17:35:19 |
| 23 | had in mind this precise definition of "computer | 17:35:22 |
| 24 | games" that you're describing, correct? | 17:35:25 |
| 25 | MS. ESKENAZI:  Objection.  Calls for | 17:35:28 |

Maier, Steven (Final)

EXHIBIT C                                    PAGE 716

338

```
 1    speculation.                                    17:35:29

 2    BY MR. PETROCELLI:                              17:35:29

 3        Q.  You would agree that that didn't happen,  17:35:30

 4    right?                                          17:35:30

 5        A.  I don't know --                         17:35:30

 6            MS. ESKENAZI:  Calls for speculation.   17:35:32

 7    Lacks foundation.                               17:35:33

 8            THE WITNESS:  I don't know what the folks  17:35:35

 9    had in mind.                                    17:35:37

10    BY MR. PETROCELLI:                              17:35:37

11        Q.  Okay.  But you would agree that given that  17:35:39

12    these games did not even exist in 1969, that's not  17:35:41

13    even possible, is it?                           17:35:44

14            MS. ESKENAZI:  Objection.  Calls for    17:35:45

15    speculation.  Lacks foundation.                17:35:47

16            THE WITNESS:  I don't know what the folks  17:35:48

17    had in mind.                                    17:35:49

18    BY MR. PETROCELLI:                              17:35:49

19        Q.  Well, but you can use your common sense and  17:35:51

20    everything you do know, and that informs your view  17:35:53

21    that no -- no such distinctions about computer games  17:35:56

22    were being made in 1969, correct?              17:35:59

23        A.  I don't know.                           17:36:03

24        Q.  Well, do you have any reason to believe it  17:36:04

25    was?                                            17:36:09
```

339

| | | |
|---|---|---|
| 1 | MS. ESKENAZI:  Objection.  Calls for | 17:36:09 |
| 2 | speculation.  Lacks foundation. | 17:36:10 |
| 3 | THE WITNESS:  I'm sorry.  Do I have any -- | 17:36:12 |
| 4 | BY MR. PETROCELLI: | 17:36:12 |
| 5 | Q.  Yes. | 17:36:12 |
| 6 | THE WITNESS:  -- reason to believe -- | 17:36:13 |
| 7 | BY MR. PETROCELLI: | 17:36:14 |
| 8 | Q.  Do you have reason to believe that when -- | 17:36:15 |
| 9 | when the parties signed the agreements in 1969 | 17:36:16 |
| 10 | containing the words "articles of personal tangible | 17:36:18 |
| 11 | property," that at that time the parties were | 17:36:21 |
| 12 | specifically contemplating that one day if computer | 17:36:24 |
| 13 | games come along, the only computer games that are | 17:36:27 |
| 14 | going to be covered by this language are those | 17:36:30 |
| 15 | contained in some physical box or disc or cartridge | 17:36:32 |
| 16 | but not those that are downloadable only?  Do you | 17:36:38 |
| 17 | believe that folks actually discussed that and | 17:36:43 |
| 18 | contemplated those sorts of distinctions back in | 17:36:45 |
| 19 | 1969? | 17:36:48 |
| 20 | A.  I have no idea. | 17:36:48 |
| 21 | MS. ESKENAZI:  Objection.  Vague and | 17:36:49 |
| 22 | ambiguous. | 17:36:49 |
| 23 | BY MR. PETROCELLI: | 17:36:49 |
| 24 | Q.  Well, do you have any -- do you have an | 17:36:50 |
| 25 | idea that they did not because nobody ever heard of | 17:36:51 |

Maier, Steven (Final)

EXHIBIT C                    PAGE 718

340

```
 1    such things back in 1969?  Would you agree with      17:36:52

 2    that?                                                 17:36:56

 3        A.  I don't have an idea that they did or that    17:36:58

 4    they did not.  I don't know.                          17:37:00

 5        Q.  You can rule out that they did -- that they   17:37:01

 6    did, because such things didn't exist in 1969,        17:37:04

 7    correct?                                              17:37:04

 8        A.  I don't know what the state of knowledge      17:37:08

 9    was in 1969.                                          17:37:10

10        Q.  So you think they might have existed in       17:37:11

11    1969?                                                 17:37:13

12        A.  I don't know.  I can't help with this.        17:37:14

13        Q.  Do you have any information that it did       17:37:16

14    exist in 1969?                                        17:37:17

15        A.  Not as I sit here today.                      17:37:19

16        Q.  Okay.  Now, at some point you looked at       17:37:23

17    the -- the merchandising agreement and saw "articles  17:37:30

18    of personal" -- "tangible" -- "tangible personal      17:37:32

19    property" referenced there, right?  We've gone over   17:37:36

20    that, correct?                                        17:37:38

21        A.  At some time I saw that --                    17:37:40

22        Q.  Right.                                        17:37:41

23        A.  -- yes.                                        17:37:41

24        Q.  And there came a time when you realized       17:37:41

25    that with respect to computer games, that definition  17:37:47
```

Maier, Steven (Final)

EXHIBIT C                                                    PAGE 719

341

```
 1    happened to match exactly your view of computer     17:37:51

 2    games.                                              17:37:54

 3            When did that happen?                       17:37:55

 4            MS. ESKENAZI:  Objection.  Vague and        17:37:56

 5    ambiguous.  Assumes facts not in evidence.  Calls   17:37:58

 6    for a legal conclusion.                             17:38:00

 7            THE WITNESS:  No, I never had that          17:38:01

 8    recognition.                                        17:38:03

 9    BY MR. PETROCELLI:                                  17:38:03

10        Q.  So is it a pure coincidence that your       17:38:06

11    understanding of -- of how computer games worked    17:38:08

12    until September 2010 happened to be exactly what you 17:38:11

13    think the merchandising agreement requires?         17:38:14

14            MS. ESKENAZI:  Objection.  Calls for        17:38:17

15    speculation.  Vague and ambiguous.  Assumes facts   17:38:22

16    not in evidence.  Calls for a legal conclusion.     17:38:23

17    Misstates the evidence.                             17:38:24

18            THE WITNESS:  What you characterize as a    17:38:28

19    coincidence is simply two factual things.           17:38:29

20    BY MR. PETROCELLI:                                  17:38:29

21        Q.  What are the two factual things?            17:38:35

22            THE WITNESS:  Would you read back the       17:38:39

23    previous question.                                  17:38:40

24              (The reporter read the record             17:38:40

25            as follows:                                 17:38:40
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 720

342

```
 1              "QUESTION:  So is it a pure          17:38:06

 2         coincidence that your                     17:38:07

 3         understanding of how computer             17:38:08

 4         games worked until September 2010         17:38:10

 5         happened to be exactly what you           17:38:12

 6         think the merchandising agreement         17:38:14

 7         requires?")                               17:38:16

 8         THE WITNESS:  I -- I really don't         17:38:54

 9    understand the question.                       17:38:54

10    BY MR. PETROCELLI:                             17:38:54

11         Q.  You -- you believe that downloadable-only   17:38:59

12    games are or are not covered by the merchandising    17:39:07

13    agreement?                                     17:39:09

14         MS. ESKENAZI:  Objection.  Calls for a    17:39:11

15    legal conclusion.                              17:39:12

16         THE WITNESS:  That is the position taken by   17:39:14

17    the Tolkien Estate in this litigation.         17:39:16

18    BY MR. PETROCELLI:                             17:39:16

19         Q.  What is the position?  That they are --   17:39:18

20         A.  Downloadable games --                 17:39:20

21         Q.  -- or are not?                        17:39:20

22         A.  -- are not included.                  17:39:21

23         Q.  Okay.

24         THE REPORTER:  That the what games?

25         MR. PETROCELLI:  "Are not included."
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 721

343

| | | |
|---|---|---|
| 1 | THE WITNESS:  "Downloadable." | |
| 2 | THE REPORTER:  Thank you. | |
| 3 | BY MR. PETROCELLI: | |
| 4 | Q.  And the reason that position is being | 17:39:28 |
| 5 | asserted is the view that downloadable-only games do | 17:39:29 |
| 6 | not constitute articles of tangible personal | 17:39:32 |
| 7 | property, correct? | 17:39:37 |
| 8 | A.  Correct. | 17:39:37 |
| 9 | MS. ESKENAZI:  Objection.  Calls for a -- | 17:39:38 |
| 10 | BY MR. PETROCELLI: | 17:39:38 |
| 11 | Q.  And the reason why -- | 17:39:39 |
| 12 | MS. ESKENAZI:  -- legal conclusion. | 17:39:39 |
| 13 | BY MR. PETROCELLI: | 17:39:39 |
| 14 | Q.  -- the position is being taken that they | 17:39:40 |
| 15 | don't constitute articles of tangible personal | 17:39:42 |
| 16 | property is because there's no disc or cartridge | 17:39:45 |
| 17 | that's being purchased that contains the contents of | 17:39:52 |
| 18 | the game, correct? | 17:39:55 |
| 19 | MS. ESKENAZI:  Objection.  Calls for a | 17:39:59 |
| 20 | legal conclusion. | 17:40:00 |
| 21 | THE WITNESS:  Correct. | 17:40:02 |
| 22 | BY MR. PETROCELLI: | 17:40:02 |
| 23 | Q.  Okay.  And so games that are | 17:40:05 |
| 24 | downloadable-only that don't involve the purchase of | 17:40:11 |
| 25 | a disc or a cartridge the Estate says are not | 17:40:15 |

344

```
 1    covered, right?                                  17:40:19

 2           MS. ESKENAZI:  Objection.  Calls for a    17:40:20

 3    legal conclusion.                                17:40:23

 4           THE WITNESS:  Right.                       17:40:23

 5    BY MR. PETROCELLI:                               17:40:23

 6       Q.  Because the Estate has asserted that such 17:40:24

 7    games don't -- don't include or involve an article 17:40:26

 8    of tangible personal property, correct?          17:40:29

 9           MS. ESKENAZI:  Same objection.            17:40:32

10           THE WITNESS:  Correct.                    17:40:34

11    BY MR. PETROCELLI:                               17:40:34

12       Q.  Okay.  Now, when -- when did the Estate   17:40:36

13    make that decision?                              17:40:49

14           MS. ESKENAZI:  Objection.  Attorney-client 17:40:49

15    privileged communication.                        17:40:50

16    BY MR. PETROCELLI:                               17:40:50

17       Q.  When?  When?  When was that idea born, that 17:40:51

18    downloadable-only doesn't involve an article of  17:40:56

19    tangible personal property?                      17:40:59

20           MS. ESKENAZI:  Same objection.            17:41:03

21           To the extent that you received that      17:41:06

22    information from the clients, it's               17:41:08

23    attorney-client --                               17:41:16

24           MR. PETROCELLI:  It's a "when" question.  17:41:19

25           MS. ESKENAZI:  -- privileged information. 17:41:17
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 723

345

```
 1            THE REPORTER:  "It's attorney-client

 2    privileged"?

 3            MS. ESKENAZI:  It's attorney-client

 4    privileged information.

 5            THE WITNESS:  Would you read back the

 6    question, please.

 7                (The reporter read the record

 8            as follows:

 9                "QUESTION:  When?  When was        17:40:52

10            that idea born, that                  17:40:53

11            downloadable-only doesn't involve     17:40:57

12            an article of tangible personal       17:40:59

13            property?")                           17:41:00

14            THE WITNESS:  I don't understand the  17:41:34

15    characterization that the idea was born.     17:41:35

16    BY MR. PETROCELLI:                            17:41:35

17        Q.  What don't you understand about it?  When  17:41:38

18    was that position first formed?              17:41:42

19        A.  In September, October 2010, the state --  17:41:45

20    the Estate became aware that Zaentz and/or Warner  17:41:49

21    were asserting the rights to license        17:41:55

22    downloadable-only games, which the Estate concluded  17:41:59

23    was contrary to the terms of the license agreement.  17:42:05

24        Q.  Did you so conclude?                 17:42:07

25        A.  Yes, I did.                          17:42:08
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 724

346

| | | |
|---|---|---|
| 1 | MS. ESKENAZI:  Objection. | 17:42:12 |
| 2 | Attorney-client -- | 17:42:12 |
| 3 | BY MR. PETROCELLI: | 17:42:12 |
| 4 | Q.  How -- | 17:42:12 |
| 5 | MS. ESKENAZI:  -- privilege. | 17:42:13 |
| 6 | BY MR. PETROCELLI: | 17:42:13 |
| 7 | Q.  How did you do it? | 17:42:13 |
| 8 | MS. ESKENAZI:  Well, objection.  Work | 17:42:16 |
| 9 | product. | 17:42:18 |
| 10 | To the extent that you were analyzing this | 17:42:20 |
| 11 | as a lawyer, it calls for attorney work product | 17:42:23 |
| 12 | information and it's privileged. | 17:42:29 |
| 13 | BY MR. PETROCELLI: | 17:42:29 |
| 14 | Q.  What did you -- what did you do?  You | 17:42:30 |
| 15 | simply looked at the words "articles of personal" -- | 17:42:32 |
| 16 | "tangible personal property" and concluded that | 17:42:36 |
| 17 | downloadable-only doesn't fit that definition?  Was | 17:42:40 |
| 18 | that what you did? | 17:42:43 |
| 19 | MS. ESKENAZI:  Same instruction.  Same | 17:42:45 |
| 20 | objection.  If you want to take a short break, maybe | 17:42:46 |
| 21 | we can cut through this. | 17:42:51 |
| 22 | MR. PETROCELLI:  Yeah, I don't think you | 17:42:52 |
| 23 | should be blocking him on this.  But why don't | 17:42:53 |
| 24 | you -- why don't you take a break, sort it out. | 17:42:55 |
| 25 | MS. ESKENAZI:  Why don't we do that. | 17:42:56 |

347

| | | |
|---|---|---|
| 1 | THE VIDEOGRAPHER:  This is the end of media | 17:42:58 |
| 2 | number 5.  Off the record at 5:42 p.m. | 17:43:00 |
| 3 | (Brief recess.) | 17:43:43 |
| 4 | THE VIDEOGRAPHER:  We are back on the | 17:53:52 |
| 5 | record at 5:54 p.m. and this is the beginning of | 17:53:59 |
| 6 | media number 6.  Counsel may proceed. | 17:54:03 |
| 7 | MS. ESKENAZI:  Okay.  So we're going to let | 17:54:06 |
| 8 | the witness answer this one question to the extent | 17:54:09 |
| 9 | that's a stipulation that by -- by virtue of | 17:54:12 |
| 10 | answering this question, he's not going to be | 17:54:15 |
| 11 | waiving the attorney-client privilege or the work | 17:54:17 |
| 12 | product privilege. | 17:54:20 |
| 13 | MR. PETROCELLI:  That's fine. | 17:54:21 |
| 14 | MS. ESKENAZI:  Okay. | 17:54:23 |
| 15 | BY MR. PETROCELLI: | 17:54:23 |
| 16 | Q.  So the question I put to you is what you | 17:54:24 |
| 17 | did to make the judgment that a downloadable-only | 17:54:28 |
| 18 | game wasn't an article of tangible personal | 17:54:33 |
| 19 | property? | 17:54:34 |
| 20 | A.  I consulted with the Estate's U.S. counsel | 17:54:37 |
| 21 | and reviewed the words of the contract. | 17:54:40 |
| 22 | Q.  Ms. Eskenazi? | 17:54:41 |
| 23 | A.  Yes. | 17:54:45 |
| 24 | Q.  Anyone else? | 17:54:45 |
| 25 | MS. ESKENAZI:  Objection.  Vague and | 17:54:53 |

Maier, Steven (Final)

EXHIBIT C                                              PAGE 726

348

| | | |
|---|---|---|
| 1 | ambiguous. | 17:54:53 |
| 2 | THE WITNESS:  My contact was with | 17:54:55 |
| 3 | Ms. Eskenazi. | 17:54:57 |
| 4 | BY MR. PETROCELLI: | 17:54:58 |
| 5 | Q.  Did you consult with anyone else besides | 17:54:58 |
| 6 | her? | 17:55:01 |
| 7 | A.  I don't recall. | 17:55:01 |
| 8 | Q.  And to look at the contract, you looked at | 17:55:02 |
| 9 | the words I just said, right, "articles of tangible | 17:55:09 |
| 10 | personal property," right? | 17:55:12 |
| 11 | MS. ESKENAZI:  Objection.  Vague and | 17:55:13 |
| 12 | ambiguous.  Misstates the evidence. | 17:55:13 |
| 13 | THE WITNESS:  The clause refers to the | 17:55:15 |
| 14 | manufacture, I think, of articles of tangible | 17:55:19 |
| 15 | personal property.  But that's the clause in | 17:55:20 |
| 16 | question. | 17:55:23 |
| 17 | BY MR. PETROCELLI: | 17:55:23 |
| 18 | Q.  Are you attaching some significance now to | 17:55:23 |
| 19 | the word "manufacture"? | 17:55:26 |
| 20 | A.  Well, all the words have significance. | 17:55:29 |
| 21 | Q.  Isn't it more than manufacture?  Is it | 17:55:32 |
| 22 | manufacture, sale or distribution or words to that | 17:55:34 |
| 23 | effect? | 17:55:36 |
| 24 | A.  I think that's right. | 17:55:37 |
| 25 | Q.  Okay.  So you -- how did you then decide -- | 17:55:39 |

Maier, Steven (Final)

EXHIBIT C                                      PAGE 727

349

```
 1    when you looked at the words, you concluded that      17:55:43

 2    "downloadable-only" didn't -- didn't meet that        17:55:48

 3    definition?                                           17:55:52

 4          MS. ESKENAZI:  Objection.  It misstates the     17:55:53

 5    testimony and this is --                              17:55:55

 6    BY MR. PETROCELLI:                                    17:55:55

 7       Q.  Were you able --                               17:55:55

 8          MS. ESKENAZI:  -- this is starting to get       17:55:55

 9    into more of work product.                            17:55:57

10          MR. PETROCELLI:  Let me rephrase the            17:55:58

11    question.                                             17:55:58

12          MS. ESKENAZI:  Okay.                            17:55:58

13    BY MR. PETROCELLI:                                    17:55:58

14       Q.  Were you able to look at the definition        17:56:00

15    and -- and -- before consulting with Ms. Eskenazi,    17:56:03

16    were you able to make an opinion yourself, just       17:56:06

17    looking at the words, was it clear to you that it     17:56:10

18    didn't include a downloadable-only game?              17:56:14

19          MS. ESKENAZI:  Objection.  Assumes facts        17:56:18

20    not in evidence.  It's compound and misstates the     17:56:21

21    witness' testimony.                                   17:56:24

22          THE WITNESS:  It did not appear to me on a      17:56:24

23    common sense basis to meet that definition.          17:56:26

24    BY MR. PETROCELLI:                                    17:56:28

25       Q.  Was it clear?  Was the language -- in          17:56:28
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 728

1    your -- in your view, was the language of the          17:56:30

2    contract clear in that regard?                          17:56:31

3            MS. ESKENAZI:  Objection.  Calls for a           17:56:34

4    legal conclusion.  Attorney-client privileged            17:56:35

5    communication.  Work product.  And this is --            17:56:37

6            MR. PETROCELLI:  You have -- you have a --        17:56:41

7    you have a running no -- no waiver agreement.            17:56:42

8            MS. ESKENAZI:  I think this gets into the         17:56:47

9    essence of work product.                                 17:56:49

10           MR. PETROCELLI:  I believe that, by the          17:56:50

11   way, that Ms. Blackburn answered these questions.        17:56:52

12           MS. ESKENAZI:  I actually don't think so,         17:56:54

13   Dan.                                                     17:56:56

14           MR. PETROCELLI:  I think I did.  I think I       17:56:56

15   asked her a lot more than these.                         17:56:58

16       Q.  But in any event, that's my question to          17:56:59

17   you.                                                     17:57:05

18           MS. ESKENAZI:  Again --                          17:57:05

19   BY MR. PETROCELLI:                                        17:57:05

20       Q.  I don't purport to remember.                     17:57:06

21           MS. ESKENAZI:  -- to the extent -- to the        17:57:08

22   extent you're agreeing not to allow this to be a         17:57:09

23   waiver of attorney-client privilege or attorney work     17:57:11

24   product, I'll let him answer this one question.          17:57:13

25           MR. PETROCELLI:  Please.                          17:57:15

351

```
 1              THE WITNESS:  It's my personal view on a      17:57:15
 2    common-sense definition that that was the case.        17:57:17
 3    BY MR. PETROCELLI:                                     17:57:17
 4        Q.  Now, when you -- when you formed that view,    17:57:20
 5    what did you understand that "downloadable" meant?     17:57:27
 6              MS. ESKENAZI:  Objection.  Vague and          17:57:32
 7    ambiguous.                                             17:57:32
 8              THE WITNESS:  I understood at that time       17:57:33
 9    that Zaentz and Warner were asserting the right to     17:57:35
10    license games that didn't involve a physical          17:57:40
11    purchase.                                              17:57:43
12    BY MR. PETROCELLI:                                     17:57:43
13        Q.  What do you understand "downloadable"          17:57:45
14    meant, "downloadable-only"?                            17:57:48
15        A.  In that context I --                           17:57:49
16        Q.  Yes.                                           17:57:50
17        A.  -- understood it to mean games that did not    17:57:51
18    involve a physical purchase.                           17:57:53
19        Q.  Okay.  But they did involve a article of       17:57:54
20    tangible personal property, correct?                   17:57:58
21              MS. ESKENAZI:  Objection.  Vague and          17:58:02
22    ambiguous.                                             17:58:02
23              THE WITNESS:  No.                             17:58:03
24    BY MR. PETROCELLI:                                     17:58:03
25        Q.  Why not?                                       17:58:05
```

352

```
 1        A.  Because there was no physical product.      17:58:05

 2        Q.  Well, the -- the game was somewhere, wasn't  17:58:10

 3   it?  In a downloadable-only situation, the game has  17:58:14

 4   to be somewhere for people to access it and          17:58:19

 5   transport it into their -- into their computers so   17:58:22

 6   they can play it, right?                             17:58:26

 7        MS. ESKENAZI:  Objection.  Assumes facts         17:58:28

 8   not in evidence.                                     17:58:29

 9        THE WITNESS:  I couldn't see how you would       17:58:31

10   meet the definition of "tangible" without a physical 17:58:32

11   product.                                             17:58:35

12   BY MR. PETROCELLI:                                   17:58:35

13        Q.  Well, the -- the -- the company -- you       17:58:37

14   understood there was a company, in this case,        17:58:41

15   Turbine, for example, for LOTRO, that made the game, 17:58:42

16   right?                                               17:58:46

17        MS. ESKENAZI:  Objection.                        17:58:46

18   BY MR. PETROCELLI:                                   17:58:47

19        Q.  Somebody had to make the game.  It didn't   17:58:47

20   just magically show up one day.  You understood      17:58:49

21   that, right, someone had to manufacture the game,    17:58:51

22   correct?                                             17:58:51

23        MS. ESKENAZI:  Objection.  Assumes facts         17:58:54

24   not in evidence.  Vague and ambiguous.  Compound.    17:58:54

25        THE WITNESS:  I was aware that computer          17:59:01
```

Maier, Steven (Final)

EXHIBIT C                                          PAGE 731

353

```
 1    games had developers.                            17:59:02

 2    BY MR. PETROCELLI:                               17:59:02

 3        Q.  Okay.  Someone developed and created the  17:59:04

 4    game, correct?                                   17:59:05

 5        A.  Yes.                                     17:59:05

 6        Q.  Well, how do you believe the public got  17:59:07

 7    access to the game in a downloadable-only situation?  17:59:09

 8        A.  I believe it's transferred from one       17:59:12

 9    computer server to another.                      17:59:23

10        Q.  And how did it get on the server?        17:59:25

11            MS. ESKENAZI:  Objection.  Assumes facts  17:59:31

12    not in evidence.                                 17:59:33

13            THE WITNESS:  By way of download.        17:59:34

14    BY MR. PETROCELLI:                               17:59:34

15        Q.  Okay.  And you don't believe a -- a server  17:59:37

16    is -- is a item of tangible personal property?   17:59:40

17            MS. ESKENAZI:  Objection.  Vague and     17:59:45

18    ambiguous.                                       17:59:49

19            THE WITNESS:  I don't understand the     17:59:49

20    question.  There's no server being sold in this  17:59:49

21    instance.                                        17:59:51

22    BY MR. PETROCELLI:                               17:59:51

23        Q.  Well, who is talking about selling now?  17:59:52

24    You're adding -- we're -- I'm focusing on tangible  17:59:54

25    personal property.                               17:59:57
```

Maier, Steven (Final)

EXHIBIT C                                          PAGE 732

354

```
 1          You indicated before that in the case of      17:59:58

 2    going into a store, you're buying some kind of       18:00:01

 3    physical product, right, a cartridge, a disc.        18:00:05

 4          Are you with me so far?                        18:00:10

 5      A.  Yeah.                                           18:00:10

 6      Q.  Okay.  Instead of a physical cartridge or      18:00:11

 7    disc -- you understand the actual plastic cartridge  18:00:14

 8    or disc is not the game.  You understand that the    18:00:17

 9    game -- the game -- that's a method of storing or    18:00:19

10    containing the game, the disc or the cartridge,      18:00:24

11    correct?                                             18:00:28

12          MS. ESKENAZI:  Objection.  Misstates the       18:00:29

13    evidence.  Assumes facts not in evidence.  Calls for 18:00:30

14    an expert opinion.                                   18:00:33

15          THE WITNESS:  I believe that the physical      18:00:35

16    media contains software.                             18:00:38

17    BY MR. PETROCELLI:                                   18:00:38

18      Q.  Okay.  And -- and why is a server any          18:00:41

19    different than the physical media that contains the  18:00:45

20    software in the -- that you go into a store and can  18:00:49

21    find in the form of a disc or a cartridge?           18:00:54

22          MS. ESKENAZI:  Objection.  Asked and           18:00:55

23    answered.                                            18:00:56

24          You can answer again.                          18:00:57

25          THE WITNESS:  I'm sorry, I'm confused.  No     18:00:57
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 733

355

```
 1    one is buying or selling a server.              18:00:59

 2    BY MR. PETROCELLI:                              18:00:59

 3        Q.  So, in your view -- well, they are buying   18:01:01

 4    the game, though, correct?                      18:01:04

 5            MS. ESKENAZI:  Objection.               18:01:06

 6    BY MR. PETROCELLI:                              18:01:06

 7        Q.  When they download it on the computer,  18:01:07

 8    correct?                                        18:01:07

 9            MS. ESKENAZI:  Objection.  Vague and    18:01:09

10    ambiguous.  Compound.                           18:01:10

11    BY MR. PETROCELLI:                              18:01:10

12        Q.  You understood that, right?  These --   18:01:11

13        A.  Yeah.                                   18:01:11

14        Q.  -- are not free games, right?           18:01:12

15        A.  Yes.                                    18:01:12

16        Q.  So you go into a store and you buy the  18:01:14

17    game.  You buy the game, which is software that 18:01:16

18    appears on a particular type of storage device, 18:01:20

19    namely a disc or a cartridge.  You -- you agree 18:01:22

20    that's covered, right?                          18:01:25

21            MS. ESKENAZI:  Objection.  Vague and    18:01:27

22    ambiguous.  Compound.                           18:01:29

23    BY MR. PETROCELLI:                              18:01:29

24        Q.  Right?                                  18:01:34

25        A.  Yes.                                    18:01:34
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 734

356

```
 1        Q.  On the other hand, if you buy the game, the    18:01:35

 2   software of which appears on some central server,       18:01:38

 3   which itself is a physical object, you don't believe    18:01:44

 4   that's covered, correct?                                18:01:46

 5        A.  Correct.                                       18:01:49

 6           MS. ESKENAZI:  Objection.                       18:01:49

 7   BY MR. PETROCELLI:                                      18:01:49

 8        Q.  Okay.  And with respect to that distinction    18:01:50

 9   between those two, you're able to arrive at that        18:01:53

10   conclusion, that one is covered and one is not,         18:01:59

11   merely by looking at the words on the contract?         18:02:01

12           MS. ESKENAZI:  Misstates the evidence.          18:02:04

13           THE WITNESS:  My conclusion was that            18:02:09

14   without a physical item, there was no article of        18:02:10

15   tangible personal property.                             18:02:13

16   BY MR. PETROCELLI:                                      18:02:13

17        Q.  And -- but the physical item you have in       18:02:15

18   mind is not the software that consists of the game.     18:02:17

19   The physical item you have in mind is the container     18:02:20

20   for the software, correct?                              18:02:23

21           MS. ESKENAZI:  Objection.  Misstates the        18:02:25

22   evidence.  Assumes facts not in evidence.               18:02:26

23   Misleading.                                             18:02:31

24           THE WITNESS:  I think I can resolve this        18:02:32

25   very quickly by saying it's the same distinction        18:02:33
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 735

357

```
 1    between physical books and e-books, which are          18:02:36

 2    clearly two different licensing streams.                18:02:38

 3    BY MR. PETROCELLI:                                       18:02:38

 4        Q.  You didn't answer my question.                  18:02:40

 5        A.  I think I did.                                   18:02:41

 6        Q.  No, you didn't.                                  18:02:42

 7            You -- you testified the game is the             18:02:44

 8    software and the software appears on some physical       18:02:46

 9    object, a physical medium, as you called it, a disc      18:02:49

10    or a cartridge.                                          18:02:53

11            MS. ESKENAZI:  Misstates the evidence.          18:02:54

12    BY MR. PETROCELLI:                                       18:02:54

13        Q.  And --                                           18:02:54

14        A.  Excuse me.  I didn't testify that the game      18:02:56

15    was the software.  I agreed with you that the            18:02:57

16    physical media contain software.                         18:03:00

17        Q.  Well, the game is in the -- is -- is            18:03:03

18    expressed by the software, not by the box or the         18:03:06

19    disc or the cartridge, correct?                          18:03:09

20            MS. ESKENAZI:  Objection.  Misstates the        18:03:11

21    testimony.  Assumes facts not in evidence.  Calls        18:03:12

22    for --                                                   18:03:12

23            THE WITNESS:  They're all --                     18:03:12

24            MS. ESKENAZI:  -- expert opinion.                18:03:17

25    BY MR. PETROCELLI:                                       18:03:17
```

Maier, Steven (Final)

EXHIBIT C                                                   PAGE 736

358

```
 1        Q.  You can buy an empty disc and cartridge and    18:03:18

 2   you're not going to play a game, correct?             18:03:20

 3        A.  You can buy an empty disc and --             18:03:22

 4        Q.  Right.                                       18:03:22

 5        A.  -- cartridge and you're not go to go play a  18:03:24

 6   game.                                                 18:03:25

 7        Q.  Okay.  So the game is the software that       18:03:26

 8   appears on the disc or the cartridge, correct?        18:03:27

 9        A.  No.  I would say the game is the whole        18:03:31

10   thing.                                                18:03:32

11        Q.  And if the game appears on a different        18:03:33

12   storage medium, namely a server, which you purchase   18:03:37

13   the game via the server instead of purch- --          18:03:42

14   purchasing the game via the disc or the cartridge,    18:03:45

15   you say the server example is not covered, the disc   18:03:49

16   or cartridge is covered?                              18:03:52

17             MS. ESKENAZI:  Objection.  Asked and         18:03:54

18   answered.  Calls for expert opinion.  Misstates the   18:03:55

19   evidence.  Assumes facts not in evidence.             18:04:01

20             THE WITNESS:  That was my opinion.           18:04:04

21   BY MR. PETROCELLI:                                    18:04:04

22        Q.  And -- and you form -- and, in your view,    18:04:06

23   that opinion was crystal clear simply by reading the  18:04:08

24   contract?                                             18:04:12

25             MS. ESKENAZI:  Misstates the evidence.       18:04:13
```

Maier, Steven (Final)

EXHIBIT C                                      PAGE 737

```
 1    BY MR. PETROCELLI:                                  18:04:13

 2         Q.  If it wasn't crystal clear, tell me that.  18:04:15

 3    I'd rather have you say that, frankly.              18:04:17

 4              MS. ESKENAZI:  Misstates the evidence.    18:04:20

 5    BY MR. PETROCELLI:                                  18:04:20

 6         Q.  But you're the witness.                    18:04:22

 7         A.  That was my opinion.                       18:04:22

 8         Q.  That it was crystal clear?                 18:04:23

 9         A.  It was clear to me.                        18:04:26

10         Q.  Crystal clear?                             18:04:28

11              MS. ESKENAZI:  Objection.                 18:04:29

12              THE WITNESS:  I don't know what "crystal  18:04:30

13    clear" means.                                       18:04:32

14              MS. ESKENAZI:  Argumentative.             18:04:33

15    BY MR. PETROCELLI:                                  18:04:33

16         Q.  Clear to you.  That's the best you can do? 18:04:35

17    Clear?                                              18:04:37

18         A.  Yes.                                       18:04:37

19         Q.  Okay.  And you were able to achieve that   18:04:38

20    clarity without doing any research on -- on -- on   18:04:40

21    how computer games are stored on servers, on discs, 18:04:44

22    on cartridges, on any of this?                      18:04:48

23              MS. ESKENAZI:  Objection.  Misstates the  18:04:52

24    evidence.                                           18:04:53

25              THE WITNESS:  It didn't appear to me to be 18:04:54
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 738

360

```
 1    a matter for research, whether something that had no    18:04:56

 2    physical component was an article of tangible          18:04:59

 3    personal property.                                     18:05:01

 4    BY MR. PETROCELLI:                                     18:05:01

 5        Q.  Have you spoken to any consultants,            18:05:14

 6    computer consultants about that subject?               18:05:17

 7            MS. ESKENAZI:  Objection.  To the extent       18:05:19

 8    that that information is -- has been discussed with     18:05:20

 9    counsel, that is attorney-client privileged            18:05:27

10    information.                                           18:05:30

11    BY MR. PETROCELLI:                                     18:05:30

12        Q.  You can answer.                                18:05:33

13        A.  On that basis, I can't answer the question.    18:05:33

14        Q.  What about before September 2010?  Did you     18:05:37

15    ever speak to a computer consultant or anybody that    18:05:39

16    you thought was specialized in computers on the        18:05:42

17    subject of whether an online or downloadable-only      18:05:45

18    game was -- was a physical -- item of physical         18:05:48

19    property or tangible personal property or any of       18:05:55

20    those things?                                          18:05:57

21            MS. ESKENAZI:  Objection.                      18:05:58

22    BY MR. PETROCELLI:                                     18:05:58

23        Q.  Did you ever have that kind of discussion?     18:06:00

24            MS. ESKENAZI:  Objection.  Vague and           18:06:01

25    ambiguous.  Compound.                                  18:06:02
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 739

361

```
 1            THE WITNESS:  No, I did not.              18:06:04

 2    BY MR. PETROCELLI:                               18:06:04

 3        Q.  Okay.  Go back to the Exhibit 37 that I  18:06:06

 4    showed you, which you said you could not recall  18:06:08

 5    anything about.                                  18:06:13

 6            Do you have that in front of you?        18:06:15

 7        A.  Yeah.                                    18:06:17

 8        Q.  Take a look at Exhibit 38.               18:06:17

 9            MS. ESKENAZI:  What's Exhibit 38?  Do I  18:06:21

10    have that?                                       18:06:21

11            (The document referred to was            18:06:26

12            marked for identification as             18:06:26

13            Exhibit 38 and attached to this          18:06:26

14            deposition.)                             18:06:26

15    BY MR. PETROCELLI:                               18:06:26

16        Q.  This is an e-mail from you back to Tom   18:06:27

17    Magnani and the others dated August 5, 2004, saying:  18:06:32

18            "Dear Tom, many thanks for               18:06:39

19            consulting us about this matter.         18:06:41

20            We feel this is one that SZC,            18:06:42

21            rather than the Estate should            18:06:46

22            pursue.  But if we can be of any         18:06:47

23            assistance, please let me know."         18:06:50

24            Do you see that?                         18:06:53

25        A.  I see that.                              18:06:53
```

Maier, Steven (Final)

EXHIBIT C                                           PAGE 740

362

```
1        Q.  You don't deny writing this e-mail, do you?   18:06:54

2        A.  It appears to be an e-mail from me to Tom     18:07:03

3    Magnani.                                              18:07:06

4        Q.  And when -- when you made the judgment that   18:07:06

5    this online video game is one that should be pursued  18:07:11

6    by Zaentz rather than the Estate, what research or     18:07:18

7    analysis did you do, if any, regarding the type of     18:07:24

8    game it was, whether it was an item of tangible        18:07:29

9    personal property or not?                              18:07:33

10       A.  Well, I still have no recollection of          18:07:37

11   this -- this e-mail or this other e-mail.              18:07:39

12       Q.  But you obviously received it because you      18:07:42

13   responded and told the Estate that they should         18:07:45

14   pursue it, correct?                                    18:07:47

15       A.  Told Zaentz.                                   18:07:49

16       Q.  Zaentz, excuse me.  Thank you.                 18:07:49

17       A.  I don't recall whether I did any research      18:07:53

18   of any kind at that time.                              18:07:55

19       Q.  But you -- you agree with me you didn't say    18:07:56

20   in here anything about what kind of game it is, what   18:07:58

21   are you doing here, is there a tangible property       18:08:01

22   involved, pointing out none of the distinctions that   18:08:04

23   you're now explaining to me in your testimony, none   18:08:09

24   of that was mentioned in this letter, correct?         18:08:12

25       A.  But that's entirely --                         18:08:14
```

363

```
 1              MS. ESKENAZI:  Objection.  Objection.      18:08:14

 2    Document speaks for itself.                          18:08:16

 3              THE WITNESS:  That's entirely consistent   18:08:17

 4    with my view that all games were bought by way of    18:08:19

 5    physical media, so I would have no reason to make    18:08:21

 6    that distinction.                                    18:08:23

 7    BY MR. PETROCELLI:                                   18:08:24

 8         Q.  Well, you never inquired, did you?         18:08:24

 9              MS. ESKENAZI:  Objection.                  18:08:26

10              THE WITNESS:  I have no reason to inquire.  18:08:26

11    BY MR. PETROCELLI:                                   18:08:26

12         Q.  Well, you might have had reason to inquire  18:08:28

13    because you had virtually no knowledge whatsoever of 18:08:30

14    computer games.                                      18:08:34

15              MS. ESKENAZI:  Objection.  Misstates the   18:08:35

16    testimony.                                           18:08:36

17    BY MR. PETROCELLI:                                   18:08:36

18         Q.  You did nothing or can remember nothing, at 18:08:37

19    least, in deriving your view of what computer games  18:08:39

20    were at the time.  And given the fact that you knew  18:08:42

21    you had very little basis for your opinion, you      18:08:46

22    might have inquired.                                 18:08:50

23              MS. ESKENAZI:  Objection.                  18:08:51

24    BY MR. PETROCELLI:                                   18:08:51

25         Q.  That's the reason why you might have        18:08:52
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 742

364

```
 1    inquired.                                        18:08:54

 2          MS. ESKENAZI:  Objection.  Move to strike   18:08:54

 3    as argumentative.  Assumes facts not in evidence.  18:08:56

 4    BY MR. PETROCELLI:                                18:08:56

 5       Q.  Well, let me ask you this:  Even though you  18:08:58

 6    can't recall a single thing that went into forming  18:09:00

 7    your view that online games had to -- had to involve  18:09:02

 8    a physical purchase, as you put it, in light of the  18:09:06

 9    fact that you can't remember a single thing, are you  18:09:10

10    confident, though, that you would have done some  18:09:16

11    significant amount of research in coming to that  18:09:18

12    view at the time you formed it?                  18:09:20

13          MS. ESKENAZI:  Objection.  Misstates the    18:09:22

14    testimony.  Misleading.                          18:09:23

15          THE WITNESS:  Please, would you read back   18:09:27

16    the question.                                    18:09:45

17              (The reporter read the record           18:09:45

18          as follows:                                18:09:45

19              "QUESTION:  Even though you             18:08:59

20          can't recall a single thing that           18:09:00

21          went into forming your view that           18:09:01

22          online games had to involve a             18:09:04

23          physical purchase, as you put it,          18:09:06

24          in light of the fact that you             18:09:09

25          can't remember a single thing, are         18:09:10
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 743

365

| | | |
|---|---|---|
| 1 | you confident, though, that you | 18:09:14 |
| 2 | would have done some significant | 18:09:17 |
| 3 | amount of research in coming to | 18:09:18 |
| 4 | that view at the time you formed | 18:09:20 |
| 5 | it?") | 18:09:21 |
| 6 | MS. ESKENAZI:  Same objections. | 18:09:47 |
| 7 | THE WITNESS:  You said possibly in the | 18:09:47 |
| 8 | question before that I had no knowledge of computer | 18:09:50 |
| 9 | games.  I don't think that was my testimony.  I -- | 18:09:54 |
| 10 | my testimony was that I was aware that computer | 18:09:56 |
| 11 | games were in physical form. | 18:09:58 |
| 12 | BY MR. PETROCELLI: | 18:09:58 |
| 13 | Q.  Well, it turns out you were wrong, right? | 18:10:01 |
| 14 | MS. ESKENAZI:  No.  Objection. | 18:10:04 |
| 15 | Argumentative. | 18:10:05 |
| 16 | THE WITNESS:  I wasn't aware of any | 18:10:07 |
| 17 | computer games that could be bought otherwise than | 18:10:08 |
| 18 | in physical form until September, October 2010. | 18:10:12 |
| 19 | BY MR. PETROCELLI: | 18:10:12 |
| 20 | Q.  But it turns out you were mistaken, that | 18:10:14 |
| 21 | prior to September 2010 there were many computer | 18:10:16 |
| 22 | games that were being sold in the -- in the | 18:10:20 |
| 23 | marketplace that did not require a purchase of a | 18:10:22 |
| 24 | physical storage or -- or disc or cartridge? | 18:10:27 |
| 25 | MS. ESKENAZI:  Objection. | 18:10:30 |

Maier, Steven (Final)

EXHIBIT C                                          PAGE 744

366

```
 1   BY MR. PETROCELLI:                              18:10:30

 2        Q.  You now know that to be true, correct?   18:10:31

 3            MS. ESKENAZI:  Objection.  Assumes facts  18:10:33

 4   not in evidence.                                 18:10:34

 5            THE WITNESS:  I'm not aware of that.     18:10:35

 6   BY MR. PETROCELLI:                              18:10:35

 7        Q.  So you -- as you're sitting here now     18:10:36

 8   testifying, you believe that consistent with your  18:10:39

 9   view of computer games, no such -- there were no   18:10:42

10   such things as downloadable-only games that existed  18:10:46

11   prior to September 2010?                         18:10:51

12        A.  Well, I recall that in September,        18:10:55

13   October 2010, I reviewed, as a result of this     18:10:58

14   matter, The Lord of the Rings Online game which    18:11:01

15   appeared to me, even at that time, to be sold by way  18:11:07

16   of physical media.                              18:11:10

17        Q.  That's not my question.                 18:11:11

18            As you're sitting here now, have you come  18:11:12

19   to learn that prior to September 2010, there were in  18:11:15

20   the marketplace downloadable-only computer games?   18:11:22

21            MS. ESKENAZI:  Objection to the extent that  18:11:27

22   it calls for attorney-client communications and    18:11:28

23   attorney work product.  I'm going to instruct the   18:11:31

24   witness not to answer.                           18:11:34

25            If you can answer the question outside of   18:11:35
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 745

```
 1    that -- outside of the knowledge that you gained in    18:11:37

 2    connection with communications with counsel, you're    18:11:41

 3    welcome to answer.                                      18:11:47

 4          THE WITNESS:  I can't answer that question        18:11:49

 5    on the basis of any independent research that I have    18:11:50

 6    done.                                                   18:11:52

 7    BY MR. PETROCELLI:                                      18:11:53

 8        Q.  The truth is, you did absolutely no            18:11:53

 9    diligence whatsoever in making the judgment that all    18:11:55

10    computer games had to involve a physical purchase of    18:12:02

11    a -- of a disc or a cartridge at the time you formed    18:12:05

12    that view, correct?  You did no diligence in forming    18:12:07

13    that view at all.  True or not true?                    18:12:12

14          MS. ESKENAZI:  Objection.  Misstates the          18:12:14

15    testimony.  Argumentative.  Compound.  Vague and        18:12:15

16    ambiguous.                                              18:12:21

17          THE WITNESS:  Your question assumes that I        18:12:21

18    proactively set out to form a view, which I did not.    18:12:22

19    BY MR. PETROCELLI:                                      18:12:22

20        Q.  The view that you held, the date of which      18:12:26

21    and the details of which you cannot recall, when you    18:12:29

22    formed that view, you performed no diligence in         18:12:32

23    order to arrive at that view, correct?                  18:12:35

24          MS. ESKENAZI:  Objection.  Misstates the          18:12:39

25    testimony.  Compound.  Argumentative.  Vague and        18:12:40
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 746

368

```
 1   ambiguous.                                        18:12:46

 2         THE WITNESS:  I don't recall forming or     18:12:46

 3   arriving at a view.  My testimony is that insofar as  18:12:49

 4   I was aware of computer games prior to 2010, I    18:12:53

 5   understood them to be purchasable on physical media.  18:12:57

 6   BY MR. PETROCELLI:                                18:12:59

 7       Q.  And you relied on that definition and this  18:12:59

 8   viewpoint -- excuse me.                           18:13:04

 9         You relied on that viewpoint in dealing     18:13:04

10   with the matters that came to your attention      18:13:06

11   regarding computer games and -- and under the     18:13:09

12   merchandising agreement between the Estate and    18:13:13

13   Zaentz, Miramax, New Line, Warner Bros., et cetera,  18:13:17

14   correct?                                          18:13:20

15         MS. ESKENAZI:  Objection.  It misstates the  18:13:20

16   testimony.                                        18:13:22

17         THE WITNESS:  As I sit here today, I have   18:13:24

18   no recollection of any issues regarding computer  18:13:27

19   games coming to my attention until September,     18:13:29

20   October 2010.                                     18:13:34

21   BY MR. PETROCELLI:                                18:13:34

22       Q.  I just showed you one.                    18:13:35

23       A.  Of which I have no recollection.          18:13:37

24       Q.  I know, but --                            18:13:38

25       A.  I'm not disputing that --                 18:13:39
```

369

```
1        Q.  Okay.  So -- but my point is that from time    18:13:40

2   to time, issues like the one I just showed you came    18:13:46

3   to your attention regarding computer games under the   18:13:48

4   Estate's license with Zaentz and others, correct?     18:13:52

5        A.  Well, you've shown me this example,           18:13:57

6   correct.                                                18:13:57

7        Q.  Okay.  And in addressing those issues that    18:13:59

8   came to your attention from time to time regarding     18:14:04

9   computer games on -- under the license, you relied     18:14:06

10  on your personal view of what constituted computer     18:14:12

11  games, correct?                                         18:14:18

12          MS. ESKENAZI:  Objection.  Misstates the       18:14:19

13  testimony.                                              18:14:20

14          THE WITNESS:  But there was no issue in        18:14:21

15  play about that.                                        18:14:23

16  BY MR. PETROCELLI:                                      18:14:23

17       Q.  That's not my question.                        18:14:24

18          My question is whenever you were called        18:14:25

19  upon to deal with the computer game issue under the    18:14:28

20  Zaentz license, or the Estate's license with Zaentz,   18:14:32

21  with New Line, with Warner Bros., with whoever, you    18:14:38

22  simply relied on your personal view of what            18:14:40

23  constituted a computer game, correct?                   18:14:44

24          MS. ESKENAZI:  Objection.  Misstates the       18:14:47

25  testimony.                                              18:14:48
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 748

370

```
 1          THE WITNESS:  I don't recall doing any      18:14:50

 2   research into what constituted a computer game.    18:14:52

 3   BY MR. PETROCELLI:                                 18:14:52

 4       Q.  Okay.  Including, for example, when you    18:14:55

 5   sent back the letter that -- the e-mail that I just 18:14:57

 6   showed you, which is Exhibit 38, correct?          18:14:59

 7       A.  I don't recall doing any research in       18:15:02

 8   connection with this.                              18:15:04

 9       Q.  And you said "research."  You don't recall 18:15:05

10   doing anything; is that right?                     18:15:09

11       A.  I don't recall this.                       18:15:11

12       Q.  Did you ever review any of the license     18:15:11

13   agreements between Zaentz and any computer game     18:15:17

14   developers?                                        18:15:19

15          MS. ESKENAZI:  Objection.  Vague and        18:15:21

16   ambiguous.  Assumes facts not in evidence.         18:15:22

17          THE WITNESS:  Not to my recollection.       18:15:24

18   BY MR. PETROCELLI:                                 18:15:24

19       Q.  Ever see one?                              18:15:26

20          MS. ESKENAZI:  Objection.  Assumes facts    18:15:27

21   not in evidence.                                   18:15:30

22          THE WITNESS:  I've seen the one that's been 18:15:30

23   produced in this litigation.                       18:15:33

24   BY MR. PETROCELLI:                                 18:15:33

25       Q.  Did you ever see one before September 2010? 18:15:36
```

371

| | | |
|---|---|---|
| 1 | A.  I don't believe so. | 18:15:38 |
| 2 | Q.  Were you ever called upon to review or look | 18:15:41 |
| 3 | at any of the provisions of any such agreements? | 18:15:44 |
| 4 | A.  No, that wouldn't be consistent with the | 18:15:48 |
| 5 | kind of work I do. | 18:15:50 |
| 6 | Q.  So the answer is you never were, not by | 18:15:51 |
| 7 | your partner, Cathleen Blackburn, or anyone else; is | 18:15:54 |
| 8 | that right? | 18:15:54 |
| 9 | A.  I have no recollection as I sit here today | 18:15:57 |
| 10 | of ever being asked to review any such documents. | 18:15:58 |
| 11 | Q.  Take a look at -- take a look at Exhibit 34 | 18:16:00 |
| 12 | previously shown to you. | 18:16:20 |
| 13 | Do you recall receiving this document? | 18:16:30 |
| 14 | Mr. Ulin went over it with you. | 18:16:31 |
| 15 | A.  I believe my testimony was that I didn't | 18:16:33 |
| 16 | recall this document. | 18:16:37 |
| 17 | Q.  Do you recall -- and you see where it talks | 18:16:38 |
| 18 | about an online computer game in the first | 18:16:39 |
| 19 | paragraph. | 18:16:41 |
| 20 | Do you see that? | 18:16:42 |
| 21 | A.  Yes. | 18:16:48 |
| 22 | Q.  And you see down in the middle of the page | 18:16:49 |
| 23 | it references: | 18:16:51 |
| 24 | "MMOGs are online 3-D virtual | 18:16:53 |
| 25 | worlds where players connect from | 18:16:56 |

Maier, Steven (Final)

EXHIBIT C                                                      PAGE 750

372

| | | |
|---|---|---|
| 1 | their home PCs across the Internet | 18:16:58 |
| 2 | to interact with players from | 18:17:01 |
| 3 | around the world." | 18:17:02 |
| 4 | Do you see that? | 18:17:02 |
| 5 | A.  Yes. | 18:17:02 |
| 6 | Q.  Okay.  You don't recall ever seeing this at | 18:17:08 |
| 7 | all.  Is that your testimony? | 18:17:17 |
| 8 | A.  I don't recall this document. | 18:17:17 |
| 9 | Q.  Well, looking at it now, does it refresh | 18:17:18 |
| 10 | your recollection that you saw it at the time in | 18:17:21 |
| 11 | August of 2005? | 18:17:23 |
| 12 | MS. ESKENAZI:  Would you like him to read | 18:17:24 |
| 13 | it? | 18:17:25 |
| 14 | MR. PETROCELLI:  No, I just want him to | 18:17:25 |
| 15 | look at the first page. | 18:17:27 |
| 16 | THE WITNESS:  It does not refresh my | 18:17:30 |
| 17 | recollection that I received this document. | 18:17:32 |
| 18 | BY MR. PETROCELLI: | 18:17:32 |
| 19 | Q.  Okay.  Assuming you did receive it at the | 18:17:33 |
| 20 | time, and with regard to the references to online | 18:17:34 |
| 21 | computer games that you see there on the first page | 18:17:37 |
| 22 | in the first paragraph and in the fourth paragraph, | 18:17:40 |
| 23 | do you think it would have prompted you to question | 18:17:45 |
| 24 | Zaentz about what constituted these games or what | 18:17:48 |
| 25 | comprised these games? | 18:17:52 |

Maier, Steven (Final)

EXHIBIT C                                    PAGE 751

373

```
 1              MS. ESKENAZI:  Calls for speculation.    18:17:53

 2    Lacks foundation.                                  18:17:55

 3              THE WITNESS:  I don't believe so, because I  18:17:57

 4    would have no reason to think that there were not  18:17:59

 5    physical media involved.                           18:18:01

 6    BY MR. PETROCELLI:                                 18:18:01

 7         Q.  So you would have simply relied on your --  18:18:02

 8    your personal view of what -- what computer games  18:18:06

 9    were?                                              18:18:12

10         A.  Well, there's nothing that would have put  18:18:13

11    me on inquiry.                                     18:18:15

12         Q.  Well, who's talk- -- inquiry about what?  18:18:16

13    How about the words "online"?  How about "virtual  18:18:19

14    worlds"?  How about those words?                   18:18:23

15              MS. ESKENAZI:  Objection.  It's been asked  18:18:26

16    and answered.  It's also speculation --            18:18:29

17    BY MR. PETROCELLI:                                 18:18:29

18         Q.  So looking at it --                       18:18:29

19              MS. ESKENAZI:  It's also speculation and  18:18:32

20    it's vague and ambiguous.                          18:18:34

21              MR. PETROCELLI:  I don't think it's       18:18:34

22    speculation.                                       18:18:35

23         Q.  Look- -- looking at it now, you see nothing  18:18:36

24    here that would have prompted you to question      18:18:38

25    whether this involved anything other than a physical  18:18:40
```

Maier, Steven (Final)

EXHIBIT C                                        PAGE 752

374

```
 1    purchase.  Is that your testimony, sir?          18:18:42

 2            MS. ESKENAZI:  Objection.  Calls for      18:18:44

 3    speculation.  Lacks foundation.  Vague and       18:18:45

 4    ambiguous.  Asked and answered.                  18:18:47

 5            THE WITNESS:  Given my state of knowledge 18:18:48

 6    in 2005, that is my testimony.                   18:18:50

 7    BY MR. PETROCELLI:                               18:18:50

 8        Q.  Okay.  Take a look at the -- at the next 18:18:53

 9    exhibit here.  This is -- you were shown one of  18:18:55

10    these documents.                                 18:19:01

11            MS. ESKENAZI:  Are you giving us an exhibit 18:19:01

12    or are we going back to something?               18:19:02

13            MR. PETROCELLI:  No, we're going to go to 18:19:05

14    a -- another one.                                18:19:07

15            Next is Exhibit 39, which is an e-mail    18:19:24

16    from -- an e-mail chain, the last or latest date of 18:19:31

17    which is e-mail from Cathleen to Tom Magnani copying 18:19:36

18    Mr. Maier and others dated June 7, 2007.         18:19:40

19                (The document referred to was         18:19:52

20                marked for identification as          18:19:52

21                Exhibit 39 and attached to this       18:19:52

22                deposition.)                          18:19:52

23    BY MR. PETROCELLI:                               18:19:52

24        Q.  You testified previously about meeting with 18:20:02

25    Mr. Bendich, Mr. Magnani and others in 2007 in   18:20:05
```

375

```
 1    Oxford -- or in London, excuse me.              18:20:11

 2        A.  Yes.                                    18:20:12

 3        Q.  Okay.  2005 was Oxford, I think, right? 18:20:14

 4        A.  I think that's right.                   18:20:16

 5        Q.  Yeah.  So look down here at the bottom of 18:20:17

 6    the page, first page of Exhibit 39, where Tom is  18:20:24

 7    writing to Cathleen and Steve; that's you and   18:20:30

 8    others.                                         18:20:34

 9        Do you see that?                            18:20:35

10        A.  Would you like me to read this document? 18:20:35

11        Q.  No, I don't want you to read the whole  18:20:38

12    thing.                                          18:20:41

13        A.  Okay.                                   18:20:41

14        Q.  Read the first paragraph, "Dear Cathleen." 18:20:42

15            MS. ESKENAZI:  Of which -- I'm sorry,   18:20:44

16    which --                                        18:20:45

17            THE WITNESS:  This starts, "Dear Tom."  18:20:45

18            MS. ESKENAZI:  I'm confused.  Where do you 18:20:46

19    want us to look?                                18:20:48

20            MR. PETROCELLI:  Nothing confusing about 18:20:48

21    it, okay?                                       18:20:50

22            MS. ESKENAZI:  I'm sorry, I just don't know 18:20:50

23    where you want him to look.                     18:20:51

24            MR. PETROCELLI:  That's all right.  The 18:20:53

25    e-mail at the bottom of page 1 of Exhibit 39 is an 18:20:54
```

Maier, Steven (Final)

EXHIBIT C                              PAGE 754

376

```
 1    e-mail from Tom Magnani to Cathleen and others.     18:20:56

 2         Q.  And I want you to read --                  18:21:01

 3             MS. ESKENAZI:  It has no text.              18:21:01

 4             MR. PETROCELLI:  It's on the next page.     18:21:04

 5         Q.  "Dear Cathleen."  And if you could just     18:21:06

 6    read that first paragraph.                           18:21:07

 7         A.  I've read the first paragraph.              18:21:12

 8         Q.  Okay.  Now, this says there in the second   18:21:14

 9    sentence:                                            18:21:17

10             "We have been caught up in a                18:21:18

11             flurry of activity around the               18:21:20

12             launch of The Lord of the Rings             18:21:21

13             Online game and the premier of the          18:21:22

14             London production of Kevin                   18:21:24

15             Wallace's musical."                         18:21:26

16             With respect to the reference to The Lord   18:21:28

17    of the Rings Online game, you recall seeing this at  18:21:29

18    the time?                                            18:21:33

19         A.  I don't recall this e-mail.                 18:21:33

20         Q.  Okay.  Do you have any reason to believe    18:21:34

21    you didn't receive this e-mail?                      18:21:36

22         A.  I don't have any reason to believe I didn't 18:21:38

23    receive this e-mail.                                 18:21:40

24         Q.  Okay.  Now, if you saw a reference like     18:21:42

25    this to The Lord of the Rings Online game being      18:21:44
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 755

377

```
 1    launched, do you believe that might have prompted     18:21:48

 2    you to inquire about the type of game it was, what    18:21:50

 3    it consisted of, anything like that?                  18:21:53

 4           MS. ESKENAZI:  Objection.  Assumes facts       18:21:58

 5    not in evidence.  Calls for speculation.  Lacks       18:21:58

 6    foundation.                                           18:22:01

 7           THE WITNESS:  No, I don't believe that         18:22:01

 8    would have prompted me.                               18:22:03

 9    BY MR. PETROCELLI:                                    18:22:03

10       Q.  Turn to the next page where Tom is -- in       18:22:04

11    the same e-mail is setting out a proposed agenda for  18:22:09

12    the meeting.  And item number 1 is the update on      18:22:12

13    recent licensing activities.                          18:22:16

14           MS. ESKENAZI:  I'm sorry, where are you        18:22:18

15    again?                                                18:22:19

16           MR. PETROCELLI:  Next page.                    18:22:20

17           MS. ESKENAZI:  Next page.                      18:22:21

18    BY MR. PETROCELLI:                                    18:22:21

19       Q.  Paragraph 1 of the proposed agenda:            18:22:25

20             "Update on Recent Licensing                  18:22:27

21          Activities:  We would like to give              18:22:29

22          you an update of SZC's most                     18:22:31

23          significant licensing activities                18:22:33

24          since the last meeting, including               18:22:35

25          some joint activities with New                  18:22:37
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 756

378

| | | |
|---|---|---|
| 1 | Line Cinema involving Electronic | 18:22:40 |
| 2 | Arts and games workshop, the | 18:22:42 |
| 3 | launch of Turbine's Lord of the | 18:22:44 |
| 4 | Rings Online game, et cetera." | 18:22:48 |
| 5 | Do you recall having a meeting in or about | 18:22:52 |
| 6 | June of 2007 with the Zaentz folks about the launch | 18:22:56 |
| 7 | of Turbine's Lord of the Rings Online game, as well | 18:23:03 |
| 8 | as other topics? | 18:23:07 |
| 9 | A.  I have no recollection of a discussion | 18:23:09 |
| 10 | about the launch of this game. | 18:23:11 |
| 11 | Q.  Do you believe such a meeting did not | 18:23:14 |
| 12 | occur? | 18:23:16 |
| 13 | A.  I've already testified that I do recall the | 18:23:17 |
| 14 | two meetings that we've discussed. | 18:23:20 |
| 15 | Q.  Okay.  Can you take a look at -- did you do | 18:23:29 |
| 16 | any -- any investigation whatsoever into the nature | 18:23:49 |
| 17 | of this computer game, this Lord of the Rings Online | 18:23:51 |
| 18 | game? | 18:23:53 |
| 19 | A.  I don't recall doing any investigation into | 18:23:55 |
| 20 | that game until September, October 2010. | 18:23:58 |
| 21 | Q.  Okay.  Certainly there was no effort by | 18:24:00 |
| 22 | anybody at Zaentz or Turbine to hide it from you, | 18:24:03 |
| 23 | right?  They were telling you about it, correct? | 18:24:06 |
| 24 | MS. ESKENAZI:  Objection.  Vague and | 18:24:10 |
| 25 | ambiguous. | 18:24:12 |

Maier, Steven (Final)

EXHIBIT C                                      PAGE 757

379

```
 1          THE WITNESS:  I can't add to what it says    18:24:12
 2   in this document.                                   18:24:15
 3   BY MR. PETROCELLI:                                  18:24:15
 4      Q.  What does that mean?  Did I ask you that     18:24:15
 5   question?                                           18:24:19
 6      A.  You asked me whether they were hiding it     18:24:22
 7   and whether they were being open.                   18:24:24
 8      Q.  Right.  Would you -- would you agree with    18:24:26
 9   me that the transmission of these materials to you, 18:24:27
10   the setting of a meeting to discuss them, that they 18:24:29
11   were keeping you informed about this new computer -- 18:24:31
12      A.  The fact --                                  18:24:31
13      Q.  -- game, this new --                         18:24:37
14      A.  The fact of the --                           18:24:37
15      Q.  -- online game?                              18:24:38
16          I'm sorry, "the fact of"?                    18:24:39
17      A.  The fact of the launch of the game, yes, I   18:24:40
18   would agree.                                        18:24:43
19      Q.  And they provided you no information or      18:24:44
20   details about the game, just the fact of its launch. 18:24:45
21   Is that your testimony?                             18:24:50
22          MS. ESKENAZI:  Objection.  It misstates the  18:24:50
23   testimony.                                          18:24:51
24          THE WITNESS:  My testimony is that I have    18:24:52
25   no recollection about any discussion about this     18:24:54
```

Maier, Steven (Final)

EXHIBIT C                                      PAGE 758

380

| 1 | game. | 18:24:56 |
| 2 | BY MR. PETROCELLI: | 18:24:57 |
| 3 |     Q.  You didn't answer my question. | 18:24:57 |
| 4 |        Do you believe they with- -- they withheld | 18:25:00 |
| 5 | from you information about the nature of the game? | 18:25:02 |
| 6 | That they only told you about the fact of the launch | 18:25:08 |
| 7 | and nothing else?  That's my question. | 18:25:10 |
| 8 |     A.  I have -- | 18:25:12 |
| 9 |        MS. ESKENAZI:  Object- -- | 18:25:12 |
| 10 |        THE WITNESS:  -- no reason to think they | 18:25:12 |
| 11 | withheld information. | 18:25:13 |
| 12 | BY MR. PETROCELLI: | 18:25:13 |
| 13 |     Q.  Look at the next exhibit. | 18:25:15 |
| 14 |        MS. ESKENAZI:  Objection.  Misstates the | 18:25:15 |
| 15 | testimony. | 18:25:16 |
| 16 |        MR. PETROCELLI:  Look at 35, Bonnie.  I | 18:25:16 |
| 17 | think he has it right there.  That's this right | 18:25:20 |
| 18 | here. | 18:25:20 |
| 19 |        MS. ESKENAZI:  35. | 18:25:20 |
| 20 |        MR. PETROCELLI:  Yeah. | 18:25:20 |
| 21 |     Q.  This is a -- | 18:25:36 |
| 22 |     A.  Right. | 18:25:36 |
| 23 |     Q.  These -- this is a set of -- well, it's a | 18:25:36 |
| 24 | document, a multi-page document you were shown | 18:25:41 |
| 25 | earlier, Exhibit 35, entitled "Overview of Prominent | 18:25:43 |

381

| | | |
|---|---|---|
| 1 | Licensees, June 2007." | 18:25:46 |
| 2 | And if you turn to -- turn to the page | 18:25:49 |
| 3 | marked PLAINTIFFS004587. | 18:25:56 |
| 4 | Do you have that? | 18:26:05 |
| 5 | MS. ESKENAZI:  I'm sorry, no. | 18:26:06 |
| 6 | THE WITNESS:  No. | 18:26:07 |
| 7 | MR. PETROCELLI:  PLAINTIFFS004587.  That's | 18:26:08 |
| 8 | the Bates number. | 18:26:11 |
| 9 | MS. ESKENAZI:  No.  We have the -- what -- | 18:26:11 |
| 10 | THE WITNESS:  We have a Zaentz copy. | 18:26:11 |
| 11 | MS. ESKENAZI:  -- we were handed was -- | 18:26:13 |
| 12 | MR. PETROCELLI:  Okay.  You must have -- | 18:26:13 |
| 13 | MS. ESKENAZI:  -- the SZC copy. | 18:26:17 |
| 14 | MR. PETROCELLI:  You must have a different | 18:26:17 |
| 15 | version. | 18:26:17 |
| 16 | MS. ESKENAZI:  Can you just -- just hold it | 18:26:17 |
| 17 | up for us, because we can find it if you hold it up. | 18:26:19 |
| 18 | It -- it looks to me like you're talking | 18:26:27 |
| 19 | about SZC 0033584. | 18:26:32 |
| 20 | MR. PETROCELLI:  Okay.  And what's the | 18:26:35 |
| 21 | title of that page?  What's it say on it? | 18:26:37 |
| 22 | MS. ESKENAZI:  "Lord of the Rings, New Line | 18:26:39 |
| 23 | Cinema." | 18:26:42 |
| 24 | MR. PETROCELLI:  Perfect. | 18:26:42 |
| 25 | MS. ESKENAZI:  Is that what you want? | 18:26:43 |

Maier, Steven (Final)

EXHIBIT C                    PAGE 760

382

| | | |
|---|---|---|
| 1 | MR. PETROCELLI:  Yep. | 18:26:45 |
| 2 | MS. ESKENAZI:  Okay. | 18:26:45 |
| 3 | BY MR. PETROCELLI: | 18:26:45 |
| 4 | Q.  Look at the last part of that boxed | 18:26:45 |
| 5 | paragraph where it says -- talking about some of the | 18:26:47 |
| 6 | licenses: | 18:26:49 |
| 7 | "They include Hasbro, Mattel, | 18:26:49 |
| 8 | Electronic Arts, the Noble | 18:26:52 |
| 9 | Collection and Sideshow WETA" - - | 18:26:53 |
| 10 | that's all caps, semicolon, | 18:26:56 |
| 11 | "producing items of jewelry and | 18:26:58 |
| 12 | fine collectables to mobile | 18:27:00 |
| 13 | ringtones, swords, furniture and | 18:27:03 |
| 14 | board games." | 18:27:08 |
| 15 | Do you see that? | 18:27:09 |
| 16 | A.  I see that. | 18:27:09 |
| 17 | Q.  Were you aware of Zaentz having licensed | 18:27:10 |
| 18 | mobile ringtones? | 18:27:12 |
| 19 | MS. ESKENAZI:  Objection.  Vague and | 18:27:15 |
| 20 | ambiguous.  Assumes facts not in evidence. | 18:27:16 |
| 21 | THE WITNESS:  I have no recollection of | 18:27:19 |
| 22 | this document. | 18:27:20 |
| 23 | BY MR. PETROCELLI: | 18:27:20 |
| 24 | Q.  Were you aware that you could download | 18:27:22 |
| 25 | ringtones onto a mobile phone prior to September | 18:27:26 |

Maier, Steven (Final)

EXHIBIT C                                    PAGE 761

383

| | | |
|---|---|---|
| 1 | 2010? | 18:27:31 |
| 2 | A.  Yes, I was. | 18:27:31 |
| 3 | Q.  Were you aware that the downloading of the | 18:27:32 |
| 4 | ringtones did not require the purchase of a storage | 18:27:35 |
| 5 | device for the tones; you would download them from | 18:27:42 |
| 6 | some computer's Web site onto a cell phone.  Were | 18:27:45 |
| 7 | you aware of that? | 18:27:50 |
| 8 | MS. ESKENAZI:  Objection.  Compound. | 18:27:51 |
| 9 | Assumes facts not in evidence. | 18:27:53 |
| 10 | THE WITNESS:  I believe I was aware of | 18:27:54 |
| 11 | that.  I can't be certain as to the date. | 18:27:56 |
| 12 | BY MR. PETROCELLI: | 18:27:57 |
| 13 | Q.  Were -- were you aware that such | 18:27:57 |
| 14 | downloading-only activity had been licensed by | 18:28:00 |
| 15 | Zaentz with respect to Lord of the Rings? | 18:28:05 |
| 16 | A.  No, I was not. | 18:28:08 |
| 17 | Q.  Okay.  When you saw the reference to mobile | 18:28:10 |
| 18 | ringtones, did you inquire about it? | 18:28:12 |
| 19 | MS. ESKENAZI:  Objection.  Assumes facts | 18:28:16 |
| 20 | not in evidence. | 18:28:17 |
| 21 | THE WITNESS:  As I've testified, I have no | 18:28:18 |
| 22 | recollection of seeing this. | 18:28:20 |
| 23 | BY MR. PETROCELLI: | 18:28:20 |
| 24 | Q.  Do you have any reason to believe you did | 18:28:21 |
| 25 | not see it? | 18:28:23 |

Maier, Steven (Final)

EXHIBIT C                                    PAGE 762

384

| 1 | Do you have a copy of this? | 18:28:35 |
|---|---|---|

```
 1              Do you have a copy of this?          18:28:35

 2       A.  If -- if, for example, this was handed out  18:28:35

 3   at the end of the meeting, I may not have read it.  18:28:37

 4              MR. PETROCELLI:  I'm going to mark as the  18:28:42

 5   next exhibit in order the version that I'm looking  18:28:43

 6   at, which has been produced by plaintiffs.  So that  18:28:45

 7   would be 40?                                  18:28:50

 8              THE REPORTER:  Yes.                  18:29:05

 9              (The document referred to was        18:29:05

10         marked for identification as             18:29:05

11         Exhibit 40 and attached to this          18:29:05

12         deposition.)                             18:29:13

13   BY MR. PETROCELLI:                             18:29:13

14       Q.  Do you have Exhibit 40?                18:29:14

15       A.  Yes, I do.                             18:29:15

16       Q.  Okay.  So it's the same document but   18:29:16

17   produced from the files of plaintiffs.         18:29:18

18              Do you know which file this came from?  18:29:20

19       A.  I don't know which file it came from.  18:29:23

20       Q.  Okay.  So turn to -- turn to Bates number  18:29:24

21   4587.  That's the page we were just looking at in --  18:29:28

22   in the --                                      18:29:32

23       A.  Yeah.                                  18:29:33

24       Q.  -- in the other copy.  Okay?           18:29:34

25              And you'll see the reference to mobile  18:29:37
```

385

```
 1    ringtones.  I've asked you about that.  You don't      18:29:39

 2    have any reason to believe this was not shown to you    18:29:41

 3    or given to you, particularly since it came from        18:29:44

 4    plaintiffs' files, correct?                             18:29:46

 5         A.  Yes.                                           18:29:46

 6         Q.  Okay.  But you're telling me you don't          18:29:50

 7    recall anything about it, right?                        18:29:52

 8         A.  That's correct.                                18:29:54

 9         Q.  Turn to page 4589, a couple pages later,       18:29:54

10    entitled "Electronic Arts."                             18:30:00

11         Do you recall a discussion or seeing a             18:30:04

12    document like this with a description of the EA         18:30:06

13    games?                                                 18:30:10

14         A.  No, I don't recall it.                         18:30:11

15         Q.  Okay.  Turn to page 4594, a few pages          18:30:15

16    later, page entitled "Turbine Entertainment             18:30:20

17    Software."                                             18:30:24

18         MS. ESKENAZI:  I'm sorry, Dan, which page?        18:30:25

19         MR. PETROCELLI:  4594.                             18:30:26

20         Q.  And you see the reference here to "Lord of     18:30:31

21    the Rings Online"?                                      18:30:33

22         A.  Yes.                                          18:30:37

23         Q.  Did you -- do you recall having any           18:30:41

24    discussions about the nature of this game, whether      18:30:43

25    it had any physical components to it, anything like     18:30:49
```

386

```
 1    that?                                            18:30:53

 2         A.  I don't recall any discussion of that.  18:30:53

 3         Q.  Okay.  You're not suggesting this wasn't 18:30:56

 4    provided to you, though, correct, the information 18:30:58

 5    about the game?                                  18:31:03

 6         A.  I'm accepting that this document looks as 18:31:04

 7    though it was provided.                          18:31:07

 8         Q.  Okay.  Now, if you continue on the next few 18:31:07

 9    pages, you'll see various pages of press reports  18:31:10

10    about the game Lord of the Rings Online.         18:31:17

11         Do you see starting with "Fellowship rules  18:31:20

12    in Lord of the Rings Online" with -- starting at 18:31:22

13    Bates number 4595 of Exhibit 40?                 18:31:26

14         A.  I see that.                             18:31:30

15         MS. ESKENAZI:  I'm sorry, what page?        18:31:35

16         MR. PETROCELLI:  Exhibit 40 or 41?          18:31:36

17         THE REPORTER:  40.                          18:31:36

18         MR. PETROCELLI:  Okay.  4595.               18:31:36

19         MS. ESKENAZI:  4595?                        18:31:37

20         MR. PETROCELLI:  Yeah.                      18:31:39

21         Q.  You'll see the MSNBC contributor Joe Hutsko 18:31:39

22    has a report about the game?                     18:31:44

23         Do you recall reading any of this material  18:31:45

24    at the time it was provided to you?              18:31:47

25         A.  I don't recall reading any of this      18:31:51
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 765

387

```
  1     material.                                    18:31:54

  2         Q.  And it goes on for a number of pages to the   18:31:54

  3     end.                                         18:31:57

  4             Is it your testimony that you had never   18:32:00

  5     heard of Lord of the Rings Online prior to September   18:32:04

  6     2010?                                        18:32:07

  7             MS. ESKENAZI:  Objection.  Misstates the   18:32:07

  8     testimony.                                   18:32:09

  9             THE WITNESS:  I believe I had heard of Lord   18:32:11

 10     of the Rings Online --                       18:32:14

 11     BY MR. PETROCELLI:                           18:32:14

 12         Q.  Okay.                                18:32:14

 13         A.  -- prior to that date.               18:32:14

 14         Q.  And how do you believe you had heard about   18:32:16

 15     it?                                          18:32:17

 16         A.  I don't recall.                      18:32:18

 17         Q.  And when you heard about it, do you recall   18:32:18

 18     doing anything to find out whether The Lord of the   18:32:21

 19     Rings Online game involved a physical purchase of a   18:32:26

 20     disc or a cartridge or other medium?         18:32:30

 21         A.  No, I don't recall doing that.        18:32:33

 22         Q.  And you don't recall discussing that with   18:32:34

 23     anybody at the time you first heard about it or at   18:32:36

 24     any time prior to September 2010?            18:32:39

 25         A.  No.                                   18:32:42
```

Maier, Steven (Final)

EXHIBIT C                                    PAGE 766

388

| | | |
|---|---|---|
| 1 | MR. PETROCELLI:  Okay.  Well, we got -- let | 18:32:48 |
| 2 | me see.  I'm not going to finish, so we're going to | 18:32:50 |
| 3 | have to discuss resuming this at another time.  We | 18:32:53 |
| 4 | also have some document issues.  So you know what, | 18:32:56 |
| 5 | given that we have under 30 seconds, we'll adjourn | 18:33:01 |
| 6 | right now. | 18:33:04 |
| 7 | Same stipulation that we had on Cathleen? | 18:33:06 |
| 8 | MS. ESKENAZI:  Which was 30 days? | 18:33:09 |
| 9 | MR. PETROCELLI:  30 days. | 18:33:11 |
| 10 | MS. ESKENAZI:  That sounds fine. | 18:33:11 |
| 11 | MR. PETROCELLI:  Okay.  And we'll -- | 18:33:11 |
| 12 | MS. ESKENAZI:  Just -- just for the record, | 18:33:13 |
| 13 | I disagree.  I think that -- that, you know, we're | 18:33:15 |
| 14 | not -- we don't believe you're entitled to more | 18:33:18 |
| 15 | time, but I'm sure everybody understands. | 18:33:20 |
| 16 | MR. PETROCELLI:  We -- just so the record | 18:33:22 |
| 17 | is clear, our position is we're not done, and I have | 18:33:24 |
| 18 | more documents, there are documents that have not | 18:33:26 |
| 19 | been turned over, which I think is clear from his | 18:33:29 |
| 20 | testimony.  Suffice it to say, you disagree.  And | 18:33:31 |
| 21 | we'll have to sort it out.  Same stipulation. | 18:33:34 |
| 22 | MS. ESKENAZI:  Same stipulation. | 18:33:37 |
| 23 | MR. ULIN:  Before we close the record, we | 18:33:40 |
| 24 | want to join in Mr. Petrocelli's position, | 18:33:42 |
| 25 | especially with respect to documents that may not | 18:33:44 |

Maier, Steven (Final)

EXHIBIT C                                           PAGE 767

389

```
 1    have been produced that should have been.        18:33:46

 2         MS. ESKENAZI:  Well, except that both       18:33:48

 3    Warner Bros. and Zaentz have insisted on going   18:33:50

 4    forward with the depositions prior to documents  18:33:53

 5    being produced and said expressly that they don't 18:33:55

 6    care whether document production is complete.     18:33:58

 7    Several times, in fact.                           18:34:01

 8         MR. ULIN:  We can argue it off line, but    18:34:03

 9    that's -- that's different from documents not having 18:34:06

10    been searched and produced that should have been. 18:34:09

11         THE VIDEOGRAPHER:  We are off the record at 18:34:10

12    6:34 p.m., and this concludes today's testimony   18:34:12

13    given by Steve Maier.  The total number of media  18:34:16

14    used was six and will be retained by Veritext Legal 18:34:19

15    Solutions.                                         18:34:21

16              (The following stipulation

17              was agreed to by the parties at

18              the deposition of CATHLEEN

19              BLACKBURN, taken on December 10,

20              2013:

21              "MR. PETROCELLI:  The

22              transcript will be -- a copy of    19:06:22

23              the transcript will be sent to --  19:06:24

24              to -- to you, Bonnie.              19:06:26

25              "MS. LENS:  You want them to       19:06:34
```

390

| | | |
|---|---|---|
| 1 | have a copy or the original? | 19:06:35 |
| 2 | "MR. PETROCELLI:  Original. | 19:06:36 |
| 3 | We get the original.  The copy | 19:06:36 |
| 4 | will go to you. | 19:06:36 |
| 5 | "MS. ESKENAZI:  Usually the | 19:06:36 |
| 6 | original -- | 19:06:36 |
| 7 | "MR. PETROCELLI:  No, the | 19:06:39 |
| 8 | person taking the deposition gets | 19:06:39 |
| 9 | the original. | 19:06:40 |
| 10 | "MS. ESKENAZI:  No, but | 19:06:42 |
| 11 | that's okay.  I don't care who | 19:06:42 |
| 12 | gets the original in today's day. | 19:06:43 |
| 13 | "MR. PETROCELLI:  It doesn't | 19:06:45 |
| 14 | matter. | 19:06:45 |
| 15 | "THE WITNESS:  Is the | 19:06:46 |
| 16 | original going to be different | 19:06:46 |
| 17 | from the copy? | 19:06:47 |
| 18 | "MR. PETROCELLI:  It is not. | 19:06:48 |
| 19 | And they're both going to be -- | 19:06:49 |
| 20 | they're both going to be in | 19:06:50 |
| 21 | English, too. | 19:06:50 |
| 22 | "THE WITNESS:  That's a | 19:06:50 |
| 23 | relief. | 19:06:50 |
| 24 | "MR. PETROCELLI:  Okay.  In | 19:06:54 |
| 25 | any event, the witness can have, | 19:06:55 |

Maier, Steven (Final)

EXHIBIT C                                          PAGE 769

391

| | | |
|---|---|---|
| 1 | what, 30 days -- | 19:07:00 |
| 2 | "MS. ESKENAZI:  30 days. | 19:07:01 |
| 3 | Fine. | 19:07:01 |
| 4 | "MR. PETROCELLI:  -- to | 19:07:02 |
| 5 | review it and let us know if there | 19:07:02 |
| 6 | are any changes or corrections. | 19:07:04 |
| 7 | Admonishing you, of course, if you | 19:07:07 |
| 8 | do make any corrections to the | 19:07:08 |
| 9 | transcript, that it can bear on | 19:07:09 |
| 10 | your credibility. | 19:07:11 |
| 11 | "If we don't get word of any | 19:07:12 |
| 12 | changes, the transcript can be | 19:07:14 |
| 13 | used in the form transcribed and | 19:07:15 |
| 14 | the court reporter is otherwise | 19:07:17 |
| 15 | relieved of her duties under the | 19:07:18 |
| 16 | rules.  So stipulated? | 19:07:21 |
| 17 | "MS. ESKENAZI:  So | 19:07:24 |
| 18 | stipulated. | 19:07:24 |
| 19 | "MR. ULIN:  So stipulated.") | 19:07:26 |
| 20 | (Deposition concluded at 6:34 p.m.) | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

Maier, Steven (Final)

EXHIBIT C                                    PAGE 770

392

```
 1                    DECLARATION

 2

 3          I hereby declare I am the deponent in the

 4    within matter; that I have read the foregoing

 5    deposition and know the contents thereof, and I

 6    declare that the same is true of my knowledge except

 7    as to the matters which are therein stated upon my

 8    information or belief, and as to those matters, I

 9    believe it to be true.

10          I declare under the penalties of perjury of

11    the State of California that the foregoing is true

12    and correct.

13          Executed on the _____ day of

14    _____ 2014, at

15    _____,

16    California.

17

18

19

20

21          _____

22              STEVEN ANDREW MAIER

23

24

25
```

```
 1    STATE OF CALIFORNIA     )
                              )   ss.
 2    COUNTY OF LOS ANGELES   )

 3

 4         I, Shanda Gabriel, Certified Shorthand

 5    Reporter, Certificate No. 10094, for the State of

 6    California, hereby certify:

 7         I am the deposition officer that

 8    stenographically recorded the testimony in the

 9    foregoing deposition;

10         Prior to being examined the witness was by

11    me first duly sworn;

12         The foregoing transcript is a true record

13    of the testimony given.

14         Before completion of the deposition,

15    review of the transcript [X] was [] was not

16    requested.  If requested, any changes made by the

17    deponent (and provided to the reporter) during the

18    period allowed are appended hereto.

19

20    Dated: 1/13/2014.

21

22

23

24         Shanda Gabriel

25         CSR No. 10094
```

Page 393

EXHIBIT D

# THIS EXHIBIT HAS BEEN DESIGNATED <u>CONFIDENTIAL</u> AND IS FILED SEPARATELY UNDER SEAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT E

**Julia R. Haye**
D: 310.201.7432
F: 310.201.2370
JHaye@GreenbergGlusker.com
File Number: 84971-00003



January 30, 2014

**Via E-Mail and U.S. Mail**

Molly M. Lens
O'Melveny & Myers LLP
1999 Avenue of the Stars
Los Angeles, CA 90067

John C. Ulin
Arnold & Porter LLP
7th Floor
Three Embarcadero Center
San Francisco CA 94111-4024

   Re: *Fourth Age Limited, et al. v. Warner Bros. Digital Distribution, Inc., et al.* (Case No. CV 12-09912 ABC (SHx))

Dear Molly and John:

   In anticipation of this afternoon's meet and confer conference, I write to address the issues raised in Molly's January 7, 2014 letter to Rachel Valadez regarding various discovery issues and Warner's improperly filed Motion to Compel Documents and Privilege Log (the "Motion").

   We believe this resolves all of the issues raised in the Motion, rendering the Motion moot. This is precisely the reason that Warner should have waited to file its Motion after today's meet and confer was concluded (a delay of only two days). That is, indeed, the purpose of the meet and confer requirement and joint stipulation process —to resolve as many issues as possible before burdening the Court, and to only seek the Court's intervention when the parties have reached an impasse.

   In any event, we believe all of the issues raised in the Motion have been addressed and resolved below. The Motion should be withdrawn.

   We also address other issues you have raised, below.

   A. <u>Ms. Blackburn and Mr. Maier's Files; Prior Law Firm Files</u>

   Your letter misconstrues the Tolkien Parties' efforts to collect, review and produce Ms. Blackburn's and Mr. Maier's hard copy and electronic files. Contrary to your accusations, the

**Greenberg Glusker Fields Claman & Machtinger LLP**
1900 Avenue of the Stars, 21st Floor, Los Angeles, California 90067
T: 310.553.3610 | F: 310.553.0687

**GreenbergGlusker.com**

84971-00003/2116607.3     EXHIBIT E     PAGE 816

Molly M. Lens
John C. Ulin
January 30, 2014
Page 2


Tolkien Parties are not avoiding their obligations to collect and produce documents for Ms.
Blackburn or Mr. Maier.

First, the Tolkien Parties have no objection to producing Ms. Blackburn's and Mr.
Maier's electronic files from MaierBlackburn LLP, and we are already in the process of
collecting, reviewing and producing these files.  As previously explained during earlier meet and
confer discussions, it was our understanding that under the "print to file" policy utilized at
MaierBlackburn, all relevant documents had been printed and filed in hard copy format.  The
hard copy documents were then collected and reviewed, and non-privileged, responsive
documents were produced.  Although we believe that the MaierBlackburn electronic files will be
entirely duplicative of the hard copy documents previously produced, to assuage your concerns,
and in an abundance of caution, we elected to collect, review and produce electronic files for Ms.
Blackburn and Ms. Maier from MaierBlackburn.  This is in process currently.

Second, the Tolkien Parties have made diligent efforts to collect Ms. Blackburn's and Mr.
Maier's electronic files from Manches.  As Mr. Maier previously explained, available electronic
information relating to "active matters," including matters relating to the Tolkien Estate, was
transferred from Manches to MaierBlackburn when Ms. Blackburn and Mr. Maier left Manches.
To the extent responsive Manches electronic files were transferred to MaierBlackburn (and we
believe they were), those files will be included in our collection and review of Ms. Blackburn's
and Mr. Maier's MaierBlackburn electronic files.

As for any electronic files remaining at Manches, the Tolkien Parties have made diligent
efforts to collect such electronic files as well.  Beginning in September, we contacted Manches to
ascertain the accessibility of Tolkien electronic files and to arrange for their collection.  Over the
past four months, we have exchanged numerous communications with Manches regarding the
accessibility of Tolkien electronic files.  However, it is our understanding that Manches has been
in administration (the equivalent, we understand, of an insolvency proceeding) and,
consequently, Manches has been preoccupied with its own difficulties.  For these reasons,
representatives of Manches have been extremely slow to respond despite our repeated follow-up
communications.  It is our further understanding that Manches is now coming out of that
proceeding and has been acquired by or merged with another firm.  After our repeated attempts
to obtain information regarding Tolkien electronic files, on December 30, 2013, we were
informed for the first time that the Tolkien electronic files are stored, and are only available, on
backup tapes.  Given the cost, expense and difficultly that will be incurred in any attempt to
restore numerous backup tapes, particularly given that they are likely duplicative of the tens of
thousands of pages of hard copy documents previously produced from the Manches files,
Manches electronic files (to the extent responsive and not transferred) are not reasonably
accessible.  Accordingly, our position is that the Tolkien Parties do not have an obligation to
incur the cost and expense of retrieving this inaccessible data.  However, we look forward to
discussing this further with you this afternoon.  We also note that Manches (now Penningtons

EXHIBIT E

Molly M. Lens
John C. Ulin
January 30, 2014
Page 3

Manches, we believe), of course, is a third party, and Warner has the option to subpoena documents directly from them.

Warner also raises a concern regarding electronic files for Dick Williamson. We have confirmed that there are no email files for Mr. Williamson. Morrell Peel & Gamlen ("MPG") did not have an email system, and the attorneys did not begin using email until MPG merged with Manches in 1997. This coincides with Mr. Williamson's retirement.

Fourth, Warner questions our collection of Greenberg Glusker electronic files. With respect to Greenberg Glusker electronic files, we have collected and produced non-privileged, responsive documents for the following custodians you list: Bonnie Eskenazi, Elisabeth Moriarty, Aaron Moss, Ricardo Cestero, Candace Carlo, and Rachel Valadez.

Given Warner's and Zaentz's insistence that plaintiffs collect documents from Manches, we fully expect that Warner and Zaentz have also collected hard copy and electronic files from all prior firms who possess relevant information including: Munger Tolles & Olson LLP; Howard Rice; Kegan, Kegan & Berkman (Kegan & Kegan Ltd.); Arent Fox LLP; and Slaff, Mosk & Rudman; Burnstein & Walker; and Bendich & Burnstein, among others. Please confirm that you have done so.

Finally, your characterization of our collection of Mr. Maier's and Mr. Blackburn's hard copy files is entirely inaccurate. We did not simply select files to review from an index (not that this would be inappropriate). Rather, Ms. Blackburn and Mr. Maier sent all Tolkien film, merchandising and trademark related files to Greenberg Glusker for review. (These documents also included hard copy files from Manches, custody of which was transferred to MaierBlackburn). We reviewed these voluminous documents, and produced responsive, non-privileged documents. In addition, Mr. Maier and Ms. Blackburn sent us an index of all Manches/MaierBlackburn Tolkien files. Greenberg Glusker chose any and all additional files we believed could be even remotely relevant to the matters at issue in this case, to cross-check against the files provided. Those additional files were also provided to Greenberg Glusker for review and production. Your argument that our collection was somehow insufficient simply because no Greenberg Glusker attorney traveled to London to examine files onsite, or at the storage facility, is unfounded. Nor does the case law you provided support such a position. We are confident that our collection of hard copy files is complete.

B.    Document Preservation Notices

Once again, Warner's professed "grave concerns" regarding whether documents have been adequately preserved are unfounded. A document preservation notice was issued to the Tolkien Parties by Greenberg Glusker in connection with the profit participation action on February 21, 2008; given the manner in which the current dispute arose, this notice continued through to the present litigation. Additionally, in an abundance of caution, the Tolkien Parties

Molly M. Lens
John C. Ulin
January 30, 2014
Page 4

were issued a second document preservation notice in this action on January 11, 2012; the HC Parties were issued a document preservation notice on January 14, 2012.

Given that you have insisted that the Tolkien/HC parties provide information regarding the document preservation notices issued to the Tolkien/HC parties, we request that all defendants similarly confirm which entity or individuals have been issued document preservation notices and the date(s) of any such notice(s).

C.     Mr. Maier's and Mr. Blackburn's Depositions

Warner's request for a second day of deposition for both Mr. Maier and Ms. Blackburn is wholly unwarranted.  Warner wasted significant time at both Mr. Maier's and Ms. Blackburn's depositions, covering the same ground Mr. Ulin had already investigated in the first half of the deposition, addressing irrelevancies and wasting time on argumentative questions and colloquy. Particularly given Mr. Maier's minimal level of involvement with respect to the issues in dispute, we will not make Mr. Maier available for an additional day of deposition.

With respect to Ms. Blackburn, provided that the parties are able to reach agreement that designation of counsel in response to a 30(b)(6) deposition notice will not be deemed a waiver of the attorney-client privilege or attorney work product doctrine, defendants will likely have an opportunity to further depose Ms. Blackburn for an additional day.  Accordingly, and solely as a matter of compromise, we would be willing to provide Ms. Blackburn for an additional ½ day of deposition as a percipient witness, provided that defendants agree: (1) not to seek additional time for the deposition of Mr. Maier; (2) not to seek additional time for Ms. Blackburn beyond the additional ½ day; and (3) the additional percipient witness deposition take place at least two weeks prior to the 30(b)(6) deposition.  Assuming this is acceptable, we propose scheduling Ms. Blackburn's additional ½ day of percipient deposition testimony while all of the parties are in England.  Ms. Blackburn is available for further deposition on Sunday, February 23, 2014. Please let us know if you are agreeable to the date and location of the continued deposition and the conditions set forth above.

D.     Custodian Metadata

We are perplexed by Warner's inflammatory description of the "custodian" information provided by plaintiffs as "a transparent attempt to obscure which custodian had which documents and/or otherwise mask the incompleteness of your production."  As you are undoubtedly aware, plaintiffs have provided custodian information in a similar manner to Zaentz.  Indeed, the vast majority of Zaentz electronic files have either no custodian information whatsoever or list "SZC" as the custodian.  Given that plaintiffs have interpreted the parties' agreement to provide "custodian" information in the exact manner as Warner's co-defendant, clearly such a position is reasonable and was understood to be sufficient.  Notwithstanding that plaintiffs believe the custodian information provided is sufficient, if all parties agree to provide "custodian"

GreenbergGlusker.com
PAGE 819

Molly M. Lens
John C. Ulin
January 30, 2014
Page 5

information which identifies the names of the individual custodians of the electronic files, plaintiffs will do the same.

With respect to hard copy files, we are confused by the request in Warner's Motion for hard copy "metadata." As we understand the term, there is no metadata associated with hard copy documents. And, Warner did not provide custodian data for many hard copy documents; Zaentz, for its part, listed the custodian of all hard copy documents as "SZC," consistent with what plaintiffs have done. Please explain precisely what you are proposing with respect to hard copy documents so that we can further discuss a proposal which will be applicable to all parties.

E.   HarperCollins Documents

We disagree with your characterization of our collection efforts and our meet and confer discussions with respect to HarperCollins. We have collected, reviewed and/or produced all responsive HarperCollins documents that plaintiffs agreed to produce in response to Warner's and Zaentz's requests. Regarding HarperCollins' hard copy documents, as we have repeatedly explained, HarperCollins does not maintain these documents by custodian; they are instead stored in central files. This applies to both former and current employees. All relevant files have been collected, reviewed and/or produced in accordance with our meet and confer agreements. As to David Brawn, Simon Dowson-Collins, Jane Johnson and Chris Smith, we have collected their accessible, relevant ESI and our review and production of these documents is nearly complete. The ESI of former employees Mary Butler (left in 1995), Adrian Laing (left 2001), Adrian Bourne (left 2002), David Daley (left 2009), David Marshall (left 2003), Peter Winslow (left 1994) and David Young (left 2003) is stored on inaccessible, unindexed back-up tapes. We do not understand your reference to loose Word, PDF, and Excel files. Please clarify. However, if you are referring to network shared files, we did collect such accessible, relevant documents, and produced responsive, non-privileged documents.

As to your January 3rd letter regarding the search terms we have employed in connection with HarperCollins ESI, our use of search terms has been broader than as indicated in your letter. Although we initially tested a broad set of terms narrowed by a secondary set of more specific terms, we were concerned that the results might be too narrow. Thus, we ultimately conducted the search using a broad, core set of key terms – FOTR, Fellowship of the Ring, Hobbit, LOTR, Lord of the Rings, ROTK, Return of the King, TTT, The Two Towers and Tolkien (with expanders) – and then put eyes on every page in conducting our review. Accordingly, the search we conducted is actually broader than the additional search terms you propose.

The additional terms you have requested us to use (excluding the term "Microsoft") pull in approximately 1% of all the ESI collected. We are willing to apply those terms to the collected data and review any additional documents that have not previously been reviewed, provided that Warner confirms that it has also applied its list of new search terms against its ESI

Molly M. Lens
John C. Ulin
January 30, 2014
Page 6

and will similarly agree to review and produce any additional documents.  However, the term
"Microsoft" hits on virtually every single document, as it appears to be pulling documents
associated with underlying Microsoft software, and so we cannot agree to use that term in our
searches.

F.      Assertion of Privilege/Privilege Log

        Once again, we disagree with your contention that communications between Ms.
Blackburn and/or Mr. Maier and their clients were made in a non-legal capacity.  Likewise, we
disagree with your contention that plaintiffs have improperly withheld communications between
Tolkien/HC based on a common interest privilege, or communications between the Tolkien
Estate and Zaentz based on a common interest and/or joint client privilege.  We have already
provided authority supporting our assertion of the common interest and joint client privilege.  If
you believe you have any authority to support your position, please provide it to us immediately.

        Moreover, we have as many, if not more, questions regarding the privilege assertions
made by defendants.  For example, Warner has made numerous unfounded privilege assertions,
including with respect to Ben Zinkin and David Imhoff communications.  Similarly, during the
deposition of Laurie Battle, Zaentz asserted for the very first time that all communications
between Ms. Battle and/or any employee of Zaentz and Al Bendich are purportedly privileged
based on the new founded assertion that Al Bendich was acting as general counsel.  Zaentz
clawed back numerous documents at the deposition based on this new privilege assertion — we
believe inappropriately.  This will be the subject of a further meet and confer shortly.  In
addition, Warner and Zaentz appear to have improperly redacted numerous relevant documents,
including documents exchanged among them long before this dispute arose.

        While we believe that preparing a privilege log will be incredibly burdensome and time-
consuming (a position with which all parties agreed at the early meeting), we are prepared to do
so, as long as the agreement to provide privilege logs is reciprocal and all defendants agree to do
the same.

G.      Engagement Letter

        We believe that you have misunderstood Mr. Maier's deposition testimony.  We have
again confirmed that there are no engagement letters prior to 2012.  Mr. Maier was not the
partner responsible for the Tolkien Estate and may have been making an assumption based on
what became an established practice.  Indeed, it is clear from the continuation of his deposition
testimony that he was simply discussing general Manches policies:

        Q.      You're sure? Are you speculating now or are you sure?
        A.      It was Manches' practice to have an engagement letter.

Molly M. Lens
John C. Ulin
January 30, 2014
Page 7

     Q.     That doesn't respond to my question, okay?  Do you know for a fact whether there
               was an engagement letter?
     A.     No.

Tr. 199:1-8.

Regarding Mr. Blackburn's 2012 engagement letter, we stand by our position that the
letter is privileged and wholly irrelevant to this dispute, and will not agree to produce it.

     H.     <u>Simon Dowson-Collins Depositions and Karly Last Files</u>

Defendants have already requested/noticed ten depositions.  Plaintiffs will not consent to
an eleventh deposition.  Accordingly, we will not make Mr. Dowson-Collins available for
deposition.

Regarding Ms. Last's files, it is our understanding that Ms. Last only began working on
Tolkien matters in connection with this litigation, and that she has had no involvement in the
underlying issues in dispute.  Additionally, she is an attorney, and so the majority, if not all, of
her communications will be privileged.  For these reasons, we have not collected Ms. Last's
files, nor do we believe it is necessary to do so.  Nonetheless, we are confirming that Ms. Last
has no files related to the underlying issues in dispute.

     I.     <u>Documents for Tolkien Heirs</u>

Your assumption that Michael Tolkien and Steven Maier were not included on our list of
custodians is incorrect.  As explained above, Mr. Maier's hard copy and electronic files have
been, and are being collected.  Regarding the Tolkien Heirs, to avoid any confusion, below is a
summary of the status of our collection and production of hard copy and electronic files for each
of the Tolkien heirs:

     1.     <u>Christopher Tolkien and Baillie Tolkien</u>:  We have collected, reviewed
and produced non-privileged, responsive hard copy and electronic files for Christopher Tolkien
and Baillie Tolkien.

     2.     <u>Priscilla Tolkien</u>: We have collected, reviewed and produced non-
privileged, responsive hard copy documents for Priscilla Tolkien.  Ms. Tolkien does not use, and
has not used, email or a computer.

     3.     <u>Michael Tolkien</u>:  We have collected, reviewed and produced some of the
hard copy documents for Michael Tolkien.  We are in the process of collecting and reviewing
additional hard copy documents and electronic documents.

Molly M. Lens
John C. Ulin
January 30, 2014
Page 8


       4.     <u>Simon Tolkien</u>:  We have collected, reviewed and produced some of the hard copy documents for Simon Tolkien.  We are in the process of collecting and reviewing additional hard copy documents and electronic documents.

      J.     <u>Jeremy Nussbaum Files</u>

       As previously explained, Mr. Nussbaum's files were collected by the Tolkien/HC Parties' prior counsel in connection with the prior litigation.  We obtained those files from prior counsel and are in the process of reviewing and producing non-privileged, responsive documents.  While we have no personal knowledge of when Mr. Nussbaum passed away, based on online research, it is our understanding that Mr. Nussbaum passed away on June 12, 2012.  We are unclear as to what additional information you are seeking with respect to Mr. Nussbaum's files, or why any further information is relevant.  Please provide a further explanation.

       In sum, the Tolkien/HC Parties are diligently working to complete their document collection and production.  It is obvious from Warner's recent document productions on the eve of critical depositions that it too is continuing to gather and produce additional documents and has not completed its production.

       Rather than waste time and resources posturing and filing premature (and now moot) motions, we urge Warner and Zaentz to focus their attentions on completing discovery and moving the case towards trial.  That is the approach we intend to take.

       In any event, please confirm that Warner will withdraw its Motion.  We look forward to speaking to you this afternoon.

       Sincerely,

       Julia R. Haye

JRH/rm

cc:    Sean M. Callagy
       Martin R. Glick
       Robert D. Hallman
       Victor Jih
       Daniel Petrocelli
       Nikolas A. Primack

EXHIBIT F

**Massing, Robert**

| | |
|---|---|
| **From:** | Lens, Molly <mlens@omm.com> |
| **Sent:** | Tuesday, October 01, 2013 1:22 PM |
| **To:** | Cestero, Ricardo |
| **Cc:** | Eskenazi, Bonnie; Moriarty, Elisabeth; Valadez, Rachel; Ulin, John C. (John.Ulin@APORTER.COM); Hallman, Robert D. (Robert.Hallman@aporter.com); Callagy, Sean M. (Sean.Callagy@aporter.com); Petrocelli, Daniel; Jih, Victor; Primack, Nikolas A. |
| **Subject:** | Fourth Age Ltd. |

Ricardo –

Pursuant to our conversation last week and the parties' ongoing meet-and-confer efforts, in an effort to avoid motion practice, Warner confirms its willingness to withdraw its pending deposition notices and replace them with amended notices for dates in the first half of December.  Please note that Warner's willingness to do so is expressly contingent on its ability to depose Cathleen Blackburn and Steven Maier by the middle of December and before any Warner witnesses are deposed.

As discussed last week, Warner disagrees that Ms. Tolkien's deposition should move forward on October 9, 2013 and, accordingly, based in part on your recent disclosures that Ms. Butler will appear for a deposition in London and that you do not represent Mr. Laing, Warner hereby withdraws the deposition notice for October 9.  Warner continues to believe that the London depositions should be consolidated as a matter of efficiency.  Furthermore, we object to your mandate, on one hand, that depositions cannot proceed without the completion of document discovery with your insistence, on the other hand, that Ms. Tolkien's deposition should move forward months before any other witnesses are "allowed" to be deposed.   In light of your confirmation that you have yet to make travel arrangements, we understand that any inconvenience on your end is minimal and far outweighed by the inefficiencies of repeat trips to London.

Warner will serve amended deposition notices for the depositions of Ms. Blackburn, Ms. Tolkien, Mr. Maier, and Mr. Brawn (as well as notices for Ms. Butler and Mr. Benjamin) after we have agreement on specific dates, assuming those dates are reasonably forthcoming.  (We assume that you prefer this to service of amended notices now but please let us know if we are mistaken and you insist on formal amended notices now).

For the avoidance of doubt, Warner continues to disagree that you are entitled unilaterally to delay the commencement of depositions based on your unfounded position that all the parties' document productions must be completed first and has agreed to the above to avoid burdening the Court with your application for a protective order.  However, in the (albeit seemingly unlikely) event that any party's document production remains substantially incomplete at the end of November, it is Warner's position that depositions must nonetheless proceed at that time.

In light of the above, please confirm that you are formally withdrawing your portion of the prematurely served (and procedurally flawed) joint stipulation and provide dates for Ms. Blackburn and Mr. Maier in early December as well as dates for Ms. Tolkien, Mr. Brawn, Mr. Benjamin, and Ms. Butler.   We are in the process of identifying dates for Mr. Imhoff's and Mr. Zinkin's depositions consistent with the schedule discussed above.

Thanks,

Molly

_____
**Molly M. Lens**
**O'Melveny & Myers LLP**
1999 Avenue of the Stars

Los Angeles, CA 90067
Phone: (310) 246-8593
Fax: (310) 246-6779
mlens@omm.com

*This message and any attached documents contain information from the law firm of O'Melveny & Myers LLP that may be confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.*

2

EXHIBIT G

**Massing, Robert**

| | |
|---|---|
| **From:** | Lens, Molly <mlens@omm.com> |
| **Sent:** | Monday, July 29, 2013 5:37 PM |
| **To:** | Cestero, Ricardo |
| **Cc:** | Jih, Victor; Petrocelli, Daniel; Primack, Nikolas A.; Callagy, Sean M.; Glick, Martin R.; Valadez, Rachel; Moriarty, Elisabeth; Eskenazi, Bonnie; Hallman, Robert D.; Ulin, John C. |
| **Subject:** | RE: Fourth Age Limited, et al. v. Warner Bros. Digital Distribution, et al. |

Ricardo -

We have never agreed to your mandate that all document productions must be completed before depositions can commence.  As you are aware, the Federal Rules expressly contemplate that depositions can commence following the Rule 26(f) conference, which happened months ago, and that the discovery vehicles may be used in any sequence.  At this point, we have no objection to your not scheduling any of Warner's witnesses until the parties have completed their document productions, but you cannot unilaterally refuse to produce your witnesses for depositions.  To the extent that you continue to insist on this condition, we will simply start noticing the depositions rather than waste our time trying to negotiate convenient dates.  Separately, your accusation that we are attempting to negotiate a schedule under which we depose your witnesses before Warner's or Zaentz's is flatly contradicted by the record.  You have requested dates for only two Warner witnesses, and we suggested dates along the same time frame that you have for your witness (and, indeed, even offered July dates for Mr. Zinkin).  To the extent that there are additional Warner witnesses that you would like to calendar, please let us know so that we can inquire about their availability.

As stated in my June 21 email, Mr. Zinkin is available to be deposed in Los Angeles.  Please let me know whether you would like to depose him in Los Angeles on October 17 and, if so, I will confirm that he remains available on that date.  As to Mr. Imhoff, we are working to confirm the location for his deposition and should have an update for you later this week.  Once we know where Mr. Imhoff will be deposed, we can discuss the specific date.

We will respond separately to your proposal about Mr. Maier and Ms. Blackburn.  In the meantime, we need dates for Mr. Bernstein, Mr. Benjamin, Ms. Butler, and Mr. Lang, as well the location for the latter two deponents.

Thanks,

Molly

_____
**Molly M. Lens**
**O'Melveny & Myers LLP**
1999 Avenue of the Stars
Los Angeles, CA 90067
Phone: (310) 246-8593
Fax: (310) 246-6779
mlens@omm.com

*This message and any attached documents contain information from the law firm of O'Melveny & Myers LLP that may be confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.*

**From:** Cestero, Ricardo [mailto:rcestero@greenbergglusker.com]
**Sent:** Friday, July 26, 2013 6:25 PM
**To:** Lens, Molly

Cc: Jih, Victor; Petrocelli, Daniel; Primack, Nikolas A.; Callagy, Sean M.; Glick, Martin R.; Valadez, Rachel; Moriarty, Elisabeth; Eskenazi, Bonnie; Hallman, Robert D.; Ulin, John C.
**Subject:** RE: Fourth Age Limited, et al. v. Warner Bros. Digital Distribution, et al.

Molly & John-

Let me begin by again making clear that any deposition schedule we agree to must be contingent upon the parties completing all outstanding document production by early September. We do not intend to proceed with depositions until we have had the opportunity to review and analyze the documents produced by all parties. Given that Warner has yet to make any significant headway in its production, I highly doubt that depositions can begin in September. Having said that, I will address the outstanding requests the best that I can.

In addition, it is readily apparent that your collective strategy is to try and arrange it so that you take all of our witnesses before any of your witnesses are deposed. We do not intend to allow that to happen. We will arrange a schedule that makes sense for the witnesses and the lawyers.

**Blackburn and Maier:** As I said, they are not available the week of September 16, 2013. And, even if they were, I cannot imagine that the document production would be completed by that time, which would mean the depositions would have to be rescheduled. I repeat my suggestion that you propose dates in October on which you wish to take their depositions and I will see if those dates are clear. As for the length of those depositions, we do not believe Mr. Maier's deposition will require more than one day, and are therefore not inclined to agree to additional time for him. With respect to Ms. Blackburn, we would be open to considering an extension of her deposition to two days on the following conditions. First, we would request two days with Al Bendich. Second, we would request an agreement that all parties question Ms. Blackburn both individually and in her capacity as a representative of the Plaintiff entities such that the defendants would not seek an additional deposition of the Plaintiff entities under Rule 30(b)(6).

**Zinkin and Imhoff:** Since it appears these depositions will both need to be in NY, I would suggest that we schedule them during the same week. I would propose Zinkin on October 17 and Imhoff on October 15, 2013. Please advise if that is acceptable.

**Priscilla Tolkien:** While I understand your desire to make only one trip to England, we should take the opportunity to fix a date for this deposition so schedules can be set. Please advise which of the two dates you would prefer. Since we do not control Mr. Williamson, we should not hold off on scheduling Mrs. Tolkien for the possibility that we may be able to coordinate Mr. Williamson's deposition.

**Bernstein and Benjamin:** As I think I told you, Alan Benjamin is located in Florida and his deposition will need to take place there. Bill Bernstein is in Los Angeles. We have reached out them, but haven't heard back. I will let you know their availability when I hear.

**Butler and Liang**: These two witnesses are no longer employed by HarperCollins. We are in the process of reaching out to them and will let you know once we have available dates. I suspect, however, that their depositions will likely take place in London.

Regards,

Ricardo

---

**From:** Lens, Molly [mailto:mlens@omm.com]
**Sent:** Thursday, July 25, 2013 4:52 PM
**To:** Cestero, Ricardo
Cc: Jih, Victor; Petrocelli, Daniel; Primack, Nikolas A.; Callagy, Sean M.; Glick, Martin R.; Valadez, Rachel; Moriarty,

Elisabeth; Eskenazi, Bonnie; Hallman, Robert D.; Ulin, John C.
**Subject:** RE: Fourth Age Limited, et al. v. Warner Bros. Digital Distribution, et al.

Ricardo -

It appears that David Imhoff's deposition will need to occur in New York, though I am working to confirm this.  Given that Mr. Imhoff currently has fairly good availability in October, I suggest that you propose several dates in October that would work on your end, and I will see if any of them work with both his and our calendars.

Otherwise, I ask again that you provide us with the information requested in ours and Zaentz's emails below.  Given your purported concern about the pace of discovery, we find your delay perplexing.

Thanks,

Molly

_____

**Molly M. Lens**
**O'Melveny & Myers LLP**
1999 Avenue of the Stars
Los Angeles, CA 90067
Phone: (310) 246-8593
Fax: (310) 246-6779
mlens@omm.com

*This message and any attached documents contain information from the law firm of O'Melveny & Myers LLP that may be confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.*

**From:** Lens, Molly
**Sent:** Monday, July 22, 2013 1:40 PM
**To:** Cestero, Ricardo
**Cc:** Jih, Victor; Petrocelli, Daniel; Primack, Nikolas A.; Callagy, Sean M.; Glick, Martin R.; Valadez, Rachel; Moriarty, Elisabeth; Eskenazi, Bonnie; Hallman, Robert D.; Ulin, John C.
**Subject:** RE: Fourth Age Limited, et al. v. Warner Bros. Digital Distribution, et al.

Ricardo -

We are writing in a further attempt to advance the scheduling of depositions.

**Blackburn and Maier**:  We join Zaentz's request that you reconsider your decision to withdraw the week of September 16 for these depositions.  Is it your position that neither one of them has any availability this week?

**Brawn**:  We join Zaentz's request that you confirm Mr. Brawn's deposition on August 30 in Los Angeles.

**Depositions in England**:  Provided that we can schedule Mr. Williamson this same week, we are prepared to depose Ms. Tolkien on one of the proffered dates.  As we need to schedule all the English deponents during one week, we repeat our request that you confirm whether Ms. Butler and Mr. Lang are willing to travel to Los Angeles for their depositions.  Because their availability impacts our ability to schedule other depositions, we must insist that you provide us an answer this week.

**Bernstein and Benjamin:**  Like Zaentz, we repeat our earlier requests that you confirm where these depositions will take place and give us a sense of each witnesses' availability.

3

**Bendich**:  Warner is available on October 23, 24 and 25.  We can consider the dates proffered on the weekends if none of these dates work on your end.

**Warner's Depositions**:  Mr. Zinkin continues to be available on October 10 and 17, though the earlier date may no longer work if depositions occur in England that week.  He is also available on October 23, 24, 30, and 31.  We expect to be able to confirm the location of Mr. Imhoff's deposition and provide suggested dates later this week.

Thanks,

Molly

_____

**Molly M. Lens**
**O'Melveny & Myers LLP**
1999 Avenue of the Stars
Los Angeles, CA 90067
Phone: (310) 246-8593
Fax: (310) 246-6779
mlens@omm.com

*This message and any attached documents contain information from the law firm of O'Melveny & Myers LLP that may be confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.*

---

**From:** Lens, Molly
**Sent:** Wednesday, July 17, 2013 10:08 AM
**To:** Ulin, John C.; Cestero, Ricardo
**Cc:** Jih, Victor; Petrocelli, Daniel; Primack, Nikolas A.; Callagy, Sean M.; Glick, Martin R.; Valadez, Rachel; Moriarty, Elisabeth; Eskenazi, Bonnie; Hallman, Robert D.
**Subject:** RE: Fourth Age Limited, et al. v. Warner Bros. Digital Distribution, et al.

Ricardo -

We agree with Zaentz that your July 15 email is misleading and inaccurate in many respects.  As we told you before you sent your email, we are aiming to respond to your firm's July 9 letter later this week and similarly hope to be able to confirm the deposition dates proposed by Zaentz shortly.

Molly

_____

**Molly M. Lens**
**O'Melveny & Myers LLP**
1999 Avenue of the Stars
Los Angeles, CA 90067
Phone: (310) 246-8593
Fax: (310) 246-6779
mlens@omm.com

*This message and any attached documents contain information from the law firm of O'Melveny & Myers LLP that may be confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.*

**From:** Ulin, John C. [mailto:John.Ulin@APORTER.COM]
**Sent:** Wednesday, July 17, 2013 7:17 AM
**To:** Cestero, Ricardo; Lens, Molly
**Cc:** Jih, Victor; Petrocelli, Daniel; Primack, Nikolas A.; Callagy, Sean M.; Glick, Martin R.; Valadez, Rachel; Moriarty, Elisabeth; Eskenazi, Bonnie; Hallman, Robert D.
**Subject:** RE: Fourth Age Limited, et al. v. Warner Bros. Digital Distribution, et al.


Ricardo,

We, too, are concerned about the status of discovery, and welcome the opportunity to establish a schedule.  Your description of the status of written discovery and document production is misleading in several respects, which are discussed below.  You should know, however, that we are preparing a response to your letter of July 9, which we expect to send within the next few days.  With respect to depositions, we need to confirm dates for your witnesses.  While you have offered dates for some of them, we have been waiting for your responses to our inquiries about others for weeks now and, with September fast approaching, it is critical that we set firm dates.

**Depositions:**

**Blackburn and Maier:**  You had previously offered Cathleen Blackburn and Steven Maier for deposition beginning the week of September 9. SZC had been planning around that offer and we strongly prefer to set their depositions for the week of September 16.  In your note, you do not indicate why these witnesses are no longer available during the weeks of September 9 and 16.  Pending input on the availability of Warner's counsel, we ask that you reconsider the week of the 16th and agree to get their depositions set that week.  As I raised with you last month, we also need to know now whether you will agree to two days of deposition for these two critical witnesses.  Based on their involvement in the core issues of the case, the number of documents they sent and received, and the divergence in topics of importance to SZC and Warner with respect to both Ms. Blackburn and Mr. Maier, we think this is a very reasonable request, but if you disagree we need to know right away, so that we can seek relief from the Court.

**Brawn:**  Can we confirm August 30 (a date  you have offered) for David Brawn's deposition?  (Once again, assuming Warner's counsel can confirm that the date works.)

**Depositions in England:**  SZC is prepared to accept your offer to produce Priscilla Tolkien for deposition on October 9 or 10.  We can proceed either day, but we need to set a full schedule for depositions in England that week, so that the parties can minimize their travel costs and make efficient use of what we hope will be a single trip to the UK.  Based on your representation that the Estate does not represent or control Dick Williamson, we are attempting to reach out to him to secure a date for his deposition during the week of October 7.  If he is not available then, we may ask to move Ms. Tolkien's deposition, but we believe it makes sense to confirm a date with her while one is being offered.  We are still waiting on your input about whether Adrian Laing and Mary Butler will travel to Los Angeles for depositions.  If they will not, then they, too, need to deposed during that same trip to London, preferably in the same week as Priscilla Tolkien.  You indicated last month that you would get us an answer, which we need now.

**Bernstein and Benjamin:**  You have indicated that you represent Alan Benjamin and Bill Bernstein and will produce them for deposition.  You told us that one of them is in Florida and that you did not know where the other was located.  We asked you last month to confirm when and where these witnesses will be produced for deposition, which you said you would do.  We are still waiting for your response and also need to get these depositions scheduled.

**SZC Depositions:**  You have asked us for available deposition dates for Al Bendich and Laurie Battle.  Mr. Bendich is currently available on September 30, October 1, 20 and 23-27.  We will forward available dates for Ms. Battle as soon as we receive them.

**Written Discovery and Documents:**

5

Your characterization of the parties' meet-and-confer efforts is puzzling.  As you know, SZC initiated the correspondence about resolving disputed discovery, and SZC requested the in-person meet-and-confer sessions.  You asked to go through Plaintiffs' requests first because the first meeting was held at your offices, and you suggested that we would get a comprehensive proposal concerning the Plaintiffs' discovery requests on or about July 1 (following our meet-and-confer on June 27).  We all agreed that SZC and Warner would review that proposal and see what parts of it could be used, in turn, as a framework for resolving disputes concerning SZC's and Warner's discovery requests (which were discussed on July 1).  We did not get your proposal until July 9.  We now need to determine what parts of it are agreeable, and what parts can be incorporated in our proposal regarding SZC's discovery requests.  This all takes time and, while we would have preferred that it happened sooner, it was your delay, not ours, that slowed the process.  We will get our counter-proposals to you this week, and we agree that we need to resolve any remaining issues promptly.

Finally, we want to clarify the status of our respective document productions to date.  In the email below, you note that SZC has produced nothing, and Warner very little, but you fail to acknowledge that Plaintiffs have not made any sort of meaningful production.  In fact, among all of the Plaintiff entities, we have received a single production (of less than 1500 pages) consisting of multiple copies of the same agreements.  SZC has been diligent in its document collection and review and is planning to make a substantial production this week or early next week.  We trust that we can expect a meaningful production from each Plaintiff entity before the end of next week.  Please confirm that is your plan.

I am available to discuss any of these topics further.

Sincerely,

_____

*John C. Ulin*

Arnold & Porter LLP
44th Floor
777 South Figueroa Street
Los Angeles, CA  90017-5844

Telephone: +1 213.243.4228
Cell Phone: +1 626.422.6092
John.Ulin@aporter.com
www.arnoldporter.com

---

**From:** Cestero, Ricardo [mailto:rcestero@greenbergglusker.com]
**Sent:** Monday, July 15, 2013 7:10 PM
**To:** mlens@omm.com; Ulin, John C.
**Cc:** vjih@omm.com; Petrocelli, Daniel (dpetrocelli@omm.com); Primack, Nikolas A. (nprimack@omm.com); Callagy, Sean M.; Glick, Martin R.; Valadez, Rachel; Moriarty, Elisabeth; Eskenazi, Bonnie
**Subject:** Fourth Age Limited, et al. v. Warner Bros. Digital Distribution, et al.

Molly & John-

We are growing increasingly concerned by the lack of progress on discovery.  In the wake of our lengthy meet and confer discussions, we promptly circulated a comprehensive summary of our discussions with respect to Warner and Zaentz's responses to our discovery requests.  Based on our discussions, we had expected that you would each do the same.  However, we have yet to receive anything from your side of the table.  You have offered no explanation for this delay, nor have you indicated that a letter is forthcoming.  In addition, this morning, Molly indicated that Warner would

not be able to respond to our letter of July 9, 2013 until possibly later this week. Zaentz has not responded at all to that letter. Obviously, any delay in reaching final agreement on the meet and confer process makes it more difficult and time consuming to review documents for production. The issues we discussed need to be resolved quickly, and we must insist that you place this matter at the top of your priority list.

It has now been over four months since the parties served the initial discovery requests and Zaentz has produced nothing, while Warner has produced very little. As we have repeatedly stated, we do not intend to make witnesses available for deposition until both Warner and Zaentz have completed their productions in response to our initial requests. At the current rate, it appears those productions will not be completed any time soon.

Given the lack of progress to date, we believe it is now necessary to give the parties deadlines for the production of documents. We will be prepared to make a substantial production of documents on Friday, July 26, 2013, and we propose that all parties mutually exchange documents ready for production on that date. We also will insist that all parties complete their productions by September 1, 2013, so that depositions can begin in late September or early October. Please let me know if you are prepared to produce documents on that schedule. If you are not, we must reserve all of our rights to compel a timely production of documents.

With respect to depositions, the weeks of September 9 and September 16 are no longer available for Steven Maier and Cathleen Blackburn. Please suggest dates at the end of September or October that would work for you for those depositions and we will see if they are clear. With respect to Priscilla Tolkien, she is available for deposition on October 9 or 10, 2013. Please advise as soon as possible if those dates will work for you. We are still waiting on dates from you for Daivd Imhoff, Al Bendich, Laurie Battle. Please advise if the dates in October you previously offered for Ben Zinkin are still available.

Please feel free to call if you'd like to discuss these matters further.

Regards,

Ricardo

**Ricardo P. Cestero**  |  **Attorney at Law** | Biography
D: 310.785.6809  |  F: 310.201.2309  |  RCestero@greenbergglusker.com

**Greenberg Glusker Fields Claman & Machtinger LLP**
1900 Avenue of the Stars, 21st Floor, Los Angeles, CA 90067
O: 310.553.3610  |  GreenbergGlusker.com

**IRS Circular 230 Disclosure:**
To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax related penalties under the Internal Revenue Code, or (ii) promoting, marketing or recommending to another party any tax-related matters addressed herein.

This message is intended solely for the use of the addressee(s) and is intended to be privileged and confidential within the attorney client privilege. If you have received this message in error, please immediately notify the sender at Greenberg Glusker and delete all copies of this email message along with all attachments. Thank you.

U.S. Treasury Circular 230 Notice

Any U.S. federal tax advice included in this communication (including any attachments) was not intended or written to be used, and cannot be used, for the

purpose of (i) avoiding U.S. federal tax-related penalties or (ii) promoting, marketing or recommending to another party any tax-related matter addressed herein.

This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any dissemination, distribution, or copying of this communication is strictly proh bited. Anyone who receives this message in error should notify the sender immediately by telephone or by return e-mail and delete it from his or her computer.

--------------------------------------------------------------------
For more information about Arnold & Porter LLP, click here :
http://www.arnoldporter.com

EXHIBIT H

BONNIE E. ESKENAZI (SBN 119401)
BEskenazi@ggfirm.com
ELISABETH A. MORIARTY (SBN 156569)
EMoriarty@ggfirm.com
RICARDO P. CESTERO (SBN 203230)
RCestero@ggfirm.com
GREENBERG GLUSKER FIELDS CLAMAN &
MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California  90067-4590
Telephone:  310.553.3610
Fax:  310.553.0687

Attorneys for Plaintiffs and Counterclaim Defendants

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FOURTH AGE LIMITED, a United Kingdom corporation; PRISCILLA MARY ANNE REUEL TOLKIEN, as TRUSTEE OF THE TOLKIEN TRUST, a United Kingdom Charitable Trust; THE J.R.R. TOLKIEN ESTATE LIMITED, a United Kingdom corporation; HARPERCOLLINS PUBLISHERS, LTD., a United Kingdom corporation; UNWIN HYMAN LTD., a United Kingdom corporation; and GEORGE ALLEN & UNWIN (PUBLISHERS) LTD., a United Kingdom corporation,<br><br>                        Plaintiffs,<br><br>        v.<br><br>WARNER BROS. DIGITAL DISTRIBUTION, INC., a division of WARNER BROS. HOME ENTERTAINMENT, INC., a Delaware corporation; WARNER BROS. ENTERTAINMENT, INC., a Delaware corporation, as successor-in-interest to New Line Cinema Corp.; WARNER BROS. CONSUMER PRODUCTS, INC., a Delaware corporation; WARNER BROS. INTERACTIVE ENTERTAINMENT, INC., a division of WARNER BROS. HOME ENTERTAINMENT, INC.; NEW LINE PRODUCTIONS, INC., a California corporation; THE SAUL ZAENTZ | Case No.  CV 12-09912 ABC (SHx)<br><br>Assigned To: Hon. Audrey B. Collins<br><br>**PLAINTIFFS AND COUNTERCLAIM DEFENDANTS' INITIAL DISCLOSURES PURSUANT TO F.R.C.P. 26(a)(1)(A)**<br><br>Trial Date:  None Set<br>Action Filed:  November 19, 2012 |

1   COMPANY d/b/a Middle-earth
    Enterprises, a Delaware corporation; and
2   DOES 1-10, inclusive,

3           Defendants.

4   ————————————————————————
    AND RELATED COUNTERCLAIMS.
5

6

7           Plaintiffs and Counterclaim Defendants Fourth Age Limited, Priscilla Mary

8   Anne Reuel Tolkien, as Trustee of the Tolkien Trust, The J.R.R. Tolkien Estate

9   Ltd., Harper Collins Publishers, Ltd., Unwin Hyman Ltd., and George Allen &

10  Unwin (Publishers), Ltd. (collectively, the "Tolkien/HC Parties") submit the

11  following initial disclosures pursuant to Rule 26(a) of the Federal Rules of Civil

12  Procedure.

13          The Tolkien/HC Parties make these initial disclosures based on information

14  presently known and without prejudice to or waiver of their right to supplement

15  these disclosures or to present additional or different information or evidence at

16  trial as permitted under the Federal Rules of Civil Procedure and the Local Rules of

17  this Court.  These disclosures shall not be deemed as an admission as to any fact in

18  dispute or as a waiver of any rights or claims the Tolkien/HC Parties have asserted

19  or may assert in this action.

20          By making these disclosures, the Tolkien/HC Parties do not represent that

21  they are identifying every document, tangible thing or witness possibly relevant to

22  this action.  The Tolkien/HC Parties' initial disclosures represent a good faith effort

23  at an early stage of this litigation to identify information they reasonably believe

24  may be relevant to their claims and defenses in this case.

25          The Tolkien/HC Parties reserve the right to object to the production and/or

26  admission of any testimony, witness, document or tangible thing identified in these

27  initial disclosures.

28

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1

PLAINTIFFS AND COUNTERCLAIM
DEFENDANTS' INITIAL DISCLOSURES

## **Definitions**

As used herein, the following terms shall have the following meanings:

A.  "Zaentz" means defendant and counterclaimant The Saul Zaentz Company d/b/a Middle-earth Enterprises.

B.  "Warner" means defendants and counterclaimants Warner Bros. Home Entertainment, Inc., Warner Bros. Entertainment, Inc., Warner Bros. Consumer Products, Inc., Warner Bros. Digital Distribution, New Line Productions, Inc., and their predecessor in interest, New Line Cinema Corp.

C.  The "Tolkien Parties" means plaintiffs and counterclaim defendants Fourth Age Limited, Priscilla Mary Anne Reuel Tolkien, as Trustee of the Tolkien Trust, and The J.R.R. Tolkien Estate Ltd.

D.  The "H/C Parties" means plaintiffs and counterclaim defendants Harper Collins Publishers, Ltd., Unwin Hyman Ltd., and George Allen & Unwin (Publishers), Ltd.

E.  "United Artists" means the entity United Artists Corporation.

F.  The "Complaint" means the Complaint filed by The Tolkien/HC Parties in the above-entitled action.

G.  The "1969 GAU Agreement" means the contract entered into between George Allen & Unwin, Ltd. and Warner's predecessor in interest, United Artists, on July 8, 1969.

H.  The "1969 Sassoon Agreement" means the contract entered into between the Sassoon Trustee and Executor Corp., Ltd. and Warner's predecessor in interest, United Artists, on July, 8, 1969.

I.  The "1969 Agreements" means the 1969 GAU Agreement and the 1969 Sassoon Agreement.

J.  The "Merchandising License" means Schedule D to the 1969 GAU Agreement, Schedule D to the 1969 Sassoon Agreement, and the 1975 and

GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

2

PLAINTIFFS AND COUNTERCLAIM DEFENDANTS' INITIAL DISCLOSURES

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1   1981 Amendments to those Schedules, as defined in paragraph 40 of the

2   Complaint.

3   K.   The "Tolkien Works" means the three volume literary work by the author

4   J.R.R. Tolkien, consisting of "The Lord of the Rings: The Fellowship of the

5   Ring," "The Lord of the Rings: The Two Towers," and "The Lord of the

6   Rings: The Return of the King," as well as J.R.R. Tolkien's literary work,

7   "The Hobbit."

8   L.   "Video Games" means interactive, computer, and other electronic and/or

9   digital games featuring characters, events, images and/or story elements from

10  the Tolkien Works.

11  M.   "Intangible Video Games" Video Games based on the Tolkien Works that

12  are delivered otherwise than by way of physical media such as DVD or

13  cartridge, including (but not limited to) games delivered by way of electronic

14  download, mobile telephone networks or social media websites.

15  N.   "Online Slots" means any online gambling slot machine game featuring

16  characters, events, images and/or story elements from the Tolkien Works,

17  including, but not limited to, the "Online Slots" as defined in paragraph 45 of

18  the Complaint.

19  O.   "Casino Slot Machines" means any gambling casino slot machine featuring

20  characters, events, images and/or story elements from the Tolkien Works,

21  including, but not limited to, the "Casino Slot Machine" as defined in

22  paragraph 48 of the Complaint.

23  P.   The "Disputed Marks" means the trademarks and/or service marks being

24  exploited by Zaentz and/or Warner based on, or related to, the characters,

25  events, images and/or story elements from the Tolkien Works, which the

26  Tolkien/HC Parties allege are beyond the scope of the Merchandising

27  License, as alleged in paragraphs 81-84 of the Complaint.  The Disputed

28  Marks include, but are not limited to, trademarks and/or service marks

3

PLAINTIFFS AND COUNTERCLAIM
DEFENDANTS' INITIAL DISCLOSURES

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1    registered in connection with hotels, restaurants, travel agencies, ringtones,

2    housing developments, Online Slots, Casino Slot Machines, Intangible

3    Games, and in International Class 16.

4    Q.    The "2010 Regrant Agreement" means the agreement dated as of September

5          1, 2010 between the Tolkien/HC Parties and several other Tolkien-related

6          entities and heirs, as well as Zaentz and certain of the Warner-related parties,

7          relating to the Tolkien Works.

8    R.    The "Hobbit Term Sheet" means the Hobbit Binding Term Sheet dated as of

9          September 7, 2010 entered into by several of the Tolkien/HC Parties and

10         related persons and entities, and several Warner and Zaentz related entities.

11   S.    The "Binding Term Sheet" means the Binding Term Sheet dated as of

12         August 21, 2009 entered into by several of the Tolkien/HC Parties and

13         related persons and entities, and several Warner related entities.

14

15   **1.    Witness Disclosures**

16         The Tolkien/HC Parties currently believe that the following witnesses,

17   excluding expert witnesses, are likely to have discoverable information that the

18   Tolkien/HC Parties may use to support their claims and defenses, unless solely for

19   impeachment.  The Tolkien/HC Parties reserve the right to supplement these

20   disclosures as discovery continues and as the case develops, or as otherwise

21   reasonably necessary and appropriate:

22         a.    Cathleen Blackburn. Ms. Blackburn is an attorney at Maier

23   Blackburn, counsel for the Tolkien Parties.  Ms. Blackburn can be contacted c/o the

24   Tolkien/HC Parties' counsel of record.  Subjects of information include, without

25   limitation: (i) the 1969 Agreements; (ii) the Merchandising License; (iii) Video

26   Games; (iv) Intangible Video Games; (v) Online Slots; (vi) Casino Slot Machines;

27   (vii) the Disputed Marks; (viii) communications between and among the

28   Tolkien/HC Parties, Zaentz, Warner, and third parties as they relate to Video

4

PLAINTIFFS AND COUNTERCLAIM
DEFENDANTS' INITIAL DISCLOSURES

1    Games, Intangible Video Games, Online Slots, Casino Slot Machines, and the

2    Disputed Marks; (viii) the goodwill the Tolkien/HC Parties have cultivated

3    surrounding the Tolkien Works and related intellectual property; (ix) the 2010

4    Regrant Agreement, The Binding Term Sheet, and the Hobbit Term Sheet; and (x)

5    the settlement discussions between the Tolkien/HC Parties, Zaentz, and Warner that

6    preceded the filing of the above-entitled action.

7        b.    Dick Williamson. Mr. Williamson was an attorney for the Tolkien

8    Parties at various times throughout the parties' history. Mr. Williamson can be

9    contacted c/o the Tolkien/HC Parties' counsel of record. Subjects of information

10   include, without limitation: (i) 1969 Agreements; (ii) the Merchandising License;

11   (iii) Video Games; (iv) Intangible Video Games; (v) Online Slots; (vi) Casino Slot

12   Machines; (vii) the Disputed Marks; (viii) communications between and among the

13   Tolkien/HC Parties, Zaentz, and third parties as they relate to Video Games,

14   Intangible Video Games, Online Slots, Casino Slot Machines, and the Disputed

15   Marks.

16       c.    Priscilla Mary Anne Reuel Tolkien. Ms. Tolkien is a trustee of the

17   Tolkien Trust and plaintiff in this action. Ms. Tolkien can be contacted c/o the

18   Tolkien/HC Parties' counsel of record. Subjects of information include, without

19   limitation: the goodwill the Tolkien/HC Parties have cultivated surrounding the

20   Tolkien Works and related intellectual property.

21       d.    David Brawn. Mr. Brawn is an employee of plaintiff and counterclaim

22   defendant HarperCollins Publishers, Ltd. Mr. Brawn can be contacted c/o the

23   Tolkien/HC Parties' counsel of record. Subjects of information include, without

24   limitation: (i) the 1969 Agreements; (ii) the Merchandising License; (iii) Video

25   Games; (iv) Intangible Video Games; (v) Online Slots; (vi) Casino Slot Machines;

26   (vii) the Disputed Marks; and (viii) communications between and among the

27   Tolkien/HC Parties, Zaentz, Warner, and third parties as they relate to Video

28   Games, Intangible Video Games, Online Slots, Casino Slot Machines, and the

GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

5

PLAINTIFFS AND COUNTERCLAIM
DEFENDANTS' INITIAL DISCLOSURES

1    Disputed Marks.

2         e.    Mary Butler.  Ms. Butler was an employee of plaintiff and

3    counterclaim defendant Unwin Hyman Ltd.  Subjects of information include,

4    without limitation: (i) the 1969 Agreements; (ii) the Merchandising License; (iii)

5    Video Games; (iv) Intangible Video Games; (v) Online Slots; (vi) Casino Slot

6    Machines; (vii) the Disputed Marks; and (viii) communications between and among

7    the Tolkien/HC Parties, Zaentz, Warner, and third parties as they relate to Video

8    Games, Intangible Video Games, Online Slots, Casino Slot Machines, and the

9    Disputed Marks.

10        f.    Adrian Laing.  Mr. Laing was an employee and in-house counsel at

11   plaintiff and counterclaim defendant HarperCollins Publishers, Ltd.  Subjects of

12   information include, without limitation: (i) the Merchandising License; (ii) Video

13   Games; (iii) Intangible Video Games; (iv) Online Slots; (v) Casino Slot Machines;

14   (vi) the Disputed Marks; and (vii) communications between and among the

15   Tolkien/HC Parties, Zaentz, Warner, and third parties as they relate to Video

16   Games, Intangible Video Games, Online Slots, Casino Slot Machines, and the

17   Disputed Marks.

18        g.    Bonnie E. Eskenazi.  Ms. Eskenazi is an attorney at Greenberg Glusker

19   Fields Claman & Machtinger LLP, counsel of record for the Tolkien/HC Parties.

20   Subjects of information include, without limitation: (i) the 2010 Regrant

21   Agreement, The Binding Term Sheet, and the Hobbit Term Sheet; and (ii) the

22   settlement discussions between the Tolkien/HC Parties, Zaentz, and Warner that

23   preceded the filing of the above-entitled action.

24        h.    Ricardo P. Cestero.  Mr. Cestero is an attorney at Greenberg Glusker

25   Fields Claman & Machtinger LLP, counsel of record for the Tolkien/HC Parties.

26   Subjects of information include, without limitation: (i) the 2010 Regrant

27   Agreement, The Binding Term Sheet, and the Hobbit Term Sheet; and (ii) the

28   settlement discussions between the Tolkien/HC Parties, Zaentz, and Warner that

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

                                                        PLAINTIFFS AND COUNTERCLAIM
                                6                       DEFENDANTS' INITIAL DISCLOSURES

1    preceded the filing of the above-entitled action.

2         i.    Alan Benjamin.  Mr. Benjamin was a business affairs executive at

3    United Artists.  Mr. Benjamin can be contacted c/o the Tolkien/HC Parties' counsel

4    of record.   Subjects of information include, without limitation: (i) 1969 Agreement;

5    and (ii) Merchandising License.

6         j.    Albert M. Bendich. Mr. Bendich can be contacted at 2600 Tenth St.,

7    Berkeley, California, 94710.  Mr. Bendich was, and on information and belief, still

8    is, a vice-president and general counsel for Zaentz.   Subjects of information

9    include, without limitation: (i) the Merchandising License; (ii) Video Games; (iii)

10   Intangible Video Games; (iv) Online Slots; (v) Casino Slot Machines; (vi) the

11   Disputed Marks; (vii) the goodwill the Tolkien/HC Parties have cultivated

12   surrounding the Tolkien Works and related intellectual property;  and (viii)

13   communications between and among the Tolkien/HC Parties, Zaentz, Warner, and

14   third parties as they relate to Video Games, Intangible Video Games, Online Slots,

15   Casino Slot Machines, and the Disputed Marks.

16        k.    Thomas A. Magnani.  Mr. Magnani was an attorney at Howard, Rice,

17   Nemerovski, Canady, Falk & Rabkin, counsel for Zaentz at various times

18   throughout the parties' history.  On information and belief, Mr. Magnani is

19   currently a partner at Arnold & Porter LLP, counsel of record for Zaentz.  Subjects

20   of information include, without limitation: (i) the Merchandising License; (ii)

21   Video Games; (iii) Intangible Video Games; (iv) Online Slots; (v) Casino Slot

22   Machines; (vi) the Disputed Marks; (vii) communications between and among the

23   Tolkien/HC Parties, Zaentz, Warner, and third parties as they relate to Video

24   Games, Intangible Video Games, Online Slots, Casino Slot Machines, and the

25   Disputed Marks; (viii) the 2010 Regrant Agreement, The Binding Term Sheet, and

26   the Hobbit Term Sheet; and (ix) the settlement discussions between the

27   Tolkien/HC Parties, Zaentz, and Warner that preceded the filing of the above-

28   entitled action.

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

7

PLAINTIFFS AND COUNTERCLAIM
DEFENDANTS' INITIAL DISCLOSURES

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1       l.     David Imhoff.  Mr. Imhoff was an executive at New Line Cinema

2    Corp.  Subjects of information include, without limitation: (i) the Merchandising

3    License; (ii) Video Games; (iii) Intangible Video Games; (iv) Online Slots; (v)

4    Casino Slot Machines; (vi) the Disputed Marks; and (vii) communications between

5    and among the Tolkien/HC Parties, Zaentz, Warner, and third parties as it relates to

6    Video Games, Intangible Video Games, Online Slots and Casino Slot Machines.

7       m.    Benjamin Zinkin.  Mr. Zinkin was an executive at, and at times general

8    counsel of, New Line Cinema Corp.  Subjects of information include, without

9    limitation: (i) the Merchandising License; (ii) Video Games; (iii) Intangible Video

10    Games; (iv) Online Slots; (v) Casino Slot Machines; (vi) the Disputed Marks; and

11    (vii) communications between and among the Tolkien/HC Parties, Zaentz, Warner,

12    and third parties as they relate to Video Games, Intangible Video Games, Online

13    Slots, Casino Slot Machines, and the Disputed Marks.

14       n.    Jeremy Williams.  Mr. Williams is an attorney at Warner.  Subjects of

15    information include, without limitation: (i) the Merchandising License; (ii) Video

16    Games; (iii) Intangible Video Games; (iv) Online Slots; (v) Casino Slot Machines;

17    (vi) the Disputed Marks; (vii) communications between and among the Tolkien/HC

18    Parties, Zaentz, Warner, and third parties as they relate to Video Games, Intangible

19    Video Games, Online Slots, Casino Slot Machines, and the Disputed Marks; (viii)

20    the 2010 Regrant Agreement, The Binding Term Sheet, and the Hobbit Term Sheet;

21    and (ix) the settlement discussions between the Tolkien/HC Parties, Zaentz, and

22    Warner that preceded the filing of the above-entitled action.

23       o.    Mark B. Helm.  Mr. Helm is an attorney at Munger, Tolles & Olson

24    LLP, counsel for Warner at various times throughout the parties' history.  Subjects

25    of information include, without limitation: (i) the 2010 Regrant Agreement, The

26    Binding Term Sheet, and the Hobbit Term Sheet; and (ii) the settlement discussions

27    between the Tolkien/HC Parties, Zaentz, and Warner that preceded the filing of the

28    above-entitled action.

8

PLAINTIFFS AND COUNTERCLAIM
DEFENDANTS' INITIAL DISCLOSURES

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1          p.     Eric P. Tuttle.  Mr. Tuttle is an attorney at Munger, Tolles & Olson

2  LLP, counsel for Warner at various times throughout the parties' history.  Subjects

3  of information include, without limitation: (i) the 2010 Regrant Agreement, The

4  Binding Term Sheet, and the Hobbit Term Sheet; and (ii) the settlement discussions

5  between the Tolkien/HC Parties, Zaentz, and Warner that preceded the filing of the

6  above-entitled action.

7          q.     Unknown employees and representatives at Warner, including, without

8  limitation, persons with knowledge of Warner's licensing activity related to the

9  Tolkien Works and persons with knowledge of the development of the Online

10  Slots, Casino Slot Machines and Intangible Video Games, including what elements

11  of the Tolkien Works were incorporated therein.  The Tolkien/HC Parties reserve

12  the right to depose and/or call as a witness a Warner representative designated

13  pursuant to F.R.C.P. 30(b)(6).

14          r.     Unknown employees and representatives at Zaentz, including, without

15  limitation, persons with knowledge of Zaentz's licensing and trademark activity

16  related to the Tolkien Works and persons with knowledge of the development of the

17  Online Slots, Casino Slot Machines and Intangible Video Games, including what

18  elements of the Tolkien Works were incorporated therein.  The Tolkien/HC Parties

19  reserve the right to depose and/or call as a witness a Zaentz representative

20  designated pursuant to F.R.C.P. 30(b)(6).

21          s.     Unknown witnesses at Sierra Online who were involved with the

22  negotiation of the 1998 license related to the Tolkien Works.

23          t.     The Tolkien/HC Parties also incorporate by reference the list of

24  individuals identified by Zaentz and the Warner Parties in their Initial Disclosures

25  and reserve the right to call any such witnesses.

26

27  **2.**    **Document Disclosure**

28         The Tolkien/HC Parties are presently aware of the following documents,

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

electronically stored information, and tangible things in their possession, custody or control that they may use to support their claims and defenses, unless solely for impeachment.  The listing of a category of documents is not a representation that the Tolkien/HC Parties have necessarily obtained such documents or that any such category is necessarily discoverable or relevant.  The Tolkien/HC Parties reserve the right to supplement these disclosures as discovery continues and as the case develops, or as otherwise reasonably necessary and appropriate, and to object to the discovery of any of the following categories of documents or any specific document falling into such category on any grounds permitted by the applicable rules and the law.

a.    The 1969 Agreements and documents and communications relating thereto.

b.    Schedules D to the 1969 Agreements and documents and communications relating thereto.

c.    The 1975 Amendment to Schedules D to the 1969 Agreements, and documents and communications relating thereto.

d.    The 1981 Amendment to Schedules D to the 1969 Agreements, and documents and communications relating thereto.

e.    The WMS Gaming License, the Microgaming License, and any other licenses purporting to grant rights relating to Intangible Video Games, Casino Slot Machines, Online Slots and/or the Disputed Marks, and documents and communications relating thereto.

f.    The August 7, 1998 agreement between New Line Cinema and Zaentz, the May 9, 2000 agreement between New Line Cinema and Zaentz, and the interactive game license dated May 27, 2009 between Zaentz and Warner Bros. Games, Inc., and documents and communications relating thereto.

g.    The Tolkien Works.

h.    The films produced by Warner that are based on the Tolkien Works.

10

PLAINTIFFS AND COUNTERCLAIM
DEFENDANTS' INITIAL DISCLOSURES

1   i. The Video Games, Intangible Video Games, Online Games and Casino

2 Gambling Games.

3   j. The 2010 Regrant Agreement, the Binding Term Sheet, and the Hobbit

4 Term Sheet, and documents and communications relating thereto.

5   k. The December 2, 1976 agreement between United Artists and Zaentz,

6 and documents and communications relating thereto.

7   l. The draft agreement dated March 15, 2000 proposed by Ben Zinkin to

8 the Tolkien/HC Parties and rejected by the Tolkien/HC Parties, and documents and

9 communications relating thereto.

10   m. Trade and service mark applications and registrations relating to the

11 Disputed Marks.

12   n. Documents and communications relating to the Merchandising

13 License, Online Slots, Casino Slot Machines, Intangible Video Games, and the

14 Disputed Marks.

15   o. Documents and communications relating to the value of Tolkien

16 Work-related Intangible Video Games and/or new media rights on the open market.

17   p. Documents reflecting the history of interactive, computer, and other

18 electronic and/or digital games incorporating the Tolkien Works, including, without

19 limitation, the Electronic Arts, Sierra Online, and Turbine licenses, and

20 communications amongst the parties and with third parties relating thereto.

21   q. Documents evidencing royalties or other amounts received by Zaentz

22 in connection with merchandising rights.

23   r. Documents evidencing royalties or other amounts received by Warner

24 in connection with merchandising rights.

25   s. Documents evidencing revenues earned and/or projected to be earned

26 in connection with gambling games based on, incorporating, or related to Video

27 Games, Intangible Video Games, Online Slots and Casino Slot Machines.

28   t. Documents evidencing the division and computation of royalties as

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

11

PLAINTIFFS AND COUNTERCLAIM
DEFENDANTS' INITIAL DISCLOSURES

1   between Warner, Zaentz and the Tolkien/HC Parties in connection with Video

2   Games, Intangible Video Games, Online Slots and Casino Slot Machines.

3        u.    Documents establishing the goodwill the Tolkien/HC Parties have

4   cultivated surrounding the Tolkien Works and related intellectual property.

5        v.    Documents evidencing negative reactions to gambling-related games

6   featuring the Tolkien Works, including the Online Slots and the Casino Slot

7   Machines.

8        w.    All communications between and among Zaentz, Warner, and the

9   Tolkien/HC Parties relating to Online Slots, Casino Slot Machines, Video Games,

10   Intangible Video Games, the Disputed Marks, the Tolkien/HC Parties' claims and

11   defenses in the above-entitled action, Zaentz's and Warner's claims and defenses in

12   the above-entitled action, and any objections by the Tolkien/HC Parties relating to

13   any of the above.

14

15   **3.    Computation of Damages**

16        The Tolkien/HC Parties' damages in this case will either be the subject of

17   expert testimony, or such information is uniquely in the possession of Zaentz and/or

18   Warner.  However, as to Intangible Video Games, the Tolkien/HC Parties are

19   informed and believe that, conservatively, and assuming worldwide licensing across

20   all categories of exploitation (e.g. mobile, social, MMOs, casual) and some

21   geographic, territory specific licenses (e.g. China and Japan) across platforms, the

22   total of typical minimum guarantees for such licenses would be in the range of

23   approximately $80 million to $130 million for a five year license for fantasy-genre

24   properties as beloved and historically successful as the Tolkien Works.  Damages

25   resulting from Zaentz' and Warner's licensing and exploitation of the Disputed

26   Marks, Online Slots, and Casino Slot Machines are currently unknown, but are

27   believed to be multiple millions of dollars.  Additionally, the Tolkien/HC Parties

28   have incurred, and continue to incur, substantial attorneys' fees in pursuing this

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

12

PLAINTIFFS AND COUNTERCLAIM
DEFENDANTS' INITIAL DISCLOSURES

1    action.

2        The Tolkien/HC Parties reserve the right to supplement these disclosures as

3    discovery continues and as the case develops, or as otherwise reasonably necessary

4    and appropriate.

5

6    **4.**   **Insurance**

7        The Tolkien/HC Parties are not currently aware of any applicable insurance

8    policies.

9

10

11   DATED:  March 28, 2013          GREENBERG GLUSKER FIELDS
                                     CLAMAN & MACHTINGER LLP
12

13                                   By: _Bonnie Eskenazi_____

14                                   BONNIE E. ESKENAZI (SBN 119401)
                                     Attorneys for PLAINTIFFS AND
15                                   COUNTERCLAIM DEFENDANTS

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS AND COUNTERCLAIM
DEFENDANTS' INITIAL DISCLOSURES

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California  90067-4590

1

## PROOF OF SERVICE BY MAIL

2      I am a citizen of the United States and employed in Los Angeles County,

3  California.  I am over the age of eighteen years and not a party to the within-entitled

4  action.  My business address is 1900 Avenue of the Stars, 21st Floor, Los Angeles,

5  California  90067.  I am readily familiar with this firm's practice for collection and

6  processing of correspondence for mailing with the United States Postal Service.  On

7  March 28, 2013, I placed with this firm at the above address for deposit with the

8  United States Postal Service a true and correct copy of the within document(s):

9          PLAINTIFFS AND COUNTERCLAIM DEFENDANTS'
          INITIAL DISCLOSURES PURSUANT TO F.R.C.P.
10          26(a)(1)(A)

11  in a sealed envelope, postage fully paid, addressed as follows:

12      SEE ATTACHED SERVICE LIST

13      Following ordinary business practices, the envelope was sealed and placed

14  for collection and mailing on this date, and would, in the ordinary course of

15  business, be deposited with the United States Postal Service on this date.

16      I declare that I am employed in the office of a member of the bar of this court

17  at whose direction the service was made.

18      Executed on March 28, 2013, at Los Angeles, California.

19

20

21                                          Robert Massing

22

23

24

25

26

27

28

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1

SERVICE LIST

2

3       Arnold & Porter LLP               Attorneys for Defendant
        Martin R. Glick                THE SAUL ZAENTZ

4       John C. Ulin                   COMPANY d/b/a
        Sarah J. Givan                Middleearth Enterprises, a

5       Sean M. Callagy              Delaware corporation

6       Three Embarcadero Center, 7th Floor
        San Francisco, California 94111-4024

7

8       O'Melveny & Meyers LLP      Attorneys for Defendants
        Daniel M. Petrocelli         WARNER BROS.

9       Victor Jih                    DIGITAL
        Molly Lens                  DISTRIBUTION, INC.;

10     1999 Avenue of the Stars      WARNER BROS.
        7th Floor                   ENTERTAINMENT, INC.;

11     Los Angeles CA 90067       WARNER BROS.
                                 CONSUMER PRODUCTS,

12                              INC.; WARNER BROS.

13                              INTERACTIVE

14                              ENTERTAINMENT, INC.;

15                              NEW LINE

16                              PRODUCTIONS, INC.

17

18

19

20

21

22

23

24

25

26

27

28

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

EXHIBIT I

DANIEL M. PETROCELLI (S.B. #97802)
dpetrocelli@omm.com
VICTOR H. JIH (S.B. #186515)
vjih@omm.com
MOLLY M. LENS (S.B. #283867)
mlens@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, California  90067-6035
Telephone:   (310) 553-6700
Facsimile:   (310) 246-6779

Attorneys for the Warner Parties

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FOURTH AGE LTD., *et al*,<br><br>        Plaintiffs,<br><br>        v.<br><br>WARNER BROS. DIGITAL<br>DISTRIBUTION, *et al*,<br><br>        Defendants. | Case No. 12-9912-ABC (SHx)<br><br>**WARNER'S INITIAL DISCLOSURES**<br><br><br>**Judge**: Hon. Audrey B. Collins<br>**Magistrate**: Hon. Stephen J. Hillman |
| WARNER BROS. DIGITAL<br>DISTRIBUTION INC., *et al*,<br><br>        Counterclaim<br>        Plaintiffs,<br><br>        v.<br><br>FOURTH AGE LTD., *et al*,<br><br>        Counterclaim<br>        Defendants. | |

Defendants and Counterclaim Plaintiffs Warner Bros. Home Entertainment Inc., Warner Bros. Entertainment Inc., Warner Bros. Consumer Products Inc., and New Line Productions, Inc. (collectively, "Warner") hereby submit the following initial disclosures in relation to the above-captioned action.  These disclosures are made pursuant to Federal Rule of Civil Procedure 26(a)(1) and Judge Audrey B. Collins' January 30, 2013 Order Re: Scheduling Conference.  Because formal discovery has just commenced in this matter, the content of this disclosure statement is provisional and based on the limited information currently available.  Warner expects to obtain additional information during the discovery process and to advance and refine its understanding of the facts currently known.  Warner expressly reserves the right under Rule 26(e) to amend or supplement this disclosure as discovery progresses.  These disclosures are subject to and made without waiving Warner's right to assert in these or any other proceedings any and all objections as to competency, relevancy, materiality, privilege, work-product, use or admissibility as evidence of these initial disclosures or their subject matters.

## I.     RULE 26(a)(1)(A)(i): WITNESSES

Pursuant to Rule 26(a)(1)(A)(i), Warner identifies the following individuals it believes may have discoverable information that Warner may use to support its defenses and counterclaims, along with each individual's current contact information, if known.  Warner's initial disclosure of the identities of potential witnesses is based solely upon a reasonable investigation conducted in the time available, as well as Warner's present analysis of the case.  This disclosure is not a representation that additional witnesses do not exist.  Accordingly, this disclosure may be supplemented or modified by additional individuals with knowledge of facts rebutting the material allegations of Plaintiffs' complaint and/or supporting the material allegations of Warner's affirmative defenses and counterclaims.  In addition to the witnesses named below, Warner may also rely on other current or former employees of Warner and any witnesses designated by Defendant and

Counterclaim Plaintiff The Saul Zaentz Company ("Zaentz") or by Plaintiffs and Counterclaim Defendants Fourth Age Ltd., The Tolkien Trust, The J.R.R. Tolkien Estate Ltd., HarperCollins Publishers Ltd., Unwin Hyman Ltd., and George Allen & Unwin (Publishers) Ltd. (collectively, "Plaintiffs" or "Counterclaim Defendants") in their initial disclosures.   By making the following disclosures, Warner is not waiving the attorney-client privilege and/or work-product immunity, nor is it waiving its right to object to the deposition of any individual pursuant to the Federal Rules of Civil Procedure and any other applicable rules or orders.

### A.   Tolkien/HarperCollins Witnesses

| Name, Title, Location | Subjects of Information |
|---|---|
| *Cathleen Blackburn* <br><br> Partner at Maier Blackburn LLP <br><br> Maier Blackburn LLP, Prama House, 267 Banbury Road, Oxford OX2 7HT, United Kingdom | Plaintiffs' knowledge/awareness of exploitation; Parties' agreements, including rights granted and negotiations. |
| *Bonnie Eskenazi* <br><br> Partner at Greenberg Glusker Fields Claman & Machtinger LLP <br><br> Greenberg Glusker Fields Claman & Machtinger LLP, 1900 Avenue of the Stars, 21st Floor, Los Angeles, CA, 90067 | Plaintiffs' knowledge/awareness of exploitation; Parties' agreements, including rights granted and negotiations. |
| *Stephen Maier* <br><br> Partner at Maier Blackburn LLP <br><br> Maier Blackburn LLP, Prama House, 267 Banbury Road, Oxford OX2 7HT, United Kingdom | Plaintiffs' knowledge/awareness of exploitation; Parties' agreements, including rights granted and negotiations. |

WARNER'S INTIAL DISCLOSURES
CASE NO. 12-9912-ABC (SHX)

EXHIBIT I                                                    PAGE 852

| | |
|---|---|
| *Ricardo Cestero*<br><br>Partner at Greenberg Glusker Fields Claman & Machtinger LLP<br><br>Greenberg Glusker Fields Claman & Machtinger LLP, 1900 Avenue of the Stars, 21st Floor, Los Angeles, CA, 90067 | Plaintiffs' knowledge/awareness of exploitation; Parties' agreements, including rights granted and negotiations. |
| *Elisabeth Moriarty*<br><br>Partner at Greenberg Glusker Fields Claman & Machtinger LLP<br><br>Greenberg Glusker Fields Claman & Machtinger LLP, 1900 Avenue of the Stars, 21st Floor, Los Angeles, CA, 90067 | Plaintiffs' knowledge/awareness of exploitation; Parties' agreements, including rights granted and negotiations. |
| *Mickey Mayerson*<br><br>Partner at Loeb & Loeb LLP<br><br>Loeb & Loeb LLP, 10100 Santa Monica Boulevard Suite 2200 Los Angeles, CA 90067 | Plaintiffs' knowledge/awareness of exploitation; Parties' agreements, including rights granted and negotiations. |
| *Robert Meyer*<br><br>Partner at Loeb & Loeb LLP<br><br>Loeb & Loeb LLP, 10100 Santa Monica Boulevard Suite 2200 Los Angeles, CA 90067. | Plaintiffs' knowledge/awareness of exploitation; Parties' agreements, including rights granted and negotiations. |
| *Christopher Tolkien*<br><br>Tolkien heir<br><br>Address unknown | Plaintiffs' knowledge/awareness of exploitation; Parties' agreements, including rights granted and negotiations. |
| *Priscilla Mary Anne Reuel*<br><br>Tolkien heir<br><br>Address unknown | Plaintiffs' knowledge/awareness of exploitation; Parties' agreements, including rights granted and negotiations. |
| *Baillie Jean Tolkien*<br><br>Tolkien heir<br><br>Address unknown | Plaintiffs' knowledge/awareness of exploitation; Parties' agreements, including rights granted and negotiations. |

- 3 -

| | |
|---|---|
| *Michael George Reuel Tolkien* <br><br> Tolkien heir <br><br> Address unknown | Plaintiffs' knowledge/awareness of exploitation; Parties' agreements, including rights granted and negotiations. |
| *Judith Mary Reuel Crombleholme* <br><br> Tolkien heir <br><br> Address unknown | Plaintiffs' knowledge/awareness of exploitation; Parties' agreements, including rights granted and negotiations. |
| *Joan Anne Reuel Tolkien* <br><br> Tolkien heir <br><br> Address unknown | Plaintiffs' knowledge/awareness of exploitation; Parties' agreements, including rights granted and negotiations. |
| *Adam Reuel Tolkien* <br><br> Tolkien heir <br><br> Address unknown | Plaintiffs' knowledge/awareness of exploitation; Parties' agreements, including rights granted and negotiations. |
| *Rachel Clare Reuel Tolkien* <br><br> Tolkien heir <br><br> Address unknown | Plaintiffs' knowledge/awareness of exploitation; Parties' agreements, including rights granted and negotiations. |
| *Simon Mario Reuel Tolkien* <br><br> Tolkien heir <br><br> Address unknown | Plaintiffs' knowledge/awareness of exploitation; Parties' agreements, including rights granted and negotiations. |
| *Piers Edmund Crombleholme* <br><br> Tolkien heir <br><br> Address unknown | Plaintiffs' knowledge/awareness of exploitation; Parties' agreements, including rights granted and negotiations. |
| *Adrian Laing* <br><br> Former Director of Legal Affairs, HarperCollins; Current Solicitor Advocate at Laing & Co. <br><br> Laing & Co., 1 Langbourne Avenue, Highgate, London N6 6AJ | Plaintiffs' knowledge/awareness of exploitation; Parties' agreements, including rights granted and negotiations. |

- 4 -

| | |
|---|---|
| *Frank Richard Williamson*<br><br>Executor, The J.R.R. Tolkien Estate<br><br>Address unknown | Plaintiffs' knowledge/awareness of exploitation; Parties' agreements, including rights granted and negotiations. |
| *David Brawn*<br><br>Publishing Director, HarperCollins<br>HarperCollins Publishers, 77-85 Fulham Palace Road, Hammersmith, London W6 8JB | Plaintiffs' knowledge/awareness of exploitation; Parties' agreements, including rights granted and negotiations. |
| *David Daley*<br><br>Legal Advisor, Solicitor, HarperCollins<br><br>HarperCollins Publishers, 77-85 Fulham Palace Road, Hammersmith, London W6 8JB | Plaintiffs' knowledge/awareness of exploitation; Parties' agreements, including rights granted and negotiations. |
| *Simon Dowson-Collins*<br><br>Director, Legal Services, HarperCollins<br><br>HarperCollins Publishers, 77-85 Fulham Palace Road, Hammersmith, London W6 8JB | Plaintiffs' knowledge/awareness of exploitation; Parties' agreements, including rights granted and negotiations. |

## B.   Warner Witnesses

| **Name, Title, Location** | **Subjects of Information** |
|---|---|
| *Jeremy Williams*<br><br>Senior Vice President, Deputy General Counsel, Warner Bros. Entertainment Inc.<br><br>c/o O'Melveny & Myers LLP, 1999 Avenue of the Stars, Suite 700, Los Angeles, CA 90067-6035 (310-553-6700). | Plaintiffs' knowledge/awareness of exploitation; Parties' agreements, including rights granted and negotiations. |
| *Robyn Martin*<br><br>Senior Vice President, New Line Cinema LLC.<br><br>c/o O'Melveny & Myers LLP, 1999 Avenue of the Stars, Suite 700, Los Angeles, CA 90067-6035 (310-553-6700). | Plaintiffs' knowledge/awareness of exploitation; Parties' agreements, including rights granted and negotiations. |

| | |
|---|---|
| *Mark Helm*<br><br>Partner at Munger Tolles & Olson LLP<br><br>Munger Tolles & Olson LLP, 355 South Grand Ave., 35th Floor, Los Angeles, CA 90071. | Plaintiffs' knowledge/awareness of exploitation; Parties' agreements, including rights granted and negotiations. |
| *Carolyn Blackwood*<br><br>Executive Vice President, New Line Cinema LLC.<br><br>c/o O'Melveny & Myers LLP, 1999 Avenue of the Stars, Suite 700, Los Angeles, CA 90067-6035 (310-553-6700). | Plaintiffs' knowledge/awareness of exploitation; Parties' agreements, including rights granted and negotiations. |
| *Ana de Castro*<br><br>Vice President, Warner Bros. Consumer Products<br><br>c/o O'Melveny & Myers LLP, 1999 Avenue of the Stars, Suite 700, Los Angeles, CA 90067-6035 (310-553-6700). | Warner's exploitation of disputed activity. |
| *Monica Kim*<br><br>Senior Counsel, Legal and Business Affairs, Warner Bros. Interactive Entertainment<br><br>c/o O'Melveny & Myers LLP, 1999 Avenue of the Stars, Suite 700, Los Angeles, CA 90067-6035 (310-553-6700). | Warner's exploitation of disputed activity. |
| *Jennifer Stump*<br><br>Vice President, Deputy General Counsel, Warner Bros. Interactive Entertainment<br><br>c/o O'Melveny & Myers LLP, 1999 Avenue of the Stars, Suite 700, Los Angeles, CA 90067-6035 (310-553-6700). | Warner's exploitation of disputed activity. |
| *Debra Baker*<br><br>Senior Vice President, Operations, Warner Bros. Interactive Entertainment<br><br>c/o O'Melveny & Myers LLP, 1999 Avenue of the Stars, Suite 700, Los Angeles, CA 90067-6035 (310-553-6700). | Warner's exploitation of disputed activity. |

- 6 -

| | |
|---|---|
| *Gary Stutman*<br><br>Vice President, Financial Contract Reporting and Administration, Warner Bros. Entertainment Inc.<br><br>c/o O'Melveny & Myers LLP, 1999 Avenue of the Stars, Suite 700, Los Angeles, CA 90067-6035 (310-553-6700). | Revenue from the challenged exploitation. |

## C.   Zaentz Witnesses

| **Name, Title, Location** | **Subjects of Information** |
|---|---|
| *Albert Bendich*<br><br>c/o Arnold & Porter LLP, Three Embarcadero Center, Tenth Floor, San Francisco, CA 94111-4024 | Plaintiffs' knowledge/awareness of exploitation; Parties' agreements, including rights granted and negotiations. |
| *Fredrica Drotos*<br><br>c/o Arnold & Porter LLP, Three Embarcadero Center, Tenth Floor, San Francisco, CA 94111-4024 | Plaintiffs' knowledge/awareness of exploitation; Parties' agreements, including rights granted and negotiations. |
| *Paul Zaentz*<br><br>c/o Arnold & Porter LLP, Three Embarcadero Center, Tenth Floor, San Francisco, CA 94111-4024 | Plaintiffs' knowledge/awareness of exploitation; Parties' agreements, including rights granted and negotiations. |
| *Laurie Battle*<br><br>c/o Arnold & Porter LLP, Three Embarcadero Center, Tenth Floor, San Francisco, CA 94111-4024 | Plaintiffs' knowledge/awareness of exploitation; Parties' agreements, including rights granted and negotiations. |
| *Thomas  Magnani*<br><br>Partner at Arnold & Porter LLP<br><br>Arnold & Porter LLP, Three Embarcadero Center, Tenth Floor, San Francisco, CA 94111-4024 | Plaintiffs' knowledge/awareness of exploitation; Parties' agreements, including rights granted and negotiations. |

| | |
|---|---|
| *Carole Barrett*<br><br>Partner at Arnold & Porter LLP<br><br>Arnold & Porter LLP, Three Embarcadero Center, Tenth Floor, San Francisco, CA 94111-4024 | Plaintiffs' knowledge/awareness of exploitation; Parties' agreements, including rights granted and negotiations. |

## II.   RULE 26(a)(1)(A)(ii): DOCUMENTS

Subject to the preliminary statement above and without waiving any available objections to the relevance or admissibility of such documents, Warner is producing simultaneously with its disclosures a good-faith first production of documents that are in its possession, custody, or control that Warner may use to support its defenses, counterclaims, or to rebut material allegations in Plaintiffs' complaint.

## III.   RULE 26(a)(1)(A)(iii): DAMAGES

Warner has asserted a claim for compensatory damages to reimburse it for injury to its business as a result of the Estate's breach of contract.  Warner has been significantly harmed as a result of Counterclaim Defendants' breach of the 2010 Regrant Agreement.  Counterclaim Defendants' breach has severely hampered Warner's ability to exercise the rights granted.  For example, because of the repudiation, Warner terminated its online gambling license agreement with Microgaming.  This cost Warner millions of dollars in foregone license fees and also required that Warner repay a significant sum to Microgaming to cover a portion of its development and advertising costs.

By repudiating the rights granted to Zaentz (which Zaentz then licensed to Warner), Counterclaim Defendants impaired Warner's ability to proceed with new exploitation, at a time when online gaming and gambling are becoming increasingly lucrative.  Counterclaim Defendants' repudiation prevented Warner from being able to represent to third parties that it has rights or to find third parties who are willing to exploit those rights given the cloud over the rights.  Warner suffered significant

1    financial harm and loss of good will as a result.  Because of the repudiation, Warner

2    has not entered into license agreements for online gambling games and casino slot

3    machines in connection with *The Hobbit*—a form of customary exploitation it had

4    previously utilized in connection with *The Lord of the Rings* trilogy—which has

5    harmed Warner both in the form of lost license revenue and also in decreased

6    exposure for *The Hobbit* films.  For example, Warner was unable to proceed with

7    plans for a *Hobbit*-themed casino slot machine with WMS Gaming.  This alone cost

8    Warner millions of dollars in license fees.  Warner has invested considerable time

9    and money into plans for further exploitation of *The Lord of the Rings* and *The*

10   *Hobbit* that it has now had to delay, reconsider, and perhaps cancel altogether as a

11   result of Counterclaim Defendants' repudiation of Warner's rights under the 2010

12   Regrant Agreement.

13        Warner currently estimates its damages to be in the millions of dollars,

14   although a more specific computation of damages is premature.  Further, Warner

15   intends to pursue an award of its attorneys' fees and costs pursuant to 17 U.S.C. §

16   505 following the likely dismissal of the Estate's copyright infringement claim.

17   Warner expects that these costs and attorneys' fees will be substantial, and will

18   continue to amass so long as the Estate continues to pursue this litigation.

19

20

21

22

23

24

25

26

27

28

- 9 -

1

## IV.   RULE 26(a)(1)(A)(iv): INSURANCE

2    Warner is currently unaware of any insurance agreements as described in

3   Rule 26(a)(1)(A)(iv).

4    Dated:  March 28, 2013

5                 DANIEL M. PETROCELLI
              VICTOR H. JIH

6                 MOLLY M. LENS
              O'MELVENY & MYERS LLP

7

8          By:

9             Molly M. Lens

10          Attorneys for Warner Defendants and
       Counterclaim Plaintiffs

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 10 -

1

## PROOF OF SERVICE - BY U.S. MAIL

2

3      I am over the age of eighteen years and not a party to the within action.  I

4  am a resident of or employed in the county where the service described below

5  occurred.  My business address is 1999 Avenue of the Stars, 7th Floor,

6  Los Angeles, California  90067-6035.  On March 28,  2013, I served the following:

7

## WARNER'S INITIAL DISCLOSURES

8

9  by putting a true and correct copy thereof in a sealed envelope, with postage fully

10  prepaid, and placing the envelope for collection and mailing today with the United

11  States Postal Service in accordance with the firm's ordinary business practices,

12  addressed as follows:

13  Bonnie E. Eskenazi, Esq.              John Ulin, Esq.
14  GREENBERG GLUSKER FIELDS              ARNOLD & PORTER LLP
    CLAMAN & MACHTINGER LLP               777 S. Figueroa Street, 44th Floor
15  1900 Avenue of the Stars, 21st Floor   Los Angeles, CA  90017
16  Los Angeles, CA 90067-4590

17

18      I declare under penalty of perjury under the laws of the State of California

19  that the above is true and correct.  Executed on March 28, 2013, at Los Angeles,

20  California.

21

22                                        _____
23                                                Evelyn Wilson

24

25

26

27

28

PROOF OF SERVICE
CASE NO. 12-9912-ABC (SJH)

EXHIBIT I                               PAGE 861

EXHIBIT J

1   ARNOLD & PORTER LLP
    MARTIN R. GLICK (No. 40187)
2   marty.glick@aporter.com
    JOHN C. ULIN (No. 165524)
3   john.ulin@aporter.com
    SEAN M. CALLAGY (No. 255230)
4   sean.callagy@aporter.com
    Three Embarcadero Center, 7th Floor
5   San Francisco, California 94111-4024
    Telephone:   415.471.3100
6   Facsimile:   415.471.3400

7   Attorneys for Defendant and Counterclaim Plaintiff
    THE SAUL ZAENTZ COMPANY d/b/a Middle-
8   earth Enterprises, a Delaware corporation

9                   UNITED STATES DISTRICT COURT

10               CENTRAL DISTRICT OF CALIFORNIA

11

12   FOURTH AGE LIMITED, a United Kingdom          Case No. 12-cv-09912-ABC (SH)
     corporation; PRISCILLA MARY ANNE REUEL
13   TOLKIEN, as TRUSTEE OF THE TOLKIEN          **THE SAUL ZAENTZ**
     TRUST, a United Kingdom Charitable Trust;   **COMPANY'S INITIAL**
14   THE J.R.R. TOLKIEN ESTATE LIMITED, a        **DISCLOSURES PURSUANT**
     United Kingdom corporation;                 **TO FED. R. CIV. P. 26(a)(1)**
15   HARPERCOLLINS PUBLISHERS, LTD., a
     United Kingdom corporation; UNWIN HYMAN
16   LTD., a United Kingdom corporation; and
     GEORGE ALLEN & UNWIN (PUBLISHERS)
17   LTD., a United Kingdom corporation,

18                   Plaintiffs,

19         v.

20   WARNER BROS. DIGITAL DISTRIBUTION,
     INC., a division of WARNER BROS. HOME
21   ENTERTAINMENT, INC., a Delaware
     corporation; WARNER BROS.
22   ENTERTAINMENT, INC., a Delaware
     corporation, as successor-in-interest to New Line
23   Cinema Corp.; WARNER BROS. CONSUMER
     PRODUCTS, INC., a Delaware corporation;
24   WARNER BROS. INTERACTIVE
     ENTERTAINMENT, INC., a division of
25   WARNER BROS. HOME ENTERTAINMENT,
     INC., a Delaware corporation; NEW LINE
26   PRODUCTIONS, INC., a California corporation,
     THE SAUL ZAENTZ COMPANY d/b/a Middle-
27   earth Enterprises, a Delaware corporation; and
     DOES 1-10, inclusive,

28                   Defendants.

1
2
3
4
5
6
7
8
9
10
11

THE SAUL ZAENTZ COMPANY d/b/a Middle-earth Enterprises, a Delaware corporation,

Counterclaim Plaintiff,

v.

FOURTH AGE LIMITED, a United Kingdom corporation; PRISCILLA MARY ANNE REUEL TOLKIEN, as TRUSTEE OF THE TOLKIEN TRUST, a United Kingdom Charitable Trust; THE J.R.R. TOLKIEN ESTATE LIMITED, a United Kingdom corporation; HARPERCOLLINS PUBLISHERS, LTD., a United Kingdom corporation; UNWIN HYMAN LTD., a United Kingdom corporation; and GEORGE ALLEN & UNWIN (PUBLISHERS) LTD., a United Kingdom corporation,

Counterclaim Defendants,

12    Pursuant to Federal Rule of Civil Procedure 26(a)(1), Defendant and

13  Counterclaimant The Saul Zaentz Company d/b/a/ Middle-earth Enterprises, a

14  Delaware corporation ("SZC") hereby makes the following initial disclosures to

15  Fourth Age Limited; Priscilla Mary Anne Reuel Tolkien, as Trustee of The Tolkien

16  Trust; The J.R.R. Tolkien Estate Limited; HarperCollins Publishers, Ltd.; Unwin

17  Hyman Ltd.; and George Allen & Unwin (Publishers) Ltd. (collectively "Plaintiffs").

18  These initial disclosures are based on information now reasonably available, prior to

19  discovery and after making in good faith such inquiry and investigation concerning

20  the issues in this matter as is reasonable under the circumstances.  By making these

21  disclosures, SZC does not represent that it is identifying every document, tangible

22  thing, or witness possibly relevant to this lawsuit.  SZC expressly reserves the right to

23  correct or supplement these disclosures pursuant to Federal Rule of Civil Procedure

24  26(e) should it subsequently become aware of additional relevant information to be

25  disclosed.  These disclosures are further made without waiving:  (1) the right to

26  object on any proper ground to the use of any information contained herein for any

27  purpose in any subsequent proceeding in this action or any other action; and (2) the

28  right to object on any and all grounds, at any time, to any other discovery request or

SZC'S INITIAL DISCLOSURES
-2-

1  proceeding involving or relating to the subject matter of these disclosures.

2                              **INITIAL DISCLOSURES**

3      **A.   Individuals Likely to Have Information That SZC May Use**

4          Pursuant to Rule 26(a)(1)(A)(i), SZC hereby discloses the following individuals

5  known to it at this time who are likely to have discoverable information, along with

6  the subject of that information, that SZC may use to support its claims or defenses,

7  unless solely for impeachment.  This list is necessarily preliminary, insofar as SZC is

8  still gathering information about its claims and defenses, and Plaintiffs have yet to

9  respond to interrogatories requesting information about the nature of Plaintiffs'

10  claims.   SZC will supplement its witness list as necessary once discovery has

11  progressed further, and once it has further considered which third-party, Plaintiff,

12  and/or Co-Defendant witnesses are likely to have discoverable information that SZC

13  may use to support its claims or defenses.

14          SZC reserves the right to supplement this list and/or call at trial or subpoena for

15  deposition additional individuals, including calling at trial as its own witnesses any

16  witnesses designated by Plaintiffs or Co-Defendants or introducing portions of these

17  individuals' deposition testimony at trial.  To the extent that any other party fails to

18  call at trial any or all of its disclosed witnesses, SZC reserves the right to call them as

19  witnesses and/or to introduce at trial relevant portions of their deposition testimony.

20  The individuals identified with SZC or Arnold & Porter LLP may be contacted in this

21  action only through SZC's litigation counsel, Arnold & Porter LLP.

| Witness Identification | Subject Matter |
|---|---|
| 1. Albert Bendich (SZC) | SZC's intellectual property and products; the parties' course of conduct concerning SZC's rights; SZC's licensing practices. |
| 2. Fredrica Drotos (SZC) | SZC's intellectual property and products and licensing practices. |
| 3. Paul Zaentz (SZC) | The parties' course of conduct concerning SZC's rights; SZC's intellectual property and products and licensing practices. |

| | |
|---|---|
| 4.  Laurie Battle (SZC) | The parties' course of conduct concerning SZC's rights; SZC's intellectual property and products and licensing practices. |
| 5.  Thomas Magnani (Arnold & Porter LLP) | SZC's intellectual property, trademark prosecution, and licensing practices. |
| 6.  Carole Barrett (Arnold & Porter LLP) | SZC's intellectual property, trademark prosecution, and licensing practices. |
| 7.  Cathleen Blackburn | The parties' course of conduct concerning SZC's rights; Plaintiffs' awareness and encouragement of SZC's licensing, prosecution, and enforcement activities; Plaintiffs' repudiation of SZC's rights. |
| 8.  Stephen Maier | The parties' course of conduct concerning SZC's rights; Plaintiffs' awareness and encouragement of SZC's licensing, prosecution, and enforcement activities; Plaintiffs' repudiation of SZC's rights. |
| 9.  Frank Richard Williamson | Plaintiffs' grant of rights to SZC; the parties' course of conduct concerning SZC's rights; Plaintiffs' awareness and encouragement of SZC's licensing, prosecution, and enforcement activities. |
| 10. Steven Maier | Plaintiffs' awareness and encouragement of SZC's licensing, prosecution, and enforcement activities. |
| 11. Bonnie Eskenazi | Plaintiffs' awareness of SZC's licensing, prosecution, and enforcement activities; Parties' agreements, including rights granted and negotiations; Plaintiffs' repudiation of SZC's rights |
| 12. Ricardo Cestero | Plaintiffs' awareness of SZC's licensing, prosecution, and enforcement activities; Parties' agreements, including rights granted and negotiations; Plaintiffs' repudiation of SZC's rights |
| 13. Elisabeth Moriarty | Plaintiffs' awareness of SZC's licensing, prosecution, and enforcement activities; Parties' agreements, including rights granted and negotiations; Plaintiffs' repudiation of SZC's rights |

SZC'S INITIAL DISCLOSURES
-4-

| | |
|---|---|
| 14. Christopher Tolkien | Plaintiffs' awareness and encouragement of SZC's licensing, prosecution, and enforcement activities; Plaintiffs' repudiation of SZC's rights. |
| 15. Baillie Tolkien | Plaintiffs' awareness and encouragement of SZC's licensing, prosecution, and enforcement activities; Plaintiffs' repudiation of SZC's rights. |
| 16. Priscilla Mary Anne Reuel Tolkien | Plaintiffs' awareness and encouragement of SZC's licensing, prosecution, and enforcement activities; Plaintiffs' repudiation of SZC's rights. |
| 17. Adrian Laing | Plaintiffs' awareness and encouragement of SZC's licensing, prosecution, and enforcement activities |
| 18. David Brawn | Plaintiffs' awareness and encouragement of SZC's licensing, prosecution, and enforcement activities |
| 19. David Daley | Plaintiffs' awareness and encouragement of SZC's licensing, prosecution, and enforcement activities |
| 20. Simon Dowson-Collins | Plaintiffs' awareness and encouragement of SZC's licensing, prosecution, and enforcement activities; Plaintiffs' repudiation of SZC's rights |

**B.   Documents**

Pursuant to Rule 26(a)(1)(A)(ii), SZC identifies the following categories of "documents, electronically stored information, and tangible things" within SZC's "possession, custody, or control" that SZC may use to support its claims and defenses. The potential location(s) of each category is indicated in parentheses. SZC preserves its objections to production of specific documents and categories of documents until requested. In addition, a protective order sufficient to protect SZC's confidential information will need to be entered prior to production of any confidential documents. These categories include, but are not limited, to the following:

1. Documents relating to the 1969 Agreements, as defined in SZC's

   Counterclaims, and to SZC's rights in the trademarks at issue, including but not

SZC'S INITIAL DISCLOSURES

-5-

1    limited to: Contracts A and B and Schedules D thereto, dated July 8, 1969;
2    Amendments to Schedules D dated October 20, 1975 and November 16, 1981;
3    the Agreement and Assignment dated December 2, 1976; the Declaration of
4    Frank Richard Williamson, dated December 2, 1977; and the Letter Agreement
5    of July 31, 1978 (Berkeley, California);

6  2.  Documents relating to SZC's registration, licensing to third parties, and
7    enforcement of rights in the trademarks at issue, as well as Plaintiffs' ongoing
8    awareness of such activities, including but not limited to: documents sufficient
9    to show SZC's decades-long registration of the marks world-wide; SZC's
10   licenses concerning such marks; and correspondence between and among SZC
11   and Plaintiffs dated June 5, 1998, May 15, 2002, March 17, 2004, April 30,
12   2004, September 20, 2006, May 2, 2007, June 8, 2007, October 18, 2007
13   (Berkeley, California);

14 3.  Documents relating to SZC's rights in and licensing of video games relating to
15   the Tolkien Works, and the Plaintiffs' awareness of such activities, including
16   but not limited to: letters between SZC and Plaintiffs dated May 16, 1996 and
17   July 18, 1996; correspondence between and among SZC and Plaintiffs dated
18   March 5, 1998, August 5, 1998, October 13, 1998, November 2, 1998,
19   November 12, 1998, August 3, 2000 and August 4, 2000; a contract between
20   SZC and Cendant Software Corporation dated May 6, 1998; and presentations
21   and proposals to Plaintiffs dated August 31, 2005 (Berkeley, California); and

22 4.  Documents relating to SZC's enforcement of its rights in the trademarks at
23   issue, including but not limited to: cease-and-desist letters to infringing and
24   potentially infringing parties; documents sufficient to show litigation efforts
25   undertaken by SZC to protect and enforce rights in the marks; and documents
26   showing Plaintiffs' awareness and encouragement of SZC's actions in this
27   regard (Berkeley, California).

28   At Plaintiffs' request, SZC will permit inspection and/or copying of these

SZC'S INITIAL DISCLOSURES
-6-

1    documents, including its confidential documents after an appropriate Protective Order

2    is entered in this action.

3        SZC is producing documents in response to Plaintiffs' discovery requests for the

4    production of documents upon which SZC may rely to support its claims and

5    defenses.

6        SZC reserves the right to amend or supplement this document disclosure

7    pursuant to Federal Rule of Civil Procedure 26(e) if additional documents are

8    identified as pertinent to disputed facts.  SZC further reserves the right to supplement

9    or modify this disclosure to the extent that Plaintiffs may further particularize claims

10    or contentions.   SZC is not providing documents or information not reasonably

11    available at this time.

12      **C.   Computation of Damages**

13        Pursuant to Rule 26(a)(1)(A)(iii), SZC identifies the following categories of

14    damages:

15        1.   Lost revenue from termination of prior licensing agreements arising from

16    Plaintiffs' repudiation;

17        2.   Lost revenue from potential licensing agreements following from

18    Plaintiffs' repudiation;

19        3.   The reasonable value of SZC's registration and enforcement activities;

20        4.   Prejudgment interest;

21        5.   Attorney's fees; and

22        6.   Costs of suit.

23        SZC's computation of damages will be prepared by an expert witness and will

24    be provided at such time as set forth in the case management order.

25      **D.   Insurance Agreements**

26    SZC is not aware of any applicable insurance agreements.

27

28

1    Dated: March 28, 2013                    ARNOLD & PORTER LLP

2                                             By: _____

3                                                 Martin R. Glick
                                                  John C. Ulin
4                                                 Sean M. Callagy

5                                             Attorneys for Defendant and
                                              Counterclaim Plaintiff THE SAUL
6                                             ZAENTZ COMPANY d/b/a Middle-
                                              earth Enterprises, a Delaware
7                                             corporation

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28