# EXHIBIT B

CERTIFIED COPY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

--oOo--

FOURTH AGE LIMITED a United Kingdom corporation; et al.,

Plaintiffs,

vs. Case No. CV 12-09912 ABC (SHx)

WARNER BROS. DIGITAL DISTRIBUTION INC., a division of WARNER BROS. HOME ENTERTAINMENT INC., a Delaware corporation; et al.

Defendants.

---

VIDEOTAPED DEPOSITION OF

LAURIE BATTLE

---

Friday, January 17, 2014

REPORTER: COREY W. ANDERSON, CSR 4096

Saul Zaentz Company?

A. In 1979.

Q. And you were there for how long?

A. 30 years.

Q. Okay. And what was your position when you started at the Saul Zaentz Company?

A. I was a part-time temporary worker in the accounting department.

Q. And for how long were you a part-time temporary worker in the accounting department?

A. For a few months.

Q. Okay. And did your responsibilities change at some point?

A. Over the years substantially.

Q. Okay. What was your next position after you were a part-time temporary worker in the accounting department?

A. I was hired full time, it was shortly after the Bakshi film had been released, so I was given Lord Of The Rings stuff to start handling.

Q. What kinds of Lord Of The Rings stuff?

A. They had a fan club called The Fellowship and they were shipping out posters and a merchandise kit doing direct mail operation, they were getting fan letters, believe it or not, for the Bakshi

Zaentz, the agreements under which the Saul Zaentz Company got the license to merchandise Hobbit and Lord Of The Rings?

A. No.

Q. Okay. What was your next job at the Saul Zaentz Company?

A. I -- the next significant shift was I believe it was 1984 when I started handling the licensing.

Q. And in 1984, did your title change?

A. The Zaentz Company is a very informal, so there wasn't any formal transfer of title. I was called licensing director and then eventually director of licensing, but there was no formal mechanism by which that was administered.

Q. Okay. But so in or around 1984 you became essentially the head of licensing.

Is that right?

A. Yes.

Q. Did you -- what were your job responsibilities in connection with your role as --

A. Right.

Q. -- head or director of licensing?

A. I responded to inquiries, any inquiries to do with licenses for the Lord Of The Rings and

A. Yes.

Q. And you remember that?

A. I do remember that.

Q. Thank you.

So did you remain the director of licensing for the entire time you were at the Saul Zaentz Company?

A. Depends on who you talk to.

Q. Was it your understanding that you were made the director of licensing the entire --

A. I held the title for the entire time I was there.

Q. And did you read these agreements, contracts A, B, and Contract D in connection with your work as the director of licensing?

A. Yes.

Q. Okay. And you read those on your own without a lawyer walking you through those agreements.

Is that right?

A. Yes.

Q. Okay. Now, while you were -- and when you read those agreements, did you form a view as to whether or not the Saul Zaentz Company had to have a tangible element in order to have the rights to

Exhibit 91, you received some further proposal from Sierra.

Is that right?

A. Subsequent to this?

Q. Yes.

A. I'm sure we did, because we ended up doing a license with them.

MS. ESKENAZI: Okay. I'd like the court reporter to mark as 92 a document which is dated October 8, 1997 from Mr. Bock to Tolkien Enterprises with a copy to Laurie Battle.

MR. ULIN: I'm going to object to any questioning on this document. If it's the one I think it is, it's a document that we clawed back on the basis of attorney-client privilege, based on highlighting and notes that are contained on the document.

MS. ESKENAZI: Okay. And I want to basically put that on the record if we can.

MR. ULIN: Okay.

MS. ESKENAZI: So...

(Whereupon, Exhibit 92 was marked and then removed from identification)

MR. ULIN: Yeah, I am going to actually --

before we go into questioning on --

MS. ESKENAZI: Let me ask you this. Can we get on the record what the -- what the document is, what the objections are, and may I ask some foundational questions so that we can, as we discussed earlier, I'm sure there is going to be a dispute about whether or not this document actually is privileged or not.

So I'm just trying to establish some foundation.

MS. LENS: Under the terms of the protective order, this document, you shouldn't still have this document in your custody.

MS. ESKENAZI: Well, because Mr. --

MS. LENS: This morning.

MS. ESKENAZI: This morning. It's hard to know exactly -- to exactly have it not in my possession.

MS. LENS: It's hard to throw it away.

MS. ESKENAZI: It's hard to throw away every single copy of it, Molly.

MS. LENS: As opposed to these five copies in the folder that you just pulled out of the box?

MS. ESKENAZI: That's correct. So the question is at least can I establish a foundation so

that we can -- so we can tee up the discussion?

MR. ULIN: I'm not sure. Let me go off the record for three minutes.

MS. ESKENAZI: Okay. Off the record.

THE VIDEOGRAPHER: Off the record. Time is 1:44.

(Whereupon, a recess was taken commencing at 1:44 P.M. and concluding at 1:47 P.M.)

THE VIDEOGRAPHER: Back on the record. The time is 1:47.

MR. ULIN: Is --

MS. ESKENAZI: Now you may go back on.

MR. ULIN: Yeah. So under the terms of the protective order this document was clawed back, should not be used, should not be attached as an exhibit to this deposition.

I'm going to ask and instruct the court order -- court reporter, rather, to de-designate this document so that it is not Exhibit 92, and we are not going to permit this document to be used on the record. It's privileged. We may have a fight over that, and that can proceed in the appropriate forum.

But it's not here.

MS. ESKENAZI: Okay. So let me ask you a question then. Let's -- what if we don't mark it and I just ask some foundational questions of the witness?

MR. ULIN: You can ask foundational questions of the witness, but not using this document.

MS. ESKENAZI: Okay. So let me -- let me --

MR. ULIN: And then I would request that you provide us with the copies of the document that you have here today. I know that under the terms of the protective order you are permitted to keep a copy for the purpose of litigating or disputing the question of our privilege assertion, but beyond that the additional copies should be returned to me.

MS. ESKENAZI: That's fine. Can you give him --

MS. MORIARTY: You have what I have.

MS. LENS: We can find them.

MR. MAGNANI: I don't know if Laurie has one.

MR. ULIN: I believe I have the one that was given to the witness.

MS. LENS: Yes.

And you don't have one, Bonnie?

MS. ESKENAZI: I have one. That's the one I'm going to keep because it's got my handwriting on it, and that's the one that I'm going to use to go to court.

MS. LENS: Hand the one with your handwriting to the court reporter.

MS. ESKENAZI: No, I'm going to use it to give it to the court. At the moment there is nothing I can do about getting all the documents back to you right this second. I can give you what we have. I'm going to keep this copy for the purpose of going to court.

Do we have a clean copy of that?

MS. MORIARTY: I do not have a printed out, clean copy of that. So I might need to reserve one back for a motion practice. This is what Molly is saying.

MS. LENS: You have one electronically?

MS. MORIARTY: I do. But I'm assuming you want us to destroy that. So maybe I should keep a hard copy and destroy the electronic copy.

MR. ULIN: I don't have any problem with you keeping a single hard copy for the purpose of litigating the question.

MS. MORIARTY: To have one back?

MR. ULIN: And then we have all of the hard copies -- I mean aside from the electronic copy that you have and the hard copy that's in Bonnie's binder with her notes, we have all of the hard copies in this room.

MS. MORIARTY: Yes.

MR. ULIN: Okay.

MS. ESKENAZI: Let's go off the record for just a second.

MR. ULIN: Sure.

THE VIDEOGRAPHER: Off the record, the time is 1:49.

(Whereupon, a recess was taken commencing at 1:49 P.M. and concluding at 1:50 P.M.)

THE VIDEOGRAPHER: Back on the record. The time is 1:50.

MS. ESKENAZI: Okay. Can I have a clean version of -- let me ask the court reporter to mark this version of the fax to -- dated October 8, 1997 from John Bock to Tolkien Enterprises with a copy to Laurie Battle.

(Whereupon, Exhibit 92 was marked for identification)

MR. ULIN: Okay.

(Pause)

THE WITNESS: Okay.

BY MS. ESKENAZI:

Q. Have you seen what's been marked as Exhibit 92 before today?

A. Yes.

MR. ULIN: Objection, lacks foundation, calls for speculation, and vague as to time.

THE WITNESS: Yes, I have.

BY MS. ESKENAZI:

Q. Okay. Did you see Exhibit 92 in or about October 8th when it was sent to you? October 8th, 1997 when it was sent to you?

A. Yes.

Q. Okay. Now, so on page 2 of the document that's been marked as Exhibit 92, you see where Mr. Bock says to you "Included in this fax you'll find a letter outlining the state of online gaming."

Do you see where it says that?

A. Uh-huh. Yes.

Q. Do you recall having any discussions with Mr. Bock about the state of online gaming in or about 1997?

MR. ULIN: Calls for speculation.

You may answer.

THE WITNESS: Yes. It was a general subject of discussion.

BY MS. ESKENAZI:

Q. Okay. And what do you recall the two of you talking about as to the state of online gaming?

MR. ULIN: Going to caution --

BY MS. ESKENAZI:

Q. In 1997?

A. My questions are -- because I was not a computer game player of what exactly was involved with playing these games.

Q. And what did he say?

A. I -- pretty much what's outlined in this letter, this would have been my asking please send something in writing that gives a more clear description of what we are talking about here, the issue of interest was the -- the realtime component and the online component being bundled in with regular computer games, that this was something new that technology was developing.

So I needed to learn how these types of games worked. So this was the time period where those issues were being explored.

Q. And do you recall that Sierra was

proposing for the online game that it would be offered through retail as a boxed game and that sale of the boxed game would then allow the consumer to play that game online?

MR. ULIN: Lacks foundation, calls for speculation, assumes facts not in evidence.

You may answer.

THE WITNESS: Yes, I believe there -- there was a package and I think as he has outlined here there was an additional component of a subscription fee to participate in the online component.

BY MS. ESKENAZI:

Q. And looking at page 3 of the document, do you see where he says down in the bottom that "It's a good strategy for Middle Earth to offer a boxed game through retail outlets that allows the player to enter the online universe once purchased."

Do you see that?

A. Which page are you on? I'm sorry.

Q. It's page 3 of the document which is Bates stamped number SZC 28288.

Oh, I'm so sorry.

MR. ULIN: I take it -- yeah --

MS. ESKENAZI: I'm sorry.

MR. ULIN: -- you are looking at a

different version.

MS. ESKENAZI: Looking at a different document. So it's SC 0029960.

THE WITNESS: Okay. And down towards the bottom of the page?

MS. ESKENAZI: Yes.

THE WITNESS: Okay. For this -- for offer a "boxed game through retail outlets." Yes, okay.

BY MS. ESKENAZI:

Q. Okay. And in connection with your reading this document, this document was sent directly to you from Mr. Bock.

Is that right?

MR. ULIN: Calls for speculation, lacks foundation. It was sent a long time ago.

THE WITNESS: Yes.

BY MS. ESKENAZI:

Q. The document didn't come through your lawyers, it was sent through -- to you from Mr. Bock.

Is that right?

A. Yes.

Q. Okay. And when you read this document, you read this document without consulting with your lawyers before reading this document.

Is that right?

MR. ULIN: Objection, vague, lacks foundation.

You may answer.

THE WITNESS: Presumably.

BY MS. ESKENAZI:

Q. Well, do you have a recollection that --

A. Yes.

Q. -- you read --

A. Yes.

Q. -- that you read the document yourself before consulting with any lawyers.

Right?

A. Yes.

Q. Okay. And did you consult with any lawyers in connection with reading this document?

MR. ULIN: Objection, vague.

THE WITNESS: I would have, as was customary, I would have discussed it with Al Bandich.

BY MS. ESKENAZI:

Q. Did you discuss it with any outside lawyers or anyone other than Mr. Bandich?

A. I don't recall on this specific document.

Q. That's all I'm asking you about.

A. Okay.

Q. This document.

A. Okay.

Q. Did you discuss this document with outside lawyers?

A. Probably.

Q. Do you have a recollection of doing that?

A. Not specifically.

Q. Okay.

A. But...

Q. And did you -- when you read this document did you take notes on or highlight the document?

A. I don't recall.

Q. Uh-huh. Was there any lawyer who directed you to annotate this document?

A. If you have a copy that's marked up in my hand, that's probably something that I did for my own thought purposes of then discussing things with legal counsel.

MS. LENS: Objection, move to strike as nonresponsive.

BY MS. ESKENAZI:

Q. So was it your custom and practice when you read documents to highlight them and/or to annotate them?

A. Sometimes.

Q. It was not uncommon for you to do that.

Is that right?

A. That's correct.

Q. And you wouldn't have done that -- strike that.

You don't have a recollection of doing that in connection with having had a conversation with a lawyer first.

Is that right?

MR. ULIN: Objection, misstates the record, lacks foundation, calls for speculation.

THE WITNESS: I can't recall a specific instance of that.

BY MS. ESKENAZI:

Q. And did you discuss with Mr. Bock that -- that it was required that he did have a boxed element or a tangible physical element of -- of the online multi -- Massively Multiplayer game?

A. Multiplayer role playing, if I remember right.

MS. LENS: Objection, vague and ambiguous, argumentative.

BY MS. ESKENAZI:

Q. You can answer.

A. I believe so.

Q. And what did you tell him?

A. That the game needed to have a box with it.

Q. And he said that's fine?

A. That's what they do, yeah.

Q. All right.

A. That was the customary practice.

Q. Now, is this a document that Mr. Ulin showed you yesterday?

A. No.

Q. Okay.

A. I don't think so. I'm sorry, I got a lot -- I don't think -- I don't think it was this one.

MS. ESKENAZI: Just for the record, I don't think there is any basis for your assertion of privilege. If you plan on still asserting privilege, that's fine, we can have that fight, but I don't think there is any basis for it.

MR. ULIN: Okay. We do plan on still asserting the privilege.

MS. ESKENAZI: Okay.

Q. As of 1997, is it your recollection that online games were still in their infancy?

CERTIFICATE OF REPORTER

I, COREY W. ANDERSON, a Certified Shorthand Reporter, hereby certify that the witness in the foregoing deposition was by me duly sworn to tell the truth, the whole truth, and nothing but the truth in the within-entitled cause;

That said deposition was taken down in shorthand by me, a disinterested person, at the time and place therein stated, and that the testimony of the said witness was thereafter reduced to typewriting, by computer, under my direction and supervision;

That before completion of the deposition, review of the transcript was requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

I further certify that I am not of counsel or attorney for either or any of the parties to the said deposition, nor in any way interested in the event of this cause, and that I am not related to any of the parties thereto.

DATED: January 31, 2014

COREY W. ANDERSON, CSR 4096

